UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————
AHARON MILLER, HADASSAH DINER, :
EFRAT FINE, ADINA MISHER,            :     Case No. 18-cv-2192
ADINA MISHER ON BEHALF OF THE  :
ESTATE OF AARON HAAR,            :
                                                  :     **COMPLAINT**
              Plaintiffs,                    :
                                                  :
       -against-                             :
                                                  :
ARAB BANK, PLC,                         :
                                                  :
              Defendant.                  :
———————————————————

       Plaintiffs Aharon Miller, Hadassah Diner, Efrat Fine, Adina Misher, and Adina Misher on

behalf of the Estate of Aaron Haar, by their attorneys, allege the following.

<u>**NATURE OF THE ACTION**</u>

       1.       This is a complaint for damages arising out of the unlawful conduct of Arab Bank,

PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federal agency[1]

in the State of New York. Arab Bank knowingly provided, distributed, and administered financial

benefits, money and financial services to: (a) terrorists who killed, injured and maimed civilians,

or attempted to do so; (b) the families and beneficiaries of such terrorists; and (c) Foreign Terrorist

Organizations (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA")) in order to facilitate acts of international terrorism as defined by

18 U.S.C. § 2331.

       2.       By these acts, Defendant Arab Bank aided and abetted said acts of international

---

[1]       Until 2005, Arab Bank operated a wholly-owned branch in New York that provided correspondent banking services to other Arab Bank branches located around the world including branches in the West Bank and the Gaza Strip (collectively: the "Palestinian Territories").

terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel between September 2000 and December 2004 during the Second Intifada,[2] including the family members of the Plaintiffs, and violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act ("ATA") as amended by the AEDPA (*see, e.g.*, 18 U.S.C. §§ 2339A, 2339B) and is civilly liable under § 2333 of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.

4.      Venue is proper in this District pursuant to 18 U.S.C. § 2334(a).

5.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2). because it has transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of the Foreign Terrorist Organization ("FTO") Islamic Resistance Movement ("HAMAS"), and other terrorist organizations and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

---

[2]      The Second Intifada refers to the violent conflict that broke out in September 2000 between the Palestinians and Israel. It is generally considered to have ended in December 2004.

## THE PARTIES

A.    **The Plaintiffs**

### THE BEN YEHUDA STREET BOMBINGS OF DECEMBER 1, 2001

6.    In the late evening of December 1, 2001, two HAMAS suicide bombers, Nabil Halabiya and Osama Bahar, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven (11) people were murdered and one hundred and eighty-eight (188) people were injured.

7.    Bahar had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000.

8.    The Al-Islah Charitable Society was one of HAMAS's key charitable front organizations in the West Bank during the relevant period, between 2000 and 2004.

9.    It also maintained accounts with Arab Bank.

10.    Halabiya received a "prisoner payment" from the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") before the attack and a "martyr payment" after the attack. Both were paid through Arab Bank.

11.    Halabiya's mother also received an Iranian sponsored "martyr" payment from the Shahid Foundation in Lebanon (discussed below) via Arab Bank.

12.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Miller Family**

13.    Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of Netanel Miller.

14.     Netanel Miller, a United States citizen, was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

15.     A bolt from the bomb lodged in the upper part of Netanel's leg. Other bolts hit him in the back, resulting in burns. His hand and knee were also injured.

16.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

17.     Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

18.     Ultimately, Netanel was taken to the Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

19.     Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

20.     Netanel was admitted to the hospital and remained there for two days.

21.     Netanel endured the pain in his leg for nearly two years.

22.     The pain in Netanel's leg became so severe that he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

23.     Netanel had flashbacks as a result of the attack and underwent psychological counseling.

24.     As a result of the attack, Plaintiff Aharon Miller has suffered severe mental anguish and extreme emotional pain and suffering.

### THE KARNEI SHOMRON PIZZERIA BOMBING OF FEBRUARY 16, 2002

25.     Three (3) teenagers were killed and twenty-eight (28) other people injured, six seriously, when a suicide bomber blew himself up next to a crowded pizzeria on Saturday night, February 16, 2002 in the Yovelim shopping mall in Karnei Shomron. Two of the teenagers murdered and several of the injured were U.S. citizens.

26.     The terrorist was an operative of one of the paramilitary factions of the Palestine Liberation Organization ("PLO"), later identified as Sadiq A'id Mahmud Abd al-Hafez.

27.     Al-Hafez's father received a "martyr payment" from the Saudi Committee through his account at Arab Bank in Qalqilya.

**The Trattner Family**

28.     Plaintiff Hadassah Diner is a citizen of the United States and a resident of the State of Israel. She is the sister of Hillel Trattner.

29.     Plaintiff Efrat Fine is a citizen of the United States and a resident of the State of Israel. She is the sister of Hillel Trattner.

30.     Hillel Trattner, a United States citizen, and his wife Ronit Trattner stopped to eat at the pizzeria in the Yovelim shopping mall when the terrorist detonated his explosives.

31.     As a result of the explosion, Hillel Trattner was struck in the head by shrapnel and sustained nerve damage to his left eye. His left eardrum was ruptured, requiring Hillel to undergo an operation on that ear. The surgery was only partially successful, and he continues to suffer from

hearing loss in his left ear. Hillel further suffered from an impairment of his speech for a period of time.

32.     To this day, shrapnel remains lodged in Hillel's brain and it remains unclear whether the shrapnel will cause further injury to him in the future.

33.     The heat of the blast burned his face and hands. He sustained nerve damage to his fingers and the sole of his foot. Shrapnel remains lodged in his right hand and was removed from his ankle.

34.     After the attack, Hillel was taken to the hospital where he remained for ten days before being transferred to a rehabilitation center. But after a bad reaction to the prescribed medication, he returned to the hospital for an additional two weeks before returning to the rehabilitation center for nearly three months. Hillel's reaction to the medication also caused serious liver damage, requiring him to spend a week in the intensive care unit. He also underwent physical therapy throughout this time.

35.     Hillel no longer has vision in his left eye. He continues to have his eye examined every three months to determine if the damage has spread to his right eye.

36.     The effects of the attack have been very traumatic for Hillel, and he underwent psychological counseling.

37.     As a result of the attack, Plaintiffs Hadassah Diner and Efrat Fine have suffered severe mental anguish and extreme emotional pain and suffering.

**THE JERUSALEM BOMBING OF JANUARY 27, 2002**

38.     On January 27, 2002, Wafa Ali Khalil Idris, a female suicide bomber dispatched by Fatah / AAMB, detonated her explosive belt on Jaffa Street in Jerusalem, killing one (1) man and injuring approximately one hundred and fifty (150) others. Idris was the first female suicide

bomber of the Second Intifada.

**The Sokolow Family**

39.     Aaron Haar was a citizen of the United States. Aaron Haar passed away on May 28, 2015. He was the father of Rena Sokolow.

40.     Plaintiff Adina Misher is a citizen of the United States, and a resident of the State of New York and this District. She is the sister of Rena Sokolow.

41.     Adina Misher brings this action both individually, and as the legal representative of the Estate of Aaron Haar.

42.     Mark Sokolow and Rena Sokolow, both United States citizens, were vacationing in Israel where their oldest daughter was spending a year in school. On the last day of their trip, January 27, 2002, the Sokolows and their two younger daughters walked to a shoe store near their hotel. Upon exiting the store, they were knocked to the ground by a bomb blast.

43.     Idris's family received its payment from the Saudi Committee in the form of twenty thousand (20,000) rials converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16). The amount was paid to the family's Arab Bank account in Ramallah Al-Bireh Branch and designated with Receipt of Transfer No. 2195593712.

44.     After the blast, Mark Sokolow gathered himself and began looking for his wife and children. Eventually, he walked to the nearby hospital where he was treated for shrapnel injuries and released the following day.

45.     As a result of the blast, Mark sustained damage to his eardrum and a loss of hearing. He required follow up surgery for a burst eardrum and still experiences ringing in his ears.

46.     After the blast, Rena Sokolow gathered herself mentally and began looking around for her husband and children. She saw instead Idris' severed head.

47.     Rena could not move because of the severe injury to her leg and the agonizing pain. She was hospitalized for ten (10) days and required extensive surgery to be able to walk again. For the first five months following the attack, Rena could not put any weight on the leg. If she needed to get around she would generally use a walker and hop. If she needed to do extensive walking she would use a wheelchair. She required approximately six months to a year of physical therapy for her leg.

