UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| AHARON MILLER, SHANI MILLER, | : | |
| ADIYA MILLER, PETER STEINHERZ, | : | Case No. 18-cv-2192 (BMC)(PK) |
| LAUREL STEINHERZ, JOSEPH | : | |
| GINZBERG, TEMIMA STEINHERZ, | : | |
| HADASSAH DINER, EFRAT FINE, | : | **AMENDED COMPLAINT** |
| YAEL HILLMAN, REUVEN FRIEDMAN, | : | |
| CHAVIVA BRAUN, YEHUDA BRAUN, | : | |
| YONI BRAUN, MATANYA BRAUN, | : | |
| ELIANA BRAUN PERETZ, ORIELLA | : | |
| BRAUN, ADINA MISHER, ADINA | : | |
| MISHER ON BEHALF OF THE ESTATE | : | |
| OF AARON HAAR, RHODA SOKOLOW, | : | |
| REHA SOKOLOW ON BEHALF OF THE | : | |
| ESTATE OF AL SOKOLOW, NOAM | : | |
| SOKOLOW, DAVID SOKOLOW, | : | |
| SYLVIA HAAR, AVRUM HAAR, | : | |
| ALEXANDER ROZENSTEIN, ESTHER | : | |
| ROZENSTEIN, ELI COHEN, SARAH | : | |
| ELYAKIM, JOSEPH COHEN, LUDWIG | : | |
| BAUER, LUDWIG BAUER ON BEHALF | : | |
| OF THE ESTATE OF ELLA BAUER, | : | |
| PHILLIP BAUER, MYRIAM MILLER, | : | |
| CHANA AIDEL MILLER | : | |
| SCHERTZMAN, TOVA MILLER, | : | |
| ROBERT SINGER, YITZHAK ZAHAVY, | : | |
| JULIE ZAHAVY, TZVEE ZAHAVY and | : | |
| BERNICE ZAHAVY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against- | : | |
| | : | |
| ARAB BANK, PLC, | : | |
| | : | |
| Defendant. | : | |

_____

Plaintiffs Aharon Miller, Shani Miller, Adiya Miller, Peter Steinherz, Laurel Steinherz,

Joseph Ginzberg, Temima Steinherz, Hadassah Diner, Efrat Fine, Yael Hillman, Reuven

Friedman, Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz,

Oriella Braun, Adina Misher, Adina Misher on behalf of the Estate of Aaron Haar, Rhoda

Sokolow, Reha Sokolow on behalf of the Estate of Al Sokolow, Noam Sokolow, David Sokolow,

Sylvia Haar, Avrum Haar, Alexander Rozenstein, Esther Rozenstein, Eli Cohen, Sarah Elyakim,

Joseph Cohen, Ludwig Bauer, Ludwig Bauer on behalf of the Estate of Ella Bauer, Phillip Bauer,

Myriam Miller, Chana Aidel Miller Schertzman, Tova Miller, Robert Singer, Yitzhak Zahavy,

Julie Zahavy, Tzvee Zahavy, and Bernice Zahavy, by their attorneys, allege the following.

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the unlawful conduct of Arab Bank,

PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federal agency[1]

in the State of New York. Arab Bank knowingly provided, distributed, and administered financial

benefits, money and financial services to: (a) terrorists who killed, injured and maimed civilians,

or attempted to do so; (b) the families and beneficiaries of such terrorists; and (c) Foreign Terrorist

Organizations ("FTOs") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA")).

2.      In so doing, Defendant Arab Bank committed acts of international terrorism and

aided and abetted the commission of acts of international terrorism as defined by 18 U.S.C. § 2331,

resulting in the killing, attempted killing and maiming of scores of American citizens in Israel

between September 2000 and December 2004 during the Second Intifada,[2] including the family

members of the Plaintiffs, violated the prohibitions on providing material support for acts of

international terrorism set forth in the Anti-Terrorism Act ("ATA") as amended by the AEDPA

---

[1]      Until 2005, Arab Bank operated a wholly-owned branch in New York that provided correspondent banking services to other Arab Bank branches located around the world including branches in the West Bank and the Gaza Strip (collectively: the "Palestinian Territories").

[2]      The Second Intifada refers to the violent conflict that broke out in September 2000 between the Palestinians and Israel. It is generally considered to have ended in December 2004.

(*see, e.g.*, 18 U.S.C. §§ 2339A, 2339B) and is civilly liable under § 2333 of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333, 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

5.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of the FTO Islamic Resistance Movement ("HAMAS"), and other terrorist organizations and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

6.      As set forth more fully below, Arab Bank maintained a large number of Eurodollar accounts in Lebanon, the Palestinian Territories and elsewhere on behalf of HAMAS entities and operatives, Palestinian Islamic Jihad ("PIJ") entities and operatives and numerous U.S., European and Israeli designated terrorists.

7.      Accordingly, Arab Bank knowingly directed millions of dollars through its own (then operating) New York branch both to Palestinian terrorist organizations and to individual terrorists and their families.

8.      Although set forth in detail below, several obvious examples of how Arab Bank purposefully availed itself of United States jurisdiction during the course of committing the wrongful acts alleged herein include:

> (a)      clearing tens of millions of dollars in New York on behalf of the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") in Saudi currency and converting it to U.S. dollars that it ultimately distributed to individual terrorists and their families;
>
> (b)      processing *at least* $2,000,000 for the Holy Foundation in Texas to at least four HAMAS entities in the Palestinian Territories that held accounts at Arab Bank;
>
> (c)      processing at least $32,000,000 for HAMAS entities in the Palestinian Territories that held accounts at Arab Bank; and
>
> (d)      processing at least several million dollars through New York for senior HAMAS leaders. *See* attached Exhibit 1.

## THE PARTIES

### A.      The Plaintiffs

### THE BEN YEHUDA STREET BOMBINGS OF DECEMBER 1, 2001

9.      In the late evening of December 1, 2001, two HAMAS suicide bombers, Nabil Halabiya and Osama Bahar, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed and 188 people were injured.

10.      Bahar had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000.

11.      The Al-Islah Charitable Society was one of HAMAS' key charitable front organizations in the West Bank between 2000 and 2004.

12.      Al Islah Charitable Society also maintained accounts with Arab Bank.

13.     Halabiya received a "prisoner payment" from the Saudi Committee before the attack, and his family received a "martyr payment" after the attack. Both were paid through Arab Bank.

14.     Halabiya's mother also received an Iranian sponsored "martyr" payment from the Shahid Foundation in Lebanon (discussed below) via Arab Bank.

15.     After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Miller Family**

16.     Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of Netanel Miller.

17.     Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is the sister of Netanel Miller.

18.     Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is the sister of Netanel Miller.

19.     Netanel Miller, a United States citizen, was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

20.     A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

21.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the

sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

22.     Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

23.     Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

24.     Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

25.     Netanel was admitted to the hospital and remained there for two days.

26.     Netanel endured the pain in his leg for nearly two years.

27.     The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

28.     It is still painful for Netanel to hike, an activity that he has always enjoyed.

29.     Netanel had flashbacks as a result of the attack and underwent psychological counseling.

30.     As a result of the attack, and the injuries Netanel Miller sustained, Plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional pain and suffering.

**The Steinherz Family**

31.     Plaintiff Peter Steinherz is a citizen of the United States, and a resident of the State of New York and this District. He is the father of Jonathan Steinherz.

32.     Plaintiff Laurel Steinherz is a citizen of the United States, and a resident of the State of New York and this District. She is the mother of Jonathan Steinherz.

33.     Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of Altea Steinherz.

34.     Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of Altea Steinherz.

35.     Altea Steinherz and Jonathan Steinherz are United States citizens.

36.     On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

37.     Altea wanted to get home to her daughter who was being babysat at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

38.     A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

39.     While walking in the street, they saw a crazed looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

40.     As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

41.     She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

42.     Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

43.     Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the

condition of their unborn child.

44. Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

45. Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

46. As a result of the attack, and the injuries Jonathan Steinherz sustained, Plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional pain and suffering.

47. As a result of the attack, and the injuries Altea Steinherz sustained, Plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional pain and suffering.

48. As a result of the attack, and the injuries Altea Steinherz sustained, Plaintiff Temima Steinherz has experienced severe mental anguish and extreme emotional pain and suffering.

### THE KARNEI SHOMRON PIZZERIA BOMBING OF FEBRUARY 16, 2002

49. Three teenagers were killed and 28 people were injured, six seriously, when a suicide bomber blew himself up next to a crowded pizzeria on Saturday night, February 16, 2002 in the Yovelim shopping mall in Karnei Shomron. Two of the teenagers murdered and several of the injured were U.S. citizens.

50. The terrorist was an operative of one of the paramilitary factions of the Palestine Liberation Organization ("PLO"), later identified as Sadiq A'id Mahmud Abd al-Hafez.

51. Al-Hafez's father received a "martyr payment" from the Saudi Committee through his account at Arab Bank in Qalqilya.

**The Trattner Family**

52.     Plaintiff Hadassah Diner is a citizen of the United States and a resident of the State of Israel. She is the sister of Hillel Trattner.

53.     Plaintiff Efrat Fine is a citizen of the United States and a resident of the State of Israel. She is the sister of Hillel Trattner.

54.     Plaintiff Yael Hillman is a citizen of the United States and a resident of the State of Israel. She is the sister of Hillel Trattner.

55.     Hillel Trattner, a United States citizen, and his wife, Ronit Trattner, had finished eating at the pizzeria in the Yovelim shopping mall when al-Hafez detonated his explosives.

56.     As a result of the explosion, Hillel Trattner was struck in the head by shrapnel and sustained nerve damage to his left eye. His left eardrum was ruptured, necessitating an operation on that ear. The surgery was only partially successful, and he continues to suffer from hearing loss in his left ear. Hillel further suffered from impaired speech for a period of time.

57.     To this day, shrapnel remains lodged in Hillel's brain and it remains unclear whether the shrapnel will cause further injury to him in the future.

58.     The heat of the blast burned Hillel's face and hands. He sustained nerve damage to his fingers and the sole of his foot. Shrapnel remains lodged in his right hand and was removed from his ankle.

59.     After the attack, Hillel was taken to the hospital where he remained for ten days before being transferred to a rehabilitation center. But after a bad reaction to the prescribed medication, he returned to the hospital for an additional two weeks before returning to the rehabilitation center for nearly three months. Hillel's reaction to the medication also caused serious liver damage, requiring him to spend a week in the intensive care unit. He also underwent physical

therapy throughout this time.

60.     Hillel no longer has vision in his left eye. He continues to have his eye examined every three months to determine if the damage has spread to his right eye.

61.     The effects of the attack have been very traumatic for Hillel, and he underwent psychological counseling.

62.     As a result of the attack, and the injuries Hillel Trattner sustained, Plaintiffs Hadassah Diner, Efrat Fine, and Yael Hillman have experienced severe mental anguish and extreme emotional pain and suffering.

**The Friedman Family**

63.     Plaintiff Reuven Friedman is a citizen of the United States. He is the father of Chana Friedman Edri.

64.     Chana Friedman Edri, a United States citizen, and some of her friends went out for pizza in the Yovelim shopping mall on Saturday night. While seated at the table, Chana saw a man (al-Hafez) coming toward the table; he detonated his explosives, and there was a loud explosion.

65.     Chana remembers running down the road. A bus driver saw her, and she told him that the mall had been bombed. The bus driver took Chana to a local Magen David Adom (Red Cross) station that drove her to an intensive care unit.

66.     Chana sustained second degree burns and shrapnel wounds in her face, legs, chest and right eye. Her eardrum had also ruptured as a result of the blasts. She had an operation to remove shrapnel from her body that had resulted in a deep hole in her leg. She also had a hole in her arm and hand. It was impossible to safely remove all of the shrapnel from her body.

67.     Chana required outpatient treatments for six months and lost more than a year of school as a result of her injuries.

68.     In addition, three of Chana's friends, including her best friend, were killed in the attack.

69.     She was scared to leave her house, and became very anxious, fearful, withdrawn, and prone to anger.

70.     Chana felt extremely self-conscious walking in public because of the burns that she sustained on her face.

71.     Chana underwent psychological counseling and continues to experience severe psychological trauma.

72.     As a result of the attack, and the injuries Chana Friedman Edri sustained, Plaintiff Reuven Friedman has experienced severe mental anguish and extreme emotional pain and suffering.

**The Braun Family**

73.     Plaintiff Chaviva Braun is a citizen of the State of Israel. She is the wife of Steven Braun.

74.     Plaintiff Yehuda Braun is a citizen of the State of Israel. He is the son of Steven Braun.

75.     Plaintiff Yoni Braun is a citizen of the State of Israel. He is the son of Steven Braun.

76.     Plaintiff Matanya Braun is a citizen of the State of Israel. He is the son of Steven Braun.

77.     Eliana Braun Peretz is a citizen of the State of Israel. She is the daughter of Steven Braun.

78.     Oriella Braun is a citizen of the State of Israel. She is the daughter of Steven Braun.

79.     Steven Braun, a United States citizen, was standing outside a store window near

the pizzeria at the Yovelim shopping mall when the terrorist detonated his explosives. Steven had gone to the shopping mall to buy medicine for his son.

80.     Steven was thrown back as a result of the blast, and immediately felt extreme pain in his legs. His pants had been torn, and both of his legs had been hit by flying shrapnel which resulted in numerous cuts and bruises. In addition to blood, Steven saw pieces from a human body on his right leg. At first, Steven believed his leg had been ruptured, but later realized that the pieces of flesh belonged to the bomber or another victim of the attack.

81.     After the initial shock, Steven attempted to assist other victims, including Hillel and Ronit Trattner, and the paramedics that arrived on the scene. He personally witnessed the carnage and saw the bodies of dead girls and many maimed and injured survivors.

82.     Following the bombing, Steven was transported to Tel Hashomer hospital where the doctors cleaned and bandaged the wounds to his legs.

83.     As a result of the suicide bombing, Steven had trouble sleeping at night and had nightmares. The suicide bombing also affected his relationship with his wife and children to the extent that he became impatient and yelled at them.

