UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------

AHARON MILLER, *et al.*,

                    Plaintiffs,

      - v. -                             1:18-CV-02192 (BMC)(PK)

ARAB BANK, PLC,

                    Defendant.

-------------------------------------------------------

NATHAN PAM, *et al.*,

                    Plaintiffs,

      - v. -                             1:18-CV-4670 (BMC)(PK)

ARAB BANK, PLC,

                    Defendant.

-------------------------------------------------------

**DEFENDANT ARAB BANK'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS THE *PAM* COMPLAINT AND *MILLER* FIRST AMENDED
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(2) AND FED. R. CIV. P. 12(B)(6)**

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020-1104
Phone:  (212) 335-4500
Fax:  (212) 335-4501

*Attorneys for Defendant Arab Bank plc*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................. 1

ALLEGATIONS ................................................. 4

STANDARDS OF REVIEW ................................................. 6

ARGUMENT ................................................. 7

I.    THE COMPLAINTS MUST BE DISMISSED FOR FAILURE TO STATE A
      CLAIM UPON WHICH RELIEF CAN BE GRANTED. ................................................. 7

      A.    The Plain And Unambiguous Statutory Text Of The ATA Controls This
            Analytic Exercise. ................................................. 7

      B.    Seventy-Two Plaintiffs Fail Plausibly To Allege Standing. ................................................. 9

            1.    Alien Plaintiffs Do Not Have Standing To Bring ATA Claims On
                  The Facts Of This Case. ................................................. 9

            2.    Seventy-Two Plaintiffs Fail To Assert Sufficient Factual Matter To
                  Support Their Standing To Bring Claims For Emotional Distress. ......... 10

      C.    Plaintiffs Fail To State A Claim For Primary Liability Under § 2333(a). ........... 12

            1.    Plaintiffs Fail Plausibly To Allege That The Bank Committed An
                  Act Of "International Terrorism." ................................................. 13

            2.    Plaintiffs Fail Plausibly To Allege That Bank Was A Factual Or
                  Proximate Cause Of Their Injuries. ................................................. 15

      D.    Plaintiffs Fail Adequately To Allege The Elements Of Their Aiding And
            Abetting Claims Against The Bank. ................................................. 18

II.   THE COMPLAINTS FAIL TO PROVIDE A SUFFICIENT BASIS FOR
      EXERCISING SPECIFIC JURISDICTION. ................................................. 21

CONCLUSION ................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)..................................................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................6

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1377 (2017)..............................................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................6

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*,
    137 S. Ct. 1773 (2017)................................................................................................7

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ...........................................................................17

*Burrage v. United States*,
    134 S. Ct. 881 (2014)..........................................................................................8, 16

*Consolidated Rail Corp. v. Gottshall*,
    114 S. Ct. 2396 (1994)..............................................................................................12

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)................................................................................................22

*Fields v. Twitter*,
    881 F.3d 739 (9th Cir. 2018) ....................................................................2, 13, 15, 16

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................4, 20, 21, 24

*Gonzalez v. Google, Inc.*,
    No. 16-CV-03282, 2018 WL 3872781 (N.D. Cal. Aug. 15, 2018) .........................17

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ......................................................................18, 19, 20

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992)............................................................................................13, 15

*Hussein v. Dahabshil Transfer Services Ltd.*,
    705 Fed. Appx. 40 (2d Cir. 2017) ..............................................................................2

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ............................................................................9, 14

*Krishanthi v. Rajaratnam*,
    No. 09-CV-5395, 2014 WL 4677175 (D.N.J. Sept. 19, 2014) ...............................................24

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d. Cir. 2013).................................................................................................25

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 571 (E.D.N.Y. 2005) ......................................................................................7

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)......................................................................... *passim*

*Linde v. Arab Bank, PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) ...............................................................5, 8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................10

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014).................................................................................6, 15

*Nassar v. Univ. of Tx. Sw.*,
    133 S. Ct. 2517 (2013)...........................................................................................16

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
    138 S. Ct. 617 (2018)...........................................................................................8

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ...........................................................................2, 8

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)................................................................................7

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).................................................................15, 16, 17

*Shatsky v. Palestine Liberation Org.*,
    No. 02-CV-2280, 2017 WL 2666111 (D.D.C. June 20, 2017)...........................17, 21

*Siegel v. HSBC Bank USA, N.A.*,
    No. 17-CV-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ...........................19

*SPV Osus Ltd. v. UBS AS*,
    882 F.3d 333 (2d Cir. 2018)...............................................................................24

*Stansell v. BGP, Inc.*,
    No. 09-CV-2501, 2011 WL 1296881 (M.D. Fl. Mar. 31, 2011) ...........................14

*Stutts v. De Dietrich Grp.*,
    No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) .............................................14

*In re Terrorist Attacks on Sept. 11, 2001*,
    295 F. Supp. 3d 416 (S.D.N.Y. 2018).............................................................................7, 24

*In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank)*,
    714 F.3d 118 (2d. Cir. 2013)........................................................................................16, 17

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ........................................................................................................22

*Waldman v. Palestinian Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 1438 (2018) ...................................2, 22

**Statutes**

18 U.S.C. § 2331 *et seq.*.................................................................................................. *passim*

Justice Against Sponsors of Terrorism Act ("JASATA"), Pub. L. No. 114-222
    (114th Cong.) (Sept. 28, 2016) ......................................................................................2, 18

**Rules**

Fed. R. Civ. P. 12(b)(2)...................................................................................................1, 7

Fed. R. Civ. P. 12(b)(6)...................................................................................................1, 6

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ...........................................................................9

Jesse Dukeminier & Robert Sitkoff, WILLS, TRUSTS, AND ESTATES (9th ed. 2013) ......................9

RESTATEMENT (SECOND) OF TORTS § 46 (1965)......................................................................11

Arab Bank plc ("Arab Bank" or "the Bank") respectfully submits this memorandum of law in support of its motion to dismiss the *Pam* Plaintiffs' Complaint ("*Pam* Compl.") and the *Miller* Plaintiffs' First Amended Complaint ("*Miller* FAC") (collectively "the Complaints") pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs are American and foreign nationals who seek to hold Arab Bank liable under § 2333 of the U.S. Anti-Terrorism Act ("ATA") as a primary and/or secondary actor for injuries resulting from 14 alleged acts of terrorism perpetrated in Israel and surrounding environs between November 4, 2001 and September 24, 2004 (the "14 Attacks"). But the terrorists responsible for committing the 14 Attacks are not defendants here, the Bank is. And the Bank played no role in those deplorable acts of violence. To the contrary, the Bank is recognized by the United States to be "a constructive partner ... in working to ***prevent*** terrorist financing" and a "leading participant in a number of regional forums on ... ***combatting*** the financing of terrorism."[1]

