UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— :
                                                          :
AHARON MILLER, et al.                                     :
                                                          :
                          Plaintiffs,                     :      Case No. 18-cv-2192 (BMC)(PK)
                                                          :
        -against-                                         :
                                                          :
ARAB BANK, PLC,                                           :
                                                          :
                                                          :
                          Defendant.                      :
———————————————————————— :
                                                          :
NATHAN PAM, et al.                                        :
                                                          :
                          Plaintiffs,                     :      Case No. 18-cv-4670 (BMC)(PK)
                                                          :
        -against-                                         :
                                                          :
ARAB BANK, PLC,                                           :
                                                          :
                                                          :
                          Defendant.                      :
———————————————————————— :


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT ARAB BANK'S CONSOLIDATED MOTION TO DISMISS THE *MILLER* FIRST AMENDED COMPLAINT AND THE *PAM* COMPLAINT**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

I.    PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d).... 3

   A.    Plaintiffs Plausibly Allege that FTOs and Their Agents Committed 12 of the 14 Attacks.............................................................................................................. 3

   B.    Plaintiffs Plausibly Allege That the Bank Was Generally Aware of Its Role.................. 4

   C.    The Complaints Plausibly Allege Proximate Causation Under § 2333(d)(2). ............... 7

II.   THE COMPLAINTS PLAUSIBLY ALLEGE THE ELEMENTS OF PRIMARY LIABILITY WITH THE CHARACTER OF SECONDARY LIABILITY, AS WELL AS PROXIMATE CAUSE. ................................................................................................. 9

   A.    Whether the Bank's Activities Involve Acts That Are Violent or Dangerous to Human Life and Appear to Have the Purposes Listed in § 2331(1)(B) Pose Questions of Fact That Should Not Be Decided as a Matter of Law. ........................................................ 9

   B.    The Complaints Plausibly Satisfy Controlling *Rothstein* Standard of Causation for Primary Liability. .................................................................................................. 12

III.  PLAINTIFFS HAVE STANDING TO SUE UNDER THE ATA. ................................. 18

   A.    The Complaints Sufficiently Plead Emotional Injuries................................................. 18

   B.    Family Members of a U.S. National Injured in a Terrorist Attack Have Standing to Sue Under the ATA.................................................................................................... 19

IV.   ARAB BANK IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION. ................. 21

CONCLUSION.............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abecassis v. Wyatt*,
    7 F. Supp. 3d 668 (S.D. Tex. 2014) ........................................................................... 11

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
    368 F.3d 1174 (9th Cir. 2004) ................................................................................... 25

*Alcohol Mon. Sys. Inc. v. Actsoft, Inc.*,
    682 F. Supp. 2d 1237 (D. Colo. 2010) ...................................................................... 25

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017) ........................................................................................ 14, 15

*Beer v. Islamic Republic of Iran*,
    574 F. Supp. 2d 1 (D.D.C. 2008) .............................................................................. 18

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    310 F. Supp. 2d 172 (D.D.C. 2004) .......................................................................... 19

*Boim v. Holy Land Found. for Relief and Dev.*,
    549 F.3d 685 (7th Cir. 2008) ......................................................................... 9, 11, 13

*Burrage v. United States*,
    571 U.S. 204 (2014) .................................................................................................. 12

*Doe v. City of New York*,
    2018 WL 3824133 (E.D.N.Y. Aug. 9, 2018) ............................................................ 19

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
    304 F. Supp. 2d 232 (D.R.I. 2004) ........................................................................... 20

*Fields v. Twitter*,
    881 F.3d 739 (9th Cir. 2018) ........................................................................ 12, 14, 15

*Freeman v. HSBC Holdings PLC*,
    2018 WL 3616845 (E.D.N.Y. July 27, 2018) ............................................... 22, 23, 25

*Gonzales v. Google, Inc.*,
    No. 16-CV-03282, 2018 WL 3872781 (N.D. Cal. Aug. 15, 2018) ........................... 15

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................ passim

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................................................... 17

*Holmes v. Sec. Inv'r Corp.*,
   503 U.S. 258 (1992) ............................................................................................... 14, 15

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,
   Nos. 08–01916–MD, 08–20641–CIV–KAM, 2015 WL 71562 (S.D. Fla. Jan. 6, 2015) ......... 13

*In re Heiser*,
   466 F. Supp. 2d 229 (D.D.C. 2006) ........................................................................... 18

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018) ............................................................................................... 9

*John v. Whole Foods Mkt. Grp., Inc.*,
   858 F.3d 732 (2d Cir. 2017) ..................................................................................... 19

*Knox v. Pal. Lib. Org.*,
   442 F. Supp. 2d 62 (S.D.N.Y. 2006) ......................................................................... 19

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir.), *cert. denied*, 540 U.S. 1012 (2003) ..................................... 14

*Licci v. Am. Express Bank Ltd.*,
   704 F. Supp. 2d 403 (S.D.N.Y. 2010) ....................................................................... 24

*Licci v. Leb. Can. Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ..................................................................................... 21

*Licci v. Leb. Can. Bank, SAL*,
   984 N.E.2d 893 (N.Y. 2012) ..................................................................................... 21

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) .................................................................. 19, 20

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ............................................................................. passim

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) .................................................................. passim

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................. 18

*Miller Pipeline Corp. v. Brit. Gas plc*,
   901 F. Supp. 1416 (S.D. Ind. 1995) .......................................................................... 25

*Noble Sec., Inc. v. MIZ Eng'g, Ltd.*,
   611 F. Supp. 2d 513 (E.D. Va. 2009) ........................................................................ 25

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ............................................................... 17

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ............................................................... 17

*Paroline v. United States*,
    572 U.S. 434 (2014) ............................................................................... 13

*Rothstein v UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ......................................................... 2, 13, 14

*Shatsky v. Palestine Lib. Org.*,
    No. 02-2280 (RJL), 2017 WL 2666111 (D.D.C. Jun. 20, 2017) ............ 16

*Siegel v. HSBC Bank USA, N.A.*,
    No. 17-CV-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ............ 6, 7

*Stansell v. BGP, Inc.*,
    No. 09-CV-2501, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ............ 11

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ............................................ 22, 23, 24

*Stutts v. De Dietrich Grp.*,
    No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ............ 11

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) ................................................................... 8

*Univ. of Tx. Sw. Med. Ctr. v. Nasser*,
    570 U.S. 338 (2013) ............................................................................... 12

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ........................................................................... 25

*Waldman v. Palestine Lib. Org.*,
    835 F.3d 317 (2d Cir. 2016) ............................................................. 1, 25

*WC Cap. Mgmt., LLC v. UBS Sec., LLC*,
    711 F.3d 322 (2d Cir. 2013) ................................................................. 19

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................................................... 20

*Weiss v. Nat'l Westminster Bank Plc*,
    768 F.3d 202 (2d Cir. 2014) ................................................................... 5

*Weiss v. Nat'l Westminster Bank, PLC*,
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) ....................................................... 22, 23, 24

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 11

**<u>Statutes</u>**

1 U.S.C. § 1 ............................................................................................................. 3

18 U.S.C. § 2331(1) ................................................................................................ 2

18 U.S.C. § 2331(1)(A) ......................................................................................... 10

18 U.S.C. § 2331(3) ................................................................................................ 3

18 U.S.C. § 2333(a) ............................................................................................ 1, 2

18 U.S.C. § 2333(d) ............................................................................................ 1, 2

18 U.S.C. § 2333(d)(1) ........................................................................................... 3

18 U.S.C. § 2333(d)(2) ..................................................................................... 3, 4, 7

18 U.S.C. § 2339A ................................................................................................. 1

18 U.S.C. § 2339B ................................................................................................. 1

Justice Against Sponsors of Terrorism Act § 2(a)(6),
    Pub. L. 114-222, 130 Stat 852 (2016) ............................................................. 17, 21

