```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
   AHARON MILLER, et al.                                    :
                                                            :
                                    Plaintiffs,             :
                                                            :
                  - against -                               :   18-cv-2192 (BMC)
                                                            :
   ARAB BANK, PLC,                                          :
                                                            :
                                    Defendant.              :
                                                            :
----------------------------------------------------------- X
                                                            :
   NATHAN PAM, et al.                                       :
                                                            :
                                    Plaintiffs,             :
                                                            :   18-cv-4670 (BMC)
                  - against -                               :
                                                            :
   ARAB BANK, PLC,                                          :
                                                            :
                                    Defendant.              :
                                                            :
----------------------------------------------------------- X
```

## **MEMORANDUM DECISION AND ORDER**

**COGAN, District Judge.**

These cases involve claims brought under the Anti-Terrorism Act (the "ATA") against Arab Bank, PLC ("Arab Bank"), which has moved to dismiss the complaints in both actions. For the reasons stated below, the [30] motion to dismiss in the action docketed under docket number 18-cv-2192 is granted in part and denied in part, and the [12] motion to dismiss in the action docketed under docket number 18-cv-4670 is denied.

## SUMMARY OF COMPLAINTS

According to the complaints in the above-captioned proceedings, which are assumed to be true for purposes of defendant's Rule 12(b)(6) motion, Arab Bank – a Jordanian bank with a branch in the State of New York that was converted into a federal agency in 2005 – provided financial support for 14 terrorist attacks in Israel and surrounding areas. Plaintiffs – all but six of whom are American citizens – were either injured in these attacks or are relatives of American citizens injured in these attacks. Designated foreign terrorist organizations ("FTOs"), including Harakat al-Muqawama al-Islamiyya ("Hamas"),[1] and their agents committed 12 of these attacks.

These terrorist attacks were part of the Second Intifada, a terrorist campaign against the State of Israel from approximately 2000-2004. At a meeting at the beginning of the Second Intifada, terrorists discussed the need for a mechanism to distribute donations to the Second Intifada. The Chairman of Arab Bank noted that – although Arab Bank employees donated 5% of their salaries for the Second Intifada in October 2000 – the donations were not transferred to support the Second Intifada. Arab business and political leaders then formed a fund to further bankroll the Palestinian Authority and the Second Intifada. Arab Bank pledged $2,000,000 to support this fund, and the Chairman of Arab Bank personally pledged $500,000.

In addition to these monetary contributions, Arab Bank provided various financial services in connection with the Second Intifada. Arab Bank processed over $30,000,000 for Hamas entities from various sources, as well as processing millions of dollars though New York for Hamas leaders. Arab Bank also maintained a large number of accounts for entities and

---

[1] Hamas includes a political wing, a military wing, and a social service wing, Da'Wa. One of Da'Wa's functions is to pay expenses for and assist the families of terrorists who were arrested, injured, or killed. Each component has different responsibilities but funds that Da'Wa collects are routed for terrorist attacks and are used to free up other funds for terrorist attacks. The United States Secretary of State designated Hamas as an FTO in 1997 and has renewed this designation every two years since 1997. Arab Bank provided banking services to Hamas.

individuals affiliated with Hamas and other American-, European-, and Israeli-designated terrorist organizations.

One of the Hamas-related entities that maintained an account at Arab Bank was a fundraising network – the "Union of Good" – whose members included the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee"). The Saudi Committee was established to support the families of "martyrs," i.e. terrorists who died during terrorist attacks, Palestinians who were wounded when confronting Israeli security forces, and Palestinians held in Israeli custody. The Saudi Committee provided Hamas-controlled front organizations with over $15,000,000, including payments routed through Arab Bank.

Further, Arab Bank administered a terrorist insurance scheme (the "Insurance Scheme") in which the Saudi Committee provided over $35 million to martyrs and their families, including individuals responsible for attacks that have injured plaintiffs in the instant cases. To fund the Insurance Scheme, the Saudi Committee raised money from private donors in Saudi currency, converted the funds to U.S. dollars through Arab Bank's then-operating New York branch, and routed the funds to local branches of the Arab Bank in the West Bank.

