UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


AHARON MILLER, et al.,          *     Case Nos. 18-CV-02192(BMC)
                                *               18-CV-04670(BMC)
            Plaintiffs,         *
                                *     Brooklyn, New York
      v.                        *     June 18, 2019
                                *
ARAB BANK, PLC,                 *
                                *
            Defendant,          *
                                *
and a related case.             *
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


         TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
                 BEFORE THE HONORABLE PEGGY KUO
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:          GARY M. OSEN, ESQ.
                             Osen, LLC
                             2 University Plaza, Suite 402
                             Hackensack, NJ  07601

                             JAMES P. BONNER, ESQ.
                             Fleischman Bonner & Rocco, LLP
                             447 Springfield Avenue, 2nd Fl.
                             Summit, NJ  07901




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES: (Cont'd)

For the Defendants:          JONATHAN D. SIEGFRIED, ESQ.
                             ANDREW J. PECK, ESQ.
                             DOUGLAS W. MATEYASCHUK, II, ESQ.
                             DLA Piper, LLP
                             1251 Avenue of the Americas
                             New York, NY  10020

                             BRETT INGERMAN, ESQ.
                             DLA Piper, LLP
                             6225 Smith Avenue
                             Baltimore, MD  21209

3

1          (Proceedings commenced at 10:07 a.m.)

2          THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3     presiding.

4          Civil cause for initial conference, Docket No. 18-

5     CV-2192, Miller, et al., vs. Arab Bank, PLC; and civil cause

6     for initial conference Docket No. 18-CV-4670, Pam, et al., vs.

7     Arab Bank, PLC.

8          Counsel, please state your name for the record

9     starting with the plaintiffs.

10          MR. OSEN:  Good morning, Your Honor.  Gary Osen,

11     Osen, LLC, for the Miller plaintiffs.

12          MR. BONNER:  Good morning, Your Honor.  Jim Bonner,

13     with Fleischman Bonner & Rocco, for the Pam plaintiffs.

14          MR. SIEGFRIED:  Good morning, Your Honor.  Jonathan

15     Siegfried for Arab Bank.

16          MR. PECK:  Good morning, Your Honor.  Andrew Peck,

17     DLA Piper for Arab Bank.

18          MR. INGERMAN:  Good morning, Your Honor.  Brett

19     Ingerman, DLA Piper for Arab Bank.

20          MR. MATEYASCHUK:  Doug Mateyaschuk, DLA Piper for

21     Arab Bank.

22          THE COURT:  All right.  Good morning, everyone.

23       We're here for an initial conference in these two cases.

24     We're handling them together even though they're two separate

25     cases.

4

1          I guess at the start, I'd like to hear from Mr. Osen

2     and Mr. Bonner as to whether there are differences other than

3     the names of the plaintiffs in the case in terms of legal

4     theories or things like that, or discovery that I need to be

5     aware of.

6          Or should we just sort of consider that it's

7     basically the same case except it's a different set of

8     plaintiffs?

9          MR. OSEN:  I think that's fair, Your Honor.

10          THE COURT:  Okay.  All right.

11          So then I would note that Judge Cogan, the district

12     judge overseeing both these cases, has already made a decision

13     on a motion to dismiss such that there were a few plaintiffs

14     who have been dismissed, but otherwise the case is moving

15     forward.

16          My understanding is -- just reviewing the history of

17     this case and the previous case, *Linde* -- is that here the

18     defendant as in *Linde* is being -- there are claims against it

19     that it aided abetted foreign terrorist organizations,

20     provided material support to terrorists and foreign terrorist

21     organizations, and committed acts of international terrorism.

22          The issue for today is how the case should proceed

23     in terms of discovery because I understand there's a dispute

24     as to how to deal with the prior extensive discovery that's

25     already happened in the *Linde* case and how that should affect

5

1     the case here.

2             So let me find out from Mr. Osen and Mr. Bonner,

3     whoever wants to talk, about your proposal for how the

4     discovery that's already been conducted in *Linde* should be

5     applicable to this case.

6             It looks from your papers as if you're asking that

7     the whole discovery just be imported into this case and I'm

8     not quite sure how that would work.  Okay.

9             MR. OSEN:  Thank you, Your Honor.

10            Our view of this is in large part contingent on how

11    Judge Cogan would want to approach the question of the trial,

12    which obviously, Your Honor, in a typical case we wouldn't

13    start at that point.

14            But this case obviously is quite different because

15    of its history with *Linde* and so forth.

16            THE COURT:  So tell me what you think the options

17    are for Judge Cogan and why --

18            MR. OSEN:  Sure.

19            THE COURT:  -- each choice would lead to a different

20    approach here.

21            MR. OSEN:  Right.  Exactly.

22            So one possibility, as the defendants have proposed,

23    is to have a trial of all the attacks and all the plaintiffs

24    combining liability and damages in one proceeding.

