```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


AHARON MILLER, et al.,          *     Case Nos. 18-CV-2192(RPK)
                                *               18-CV-2192(RPK)
                                *
              Plaintiffs,        *     Brooklyn, New York
                                *     January 20, 2022
     v.                         *
                                *
ARAB BANK, PLC,                 *
                                *
              Defendant,         *
                                *
and a related case.             *
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

```
         TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
                  BEFORE THE HONORABLE PEGGY KUO
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Miller Plaintiffs:      AARON SCHLANGER, ESQ.
                                ARI UNGAR, ESQ.
                                Osen LLC
                                190 Moore Street
                                Suite 272
                                Hackensack, NJ 07601

                                STEVEN M. STEINGARD, ESQ.
                                ZAHRA DEAN, ESQ.
                                Kohn, Swift & Graf, PC
                                1600 Market Street, Suite 2500
                                Philadelphia, PA  19103

For the Pam Plaintiffs:         JAMES P. Bonner, ESQ.
                                Fleischman Bonner & Rocco LLP
                                447 Springfield Avenue
                                Second Floor
                                Summit, NJ 07901


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:  (Cont'd)


For the Pam Plaintiffs:          SUSAN MARLENE DAVIES, ESQ.
                                 Fleischman Bonner & Rocco LLP
                                 81 Main Street
                                 Suite 515
                                 White Plains, NY 10601

                                 JOSEPH TIPOGRAPH, ESQ.
                                 TRACY KALIK, ESQ.
                                 Heideman Nudelman & Kalik, PC
                                 Fifth Floor
                                 5335 Wisconsin Ave.
                                 Suite 440
                                 Washington, DC 20015

                                 EDWARD MACALLISTER, ESQ.
                                 Perles Law Firm, PC
                                 Suite 1000
                                 1050 Connecticut Avenue
                                 Suite 500
                                 Washington, DC 20036

For the Defendant:               BRETT INGERMAN, ESQ.
                                 DLA Piper US LLP
                                 6225 Smith Avenue
                                 Baltimore, MD  21209

                                 ANDREW JAY PECK, ESQ.
                                 JONATHAN D. SIEGFRIED, ESQ.
                                 COURTNEY SALESKI, ESQ.
                                 DLA Piper LLP
                                 1251 Avenue of the Americas
                                 New York, NY 10020

3

1          (Proceedings commenced 11:40 a.m.)

2          THE COURT:  18-CV-2192, Miller, et al. v. Arab Bank,

3     PLC and docket no. 18-CV-4670, Pam, et al. v Arab Bank, PLC,

4     Magistrate Judge Peggy Kuo presiding.

5          Will the parties please state their appearances,

6     beginning with plaintiff.

7          MR. BONNER:  Good morning, Your Honor.  My name is

8     Jim Bonner.  I'm one of the counsel for the Pam plaintiffs.

9          MR. UNGAR:  Good morning, Your Honor.  This is Ari

10    Ungar on behalf of the Miller plaintiffs.

11         MR. STEINGARD:  Good morning, Your Honor.  This is

12    Steven Steingard on behalf of the Miller plaintiffs.

13         MS. DAVIES:  Good morning, Your Honor.  Susan Davies

14    on behalf of the Pam plaintiffs.

15         MR. SCHLANGER:  Good morning, Your Honor. Aaron

16    Schlanger on behalf of the Miller plaintiffs.

17         MR. TIPOGRAPH:  Good morning, Your Honor.  Joe

18    Tipograph for the Pam plaintiffs.

19         MR. MACALLISTER:  Good morning, Your Honor.  Edward

20    Macallister here for the Pam plaintiffs.

21         MS. KALIK:  Good morning, Your Honor.  Tracy Kalik

22    for the Pam plaintiffs.

23         THE COURT:  Anyone else here for the Miller

24    plaintiffs?

25         THE COURT:  Okay.  So is there anybody else here for

4

1    the Pam plaintiffs?

2            MS. DEAN:  Good morning, Your Honor.  This is Zahra

3    Dean for the Miller plaintiffs.

4            THE COURT:  And who is here for the defendants?

5            MR. INGERMAN:  Good morning, Your Honor.  On behalf

6    of the defendants will be myself, Brett Ingerman.  And then we

7    will also have with us here Jonathan Siegfried, Andrew Peck

8    and Courtney Saleski.

9            THE COURT:  All right.  Thank you, everyone.

10           We're here because it sounds like there are a number

11   of disputes that have arisen. I will take each in turn.  One

12   of them is with regard to the bank secrecy law and the other

13   is with regard to other discovery issues.

14           So let's start with the bank secrecy issue. I have

15   read what you've sent me and I also read Judge Pohorelsky's

16   decision in the *Linde* case.  And I know that the letters

17   rogatory here have gone out.

18           I guess I would like the parties to fill me in on

19   where exactly you are and then I'm also curious as to what

20   happened after Judge Pohorelsky's decision in the *Linde* matter

21   when he directed the discovery to proceed notwithstanding the

22   bank secrecy laws.

23           So perhaps, Mr. Ingerman, since you were -- or your

24   client was involved in that other matter as well, let me start

25   with you and why don't you tell me what has happened so far

5

1    and also what happened in that case because what happened

2    factually will inform my attempt to come up with a practical

3    solution in this case.

4            MR. INGERMAN:  Sure.  Sure. I understand.  Thank

5    you, Judge. It's Brett Ingerman on behalf of the defendants.

6    And I think I have a practical proposal at the end of this,

7    which I will give you.  Let me tell you where we are in this

8    case.

9            So Your Honor will recall that we had the hearing on

10   September 24th, 2019 in front of you.  As a result of that

11   hearing you directed the parties to get together and to come

12   up with a representative list of individuals or entities that

13   he parties would ask the three foreign governments to issue

14   essentially a bank secrecy waiver for.

15           So we came up with a list of -- it was ten or 15

16   names.  We attached them to the letter rogatory that we

17   submitted to Your Honor.

18           Your Honor issued those letters rogatory.  That were

19   sent to the government authorities in Lebanon, Jordan and the

20   Palestinian authorities.  They went out in the February/March,

21   2020 time frame.  That's when the letter rogatory went out.

22           We provided status updates to the court I think

23   every 30 or so days while we were waiting to hear back from

24   those government authorities. We did hear back from all three

25   of them.  We heard back from Jordan on October 12th.  We heard

1      back from Lebanon  -- I'm sorry, the Palestinian authorities

2      on October 26th and we heard back from Lebanon on November

3      11th.

4                    All three of the government authorities denied the

5      request for the bank secrecy waivers for the individuals and

6      entities that were attached to Your Honor's letters rogatory.

7                    So as a result of those denials we had discussions,

8      or attempted to have discussions with the plaintiffs about

9      next steps.

10                    And the proposal that the bank made was that now

11     that the government entities had denied what I'll call blanket

12     waivers as to the individuals and entities that were attached

13     to the letters rogatory, we would like to go to individual

14     bank customers and try to get individual waivers.

15                    But we explained to the plaintiffs that we did not

16     think that a blanket waiver for all transactions for a

17     particular person or entity for a six year period was likely

18     to be successful.

19                    And we had certain objections to the relevance and

20     scope of the plaintiff's discovery.

21                    So what we proposed to the plaintiffs was that we

22     sit down with them and try to agree on a group of individuals

23     or entities that the bank would approach and ask for a waiver

24     with some limitations, whether they be time limitations,

25     whether they be search terms to be applied to the bank records

1    so that we could actually try to get the plaintiffs what

2    they're looking for.

3              For instance, if they believe that a particular

4    charity was involved in financial terrorism and the bank

5    should have known them by looking at the transactions, well,

6    then let's come up with some search terms to run through that

7    bank customer's account and try to find those records.

8              We were just trying to engage with the plaintiff's

9    on some limitation so that we weren't asking for broad waivers

10   from individual bank customers.

11             The plaintiffs rejected that proposal out of hand

12   and refused to really engage with us on the details of that

13   proposal.

14             We have reason to believe, based on some legwork

15   that we've done, that with some limitations on scope, we will

16   -- we may be able to get certain waivers from certain

17   customers.

18             I can't promise that but we do think if there's some

19   limited request for a waiver that's tied to the allegations in

20   the case, that we might be able to be successful.

21             And the plaintiff said no to that and the resulting

22   letter that they sent and we sent is what you have before you.

23   So that's kind of where we are in this case.

24             With respect to -- and by the way, we propose that

25   we could do that in 60 to 90 days.  So we're not talking about

8

1    a huge delay here.

2            And when we get to the plaintiff's production you'll

3    see that the plaintiffs are producing, for instance, ESI

4    information in 90 days.  So we would be doing it in the same

5    window as the plaintiff's production without any further delay

6    of the case.

7            And so our proposal to you is that essentially you

8    allow us to brief relevance, proportionality and scope of the

9    plaintiff's discovery requests.  Allow us to explain to you

10   why we believe there should be limitations on these discovery

11   requests.

12           The plaintiffs, of course, can oppose that and then

13   once you have ruled on the scope -- in other words, does the

14   bank have to produce, we then be permitted a short window of

15   time, 90 days, to go to bank customers with the request for

16   information as limited, if it's limited by Your Honor, and ask

17   for waivers from some of the customers, some or all of the

18   customers, of the bank.

19           And then at the end of that 90 day period we will

20   then know what the bank can produce and what the bank can't

21   produce based on bank secrecy. And then the parties can brief

22   the bank secrecy issues for Your Honor.

23           Because until you decide scope and we're given the

24   opportunity to get individual bank customer waivers, the bank

25   is really not in a position to know what it can produce and

1    not produce and we don't think there's be an adequate record,

2    frankly, for Your Honor to decide the bank secrecy issue.

3          So that's my practical proposal, which is either --

4    I can't force the plaintiffs to talk to us so either you order

5    us to talk to one another, as you have in the past, about some

6    limitation and scope so that we could go to individual bank

7    customers and ask for waivers or in the alternatives you allow

8    the parties to brief the scope issues.

