UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| AHARON MILLER, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:18-cv-02192-RPK-PK |
| | : | |
| - v - | : | |
| | : | |
| ARAB BANK, PLC, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| NATHAN PAM, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:18-cv-04670-RPK-PK |
| | : | |
| - v - | : | |
| | : | |
| ARAB BANK, PLC, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------

# DEFENDANT ARAB BANK, PLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER PURSUANT TO RULE 26(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

I.      RELEVANT BACKGROUND FACTS ............................................................4

II.     THE BANK SECRECY LAWS OF JORDAN, LEBANON, AND THE
        PALESTINIAN TERRITORIES ....................................................................4

        A.      Jordanian Bank Secrecy Law..............................................................5

        B.      Lebanese Bank Secrecy Law ...............................................................6

        C.      Palestinian Bank Secrecy Law ............................................................7

III.    LETTERS ROGATORY TO FOREIGN GOVERNMENTS ............................7

ARGUMENT .......................................................................................................8

I.      THE BANK IS ENTITLED TO A PROTECTIVE ORDER
        NARROWING THE SCOPE OF PLAINTIFFS REQUESTS ...........................8

        A.      The Legal Standard .............................................................................8

                1.      Federal Rule of Civil Procedure 26 .......................................8

                2.      The Restatement (Third) of Foreign Relations Law § 442 .........9

                3.      The Discovery Rulings of the District Court in Linde are No
                        Longer Relevant and Do Not Reflect Current Law ...................10

        B.      Plaintiffs' Requests Do Not Comply with Rule 26(b) or the Restatement ...........12

                1.      Saudi Committee Requests (Category A) .................................12

                2.      Charities and Social Service Institutions (Category B) .............15

                3.      Individuals Not Identified as Both Linked to an FTO And Closely
                        Intertwined with Its Terrorist Activities During the Relevant Time
                        Period (Category C) .............................................................18

                4.      Individuals and Entities Linked to an FTO During the Relevant
                        Time Period (Category D) .....................................................20

                5.      The Palestinian Government and Political Parties (Category E) .............21

II.     THE COURT SHOULD DEFER ORDERING THE BANK
        TO VIOLATE THE LAWS OF FOREIGN SOVEREIGNS OR, IN THE
        ALTERNATIVE, GRANT A PROTECTIVE ORDER PERMITTING THE
        BANK TO WITHHOLD ALL OUTSTANDING DISCOVERY OF
        DOCUMENTS LOCATED IN JORDAN, LEBANON, AND THE
        PALESTINIAN TERRITORIES ....................................................................23

        A.      Application of Restatement Factors .....................................................25

                1.      Plaintiffs' Remaining Discovery Is Not Crucial to the Litigation
                        and, Therefore, Is Not "Important." .......................................25

                2.      Degree of Specificity of the Requests.....................................26

                3.      Whether the Information Originated in the United States. .........27

|  | 4. | Availability of Alternative Means of Securing Information......................27 |
|  | 5. | Balancing National Interests. .................................................................28 |
| B. | | Additional Factors Also Weigh in Favor of a Protective Order ...........................33 |
|  | 1. | Arab Bank Would Suffer Significant Hardship If It Produced Documents Protected by Bank Secrecy. ...................................................33 |
|  | 2. | Arab Bank Has Acted in Good Faith. ......................................................34 |

CONCLUSION.........................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Application of Chase Manhattan Bank*,
  297 F.2d 611 (2d Cir. 1962) .................................................................................24, 32

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips
  Petroleum Co.*,
  105 F.R.D. 16 (S.D.N.Y. 1984) ...........................................................................28

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ...........................................................................................24

*DoubleLine Capital LP v. Oderbrecht Finance, Ltd.*,
  17-cv-4576 (GHW) (BCM), 2021 WL 4596561 (S.D.N.Y. Oct. 6, 2021) ............................27

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .........................................................................17, 18

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .............................................................................................18

*Honickman v. Blom Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) .................................................................17, 18, 19, 27

*Ings v. Ferguson*,
  282 F.2d 149 (2d Cir. 1960) .................................................................................24

*Johnson v. Nyack Hosp.*,
  169 F.R.D. 550 (S.D.N.Y. 1996) ...........................................................................9

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2nd Cir. 2021) .........................................................................17, 19

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ............................................................. *passim*

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ......................................................................... *passim*

*Milliken & Co. v. Bank of China*,
  758 F. Supp. 2d 238 (S.D.N.Y. 2010) .............................................................10, 33

*Minpeco, S.A. v. Conticommodity Svcs., Inc.*,
  116 F.R.D. 517 (S.D.N.Y. 1987) ...................................................................10, 25, 32

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
   15 Civ. 0293 (LTS) (JCF), 2016 WL 3906712 (S.D.N.Y. July 14, 2016) ...............................9

*Nike, Inc. v. Wu*,
   349 F. Supp. 3d 310 (S.D.N.Y. 2018)....................................................................................28

*Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*,
   902 F.2d 1275 (7th Cir. 1990) ...............................................................................................30

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) .......................................................................................10, 26

*Rotstain v. Trustmark Nat'l Bank*,
   09-cv-2384-N-BG, 2015 WL 13031698 (N.D. Tex. Dec. 9, 2015)........................................34

*In re Rubber Chemicals Antitrust Litig.*,
   486 F. Supp. 2d 1078 (N.D. Cal. 2007) .................................................................................26

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984)..................................................................................................................8

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019).................................................................................................17

*Societe Internationale Pour Participations Industrielles ET Commerciales, S.A. v. Rogers*,
   357 U.S. 197 (1958)..............................................................................................10, 25, 34

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S.D. Iowa*,
   482 U.S. 522 (1987)........................................................................................1, 9, 25, 32

*Solarex Corp. v. Arco Solar, Inc.*,
   121 F.R.D. 163 (E.D.N.Y. 1988) ...........................................................................................8

*Tiffany (NJ) LLC v. Qi Andrew*,
   276 F.R.D. 143 (S.D.N.Y. 2011) ....................................................................................27, 28

*U.S. v. Vetco Inc.*,
   691 F.2d 1281 (9th Cir. 1981) ..............................................................................................30

*In re Vitamins Antitrust Litig.*,
   No. 99-197TFH, 2001 WL 1049433 (D.D.C. June 20, 2001) ................................................26

*Wang v. Wu*,
   SA CV 16-84 GW (MRWx), 2016 WL 10957847 (C.D. Cal. Dec. 7, 2016)..........................26

*Weiss v. Nat'l Westminster Bank PLC*,
  381 F. Supp. 3d 223 (E.D.N.Y. 2019) ...................................................................16

*Weiss v. Nat'l Westminster Bank, PLC*,
  453 F. Supp 2d 609 (E.D.N.Y. 2006) ...................................................................16

*Weiss v. Nat'l Westminster Bank, PLC*.,
  993 F. 3d 144 (2d Cir. 2021) ....................................................................16, 17, 27

*In re Westinghouse Elec. Corp. Uranium Contracts Litig.*,
  563 F.2d 992 (10th Cir. 1977) ...............................................................................26

*Wultz v. Bank of China Ltd.*,
  298 F.R.D. 91 (S.D.N.Y 2014) ..............................................................................27

*In re: Xarelto (Rivaroxaban) Prod. Liab. Litig*
  No. MDL 2592, 2016 WL 3923873 (E.D. La. July 21, 2016).................................26

## Statutes & Rules

18 U.S.C. § 2332........................................................................................... *passim*

18 U.S.C. § 2333........................................................................................... *passim*

18 U.S.C. § 2339 ..................................................................................................10

Fed. R. Civ. P. 26 ......................................................................................... *passim*

## Other Authorities

Restatement (Third) of Foreign Relations Law § 442 (1987)..........................1, 5, 9, 35

Arab Bank plc ("Arab Bank" or the "Bank") respectfully submits this memorandum of law in support of its Motion for a Protective Order pursuant to Fed. R. Civ. P. 26(c).

## PRELIMINARY STATEMENT

The Supreme Court long ago warned that U.S. courts should exercise "*special vigilance*" to protect foreign litigants from unnecessary or unduly burdensome discovery. *Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S.D. Iowa*, 482 U.S. 522, 542, 546 (1987) (emphasis added). This is such a case. Plaintiffs waited almost eighteen years to bring these actions, having chosen not to join the lawsuits dating back to 2004 in *Linde v. Arab Bank, PLC*, 1:04-CV-02799 (BMC) (PK), that were brought by many of their relatives.[1] Represented by the same counsel, they seek to borrow from the discovery playbook previously employed in those cases. But this case is not *Linde*, and both the substantive law governing the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2332, claims and the Federal Rules of Civil Procedure governing discovery have changed. Indeed, the jury verdict in *Linde* was vacated based upon the District Court's misapprehension of the law which permeated its discovery rulings and the jury charge.

Plaintiffs are, of course, entitled to all discovery that complies with Rule 26(b) of the Federal Rules of Civil Procedure (with respect to documents located in the United States) and the heightened standard under Section 442(1)(c) of the Restatement (Third) of Foreign Relations Law (the "Restatement") (with respect to documents located abroad). The document requests that are the subject of this motion for a protective order comply with neither.[2] To be clear, this motion does not seek protection for documents located in the United States. Arab Bank has already

---

[1] Sixty-two of the sixty-eight Plaintiffs are relatives of the *Linde* plaintiffs, but only three allege physical injury arising from fourteen terrorist attacks committed by various U.S. designated Foreign Terrorist Organizations ("FTOs") in Israel between November 4, 2001, and September 24, 2004.

[2] Copies of Plaintiffs' First and Second Requests for Production of Documents (hereinafter referred to as "First RFP" and "Second RFP" or collectively the "Requests") are attached to the Declaration of Courtney Gilligan Saleski dated March 4, 2022 ("Saleski Decl.") as Exhibits 4 and 5.

produced all such documents, even where it might have withheld production on grounds of relevancy and burden under Rule 26(b).  Plaintiffs do not claim otherwise.  This motion is directed solely at documents located in Jordan, Lebanon, and the Palestinian Territories.  With the joint agreement of the Parties, the Court proceeded in the first instance with Letters Rogatory addressed to the foreign governments, deferring, as the Court proposed, issues regarding the scope of Plaintiffs' Requests pending the response of the foreign governments.

The foreign governments subsequently declined to authorize the Bank to produce documents located in their jurisdictions as requested in the Letters Rogatory.  As a result, the Bank is not free to ignore and breach the laws of those countries, just as Plaintiffs are not free to ignore U.S. law regarding the proper scope of discovery.  The Bank is willing, as an alternative, to attempt to seek customer consents as permitted under those foreign laws.  Plaintiffs, however, have refused to engage in any discussion to narrow their document demands so that the Bank could seek those waivers based upon properly drawn requests, necessitating this motion.

Simply put, Plaintiffs' Requests fail to comply with Rule 26(b)(1) of the Federal Rules, which requires that discovery be limited in scope to matters *relevant* to a claim and *proportional* to the needs of the case.  The Rule, as amended in 2015, replaces and abolishes the "reasonably calculated to lead to admissible evidence" standard that governed the scope of discovery during the time of the District Court rulings in *Linde*.  The Requests also violate the *heightened* standard under the Restatement for discovery of documents located abroad.  The Restatement requires not only that the requested documents be relevant under Rule 26(b), but also that they be "vital" or "crucial" to the litigation—*i.e.*, that the litigation will "stand or fall" on their production.

As discussed below, the Requests at issue are too broadly drawn to meet these standards. They do not seek evidence relevant and vital to their claims under the ATA and Justice Against

Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), and are not proportional to the needs of the case.  Requests for all banking records of 38 charities over a period of seven years, regardless of the nature of the transactions, go well beyond seeking evidence relevant or vital to establishing primary or secondary liability under existing Second Circuit precedent, as do requests for the accounts of individuals who are not even mentioned in the pleadings or alleged to be "closely intertwined with the violent terrorist activities" of any terrorist group.  Accordingly, the Bank is entitled to a protective order narrowing Plaintiffs' Requests to comply with Rule 26(b)(1) and the Restatement as set forth below.

The Bank also requests that it be given the opportunity to seek customer waivers based on discovery demands this Court determines are relevant, proportional, and vital to this case.  While the Court may have the authority to order Arab Bank to violate the bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories under appropriate circumstances, the issue is whether it should exercise that authority at this time.  The Bank respectfully submits that as a matter of international comity, it should not.  Rather, it should defer issuing such an order—which unnecessarily places this Court in conflict with foreign sovereigns—pending the outcome of the Bank's efforts to produce documents based on customer waivers, which may render such an order moot or cabin its scope depending on the production it is able to make.[3]  In the alternative, should the Court decide to rule on the bank secrecy objection as this time, the Bank submits that it is entitled to a protective order that honors foreign bank secrecy laws of general applicability under existing Supreme Court and Second Circuit precedent.

---

[3]  As the Bank has advised the Court, it would expect to complete this process in sixty to ninety days, which is still within the timeframe that Plaintiffs have stated they need to complete their production in response to the Bank's discovery requests, and to provide status reports if requested by the Court during this period.

## I.      RELEVANT BACKGROUND FACTS

The background facts relevant to this motion may be simply stated.

On July 5, 2018, the *Miller* Plaintiffs filed their Amended Complaint, and, on December 13, 2018, the *Pam* Plaintiffs filed their First Supplemental Complaint (to their original Complaint filed on August 17, 2018), seeking to hold the Bank liable under the ATA and JASTA, as a primary or secondary actor in these related actions.

On July 22, 2019, Plaintiffs served their Requests.  The Requests seek a wide range of bank records over a seven-year period (1998-2004) for 673 individuals and entities.  Only 123 of these individuals and entities are mentioned in the operative Complaints and only twelve are alleged to have committed, planned, or authorized any of the fourteen attacks that Plaintiffs allege resulted in their injuries.

On August 23, 2019, the Bank served its written Responses to the Requests, objecting to individual Requests, where appropriate, on, *inter alia*, grounds of relevance, proportionality, and foreign bank secrecy.[4]  Notwithstanding its objections, which it expressly reserved, the Bank agreed to and, in fact, produced over 217,390 pages of documents that were located in the United States and/or previously produced in *Linde*.

At issue in this motion are Plaintiffs' Requests for documents located abroad and subject to the bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories.  Plaintiffs do not dispute that the Bank has otherwise complied with and completed its responses to their Requests.

## II.     THE BANK SECRECY LAWS OF JORDAN, LEBANON, AND THE
##         PALESTINIAN TERRITORIES

The bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories are consistent with those of many European and other Middle Eastern jurisdictions.  They are not blocking

---

[4]  Copies of the Responses are attached to the Saleski Decl. as Exhibits 6 and 7.

statutes,[5] which are clearly disfavored by U.S. courts and given little credence as a basis for denying discovery. They are laws of general applicability, which apply equally to domestic and foreign requests. They bar disclosure by banks of customer records located in their jurisdictions absent an express authorization by the foreign government or waiver by the customer. In each of these jurisdictions, violations of bank secrecy laws are punishable by imprisonment and fines, as well as other consequences such as loss of banking license, placement under government management, dissolution of the board of directors, and civil claims for damages by customers whose confidentiality rights are breached.

### A.  Jordanian Bank Secrecy Law

Bank secrecy is governed by Jordanian Banking Law No. 28 of 2000. Saleski Decl., Ex. 1 (Odeh Declaration at ¶ 23.) The law states in pertinent part, "[a] bank shall observe full confidentiality regarding all accounts, deposits, trusts, and safe-deposit boxes of its customers." (*Id.* at ¶ 24.) "It shall be prohibited from providing directly or indirectly any information thereon." (*Id.*) It further provides that, "[a]ll present and former administrators of the bank shall be prohibited from providing any information or data on the clients or their accounts, deposits, trusts, safe-deposit boxes, or any of their transactions, or disclosing or enabling others to have access to such information and data in situations other than those permitted under this law." (*Id.* at ¶ 25.)

