# Exhibit 3

**DECLARATION OF RASEM KAMAL**

1. I, Rasem Kamal, declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

2. I am a corporate lawyer and the managing partner of Kamal and Associates - Attorneys and Counsellors-at–Law, a law firm based in the city of Al-Bireh – Ramallah and Al-Bireh District in the West Bank – Palestinian Authority.

3. I hold a Bachelor of Laws (LL.B.) degree from the University of Jordan School of Law (1998), a Master of Laws (LL.M.) degree from the University of San Francisco School of Law (2000, where I was a grantee of the U.S. State Department-funded Fulbright Scholarship) and an Executive Master of Business Administration (MBA) degree from Northwestern University Kellogg School of Management and Tel Aviv University Coller School of Management (2016).

4. I was a lecturer on civil procedure at Birzeit University School of Law from 2007-2009, as well as during the academic year from 2018-2019.

5. I am fully familiar with the banking laws, regulations, practices and policies of the Palestinian Territories.

6. From 2015–2019, I served as a member of the Board of Directors (the "BOD") of the Palestine Deposit Insurance Corporation (the "PDIC"), a state institution established by Law no. (7) of 2013 aimed at insuring the deposits within Palestinian banks.  As part of my role, I served as the

Chairperson of the BOD's Subcommittee on Corporate Governance, as well as a member of the

BOD's Audit Committee.  I also authored the PDIC's Code of Corporate Governance.

7.  In recent years, I have acted as legal advisor to many foreign and international institutions with

respect to Palestinian law, including on matters relating to bank secrecy laws.  Such foreign clients

included the U.S. Department of Justice, The World Bank, Citibank, Western Union, Master Card,

the European Bank for Reconstruction and Development, the European Investment Bank and

Finance in Motion.  I have not represented Arab Bank plc in the past.

8.  I submit this Declaration in support of Arab Bank's motion for protective order as a result of the

Bank's inability to comply with plaintiffs' requests to produce customer documents and

information in light of Palestinian laws.  Specifically, I have been asked to describe Palestinian

law as it applies to bank secrecy protections over customer transactions and data.

9.  The regulatory authority overseeing the banking sector in the Palestinian Territories is the

Palestinian Monetary Authority (the "PMA"), which acts as the supervisor and regulator of all

aspects of banking activities by virtue of the powers granted under the laws of the Palestinian

Authority (the "PA").  Since its establishment in 1994 through the Oslo Accords, the PA has

assumed the legislative, judicial, and executive authority over the Palestinian Territories,

including the banking and financial sectors.  The licensing of banks was initially granted by the

PA's Ministry of Finance until the establishment of the PMA in 1994.

10. As in many jurisdictions around the world, including in the Middle East and North Africa region, the banking sector in the Palestinian Territories is heavily regulated. Palestinian banks are required to strictly comply with the laws of the PA and the rules and regulations of the PMA. Bank secrecy compliance is a requirement imposed by the PMA under the prevailing laws. The seriousness and importance of the subject matter is emphasized by the imposition of heavy penalties in case of a breach by a bank or its employees of such obligations. In case of a breach, the banks and its employees would be subject to criminal liability, ranging from fines to imprisonment sentences, and in certain cases, replacement of the banks' board of directors, and/or cancelation of their banking licenses.

11. Although the banking sector in the Palestinian Territories is fairly young, bank secrecy was in effect in the West Bank prior to the Oslo Accords. As part of the Kingdom of Jordan (1950-1967), the West Bank was subject to the application of the Jordanian Penal Code No.6 of 1960, which imposed criminal liability under Article 355 of said Code on any person who obtained secrets by virtue of his or her profession and disclosed such secret information to another who had no right to such information. Any such breach imposed a penalty of up to three years of imprisonment. The Jordanian Penal Code No. 6 of 1960 is still applicable today.

12. The PMA has developed comprehensive AML policies to be followed by the banking sector.

13. Following the Oslo Accords in 1993-1994, the PMA issued Circular No. 27(a)/1998, which prohibited banks and all bank staff from divulging secret information related to its customers, applying Article 355 of the Criminal Code of 1960.

14. Bank secrecy was further protected through the Banking Law no.2 of 2002.  Article 26 of that law prohibited the disclosure of customer information without customer consent. In case such secrecy obligations were breached, Article 52 of that law subjected the bank and its employees to a fine of between 5,000 and 100,000 Jordanian Dinar (one Dinar is equivalent to US$1.4), up to one year in prison, or a combination of both penalties for each breach.  Other penalties included the revocation of a bank's authorization to operate in the Palestinian Territories and the striking of a bank from the PMA's records as a result of repeated violations of the Banking Law (pursuant to Article 56(9) and Article 58(1)(e)).

15. The Banking Law of 2002 was superseded by the Banking Law no.9 of 2010. The Banking Law of 2010 imposes an obligation to maintain the confidentiality of bank accounts, data and information related to those accounts by any person to whom that information and data have been accessed by virtue of his or her job, profession or work in a direct or indirect way with the bank, including the current and former members of the bank's board of directors, main officials, employees, auditors, consultants and external contractors, and none of them may disclose any of this information, including by allowing others outside the bank to view it.

