# Exhibit 18

**GAZA-JERICHO AGREEMENT**

**ANNEX IV**
**Protocol on Economic Relations between the Government of the State of Israel and the P.L.O., representing the Palestinian people**

**Paris, April 29, 1994**

**PREAMBLE**

The two parties view the economic domain as one of the cornerstone in their mutual relations with a view to enhance their interest in the achievement of a just, lasting and comprehensive peace. Both parties shall cooperate in this field in order to establish a sound economic base for these relations, which will be governed in various economic spheres by the principles of mutual respect of each other's economic interests, reciprocity, equity and fairness.

This protocol lays the groundwork for strengthening the economic base of the Palestinian side and for exercising its right of economic decision making in accordance with its own development plan and priorities. The two parties recognise each other's economic ties with other markets and the need to create a better economic environment for their peoples and individuals.

**Article I**
**FRAMEWORK AND SCOPE OF THIS PROTOCOL**

1. This protocol establishes the contractual agreement that will govern the economic relations between the two sides and will cover the West Bank and the Gaza Strip during the interim period. The implementation will be according to the stages envisaged in the Declaration of Principles on Interim Self Government Arrangements signed in Washington D.C. on September 13, 1993 and the Agreed Minutes thereto. It will therefore begin in the Gaza Strip and the Jericho Area and at a later stage will also apply to the rest of the West Bank, according to the provisions of the Interim Agreement and to any other agreed arrangements between the two sides.

2. This Protocol, including its Appendixes, will be incorporated into the Agreement on the Gaza Strip and the Jericho Area (in this Protocol - the Agreement), will be an integral part thereof and interpreted accordingly. This paragraph refers solely to the Gaza Strip and the Jericho Area.

3. This Protocol will come into force upon the signing of the Agreement.

4. For the purpose of this Protocol, the term "Areas" means the areas under the jurisdiction of the Palestinian Authority, according to the provisions of the Agreement regarding territorial jurisdiction. The Palestinian Jurisdiction in the subsequent agreements could cover areas, spheres or functions

according to the Interim Agreement. Therefore, for the purpose of this Protocol, whenever applied, the term "Areas" shall be interpreted to mean functions and spheres also, as the case may be, with the necessary adjustments.

## Article II
## THE JOINT ECONOMIC COMMITTEE

1. Both parties will establish a Palestinian-Israeli Joint Economic Committee (hereinafter - the JEC) to follow up the implementation of this Protocol and to decide on problems related to it that may arise from time to time. Each side may request the review of any issue related to this Agreement by the JEC.
2. The JEC will serve as the continuing committee for economic cooperation envisaged in Annex III of the Declaration of Principles.
3. The JEC will consist of an equal number of members from each side and may establish sub-committees specified in this Protocol.
   A sub-committee may include experts as necessary.
4. The JEC and its sub-committees shall reach their decisions by agreement and shall determine their rules of procedure and operation, including the frequency and place or places of their meetings.

## Article III
## IMPORT TAXES AND IMPORT POLICY

1. The import and customs policies of both sides will be according to the principles and arrangements detailed in this Article.
2. 
   a. The Palestinian Authority will have all powers and responsibilities in the sphere of import and customs policy and procedures with regard to the following:
      1. Goods on List Al, attached hereto as Appendix I locally-produced in Jordan and in Egypt particularly and in the other Arab countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs as estimated according to para 3 below.
      2. Goods on List A2, attached hereto as Appendix II, from the Arab, Islamic and other countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs as estimated according to para 3 below.
   b. The import policy of the Palestinian Authority for Lists Al and A2 will include independently determining and changing from time to time

the rates of customs, purchase tax, levies, excises and other charges, the regulation of licensing requirements and procedures and of standard requirements. The valuation for custom purposes will be based upon the GATT 1994 agreement as of the date it will be introduced in Israel, and until then - on the Brussels Definition of Valuation (BDV) system. The classification of goods will be based on the principles of "the Harmonized Commodity Description and Coding System". Concerning imports referred to in Article VII of this Protocol (Agriculture), the provisions of that Article will apply.

3. For the purposes of para 2(a) above, the Palestinian market needs for 1994 will be estimated by a sub-committee of experts. These estimates will be based on the best available data regarding past consumption, production, investment and external trade of the Areas. The sub-committee will submit its estimate within three months from the signing of the Agreement. These estimates will be reviewed and updated every six months by the sub-committee, on the basis of the best data available regarding the latest period for which relevant data are available, taking into consideration all relevant economic and social indicators. Pending an agreement on the Palestinian market needs, the previous period's estimates adjusted for population growth and rise in per-capita GNP in the previous period, will serve as provisional estimate.

4. The Palestinian Authority will have all powers and responsibilities to independently determine and change from time to time the rates of customs, purchase taxes; levies, excises and other charges on the goods on List B, attached hereto as Appendix III, of basic food items and other goods for the Palestinian economic development program, imported by the Palestinians to the Areas.

5.
   a. With respect to all goods not specified in Lists Al, A2 and B, and with respect to quantities exceeding those determined in accordance with paras 2(a) & 3 above (hereinafter - the Quantities), the Israeli rates of customs, purchase tax, levies, excises and other charges, prevailing at the date of signing of the Agreement , as changed from time to time, shall serve as the minimum basis for the Palestinian Authority. The Palestinian Authority may decide on any upward changes in the rates on these goods and exceeding quantities when imported by the Palestinians to the Areas.
   b. With respect to all goods not specified in Lists A1 and A2, and with respect to quantities exceeding the Quantities, Israel and the Palestinian Authority will employ for all imports the same system of importation, as stipulated in para 10 below, including inter alia standards, licensing, country of origin, valuation for customs purposes etc.

6. Each side will notify the other side immediately of changes made in rates and in other matters of import policy, regulations and procedures, determined by it within its respective powers and responsibilities as

detailed in this Article. With regard to changes which do not require immediate application upon decision, there will be a process of advance notifications and mutual consultations which will take into consideration all aspects and economic implications.

7. The Palestinian Authority will levy VAT at one rate on both locally produced goods and services and on imports by the Palestinians (whether covered by the three Lists mentioned above or not), and may fix it at the level of 15% to 16%.