48.     Rena still cannot move her toes or ankle fully, has permanent nerve damage, and experiences numbness in parts of her leg.

49.     As a result of the attack, Plaintiff Adina Misher has suffered severe mental anguish and extreme emotional pain and suffering.

50.     As a result of the attack and prior to his death, Aaron Haar suffered severe mental anguish and extreme emotional pain and suffering.

**B.     The Defendant**

51.     Defendant Arab Bank is Jordanian bank headquartered in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange. Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority ("PA") controlled territories and, until 2005, a wholly-owned branch office located at 520 Madison Avenue, New York, New York, that was regulated by the Controller of the Currency of the United States Treasury Department.

52.     Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.

53.     Arab Bank operated its federally chartered branch in New York since 1983. The New York branch was designated as a wholesale bank, and among the banking and financial

services that it conducted in New York was providing clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

54.     In 2005, Arab Bank's New York branch was converted to a federal agency following an investigation by the United States Office of the Comptroller of the Currency and the Financial Crimes Enforcement Network.

55.     Arab Bank and Arab Bank Group were majority owned and/or controlled by members of the Shoman family, including until his death in 2005, Abdul Majeed A.H. Shoman, who was the Chairman of Arab Bank and Arab Bank Group. Abdel Hamid A.M. Shoman succeeded his father as Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group upon the latter's death and remained in that position until his resignation in 2012.

56.     Mr. Shoman was succeeded by current Chairman Sabih al-Masri, who was previously Deputy Chairman of Arab Bank.

57.     In 2017, Mr. al-Masri led a group of Jordanian and Arab investors in buying the approximately 20% stake of Arab Bank held by Oger Middle East Holding Company, which is owned by the Lebanese Hariri family.

## **FACTUAL ALLEGATIONS**

### A.     **The Al Aqsa Intifada or Intifada Al Quds**

58.     Following the collapse of peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terrorist organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000 that continued through December 2004 which was widely referred to as the *Al Aqsa Intifada* or *Intifada Al Quds*, and herein as the Second Intifada.

59.     During this period, various Palestinian terrorists attempted approximately 23,000 attacks, which claimed more than 8,000 casualties, including over 1,000 civilian deaths.

60.     These acts of violence resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

61.     The preferred method of mass murder used by Palestinian terrorist groups was suicide bombing, which involved an individual carrying an explosive device which he or she detonated in a bus, restaurant or other crowded public gathering place.

62.     The device was typically packed with nails, bolts and ball bearings, which, when detonated, lodged themselves deep within the bodies of those unfortunate individuals who happened to be inside the blast radius, causing cruel and horrific injuries.

63.     The objectives of the Second Intifada terror campaign included intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli Government by compelling Israel to withdraw from territory it presently controls.

**B.     Arab Bank's Longstanding Commitment to Supporting Palestinian Terrorism**

**1.     The Shoman Family**

64.     In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the Bank's founder) entitled The Indomitable Arab, in which he consistently set forth his antipathy toward Jews, Zionists and the State of Israel. He also clearly described his abhorrence for the United States, which he claimed to have once admired until it supported Israel.

65.     Prior to the establishment of Arab Bank, Mr. Shoman had described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy. In his biography he is quoted as saying that "…within a few years Zionism will have grown strong enough to control the entire economy. I believe that all business dealings with the

Jews – buying, selling or banking transactions – are damaging to our country's best interests."

66.     Mr. Shoman's antipathy toward Jews, Zionists and the State of Israel is also reflected in Arab Bank's Annual Reports. For example, in Arab Bank's 1968 Annual Report, Mr. Shoman wrote in his letter to shareholders:

> Nothing would have pleased me more than to be able to refer to the liberation of the enemy-occupied territories of our Arab homeland. But unfortunately, the Zionists still occupy the whole of our beloved Palestine as well as Sinai and the Golan Heights; and our Moslem and Christian holy places continue to suffer from enemy occupation. Moreover, the expansionist policy of the Zionists has been unmasked and the Arabs now know that the Zionist danger threatens not only the occupied territories but the entire Arab world. The only course open to the Arabs, therefore, is to concert their efforts throughout the area extending from the Atlantic Ocean in the west to the Arabian Gulf in the east, and to sacrifice the lives and offer the money needed for their self-defence and for the liberation of their sacred places and all their occupied territories.

67.     In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

68.     Mr. Shoman's son, Abdul Majeed Shoman, succeeded him as the chairman of Arab Bank.

69.     Abdul Majeed Shoman was the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the First Intifada,[3] in 1987-1988. The Popular Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995

---

[3]     The First Intifada refers to the violent conflict that broke out in December 1987 between the Palestinians and Israel. It is generally considered to have ended with the signing of the Oslo Accords in 1993.

to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the First Intifada.

70.     Arab Bank's own support and commitment to the violent goals of the various terrorist organizations during the Second Intifada were embodied by the personal commitment of its chairman during the Second Intifada, Abdul Majeed Shoman, who was a vocal supporter of the Second Intifada.

71.     At an October 2000 meeting, the Popular Committee's chairman, Abdul Majeed Shoman, and its other members discussed the need for a new mechanism to distribute the new donations to the Second Intifada which had not yet been transferred to the martyrs' families and the injured of the Intifada as of that date.

72.     They decided to bestow financial support to the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. Abdul Majeed Shoman, Chairman of Arab Bank at the time, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

73.     Mr. Shoman objected to locating the committee's office in Arab Bank's Amman headquarters building, but he left open the possibility of "loaning" an accountant to the committee.

74.     Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

75.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab

Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

76.     On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, then chairman of the PLO, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

77.     Defendant Arab Bank pledged $2,000,000.00.

78.     Mr. Shoman personally pledged $500,000.00.

79.     The Shoman family's altruism toward the Second Intifada continued in June 2001, when the Cultural Center of the Abdul Hameed Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The stated purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom.'

80.     Mr. Shoman's support for the Second Intifada could also be seen in his letters to shareholders contained within the Arab Bank Annual Report. For example, in his 2003 letter to shareholders, Mr. Shoman wrote, "Throughout 2003 our branches in the Arab countries were affected by many negative pressure factors, first and foremost the enduring difficult situation which our brothers in Palestine suffer from and by the **occupying enemy's enduring obstinacy and oppression** …"

81.     Accordingly, the Bank's financial and ideological support for the Second Intifada was a matter of public record.

### 2.     The Saudi Committee in Support of the Intifada Al Quds

82.     On or about October 16, 2000, the Saudi Committee was established as a private charity registered with the Kingdom of Saudi Arabia.

83.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

84.     The Saudi Committee was also a member of the Union of Good, HAMAS' global fundraising network, and was listed as a member on the Union of Good's website.

85.      The Union of Good maintained account 002850/811/9 at Arab Bank's Beirut Branch.

86.     The Saudi Committee issued a press release regarding the visit to Saudi Arabia by the head of the Union of Good, Dr. Yousef al-Qaradawi, at the invitation of Prince Nayef Bin Abd al-Aziz Al Sa'ud.

87.     According to the press release "His Royal Highness approved 28 employment projects that the Union proposed to the Saudi Committee for the Support of the al-Quds Intifada. An initial sum of 1.3 million dollars was allocated as a first allotment and shall be followed by additional allotments and projects that the Union will propose to the Committee in the future."

88.     The Saudi Committee also established a website to promote its activities.

89.     The website was later revamped, and the Saudi Committee's name sanitized on the English language version of the website.

90.     However, even the sanitized English version of the website stated that the committee's activities include: "**support of the families of martyrs and wounded**, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and

landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families …"

91.     In practice, the Saudi Committee constituted a professional fundraising apparatus intended to subsidize the Second Intifada, *i.e.*, to subsidize the Palestinian terror campaign and to bankroll HAMAS and its related front organizations in the Palestinian Territories. In fact, the Saudi Committee's website listed two well-known HAMAS front organizations, Al Salah Islamic Society in the Gaza Strip and the Islamic Charitable Society of Hebron in the West Bank, as coordinating the efforts of the Saudi Committee.