84.     He underwent psychological counseling and marital therapy.

85.     As a result of the attack, and the injuries Steven Braun sustained, Plaintiffs Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz, and Oriella Braun have experienced severe mental anguish and extreme emotional pain and suffering

**THE JERUSALEM BOMBING OF JANUARY 27, 2002**

86.     On January 27, 2002, Wafa Ali Khalil Idris, a female suicide bomber dispatched by Fatah/Al Aqsa Martyrs Brigade ("AAMB"), detonated her explosive belt on Jaffa Street in Jerusalem, killing one man and injuring approximately 150 others. Idris was the first female

suicide bomber of the Second Intifada.

87.     Wafa Idris' mother, Wasfiya Mabruk Saleh Idris, received a payment from the Saudi Committee in the form of twenty thousand (20,000) rials converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16). The amount was paid to her Arab Bank account in Ramallah Al-Bireh Branch and designated with Receipt of Transfer No. 2195593712.

**The Sokolow Family**

88.     Aaron Haar was a citizen of the United States. Aaron Haar passed away on May 28, 2015. He was the father of Rena Sokolow.

89.     Plaintiff Adina Misher is a citizen of the United States, and a resident of the State of New York and this District. She is the sister of Rena Sokolow.

90.     Adina Misher brings this action both individually, and as the legal representative of the Estate of Aaron Haar.

91.     Plaintiff Rhoda Sokolow is a citizen of the United States, and a resident of the State of New York and this District. She is the mother of Mark Sokolow, who represents her as her attorney-in-fact.

92.     Al Sokolow was a citizen of the United States. Al Sokolow passed away on January 8, 2018. He was the father of Mark Sokolow. Reha Sokolow, Al Sokolow's widow, brings this action on behalf of the Estate of Al Sokolow.

93.     Plaintiff Noam Sokolow is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Mark Sokolow.

94.     Plaintiff David Sokolow is a citizen of the United States and a resident of the State of New York. He is the brother of Mark Sokolow.

95.     Plaintiff Sylvia Haar is a citizen of the United States, and a resident of the State of

New York and this District. She is the mother of Rena Sokolow, who represents her as her attorney-in-fact.

96.     Plaintiff Avrum Haar is a citizen of the United States and a resident of the State of New York. He is the brother of Rena Sokolow.

97.     Mark Sokolow and Rena Sokolow, both United States citizens, were vacationing in Israel where their oldest daughter was spending a year in school. On the last day of their trip, January 27, 2002, the Sokolows and their two younger daughters walked to a shoe store near their hotel. Upon exiting the store, they were knocked to the ground by a bomb blast.

98.     After the blast, Mark Sokolow gathered himself and began looking for his wife and children. Eventually, he walked to the nearby hospital where he was treated for shrapnel injuries and released the following day.

99.     As a result of the blast, Mark sustained damage to his eardrum and a loss of hearing. He required follow up surgery for a burst eardrum and still experiences ringing in his ears.

100.     After the blast, Rena Sokolow gathered herself mentally and began looking around for her husband and children. She saw instead Idris' severed head.

101.     Rena could not move because of the severe injury to her leg and the agonizing pain. She was hospitalized for ten days and required extensive surgery to be able to walk again. For the first five months following the attack, Rena could not put any weight on the leg. If she needed to get around she would generally use a walker, and hop. If she needed to do extensive walking she would use a wheelchair. She required approximately six months to a year of physical therapy for her leg.

102.     Rena still cannot move her toes or ankle fully, has permanent nerve damage, and experiences numbness in parts of her leg.

14

103.     As a result of the attack, and the injuries Rena Sokolow sustained, Plaintiff Adina Misher has experienced severe mental anguish and extreme emotional pain and suffering.

104.     As a result of the attack, and the injuries Rena Sokolow sustained, and prior to his death, Aaron Haar experienced severe mental anguish and extreme emotional pain and suffering.

105.     As a result of the attack, and the injuries Mark Sokolow sustained, Plaintiff Rhoda Sokolow has experienced severe mental anguish and extreme emotional pain and suffering.

106.     As a result of the attack, and the injuries Mark Sokolow sustained, and prior to his death, Al Sokolow experienced severe mental anguish and extreme emotional pain and suffering.

107.     As a result of the attack, and the injuries Mark Sokolow sustained, Plaintiffs Noam Sokolow and David Sokolow have experienced severe mental anguish and extreme emotional pain and suffering.

108.     As a result of the attack, and the injuries Rena Sokolow sustained, Plaintiff Sylvia Haar has experienced severe mental anguish and extreme emotional pain and suffering.

109.     As a result of the attack, and the injuries Rena Sokolow sustained, Plaintiff Avrum Haar has experienced severe mental anguish and extreme emotional pain and suffering.

## THE MIKE'S PLACE BOMBING – TEL AVIV OF APRIL 30, 2003

110.     On April 30, 2003, a HAMAS suicide bomber, Asif Muhammad Hanif, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives, killing three people and injuring more than 50 others.

111.     Hanif was a British citizen who entered Israel through Jordan.[3]

---

[3]     There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

**The Rozenstein Family**

112.    Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Florida. He is the father of Daniel Rozenstein.

113.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Daniel Rozenstein.

114.    Daniel Rozenstein, a United States citizen, was seated inside the bar and had decided to step outside when he crossed paths with Hanif in the entryway just as Hanif detonated his explosives.

115.    As a result of the attack, Daniel suffered second degree burns over his entire body.

116.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for two weeks. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

117.    As a result of the bombing, he sustained severe hearing loss. He has also suffered a permanent loss of balance, is often dizzy, and frequently experiences black outs.

118.    Daniel's right hand no longer functions properly as it is covered in scar tissue. Much of the rest of his body is also covered by scar tissue, including his back.

119.    He also suffers from memory loss, nightmares and Post-Traumatic Stress Disorder ("PTSD"), and he underwent psychological counseling.

120.    As a result of the attack, and the injuries Daniel Rozenstein sustained, Plaintiff Alexander Rozenstein has experienced severe mental anguish and extreme emotional pain and suffering.

121.     As a result of the attack, and the injuries Daniel Rozenstein sustained, Plaintiff Esther Rozenstein has experienced severe mental anguish and extreme emotional pain and suffering.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

122.     On the night of May 7, 2002, a HAMAS suicide bomber, Muhammad Muammar, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

123.     Fifteen people were killed in the attack including Esther Bablar, a United States citizen, and more than 50 others were injured.

124.     Although Esther had initially survived the attack, she died of her injuries the following morning.

**The Bablar Family**

125.     Plaintiff Eli Cohen is a citizen of the United States, and a resident of the State of New York and this District. He is the son of Esther Bablar, and he is represented in this matter by his sister and legal guardian, Jacqueline Chambers.

126.     Plaintiff Sarah Elyakim is a citizen of the United States, and a resident of the State of New York and this District. She is the sister of Esther Bablar.

127.     Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of Florida. He is the brother of Esther Bablar.

128.     On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified, and they quickly arranged to fly to Israel with their aunt and uncle.

129.    As a result of the attack, and the death of Esther Bablar, Plaintiff Eli Cohen has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel.

130.    As a result of the attack, and the death of Esther Bablar, Plaintiff Sarah Elyakim has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her sister's society, companionship, comfort, protection, attention, advice and counsel.

131.    As a result of the attack, and the death of Esther Bablar, Plaintiff Joseph Cohen has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of his sister's society, companionship, comfort, protection, attention, advice and counsel.

## THE KING GEORGE STREET BOMBING OF MARCH 21, 2002

132.    On March 21, 2002, a suicide bomber got out of a car on King George Street in Jerusalem and detonated explosives. The attack killed at least two people and injured more than 80 others, including a woman pregnant with twins, and her husband.

133.    The AAMB claimed responsibility for the attack and identified the bomber as Muhammad Hashaika, 22, of Taluza, north of Nablus. The bomber was an ex-Palestinian Authority policeman.

### The Bauer Family

134.    Plaintiff Ludwig Bauer is a citizen of the United States and a resident of the State of Nevada. He is the father of Alan Bauer.

135.    Ella Bauer was a citizen of the United States. Ella Bauer passed away on February 26, 2017. She was the mother of Alan Bauer.

136.    Ludwig Bauer brings this action both individually, and as the legal representative of the Estate of Ella Bauer.

137.     Plaintiff Phillip Bauer is a citizen of the United States. He is the brother of Alan Bauer.

138.     On March 21, 2002, Alan Bauer, a United States citizen, and his son, Yehonaton Bauer, were walking home when Hashaika detonated his explosives near them.

139.     Alan was thrown to the ground and saw smoke everywhere.

140.     He finally located his son, who was on the ground, unconscious. Yehonaton had been struck by part of a screw packed with the explosives. The screw passed through his brain from the back to the front of his head.

141.     Alan was struck by two nails that severed two arteries in his left arm. One passed through and the other was lodged in his arm.

142.     Both Alan and Yehonaton were operated on. Alan has had two skin grafts to cover the scarring in that injured area.

143.     Yehonaton was hospitalized for three and a half weeks; he was then moved to another hospital where he was hospitalized for an additional three and a half months.

144.     For three weeks after the attack, Yehonaton was blind in both eyes and paralyzed on his left side.

145.     His legs are no longer the same size, causing them to atrophy and him to limp.

146.     As a result of the attack, and the injuries Alan Bauer sustained, Plaintiffs Ludwig Bauer and Phillip Bauer have experienced severe mental anguish and extreme emotional pain and suffering.

147.     As a result of the attack, and the injuries Alan Bauer sustained, and prior to her death, Ella Bauer experienced severe mental anguish and extreme emotional pain and suffering.

## THE JERUSALEM BUS SHOOTING OF NOVEMBER 4, 2001

148.     During rush hour on November 4, 2001, a PIJ terrorist named Hatem Yaqin Ayesh Al-Shweikeh approached Egged Bus #25, which was carrying mostly schoolchildren in the French Hill neighborhood of Jerusalem.

149.     Al-Shweikeh emptied an entire rifle magazine into the bus before being shot and killed by police officers and a civilian in the area.

150.     By the time the attack was over, two schoolchildren aboard the bus had been killed and more than 40 others, mostly children, had been injured.

151.     Al-Shweikeh's family received a Saudi Committee martyr payment through Arab Bank.

152.     Muhammad Ayub Muhammad Sidr, the PIJ operative who planned the attack, received a prisoner payment from the Saudi Committee through Arab Bank a few months prior to the attack.

153.     Dhiyab Abd al-Rahim Abd al-Rahman al-Shweiki, who dispatched the shooter, also received a prisoner payment from the Saudi Committee through Arab Bank a few months prior to the attack.

**The Miller Family**

154.     Plaintiff Myriam Miller is a citizen of the United States and a resident of the State of Israel.

155.     Plaintiff Chana Aidel Miller Schertzman is a citizen of the United States and a resident of the State of Israel. She is Myriam Miller's daughter.

156.     Plaintiff Tova Miller is a citizen of the United States and a resident of the State of Israel. She is Myriam Miller's daughter.

157.     Myriam was sitting with Chana Aidel, then age 5, in her lap and Tova, then age 2, in the seat next to her; two Israeli soldiers sat in the seats facing the Millers.

158.     Al-Shweikeh approached the side of the bus the Millers were sitting on and opened fire. Myriam witnessed the terrorist take aim at her and her daughters multiple times but miss.

159.     Instead, bullets struck both soldiers sitting opposite the Millers. As they fell, they pinned Myriam and Chana Aidel to the floor, such that Myriam was unable to reach her toddler, Tova.

160.     Myriam watched helplessly while Tova lay screaming on her seat, covered in broken glass.

161.     Eventually, someone on the bus was able to hide Tova under a seat.

162.     Myriam and Chana Aidel were covered in the blood of the injured soldiers.

163.     Myriam also suffered from cuts from broken glass, and Chana Aidel was badly bruised. All three Millers were examined at the Mt. Scopus Hospital of the Hadassah Medical Center.

164.     Each of the Millers also witnessed the murder of Shoshana Ben-Yishai, a U.S. citizen killed in the attack, and other bus passengers being killed and injured.

165.     Myriam witnessed the terrorist's attempt to murder her and her daughters, and Chana Aidel and Tova each witnessed the terrorist's attempt to murder herself, her sister, and her mother.

166.     Myriam began seeing a psychologist a few months after the attack (and continues to do so). The psychologist diagnosed her with PTSD and concluded that she exhibits the following PTSD symptoms: migraine headaches, panic attacks, generalized anxiety, nightmares, sleep disturbances, and acute reactions to loud noises or any reminders of the attack.

167.    Myriam frequently re-experiences the attack in her mind and is often preoccupied by her inability to reach Tova during the attack.

168.    Myriam has been unable to work outside the home or use public transportation.

169.    Myriam's relationship with her husband, father to Chana Aidel and Tova, was strained due to her and her daughters' symptoms, and ultimately the marriage ended in divorce.

170.    As a result of the attack, Plaintiff Myriam Miller has experienced physical injuries, severe mental anguish and extreme emotional pain and suffering.

171.    Chana Aidel, only five years old at the time of the attack, has suffered from nightmares, flashbacks, anxiety, and depression as a result of her experiences in the attack.

172.    As a result of the attack, Plaintiff Chana Aidel Miller Schertzman has experienced physical injuries, severe mental anguish and extreme emotional pain and suffering.

173.    Tova, only two years old at the time of the attack, stopped speaking to nearly everyone, including her father, for years following the attack.

174.    As a result of the attack, Plaintiff Tova Miller has experienced severe mental anguish and extreme emotional pain and suffering.

## THE JAFFA ROAD BUS #14A BOMBING OF JUNE 11, 2003

175.    At approximately 5:30 p.m. on June 11, 2003, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, Abd el-Mu'ati Shabana, boarded Egged Bus 14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road near the Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 people, including dozens of bystanders.