The Complaints borrow allegations from pleadings filed by Plaintiffs' relatives against the Bank dating back to 2004 in *Linde v. Arab Bank, PLC,* 1:04-CV-02799 (BMC) (PK) (the "*Linde* ATA Actions"). The Complaints do not explain why Plaintiffs waited ***14 years or more*** following the attacks at issue to bring this suit or why they did not join with their relatives in pursuing claims in the *Linde* ATA Actions. Plaintiffs' delay in bringing their claims is especially curious because, with few exceptions, they do not allege that they were present at the scene of one of the 14 Attacks, but rather claim "severe mental anguish and extreme emotional pain and suffering" as a result of

---

[1]     *See* Br. for the U.S. as *Amicus Curiae*, *Arab Bank, PLC v. Linde*, No. 12-1485 (May 23, 2014) (U.S.) ("U.S. Br."), at 20 (emphasis supplied), https://tinyurl.com/ycppxd4c (unless otherwise noted, October 4, 2018 is the date all websites cited herein were last visited).

an injury sustained over a decade ago by a victim-relative of one of the 14 Attacks (*e.g.*, *Miller* FAC ¶¶ 62, 72, 85; *Pam* Compl. ¶¶ 23-25).

Whatever the reason for Plaintiffs' delay, since the *Linde* ATA Actions were filed in 2004, there have been significant developments in the law governing the requirements for (i) pleading a *prima facie* basis for exercising personal jurisdiction over a foreign corporation; (ii) stating a claim for primary liability under § 2333(a) of the ATA; and (iii) stating a claim for secondary liability under § 2333(d)(2) of the ATA. These developments include the enactment of the Justice Against Sponsors of Terrorism Act ("JASTA") in September 2016, which created a limited cause of action for secondary liability under § 2333(d)(2); opinions issued by the Second Circuit, D.C. Circuit, and Ninth Circuit in 2017 and 2018 that establish clear and exacting standards for pleading (and proving) ATA civil claims that ***expressly reject*** reliance on legislative history and policy arguments regarding the "fungible" nature of money in interpreting and applying § 2333 (*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ("*Linde III*"), *Hussein v. Dahabshil Transfer Services Ltd.*, 705 Fed. Appx. 40 (2d Cir. 2017), *Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018), and *Owens v. BNP Paribas, S.A.,* 897 F.3d 266 (D.C. Cir. 2018)); and the Second Circuit's recent decision overturning an ATA judgment for want of personal jurisdiction over the defendants (*Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 328 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 1438 (2018)).

Faithful application of the plain language of the ATA and this new body of authority requires the Complaints to be dismissed for failing plausibly to allege essential elements of Plaintiffs' § 2333 claims. The Complaints are also subject to dismissal because they fail to assert sufficient factual matter to establish a jurisdictional nexus between the Bank's in-state conduct and

Plaintiffs' injuries arising from the 14 Attacks that occurred more than 5,500 miles away from the doors of this courthouse.

## PARTIES

### A.    Plaintiffs

Three Plaintiffs—Myriam Miller, Chana Aidel Miller, and Tova Miller—claim (*Miller* FAC ¶¶ 154-74) that they are U.S. citizens who suffered physical and emotional injuries as a result of a shooting perpetrated in the French Hill section of Jerusalem on November 4, 2001.  A fourth Plaintiff, Yitzhak Zachary, claims (*id.* ¶¶ 193, 199-202) that he is a U.S. citizen who suffered physical and emotional injuries as a result of a suicide bombing carried out at a gas station located in the Ariel settlement in the West Bank on October 27, 2002.

The remaining 72 *Pam* and *Miller* Plaintiffs, including six foreign nationals (*Miller* FAC ¶¶ 73-78), do not allege that they were present at the scene of any of the 14 Attacks but rather claim that they "suffered severe mental anguish and extreme emotional pain and suffering" as a result of the remote injuries sustained by a relative (parent, spouse, sibling, or child) who was present for, and directly injured as a result of, one of the 14 Attacks.

### B.    Arab Bank

Arab Bank is the "largest financial institution in Jordan, and one of the most important private banks in the Middle East."[2]  It plays a central role in maintaining regional stability.[3]  The Bank operates over 600 branches, across five continents, and is present in financial markets such as London, Dubai, Singapore, Geneva, Paris, Frankfurt, and Sydney.[4]  The Bank has distinguished

---

[2]     *See* Br. for the Hashemite Kingdom of Jordan as *Amicus Curiae*, *Arab Bank, PLC v. Linde*, No. 12-1485 (July 24, 2013) (U.S.)) ("Jordan Br.") at 9, 17-18, https://tinyurl.com/yat3prch.

[3]     *Id.* at 17-18.

[4]      Arab Bank, "*Our Profile*," https://tinyurl.com/y72njpf8.

itself for *decades* as a leading and highly decorated global financial institution; most recently, it was named "Best Bank in the Middle East" and "Best Bank in Jordan" by Global Finance, and the "Middle East's best bank for SMEs" by Euromoney.[5]

The Bank maintains a small U.S. presence in the form of a regulated federal agency that operates on Madison Avenue ("ABNY") and is mostly engaged in limited trade finance.  At the time of the attacks at issue, ABNY operated as a branch and processed approximately 500,000 automated, electronic funds transfers each year.  *Gill v. Arab Bank, PLC,* 893 F. Supp. 2d 542, 565 (E.D.N.Y. 2012).  Each of these transfers was screened against a comprehensive list of U.S.-designated terrorists and other suspected criminals maintained by the Office of Foreign Assets Control (the "OFAC List"), and was processed by computers without manual intervention.  *Id.* This routine and mechanistic processing of funds transfers is the cornerstone of correspondent banking—*over $1.5 trillion in such payments are cleared through New York every day*.[6]

## ALLEGATIONS

Plaintiffs allege that they were injured as a result of 14 terrorist attacks perpetrated by alleged agents of the Popular Front for the Liberation of Palestine ("PFLP"), Palestinian Islamic Jihad ("PIJ"), Hamas, Al Aqsa Martyrs Brigades ("AAMB"), Fatah, and/or the Palestine Liberation Organization ("PLO").  *See* Appendix A.  Plaintiffs name the terrorists responsible for committing 13 of these attacks; they fail to identify the person who committed the Neve Dekalim Mortar Attack of September 24, 2004.  *Id.*[7]

---

[5]     GLOBAL FINANCE, "*Global Finance Names The Best Banks In The Middle East 2018*," https://tinyurl.com/y7z3m225; EUROMONEY, "*Middle East's best bank for SMEs 2018: Arab Bank*," https://tinyurl.com/yaxnmfun.

[6]     *See* The Clearing House Interbank Payments System (CHIPS), *Annual Statistics From 1970 to 2017*, https://tinyurl.com/y7yabxf3.