Justice Against Sponsors of Terrorism Act § 2(a)(7),
    Pub. L. 114-222, 130 Stat 852 (2016) ................................................................... 17

Justice Against Sponsors of Terrorism Act § 2(b),
    Pub. L. 114-222, 130 Stat 852 (2016) ............................................................. 17, 21

National Defense Authorization Act for FY 2013,
    Pub. L. No. 112-239, § 1251(c), 126 Stat. 2017 (2013) ........................................... 2

**<u>Other Authorities</u>**

Restatement (Second) of Torts § 46 (1965) ............................................................. 18

# INTRODUCTION[1]

The Plaintiffs in *Miller v. Arab Bank, PLC* and *Pam v. Arab Bank, PLC* respectfully submit this joint memorandum of law in opposition to Arab Bank's consolidated motion to dismiss their complaints (together, the "Complaints")[2]. Plaintiffs assert claims under 18 U.S.C. § 2333(d) against the Bank for aiding and abetting the U.S.-designated Foreign Terrorist Organizations ("FTOs") HAMAS, PFLP, PIJ, and AAMB, which committed, planned, and authorized 12 of the 14 attacks alleged in the Complaints. They also assert primary liability claims against the Bank under 18 U.S.C. § 2333(a) for providing material support to these FTOs in violation of 18 U.S.C. § 2339B, and for providing material support in violation of 18 U.S.C. § 2339A for all 14 terrorist attacks, including the two attacks committed by AAMB before it was a designated terrorist organization.

The Bank largely rehashes arguments that this Court and others have repeatedly rejected, but also argues that a "new body" of controlling legal authority, Def. mem. at 2, mandates a different result here, namely that: (1) the Justice Against Sponsors of Terrorism Act ("JASTA") requires dismissal of Plaintiffs' § 2333(d) claim; (2) this Circuit's decision in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) requires this Court to find as a matter of law that Plaintiffs cannot meet the definitional requirements for primary liability; (3) a Ninth Circuit decision requires dismissal of the primary liability claims for failure to plead proximate causation; (4) *Waldman v. Palestine Lib. Org.*, 835 F.3d 317 (2d Cir. 2016) requires dismissal on personal jurisdiction grounds; and (5) Plaintiffs lack standing because they have not sufficiently pled, or

---

[1]     Plaintiffs presume the Court is familiar with the allegations relating to HAMAS, which were the subject of the trial in *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (BMC)(PK). Allegations relating to PIJ, PFLP and AAMB, which were not presented in the trial, are set forth in the *Miller* Amended Complaint, ¶¶ 315-22, 500-33 (PIJ); 534-61 (AAMB); 562-78 (PFLP).

[2]     For efficiency purposes, where similar allegations are contained in both Complaints, Plaintiffs cite only the *Miller* Amended Complaint. Plaintiffs will, of course, supply the corresponding *Pam* citations at the Court's request.

are not entitled to plead, their emotional injuries.

But JASTA directly supports Plaintiffs' § 2333(d) claim for aiding and abetting the attacks committed, planned, or authorized by FTOs. *Linde* expressly held that § 2331(1)'s definitional requirements do not apply to a § 2333(d) claim, that whether the Bank was generally aware of its role in aiding and abetting is a question of fact for the jury, and that under a JASTA theory of liability, an FTO's act of international terrorism can satisfy both the proximate cause standard and but-for causation standard (though the latter is not required by the ATA). *Linde* likewise held that whether Arab Bank's material support for FTOs satisfied § 2331(1)'s definitional requirements for a § 2333(a) primary liability claim poses a fact question for the jury. It declined to reach the question of causation for such liability, leaving undisturbed the "substantial factor" standard established in this Circuit by *Rothstein v UBS AG*, 708 F.3d 82 (2d Cir. 2013). That standard was not overruled by another circuit's refusal to follow *Rothstein* and its adoption, instead, of a dubious "higher" "direct-relationship" causation standard. Moreover, ATA cases have consistently found emotional injury allegations such as those pled here sufficient for pleading purposes. Finally, *Waldman* rejected specific jurisdiction over defendant Palestinian Authority because it directed no activity at the United States related to the claims against it. That case has no application to the Bank's processing of millions of dollars by its former New York branch for FTOs and their leaders, agents, and "charities," as well as other terrorists.

The Court should therefore deny the Bank's motion in its entirety.[3]

---

[3]     Although the Bank repeatedly (and in boldface) criticizes Plaintiffs for waiting 14 years to bring their claims (*e.g.*, Def. mem. at 1), Plaintiffs' claims are all timely. Nat'l Def. Auth. Act. FY 2013, Pub. L. No. 112-239, § 1251(c), 126 Stat 1623, (Jan. 2, 2013). Plaintiffs explained the settlement-related reasons for the timing of the filing of their claims in connection with the Bank's ill-conceived and summarily rejected effort to recall the *Linde* mandate. *See* Pls.' Opp., *Linde v. Arab Bank, PLC*, No. 16-2119, at 3-8 (2d Cir. June 13, 2018), ECF No. 252-1.

I.      **PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d).**

A.      **Plaintiffs Plausibly Allege that FTOs and Their Agents Committed 12 of the 14 Attacks.**

JASTA imposes civil liability for attacks "committed, planned, or authorized" by an FTO on "any person who aids and abets, by knowingly providing substantial assistance . . . the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). The Bank does not dispute that the Complaints plausibly allege the FTOs' role in 12 of the attacks but argues that Plaintiffs must allege that the Bank aided and abetted the "*individuals* who allegedly participated in" these attacks, apparently construing "person" to mean the triggermen or suicide bombers. Def. mem. at 20 (emphasis added). But § 2333(d)(1) expressly defines "person" more broadly than even the ATA's own broad definition of person set forth in § 2331(3) ("any individual or entity capable of holding a legal or beneficial interest in property") by incorporating, instead, the more expansive definition in 1 U.S.C. § 1 ("'person' . . . include[s] corporations, companies, *associations*, firms, partnerships, *societies*, and joint stock companies, *as well as individuals*") (emphasis added).

The "person who committed" the attack is therefore not limited to the individual triggerman or suicide bomber, but clearly includes any FTO or *other* individual or entity that committed the attack. Congress's definitional choice recognizes that acts of international terrorism are often committed with the assistance and participation of a variety of actors, including FTOs, other designated terrorist groups (e.g., Specially Designated Global Terrorists ("SDGTs")), criminal organizations, and other entities and individuals. Thus, while § 2333(d) limits a JASTA cause of action to individuals injured in terrorist attacks "committed, planned, or authorized" by an FTO, liability attaches to a defendant that aids and abets (or conspires with) any "person" – broadly defined under 1 U.S.C. § 1 – who commits the attack. That "person" can be an organization,

association or person and need not be a member or operative of the FTO that "committed, planned, or authorized" the attack.[4]

## B.     Plaintiffs Plausibly Allege That the Bank Was Generally Aware of Its Role.

Realizing that the Complaints sufficiently plead the foregoing elements of § 2333(d)(2) liability, the Bank focuses on whether these allegations show that it was "generally aware" of its role "as part of an overall illegal or tortious activity," as *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) requires. Def. mem. at 18-19. The Bank strains to marshal evidence from *Halberstam* that it implies establishes a high threshold for such awareness, *id.* 19-20 & n.13, and notes that *Linde* found that "knowledge of the [materially supported] organization's connection to terrorism" is not enough. *Linde,* 882 F.3d at 330. But the Second Circuit's application of *Halberstam* does not raise the *Halberstam* standard dictated by Congress—it simply acknowledges that it is possible (if unlikely) that one *could* provide assistance to a terrorist organization in a manner that does not suggest awareness of one's role in the terrorist or terrorist organization's "overall illegal or tortious activity." For example, a defendant could knowingly drive someone the defendant knows to be a terrorist to a bus stop – thereby knowingly providing material support to a terrorist – but not be aware that the terrorist intends to blow up the bus rather than *ride* the bus. The Bank's labored manipulation of *Halberstam* only underscores the fact-bound nature of this general awareness inquiry, which is why *Linde* held that it poses a fact question for the jury and should not be decided as a matter of law. *Linde*, 882 F.3d at 330 (citing cases emphasizing that the tortfeasor's state of mind should ordinarily be decided by the jury, not as a matter of law).