To distribute these funds, the Saudi Committee and Hamas-affiliated organizations provided Arab Bank with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs, and assassinations. The causes of death identified in lists provided to Arab Bank even included "Martyr Operation," and – in the case of an individual who died carrying out a terrorist attack in the French Hill section of Jerusalem – "French Hill Operation." The lists contained instructions to substitute transfers for these individuals with transfers for an attached list of beneficiaries.

The beneficiaries were encouraged to collect their benefits through Arab Bank, as illustrated through the following examples:

- In early 2001, an Arab Bank employee called a terrorist to inform him that, because the terrorist was injured and hospitalized, he was eligible for $1,330. The terrorist met with an Arab Bank employee who gave him a check for that amount;

- On July 1, 2001, a Palestinian newspaper published an announcement calling on residents of the West Bank and the northern Gaza Strip to collect their funds from the Insurance Scheme at Arab Bank;

- November 23, 2001, the Saudi Committee placed an announcement in a Palestinian newspaper listing the names of over 1,000 individuals killed or captured during the Second Intifada and invited their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee...";

- On February 18, 2002, a Hamas front organization placed an advertisement in a Palestinian newspaper announcing that "the relatives of the martyrs, whose names hereby follow, are requested to head for the Arab Bank branches in their place of residence in order to receive the tenth payment from the Honorable Saudi Committee – a sum of 5,316.06 USD … ."  One of the individuals on this list carried out a terrorist attack that injured multiple plaintiffs in the instant proceedings.

The Insurance Scheme incentivized terrorists to commit acts of violence to receive the benefits.  The Insurance Scheme also helped Hamas gather support among the Palestinian people, but it was open to terrorists belonging to any terrorist organization or none at all – not just Hamas-affiliated terrorists – which further incentivized terrorist attacks in Israel.  By administering the Insurance Scheme, Arab Bank allowed donors to bypass corrupt Palestinian Authority officials, avoided the uncertainty associated with cash payments delivered by courier, and provided a professional accounting system that minimized the risk of duplicate payments and unreliable record-keeping.

Arab Bank's conduct prompted multiple lawsuits, including the instant proceedings, in which victims of terrorism alleged that Arab Bank violated the ATA.  Litigation against the Arab

Bank also prompted the Office of the Comptroller of the Currency and the Financial Crimes Enforcement Network ("FinCEN") to investigate Arab Bank.

FinCEN found that, from 2000 to 2004, regulatory authorities in the Palestinian Territories provided Arab Bank with information regarding the fund transfers to beneficiaries with accounts at the Arab Bank and also ordered financial institutions to either freeze accounts of suspected criminals or place the accounts on a watch list.  FinCEN also found that, despite a heightened risk of illicit activity, Arab Bank failed to implement proper compliance procedures.  FinCEN also found that Arab Bank failed to conduct the proper investigations after Arab Bank learned that it cleared fund transfers for entities that the United States government later designated as terrorist organizations.

In these two actions, plaintiffs claim that Arab Bank aided and abetted foreign terrorist organizations; provided material support to terrorists and foreign terrorist organizations; and committed acts of international terrorism.  Plaintiffs seek damages and attorneys' fees under the ATA.  Arab Bank has moved to dismiss both actions for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## DISCUSSION

**I.     Standing**

To have standing to sue, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016).  "[T]he 'fairly traceable' standard is lower than that of proximate cause." Rothstein v. UBS AG, 708

F.3d 82, 95 (2d Cir. 2013).  The "injury in fact" requirement is a "low threshold" designed "to ensure that the plaintiff has a personal stake in the outcome of the controversy." John v. Whole Foods Market Group, Inc., 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation marks omitted).  "[E]motional harm satisfies the 'injury in fact' requirement of constitutional standing." Doe v. City of New York, No. 18-cv-670, 2018 WL 3824133, at *14 (E.D.N.Y. Aug. 9, 2018).