25            And in one sense, that's quite straightforward.  I

6

1    believe in total that's about 70 plaintiffs factoring in the

2    few plaintiffs who have been dismissed in the *Miller* case.  So

3    I believe we have 35 plaintiffs in total and the Pam

4    plaintiffs are 35 as well.

5            I think again -- don't hold me to the exact number -

6    - but I think it's approximately 35 plaintiffs in Hamas

7    attacks and 35 in other non-Hamas attacks.

8            In other words, Palestinian Islamic Jihad, a popular

9    front for the liberation of Palestine, or Al-Aqsa Martyrs

10   Brigade attacks.  So that's sort of the broad division.

11           Now ordinarily, Your Honor, I think 70 plaintiffs --

12   and I think in our case at least we have a total of nine

13   attacks -- that certainly would be manageable from a trial

14   management standpoint to do in one proceeding.  And ordinarily

15   I think the plaintiffs in most cases would prefer to combine

16   damages and liability.

17           The reason not to do it here is really just one of

18   judicial efficiency and frankly less labor and contentious

19   issues on the front and at least from the plaintiffs'

20   perspective.

21           If our proposal were adopted, we would begin

22   primarily with the Hamas attacks of which all but one have

23   been previously litigated in *Linde*.  And we would propose to

24   largely import the prior *Linde* record into this case as Judge

25   Weinstein did in the *Gill* case.

7

1          But it ties into the question of bank secrecy, which

2     is sort of the 800-pound gorilla in the room so to speak,

3     because depending on how bank secrecy plays out, the issues

4     become more or less complex.  And let me give a practical

5     example.

6          So with respect to the Hamas attacks and the Hamas

7     claims that were in *Linde*, the parties and the Court have a

8     pretty good understanding of what the relevant scope of

9     production was in the *Linde* case as well as what sort of names

10    and entities would be the subject of a production order for

11    the Hamas attacks.  So the sort of typical scope issues and so

12    forth were essentially all decided.

13         In *Linde*, the Court allowed certain evidence to be

14    presented at trial so we know what the Court's view is of

15    which parts of that record were germane and which weren't.

16         To the extent that we were to proceed beyond the

17    Hamas attacks, then the scope obviously would expand and would

18    be subject to potentially greater dispute and delay.

19         So our proposal -- let me sort of go back to the

20    beginning -- our proposal which is the sort of the rifle-shot

21    approach would be a Hamas only, liability only trial.  And,

22    therefore, following that -- in other words -- well, one more

23    step back, Your Honor.  I apologize.  We would contemplate

24    overall having two trials, one for Hamas and one for all other

25    attacks if that became necessary at a later date.

1          The advantage of doing the Hamas only process is

2     that essentially everything is teed up except for the question

3     of how bank secrecy plays out.

4          The defendants have -- the defendant has made clear

5     that they want to sort of start from day one on discovery in

6     this case and to proceed with discovery and to allow them to

7     sort of restart the whole bank secrecy process again starting

8     with discovery requests, eventually a production order,

9     letters of request to foreign governments, et cetera, et

10    cetera.

11         And that may be appropriate to some degree, but we

12    think it would be far more manageable if it were in the

13    narrower context of Hamas claims than it would be in the

14    context of the case as a whole.  And I can give a practical

15    example of that.

16         THE COURT:  Well, I don't think you need to do that.

17    So let me see if I understand what you're saying.

18         You're contemplating having basically three trials,

19    one is Hamas only, the other on liability.  The second would

20    be other organizations on liability.  And then a third would

21    be on damages, right?

22         MR. OSEN:  Right.

23         THE COURT:  Okay.

24         MR. OSEN:  Essentially.

25         THE COURT:  And you're also contemplating having all

9

1    the discovery from *Linde* import.  So let me just back up.  In

2    *Linde*, was the discovery just Hamas or was it others?

3              MR. OSEN:  It started -- in the history of the case,

4    it started more broadly and the production orders initially

5    covered a much wider range.

6              But once the Court -- and that time it was Judge

7    Gershon -- decided to adopt a trial management plan for Hamas

8    only attacks, then the discovery focused on Hamas.

9              THE COURT:  Was that an agreement among the parties

10   to focus on Hamas or did Judge Gershon order the parties to

11   disregard the other organizations and just focus on Hamas?

12             MR. OSEN:  Well, as a practical matter, the

13   plaintiffs' position was to have a Hama only trial.  At the

14   time the defendant wanted each attack to be tried separately.

15             And also at that time, Your Honor -- although it's

16   kind of ancient history to this case -- there was also a

17   sizeable alien tort statute part of the case.  So this

18   aggregation of all those claims involving thousands of

19   plaintiffs -- without going into the entire history of it --

20   was distilled ultimately into a trial for 297 plaintiffs who

21   were victims of Hamas attacks.