9          Once Your Honor issues an order on scope you give us

10   some limited period of time, 90 days, the same time period the

11   plaintiffs are asking to produce their electronic records.

12         We go, we see what we can get from the bank

13   customers by way of waivers and then at the end of that 90 day

14   period we either have waivers or we don't and we can produce

15   what we're allowed to produce.

16         And then Your Honor has a record before her as to

17   the bank secrecy issues. So that's the practical proposal.

18         In response to your question about Judge Pohorelsky,

19   he did order the production of the documents.  The bank --

20   with respect to documents we were not permitted to produce by

21   bank secrecy Judge Pohorelsky did issue a sanction.  That

22   sanction was then appealed up to Judge Cogan -- I'm sorry. I

23   think it -- I'm trying to remember. I think it was Judge

24   Gershon at the time, Your Honor.  I'm testing my memory here.

25         Appealed up to Judge Gershon.  Judge Gershon issued

1    a much more severe sanction than Judge Pohorelsky had proposed

2    and that was the sanction that was applied in the prior trial.

3           THE COURT:  Okay. I remember that now.  Thank you.

4           MR. INGERMAN:  Sure.

5           THE COURT:  Okay.  So for the plaintiffs I don't

6    know whether Mr. Bonner or Mr. (indiscernible)  wants to be

7    the one that addresses Mr. Ingerman's proposal.

8           MR. BONNER:  Your Honor, this is Jim Bonner. I'm

9    going to speak for all the plaintiffs with respect to this

10   issue.

11          And I think I'll start where Mr. Ingerman had left

12   off in what Judge Pohorelsky had done in the previous case and

13   how that sanction was applied.

14          And I think it's just very important to note at the

15   outset that Judge Pohorelsky and then Judge Gershon and then

16   Judge Cogan after them ordered the production of a larger

17   number of documents, or larger categories of documents than

18   the ones that we're seeking here.

19          So we've kind of -- we're trying at this point to

20   just kind of move to the point where in the last case, which

21   was that as a result of the fact that the bank refuses to

22   produce the most important documents in the case, the account

23   records for people who are admitted terrorists, designated as

24   such by the U.S. government.  Charities that are directly tied

25   to terrorist organizations.  Families of suicide bombers who

1   received payments solely because they engaged in that

2   terrorist activity.  We're looking to have those documents

3   produced just as they were ordered to be produced in the *Linde*

4   action.

5           And I think that the effort this morning to try to

6   paint us a being uncooperative is with all respect to Mr.

7   Ingerman is completely inaccurate.

8           I think you'll find, Your Honor, in this case the

9   document requests that we've set forth are very unusual in

10  that we have identified specific individuals who have ties to

11  terrorism and we've asked for the documents related to their

12  account records.

13          But we've cited particular documents in the bank's

14  production which shows that those individuals have direct ties

15  to terrorism.

16          We've done that organizations, again, identified

17  specific organizations, identified documents that are in the

18  bank's records that show that they have ties to terrorism.

19  And we have an entire record from the *Linde* action which shows

20  that all of these persons and entities are tied directly to

21  terrorism.

22          So what the bank is saying here, Your Honor, is not

23  that it's burdensome on the bank to produce these documents.

24  What they're saying is that it's burdensome on these

25  terrorists and people who are affiliated with terrorists to

12

1  consent to produce documents over what amounts to a six year

2  period.

3         But that turns logic on its head, Your Honor. It's

4  not up to the founder of Hamas or the family of a suicide

5  bomber to determine for us what's relevant and what we're

6  permitted to ask for.

7         All of the precedent from the *Linde* action and then

8  subsequent cases from this circuit and from this district have

9  shown that courts have ordered the production of a larger

10 swath of documents than the ones that we're looking for here.

11        And they've done that because courts have recognized

12 the great importance in terrorism related litigation, of

13 accounts records for people who have direct ties to these

14 terrorist organizations. It makes imminent sense.

15        And it's not up the family of Sheik Yassin, the

16 founder of Hamas, or the family of a suicide bomber who

17 received thousands of dollars purely because their son

18 participated in the murder of American citizens to decide

19 whether they want to consent or not to the production of

20 documents.

21        So we're here, Your Honor.  We've cooperated with

22 the defendants by giving them detailed lists of who all of

23 these people are, and who all of these entities are.

24        And we've said to them if you want to go to your

25 clients and you want to try to create the appearance that

13

1    you've engaged in good faith efforts to try to produce these

2    documents, then we're certainly not going to stand in your

3    way.

4         And if there are any documents that get produced as

5    a result of that, then that's perfectly acceptable.  But we

6    have a right to all these documents.  We've not heard a word

7    that any of them are not relevant.  They're clearly relevant.

8    And we've not heard a word that it's burdensome for the bank

9    to just go to its computer and print out accounts records for

10   Sheik Yassin or the other founders of Hamas for whom the bank

11   maintained accounts.  That's not a burden.

12        Their burden that they're claiming is they can't

13   convince their clients to hand over these documents.  And,

14   frankly, that makes no sense.  They're not the arbiters of

15   what's relevant or what we're entitled to here.

16        And so what we would ask the court to do is in

17   contrast to the approach that Mr. Ingerman would like the

18   court to adopt is to allow us to brief this bank secrecy issue

19   at this point in time.  There's ample precedent in the *Linde*

20   case and in other cases in this district that we're entitled

21   to these documents.

22        And in the meantime, if the bank wants to engage in

23   its theater of going out and trying to get these people,

24   terrorists and their family members to produce documents to

25   us, then nothing's stopping them from doing that.

14

1    And indeed nothing has stopped them, Your Honor, for

2    the past two years where they've had these requests in hand

3    from going and asking their clients to consent to the

4    production of these documents.

5    And so there's no point in the delay that the bank

6    is asking for.  The prior precedent is that we were able to

7    brief these issues and that we were able to get a motion -- or

8    the motion to compel was granted and as a result we'd ask Your

9    Honor to just proceed at this point with the bank secrecy

10   briefing that we addressed in our letter.

11   THE COURT:  All right.  Thank you.

12   So my understanding of what Mr. Ingerman was

13   proposing was that if he were able to get the individual

14   customers to consent, then that would obviate the need to

15   address the bank's secrecy issue and that seems to be part of

16   the practical thinking behind the sequence of what he's

17   proposing.

18   But let me ask, Mr. Ingerman, in the *Linde* case, how

19   successful was the bank in getting customers to consent to the

20   production --

21   MR. INGERMAN:  So we --

22   THE COURT:  -- of their account information?

23   MR. INGERMAN:  Yeah.  Good question, Your Honor.  We

24   were able to get two significant consents.  The biggest one

25   was Your Honor recalls that part of this case involved the

15

1    Saudi Committee.

2         THE COURT:  Mm-hmm.

3         MR. INGERMAN:  The Saudi Committee was an

4    organization that provided benefits to Palestinians who were,

5    you know, who were in need and those transactions went through

6    the bank.  We went to the Saudi Committee, who was a bank

7    customer, got them to waive bank secrecy.  That resulted in

8    the production of almost 180,000 documents and obviated the

9    need for the Court to deal with bank secrecy as to the Saudi

10   Committee.

11        Another example is Hamdan, which is an alleged Hamas

12   spokesperson terrorist the plaintiffs characterize in

13   different ways.  We were able to get a waiver as to Hamdan's

14   account and produced those documents.

15        So, you know, I think there is -- you know, we have

16   reason to believe that we can get some waivers from some of

17   the bank customers.  And I'll give you an example.

18        I mean, Mr. Bonner -- I'm not going to -- I'm not

19   going to address the pejorative use of the word theater, but,

20   you know, Mr. Bonner highlights Sheik Yassin, right, who's the

21   founder of Hamas.  There are 677 entities and individuals in

22   the plaintiffs' document request for which they want bank

23   records.  A lot of those are charities for instance.

24        And so for instance if the charity is a bank

25   customer, and we go to the charity and say you're being

16

1    accused of facilitating payments to terrorist organizations

2    here's a request for a waiver that's limited in time and

3    limited to specific transactions, will you waive so that we

4    can demonstrate, you know, to the Court and to the plaintiffs

5    whether or not there are transactions that meet those search

6    terms, we have reason to believe that some of those charities

7    may well agree to that and obviate the need for the Court to

8    deal with bank secrecy.

9            Now, again, I can't make any promises, but we were

10   able to do it in a significant way from a volume perspective

11   in *Linde* and we think that it makes imminent sense to try to

12   do that here.  So that's number one.

13           And I'll also point out, you know, I know the

14   plaintiffs refer back to *Linde* over and over again, *Linde* was

15   overturned by the Second Circuit.

16           This is a different case than *Linde* frankly.  The

17   law is different as it's evolved.  The discovery requests are

18   different.  The bank's position on these issues are different.

19   We are much further away in time from these incidents which I

20   think will make a difference as we approach some of these

21   customers and ask for waivers.

22           So I just think it's -- I mean, I think it was

23   telling what Mr. Bonner said.  We're just trying to get to the

24   sanction.  I mean, that's what he told you effectively.

25           And skipping over the issues of proportionality,

17

1    relevance, and bank secrecy -- and I want to make one other

2    point, Your Honor, and then I'll stop -- you know, Mr. Bonner

3    said, well, you know, we're putting relevance in the hands of

4    the terrorists.

5         And what the plaintiffs are doing is they're

6    conflating relevance and bank secrecy.  We made scope and

7    relevance objections in our responses to the written document

8    requests from the plaintiffs.

9         We would like the opportunity to brief those issues

10   for Your Honor.  That has nothing to do with the individual

11   account holders.  Those are arguments that the bank will make

12   on scope and relevance.

13        Bank secrecy is a situation in which we do have to

14   go to our customers and seek waivers.