The law states that violations "shall be punished with imprisonment for a period not less than six months and up to three years, or a fine not less than ten thousand Dinars and not more than fifty thousand Dinars, or with both penalties" *per disclosure*.[6] (*Id.* at ¶ 27.) Banks that violate the statute are subject to additional sanctions imposed by the Central Bank, including (1) revoking

---

[5] A "blocking statute" is a foreign government's law that prohibits disclosure and transfer of information to the United States for litigation. (*See* Reporter's Note 4 to Restatement (Third) of Foreign Relations Law § 442 (1987).)

[6] At current exchange rates, 10,000 Jordanian Dinars is equal to approximately $14,104 U.S. dollars, while 50,000 Jordanian dinars is equal to approximately $70,522 U.S. dollars.

of the license of the bank; (2) dissolving the board of directors of the bank and placement of the bank under the management of the Central Bank; (3) removing the chairman or any member of the board of directors of the bank; (4) instructing the bank to cease certain activities, or forbidding the bank from distributing dividends; (5) instructing the bank to temporarily suspend from service any administrator, other than a member of its board of directors, or to dismiss such administrator, depending on the gravity of the violation; and (6) requesting that the bank pursue legal remedies against its administrators in accordance with Jordanian law.  (*Id.* at ¶¶ 28-31.)  Furthermore, banks will be exposed to damages claims by customers for the breach of confidentiality rights.

## B.    Lebanese Bank Secrecy Law

Lebanon enacted its bank secrecy law on September 3, 1956.  Saleski Decl., Ex. 2 (Cortbaoui Decl. at ¶ 6.)  Article 2 of the law prohibits directors and employees of banks in Lebanon, including any person who might have access to registers, operations, or correspondence of banks, from disclosing to third parties the names of bank customers, their assets, or the facts of their account transactions.  (*Id.*)  Specifically, the law states in pertinent part, "all persons who, through their position or function, by one means or another, have knowledge of the bank's books, operations and correspondence, are bound to ***absolute secrecy*** in favor of the bank's clients and may not disclose to anyone whatsoever . . . the names of clients, their assets and facts of which they are aware . . . ."  (*Id.*) (emphasis in original).  Such disclosure is prohibited to any person or entity, ***even the Lebanese government***.  (*Id.*)

Article 8 of the Law provides that violation of bank secrecy is a criminal offense punishable by imprisonment for a period of three months to one year.  (*Id.* at ¶ 13.)  Furthermore, violations of bank secrecy obligations may subject offending banks and their employees to civil claims for damages brought by customers whose confidential information was disclosed.  (*Id.* at ¶ 14.)

6

### C.    Palestinian Bank Secrecy Law

Palestinian law likewise imposes on banks a broad duty of secrecy and makes violations of bank secrecy a criminal offense.  Saleski Decl., Ex. 3 (Kamal Declaration at ¶ 10.)  Palestinian Banking Law No. 9 of 2010 imposes obligations to maintain the confidentiality of bank accounts on any person who accessed information and data related to an account in relation to his or her "job, profession, or work in a direct or indirect way with the bank," including all current and former employees, directors, auditors, consultants, and contractors.  (*Id.* at ¶ 15.)  Anyone violating this law is subject to a fine of between 5,000 and 250,000 Jordanian Dinars,[7] up to one year in prison, or both *per violation*.  (*Id.* at ¶ 16.)  Additionally, the bank may be subject to additional sanctions, including revocation of its license to operate, as well as claims by customers.  (*Id.*)

## III.    LETTERS ROGATORY TO FOREIGN GOVERNMENTS

The Bank sought to raise issues regarding both the scope of Plaintiffs' Requests and their impact on seeking authorizations from foreign governments and customers in a letter dated September 13, 2019.  *See* ECF No.[8] 53, Letter Motion for Conference in Lieu of Motions.  At a conference held on September 24, 2019, the Court decided to defer motion practice addressed to scope by either party, pending the responses to the Letters Rogatory to the Jordanian, Lebanese, and Palestinian governments.  The Court fairly reasoned that if the foreign authorities agreed to blanket authorizations permitting the Bank to produce the accounts subject to bank secrecy laws, it might obviate the need for the Court to determine issues of scope under either Rule 26(b) or the Restatement.  *See* Saleski Decl., Ex. 8 (ECF No. 56, Tr. of Sept. 24, 2019 Conference at 33:20-34:5; 37:5-38:6; 40:21-25; 41:12-22); ECF No. 60 at p. 1-2, Order Issuing Letters Rogatory.

---

[7]  At the current exchange rates, 5,000 Jordanian Dinars is equal to approximately $7,052 U.S. dollars, while 250,000 Jordanian Dinars is equal to approximately $352,613 U.S. dollars.

[8]  Because the same filings in these related cases are simultaneously filed on the *Miller* and *Pam* dockets, unless stated otherwise, this Motion only cites to ECF Nos. in the *Miller* docket in order to avoid duplicate citations.

All three foreign governments, having considered the requests, respectfully denied them as contrary to their privacy laws.  Saleski Decl., Ex. 9 (Nov. 5, 2020 Banque du Liban Response); Ex. 10 (Oct. 12, 2021 Central Bank of Jordan Response); Ex. 11 (Oct. 28, 2021 Palestinian Minister of Justice's Response.)  Immediately after receiving those denials, the Bank requested that Plaintiffs narrow the scope of their Requests so that it could solicit customer waivers based upon agreed to Requests.  Plaintiffs refused, necessitating this motion.

## ARGUMENT

## I.   THE BANK IS ENTITLED TO A PROTECTIVE ORDER NARROWING THE SCOPE OF PLAINTIFFS REQUESTS

### A.   The Legal Standard

#### 1.   Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26(c) authorizes a federal court, for good cause, to "issue an order to protect a party or person [from whom discovery is sought] from annoyance, embarrassment, oppression, or undue burden or expense."  Undue burden under Rule 26(c) encompasses both hardship to the producing party and the wider social consequences of producing the discovery.  *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 169 (E.D.N.Y. 1988).  Rule 26 "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34-36 (1984) ("It is clear from experience that pretrial discovery . . . has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties. . . . The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders.").

Rule 26(b)(1) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Rule 26(b)(1) defines the six

factors used to determine proportionality:  "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  F.R.C.P. 26(b)(1).  As to the latter point, the burden analysis under Rule 26(b) requires at least one additional consideration relevant here.  That is the burden of producing documents in violation of foreign law, *see Aerospatiale*, 482 U.S. at 544, n.29, and in particular, privacy laws.  *See Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996) (granting motions to quash because the "burdens imposed on the hospitals' privacy and other interests sufficiently outweigh[ed] the needs of the parties," and explaining that burden under Rule 26(b) at times "lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material.").  Rule 26(b)(2)(C) further provides for a protective order where the discovery sought is unreasonably cumulative or duplicative.

Rule 26 places the burden on Plaintiffs to establish the relevance of their requests.  *Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 15 Civ. 0293 (LTS) (JCF), 2016 WL 3906712, at *3 (S.D.N.Y. July 14, 2016).

### 2.      The Restatement (Third) of Foreign Relations Law § 442

As the Supreme Court has stated, "Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests.  When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings ***particularly closely*** to prevent discovery abuses."  *Aerospatiale*, 482 U.S. at 546.

When considering whether to order production of foreign documents notwithstanding foreign laws prohibiting their disclosure (like the bank secrecy restrictions at issue here), the Second Circuit applies a comity analysis that includes the factors set forth in the Restatement.  Under this *heightened* standard, any requested information that is relevant under Rule 26, must

9

*also* be identified with "specificity," "vital," or "crucial" to the litigation and not available by "alternate means"—meaning the litigation will "stand or fall" on whether the document is produced.  *See Société Internationale Pour Participations Industrielles ET Commerciales, S.A. v. Rogers*, 357 U.S. 197, 205 (1958); *Minpeco, S.A. v. Conticommodity Svcs., Inc.*, 116 F.R.D. 517, 528 (S.D.N.Y. 1987); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992).[9]r

### 3.    The Discovery Rulings of the District Court in *Linde* are No Longer Relevant and Do Not Reflect Current Law

Plaintiffs have asserted, as recently as this Court's January 20, 2022, conference, that their Requests are no broader than those previously approved by the District Court in *Linde* and that the District Court's rulings as to scope should, therefore, be followed by this Court.  Plaintiffs are wrong.

First, the District Court's rulings in *Linde* regarding the scope of discovery were premised on a mistaken interpretation of the statutory requirement for primary liability under § 2333(a) of the ATA.  In 2005, it held that Arab Bank's provision of *any* type of material support to a terrorist organization in violation of 18 U.S.C. § 2339B was sufficient, by itself, to establish the Bank's liability under the ATA.  *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 582, 586 (E.D.N.Y. 2005).  Based on this interpretation of ATA primary liability, it then ordered the production of all transfers processed by the Bank for it alleged customers, regardless of the nature of the transfer. In 2018, the Second Circuit found that the District Court had misinterpreted the statute and vacated the jury verdict.  It held that to hold a bank liable as a principle under the ATA, the transfers

---

[9]  Other factors discussed in Point II, *infra,* include whether the information (a) originated in the Unites States, (b) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance would undermine important interests of the state where the information is located, (c) hardship to the producing party, and (d) whether the party has proceeded in good faith.  *See, e.g.*, the Restatement; *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 246 (S.D.N.Y. 2010).

processed by the bank must "*involve violence or endanger human life*." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018). Transfers for other purposes—such as humanitarian aid—do not manifest the intent required to establish an act of international terrorism and thus primary liability under the ATA. *Id.* The District Court's misreading of the law, which resulted in its erroneous charge to the jury, was also the legal basis on which the District Court predicated its order regarding the scope of discovery: that the Bank produce *all* customer transfers over a multi-year period regardless of the nature of the transaction based on its erroneous view that even transfers for humanitarian aid and social services are sufficient to establish primary liability. As the Second Circuit's holding in *Linde* makes clear, that is not the law.

Second, the District Court in *Linde* made no ruling on the proper scope of discovery in a JASTA aiding and abetting action, because JASTA had yet to be enacted. *See* 18 U.S.C. 2333(d) (enacted September 28, 2016).

Third, the District Court's discovery rulings predated by thirteen years the 2015 Amendments to Rule 26(b) which added proportionality, tied relevance to proportionality, and abolished the "reasonably calculated to lead to the discovery of admissible evidence" standard applied by the court at that time. *See* 2015 Committee Notes.

Fourth, the District Court's analysis of bank secrecy and Restatement factors was subsequently criticized by the U.S. Solicitor General as "flawed" in an *amicus* brief to the Supreme Court.[10] Saleski Decl., Ex. 23 (Brief for United States as *Amicus Curiae* at 12.)[11]

---

[10] The reasons for this conclusion of the Solicitor General are discussed at greater length *infra* in Point II.

[11] The Second Circuit stated that it need not decide whether the trial court's ruling on bank secrecy was erroneous given its decision to vacate the judgment based on the erroneous jury charge and the agreement of the parties to forego a retrial. *Linde,* 882 F.3d at 333.

**B.     Plaintiffs' Requests Do Not Comply with Rule 26(b) or the Restatement**

For purposes of the Motion, Arab Bank has grouped the Requests that are the subject of this motion, and seek account records for 673 individuals and entities into five categories.  As discussed below, these Requests are for documents that are not relevant or vital to Plaintiffs' claims and are not proportional to the needs of the case.  As such, they exceed the permissible bounds of discovery under Rule 26(b) and Section 442(1)(c) and, being located abroad, are also subject to the bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories prohibiting their production absent customer waivers.  A protective order is therefore warranted.

**1.     Saudi Committee Requests (Category A)**

The Saudi Committee was established in October 2000 as a private charity registered with the Kingdom of Saudi Arabia.  ECF No. 25, *Miller* First Amended Complaint ("*Miller* FAC"), ¶¶ 247-51.  It was created at the urging of the international community and operated in full transparency by publishing on its website the details of its program and every payment made to the beneficiaries.  During the time period relevant to this suit, then Secretary of State Colin Powell described it as a charitable effort to "tak[e] care of people in need."  Saleski Decl., Ex. 12 (U.S. Dep't of St., Interview on NBC'S Meet the Press with Tim Russert (May 5, 2002) at p. 2.)  The Saudi Committee provided over $194 million to fund projects that provided food, supplies, education, jobs, health, and housing in the West Bank and Gaza, as well as support for orphans, the disabled, and hospitals and financial assistance to families in need, working with, among others, the United Nations Relief and Works Agency, the World Wide Red Cross, and other recognized international donors.

In their pleadings, Plaintiffs focus on two of these programs: (1) a program to provide one-time payments to family members of Palestinians detained or imprisoned by Israeli military forces; and (2) a program to make one-time payments to families who lost a provider during the Second

Intifada.   Plaintiffs characterize these programs as insurance programs, which they allege incentivized prospective martyrs to commit acts of violence.  *See, e.g.*, *Miller* FAC at ¶ 267, ECF No. 1, Pam Complaint ("*Pam* Compl.") at ¶ 120.   This motion is not about the accuracy of Plaintiffs' characterization,[12] nor strongly held views to the contrary.[13]

Nor is it about whether the Bank made transfers as directed by Arab National Bank ("ANB") on behalf of ANB's customer, the Saudi Committee.  The Bank acknowledges doing so. The issue is about the scope of the sixteen Saudi Committee Requests in Category 1 (together, the "Saudi Committee Requests") which request, in addition to transactions processed for or on behalf of the Saudi Committee by the Bank, the account records of over 400 individuals, over a seven-year time frame and seek documents along the following lines: "All Documents concerning transactions processed by Arab Bank for or on behalf of the Saudi Committee for the benefit of the families of the following HAMAS 'martyrs,' including but not limited to, transaction records, account statements, account opening documentation, communications concerning the transactions and/or recipients, receipts issued by Arab Bank to account holders and/or payees, and death

---

[12]  The vast majority of payments under these two Saudi programs did not, in fact, go to the families of imprisoned terrorists and suicide bombers, contrary to Plaintiffs' characterization of these programs as a "death and dismemberment insurance scheme."  (*Miller* FAC at ¶ 272.)  *First*, the Second Intifada was a period of mass detention and incarceration involving over 650,000 Palestinians, the majority of whom were not detained as terrorists or for having engaged in violent acts.  *Second*, individuals who qualified for martyr payments included mostly innocent third parties whose deaths were unrelated to terrorism.  B'Tselem, an Israeli human rights organization, identifies on its website hundreds of individuals who qualified as "martyrs" because their deaths occurred during the hostilities but were themselves not engaged in terrorist acts.  They and their families were part of the "collateral" damage of military operations and blockades during this conflict.  *See* Saleski Decl., Ex. 13 (B'Tselem, Database providing statistical information on fatalities relating to the conflict between Israel and the Palestinians since the beginning of the Second Intifada.)

[13]  *See, e.g.*, Saleski Decl., Ex. 14 (ICG Middle East Report No. 13 (Apr. 2, 2003) at 23-24) ("[T]here is strong evidence that neither rewards nor penalties provided to the families have much to do with [motivating suicide bombers]. Payments by charitable institutions to families of suicide bombers stand out in part because of the absence of a generalized Palestinian welfare system [which] Palestinians for the most part support." (ellipses omitted); Saleski Decl., Ex. 15 (*Israel Cracks Down on Banks Over Payments to Palestinian Inmates,* N.Y. Times (May 9, 2020)), (noting that Israel first passed a statute making payments to prisoners or families of prisoners a criminal offense in 2020, *sixteen years after the last attack at issue here*.)

certificates, photographic identification and/or certificates of martyrdom for the individuals that qualified the account holder or payee to receive payment." *See, e.g.*, Saleski Decl., Ex. 4 (Plaintiffs' First RFP No. 7), which lists fifty-nine of the over 400 names.[14]

In response to these Requests, the Bank has already produced, as a result of the waiver it obtained from the Saudi Committee, the transfer records and related correspondence of transactions processed by Arab Bank on behalf of ANB's customer, the Saudi Committee, which included transfer instructions identifying recipients, dates, and amounts for any and all beneficiary payments, as well as all internal communications relating to those instructions, related correspondence, and documentation provided by beneficiaries redacted to delete the identifying information, as required by law.  What the Bank has not produced, and should not be required to produce, are the account documents of the family members reflecting the mirror-image credit into those accounts of the transfers already identified in the Bank's production and which the Bank acknowledges making.