16. In case of breach, the Banking Law of 2010 increases the level of fines imposed to between 5,000 and 250,000 Jordanian Dinars, and grants the PMA the right to initiate criminal procedures against any of the bank employees for committing such offences for each breach. The PMA considers that the breach by the bank or any bank employee of bank secrecy laws harms not only the reputation of the bank, but it damages the credibility of the banking system in the Palestinian community and the marketplace. Further, repeat violations of the bank secrecy provisions provide grounds for the cancellation of the bank's license, provided that such repeat offences threaten the interests of the depositors or the stability of the banking system in the Palestinian Territories in general. Such breaches are prosecuted without being conditioned on a compliant from the injured party. Any accountholder will be eligible to claim damages against the individual employee as well as the bank as a result of such breach.

17. Bank secrecy is a right of the accountholder and an obligation of the Bank. Any breach of Bank secrecy exposes the Bank to potential claims for damages by the customer whose right would be deemed violated.

18. It should be noted that this provision covers "all information and documents" and thereby affords to bank customers broad protection from disclosure of their private affairs. The provision also applies to former, including deceased, bank customers because confidentiality is understood to survive even the termination of the bank-customer relationship. Thus, in order to obtain a

customer waiver of bank secrecy protection involving the account of a deceased customer, a bank must seek consent to disclose information from the heirs of the deceased.

19. The PMA Instructions No.8 of the year 2009 outline the same secrecy provisions stipulated under the Banking Law of 2010, and have been emphasized by the Ministry of Interior's Palestinian police department on its website, dated April 8, 2010, of notices to the banks operating in the Territories to strictly abide by the bank secrecy laws in effect (https://www.palpolice.ps/content/245021.html; last accessed February 23, 2022).

20. The only exemption to the above provisions is stipulated under paragraph 2 of article 32 of the Banking Law of 2010, where bank secrecy is lifted in the case of written customer consent or a judicial decision rendered by a Palestinian court ordering the disclosure of customer information.

21. Note that a third party (other than a customer's heir or a Palestinian court as provided under Palestinian law) may not cause bank secrecy obligations to be waived.  In addition, public dissemination of a customer's documents or data by such third party does not lift a bank's obligation to maintain bank secrecy over such customer's account and such information cannot be confirmed or authenticated by the bank as such an act by itself would be tantamount to a breach of the secrecy provisions of the applicable banking laws.

22. To the best of my knowledge, each of the PA and the PMA cooperates with foreign jurisdictions, including the US, in cases of criminal prosecutions, money laundering or terrorist financing.  I

understand that the request to Arab Bank to produce documents by Plaintiffs relates to a civil claim for damages.

23. Respecting an individual's right to privacy has been rooted in Palestinian culture for decades and the concept of a bank customer's bank secrecy rights over his/her account and transactions is a component of that right. Violating customers' rights would undermine the trust that customers have in their banks and could lead to their withdrawing their funds and business from Palestinian banks, leading to a collapse of the entire banking sector in the Territories and thus, create a vacuum for any type of control of financial transactions. Hence, the PMA's concern with protecting bank secrecy rights.

24. The PMA was created and organized after the Oslo Accords through the financing of USAID and U.S. cooperation with the intent to create an institution and a mechanism to oversee the banking activities in the Palestinian Territories. Through the years, the PMA has been focused on developing trust in the banking sector among residents and businesses in the Palestinian Territories as local society was based almost exclusively on cash economy with lack of usage of credit/debit cards or personal checks. While the Palestinian Territories' economy still remain a primarily cash-based society, the PMA has succeeded in developing a structured banking system that is more accessible to the Palestinian population and is duly monitored and supervised by a regulatory authority. The PMA continues to strive to bring about financial inclusion and increase the percentage of the Palestinian population that use the financial services of Palestinian banks.

The greater the financial inclusion, the greater the potential for the financial stability and the integrity of the banking system as more transactions will be processed transparently through the banking system which is of the utmost importance for the fight against money laundering and terrorist financing.

25. Processing transactions through a regulated banking system allows regulatory authorities to monitor financial transactions and ensure compliance with local and international rules, regulations and practices.  For example, in order to exercise closer control and supervision of banking activity within the Territories and prevent illicit transactions, in 2001 PMA instructions required banks operating in the Territories to submit daily detailed reports on all cross border incoming and outgoing funds transfers of US$10,000 or above to the PMA, and hold such transactions for a 24-hour period for the PMA to clear such operations.  In addition, the PMA instructions required banks to provide the PMA with weekly or monthly detailed reports of every single funds transfer processed by the banks regardless of the amount of such transactions.

26. The PMA has been and continues to be keen to enforce drastic means to ensure compliance with bank secrecy laws as violations of such rights would be detrimental to the evolving trust of the Palestinian population in the Palestinian financial sector.   Such violations may prompt the population to return to conducting financial transactions through informal channels, away from domestic and international supervision and would undermine the PMA's ability to prevent money laundering activities and terrorist financing.   Accordingly, disclosing customer information of

any kind to a private party by a bank or its employee in violation of the laws of the PA and the regulations of the PMA would expose the bank and its employee to heavy penalties as described above.

27. I understand that in response to a production order from the honorable court in New York issued by the Eastern District of New York (Judge Kuo) on January 29, 2020, Arab Bank has sought a ruling from the Palestinian Authority for the waiver of bank secrecy to permit it to disclose certain customer information.   As requested, Arab Bank provided the New York court order to the Ministry of Justice of the PA as well as to the PMA and we further understand that the request of such waiver of bank secrecy sought by the New York court has been declined by the local authorities pursuant to the relevant laws.  Accordingly, Arab Bank, failing to receive authorization from its regulators and local authorities, will be in breach of the Palestinian laws if it elects to disclose the documents requested by the plaintiffs and will expose itself to the sanctions referred to above.

Executed this 28 day of February, 2022     Rasem Kamal

Page **9** of **9**