8. Goods imported from Jordan, Egypt and other Arab countries according to para 2(a)(1) above (List Al) will comply with rules of origin agreed upon by a joint sub-committee within three months of the date of the signing of the Agreement. Pending an agreement, goods will be considered to have been "locally produced" in any of those countries if they conform with all the following:

    a.

        i. They have been wholly grown, produced, or manufactured in that country, or have been substantially transformed there into new or different goods, having a new name, character, or use, distinct from the goods or materials from which they were so transformed;

        ii. They have been imported directly from the said country;

        iii. The value or the costs of the materials produced in that country, plus the direct processing costs in it, do not fall short of 30 percent of the export value of the goods. This rate may be reviewed by the joint committee mentioned in para 16 a year after the signing of the Agreement.

        iv. The goods are accompanied by an internationally recognized certificate of origin;

        v. No goods will be deemed as substantially new or different goods, and no material will be eligible for inclusion as domestic content, by virtue of having merely undergone simple combining or packaging, or dilution with water or other substances, which do not materially alter the characteristics of the said goods.

9. Each side will issue import licences to its own importers, subject to the principles of this Article and will be responsible for the implementation of the licensing requirements and procedures prevailing at the time of the issuance of the licenses. Mutual arrangements will be made for the exchange of information relevant to licensing matters.

10. Except for the goods on Lists Al and A2 and their Quantities - in which the Palestinian Authority has all powers and responsibilities, both sides will maintain the same import policy (except for rates of import taxes and other charges for goods in List B) and regulations including classification, valuation and other customs procedures, which are based on the principles governing international codes, and the same policies of import licensing and of standards for imported goods, all as applied by Israel with

respect to its importation. Israel may from time to time introduce changes in any of the above, provided that changes in standard requirements will not constitute a non-tariff-barrier and will be based on considerations of health, safety and the protection of the environment in conformity with Article 2.2. of the Agreement on Technical Barriers to trade of the Final Act of the Uruguay Round of Trade Negotiations. Israel will give the Palestinian Authority prior notice of any such changes, and the provisions of para 6 above will apply.

11.

    a. The Palestinian Authority will determine its own rates of customs and purchase tax on motor vehicles imported as such, to be registered with the Palestinian Authority. The vehicle standards will be those applied at the date of the signing of the Agreement as changed according to para 10 above. However, the Palestinian Authority may request, through the sub-committee on transportation, that in special cases different standards will apply. Used motor vehicles will be imported only if they are passenger cars or dual-purpose passenger cars of a model of no more than three years prior to the importation year. The sub-committee on transportation will determine the procedures for testing and confirming that such used cars comply with the standards' requirements for that model year. The issue of importing commercial vehicles of a model prior to the importation year will be discussed in the joint sub-committee mentioned in para 16 below.

    b. Each side may determine the terms and conditions for the transfer of motor vehicles registered in the other side to the ownership or use of a resident of its own side, including the payment of the difference of import taxes, if any, and the vehicle having been tested and found compatible with the standards required at that time by its own registration administration, and may prohibit transfer of vehicles.

12.

    a. Jordanian standards, as specified in the attached Appendix I, will be acceptable in importing petroleum products into the Areas, once they meet the average of the standards existing in the European Union countries, or the USA standards, which parameters have been set at the values prescribed for the geographical conditions of Israel, the Gaza Strip and the West Bank. Cases of petroleum products which do not meet these specifications will be referred to a joint experts' committee for a suitable solution. The committee may mutually decide to accept different standards for the importation of gasoline which meet the Jordanian standards even though, in some of their parameters, they do not meet the European Community or USA standards. The committee will give its decision within six months. Pending the committee's decision, and for not longer than six months of the signing of the Agreement,

the Palestinian Authority may import to the Areas, gasoline for the Palestinian market in the Areas, according to the needs of this market, provided that:

    0.   this gasoline is marked in a distinctive colour to differentiate it from the gasoline marketed in Israel; and

    1.   the Palestinian Authority will take all the necessary steps to ensure that this gasoline is not marketed in Israel.

    b.  The difference in the final price of gasoline to consumers in Israel and to consumers in the Areas, will not exceed 15% of the official final consumer price in Israel. The Palestinian Authority has the right to determine the prices of petroleum products, other than gasoline, for consumption in the Areas.

    c.  If Egyptian gasoline standards will comply with the conditions of sub-para (a) above, the importation of Egyptian gasoline will also be allowed.

13. In addition to the points of exit and entry designated according to the Article regarding Passages in Annex I of the Agreement for the purpose of export and import of goods, the Palestinian side has the right to use all points of exit and entry in Israel designated for that purpose. The import and export of the Palestinians through the points of exit and entry in Israel will be given equal trade and economic treatment.

14. In the entry points of the Jordan River and the Gaza Strip:

    a.  Freight shipment

    The Palestinian Authority will have full responsibility and powers in the Palestinian customs points (freight-area) for the implementation of the agreed upon customs and importation policy as specified in this protocol, including the inspection and the collection of taxes and other charges, when due.

    Israeli customs officials will be present and will receive from the Palestinian customs officials a copy of the necessary relevant documents related to the specific shipment and will be entitled to ask for inspection in their presence of both goods and tax collection.

    The Palestinian customs officials will be responsible for the handling of the customs procedure including the inspection and collection of due taxes.

    In case of disagreement on the clearance of any shipment according to this Article, the shipment will be delayed for inspection for a maximum period of 48 hours during which a joint sub-committee will resolve the issue on the basis of the relevant provisions of this Article. The shipment will be released only upon the sub-committee's decision.

    b.  Passengers customs lane

    Each side will administer its own passengers customs procedures, including inspection and tax collection. The inspection and

collection of taxes due in the Palestinian customs lane will be conducted by customs officials of the Palestinian Authority. Israeli customs officials will be invisibly present in the Palestinian customs lane and entitled to request inspection of goods and collection of taxes when due. In the case of suspicion, the inspection will be carried out by the Palestinian official in a separate room in the presence of the Israeli customs official.