92.     The Saudi Committee helped bankroll HAMAS-controlled front organizations in the Palestinian Territories by providing these organizations with more than $15,000,000. The biggest recipients of Saudi Committee funds were the two organizations that coordinated the Saudi Committee's efforts in the Palestinian Territories: the Al Salah Islamic Society, which received over $9,700,000, and the Islamic Charitable Society of Hebron, which received just over $4,800,000. Smaller amounts were received by other well-known HAMAS organizations in the West Bank and Gaza Strip such as Al Mujama Al Islami (The Islamic Center – Gaza), Al Jam'iya Al-Islamiya (The Islamic Society – Gaza) and Al-Tadamun Charitable Society.

93.     These funds were transferred to the organizations via the accounts they maintained at Arab Bank. Hence, Arab Bank played a key role in the efforts of the Saudi Committee to help bankroll HAMAS and its front organizations.

94.     The Saudi Committee's other goal was accomplished by providing a comprehensive insurance benefit or "martyr" payment of approximately $5,316 to the families of Palestinian terrorists such as the aforementioned HAMAS suicide bombers Nabil Halabiya and Osama Baher, who carried out the deadly double suicide bombing at the Ben Yehuda pedestrian

mall in Jerusalem on December 1, 2001 in which U.S. citizen Plaintiff Netanel Miller was injured.

95.     Other beneficiaries of martyr payments included: (1) the family of Sadeq Ahed Abd el-Hafez, who carried out the Karnei Shomron Pizzeria Bombing on February 16, 2002 in which Hillel Trattner was injured; and (2) the mother of Wafa' Ali Khalil Idris, who carried out the suicide bombing on Jaffa Road in Jerusalem on January 27, 2002 in which the Sokolow family was injured.

96.     Terrorists who were injured by Israeli security forces received a payment of approximately $1,325.

97.     Terrorists who were captured as a result of their criminal conduct received a payment of approximately $ 2,655.

98.     The Saudi Committee provided approximately $35 million, all of which flowed through Arab Bank branches, as benefits to the families of the so-called "martyrs," *i.e.*, the families of suicide bombers, and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well those activists held in Israeli custody. This type of support was critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS' position within Palestinian society.

99.     Moreover, the insurance benefit not only provided universal terrorist death and dismemberment insurance coverage for specific members of preferred terrorist organizations such as HAMAS, as seen above with respect to the payment to the family of Nabil Halabiya, but was also intended as universal terrorist death and dismemberment insurance coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding _all_ terrorists in Israel during the Second Intifada and eliminating the potential

distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

100.    Wafa Idris' mother was compensated notwithstanding her daughter being dispatched by Fatah to perpetrate the January 27, 2002 Jerusalem Bombing in which the Sokolow family members were injured. The family of Sadeq el-Hafez, who carried out the Karnei Shomron Pizzeria Bombing in which Hillel Trattner was injured, was compensated notwithstanding his being dispatched by the PFLP.

101.    Defendant Arab Bank administered the comprehensive terrorist death and dismemberment insurance scheme by receiving, transmitting and distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

102.    Arab Bank was provided relatively detailed lists consisting of the names of the "martyrs," personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading HAMAS organizations.

103.    For example, Arab Bank received a list from the Saudi Committee that contained over 650 names. The instructions Arab Bank received were to substitute the pending transfers per the attached list of new beneficiaries. Number 610 on the list was Hatem Al-Sheweikeh, who carried out a terrorist attack on November 4, 2001. This list that Arab Bank received included information about the name of the "martyr," the date of death, the cause of death and the name of the beneficiary. In the case of Al-Sheweikeh, it lists his date of death as November 4, 2001 and the cause of death as "French Hill Operation." The attack that Al-Sheweikeh carried out on November 4, 2001 occurred in the French Hill section of Jerusalem.

104.    This list also contained the name of HAMAS' Third Engineer, Ayman Halawa.

"Engineer" is term HAMAS uses to describe its bomb-makers. According to the list, Ayman Halawa was killed on October 22, 2001 in a car bombing.

105.    In another list provided to Arab Bank, which was titled "List of Martyrs' Names in the West Bank Sixth Installment," the sixteenth name on the list is Hamed Abu Hijla and lists the cause of death as "Martyr Operation." Hamed Abu Hijla was a very active HAMAS operative. HAMAS' operational terrorist wing, the Izz al-Din al-Qassam Brigades, posted a picture of well-known HAMAS operatives Sheikh Hamed al-Bitawi, Jamal Mansour and Jamal Salim Damuni attending Abu Hijla's funeral.

106.    Accordingly, the terrorist death and dismemberment insurance plan included the families of suicide bombers, and Defendant Arab Bank and its senior management knew this fact.

107.    Arab Bank coordinated with the Saudi Committee and local representatives of HAMAS to finalize the lists, maintain a database of persons eligible under this universal terrorist death and dismemberment insurance plan and received the funds for the plan. HAMAS, through its network of organizations, collected data on its own operatives as well as all other terrorists killed, injured or in Israeli custody and transmitted that information to the Saudi Committee and Defendant Arab Bank.

108.    This can be seen from an August 2001 letter sent by Arab National Bank on behalf of the Saudi Committee to Arab Bank, which states "We would like to provide you with the names and addresses of the parties that have provided the Saudi Committee in Support of the Al-Quds Intifada with the names of the transfers' beneficiaries …" The letter goes on to list Al Salah Islamic Society and the Islamic Charitable Society of Hebron.

109.    Arab Bank's coordination with local HAMAS representatives can be seen in correspondence it received from the Al Salah Islamic Society. In a May 2001 letter from the head

of Al Salah, Ahmad Al-Kurd, to Muhammad al-Tahan, Manager of Operations in the Palestinian Territories during the Second Intifada, Al Salah requested that certain transfers from the Saudi Committee be stopped and sent back to the Saudi Committee.

110.    Similarly, in a July 2001 letter from Al Salah to Arab Bank, Al Salah requested that it be provided with a list of all the names of individuals who had pending transfers from the Saudi Committee.

111.    Every Palestinian family eligible for a Saudi Committee payment was encouraged to collect the terrorism benefits through a local branch of Arab Bank in the Palestinian Territories.

112.    The conspiracy between the Saudi Committee and HAMAS and others was ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew that the purpose of the conspiracy and acts taken pursuant thereto was to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

113.    Arab Bank was aware of the methods and means by which HAMAS, the Popular Front for the Liberation of Palestine ("PFLP"), and other Foreign Terrorist Organizations sought to carry out their objectives.

114.    Defendant Arab Bank knowingly and substantially assisted in the recruitment of terrorists by serving as the paymaster for this and other death and dismemberment insurance plans.

115.    Any person who chose to participate in a suicide bombing or other terrorist attack did so secure in the knowledge that if he or she was killed in that attack, the financial needs of his or her family would be met for some time.

116.    The same is true of the families of terrorists who were injured or apprehended.

117.    In short, the Saudi Committee raised funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocated payments to Defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

118.    According to a U.S. State Department report, "Saudi Arabia continues to serve as a base for Hamas fundraising, by means of direct Hamas representational presence in the Kingdom of Saudi Arabia and through the possible continuing operation of the Account 98 system." Account 98 was the designated account at numerous Saudi banks for collecting money destined for Palestinian charitable organizations.

119.    According to the State Department Report:

> In 2003, the United States provided evidence to Saudi authorities that the Saudi al Quds lntifadah Committee ("Committee") founded in October 2000, was forwarding millions of dollars in funds to the families of Palestinians engaged in terrorist activities, including those of suicide bombers. The funds were often transferred through integrated accounts at a number of major Saudi banks that were popularly referred to as Account 98.

120.    This system of collecting funds via Account 98 was still in use in 2005. According to the State Department Report:

> In fact, Account 98 appears to still be in operation, as it is widely advertised as a receiving point for contributions to Palestinian organizations. As of early December 2005, on King Fahd Road, just south of the Ministry of Interior, there is a billboard reminding readers to "remember Jerusalem" (Al Quds) and to make donations to Account 98. U.S. visitors first observed the billboard in the spring of 2005.

> On August 29, 2005, a program aired in Saudi Arabia on lqra TV soliciting funds for the Saudi Committee for the Support of the al Quds Intifadah and asked donors to direct funds to a joint Account 98 at "all banks in the Kingdom of Saudi Arabia."

121.    Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to over 1,600 "martyrs" totaling more than $8,500,000. Between 2000 and 2002, the Saudi Committee paid more than $35,000,000 to the families of Palestinian

"martyrs," "prisoners" and wounded.