176.    Shabana was initially recruited by HAMAS while playing at a local jihad mosque soccer team.

**The Singer Family**

177.    Plaintiff Robert Singer is a citizen of the United States and a resident of the State of New Jersey. He is the father of Sarri Anne Singer.

178.    On June 11, 2003, Sarri Anne Singer, a United States citizen, boarded Bus 14A in Jerusalem to meet a friend for dinner. It was approximately 4:45 p.m., and the bus was filled with rush hour commuters. Eventually she was able to take a seat near the window.

179.    Shortly thereafter, Shabana detonated his bomb only two to three seats away from where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

180.    When the explosives were detonated, Sarri felt a shockwave across her face.

181.    Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle.

182.    After the blast, she was unable to open her left eye, and her right eye was extremely restricted.

183.     Sarri was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.

184.    Barely walking, Sarri was taken to an ambulance.

185.    She incurred wounds to her face and legs resulting in scarring. She underwent physical therapy and additional surgery.

186.    Shrapnel lodged in Sarri's gums, moving her teeth and necessitating dental work.

187.    As a result of the attack, and the injuries Sarri Anne Singer sustained, Plaintiff Robert Singer has experienced severe mental anguish and extreme emotional pain and suffering.

## THE ARIEL SHOOTING OF OCTOBER 27, 2002

188.    On October 27, 2002, a HAMAS suicide bomber, Muhammad Kazid Faysal al-Bustami, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 others, including Yitzhak Zahavy.

189.    On the morning of October 27th, Firas Faydi, a HAMAS operative from Nablus, received an explosive belt from fellow HAMAS operative Muhammad al-Hanbali and met al-Bustami at the eastern cemetery of Nablus.

190.    At the cemetery, Faydi showed al-Bustami how to detonate the explosive belt and dressed him in the device.

191.    Thereafter, a third HAMAS operative, Khaled Dib Hasen Abu Hamed, drove al-Bustami to Ariel and dropped him off there.

192.    Al-Bustami walked to the "Eshel Ha-Shomron" gas station at the entrance to Ariel and perpetrated the attack.

## The Zahavy Family

193.    Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

194.    Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of Yitzhak Zahavy.

195.    Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of Israel. He is the father of Yitzhak Zahavy.

196.    Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of Israel. She is the mother of Yitzhak Zahavy.

197.    On October 27, 2002, Yitzhak Zahavy was waiting with his platoon for a transport

pickup at a gas station at the entrance to the town of Ariel.

198.    Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

199.    Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Buatami before he detonated his explosives.

200.    Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

201.    The emotional effects of the attack continue to affect Yitzhak to the present day.

202.    As a result of the attack, Plaintiff Yitzhak Zahavy has experienced physical injuries, severe mental anguish and extreme emotional pain and suffering.

203.    As a result of the attack, and the injuries Yitzhak Zahavy sustained, Plaintiffs Julie Zahavy, Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional pain and suffering.

**B.    The Defendant**

204.    Defendant Arab Bank is a Jordanian bank headquartered in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange. Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority ("PA") controlled territories and, until 2005, a wholly-owned branch office located at 520 Madison Avenue, New York, New York, that was regulated by the Office of the Comptroller of the Currency ("OCC") of the United States Treasury Department.

205.    Arab Bank conducts business in the State of New York.

206.    Arab Bank operated its federally chartered branch in New York beginning in 1983.

207.    The New York branch was designated as a wholesale bank, and among the banking and financial services that it conducted in New York was providing clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also

owned and/or controlled by the Arab Bank Group as well as other foreign banks.

208.    In July 2004, American citizens sued Arab Bank in this Court alleging that Arab

Bank provided material support to HAMAS and other terrorist groups.

209.    That civil lawsuit prompted the OCC and the Financial Crimes Enforcement

Network ("FinCEN") to launch investigations into the conduct of Arab Bank's New York branch.

210.    In 2005, Arab Bank's New York branch was converted to a federal agency

following investigations by the OCC and FinCEN.

211.    As part of its investigation of Arab Bank's New York branch, FinCEN found that:

[D]uring the period from 2000 through 2004, management of an Arab Bank affiliate
in the Palestinian Territories received, from regulatory authorities in the Palestinian
Territories, orders that focused explicitly on funds transfers to a number of
beneficiaries with accounts at members of the Arab Bank Group in the Palestinian
Territories. In addition, regulatory authorities in the Palestinian Territories issued
circulars containing the names of suspected criminals and ordered institutions
holding accounts of the suspected criminals to either freeze the accounts or place
the accounts on a watch list. Despite the heightened risk of illicit activity, Arab
Bank - New York failed to implement procedures for obtaining this type of
information from other members of the Arab Bank Group, to mitigate the risk and
ensure compliance with the Bank Secrecy Act.

212.    FinCEN further found that:

[D]uring the period from 2001 through 2004, Arab Bank - New York cleared funds
transfers for originators or beneficiaries that the Office of Foreign Assets Control
or the Department of State later designated as "specially designated terrorists,"
"specially designated global terrorists," or "foreign terrorist organizations." At the
time of the funds transfers, neither the Office of Foreign Assets Control nor the
Department of State had designated the originators or beneficiaries. Arab Bank -
New York largely complied with the requirement to cease clearing funds transfers
once the Office of Foreign Assets Control designated an entity as a "specially
designated terrorist," "specially designated global terrorist," or "foreign terrorist
organization."

However, designations of individuals and entities as terrorists by the United States
Government provide critical information for financial institutions to use in
assessing terrorist financing risk. Once a designation occurred, Arab Bank - New
York failed to review recent activity, occurring prior to the designation and
associated with the designated entities, to identify potentially suspicious activity.

Had such a review been conducted, it would have uncovered originators and beneficiaries - with possible ties to the designated entities - that had recently engaged in potentially suspicious activity. Arab Bank - New York failed to review information in its possession that would have shown it was clearing funds transfers for individuals and entities dealing with subsequently designated terrorists and terrorist organizations, failed to analyze this information, and failed to file suspicious activity reports.

213.    Arab Bank and Arab Bank Group were majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who, until his death in 2005, was the Chairman of Arab Bank and Arab Bank Group.

214.    Abdel Hamid A.M. Shoman succeeded his father as Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group upon the latter's death and remained in that position until his resignation in 2012.

215.    Mr. Shoman was succeeded by the current Chairman of Arab Bank, Sabih al-Masri, who was previously Deputy Chairman of Arab Bank.

216.    In 2017, Mr. al-Masri led a group of Jordanian and Arab investors in buying the approximately 20% stake of Arab Bank held by Oger Middle East Holding Company, which is owned by the Lebanese Hariri family.

## FACTUAL ALLEGATIONS

### A.    The Al Aqsa Intifada or Intifada Al Quds ("Second Intifada")

217.    Following the collapse of peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terrorist organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000 that continued through December 2004 which was widely referred to as the *Al Aqsa Intifada* or *Intifada Al Quds*, and herein as the "Second Intifada."

218.    During this period, various Palestinian terrorists attempted approximately 23,000

attacks, which claimed more than 8,000 casualties, including over 1,000 civilian deaths.

219.    These acts of violence resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

220.    The preferred method of mass murder used by Palestinian terrorist groups was suicide bombing, which involved an individual carrying an explosive device which he or she detonated in a bus, restaurant or other crowded public gathering place.

221.    The device was typically packed with nails, bolts and ball bearings, which, when detonated, lodged themselves deep within the bodies of those unfortunate individuals who happened to be inside the blast radius, causing death or cruel and horrific injuries.

222.    The objectives of the Second Intifada terror campaign included intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli Government by compelling Israel to withdraw from territory it presently controls.

**B.**      **Arab Bank's Longstanding Commitment to Supporting Palestinian Terrorism**

**1.**      **The Shoman Family**

223.    In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the Bank's founder) entitled The Indomitable Arab, in which he consistently set forth his antipathy toward Jews, Zionists and the State of Israel.

224.    He also clearly described his abhorrence for the United States, which he claimed to have once admired until it supported Israel.

225.    Prior to the establishment of Arab Bank, Mr. Shoman had described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.

226.    In his biography he is quoted as saying that "…within a few years Zionism will

have grown strong enough to control the entire economy. I believe that all business dealings with

the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

227.    Mr. Shoman's hostility toward Jews, Zionists and the State of Israel is also reflected

in Arab Bank's Annual Reports. For example, in Arab Bank's 1968 Annual Report, Mr. Shoman

wrote in his letter to shareholders:

> Nothing would have pleased me more than to be able to refer to the liberation of
> the enemy-occupied territories of our Arab homeland. But unfortunately, the
> Zionists still occupy the whole of our beloved Palestine as well as Sinai and the
> Golan Heights; and our Moslem and Christian holy places continue to suffer from
> enemy occupation. Moreover, the expansionist policy of the Zionists has been
> unmasked and the Arabs now know that the Zionist danger threatens not only the
> occupied territories but the entire Arab world. The only course open to the Arabs,
> therefore, is to concert their efforts throughout the area extending from the Atlantic
> Ocean in the west to the Arabian Gulf in the east, and to sacrifice the lives and offer
> the money needed for their self-defence and for the liberation of their sacred places
> and all their occupied territories.

228.    In his final speech before 400 Arab Bank employees, Mr. Shoman also explained

his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their
> country. But since they started to help the Zionists and supply them with arms to
> fight us, I have come to detest them. It was not the Jews, but the Americans, who
> fought us.

229.    Mr. Shoman's son, Abdul Majeed Shoman, succeeded him as the Chairman of Arab

Bank.

230.    Abdul Majeed Shoman served as the chairman of the Popular Committee in Support

of the Palestinian Intifada, which was established during the First Intifada,[4] in 1987-1988. The

Popular Committee raised approximately eight million Jordanian Dinar (JOD 8,000,000) or

approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's

---

[4]    The First Intifada refers to the violent conflict that broke out in December 1987 between the Palestinians and
Israel. It is generally considered to have ended with the signing of the Oslo Accords in 1993.

family and 300 JOD ($425) to each Palestinian injured in the violence.

231.    From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the First Intifada.

232.    Arab Bank's own support and commitment to the violent goals of the various terrorist organizations during the Second Intifada were embodied by the personal commitment of its Chairman during the Second Intifada, Abdul Majeed Shoman, who vocally supported the Second Intifada.

233.    At an October 2000 meeting, the Popular Committee's chairman, Abdul Majeed Shoman, and its other members discussed the need for a new mechanism to distribute the new donations which had not yet been transferred to the martyrs' families and the injured of the Second Intifada.

234.    They decided to bestow financial support to the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. Abdul Majeed Shoman, Chairman of Arab Bank at the time, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

235.    As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

236.    On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, then chairman of the PLO, at which time a new entity was formed, the Fund for Support of the

Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

237.    Defendant Arab Bank pledged $2,000,000.

238.    Mr. Shoman personally pledged $500,000.

239.    The Shoman family's altruism toward the Second Intifada continued in June 2001, when the Cultural Center of the Abdul Hameed Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada."

240.    The stated purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives.

241.    The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom.'

242.    Mr. Shoman's support for the Second Intifada was also manifested in his letters to shareholders contained within Arab Bank's Annual Reports.

243.    For example, in his 2003 letter to shareholders, Mr. Shoman wrote, "Throughout 2003 our branches in the Arab countries were affected by many negative pressure factors, first and foremost the enduring difficult situation which our brothers in Palestine suffer from and by the **occupying enemy's enduring obstinacy and oppression** …"

244.    Accordingly, Arab Bank's financial and ideological support for the Second Intifada was a matter of public record.

245.    In fact, recently, senior HAMAS leader Moussa Abu Marzook issued a statement complaining that in the aftermath of the *Linde* trial, Arab Bank was now insufficiently cooperative.

246.    Marzook took to Twitter on June 19, 2018 to complain that the "current policies of

Arab Bank" is not to deal with "national" matters in the Gaza Strip such as payments to "martyrs, wounded, widows or orphans … under the pretext of protecting itself from litigation. **This, after the bank was one of the national institutions**. What kind of image does the bank want to portray about itself?" (Emphasis added.)

      2.    <u>The Saudi Committee in Support of the Intifada Al Quds</u>

247.    On or about October 16, 2000, the Saudi Committee was established as a private charity registered with the Kingdom of Saudi Arabia.

248.    The Saudi Committee stated that its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

249.    The Saudi Committee was also a member of the Union of Good, HAMAS' global fundraising network, and was listed as a member on the Union of Good's website.

250.    The Saudi Committee issued a press release regarding the visit to Saudi Arabia by the head of the Union of Good, Dr. Yousef al-Qaradawi, at the invitation of Prince Nayef Bin Abd al-Aziz Al Sa'ud.

251.    According to the press release, "His Royal Highness approved 28 employment projects that the Union proposed to the Saudi Committee for the Support of the al-Quds Intifada. An initial sum of 1.3 million dollars was allocated as a first allotment and shall be followed by additional allotments and projects that the Union will propose to the Committee in the future."

252.    The Saudi Committee also established a website to promote its activities.

253.    The website was later revamped, and the Saudi Committee's name sanitized on the English language version of the website.

254.    However, even the sanitized English version of the website stated that the Saudi

Committee's activities include: "**support of the families of martyrs and wounded**, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families …"

255. In practice, the Saudi Committee constituted a professional fundraising apparatus intended to subsidize the Second Intifada, *i.e.*, to subsidize the Palestinian terror campaign and to bankroll HAMAS and its related front organizations in the Palestinian Territories.

256. In fact, the Saudi Committee's website listed two well-known HAMAS front organizations, Al Salah Islamic Society in the Gaza Strip and the Islamic Charitable Society of Hebron in the West Bank, as coordinating the efforts of the Saudi Committee.

257. The Saudi Committee helped bankroll HAMAS-controlled front organizations in the Palestinian Territories by providing these organizations with more than $15,000,000.

258. The biggest recipients of Saudi Committee funds were the two organizations that coordinated the Saudi Committee's efforts in the Palestinian Territories: the Al Salah Islamic Society, which received over $9,700,000, and the Islamic Charitable Society of Hebron, which received just over $4,800,000.