[7]     In the *Linde* ATA Actions, this Court granted the Bank's post-verdict motion for judgment against the claims arising from the Neve Dekalim Mortar Attack of September 24, 2004 after concluding, as a

Arab Bank is not alleged to have directly participated in any of the 14 Attacks.  Instead, Plaintiffs claim that the Bank provided "material support" in the form of financial services to charitable "front organizations" and "leaders" affiliated with the organizations that allegedly claimed credit for perpetrating the 14 Attacks.  *See*, *e.g.*, *Mille*r FAC ¶¶ 315-593; *Pam* Compl. ¶¶ 155-303.  Plaintiffs also allege that the Bank processed funds transfers initiated by an organization known as the Saudi Committee, which was established in October 2000 "as a private charity registered with the Kingdom of Saudi Arabia," and was overseen by Saudi Arabia's late-Crown Prince Nayef Bin Abd al-Aziz Al Sa'ud.  *Miller* FAC ¶¶ 247-51.  Plaintiffs allege that the Saudi Committee "constituted a professional fundraising apparatus intended to subsidize the Second Intifada," and that it assisted in recruiting terrorists by offering an "insurance" payment to relatives of suicide bombers and captured terrorists.  *Id.* ¶¶ 291-301; *see also Pam* Compl. ¶¶ 102-54.  They also allege that the Bank "served as the exclusive administrator of the Saudi Committee's payment programs" by, *inter alia*, processing funds transfers initiated by the Saudi Committee from its bank in Riyadh to beneficiaries in the West Bank and Gaza with the alleged knowledge that recipients of those payments included relatives of terrorists.  *Ibid*.

Plaintiffs **do not allege** that the Bank provided a financial service to anyone involved in committing 12 of the 14 Attacks.  *See* Appendix B, Nos. 3-14; *see also* Appendices C-D.  With regard to the remaining attacks, Plaintiffs allege that a "planner" and "dispatcher" involved in the French Hill Shooting of November 4, 2001 received one funds transfer each from the Saudi Committee in the amount of $2,655.78 that was processed through Arab Bank **more than six**

---

matter of law, "that there was insufficient evidence to support the jury's finding that plaintiffs had proven that Hamas committed th[is] attack[ ] by a preponderance of the evidence."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015) ("*Linde II*").  The Complaints contain no new information to suggest that Plaintiffs—relatives of the *Linde* ATA Actions' plaintiffs—are any closer to identifying the perpetrators of this attack.  *See* Appendix B, No. 14.

*months prior to their attack*.  Appendix B, No. 1 nn.1-2.  The suicide bomber responsible for the Ben Yehuda Street Bombings of December 1, 2001 also allegedly received a funds transfer from the Saudi Committee in the amount of $2,655.78 that was processed through Arab Bank *more than seven months prior to his attack*.  *Id.*, No. 2 n.4.  The only other banking activity Plaintiffs attempt to link to the 14 Attacks are four discrete funds transfers *made primarily by the Saudi Committee* to *relatives* of alleged operatives involved in the French Hill Shooting, Ben Yehuda Street Bombings, Jerusalem Suicide Bombing, and Karnie Shmoron Pizzeria Bombing—transfers that *post-date* those attacks by many months.  *Id.*, Nos. 1-4 nn. 3, 5, 7 & 9.  These few transfers— which were produced in the *Linde* ATA Actions and are now incorporated by reference in the Complaints—were *not* routed through the United States.  *Id.*

## STANDARDS OF REVIEW

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).  The court may consider only well-pled factual allegations, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014), and must ignore "legal conclusions and threadbare recitals of the elements of a cause of action, supported by merely conclusory statements."  *Iqbal*, 556 U.S. at 678 (citation omitted).  A pleading that offers "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "naked assertion[s] devoid of 'further factual enhancement'" will not

do.  *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.

2013) (quoting *Iqbal*, 556 U.S. at 678) (other citations omitted).

      To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule

12(b)(2), "the plaintiff has the burden of making a *prima facie* showing that personal jurisdiction

over the defendant exists."  *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 424

(S.D.N.Y. 2018) (citation omitted).   Here too, "the court is neither required to draw argumentative

inferences in the plaintiff's favor, nor must it accept as true a legal conclusion couched as a factual

allegation."  *Id.*  (citations and internal quotation marks omitted).  In assessing the sufficiency of

well-pled allegations, the court is required to find sufficient factual matter to support the exercise

of specific jurisdiction over **each claim**, *i.e,* the mere fact that specific jurisdiction may exist over

claims arising from one of the 14 Attacks is alone insufficient to support the exercise of specific

jurisdiction over claims arising from a different attack.  *Bristol-Myers Squibb Co. v. Superior*

*Court of California, San Francisco County*, 137 S. Ct. 1773, 1781-82 (2017).

<u>**ARGUMENT**</u>

I.    **THE COMPLAINTS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

    A.    **The Plain And Unambiguous Statutory Text Of The ATA Controls This Analytic Exercise.**

In the *Linde* ATA Actions, the district court granted the Bank's initial motion to dismiss

plaintiffs' common law claims for emotional distress after concluding that the Bank's alleged

conduct was "too removed" from plaintiffs' injuries to sustain such claims, but denied the Bank's

motion to dismiss plaintiffs' statutory claims after concluding that they were consistent with

Congress' aim of "cut[ting] off the flow of money to terrorists at every point along the causal chain

of violence."  *Linde v. Arab Bank, PLC*, 384 F. Supp. 571, 590 (E.D.N.Y. 2005) ("*Linde I*")

(citation omitted).  The district court continued to reference this same "causal chain" language

drawn from legislative history in denying the Bank's subsequent dispositive motions in the *Linde* ATA Actions.  *See, e.g., Linde II*, 97 F. Supp. 3d at 326 (denying, in substantial part, the Bank's motion for judgment after concluding, *inter alia*, that requiring plaintiffs to prove "but for" causation would be inconsistent with "Congress' intent to impede terrorism by 'the imposition of liability at any point along the causal chain of terrorism.'  S. Rep. No. 102-342, at 22 (1992).").

Since those decisions were rendered, the Second Circuit, D.C. Circuit, and Ninth Circuit have held that it is ***improper*** for courts to rely on legislative history when interpreting and applying the plain and unambiguous text of the ATA:

- "We recognize that the ATA's legislative history references Congress's intent to authorize the 'imposition of liability at any point along the causal chain of terrorism,' including by 'interrupt[ing] or at least imperil[ing] the flow of money' to terrorist groups.  …  Nevertheless, ***legislative history cannot alter plain text that, as here, expressly defines the acts giving rise to liability***." *Linde III,* 97 F. Supp. 3d at 326 (emphasis supplied).