Further, neither *Halberstam* nor *Linde* suggests that the Bank must be aware of the specific

---

[4]    For example, the Haqqani Network ("HQ") is a designated FTO. A plaintiff injured in an attack planned by HQ but carried out by the Taliban (which works hand-in-glove with HN) has standing to bring suit under § 2333(d) against a person or entity that aided and abetted the Taliban even though the Taliban is not a designated FTO.

attacks at issue. *Linde*, 882 F.3d at 329. In *Halberstam*, the D.C. Circuit Court of Appeals upheld a finding that defendant Linda Hamilton, who acted as "banker, bookkeeper, recordkeeper, and secretary" to her boyfriend, was liable for an *unplanned* murder he committed while burglarizing a house. 705 F.2d at 487. The *Halberstam* court held that her banker role demonstrated that she "had a general awareness of her role in a continuing criminal enterprise," even though she allegedly only knew that enterprise involved "some type of personal property crime at night." *Id.* at 488. She was unaware of the murder, but, because it was foreseeable, was liable for it. *Id.*[5]

Moreover, on the facts here, *Linde* squarely rebuts the Bank's general awareness challenge. *Linde* found that the martyrs' lists identifying families of terrorists and, in some cases, "martyr operation" as the cause of death, *see Miller* Amended Complaint ("AC") ¶¶ 272-284, "could have alerted the bank that the transfers being requested therein were payments for suicide bombings," evidencing general awareness. *Linde*, 882 F.3d at 330 (citing *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 304 (E.D.N.Y. 2015) (discussing such lists)). As this Court previously found, the lists of payees for "martyrdom operations"—"which defendant's regional compliance manager acknowledged means 'suicide operation'"—provided sufficient evidence that Arab Bank "knew or was deliberately indifferent to its clients' association with terrorism." *Linde*, 97 F. Supp. 3d at 307, 335. Just as in *Halberstam*, given the martyrs' lists, "it defies credulity that [the Bank] did not know that something illegal was afoot." 705 F.2d at 486.

---

[5]     Further, the Second Circuit in *Linde* required general awareness of "a 'role' in terrorist *activities*." 882 F.3d at 329 (emphasis added) (citing *Halberstam*, 705 F.2d at 477). The Court of Appeals previously ruled that soliciting funds for HAMAS itself constitutes "terrorist activity." *Weiss v. Nat'l Westminster Bank Plc*, 768 F.3d 202, 209 (2d Cir. 2014) ("[I]f [SDGT] Interpal solicited funds for Hamas, then *Interpal engaged in terrorist activity* within the meaning of Section 212(a)(3)(B) of the Immigration and Nationality Act.") (emphasis added). Here, the record contains substantial evidence that Arab Bank was aware that its SDGT customer was collecting and dispersing funds for HAMAS, which is, *by definition*, a "terrorist activity." The allegations of the Bank's knowledge alone suffice to raise a material question of fact as to whether it had the requisite state of mind for § 2333(d) aiding and abetting liability. Thus, as in *Linde*, "[t]he possibility of liability on that theory would have to be pursued at [trial]." 882 F.3d at 329.

As in *Halberstam*, the Bank's general awareness is also shown by its performance of "services in an unusual way under unusual circumstances for a long period of time." *Id*. at 487. Here, such services included administering the universal terrorist death and dismemberment insurance scheme, AC ¶¶ 261-96, and making over-the-counter cash "martyr" and prisoners' payments to non-customers identified by martyrs' lists, a process that its own London compliance officer admitted was extraordinary and improper. *Linde*, 97 F. Supp. 3d at 305 ("We would never in a million years have dealt with a payment order such as this.").

Finally, the *Halberstam* court declared that "[t]he particularly offensive nature of an underlying offense might also factor in . . . the 'state of mind' of the defendant." 705 F.2d at 484 n.13 (discussing the "state of mind" factor for substantial assistance on reasoning that applies with the same logical force to the Bank's awareness of its general role). Given the frequency of the terrorist attacks in the Bank's own backyard (23,000 attacks causing 8,000 casualties and deaths, AC ¶ 218), their notoriety (many publicly celebrated by the FTOs that committed, planned, or authorized them, AC ¶¶ 463-64), and their horrific nature (deploying suicide bombers using packed nails, bolts, and ball bearings to maim, as well as kill, innocent civilians, and systematically shooting and killing schoolchildren, AC ¶¶ 9, 148-150, 221), it is highly plausible that the Bank was aware of the role it played funding the terrorism committed by its notorious FTO customers.

Ignoring its earlier insistence that the Court must "reject reliance on . . . policy arguments regarding the 'fungible' nature of money in interpreting and applying § 2333," Def. mem. at 2, a few pages later the Bank urges "caution" in applying § 2333(d)'s elements "'[b]ecause money is fungible and because the international banking system depends on cooperation among financial institutions across borders . . . .'" Def. mem. at 19 (quoting *Siegel v. HSBC Bank USA, N.A*., No. 17-CV-6593, 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018)). In *Siegel*, however, defendants

maintained correspondent banking accounts for al-Rajhi Bank in Saudi Arabia. Al Rajhi allegedly funded terrorists responsible for the attacks at issue but the complaint did "not allege any direct relationship with the terrorist organizations that were responsible for the . . . [a]ttack." *Id*. at *4. In other words, the *Siegel* plaintiffs sought to extend ATA liability to the defendants in that case for their willingness to maintain accounts and process funds transfers, not for terrorists, but for a bank that they allegedly knew *posed a risk* of processing funds transfers for terrorists. Here, the Complaints do not depend on the allegation that Arab Bank acted as a correspondent bank for *another* bank that posed a risk of aiding and abetting terrorism. Instead, the Complaints allege that Arab Bank, through its New York branch, knowingly helped fund accounts that *it itself* held knowingly and directly for FTO leaders, agents, and "charities" in the Palestinian Territories, and that the Bank engaged in the decidedly uncommon non-commercial administration of the death and dismemberment insurance plan for families of Palestinian terrorists, as recounted above.

## C.   The Complaints Plausibly Allege Proximate Causation Under § 2333(d)(2).

After invoking *Halberstam* and *Linde* regarding the general awareness element of § 2333(d)(2) aiding and abetting liability, the Bank ignores these cases in analyzing proximate causation. But aiding and abetting liability is inherently secondary; it consists of providing substantial assistance to a principal tortfeasor who proximately causes the injury. Thus, the first element of such liability listed by *Halberstam* is that "*the party whom the defendant aids* must perform a wrongful act that *causes* an injury." 705 F.2d at 477 (emphasis added). "[O]n a theory of aiding and abetting liability," the plausible allegations here, like the evidence in *Linde*, show that "there can be no question that Hamas [and other FTO] acts of terrorism satisfy both the proximate and but-for causation standards." *Linde*, 882 F.3d at 332.