The ATA provides a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs … ." 18 U.S.C. § 2333.  The ATA thus "excludes foreign nationals (with the possible exception of foreign survivors or heirs)" from its provision providing a cause of action.  Jesner v. Arab Bank, PLC, 138 S.Ct. 1386, 1404 (2018).  Further, under the ATA, someone who "survived the attack … has no 'survivors' or 'heirs' that can recover for his injuries on his behalf." Morris v. Khadr, 415 F. Supp. 2d 1323, 1337 (D. Utah 2006).

Courts permit "[p]laintiffs to pursue claims for solatium [emotional] damages" under the ATA.  Lelchook v. Commerzbank AG, No. 10-cv-5795, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011).  "Spouses and relative[s] in direct lineal relationships are presumed to suffer damages for mental anguish." Knox v. Palestine Liberation Organization, 442 F. Supp. 2d 62, 78 (S.D.N.Y. 2006) (quoting Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 234 (S.D.N.Y. 2003)).  Family members do not need to be present for the terrorist attacks to recover under the ATA, because "a terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act." Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 328 (D.D.C. 2006).

Here, the American citizen plaintiffs have standing. They either suffered physical and emotional injuries from the attacks, or are relatives of victims of the attacks and are presumed to suffer emotional damages regardless of whether they were present for the attacks. These plaintiffs' injuries are likely to be redressed by the damages they seek, which are the remedies that Congress has found appropriate for victims of terrorism under the ATA. Further, "for the same reasons that there are triable proximate causation issues, *a fortiori*, there is sufficient evidence that Plaintiffs' injuries are fairly traceable to Defendant's conduct." Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 436-37 (E.D.N.Y. 2013) ("Strauss I").

However, Chaviva Braun, Yehuda Braun, Yoni Braun, Matanya Braun, Eliana Braun Peretz, and Oriella Braun – who are all plaintiffs in the action docketed under docket number 18-cv-2192 – are relatives of a United States national injured in a suicide bombing but they are not United States citizens. Because this United States national survived the attack, he has no survivors or heirs. Therefore, the ATA does not provide a cause of action for these six plaintiffs, and their claims are dismissed.

## II.    Personal Jurisdiction

When deciding a motion to dismiss for lack of personal jurisdiction, courts may rely on pleadings and affidavits, in which case "the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant." DiStefano v. Carozzi North America, Inc., 286 F.3d 81, 84 (2d Cir. 2001) (internal quotation marks omitted). When deciding whether the plaintiff has made such a *prima facie* showing, courts "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in his favor." Id.

"This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012) ("Licci I") (internal quotation marks and alterations omitted). When parties do not submit "an affidavit or other evidence on which the court could rely … the court must rely on the allegations in the complaint to determine if personal jurisdiction exists." MacFarlane v. Brock, No. 3:00-cv-1097, 2000 WL 1827353, at *2 (D. Conn. Nov. 30, 2000). Here, the parties have not submitted affidavits on the issue of personal jurisdiction.

To determine whether a court has personal jurisdiction over defendants, courts first "look to the law of the forum state to determine whether personal jurisdiction will lie" and, if "jurisdiction lies, [courts] consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) ("Licci II").

New York's long-arm statute provides that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent … transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1). A single transaction is sufficient to satisfy this requirement, provided the relevant claims arise from that transaction. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999). To exercise specific jurisdiction[2] over a defendant consistent

---

[2] Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Waldman, 835 F.3d at 331. General jurisdiction, on the other hand, allows a court to hear any claims against a defendant who is "essentially at home" in the forum state. Id. (quoting Daimler AG v. Bauman, 571 U.S. 117, 120 (2014)). Because Arab Bank, a Jordanian bank, is not essentially at home in New York, the Court does not have general jurisdiction over Arab Bank.

with the defendant's due process rights, "the defendant's suit-related conduct must create a substantial connection with the forum State." Waldman v. Palestine Liberation Organization, 835 F.3d 317, 335 (2016). However, "[t]here is no requirement under § 302(a)(1) that a plaintiff's claim must arise *exclusively* from New York conduct." Strauss v. Crédit Lyonnais, S.A., 175 F. Supp. 3d 3, 25 (E.D.N.Y. 2016) (Strauss II).