22             THE COURT:  Okay.  So it doesn't sound like the

23   discovery in *Linde* was all that straightforward either, right?

24             MR. OSEN:  No.  By no means.  It's a 14-year record,

25   Your Honor.

10

```
 1            THE COURT:  Okay.

 2            MR. OSEN:  We're not suggesting by the way, Your

 3     Honor, that if for example the defendants were permitted to

 4     proceed with letters rogatory or requests to their -- to the

 5     bank's regulators in the Palestinian territories or whatever,

 6     if by some miracle, contrary to the last 14 years of

 7     experience they decided to have a change of policy and allow

 8     production, well, that would obviously change the nature of

 9     the entire equation.  We recognize that.

10            But since the probabilities here are that in one

11     form or another we're going to be more or less in exactly the

12     same place we left off the last case from a production

13     standpoint, it seems to us to try and avoid as much as we can

14     the sort of 14-year saga that the Court has already

15     experienced previously.

16            THE COURT:  Well, the 14-year saga is not because of

17     discovery.  There were a lot of other things that were

18     happening during that time.

19            So if we were to begin discovery as defendant

20     proposes from day one, it wouldn't take us 14 years.

21            MR. OSEN:  Well, Your Honor, I'd respectfully

22     disagree somewhat.

23            THE COURT:  Really?

24            MR. OSEN:  Yes.  Because --

25            THE COURT:  You think this will take 14 years?
```

11

1    MR. OSEN:  I don't know about 14 years.  But if I

2 may just briefly, we began discovery in 2005 in *Linde* and we

3 concluded with the supreme court denying sur* petition* in

4 2013.  So that's eight years just from that standpoint.

5    THE COURT:  All right.  So why wouldn't it make

6 sense to have discovery?

7    I mean, I guess the other thing that stands out is

8 that in the *Linde* discovery there was a discovery sanction

9 because there was a -- partly because of delay and then also

10 refusal to turn over records, and there was a clear order

11 which the defendant disobeyed.  All right.

12    And so in this case, it's possible -- and I'll ask

13 defendant in a moment -- that they will in fact comply and,

14 therefore, all of that history won't be applicable in this

15 case.  If there's no delay and there's compliance, then there

16 may not be a sanction.  So to just take everything that's

17 happened and superimpose it on today may not make sense.

18    MR. OSEN:  Well, I agree with that, Your Honor.  I

19 don't think this is a process where the Court has to make that

20 determination now.

21    However, because for example in *Linde,* before we got

22 to the Hamas focused process, for a time the parties were

23 briefing and dealing with assertions of bank secrecy in I

24 think at least seven and maybe more jurisdictions because of

25 where records, responsive records were.

12

1      In a Hamas only context, we'd in all likelihood be

2    dealing with bank secrecy in two jurisdictions, not seven or

3    ten and so forth.  The wider the net, the more collateral

4    issues we have.  So that's really our point.

5      It's not a question of starting out from the outside

6    and saying, you know, the defendants are precluded from having

7    an expert or offering testimony because it's already in the

8    record.

9      Well, to use a practical example, if the defendants

10   produced thousands of records that had previously been

11   withheld, we certainly would want to take the depositions of

12   the bank employees whose records are responsive and so forth.

13   We wouldn't want to stand on those prior depositions.

14     But on the other hand, if the song remains the same

15   and there is no production, then the idea of having to redo

16   the entire record as a formality seems to be a waste of

17   resources.

18     THE COURT:  What record are you talking about?

19     MR. OSEN:  I'm talking about previously, Your Honor,

20   for example, no bank employees -- at least in the Palestinian

21   territories or Jordan -- were allowed to answer questions

22   about specific accounts or their knowledge of specific account

23   holders and so forth.

24     If that were to remain the case, then we feel it

25   makes sense to simply adopt that prior testimony rather than

13

1    going through a process of deposing 10 or 15 people to get the

2    same instructions and so forth.

3          THE COURT:  But we won't know it's the same until --

4    or different -- until we go through the process.  And that's

5    -- what I'm trying to figure out is what are we actually

6    saving by your proposal?

7          Why not have the parties get together in the first

8    instance and see what can be produced because it's already

9    been produced and it's easily accessible and easily

10   producible.  Right?

11         A lot of times the delay is the defendant or the

12   parties having a hard time gathering the documents, figuring

13   out what's responsive, et cetera.

14         So if you were to sit down and look at the things

15   that the plaintiffs are looking for and the defendant can look

16   and see if they can just produce it because it's pretty easy

17   because they've been asked to produce already, they can make a

18   decision whether producing the same thing makes sense.  Maybe

19   they've discovered something more in the interim and they need

20   to supplement it and produce it there.