15        They are two different issues and that is why, Your

16   Honor, I'm proposing that we brief for you first scope and

17   relevance consistent with the objections that we made to the

18   plaintiffs' document requests, then give us an opportunity to

19   get the waivers once we know what the scope is, and then we

20   can brief bank secrecy.

21        For instance, I'll give you an example.  They have

22   677, 676, whatever the number is, people and entities for

23   which they're seeking bank transactions in foreign

24   jurisdictions.

25        Maybe as a result of the briefing that number comes

1    down significantly because you are convinced that we made a

2    proper relevance argument or proper scope argument.  And maybe

3    you are convinced by an argument that six years, from 1998 to

4    2004, is too broad.

5           And maybe you are convinced by us that there should

6    be certain search terms applied to these accounts as opposed

7    to producing all of the transactions for a six-year period.

8    Those scope restrictions will be relevant as we go to

9    customers and ask for waivers.

10          And so at the end of the day all we're trying to do

11   is create a record for you, Your Honor, that is complete on

12   which you can then decide the bank secrecy issues.

13          THE COURT:  All right.  Thank you.  I'm not sure why

14   then that the process needs to be sequential and why it should

15   be in that order.  It seems that both things could be

16   happening.  You can approach the customers and try to seek

17   waivers.  It doesn't sound like in *Linde* they were especially

18   successful if they only got one waiver, albeit a very helpful

19   one, but if you want to try, you certainly could.

20          In the course of your discussions with those

21   entities seeking waivers you could also seek -- if for example

22   the customer is open to having a certain amount of the

23   documents available that they could themselves seek to limit

24   the scope and then you would have a limited waiver and they

25   would produce that amount and then anything else could later

19

1    be the subject of a motion to compel that's less than

2    voluntary.

3            And so I -- I'm just concerned about the amount of

4    time that you're seeking because 677 customers seems like a

5    lot of people and that you will be looking for a lot of time

6    to try to get those waivers, so can you speak to the time

7    frame, Mr. Ingerman?

8            MR. INGERMAN:  Yeah.  Let me -- yeah, let me address

9    that.  Let me start out -- I mean, you know, we kind of are

10   where we are in this case for a couple of reasons.

11           One is that the plaintiffs -- remember, these

12   incidents occurred between 2000 and 2004, so almost 22 years

13   ago -- and the plaintiffs in this case, the majority of whom

14   are relatives of plaintiffs who were in the *Linde* case,

15   waited, you know, 13 to 16 years to bring their claims, really

16   just before the statute of limitations expired.  So we have 68

17   plaintiffs who waited, you know, 22 years effectively or so to

18   bring these claims.

19           And then of course Your Honor knows we had -- we had

20   the letters rogatory and then we had COVID, right, so that

21   caused inevitable delays in the case.

22           But what we're proposing -- particularly given the

23   fact that the plaintiffs are still at least 90 days and

24   perhaps more away from completing their production, we don't

25   think that the timing is going to be an issue here, number

20

1    one.

2          Number two, a big -- a large percentage of the 677

3    individuals and entities for which the plaintiffs seek

4    documents covered by the bank's secrecy laws are beneficiaries

5    of the Saudi Committee payments.

6          So we think -- and the reason we want the

7    opportunity to brief this for you is we think that those are

8    not relevant in this case.

9          Number one, because they're already gotten the

10   information that demonstrates that the Saudi Committee made

11   these payments through the bank to these individuals, so

12   there's not a real need or relevance to the individual account

13   records of those hundreds of beneficiaries of the Saudi

14   Committee payments.

15         And that's one of the issues that we'd like to brief

16   for Your Honor.  So, in other words, if you agree with us on

17   that issue, that wipes out I don't know a couple of hundred

18   probably of the 677.

19         So I understand what you're saying.  You know, you

20   could go to the bank -- you could go to the customers at the

21   same time, but, you know -- let me lay out a time line for

22   you, right?

23         So if Your Honor said, okay, Arab Bank, I want you

24   to get your motion for protective order on file in the next

25   two weeks, let's say, and then, you know, you give the

21

1    plaintiffs a couple, three weeks to respond, there's a reply

2    brief, a hearing, you know, your decision on scope and

3    relevance is probably -- I know you're busy, Judge, I'm not

4    even going -- I'm not even going to guess -- but, you know,

5    maybe in the next three to four months we get a decision on

6    scope and relevance, we're only asking for 60 to 90 days

7    thereafter to ask for the bank waivers.

8            And we're fine if you put a deadline on us of 90

9    days.  Whatever you get, you get at the end of 90 days.  And

10   then we're at bank secrecy at that point.  And my guess is

11   that the plaintiffs' production is not even going to be done

12   by then based on what we're seeing.

13           So I just think it would be hugely helpful to the

14   bank as we go about trying to get these individual customer

15   waivers to have a ruling from you on scope as opposed to

16   having the bank customer or the bank try to guess at what the

17   scope might be.

18           And going to them and asking for a broad waiver for

19   six years of transactions, every transaction you did over a

20   six-year period is likely doomed to failure.  I mean, that's

21   what we saw with the government authorities.  And that's

22   really why we're looking for at least the opportunity to argue

23   to you a limitation on scope and relevance before we have to

24   go to the bank customers.

25           THE COURT:  Although I would note that for a waiver

22

1    they don't need my ruling because they can waive as much or as

2    little as they're voluntarily waiving.

3             MR. INGERMAN:  Right.  Right.

4             THE COURT:  And so if you went to them and said

5    unfettered the request is for six years, and they said, no, I

6    think I should -- I'm just going to waive for one year, then

7    that's the waiver that you got, you don't need me to say that

8    it's limited to one year because the waiver is voluntary.  So

9    if they waive the one year, and if the plaintiff still wants

10   to argue that it should be six years, they will put that in

11   their motion and -- opposing your limitation -- your

12   protective order motion.

13            And if I say plaintiff you're right, it should be

14   six years, then you can either go back and ask -- tell the

15   party that waived the one year, okay, thank you very much for

16   voluntarily giving up the one year, but the judge says you

17   have to give five more years and you have no choice now.

18   Right?  I mean, those things can still happen.

19            I am concerned because this case is getting older

20   about building in delay when things don't seem to require one

21   thing before the next.

22            MR. INGERMAN:  Yeah.

23            THE COURT:  And, yeah.

24            MR. INGERMAN:  I'm sorry.  It's harder by telephone,

25   Your Honor.

23

1          THE COURT:  Yeah.

2          MR. INGERMAN:  I apologize.

3          THE COURT:  No.  No.  I understand.

4          MR. INGERMAN:  Yeah.  I hear you.  I think -- I

5    mean, here's what I'm trying to avoid, right.  If we get a

6    decision from you on scope, we then have a consistent approach

7    to all of the bank customers from whom we're asking for

8    waivers.  If we don't, if we do it ahead of your decision on

9    scope, then let me give you an example of what could happen.

10          Let's say we get -- I don't know, I'm just going to

11    pick a number -- ten waivers from ten different bank customers

12    and each one produces a different scope of documents, right,

13    then when we get to bank secrecy Your Honor is going to have

14    to look at each one, okay, is this enough, is that enough, was

15    this, you know, was this sufficient, was this reasonable?

16          Whereas if you give us your ruling then everybody

17    knows, the plaintiffs know, we know, the bank customer knows

18    what the scope of the request is and it's consistent and we

19    get a yes or a no from them at that point.  And, you know --

20    because I'm -- you know, if we get a year from a charity, the

21    plaintiffs are going to say that's not enough, you should have

22    six years.

23          But if we have a ruling from Your Honor then

24    everybody knows what the rules are and we can go to the bank

25    customers and say, hey, look, we have a judge that ordered

24

1   this is the scope.  We would like you to produce it.  You're a

2   charity or whatever.  And then it's a consistent approach and

3   you have a consistent record on which to rule when we get to

4   bank secrecy.

5           THE COURT:  Mm-hmm.  Okay.  I'm looking at Judge

6   Pohorelsky's decision in the *Linde* matter.  And when he was

7   deciding the issue of bank secrecy he listed some factors to

8   be considered based on the restatements of foreign relations

9   law.

10          And they're things like the importance of the

11  investigation, the specificity of the requests, whether the

12  information originated in the U.S., alternative means of

13  securing the information, the interest of the United States

14  versus the interest of the state where the information is

15  located.

16          I see specificity of requests as one of the factors,

17  but I -- and I don't see the scope of the requests as being

18  one of those factors.  And so, you know, just in terms of what

19  information I need before ruling on bank secrecy, I'm -- I

20  don't see that one of the factors at least that Judge

21  Pohorelsky identified is the scope of the discovery requests.

22          Can you tell me why what you're proposing -- the

23  sequence that you're proposing that I rule first on the scope

24  before making an assessment of bank secrecy, whether you just

25  think it's more practical, or whether you think it's a legal

25

1   matter I actually need information as to the scope before I

2   can rule on bank secrecy?

3            MR. INGERMAN:  Sure.  I think it's -- I think it's

4   the latter.  I think it's as a legal matter.  And that's

5   because we're talking about two different things really.

6            We're talking about first making a 26(C)

7   determination on scope and proportionality because you can't

8   -- you really should -- I don't think you can and I don't

9   think you should rule on the restatement factors on bank

10  secrecy until there's been a determination of whether or not

11  what the plaintiffs are asking for is appropriate.  Because if

12  what they're asking for is not appropriate, then we should not

13  be penalized for not producing it.

14           So I think you -- I think as a practical matter and

15  as a legal matter, I think you need to make a 26(C)

16  determination first because if there is an appropriate

17  narrowing of the requests, then that should be done before you

18  consider the restatement factors.

19           THE COURT:  Mm-hmm.  Okay.  I understand.  But is

20  there any reason you couldn't brief both issues first?  You

21  don't have to wait for a decision before you brief the bank

22  secrecy --

23           MR. INGERMAN:  Well, I think it's in part --

24           THE COURT:  -- issue, right?

25           MR. INGERMAN:  I think it would -- I mean, one of

1    the -- my recollections, one of the restatement factors is,

2    you know, what did we produce and what did we not produce,

3    right, and how important is the information that we did not

4    produce?