Rule 26 protects against discovery requests that are duplicative of the information already provided, and the Restatement expressly recognizes that information need not be provided that is available by alternate means.  That is the case here with respect to the mirror image of the deposit into the beneficiary's account.  Rule 26 and Section 442 also require that the information requested must be relevant, proportional, and vital to the claims.  The additional information that Plaintiffs seek with respect to the accounts of the family members is not.  Furthermore, it is both disproportionate to the needs of the case and burdensome (if not impossible during the COVID-19 pandemic when vaccines are largely unavailable in the Territories) to obtain waivers from some 400 family members, assuming they are even still living, to produce information that Plaintiffs

---

[14]  The sixteen Requests are First RFP Nos. 6-9 and Second RFP Nos. 4-7, 11-14, and 18-21.

already have, or other account information of family members unrelated to the Saudi Committee transfers.

Accordingly, to the extent the sixteen Saudi Committee Requests seek information from the accounts of the family members who are entitled to their privacy and whose accounts are subject to bank secrecy, the Requests should be narrowed to remove the demand for production of those account documents.

### 2.    Charities and Social Service Institutions (Category B)

The Requests also seek all bank records over a seven-year period for 38 charities or other social service institutions which Plaintiffs allege are part of the FTOs' social infrastructures.  *See* Appendix 1 (listing 38 entities).  Plaintiffs seek records for every transaction processed on behalf of such charity or institution—be it the purchase of food baskets for the poor, supplies for an orphanage, or equipment for a medical facility—without regard to whether such transactions could be relevant or vital to proving either primary or secondary liability under existing Second Circuit precedent.  As such, the Requests are overbroad.

In *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327–28 (2d Cir. 2018), the Second Circuit rejected the theory that any form of material support to entities, such as charities or social service institutions, was sufficient to satisfy the ATA's requirement for civil liability as a principle.  As the Court held, the Bank's acts must "involve violence or endanger human life. . . or appear intended to intimidate or coerce a civilian population or to influence or affect a government."  *Id.* at 326.  The provision of financial services, even to a U.S.-designated FTO or an entity linked to an FTO, that do not involve violence or endanger human life or appear intended to intimidate or coerce a civilian population, do not qualify as acts of international terrorism or prove primary liability.  *Id*. at 332; *Weiss v. Nat'l Westminster Bank, PLC*., 993 F. 3d 144, 155 (2d Cir. 2021) (upholding dismissal of claim for primary liability against Bank based on transfers for its customer,

a U.S.-designated terrorist entity, that included programs for orphans, a maternity clinic, student aid, emergency medical aid, food parcels, winter clothes, and other community projects, and run by many of the very same charities identified in the *Miller* and *Pam* Complaints, because such transfers are not "identified as being for any violent or terroristic purpose").[15]

To the extent that Plaintiffs' Requests sweep in transfers involving humanitarian and social service programs, they do not seek information that is relevant and proportionate under Rule 26(b) or vital under the Restatement to establish primary liability. To establish primary liability, the Requests must be specifically tailored to seek account information that can be identified as being for a violent or life endangering purpose pursuant to Second Circuit precedent.

A somewhat different analysis applies with respect to the scope of these Requests under JASTA, but the result in terms of their overbreadth is the same. The Second Circuit clearly stated in *Linde* and in subsequent decisions that the provision of material support in the form of banking services to an FTO or an entity linked to an FTO is, *without more*, insufficient to establish civil aiding and abetting liability. *Linde*, 882 F. 3d at 329–30; *Weiss*, 993 F.3d at 164–65; *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019); *Honickman v. Blom Bank SAL*, 6 F.4th 487 (2d Cir. 2021). In each of these cases, the Second Circuit has provided guidance as to the types of transactions that will give rise to liability and those that will not, using the framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as its touchstone.

---

[15] In 2007, the Magistrate Judge in *Weiss* ordered broad discovery of all transfers processed by NatWest for its customer, based on Judge Sifton's ruling, citing Judge Gershon decision in *Linde*, that "even the provision of basic banking services," without regard to the nature of the transactions processed, constituted an act of international terrorism for purposes of proving primary liability. *Weiss v. Nat'l Westminster Bank, PLC*, 453 F. Supp 2d 609, 625, 631–32 (E.D.N.Y. 2006) (internal citation omitted). These early rulings in *Weiss*, expressly citing and relying on the district court decisions in *Linde*, thus rested on the same misreading of the ATA, with the same result. Following the Second Circuit's decision in *Linde*, NatWest successfully moved for dismissal of the claims against it, with the Second Circuit upholding their dismissal on appeal. *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223 (E.D.N.Y. 2019), *aff'd sub nom. Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144 (2d Cir. 2021).

In *Halberstam*, the Court was careful to distinguish between the normal supportive activities of a spouse versus what it referred to as the defendant's "collusive" conduct that evidenced her knowing assistance in Welch's illegal activities, such as helping to "dispos[e] of the loot," falsifying tax returns, smelting gold and silver in the basement, and "launder[ing] the loot," because she "performed these services in an unusual way under unusual circumstances." *Id.* at 486–87. In *Kaplan*, the Second Circuit focused on evidence that the defendant bank had granted "special exceptions" to customers linked to Hezbollah that "permitted the laundering of money – nearly half a million dollars or dollar equivalents per day – in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858, 865 (2nd Cir. 2021). The Court distinguished these services from "routine banking services to the five customers in connection with non-violent social service activities." *Id.* at 858.

By contrast, in *Weiss*, evidence that the defendant bank had transferred funds for charitable or social service programs was dismissed as non-probative and immaterial to establishing secondary liability. 993 F. 3d at 166–67. And in *Honickman*, the Court outright rejected the theory that funds transferred for charitable purposes establishes aiding and abetting liability because such transfers make available other funds for terrorist attacks or support an FTO's military operations by enhancing its reputation and attracting recruits. 6 F.4th at 499 ("[W]e reject Plaintiffs' attempt to equate the *Halberstam* foreseeability standard with the 'fungibility' theory in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)"). The same discredited theory of liability is asserted here to support Plaintiffs' overly broad Requests. *See Pam* Compl. at ¶ 167; *Miller* FAC at ¶ 331.

Accordingly, the Requests for all transfers processed on behalf of the charities and social service institutions, regardless of their nature, are far too broad.  They seek information that is neither proportionate nor vital under Rule 26(b) or the Restatement to prove either primary or secondary liability.  They should be narrowed to the 2000-2004 time period relevant to the attacks and specifically tailored to Plaintiffs' claims in accordance with the law of the Circuit, excluding transfers for routine banking services related to charitable and humanitarian programs that are not identifiable as being for a terrorist purpose.

### 3. Individuals Not Identified as Both Linked to an FTO And Closely Intertwined with Its Terrorist Activities During the Relevant Time Period (Category C)

For primary liability, a bank must have knowledge of its customer's connection to terrorism.  *Linde*, 882 F.3d at 330.  For secondary liability, it must (a) as a "threshold" requirement be aware of a customer's connection to the FTO ***before the relevant attacks*** and (b) also be aware ***from public source information available prior to the attacks*** that its customer was "closely intertwined with the [FTO's] violent terrorist activities."  *Honickman*, 6 F.4th at 501. (Emphasis added.)  In *Honickman*, the Second Circuit rejected plaintiffs' argument that knowledge based on "publicly available evidence" or on "facts that were previously knowable" would be sufficient, distinguishing between such evidence and "public sources such as media articles," because the former "requires the implausible inference that the defendant was aware of those facts even before the news media."  *Id.* at 502 n.18.  Thus, undated articles, undated website postings, references to classified government reports, intelligence sources, or materials that post-date the relevant time period are not sufficient to establish a Bank's knowledge or liability under the ATA or JASTA.[16]  *Id.*

---

[16]  The Court in both *Honickman* and *Kaplan* placed special emphasis on public source statements made by the FTO itself acknowledging these connections.  *Id.* at 502; *Kaplan*, 999 F.3d at 864–65.

In their Requests, Plaintiffs seek the account records of 174 individuals for whom no public source material is cited prior to the attacks or to the individual's death or imprisonment for a violent act, either in the Complaints, in the appendices to the Spitzen Report that Plaintiffs stated at the September 24, 2019, hearing would demonstrate the purported relevance of these Requests, or elsewhere.  Saleski Decl., Ex. 8 (Sept. 24, 2019 Tr. at 24:14-21; 29:7-23) (representing that Appendices 4-24 of the Spitzen Report contained information on the majority of the names requested by Plaintiffs in this case).  In short, while the Second Circuit opened the door to discovery of customer accounts based on citations to public source evidence available to a bank prior to terrorist attacks, it clearly did not do so where no such evidence is cited.  *Honickman*, 6 F.4th at 502 (dismissing claims against defendant bank where complaint failed to identify public source information during relevant time period identifying its customers as connected to an FTO and closely intertwined with its terrorist activities).

Attached as Appendix 2 are Requests for the accounts of 146 individuals where Plaintiffs have failed to identify public sources demonstrating that the Bank knew or should have known during the relevant time period (or prior to the customers' death or imprisonment) that the individuals were both (a) connected to an FTO and (b) closely intertwined with the FTO's violent and terrorist activity.  Accordingly, the Requests should be narrowed to eliminate production of their accounts.

In addition, attached as Appendix 3 are Requests for the accounts of 28 family members whose relatives are alleged by Plaintiffs to be martyrs, leaders, or operatives of an FTO.  *See* First

RFP Nos. 10(1)-(27);[17] Second RFP Nos. 16(n).[18]  But none of the family members of these individuals referenced in this Appendix are themselves alleged in the pleadings to have been members of any FTO, much less closely intertwined with an FTO's terrorist activity, nor have Plaintiffs cited any public source information identifying them as such.  While Plaintiffs allege that the existence of martyr or prisoner payment programs may have incentivized their relatives to commit terrorist acts (a contested proposition, *see supra*, n.10), they do not allege that any of the family members who received these payments, and whose bank accounts Plaintiffs now seek, were themselves so incentivized or thereafter engaged in terrorist acts, justifying production of their personal accounts.[19]  Accordingly, the Requests for the accounts of the family members should be stricken.

### 4. Individuals and Entities Allegedly Linked to an FTO During the Relevant Time Period (Category D)

The Requests identify a number of FTO leaders and related entities that Plaintiffs allege, based on public information, may have been known to be closely intertwined with terrorist activities.  *See* Appendix 4 (listing 44 individuals and entities).  To the extent any of these individuals or entities were customers of the Bank, it agrees to seek waivers from them.  However,

---

[17]  These twenty-seven Requests are separate and distinct from requests for the bank documents relating to the actual alleged martyr, leader, or operative.  *Compare* Saleski Decl., Ex. 4 (First RFP Nos. 10(1)-(27), *with* First RFP Nos. 2(a)-(cc)).

[18]  This Request is interwoven with requests for bank documents relating to the actual alleged martyr, leader, or operative.  *Compare* Saleski Decl., Ex. 5 (Second RFP No. 16(n), *with* Second RFP No. 16(o).).

[19]  Nor is there any law (Palestinian, Israeli, or United States) that penalizes the families or subjects them to criminal liability for receipt of such payments.  As Jeroen Gunning observed at 102 in *Terrorism, Charities and the diaspora* published in "Countering the Financing of Terrorism," edited by T. Biersteker and S. Eckert, "According to Article 33 of the Geneva Convention, no person in a conflict situation 'may be punished for an offence he or she has not personally committed.'  Refusal of humanitarian assistance to a family on the ground that the father (or mother) of the family has committed a terrorist act would thus arguably constitute a breach of the Geneva Convention."  Saleski Decl., Ex. 16 (T. Biersteker & S. Eckert, "Countering the Financing of Terrorism" at 102.)

just as providing banking services to an FTO, ***without more***, is insufficient to establish primary or secondary liability, so is the provision of banking services to a leader of an FTO ***without more***.

For the reasons already discussed *supra*, at pp. 18–20, these Requests are overbroad, including within their scope personal information unrelated to terrorist activity. The Requests should be narrowed to account information involving transfers during the period 2000-2004 that either on their face, or by their unlawful nature, could foreseeably result in terrorist attacks, such as transfers to those engaged in military operations, suicide bombings, the purchase of weapons, or other non-routine transactions, based on agreed-to search terms.

### 5.   The Palestinian Government and Political Parties (Category E)

The Second RFP Nos. 17(a)-(c), (f)-(g), (m)-(p), 15(a), and 24–25 seek all banking transactions for the Palestinian Liberation Organization ("PLO") (and its former Chairman Yasser Arafat), Fatah, and various ministries and departments of the Palestinian Authority ("PA"). *See* Appendix 5 (listing 13 names in this category). Arab Bank assumes that Plaintiffs made these Requests to ensure that any Letters Rogatory containing them would be denied by the Palestinian government since all four were or are integral to the operation of the Palestinian Government and partners of the United States in the peace process with Israel; unlike Hamas or the FTOs cited in the Complaints that refuse to recognize Israel's right to exist. Plaintiffs' wholesale requests for transactions between the Bank and the Palestinian government are clearly overbroad and designed to harass.

The PA was created by the Gaza-Jericho Agreement, signed by Israel and the PLO on May 4, 1994, to administer Palestinian self-governance in the Territories. *See* Saleski Decl., Ex. 17 (Agreement on the Gaza Strip and the Jericho Area (May 4, 1994) at Article II, *Scheduled Withdrawal of Israeli Military Forces*). The Agreement expressly authorized the PA, among other things, to establish the Palestine Monetary Authority ("PMA") with responsibility for, *inter alia*,

regulation, supervision, and inspection of all banks operating in the Territories, including Israeli banks.  *See* Saleski Decl., Ex. 18 (Gaza-Jericho Agreement, Annex IV: Protocol on Economic Relations between the Government of State of Israel and the PLO, Representing the Palestinian People (April 29, 1994) at Article IV, *Monetary and Financial Issues*, §§ 2,7.)

Notwithstanding their early history of resistance to Israel, in 1988, the Fatah-led PLO recognized the existence of Israel and accepted the two-state solution.  Saleski Decl., Ex. 19 (AP News, *Arafat Endorses Statement Recognizing Israel's Right to Exist* (Dec. 7, 1988).).  In 1993, the PLO signed the Oslo Accords, and in 1994, as noted, the Gaza Jericho Agreement, with Fatah winning the majority of seats in the Palestinian Legislative Council in 1996.  Saleski Decl., Ex. 20 (Encyclopedia Britannica, "Two-State Solution".)  The PLO represents the Palestinian people at the United Nations as "The Permanent Observer Mission of the State of Palestine to the United Nations."  Saleski Decl., Ex. 21 (Permanent Observer Mission of the State of Palestine to the United Nations, "Palestine Liberation Organization.")

The Requests directed at the PA's internal departments, the PLO, and Fatah are designed to fail.  They also violate Rule 26(b) and the Restatement factors.  Second RFP Nos. 17(a), (n)-(p), and 25, request the accounts of various ministries and departments of the PA.  But there is no allegation in the pleadings that the PA directed transfers in violation of its own laws and banking regulations or for violent terrorist activities.  Similarly, Second RFP No. 24, seeks all of the PLO's bank accounts, absent any factual allegations in the Complaints that the Bank processed any transactions for the PLO in furtherance of terrorist activity.  As noted *supra*, the 2015 Amendments to Rule 26(b) tied relevance to proportionality and abolished the "reasonably calculated to lead to admissible evidence" standard.  *See* 2015 Committee Notes.  In the absence of any factual allegation that the Bank had an account or processed violent, life-endangering, or unlawful

transactions for the PA or PLO, these Requests are neither relevant and proportional nor vital; they are fishing expeditions.  Finally, Second RFP Nos. 17(b), (c), (f), (g), and (m), relating to Fatah or Fatah's social service-related entities, should be stricken.  Although the Complaints at least allege that Fatah itself had an account at the Bank, there are no factual allegations (a) that the account was used by Fatah for any improper transactions, (b) that any of the affiliated social service entities identified in these Requests had accounts at the Bank, or (c) that the Bank processed any unlawful or terror-related transactions on behalf of these social service entities.