15. The clearance of revenues from all import taxes and levies, between Israel and the Palestinian Authority, will be based on the principle of the place of final destination. In addition, these tax revenues will be allocated to the Palestinian Authority even if the importation was carried out by Israeli importers when the final destination explicitly stated in the import documentation is a corporation registered by the Palestinian Authority and conducting business activity in the Areas. This revenue clearance will be effected within six working days from the day of collection of the said taxes and levies.

16. The Joint Economic Committee or a sub-committee established by it for the purposes of this Article will deal inter alia with the following:
    1. Palestinian proposals for addition of items to Lists Al, A2 and B. Proposals for changes in rates and in import procedures, classification, standards and licensing requirements for all other imports;
    2. Estimate the Palestinian market needs, as mentioned in para 3 above;
    3. Receive notifications of changes and conduct consultations, as mentioned in para 6 above;
    4. Agree upon the rules of origin as mentioned in para 8 above, and review their implementation;
    5. Coordinate the exchange of information relevant to licensing matters as mentioned in para 9 above;
    6. Discuss and review any other matters concerning the implementation of this Article and resolve problems arising therefrom.

17. The Palestinian Authority will have the right to exempt the Palestinian returnees who will be granted permanent residency in the Areas from import taxes on personal belongings including house appliances and passenger cars as long as they are for personal use.

18. The Palestinian Authority will develop its system for temporary entry of needed machines and vehicles used for the Palestinian Authority and the Palestinian economic development plan.
Concerning other machines and equipment, not included in Lists Al, A2 and B, the temporary entry will be part of the import policy as agreed in para 10 above, until the joint sub-committee mentioned in para 16 decides upon a new system proposed by the Palestinian Authority. The temporary entry will be coordinated through the joint sub-committee.

19. Donations in kind to the Palestinian Authority will be exempted from customs and other import taxes if destined and used for defined development projects or non-commercial humanitarian purposes. The Palestinian Authority will be responsible exclusively for planning and management of the donors' assistance to the Palestinian people. The Joint Economic Committee will discuss issues pertaining to the relations between the provisions in this Article and the implementation of the principles in the above paragraph.


**Article IV**
**MONETARY AND FINANCIAL ISSUES**

1. The Palestinian Authority will establish a Monetary Authority (PMA) in the Areas. The PMA will have the powers and responsibilities for the regulation and implementation of the monetary policies within the functions described in this Article.
2. The PMA will act as the Palestinian Authority's official economic and financial advisor.
3. The PMA will act as the Palestinian Authority's and the public sector entities' sole financial agent, locally and internationally.
4. The foreign currency reserves (including gold) of the Palestinian Authority and all Palestinian public sector entities will be deposited solely with the PMA and managed by it.
5. The PMA will act as the lender of last resort for the banking system in the Areas.
6. The PMA will authorize foreign exchange dealers in the Areas and will exercise control (regulation and supervision) over foreign exchange transactions within the Areas and with the rest of the world.
7.
   a. The PMA will have a banking supervision department that will be responsible for the proper functioning, stability, solvency and liquidity of the banks operating in the Areas.
   b. The banking supervision department will predicate its supervision on the international principles and standards reflected in international conventions and especially on the principles of the "Basle Committee".
   c. The supervision department will be charged with the general supervision of every such bank, including:
      ▪ The regulation of all kinds of banking activities, including their foreign activities;
      ▪ The licensing of banks formed locally and of branches, subsidiaries, joint ventures and representative offices of foreign banks and the approval of controlling shareholders;
      ▪ The supervision and inspection of banks.

• The PMA will relicense each of the five branches of the Israeli banks operating at present in the Gaza Strip and the West Bank, as soon as its location or the authorities regarding it come under the jurisdiction of the Palestinian Authority. These branches will be required to comply with the general rules and regulations of the PMA concerning foreign banks, based on the "Basle Concordat". Para I0 d, e, and f below will apply to these branches.

a. • Any other Israeli bank wishing to open a branch or a subsidiary in the Areas will apply for a license to the PMA and will be treated equally to other foreign banks, provided that the same will apply to the Palestinian banks wishing to open a branch or a subsidiary in Israel.

b. Granting of a license by both authorities will be subject to the following arrangements based on the "Basle Concordat" valid on the date of signing of the Agreement and to the host authority's prevailing general rules and regulations concerning opening of branches and subsidiaries of foreign banks.
In this para 10 "host authority" and "home authority" apply only to the Bank of Israel (BOI) and the PMA.

c. A bank wishing to open a branch or establish a subsidiary will apply to the host authority, having first obtained the approval of its home authority. The host authority will notify the home authority of the terms of the license, and will give its final approval unless the home authority objects.

d. The home authority will be responsible for the consolidated and comprehensive supervision of banks, inclusive of branches and subsidiaries in the area under the jurisdiction of the host authority. However, the distribution of supervision responsibilities between the home and the host authorities concerning subsidiaries will be according to the "Basle Concordat".

e. The host authority will regularly examine the activities of branches and subsidiaries in the area under its jurisdiction. The home authority will have the right to conduct on site examinations in the branches and subsidiaries in the host area. However, the supervision responsibilities of the home authority concerning subsidiaries will be according to the "Basle Concordat".
Accordingly, each authority will transfer to the other authority copies of its examination reports and any information relevant to the solvency, stability and soundness of the banks, their branches and subsidiaries.

f. The BOI and the PMA will establish a mechanism for cooperation and for the exchange of information on issues of mutual interest.

a. • The New Israeli Sheqel (NIS) will be one of the circulating currencies in the Areas and will legally serve there as means of payment for all purposes including official transactions. Any circulating currency, including the NIS, will be accepted by the Palestinian Authority and by all its institutions, local authorities and banks, when offered as a means of payment for any transaction.

b. Both sides will continue to discuss, through the JEC, the possibility of introducing mutually agreed Palestinian currency or temporary alternative currency arrangements for the Palestinian Authority.

a. • The liquidity requirements on all deposits in banks operating in the Areas will be determined and announced by the PMA.

b. Banks in the Areas will accept NIS deposits. The liquidity requirements on the various kinds of NIS deposits (or deposit linked to the NIS) in banks operating in the Areas will not be less than 4% to 8%, according to the type of deposits. Changes of over 1% in the liquidity requirements on NIS deposits (or deposits linked to the NIS) in Israel will call for corresponding changes in the above mentioned rates.

c. The supervision and inspection of the implementation of all liquidity requirements will be carried out by the PMA.

d. The reserves and the liquid assets required according to this paragraph will be deposited at the PMA according to rules and regulations determined by it. Penalties for non compliance with the liquidity requirements will be determined by the PMA.