122.    According to Arab Bank's Chief Banking Officer, Shukry Bishara, beginning in December 2001 Arab Bank transmitted over $90,000,000.00 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

123.    In fact, Arab Bank served as the exclusive administrator for the Saudi Committee's payment programs.

124.    Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of Arab Bank in Palestine. Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

125.    Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

126.    The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

127.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 10, 2001, the Saudi Committee identified payments made to "Martyrs of al-Aqsa Intifada – The West Bank (The Third Group)." A total of 22 individuals are listed and for each "martyr," the list identifies, *inter alia*, the name of the "martyr," their beneficiary, and their account number at Arab Bank.

128.    Defendant Arab Bank provided a convenient means for transmitting and distributing payments across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier. Israeli territory separates Gaza from the West Bank and

Israeli military checkpoints often separate one Palestinian city from another.

129.    Arab Bank knew the criminal purpose that the accounts it opened and maintained for the Saudi Committee were intended to serve.

130.    The Saudi Committee and local HAMAS charitable front organizations publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which were known to Arab Bank and all of which were calculated to – and did – reach terrorists and potential terrorists.  For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazira*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "the relatives of the martyrs, whose names hereby follow, are requested to head for the Arab Bank branches in their place of residence in order to receive the tenth payment from the Honorable Saudi Committee – a sum of 5,316.06 USD ...." Among the names contained on this list are Ayman Halawa, discussed above, Hatem Al-Sheweikeh, discussed above, who carried out the attack on November 4, 2001, and Mamud Abu Hanud, commander of HAMAS' Izz al-Din al-Qassam Brigades in the West Bank.

131.    Since the Saudi Committee raised its funds in Saudi currency, which could not conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds were primarily converted into U.S. dollars through Arab Bank's then-operating New York branch and then routed to the local branches of Arab Bank in the West Bank. Arab Bank's role was material and essential to the furtherance of the Saudi Committee's terror financing

in two (2) important respects.

132.    First, Arab Bank provided both professionalism and transparency to the process, thereby reassuring wealthy Saudi and Gulf State donors that the money they were contributing would not be siphoned off by corrupt officials, but would in fact reach the families of terrorists as intended.

133.    Second, Arab Bank, through its network of local branches in the West Bank and Gaza, provided an ideal distribution system that offered both convenience to the families of the terrorists who were able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimized the risk of duplicate payments and unreliable record-keeping.

### C.    The Primary Palestinian Terrorist Groups

134.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS and Palestinian Islamic Jihad ("PIJ"). HAMAS and PIJ are both primarily radical Islamist terrorist organizations committed to the globalization of Islam through violent "Jihad" or holy war.

135.    HAMAS and PIJ are formally committed to the destruction of the State of Israel and to achieving their objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

136.    In addition, the nominal proto-government within Palestinian-controlled territory known as the Palestinian Authority operates several paramilitary organizations through its political organizations, the PLO and Fatah.

137.    Through the PLO's various permutations, including its "security services," the PA

(and Fatah) competed with HAMAS and PIJ to commit terrorist attacks against civilian targets in Israel, including attacks that have killed and injured United States citizens.

138. The Al Aqsa Martyrs Brigades is one of the more well-known and lethal terror organizations sponsored by and belonging to Fatah.

### 1. The Islamic Resistance Movement ("HAMAS")

#### a. HAMAS' Founding and Structure

139. HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement, which was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

140. HAMAS is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

141. HAMAS is nominally divided into three interconnected wings: the political wing, the "Da'wa" (HAMAS' social service or humanitarian component), and the military operational wing known as the Izz-al-Din al-Qassam Brigades. Although these components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

142. HAMAS' social services are, in large part, administered by local "zakat," committees and charitable societies. These committees and societies were either established by HAMAS or taken over by HAMAS by, *inter alia*, HAMAS members, operatives and activists sitting as members of their governing committees. These committees and organizations collect and distribute funds on behalf of HAMAS.

143. Al Mujama Al Islami (The Islamic Center – Gaza) and Al Jam'iya Al Islamiya (The

Islamic Society – Gaza) were both founded by Sheikh Yassin in the 1970s, prior to the formation of HAMAS. With the founding of HAMAS, both of these organizations formed the backbone of HAMAS' Da'wa. As discussed below, Defendant Arab Bank maintained accounts for both of these organizations.

144.    One of the important roles of these organizations was their involvement in channeling funds to pay expenses for and assist the families of terrorist operatives who were arrested, injured or killed. These entities also assisted with providing housing subsidies to the families of suicide bombers whose homes were often demolished by the Israeli army after the bomber's identity had been confirmed.

145.    The network of these "charities" and other "charitable" associations not only helped raise funds for HAMAS's terrorist operations, but also helped it to identify and recruit potential terrorists. The network also assisted recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who were arrested, injured, or killed.

146.    Due to the substantial expenditures of HAMAS and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS' terrorist and other operational uses, in addition to being used to free up other funds for specific terrorists acts. HAMAS used (and still uses) such funds to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.

147.    As noted above, HAMAS is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel. It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

148.     HAMAS knowingly, willfully, and unlawfully combined, conspired, confederated and agreed to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

**b.     HAMAS' Formal Designation as a Terrorist Organization**

149.     In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

150.     On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

151.     Executive Order No. 12947 designated HAMAS a Specially Designated Terrorist ("SDT"). Executive Order No. 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

152.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996. The designation of HAMAS as an FTO has been renewed every two years since 1997.

153.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

154.     Executive Order No. 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT"). Executive Order No. 13224 blocked all property and interests in property of SDGTs, including HAMAS.

### c.     HAMAS' Leadership

### 1.     Sheikh Ahmed Yassin

155.     As noted above, Sheikh Ahmed Yassin founded HAMAS in 1987. He was also its spiritual leader and iconic symbol.

156.     During the 1970s, Yassin established Al Mujama Al Islami and Al Jam'iya Al Islamiya. These two organizations are central organizations within HAMAS' Da'wa.

157.     On January 25, 1995, Yassin was designated an SDT pursuant to Executive Order 12947.

158.     On August 22, 2003, Yassin was designated an SDGT pursuant to Executive Order 13224.

159.     Yassin maintained account number 36444 at Arab Bank's Gaza branch. On May 30, 2001, Yassin received a $60,000 transfer into this account from Yousef El Hayek through Arab Bank's New York branch. Yassin's wife, Halima Hasan Yassin, also maintained an account at Arab Bank and received $153,435 between November 2000 and May 2001 through Arab Bank's New York branch.

160.     Sheikh Yassin was assassinated by Israel in 2004.

### 2.      Salah Shehada

161.    As noted above, Salah Shehada was one of the founders of HAMAS.

162.    With the founding of HAMAS, Shehada was appointed to head HAMAS' operations in the northern Gaza Strip.

163.    Shehada was also the founder of HAMAS' operational terrorist wing, the Izz al-Din al-Qassam Brigades.

164.    Shehada was arrested by Israel in 1988 and released in 2000. He was killed by the Israel Defense Forces ("IDF") in July 2002.

165.    Shehada maintained account number 349321510 at Arab Bank's Gaza branch. Between November 2000 and February 2001 he received 7 transfers totaling $109,500 through Arab Bank's New York branch.

166.    Shehada's wife also received a Saudi Committee prisoner payment of $2,655.

### 3.      Muhammad Sham'a

167.    As noted above, Muhammad Sham'a was one of the founders of HAMAS. He was born in 1937 and was one of the co-founders of Al Mujama Al Islami.

168.    With the founding of HAMAS, he was put in charge of Shati Refugee Camp.

169.    Sham'a maintained account number 513636510 at Arab Bank's Gaza branch. Between January 2001 and December 2001 he received at least four transfers totaling $144,000 through Arab Bank's New York branch.

### 4.      Abd al-Fatah Dukhan

170.    As noted above, Abd al-Fatah Dukhan was one of the founders of HAMAS.

171.    Dukhan was a member of Al Mujama Al Islami and headed its Nusairat Refugee Camp branch.

172.    With the founding of HAMAS, Dukhan was put in charge of the central camps (four refugee camps).

173.    Dukhan was the beneficiary of a Saudi Committee prisoner payment of $2,655 through Arab Bank's New York branch for his son who was imprisoned in Israel.

### 5.    Ismail Abd al-Salam Haniya

174.    Ismail Haniya was born in 1962 in the Shati Refugee Camp in Gaza. In 1981, he joined the Islamic Bloc (Al-Kutla Al-Islamiya), the student affiliation of the Muslim Brotherhood, from which HAMAS emerged.