259. Smaller amounts were received by other well-known HAMAS organizations in the West Bank and Gaza Strip such as Al Mujama Al Islami (The Islamic Center – Gaza), Al Jam'iya Al-Islamiya (The Islamic Society – Gaza) and Al-Tadamun Charitable Society (in Nablus).

260. Hence, Arab Bank played a key role in the Saudi Committee's efforts to help bankroll HAMAS and its *da'wa* organizations.

261. The Saudi Committee's other goal was accomplished by providing a comprehensive insurance benefit or "martyr" payment of approximately $5,316 to the families of

Palestinian terrorists such as HAMAS suicide bombers Nabil Halabiya and Osama Bahar, who carried out the deadly double suicide bombing at the Ben Yehuda pedestrian mall in Jerusalem on December 1, 2001 in which U.S. citizens Netanel Miller, Altea Steinherz and Jonathan Steinherz were injured.

262.    Terrorists who were injured by Israeli security forces received a payment of approximately $1,325.

263.    Terrorists who were captured as a result of their criminal conduct received a payment of approximately $2,655.

264.    The Saudi Committee provided approximately $8 million – all of which flowed through Arab Bank branches – as benefits to the families of the so-called "martyrs," which included the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts.

265.    The Saudi Committee also provided "prisoner payments" to individual terrorists and families of individuals held in Israeli custody. This type of support was critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS' position within Palestinian society.

266.    More than 90% of these Saudi Committee payments to individuals were made in cash.

267.    Moreover, the insurance benefit not only provided universal terrorist death and dismemberment insurance coverage for specific members of preferred terrorist organizations such as HAMAS, as seen above with respect to the payment to the family of Nabil Halabiya, but was also intended as universal terrorist death and dismemberment insurance coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and

rewarding <u>all</u> terrorists in Israel during the Second Intifada and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

268. For example, Wafa Idris was a suicide bomber dispatched by the AAMB.

269. Wafa Idris' mother, Wasfiya Mabruk Saleh Idris, received a martyr payment from the Saudi Committee through Arab Bank as a result of Wafa Idris's death during the January 27, 2002 Jerusalem Bombing in which the Sokolow family members were injured.

270. Ahed Mahmud Abdalla Abd el-Hafez was the father of Sadiq al-Hafez, the Popular Front for the Liberation of Palestine ("PFLP") operative who carried out the Karnei Shomron Pizzeria Bombing in which Hillel Trattner was injured.

271. In June 2002, Ahed Mahmud Abdalla Abd al-Hafez received a martyr payment from the Saudi Committee through Arab Bank because of Sadiq al-Hafez's role as a suicide bomber.

272. Defendant Arab Bank administered the comprehensive terrorist death and dismemberment insurance scheme by receiving, transmitting and distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

273. Arab Bank was provided relatively detailed lists consisting of the names of the "martyrs," personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading HAMAS organizations.

274. For example, Arab Bank received a list from the Saudi Committee in January 2002 that contained over 650 names. *See* attached <u>Exhibit 2</u>.

275. The list was titled: "List of Names of Martyrs to Substitute the Existing Transfers

at the Bank Substituting the Name of One Beneficiary with Another."

276.    The instructions Arab Bank received were to substitute the pending transfers per the attached list of new beneficiaries. Number 610 on the list was Hatem Al-Shweikeh, who carried out the shooting attack on November 4, 2001 discussed above.

277.    This list that Arab Bank received included information about the name of the "martyr," the date of death, the cause of death and the name of the beneficiary.

278.    In the case of Al-Shweikeh, it lists his date of death as November 4, 2001 and the cause of death as "French Hill Operation." As noted above, the attack that Al-Shweikeh perpetrated on November 4, 2001 occurred in the French Hill section of Jerusalem.

279.    This list also contained the name of HAMAS' Third Engineer, Ayman Halawah. "Engineer" is the term HAMAS uses to describe its bomb-makers.

280.    According to the list, Ayman Halawah was killed on October 22, 2001 in a car bombing.

281.    In another list provided to Arab Bank, which was titled "List of Martyrs' Names in the West Bank Sixth Installment," the sixteenth name on the list is Hamed Abu Hijla and lists the cause of death as "Martyr Operation." *See* attached as <u>Exhibit 3</u>.

282.    Hamed Abu Hijla was a HAMAS operative.

283.    Accordingly, the terrorist death and dismemberment insurance plan included the families of suicide bombers, and Defendant Arab Bank and its senior management knew this fact, including Defendant's former Regional Manager for the Palestinian Territories Mazen Abu Hamdan.

284.    Arab Bank coordinated with the Saudi Committee and local representatives of HAMAS to finalize the lists, maintain a database of persons eligible under this universal terrorist

death and dismemberment insurance plan, and received the funds for the plan. HAMAS, through its network of organizations, collected data on its own operatives as well as all other terrorists killed, injured or in Israeli custody and transmitted that information to the Saudi Committee and Defendant Arab Bank.

285.    This can be seen from an August 2001 letter sent by Arab National Bank on behalf of the Saudi Committee to Arab Bank, which states "We would like to provide you with the names and addresses of the parties that have provided the Saudi Committee in Support of the Al-Quds Intifada with the names of the transfers' beneficiaries …."

286.    The letter goes on to list Al Salah Islamic Society and the Islamic Charitable Society of Hebron.

287.    Arab Bank's coordination with local HAMAS representatives can be seen in correspondence it received from the Al Salah Islamic Society.

288.    In a May 2001 letter from the head of Al Salah, Ahmad Al-Kurd, to Muhammad al-Tahan, Arab Bank's Manager of Operations in the Palestinian Territories during the Second Intifada, Al Salah requested that certain transfers from the Saudi Committee be stopped and returned to the Saudi Committee.

289.    Similarly, in a July 2001 letter from Al Salah to Arab Bank, Al Salah requested that it be provided with a list of all the names of individuals who had pending transfers from the Saudi Committee.

290.    Every Palestinian family eligible for a Saudi Committee payment was encouraged to collect the terrorism benefits through a local Arab Bank branch in the Palestinian Territories.

291.    The conspiracy between the Saudi Committee and HAMAS and others was ultimately designed to provide substantial material support to Palestinian terrorist organizations

and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew that the purpose of the conspiracy and acts taken pursuant thereto was to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

292.     Arab Bank was aware of the methods and means by which HAMAS, PIJ, the PFLP, and other Foreign Terrorist Organizations sought to carry out their objectives.

293.     Arab Bank knowingly and substantially assisted in the recruitment of terrorists by serving as the paymaster for this and other death and dismemberment insurance plans.

294.     Any person who chose to participate in a suicide bombing or other terrorist attack did so secure in the knowledge that if he or she was killed in that attack, the financial needs of his or her family would be met for some time.

295.     The same is true of the families of terrorists who were injured or apprehended.

296.     In short, the Saudi Committee raised funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocated payments to Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

297.     According to a U.S. State Department report, "Saudi Arabia continues to serve as a base for Hamas fundraising, by means of direct Hamas representational presence in the Kingdom of Saudi Arabia and through the possible continuing operation of the Account 98 system."

298.     Account 98 was the designated account at numerous Saudi banks for collecting money destined for Palestinian putative charitable organizations.

299.     According to the State Department Report:

In 2003, the United States provided evidence to Saudi authorities that the Saudi al Quds lntifadah Committee ("Committee") founded in October 2000, was forwarding millions of dollars in funds to the families of Palestinians engaged in terrorist activities, including those of suicide bombers. The funds were often

transferred through integrated accounts at a number of major Saudi banks that were popularly referred to as Account 98.

300.    This system of collecting funds via Account 98 was still in use in 2005. According to the State Department Report:

> In fact, Account 98 appears to still be in operation, as it is widely advertised as a receiving point for contributions to Palestinian organizations. As of early December 2005, on King Fahd Road, just south of the Ministry of Interior, there is a billboard reminding readers to "remember Jerusalem" (Al Quds) and to make donations to Account 98. U.S. visitors first observed the billboard in the spring of 2005.

> On August 29, 2005, a program aired in Saudi Arabia on lqra TV soliciting funds for the Saudi Committee for the Support of the al Quds Intifadah and asked donors to direct funds to a joint Account 98 at "all banks in the Kingdom of Saudi Arabia."

301.    Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to over 1,600 "martyrs" totaling more than $8,500,000. Between 2000 and 2002, the Saudi Committee paid more than $35,000,000 to the families of Palestinian "martyrs," "prisoners" and wounded.

302.    According to Arab Bank's then-Chief Banking Officer, Shukry Bishara, beginning in December 2001 Arab Bank transmitted over $90,000,000 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

303.    In fact, Arab Bank served as the exclusive administrator for the Saudi Committee's payment programs.

304.    Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of Arab Bank in Palestine. Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

305.    Item number ten on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

306.    The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

307.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 10, 2001, the Saudi Committee identified payments made to "Martyrs of al-Aqsa Intifada – The West Bank (The Third Group)." A total of 22 individuals are listed and for each "martyr," the list identifies, *inter alia*, the name of the "martyr," their beneficiary, and their account number at Arab Bank.

308.    Arab Bank provided a convenient means for transmitting and distributing payments across Palestinian-controlled territories that would be far more difficult if attempted by other means such as courier. Israeli territory separates the Gaza Strip from the West Bank, and Israeli military checkpoints often separate one Palestinian city from another.

309.    Arab Bank knew the criminal purpose that the accounts it opened and maintained for the Saudi Committee were intended to serve.

310.    The Saudi Committee and local HAMAS charitable front organizations publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which were known to Arab Bank and all of which were calculated to – and did – reach terrorists and potential terrorists. For example:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazira*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper *Al Quds*, the Saudi Committee placed an announcement listing the names of more than

1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that "the relatives of the martyrs, whose names hereby follow, are requested to head for the Arab Bank branches in their place of residence in order to receive the tenth payment from the Honorable Saudi Committee – a sum of 5,316.06 USD ...." Among the names contained on this list are Ayman Halawah, discussed above, Hatem Al-Shweikeh, discussed above, who carried out the attack on November 4, 2001, and Mahmud Abu Hanud, commander of HAMAS' Izz al-Din al-Qassam Brigades in the West Bank.

311.    Since the Saudi Committee raised its funds in Saudi currency, which could not conveniently be converted into Israeli currency (most commonly used in Palestinian-controlled areas), those funds were primarily converted into U.S. dollars through Arab Bank's then-operating New York branch and then routed to the local Arab Bank branches in the West Bank.

312.    Arab Bank's role was material and essential to the furtherance of the Saudi Committee's terror financing in two important respects.

313.    First, Arab Bank provided both professionalism and transparency to the process, thereby reassuring wealthy Saudi and Gulf State donors that the money they were contributing would not be siphoned off by corrupt officials but would in fact reach the families of terrorists as intended.

314.    Second, Arab Bank, through its network of local branches in the West Bank and Gaza Strip, provided an ideal distribution system that offered both convenience to the families of the terrorists who were able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimized the risk of duplicate payments and unreliable record-keeping.

C.     **The Primary Palestinian Terrorist Groups**

315.     Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS and PIJ.

316.     HAMAS and PIJ are both radical Islamist terrorist organizations committed to the globalization of Islam through violent "jihad" or holy war.

317.     HAMAS and PIJ are formally committed to the destruction of the State of Israel and to achieving their objectives by violent means, including acts of terrorism.

318.     The HAMAS Charter states that HAMAS' very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

319.     In addition, the nominal proto-government within Palestinian-controlled territory known as the Palestinian Authority operated several paramilitary organizations through its political organizations, the PLO and Fatah.

320.     Through the PLO's various permutations, including its "security services," the PA (and Fatah) competed with HAMAS and PIJ to commit terrorist attacks against civilian targets in Israel, including attacks that have killed and injured United States citizens.

321.     The AAMB is one of the more well-known and lethal terror organizations sponsored by and belonging to Fatah.

322.     In addition, the PFLP, one of the oldest Palestinian terrorist groups, known primarily for its spree of hijackings and atrocities during the 1970s, also perpetrated terrorist attacks during the Second Intifada.

1.     **The Islamic Resistance Movement ("HAMAS")**

a.     **HAMAS' Founding and Structure**

323.     HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic

42

Resistance Movement, which was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

324.    HAMAS is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

325.    HAMAS is nominally divided into three interconnected wings: the political wing, the "*da'wa*" (HAMAS' putative social service or humanitarian component), and the military operational wing known as the Izz-al-Din al-Qassam Brigades. Although these components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

326.    HAMAS' social services are, in large part, administered by local "zakat," committees and charitable societies. These committees and societies were either established by HAMAS or taken over by HAMAS via, *inter alia*, HAMAS members, operatives and activists sitting as members of their governing committees. These committees and organizations collect and distribute funds on behalf of HAMAS.

327.    Al Mujama Al Islami (The Islamic Center – Gaza) and Al Jam'iya Al Islamiya (The Islamic Society – Gaza) were both founded by Sheikh Yassin in the 1970s, prior to the formation of HAMAS.

328.    Once HAMAS was formed, both of these organizations provided the backbone of HAMAS' *da'wa*. As discussed below, Arab Bank maintained accounts for both of these organizations.

329.    One of the important roles of these organizations was their involvement in channeling funds to pay expenses for and assist the families of terrorist operatives who were

arrested, injured or killed. These entities also assisted with providing housing subsidies to the families of suicide bombers whose homes were often demolished by the Israeli army after the bomber's identity had been confirmed.

330. The network of these "charities" and other "charitable" associations not only helped raise funds for HAMAS' terrorist operations, but also helped it to identify and recruit potential terrorists. The network also assisted recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who were arrested, injured, or killed.

331. Due to the substantial expenditures of HAMAS and the fungible nature of money, significant sums of monies collected externally under putative charitable and humanitarian banners are routed for HAMAS' terrorist and other operational uses, in addition to being used to free up other funds for specific terrorist acts. HAMAS used (and still uses) such funds to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.