- "While legislative history may help discern the meaning of an otherwise ambiguous text … it may not be used show an intent at variance with the meaning of the text[.]  …  Nor is any reference to legislative history necessary when the meaning of a statute is clear enough on its face.  ***Section 2333 is not ambiguous, so no appeal to legislative history is necessary or helpful here***." *Owens*, 897 F.3d at 279 (emphasis supplied).

These decisions provide the proper interpretative guidance that must be followed here.  *Burrage v. United States*, 134 S. Ct. 881, 889 (2014) (concluding it is the role of the courts "to apply the statute as it is written—even if we think some other approach might 'accord with good policy.'" (citation omitted)); *see also Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 631-32 (2018) (holding where a statute is "unambiguous" a court's "inquiry begins with the statutory text, and ends there as well").

As demonstrated herein, the Complaints fail plausibly to plead the elements of liability required by the plain and unambiguous text of the ATA.

B.        **Seventy-Two Plaintiffs Fail Plausibly To Allege Standing.**

The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs may sue…."  18 U.S.C. § 2333(a).  Therefore, standing under the ATA has two basic requirements:  each Plaintiff must be (i) a U.S. national (or the estate, heir, or survivor of a U.S. national) who (ii) was injured by reason of an act of international terrorism.  18 U.S.C. §§ 2333(a), 2333(d)(2).  Here, 72 of the 76 Plaintiffs fail to satisfy these requirements.

1.        **Alien Plaintiffs Do Not Have Standing To Bring ATA Claims On The Facts Of This Case.**

Six Plaintiffs—Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz, and Oriella Braun—cannot satisfy the citizenship requirement for bringing an ATA claim. These Plaintiffs allege ***foreign citizenship*** (*Miller* FAC ¶¶ 73-78), and assert claims (*id.* ¶ 85) for "severe mental anguish and extreme emotional pain and suffering" arising from "cuts and bruises" sustained by a relative-national of the United States during a deplorable act of suicide terrorism committed in the West Bank on February 16, 2002.  The plain text of § 2333 requires the dismissal of these claims:   ***these Plaintiffs*** are neither nationals of the United States nor the estate representatives, heirs, or survivors of a national of the United States.  *See Linde III*, 882 F.3d at 319 ("The ATA affords a civil action for damages to United States nationals injured by act of international terrorism."); *see also* BLACK'S LAW DICTIONARY (10th ed. 2014) (a survivor is "[s]omeone who outlives another"); Jesse Dukeminier & Robert Sitkoff, WILLS, TRUSTS, AND ESTATES (9th ed. 2013) ("No living person has heirs.").  Permitting alien Plaintiffs to assert ATA claims for alleged emotional distress brought about by an alleged non-fatal injury suffered by a relative-national of the United States would improperly "bypass Congress' express limitations on liability under the [ATA]." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018) (affirming

dismissal of analogous claims brought against Arab Bank by aliens under the Alien Tort Statute).

Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz, and Oriella

Braun therefore lack standing to bring suit under the ATA and their claims must be dismissed.

> **2.      Seventy-Two Plaintiffs Fail To Assert Sufficient Factual Matter To Support Their Standing To Bring Claims For Emotional Distress.**

Seventy-two Plaintiffs, *i.e.*, all Plaintiffs other than Myriam Miller, Chana Aidel Miller,

Tova Miller, and Yitzhak Zachary, fail to plead standing to assert a clam for emotional distress.

The requirements for establishing standing were set out by the Supreme Court in *Lujan v.*

*Defenders of Wildlife*:

> The irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is *(a) concrete and particularized … and (b) actual or imminent, not conjectural or hypothetical*….   Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly…trace[able] to the challenged action of the defendant, and *not … th[e] result [of] the independent action of some third party not before the court*….   Third, it must be likely, as opposed to merely speculative, that the injury well be redressed by a favorable decision.

504 U.S. 555, 560-61 (1992) (other internal quotation marks omitted) (emphasis supplied).  Here,

the 72 Plaintiffs at issue have only alleged that they are ***related to*** someone injured by the terrorists

who committed the 14 Attacks and, in an entirely threadbare manner, that they "experienced severe

mental anguish and extreme emotional pain and suffering."  More is required.

By way of example, ***non-party*** Chana Friedman Edri (*Miller* FAC ¶¶ 63-71) allegedly

sustained physical and emotional distress injuries as a result of the pizzeria bombing of February

16, 2002.  With regard to her emotional distress injuries, Plaintiffs allege (*id.* ¶¶ 69-71) that

following the attack, Chana was "scared to leave her house," "became very anxious, fearful,

withdrawn, and prone to anger," "extremely self-conscious," and "underwent psychological

counselling and continues to experience severe psychological trauma."  ***But Chana is not a***

***Plaintiff in this action***; she filed her claims in 2005 along with her mother and siblings.[8]  Here, Chana's father—Reuven Friedman—brings suit ***more than 16 years*** after Chana was injured.  And in support of his claim he asserts only one conclusory allegation (*Miller* FAC ¶ 72):  "As a result of the attack, and the injuries Chana Friedman Edri sustained, Plaintiff Reuven Friedman has experienced severe mental anguish and extreme emotional pain and suffering."[9]  This same threadbare allegation is asserted by each of the 72 Plaintiffs claiming emotional distress resulting from injury to a relative.  *Miller* FAC ¶¶ 30, 48, 62, 72, 85, 103-09, 120-21, 146-47, 187, 203; *Pam* Compl. ¶¶ 11-13, 18-25, 35-43, 49, 54-62, 66-70.

More is required to plead a claim for emotional distress.  "It is only where [emotional distress] is extreme that liability arises[;] … [t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  RESTATEMENT (SECOND) OF TORTS § 46, cmt. j (1965).  When, as here, an emotional distress claim is based on injury to another, the law is particularly circumspect.  To state such a claim the plaintiff is normally required to allege, *inter alia*, that he or she witnessed an injury to a close relative, or that their knowledge of such an injury was acquired shortly after it occurred.  *See, e.g., id.,* cmt. l.  Additional factors considered include, but are not limited to, the duration and intensity of the plaintiff's emotional distress, whether the plaintiff suffered illness or other bodily harm as result of their emotional distress, and whether the plaintiff's emotional distress adversely impacted their quality of life or ability to earn a living.  *See id.*, cmts. j-k.

---

[8]      *See* Compl. ¶¶ 142-54, *Coulter v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y. filed Jan. 21, 2005) (*Coulter* ECF No. 1).