When the principal tortfeasor proximately causes the injury, the Court's analysis turns to the "relationship between the act of international terrorism and the secondary actor's alleged

supportive conduct," *Linde* 882 F.3d at 331, and whether the act was reasonably foreseeable. *Halberstam*, 705 F.2d at 483, 484 ("a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it").[6] The Bank therefore makes a half-hearted effort to argue that Plaintiffs' allegations do not show that the conduct was *supportive enough*, Def. mem. at 20-21 – another quintessentially fact-bound question inappropriate for decision as a matter of law.[7] Moreover, multiple factors that the fact-finder must weigh to determine whether assistance is substantial, *see Halberstam*, 705 F.2d at 483-84, support the plausibility of Plaintiffs' allegations:

- the horrific nature of the primary tort, *id.* at 484 n.13 ("a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences");
- the amount of the support, AC ¶¶ 8, 264, 301, 339-439;
- the Bank's presence in the middle of the communities in which, and at the time when, numerous attacks took place, AC ¶¶ 1 n.2, 227, 308, 314;
- the Bank's direct role as personal banker to FTO account holders, AC ¶¶ 6-8, 12, 328, 343, 351, 353, 361-64, 438, 445, 471, 476, 489, 498, 507-33, 552-61, 566-78, *et al.*;
- the duration of the Bank's material support for FTOs and for families of terrorists, which extended from at least 2000 to 2007, AC ¶¶ 301, 441-42; and
- the Bank's knowledge that it was interacting with (and supporting) FTOs and their agents, as well as families of terrorists, responsible for the wave of terrorist attacks, AC ¶¶ 309, 339-445, 497-99, 500-14, 532-33.

In any case, "[d]isputed facts pertinent to these factors and the weight to assign such facts are not matters that can be determined as a matter of law from the record in this case." *Linde*, 882 F.3d at 330. That is equally true from the allegations in this case based on the same facts and the same defendant.

---

[6]     The Bank erroneously asserts that *Halberstam* articulates a "substantial factor" standard. Def. mem. at 20 (citing 705 F.2d at 477). That standard is not delineated in *Halberstam*.

[7]     The Bank also rehashes arguments based on the "OFAC-only" argument that the FTO "charities" for which the Bank processed funds were not FTOs at the time, ignoring plausible allegations that they were notorious fronts for FTOs. AC ¶¶ 443-65, 472-499, 505-578. *See generally Linde*, 97 F. Supp. 3d at 301-304, 332-35; *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011). This Court previously rejected the contention that this argument could justify the dismissal of claims as a matter of law.

## II. THE COMPLAINTS PLAUSIBLY ALLEGE THE ELEMENTS OF PRIMARY LIABILITY WITH THE CHARACTER OF SECONDARY LIABILITY, AS WELL AS PROXIMATE CAUSE.

The Bank also asserts that the Complaints do not plausibly allege that the Bank's acts satisfy the § 2331(1)(A) & (B) definitional requirements for § 2333(a) "primary liability . . . with the character of secondary liability," *see Boim v. Holy Land Found. for Relief and Dev.* ("*Boim III*"), 549 F.3d 685, 691 (7th Cir. 2008) (en banc), or that the Bank "was a 'but for' and direct cause of their injuries" under that theory. Def. mem. at 12-18. The Bank misreads *Linde* to hold that a bank's provision of material support can never satisfy those definitional requirements. 882 F.3d at 326. *Linde* never reached the question of causation for primary liability. *Rothstein's* substantial factor standard is therefore still good law, as is its determination that a "but for allegation" is not necessary (whether or not sufficient) to meet this Circuit's causation standard.

### A. Whether the Bank's Activities Involve Acts That Are Violent or Dangerous to Human Life and Appear to Have the Purposes Listed in § 2331(1)(B) Pose Questions of Fact That Should Not Be Decided as a Matter of Law.

The Bank asserts that, with respect to § 2331(1)'s definitional requirements, "the relevant question is whether the commercial banking services at issue – including automated, electronic funds transfers and account services – qualify as acts of 'international terrorism,'" and then emphasizes that "'entirely mechanical function[s]'" that occur in the "'blink of an eye,'" fail to satisfy that standard. Def. mem. at 13-14 (internal quotes from *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018)). This argument sanitizes and mischaracterizes the activities which the Bank's actual conduct allegedly involved and ignores *Linde*'s holding.

Although the Bank's former New York branch engaged in extensive electronic funds transfers on behalf of HAMAS and other terrorists,[8] its branches in the Palestinian Territories dealt

---

[8]      Even as to purely "mechanical" transfers, the Financial Crimes Enforcement Network found that the Bank, aware of "the heightened risk of illicit activity," failed to investigate and cleared funds for originators or beneficiaries

personally, and often face-to-face, with FTO leaders, agents, and "charities" for which the Bank held accounts. Opening those accounts, obtaining signature cards and identifications, and checking identifications during personalized account transactions were neither mechanical nor instantaneous activities. Furthermore, administering the extraordinary terrorist death and dismemberment insurance plan required not only the identification of families by terrorist act (in a significant number of cases, by "martyrdom operation"), but also involved practices that, as noted above, a Bank compliance officer in London acknowledged he would never allow in "a million years." *Linde*, 97 F. Supp. 3d at 314.

The Second Circuit held only that "the provision of material support to a terrorist organization does not *invariably* equate to an act of international terrorism," not that it *never* can. *Linde*, 882 F.3d at 326 (emphasis added). Thus, the court "conclude[d] *only* that providing *routine* financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to . . . *compel* a finding that as a matter of law, the services were violent or life-endangering acts that appear to be intended to intimidate or coerce civilians or to influence or affect governments." 882 F.3d at 327 (emphasis added).[9] The Complaints, however, plausibly allege activities that are far from *routine* under any reasonable banking standard. *Linde* held that whether those practices qualify as an "act of international terrorism" raises questions of fact for a jury to decide." *Id*.

---

that were later designated specially designated terrorists, SDGTs, and FTOs without undertaking lookbacks to identify "uncovered originators and beneficiaries with possible ties to the designated entities . . . ." AC ¶¶ 211-12.

[9]    Section 2331(1)(A) defines international terrorism as "activities that involve violent acts or acts dangerous to human life . . ." not as activities that *are* themselves violent or dangerous to human life. Congress's addition of this degree of separation is consistent with the availability of predicate crimes under § 2331(1)(A) (activities that violate criminal laws of the United States or of any State) that are not themselves violent or life-endangering, such as material support, 18 U.S.C. §§ 2339A-2339C, financial transactions with state sponsors of terrorism, 18 U.S.C. § 2332d, and harboring or concealing terrorists, 18 U.S.C. § 2339, as well as a large number of state crimes, such as identity fraud.

*Boim III* also makes clear that where a defendant provides material support to a terrorist organization, knowing its "aims and activities" and knowing that the support would "enable" it "to kill or wound, or try to kill, or conspire to kill more people," that support "would 'appear to be intended'" to have the objectives listed in § 2331(1)(B). 549 F.3d at 693-94. Moreover, *Boim III* recognized that deliberate indifference, in which "one knows there is a substantial probability that the [supported] organization engages in terrorism but one does not care," qualifies as knowledge under § 2333(a). *Id.* at 693. One can reasonably infer, from the Bank's knowledge (AC ¶¶ 283, 291, 293, 309, 310, 368, 597, 601, 606) of the high probability that its FTO leaders, operatives, and "charities" customers engaged in terrorism to coerce and intimidate a civilian population or affect the conduct of a government, AC ¶ 222, that by providing those customers with substantial assistance the Bank had the same apparent intent. *See Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 676 (S.D. Tex. 2014); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010)[10]

The Complaints thus plausibly allege both the Bank's knowing performance of extraordinary, non-routine practices supporting FTOs and families of terrorists, and the appearance of intent sufficient to create a question of fact which should not be decided on a motion to dismiss.