Moreover, the doctrine of pendent personal jurisdiction allows courts in a federal question case to assert "personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004). "[W]ithin the Second Circuit, the doctrine of pendent personal jurisdiction primarily has been embraced to permit the adjudication of pendent state law claims that derive from the same common nucleus of fact as a federal claim for which the court has jurisdiction over the defendant." Strauss II, 175 F. Supp. 3d at 32.

The Second Circuit has held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs" under the ATA is sufficient for a bank to be subject to the specific jurisdiction of a district court in New York. Licci II, 732 F.3d at 171. In Licci II, the Second Circuit found specific jurisdiction proper over a bank that "deliberately chose to process … wire transfers … in New York" even though, "[i]n light of the widespread acceptance and availability of U.S. currency, [the bank] could have … processed U.S.-dollar-denominated wire transfers … through correspondent accounts anywhere in the world." Id.

9

Further, to establish personal jurisdiction, ATA claims "do not necessarily [have to] correspond one-to-one with particular transfers, but instead [may] rest upon the millions of dollars [d]efendant allegedly transferred to Hamas front organizations in close temporal proximity to the … attacks in which Plaintiffs were injured." Strauss II, 175 F. Supp. 3d at 24. See also Weiss v. National Westminster Bank PLC, 176 F.Supp.3d 264, 280 (E.D.N.Y. 2016) (finding personal jurisdiction over a bank proper when transfers routed through a bank "overlapped with the attacks … that caused Plaintiffs' injuries, but also occurred at a time when Defendant allegedly knew that funds it transferred … were being used to support a terrorist organization").

When transfers made through New York are "part of that allegedly unlawful conduct, the Court may exercise jurisdiction with respect to claims made in connection with all [relevant] attacks." Strauss II at 24. "A foreign bank's repeated use of a correspondent account in New York on behalf of a client – in effect, a course of dealing – shows purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." Id. at 19 (internal quotation marks and alterations omitted).

Here, as noted above, neither party has submitted affidavits relating to Arab Bank's motion to dismiss for lack of personal jurisdiction. Therefore, the Court relies on the allegations in the complaint to determine whether it has personal jurisdiction over Arab Bank. These allegations are sufficient for plaintiffs to make a *prima facie* case that the Court has personal jurisdiction over Arab Bank because it chose to operate a branch in New York and benefit from New York's legal and economic infrastructure. According to the complaints, Arab Bank used its

branch in New York to process millions of dollars for Hamas leaders as well as convert Saudi currency to U.S. dollars as part of the Insurance Scheme.

Such conduct, in conjunction with the other financial services that Arab Bank allegedly provided in violation of the ATA, constitutes a single course of conduct in which Arab Bank provided financial services to terrorists in close proximity to the time of the terrorist attacks. The Court may therefore exercise personal jurisdiction over Arab Bank for all of plaintiff's claims, despite Arab Bank's claim that four of the attacks at issue did not involve Hamas or the Saudi Committee. Because personal jurisdiction is proper over Arab Bank for all of plaintiffs' claims, the Court does not decide whether it may exercise pendent personal jurisdiction here.

### III. Failure to State a Claim

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). Here, the allegations in the complaints are sufficient to survive Arab Bank's motion to dismiss for failure to state a claim upon which relief can be granted.

#### A. Arab Bank's Primary Liability

##### 1. International Terrorism

As noted above, section 2333(a) of the ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international

terrorism, or his or her estate, survivors, or heirs, may sue" for damages. Section 2331(1) of the ATA defines "international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

The Second Circuit has "conclude[d] … that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to … compel a finding that as a matter of law, the services" met the definition of "international terrorism" under the ATA. Linde v. Arab Bank, PLC, 882 F.3d 314, 327 (2d Cir. 2018) ("Linde II"). Whether financial services are "routine … raises questions of fact for a jury to decide." Id.

In a persuasive opinion that the Second Circuit described at length in Linde II, Judge Posner explained that a defendant who provides financial support to an organization like Hamas who "knew the aims and activities of the organization" would "by augmenting Hamas's resources … enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel." Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685, 694 (7th Cir. 2008). "And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by

12

assassination, as required by section 2331(1)" of the ATA.  Id. (internal quotation marks and alterations omitted).  Even if one does not know the organization engages in terrorism, liability is appropriate when one "is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."  Id. at 693.