21         So in other words, I don't know what we save by just

22   wholesale importing the discovery as opposed to going through

23   the process of having plaintiffs make the requests, defendants

24   produce the responsive documents, and then figure out the

25   deficiencies.

14

1          Like I said, given that there were deficiencies in

2     the first -- in the *Linde* discovery, I don't think defendants

3     are precluded from fixing those problems in this case if

4     that's, you know, what they want to do.

5          And so I think it makes sense -- I'm questioning --

6          MR. OSEN:  Right.

7          THE COURT:  -- what we're saving by not going

8     through that process?  Because, in fact, in fairness, given

9     what has happened already -- and this is a fresh case -- the

10    parties may be dealing with responses differently.  So let's

11    go ahead and have -- you're calling them formalities, but I

12    think it's just the process.  Right?

13         So you make your requests.  They could be the same

14    requests.  I don't know what your working relationship is with

15    plaintiffs' counsel in the *Linde* case.  It may be the same

16    requests.  Fine.  Make those same requests.  Defendants will

17    make their answers.  They may be the same or they may be

18    different.  And then you can deal with it if it's different,

19    you know, in that case.

20         If it's the same and you're having the same

21    problems, of course you can come to the Court and say as

22    precedent in *Linde* this is how the judge dealt with the exact

23    same situation and, therefore, that situation should apply

24    here.  And certainly given our, you know, reliance on

25    precedent, I or Judge Cogan would certainly look at what has

15

1   already happened previously.  If nothing has changed and it's

2   exactly the same, we may well come out the same way.

3          But I just don't know why -- given that there may

4   well be many differences in how the responses are, how there

5   are responses in this case -- that we shouldn't go through the

6   process of figuring out what's the same and what's different.

7          MR. OSEN:  I largely agree with that.

8          THE COURT:  Okay.

9          MR. OSEN:  And so the point we made was not about

10  what the Court's next step would be.  In our letter to defense

11  counsel, we laid out what we think the overall approach to the

12  case would be.

13         The way it would practically play out from our

14  standpoint in terms of the initial discovery is between I'll

15  call it Hamas-focused requests versus those that are broader

16  and encompass the PLO and so forth.

17         THE COURT:  Okay.  All right.  So let's focus on

18  that then.  So are you saying that with a bifurcated trial,

19  focusing first on Hamas and then on the PLO, just that's

20  shorthand, that you -- if you were to prevail on the Hamas

21  liability that you wouldn't go forward on the other

22  organizations?

23         MR. OSEN:  No.  I'm --

24         THE COURT:  So what are we saving?

25         MR. OSEN:  What we're not so much saving is sort of

16

1    delineating the battle space if you will, Your Honor, between

2    places where we know what the sort of universe of likely

3    responsive records are and the jurisdictions they're in versus

4    the ones we don't, which is just more of a black box in terms

5    of how open ended that is and whether we're having collateral

6    disputes over records in Germany or England or Morocco or

7    other jurisdictions.

8              THE COURT:  Okay.  So is your -- is the basis for

9    your bifurcating Hamas and non-Hamas discovery and trial just

10   because *Linde* focused on Hamas so that's a more known entity

11   and the other stuff is more unknown?  Is that the basis or

12   primary basis?

13             MR. OSEN:  That's part of it.  That, and obviously

14   from our standpoint we know what the evidence was to establish

15   that Hamas perpetrated those attacks.

16             We've had experts, both expert reports and testimony

17   at trial on that issue.  We've had a comprehensive evaluation

18   of the records that were produced in that case with respect to

19   Hamas attacks.

20             So it's simply a much more known quantity.  We know

21   what the fault lines are and the battle lines of that dispute.

22   That's not to say that we can't serve discovery requests that

23   touch upon Islamic Jihad or other groups and so forth.

24             But from our standpoint, at least until the Court

25   determines what it wants to do in terms of the ultimate trial

17

1    management, we would prefer to separate those out into

2    separate kind of tracks of requests.  Because one, we already

3    know at least what are the likely responsive documents, the

4    likely jurisdictions involved, versus the other which is a

5    more open-ended proposition.

6            THE COURT:  Well, I mean, if you want to track it

7    that way, you should feel free.  But there's no reason they

8    can't happen simultaneously.

9            MR. OSEN:  No.  I agree with that, Your Honor.

10           THE COURT:  Right?  I mean, if you want to classify

11   for your ease as Hamas/non-Hamas, that's your prerogative to

12   keep track.

13           But I'm not sure I see a scenario where Judge Cogan

14   or I would be bifurcating trials because you could get two

15   different, conflicting verdicts by two different juries on

16   basically the same case.

17           So it just seems like there should be one trial.  I

18   don't know why you think that we should be bifurcating

19   discovery on the -- because there's some likelihood that there

20   will be two different trials.