5              And we're not going to know the answers to that

6    until you've made a scope determination and we have gone and

7    tried to get the waivers in that limited time period that we

8    asked for.

9              THE COURT:  Mm-hmm.   In *Linde* did you attempt to

10   get waivers before this bank secrecy issue was briefed?

11             MR. INGERMAN:  Yeah.  We got the Saudi Committee and

12   the Hamdan, the two that I mentioned to you.

13             THE COURT:  Right.

14             MR. INGERMAN:  And I think Judge Pohorelsky ruled on

15   scope first before he got to bank secrecy.

16             THE COURT:  Yeah.  I can see that happened, but I'm

17   just wondering if it's necessary from --

18             MR. INGERMAN:  Yeah.  I think -- I think it -- I'm

19   sorry.  Go ahead, Your Honor.

20             THE COURT:  No.  Go ahead.  Why don't you finish

21   your thought and I'll (indiscernible) --

22             MR. INGERMAN:  I was just saying -- I was just going

23   to say I think it's particularly necessary here just given the

24   number of, you know, alleged account holders that they're

25   seeking bank records for in foreign jurisdictions over a six-

27

1    year period.

2              I mean, look, if they're -- you know, think about

3    this.  I mean, you know, take a charity for example, right?  I

4    mean, why do they need six years of transactions from a

5    charity?

6              If they think the charity is involved in terrorist

7    organizations, then -- in terrorist activities, then let's

8    come up with search terms by which the bank can search those

9    transactions and produce those records and then let us go to

10   the -- let us go to the customer, the charity, and say, hey,

11   look, here's what we want to do.

12             We want to be able to search your records for these

13   search terms and produce whatever gets hit upon.  And I think

14   that we are much more likely if we're going to get a waiver to

15   get a waiver with that kind of limitation from Your Honor than

16   we are going to a charity and we're saying we want -- we have

17   to produce every single record of your organization for six

18   years.

19             THE COURT:  All right.  Thank you.

20             So, Mr. Bonner, before I let you speak, I just had a

21   question I want you to address.  Which is it sounds like what

22   Mr. Ingerman is proposing is to get the ruling on the scope

23   first, and that tracks what actually happened in *Linde*, and

24   the delay if you were -- if you were as far as the attempt to

25   get waivers of 60 to 90 days for that to happen.

28

1          So the question from me is does it make sense to get

2     a ruling on the scope first because that is actually what

3     Judge Pohorelsky actually had before him when he made the

4     ruling on the bank secrecy -- and you're relying so much --

5     wouldn't it make sense to just go ahead and get a ruling on

6     the scope?

7          And then however my decision on bank secrecy turns

8     out the parties will know immediately what needs to be

9     produced and what doesn't need to be produced pursuant to bank

10    secrecy?

11         Mr. Bonner?

12         MR. BONNER:  I don't think, Your Honor, that there's

13    any need to do these things one before the other.  And I think

14    the reasons for that is if we look at the factors that courts

15    have considered in deciding these bank secrecy objections,

16    there are two that are particularly important to this issue of

17    what we're characterizing now as the scope of the production.

18         One of them is that courts will look at the

19    importance of the documents that you've requested.  And then

20    the second factor -- Your Honor highlighted a little bit

21    earlier -- is the specificity rather of the requests.  So that

22    in order for the Court to rule on the bank secrecy issue,

23    you're going to have to decide that the documents that we're

24    seeking are indeed important.

25         And we've already done that work, that leg work,

1    that was done in *Linde* in terms of narrowing the scope, the

2    discovery, Your Honor.

3         We've only asked for the documents that were

4    eventually produced in the *Linde* -- or that were ordered to be

5    produced in the *Linde* case.

6         In fact, we've got a narrower scope of requests than

7    what was actually ordered by Judge Pohorelsky.  So there's no

8    need for us to go through this exercise that Mr. Ingerman is

9    talking about, which again only relates to his going back to

10   the bank clients who refused obviously in the *Linde* case to

11   allow the production of any documents.

12        This is not an issue about whether those documents

13   are relevant or not.  They're clearly relevant.  They've been

14   found relevant in *Linde*.  They've been found relevant in other

15   terrorism cases here in this district and in this circuit.

16   And they're clearly relevant.

17        So, again, those documents are -- they've already

18   been determined to be important to the case, which is one of

19   the factors that the restatements and the case law asked the

20   Court to take a look at.  Those requests were also extremely

21   specific.  Again, we identified specific entities.  We cited

22   particular documents in the production where they're

23   identified.  You're not going to find a set of document

24   requests that are more specific than the ones that we have

25   propounded here.

30

1      And so I don't think there's any point to this

2  exercise that Mr. Ingerman is proposing because Your Honor is

3  going to have to determine that the documents are important

4  and that our requests are sufficiently specific in order to

5  adjudicate the bank secrecy issue.

6      And just a few things that I think bear commenting

7  on, Your Honor, because it's relevant to how you're going to

8  proceed here.

9      It is charitable in the extreme to say that there

10  were consents that were granted by the Saudi Committee and

11  Hamdan and those are the two that Mr. Ingerman has highlighted

12  here.

13      The Saudi Committee documents that were produced

14  were documents that ran through the New York branch of Arab

15  Bank and that's why they were produced.  They weren't produced

16  because of some magical consent that was delivered from the

17  Saudi Committee.

18      I think importantly in that regard we didn't get the

19  documents that we wanted related to the Saudi Committee

20  transactions, which are -- you know, just to fill in a little

21  bit of detail here, a suicide bomber's father shows up at the

22  bank and says, hi, I'm the father of a suicide bomber, I want

23  my $5,000, and the bank hands that over to that person.

24      We want to see what records the bank had at that

25  point in time in order to identify that person, determine why

31

1          it was that he or she was getting the transfer, and the bank

2          refused in the last case to produce those documents on bank

3          secrecy grounds and those are obviously critical documents.

4          So to say that we got a consent from the Saudi Committee,

5          again, charitable in the extreme.

6                    With respect to the Hamdan documents, which is the

7          only account for which we received a full production, those

8          documents had been produced to the federal government, the OTC

9          (indiscernible) in the course of their investigations.  They

10         were present here in New York.  And as a result to say that

11         the Hamdan account there was some magical consent that was

12         delivered and so we got those documents, inaccurate, not

13         really adheres to the facts.

14                    And I think also, Your Honor, just because it merits

15         emphasis here, Hamdan, a specially designated global

16         terrorist, the one account for which we received production in

17         full in the *Linde* case shows that there were transfers that

18         were made directly with the name Hamas on them that were

19         approved by senior people at the bank.

20                    And it also showed that after the U.S. designated

21         Mr. Hamdan as a specially designated global terrorist the bank

22         cut him a check for $8,000 to empty out his account.

23                    And so this is what we're dealing with here, Your

24         Honor.  There's no need to have this sequential delay here.

25         We can decide the importance of the documents and the

32

1    specificity of the requests as we must in the context of the

2    bank secrecy documents.

3            And there's no reason to believe based upon what

4    happened in *Linde* that these terrorists are going to consent

5    to productions of their documents even though the *Linde* court

6    and other courts in this district have already determined that

7    larger document productions or wider categories of productions

8    are relevant in a case like this.

9            Your Honor, can I just have just two minutes in

10   response?

11           THE COURT:  Sure.

12           MR. INGERMAN:  Please.  Okay.  Thank you.  Just I

13   want to make -- I want to make two points.  And I'm not going

14   to argue the merits of the case as Mr. Bonner did, but I want

15   to correct two factual inaccuracies.

16           Number one, the Saudi Committee documents, the

17   majority of those documents never went through New York.

18   There were 73 transactions that went through New York.  We

19   produced 180,000 pages, the majority of which had nothing to

20   do with the U.S.  They were based on a waiver that we got to

21   produce foreign documents subject to bank secrecy.

22           And Mr. Hamdan got an $8,000 check because the

23   Lebanese regulator ordered us to close the account and return

24   the money to him.  So it's just fundamentally wrong what he's

25   saying.

33

1          But what they're doing -- back to the main issue

2     here of the process -- what they're doing is they're

3     conflating 26(C) and bank secrecy.

4          And I just want to quote to you from Mr. Gary Osen,

5     who's the lead counsel for the Miller plaintiffs in this case,

6     back at the hearing we had on September 24th, Mr. Osen said

7     that it's important, quote, "Not to conflate two separate

8     issues.  One is the proper scope of discovery under Rule 26

9     and the other is how the defendant deals with bank secrecy

10    objections under Restatement 442.  They are two separate

11    things."  And that's the transcript at page 34.

12         And that's the point we're making, Your Honor, and

13    that's all we're asking for.

14         THE COURT:  Yes.  All right.  Thank you, Mr.

15    Ingerman.  I appreciate that they're different things.

16         And the only issue that I think I need to decide

17    today is the sequence, whether one should -- that they should

18    be dealt with one after the other or whether they can be dealt

19    with simultaneously.

20         And based on what I'm hearing I think that the

21    parties can deal with these two issues in the same brief.  You

22    can make the argument on one on the first half of the brief

23    that talks about the scope, that it should be limited, so that

24    I can consider it and under 26(C) and see if the scope should

25    be limited.

1          If it should be six years or one year or something

2     of that nature.  And then once I've made that decision move on

3     to the assertion of bank secrecy as a reason that the

4     defendant doesn't have to produce the documents that are

5     otherwise producible.

6          I appreciate that the plaintiffs are relying very

7     heavy on *Linde* and so in that briefing I would very much

8     appreciate kind of the development of the law since that point

9     in time to see what has happened, if anything, and perhaps it

10    has been strengthened, or perhaps nothing has happened, and I

11    hear from the defendant's side the questions about its ongoing

12    validity.