Accordingly, these Requests should be denied by the Court.

## II.   THE COURT SHOULD DEFER ORDERING THE BANK TO VIOLATE THE LAWS OF FOREIGN SOVEREIGNS OR, IN THE ALTERNATIVE, GRANT A PROTECTIVE ORDER PERMITTING THE BANK TO WITHHOLD ALL OUTSTANDING DISCOVERY OF DOCUMENTS LOCATED IN JORDAN, LEBANON, AND THE PALESTINIAN TERRITORIES

While this Court has the authority, where appropriate, to order Arab Bank to violate the bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories, the issue is whether it should exercise that authority at this time.  It should not.  Rather, it should defer doing so in order to give the Bank an opportunity to produce documents in response to properly drawn requests without violating the laws of these foreign sovereigns.

This Court took the first step in avoiding a potentially unnecessary conflict with all three foreign governments by issuing Letters Rogatory requesting that they authorize the Bank to produce documents from certain bellwether customer accounts.  The Court should now complete the process by allowing the Bank to produce documents, without ordering it to violate foreign law,

through a good faith attempt to obtain customer waivers for Requests approved by this Court that comply with Rule 26(b) and the Restatement factors.[20]

Courts in this Circuit have long abided by a deferential approach, as the Bank urges here, in order to avoid unnecessary conflict with foreign law. *See, e.g.*, *Application of Chase Manhattan Bank*, 297 F.2d 611, 613 (2d Cir. 1962) (affirming an order modifying a subpoena *duces tecum* for bank records located in Panama to avoid violating Panamanian law because "[j]ust as we would expect and require branches of foreign banks to abide by our laws applicable to the conduct of their business in this country, so should we honor their laws affecting our bank branches which are permitted to do business in foreign countries."). The Second Circuit has explained, "[u]pon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures." *Ings v. Ferguson*, 282 F.2d 149, 152–53 (2d Cir. 1960). This principle aligns with precedent of the U.S. Supreme Court, which not only strongly favors comity, but also criticizes lower courts for failing to sufficiently account for foreign interests in litigation with collateral consequences felt beyond the United States' borders. *See Daimler AG v. Bauman*, 571 U.S. 117, 141–42 (2014) (declining to extend general jurisdiction because of "[c]onsiderations of international rapport" and criticizing the lower court for paying "little heed to the risks to international comity its expansive view of general jurisdiction posed[.]").

---

[20] Contrary to Plaintiffs' assertion at the January 20, 2022, conference that waivers would allow customers to determine what they will or will not produce, the waivers will be sought based upon *what this Court decides are proper Requests* under Rule 26(b) and the Restatement. Plaintiffs have also asserted that the Bank could have sought these waivers at any time over the past two years. Not true. Seeking waivers based on the overly broad Requests that are the subject of Point I of this memorandum would have been doomed to failure. No individual or entity, whether a U.S. citizen or a Palestinian, would likely agree to produce seven years of their bank statements to an individual they do not know in a lawsuit to which they are not a party. That is why, of course, requesting blanket waivers from the foreign governments through letters rogatory made initial sense and presumably why the Court, itself, expressed the hope that it might be able to avoid addressing issues of scope pending the response of the foreign governments.

24

This principle is at its apex in the context of private civil litigation seeking discovery abroad that pits U.S. interests in the enforcement discovery obligations under the Federal Rules of Civil Procedure against the interests of other sovereign nations in the enforcement of their substantive laws.  As the Supreme Court has recognized, "[i]t is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions." *Aerospatiale*, 482 U.S. at 542.  This can create "special problem[s]" for foreign litigants. *See id.* at 546.  Accordingly, the Supreme Court has cautioned:

> American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.  Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests.  When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings *particularly closely* to prevent discovery abuses.

*Id.* (emphasis added).

While the Bank proposes a course of action—*i.e.*, seeking customer waivers—designed to avoid potential conflict between this Court and the governments of Jordan, Lebanon, and the Palestinian Territories, should the Court nonetheless decide to issue a definitive order addressing bank secrecy now without regard to the outcome of efforts to seek customer waivers, international comity warrants a protective order permitting the Bank to withhold all outstanding discovery of documents located in Jordan, Lebanon, and the Palestinian Territories.

## A.    Application of Restatement Factors

### 1.    Plaintiffs' Remaining Discovery Is Not Crucial to the Litigation and, Therefore, Is Not "Important"

The Restatement's demanding "importance" factor requires a showing the "records might have a *vital* influence upon this litigation" and be "*crucial* in the outcome of this litigation." *Rogers*, 357 U.S. at 201, 204–05 (emphasis added); *see also Minpeco*, 116 F.R.D. at 528;

*Richmark*, 959 F.2d at 1475; *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 999 (10th Cir. 1977) (reversing a contempt and sanctions finding after analyzing whether the litigation would "stand or fall on the present discovery order"); *In re Vitamins Antitrust Litig.*, No. 99-197TFH, 2001 WL 1049433, at *9 (D.D.C. June 20, 2001) (assessing "importance" in terms of whether the "requested information is absolutely essential to [plaintiffs'] case"); *In re: Xarelto (Rivaroxaban) Prod. Liab. Litig*, No. MDL 2592, 2016 WL 3923873, at *14 (E.D. La. July 21, 2016) (surveying precedent and assessing "importance" in terms of whether the evidence is "critical or compelling"). *See also In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d 1078, 1082 (N.D. Cal. 2007) (denying Plaintiffs' motion to compel in part because the documents were not important and stating, "[C]ourts are less inclined to ignore a foreign state's concerns where the outcome of litigation does not stand or fall on the present discovery order, or where the evidence sought is cumulative of existing evidence . . . Here, plaintiff has failed to persuade me of the importance of the [ ] documents.") (internal quotations and citations omitted); *Wang v. Wu*, SA CV 16-84 GW (MRWx), 2016 WL 10957847, at *3 (C.D. Cal. Dec. 7, 2016) (denying a motion to compel additional and explaining, "the Court is not inclined to order CTBC to search for or produce materials that are potentially responsive to Plaintiff's disputed discovery requests.").

As discussed in detail above in Point I *supra*, the documents Plaintiffs seek here do not meet this exacting standard. Accordingly, this factor weighs in favor of a protective order.

### 2.     Degree of Specificity of the Requests

Similarly, as discussed above in Point I, *supra*, the Requests lack specificity because they seek, among other documents, all conceivable bank records for 673 individuals and entities, without regard to whether the individuals or entities have any connection to terrorism and without limiting the records sought to transfers involving violent or life endangering acts by the Bank (for primary liability), or transactions that bore red flags that were performed in "an unusual way, under

unusual circumstances" from which terrorist acts are reasonably foreseeable—such as money laundering or cash bribes in violation of anti-terrorism laws (for secondary liability). Plaintiffs, as an example, make no attempt to specify among the records of the 673 individuals and entities between such transactions and ordinary lawful routine banking, such as transactions for humanitarian purposes, which cannot form the basis of a claim under Second Circuit precedent. *See Linde*, 882 F.3d at 329; *Weiss*, 993 F.3d at 162, 166. Plaintiffs likewise have made no effort to grapple with the fact that one of their main theories—fungibility of money—has been rejected such that their requests require more specificity. *See Honickman*, 6 F.4th at 498–99.

As the Requests lack regard for the state of the law, they necessarily are not specifically tailored to the (lawful) claims and defenses in this litigation. This factor, therefore, also weighs in favor of a protective order.

### 3. Whether the Information Originated in the United States

It is undisputed that the bank records at issue were created and are located outside of the United States. Indeed, Plaintiffs' Requests explicitly targeted documents in Jordan, Lebanon, and the Palestinian territories. Saleski Decl., Ex. 4 (Plaintiffs' First RFP); Saleski Decl., Ex. 5 (Second RFP.) The overseas location of the evidence weighs in favor of a protective order. *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 152 (S.D.N.Y. 2011).

### 4. Availability of Alternative Means of Securing Information

The critical question under this factor is "whether there are 'alternative means of securing the [requested] information.'" *DoubleLine Capital LP v. Oderbrecht Finance, Ltd*., 17-cv-4576 (GHW) (BCM), 2021 WL 4596561 at *13 (S.D.N.Y. Oct. 6, 2021) (*citing Wultz v. Bank of China Ltd*., 298 F.R.D. 91, 96 (S.D.N.Y 2014)). Those means could include any of the variety of discovery tools available to civil litigants to limit the scope of their requests and obtain necessary information from other sources in accordance with the Rules of Evidence. Plaintiffs, for example,

in *Linde*, produced documents such as Israeli intelligence or police interrogation reports of persons referenced in their Requests in that case that were obtained from a source other than the Bank. Plaintiffs can also seek banking records in the possession of third-party.  The Israeli government, which has an obvious and compelling interest in assisting victims of terrorism pursue their claims and is not bound by the bank secrecy laws applicable to Arab Bank.[21]  Plaintiffs' counsel has in other cases alleged that Israeli forces have seized such records from raids on institutions, including banks, in the Territories, and has referenced such documents, as well as various Israeli intelligence reports, in these other cases.[22]

### 5.    Balancing National Interests

The fifth factor, "the balancing of national interests ***is the most important [factor], as it directly addresses the relations between sovereign nations***."  *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 338 (S.D.N.Y. 2018) (emphasis added) (internal citation omitted).  The United States has a broad range of interests in this matter—many of which counsel in favor of a protective order.  The only interest that does not is the interest in enforcing discovery obligations.  *Tiffany*, 276 F.R.D. at 157; *see also Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984).  But that interest pales in comparison to the other interests of the United States and the foreign governments.

***First*** and foundationally, as explained in the comments to the Restatement, the court should take into account "the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance," which includes "giving effect to formal

---

[21]  In the Palestinian Territories, the Bank is required to report all transactions processed by its local branches—regardless of dollar value—to the PMA on a weekly or monthly basis depending on the time period.  Under the 1994 Oslo Accords, the PMA has the authority to share this information with the Israeli government and, upon information and belief has done so where appropriate.  Saleski Decl., Ex. 3 (Kamal Decl. ¶ 25).

[22]  *See e.g.*, Saleski Decl., Ex. 22 (Second Amended Complaint filed by same counsel in *Averbach v. Cairo Amman Bank*, 1:19-cv-00004, ECF No. 96 (E.D.N.Y.) at ¶¶ 585, 676, 707, 713, 794).

or informal international agreements, and in orderly international relations." *Id*. at cmt. c.  To account for these interests, the Advisory Committee recommended asking the "United States attorney or other appropriate official to advise it of the interests of the United States government." The U.S. Government was invited to do just that by the Supreme Court in *Linde*.  The Government identified key interests that the *Linde* district court did not account for, including maintaining: "close cooperative relationships with Jordan and other key regional partners in the fight against terrorism," and "the stability of Jordan's financial and political system."  Saleski Decl., Ex. 23 (Brief for United States as *Amicus Curiae* at 18-20).

The Government's concerns, as expressed in its brief, are easily and objectively affirmed. The Bank plays a key role in the Middle East economy and has accounted for 20% to 33% of the total market capitalization of the Amman Stock Exchange in recent years.  Saleski Decl., Ex. 24 (2017 Brief for the Hashemite Kingdom of Jordan as *Amicus Curiae* at 8.)  It is the largest financial entity in Jordan, the West Bank and Gaza.  Saleski Decl., Ex. 27 (2013 Brief for the Hashemite Kingdom of Jordan as *Amicus Curiae* at 2); *see also* Saleski Decl. Ex. 23 (Brief for United States as *Amicus Curiae* at 20.)  The Bank processes foreign financial assistance payments from the United States; finances the public debt, and processes customs clearance revenues from Israel, which represent the overwhelming majority of Palestinian Authority revenue.  Saleski Decl., Ex. 24 (2017 Brief for the Hashemite Kingdom of Jordan as *Amicus Curiae* at 8); *see also* Saleski Decl. Ex. 23 (Brief for United States as *Amicus Curiae* at 20-21.)  Therefore, as an example, should the Bank lose its banking license or the public trust as a result of being ordered to violate bank secrecy laws by this Court, the effect would be significant and hard felt throughout the Middle East economy.

Thus, as the Government explained, although private actions under the ATA can be a means of combatting terrorism, the District Court's manner of advancing that interest has potential negative impacts on the broader international relations interests at stake.  Saleski Decl. Ex. 23 (Brief for United States as *Amicus Curiae* at 19.)  Point in fact, the Jordanian government, which has long been viewed as the U.S. Government's closest ally in the region, viewed the *Linde* court's decision to require production of documents protected by Jordanian bank secrecy laws and to impose sanctions as a "direct affront" to its sovereignty.  (*Id.*)  No doubt this played no small role in the decision by the U.S. Government to declare in its brief that the comity analysis employed by the District Court was "flawed."  (*Id.* at 12.)

**Second**, even where "private litigants may be asserting a federal statutory claim that embodies important U.S. interests, their document requests do not reflect a specific determination by the Government that the request is sufficiently in the public interest to warrant the adverse consequences that could ensue."  (*Id.* at 14.)  Courts commonly distinguish between criminal or civil enforcement proceedings (which obtain great deference), and private civil litigations (which enjoy much less deference).  *Compare U.S. v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981) (U.S. Government has a strong interest in collecting taxes and prosecuting tax fraud that outweighed Switzerland's interest in preserving business secrets of Swiss subsidiaries of United States parent corporations), *cert. denied,* 454 U.S. 1098 (1981), *with Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*, 902 F.2d 1275, 1280 (7th Cir. 1990) (United States' interest in enforcing private judgment is outweighed by "vigorously enforced" Romanian secrecy law).

A request by the Government "reflects the Executive Branch's conclusion, in the exercise of its responsibility for both foreign affairs and the enforcement of laws requiring production, that

disclosure would be consistent with both the domestic public interest and international comity concerns." Saleski Decl., Ex. 23 (Brief for United States as *Amicus Curiae* at 13.) However, "[p]rivate requests may intrude more deeply on foreign sovereign interests because private parties often do not exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government." (*Id.* at 14.) (internal quotation marks and citation omitted). That can be seen clearly in Plaintiffs' Requests in this case, which, in direct opposition to the needs of their case, are sweeping in scope without justification and explicitly target documents protected by foreign bank secrecy laws.

Indeed, Jordan, Lebanon, and the PA drew that distinction here. The PA advised this Court that "[it] cooperates with the United States of America in the fight against terrorism, and **whenever the U.S. Government** seeks cooperation in the investigation of activities that involve terrorism, money laundering or other illegal activities[.]" Saleski Decl., Ex. 11 (Oct. 28, 2021 Palestinian Minister of Justice's Response at 2) (emphasis added). However, the PA explained, "with regard to the current civil lawsuit and the request for documents on behalf of **private litigants seeking monetary relief for damages**, it is not possible to execute such a request[.]" (*Id.*) (emphasis added.) The Palestinian Banking Law does not permit the disclosure of bank records in private civil litigation in the Territories or anywhere else, because "[t]he bank privacy provisions are essential to encourage the development of a banking sector that attracts the trust and confidence of a population that had a serious mistrust of the system. . . . [I]ts absence would lead to [the banking system's] collapse and thus economic, social and political instability." (*Id* .at 3.) The PA explained that without these protections, "[p]eople will distrust the system" and lose "confidence in the banking system in Palestine." (*Id.*) Similarly, both Jordan and Lebanon explained that their laws do not permit exceptions to bank secrecy for the **private civil** discovery requested in their

respective letters rogatory.[23] Saleski Decl., Ex. 10 (Oct. 12, 2021 Central Bank of Jordan Response at 1), Ex. 11 (Oct. 28, 2021 Palestinian Minister of Justice's Response at 1-2, 4) (emphasis added).