• The PMA will regulate and administer a discount window system and the supply of temporary finance for banks operating in the Areas.

a. • The PMA will establish or license a clearing house in order to clear money orders between the banks operating in the Areas, and with other clearing houses.

b. The clearing of money orders and transactions between banks operating in the Areas and banks operating in Israel will be done between the Israeli and the Palestinian clearing houses on same working day basis, according to agreed arrangements.

• Both sides will allow correspondential relations between each others' banks.
• The PMA will have the right to convert at the BOI excess NIS received from banks operating in the Areas into foreign currency, in which the BOI trades in the domestic inter-bank market, up to the amounts determined per period, according to the arrangements detailed in para 16 below.

a. • The excess amount of NIS, due to balance of payments flows, that the PMA will have the right to convert into foreign currency, will be equal to:

1. Estimates of all Israeli "imports" of goods and services from the Areas, valued at market prices (inclusive of taxes), which were paid for in NIS, less:

i. the taxes collected by the Palestinian Authority on all Israeli "imports" from the Areas and rebated to Israel in NIS, and

ii. the taxes collected by Israel on all Israeli "imports" from the Areas and included in their market value, and not rebated to the Palestinian Authority,

minus

2.  Estimates of all Israeli "exports" of goods and services to the Areas, valued at market prices (inclusive of taxes), which were paid for in NIS, less
    i.   the taxes collected by Israel on such "exports" and rebated to the Palestinian Authority, and
    ii.  the taxes collected by the Palestinian Authority on such "exports" and included in their market value, and not rebated to Israel;

plus

3.  The accumulated net amounts of foreign currency converted previously into NIS by the PMA, as recorded in the BOI Dealing Room.

b.  The said flows and amounts will be calculated as of the date of the signing of the Agreement.

Notes to para 16:

i.   The estimates of the said "exports and imports" of goods and services will include inter alia labor services, NIS expenditure of tourists and Israelis in the Areas and NIS expenditure of Palestinians of the Areas in Israel.

ii.  Taxes and pension contributions on "imports" of labor services, paid to "importing" side and rebated to the "exporting" one, will not be included in the estimates of the sums to be converted, as the "exports'" earnings of labor services are recorded in the statistics inclusive of them, although they do not accrue to the individuals supplying them.

• The PMA and the BOI will meet annually to discuss and determine the annual amount of convertible NIS during the following calendar year and will meet semi-annually to adjust the said amount. The amounts determined annually and adjusted semi-annually will be based on data and estimates regarding the past and on forecasts for the wi following period, according to the formula mentioned in para 16. The first meeting will be as soon as possible within three months after the date of the signing of the Agreement.

a.  • The exchange of foreign currency for NIS and vice-versa by the PMA will be carried out through the BOI Dealing Room, at the market exchange rates.

b.  The BOI will not be obliged to convert in any single month more than 1/5 of the semi-annual amount, as mentioned in para 17.

c.  There will be no ceiling on the annual foreign currency conversions by the PMA into NIS. However, in order to avoid undesirable fluctuations in the foreign exchange market, monthly ceilings of such conversions will be

agreed upon in the annual and semi-annual meetings referred to in para 17.
d. Banks in the Areas will convert NIS into other circulating currencies and vice-versa.
e. The Palestinian Authority will have the authorities, powers and responsibilities regarding the regulation and supervision of capital activities in the Areas, including the licensing of capital market institutions, finance companies and investment funds.

## Article V
## DIRECT TAXATION

1. Israel and the Palestinian Authority will each determine and regulate independently its own tax policy in matters of direct taxation, including income tax on individuals and corporations, property taxes, municipal taxes and fees.
2. Each tax administration will have the right to levy the direct taxes generated by economic activities within its area.
3. Each tax administration may impose additional taxes on residents within its area on (individuals and corporations) who conduct economic activities in the other side's area.
4. Israel will transfer to the Palestinian Authority a sum equal to:
   a. 75% of the income taxes collected from Palestinians from the Gaza Strip and the Jericho Area employed in Israel.
   b. The full amount of income taxes collected from Palestinians from the Gaza Strip and Jericho Area employed in the settlements.
5. The two sides will agree on a set of procedures that will address all issues concerning double taxation.

## Article VI
## INDIRECT TAXES ON LOCAL PRODUCTION

1. The Israel and the Palestinian tax administrations will levy and collect VAT and purchase taxes on local production, as well as any other indirect taxes, in their respective areas.
2. The purchase tax rates within the jurisdiction of each tax administration will be identical as regards locally produced and imported goods.
3. The present Israeli VAT rate is 17%. The Palestinian VAT rate will be 15% to 16%.
4. The Palestinian Authority will decide on the maximum annual turnover for businesses under its jurisdiction to be exempt from VAT, within an upper limit of 12,000 US $.
5. The VAT on purchases by businesses registered for VAT purposes will accrue to the tax administration with which the respective business is

registered.

Businesses will register for VAT purposes with the tax administration of
the side of their residence, or on the side of their ongoing operation.
There will be clearance of VAT revenues between the Israeli and
Palestinian VAT administrations on the following conditions:

    a. The VAT clearance will apply to VAT on transactions between
       businesses registered with the VAT administration of the side in
       which they reside.

    b. The following procedures will apply to clearance of VAT revenues
       accruing from transactions by businesses registered for VAT
       purposes:

        1. To be acceptable for clearance purposes, special invoices,
           clearly marked for this purpose, will be used for transactions
           between businesses registered with the different sides.