175.    Haniya served as a member of Al Jam'iya Al Islamiya's senior administrative body and headed its club in Gaza for approximately 10 years.

176.    Haniya became a close aide to Sheikh Yassin.

177.    In 2006, Haniya led HAMAS' Change and Reform List when HAMAS won the Palestinian Authority elections, and he became the Prime Minister of the HAMAS government in Gaza.

178.    He is currently the head of HAMAS.

179.    Haniya maintained account number 63517500 at Arab Bank's Gaza branch. Between July 2000 and September 2001, Haniya received 19 transfers totaling $420,100 through Arab Bank's New York branch.

### 6.    Ismail Abu Shanab

180.    Ismail Abu Shanab was born in 1950 in the Nuseirat Refugee Camp in the Gaza Strip. He studied engineering at al-Mansura University in Egypt and received a master's degree in engineering from the University of Colorado.

181.    Abu Shanab was one of the founders of the Islamic Society – Gaza. He was a close

aide to Sheikh Yassin, serving as his deputy.

182.    Abu Shanab was killed in an IDF operation on August 21, 2003.

183.    Abu Shanab maintained account number 236519510 at Arab Bank's Gaza branch. Between August 2000 and August 2001, Abu Shanab received 9 transfers totaling $173,172 through Arab Bank's New York branch.

### d.    Terrorism Financing

184.    Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

185.    HAMAS received a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good. The Union of Good, in turn, raised funds that were, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal, a British charity that was designated an SDGT by the U.S. government in August 2003.

### 1.    The Union of Good

186.    I'Tilafu Al-Khayr a/k/a the Union of Good was an umbrella organization established by HAMAS' leadership in October 2000, immediately following the outbreak of the Second Intifada. It comprised more than fifty (50) Islamic charitable foundations worldwide.

187.    The Union of Good was a principal fundraising mechanism for HAMAS.

188.    The Union of Good's primary "charitable" purpose was to provide financial support for HAMAS and its agents in the Palestinian Territories.

189.   The Government of Israel outlawed the Union of Good and one of its member organizations, the World Assembly of Muslim Youth, in February 2002 and furthered outlawed 36 of its member organizations in July 2008.

190.   Three member organizations of the Union of Good – Interpal, Commite de Bienfaisance et de Secours aux Palestiniens ("CBSP") and the Al Aqsa Foundation – were designated by the Government of Israel in 1997.

191.   The Al Aqsa Foundation in Germany opened account number 300733-300 at Arab Bank's Frankfurt branch in 1994. The Al Aqsa Foundation in Germany was closed down by the German Government in 2002.

192.   On May 29, 2003, the United States designated Al Aqsa Foundation an SDGT because of its role  as a HAMAS fundraiser.

193.   On August 19, 2003, a HAMAS suicide bomber blew up Egged bus #2, killing twenty-three (23) people, including seven (7) children.

194.   On August 22, 2003, pursuant to Executive Order 13224, President Bush linked HAMAS to the Egged bus #2 attack, identified CBSP and Interpal as HAMAS fundraising entities, and designated them SDGTs, referencing CBSP as the "primary fundraiser[] for HAMAS in France," and Interpal as "the fundraising coordinator of HAMAS."

195.   Other Union of Good members designated by the U.S. Government include Association de Secours Palestinien ("ASP") and Palestinian Association in Austria ("PVOE") (both designated on August 22, 2003 with CBSP and Interpal).

196.   The United States Government designated the Union of Good itself an SDGT on November 12, 2008. The press release announcing the designation noted:

> The Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations—including several

> organizations previously designated under E.O. 13224 for providing support to Hamas—and Hamas-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen Hamas' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas.
>
> …
>
> Funds raised by the Union of Good affiliates have been transferred to Hamas-managed organizations in the West Bank and Gaza. In addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers.

197.    As previously noted, the Union of Good used Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

198.    The Union of Good's "101 Days Campaign" maintained its own website at www.101days.org. The campaign solicited funds for HAMAS and directed prospective donors to donate via Interpal's bank accounts.

199.    Similarly, CBSP's website solicited funds for the 101 Days Campaign and provided contact information and bank account information for donations. Among the organizations listed on this website were several U.S. designated SDGTs including Interpal, CBSP and various branches of the Al Aqsa Foundation.

200.    The Union of Good is headed by Dr. Yousef al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar. al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

201.    al-Qaradawi is well known in the Arab world. He had his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing

suicide bombing attacks against Israel.[4]

202.    In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Second Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

203.    In an interview with *The Guardian* newspaper in October 2005, al-Qaradawi discussed suicide bombing in Israel and was quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as the weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have - the powerful are not willing to give their lives for any cause.

204.    During a 2007 broadcast on *Al Jazeera*, al-Qaradawi sat next to the head of HAMAS' political wing, Khalid Mishal, a designated SDGT. During the broadcast, al-Qaradawi stated:

> I support the Palestinian cause. I support resistance and jihad. I support Hamas. I support the [Islamic] Jihad group, I support Hizballah. I am against the peace that Israel and America want to dictate. This is an illusory peace. I support amaliyat istishhadyia [suicide attacks] and this is the straw [that broke the camel's back]. What should I do now? This big terrorist is sitting next to me and they will accuse me because of this today.

205.    During the same conference, Khalid Mishal stated:

> The third point: the Union of Good. One of the blessings of our Sheikh, may Allah reward him is that he supports what he says with acts. His support of the Palestinian people and the Intifada was not in words, positions and fatwas [religious rulings] only, but also in activities and efforts. He sponsored a big project which is the Union of Good during the Second Intifada – the blessed al-Aqsa Intifada. I do not exaggerate when I say that what the projects of Union of Good provided - the blessed money from the

---

[4]    Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the Second Intifada, as cited in HAMAS' official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

good people of the [Muslim] nation to the steadfast people on the land of Palestine was tens, even hundreds of millions of dollars. I wish that this will be in the Sheikhs balance of good deeds.

## 2.     Interpal

206.    As noted above, charitable donations to the Union of Good are partially collected and distributed through Interpal.

207.    Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

208.    As noted above, the U.S. Government designated Interpal an SDGT on August 22, 2003.

209.    Between January 1999 and August 22, 2003, Interpal transferred over $8,800,000 to beneficiaries who maintained accounts at Arab Bank. Between August 23, 2003 and December 2004, Interpal transferred over $600,000 to beneficiaries who maintained accounts at Arab Bank.

210.    According to testimony during the *Linde v. Arab Bank* trial, Arab Bank's branch in London maintained an account for Interpal.

## 3.     Holy Land Foundation for Relief and Development

211.    The Holy Land Foundation ("HLF"), originally known as the Occupied Land Fund, was founded in the late 1980s in California. In 1992 it relocated to Richardson, Texas. HLF maintained representative offices in the West Bank and Gaza.

212.    HLF was HAMAS' primary fundraiser in the United States until it was designated an SDGT in December 2001.

213.    HLF supported HAMAS with money that was delivered to HAMAS-controlled charitable societies in the Palestinian Territories. For example, between 1989 and 1994, HLF sent more than $730,000 to Al Mujama Al Islami and its director (an HAMAS co-founder) Ibrahim al-

Yazuri.

214.    Defendant Arab Bank knowingly laundered funds for HLF for more than a decade. Arab Bank accomplished this by channeling tens of thousands of dollars for HLF through its New York branch to the Ramallah Zakat Committee, the Tulkarem Zakat Committee, and the Islamic Charitable Society of Hebron, all agents of HAMAS.

215.    On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli Government claims that HLF was a "key fundraising operation" for HAMAS.

216.    On May 6, 1997, the Government of Israel designated HLF an "unlawful association" and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ..." The Government of Israel further designated HLF a terrorist organization on January 17, 1998.

217.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities (temporarily) closed by the PA. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

218.    HLF and its officers have been convicted in the United States District Court for the Northern District of Texas for knowingly providing material support to HAMAS – including for specific transactions involving payments made by HLF to the Islamic Charitable Society of Hebron, the Ramallah Zakat Committee, Tulkarem Zakat Committee, Nablus Zakat Committee, and Jenin Zakat Committee.

219.    The HLF indictment specified particular financial transactions HLF initiated that resulted in monetary transfers to the Ramallah Zakat Committee, Tulkarem Zakat Committee, and

the Islamic Charitable Society of Hebron which violate 18 U.S.C. § 2339B.