332. As noted above, HAMAS is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel. It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

### b.     HAMAS' Formal Designation as a Terrorist Organization

333. In 1989, Israel's Ministry of Defense designated HAMAS an "unlawful organization" and the Government of Israel declared HAMAS a "terrorist organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

334. On January 23, 1995, President Clinton issued Executive Order No. 12947.

President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

335.     Executive Order No. 12947 designated HAMAS a Specially Designated Terrorist ("SDT"). Executive Order No. 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

336.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA of 1996. The designation of HAMAS as an FTO has been renewed every two years since 1997.

337.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

338.     Executive Order No. 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT"). Executive Order No. 13224 blocked all property and interests in property of SDGTs, including HAMAS.

### c.     HAMAS' Leadership

#### 1.     Sheikh Ahmed Yassin

339.     As noted above, Sheikh Ahmed Yassin founded HAMAS in 1987. He was also its spiritual leader and iconic symbol.

340.     During the 1970s, Yassin established Al Mujama Al Islami and Al Jam'iya Al Islamiya. These two organizations are central organizations within HAMAS' *da'wa*.

341.     On January 25, 1995, Yassin was designated an SDT pursuant to Executive Order 12947.

342.     On August 22, 2003, Yassin was designated an SDGT pursuant to Executive Order 13224.

343.     Yassin maintained account number 36444 at Arab Bank's Gaza branch.

344.     On May 30, 2001, Yassin received a $60,000 transfer into this account from Yousef El Hayek through Arab Bank's New York branch.

345.     Yassin's wife, Halima Hasan Yassin, also maintained an account at Arab Bank and received $153,435 between November 2000 and May 2001 through Arab Bank's New York branch.

346.     Sheikh Yassin was assassinated by Israel in March 2004.

### 2.     Salah Shehada

347.     As noted above, Salah Shehada was one of the founders of HAMAS.

348.     After HAMAS was founded, Shehada was appointed to head HAMAS' operations in the northern Gaza Strip.

349.     Shehada was also the founder of HAMAS' operational terrorist wing, the Izz al-Din al-Qassam Brigades.

350.     Shehada was arrested by Israel in 1988 and released in 2000. He was killed by the Israel Defense Forces ("IDF") in July 2002.

351.     Shehada maintained account number 349321510 at Arab Bank's Gaza branch. Between November 2000 and February 2001, he received seven transfers totaling $109,500 through Arab Bank's New York branch.

352.     Shehada's wife also received a Saudi Committee prisoner payment of $2,655.

46

### 3. Hamdan Account

353. Arab Bank knowingly provided banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collected funds directly in the name of HAMAS.

354. This account was opened in July 1998 by Osama Hamdan as an individual account.

355. Osama Hamdan has been HAMAS' representative in Lebanon since 1998 and a senior HAMAS leader.

356. Hamdan was not a clandestine figure unknown to the public.

357. For example, on March 27, 2002, following the infamous bombing of the Park Hotel in Netanya, Israel on Passover, he was interviewed by CNN regarding the bombing. CNN identified Hamdan as HAMAS' spokesman.

358. In August 2003, the U.S. Treasury Department designated Hamdan an SDGT due to his leadership position in HAMAS.

359. According to the U.S. Treasury press release announcing his designation:

Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad. He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters.

Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian "martyrs" have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel.

360. The United States Department of Justice has identified the website: www.palestine-info.com as the "official" website of the political wing of HAMAS.[5]

---

[5] The website has since migrated to a new "URL" and can be found at https://www.palinfo.com.

361.     The website itself solicited funds and asked contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut, but it also asked donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

362.     As noted above, this account was opened by Osama Hamdan, not the Palestine Information Center.

363.     During the 2014 civil trial against Arab Bank for attacks perpetrated by HAMAS, three wire transfers to this account were introduced into evidence for which the listed beneficiary was "Harakat al Muqawamah al Islamiyah Hamas" or "Hamas Organization."

364.     There were also additional wire transfers that listed the beneficiary as the "Palestine Information Center" – the name given to HAMAS' website.

365.     This account was maintained by Arab Bank until several months after the *Linde v. Arab Bank* lawsuit was filed in July 2004.

366.     At the end of August 2004, more than a year after Hamdan had been designated an SDGT by the U.S. Government, Arab Bank finally took steps to close the account.

367.     Arab Bank retained the $8,677.92 that was contained in the account until March 30, 2005, at which point the Defendant issued a check in that amount to Hamdan, who retrieved the money from Arab Bank.

368.     Arab Bank knowingly provided Hamdan with the funds despite knowing that he had been designated an SDGT by the U.S. Government because he was a senior HAMAS official.

### 4.     Muhammad Sham'a

369.     As noted above, Muhammad Sham'a was one of the founders of HAMAS.

370.     He was born in 1937 and was one of the co-founders of Al Mujama Al Islami.

371.     After HAMAS was founded, Sham'a was put in charge of Shati Refugee Camp.

372.     Sham'a maintained account number 513636510 at Arab Bank's Gaza branch.

373.     Between January 2001 and December 2001 he received at least four transfers totaling $144,000 through Arab Bank's New York branch.

### 5.     Abd al-Fatah Dukhan

374.     As noted above, Abd al-Fatah Dukhan was one of the founders of HAMAS.

375.     Dukhan was a member of Al Mujama Al Islami and headed its Nusairat Refugee Camp branch.

376.     With the founding of HAMAS, Dukhan was put in charge of the central camps (four refugee camps).

377.     Dukhan received a Saudi Committee prisoner payment of $2,655 through Arab Bank on behalf of his son who was imprisoned in Israel.

### 6.     Ismail Abd al-Salam Haniya

378.     Ismail Haniya was born in 1962 in the Shati Refugee Camp in Gaza.

379.     In 1981, he joined the Islamic Bloc (Al-Kutla Al-Islamiya), the student affiliation of the Muslim Brotherhood, from which HAMAS emerged.

380.     Haniya served as a member of Al Jam'iya Al Islamiya's senior administrative body and headed its club in Gaza for approximately 10 years.

381.     Haniya became a close aide to Sheikh Yassin.

382.     In 2006, Haniya led HAMAS' Change and Reform List when HAMAS won the PA elections, and he became the Prime Minister of the HAMAS government in Gaza.

383.     He is currently the head of HAMAS.

384.     Haniya maintained account number 63517500 at Arab Bank's Gaza branch.

385.     Between July 2000 and September 2001, Haniya received 19 transfers totaling $420,100 through Arab Bank's New York branch.

### 7.     Ismail Abu Shanab

386.     Ismail Abu Shanab was born in 1950 in the Nuseirat Refugee Camp in the Gaza Strip.

387.     He studied engineering at al-Mansura University in Egypt and received a master's degree in engineering from the University of Colorado.

388.     Abu Shanab was one of the founders of Al Jam'iya Al Islamiya.

389.     He was a close aide to Sheikh Yassin, serving as his deputy.

390.     Abu Shanab was killed in an IDF operation in August 2003.

391.     Abu Shanab maintained account number 236519510 at Arab Bank's Gaza branch. Between August 2000 and August 2001, Abu Shanab received nine transfers totaling $173,172 through Arab Bank's New York branch.

### 8.     Abbas Muhammad Mustafa al-Sayed

392.     Abbas al-Sayed was born in 1966 in Tulkarem.

393.     He studied mechanical engineering at Al-Yarmuk University in Jordan. He also received an MA in Medical Engineering from a university in America.

394.     During the Second Intifada, al-Sayed was one of Hamas's most senior political and terrorist leaders in Tulkarem.

395.     Al-Sayed was the mastermind of the March 27, 2002 bombing of the Park Hotel in Netanya. During his interrogation, he confessed to having supervised the terrorist attack and to having participated in the preparation of the explosive charge.

396.     During his interrogation, Abbas al-Sayed stated that he used funds sent to his Arab Bank account from abroad to buy weapons.

397.     An Israeli court convicted him and sentenced him to 35 life terms of imprisonment for his role in the Park Hotel attack.

398.     Al-Sayed maintained account number 90705094240 at Arab Bank's Tulkarem branch.

399.     Between February 2001 and May 2001, Abbas al-Sayed received nine transfers totaling $123,000 through Arab Bank's New York branch.

### 9.     Salah al-Din Darwazah

400.     Salah Darwazah was born in 1963.

401.     He received a Bachelor of science degree from Al-Quds University.

402.     In 1992, he was among the 400 Palestinians terrorist leaders deported to Marj al-Zuhur, Lebanon.

403.     He was one of HAMAS' leading political figures in the Nablus area as well as a senior commander in the Izz al-Din al-Qassam Brigades in the Samaria region.

404.     Darwazah was killed by the IDF on July 25, 2001.

405.     Darwazah's wife, Huda Ahmad Darwazah, maintained account number 4286871-510 at Arab Bank's Nablus branch.

406.     Between July 2000 and June 2001, she received 20 transfers totaling $302,000 through Arab Bank's New York branch.

### 10.     Jamal Salim Damuni

407.     Jamal Salim was born in 1958 in Nablus.

408.     He studied Islamic Law at the University of Jordan, graduating in 1982.

409.     Salim continued his Islamic Studies at al-Najah University, graduating in 1996.

410.     In 1992, he was among the 400 Palestinians terrorist leaders deported to Marj al-Zuhur, Lebanon.

411.     Salim was the head of HAMAS' Samarian branch, together with Jamal Mansur.

412.     Salim was also a member of the Al-Tadamun Charitable Society - Nablus.

413.     Salim was killed by the IDF on July 31, 2001.

414.     Salim maintained account number 4033906-500 at Arab Bank's Nablus branch.

415.     Between December 2000 and March 2001, he received three transfers totaling $13,500 through Arab Bank's New York branch.

### 11.     Jamal Abd al-Rahman Muhammad Mansur

416.     Jamal Mansur was born in 1960 in Balata Refugee Camp, near Nablus.

417.     Mansur studied Accounting and Business Management in Al-Najah University in Nablus between 1978-1982.

418.     Mansur was HAMAS' spokesman in the West Bank and was arrested several times by Israel and the Palestinian Authority.

419.     In 1992, he was among the 400 Palestinians terrorist leaders deported to Marj al-Zuhur, Lebanon.

420.     Mansur was killed by the IDF on July 31, 2001.

421.     Mansur's wife, Muna Salim Saleh Mansur, maintained account number 4064788500 at Arab Bank's Nablus branch.

422.     Between December 2000 and September 2001, she received four transfers totaling $85,000 through Arab Bank's New York branch. She also received two payments from the Saudi Committee.

### 12. Ghazi Ahmad Hamad

423. Ghazi Hamad was born in 1964 in Rafah.

424. Hamad served as a senior HAMAS spokesman.

425. Ghazi Hamad also headed the HAMAS newspaper, *Al-Risala*.

426. Hamad maintained account number 1170465-510 at Arab Bank's Gaza branch.

427. Between July 2000 and January 2002, he received 15 transfers totaling $152,986 through Arab Bank's New York branch.

### 13. Mahdi Shaker Hasan al-Hanbali

428. Mahdi Hanbali received an M.A. in Transportation Engineering from the University of Belarus in 1989.

429. Hanbali was secretary of *al-Tadamun*'s sports club.

430. In 2005, he was elected Deputy Mayor for Administrative & Financial Affairs, representing HAMAS' Change & Reform Party in Nablus.

431. Hanbali maintained account number 4026306-510 at Arab Bank's Nablus branch.

432. Between July 2000 and February 2002, he received 28 transfers totaling $397,450 through Arab Bank's New York branch.

### 14. Abd al-Khaleq Hasan al-Natsha

433. Abd al-Khaleq al-Natsha was born in 1954 in Hebron.

434. During the First Intifada, he was arrested several times because of his activity for HAMAS.

435. In 1992, he was among the 400 Palestinians terrorist leaders deported to Marj al-Zuhur, Lebanon.

436.    He was the head of the Islamic Charitable Society in Hebron until his arrest in August 2002.

437.    During the Second Intifada, he was the head of HAMAS in Hebron and the HAMAS spokesman there.

438.    Natsha maintained account number 7567847510 at Arab Bank's Hebron branch.

439.    In July 2001, he received a transfer totaling $15,000 through Arab Bank's New York branch.

### d.    HAMAS' External Financing

440.    HAMAS received a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good. The Union of Good, in turn, raised funds that were, in part, channeled through an entity known as the Palestine Relief and Development Fund ("Interpal"), a British putative charity that was designated an SDGT by the U.S. Government in August 2003.

441.    Arab Bank admits to processing 282 funds transfers for U.S.-designated Palestinian terrorist organizations and U.S.-designated Palestinian terrorists from the date of designation of those individuals or entities through December 21, 2007.

442.    Arab Bank admits to processing $2,563,275 in funds transfers for U.S.-designated Palestinian terrorist organizations and U.S.-designated Palestinian terrorists from the date of designation of those individuals or entities through December 21, 2007.

### 1.    The Union of Good

443.    I'Tilafu Al-Khayr a/k/a the Union of Good was an umbrella organization established by HAMAS' leadership in October 2000, immediately following the outbreak of the Second Intifada. It comprised more than 50 Islamic charitable foundations worldwide.

444.     The Union of Good was a principal fundraising mechanism for HAMAS.

445.     The Union of Good maintained account 002850/811/9 at Arab Bank in Beirut and actively solicited funds to that account, including funds transfers cleared in USD through Arab Bank's New York Branch.

446.     The Union of Good's primary "charitable" purpose was to provide financial support for HAMAS and its agents in the Palestinian Territories.

447.     The Government of Israel outlawed the Union of Good and one of its member organizations, the World Assembly of Muslim Youth, in February 2002 and further outlawed 36 of its member organizations in July 2008.

448.     Three member organizations of the Union of Good – Interpal, Commite de Bienfaisance et de Secours aux Palestiniens ("CBSP") and the Al Aqsa Foundation – were designated by the Government of Israel in 1997.