[9]      In support of her emotional distress claims, Chana's mother alleged (*Coulter* Compl. ¶¶ 148-52) that she received a phone call from her son on the night of the attack informing her of the bombing, she rushed to the scene of the attack and was unable to find Chana and believed her to be dead based on initial reports, and that she was unable to work for two months following the attack.  Chana's father, Plaintiff Reuven Friedman, is not mentioned in the allegations set forth in *Coulter*.

Here, 72 of the 76 Plaintiffs **waited 14 years or longer** to bring their claims, and have done

so after choosing not to participate in the *Linde* ATA Actions along with the very relatives whose

injuries they now invoke as the basis of their cause of action.  These 72 Plaintiffs do not allege that

they were present at the scene of one the 14 Attacks, that they witnessed a relative being injured

in one of the 14 Attacks, details about the nature or duration of their alleged emotional distress,

whether their emotional distress produced a bodily injury, or any other factual matter that would

support an inference that they have, in fact, sustained a compensable emotional distress injury.[10]

Instead, these 72 Plaintiffs allege only "naked assertions" that are patently insufficient to satisfy

the applicable pleading requirements.  *Supra* at I.A.  Nor have these Plaintiffs fairly alleged that

their alleged emotional distress is fairly traceable to the Bank's conduct.  *See infra* at I.C.2 & I.D.

### C.     Plaintiffs Fail To State A Claim For Primary Liability Under § 2333(a).

Primary liability under the ATA is established in § 2333(a), which reads as follows:

> Any national of the United States injured in his or her person, property, or business
> by reason of an act of international terrorism, or his or her estate, survivors, or heirs,
> may sue therefor in any appropriate district court of the United States and shall
> recover threefold the damages he or she sustains and the cost of the suit, including
> attorney's fees.

18 U.S.C. § 2333(a).  In order to state such a claim, Plaintiffs must plausibly allege that the Bank

engaged in conduct that satisfies each element of the statutory definition of an act of "international

terrorism."  *Linde III*, 882 F.3d at 326, 332.  If this prerequisite is met, the "by reason of" language

Congress wrote into § 2333(a) requires Plaintiffs to also credibly allege that the Bank's act of

---

[10]     *See, e.g., Consolidated Rail Corp. v. Gottshall*, 114 S. Ct. 2396, 2406-07 (1994) (discussing the "[t]hree major limiting tests" imposed by courts on plaintiffs seeking to assert emotional distress claims: (1) "physical impact" (requiring a contemporaneous physical impact (no matter how slight) or injury brought about by the defendant's conduct; (2) "zone of danger" (limiting recovery to plaintiffs placed in "immediate risk of physical harm"); and (3) "relative bystander" (limiting recovery to plaintiffs who have suffered **severe** emotional distress resulted from witnessing (or learning contemporaneously about) an injury to a close relative); *see also id.,* 114 S. Ct. at 2405 (noting that "pain and suffering" traditionally refers to "sensations stemming directly from a physical injury or condition." (citation omitted)).

"international terrorism" was a "but for" and direct cause of their injuries. *Fields*, 881 F.3d at 744-46 (citing, *inter alia*, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) and *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1377, 1390 (2017)). The Complaints fail to satisfy these three separate requirements.

### 1. Plaintiffs Fail Plausibly To Allege That The Bank Committed An Act Of "International Terrorism."

In order to plead the act of "international terrorism" element of a primary liability claim under the ATA, the Complaints must contain sufficient factual matter to support a reasonable inference that **the Bank** engaged in activities that:

(A) **[1]** involve violent acts or acts dangerous to human life that are **[2]** a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) **[3]** appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) **[4]** occur primarily outside the territorial jurisdiction of the United States.

18 U.S.C. § 2331(1)(A)-(C). The Complaints, however, assert sufficient factual matter to support a reasonable inference that terrorists—***and not the Bank***—engaged in conduct that meets the requirements of this four-part definition.[11]

Whether suicide bombings and mass shootings committed by terrorist groups qualify as acts of "international terrorism" is not, however, in dispute with regard to this claim. The relevant question is whether the commercial banking services at issue—including automated, electronic

---

[11]     *See, e.g., Miller* FAC ¶ 332 ("Hamas is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel.  It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people."); *Pam* Compl. ¶¶ 281-82 ("PIJ is … primarily [a] radical Islamist terrorist organization[ ] committed to the globalization of Islam through violent 'jihad,' or holy war.  PIJ is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.").

funds transfers and account services—qualify as acts of "international terrorism."  And with regard to that question, "*[t]he plain language of the ATA compels the conclusion* that, by engaging in commercial banking activity, [financial institutions are] not involved in 'violent acts or acts dangerous to human life.'  Nor [are] their actions designed to coerce civilians or government entities as required under § 2331."  *Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 WL 1867060, at *2-4 (E.D.N.Y. June 30, 2006) (emphasis supplied); *Linde III*, 882 F.3d at 326-27 ("The provision of [financial services to a FTO] in violation of § 2339B can certainly satisfy [one] part of the statutory definition.  But, to qualify as international terrorism, a defendant's act must also involve violence or endanger human life.…  Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government.").

While the Second Circuit has acknowledged that the provision of some forms of material support may qualify as acts of "international terrorism," it indicated that such cases will be truly exceptional, *e.g.*, "a person who voluntarily acts as a suicide bomber for Hamas in Israel."  *Id.*, 882 F.3d at 326 (noting that the "suicide bombing is unquestionably a violent act whose apparent intent is to intimidate civilians or to influence governments").  By contrast, the Supreme Court has recognized that the processing of funds transfers, as the Bank is alleged to have done here, "is an entirely mechanical function [that] occurs without human intervention in the proverbial 'blink of an eye,'" and that "the speed and volume of these transactions are such that individual supervision is simply not a systemic reality."  *Jesner*, 138 S. Ct. at 1395 (internal quotation marks and citation omitted).  Much more is required for Plaintiffs to plead that the Bank committed an act of "international terrorism."  *See, e.g., Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881 (M.D. Fl. Mar. 31, 2011) (dismissing ATA primary liability claims after concluding that corporate defendant's payment of funds to a U.S.-designated foreign terrorist organization in connection

with its oil exploration business "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)"); *see also Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014) (rejecting, in the context of the Alien Tort Statute, "the plausibility of a large international corporation intending … [to assist] the Saddam Hussein regime's torture and abuse of Iraqi persons.").

In this case, the Complaints contain no well-pled allegations to support an inference that the Bank's financial services constitute acts of "international terrorism" akin to suicide bombings. Plaintiffs' primary liability claims must, therefore, be dismissed.