---

[10] The handful of cases the Bank cites for its argument that, contrary to *Linde*, this Court may decide the Bank's apparent intent as a matter of law, provide no support. First, the Bank cites *Stutts v. De Dietrich Grp.*, *which did not even involve a terrorist attack*. No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006). The *Stutts* court found that the "Bank Defendants" exhibited no apparent intent because the "sole allegation of conduct by the Bank Defendants" was that they *legally* "issued letters of credit in favor of" other defendants. Those other defendants then sold chemicals to Iraq, which used them to manufacture the weapons that injured the plaintiff soldiers and contractors when U.S. and allied forces detonated them during disposal efforts after the invasion of Iraq. *Id.* at *2. Second, *Stansell v. BGP, Inc.*, relied on allegations of the defendant's *subjective* innocent intent to decide the objective question of apparent intent under § 2331(1)(A). No. 09-CV-2501, 2011 WL 1296881, at *10 (M.D. Fla. Mar. 31, 2011). *See Abecassis*, 7 F. Supp. 3d at 676 ("[T]he [*Stansell*] court relied on the subjective intent of the defendants as pled by the plaintiffs."). Even a subjective intent test would not benefit Arab Bank here. The Bank's Annual Reports endorsed and encouraged Arab efforts to "sacrifice the lives and offer the money needed for their self-defence and for the liberation of their sacred places and all their occupied territories," AC ¶ 227, to which end the Bank contributed by making its employees donate 5% of their salary to the Palestinian cause and for Palestinians injured during the Second Intifada. AC ¶¶ 231-238. Those actions exhibit a patent intent "to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327.

11

B.     **The Complaints Plausibly Satisfy Controlling *Rothstein* Standard of Causation for Primary Liability.**

Although the Bank claims that "recent and controlling precedent" now requires Plaintiffs to plead that the Bank's activities were the "'but for' and direct cause of their injuries," Def. mem. at 15, the "controlling precedent" it cites are a Ninth Circuit opinion *rejecting* this Circuit's controlling causation standard, and an out-of-circuit district court decision that does not address but-for causation.[11]

**1. Causation in Fact.** The Bank again rounds up the usual suspects to press its but-for argument, citing *Burrage v. United States*, 571 U.S. 204 (2014) and *Univ. of Tx. Sw. Med. Ctr. v. Nasser*, 570 U.S. 338 (2013), along with *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), which *specifically declined* to address but for causation, *id.* at 744 n.4. This Court has rejected this argument repeatedly. *See Linde*, 97 F. Supp. 3d at 323 (reviewing the Court's rejections of the Bank's several attempts). *Burrage* itself states that "but-for" causation is just "one of the traditional background principles" against which Congress legislates, applicable "[w]here there is no textual or contextual indication to the contrary . . . ." 571 U.S. at 212, 214. A contrary contextual indication exists "when multiple sufficient causes independently, but concurrently, produce a result." *Id.* at 214. *See also Linde*, 97 F. Supp. 3d at 323 ("*Nassar* and *Burrage* did not change the controlling law applicable here because in those cases, the Supreme Court was interpreting different statutes that involved different contexts and even used different language to establish their respective causation elements.").

In *Boim III*, the Seventh Circuit explained at length why the multiple sufficient cause

---

[11]     This Circuit's *Linde* decision does not help the Bank, because, after finding that there can be no question that HAMAS's acts of terrorism satisfy both the proximate and any but-for causation standards for JASTA adding and abetting liability, the Court expressly declined to reach the issue of proximate cause for ATA primary liability claims. 882 F.3d at 332 ("we do not further consider the bank's challenges as to . . . the causation standard"). *Linde* thus left standing the standard set out in *Rothstein*.

exception applies with particular force to material support claims under the ATA and concluded that requiring but-for causation in ATA material support cases would leave a wrong without a remedy, 549 F.3d at 695-98. That holding harmonizes with the Supreme Court's explanation of the reason for the multi-cause exception set forth in *Paroline v. United States*, 572 U.S. 434, 452 (2014): "it would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm." *See also Linde*, 97 F. Supp. 3d at 325 (quoting *Paroline*, 572 U.S. at 452).

Thus, this Court's conclusion in *Linde* remains as true today as it was in 2015: "The Supreme Court's cases [*Nassar* and *Burrage*] have nothing to do with the ATA and are distinguishable on their facts. The fact remains that no court has expressly held that the ATA's civil remedy requires a showing of but-for causation. And in the only Court of Appeals decision to actually decide the issue [*Boim III*], Judge Posner set forth a detailed and compelling explanation of why it does not." *Linde*, 97 F. Supp. 3d at 327-28. *See also In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, Nos. 08–01916–MD, 08–20641–CIV–KAM, 2015 WL 71562, at *7 (S.D. Fla. Jan. 6, 2015) ("Neither *Nassar* nor *Burrage* mandate reconsideration of [a prior ruling rejecting "but-for" causation]."). As the Court previously held, therefore, the Bank's material financial support for terrorism easily satisfies the ATA causation standard, even though other actors also contributed to Plaintiffs' injuries. *See, e.g.*, AC ¶¶ 8, 264, 441-42.

*Rothstein* is not to the contrary. In *Rothstein*, plaintiffs argued that defendant's provision of currency to Iran violated U.S. criminal law, and thus they should be entitled to a finding of *per se* liability and that proximate cause "should be presumed." *Rothstein*, 708 F.3d at 96. The Second Circuit disagreed, holding that plaintiffs were relying on a case "discussing not proximate cause but 'cause-in-fact' and 'but-for cause.'" *Id.* (discussing *Liriano v. Hobart Corp.*, 170 F.3d 264,

271 (2d Cir. 1999)). The *Rothstein* court held that § 2333(a)'s "by reason of" language indicates that § 2333(a) plaintiffs must make a proximate cause showing because other statutes that employ that language—*including* statutes also requiring a "but-for" showing as required by common law in *Liriano*—require a proximate cause showing. *Id.* at 95. *Rothstein*, however, does not hold that the ATA requires a but-for showing.

    **2. Causation in law – Proximate Causation**. *Rothstein* set forth the applicable proximate cause standard in this Circuit: a defendant is liable to persons "with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence." 708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). The new authority that the Bank cites for a "direct relationship" standard of proximate cause is *Fields*, which does not provide the causation pleading standard in this Circuit, for two reasons. First, it *rejected Rothstein* in favor of a "higher" standard. 881 F.3d at 744. The defendant there argued that the ATA causation standard is higher than the *Rothstein* standard because it requires plaintiffs to plead that defendant's acts "'led directly' to their injuries." *Id*. The panel agreed, concluding that the defendant "has the better of the argument." *Id*. The Ninth Circuit obviously cannot overrule the *Rothstein* standard that controls in this Circuit.

    Second, *Fields* was incorrectly decided.[12] Woodenly relying on *Holmes v. Sec. Inv'r Corp.*, 503 U.S. 258 (1992) and companion RICO cases, including *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) (*Fields*, 881 F.3d at 744-45), *Fields* ignored the Supreme Court's caution in those cases that the "infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *Holmes*, 503 U.S. at 274 n.

---

[12]    The *Fields* court also failed to address JASTA, which, as explained above, does not require a showing that defendant's own acts were the direct cause of plaintiff's injuries.

20 (internal quote omitted).[13] Therefore, "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action." *Bank of Am.*, 137 S. Ct. at 1305 (citation omitted).

Instead of considering the nature of the ATA cause of action, *Fields* relied on RICO and Sherman/Clayton Act cases, in which the underlying torts can have economic consequences that ripple throughout the economy, indirectly injuring a vast pool of potential plaintiffs. Quoting those cases, it compared a RICO cause of action, in which an injury is ordinarily "'too remote' from a defendant's unlawful conduct" if the harm "is purely derivative of misfortunes visited upon a third person by the defendant's acts," with an ATA cause of action for material support, which "assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party." 881 F.3d at 746 (internal quotation marks and citations omitted). The comparison conflates harms derivative of injuries *to* a third party with harm from injuries *by* a third party to whom the defendant provides material support. The injuries *by* the third party (a terrorist or terrorist organization) are direct, and ATA plaintiffs *are* those directly injured;[14] there are no more directly affected plaintiffs waiting in the wings "to vindicate the law as private attorneys general." *Holmes*, 503 U.S. at 269-70. Indeed, it is terror victims like the Plaintiffs in this case who alone can vindicate the statute's purpose. In short, *Fields* draws on the wrong body of law to apply the wrong analysis in an opinion that rejects the controlling authority in this Circuit.[15]

Ironically, the only other new authority concerning proximate cause cited by the Bank is

---

[13]    The Supreme Court added the caveat that "our use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text." 503 U.S. at 272 n.20. The caveat underscores that "directness" plays a different role under different statutory schemes.