Under these circumstances, "[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life'" under the ATA.  Id. at 690.  Providing financial services like wire transfers under these circumstances is also dangerous to human life since "financial services increase Hamas' ability to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them."  Linde v. Arab Bank, PLC, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015) (vacated on other grounds) ("Linde I").

Here, plaintiffs have adequately alleged that Arab Bank committed acts of international terrorism under the ATA.  Arab Bank's administration of the Insurance Scheme was dangerous to human life under 18 U.S.C. § 2331(1)(A) because, by rewarding acts of terrorism, it incentivized prospective "martyrs" to commit acts of violence and enhanced Hamas's reputation among potential recruits.  Arab Bank further enhanced terrorists' ability to conduct acts of violence by routing payments and maintaining accounts for terrorists and terrorist organizations.

As part of this financial support for terrorism, Arab Bank received lists for the Insurance Scheme that identified violent causes of death – including "Martyr Operation" – which was more than sufficient notice for Arab Bank about the nature of the Insurance Scheme it was administering.  FinCEN reported also that Arab Bank failed to investigate after learning that it provided financial services to entities that the United States government later designated as

13

terrorist organizations. Further, Palestinian publications openly advertised Arab Bank's role in providing payments to the families of martyrs, and the complaints identify at least one Arab Bank employee who reached out to a terrorist to explain that he is eligible for payment for his injuries.

The most plausible inference from the complaints is that Arab Bank knew it was doing business with terrorists who were going to use violence to attack civilians. Even if Arab Bank did not know the nature of its customers, its ignorance would be the result of deliberate indifference; in that case, Arab Bank cannot ignore blatant red flags and then use its deficient compliance program as a shield against liability. Arab Bank's conduct therefore meets the requirements of 18 U.S.C. § 2331(1)(B). Moreover, because this conduct primarily occurred outside of the United States, Arab Bank's conduct also meets the requirements of 18 U.S.C. § 2331(1)(C).

Arab Bank's argument to the contrary is not persuasive. Arab Bank contends that its conduct – which it characterizes as providing automated, electronic banking services – falls below the standard of international terrorism. However, deciding whether "Arab Bank's financial services to Hamas should … be viewed as routine … raises questions of fact for a jury to decide." Linde II, 882 F.3d at 327. At a minimum, plaintiffs have raised questions of fact that are not appropriate for resolution in connection with a motion to dismiss.

### 2. Causation

Section 2333(a)'s requirement that the injury must occur "by reason of an act of international terrorism" requires a showing that defendant's conduct was a proximate cause of plaintiff's harm, i.e. the conduct was a "substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence."

Rothstein v. UBS AG, 708 F.3d 82, 92 (2d Cir. 2013) (internal quotation mark and italics omitted). Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA. See id. at 97.

However, a showing that defendant's conduct was the "'[b]ut for' cause [of plaintiff's injuries] cannot be required in the section 2333(a) context." Gill v. Arab Bank, PLC, 893 F. Supp. 2d. 474, 507 (E.D.N.Y. 2012). Requiring a showing of but-for causation would eviscerate Section 2333(a) of the ATA because money is fungible. Linde I at 324. "Even if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack – a requirement rejected by this Court – that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere." Id.

In such circumstances "the requirement of proving causation is relaxed because otherwise there would be a wrong and an injury but no remedy because the court would be unable to determine which wrongdoer inflicted the injury." Boim, 549 F.3d at 697. See also Paroline v. US, 572 U.S. 434, 452 (2014) ("[I]t would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm …").

Here, plaintiffs have sufficiently alleged that Arab Bank's conduct was the proximate cause of their injuries. According to the complaints, the payments that Arab Bank administered through the Insurance Scheme incentivized terrorists to commit acts of violence and also enhanced Hamas's reputation among potential recruits. One of the "martyrs" whom Hamas

15

identified as an eligible recipient of a terrorist insurance payment was responsible for the terrorist attack that injured multiple plaintiffs here.