21           MR. OSEN:  Well, Your Honor, just on that first

22   point, I can't speak obviously to the evidence with respect to

23   Islamic Jihad or the PLO attacks and so forth, but there is

24   usually three elements if you will to these kinds of claims.

25           The first is the attribution to the particular

18

1      terrorist group.  Then there's the question of the material

2      support or aiding and abetting that was given to that

3      particular terrorist group.  And the third is the defendant's

4      state of mind with respect to any support it gave, its

5      awareness of its role.

6            So the evidence could very well be different that I

7      can't speak to at this stage of the proceeding, but --

8            THE COURT:  Right.  I understand that the evidence

9      could be different.  But from a case management perspective,

10     it seems premature.

11           It seems -- you seem to be saying how discovery is

12     conducted depends on whether there will be two trials on Hamas

13     and non-Hamas terrorist activity let's say and I think that's

14     backwards.

15           I think you should just go forward on all your

16     discovery.  And at the end of the discovery -- depending on

17     how the evidence shows up -- if there's a motion to have a

18     bifurcated trial on that basis, you can make that motion.

19           But I just don't see at this point that it makes any

20     sense to delay because that's really what you're asking for,

21     discovery on one aspect of this case over another.  All right.

22           So it seems to me all discovery should go forward.

23     It seems to me the discovery should just go forward in the

24     normal course.  And then depending on things go, if you want

25     to make an application to bifurcate the trial, you can

19

1   certainly do that.

2           I saw in *Linde* that the damages were supposed to be

3   the subject of a separate trial.  So probably that might make

4   sense in this case.  I'm not prejudging it.  That part makes

5   sense to me.  But bifurcating Hamas/non-Hamas doesn't at this

6   point.  It may later on, but I don't think that that decision

7   need to be made before discovery goes forward.  All right.

8           MR. OSEN:  That's fine, Your Honor.

9           THE COURT:  All right.  Mr. Siegfried, is there

10  anything you want to say or have I made all your points?

11          MR. SIEGFRIED:  I'm not sure I do, Your Honor.  It

12  seems that you have -- as I understand it -- outlined exactly

13  what we put in our proposed discovery order.  And we think

14  that's absolutely correct.

15          I do think, to the extent it might become relevant

16  later, that it's worth also noting a couple of points that are

17  subsumed within what you said.

18          The first is that there is prejudice to the

19  bifurcation if, as and when that issue were to arise.  The

20  plaintiffs here chose to bring a lawsuit alleging these

21  various support to various groups and to put all of these

22  attacks into one lawsuit.  Now they say they basically want to

23  disaggregate that.  And for what reason?

24          It doesn't -- certainly not more expeditious to have

25  multiple trials as opposed to having a single trial.  It's

1    certainly not more efficient.

2            And, in fact, if you're talking about expediting

3    discovery on the one hand and then saying but we should be

4    delaying trials on the other, those seem to be clearly

5    inconsistent concepts.  But they're also prejudicial concepts

6    in this case.

7            Your Honor alluded to the Second Circuit decision I

8    think and the sanctions issue -- and you said, you know, a

9    delay in discovery which was found by the Second Circuit.

10           I think it's important to remember that when that

11   sanctions issue went to the Second Circuit, the real issue for

12   the Court was whether it really had jurisdiction to hear the

13   sanctions order at that point, whether under the issue or the

14   collateral order issue on mandamus it was proper.

15           And the Court, in fact, went out of its way to say

16   that the order -- that its decision should not be read to

17   preclude a future challenge, that the Court erred in the

18   sanctions.

19           And specifically it found the district court's

20   explication of the foreign state interests were sparse.  And

21   that, in fact, the whole description of the Bank's delay was

22   really subject to legitimate debate.

23           And later when that issue went up to the supreme

24   court on cert, the supreme court asked for an amicus brief

25   from the Solicitor General.

21

1         THE COURT:  And cert was denied.

2         MR. SIEGFRIED:  Right.  The cert was denied, but the

3  Solicitor General made the point that the order itself was a

4  fatally flawed order in its opinion.

5         THE COURT:  The Solicitor General asked that cert be

6  denied?

7         MR. SIEGFRIED:  Yes.

8         THE COURT:  Okay.  So that's --

9         MR. SIEGFRIED:  But --

10        THE COURT:  -- the supreme court denied cert.

11        MR. SIEGFRIED:  The supreme court -- but --

12        THE COURT:  And the Solicitor General wasn't asking

13  the supreme court to revisit the issue so the order stands.

14  So, in fact, not withstanding dicta, that the Solicitor

15  General somehow felt compelled to put out there, they were not

16  asking for the district judge's decision or the Second Circuit

17  review to be overturned.

18        MR. SIEGFRIED:  All of which is to my point.

19        THE COURT:  Okay.

20        MR. SIEGFRIED:  That the issue was that the

21  sanctions order was to be subject to an appeal from a final

22  judgment.