13         So certainly that will be a very central part of

14    your arguments, but I'm very interested in that argument and I

15    think that will be the crux of your bank secrecy argument.

16         But I don't see a reason that they can't be dealt

17    with in the same brief and I can deal with them at the same

18    time.

19         If the defendant wants to try to get consents in the

20    meantime, that's fine.  I am doubtful that you will get 677

21    consents.  And so that's part of my concern about giving you

22    time to get the consents because I don't think if you were to

23    get a small number of consents that that would really affect

24    the ruling or the need to rule on bank secrecy anyway.

25         So I'll give the parties as much time as they need

35

1    to brief both issues, but I don't think that you need to wait

2    for a ruling on one before the next.  When I make the

3    decision, I will certainly make them separately because they

4    are based on different bases, legal bases, and so be assured

5    that I won't conflate the two.

6            But as far as timing I think they can -- there's no

7    reason to wait for one to be ruled on before the next.  They

8    both need to be ruled on eventually.

9            So given that, let me just see where we are.  I

10   think, Mr. Ingerman, this your motion to make, right?  It's a

11   motion to limit the scope of the discovery and to assert bank

12   secrecy as the reason for not producing your documents, so

13   it's -- you should be filing the opening brief.  Am I right?

14           MR. INGERMAN:  Yes, Your Honor.

15           MR. BONNER:  We actually thought, Your Honor --

16           THE COURT:  How much time -- yeah.

17           MR. BONNER:  -- that we were going to file our

18   motion to compel.  That's the way things were set up in these

19   letters (indiscernible) objection to the discovery and our --

20           THE COURT:  Okay.

21           MR. BONNER:  -- it really should be moving brief I

22   believe.

23           MR. INGERMAN:  I disagree with that, Your Honor.

24           THE COURT:  (Indiscernible.)

25           MR. INGERMAN:  I think it's -- it's our motion for a

36

1    protective order I think.

2          THE COURT:  Let me look at -- motions to compel and

3    motions for a protective order are really (indiscernible) each

4    other.  So if the reason you're having this discussion is

5    because one side wants to have the opportunity to file a reply

6    brief, I can certainly deal with that by allowing each side to

7    have an opening brief and a responsive brief.  It's just a

8    question of who goes first.

9          So, Mr. Bonner, if I allow you the opportunity to

10   file a surreply, does that address your need to have this be a

11   motion to compel as opposed to a motion for a protective

12   order?

13         MR. BONNER:  That would be terrific, Your Honor.

14   And that I think sounds fair and reasonable, so we appreciate

15   the opportunity.

16         THE COURT:  All right.  So, Mr. Ingerman, I'll let

17   you do the opening and a reply.  And I'll permit the

18   plaintiffs have an opposition and a surreply.  So you each get

19   two briefs.

20         And, Mr. Ingerman, how much time do you think you'll

21   need to file your opening brief?

22         MR. INGERMAN:  Can I propose March 4th, Your Honor,

23   since we're briefing the two issues together?

24         THE COURT:  All right.  Great.

25         And then, Mr. Bonner, how much time will you need to

1    respond?

2              MR. BONNER:  I always hesitate to speak for everyone

3    when I'm alone by myself on the telephone, but I think

4    certainly we could get it done within 30 days, Your Honor,

5    unless I hear a scream from somebody else.

6         (No audible response.)

7              THE COURT:  Okay.  No screaming, so --

8              MR. BONNER:  Hearing no screams yet.

9              THE COURT:  April 4th.

10             And then a reply by the defendant?

11             MR. INGERMAN:  Two weeks is fine, Your Honor.

12             THE COURT:  So that will be April 18th.

13             And then two weeks for the sureply?

14             MR. BONNER:  Terrific, Your Honor.

15             THE COURT:  And that will be March, sorry, May 2nd.

16   Terrific.  So I will look for those papers.  I will give them

17   very careful consideration.  If I think an oral argument would

18   be helpful, I may schedule one after I've reviewed everything.

19   Otherwise I'll try to issue a ruling quickly so the parties

20   can keep moving.

21             All right.  So, Mr. Ingerman, is there anything

22   further that we need to do today?

23             MR. INGERMAN:  We have our -- we have our letter,

24   Your Honor, on the plaintiffs' production.

25             THE COURT:  Ah, yes.  Okay.  (Indiscernible.)

38

1          MR. INGERMAN:  Sure.  Also filed on December 27th.

2          THE COURT:  Yes, I see that.  Okay.  So this is the

3     issue with regard to the medical records and the proof of

4     citizenship?

5          MR. INGERMAN:  Correct.  And the individual

6     responses.  So if I may, Your Honor?

7          THE COURT:  Yes.

8          MR. INGERMAN:  Yeah.  So let me just step back for a

9     minute and give you a sense of kind where the production is.

10         And I will say that the filing of the letter and

11    this telephone hearing has certainly prompted a flurry of

12    activity on behalf of the plaintiffs.

13         I would say in the last ten days we've received a

14    lot of information, which is great.  I don't think it obviates

15    the need for this conference or our motion, but let me tell

16    you where we are as I understand it as of yesterday with the

17    plaintiffs' production.

18         So there are -- you recall there are 68 plaintiffs,

19    Your Honor.  There are 37 Pam plaintiffs and 31 Miller

20    plaintiffs.  We have one Pam plaintiff that has produced zero

21    documents, Delka Gez, G-E-Z.  Twelve of the plaintiffs have

22    produced eight pages or less of documents.  Twenty-six of the

23    68 plaintiffs have produced written responses to the

24    discovery.  So let me stop there for a minute.

25         Your Honor may recall that we served two sets of

39

1    requests for documents.  The first set was a general set to

2    all the plaintiffs related principally to the liability issues

3    in the case.  And then we served individual requests for

4    documents on the plaintiffs as to individualized issues like

5    U.S. citizenship and damages.  And then there are individual

6    interrogatories.  So there's effectively three sets of

7    discovery that we served.

8            Only 26 of the 68 plaintiffs have produced written

9    responses to the individual requests for documents or

10   interrogatories.  We don't have a single page of ESI.

11      Remember, our document requests were swerved back in July

12   of 2019.  We have lots of promises of producing this stuff in

13   60 days, in 90 days, and stuff is dribbling in.  And, you

14   know, we got a big rush of information running up to this

15   conference, but it's still significantly deficient.

16           And there are three critical issues that I wanted to

17   you about today.  We have other issues that we're continuing

18   to meet and confer on and maybe hopefully will resolve before

19   they require Your Honor's attention, but the three issues that

20   I want to talk about today are the proof of citizenship

21   information, the medical records, and the individualized

22   responses to the discovery.

23           As Your Honor knows, as to the U.S. citizenship or

24   U.S. national discovery, these are requests for productions

25   one, two and three.

40

1    The bank's position is that under the ATA plaintiffs

2    are required to be U.S. nationals to have standing to be in

3    this lawsuit.  We presumed that the plaintiffs' counsel would

4    have confirmed this with their clients before bringing the

5    lawsuit.  Accordingly, we sought in discovery documents to

6    confirm that the plaintiffs were in fact U.S. nationals at the

7    time of the incident, which is what is required under the ATA.

8    As a result of those inquiries, we've lost -- we

9    think we've lost four plaintiffs because of that that have

10    been dismissed.  We've already determined thanks to the

11    plaintiffs that there are two that are not U.S. nationals, so

12    we're really talking about 66.

13    And what we're looking for is a birth certificate in

14    the U.S.  Or if they were not -- if they were not born in the

15    U.S., a U.S. passport that predates the incident that's

16    relevant to their alleged injuries or something like that that

17    demonstrates that they were in fact a U.S. national at the

18    time of the incident.

19    We have -- notwithstanding the fact that it's been

20    29 months now I think since we served our discovery, we have

21    seven plaintiffs that have still not provided any information

22    to demonstrate that they were U.S. nationals at the time of

23    the incident.

24    And so -- and just by way of example, some of the

25    deficiencies that we've gotten, so for instance, the plaintiff

41

1   will produce in response to this request an Israeli birth

2   certificate that demonstrates that they were a U.S. national

3   and then a U.S. passport issued in 2012.  So those two

4   documents together don't demonstrate that the plaintiff was a

5   U.S. national at the time of the attacks, which of course

6   occurred between 2000 and 2004.

7           Or they'll produce a New York State driver's

8   license, which of course doesn't establish that you're a U.S.

9   national.

10          So I know what you're going to say to me, Mr.

11  Ingerman, what is your ask? Right?

12          So our ask is that the seven plaintiffs be compelled

13  to provide documentary support that they are in fact or were a

14  U.S. national at the time of the attack.  And they've had 29

15  months to do this.

16          If you were born in the U.S., you can go on the

17  website and you can order a birth certificate and it takes a

18  couple of weeks.  It's just not that hard.  And so that's the

19  ask with respect to the U.S. national piece.

20          THE COURT:  So let me stop there --

21          MR. INGERMAN:  Sure.

22          THE COURT:  -- because I'll just take these one at a

23  time.

24          So the -- you said there are seven plaintiffs who

25  have given you nothing, is that right?

42

1          MR. INGERMAN:  Correct.

2          THE COURT:  Now, you said that some of the others

3    gave you documentation that you said is deficient, but it is

4    what it is.  Are you asking for more documentation or you're

5    just going to deal with what you've got?

6          MR. INGERMAN:  Let me begin.  If I wasn't clear, I

7    apologize.  The seven plaintiffs include the ones who have

8    given us insufficient documentation.

9          THE COURT:  I see.  Okay.

10         MR. INGERMAN:  Yes.  And we would like documents.  I

11   mean, you can get a birth certificate or you can get a copy of

12   a passport, so we don't think we should have to take the

13   plaintiff's word for it is my point.