Here, the U.S. interest in enforcing broad discovery requests in a private civil litigation is outweighed by competing U.S. foreign policy interests in the Middle East, including promoting economic stability in the Palestinian Territories with a bank that the U.S. Government has described as a "leader in the fight against international terrorism" and not offending its closest ally in the region, Jordan, by overriding its bank secrecy laws in a dispute between private parties.  *Cf. Aerospatiale*, 482 U.S. at 548 (Blackmun, J., dissenting) ("I fear . . . courts will resort unnecessarily to issuing discovery orders under the Federal Rules of Civil Procedure in a raw exercise of their jurisdictional power to the detriment of the United States' national and international interests.").

The interests of the foreign governments that this Court must consider are also weighty. All nations have a substantial interest in the vigorous and uniform enforcement of their substantive laws, particularly their criminal laws.  *See, e.g.*, *Minpeco*, 118 F.R.D. at 333 (holding that Switzerland has a "substantial" national interest in enforcement of its criminal law).  Moreover, the bank secrecy laws at issue here advance specific sovereign interests in protecting the stability and integrity of their nations' financial systems, which rely on public trust in financial institutions. Saleski Decl., Ex. 1 (Odeh Decl. at ¶¶ 16-20), Saleski Decl., Ex. 2 (Cortbaoui Decl. at ¶¶ 5-6, 11-12), Saleski Decl., Ex. 3 (Kamal Decl. at ¶¶ 10-12, 23-26.)

Personal banking records obviously can reveal a person's most sensitive information, which is why nations provide for the protection of financial privacy.  This interest is not diminished

---

[23] Notably, according to the U.S. State Department, "The United States deeply values its long history of cooperation and friendship with Jordan, with which it established diplomatic relations in 1949 . . . Jordan has an enhanced partnership with NATO and is a key partner in the U.S. and Arab Coalition to defeat ISIS."  *See* Saleski Decl., Ex. 25 (U.S. Dep't of St., *U.S. Relations with Jordan* (Dec. 30, 2020)).

by the fact that the foreign bank secrecy laws at issue here (which are similar to bank secrecy laws throughout the European Union) are more protective of privacy and embody a different philosophy than that reflected in U.S. law.  As the Second Circuit has held, U.S. courts "have an obligation to respect the laws of other sovereign states even though they may differ in economic and legal philosophy from our own."  *Application of Chase Manhattan Bank*, 297 F.2d at 613.

Accordingly, in the circumstances of this case, the U.S. interest in the enforcement of its discovery rules in a litigation between private parties is outweighed by the other interests of the U.S. Government (as stated in its Supreme Court *Amicus Curiae* brief) and by the foreign governments that weigh in favor of respecting foreign bank secrecy.  That fact weighs heavily in favor of a protective order.

## B.     Additional Factors Also Weigh in Favor of a Protective Order

In addition to the Restatement factors, courts in the Second Circuit also weigh two other considerations: (1) any hardship the responding party would suffer if it complied with the discovery demands; and (2) whether the responding party has proceeded in good faith.  *See, e.g.*, *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 246 (S.D.N.Y. 2010).  These factors also weigh in favor of a protective order.

### 1.     Arab Bank Would Suffer Significant Hardship If It Produced Documents Protected by Bank Secrecy

If Arab Bank were ordered by the Court to violate the foreign bank secrecy laws of Jordan, Lebanon and the Palestinian Territories and thereafter produced documents in violation of those laws, both the Bank and its employees could face criminal prosecution, as well as other devastating repercussions like loss of the Bank's license.  Saleski Decl., Ex. 1 (Odeh Decl. at ¶¶ 28, 37-39), Saleski Decl., Ex. 2 (Cortbaoui Decl. at ¶¶ 15-19), Saleski Decl., Ex. 3 (Kamal Decl. at ¶¶ 10-12, 23-26); *see also* Saleski Decl., Ex. 6, (Defendant Arab Bank PLC's Responses and Objections to

Plaintiffs' First Request for the Production of Documents), Ex. 7, (Arab Bank, PLC's Responses and Objections to Plaintiffs' Second Request for the Production of Documents), and Ex. 8, (Sept. 24, 2019 Tr. at 5:18-21; 37:6-38:7.)  That is an immense hardship. The Bank cannot ask its employees to subject themselves to imprisonment or risk having its doors shuttered.  The Supreme Court has recognized, "[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." *Rogers*, 357 U.S. at 211; *see also Rotstain v. Trustmark Nat'l Bank*, 09-cv-2384-N-BG, 2015 WL 13031698, at *4 (N.D. Tex. Dec. 9, 2015) (declining to compel production of foreign documents because the defendant bank "may be subject to criminal, civil, and administrative penalties").  In addition, the Bank would likely be subject in all three jurisdictions to lawsuits seeking large amounts of compensation by customers whose right to confidentiality has been breached.

### 2.    Arab Bank Has Acted in Good Faith

Finally, the record thus far demonstrates Arab Bank's good faith compliance with discovery in this case.  First, it worked diligently to identify and produce on a timely basis all responsive documents that are not subject to applicable bank secrecy laws.  Second, the Bank promptly produced all responsive foreign bank transfer records of the Saudi Committee pursuant to that Committee's waiver of bank secrecy.  Third, the Bank also produced all foreign account records for Osama Hamdan.  *See* Saleski Decl. Ex., Ex. 4 (Plaintiffs' First RFP Nos. 1, 2(e).)  To do so the Bank obtained the consent of Lebanese Government Authorities in *Linde*.  Fourth, without waiver of its objections as to relevance, overbreadth, and proportionality, the Bank agreed to produce on a rolling basis responsive records located in the United States for all 673 persons and entities listed in the Requests, since those U.S.-based records are not subject to foreign bank secrecy laws.  Saleski Decl., Ex. 26 (Jan. 30, 2020 Email from B. Ingerman.)  Fifth, the Bank

identified, recovered, and produced documents existing on outdated software that could no longer be run on current systems. Sixth, the Bank worked closely with the Court and Plaintiffs to fashion and serve Letters Rogatory to secure the foreign-based documents in compliance with foreign bank secrecy laws. Finally, the Bank has shown its good faith by expressing its willingness to seek waivers on a case-by-case basis from its customers for any Requests this Court finds are relevant and proportionate to the needs of the case, rather than the current broad Requests that will be rejected out of hand.

Because all of the above-stated factors weigh in favor of the Bank's request for a protective order based on bank secrecy, it should be granted should the Court choose to address that issue now. The Bank, however, urges the Court not to decide the issue prematurely—particularly if it were to disagree with the Bank because it would be premature to order the Bank, at Plaintiffs' request, to violate foreign bank secrecy laws with the attendant consequences that entails at this time. The Bank respectfully submits that, in the interests of international comity, the Court defer its decision in that regard pending the outcome of the Bank's efforts to secure voluntary customer waivers to produce documents responsive to Requests the Court has narrowed to comply with Rule 26(b) and the Restatement.

## CONCLUSION

Wherefore, Arab Bank respectfully requests that the Court enter a Protective Order limiting the Bank's discovery obligations as follows:

1. Narrowing the Requests identified in Categories A through E above to comply with Rule 26(b) of the Federal Rules of Civil Procedure and Section 442(1)(c) of the Restatement (Third) of Foreign Relations Law;

2. Deferring a decision on whether to order the Bank to violate the bank secrecy laws of Jordan, Lebanon and the Palestinian Territories pending the outcome of the Bank's attempt to obtain customer waivers and produce documents in response to discovery Requests that this Court deems appropriate; and/or

3. In the alternative, granting the Bank's request that it not be required to produce documents located abroad that it is prohibited from legally producing under foreign bank secrecy.

Dated:  March 4, 2022                      Respectfully submitted,

                                           **DLA Piper LLP (US)**

                              By: /s/ *Jonathan D. Siegfried*
                                     Jonathan D. Siegfried
                                     Andrew J. Peck
                                     1251 Avenue of the Americas
                                     New York, New York 10020
                                     (212) 335-4500
                                     jonathan.siegfried@us.dlapiper.com
                                     andrew.peck@us.dlapiper.com

                                     Courtney G. Saleski (admitted *pro hac vice*)
                                     1650 Market Street
                                     Suite 4900
                                     Philadelphia, PA 19103
                                     (215) 656-2431
                                     courtney.saleski@dlapiper.com

                                     Brett Ingerman
                                     6225 Smith Avenue
                                     Baltimore, MD 21209
                                     (410) 580-4177
                                     brett.ingerman@dlapiper.com

## Appendix 1: Category B, Charities and Social Services Institutions

| Name | Miller/Pam Reference |
|---|---|
| Al Ansar Society | RFP2: 22, 32; RFP1: 10, 11 |
| Al Aqsa Foundation | RFP1: 5(e) |
| Al Nur Prisoner Society - Gaza, a/k/a the Charity Society for Caring for the Prisoners and the Martyrs' Families (Jam'iyat Al-Nur al-Khairiya L-Ri'ayat al-Asra Wa-Usar al-Shuhada) | RFP1: 4(k) |
| Al-Huda Women Society (Jam'iyat al-Huda al-Nisa'iya) | RFP1: 4(l) |
| Al-Ihsan Charitable Society in Tulkarem | RFP2: 3(d) |
| Al-Ihsan Charitable Society in Bethlehem | RFP2: 3(a) |
| Al-Ihsan Charitable Society in Gaza | RFP2: 3(b) |
| Al-Ihsan Charitable Society in Jenin | RFP2: 3(c) |
| Al-Islah Charitable Society – Ramallah & Al-Bireh (Jam'iyat al-Islah al- Khiriya al-Ajthamiya Ramallah wal-Bireh) | RFP1: 4(j) |
| Al-Jam'iya Al-Islamiya | RFP1: 4(b) |
| Al-Jama'a al-Islamiya a/k/a al-Rabita al Islamiya | RFP2: 3(f) |
| Al-Karmel Cultural and Social Development Association | RFP2: 10(a) |
| Al-Mujama Al-Islami | RFP1: 4(a) |
| Al-Qawasmeh Neighbourhood Charity a/k/a Charitable Al-Qawasmeh Neighborhood Society | RFP2: 17(l) |
| Al-Salah (Jam'iyat al-Salah al-Islamiya ) | RFP1: 4(c) |
| Al-Tadamun Charitable Society – Nablus (Jam'iyat Al-Tadamun al-Khiriya al-Islamiya Nablus) | RFP1: 4(g) |
| Banners of Charity a/k/a Bayareq al-Ataa Society | RFP2: 3(g) |
| CBSP a/k/a Comité de Bienfaisance et de Secours Aux Palestiniens | RFP1: 5(d) |
| Cultural Forum of Palestinian Islamic Jihad Women | RFP2: 3(i) |
| Dar al-Huda Society | RFP2: 3(e) |
| Development Charitable Society | RFP2: 17(i) |
| Fund for Support of the Persistence of the Palestinian People | RFP2: 28, RFP2: 29 |
| General Union of Palestinian Students | RFP2: 17(d) |
| Give Gaza Society | RFP2: 17(j) |

| Name | Miller/Pam Reference |
|---|---|
| Health Work Committees a/k/a Union of Health Work Committees | RFP2: 10(b) |
| Holy Land Foundation for Relief and Development | RFP1: 5(b) |
| Interpal a/k/a Palestine Relief and Development Fund | RFP1: 5(c) |
| Islamic An-Naqqa Society for Women Bethlehem a/k/a Islamic Women Charitable Society for Purity | RFP2: 3(h) |
| Islamic Charitable Society – Hebron (Al Jam'iya al-Khiriya al-Islamiya al- Khalil) | RFP1: 4(d) |
| Jenin Zakat Committee (Lajnat al-Zakah Jenin) | RFP1: 4(e) |
| Nablus Zakat Committee (Lajnat al-Zakah Nablus) | RFP1: 4(f) |
| Progressive Labor Front | RFP2: 10(d) |
| Ramallah – al-Bireh Zakat Committee (Lajnat al-Zakah Ramallah wal- Bireh) | RFP1: 4(i) |
| Tulkarem Zakat Committee (Lajnat al-Zakah Tulkarem) | RFP1: 4(h) |
| Union of Agricultural Work Committees | RFP2: 10(c) |
| Union of Good (I'tilaf al-Khayr) | RFP1: 5(a) |
| Union of Palestinian Women's Committee | RFP2: 10(e) |
| Welfare Association for Palestinian and Lebanese Families a/k/a Waqifiya Ri'aya al-Usra al-Filistinya wa al-Lubnanya | RFP1: 5(f) |

**Appendix 2: Category C.1, No Public Sources Showing that the Bank Knew or Should Have Known During the Relevant Period (or Prior to the Individual's Death or Imprisonment) that the Individuals Were Both (a) Connected to an FTO and (b) Closely Intertwined with the FTO's Violent and Terrorist Activity**

| Name | RFP | RFP Category | Sources Cited in Complaint or Provided by Plaintiffs[1]; OFAC Designation |
|------|-----|-------------|---------------------------------------------------------------------------|
| Abd al-Hakim Ali al-Mana'ameh | RFP1: 2(d) | Hamas | Died 5/15/2001.<br>Public sources post-date death.  Source: Spitzen Report (2011) cites Alrepat (4/2008); Al Qassam (dates indicate 2007); Al Qassam (5/15/02); Al Bawaba (2001 - indicates he died).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Ismail Abd Al Salam Haniyeh a/k/a Ismail Haniya | RFP1: 2(f) | Hamas | Public sources post-date relevant time period.  Sources: Spitzen Report (2011) cites Al Watan Voice (9/30/2019); Spitzen Appendix (2011) cites Alkotla (3/2009).<br>Designated by OFAC 4/2006 |
| Huda Ahmad Darwazah | RFP1: 2(k) | Hamas | No public source.<br>Individual not designated by OFAC.<br>Complaint alleges received funds transfers. |
| Jamal Salim Damuni | RFP1: 2(n) | Hamas | Died 7/31/2001.<br>Public sources post-date death.  Source: Spitzen Report (2011) cites: Milstein, The Green Revolution (published in 2007); Aviad, Lexicon of the Hamas Movement, (published in 2008); Palestoday Report (2006); Alqassam (2011); Alqassam (2011); Palestine-info (2006); Palestine-info (2014).<br>Individual not designated by OFAC.<br>Complaint alleges, among other things, that Jamal Salim Damuni was a Hamas leader and received funds transfers. |
| Muna (Mina) Mansur | RFP1: 2(o) RFP1: 7(1) RFP1: 8(3) | Hamas | Public sources post-date relevant time period.  Source: Spitzen Report (2011) citing: Milstein, The Green Revolution (2007); Aviad, Lexicon of the Hamas Movement, (published in 2008); Palestine-info (2006); Alaqsavoice (12/2009); Islamicrabita (12/2009); Alkulta (2008); Paldf (2008).<br>Designated by OFAC 4/2006. |
| Riyad Husain | RFP1: 2(p) | Hamas. | Died 2/17/03.<br>Public sources appear to post-date death.  Source: Spitzen Appendix VII: citing Palestine-info (2003). |