        2. The invoices will be worded either in both Hebrew and
           Arabic or in English and will be filled out in any of these three
           languages, provided that the figures are written in "Arabic"
           (not Hindi) numerals.

        3. For the purpose of tax rebates, such invoices will be valid for
           six months from their date of issue.

        4. Representatives of the two sides will meet once a month, on
           the 20th day of the month, to present each other with a list of
           invoices submitted to them for tax rebate, for VAT clearance.
           This list will include the following details regarding each
           invoice:

             a. The number of the registered business issuing it;
             b. The name of the registered business issuing it;
             c. The number of the invoice;
             d. The date of issue;
             e. The amount of the invoice;
             f. The name of the recipient of the invoice.

        5. The clearance claims will be settled within 6 days from the
           meeting, through a payment by the side with the net balance
           of claims against it, to the other side.

        6. Each side will provide the other side, upon demand, with
           invoices for verification purposes. Each tax administration
           will be responsible for providing invoices for verification
           purposes for 6 months after receiving them.

        7. Each side will take the necessary measure to verify the
           authenticity of the invoices presented to it for clearance by
           the other side.

        8. Claims for VAT clearance which will not be found valid will
           be deducted from the next clearance payment.

        9. Once an inter-connected computer system for tax rebates to
           businesses and for VAT clearance between the two sides is

operational, it will replace the clearance procedures specified in sub-paras (4) - (8).

10. The two tax administrations will exchange lists of the businesses registered with them and will provide each other with the necessary documentation, if required, for the verification of transactions.

11. The two sides will establish a sub-committee which will deal with the implementation arrangements regarding the clearance of VAT revenues set above.

6. VAT paid by not-for-profit Palestinian organizations and institutions, registered by the Palestinian Authority, on transactions in Israel, will accrue to the Palestinian tax administration. The clearance system set out in para 5 will apply to these organizations and institutions.

**Article VII**
**LABOR**

1. Both sides will attempt to maintain the normality of movement of labor between them, subject to each side's right to determine from time to time the extent and conditions of the labor movement into its area. If the normal movement is suspended temporarily by either side, it will give the other side immediate notification, and the other side may request that the matter be discussed in the Joint Economic Committee.
The placement and employment of workers from one side in the area of the other side will be through the employment service of the other side and in accordance with the other sides' legislation. The Palestinian side has the right to regulate the employment of Palestinian labor in Israel through the Palestinian employment service, and the Israeli Employment Service will cooperate and coordinate in this regard.

2.
   a. Palestinians employed in Israel will be insured in the Israeli social insurance system according to the National Insurance Law for employment injuries that occur in Israel, bankruptcy of employers and maternity leave allowance.
   b. The National Insurance fees deducted from the wages for maternity insurance will be reduced according to the reduced scope of maternity insurance, and the equalization deductions transferred to the Palestinian Authority, if levied, will be increased accordingly.
   c. Implementation procedures relating thereto will be agreed upon between the Israeli National Insurance Institute and the Palestinian Authority or the appropriate Palestinian social insurance institution.

3.
   a. Israel will transfer to the Palestinian Authority, on a monthly basis, the equalization deductions as defined by Israeli legislation, if imposed and to the extent levied by Israel. The sums so transferred

will be used for social benefits and health services, decided upon by the Palestinian Authority, for Palestinians employed in Israel and for their families.

The equalization deductions to be so transferred will be those collected after the date of the signing of the Agreement from wages of Palestinians employed in Israel and from their employers. These sums will not include

1. Payments for health services in places of employment.
2. 2/3 of the actual administrative costs in handling the matters related to the Palestinians employed in Israel by the Payments Section of the Israeli Employment Service.

4. Israel will transfer, on a monthly basis, to a relevant pension insurance institution to be established by the Palestinian Authority, pension insurance deductions collected after the establishment of the above institution and the completion of the documents mentioned in para 6. These deductions will be collected from wages of Palestinians employed in Israel and their employers, according to the relevant rates set out in the applicable Israeli collective agreements. 2/3 of the actual administrative costs in handling these deductions by the Israeli Employment Service will be deducted from the sums transferred. The sums so transferred will be used for providing pension insurance for these workers. Israel will continue to be liable for pension rights of the Palestinian employees in Israel, to the extent accumulated by Israel before the entry into force of this para 4.

5. Upon the receipt of the deductions, the Palestinian Authority and its relevant social institutions will assume full responsibility in accordance with the Palestinian legislation and arrangements, for pension rights and other social benefits of Palestinians employed in Israel, that accrue from the transferred deductions related to these rights and benefits. Consequently, Israel and its relevant social institutions and the Israeli employers will be released from, and will not be held liable for any obligations and responsibilities concerning personal claims, rights and benefits arising from these transferred deductions, or from the provisions of paras 2-4 above.

6. Prior to the said transfers, the Palestinian Authority or its relevant institutions, as the case may be, will provide Israel with the documents required to give legal effect to their aforesaid obligations, including mutually agreed implementation procedures of the principles agreed upon in paras 3-5 above.

7. The above arrangements concerning equalization deductions and/or pension deductions may be reviewed and changed by Israel if an authorized court in Israel will determine that the deductions or any part thereof must be paid to individuals, or used for individual social benefits or insurance in Israel, or that it is otherwise unlawful. In such a case the liability of the Palestinian side will not exceed the actual transferred deductions related to the case.

8. Israel will respect any agreement reached between the Palestinian Authority, or an organization or trade-union representing the Palestinians employed in Israel, and a representative organization of employees or employers in Israel, concerning contributions to such organization according to any collective agreement.

9.

    a. The Palestinian Authority may integrate the existing health insurance scheme for Palestinians employed in Israel and their families in its health insurance services. As long as this scheme continues, whether integrated or separately, Israel will deduct from their wages the health insurance fees ("health stamp") and will transfer them to the Palestinian Authority for this purpose.

    b. The Palestinian Authority may integrate the existing health insurance scheme for Palestinians who were employed in Israel and are receiving pension payments through the Israeli Employment Service, in its health insurance services. As long as this scheme continues, whether integrated or separately, Israel will deduct the necessary sum of health insurance fees ("health stamp") from the equalization payments and will transfer them to the Palestinian Authority for this purpose.