### 4. Hamdan Account

220.     Arab Bank knowingly provided banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collected funds directly in the name of HAMAS.

221.     This account was opened in July 1998 by Osama Hamdan as an individual account.

222.     Osama Hamdan was HAMAS' representative in Lebanon since 1998 and a senior HAMAS leader.

223.     Hamdan was not a clandestine figure unknown to the public. For example, on March 27, 2002, following the bombing of the Park Hotel in Netanya Israel on Passover, he was interviewed by CNN regarding the bombing. CNN identified Hamdan as HAMAS' spokesman.

224.     In August 2003, the U.S. Treasury Department designated Hamdan an SDGT due to his leadership position in Hamas.

225.     According to the U.S. Treasury press release announcing his designation:

> Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad. He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters.

> Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian "martyrs" have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel.

226.     The United States Department of Justice has identified the website: www.palestine-

info.com as the "official" website of HAMAS.[5]

227.    The website itself solicited funds and asked contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut, but it also asked donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

228.    As noted above, this account was opened by an Osama Hamdan, not the Palestine Information Center.

229.    During the 2014 civil trial against Arab Bank for attacks perpetrated by HAMAS, three (3) wire transfers to this account were introduced into evidence for which the listed beneficiary was "Harakat al Muqawamah al Islamiyah Hamas." There were also additional wire transfers that listed the beneficiary as the "Palestine Information Center" – the name given to HAMAS' website.

230.    This account was maintained by Arab Bank until after the *Linde v. Arab Bank* lawsuit was filed in July 2004.

231.    At the end of August 2004, more than a year after Hamdan had been designated an SDGT by the U.S. Government, Arab Bank finally took steps to close the account.

232.    Arab Bank retained the $8,677.92 that was contained in the account until March 30, 2005, at which point the Defendant issued a check in that amount to Hamdan, who retrieved the money from the Bank. Arab Bank knowingly provided Hamdan with the funds despite knowing that he had been designated by the U.S. government as an SDGT because he was a senior HAMAS official.

---

[5]    The website has since migrated to a new "URL" and can be found at https://www.palinfo.com.

### 5.    HAMAS-Controlled Entities in the West Bank and Gaza

233.    As noted above, HAMAS raises funds to support its terrorist acts through a network of "charitable" front organizations called the Da'wa.

234.    Arab Bank knowingly provided banking services to these zakat committees and charitable committees and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

235.    The numerous front organizations HAMAS established to assist it in carrying out its terrorist activities, included:

  i.     Al Mujama Al Islami a/k/a The Islamic Center – Gaza;

  ii.    Al Jam'iya Al Islamiya a/k/a The Islamic Society – Gaza;

  iii.   Al Salah Islamic Society – Gaza;

  iv.    Islamic Charitable Society of Hebron;

  v.     Ramallah Zakat Committee;

  vi.    Tulkarem Zakat Committee;

  vii.   Nablus Zakat Committee;

  viii.  Jenin Zakat Committee;

  ix.    Al-Tadamun Charitable Society – Nablus; and

  x.     Al Islah Charitable Society.

236.    Arab Bank provided direct financial services, including maintaining bank accounts and conducting wire transfers for, Al Mujama Al Islami, Al Jam'iya Al Islamiya, Al Salah Islamic Society – Gaza, Islamic Charitable Society of Hebron, Ramallah Zakat Committee, Tulkarem Zakat Committee, Nablus Zakat Committee, Jenin Zakat Committee, Al-Tadamun Charitable Society – Nablus, and Al Islah Charitable Society.

237.     Al Mujama Al Islami, Al Jam'iya Al Islamiya, Al-Salah Islamic Society – Gaza, Islamic Charitable Society of Hebron, Tulkarem Zakat Committee, Nablus Zakat Committee, Ramallah Zakat Committee, and Jenin Zakat Committee were all identified by the United States Department of Justice as HAMAS front organizations, and the management of each of these "charities" is in fact controlled by HAMAS operatives.

238.     Al Mujama Al Islami, Al Jam'iya Al Islamiya, Al Salah Islamic Society – Gaza, Al-Tadamun Charitable Society – Nablus, Tulkarem Zakat Committee, Ramallah Zakat Committee, Jenin Zakat Committees, the Islamic Charitable Society of Hebron and Al Islah Charitable Society were all designated "unlawful organizations" by the Government of Israel in February 2002 because of their connection to HAMAS.

239.     The Nablus Zakat Committee was designated an "unlawful organization" by the Government of Israel in June 2005.

240.     On August 7, 2007, the United States Government designated Al Salah Islamic Society – Gaza and its chairman, Ahmad al-Kurd, SDGTs.

241.     According the U.S. Treasury Press Release announcing the designation:

> One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the Al-Salah Society as "one of the three Islamic charities that form Hamas' welfare arm." The Al-Salah Society has received substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors.
> …
> The Al-Salah Society has employed a number of Hamas military wing members. In late 2002, an official of the Al-Salah Society in Gaza was the principal leader of a Hamas military wing structure in the Al-Maghazi refugee camp in Gaza. The founder and former director of the Al-Salah Society's Al-Maghazi branch reportedly also operated as a member of the Hamas military wing structure in Al-Maghazi, participated in weapons deals, and served as a liaison to the rest of the Hamas structure in Al-Maghazi. At least four other Hamas military wing members in the Al-Maghazi refugee camp in Gaza were tied to the Al-Salah Society.

242.    According to the same press release, "The Al-Salah Society was included on a list of suspected Hamas and Palestinian Islamic Jihad-affiliated NGOs whose accounts were frozen by the Palestinian Authority as of late August 2003. After freezing the bank accounts, PA officials confirmed that the Al-Salah Society was a front for Hamas."

243.    Arab Bank also processed wire transfers totaling more than $100,000 for Abbas al-Sayyed, who was described as "the individual who confessed responsibility for the Park Hotel bombing in 2002."

244.    Arab Bank provided financial services to agents of HAMAS through the following accounts that it maintained in the West Bank and Gaza Strip:

(1)     Tulkarem Zakat Committee Account No. 9070-500010-6-500

(2)     Tulkarem Zakat Committee Account No. 9070-500010-6-510

(3)     Tulkarem Zakat Committee Account No. 9070-500010-0-520

(4)     Tulkarem Zakat Committee Account No. 1003-536447-301 (at Arab Bank's Kensington Branch)

(5)     Ramallah Zakat Committee Account No. 9030-610686-2-510

(6)     Ramallah Zakat Committee Account No. 9030-610686-2-500

(7)     Ramallah Zakat Committee Account No. 9030-610686-0-500

(8)     Nablus Zakat Committee Account No. 9020-400336-0-500

(9)     Nablus Zakat Committee Account No. 9020-400336-5-500

(10)    Nablus Zakat Committee Account No. 9020-400336-5-598

(11)    Al Mujama Al Islami Account No. 9500-012410-9-510

(11)    Islamic Charitable Society of Hebron Account No. 9040-750049-0-510

(12)    Islamic Charitable Society of Hebron Account No. 9040-750049-1-510

(13)    Al Jam'iya Al Islamiya Account No. 411-546868-1003 (at Arab Bank's Kensington Branch)

(14)    Al Jam'iya Al Islamiya Account No. 3683-8-510

(15)    Al Salah Islamic Society – Gaza Account No. 9500-5600-510

(16)    Al Salah Islamic Society – Gaza Account No. 9500-5600-6

(17)    Jenin Zakat Committee Account No. 543079301

(18)    Jenin Zakat Committee Account No. 1003-225-543087 (at Arab Bank's Kensington Branch)

(19)    Al Islah Charitable Society Account No. 9030-649611-3-510

(20)    Al-Tadamun Charitable Society – Nablus Account No. 400271-7-510.