449.     The Al Aqsa Foundation in Germany opened account number 300733-300 at Arab Bank's Frankfurt branch in 1994.

450.     The Al Aqsa Foundation in Germany was closed down by the German Government in 2002.

451.     On May 29, 2003, the United States designated Al Aqsa Foundation an SDGT because of its role as a HAMAS fundraiser.

452.     On August 19, 2003, a HAMAS suicide bomber blew up Egged Bus #2, killing 23 people, including seven children.

453.     On August 22, 2003, pursuant to Executive Order 13224, President Bush linked HAMAS to the Egged Bus #2 attack, identified CBSP and Interpal as HAMAS fundraising entities, and designated them SDGTs, referencing CBSP as the "primary fundraiser[] for HAMAS in

France," and Interpal as "the fundraising coordinator of HAMAS."

454.    Other Union of Good members designated by the U.S. Government include Association de Secours Palestinien ("ASP") and Palestinian Association in Austria ("PVOE") (both designated on August 22, 2003 with CBSP and Interpal).

455.    Arab Bank (Switzerland) Ltd. maintained an account for ASP and transferred funds on its behalf to HAMAS *da'wa* organizations in the Palestinian Territories.

456.    The United States Government designated the Union of Good itself an SDGT on November 12, 2008. The press release announcing the designation noted:

> The Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to Hamas—and Hamas-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen Hamas' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas.
> …
> Funds raised by the Union of Good affiliates have been transferred to Hamas-managed organizations in the West Bank and Gaza. In addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers.

457.    As previously noted, the Union of Good used Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

458.    The Union of Good's "101 Days Campaign" maintained its own website at www.101days.org. The campaign solicited funds for HAMAS and directed prospective donors to donate via Interpal's bank accounts.

459.    Similarly, CBSP's website solicited funds for the 101 Days Campaign and provided contact information and bank account information for donations. Among the organizations listed on this website were several U.S.-designated SDGTs including Interpal, CBSP and various

branches of the Al Aqsa Foundation.

460.    As noted above, the Union of Good is headed by Dr. Yousef al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar. Al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

461.    Al-Qaradawi is well known in the Arab world. He had his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[6]

462.    In 2001, al-Qaradawi publicly described the activities of the putative Islamic charitable societies sustaining the Second Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

463.    In an interview with *The Guardian* newspaper in October 2005, al-Qaradawi discussed suicide bombing in Israel and was quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as the weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have - the powerful are not willing to give their lives for any cause.

464.    During a 2007 broadcast on *Al Jazeera*, al-Qaradawi sat next to the then-head of HAMAS, Khalid Mishal, a designated SDGT. During the broadcast, al-Qaradawi stated:

> I support the Palestinian cause. I support resistance and jihad. I support Hamas. I support the [Islamic] Jihad group, I support Hizballah. I am against the peace that Israel and America want to dictate. This is an illusory peace. I support amaliyat istishhadyia [suicide attacks] and this is the straw [that broke the camel's back]. What should I do now? This big terrorist is sitting next to me and they will accuse me because of this today.

---

[6]    Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the Second Intifada, as cited in HAMAS' official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

465.     During the same conference, Khalid Mishal stated:

The third point: the Union of Good. One of the blessings of our Sheikh, may Allah reward him is that he supports what he says with acts. His support of the Palestinian people and the Intifada was not in words, positions and fatwas [religious rulings] only, but also in activities and efforts. He sponsored a big project which is the Union of Good during the Second Intifada – the blessed al-Aqsa Intifada. I do not exaggerate when I say that what the projects of Union of Good provided - the blessed money from the good people of the [Muslim] nation to the steadfast people on the land of Palestine was tens, even hundreds of millions of dollars. I wish that this will be in the Sheikhs balance of good deeds.

## 2.      Interpal

466.     As noted above, charitable donations to the Union of Good are partially collected and distributed through Interpal.

467.     Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

468.     As noted above, the U.S. Government designated Interpal an SDGT on August 22, 2003.

469.     Between January 1999 and August 22, 2003, Interpal transferred over $8,800,000 to beneficiaries who maintained accounts at Arab Bank.

470.     Between August 23, 2003 and December 2004, Interpal transferred over $600,000 to beneficiaries who maintained accounts at Arab Bank.

471.     According to testimony during the *Linde v. Arab Bank* trial, Arab Bank's branch in London maintained an account for Interpal.

## 3.      Holy Land Foundation for Relief and Development

472.     The Holy Land Foundation ("HLF"), originally known as the Occupied Land Fund, was founded in the late 1980s in California. In 1992 it relocated to Richardson, Texas. HLF maintained representative offices in the West Bank and Gaza.

473. HLF was HAMAS' primary fundraiser in the United States until it was designated an SDGT in December 2001.

474. HLF supported HAMAS with money that was delivered to HAMAS-controlled putative charitable societies in the Palestinian Territories.

475. For example, between 1989 and 1994, HLF sent more than $730,000 to Al Mujama Al Islami and its director (and HAMAS co-founder) Ibrahim al-Yazuri.

476. Arab Bank knowingly laundered funds for HLF for more than a decade and also maintained account number 3526801-510 at its Jericho Branch for HLF.

477. Arab Bank accomplished this by channeling tens of thousands of dollars for HLF through its New York branch to the Ramallah Zakat Committee, the Tulkarem Zakat Committee, Nablus Zakat Committee, Jenin Zakat Committee's al-Razi Hospital, Qalqilya Zakat Committee and the Islamic Charitable Society of Hebron, all agents of HAMAS.

478. On March 14, 1996 the Government of Israel issued a confiscation order directed at HLF.

479. On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli Government claims that HLF was a "key fundraising operation" for HAMAS.

480. On May 6, 1997, Israel's Ministry of Defense designated HLF an "unlawful association" and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ..." The Government of Israel further declared HLF a terrorist organization on January 17, 1998.

481. On September 25, 1997, the PA closed what it identified as 16 HAMAS institutions and associations.

482.     HLF's Gaza office was one of the entities (temporarily) closed by the PA.

483.     The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

484.     HLF and its officers have been convicted in the United States District Court for the Northern District of Texas for knowingly providing material support to HAMAS – including for specific transactions involving payments HLF made to the Islamic Charitable Society of Hebron, the Ramallah Zakat Committee, Tulkarem Zakat Committee, Nablus Zakat Committee, and Jenin Zakat Committee.

485.     The HLF indictment specified particular financial transactions HLF initiated that resulted in monetary transfers to the Ramallah Zakat Committee, Tulkarem Zakat Committee, and the Islamic Charitable Society of Hebron which violate 18 U.S.C. § 2339B.

### 4.     Welfare Association for Palestinian and Lebanese Families a/k/a Al-Waqfiya

486.     The Welfare Association for Palestinian and Lebanese Families (Al-Waqfiya) was designated an SDGT on October 4, 2012.

487.     On December 2, 2012, the Government of Israel designated it a terrorist organization.

488.     According to the U.S. Treasury Department, Al-Waqfiya is "a central component of the Union of Good, which was designated pursuant to E.O. 13224 in November 2008 for supporting Hamas, was established by Hamas in 2000 to financially support the families of Hamas terrorists. The organization has been run by senior Hamas leadership for years, and several senior Hamas leaders play a dominant role within the organization. Al-Waqfiya has facilitated the collection of money on Hamas's behalf, and has used its ties with money-changers and merchants in the Middle East to transfer funds to Hamas in Gaza."

489.    During the relevant period, Arab Bank maintained account number 2850-9-810 in Beirut for Al-Waqfiya.

490.    In 2001, Arab Bank transferred tens of thousands of USD through its then-active New York branch on behalf of Al-Waqfiya to a variety of HAMAS-controlled entities, including the Islamic Charitable Society of Hebron and the Al-Nur Society.

### 5.    HAMAS-Controlled Entities in the West Bank and Gaza

491.    As noted above, HAMAS raises funds to support its terrorist acts through a network of "charitable" front organizations called the *da'wa*.

492.    Arab Bank knowingly provided banking services to these zakat committees and charitable committees and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

493.    The following organizations were designated by the Government of Israel as "unlawful organizations" that were determined to belong to HAMAS:

  i.      Al Mujama Al Islami a/k/a The Islamic Center – Gaza;

  ii.     Al Jam'iya Al Islamiya a/k/a The Islamic Society – Gaza;

  iii.    Al Salah Islamic Society – Gaza;

  iv.     Al Nur Society – Gaza;

  v.      Islamic Charitable Society of Hebron;

  vi.     Ramallah Zakat Committee;

  vii.    Tulkarem Zakat Committee;

  viii.   Nablus Zakat Committee;

  ix.     Jenin Zakat Committee;

  x.      Al-Tadamun Charitable Society – Nablus;

> xi.     Al Islah Charitable Society Jericho;
>
> xii.    Al Islah Charitable Society – Ramallah-al-Bireh;
>
> xiii.   Nablus Zakat Committee;
>
> xiv.    Quran and Sunnah Society Qalqilya; and
>
> xv.     Al-Huda Women's Society.

494.    On August 7, 2007, the United States Government designated Al Salah Islamic Society – Gaza and its Chairman, Ahmad al-Kurd, SDGTs.

495.    According to the U.S. Treasury Press Release announcing the designation:

> One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the Al-Salah Society as "one of the three Islamic charities that form Hamas' welfare arm." The Al-Salah Society has received substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors.
> …
> The Al-Salah Society has employed a number of Hamas military wing members. In late 2002, an official of the Al-Salah Society in Gaza was the principal leader of a Hamas military wing structure in the Al-Maghazi refugee camp in Gaza. The founder and former director of the Al-Salah Society's Al-Maghazi branch reportedly also operated as a member of the Hamas military wing structure in Al-Maghazi, participated in weapons deals, and served as a liaison to the rest of the Hamas structure in Al-Maghazi. At least four other Hamas military wing members in the Al-Maghazi refugee camp in Gaza were tied to the Al-Salah Society.

496.    According to the same press release, "The Al-Salah Society was included on a list of suspected Hamas and Palestinian Islamic Jihad-affiliated NGOs whose accounts were frozen by the Palestinian Authority as of late August 2003. After freezing the bank accounts, PA officials confirmed that the Al-Salah Society was a front for Hamas."

497.    Arab Bank provided financial services to organizations designated by the Government of Israel as "unlawful organizations" that were determined to belong to HAMAS.

498.    Arab Bank provided financial services through bank accounts for the following organizations:

(1)     Tulkarem Zakat Committee Account No. 9070-500010-6-500 (Dinar); 9070-500010-6-510 (USD); 9070-500010-6-520 (GBP); 9070-500010-0-520; 9070-500010-6-596 (EUR);

(2)     Tulkarem Zakat Committee Account No. 1003-536447-301 (at Arab Bank's Kensington Branch);

(3)     Ramallah-al-Bireh Zakat Committee Account No. 9030-610686-2-510 (USD); 9030-610686-2-500 (Dinar); (530 – EUR); (570 – NIS);

(4)     Nablus Zakat Committee Account No. 9020-400336-0-500; 9020-400336-5-500; 9020-400336-5-598;

(5)     Al Mujama Al Islami Account No. 9500-012410-9-510 (USD);

(6)     Islamic Charitable Society of Hebron Account No. 9040-750049-0- (500 – Dinar); (510 – USD); (570 – NIS);

(7)     Islamic Charitable Society of Hebron Account No. 9040-750049-1-510 (USD);

(8)     Al Jam'iya Al Islamiya Account No. 411-546868-1003 (at Arab Bank's Kensington Branch);

(9)     Al Jam'iya Al Islamiya Account No. 9500-3683 (500 - Dinar); (510 – USD) (511 – USD) (570 – NIS) (594 – EUR);

(10)    Al Jam'iya Al Islamiya Jebalya Account No. 9500-015115 (500 – Dinar); (510 – USD); (570 – NIS) (530 – EUR);

(11)    Al Jam'iya Al Islamiya Nusairat Account No. 58580;

(12)    Al Jam'iya Al Islamiya East Area Account No. 12191;

(13)    Al Jam'iya Al Islamiya Rafah Account No. 2036;

(14)    Al Jam'iya Al Islamiya Qarara Account No. 200139;

(15)    Al Salah Islamic Society – Gaza Account No. 9500-5600-510 (USD); 9500-5600-6;

(16)    Jenin Zakat Committee Account No. 543079301; 9060-581345 (500 – JOD); (510 – USD); (570 – NIS);

(17)    Jenin Zakat Committee Account No. 1003-225-543087 (at Arab Bank's Kensington Branch);

(18)    Al Islah Charitable Society Account No. 9030-649611-3 (500 – Dinar); (510 –USD); (530 – EUR) (570 – NIS);

(19)    Al-Tadamun Charitable Society – Nablus Account No. 400271-7 (500 – Dinar); (510 – USD); (520 – GBP) (570 – NIS) (598 – EUR);

(20)    Quran and Sunnah Society – Qalqilya Account No. 9080-542042 (500 – Dinar); (510 – USD); (570 – NIS);

(21)    al Huda Women's Society Account No. 9030-609509-7 (500 – Dinar); (510 –USD); (570 – NIS); and

(22)    Islamic University of Gaza Account No. 003155 (500 – Dinar); (510 – USD); (511 – USD); (512 – USD); (513 – USD); (514 – USD); (515 – USD); (516 – USD); (517 – USD); (518 – USD); (519 – USD); (520 – GBP); (570 – NIS); (571 – NIS); (580 – EUR); (581 – EUR).