### 2. Plaintiffs Fail Plausibly To Allege That Bank Was A Factual Or Proximate Cause Of Their Injuries.

As noted *supra* at I.A, in light of recent and controlling precedent, this Court must look no further than the text of § 2333(a) in discerning the elements of liability that Plaintiffs are required to plead with sufficient particularity in order to state their primary liability claims.  And when engaged in that analytic exercise, this Court must now find that § 2333(a)'s "by reason of" language requires Plaintiffs plausibly to allege—as they have not—that the Bank's conduct was the "but for" and direct cause of their injuries.  Relying on Supreme Court and Second Circuit precedent, the Ninth Circuit recently explained why this is so:

> [W]e assume that because Congress has used "the same words"—"by reason of"— in the ATA as it used previously in the Sherman, Clayton, and Racketeer Influenced and Corrupt Organizations (RICO) Acts, ***Congress intended these words to "have the same meaning that courts had already given them" in those contexts***.

*Fields*, 881 F.3d at 744 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)) (emphasis supplied).  Notably, in *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013), the Second Circuit also relied on *Holmes* and quoted it for the proposition that the statutory phrase "by reason of" "'***require[s] a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well***.'"  *See also id.*, 708 F.3d at 91-92 (holding that, with

-15-

respect to "by reason of" proximate causation, "'the central question is whether the alleged violation *led directly* to the plaintiff's injuries.'" (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis supplied)); *Burrage*, 134 S. Ct. at 889 (holding that "the phrase, 'by reason of,' requires *at least* a showing of 'but for' causation" (citation omitted) (emphasis supplied)).

In order to plead "but for" causation, Plaintiffs must plausibly allege that the 14 Attacks "'would not have occurred' in the absence of—that is, but for—the [Bank's] conduct." *Nassar v. Univ. of Tx. Sw.*, 133 S. Ct. 2517, 2525 (2013); *see also Burrage*, 134 S. Ct. at 888, 892 (a "nonessential contributing role" is not a "but for" cause); *Rothstein*, 708 F.3d at 97 (affirming dismissal of ATA claims for lack of causation where plaintiffs did "not allege that if UBS had not transferred U.S. currency to Iran, Iran . . . would not have funded the attacks in which the plaintiffs were injured."). But nowhere in the Complaints do Plaintiffs assert allegations sufficient to support a reasonable inference that the deranged suicide terrorists and mass murderers who committed the 14 Attacks would not have done so absent the Bank's alleged provision of financial services. *See* Appendices A-B. This deficiency is fatal to Plaintiffs' primary liability claims.

Dismissal is also required because the Complaints fail to plead proximate causation. Here "the fact of fungibility does not modify the causal requirement imposed by the ATA's 'by reason of' element. A plaintiff must show *at least some direct relationship* between the injuries that he or she suffered and the defendant's acts to being a successful ATA claim." *Fields,* 881 F.3d at 746, 749 (affirming dismissal of ATA claims for failure to plead "some direct relation" between Twitter's alleged provision of social media account services to ISIS, and an attack carried out by ISIS) (emphasis supplied); *accord In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118, 124 (2d Cir. 2013) ("*Al Rajhi Bank*") (affirming dismissal of ATA claims for failure

to plead "that the money allegedly donated by the . . . defendants to the purported [Al Qaeda front] charities actually was transferred to Al Qaeda *and aided in the September 11, 2001 attacks*." (emphasis supplied)); and *Rothstein,* 708 F.3d at 97 (affirming dismissal of claims where plaintiffs failed to credibly allege a direct connection "between the cash transferred by UBS to Iran *and the terrorist attacks* by Hizbollah and Hamas that injured plaintiffs." (emphasis supplied)).  Applying these standards, an ATA case brought against Google for allegedly sharing advertising revenue with ISIS was recently dismissed where plaintiffs failed plausibly to allege that the revenue at issue was used in the commission of the ISIS attack that caused plaintiffs' injuries.  *Gonzalez v. Google, Inc.*, No. 16-CV-03282, 2018 WL 3872781, at *16 (N.D. Cal. Aug. 15, 2018).

The Complaints fail to plead any direct connection between the Bank's conduct and the 14 Attacks.  Plaintiffs allege that the Bank processed less than a handful of funds transfers initiated by the Saudi Committee for the benefit of three individuals involved in committing two of the 14 Attacks, but these alleged transfers were remote in time from the attacks and there is no credible allegation that they played a direct role in their commission.  *See* <u>Appendix B</u>.[12]  Similarly unavailing are Plaintiffs' allegations that relatives of individuals involved in carrying out four of the 14 Attacks received funds transfers from the Saudi Committee *after* the relevant attacks occurred.  *Compare* <u>Appendix B</u>, Nos. 1-4 *with Shatsky v. Palestine Liberation Org.*, No. 02-CV-2280, 2017 WL 2666111, at *10 (D.D.C. June 20, 2017) (payments to "martyr" families post-dating a terrorist attack cannot have caused that attack).  The Complaints otherwise do not attempt to establish any credible direct link between the Bank's financial services and the 14 Attacks.  *See*

---

[12]      *N.b.,* in *Al Rajhi Bank*, 714 F.3d at 125, the Second Circuit quoted with approval from *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003):  "'*Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service*.'"  (Emphasis supplied).

<u>Appendices B-D</u>.  Plaintiffs' failure plausibly to plead proximate causation is a third reason why their primary liability claims must be dismissed.

### D.   Plaintiffs Fail Adequately To Allege The Elements Of Their Aiding And Abetting Claims Against The Bank.

Few courts have interpreted § 2333(d)(2) since its adoption in 2016.  This provision creates limited cause of action under the ATA for secondary liability and reads as follows:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization … as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2).  Therefore, secondary liability claims brought under § 2333(d)(2) have two basic requirements:  (1) the plaintiff's injuries must have been caused by an act of international terrorism "committed, planned, or authorized" by an organization that was then-designated ***as an FTO***; and (2) the defendant must have "knowingly" provided "substantial assistance" to (or "conspired with") "the person who committed"—to be distinguished from "the person who … planned[ ] or authorized"—the act of international terrorism that caused the plaintiff's injuries.

In assessing the sufficiency of Plaintiffs' allegations to satisfy these pleading requirements, courts are instructed to follow the "legal framework" set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  JASTA, Pub. Law No. 114-222, at § 2(a)(5) (114th Cong.) (Sept. 28, 2016).  In applying these standards to cases brought against banks, a central consideration is whether there are plausible allegations to support a reasonable inference that the defendant, "in providing [financial] services, was generally aware that it was thereby playing a role in [an FTO's] violent or life-endangering activities."  *Linde III*, 882 F.3d at 329.  Allegations that a bank knowingly provided financial services to an FTO are not alone sufficient to state a claim.  *Id.*

*Linde III* accords with the approach taken in *Halberstam* and acknowledges the realities of the international payments system.  As noted *supra* at 4 and 14, funds transfers totaling more than $1.5 trillion are processed through the New York banking system "in the proverbial 'blink of an eye'" *every day*.  For these reasons, ATA claims brought against global financial institutions by victims of hotel bombings in Amman, Jordan, were recently dismissed at the pleading stage for failing to "show in a plausible, non-conclusory fashion that the defendants knowingly aided or abetted [an FTO's] violent or life-endangering activities."  *Siegel v. HSBC Bank USA, N.A.*, No. 17-CV-6593, 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018).  The *Siegel* court too recognized the need for caution in the context of § 2333(d)(2) suits against global financial institutions:

> Because money is fungible and because the international banking system depends on cooperation among financial institutions across borders, it is particularly important to focus with care in cases like this on each of the necessary elements to a finding that [§ 2333(d)] has been violated.