[14]    Plaintiffs' emotional distress and solatium injuries are direct and their own, not derivative of injuries to others.

[15]    *Gonzales v. Google, Inc.*, No. 16-CV-03282, 2018 WL 3872781 (N.D. Cal. Aug. 15, 2018), cited by Arab Bank, Def. mem. at 17, merely follows *Fields,* its own circuit authority, and adds nothing to its reasoning.

not only also out-of-circuit, but *accepts* the *Rothstein* standard as "a traditional proximate cause test that has been applied in our Circuit outside of the ATA context." *Shatsky v. Palestine Lib. Org.*, No. 02-2280 (RJL), 2017 WL 2666111, at *6 (D.D.C. Jun. 20, 2017). *Shatsky* makes no reference whatsoever to "directness." But in applying the *Rothstein* standard, it finds that martyr payments to the family of the bomber in that case did not meet the standard because "plaintiffs have pointed to no evidence suggesting that [the bomber] knew his family would receive martyrdom payments, or that [he] was motivated by the prospect of such payments." *Id.* at *10.

Here, in contrast, the Complaints plausibly plead that terrorists recognized that their family members would collect "martyrdom" payments because every eligible Palestinian family was encouraged to collect Saudi Committee and Al-Ansar payments through the Bank's branches, AC ¶¶ 290, 583-86, by announcements that were "publicly and repeatedly advertised" in both newspapers, television, and websites. AC ¶ 310 (also providing specific examples). In fact, the AAMB terrorist responsible for the May 28, 2003 attack admitted that he went to Arab Bank to collect an injured terrorist payment, even though he held no account there, "because everyone knew that if you were injured while participating in operations against Israel you would get the money, and if you were killed then your family would get money." AC ¶ 555. The Complaints also allege that the payments were intended "to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the 'popular resistance.'" AC ¶ 291. On the available record before it, the *Shatsky* court felt it lacked a sufficient basis to credit the role of the martyr payment(s) before it. That is not the case here.[16]

---

[16]    *Shatsky* was decided in an unusual evidentiary and procedural posture because plaintiffs had been previously sanctioned in 2013 and therefore barred "from introducing or using, including on motion or at trial, any expert testimony" from their three expert witnesses. ECF No. 242. They were sanctioned a second time in 2015 and prohibited from introducing "all documents produced by plaintiffs in this action after September 19, 2012." ECF No. 326.

Finally, the Bank ignores another recent out-of-circuit decision that adopts *Rothstein*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018), even though the Bank cites *Owens* elsewhere for its supposed rejection of ATA legislative history. Def. mem. at 2, 8. *Owens* expressly and verbatim adopted the *Rothstein* standard, and added that it already encompasses "sufficient directness." 897 F.3d at 273 n.8. *Accord, Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017).

A standard requiring more directness than the "traditional proximate cause test" in *Rothstein* also conflicts with Congress's clear intent in enacting and repeatedly expanding the ATA (both civilly and criminally).[17] In the "Findings and Purpose" of JASTA, Congress stated *three times* that it intended to reach defendants who provide "material support or resources, *directly or indirectly*" to those "responsible for [victims'] injuries." JASTA § 2(a)(7) (emphasis added). *See also* §§ 2(a)(6) and 2(b). Moreover, whether indirect material support encourages terrorism "is an empirical question" of national security to which Congress's answer "is entitled to deference" and "significant weight." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29, 34-36 (2010) ("Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not"). There is therefore nothing "improper" about judicial deference to Congress's findings in these circumstances.

---

[17]      *See, e.g.*, Pub. L. No. 112-239, Div. A, Title XII, § 1251(a), Jan. 2, 2013, 126 Stat. 2017 (extending statute of limitations); Pub. L. No. 114-222, § 4(a), Sept. 28, 2016, 130 Stat. 854 (JASTA); Pub. L. No. 115-253, § 4(a), Oct. 3, 2018, 132 Stat. 3184 (clarifying "act of war" defense to make it unavailable in cases involving FTO and SDGT attacks); Pub. L. No. 104-132, Title III, § 323, Apr. 24, 1996, 110 Stat. 1255 (extending definition of material support); Pub. L. No. 107-56, Title VIII, §§ 805(a), 810(c), 811(f), Oct. 26, 2001, 115 Stat. 377, 380, 381 (broadening definition of material support and adding attempt and conspiracy elements); Pub. L. No. 108-458, Title VI, § 6603(a)(2), (b), Dec. 17, 2004, 118 Stat. 3762 (broadening definition of material support or resources); Pub. L. No. 111-122, § 3(d), Dec. 22, 2009, 123 Stat. 3481 (adding attempt and conspiracy elements).

17

*Rothstein* is still the law in this Circuit and this Court should reject the Bank's latest effort to contravene it.

## III.   PLAINTIFFS HAVE STANDING TO SUE UNDER THE ATA.

### A.   The Complaints Sufficiently Plead Emotional Injuries.

Arab Bank argues that 72 of the 76 Plaintiffs lack standing to sue because "[m]ore is required" to allege their emotional injuries resulting from their family member's injury caused "by the terrorists who committed the 14 Attacks."[18] Def. mem. at 11-12. In support, Arab Bank cites *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992), which does not relate to emotional distress injuries. The Bank does not—and cannot—cite a single case where a court dismissed an ATA claim on grounds that plaintiffs failed to allege the factors listed in the Restatement (Second) of Torts § 46 (1965), such as whether plaintiffs "witnessed" the injury, learned of the injury "shortly after it occurred," or "their emotional distress produced a bodily injury." Def. mem. at 11-12. Indeed, as Arab Bank admits, ATA and FSIA cases premised on terrorist attacks have held the opposite.[19] *See* Def. mem. at 10-11 (acknowledging that the plaintiffs in *Coulter v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y.) included the mother and siblings of Chana Edri, who suffered non-fatal injuries in a suicide bombing). *See also In re Heiser*, 466 F. Supp. 2d 229, 328 (D.D.C. 2006) ("a terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act."); *Beer v. Islamic Rep. of Iran*, 574 F. Supp. 2d 1, 12 (D.D.C. 2008)

---

[18]      Arab Bank ignores that five of the *Pam* Plaintiffs—Baruch Tratner, Judith Tratner, Drora Tratner, Rivka Selzer, and Belka Gez—suffered severe emotional distress as a result of a HAMAS mortar attack that killed their sister, Tiferet Tratner.  *Pam* Compl. ¶¶ 63-70.

[19]      Even § 46 of the Restatement acknowledges "other circumstances" may affect the factors, a caveat which "is intended . . . to leave open the possibility of situations in which presence at the time may not be required." Caveat and Cmt. 1.

("claims for IIED may be brought by family members of terrorist attack victims without having to establish presence"); *Knox v. Palestine Lib. Org.*, 442 F. Supp. 2d 62, 77-78 (S.D.N.Y. 2006).

Second, Arab Bank's unsupported suggestion that the allegations are too "threadbare" is similarly unavailing. *See* Def. mem. at 10-12. Courts have repeatedly held that plaintiffs need allege very little to demonstrate standing. *See, e.g., Doe v. City of New York*, 2018 WL 3824133, at *14 (E.D.N.Y. Aug. 9, 2018) (allegation that plaintiff suffered "'severe and extreme emotional distress'…r[o]se far above the bare minimum required for constitutional standing"); *John v. Whole Foods Mkt. Grp., Inc*., 858 F.3d 732, 736 (2d Cir. 2017) (the injury-in-fact requirement is "'a low threshold'") (quoting *WC Cap. Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013)).