Arab Bank's role in the Insurance Scheme also encouraged donations to terrorists because donors could use Arab Bank's services to avoid corrupt Palestinian Authority officials, unreliable couriers, and inaccurate record-keeping. Further, Arab Bank maintained accounts for terrorist organizations, and routed payments to terrorist organizations, which further enhanced their ability to fund and commit acts of terrorism. In light of the nature of the Saudi Committee, Hamas, and other entities that Arab Bank provided these services to, it was reasonably foreseeable that Arab Bank's conduct would lead to plaintiff's injuries.

Although Arab Bank contends that the complaints do not sufficiently allege that its conduct was a "but for" cause of the attacks, this purported deficiency in the complaints is not a reason to dismiss plaintiff's claims. Plaintiffs may or may not be able to show that their injuries would not have occurred "but for" Arab Bank's conduct, but, as noted above, no such showing is necessary under the ATA.

### B. Arab Bank's Secondary Liability

Under 18 U.S.C. § 2333(d), for "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" the ATA provides for liability "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." Under this provision of the ATA, the "person" who committed such an act of international terrorism may include individuals but may also include associations, societies, and other entities. See 1 U.S.C. § 1.

Aiding and abetting liability under the ATA requires that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation." Linde II at 329 (internal quotation marks omitted).  A plaintiff does not have to prove the defendant "knew of the specific attacks at issue when it provided financial services for" organizations like Hamas to prove the defendant's general awareness, but to be liable a defendant must have been "generally aware that it was thereby playing a role in Hamas's violent or life-endangering activities." Id. (internal quotation marks omitted).

When determining whether the defendant knowingly and substantially assisted the principal violation, courts look to factors including "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." Id. (citing Halberstam v. Welch, 705 F.2d 472, 483-84 (D.C. Cir. 1983)).[3]  The provision of banking services, "in an unusual way under unusual circumstances for a long period of time" supports the inference that the defendant provided knowing assistance. Halberstam, 705 F.2d at 487.

Here, plaintiffs have adequately alleged secondary liability under the ATA.  Twelve of the attacks at issue were caused by FTOs and their agents.  For years, Arab Bank provided banking services – including, but not limited to, administering the Insurance Scheme – that assisted their terrorist campaign under circumstances indicating that Arab Bank had a culpable state of mind, as explained above.  Arab Bank also maintained accounts for Hamas, its affiliates,

---

[3] Congress has instructed courts to apply the "legal framework" delineated in Halberstam when determining aiding and abetting liability under the ATA.  Linde II at 329.

17

and other terrorist organizations, which is further demonstrates its close relationship with the perpetrators.

Even if Arab Bank did not know about the specific attacks at issue when it provided financial support for terrorist organizations, it was generally aware of its role in violent activities in light of the causes of death identified on the lists Arab Bank received as part of the Insurance Scheme and in light of the information Arab Bank received indicating that it cleared fund transfers for entities that the United States government later designated as terrorist organizations.

Arab Bank seeks to minimize its role by noting that the complaints only alleged that Arab Bank provided financial services to four individuals who directly participated in the attacks, but a defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual "triggerman" or suicide bomber. That is precisely why Congress broadly defined "person" under the ATA to include entities, as well as individuals.

Arab Bank further contends that, since the terrorist organizations it provided financial services to were also engaged in humanitarian activities, Arab Bank was not generally aware it was playing a role in their terrorist activities. However, these "humanitarian" activities involved providing payments to the families of terrorists through the Insurance Scheme that Arab Bank administered. The allegation that Arab Bank provided banking services "in an unusual way under unusual circumstances," Halberstam, 705 F.2d at 487 – including by administering the Insurance Scheme for individuals whose cause of death included "Martyr Operation" – strongly suggests that Arab Bank was generally aware of the nature of the conduct it was supporting. Therefore, Arab Bank's argument is not persuasive.

## CONCLUSION

The [30] motion to dismiss in the action docketed under docket number 18-cv-2192 is granted in part and denied in part, and the [12] motion to dismiss in the action docketed under docket number 18-cv-4670 is denied.

**SO ORDERED.**

                                                                                  U.S.D.J.

Dated: Brooklyn, New York
        March 10, 2019