23        THE COURT:  Which it was and --

24        MR. SIEGFRIED:  Which it was.

25        THE COURT:  Yeah.

22

1          MR. SIEGFRIED:  And as you know, because the Court

2     was informed by among others the plaintiffs that there would

3     be no further trial in *Linde* that it was unnecessary.  If the

4     Court dismissed on any -- reversed and vacated on any grounds,

5     it needn't reach other grounds.  So it didn't reach the

6     sanctions order.

7          So having a proper record should -- that situation

8     unfortunately arise again, it is important to have a proper

9     record.  What were the requests?  What were the responses?

10    What was the timeliness of the responses?

11          THE COURT:  Right.

12          MR. SIEGFRIED:  What were the efforts?

13          THE COURT:  So are you trying to persuade me to

14    change my mind?  Because I think I made that point.

15          MR. SIEGFRIED:  Right.

16          THE COURT:  Okay.

17          MR. SIEGFRIED:  So I think that that is important.

18    And really other than that, I think as long as what we are

19    understanding is that they will make requests for documents

20    and we'll respond to those requests, then that's all that

21    we've asked for today so that we have a clean record.

22          THE COURT:  Okay.  So what I would like to see

23    happen in this case is for the parties to move forward with

24    discovery.  And I don't want to call it a clean slate, but

25    we're going to start as every other case does with requests

23

1    and interrogatories and responses.

2              Now knowing and understanding that at least one

3    party here has been through this process before, I would

4    anticipate that your responses can be expedited and that there

5    won't be a lot of delay due to your need to collect documents.

6              Now if the requests are different in scope, that is

7    understandable and you might need more time for that.

8              But given that if the requests are the same, there's

9    no reason that the responses wouldn't be the same other than

10   if things needed to be updated.  All right.

11             The other point is this bank secrecy issue.  Now are

12   you going to assert that in this case?  Do you know?  Because

13   if you are, then I'd like to just have it put out there.

14       Discovery should proceed, but I think there should also

15   be some early briefing on the issue given that it's been

16   through the whole gamut of discussion that you've put out

17   there.

18             If anything has changed such that Judge Cogan who

19   very clearly set out in his decision -- he believed that the

20   sanctions should stay and, you know, everything should stay --

21   that's one thing.

22             But if there's some different -- if there's some

23   reason to view that issue differently, then this might be a

24   good time to get the parties geared up on that.

25             MR. SIEGFRIED:  Yes.  I'd like to ask Mr. Peck to

1    address that.

2              THE COURT:  Okay.  Mr. Peck.

3              MR. PECK:  Your Honor, do you prefer we stand or sit

4    because of the microphones?  I'm used to standing.

5              THE COURT:  Whatever you want to do is fine --

6              MR. PECK:  Okay.

7              THE COURT:  -- as long as you speak into the

8    microphone.

9              MR. PECK:  All right.

10             THE COURT:  All right.

11             MR. PECK:  The one other point with respect to that

12   is, as Your Honor well knows, there have been changes in the

13   federal rules of civil procedure.

14             In particular the elevation of proportionality up

15   into 26(b)(1) and the proportionality factors really require,

16   as Judge Campbell did in I think it was *In re: Bard*, looking

17   first at is the request relevant, proportional, et cetera,

18   under the federal rules.

19             Now in *Linde*, they asked for the records not only of

20   the Saudi Committee, one of the charities or terrorist

21   organizations as they would call it, but they asked for those

22   records.  We got a waiver.  We produced.

23             They also asked for the records of something like

24   10,000 bank customers in the Palestinian territories.  Pre

25   December 2015, that was looked at merely as a question of

25

1   foreign bank secrecy.  I would suggest, Your Honor, that that

2   may well be something that needs to be looked at first as to

3   proportionality, how much should they be entitled to.

4          And then once that has been determined either by

5   agreement of the parties or by putting that quickly before

6   Your Honor after we see their requests and they see our

7   responses, then go to the issue of how are we going to get

8   waivers from customers or how are we going with the

9   cooperation of plaintiffs' counsel and Your Honor to get

10  letters rogatory or Hague Convention requests in an attempt to

11  override the bank secrecy by going through lawful foreign

12  courts to get the information.

13         THE COURT:  Okay.  Well, thank you for giving me a

14  preview of that.  And I guess I would point out, as you well

15  know, that proportionality isn't just how difficult it is.

16         MR. PECK:  Yes.

17         THE COURT:  It's the need for that information

18  versus the burden.  And so you don't start with the burden,

19  you start with the need and then you look at the burden.