14         THE COURT:  Sure.  And of course for discovery

15   purposes, if document is not produced in discovery, it can't

16   later be produced at a trial.  I understand that testimony

17   might be sufficient to prove nationality, but, you know, then

18   it will be up to the jury or whoever the decision-maker is

19   whether to accept that.

20         So let me turn to plaintiffs.  Mr. Bonner, are you

21   addressing this issue?  Or counsel?

22         MR. BONNER:  I think Mr. Steingard is going to speak

23   for us on this.

24         MR. STEINGARD:  Well, I'm going to speak on behalf

25   of the Miller plaintiffs.  I think Susan will address your

1    situation in the Pam case.

2         Practically speaking, Your Honor, we're down to one

3    plaintiff, an elderly plaintiff who relocated to Israel in the

4    middle of the pandemic, who is a naturalized citizen.  And

5    after yesterday's production, we've provided the materials for

6    everybody else.

7         There's the one plaintiff who has not been able to

8    locate his certificate of naturalization.  And we think

9    there's still an outside chance he may find it, but in order

10    for us to come up with it, we're going to have to apply to the

11    U.S. Government, and our research on that indicates it's going

12    -- it may take some time until we hear back from the U.S.

13    Government.

14         So as to everybody else of the Miller plaintiffs, I

15    believe we've provided now the information.

16         THE COURT:  All right.  So for that one plaintiff

17    you've made a request to the state department for

18    (indiscernible)?

19         MR. STEINGARD:  Well, we just heard that he still

20    might have it located somewhere so we didn't do it.  But if

21    it's not -- if we can't determine from the people in Israel

22    that he's able to locate it, we will apply to the U.S.

23    Government forthwith.  That's the only one.

24         THE COURT:  Okay.  So please do that quickly because

25    it will take the U.S. Government some time to produce that

44

1    information for you.

2                Okay.  Ms. Davies, do you want to just speak for the

3    Pam plaintiffs?

4                MR. BONNER:  I think actually I'll just speak, Your

5    Honor.

6                THE COURT:  Oh, okay.

7                MR. BONNER:  Ms. Davies is much more eloquent, but I

8    think I have this information in front of me.

9                We basically have four plaintiffs who we have not at

10   this point produced --

11               THE COURT:  I'm sorry.  Is this Mr. Bonner or --

12               MR. BONNER:  Mr. Bonner, yes.  I'm so sorry, Your

13   Honor.  Yeah.

14               THE COURT:  Okay.  No, it's okay.

15               MR. BONNER:  I forget the telephone situation.

16               But just to cut this short, we've agreed to produce

17   these documents even though there normally wouldn't be an

18   obligation to go out and try to create documents in order to

19   produce them in discovery in order to put an end to this

20   issue.

21               So with respect to the four plaintiffs as I

22   understand it at this point who have not yet produced proof of

23   their citizenship, we will undertake to do that.  And we've

24   already made an effort to try to accomplish that and we will

25   produce it as soon as it becomes available.

45

1          And then there are two plaintiffs I think, as Mr.

2     Ingerman had highlighted, who are not U.S. citizens, who are

3     in the Pam case, and there's some conflict in authority as to

4     whether people who are family members in their situation have

5     a claim under the ATA, and that's something that the Court

6     will have to determine at some point in time whether or not

7     these people -- perhaps at the summary judgment stage or

8     perhaps by motion earlier than that -- whether they actually

9     have standing to bring a claim or not.

10          THE COURT:  Okay.  So you are conceding that you

11     don't have documents to show their proof of citizenship

12     because in fact they're not citizens?

13          MR. BONNER:  Correct, Your Honor.

14          THE COURT:  Okay.  Great.  So anything further that

15     needs to be discussed there, Mr. Ingerman?

16          MR. INGERMAN:  I don't think so.  I don't know why

17     -- I mean, it's been 29 months -- why they're first applying

18     now for (indiscernible).

19          THE COURT:  Well, let's just move forward.

20          MR. INGERMAN:  Yeah.  Yeah.  I hear you.  I hear

21     you.  That's it.  All right.

22          Let me go -- may I go to the next issue, Your Honor?

23          THE COURT:  Yes.  Damages and medical records.

24          MR. INGERMAN:  Yeah, the medical records.  So the

25     plaintiffs claim in the complaint -- so let me back up.

46

1       So 60 -- I think it's 65 of the 68 plaintiffs in the

2   case are seeking only emotional distress damages.  There are -

3   - as I understand it, there are three Pam plaintiffs that are

4   seeking some form of physical injury damages, but the rest are

5   all emotional distress damages.

6       And the allegations in the complaint are that they

7   suffered, quote, "Severe mental anguish and extreme emotional

8   pain and suffering," end quote.  And so -- and this is from

9   having relatives who were killed or injured in terrorist

10  attacks back in the 2000-2004 time period.

11      So what the bank sought in discovery were all of the

12  medical records for a five-year period prior to the attack and

13  a five-year period after the attack based on -- based on the

14  allegation that they were seeking severe emotional distress

15  damages.

16      And I know Your Honor knows, because you wrote one

17  of the opinions on this issue in *Francis*, that there's a

18  gradation of emotional distress damages.  So if they're only

19  seeking garden variety emotional distress damages, then the

20  defendant doesn't get to delve into the medical history of the

21  plaintiff.  And we agree with that, right.

22      And so -- and of course if you're seeking garden

23  variety emotional distress damages your damages are generally

24  limited in the $35,000 range.  And of course that would make

25  this a very different case frankly.

47

1          And so -- but that's not what they allege in their

2     complaint.  So they allege severe emotional distress, which

3     does allow a defendant to explore the medical history of the

4     plaintiff, and so that's why we asked for those records.  And

5     what we wanted to see was, one, were there alleged emotional

6     or psychological or mental health issues prior to the

7     incidents, so was there a preexisting injury?

8          Number two, was there perhaps another stressor that

9     caused this injury other than the injury of a loved one in a

10    terrorist attack?

11         And number three, you know, post-incident, were

12    there complaints to their healthcare providers about emotional

13    or psychological injuries?

14         I mean, those were the principal reasons why we were

15    seeking this information.

16         And it shows up, as Your Honor may know, in any

17    medical record, because it doesn't have to be a mental health

18    provider, you go in for foot surgery and a lot of times the

19    surgeon will do a quick mental health assessment or

20    psychiatric assessment, psychological assessment I should say,

21    of the patient.  You know, part of that is, you know, as to

22    whether or not they can sign an informed consent and so forth.

23         So those issues, the things that we're looking for,

24    often show up in medical records that may not be related to

25    services provided by a mental health professional.

48

1    And what's interesting about this is that the two

2    different groups of plaintiffs have taken different approaches

3    to this.

4         The Miller plaintiffs have agreed to produce all of

5    the medical records that they can find.  Now, you know,

6    whether they've done that or not is an issue maybe for another

7    day, but we appreciate their willingness to produce all the

8    medical records for their group of plaintiffs.

9         The Pam plaintiffs originally took the position that

10   they would only produce medical records that were related to

11   the alleged injury.

12        So in other words if a Pam plaintiff sought

13   psychiatric, psychological or mental health services as a

14   result of the injury they're claiming in this case they would

15   produce those records and only those records.

16        As a result of a series of meet and confers they've

17   expanded that slightly and they've agreed to produce medical

18   records that demonstrate some type of mental health service to

19   the -- to the plaintiff or psychiatric service or

20   psychological treatment to the plaintiff.

21        We don't think that's enough in this case unless, as

22   they did in the *Babbitt* case, they're willing to stipulate

23   that they're only seeking garden variety emotional distress

24   damages.  If they're willing to make that stipulation, we will

25   drop our requests for the medical records.

49

1          So, again, Judge, you're going to say, all right,

2    Mr. Ingerman, what's your ask?  Right?

3          So what we'd like to -- I think we're fine with the

4    Miller plaintiffs where we are for now.

5          With respect to the Pam plaintiffs, the ask is that

6    they -- we're willing to agree that they collect all of the

7    medical records for their plaintiffs, five years before and

8    five years after the relevant event, produce to us a log, just

9    a listing of those medical records, the provider and the

10   treatment provided, and then we're fine if the plaintiffs want

11   to review all of those medical records and produce to us only

12   those medical records that reference the plaintiff's emotional

13   mental health, psychological condition.

14         But we don't think it should be limited to treatment

15   by a psychiatrist or psychologist or mental health

16   professional.  Because as I pointed out earlier oftentimes

17   routine medical records, your internist, your surgeon, could

18   have an indication in the medical record about the mental

19   health state of the patient.

20         So that's the ask.  We'd ask that they collect all

21   the medical records, five years before, five years after,

22   produce to us a log for each plaintiff, what records they

23   collected so we know, have some sense of what they collected,

24   and then produce to us those -- any record that references the

25   mental health condition of the plaintiff.  Or give us all the

50

1    records.  I mean, you know -- I mean, either way.

2            MR. BONNER:  Your Honor, this is Jim Bonner just to

3    briefly address these issues.

4            THE COURT:  Okay.

5            MR. BONNER:  So I think as Mr. Ingerman -- sorry,

6    Your Honor.

7            THE COURT:  Okay.  Go ahead.  I'm sorry.

8            MR. BONNER:  As Mr. Ingerman had stated, we've

9    agreed to produce all of the psychiatric or psychological

10   counseling records that the plaintiffs had received during the

11   relevant time period.  So anything, whether it relates to this

12   injury or this incident or not, the bank is going to get that.

13           So I think we do have though a fundamental

14   disagreement as to whether if somebody were to go to a

15   podiatrist at some point in time that those records have any

16   relevance here.

17           And I think that the process that Mr. Ingerman

18   suggested is contrary to what the law says.  And usually what

19   courts have done is say that if there is some indication the

20   plaintiff gives that he or she did go to his internist or her

21   internist and say I've got this psychological issue because of

22   the fact that my brother-in-law was killed in a suicide

23   bombing attack then those documents have to be searched and

24   perhaps turned over to the opposing party.