---

[1]  The references in this Category are to cites provided by Plaintiffs.  The Bank does not necessarily agree that all such cites qualify as public source documents as defined by the Second Circuit

| Abdallah Abu Zaid | | | Individual not designated by OFAC.<br>No reference in complaint. |
|---|---|---|---|
| Mahdi Shaker al-Hanbali | RFP1: 2(q) | Hamas | Public sources are undated or post-date relevant time period. Sources: Spitzen Report (2011) citing Hamas website (2005); Pchrgaza (2007); Alqassam (undated); Nablustv.net (2010); Takdin.co (2009).<br>Individual not designated by OFAC. |
| Baha al-Din al-Madhun | RFP1: 2(r) | Hamas | Public sources post-date relevant time period or does not mention Baha al-Din al-Madhun.  Sources: Shaked Report (2011) citing Arutz 7 (7/4/10); Spitzen Report (2011) citing Arutz 7 (7/4/10); Ma'an News Agency (5/31/10); Ezz El Deen El Qassam Brigades – Information Office (10/20/03) (does not mention Baha al-Din al-Madhun).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Khaled Muhammad Amin al-Haj | RFP1: 2(t) | Hamas | Public sources post-date relevant time period.  Sources: Spitzen Report (2011) citing Milstein, The Green Revolution (2007); Palestinian Media Center (2010); Palestinian Information Center (10/10/2010); and Israel Ministry of Foreign Affairs (07/10/2008).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Nada Jamal al-Jayousi | RFP1: 2(u) | Hamas | Public sources post-date relevant time period.  Sources: Hamas website (1/13/2020); Spitzen Report (2011) does not cite any references.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Asma' Muhammad Suliman Saba'ana | RFP1: 8(41); RFP1: 2(v) | Hamas | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Lateefah Naji Othman Chawa | RFP1: 2(w) | Hamas | Public sources post-date relevant time period and/or do not relate to violent activity.  Sources: Spitzen Report (2011) notes that she "heads the al-Hudak Women's Society (see infra)," which is "part of Hamas' civilian infrastructure" and cites:<br>http://web.archive/org/web/20041210013218/<br>www.al-hudah.org/about/about.html (undated but appears to be from 2004).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Khaled Ghazi Daud al-Masri | RFP1: 2(x) | Hamas | Died 10/20/2003.<br>Public sources are undated and appear to post-date relevant time period.  Sources: Spitzen Report (2011) cites al-Qassani website; http://btselem.org/hebrew/Statistics/Casualties_Data.asp?Category=19&region=GAZA&sD=29&sM=09&sY=2000&eD=26&eM=12&eY=2008&filterby=event&oferet_stat=before; and Shahid Palestine website |

| | | | |
|---|---|---|---|
| | | | (http://shahidpalestine.org/index.php?option=com_martyrs&view=martyrs&Itemid=59&limitstart=1280) (unable to access links). Individual not designated by OFAC. No reference in complaint. |
| Abd al-Salam Ismail Haniyeh | RFP1: 2(y) | Hamas | Public source post-dates relevant time period.  Source: alwatanvoice.com (09/30/2019). Individual not designated by OFAC. No reference in complaint. |
| Khaled Ibrahim Al Abd Al Quqa | RFP1: 2(z) | Hamas | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity. Individual not designated by OFAC. No reference in complaint. |
| Khalil Mohamad Amin El Haj | RFP1: 2(aa) | Hamas | No public source. Individual not designated by OFAC. No reference in complaint. |
| Mohamed Redwan Ibrahim Yasine | RFP1: 2(bb) | Hamas | No public source. Individual not designated by OFAC. No reference in complaint. |
| Rabah Hayel Takrouri | RFP1: 2(cc) | Hamas | No public source. Individual not designated by OFAC. No reference in complaint. |
| Ayman Anwar Ahmad Arafat | RFP1: 3(a) | Hamas | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity. Individual not designated by OFAC. No reference in complaint. |
| Mohamad Saleh Taha | RFP1: 3(b) | Hamas | No accessible public sources cited prior to the relevant time period and/or source is undated.  Sources: Spitzen Report (2011) cites: http://al-fateh.net/hide/arch/fa13/hikaya13.htm (undated); http://www.aleppos.net/forum/showthread.php?t=78966 (alleged link cannot be accessed);  http://www.alqusia.com/new/play-2762.htm (alleged link cannot be accessed l; and www.alaqsavoice.ps/arabic/index.php?action=detail&id=52153 (alleged links cannot be accessed). Individual not designated by OFAC. No reference in complaint. |
| Omar Ali Abd al-Al | RFP1: 3(c) | Hamas | No public source. Individual not designated by OFAC. No reference in complaint. |
| Sabah Saeed Hasan | RFP1: 3(d) | Hamas | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity. |

| | | | |
|---|---|---|---|
| Dar Khalil | | | Individual not designated by OFAC. No reference in complaint. |
| Omar Saleh Muhamm ad Faiq Sharif | RFP1: 3(f) | Hamas | No public sources cited prior to the attack. Sources: Shaked Report (2011) cites: ISA Report (09/2007); An announcement from the Prime Minister of Israel's office (06/15/2003); Israeli government report (2003, discusses the attack so post-dates). Individual not designated by OFAC. No reference in complaint. (Allegedly involved in suicide bombing on 6/11/2003, attack on Bus No. 14A on Jaffa Road in Jerusalem.) |
| Firas Fawzi Salim Faydi | RFP1: 3(g) | Hamas | No public sources cited prior to attack. Sources: Ahrar.ps (09/03/2012); VB.al-wed.com (Muntadayat al-Wed) (10/23/2004) notes that he was an Izz al-Din operative but that, "Students at the Shari'a Faculty, an-Najah National University, did not expect their fellow student, a seemingly quiet and shy person, to be hiding a huge personality and to be a prominent member of Martyr Izz ad-Din al-Qassam Brigades"; Palestine Times (09/18/2014). Individual not designated by OFAC. Complaint alleges that he assisted in the 10/27/02 Ariel Shooting. |
| Khaled Dib Hasan Abu Hamd | RFP1: 3(h) | Hamas | Public sources post-date relevant time period. Sources: Ajnad News (07/08/2012); Unknown source (04/14/2016); and Palestine Times (09/18/2014). Individual not designated by OFAC. |
| Muhamm ad Hasan Arman | RFP1: 3(i) | Hamas | Indicted 11/21/2002. No public sources cited prior to the attacks or his imprisonment. Sources: Spitzen Report (2011) cites Judea Military Court Protocol (11/10/2003); Indictment of Mahmad Hasan Ahmad Arman (aka Abu Moaz), Martial Court in Bethel (11/21/2002). Individual not designated by OFAC. No reference in complaint. (Allegedly involved in Sheffield Club Bombing (5/7/2002)). |
| Walid Abd al-Aziz Anjas | RFP1: 3(j) | Hamas | Arrested 09/09/2002. No public sources cited prior to arrest. Source: Shaked Report (2011) cites the indictment and verdict for this individual (11/30/2003). Individual not designated by OFAC. No reference in complaint. |
| Wa'el Mahmud 'Muham mad Ali' Qasem | RFP1: 3(k) | Hamas | Public source post-dates relevant time period. Sources: Alhayat-j Website (12/03/2017). Individual not designated by OFAC. No reference in complaint. (Allegedly involved in Sheffield Club Bombing (5/7/2002)). |
| Ala al-Din Mahmud | RFP1: 3(l) | Hamas | No dated public sources during the relevant time period. Sources: Al-Hayat Al-Jadida article (not dated). Individual not designated by OFAC. |

| Muhamm ad Abasi | | | No reference in complaint. (allegedly involved in Sheffield Club Bombing (05/07/2002)). |
|---|---|---|---|
| Wisam Sa'id Musa Abasi | RFP1: 3(m) | Hamas | Arrested.<br>No dated public sources cited prior to arrest or sources are undated.<br>Sources: Shaked Report (2011) cites court documents and his confession (12/15/2002); Al-Hayat Al-Jadida (undated).<br>Individual not designated by OFAC. No reference in complaint. |
| Muhamm ad Ishaq Awda | RFP1: 3(n) | Hamas | Public source post-dates relevant time period. Source: Al-Hayat Al-Jadida (12/3/2007).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Jamal al-Tawil | RFP1: 3(o) | Hamas | Public sources post-date relevant time period and/or do not link to violence.  Sources: Unknown/undated source (TVPL0058840), a document detailing 159 suicide bombings from September 2000 to May 2005; Spitzen Report (2011) cites Ynet article noting his arrest but not noting reason (2002);<br>http://www.shabak.gov.il/English/EnTerrorData/Reviews/ Pages/coalition.en.aspx (2011); http://www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/charities_post-earthquake.pdf (2005).<br>Individual not designated by OFAC. |
| Ibrahim Jamil Mar'i Hamed | RFP1: 3(p) | Hamas | Arrested.<br>No public sources cited prior to arrest.  Sources: Shaked Report (2011) cites Indictment against Ibrahim Hamed, Prosecution File 3181/6, Military Court of Judea; Guy Aviad, Lexicon of Hamas Movement (2014).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Farid Salah Na'im Atrash | RFP1: 3(r) | Hamas | No public sources cited prior to attack.  Source: Shaked Report (2011) cites Announcement from the Prime Minister's office (02/07/2002).<br>Individual not designated by OFAC.<br>No reference in complaint.<br>(Allegedly involved with the Ben Yehuda attack on 12/01/2001.) |
| Ayad Yusuf Abu Hilal | RFP1: 3(s) | Hamas | No public sources cited prior to attack.  Source: Shaked Report (2011) cites Announcement from the Prime Minister's office (02/07/2002).<br>Individual not designated by OFAC.<br>No reference in complaint.<br>(Allegedly involved with the Ben Yehuda attack on 12/01/2001.) |
| Aziz Yusuf Ans abu Hilal | RFP1: 8(27); RFP1: 3(t) | Hamas | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Abd el-Mu'ati Shabana | RFP1: 3(u) | Hamas | Died 06/11/2003.<br>Public sources post-date death.  Sources: Unknown source (TVPL0058840) from unknown date that describes suicide bombings |

5

| | | | |
|---|---|---|---|
| | | | from September 2000 to May 2005; Shaked Report (2011) cites Al-Risala newspaper (06/19/2003).<br>Individual not designated by OFAC.<br>Complaint alleges Abd el-Mu'ati Shabana committed suicide bombing of Jaffa Road Bus #14A Bombing (06/11/2003). |
| Muhamm ad Fathi Farhat a/k/a Mohamm ed Farhath | RFP1: 3(v) | Hamas | No public sources.<br>Individual not designated by OFAC.<br>Complaint alleges Muhammad Fathi Farhat committed suicide attack at Atzmona (03/07/2002). |
| Abd Allah Qawasme h | RFP1: 3(w) | Hamas | Died 06/11/2003.<br>Public sources post-date death.  Source: Spitzen Report (2011) cites http://www.alqassam.psiarabicispecial_internal.php7id=13 (date unknown).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Izz al-Din Khader Shams al-Din Misk | RFP1: 3(x) | Hamas | No public sources cited prior to relevant event (April 19, 2003 suicide bombing on the No. bus, Jerusalem).  Source: Shaked Report (2011) cites Announcement from the IDF (09/22/2003).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Ahmad Othman Muhamm ad Badr | RFP1: 3(y) | Hamas | Died 09/09/2003.<br>Public source post-dates death.  Source: Shaked Report (2011) cites "sealed" Indictment of Nasim Rashed Ad-Al Wadoud Za'atari (11/09/2003).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Sayid Isa Jabar Siam | RFP1: 3(z) | Hamas | Public sources post-date relevant time period.  Source: Israeli Ministry of Foreign Affairs (07/18/2005).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Bilal Sub Laban | RFP1: 3(aa) | Hamas | No public sources cited prior to the attack.  Source: Shaked Report (2011) cites his confession in connection with 06/11/2003 Bust 14A bombing to Israeli police (date of confession: 06/25/2003).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Amar Nasser al-Din | RFP1: 3(bb) | Hamas | No public sources cited prior to attack.  Sources: Shaked Report (2011) cites his confession to Israeli police regarding June 11, 2003 Jaffa Road bus bombing (07/15/2003) and http://www.palestine-info.com/arabic/feda/naser.htm (05/09/2011).<br>Individual not designated by OFAC.<br>No reference in complaint. |

| Bisam Abd al-Rahman Ahmad Abu Akar | RFP2: 1(a) | PIJ | No public source.<br>Individual not designated by OFAC.<br>No reference in complaint. |
|---|---|---|---|
| Issa (Isa) Muhammad Ismai'l al-Batat | RFP2: 1(b) | PIJ | Arrested 06/15/2003.<br>Public source post-dates relevant time period.  Source: Spitzen Report (2011) cites https://web.archive.org/web/20071019005750/http://amin.org:80/look/amin/article.tpl?IdLanguage=17&IdPublication=7&NrArticle=30010&NrIssue=1&NrSection=1 (02/27/2005).<br>Individual not designated by OFAC. |
| Ziyad al-Nakhala | RFP2: 2(a) | PIJ | Public sources post-date relevant time period.  Sources: Palestine Today (09/27/2018); SDGT (2014); terrorism-info.org (10/31/2018).<br>OFAC listed 01/01/2014**.**<br>No reference in complaint. |
| Sami al-Arian | RFP2: 2(e) | PIJ | No public source.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Muhammad Ayub Muhammad Sidr | RFP2: 2(g) | PIJ | Died 08/14/2003.<br>Public sources post-date death.  Sources: Spitzen Report (2011) cites Saraya Al Quds (08/18/2003); Palestine-info (12/02/2007); Palestinian Media Center website (12/02/2007).<br>Individual not designated by OFAC. |
| Luay Jihad Fathallah al-Sa'di | RFP2: 2(h) | PIJ | Public sources post-date relevant time period.  Sources: Sarya Al-Quds (10/04/2018), martyr page; article from http://www.terrorism-info.org.il/ malam_multimedia/html/final/sp/heb_n/sal-Sa'di.htm (10/26/2005).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Hanadi Taysir Abd al-Malek Jaradat | RFP2: 2(i) | PIJ | Died 10/04/2003.<br>Public sources post-date death.  Sources: Arab Media Network (10/05/2003); Haaretz (10/15/2003).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Muhammad Fares Bashir Jaradat | RFP2: 2(j) | PIJ | Arrested 07/13/2004.<br>No accessible public sources cited prior to arrests.  Source: Spitzen Report (2011) citeshttp://arabic.pnn.ps/index.php?option=com_content&task=view&id=21616&Itemid=37 (link cannot be accessed).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Khaled Hussein Jaradat | RFP2: 2(k) | PIJ | Arrested July/August 2004.<br>No accessible public sources cited prior to arrest.  Sources: Spitzen Report (2011) cites http://www.alhaqvoice.com/vb/showthread.php?t=11389 (link cannot be accessed). |

| | | | Individual not designated by OFAC.<br>No reference in complaint. |
|---|---|---|---|
| Muhamm ad Abd al-Aziz Ghanem | RFP2: 2(l) | PIJ | No dated public source during the relevant time period.  Source: Elehassan Society letter (undated document but the metadata indicates the article is from 2018).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Mustafa Tawfiq Muhamm ad Awd | RFP2: 2(m) | PIJ | Public sources post-date relevant time period and/or do not relate to violent activity.  Sources: Saraya Al Quds (07/06/2010); qaweim.com (02/18/2009); Elehssan Society (09/11/2003) (document provides authorization to open an account).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Muhamm ad Saleh Muhamm ad Sayfi | RFP2: 2(n) | PIJ | Public source does not relate to violent activity.  Source: Elehssan Society (09/11/2003, document provides authorization to open an account).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Shafiq Ali Suliman Radaida | RFP2: 2(o) | PIJ | Arrested 03/07/2002.<br>No accessible public sources cited prior to the attacks or arrest.  Source: Spitzen Report (2011) cites http://www.nawafithna.com/post-186813.html (unable to access link).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Ataf Dawud Hasan Aliyan | RFP2: 2(p) | PIJ | Public sources post-date relevant time period.  Sources: World Association of Arab Translators and Linguists (Wata) (10/25/2008); Webpage at yoo7.com (01/08/2010).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Nihaya Khaled Mahmud al-Khatib | RFP2: 2(q) | PIJ | Public source post-dates relevant time period.  Sources: Qanon.ps (12/25/2014).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Tamer Khuweir | RFP2: 2(r) | PIJ | Arrested 03/29/2004.<br>Public sources post-date arrest.  Source: Astandforjustice.org (03/30/2004).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Ghasan al-Tirmasi | RFP2: 2(s) | PIJ | Public source post-dates relevant time period.  Source: Alyaum.com (11/07/2008).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Muhamm ad Dahduh | RFP2: 2(t) | PIJ | Died 05/20/2006.<br>Public source post-dates relevant time period and individual's death.  Source: Saraya Al Quds website (11/17/2019).<br>Individual not designated by OFAC. |