10. The JEC will meet upon the request of either side and review the implementation of this Article and other issues concerning labor, social insurance and social rights.

11. Other deductions not mentioned above, if any, will be jointly reviewed by the JEC. Any agreement between the two sides concerning these deductions will be in addition to the above provisions.

12. Palestinians employed in Israel will have the right to bring disputes arising out of employee - employer relationships and other issues before the Israeli Labor Courts, within these courts' jurisdiction.

13. This Article governs the future labor relations between the two sides and will not impair any labor rights prior to the date of signing of the Agreement.


**Article VIII**
**AGRICULTURE**

1. There will be free movement of agricultural produce, free of customs and import taxes, between the two sides, subject to the following exceptions and arrangements.

2. The official veterinary and plant protection services of each side will be responsible, within the limits of their respective jurisdiction, for controlling animal health, animal products and biological products, and plants and parts thereof, as well as their importation and exportation.

3. The relations between the official veterinary and plant protection services of both sides will be based on mutuality in accordance with the following

principles, which will be applied in all the areas under their respective jurisdiction:

    a. Israel and the Palestinian Authority will do their utmost to preserve and improve the veterinary standards.

    b. Israel and the Palestinian Authority will take all measures to reach equivalent and compatible standards regarding animal disease control, including mass vaccination of animals and avians, quarantines, "stamping out" measures and residue control standards.

    c. Mutual arrangements will be made to prevent the introduction and spread of plant pests and diseases, for their eradication and concerning residue control standards in plant products.

    d. The official veterinary and plant protection services of Israel and the Palestinian Authority will coordinate and regularly exchange information regarding animal diseases, as well as plant pests and diseases, and will establish a mechanism for immediate notification of the outbreak of such diseases.

4. Trade between the two sides in animals, animal products and biological products will be in keeping with the principles and definitions set out in the current edition of the OIE National Animal Health Code as updated from time to time (hereinafter - I.A.H.C.).

5. Transit of livestock, animal products and biological products from one side through the area under the jurisdiction of the other side, should be conducted in a manner aimed at the prevention of diseases spreading to or from the consignment during its movement. For such a transit to be permitted, it is a prerequisite that the veterinary conditions agreed upon by both sides will be met in regard to importation of animals, their products and biological products from external markets. Therefore the parties agree to the following arrangements.

6. The official veterinary services of each side have the authority to issue veterinary import permits for import of animals, animal products and biological products to the areas under its jurisdiction. In order to prevent the introduction of animal diseases from third parties, the following procedures will be adopted:

    a. The import permits will strictly follow the professional veterinary conditions for similar imports to Israel as prevailing at the time of their issuance. The permits will specify the country of origin and the required conditions to be included in the official veterinary certificates which should be issued by the veterinary authorities in the countries of origin and which should accompany each consignment.

    Each side may propose a change in these conditions. The change will come into force 10 days after notice to the other side, unless the other side requested that the matter be brought before the Veterinary Sub-Committee specified in para 14 (hereinafter - VSC). If it is more stringent than the prevailing conditions - it will come into

force 20 days after the request, unless both sides decide otherwise through the VSC, and if more lenient - it will come into force only if agreed upon by both sides through the VSC. However, if the change is urgent and needed for the protection of animal and public health, it will come into force immediately after notice by the other side and will remain in force unless and until both sides agree otherwise through the VSC.

b. The official veterinary certificates will include the provisions regarding OIE Lists A & B Diseases as specified in the I.A.H.C. When the I.A.H.C. allows alternative requirements regarding the same disease, the most stringent one will be adopted unless otherwise agreed upon by the VSC.

c. When infectious diseases which are not included in Lists A & B of the I.A.H.C. exist or are suspected, on scientific grounds, to exist in the exporting country, the necessary veterinary import conditions that will be required and included in the official veterinary certificates, will be discussed in the VSC, and in the case of different professional opinions, the most stringent ones will be adopted.

d. The import of live vaccines will be permitted only if so decided by the VSC.

e. Both sides will exchange, through the VSC, information pertaining to import licensing, including the evaluation of the disease situation and zoosanitary capability of exporting countries, which will be based upon official information as well as upon other available data.

f. Consignments which do not conform with the above mentioned requirements will not be permitted to enter the areas under the jurisdiction of either side.

7. Transportation of livestock and poultry and of animal products and biological products between areas under the jurisdiction of one side through areas under the jurisdiction of the other side, will be subject to the following technical rules:

a. The transportation will be by vehicles which will be sealed with a seal of the official veterinary services of the place of origin and marked with a visible sign "Animal Transportation" or "Products of Animal Origin" in Arabic and Hebrew, in coloured and clearly visible letters on white background;

b. Each consignment will be accompanied by a veterinary certificate issued by the official veterinary services of the place of origin, certifying that the animals or their products were examined and are free of infectious diseases and originate from a place which is not under quarantine or under animal movement restrictions.

8. Transportation of livestock and poultry, animal products and biological products destined for Israel from the Areas and vice versa will be subject to veterinary permits issued by the official veterinary services of the

recipient side, in keeping with the OIE standards used in international traffic in this field. Each such consignment will be transported by a suitable and marked vehicle, accompanied by a veterinary certificate in the form agreed upon between the official veterinary services of both sides. Such certificates will be issued only if permits of the recipient side are presented.

9. In order to prevent the introduction of plant pests and diseases to the region, the following procedures will be adopted:

   a. The transportation between the Areas and Israel, of plants and parts thereof (including fruits and vegetables), the control of pesticide residues in them and the transportation of plant propagation material and of animal feed, may be inspected without delay or damage by the plant protection services of the recipient side.

   b. The transportation between the Areas through Israel of plants and parts thereof (including fruits and vegetables) as well as of pesticides, may be required to pass a phytosanitary inspection without delay or damage.

   c. The official Palestinian plant protection services have the authority to issue permits for the import of plants and parts thereof as well as of pesticides from external markets. The permits will be based on the prevailing standards and requirements.
   The permits will specify the required conditions to be included in the official Phytosanitary Certificates (hence P.C.) based upon the standards and the requirements of the International Plant Protection Convention (I.P.P.C.)and those of the European and Mediterranean Plant Protection Organization (E.P.P.O.) which should accompany each consignment. The P.C.'s will be issued by the plant protection services in the countries of origin. Dubious or controversial cases will be brought before the sub-committee on plant protection.