245.    Between 1999 and 2004, Arab Bank processed wire transfers for the following:

(1)    Al Mujama Al Islami – at least 31 transfers totaling $799,552 including 1 transfer that was processed by Arab Bank's New York Branch

(2)    Al Jam'iya Al Islamiya – at least 132 transfers totaling $2,673,467 including 39 transfers that were processed by Arab Bank's New York Branch

(3)    Al Salah Islamic Society – Gaza – at least 147 transfers totaling $15,236,322 including 61 transfers that were processed by Arab Bank's New York Branch

(4)    Islamic Charitable Society of Hebron – at least 177 transfers totaling $9,457,768 including 91 transfers that were processed by Arab Bank's New York Branch

(5)    Jenin Zakat Committee – at least 2 transfers totaling $21,264 that were processed by Arab Bank's New York Branch

(6)    Nablus Zakat Committee – at least 55 transfers totaling $687,100 including 21 transfers that were processed by Arab Bank's New York Branch

(7)    Tulkarem Zakat Committee – at least 64 transfers totaling $704,526 including 22 transfers that were processed by Arab Bank's New York Branch

(8)    Ramallah Zakat Committee – at least 83 transfers totaling 862,815 including 37 transfers that were processed by Arab Bank's New York Branch

(9)     Al Islah Charitable Society – at least 32 transfers totaling $1,168,066 including 15 transfers that were processed by Arab Bank's New York Branch

(10)    Al-Tadamun Charitable Society – Nablus – at least 48 transfers totaling $648,395 including 16 transfers that were processed by Arab Bank's New York Branch.

**2.      Palestinian Islamic Jihad**

246.    PIJ knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

247.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens. During the Second Intifada, PIJ has conducted and taken credit for at least twenty-eight (28) murderous attacks, including at least seven (7) mass murder attacks that have killed at least ninety-five (95) civilians, including U.S. citizens such as Shoshana Ben-Yishai who was murdered on November 4, 2001 by a PIJ terrorist.

248.    As noted above, President Clinton issued Executive Order No. 12947 on January 23, 1995. Executive Order No. 12947 designated PIJ an SDT.

249.    On October 8, 1997, PIJ was designated an FTO by the U.S. Government under the AEDPA. The designation has since been renewed every two years, including in 2003.

250.    In 2001, pursuant to Executive Order 13224, PIJ was designated an SDGT.

**3.      The Al Aqsa Martyrs Brigade ("AAMB")**

251.    Fatah was (and remains) the dominant political faction within the PA and the PLO.

252.    Tanzim is one of the armed factions within Fatah.

42

253.    Al Aqsa Martyrs Brigade ("AAMB") emerged at the outset of the Second Intifada as a deniable arm of Fatah that could compete with HAMAS and PIJ as a terror organization with a more Islamic flavor than Fatah's typically nationalist organizations.

254.    AAMB knowingly, willfully, and unlawfully combined, conspired, confederated and agreed together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

255.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured Americans citizens. Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed twenty-three (23) people and injured approximately one hundred (100) others and a string of other attacks that have killed more than seventy (70) civilians and wounded more than five hundred (500) others.

256.    In 2001, pursuant to Executive Order 13224, AAMB was designated an SDGT.

257.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB an FTO.

258.    During the relevant period, Fatah maintained an account with Arab Bank in Amman, Jordan and many members of its terror cells (Tanzim, Ahmad Abu al-Rish Brigades, AAMB) received payments through Arab Bank from Hezbollah (*al-Ansar*) and/or the Saudi Committee.

259.    For example, Abu al-Jadyan was Fatah's Secretary General in the northern Gaza Strip, a Colonel in the Palestinian Presidential Security Force (Force 17) and one of the founders of AAMB in Gaza. In May 2001, he directly received a Saudi Committee prisoner payment.

260.    Zuheir Muhammad As'ad Istiti was a senior operative of AAMB who was involved in a number of terror attacks. His family received payments from both the Saudi Committee (through Arab Bank's Jenin branch) and the *Shahid* Foundation, through Arab Bank's accounts for *al-Ansar*.

261.    Arab Bank knowingly provided financial services to AAMB. For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002 assault on the Hadera banquet hall that resulted in the death of U.S. citizen Aharon Ben-Yisrael Ellis.

262.    Tamer Rasem al-Rimawi was an AAMB operative responsible for a May 28, 2003 terrorist attack.

263.    He later stated that in early 2001 he:

> received a telephone call from an officer at the Arab Bank in Ramallah, indicating that I should come to the Bank branch in Ramallah because they had money for me from the Saudi funds as a result of my first injury and hospitalization. I didn't know the bank officer and had no account at the Arab Bank. But I went to the bank because everyone knew that if you were injured while participating in operations against Israel you would get money, and if you were killed then your family would get money. When I went to the bank I met with a bank officer who gave me a check from the Arab Bank in the amount of $1330.00 US dollars. I was told the money was because I was injured during an operation throwing stones; I signed the check which was not a check from a charity but actually a check on the account of the Arab Bank, and I was given $1330.00 in the US dollars at the Arab Bank.

264.     Tamer Rasem al-Rimawi was paid $1,325.64 through Arab Bank's branch in Ramallah.

265.     Numerous other AAMB operatives received payments through Arab Bank, including Umar Abd al-Fatah Hafez Yasin, Abd al-Rahman Muhammad Abu Bakra, Alaa Suliman Hussein Abu Bakra, Sami Jawdat Barbakh, Rami Ismail Ali Alyan and many others.

**4.     The Popular Front for the Liberation of Palestine ("PFLP")**

266.     The Popular Front for the Liberation of Palestine was founded in the late 1960s under the leadership of George Habash, its general secretary.

267.     The PFLP was guided by a crude form of Marxism-Leninism and, together with other left-wing Palestinian organizations, claimed to be struggling to build a working-class party.

268.     During the Second Intifada, the PFLP tried to remain politically relevant by joining in attacks against Israeli targets.

269.     Senior leaders of the PLFP received Saudi Committee payments through Arab Bank branches.

270.     For example, Abd al-Rahman Nayef Yusuf al-Salibi, a member of PFLP's Central Committee, directly received a Saudi Committee prisoner payment through Arab Bank's Gaza branch.

271.     Ahmad Abu al-Sa'ud Abd al-Razaq Hanani, another member of PFLP's Central Committee, received a Saudi Committee prisoner payment through Arab Bank's Nablus branch in 2001.

272.     Salah Abd Rabo Muhammad Abu al-Jadya and Hasan Mahmud Hasan Labad, prominent PFLP terrorists imprisoned for more than a decade for their terrorist activities, directly received Saudi Committee prisoner payments through Arab Bank's Gaza branch.

273.    In addition to the family of the suicide bomber who killed and injured numerous victims on February 16, 2002 at the pizzeria in Karnei Shomron, including Hillel Trattner, Arab Bank facilitated Saudi Committee payments to numerous other PLFP operatives including Hamza Nayef Hasan Zayed, Ayman Muhammad Fayiq Jalad and Jamil Khamis Muhammad Tarkhan.

**D.    Defendant Arab Bank Provided Material Support To Other Foreign Terrorist Organizations**

274.    PIJ has established numerous front organizations, including:

    i.      Al-Ihsan Charitable Society;

    ii.     Dar al-Huda Society; and

    iii.    Islamic An-Naqqa Society for Women, Bethlehem.

275.    Arab Bank knowingly maintained accounts for Al-Ihsan Charitable Society including its Al-Ihsan's branch in Gaza (Account No. 100379-8-500) and its branch in Bethlehem in USD (Account No. 717520-1-510), Israeli Shekel (Account No. 717520-1-570) and Jordanian Dinar (Account No. 717520-1-500).

276.    On May 4, 2005 the U.S. Government designated Al-Ihasn an SDGT. According to the press release announcing the designation, "Elehssan cooperated with PIJ to distribute funds to the families of PIJ prisoners and deceased members …. Elehssan maintains lists of PIJ-associated families who are to receive compensation – including the families of PIJ suicide bombers."

277.    Arab Bank also knowingly maintained accounts for Dar al-Huda Society in USD (Account No. 16782/7/510), Israeli Shekel (Account No. 16782/7/570) and Jordanian Dinar (Account No. 16782/7/500).

E.     **The Iranian Program in Support of the Martyrs**

278.     The Saudi Committee was not the only organization that supported and funded the Second Intifada. There were also other organizations that transferred money in direct support of the families of "martyrs" and prisoners, aiming at strengthening and encouraging the Palestinians to continue the violence. Among these organizations were the Arab Liberation Front ("ALF"), which operated in the Palestinian Territories (on behalf of the Iraqi dictator Saddam Hussein) and the Lebanon-based *Shahid* Foundation, which was funded by Iran and operated in the Palestinian Territories in cooperation with the Gaza-based *al-Ansar* society.[6]

279.     The *Shahid* Foundation in Lebanon was designated by the U.S. Government on July 24, 2007 as an SDGT.

280.     The U.S. Treasury Department noted at the time that:

> The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

281.     The *Shahid* Foundation in Lebanon used the *al-Ansar* Society to distribute martyr payments on behalf of Iran through its Arab Bank accounts.