499.    Between 1999 and 2004, Arab Bank processed wire transfers through its former New York branch for the following:

(1)    Al Mujama Al Islami – at least 31 transfers totaling $799,552 including one transfer that was processed by Arab Bank's New York Branch;

(2)    Al Jam'iya Al Islamiya – at least 132 transfers totaling $2,673,467 including 39 transfers that were processed by Arab Bank's New York Branch;

(3)    Al Salah Islamic Society – Gaza – at least 147 transfers totaling $15,236,322 including 61 transfers that were processed by Arab Bank's New York Branch;

(4)    Islamic Charitable Society of Hebron – at least 177 transfers totaling $9,457,768 including 91 transfers that were processed by Arab Bank's New York Branch;

(5)    Jenin Zakat Committee – at least two transfers totaling $21,264 that were processed by Arab Bank's New York Branch;

(6)    Nablus Zakat Committee – at least 55 transfers totaling $687,100 including 21 transfers that were processed by Arab Bank's New York Branch;

(7)    Tulkarem Zakat Committee – at least 64 transfers totaling $704,526 including 22 transfers that were processed by Arab Bank's New York Branch;

(8)     Ramallah Zakat Committee – at least 83 transfers totaling $862,815 including 37 transfers that were processed by Arab Bank's New York Branch;

(9)     Al Islah Charitable Society – at least 32 transfers totaling $1,168,066 including 15 transfers that were processed by Arab Bank's New York Branch; and

(10)    Al-Tadamun Charitable Society – Nablus – at least 48 transfers totaling $648,395 including 16 transfers that were processed by Arab Bank's New York Branch.

## 2.     **Palestinian Islamic Jihad**

500.    PIJ committed numerous terrorist attacks, including several that killed and injured American citizens.

501.    During the Second Intifada, PIJ conducted and took credit for at least 28 murderous attacks, including at least seven mass murder attacks that have killed at least 95 civilians, including U.S. citizens such as Shoshana Ben-Yishai who was murdered on November 4, 2001 by a PIJ terrorist.

502.    As noted above, President Clinton issued Executive Order No. 12947 on January 23, 1995. Executive Order No. 12947 designated PIJ an SDT.

503.    On October 8, 1997, PIJ was designated an FTO by the U.S. Government under the AEDPA. The designation has since been renewed every two years, including in 2003.

504.    In 2001, pursuant to Executive Order 13224, PIJ was designated an SDGT.

505.    PIJ has established several *da'wa* organizations, including:

    a.      Al-Ihsan Charitable Society (a/k/a Elehssan);
    b.      Dar al-Huda Society;
    c.      Al-Jamaa al-Islamiya;
    d.      Islamic An-Naqqa Society for Women, Bethlehem; and
    e.      Cultural Forum of Palestinian Islamic Jihad Women.

506.    On May 4, 2005 the U.S. Government designated Al-Ihsan an SDGT. According

to the press release announcing the designation, "Elehssan cooperated with PIJ to distribute funds to the families of PIJ prisoners and deceased members …. Elehssan maintains lists of PIJ-associated families who are to receive compensation – including the families of PIJ suicide bombers."

507. Arab Bank maintained accounts for Elehssan Charitable Society at its branch in Gaza (Account No. 100379-8-500).

508. Arab Bank also maintained accounts for Elehssan Charitable Society at its branch in Jenin – Account No. 578669 (500-Dinar) (510 USD) (570 NIS).

509. Arab Bank maintained accounts for Elehssan Charitable Society at its branch in Bethlehem in USD (Account No. 717520-1-510), Israeli Shekel (Account No. 717520-1-570) and Jordanian Dinar (Account No. 717520-1-500).

510. PIJ's former website – www.jihadislami.com – exhorted its supporters to donate funds to support "our jihad in Palestine" and listed Arab Bank's accounts for Elehssan in Gaza, Jenin and Bethlehem.

511. Arab Bank maintained accounts for Dar al-Huda Society in USD (Account No. 16782-7-510), Israeli Shekel (Account No. 17782-7-570) and Jordanian Dinar (Account No. 16782-7-500).

512. On March 12, 2003 the Government of Israel designated Al-Jamaa al-Islamiya as a terrorist organization affiliated with the PIJ.

513. Arab Bank maintained accounts for Al-Jamaa al-Islamiya at its Ramallah branch, (Account No. 666473).

514. Arab Bank also maintained accounts for Islamic An-Naqqa Society for Women, Bethlehem, including its branch in Bethlehem (Account No. 706638-4-600).

515. Arab Bank was also used by PIJ's Damascus, Syria's headquarters as the conduit of large sums of money to facilitate terrorism including transfers to PIJ leaders and cells in Jenin, Ramallah and Bethlehem.

516. For example, Sheikh Bassam Sa'adi, the senior PIJ leader in Jenin and chairman of Elehssan Charitable Society in 2002, was indicted in January 2004 for transferring funds to operate terrorist activities, including multiple terrorist attacks in 2002 and 2003 in which more than 30 people were killed.

517. Sa'adi admitted that he had received a significant amount of money from PIJ headquarters in Damascus and opened several accounts at Arab Bank.

518. Some of the money was transferred by Specially Designated Terrorist Dr. Ramadan Shalah, PIJ's Damascus-based Secretary General, to PIJ's Jenin cell, including $127,000 to support the families of suicide bombers.

519. Arab Bank held an account for senior PIJ commander from Jenin, Thabet Azmi Suliman Mardawi, in the name of his mother Badriya Muhammad Nimer Mardawi (Account No. 569415).

520. Mardawi was involved in the planning and operations of numerous shooting attacks and suicide bombings.

521. Mardawi admitted during his police interrogation that he received money from PIJ headquarters in Damascus through a bank account under the name of an elderly woman or his own name.

522. Mardawi was arrested by Israel in 2002 and sentenced to 21 life sentences,

523. Similarly, Riyad Fahri Aref Khalifa and Juma Abdallah Khalaf al-Taya organized a PIJ cell in Ramallah and requested funds from Shalah in Syria.

524.    Shalah instructed them to open a bank account to receive funds.

525.    Al-Taya opened an account in Arab Bank in Ramallah under his mother in-law's name.

526.    Arab Bank held accounts for the head of the Al-Quds Brigades in Bethlehem, Isa Muhammad Ismail al-Batat, at least one of which was in the name of Hilwa Suliman Al-Batat - Account Number 708060.

527.    Al-Batat opened an account at Arab Bank's Bethlehem branch to receive money for the Al-Quds Brigades in Bethlehem.

528.    Starting in 1998, al-Batat regularly received funds from PIJ headquarters in Syria.

529.    Al-Batat was responsible for multiple PIJ car bombings and shooting attacks in 2001.

530.    Arab Bank also held accounts for other senior PIJ terror operatives.

531.    For example, Arab Bank held an account (518909) for Khaled Rayeq Muhammad Hussein, a senior commander of the Al-Quds Brigades.

532.    Arab Bank also held accounts for dozens of families of PIJ "martyrs" and prisoners who received payments from PIJ and other organizations supporting PIJ's violent activities.

533.    For example, in the Ramallah area alone, Arab Bank maintained accounts for:

| Beneficiary's name (agent) | Account number | Name of prisoner |
|---|---|---|
| Ibtisam Faruq Awda Ya'kub | 654129-1-410 | Ramadan Muhammad Awda Ya'kub |
| Ibrahim Musa Obeidat | 614801-8-510 | Musa Ibrahim Musa Obeidat |
| Ahmad Mahmud Mustafa | 658650-3-510 | Hani Ahmad Mahmud Mustafa |
| Amani Abd Al-Razeq Jaray'a | 656424-0-510 | Hassan Ali Dhib Hamad |
| Amna Ibrahim Salameh Falna | 654059-7-510 | Muhammad Fawzi Salameh Falna |

| | | |
|---|---|---|
| Intisar As'ad Abu Safiyah | 655388-5-510 | Riyad Hasan Hader Abu Safiyah |
| Intisar Muhammad Abu Zir | 612704---510 | Nuhammad Mustafa Ahmad Afana |
| Ayman Muhammad Zayed | 641001-4-510 | Ayman Muhammad Nabhan Zayed |
| Hassiba Yusef Ali Shehadah | 654188-7-510 | Ahmad Farid Muhammad Shehadah |
| Hanan Ahmed al-Hudali | 613371-1-510 | Khaled Ibrahim al-Hudali |
| Kholoud M. K Abu al-Bahaa | 613615—500 | Sami Yusef Ibrahim Husein |
| Rihab al-Eid Mustafa Hammed | 656425-9-510 | Ahmed Balqawi Saleh M'utan |
| Sa'id Ibrahim Awd | 612913-7-510 | Muhammad Sa'id Ibrahim Awd |
| Salwa Abd al-Rahim Hamdan | 655387-7-510 | Muhammad Abd al-Aziz Hamdan |
| Sumaya Musa Salameh Falna | 654058-9-510 | 'Atta Mahmud Abd al-Rahman Falna |
| Shukria Badawi al-Natsheh | 611503-9-570 | Yaqub Ishaq Murshid al-Natsheh |
| Ayesh As'ad Abu Safiyah | 614225---510 | Ayesh Khader Abu Safiyah |
| Adb al-Aziz Yusef Suliman | 640317 – 510 | Muhammad Dawud |
| Adnan Ibrahim al-Hanini | 654824-1-510 | Hazem Adnan Muhammad al-Hanini |
| Fatima Yusef al-Rifa'i | 613595-1-700 | Ahmed Abd al-Jabar al-Rifa'i |
| Fadwa Yihya Zalloum | 657970-1-510 | Ayman Abd al-Razeq Zalloum |
| Fadwa Yihya Zalloum | 657970-1-510 | Nidal Abd al-Razeq 'Izat Zalloum |
| Falasteen Othman Nahla | 640952-0-610 | Mahmud Abd al-Fatah Ghawanmeh |
| Leila Abd al-Hamid Ghawanmeh | 612103-9-500 | Ibrahim Mahmud Ghawanmeh |
| Muna Mahrous Ragheb Kfoury | 6120624-4-510 | Imad Taher Ahmed Sandouqa |
| May Ibrahim Abu al-Nasr | 6552041-2-510 | Ahmad Muhammad Abu al-Nasr |
| Maysoon Saleh Dawud Shtaya | 611779-1-500 | Hassan Zakariya Dawud Shtaya |

**3.**     **The Al Aqsa Martyrs Brigade ("AAMB")**

534.     Fatah was (and remains) the dominant political faction within the PA and the PLO.

535.     Fatah maintains an account with Arab Bank, account number 21250 in the Amman Branch.

536.     AAMB emerged at the outset of the Second Intifada as a deniable arm of Fatah that could compete with HAMAS and PIJ as a terror organization with a more Islamic flavor than Fatah's typically nationalist organizations.

537.     AAMB committed numerous terrorist attacks, including several that have killed and injured Americans citizens.

538.     Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately 100 others and a string of other attacks that have killed more than 70 civilians and wounded more than 500 others.

539.     In 2001, pursuant to Executive Order 13224, AAMB was designated an SDGT.

540.     On March 21, 2002, the Secretary of State of the United States officially designated AAMB an FTO.

541.     During the relevant period, Fatah maintained an account with Arab Bank in Amman, Jordan, and many members of its terror cells (Tanzim, Ahmad Abu al-Rish Brigades, AAMB) received payments through Arab Bank from Hezbollah (*al-Ansar*) and/or the Saudi Committee.

542.     For example, Jamal Abd Rabo Muhammad Abu al-Jadyan was Fatah's Secretary General in the northern Gaza Strip, a Colonel in the Palestinian Presidential Security Force (Force 17) and one of the founders of AAMB in Gaza.

543.    In May 2001, Jamal Abd Rabo Muhammad Abu al-Jadyan directly received a Saudi Committee prisoner payment.

544.    Ra'ed Muhammad Sa'id al-Karmi was an AAMB founder and commander in Tulkarem.

545.    His family received payments from both the Saudi Committee (through Arab Bank's Tulkarem branch), and the Arab Liberation Front ("ALF").

546.    Jamal Abdallah Nawawira Abayat was deputy-head of AAMB. His family received a Saudi Committee martyr payment in cash through Arab Bank's Bethlehem branch.

547.    Ahmad Ata Yusuf Abu Saltah was a senior AAMB member.

548.    He received a Saudi Committee injury payment in cash through Arab Bank's Nablus branch.

549.    Zuheir Muhammad As'ad Istiti was a senior AAMB operative involved in a number of terror attacks.

550.    Zuheir Muhammad As'ad Istiti's family received payments from both the Saudi Committee (through Arab Bank's Jenin branch) and the *Shahid* Foundation, through Arab Bank's accounts for *al-Ansar*.

551.    Arab Bank knowingly provided financial services to AAMB.

552.    Arab Bank also knowingly provided Bank Account No. 628328 for the benefit of AAMB founder and convicted (in 2004) terrorist, Marwan al-Barghuthi at its Ramallah-Al-Bireh branch.

553.    For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone

on the success of his attacks, such as the January 17, 2002 assault on the Hadera banquet hall that resulted in the death of U.S. citizen Aharon Ben-Yisrael Ellis.

554.    Tamer Rasem al-Rimawi was an AAMB operative responsible for a May 28, 2003 terrorist attack.

555.    He later stated that in early 2001 he:

> received a telephone call from an officer at the Arab Bank in Ramallah, indicating that I should come to the Bank branch in Ramallah because they had money for me from the Saudi funds as a result of my first injury and hospitalization. I didn't know the bank officer and had no account at the Arab Bank. But I went to the bank because everyone knew that if you were injured while participating in operations against Israel you would get money, and if you were killed then your family would get money. When I went to the bank I met with a bank officer who gave me a check from the Arab Bank in the amount of $1330.00 US dollars. I was told the money was because I was injured during an operation throwing stones; I signed the check which was not a check from a charity but actually a check on the account of the Arab Bank, and I was given $1330.00 in the US dollars at the Arab Bank.

556.    Tamer Rasem al-Rimawi was paid $1,325.64 through Arab Bank's branch in Ramallah.

557.    Muntasir Abu Ghalyun, one of the Tanzim commanders in Jenin who was involved in financing and perpetrating a large number of terrorist attacks maintained an account for that purpose at Arab Bank.

558.    Numerous other AAMB operatives received payments through Arab Bank, including, Alaa Suliman Hussein Abu Bakra, Sami Jawdat Barbakh, and many others.

559.    Jihad Isma'il Ashur al-Umrayn, a senior AAMB commander in Gaza, received a cash (prisoner) payment through Arab Bank from the Saudi Committee.

560.    Murad Suliman Zuhdi Marshud, a senior AAMB commander in Nablus, who recruited several suicide bombers, received a cash payment through Arab Bank from the Saudi Committee.