*Siegel*, 2018 WL 3611967, at *5.  Similar caution is required here, where the Bank is recognized by the United States to be a "constructive partner … in working to prevent terrorist financing."  U.S. Br. at 20.

*Halberstam* cautiously extended the reach of liability to a secondary actor on the compelling and readily distinguishable facts of that case—the defendant was a partner in a two-person team that engaged in a years-long joint criminal enterprise involving concealing and laundering the proceeds of armed robberies.[13]  In finding it appropriate to impose liability for the

---

[13]    The *Halberstam* court found it compelling that the defendant (Linda Hamilton) was closely linked to the principal (Bernard Welch):  (1) they were housemates and partners for the five years of their criminal enterprise; (2) substantial quantities of stolen loot and the tools used in the commission of their crimes, including a smelting furnace used to melt stolen gold and silver into bars, were kept in their shared residence; (3) they each played a separate but "indisputably important" role in ensuring the success of the overall criminal venture—Welch, the pilferer, Hamilton, the launderer; and (4) ***"the principal business in which Welch and Hamilton engaged while at home" was the disposal of stolen loot***.  *Halberstam*, 705 F.2d at 486-88 (emphasis supplied).

fatal consequences of an armed robbery on the defendant, who was engaged in the non-violent side of the "business," the *Halberstam* court likened her knowledge and conduct to those of a get-away driver who takes part in a well-planned bank robbery.  *See Halberstam*, 705 F.2d at 477-78.

By contrast, the Complaints fail to assert sufficient factual matter to support an inference that the Bank and a "person who committed" any of the 14 Attacks maintained a synergetic relationship remotely analogous to the one shared between defendant and the principal in *Halberstam.*  When viewed most favorably to the Plaintiffs, the Bank is alleged to have processed automated, electronic funds transfers to four individuals who allegedly participated in three of the 14 Attacks "committed, planned, or authorized" by a then-designated FTO.  *See* Appendix B, Nos. 1-2 & 10.  And there are no non-conclusory allegations that the Bank was "well aware" that it was assuming a "role" in the commission of the 14 Attacks, specifically, or acts of "international terrorism," more generally, when it processed those transfers.  *Halberstam*, 765 F.2d at 477; *see also Gill*, 893 F. Supp. 2d at 563-65 (finding that, with the exception of a few errant transfers out of millions processed, the individuals and entities receiving financial services from the Bank were not U.S.-designated terrorists during the relevant time period), *accord* Appendices B-D.

Nor do the Complaints assert sufficient factual matter to support a reasonable inference that the Bank's alleged conduct proximately caused Plaintiffs' injuries, *i.e.*, that the financial services provided by the Bank were a "substantial factor" in causing any of the 14 Attacks, and that Plaintiffs' injuries were a "reasonably foreseeable result" of the Bank's provision of those services.  *Halberstam*, 765 F.2d at 477.  The transfers initiated by the Saudi Committee for the benefit of individuals allegedly involved in two of the 14 Attacks were processed well before those attacks and at a time when none of those individuals were identified as terrorists.  *See* Appendices B-D.  And it was certainly not "reasonably foreseeable" that processing funds transfers initiated

by the Saudi Committee to *relatives of deceased terrorists* would cause terrorist attacks that had already occurred; nor could such post-mortem transfers have been a "substantial factor" in the chain of causation that led to those tragic events.  Appendix B, Nos. 1-4; *see also supra* at 17 (*citing Shatsky*, 2017 WL 2666111, at *10).  Furthermore, the Saudi Committee and the Shahid Foundation (*see* Appendix B, Nos. 1-4) *were not designated FTOs at the time of the 14 Attacks and are not alleged by Plaintiffs to be "the person who committed" the 14 Attacks*.  *See* Appendices B-D.  No allegation concerning the Bank's alleged provision of financial services to these entities—or to any of the similarly-situated alleged "front organizations" or individuals who, while named in the Complaints, were not designated as FTOs by the U.S. during the relevant time period and/or are not the alleged "person who committed" one of the 14 Attacks—can support a claim for secondary liability under § 2333(d)(2)'s plain language.  Appendix C, App. 7 nn.11-12.

For these reasons, the Complaints fail plausibly to allege that the Bank aided and abetted the "person[(s)] who committed" any of the 14 Attacks.

## II.     THE COMPLAINTS FAIL TO PROVIDE A SUFFICIENT BASIS FOR EXERCISING SPECIFIC JURISDICTION.

"The law of personal jurisdiction—when a court can exercise jurisdiction over an out-of-state defendant—has changed significantly in recent years."[14]  New restrictions have been imposed on a court's ability to exercise jurisdiction that support the dismissal of Plaintiffs' claims against the Bank, which is neither "at home" in this forum, nor are its alleged limited contacts—consisting of automated, electronic processing of funds transfers—substantially related to Plaintiffs' claims.

As an initial matter, it appears undisputed that *Daimler AG v. Bauman*, 134 S. Ct. 746, 750 (2014) bars this Court from exercising its general (or all-purpose) jurisdiction over the Bank, which

---

[14]     Erwin Chemerinsky, *Chemerinsky: SCOTUS takes on when state courts can assert jurisdiction over out-of-state parties*, ABA JOURNAL (Apr. 25, 2017), https://tinyurl.com/ycalxsko.

is based in Jordan and conducts the majority of its business on foreign soil.[15]  In the absence of general jurisdiction, Plaintiffs are required plausibly to allege a *prima facie* basis for this Court to exercise specific jurisdiction over the Bank on the facts of this case.  They have not done so.

Plaintiffs served their Complaints on the Bank in New York in compliance with § 2334's nationwide service of process provision.  This fact, however, does not obviate the need for this Court to inquire into "whether jurisdiction over [an ATA defendant] may be exercised consistent with the Constitution."  *Waldman*, 835 F.3d at 328 (vacating a $655.5 ATA jury verdict after concluding that there was no adequate basis to exercise jurisdiction over the defendants ***despite the fact that they were both properly served within the United States***).