## B.   Family Members of a U.S. National Injured in a Terrorist Attack Have Standing to Sue Under the ATA.

Arab Bank argues that six of the non-U.S. national Plaintiffs lack standing because they are "neither nationals of the United States nor the estate representatives, heirs, or survivors of a national of the United States." Def. mem. at 9. These Plaintiffs are the wife and children of Steven Braun, a U.S. national injured in a suicide bombing. Arab Bank argues that because Mr. Braun is alive, these six Plaintiffs are not his "survivors or heirs," and thus have no claim under the ATA.

Arab Bank cites no case that came to this conclusion. In fact, courts that have permitted such claims have suggested the opposite: The ATA intends to reach the family members of a U.S. national injured in his or her person or property, regardless of citizenship. The *Linde* Court expressed doubt "that Congress could have intended that U.S. nationals could recover for losses of property yet not for losses of family members, simply because those family members were not U.S. nationals." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (citing *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 181-82 (D.D.C. 2004)). Rather, "[t]he congressional purpose was to grant a remedy to U.S. nationals *and their families* who suffered

from *injury to an individual or property* as a result of international terrorism." *Id.* (emphasis added). The *Weiss* court also rejected the argument that non-U.S. nationals' ATA claims "must be dismissed because these plaintiffs have failed to allege in so many words that they are U.S. nationals or the heirs or survivors of U.S. nationals," where those U.S. nationals survived terrorist attacks, concluding that "it is not necessary that plaintiffs specifically use the terms 'heirs' or 'survivors' in alleging their relationship to U.S. nationals. Rather, it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national." *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006) (quoting *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 264 (D.R.I. 2004)).

The phrase "or his or her estate, survivor, or heirs" was added to the provision providing a civil action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" to reach the U.S. national's family members (i.e., those eligible to be his or her survivor or heir), regardless of whether the U.S. national later happened to die. *See Ungar*, 304 F. Supp. 2d at 263 (noting that Senator Strom Thurmond received assurance that the language "or his or her estate, survivors or heirs" was added to "to make certain the ability of family members to file a lawsuit on behalf of a slain *or injured* relative.") (quoting Sen. Thurmond, *Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts & Admin. Practice of the Senate Comm. on the Judiciary,* 101st Congress at 46 (1990)) (emphasis added). Arab Bank's cited cases do not support its arbitrary distinction between relatives of U.S. nationals who initially survive an attack and those who subsequently die from their injuries.[20]

---

[20]     Such a bizarre distinction would also implicate statute of limitations issues for the families of victims whose loved ones only succumbed to their injuries after the 10-year statute of limitations.

## IV.    ARAB BANK IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION.

As a preliminary issue, Arab Banks's personal jurisdiction argument fails to even acknowledge, let alone address, the congressional findings set forth in JASTA:

> [E]ntities . . . that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, *necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.*

JASTA § 2(a)(6) (emphasis added). Congress then explicitly stated that JASTA's purpose was to:

> [P]rovide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b). The allegations set forth in the Complaints (involving tens of millions of dollars Arab Bank knowingly transferred through its former New York branch to a veritable "who's who" list of terrorists and terrorist organizations) fall squarely within the scope of conduct Congress has found should lead a party to "reasonably anticipate being brought to court in the United States to answer for such activities."

Moreover, the Second Circuit and the New York Court of Appeals have held that that a foreign bank's use of its New York correspondent account(s) to effectuate dozens of U.S. dollar wire transfers for the benefit of accounts it allegedly maintained for a designated terrorist organization rendered that foreign bank subject to specific personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1) for alleged violations of the ATA. *See Licci v. Leb. Can. Bank, SAL*, 984 N.E.2d 893, 900-901 (N.Y. 2012) ("*Licci I*"); *Licci v. Leb. Can. Bank, SAL*, 732 F.3d 161, 167-74 (2d Cir. 2013) ("*Licci II*"). Here, Arab Bank's relevant New York conduct is even more substantial and sustained than that of the foreign bank in the *Licci* cases. Whereas the foreign bank in *Licci*

maintained only a correspondent account as its sole point of contact in New York, Arab Bank maintained a New York branch during the relevant period, staffed with employees and licensed to operate under New York banking laws. *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 19 (E.D.N.Y. 2016) (following *Licci* and finding specific personal jurisdiction over ATA claims against foreign bank that executed a total of five U.S. dollar-denominated wire transfers over five years through its New York branch for the benefit of a HAMAS-affiliated "charity"); *Weiss v. Nat'l Westminster Bank, PLC*, 176 F. Supp. 3d 264, 279 (E.D.N.Y. 2016) (foreign bank subject to jurisdiction where it executed a total of 196 U.S. dollar-denominated wire transfers through its New York branch over eight years). *Accord, e.g., Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, at \*61-62 (E.D.N.Y. July 27, 2018) (same result where foreign bank used the New York correspondent accounts of its agents to launder money for Iran).

Like the foreign banks in *Strauss* and *Weiss*, Arab Bank at all relevant times "had a New York Branch" through which it "routinely conducted business in New York through a correspondent account it maintained at that branch, utilizing that account to clear U.S. Dollar transfers requested by" other Arab Bank branches, affiliated banking institutions, and other foreign banks. *Weiss*, 176 F. Supp. 3d at 27; *Strauss*, 175 F. Supp. 3d at 19; *see* AC ¶¶ 204-12. This conduct satisfies the "purposeful availment" prongs of § 302(a)(1) and constitutional due process because, in utilizing its New York branch to allegedly transfer funds to HAMAS and other designated terrorist organizations, Arab Bank "necessarily availed itself of the benefits and protections accorded to such transactions when carried out using New York's dependable banking system, under the auspices of New York banking and commercial laws." *Strauss*, 175 F. Supp. 3d at 19-29 (citing *Licci I*, 984 N.E.2d at 900-901); *Weiss*, 176 F. Supp. 3d at 279 (same). Arab Bank used New York's banking system by knowingly executing through its New York branch at least

hundreds of U.S.-dollar denominated wire transfers worth tens of millions of dollars for the Saudi Committee, HAMAS leaders, and HAMAS front organizations, among others. *See, e.g.*, AC ¶¶ 7-8, 311, 344-45, 351, 373, 385, 391, 399, 406, 415, 422, 427, 432, 439, 445, 477, 490, 499.

The Bank's argument that some U.S.-dollar denominated martyr payments made to a terrorist or his survivors were not routed through its New York branch is unavailing. *See* Def. mem. at 23 and Appendix B at nn.1-4, 6, 8, 10. First, such assertions are more properly submitted in an Answer, not as an argument in a Rule 12(b)(6) motion. Second, the Bank's admission that it also used its New York branch as a source of U.S. dollars so that its other branches could execute transactions for terrorists outside the U.S., *see* Def. mem. at 23 n.16, itself "'show[s] purposeful availment of New York's dependable and transparent banking system [and] the dollar as a stable and fungible currency.'" *Strauss*, 175 F. Supp. 3d at 19 (quoting *Licci I*, 984 N.E.2d at 900); *Weiss*, 176 F. Supp. 3d at 279 (same); *Freeman*, 2018 WL 3616845, at *61 (foreign bank's use of another bank's New York correspondent account constituted "purposeful use of New York banks"). Moreover, "[t]here is no requirement under § 302(a)(1) that a plaintiff's claim must arise *exclusively* from New York conduct." *Strauss*, 175 F. Supp. 3d at 25; *Weiss*, 176 F. Supp. 3d at 282 (emphasis in original).