20         So I'm glad everybody's put that out on the table.

21  So I would urge the parties to put that issue early on.

22         If that's going to be a request, to put the request

23  out early so that you can respond appropriately.  So that then

24  if the issue comes to me or Judge Cogan, that we have time to

25  look at it while discovery continues.  All right.  So it's not

26

1    the last thing that we deal with because that could lead to

2    delays.

3              So let's do this.  I will ask the parties to go back

4    to the drawing board and come up with a discovery plan given

5    how I have outlined how I think discovery should proceed.  All

6    right.

7              So if you -- if plaintiffs still want to use this

8    Hamas/non-Hamas track, that's fine, but you need to keep them

9    running at the same time.  All right.

10             There's no reason to have one start and the other

11   just because one's easier than the other.  All discovery

12   should just be proceeding as a group.

13             The damages issue.  I don't know how *Linde* dealt

14   with the damages issue in discovery.  Certainly that's

15   something if you wanted to come to an agreement as to how to

16   do that, that's fine too.

17             But I'm not inclined to permit there to be

18   everything in a request for example for everything produced in

19   *Linde* should be produced here.  That's not going to be very

20   helpful.  I think that you should go through each request even

21   if they are identical to what was propounded in *Linde* so that

22   defendants have an opportunity to respond to each item.

23             If there are ways to shortcut that issue by grouping

24   things -- so if defendant already knows what's been produced

25   and you're going to produce the same thing -- then the request

27

1    can be tailored to do that.  All right.

2           So I guess this is by way of saying I'm allowing you

3    to start with a fresh slate, but don't act as if you don't

4    know what has already happened.  All right.

5           Don't put everything that has already happened and

6    your experience and your knowledge out of your heads.  You've

7    been through it before.  That should make it easier for you.

8    It doesn't make sense for you to act as if this is all brand

9    new.  Okay.

10          So rely on your experience, try to be efficient,

11   move forward, but be precise so that there are -- I think the

12   takeaway from this is I want to give the defendants an

13   opportunity to fix problems that occurred in *Linde*.  All

14   right.  And so if they fix them, they should have that

15   opportunity.  If it's going to be the same problem, then

16   plaintiffs have whatever they've got.  Okay.

17          And then the bank secrecy issue should be flagged

18   and briefed quickly early on so I know the scope of what's

19   being requested and, therefore, the need and the burden can be

20   waived.

21          Yes.

22          MR. OSEN:  Your Honor, just a couple of quick

23   things.  We understand completely the Court's position.  Just

24   one point of clarification.  Counsel here are the same counsel

25   as were in the *Linde* cases.

28

1           THE COURT:  Oh, great.

2           MR. OSEN:  And so we actually have physical

3    possession of the production in that case and, therefore,

4    we're really just talking about Bates numbers --

5           THE COURT:  Okay.

6           MR. OSEN:  -- not, you know --

7           THE COURT:  Yeah.

8           MR. OSEN:  -- a more abstract reference.

9           THE COURT:  So that's even better.  So why don't you

10   sit down with defense counsel and say we've got these.  Is

11   there any reason that we can't use these documents in this

12   case?

13          I don't know if there was an order of -- a

14   stipulation of confidentiality for example or, you know,

15   something like that.  So why don't you start with the --

16   that's a great place to start.  Okay.

17          MR. OSEN:  Right.

18          THE COURT:  So just say we've got these documents.

19   Is there any reason we can't use them?  And then you can

20   propound your requests.  You may not need to make specific

21   requests because you've already got the documents and the full

22   compliance.  You may just ask for supplementation.  However

23   you want to do it.

24          But I'm glad to know that you've got all the

25   requests and responses.  And so I think you should be coming

29

1    up with an expedited discovery schedule here.

2           MR. SIEGFRIED:  Your Honor, just to be clear on that

3    point --

4           THE COURT:  Yes.

5           MR. SIEGFRIED:  -- because I agree that they have a

6    number of documents and I agree that nobody on our side is

7    suggesting that people engage in -- unless they choose to do

8    so -- in reproducing documents.

9           But I do think it is important the starting point,

10   as you started before, was let us have specific requests so we

11   know -- if the response to that request is see Bates numbers 1

12   through 10, that's fine.  But you understand here's the

13   request, here's the response.  Rather than, well, we have all

14   your documents.

15          Do you agree we can use all of those documents?

16   Because all of those documents in all of that discovery in

17   *Linde* is not relevant to the attacks here.

18          THE COURT:  All right.  But I suppose I'm suggesting

19   that you sit down and go through that together rather than

20   have an email correspondence of, you know, 50 requests and 100

21   responses or something like that.  Right.

22          MR. OSEN:  Yes, Your Honor.  The only other point I

23   wanted to make was that with respect to the sort of standard

24   form Your Honor uses, I think it only makes sense to start

25   with the exchange of the initial requests and so forth.  We

1    anticipate, as I think you've heard already, that there will

2    be a response with respect to bank secrecy and that will --

3              THE COURT:  Yeah.

4              MR. OSEN:  -- inevitably derail the normal schedule.

5              THE COURT:  Yeah.  So why don't I give the parties

6    leave to deviate from my standard list.