25           But normally what courts have said is just because

51

1    you bring a claim for psychological distress, whether it's

2    extreme psychological distress or the garden variety that Mr.

3    Ingerman's talking about, you don't have to produce your

4    entire medical history, and that's all that we're objecting

5    to, Your Honor.

6              Anything that relates to any kind of psychiatric or

7    psychological treatment the defendant is getting that.  And if

8    there's any indication from our clients that he or she spoke

9    to another medical professional about mental distress, then

10   again we're going to produce those documents.

11             But the courts have uniformly said just because you

12   bring an emotional distress claim doesn't mean that your

13   entire medical record has to be opened up to the opposing

14   party.

15             THE COURT:  Yes.  Thank you.

16             So I'm -- let me ask, Mr. Ingerman, in your

17   proposal, the log or the list that you're proposing, would it

18   say sought medical -- sought foot surgery, had foot surgery

19   this date, this hospital, this provider, yes, no, spoke about

20   the fact that a relative had died in a terrorist attack, had

21   heart surgery, yes, no, spoke about this recent loss, those

22   kinds of things, are you seeking that or are you just seeking

23   a log of medical providers or the documents where there was

24   actually a statement made by the plaintiff to the medical

25   provider even it wasn't to a psychiatrist?

52

1          So in your scenario if in the course of the foot

2     surgery the individual said to the surgeon I'm, you know, very

3     upset because my daughter recently died and that's noted in

4     the medical records you would get that, but would you have to

5     know that it -- if there was some surgery that occurred that

6     you were -- that it wasn't brought up you -- are you saying

7     that you would still get at least notification that there was

8     heart surgery for example?

9          MR. INGERMAN:  I mean, I think -- yeah, that's a

10    good question.  I think the reason I was asking for the log,

11    Your Honor -- let me give you an example.

12         If John Doe, plaintiff, saw 27 medical providers

13    after the incident and in none of those medical records did

14    John Doe say anything about some emotional distress or

15    psychological injury, then I think that would be of interest.

16    Who wouldn't want the records, right?

17         Because I don't think I need them unless there's a

18    reference to his mental health state.  But the fact that he

19    say 27 doctors and didn't tell anybody that he had some kind

20    of emotional injury I think would be relevant and of interest

21    to us.  And I also want to be clear -- and so -- so that's

22    number one.

23         Number two, if John Doe, plaintiff, went to the

24    podiatrist and complained about any mental health issue,

25    whether it was related to the incident or not, may be he had a

53

1    terrible divorce and he's been very, very depressed as a

2    result of the divorce, we would be very interested in that

3    because I think our experts will say that there can be other

4    causes of emotional distress or contributors to emotional

5    distress.

6            Now, do I need the podiatrist record of what he went

7    there for his foot?  No.  If they want to redact that

8    information and just give me the information that where he

9    describes his mental state, we're totally fine with that.

10           But I do think we need the log of all providers.

11   Because if we get a log of providers and no production of

12   medical records, that tells us that that plaintiff never

13   complained about any emotional injury to any doctor during

14   that time period.

15           The only records --

16           THE COURT:  So you want to be able to argue a

17   negative?

18           MR. INGERMAN:  Exactly.

19           THE COURT:  Mm-hmm.  All right.  So, Mr. Bonner, if

20   the request is not for the medical treatment itself, but some

21   notation that a medical provider was spoken to and this issue

22   was not addressed, the sheer number of medical visits and the

23   sheer lack of bringing this up is something that the

24   defendants want to be able -- the defendant wants to be able

25   to argue.

54

1      So is there a way to redact information or provide

2   just the bare bones information so that they know how many

3   times medical treatment was sought and this issue was not

4   brought up in addition to the production of when it was

5   actually brought up?

6      MR. BONNER:  Sure, Your Honor.  I'm looking for a

7   fair compromise here.

8      I don't think the case law requires any disclosure

9   at all about these medical treatments that have nothing to do

10  with psychological counseling.

11     But in order to move things along, if what the

12  defendant wants is a list of doctors that our clients have

13  consulted, maybe by category or we'll work out the specifics

14  in that regard, I think we can provide that and then they can,

15  you know, base their argument that I didn't tell my podiatrist

16  I'm going through a divorce, which seems kind of an odd

17  disclosure to make to my podiatrist, but they can make that

18  argument to a jury, we would be able to provide that I think

19  and hopefully that will alleviate the concerns that Mr.

20  Ingerman is expressing.

21     And we've already asked our clients, you know, did

22  you talk to any of these other doctors about your

23  psychological distress, and like most people, they say, you

24  know, that they didn't.

25     So I think that hopefully, you know, that will be an

55

1    adequate solution here, Your Honor.  And to move the ball

2    along, we would give a list of the doctors that they consulted

3    during the relevant time frame.  And, again, if there were any

4    consultation with respect to their psychology or their

5    emotional distress, we would produce records appropriately

6    redacted.

7            THE COURT:  Okay.  And then if in some incident

8    your client did say to a foot doctor for example that he

9    recently lost a relative in a terrorist attack, then that

10   would be something that you would produce?

11           MR. BONNER:  Correct, Your Honor.  But I'm saying

12   though is -- I want to be clear -- there's no indication in

13   any of this that there was ever such a disclosure, and so

14   we're not intending to go out to every medical professional

15   that our clients consulted over the course of a ten-year

16   period and acquire all those records.

17           THE COURT:  I see.

18           MR. BONNER:  What we're doing is we're asking our

19   clients did you ever speak to, you know, Dr. Jones or Dr.

20   Smith about any of these issues.

21           If the client says, no, we're going to list this

22   person on this log or whatever list it is that Mr. Ingerman

23   and I come up with, but we're not actually going to go out and

24   acquire all those medical records because there's no reason to

25   believe that there's anything relevant in it.

56

1          THE COURT:  I see.  And actually that might provide

2     enough for Mr. Ingerman to make his argument.  Because if your

3     clients are telling you, no, I never mentioned it to the foot

4     doctor and the cardiologist, et cetera, then he can make the

5     argument, well, it wasn't so serious because you didn't bring

6     it up?

7          MR. BONNER:  That's correct, Your Honor.

8          THE COURT:  All right.  Okay.  Mr. Ingerman, does

9     that work for you?

10          MR. INGERMAN:  I don't think so and let me explain

11     why.

12          Number one, all we're asking them to do is what the

13     Miller plaintiffs already did, so it's not such a heavy lift.

14     I mean, the Miller plaintiffs were able to do this and agreed.

15     So that's number one.

16          And number two, there are two things that we're

17     looking for in these records.

18          One is, yes, did they mention to any provider, their

19     internist or whomever, that they're very upset about, you

20     know, that the fact that their loved one was injured in one of

21     these incidents.

22          But the other thing that we're looking for are

23     additional stressors that could have brought about these

24     emotional injuries.

25          And so I don't think we should have to take the

57

1    plaintiff's word for it.  I think that the Pam plaintiffs,

2    like the Miller plaintiffs, should have to go out and gather

3    the medical records.

4         And if they don't want to produce them all to us,

5    that's fine, but I think that they have an obligation to go

6    through them and produce to us any discussion of the

7    plaintiff's emotional state to any doctor, whether it's

8    related specifically to the allegations in this complaint or

9    otherwise.

10         Or they can, you know, they could give us a

11   declaration that they're only seeking garden variety emotional

12   distress damages and we -- you know, then we don't need this

13   information.

14         THE COURT:  Well, I appreciate that point, but I

15   think having a relative die in a terrorist attack might have a

16   different -- it doesn't mean your damages are limited, it just

17   means that when you say garden variety, it just means you

18   didn't go see a psychiatrist to deal with that emotional

19   distress.  I think the jury could still say what is the degree

20   of distress that a reasonable person would experience having

21   undergone that?

22         So I don't -- I mean, if there are no medical

23   records to support treatment and there are no medical records

24   to support that somebody brought up the issue with any

25   provider, that is what the jury will be looking at, but it

58

1    doesn't mean necessarily that, therefore, they're capped at

2    some degree of damages.  It would still be up to the jury in

3    the absence of those medical records to place a dollar amount

4    on the damages.  Right?

5              MR. INGERMAN:  I understand that's probably an issue

6    for another day.

7              THE COURT:  Yeah.

8              MR. INGERMAN:  But to your point, I mean, I think

9    you made my point perhaps more eloquently than I did.  I mean,

10   that is why we need records.

11             If the plaintiffs discussed their emotional state

12   with a medical provider, we're entitled to that information in

13   order to be able to adequately cross-examine these plaintiffs.

14

15             For instance, you go to your internist.  And, you

16   know, prior to the incident you talk about the fact that

17   you're depressed and you can't sleep and you can't eat and the

18   reason is that you found out your spouse is cheating on you or

19   whatever, whatever it is, and then those symptoms align with

20   the same symptoms that that plaintiff claims post-incident,

21   that's the kind of thing that I think our expert would need to

22   look at.

23             And in fairness, we'd need to be able to adequately

24   cross-examine the plaintiff.

25             THE COURT:  Well, that seems to be a separate point,

59

1   which is that you want to attribute the stress to other

2   causes.

3        So let me ask, Mr. Bonner, how can the plaintiff --

4   how can the defendant know what other stressors there were if

5   there isn't an examination of a statement to medical providers

6   about what those stressors are?

7        MR. BONNER:  What the courts have typically done,

8   Your Honor, is that they've allowed the defendant to take

9   depositions of the plaintiffs and they've asked them about

10  these issues.

11       And if they find that there was a doctor or some

12  other professional that the plaintiff had spoken to about

13  these issues, then they've ordered the production of those

14  documents.  And we've tried to do that legwork by asking our

15  plaintiffs.

16       But the defendants will have every opportunity to

17  undertake that cross-examination of our clients and they'll

18  either find that there were discussions or there were not.

19       And the courts have, you know, again, uniformly said

20  just because you bring a claim for emotional distress, whether

21  garden variety or of greater magnitude, that that doesn't open

22  up every single piece of medical treatment you've ever

23  received for examination by the opposing party.