| | | | No reference in complaint. |
|---|---|---|---|
| Mahmud al-Majzub | RFP2: 2(u) | PIJ | Public sources post-date relevant time period.  Sources: Saray Al Quds webpage (05/26/2018); Al Jazeera (05/27/2006). Individual not designated by OFAC. No reference in complaint. |
| Husam Jaradat | RFP2: 2(v) | PIJ | Public sources post-date relevant time period.  Source: HistoricaWiki, historica.fandom.com/wiki (01/13/2020). Individual not designated by OFAC. No reference in complaint. |
| Ahmad Abd al-Rahman Abu Hasira | RFP2: 2(w) | PIJ | Public source post-dates relevant time period.  Source: Spitzen Report (2011) cites http://www.alasra.ps/news.php?maa=View&id=10474 (02/19/2010). Individual not designated by OFAC. No reference in complaint. |
| Mustafa Tawfiq Zaydan | RFP2: 2(x) | PIJ | Public source post-dates relevant time period.  Source: PFLP website (07/29/2016). Individual not designated by OFAC. No reference in complaint. |
| Salah Abu Hasnin | RFP2: 2(y) | PIJ | Public source post-dates relevant time period.  Source: Jerusalem Post article (07/25/2014). Individual not designated by OFAC. No reference in complaint. |
| Muqlid Hamid | RFP2: 2(aa) | PIJ | Public sources post-date relevant time period and/or death.  Sources: Spitzen Report (2011) cites Information page from The Center for the Heritage of Intelligence (07/29/2009); Saraya Al Quds webpage (12/25/2018) (martyr's page from assassination). Individual not designated by OFAC. No reference in complaint. |
| Ali Suliman Said al-Sa'adi | RFP2: 2(dd) | PIJ | Arrested March-May 2002. No public sources cited prior to arrest.  Sources: Verdict (06/01/2003); Al Saraya news article (04/12/2014). Individual not designated by OFAC. No reference in complaint. |
| Ahmad al-Mudalal | RFP2: 2(ee) | PIJ | Public sources post-date relevant time period.  Sources; Almanar.com news article (09/06/2018); Nidaa Al-Quds Network news article (08/03/1008). Individual not designated by OFAC. No reference in complaint. |
| Anwar Mahmud Ahmad Hamran | RFP2: 2(ff) | PIJ | Died 12/11/2000. Public sources post-date relevant time period and/or death.  Sources cited: Khansaa Palestine news article (undated but discusses his death); Alwatanvoice.com news article (12/15/2016). Individual not designated by OFAC. No reference in complaint. |
| Muhammad Saqr | RFP2: 2(gg) | PIJ | Died 04/10/2003. |

| Ragheb al-Zatme | | | Public source post-dates relevant time period and/or death.  Source: Saray Al Quds website (04/05/2014) Individual not designated by OFAC. No reference in complaint. |
|---|---|---|---|
| Murad Abd al-Fatah Abu al-Asal | RFP2: 2(hh) | PIJ | Public sources post-date relevant time period.  Sources: The Sydney Morning Herald (06/11/2008); Al Sharq Al-Awat (6/11/08). Individual not designated by OFAC. No reference in complaint. |
| Nu'man Taher Sadeq Tahaina | RFP2: 2(ii) | PIJ | Died 07/13/2004. No public sources cited prior to death:  Spitzen Report (2011) cites http://sarayalquds.org/njm/njm-2004-049.htm (not dated but discusses his death). Individual not designated by OFAC. No reference in complaint. |
| Bassam Sa'adi | RFP2: 2(jj) | PIJ | Indicted 1/2004. Public source post-dates relevant time period.  Sources: Nidaa Al-Quds Network (07/29/2007). Individual not designated by OFAC. Complaint alleges Bassam Sa'adi was indicted for transferring funds to operate terrorist activities. |
| Sheikh Sharif Tahayna | RFP2: 2(kk) | PIJ | Public sources post-date relevant time period and/or do not relate to violent activity. Sources: Arabic Media Internet Network (08/14/2006); Palestine Today (12/18/2014); www.qudsway.com (10/19/2003) (document describes documents being stolen from Al-Ehssan Charitable Community by "occupational forces").  Individual not designated by OFAC. No reference in complaint. |
| Usri Fayad | RFP2: 2(ll) | PIJ | Arrested 05/19/2004. Public source post-dates arrest.  Sources: Arabic Media Internet Network (06/05/2004). Individual not designated by OFAC. No reference in complaint. |
| Ali Suliman al-Safuri | RFP2: 2(oo) | PIJ | No dated public sources during the relevant time period.  Source: www.amanjordan.org (date unknown). Individual not designated by OFAC. No reference in complaint. |
| Riyad Muhammad Ali Badir | RFP2: 2(qq) | PIJ | No public sources.  Plaintiffs cited Spitzen Appendix 1, p. 375, but that page does not mention Riyad Muhammad Ali Badir. Individual not designated by OFAC. No reference in complaint. |
| Sameh Samir | RFP2: 2(rr) | PIJ | Arrested 08/28/2003. |

| Muhamm ad Shubki | | | No public sources cited prior to relevant time period or arrest. Sources: Spitzen Report (2011) does not cite source. Individual not designated by OFAC. No reference in complaint. |
|---|---|---|---|
| Bahaa Abu Al Ata | RFP2: 2(ss) | PIJ | Public sources post-date relevant time period.  Sources: Walla! News (11/2/2019); terrorism-info.org (11/12/2019); U.S. Department of the Treasury Resource Center (11/13/2019). Designated by OFAC in 09/2019. No reference in complaint. |
| Tareq Qa'adan | RFP2: 2(tt) | PIJ | Public sources post-date relevant time period.  Sources: Addammer.org (12/31/2012); Alaraby.co.uk (10/27/2019). Individual not designated by OFAC. No reference in complaint. |
| Shahdi Mhanna | RFP2: 2(uu) | PIJ | Public sources post-date relevant time period.  Sources: The Star (10/28/2005).  Individual not designated by OFAC. No reference in complaint. |
| Ali Zafour | RFP2: 2(vv) | PIJ | Arrested March/April 2002. No public source cited prior to arrest.  Source: Institute for Near East Policy (04/17/2002). Individual not designated by OFAC. No reference in complaint. |
| Raed Jundiya | RFP2: 2(ww) | PIJ | Public source post-dates relevant time period.  Source: Fox News (06/23/2013).  Individual not designated by OFAC. No reference in complaint. |
| Khaled al-Batsh | RFP2: 2(xx) | PIJ | Public sources post-date relevant time period.  Sources : Al Jazeera (01/13/2015); and Timesofisrael.com (05/11/2019). Individual not designated by OFAC. No reference in complaint. |
| Nasser Ahmad Yussuf Shawka h | RFP2: 2(yy) | PIJ | Public sources post-date relevant time period.  Sources:  Hamas website (01/13/2020); and Saraya Al Quds (06/09/2012). Individual not designated by OFAC. No reference in complaint. |
| Khader Taleb Khader Dhiyab | RFP2: 8(a) | PFLP | Died.  Public sources post-date death.  Sources: Arab International Newspaper (Al-Sharq Al-Awsat) (09/30/2002); and Al-Jazirah, Saudi newspaper (09/30/2002) (articles report he was killed by heavy bombing in Gaza). Individual not designated by OFAC. No reference in complaint. |
| Ahmad Sa'adat a/k/a Ahmad Sa'dat Abd al-Rasul | RFP2: 9(c) | PFLP | Public sources post-date relevant time period.  Sources: Haaretz (12/16/2019); Ajras Alawda Network (01/15/2008); OMEDIA.ORG (03/16/2006); "Intelligence Heritage & Commemoration Center" (03/15/2013); Arab48 Website (07/25/2012). Individual designated by OFAC in 04/2006. No reference in complaint. |

| Abd al-Rahim Maluh | RFP2: 9(d) | PFLP | Public sources post-date relevant time period or are undated.  Sources: Al Jazeera (7/18/2007); Mapping Palestinian Politics (undated). Individual not designated by OFAC. No reference in complaint. |
|---|---|---|---|
| Maryam Abu Diqa | RFP2: 9(e) | PFLP | Public sources post-date relevant time period.  Sources: Al Watan Voice (09/30/2019); PFLP website (11/15/2019). Individual not designated by OFAC. No reference in complaint. |
| Muham mad Shauqi Sa'id Nazal | RFP2: 9(f) | PFLP | No public source. Individual not designated by OFAC. No reference in complaint. |
| Nureddi n Adnan Sa'id Daoud | RfP2: 9(g) | PFLP | Arrested 4/23/03. Public source post-dates relevant time period.  Source: Man-nisr al-ahmar "The Red Eagle" Forum website (12/14/2009). Individual not designated by OFAC. No reference in complaint. |
| Jamal Hindi Zayed | RFP2: 9(h) | PFLP | No public source prior to imprisonment, public source post-dates relevant time period, or source is undated. Sources: News1 (09/06/2002) (noting his arrest in 2002); Fatah (11/3/2015); The Israeli Information Center for Human Rights in the Occupied Territories (undated). Individual not designated by OFAC. No reference in complaint. |
| Jamil Mizher | RFP2: 9(i) | PFLP | Public sources post-date relevant time period or are undated.  Sources: PFLP website (06/14/2013); PFLP website undated, but concerns a January 20, 2007 speech; Arabi21.com (undated). Individual not designated by OFAC. No reference in complaint. |
| Ra'fat Ali Muham mad al-Aruqi | RFP2: 9(j) | PFLP | Public sources post-date relevant time period or are prior to imprisonment.  Sources: Spitzen Report (2011) citing http://www.alhayatj. com/details.php?opt=3&id=15577&cid=288 (2005); Moqawmh.ps (09/02/2015); Spitzen Report (2011) cited http://pflp2.jeeran.com/alasra.html and noting this states the date of his arrest. Individual not designated by OFAC. No reference in complaint. |
| Shaher Ali Mahmo ud al-Rai | RFP2: 9(k) | PFLP | Public source post-dates relevant time period: Al Watan Voice (06/04/2016). Individual not designated by OFAC. No reference in complaint |
| Ali Atiya Jaradat | RFP2: 9(m) | PFLP | Public sources are undated.  Sources: Spitzen report (2011) cited Al Jazeera (undated); and PFLP website (undated). Individual not designated by OFAC. |

| Amer Muhammad Musa Jafal | RFP2: 9(n) | PFLP | No public source.<br>Individual not designated by OFAC.<br>No reference in complaint. |
|---|---|---|---|
| Ahmad Abu al-Sa'ud Abd al-Razaq Hanani | RFP2: 9(o) | PFLP | Public sources do not link to violent activity or are not accessible. Source: Ozzo.com (dated 2004) (notes member of PFLP)); Spitzen Report (2011) cited: http://www.qudsnet.com/arabic/news.php?maa=View&id=45005.<br>Individual not designated by OFAC.<br>Complaint alleges Ahmad Abu al-Sa'ud Abd al-Razaq Hanani received a Saudi Committee prisoner payment. |
| Ra'ed Musa Ibrahim Nazal | RFP2: 9(q) | PFLP | Died 04/26/2002.<br>No public sources cited prior to death or is undated.  Sources: Hadf News (04/26/2018); LEBnights (06/17/2006); Al Watan (05/11/2016); Israeli Air Force website (iaf.org.il) (04/26/2002); Palestine News Network (undated)<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Adnan Muhammad Ata Maragha | RFP2: 9(r) | PFLP | Prisoner from 1989-2011.<br>No public source prior to imprisonment.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Othman Muhammad Ata Maragha | RFP2: 9(s) | PFLP | No public source prior to imprisonment. Source: PALDF.net (08/28/2004), lists Othman Muhammad Ata Maragha as a PFLP prisoner.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Handuma Rashed Ibrahim Wishah | RFP2: 9(t) | PFLP | No allegation in the complaints and no public source information that family member was linked to an FTO or engaged in violent and terrorist activity.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Kamil Sa'id Abu Hanish | RFP2: 9(u) | PFLP | Arrested 04/13/2003.<br>Public sources are undated:  ASRA Voice (screenshot of website) (undated); Al-Hayat Al-Jadida (undated).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Basel Asmar | RFP2: 9(v) | PFLP | Public sources post-date relevant time period.  Sources: Ma'an News Agency (02/06/2008); and International Middle East Media Center (02/06/2008).<br>Individual not designated by OFAC.<br>No reference in complaint. |

| Ahed Abu Ghalma | RFP2: 9(w) | PFLP | Arrested 2002. Public sources post-date relevant time period and arrest. Sources: Miljad Majeed (07/25/2012); and unknown blog (08/25/2007). Individual not designated by OFAC. No reference in complaint. |
|---|---|---|---|
| Ayman al-Hur | RFP2: 9(x) | PFLP | Public sources post-date relevant time period. Sources: Felesteen.ps (05/19/2007); Khan Younis Governorate (08/06/2007); Statement of the Popular Front for the Liberation of Palestine (11/06/2006); and Screenshots of Ayman al-Hur's Facebook profile (various dates in October and November of mostly likely 2013--some posts have the year listed and some do not). Individual not designated by OFAC. No reference in complaint. |
| Muhammad Dahlan | RFP2: 15(c) | Fatah/AAMB | Public sources post-date relevant time period or are unrelated to violent activity. Sources: Lawrence of Cyberia Blog (07/27/2004) (biographical information); and News Article (Echoroukonline) (06/18/2007). Individual not designated by OFAC. No reference in complaint. |
| Nayef Abu-Sharakh | RFP2: 15(d) | Fatah/AAMB | Public source post-dates relevant time period. Source: Archive from nedal.net (08/31/2018). Individual not designated by OFAC. No reference in complaint. |
| Bilal Abu Amsha | RFP2: 15(e) | Fatah/AAMB | Died 04/22/2004. Public sources post-date death. Source: Alayam.com (04/23/2004). Individual not designated by OFAC. No reference in complaint. |
| Faruq Qadumi | RFP2: 16(a) | Fatah/AAMB | Public sources post-date relevant time period or are undated. Source: Encyclopedia Palestina (05/16/2013); and reference to undated document MIPT Terrorism Knowledge Base (undated). Individual not designated by OFAC. No reference in complaint. |
| Mahmud Abu Hamam | RFP2: 16(b) | Fatah/AAMB | Public source post-dates relevant time period. Source: Wafa.ps (03/11/2007). Individual not designated by OFAC. No reference in complaint. |
| Khaled Abu Hilal | RFP2: 16(d) | Fatah/AAMB | Public sources post-date relevant time period. Sources: Al Jazeera (01/2015); and Palestinian Liberal Movement Media Office (03/05/2016). Individual not designated by OFAC. No reference in complaint. |
| Naser Badawi | RFP2: 16(f) | Fatah/AAMB | Public source post-dates relevant time period. Source: Israel National News (06/28/2007). Individual not designated by OFAC. No reference in complaint. |