10. The agricultural produce of both sides will have free and unrestricted access to each others' markets, with the temporary exception of sales from one side to the other side of the following items only: poultry, eggs, potatoes, cucumbers, tomatoes and melons. The temporary restrictions on these items will be gradually removed on an increasing scale until they are finally eliminated by 1998, as listed below:

| Year | Poultry (tons) | Eggs (millions) | Potatoes (tons) | Cucumbers (tons) | Tomatoes (tons) | Melons (tons) |
|---|---|---|---|---|---|---|
| 1994 | 5,000 | 30 | 10,000 | 10,000 | 13,000 | 10,000 |
| 1995 | 6,000 | 40 | 13,000 | 13,000 | 16,000 | 13,000 |
| 1996 | 7,000 | 50 | 15,000 | 15,000 | 19,000 | 15,000 |
| 1997 | 8,000 | 60 | 17,000 | 17,000 | 22,000 | 17,000 |
| 1998 | unlimited | unlimited | unlimited | unlimited | unlimited | unlimited |

11.
> Note: The above figures refer to the combined quantities marketed from the West Bank and Gaza Strip to Israel and vice-versa. The Palestinian Authority will notify Israel the apportioning of these quantities between these areas concerning the quantities pertaining to the Palestinian produce.

12. The Palestinians will have the right to export their agricultural produce to external markets without restrictions, on the basis of certificates of origin issued by the Palestinian Authority.

13. Without prejudice to obligations arising out of existing international agreements, the two sides will refrain from importing agricultural products from third parties which may adversely affect the interests of each other's farmers.

14. Each side will take the necessary measures in the area under its jurisdiction to prevent damage which may be caused by its agriculture to the environment of the other side.

15. The two sides will establish sub-committees of their respective official veterinary and plant protection services, which will update the information and review issues, policies and procedures in these fields. Any changes in the provisions of this Article will be agreed upon by both sides.

16. The two sides will establish a sub-committee of experts in the dairy sector in order to exchange information, discuss and coordinate their production in this sector so as to protect the interests of both sides. In principle, each side will produce according to its domestic consumption.

**Article IX**
**INDUSTRY**

1. There will be free movement of industrial goods free of any restrictions including customs and import taxes between the two sides, subject to each side's legislation.

2.
   a. The Palestinian side has the right to employ various methods in encouraging and promoting the development of the Palestinian industry by way of providing grants, loans, research and development assistance and direct-tax benefits. The Palestinian side has also the right to employ other methods of encouraging industry resorted to in Israel.
   b. Both sides will exchange information about the methods employed by them in the encouragement of their respective industries.
   c. Indirect tax rebates or benefits and other subsidies to sales shall not be allowed in trade between the two sides.

3. Each side will do its best to avoid damage to the industry of the other side and will take into consideration the concerns of the other side in its industrial policy.

4. Both sides will cooperate in the prevention of deceptive practices, trade in goods which may endanger health, safety and the environment and in goods of expired validity.

5. Each side will take the necessary measures in the area under its jurisdiction to prevent damage which may be caused by its industry to the environment of the other side.

6. The Palestinians will have the right to export their industrial produce to external markets without restrictions, on the basis of certificates of origin issued by the Palestinian Authority.

7. The JEC will meet and review issues pertaining to this Article.

## Article X
## TOURISM

1. The Palestinian Authority will establish a Palestinian Tourism Authority which will exercise, inter alia, the following powers in the Areas.
   a. Regulating, licensing, classifying and supervising tourist services, sites and industries.
   b. Promoting foreign and domestic tourism and developing the Palestinian tourist resources and sites.
   c. Supervising the marketing, promotion and information activities related to foreign and domestic tourism.

2. Each side shall, under its respective jurisdiction, protect, guard and ensure the maintenance and good upkeep of historical, archaeological, cultural and religious sites and all other tourist sites, to fit their status as well as their purpose as a destination for visitors.

3. Each side will determine reasonable visiting hours and days for all tourist sites in order to facilitate visits at a wide variety of days and hours, taking into consideration religious and national holidays. Each side shall publicize such opening times. Meaningful changes in the opening times will take into consideration tourist programs already committed to.

4. Tourist buses or any other form of tourist transport authorized by either side, and operated by companies registered and licensed by it, will be allowed to enter and proceed on their tour within the area under the jurisdiction of the other side, provided that such buses or other vehicles conform with the EEC technical specifications [I. currently adopted.] All such vehicles will be clearly marked as tourist vehicles.

5. Each side will protect the environment and the ecology around the tourist sites under its jurisdiction. In view of the importance of beaches and maritime activities for tourism, each side will do its best efforts to ensure that development and construction on the Mediterranean coast, and especially at ports (such as Ashqelon or Gaza), will be planned and carried out in a manner that will not adversely affect the ecology, environment or the functions of the coastline and beaches of the other side.

6. Tourism companies and agencies licensed by either side shall enjoy equal access to tourism - related facilities and amenities in border points of exit and entry according to the regulations of the authority operating them.

7.
   a. Each side will license, according to its own rules and regulations, travel agents, tour companies, tour guides and other tourism businesses (hereinafter - tourism entities) within its jurisdiction.
   b. Tourism entities authorized by either side, will be allowed to conduct tours that include the area under the jurisdiction of the other side, provided that their authorization as well as their operation will be in accordance with rules, professional requirements and standards agreed upon by both sides in the sub-committee mentioned in para 9.
   Pending that agreement, existing tourism entities in the Areas which are currently allowed to conduct tours that include Israel, will be allowed to continue to do so, and Israeli authorized tourism entities will continue to be allowed to conduct tours that include the Areas.
   In addition, any tourism entity of one side that the tourism authorities of the other side will certify as fulfilling all its rules, professional requirements and standards, will be allowed to conduct tours that include that other side.