282.     On May 15 and 16, 2001 the Palestinian daily *Al-Hayat Al-Jadida* published an announcement signed by *al-Ansar*, which called families of martyrs that resided in the Gaza Strip to arrive at the society's offices (indicating its address in Gaza) in order to receive their money. Families of martyrs from the West Bank were asked to send to a mail box in Gaza copies of official documents, which proved their status as martyrs' families, so that they could receive their money.

---

[6]     *Al-Ansar* was designated an "illegal association" in Israel on October 24, 2003.

283.    On July 1, 2001, *Al-Hayat Al-Jadida* published an announcement signed by *al-Ansar* calling on the residents of the southern Gaza Strip to come and collect their due payments in *al-Ansar*'s offices in Gaza. Residents of the West Bank, as well as the northern Gaza Strip, were asked to arrive at the Arab Bank branch in which their account was managed in order to collect their funds.

284.    The documents the martyrs' families from the West Bank had to provide, included the martyr's identification card and his picture (if they had it), the beneficiary's identification card, a copy of the death certificate, and a copy of the birth certificate of the martyr's sons if they had them.

285.    On its website, *al-Ansar* also identified its accounts with Arab Bank's Al-Rimal branch in Gaza.  The website also expressed its goals explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn. Al-Ansar follows their path and shares with their families and their parents the grief, the burden and the hope.

286.    On its internet website, the *Shahid* Foundation was even more direct by publishing lists of Palestinian "martyrs" who received support from the foundation.

287.    Its lists were in some ways more detailed than the Saudi Committee's lists (both those which were published on the Saudi Committee's website and those which were sent to Arab Bank) and included the dates of the martyr's birth and death, as well as his organizational affiliation (Fatah, HAMAS, PIJ, and the PFLP) or a statement, according to which the "martyr" was allegedly a civilian, who was purportedly not involved with one of the terrorist organizations' activities.

288.    The *Shahid* Foundation's web site listed various beneficiaries:

- "Martyr #1" in the January 2002 list, Muhammad Abd al-Ghani Muhammad Abu Jamus, is listed as a member of HAMAS in Gaza. HAMAS' web site confirms that he was indeed affiliated with HAMAS. It also confirms his date of death. In addition, the Abu Jamus family received a martyr's payment from the Saudi Committee.

- "Martyr #154" on the March 2002 list, Muhammad Ahmad Hilis, is also listed as an Izz al-Din al-Qassam Brigades operative in Gaza / Al-Shuja'iya. HAMAS' website confirms this fact, as well as his date of death. His father received a martyr's payment from the Saudi committee on June 6, 2002.

- "Martyr #153" on the same list, Bilal Fayez Mustafa Shehada, is also identified as an Izz al-Din al-Qassam Brigades operative. Bilal is a resident of Beit Hanun, who was killed along with Muhammad Ahmad Hilis on the same date and during the same attack. His father received a martyr's payment from the Saudi Committee on June 6, 2002.

289.    The *Shahid* Foundation, through *al-Ansar*, also paid numerous Fatah terrorists, including those affiliated with AAMB, such as Abd al-Karim Umar Abu Na'isa, who committed a terrorist attack in Afula, Israel in November 2001. Abu Na'isa's family received payments from the *Shahid* Foundation, the Saudi Committee and the ALF.

290.    Arab Bank's branches played a central and important role in transferring money on behalf of Iran – through the *Shahid* Foundation and *al-Ansar* society.

291.    The activities of *al-Ansar* were also the target of Israeli counter-terrorism measures in two ways. First, *al-Ansar* was declared an "unlawful association" by Israel on October 25, 2003. Second, its account was targeted by the Israeli security forces when they raided bank branches in Ramallah in 2004 (including Arab Bank). In fact, on its website, *al-Ansar* publicly denounced these measures:

> Al-Ansar Charitable Society denounces and condemns the criminal, sinful attacks of insane piracy committed by the forces of the occupation against the Palestinian banks in the city of Ramallah, which robbed the banks' money that included, inter alia, the money of the martyrs who are sponsored by the society.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS
IN VIOLATION OF 18 U.S.C. § 2333(d)**

292.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

293.    Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331.

294.    Plaintiffs injured in the Ben Yehuda Street Bombings – December 1, 2001 and the Karnei Shomron Pizzeria Bombing – February 16, 2002 assert claims under 18 U.S.C. § 2333(d) predicated on Arab Bank having aided and abetted acts of international terrorism perpetrated by HAMAS and the PFLP (both FTOs at the time of the respective attacks).

295.    Arab Bank provided substantial assistance to those FTOs by transferring significant sums of money to those organizations and their operatives and maintaining bank accounts for its organizations and senior operatives, knowing that the two FTOs were so designated or knowing that they engaged in terrorism and knowing the severity of the wrongful acts committed by these organizations and their operatives.

296.    Arab Bank's acts were a substantial factor in causing those Plaintiffs' injuries, and those Plaintiffs' injuries were a foreseeable result of the significant sums of money Arab Bank provided to those FTOs, their leaders and operatives.

297.    Plaintiffs allege that Arab Bank aided and abetted those FTOs within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign

organizations or persons that engage in terrorist activities against the United States." *See* Justice

Against Sponsors of Terrorism Act ("JASTA"), §2b.

## SECOND CLAIM FOR RELIEF

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

298.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs

as if fully set forth herein.

299.    The extraordinary financial and administrative services that Arab Bank knowingly

provided to the terrorists, their families, and HAMAS, Fatah/AAMB and PFLP, including serving

as the exclusive administrator of the Saudi Committee payments program provided material

support to the preparation and carrying out of numerous acts of international terrorism which have

caused direct injury to Plaintiffs.

300.    That knowing support was a substantial and foreseeable factor in causing Plaintiffs'

injuries.

301.    As set forth more fully above, but for Arab Bank's assistance, the funding of the

Saudi Committee and *Shahid* Foundation payment programs for terrorists and the families of

terrorists would have been substantially more difficult to implement.

302.    By participating in the commission of violations of 18 U.S.C. § 2339A that have

caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank committed

acts of international terrorism and is liable pursuant to 18 U.S.C. § 2333(a) because its conduct

involved violent acts or acts dangerous to human life that were a violation of the criminal laws of

the United States and in so doing the Bank's conduct objectively appeared to be intended to

intimidate or coerce the civilian population of Israel and influence the policy of the Israeli

government by intimidation or coercion, and its conduct transcended national boundaries in terms

of the means by which they were accomplished.

## THIRD CLAIM FOR RELIEF

## COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

303.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

304.    By participating in the commission of violations of 18 U.S.C. § 2339B that have caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank committed acts of international terrorism and is liable pursuant to 18 U.S.C. § 2333(a) because its conduct involved violent acts or acts dangerous to human life that were a violation of the criminal laws of the United States and in so doing the Bank's conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel and influence the policy of the Israeli government by intimidation or coercion, and its conduct transcended national boundaries in terms of the means by which they were accomplished.

305.    Arab Bank knowingly provided HAMAS and the PFLP with material support as it is defined in 18 U.S.C. § 2339A and in so doing its conduct was a substantial and foreseeable factor in causing Plaintiffs' injuries and thereby making it liable to the Plaintiffs under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against Arab Bank and in favor of each Plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in

amounts to be determined at trial;

(c)     Enter judgment against Arab Bank and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against Arab Bank and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated:  April 13, 2018
        Hackensack, NJ


                                OSEN LLC


                        By:     /s/ Gary M. Osen
                                Gary M. Osen, Esq.
                                Ari Ungar, Esq.
                                Peter Raven-Hansen, Esq., Of Counsel
                                Aaron Schlanger, Esq.
                                2 University Plaza, Suite 402
                                Hackensack, New Jersey 07601
                                (201) 265-6400

                                ZUCKERMAN SPAEDER LLP
                                Shawn P. Naunton, Esq.
                                485 Madison Avenue, 10th Floor
                                New York, NY 10022
                                (646) 746-8655

                                TURNER & ASSOCIATES, P.A.
                                C. Tab Turner, Esq.
                                4705 Somers Avenue, Suite 100
                                North Little Rock, AR 72116
                                (501) 791-2277

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

*Attorneys for Plaintiffs*