561.     Arab Bank facilitated Saudi Committee martyr payment in cash to the relatives of

AAMB operatives, including:

     a)     Mustafa Ahed Hasan Anbas
     b)     Mahmud Umar Ali Jaser
     c)     Abd al-Rahman Muhammad Abu Bakra
     d)     Ali Ibrahim Abd al-Rahman al-Julani
     e)     Amin Muhammad Hafez Sawafita
     f)     Dargham Izat Muhammad Zakarna
     g)     Hasan Muhammad Hasan al-Qadi
     h)     Husein Muhammad Salem Abayat
     i)     Ibrahim Muhammad Mahmud Hasuna
     j)     Akrama Muhammad Khader Istiti
     k)     Imad Hamdi Saleh Awd
     l)     Nidal Muhammad Tawfiq Aghbariya
     m)     Ra'fat Ibrahim Khalaf al-Bajali
     n)     Salem Taleb Salem al-Dar'awi
     o)     Umar Abd al-Fatah Hafez Yasin
     p)     Yaser Juma Abd al-Rahim al-Badawi
     q)     Yaser Sa'id Musa Awda
     r)     Ziyad Ibrahim Ayd Amer.

### 4.    The Popular Front for the Liberation of Palestine ("PFLP")

562.     The Popular Front for the Liberation of Palestine was founded in the late 1960s

under the leadership of George Habash, its general secretary.

563.     The PFLP was guided by a crude form of Marxism-Leninism and, together with

other left-wing Palestinian organizations, claimed to be struggling to build a working-class party.

564.     The PFLP operates a number of organizations in the West Bank and Gaza as well

as internationally.

565.     One example is the Union of Health Works Committees located in Gaza. It was

designated an unlawful organization by Israel in 2015.

566.     The Union of Health Work Committees maintains an account in Arab Bank's Gaza

Branch, account number 9500-470-7.

567. The Health Work Committees located in Ramallah was also designated an unlawful organization by Israel in 2015.

568. The Health Work Committees maintains an account in Arab Bank's Al-Bireh Branch, account number 624260.

569. During the Second Intifada, the PFLP tried to remain politically relevant by joining in attacks against Israeli targets.

570. Senior leaders of the PLFP received Saudi Committee payments through Arab Bank branches.

571. For example, Abd al-Rahman Nayef Yusuf al-Salibi, a member of PFLP's Central Committee, directly received a Saudi Committee prisoner payment through Arab Bank's Gaza branch.

572. Ahmad Abu al-Sa'ud Abd al-Razaq Hanani, another member of PFLP's Central Committee, received a Saudi Committee prisoner payment through Arab Bank's Nablus branch in 2001.

573. Ahmad Abu al-Sa'ud Abd al-Razaq Hanani held Account Number 437398 at Arab Bank's Nablus branch.

574. Ali Saleh Ibrahim Darwish another member of PFLP's Central Committee, directly received a Saudi Committee prisoner payment through Arab Bank in 2001.

575. Ali Atiya Jaradat, a PFLP spokesman and a member of the movement's Political Bureau, directly received a Saudi Committee prisoner payment through Arab Bank in 2001.

576. Ali Atiya Jaradat held Account Number 309819 at Arab Bank's Ayzariya branch.

577. Salah Abd Rabo Muhammad Abu al-Jadyan and Hasan Mahmud Hasan Labad, prominent PFLP terrorists imprisoned for more than a decade for their terrorist activities, directly

received Saudi Committee prisoner payments through Arab Bank's Gaza branch.

578. In addition to the family of the suicide bomber who killed and injured numerous victims on February 16, 2002 at the pizzeria in Karnei Shomron, including Hillel Trattner, Arab Bank facilitated Saudi Committee prisoner payments in cash to PLFP operatives, including:

a)    Dhib Uthman Ali al-Najar
b)    Fawzi Talab Naser al-Wahidi
c)    Imad Saleh Husein Abu Haya
d)    Isa Mahmud Jaber al-Ghul
e)    Muhammad Ibrahim Rajab Jarwan
f)    Muhammad Maali Ubayd Samra
g)    Ramadan Atiya Ibrhaim Abu Qamar
h)    Rashid Muhammad Rashid al-Sidawi
i)    Rashid Saleh Muhammad al-Mabhuh
j)    Riyad Saleh Jaber al-Ghul.

## D. The Iranian Program in Support of the Martyrs

579. The Saudi Committee was not the only organization that supported and funded the Second Intifada. There were also other organizations that transferred money in direct support of the families of "martyrs" and prisoners, aiming at strengthening and encouraging the Palestinians to continue the violence. Among these organizations were the Arab Liberation Front ("ALF"), which operated in the Palestinian Territories (on behalf of the Iraqi dictator Saddam Hussein) and the Lebanon-based *Shahid* Foundation, which was funded by Iran and operated in the Palestinian Territories in cooperation with the Gaza-based *al-Ansar* society.[7]

580. The *Shahid* Foundation in Lebanon was designated an SDGT by the U.S. Government on July 24, 2007.

581. The U.S. Treasury Department noted at the time that:

The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs

---

[7]    *Al-Ansar* was designated an "illegal association" in Israel on October 24, 2003.

Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

582. The *Shahid* Foundation in Lebanon used the *al-Ansar* Society to distribute martyr payments on behalf of Iran through its Arab Bank accounts.

583. On May 15 and 16, 2001 the Palestinian daily *Al-Hayat Al-Jadida* published an announcement signed by *al-Ansar*, which called on families of martyrs that resided in the Gaza Strip to arrive at the society's offices (indicating its address in Gaza) to receive their money. Families of martyrs from the West Bank were asked to send to a mail box in Gaza copies of official documents, which proved their status as martyrs' families, so that they could receive their money.

584. On July 1, 2001, *Al-Hayat Al-Jadida* published an announcement signed by *al-Ansar* calling on the residents of the southern Gaza Strip to come and collect their due payments in *al-Ansar*'s offices in Gaza. Residents of the West Bank, as well as the northern Gaza Strip, were asked to arrive at the Arab Bank branch in which their account was managed in order to collect their funds.

585. The documents the martyrs' families from the West Bank had to provide included the martyr's identification card and his picture (if they had it), the beneficiary's identification card, a copy of the death certificate, and a copy of the birth certificate of the martyr's sons if they had them.

586. On its website, *al-Ansar* also identified its accounts with Arab Bank's Al-Rimal branch in Gaza. The website also expressed its goals explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn. Al-Ansar follows their path and shares with their families and their parents the grief, the burden and the hope.

587.    Arab Bank maintained multiple accounts for the Al-Ansar Society:

- 9600 -100541 – 211 (USD);
- 9600 -100541 – 510 (USD);
- 9600 -100541 – 511 (USD);
- 9600 -100541 – 512 (USD);
- 9600 -100541 – 513 (USD);
- 9600 -100541 – 570 (NIS);
- 9600 -100541 – 571 (NIS); and
- 9600 -100541 – 810 (USD).

588.    On its website, the *Shahid* Foundation was even more direct by publishing lists of Palestinian "martyrs" who received support from the foundation.

589.    Its lists were in some ways more detailed than the Saudi Committee's lists (both those which were published on the Saudi Committee's website and those which were sent to Arab Bank) and included the dates of the martyr's birth and death, as well as his organizational affiliation (Fatah, HAMAS, PIJ, and the PFLP) or a statement, according to which the "martyr" was allegedly a civilian, who was purportedly not involved with one of the terrorist organizations' activities.

590.    The *Shahid* Foundation's web site listed various beneficiaries:

- "Martyr #1" in the January 2002 list, Muhammad Abd al-Ghani Muhammad Abu Jamus, is listed as a member of HAMAS in Gaza. HAMAS' web site confirms that he was indeed affiliated with HAMAS. It also confirms his date of death. In addition, the Abu Jamus family received a martyr's payment from the Saudi Committee.

- "Martyr #154" on the March 2002 list, Muhammad Ahmad Hilis, is also listed as an Izz al-Din al-Qassam Brigades operative in Gaza / Al-Shuja'iya. HAMAS' website confirms this fact, as well as his date of death. His father received a martyr's payment from the Saudi Committee on June 6, 2002.

- "Martyr #153" on the same list, Bilal Fayez Mustafa Shehada, is also identified as an Izz al-Din al-Qassam Brigades operative. Bilal is a resident of Beit Hanun, who was killed along with Muhammad Ahmad Hilis on the same date and during the same attack. His father received a martyr's payment from the Saudi Committee on June 6, 2002.

591.    The *Shahid* Foundation, through *al-Ansar*, also paid numerous Fatah terrorists,

including those affiliated with AAMB, such as Abd al-Karim Umar Abu Na'isa, who committed

a terrorist attack in Afula, Israel in November 2001. Abu Na'isa's family received payments from

the *Shahid* Foundation, the Saudi Committee and the ALF.

592.    Arab Bank's branches played a central and important role in transferring money on

behalf of Iran – through the *Shahid* Foundation and *al-Ansar* society.

593.    The activities of *al-Ansar* were also the target of Israeli counter-terrorism measures

in two ways. First, *al-Ansar* was declared an "unlawful association" by Israel's Ministry of

Defense on October 25, 2003. Second, its account was targeted by the Israeli security forces when

they raided bank branches in Ramallah in 2004 (including Arab Bank). In fact, on its website, *al-

Ansar* publicly denounced these measures:

> Al-Ansar Charitable Society denounces and condemns the criminal, sinful attacks
> of insane piracy committed by the forces of the occupation against the Palestinian
> banks in the city of Ramallah, which robbed the banks' money that included, inter
> alia, the money of the martyrs who are sponsored by the society.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS
## IN VIOLATION OF 18 U.S.C. § 2333(d)

594.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs

as if fully set forth herein.

595.    Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C.

§ 2331.

596.    Plaintiffs injured in the Ben Yehuda Street Bombings of December 1, 2001, the

Karnei Shomron Pizzeria Bombing of February 16, 2002, the Mike's Place Bombing – Tel Aviv

of April 30, 2003, the Sheffield Club Bombing of May 7, 2002, the Jerusalem Bus Shooting of

November 4, 2001, the Jaffa Road Bus #14A Bombing of June 11, 2003, and the Ariel Shooting of October 27, 2002 assert claims under 18 U.S.C. § 2333(d) predicated on Arab Bank having aided and abetted HAMAS, PFLP and PIJ (all FTOs at the time of the respective attacks).

597.    Arab Bank provided substantial assistance to those FTOs by transferring significant sums of money to those organizations and their operatives and maintaining bank accounts for their organizations and senior operatives, knowing that the FTOs were so designated or knowing that they engaged in terrorism and knowing the severity of the wrongful acts committed by these organizations and their operatives.

598.    Arab Bank's acts were a substantial factor in causing those Plaintiffs' injuries, and those Plaintiffs' injuries were a foreseeable result of the significant sums of money Arab Bank provided to those FTOs, their leaders and operatives.

599.    Plaintiffs allege that Arab Bank aided and abetted those FTOs within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), §2b.

## SECOND CLAIM FOR RELIEF

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

600.    Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

601.    The extraordinary financial and administrative services that Arab Bank provided to the terrorists, their families, and HAMAS, Fatah/AAMB, PFLP, and PIJ, included serving as the

exclusive administrator of the Saudi Committee payments program knowing that its support would be used in preparation for, or in carrying out, numerous acts of international terrorism which caused direct injury to Plaintiffs.

602.     That knowing support was a substantial and foreseeable factor in causing Plaintiffs' injuries.

603.     As set forth more fully above, but for Arab Bank's substantial assistance, the funding of the Saudi Committee and *Shahid* Foundation payment programs for terrorists and the families of terrorists would have been substantially more difficult to implement.

604.     By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank committed acts of international terrorism and is liable pursuant to 18 U.S.C. § 2333(a) because its conduct involved violent acts or acts dangerous to human life that were a violation of the criminal laws of the United States, and in so doing Arab Bank's conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel and influence the policy of the Israeli and American governments by intimidation or coercion, and its conduct transcended national boundaries in terms of the means by which they were accomplished.

### THIRD CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

605.     Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

606.     By knowingly participating in the commission of violations of 18 U.S.C. § 2339B that have caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank committed acts of international terrorism and is liable pursuant to 18 U.S.C. § 2333(a) because its

conduct involved violent acts or acts dangerous to human life that were a violation of the criminal laws of the United States and in so doing Arab Bank's conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel and influence the policy of the Israeli and American governments by intimidation or coercion, and its conduct transcended national boundaries in terms of the means by which they were accomplished.

607.    Arab Bank knowingly provided HAMAS, Fatah/AAMB, PFLP, and PIJ with material support as it is defined in 18 U.S.C. § 2339A and in so doing its conduct was a substantial and foreseeable factor in causing Plaintiffs' injuries and thereby making it liable to the Plaintiffs under 18 U.S.C. § 2333(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Arab Bank and in favor of each Plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

(c)     Enter judgment against Arab Bank and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against Arab Bank and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: July 5, 2018
       Hackensack, NJ

OSEN LLC

By:    /s/ Gary M. Osen
        Gary M. Osen, Esq.
        Ari Ungar, Esq.
        Peter Raven-Hansen, Esq., Of Counsel
        Aaron Schlanger, Esq.
        2 University Plaza, Suite 402
        Hackensack, New Jersey 07601
        (201) 265-6400

        ZUCKERMAN SPAEDER LLP
        Shawn P. Naunton, Esq.
        485 Madison Avenue, 10th Floor
        New York, NY 10022
        (646) 746-8655

        TURNER & ASSOCIATES, P.A.
        C. Tab Turner, Esq.
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        (501) 791-2277

        KOHN, SWIFT & GRAF, P.C.
        Steven M. Steingard, Esq.
        Stephen H. Schwartz, Esq.
        Neil L. Glazer, Esq.
        1600 Market Street, Suite 2500
        Philadelphia, PA 19103
        (215) 238-1700

        *Attorneys for Plaintiffs*