For jurisdiction to be exercised consistent with due process, "'the defendant's suit-related conduct must create a substantial connection with the forum State.'  The relationship between the defendant and the forum 'must arise out of contacts that the "defendant *himself*" creates with the forum.'"  *Waldman*, 835 F.3d at 335 (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)).  In other words, "[t]he exercise of specific jurisdiction" depends on the existence of well-pled allegations of "in-state activity [by the defendant] that '*gave rise to the episode-in-suit*.'"  *Waldman*, 835 F.3d at 331 (citation omitted).

Plaintiffs' allegations concerning the Bank's in-state conduct are that it (1) "clear[ed] tens of millions of dollars in New York on behalf of the Saudi Committee … in Saudi currency and covert[ed] it to U.S. dollars"; (2) "process[ed] *at least* $2,000,000 for the Holy Land Foundation in Texas to at least four Hamas entities in the Palestinian Territories that held accounts at Arab

---

[15]     *See* U.S. Br. at 20 (Arab Bank "is the single largest financial entity in Jordan" and "is also by market share the largest bank in the West Bank and Gaza, and it plays an important role in financing public debt there."); Jordan Br. at 17-18 (the Bank's "market capitalization has represented 20% to 33% of the total market capitalization of the Amman Stock Exchange in recent years;" [i]n the Palestinian Territories … Arab Bank maintains branches that provide some of the only safe, sophisticated, and transparent financial infrastructure available—a measure of stability in a turbulent region.").

Bank"; (3) "process[ed] at least $32,000,000 for Hamas entities in the Palestinian Territories that held accounts at Arab Bank"; and (4) "process[ed] at least several million dollars through New York for senior Hamas leaders."  *See Miller* FAC ¶ 8(a)-(d); *see similarly Pam* Compl. ¶ 5, 151, 154, 180, 186, 190, 194, 200, 204, 235, 266.

As an initial matter, Plaintiffs' allegations concerning the Bank's in-state conduct relate only to financial services allegedly provided to Hamas and the Saudi Committee—***entities that had no alleged role in four of the 14 Attacks***.  See Appendix B, Nos. 6-7, 9, 13.  Accordingly, the Complaints provide no adequate basis for this Court to exercise specific jurisdiction over the Bank for claims arising from these four attacks.  *See supra* at 7.

With regard to the four attacks that involve an alleged payment made by the Saudi Committee, the Bank's processing of those funds transfers is patently deficient to establish the requisite jurisdictional nexus:  these funds transfers were not routed through ABNY.  Appendix B, Nos. 1-4.[16]  Moreover, even if these electronic funds transfers transited through New York—and they did not—it is not reasonable to infer that Plaintiffs' claims arose from the Bank's processing of those transfers, which either significantly pre-date or post-date these four attacks.  *Id.*

Similarly inadequate are Plaintiffs' claims concerning ABNY's alleged processing of funds transfers involving alleged Hamas-linked individuals and entities—allegations relevant to seven of the 14 Attacks.  *See* Appendix B, Nos. 2, 5, 8, 10-12 & 14.  The Complaints fail plausibly to allege that Plaintiffs' claims arose from these alleged services, *i.e.*, they nowhere assert non-conclusory allegations to support an inference that any of these transfers was substantially related to the 14 Attacks.  *See* Appendices B-D.  For example, Plaintiffs allege (*Miller* FAC ¶ 396; *Pam*

---

[16]     As Plaintiffs know well, Arab Bank's branch in Jordan obtained U.S. dollars from ABNY, which it then used to process U.S.-dollar denominated payments outside of the U.S., including the Saudi Committee transfers at issue.  *See* Appendix B, Nos. 1-4 nn. 1-5 & 8.

Compl. ¶ 264) that ABNY processed funds transfers involving a purported Hamas "leader" named Abbas al-Sayed, who confessed to "us[ing] funds sent to his Arab Bank account from abroad to buy weapons."  Yet, like nearly all of the alleged bad actors named in the Complaints, al-Sayed was not listed on the OFAC List used by banks in the U.S., including ABNY, to screen and block funds transfers with perceptible indicia of terror financing.  *See* Appendices C-D.  More to the point, Plaintiffs allege that al-Sayed was involved in an attack that is ***not at issue in this case***—a bombing carried out in Netanya on March 27, 2002.  *Miller* FAC ¶ 295; *Pam* Compl. ¶ 264.

Allegations of this stripe clearly do not, and cannot, confer specific jurisdiction over the Bank on the facts of this case since there is no allegation that al-Sayed was involved in the 14 Attacks, or that Plaintiffs' injuries arose from funds transfers that al-Sayed received or withdrawals that he made.  *See In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 3d at 424-25 (dismissing ATA claims for lack of specific jurisdiction over foreign banks that held foreign accounts and processed funds transfers for Al Qaeda "front" charities and operatives); *SPV Osus Ltd. v. UBS AS*, 882 F.3d 333, 344-35 (2d Cir. 2018) (affirming dismissal of claims for lack of specific jurisdiction over foreign banks engaged in limited suit-related "communications and transfers of funds" within New York).  *Cf. Krishanthi v. Rajaratnam*, No. 09-CV-5395, 2014 WL 4677175, at *5 (D.N.J. Sept. 19, 2014) (dismissing ATA claims for lack of specific jurisdiction absent credible allegations that defendant's in-state fundraising for FTO caused attacks at issue).

These pleading deficiencies distinguish this case from *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 166, 169 (2d Cir. 2013), where plaintiffs plausibly alleged that a Lebanese bank knowingly processed funds transfers through its New York correspondent accounts "with the specific purpose and intention of enabling and assisting Hizbollah to carry out terrorist attacks … ***including the attacks that caused plaintiffs' injuries***."  First Am. Compl., *Licci v. American*

*Express Bank,* No. 08-07253(GBD) (S.D.N.Y. Jan. 22, 2009) (emphasis supplied).   No such

plausible factual allegations regarding Arab Bank's in-state activities are alleged here.

<u>**CONCLUSION**</u>

The Complaints fail both to establish a *prima facie* basis for this Court to exercise its

personal jurisdiction over the Bank on the facts of this case, and to assert sufficient factual matter

to state a claim for relief under § 2333(a) or § 2333(d)(2) of the ATA.   For these reasons, Plaintiffs'

claims should be dismissed in their entirety.

Dated: October 5, 2018

Respectfully submitted,

**DLA Piper LLP (US)**

By:     <u>/s/ *Jonathan D. Siegfried*</u>
Jonathan D. Siegfried
Douglas W. Mateyaschuk II
1251 Avenue of the Americas
jonathan.siegfried@dlapiper.com
douglas.mateyaschuk@dlapiper.com
New York, NY 10020-1104
(212) 335-4500

*Counsel for Arab Bank plc*

Of Counsel:
Rana Bahri
Isha Mehmood