Contrary to the Bank's contention, neither § 302(a)(1) nor constitutional due process requires that Plaintiffs allege a one-to-one correspondence between a wire transfer executed through Arab Bank's former New York branch and each of the 14 terrorist attacks that gave rise to Plaintiffs' injuries. *See* Def. mem. at 23-24 and Appendices. Rather, all of the financial services Arab Bank provided in violation of the ATA, including the hundreds of wire transfers routed through its New York branch, "constitute a single course of conduct by Defendant that purportedly entailed violations of the same statute in the same manner with respect to all of Plaintiffs' claims."

23

*Strauss*, 175 F. Supp. 3d at 25; *Weiss*, 176 F. Supp. 3d at 283.[21] Thus, "Plaintiffs' claims…do not necessarily [have to] correspond one-to-one with particular [New York] transfers, but instead rest upon the millions of dollars [it] allegedly transferred to Hamas [and other FTO] front organizations in close temporal proximity to the [14] attacks in which Plaintiffs were injured. Because the New York Transfers were a substantial part of that alleged unlawful conduct, the Court may exercise jurisdiction with respect to claims made in connection with all [14] attacks." *Strauss*, 175 F. Supp. 3d at 24; *Weiss*, 176 F. Supp. 3d at 282 (same).[22]

The Complaints allege that through the Saudi Committee's martyr payments scheme, the Bank provided material support not only to HAMAS, but also to PIJ, AAMB, and PFLP, all designated FTOs or SDGTs. *See Miller* Compl. at ¶¶ 6, 9-14, 87, 148-153, 260, 268-314, 323-499, 500-561, 562-578.[23] Thus, because the Bank's role as "paymaster," "accountant," and "exclusive administrator" of the martyr payments scheme is part of "a single course of conduct by Defendant" that also included the New York transfers, the scope of the Court's personal jurisdiction extends even to those terror attacks perpetrated by non-HAMAS terrorists, for whose benefit the Bank was also administering the martyr payments scheme. *See* AC ¶¶ 293, 303, 601. This Court may also

---

[21]   That course of conduct also included millions of U.S. dollars obtained from Defendant's New York branch that funded the Saudi Committee's universal insurance coverage and incentive payments to Palestinian terrorists, which incentivized *all* of the terrorist attacks at issue in this case. *See* AC ¶¶ 296, 301, 310-11; *Pam* ¶ 154.

[22]   The decisions in *Licci*, *Strauss,* and *Weiss* also dispose of Arab Bank's contention that some of the terror attacks are not sufficiently related to particular New York transfers that "either significantly pre-date or post-date" them. *See* Def. mem. at 23. In this case, the temporal overlap between the New York transfers (1999-2004) and the terror attacks (2001-2004) is even more substantial than in any of those cases. *See Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 404-405 (S.D.N.Y. 2010) (dozens of New York transfers 2004-2006; terror attacks in July and August 2006); *Strauss*, 175 F. Supp. 3d at 20, 23 (five New York transfers 1997-July 2001; 19 attacks 2001-2004); *Weiss*, 176 F. Supp. 3d at 279-80, 282 (196 New York transfers 1996-August 2003; 15 attacks 2002-2004).

[23]   Defendant's New York branch was instrumental in providing AAMB "with access to U.S. dollars and the international banking system" (*Pam* Compl. at ¶¶ 154, 310). Accordingly, Defendant "knowingly provided financial services to AAMB by facilitating the transfer of between "$40,000 and $50,000 for weapons, expenses and bomb-making materials" to the account of a senior Fatah operative (AC ¶ 553), and Arab Bank made a U.S. dollar payment to an operative injured in an attack against Israel (AC ¶ 555).

exercise pendent personal jurisdiction over claims by Plaintiffs whose injuries arise from attacks perpetrated by non-HAMAS terrorists because they are "based on the same nucleus of fact" as the other Plaintiffs' claims—"providing material support directly, or indirectly, to terrorist entities or their alter egos." *Freeman*, 2018 WL 3616845, at *49 n.69.[24]

Most of the cases upon which the Bank relies are inapposite applications of the so-called "effects test" for personal jurisdiction which is employed "where . . . the only relevant jurisdictional contacts with the forum are . . . in-forum effects harmful to the plaintiff." *Licci II*, 732 F.3d at 173 (distinguishing, *inter alia*, *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013)).[25] The Bank's remaining cases are also inapposite. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018) (no allegations that plaintiff relied on defendant's in-forum contacts) (*cited in* Def. mem. at 24). Lastly, the Bank misleadingly describes *Krishanthi v. Rajaratnam*, 2014 WL 4677175, at *5 (D.N.J. Sept. 19, 2014) as "dismissing ATA claims for lack of specific jurisdiction absent credible allegations that defendant's in-state fundraising for FTO caused attacks at issue," *see* Def. mem. at 24, but *Krishanthi* was **not** an ATA case, which is why it applied the Third Circuit's "causation test," not *Licci's* governing law on specific jurisdiction in ATA cases.

## CONCLUSION

For the reasons set forth herein, Defendant's motion to dismiss should be denied.

---

[24]     *See also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180–81 (9th Cir. 2004) ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state *or federal claims* for which there is not nationwide personal jurisdiction.") (emphasis added); *Alcohol Mon. Sys. Inc. v. Actsoft, Inc.*, 682 F. Supp. 2d 1237, 1253 (D. Colo. 2010) (noting that "several courts have applied the concept of pendent personal jurisdiction where the additional claim is *a federal claim*" and holding the same) (emphasis added); *Miller Pipeline Corp. v. Brit. Gas plc*, 901 F. Supp. 1416, 1423-24 (S.D. Ind. 1995) (pendent personal jurisdiction can be used to obtain personal jurisdiction over a defendant for related *federal claims*); *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 556 (E.D. Va. 2009) ("the Fourth Circuit has approved the exercise of pendent personal jurisdiction over claims arising from a common nucleus of operative fact, whether the additional claim is a state claim *or a federal claim*") (emphasis added).

[25]     *See* Def. Mem. at 22-24 (citing *In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 3d 416 (S.D.N.Y. 2018), *Walden v. Fiore*, 134 S. Ct. 1115 (2014) and *Waldman*, 835 F.3d 317, none of which involved any in-forum conduct by the defendant).

Dated: November 4, 2018
      Hackensack, NJ

OSEN LLC

By: /s/ Gary M. Osen
     Gary M. Osen, Esq.
     Ari Ungar, Esq.
     Peter Raven-Hansen, Esq., Of Counsel
     Michael Radine, Esq.
     Aaron Schlanger, Esq.
     2 University Plaza, Suite 402
     Hackensack, New Jersey 07601
     (201) 265-6400

ZUCKERMAN SPAEDER LLP
Shawn P. Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
(646) 746-8655

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700

*Attorneys for the Miller Plaintiffs*

STONE BONNER & ROCCO LLP

By: /s/ James P. Bonner
     jbonner@lawsbr.com
     1700 Broadway, 41st Floor
     New York, NY 10019
     (212) 239-4340

HEIDEMAN NUDELMAN & KALIK, PC
Richard D. Heideman
(*pro hac vice motion to be filed*)
Noel J. Nudelman
Tracy Reichman Kalik
(*pro hac vice motion to be filed*)
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

SAYLES WERBNER P.C.
Mark S. Werbner (*pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

PERLES LAW FIRM, P.C.
Steven R. Perles (*pro hac vice motion to be filed*)
Ed Macallister (*pro hac vice motion to be filed*)
1050 Connecticut Ave., NW, Fifth Suite 500
Washington, D.C. 20036
(202) 955-9055

THE DAVID LAW FIRM, P.C.
Jonathan David (*pro hac vice motion to be filed*)
301 Congress Avenue, Suite 1910
Austin, Texas 78701-2959

*Attorneys for the Pam Plaintiffs*