7              Just make sure that those deadlines -- that you're

8    looking at those deadlines and accounting for them, but you

9    don't have to use that form because, as you point out, there

10   are certain things that need to be included which I don't have

11   in the normal course.  All right.

12             So just sit down and come up with a schedule that

13   makes sense that includes the discussion, the requests, the

14   responses, the agreement on the number of requests and

15   interrogatories, those kinds of things, the briefing for the

16   bank secrecy issue, and just set out a roadmap that will be a

17   comprehensive case management plan that makes sense.

18             Remember this is Judge Cogan.  He likes to move

19   things quickly.  So you should not have too much slack built

20   into that.

21             And I will also be looking at it in that way.

22   Because if you've been through this before, it's the same

23   parties, same counsel.  You know, it's not going to be exactly

24   the same, but I think you have enough experience to not have

25   to reinvent the wheel.  All right.  But do have those

1    discussions so that you know exactly what you're talking

2    about.  All right.

3              So when can you give me that schedule?

4              UNIDENTIFIED:  Two weeks?  A week?

5              UNIDENTIFIED:  Two weeks?

6              THE COURT:  Can I say end of next week?  June 28

7    gives you ten days.  All right.

8              UNIDENTIFIED:  Perfect.

9              THE COURT:  So June 28 you should file that on ECF

10   and this will be a proposed -- I'll call it case management

11   plan because it will have more than just discovery.  And that

12   should take us -- I'd like to have that go all the way up to a

13   joint pretrial order.  All right.  To the extent that you can

14   anticipate how the dates will go.

15             And like I said, if you brief the bank secrecy issue

16   early on, then the discovery can be going on while that matter

17   is being decided so you don't build in delay for the Court's

18   decision on the -- on the issue.  All right.

19             So I will look at what you've proposed.  If it looks

20   good, I will so order it.  If I have any questions, I will

21   have another conference.

22             If it's -- if I just have a few questions, I may

23   have the conference by phone and there won't be a need for you

24   to come in.  If I think it's useful to have you come in, I'll

25   have another conference in person.

32

1        If it looks fine and I'm so ordering it, I'll

2    probably ask for a status report at some point or maybe you

3    can build in a status report schedule as well to let me know

4    how things are going.  All right.

5        Is there room for settlement in this case?  Should I

6    be asking?  Well, maybe you can consider that as part of your

7    schedule.  All right.

8        So as part of the case management plan, if you think

9    it would be useful to have a settlement conference at any

10   point, please put that date in there as well and I'll see if I

11   can accommodate you.

12       But if you don't think there's room for settlement

13   or you don't think it's useful to have a settlement discussion

14   until every thing is done and you're almost on the eve of

15   trial, then that's fine too.  All right.

16       I'll leave it up to you in the first instance to

17   tell me, to give me some guidance and I'll look at it and see

18   if it makes sense.  All right.

19       Yes, Mr. Peck.

20       MR. PECK:  Your Honor, speaking of guidance -- and

21   this may be premature and I apologize to my colleagues -- but

22   we have exchanged drafts of a protective order and the only

23   provision we disagree on is we have requested a federal rule

24   of evidence 502(d) non-waiver of privilege paragraph in that

25   order.

33

1        And one of Mr. Osen's colleagues emailed yesterday

2   saying, oh, no, no, we just want a 502(b) where you've got to

3   go through the, you know, was the review for privilege careful

4   enough, et cetera, et cetera.

5        I have been for years a big advocate of having

6   502(d) non-waiver orders in every case.  I can expand on that

7   now if you wish.

8        I don't know if Mr. Osen is prepared on this or if

9   we should spend some more time talking about it.  But if Your

10  Honor had any guidance you wanted to give with respect to a

11  502(d) provision, I'm sure we'd both appreciate it.

12       THE COURT:  I have not given that any thought and so

13  I think the parties should talk about it some more.  And if

14  you have a specific -- if you have specific arguments you want

15  to present, just submit that to me in writing.

16       It can be just very brief as to why one party wants

17  it one way and another wants it another way and I'll let you

18  know at that point what makes sense.  All right.

19       MR. PECK:  All right.

20       THE COURT:  If you could work it out on your own,

21  that's always preferable, and come to some agreement on it.

22  Okay.

23       Anything else?  Great.  Thank you, everybody.

24       ALL COUNSEL:  Thank you, Your Honor.

25       (Proceedings concluded at 10:52 a.m.)

34

1      I, CHRISTINE FIORE, Certified Electronic Court Reporter

2    and Transcriber, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6

7

8

9    _____   June 18, 2019

10    Christine Fiore, CERT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25