24       THE COURT:  Well --

25       MR. BONNER:  And so I think what Mr. Ingerman is

60

1    asking for is more than what they're entitled to.  And they'll

2    have every opportunity to ask the clients about this and to

3    verify what we're telling them that there haven't been any

4    such discussions.

5             THE COURT:  So, Mr. Bonner, I don't hear Mr.

6    Ingerman asking for every medical record, but he's asking you

7    to just search.

8             And I take your point that that might not be a

9    burden to be placed on you in the first instance, that that's

10   something that might happen subsequent to a deposition if your

11   client were to testify that another family member was

12   seriously ill during that time or there were other reasons for

13   stress on your client.  So, okay.

14            Mr. Ingerman, is that the end of this issue?

15            MR. INGERMAN:  I just want to point out I don't

16   think we should have to take the plaintiff's word for it is my

17   only point.

18            And the Miller plaintiffs didn't have a problem

19   doing this, and we just ask that the Pam plaintiffs do the

20   same.

21            THE COURT:  All right.  My sense -- well, let me

22   ask.  Mr. Bonner, are there voluminous medical records?

23            I heard you speak earlier -- or maybe it was -- no,

24   it was Mr. Steingard who was talking about an elderly

25   plaintiff -- but is it that there's so many medical records

61

1    that this is going to be too much of a burden on you or what

2    is the situation here?

3              MR. BONNER:  For some plaintiffs, you know,

4    depending upon their age and their health, Your Honor, there

5    probably are a significant number of records if we were to ask

6    them to produce everything that they ever consulted a doctor

7    about.

8              We're also dealing of course with things that are

9    going back 20 years.  And the list, in order to produce in

10   many cases what are doctors who are abroad in Israel, to try

11   to produce their entire files, it's an enormous undertaking to

12   try to do this.

13             And there's no reason to do it if the courts have

14   told us that this is not something that the defendant is

15   entitled to in the first instance.

16             So it would not be a simple matter to put those --

17   to acquire all those records.  And we've faced enormous

18   difficulty in trying to get what -- you know, the

19   psychological records that we've put together.

20             THE COURT:  Right.  Well, you should compile any

21   psychological records.  And that's easy to do because you can

22   identify whether the doctor or the professional is a

23   psychologist, psychiatrist, therapist, or other mental health

24   professional.

25             The issue of all the other doctors I can understand

62

1    how that would be burdensome.  And it is not my experience

2    that people generally bring these issues up in the course of

3    those consultations.

4              So I will deny the request by the defendant to

5    compel those medical records.

6              But by all means, what you have offered in terms of

7    the production that you're willing to make, Mr. Bonner,

8    provide that list of the doctors and then provide all the

9    medical records which related -- related to mental health

10   treatment.

11             MR. BONNER:  Yes, Your Honor.

12             THE COURT:  And if anything else comes up in the

13   course of depositions or further discovery, then you should

14   follow up.  All right.

15             Mr. Ingerman?

16             MR. INGERMAN:  Your Honor, can we -- I'm sorry, can

17   we just get -- I mean, I gave you a sense of the status of the

18   plaintiffs' production.  Can we get a date by which those

19   documents have to be produced?

20             THE COURT:  Mr. Bonner, how much time will you need

21   to do that?

22             MR. BONNER:  We're stepping outside the realm of my

23   expertise here, Your Honor, but as I understand it, we were

24   intending to produce all of our documents within 90 days.

25             But there are some documents of course that are

63

1    outside of our control.  We've been trying to extract some of

2    these medical records, again, many of which are overseas.  So

3    we've been doing that leg work.

4             But anything that's in our control -- in terms even

5    of the ESI that I think Mr. Ingerman is going to bring up next

6    -- we had intended to produce that within 90 days.

7             THE COURT:  Ninety days of when?

8             MR. BONNER:  Today.

9             THE COURT:  So April 20th?

10            MR. BONNER:  Right.

11            THE COURT:  So I'm going to put down April 20th as

12   the deadline.  If you can get it done more quickly, that would

13   be great.  If not, even if this is a giant production on April

14   20th itself.

15            All right.  Mr. Ingerman, let's move on.

16            MR. INGERMAN:  Any chance I could get you to

17   reconsider the scope steps that I've produced in light of the

18   plaintiffs' discovery schedule?

19            THE COURT:  Say that again.

20            MR. INGERMAN:  I was making a joke.  I was making a

21   joke.

22            THE COURT:  All right.

23            MR. INGERMAN:  I said in light of the fact that the

24   plaintiffs are going to take 90-plus days to produce, I

25   wondered if we could revisit the schedule on scope, waiver and

64

1    bank secrecy?

2              THE COURT:  Oh, the briefing schedule?

3              MR. INGERMAN:  Yes.  Yeah.  Yeah.

4              THE COURT:  I mean, we can go back to it at the end

5    of this discussion --

6              MR. INGERMAN:  Okay.

7              THE COURT:  -- if you seriously want more time.  I

8    understand that these are all, you know, different deadlines

9    that you have to juggle.

10             So we've talked about the medical records.  And then

11   there's -- and we've talked about the -- did we talk about the

12   citizenship?  Yes, we did that too.

13             MR. INGERMAN:  Yes.

14             THE COURT:  So now it's the individualized requests.

15   Here I'm going to start with Mr. Bonner because I understand

16   there's things that are missing.

17             Is it just that you're behind and you need until

18   April 20th to get everything produced?

19             MR. BONNER:  I'm sorry, Your Honor.  You're asking

20   about the ESI?

21             THE COURT:  Yes.  There was this request by the

22   defendant and they said the individualized information has not

23   been produced.

24             MR. BONNER:  Well, there are some written individual

25   requests, Your Honor, that we're in the process of knocking

65

1    out.

2              As Mr. Ingerman said, indeed, the letter writing and

3    updating or the upcoming court schedule has resulted in us

4    trying to get as many of those out as possible.

5              We have 19 plaintiffs who have already served their

6    individual requests.  And the remaining 18 we would propose to

7    serve on the bank as quickly as possible.  The very outermost

8    deadline that we would propose, Your Honor, is 60 days, so it

9    would be by March 21st of 2022 that we would get them all of

10   those individual responses.

11             And, you know, we're moving with all deliberate

12   speed on that front, Your Honor, and we will endeavor to get

13   the bank those individual responses as quickly as possible, as

14   far in advance of that March deadline as possible.

15             THE COURT:  All right.

16             MR. UNGAR:  And on behalf of Miller, I join in that.

17             THE COURT:  All right.  Thank you, Mr. Ungar.

18             So, Mr. Ingerman, for any outstanding responses from

19   the individual plaintiffs the plaintiffs are committing to get

20   those to you by March 21st.

21             MR. INGERMAN:  Okay.  Great.

22             THE COURT:  All right.  And then the ESI issue, is

23   there anything there?

24             MR. INGERMAN:  I think what I -- I think what I

25   heard Mr. Bonner say is that, again, 90 days to complete the

1    ESI production.  Is that right?

2              THE COURT:  Mr. Bonner, April 20th for the ESI

3    production?

4              MR. BONNER:  That's correct, Your Honor.  But

5    there's just, you know, kind of one wrinkle.  And that is that

6    we've been working with the defendant on search terms for

7    individual plaintiffs and the like.

8              And we expect of course the bank will be cooperative

9    because of course they're looking for these documents, but we

10   do need a little bit of help from them so we are only, you

11   know, going once through these documents with the search

12   terms.

13             And there are some translation issues and the like

14   that we've been working on.  Again, cooperatively, Your Honor.

15   So that 90-day deadline is a little bit contingent on us

16   continuing to work together with the bank, but I don't

17   anticipate there will be any problems on that front.

18             THE COURT:  All right.  So I will put down that date

19   as the deadline and everybody should be working together to

20   meet that deadline.

21             Mr. Ingerman?

22             MR. INGERMAN:  Yeah.  I was going to say I think --

23   I agree with Mr. Bonner that we've been working cooperatively.

24   I would just add that we're done with respect to the search

25   terms.

1      THE COURT:  Okay.  So please confirm that that is in

2  fact the case.  Because if there are issues that still need to

3  be worked out, you need to do that so that you can in fact

4  move forward and do those searches.

5      Okay.  So I think that we've reached the end of the

6  list of things that need to be addressed.

7      Mr. Ingerman, was there anything else from you?

8      MR. INGERMAN:  Your Honor, I would just -- in light

9  of the plaintiffs' production schedule, I would ask that we

10  move the reply brief on the scope and bank secrecy issues from

11  4/18 to 4/25.  And of course we wouldn't object to a similar

12  extension for the plaintiffs.

13      THE COURT:  All right.  So that will be 4/25 for the

14  reply.  And then a week extension for the surreply takes us to

15  May 9th.

16      Is that agreeable to the plaintiffs?

17      MR. BONNER:  That's fine, Your Honor.

18      THE COURT:  Okay.  Good.  So thank you, everybody,

19  for a very productive conference.

20      UNIDENTIFIED:  Thank you, Your Honor.

21      THE COURT:  I will look forward to your briefings.

22  Please move forward cooperatively on discovery issues.  And

23  stay safe out there.

24      MR. INGERMAN:  Thank you, Your Honor.

25      MR. BONNER:  Thank you for your time, Your Honor.

68

1    We appreciate it.

2              THE COURT:  Thank you, everyone.

3         (Proceedings adjourned at 1:09 p.m.)

4

5    I, CHRISTINE FIORE, court-approved transcriber and certified

6    electronic reporter and transcriber, certify that the

7    foregoing is a correct transcript from the official electronic

8    sound recording of the proceedings in the above-entitled

9    matter.

10

11         *Christine Fiore*

12    _____          January 25, 2022

13         Christine Fiore, CERT

14

15

16

17

18

19

20

21

22

23

24

25