| | | | |
|---|---|---|---|
| Naser Naji Abu Hamid | RFP2: 16(g) | Fatah/AA MB | No public source.<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Fadi Qafisha | RFP2: 16(h) | Fatah/AA MB | Public sources post-date relevant time period.  Sources: Maariv NRG (08/31/2006); and nedal.net (08/31/2018).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Zakaria Zbeidi | RFP2: 16(j) | Fatah/AA MB | Public sources post-date relevant time period.  Sources: Ynet Date (05/21/2019); Tablet (09/21/2012); Indymedia Ireland Date (2009); and The New Arab (01/07/2015).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Mahmu d Ahmad Muham mad Shawer | RFP2: 16(l) | Fatah/AA MB | Died 07/04/2003.<br>Public sources post-date death.  Sources: Al Riyadh Newspaper (07/04/2003); and Al Jazeera (07/04/2003).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Sanaa' Shahada | RFP2: 16(p) | Fatah/AA MB | Arrested 03/21/2002.<br>Public sources post-date arrest or relevant time period.  Sources: NRG News (09/15/2005); Appeal No. 2397-04 (07/31/2005); and Arab Media Internet Network (11/21/2002, discussing arrest)<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Naser Jamal Musa Shawish | RFP2: 16(r) | Fatah/AA MB | Public sources post-date attack and relevant time period.  Sources: Krama Press News (03/18/2014); and Maan News (02/23/2013).<br>Individual not designated by OFAC.<br>No reference in complaint.<br>Allegedly involved in Al Aqsa Martyrs Brigades suicide bomber in King George Street Bombing (03/21/2002). |
| Moham med Qasem Ahmed Aradah | RFP2: 16(s) | Fatah/AA MB | Public sources post-date relevant time period.  Sources: Saraya Al-Quds website (05/14/2015); and Saraya Al-Quds website (05/14/2016).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Moham med Said Ali Kablawi | RFP2: 16(t) | Fatah/AA MB | Public source post-dates attack. Source: Court document related to appeal (03/31/2004).<br>Individual not designated by OFAC.<br>No reference in complaint. |

| | | | |
|---|---|---|---|
| | | | Allegedly involved in Al Aqsa Martyrs Brigades suicide bomber in King George Street Bombing (03/21/2002). |
| Khad'er Amin Mohammed Dabiyah | RFP2: 16(u) | Fatah/AAMB | Arrested. No public sources cited prior to arrest. Source: Indictment of Kahira Sa'id Al-Sa'di before Israel Military Court in Beit El. Khad'er (07/08/2002) Individual not designated by OFAC. No reference in complaint. |
| Atef Abayat | RFP2: 16(v) | Fatah/AAMB | Public source is undated.  Source: Spitzen Report (2011), citing http://www.fatehforums.com/showthread.php?p=101404 (undated). |
| Ahmad Taleb Mustafa Barghuthi al-Faransi | RFP2: 16(w) | Fatah/AAMB | Arrested 04/15/2002. No public sources cited prior to arrest.  Sources: Amended Indictment of military occupation court of Beit El for Ahmad Taleb Mustafa Barghuthi al-Faransi (10/01/2002); Al-Sabeel Newsletter (08/11/2003); Times of Israel (02/06/2015); and Spitzen Report (2011) citing: https://mfa.gov.il/MFA/MFA-Archive/2002/Pages/Information%20on%20Marwan%20and%20Ahmed%20Barghouti%20-%2015-Apr.aspx, which is dated April 14, 2002. Individual not designated by OFAC. No reference in complaint. |
| Majed Qini | RFP2: 16(x) | Fatah/AAMB | Public source post-dates relevant time period.  Source: AAMB Website (11/2018).  Individual not designated by OFAC. No reference in complaint. |
| Munzar Mahmoud Khalil Noor | RFP2: 16(y) | Fatah/AAMB | No public source. Individual not designated by OFAC. No reference in complaint. (Allegedly involved in 1/27/02 Jerusalem bombing.) |
| Tawfiq Tirawi | RFP2: 16(z) | Fatah/AAMB | No public source. Individual not designated by OFAC. No reference in complaint. (Allegedly involved in 01/27/2002 Jerusalem bombing.) |
| Amjad Mahmud Ibrahim Fakhuri | RFP2: 16(aa) | Fatah/AAMB | Public sources post-date relevant time period.  Sources: Palestineremebered.com (02/03/2012); PalVoice Onling (11/09/2007). Individual not designated by OFAC. No reference in complaint. |
| Muhammad Hijazi | RFP2: 16(bb) | Fatah/AAMB | Public sources post-date relevant time period or not related to violence. Sources: Al Watan Voice (06/02/2014); WikiLeaks (04/12/2016); Israeli Military Court Ruling (07/29/2002) discusses Mr. Hijazi's testimony regarding the interrogation of Fuad Hejazi Shubaki). Individual not designated by OFAC. |

| | | | No reference in complaint. |
|---|---|---|---|
| Alaa Tafesh | RFP2: 16(cc) | Fatah/AA MB | Public sources post-date relevant time period.  Sources: Aljazeera (06/14/2009); Echoroukonline (06/18/2007); Alwatanvoice (01/10/2012).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Haytha m Abu al-Naja | RFP2: 16(dd) | Fatah/AA MB | Public source post-dates relevant time period.  Source: karamanews.net (03/06/2016).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Zaher Abu Harbid | RFP2: 16(ee) | Fatah/AA MB | Died 07/08/2004.<br>Public sources post-date death.   Sources: Al Jazeera (10/03/2004); AlWatan Voice (07/08/2004); Nedal.net (07/08/2019); and Verdict against Sayed Abu Awda from the Israeli legal website (before the Beer Sheba District Court) (07/13/2010).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Nasser al-Din Abu Harbid | RFP2: 16(ff) | Fatah/AA MB | Died 07/08/2004.<br>Public sources post-date death.  Sources: Al Jazeera (10/03/2004); AlWatan Voice (07/8/04); and Al Jazeera (10/3/04).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Ahmad Hilis | RFP2: 16(gg) | Fatah/AA MB | Died 03/12/2002.<br>Public sources undated or post-date death.  Sources: Al Jazeera (10/3/04); AlWatan Voice (7/8/04); Al Jazeera (10/3/04); Spitzen Report (2011) citing http://web. archive.org/web/20080822052232/www.shahidpalestine.org/shouhada /intifadaaksa/<br>shohadaa+2002.htm (undated);<br>http://www.palestineinfo.comiarabic/hamasishuhda /2002/mohamadhalas/bayan.htm (3/17/11).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Hassan 'Atiya Hassan Madhou n | RFP2: 16(hh) | Fatah/AA MB | Public source post-dates relevant time period.  Sources:  Aljazeera (undated but references 11/01/2005).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Na'el al-Sharif | RFP2: 16(ii) | Fatah/AA MB | Public source post-dates relevant time period.  Source: Palestinian Information Center (10/18/2007).<br>Individual not designated by OFAC.<br>No reference in complaint. |
| Jamil Khalaf Mustafa | RFP2: 16(jj) | Fatah/AA MB | Died 03/31/2002. |

| Hamid (Jamil Khalaf Hamied) | | | Public source post-dates death and attack.  Source: Bates Number TVPL0058840, which is an unknown source from unknown date that describes suicide bombings from 09/2000 to 05/2005. Individual not designated by OFAC. Complaint alleges that Jamil Khalaf Hamied committed 03/31/2002 suicide bombing at supermarket and medical center. |
|---|---|---|---|
| Riyad Dakhlall ah al-Amur | RFP2: 16(kk) | Fatah/AA MB | Arrested 05/07/2002. Public source post-dates arrest and relevant time period.  Source: Asra Media (05/17/2018). Individual not designated by OFAC. No reference in complaint. |
| Muhssie n Attah | RFP2: 16(mm) | Fatah/AA MB | Died 07/30/2002. Public source post-dates death and attack.  Source: Bates Number TVPL0058840 Unknown source from unknown date that describes suicide bombings from 09/2000 to 05/2005. Individual not designated by OFAC. Complaint alleges that Muhssien Attah committed 7/30/02 Suicide Bombing at Hanevi'im Street in Jerusalem. |
| Alaa 'Abd al-Kareen | RFP2: 16(nn) | Fatah/AA MB | No public source. Individual not designated by OFAC. No reference in complaint. (Allegedly involved in 7/30/02 suicide bombing on Hanevi'im Street, Jerusalem.) |
| Muham mad Hamash | RFP2: 16(oo) | Fatah/AA MB | Public source post-dates relevant time period. Source: Notary translation of verdict - Military tribunal Judea (08/24/2006). Individual not designated by OFAC. No reference in complaint. |
| Zaynab Ali Abu Salem a/k/a Zeinab Ali Issa Abu Salem | RFP2: 16(pp) | Fatah/AA MB | Public sources post-date relevant time period and attack.  Source: Bates Number TVPL0058840, which is an unknown source from unknown date that describes suicide bombings from 09/2000 to 05/2005. Individual not designated by OFAC. Complaint alleges that he committed the French Hill attach on 09/22/2004. |
| Moham med Muhtasi b | RFP2: 16(qq) | Fatah/AA MB | No public source. Individual not designated by OFAC. No reference in complaint. (Allegedly involved in 7/30/02 suicide bombing on Hanevi'im Street, Jerusalem.) |

| Amnah Reehan | RF2: 16(rr) | Fatah/AA MB | Public source post-dates relevant time period.  Source: "Plaintiff Sokolow opposition to Defendant PLO's MTD for JMOL in SDNY" (05/21/2015). Individual not designated by OFAC. No reference in complaint. |
|---|---|---|---|

**Appendix 3: Category C.2, No Allegation In The Complaints That Family Member Was Linked To An FTO Or Engaged In Violent And Terrorist Activity**

| Name | Miller/Pam Reference |
|------|----------------------|
| Family of Muhanad Mahmoud Ibrahim Abu Zor | RFP1: 10(1) |
| Family of Khaled Nabil Khamis Mohammed Sawalha | RFP1: 10(2) |
| Family of Ibrahim Yasser Ibrahim Naji Khalil | RFP1: 10(3) |
| Family of Amjad Sulieman Hassan Hussein Abu Salim | RFP1: 10(4) |
| Family of Khaldoun Walid Aref Mohammed Sha'ablu | RFP1: 10(5) |
| Family of Omar Mohhamed Awad Abu Al-Rob | RFP1: 10(6) |
| Family of Yusuf Mohammed Rareb Hamdan Abu Al-Rob | RFP1: 10(7) |
| Family of Abd Al-Karim Omar Mohammed Yusuf Ahmed | RFP1: 10(8) |
| Family of Nazir Muhammad Mahmud Hamad | RFP1: 10(9) |
| Family of Izz al-Din Shuhayl Ahmad al-Masri | RFP1: 10(10) |
| Family of Muhammad Ahmad Halas | RFP1: 10(11) |
| Family of Bilal Fayez Mustafa Shehada | RFP1: 10(12) |
| Family of Muhammad Abd al-Ghani Muhammad Abu Jamus | RFP1: 10(13) |
| Family of Imad Atiwi Abu Razaq | RFP1: 10(14) |
| Family of Abd al-Rahman Naser Ghazal | RFP1: 10(15) |
| Family of Ahmad Abd al-Qader Atiq | RFP1: 10(16) |
| Family of Muhammad Hasan Ahmad al-Fayed | RFP1: 10(17) |
| Family of Amjad Hussein Ahmad al-Fayed | RFP1: 10(18) |
| Family of Khaled Jamal Ali Najem | RFP1: 10(19) |
| Family of Mahmud Ali al-Hilwa | RFP1: 10(20) |
| Family of Saleh Muhammad Saleh Kamil | RFP1: 10(21) |
| Family of Mustafa Abd al-Rahim Yusuf al-Shalabi | RFP1: 10(22) |
| Family of Muhammad Khalil Atiya Musharaqa | RFP1: 10(23) |

| Name | Miller/Pam Reference |
|---|---|
| Family of Muhammad Omar Salim Hawashin | RFP1: 10(24) |
| Family of Munir Issa Wishahi | RFP1: 10(25) |
| Family of Munqidh Muhammad Sawafteh | RFP1: 10(26) |
| Family of Yaser Husni Al-Masdar | RFP1: 10(27) |
| Family of Muhammad Mashhur Muhammad Hashaikeh | RFP2: 16(n) |

**Appendix 4: Category D Individuals and Entities Allegedly Linked to an FTO During the Relevant Time Period**

| Name | Miller/Pam Reference |
|---|---|
| Sheikh Ramadan Abdalla Shalah (Dr. Ramadan Shalah) | RFP2: 2(b) |
| Sheikh Abd al-Aziz Awda | RFP2: 2(c) |
| Fathi Shiqaqi | RFP2: 2(d) |
| Bashir Musa Muhammad Nafi | RFP2: 2(f) |
| Mahmud al-Hindi | RFP2: 2(z) |
| Iyad Ahmad Yusuf Sawalha | RFP2: 2(bb); RFP2: 2(pp) |
| Muhammad Said al-Hindi | RFP2: 2(cc) |
| Dhiyab Abd al-Rahim Abd al-Rahman al-Shweiki | RFP2: 2(mm) |
| Akef Fayez Nazal | RFP2: 2(nn) |
| George Habash | RFP2: 9(a) |
| Mustafa al-Zibri AKA Abu Ali Mustafa | RFP2: 9(b) |
| Maher Ali Mahmoud al-Rai | RFP2: 9(l) |
| Yaman Tayeb Ali Faraj | RFP2: 9(p) |
| Marwan Barghuti | RFP2: 15(b) |
| Maslama Thabet | RFP2: 16(c) |
| Osama Khaled al-Silawi | RFP2: 16(e) |
| Sirhan Sirhan | RFP2: 16(i) |
| Ahmad Yusuf Maghrabi | RFP2: 16(k) |
| Marwan Kaid Mutliq abd al-Karim Zalum | RFP2: 16(m) |
| Qahira Said Ali Sa'adi | RFP2: 16(o) |
| Abd al-Karim Rateb Yunes Aweis | RFP2: 16(q) |
| Ahmad Taleb Mustafa Barghuthi al-Faransi | RFP2: 16(w) |
| Ibrahim Musa Salem Abayat | RFP2: 16(ll) |
| Fatah Revolutionary Council | RFP2: 17(f) |

| Name | Miller/Pam Reference |
|---|---|
| Vanguards of the Popular Army a/k/a Tala'I Aal-Jaysh al-Sha'bi | RFP2: 17(k) |
| Palestinian Islamic Jihad | RFP2: 26(a) |
| Popular Front for the Liberation of Palestine | RFP2: 26(b) |
| Al Aqsa Martyrs Brigade | RFP2: 26(c) |
| Fatah/Tanzim | RFP2: 26(d) |
| Force 17 | RFP2: 26(e) |
| Fatah Hawks | RFP2: 26(f) |
| Ahmad Abu al-Rish Brigades | RFP2: 26(g) |
| Ahmed Yassin a/k/a Ahmad Yasine | RFP1: 2(a) |
| Ismail Abu Shanab | RFP1: 2(g) |
| Salah Shehadeh a/k/a Salah Shehada | RFP1: 2(h) |
| Abbas al-Sayed | RFP1: 2(j) |
| Muhammad Sham'a | RFP1: 2(l) |
| Ghazi Hamad | RFP1: 2(m) |
| Abd al-Khaleq al-Natsheh | RFP1: 2(s) |
| Sayed Abu Msameh | RFP1: 3(e) |
| Abdalla Ghaleb Abdalla Barghuthi | RFP1: 3(q) |
| Halima Yassin Ahmed Yassin's wife | RFP1: 2(b) |
| Khalil Hasan Yassin Ahmed Yassin's nephew | RFP1: 2(c) |
| Layla Khamis Yusuf Safira Salah Shehadeh's wife | RFP1: 2(i) |

**Appendix 5: Category E, The Palestinian Government and Political Parties**

| Name | Miller/Pam Reference |
|---|---|
| Palestine National Fund | RFP2: 17(a); RFP2: 25 |
| Fatah Central Committee | RFP2: 17(b) |
| Fatah Youth Movement | RFP2: 17(c) |
| Civil Society Organizations Commissions | RFP2: 17(e) |
| Fatah Mobilization and Organization Commission | RFP2: 17(g) |
| Martyr Institute | RFP2: 17(h) |
| Birzeit University Fatah Youth Movement | RFP2: 17(m) |
| Palestinian Authority Ministry of Detainees and ex-Detainees | RFP2: 17(n) |
| Palestinian Authority Economic Affairs Department | RFP2: 17(o) |
| Palestinian Authority Institute for the Care of Martyrs' Families and the Injured | RFP2: 17(p), 26(h) |
| Palestine Liberation Organization (PLO) | RFP2: 24 |
| Palestinian Ministry of Social Welfare's Institute for the Care of Martyrs' Families and the Injured | RFP2: 23 |
| Yasser Arafat | RFP2: 15(a) |