8. Each side will make its own arrangement for compensation of tourists for bodily injury and property damages caused by political violence in the areas under its respective jurisdiction.

9. The JEC or a tourism sub-committee established by it shall meet upon the request of either side in order to discuss the implementation of the provisions of this Article and resolve problems that may arise. The sub-committee will also discuss and consider tourist issues of benefit to both sides, and will promote educational programs for tourism entities of both sides in order to further their professional standards and their ethics. Complaints of one side against the behaviour of tourism entities of the other side will be channelled through the committee.

Note: It is agreed that the final wording in the last sentence in para 4 will be adopted according to the final wording in the relevant provisions of the Agreement.


**Article XI**
**INSURANCE ISSUES**

1. The authorities, powers and responsibilities in the insurance sphere in the Areas, including inter alia the licensing of insurers, insurance agents and the supervision of their activities, will be transferred to the Palestinian Authority.

2.

    a. The Palestinian Authority will maintain a compulsory absolute liability system for road accident victims with a ceiling on the amount of compensation based upon the following principles:

        1. Absolute liability for death or bodily injury to road accident victims, it being immaterial whether or not there was fault on the part of the driver and whether or not there was fault or contributory fault on the part of others, each driver being responsible for persons travelling in his vehicle and for pedestrians hit by his vehicle.

        2. Compulsory insurance for all motor vehicles, covering death or bodily injury to all road accident victims, including drivers.

        3. No cause of action in tort for death or bodily injury resulting from road accidents.

        4. The maintenance of a statutory fund (hereinafter - the Fund) for compensation of road accident victims who are unable to claim compensation from an insurer for the following reasons:

            i. the driver liable for compensation is unknown;

            ii. the driver is not insured or his insurance does not cover the liability involved; or

            iii. the insurer is unable to meet his liabilities.

        5. Terms in this Article will have the same meaning as in the legislation prevailing at the date of signing of the Agreement concerning compulsory motor vehicle insurance and compensation of road accident victims.

        6. Any change by either side in the rules and regulations regarding the implementation of the above mentioned principles will require prior notice to the other side. A change which might substantially affect the other side will require prior notice of at least three months.

3.

    a. Upon the signing of the Agreement the Palestinian Authority will establish a Fund for the Areas (hereinafter - the Palestinian Fund) for the purposes detailed in para 2(a)(4) above and for the purposes detailed below. The Palestinian Fund will assume the responsibilities of the statutory Road Accident Victims Compensation Fund in the West Bank and the Gaza Strip (hereinafter - the Existing Fund) regarding the Areas, according to the prevailing law at that time. Accordingly, the Existing Fund will cease to be responsible for any liability regarding accidents occurring in the Areas from the date of signing of the Agreement.

    b. The Existing Fund will transfer to the Palestinian Fund, after the assumption of the above mentioned responsibilities by it, the premiums paid to the Existing Fund by the insurers for vehicles

registered in the Areas, pro-rata to the unexpired period of each insurance policy.

4.

    a. Compulsory motor vehicle insurance policies issued by insurers licensed by either side will be valid in the territories of both sides. Accordingly, a vehicle registered in one side covered by such a policy will not be required to have an additional insurance coverage for travel in the areas under the other side's jurisdiction. These insurance policies will cover all the liabilities according to the legislation of the place of the accident.

    b. In order to cover part of the liabilities which may incur due to road accidents in Israel by uninsured vehicles registered in the Palestinian Authority, the Palestinian Fund will transfer to the Israeli Fund, on a monthly basis, for each insured vehicle, an amount equal to 30% of the amount paid to the Israeli Fund by an insurer registered in Israel, for the sat-ne type of vehicle, for the same period of insurance (which will not be less than 90 days).

5. In cases where a victim of a road accident wishes to claim compensation from an insurer registered by the other side or from the Fund of the other side or in cases where a driver or an owner of a car is sued by a victim, by an insurer or by the Fund of the other side, he may nominate the Fund of his side as his proxy for this purpose. The Fund so nominated may address any relevant party from the other side directly or through the other sides' Fund.

6. In the case of a road accident in which neither the registration number of the vehicle nor the identity of the driver are known, the Fund of the side which has jurisdiction over the place of the accident will compensate the victim, according to its own legislation.

7. The Fund of each side will be responsible towards the victims of the other side for any liability of the insurers of its side regarding the compulsory insurance and will guarantee their liabilities.

8. Each side will guarantee its Fund's liabilities according to this Article.

9. The two sides will negotiate within three months from the date of the signing of the Agreement a cut-off agreement between the Existing Fund and the Palestinian Fund concerning accidents which occurred in the Areas prior to the date of the signing of the Agreement, whether claims have been reported or not. The cut-off agreement will not include compensation for Israeli victims involved in accidents which occurred in the Areas prior to the date of the signing of the Agreement.

10.

    a. The two sides will establish immediately upon the signing of the Agreement, a sub-committee of experts (hereinafter - the Sub-Committee) which will deal with issues regarding the implementation of this Article, including:

        1. Procedures concerning the handling of claims of victims of the one side from insurers or from the Fund of the other side;

        2.  Procedures concerning the transfer of the amounts between the Funds of both sides as mentioned in para 4(b) above;

        3.  The details of the cut-off agreement between the Existing Fund and the Palestinian Fund, as set out in para 9 above;

        4.  Any other relevant issue raised by either side.

  b.  The Sub-Committee will act as a continuous committee for issues regarding this Article.

  c.  The two sides will exchange, through the Sub-Committee, the relevant information regarding the implementation of this Article, including police reports, medical information, relevant statistics, premiums, etc. The two sides will provide each other with any other assistance required in this regard.

11. Each side may require the re-examination of the arrangements set out in this Article a year after the date of the signing of the Agreement.

12. Insurers from both sides may apply for a license to the relevant authorities of the other side, according to the rules and regulations regarding foreign insurers in the latter side. The two sides agree not to discriminate against such applicants.

*Done in Paris, this twenty ninth day of April, 1994*

*For the Government of Israel*
*Finance Minister Avraham Shohat*

*For the PLO*
*Abu Ala (Ahmed Korei)*