# Exhibit 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF :
STEVEN AVERBACH, JULIE AVERBACH, :
TAMIR AVERBACH, DEVIR AVERBACH, :
SEAN AVERBACH, ADAM AVERBACH, : **SECOND AMENDED COMPLAINT**
MAIDA AVERBACH FOR THE ESTATE OF : **JURY TRIAL DEMANDED**
DAVID AVERBACH, MAIDA AVERBACH, :
MICHAEL AVERBACH, EILEEN SAPADIN, :
MOSES STRAUSS, PHILIP STRAUSS, :
BLUMA STRAUSS, AHRON STRAUSS, : 19-cv-00004-GHW-KHP
ROISIE ENGELMAN, JOSEPH STRAUSS, :
TZVI WEISS, LEIB WEISS, LEIB WEISS FOR :
THE ESTATE OF MALKA WEISS, :
YITZCHAK WEISS, YERUCHAIM WEISS, :
ESTHER DEUTSCH, MATANYA :
NATHANSEN, CHANA NATHANSEN, :
MATANYA NATHANSEN AND CHANA :
NATHANSEN FOR THE ESTATE OF :
TEHILLA NATHANSEN, YEHUDIT :
NATHANSEN, SHOSHANA NATHANSEN, :
HEZEKIEL TOPOROWITCH, PEARL B. :
TOPOROWITCH, YEHUDA TOPOROWITCH, :
DAVID TOPOROWITCH, SHAINA CHAVA :
NADEL, BLUMY ROM, RIVKA POLLACK, :
RACHEL POTOLSKI, OVADIA :
TOPOROWITCH, TEHILLA GREINIMAN, :
YISRAEL TOPOROWITCH, YITZCHAK :
TOPOROWITCH, MICHAL HONICKMAN :
FOR THE ESTATE OF HOWARD :
GOLDSTEIN, MICHAL HONICKMAN, :
LORRAINE GOLDSTEIN FOR THE ESTATE :
OF EUGENE GOLDSTEIN, LORRAINE :
GOLDSTEIN, RICHARD GOLDSTEIN, :
BARBARA GOLDSTEIN INGARDIA, :
MICHAEL GOLDSTEIN, CHANA :
FREEDMAN, DAVID GOLDSTEIN, HARRY :
LEONARD BEER, HARRY LEONARD BEER :
AS EXECUTOR OF THE ESTATE OF ALAN :
BEER, HARRY LEONARD BEER AS :
EXECUTOR OF THE ESTATE OF ANNA :
BEER, PHYLLIS MAISEL, ESTELLE :
CAROLL, SARRI ANNE SINGER, JUDITH :
SINGER, ERIC M. SINGER, ROBERT :
SINGER, DANIEL ROZENSTEIN, JULIA :

ROZENSTEIN SCHON, ALEXANDER :
ROZENSTEIN, ESTHER ROZENSTEIN, :
JACOB STEINMETZ, DEBORAH :
STEINMETZ, JACOB STEINMETZ AND :
DEBORAH STEINMETZ FOR THE ESTATE :
OF AMICHAI STEINMETZ, NAVA :
STEINMETZ, ORIT MAYERSON, NETANEL :
STEINMETZ, ANN COULTER FOR THE :
ESTATE OF ROBERT L. COULTER, SR., :
DIANNE COULTER MILLER, ROBERT L. :
COULTER, JR., DIANNE COULTER MILLER :
AND ROBERT L. COULTER, JR. FOR THE :
ESTATE OF JANIS RUTH COULTER, :
LARRY CARTER AS THE :
ADMINISTRATOR OF THE ESTATE OF :
DIANE LESLIE CARTER, LARRY CARTER, :
SHAUN CHOFFEL, RICHARD BLUTSTEIN :
AND KATHERINE BAKER FOR THE :
ESTATE OF BENJAMIN BLUTSTEIN, :
RICHARD BLUTSTEIN, KATHERINE :
BAKER, REBEKAH BLUTSTEIN, NEVENKA :
GRITZ FOR THE ESTATE OF DAVID GRITZ, :
NEVENKA GRITZ, NEVENKA GRITZ FOR :
THE ESTATE OF NORMAN GRITZ, :
JACQUELINE CHAMBERS AND LEVANA :
COHEN AS THE ADMINISTRATORS OF :
THE ESTATE OF ESTHER BABLAR, :
JACQUELINE CHAMBERS, LEVANA :
COHEN, ELI COHEN, SARAH ELYAKIM, :
JOSEPH COHEN, GRETA GELLER, ILANA :
DORFMAN, REPHAEL KITSIS AND TOVA :
GUTTMAN AS THE ADMINISTRATORS OF :
THE ESTATE OF HANNAH ROGEN, :
TEMIMA SPETNER, JASON :
KIRSCHENBAUM, ISABELLE :
KIRSCHENBAUM, ISABELLE :
KIRSCHENBAUM FOR THE ESTATE OF :
MARTIN KIRSCHENBAUM, JOSHUA :
KIRSCHENBAUM, SHOSHANA BURGETT, :
DAVID KIRSCHENBAUM, DANIELLE :
TEITELBAUM, NETANEL MILLER, CHAYA :
MILLER, AHARON MILLER, SHANI :
MILLER, ADIYA MILLER, ALTEA :
STEINHERZ, JONATHAN STEINHERZ, :
TEMIMA STEINHERZ, JOSEPH GINZBERG, :
PETER STEINHERZ, LAUREL STEINHERZ, :

GILA ALUF, YITZHAK ZAHAVY, JULIE  :
ZAHAVY, TZVEE ZAHAVY and BERNICE  :
ZAHAVY,  :
  :
                Plaintiffs,  :
  :
    -against-  :
  :
CAIRO AMMAN BANK,  :
  :
               Defendant.  :
  :
-------------------------------------------------------------x

Plaintiffs Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Tzvi Weiss, Leib Weiss, Leib Weiss for the Estate of Malka Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Matanya Nathansen, Chana Nathansen, Matanya Nathansen and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Pollack, Rachel Potolski, Ovadia Toporowitch, Tehilla Greiniman, Yisrael Toporowitch, Yitzchak Toporowitch, Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, Lorraine Goldstein for the Estate of Eugene Goldstein, Lorraine Goldstein, Richard Goldstein, Barbara Goldstein Ingardia, Michael Goldstein, Chana Freedman, David Goldstein, Harry Leonard Beer, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer as Executor of the Estate of Anna Beer, Phyllis Maisel, Estelle Caroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Netanel Steinmetz, Ann Coulter for the Estate of Robert L. Coulter, Sr., Dianne Coulter Miller, Robert L. Coulter, Jr., Dianne Coulter Miller and Robert L. Coulter, Jr. for the Estate of Janis Ruth Coulter, Larry Carter as the Administrator of the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Nevenka Gritz for the Estate of Norman Gritz, Jacqueline Chambers and Levana Cohen as the Administrators of the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Joseph Cohen, Greta Geller, Ilana Dorfman, Rephael Kitsis and Tova Guttman as the Administrators of the Estate of Hannah Rogen, Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Aharon Miller, Shani Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz, Gila Aluf, Yitzhak Zahavy, Julie Zahavy, Tzvee Zahavy and Bernice Zahavy, by their attorneys, allege the following:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the unlawful conduct of Cairo

Amman Bank ("CAB") – a Jordanian bank headquartered in Amman, Jordan. CAB aided and

abetted the Islamic Resistance Movement ("HAMAS"), a Foreign Terrorist Organization ("FTO")

(as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA")) by knowingly providing substantial assistance to HAMAS. CAB is civilly

liable under the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of

Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person by reason of such acts of international terrorism perpetrated by HAMAS, because CAB knowingly provided substantial and significant financial services to HAMAS in multiple related ways set forth below, by maintaining accounts for, and facilitating substantial payments on behalf of, several of HAMAS's leaders, HAMAS-controlled institutions, the families of HAMAS suicide bombers and other "martyrs," and HAMAS prisoners. CAB did so with general awareness that it was playing a role in an illegal enterprise from which HAMAS's terrorist activities were a foreseeable risk.

2.      CAB is also liable under the ATA, 18 U.S.C. § 2333(a), because CAB's aforementioned conduct – including its knowing provision of material support to HAMAS – violated 18 U.S.C. § 2339B and satisfies all of the definitional requirements set forth in 18 U.S.C. § 2333(1). CAB, therefore, itself committed an "act of international terrorism," and its own actions also proximately caused plaintiffs' injuries because they constituted a substantial factor in the sequence of responsible causation of the attacks described herein, and plaintiffs' injuries were a reasonably foreseeable consequence of that conduct.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333, 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

5.      CAB is subject to personal jurisdiction in the State of New York pursuant to 18

U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of the FTO HAMAS and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

6.     Specifically, CAB transfers most of its U.S. dollar wire transfers through three correspondent banks located in New York: Bank of New York Mellon Corporation, JP Morgan Chase, and Standard Chartered Bank. From at least 1999-2004, CAB maintained correspondent banking relationships in New York with Citibank, N.A., American Express Bank Ltd., and Bank of New York.

7.     During the same period, CAB purposefully and knowingly used its correspondent bank accounts in New York, particularly its account with Citibank, N.A. (Account No. 3612-1701), to facilitate a large volume of U.S. dollar-denominated funds transfers to HAMAS.

8.     During the same period, CAB also purposefully and knowingly used its correspondent bank accounts in New York with Bank of New York, N.A. (Account No. 8900291605) and American Express Bank Ltd. (now Standard Chartered Bank) (Account No. 300732396).

## THE PARTIES

**A.     The Plaintiffs**

### THE COMMUTER BUS #6 BOMBING – MAY 18, 2003

9.     On May 18, 2003, Basem Takruri, a HAMAS suicide bomber, boarded Bus #6, a commuter bus heading for Jerusalem, and detonated his explosives.

10.     Seven people ranging in age from 35 to 68 were killed by the explosion, and 20 others were injured.

**The Averbach Family**

11.     Steven Averbach was a citizen of the United States and a resident of the State of Israel when he died.

12.     Steven died in 2010 as a result of injuries sustained during the suicide bombing that occurred on May 18, 2003. He was 44 years old.

13.     At the time of the attack Steven resided near Tel Aviv, Israel. He was a married father of four sons ranging in age from 2 to 13 at the time. Steven and his wife, Julie, were married in 1994 and have two sons together, Sean Averbach and Adam Averbach.

14.     Steven's older sons, Tamir Averbach and Devir Averbach, are from a prior marriage.

15.     On May 18, 2003, Steven boarded the commuter bus heading for Jerusalem and took a seat facing the back.

16.     As the bus pulled away from the stop, it suddenly stopped, and the bus driver allowed another passenger to get on.

17.     Steven caught a glimpse of him and saw that he was wearing a heavy coat in warm weather that covered bulges underneath it. He also saw what looked like a trigger mechanism in his right hand.

18.     Having worked in the anti-terrorist division in the Israeli Army and the Israeli Police, knowing that Israeli buses do not usually pick up passengers after they have begun to leave the station, seeing the tension on the faces of the people on the bus, and considering Takruri's aforementioned suspicious characteristics, Steven immediately recognized that a terrorist attack was imminent.

4

19.     Steven grabbed the gun he carried and turned toward Takruri, who detonated the explosives.

20.     Steven absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

21.     Steven sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

22.     Following surgery, Steven was moved to intensive care where he stayed for five weeks. He almost died there several times because of an extremely high fever and from the blast injury to his lungs. He subsequently underwent numerous operations to his back, groin, and gastric intestines. He also had a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

23.     Steven was forced to return to the Intensive Care Unit at least twice with complications.

24.     Steven was paralyzed from his neck down.

25.     On more than one occasion, Steven pleaded with his doctors and family members to take him off of life support.

26.     He was completely dependent on the 24-hour care provided to him and had no foreseeable hope of recovery.

27.     Steven lived in constant pain. He battled depression and took antidepressants.

28.     As a result of the attack, Steven Averbach sustained severe physical injuries and

experienced severe mental anguish and extreme emotional distress from May 18, 2003, until his death.

29.     Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the widow of Steven Averbach, and the mother of Sean Averbach and Adam Averbach.

30.     Plaintiff Julie Averbach brings this action both individually and as the legal representative of the Estate of Steven Averbach.

31.     As a result of the injuries Steven sustained, Julie had to relocate her family to be closer to the rehabilitation center where Steven resided for nearly a year. Steven moved home from the rehabilitation center in July 2004 but required continuous 24-hour care. Following the attack, Julie was, in most respects, a single parent and could not enjoy the normal companionship, day-to-day assistance, and mutual support that she had previously received from her husband.

32.     Julie underwent psychological counseling after the attack.

33.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Julie Averbach has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

34.     Plaintiff Tamir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

35.     After the attack, Tamir underwent psychological counseling for approximately one year.

36.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Tamir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort,

advice and counsel, and severe mental anguish and extreme emotional distress.

37. Plaintiff Devir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

38. After the attack, Devir experienced difficulty making friends, his grades declined, he cried, and he felt angry. He also underwent psychological counseling.

39. Tamir and Devir witnessed their father's relentless and painful suffering and repeated surgeries and brushes with death. They remember what it was like before the attack when he was an able-bodied man.

40. As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Devir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

41. Plaintiff Sean Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

42. As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father. Due to the severity of his father's injuries, ordinary companionship, and simple pleasures of traveling with or playing sports with his father were denied to him.

43. As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Sean Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

44. Plaintiff Adam Averbach is a citizen of the United States and a resident of the State

of Israel. He is a son of Steven Averbach and Julie Averbach.

45.     As a result of the brutal attack on his father he has been emotionally traumatized and does not remember a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship, and simple pleasures of walking together, playing sports together, or driving in a car with his father were denied to him.

46.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Adam Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

47.     David Averbach was a United States citizen and resident of the State of New Jersey when he died in 2013. He was the father of Steven Averbach.

48.     Plaintiff Maida Averbach is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Steven Averbach.

49.     Plaintiff Maida Averbach brings this action both individually and as the legal representative of the Estate of David Averbach.

50.     Maida Averbach and David Averbach had returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's body leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

51.     After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that

Steven had been grievously wounded by the explosion and a ball bearing had lodged between his C3 and C4 vertebrae.

52.     As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

53.     At the time of the attack, David Averbach and Maida Averbach had partially retired from their jobs so that they could spend more time with Steven and his children.

54.     Following the attack, Steven's constant inability to use his hands and legs, his inevitable battle with depression, and the emotional effect it has had on Steven's four children were a constant source of anguish to both of his parents.

55.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, (before he died) David Averbach experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

56.     Plaintiff Maida Averbach experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack from the moment she saw her son's body on television in the early morning hours of May 18, 2003.

57.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Maida Averbach has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

58.     Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steven Averbach.

59.     Michael Averbach has always looked up to his brother and admired him. The

injuries that his brother sustained, as well as his subsequent death, have been a severe emotional blow to Michael.

60.    Since the date of the attack, Michael flew to Israel repeatedly, often at his brother's request, simply to sit by Steven's bedside and talk.

61.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Michael Averbach has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

62.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steven Averbach.

63.    Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

64.    Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steven sustained as a result of the attack, as well as his subsequent death.

65.    After the attack, she suffered from anxiety and depression, had trouble sleeping, and cried every day.

66.    Since the attack, she lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother, and subsequently resulted in his death.

67.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Eileen Sapadin has

experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

### THE JERUSALEM EGGED BUS #2 BOMBING – AUGUST 19, 2003

68.    On August 19, 2003, Ra'ed Abdul Hamid Misk, a HAMAS suicide bomber, detonated explosives on Egged Bus #2.

69.    Twenty-three people were killed and over 130 others were injured in the attack.

**The Strauss Family**

70.    Plaintiff Moses Strauss is a citizen of the United States and a resident of the State of New Jersey.

71.    Moses was studying in Israel in 2003 and was planning to return to the United States in April 2004.

72.    At around 9:00 pm on August 19, 2003, he boarded Egged Bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

73.    Approximately 15 minutes into the bus ride, Moses heard a deafening boom when Misk detonated the explosives on the bus.

74.    Moses fell forward as a result of the explosion. His eyeglasses, jacket, hat, and cell phone flew off his body.

75.    As Moses regained his bearings and realized what had occurred, he witnessed people screaming and crying, and he saw blood and body parts all around him.

76.    His clothes were covered with blood, and his hearing was severely impaired.

77.    To exit the bus, Moses stepped over bodies, and in a state of shock made his way toward his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Moses's father, plaintiff Philip Strauss, to tell him

Moses had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

78.     As a result of the explosion, Moses's body ached, especially his right ear and hand. After arriving at the hospital, he underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

79.     Days after the attack, Moses still experienced agonizing pain in his ear, and his hearing loss did not improve.

80.     After the attack, Moses returned to the United States without completing his studies in Israel.

81.     Moses was examined by medical specialists in both Israel and the United States. Both physicians confirmed that he would require surgery on his ear.

82.     In the winter of 2004, Moses underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An ear specialist continues to monitor his condition.

83.     Moses continues to relive the attack, the images of the attack replaying in his mind daily.

84.     As a result of the attack, plaintiff Moses Strauss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

85.     Plaintiff Philip Strauss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Moses Strauss.

86.     Plaintiff Bluma Strauss is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Moses Strauss.

87.     After hearing of the attack, Bluma attempted unsuccessfully to reach Moses on his

12

cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Bluma grew increasingly concerned.

88.     Upon learning that her son was injured in the bombing, Bluma's distress grew.

89.     As a result of the attack, plaintiffs Philip Strauss and Bluma Strauss have experienced severe mental anguish and extreme emotional distress.

90.     Plaintiff Ahron Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

91.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

92.     Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact Moses on his cellular telephone but was unable to reach him. She also telephoned her other brother, Ahron, attempting to locate Moses or her parents.

93.     When Roisie finally received the news that Moses had been injured in the bus bombing, she was very concerned and extremely anxious.

94.     Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

95.     Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where Moses lived. Upon arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the plane flight, Joseph experienced great anxiety because he was uncertain if his brother had been present at the bombing.

96.     Ahron Strauss, Roisie Engelman and Joseph Strauss experienced great anxiety after learning of the attack that caused the injuries that Moses sustained.

97.     As a result of the attack, plaintiffs Ahron Strauss, Roisie Engelman and Joseph Strauss have experienced severe mental anguish and extreme emotional distress.

**The Weiss Family**

98.     Plaintiff Tzvi Weiss is a citizen of the United States and a resident of the State of New Jersey.

99.     Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

100.    On the evening of August 19, 2003, Tzvi boarded Egged Bus #2 in Jerusalem after visiting the Kotel, Judaism's holiest site, to pray. He was on his way to a friend's wedding.

101.    As the bus arrived at Shmuel Hanavi Street, he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

102.    In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

103.    Tzvi was covered with blood, and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.

104.    Once he got his bearings, Tzvi telephoned one of his brothers, plaintiff Yitzchak Weiss, and waited for him to arrive to accompany him to the hospital.

105.    An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent medical tests.

106.    Both of his eardrums had been completely torn, and his hearing in his left ear was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

107.    Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

108.    After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

109.    Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

110.    Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

111.    As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

112.    Tzvi enrolled in rabbinical college upon his return to the United States, but the

injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer realize the academic success that he had achieved prior to the attack.

113. As a result of the attack, plaintiff Tzvi Weiss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

114. Plaintiff Leib Weiss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Tzvi Weiss.

115. Malka Weiss was a citizen of the United States and a resident of the State of New York when she died in 2018. She was the mother of plaintiff Tzvi Weiss.

116. Plaintiff Leib Weiss brings this action both individually and as the legal representative of the Estate of Malka Weiss.

117. Leib Weiss and Malka Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

118. As a result of the attack, plaintiffs Leib Weiss and Malka Weiss (before her death) have experienced severe mental anguish and extreme emotional distress.

119. Plaintiff Yitzchak Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

120. Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

121. Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

122. Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

123.     As a result of the attack, plaintiffs Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch have experienced severe mental anguish and extreme emotional distress.

**The Nathansen/Toporowitch Family**

124.     Tehilla Nathansen was a citizen of the United States and a resident of the State of Israel when she died.

125.     Tehilla was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack on August 19, 2003.

126.     The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

127.     Plaintiff Matanya Nathansen is a citizen and resident of the State of Israel. He is the father of Tehilla Nathansen.

128.     Plaintiff Chana Nathansen is a citizen of the United States and a resident of the State of Israel. She is the mother of Tehilla Nathansen.

129.     Plaintiffs Matanya Nathansen and Chana Nathansen bring this action individually and on behalf of the Estate of Tehilla Nathansen.

130.     As a result of the explosion, Matanya suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye, and finger. He is now hearing impaired and can no longer walk properly.

131.     As a result of the attack, plaintiff Matanya Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries he sustained, from witnessing and experiencing first-hand the death of his 3-year-old daughter, Tehilla, as well as the severe injuries sustained by his wife and young daughters (all of whom are U.S. citizens).

132.    Chana was severely injured in the explosion that killed Tehilla, was taken to Hadassah Hospital, and remained there for 12 days.

133.    Although Chana repeatedly asked about Tehilla's whereabouts, she did not learn until the next day that she had been killed. That uncertainty was torture for Chana.

134.    Chana's spleen was torn, and her ribs were broken.

135.    She had seven ball bearings that caused holes in her chest, leg, and arm that had to be removed from her body.

136.    She has undergone numerous surgeries.

137.    Shrapnel lodged throughout her body, including her eye.

138.    Chana's hip was crushed, necessitating a hip replacement. She still experiences pain in that area.

139.    Her hearing is impaired, and she suffers from tinnitus.

140.    Chana cannot walk long distances, and she has a limited range of movement.

141.    She feels indescribable pain at losing Tehilla and seeing her daughter Yehudit injured and her daughter Shoshana severely injured.

142.    Chana has undergone psychological counseling.

143.    As a result of the attack, plaintiff Chana Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries she sustained, from witnessing and experiencing first-hand the death of her 3-year-old daughter, Tehilla, and witnessing the severe injuries sustained by her daughters, plaintiff Shoshana Nathansen, and plaintiff Yehudit Nathansen.

144.    Plaintiff Yehudit Nathansen is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff Shoshana Nathansen.

145.    At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

146.    Yehudit incurred cuts on her neck and waist from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

147.    She hears constant noise in her ears, which makes her tense.

148.    Yehudit suffered nightmares, sadness and guilt and underwent psychological counseling.

149.    As a result of the attack, plaintiff Yehudit Nathansen has sustained physical injuries and experienced severe mental anguish and extreme emotional distress due to her own injuries and from witnessing and experiencing first-hand the death of her 3-year-old sister, Tehilla, as well as the severe injuries sustained by her mother, father, and baby sister.

150.    Plaintiff Shoshana Nathansen is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff Yehudit Nathansen.

151.    Shoshana Nathansen was sitting on Chana's lap at the time of the explosion. She was 5 months old at the time. As a result of the explosion, Shoshana Nathansen sustained burns all over her face, and her eardrums were ruptured.

152.    She suffered bilateral lung contusions and a fracture of her left femur and right leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs.

153.    Shoshana Nathansen also had multiple shrapnel and metal pellets lodged in her

19

body, including in her eyes, and a laceration of the bone of her left forearm and in her left wrist. She has pain in her upper left arm.

154.    She is hearing impaired and suffers from tinnitus.

155.    She underwent psychological counseling.

156.    As a result of the attack, plaintiff Shoshana Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

157.    Plaintiff Hezekial Toporowitch is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

158.    Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

159.    In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla, and crippled their daughter, Chana. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

160.    In the aftermath of the bombing, Chana, Matanya, and their children were transferred to different hospitals, thereby complicating the family's efforts to locate them.

161.    Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body but was in too much shock to do so. He was initially told to identify the bodies of two granddaughters since Shoshana had not yet been identified at the hospital and was thought to be deceased.

162.    As a result of the attack, plaintiff Hezekial Toporowitch has experienced severe

mental anguish and extreme emotional distress from experiencing the death of his 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

163.    As a result of the attack, plaintiff Pearl B. Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by her daughter, and injuries sustained by her granddaughters and son-in-law.

164.    Plaintiff Yehuda Toporowitch is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

165.    In the middle of the night Yehuda was notified by telephone of the bombing that had killed his niece and crippled his sister.

166.    He had been working at a resort when he received the telephone call, and he quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

167.    Yehuda rushed home, traveled with his parents to the Tel Aviv area, and stopped at the home of one of his sisters. He took a taxicab to the central morgue and attempted to identify Tehilla's remains but could not positively identify them because of the nature and extent of Tehilla's injuries.

168.    Yehuda then made arrangements for necessary DNA testing, which ultimately confirmed his niece's identity.

169.    As a result of the attack, plaintiff Yehuda Toporowitch has experienced severe mental anguish and extreme emotional distress from the death of his 3-year-old niece, Tehilla, and

the attempt to identify her remains. He has also experienced severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

170.    Plaintiff David Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

171.    David was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

172.    Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

173.    As a result of the attack, plaintiff David Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries sustained by his sister and other niece.

174.    Plaintiff Shaina Chava Nadel is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

175.    Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

176.    As a result of the attack, plaintiff Shaina Chava Nadel has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old

niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

177. Plaintiff Blumy Rom is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

178. Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

179. As a result of the attack, plaintiff Blumy Rom has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

180. Plaintiff Rivka Pollack is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

181. Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

182. She stayed with her baby niece Shoshana, caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply affected her.

183. As a result of the attack, plaintiff Rivka Pollack has experienced severe mental

anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece, and brother-in-law.

184.    Plaintiff Rachel Potolski is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

185.    Like the rest of her immediate family, Rachel experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

186.    As a result of the attack, plaintiff Rachel Potolski has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece, and brother-in-law.

187.    Plaintiff Ovadia Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

188.    Like the rest of his immediate family, Ovadia experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

189.    As a result of the attack, plaintiff Ovadia Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece, and brother-in-law.

190.    Plaintiff Tehilla Greiniman is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

191.    Like the rest of her immediate family, Tehilla experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with

the pain and loss experienced by her younger sister.

192.    As a result of the attack, plaintiff Tehilla Greiniman has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece, and brother-in-law.

193.    Plaintiff Yisrael Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

194.    Like the rest of his immediate family, Yisrael experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

195.    As a result of the attack, plaintiff Yisrael Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece, and brother-in-law.

196.    Plaintiff Yitzchak Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

197.    Like the rest of his immediate family, Yitzchak experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

198.    As a result of the attack, plaintiff Yitzchak Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece, and brother-in-law.

## THE SHOOTING ATTACK ON ROUTE #60 – JUNE 20, 2003

199.    On June 20, 2003, Ahmad Najjar and Farah Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60 near the Yabroud underpass, killing one person and seriously injuring three others.

### The Goldstein Family

200.    Howard Goldstein was a citizen of the United States and a resident of the State of Israel when he died.

201.    He was murdered on June 20, 2003, while driving his car with his parents on Route #60 in Israel.

202.    Howard was driving his parents and his wife from Eli to Jerusalem where they had stayed the previous night following the wedding of Howard's son, plaintiff David Goldstein. Howard and his wife and parents were traveling for a weekend in Jerusalem to further celebrate David's wedding (which had taken place the previous night).

203.    While Howard was driving, Howard's father, Eugene Goldstein, was seated in the front passenger seat and Howard's mother, plaintiff Lorraine Goldstein, was seated behind her husband. Howard's wife, plaintiff Michal Goldstein (now Michal Honickman), was seated in the rear seat of the car, on the driver's side, behind Howard.

204.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road near the Yabroud underpass. As the Goldsteins' car approached, the men turned and began rapidly firing their guns at the Goldsteins' vehicle.

205.    Howard was struck by at least one bullet and ultimately succumbed to his injuries while driving and slumped over the steering wheel.

206.    At some point in time, while Howard was slumped over the steering wheel, Eugene

grabbed the steering wheel and maintained control of the car until it crashed and rolled over, approximately eight miles south of where the HAMAS gunmen had opened fire.

207.    Plaintiff Michal Honickman is a citizen of the United States and a resident of the State of Nevada. She is the widow of Howard Goldstein.

208.    Plaintiff Michal Honickman brings this action both individually and as the legal representative of the Estate of Howard Goldstein.

209.    As a result of the attack, Michal was injured when glass fragments from the vehicle's windows struck her body, including her left eye. She also sustained hairline fractures of her ribs, bruising, and physical trauma when the vehicle eventually crashed and rolled over.

210.    Michal has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress having been present during the attack, and witnessed the death of her husband, whom she had to bury and mourn with her children, while her in-laws were hospitalized, all in the context of what had been, prior to that point, a joyous family occasion celebrating her son David's wedding.

211.    As a result of Howard's death, plaintiff Michal Honickman experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

212.    Eugene Goldstein was a citizen of the United States and a resident of the State of Florida. He was the father of Howard Goldstein.

213.    Plaintiff Lorraine Goldstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Howard Goldstein. Lorraine Goldstein brings this action both individually and as the legal representative of the Estate of Eugene Goldstein.

214.    Eugene suffered multiple gunshot wounds in the attack.

215.    His shoulder blade was fractured, and his lungs were punctured. Shrapnel was lodged in his lung, liver, and kidneys. A bullet remained stuck between his heart and his lungs.

216.    These injuries, which caused Eugene immense pain, were life threatening. Indeed, it was highly improbable that Eugene would survive them.

217.    Eugene's injuries necessitated insertion of a trocar, a metal cylinder used to drain blood from his chest and facilitate insertion of a chest tube to maintain suction and permit healing of the lung. Insertions of a trocar and chest tube are extremely painful.

218.    Eugene was unable to see Lorraine for approximately five days after the attack and did not have specific information about her condition. His uncertainty about Lorraine's condition caused him immense anxiety.

219.    As a result of the attack, Eugene had several bullet fragments lodged in his chest. He had to undergo an x-ray every three months to monitor their condition.

220.    As a result of the attack, Eugene had difficulty falling and remaining asleep. He constantly replayed the image of the attack in his mind.

221.    He blamed himself for taking his wife to attend his grandson's wedding.

222.    Lorraine was shot multiple times and severely injured in the attack.

223.    She suffered a bullet fragment injury from a bullet that clipped the tip of her nose and her left upper lip and lodged in her mouth. The fragment necessitated intubation and emergency surgery, during which the fragment was removed from an area less than an inch from the carotid sheath, which contains the carotid artery and the internal jugular vein. Disruption of either of them would have resulted in her death.

224.    At one point during her hospital stay, Lorraine was placed on life support.

225.    Lorraine's chewing muscles were severely and permanently damaged, and she could not eat solid food for approximately one year.

226.    She required physiotherapy that encompassed use of a ratchet-like device designed to force her jaws open. It was very painful.

227.    Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from fully opening it. She still suffers from pain and headaches.

228.    She requires bridges (partials) because she lost her teeth as a result of the attack, and extensive periodontal and dental work.

229.    She was also struck by bullets that entered her body through her left shoulder and right lower neck. The resulting wounds caused her excruciating pain at the time.

230.    She must also deal with the harmful effects of shrapnel that lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations.

231.    Lorraine had difficulty sleeping because she thought about Howard's death.

232.    Eugene and Lorraine remained in Jerusalem at Hadassah Hospital for approximately 10 days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

233.    As a result of the attack, Eugene Goldstein and plaintiff Lorraine Goldstein have sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

234.    As a result of Howard's death, Eugene Goldstein (before his death) and plaintiff Lorraine Goldstein have experienced emotional pain and suffering, loss of their son's society,

companionship, comfort, advice, and counsel, and severe mental anguish and extreme emotional distress.

235.     The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

236.     The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (*CNN*) shortly after the attack occurred. The video broadcast showed Howard, Eugene, and Lorraine being pulled from the wreckage of the car Howard had been driving.

237.     Lorraine's face and hair were covered with blood.

238.     Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York. He is a son of Eugene Goldstein and plaintiff Lorraine Goldstein and a brother of Howard Goldstein.

239.     After learning of the attack, plaintiff Richard Goldstein telephoned his sister, plaintiff Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

240.     As a result of the attack, plaintiff Richard Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

241.     As a result of Howard's death, Richard Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

242.   Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of Eugene Goldstein and plaintiff Lorraine Goldstein and the sister of Howard Goldstein.

243.   Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

244.   In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

245.   Barbara blames herself for encouraging her parents to attend the wedding.

246.   As a result of the attack, plaintiff Barbara Goldstein Ingardia has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of her parents.

247.   As a result of Howard's death, Barbara Goldstein Ingardia has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

248.   Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a son of Eugene Goldstein and plaintiff Lorraine Goldstein and a brother of Howard Goldstein.

249.   As a result of the attack, plaintiff Michael Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

250.   As a result of Howard's death, Michael Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice, and counsel, and

severe mental anguish and extreme emotional distress.

251. Plaintiff Chana Freedman is a citizen of the United States and a resident of the State of New York. She is the daughter of Howard Goldstein and plaintiff Michal Honickman.

252. Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

253. Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

254. When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

255. Chana informed her brother, David, and his wife, who had just been married, of the attack when they arrived at the hospital.

256. As a result of Howard's death, plaintiff Chana Freedman has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

257. Plaintiff David Goldstein is a citizen of the United States and a resident of the State of Israel. He is the son of Howard Goldstein and plaintiff Michal Honickman.

258. At the time of the attack, David was at a Jerusalem hotel awaiting his family's arrival for weekend wedding celebrations when he was notified that something had happened to his parents and his grandparents, and that they had been taken to Hadassah Hospital.

259. Upon his arrival at the hospital, David learned that his father had been killed in the attack, and that his mother and grandparents had been injured.

260.    Prior to the attack, David frequently spoke to his father, including on the morning of his father's death.

261.    As a result of Howard's death, plaintiff David Goldstein has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

### THE JAFFA ROAD BUS #14A BOMBING – JUNE 11, 2003

262.    At approximately 5:30 p.m. on June 11, 2003, Abd el-Mu'ati Shabana, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, boarded Egged Bus #14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road near the Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 more, including dozens of bystanders.

### The Beer Family

263.    Alan Beer was a citizen of the United States when he died.

264.    Alan was on the bus returning from a condolence call to his friend's family when Shabana detonated his explosives and killed him.

265.    Alan's friend, to whom he had paid the condolence call, learned of the bus bombing, and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to have been in the area of the bombing earlier. Harry then telephoned his other sister, plaintiff Estelle Caroll, and informed her of the terrorist attack.

266.    After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body. Thereafter, Alan's mother, Anna Beer; Harry Leonard Beer; and Estelle Caroll flew to Israel to attend Alan's funeral.

267. Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio. He is the brother of Alan Beer.

268. Anna Beer was a citizen of the United States and a resident of the State of Ohio when she died in 2016. She was the mother of Alan Beer.

269. Plaintiff Harry Leonard Beer brings this action in his individual capacity, as the executor of the Estate of Alan Beer, and as the executor of the Estate of Anna Beer.

270. As a result of Alan's death, plaintiff Harry Leonard Beer has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

271. Plaintiff Estelle Caroll is a citizen of the United States and a resident of the State of Virginia. She is a sister of Alan Beer.

272. Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel. She is a sister of Alan Beer.

273. As a result of Alan's death, plaintiffs Estelle Caroll and Phyllis Maisel have experienced emotional pain and suffering, loss of their brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

274. As a result of Alan's death, (before her death) Anna Beer experienced emotional pain and suffering, loss of her youngest child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Singer Family**

275. Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

276. On June 11, 2003, Sarri boarded Bus #14A in Jerusalem to meet a friend for dinner.

The bus was filled with rush hour commuters. Eventually she was able to take a seat near the window.

277. Shortly thereafter, Shabana detonated his bomb only two to three seats away from where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

278. When the explosives were detonated, Sarri felt a shockwave across her face.

279. Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle.

280. After the blast, she was unable to open her left eye, and her right eye was extremely restricted.

281. Sarri was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.

282. Barely walking, Sarri was taken to an ambulance.

283. She incurred wounds to her face and legs resulting in scarring. She underwent physical therapy and additional surgery.

284. Shrapnel lodged in Sarri's gums, moving her teeth, and necessitating dental work.

285. As a result of the attack, plaintiff Sarri Anne Singer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

286. Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Sarri Anne Singer.

287. Judith learned of the attack when her son telephoned her at work.

288. As a result of the attack, plaintiff Judith Singer has experienced severe mental anguish and extreme emotional distress.

289.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Sarri Anne Singer.

290.    Eric first learned of the attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

291.    As a result of the attack, plaintiff Eric M. Singer has experienced severe mental anguish and extreme emotional distress.

292.    Plaintiff Robert Singer is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Sarri Anne Singer.

293.    After learning of the attack, Robert traveled to Israel to be with his daughter.

294.    As a result of the attack, plaintiff Robert Singer has experienced severe mental anguish and extreme emotional distress.

### THE MIKE'S PLACE BOMBING IN TEL AVIV - APRIL 30, 2003

295.    On April 30, 2003, Asif Muhammad Hanif, a HAMAS suicide bomber, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives,[1] killing three people and injuring more than 50 others.

296.    Hanif, 22, was a British citizen who entered Israel through Jordan.

**The Rozenstein Family**

297.    Plaintiff Daniel Rozenstein is a citizen of the United States and a resident of the State of Florida.

298.    Daniel was seated inside the bar and decided to step outside when he crossed paths

---

[1]    There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

with Hanif in the entryway just as he detonated his explosives.

299.    As a result of the attack, Daniel suffered second degree burns over his entire body.

300.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for two weeks. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

301.    As a result of the bombing, he sustained severe hearing loss. He has also suffered a permanent loss of balance, is often dizzy, and frequently experiences black outs.

302.    Daniel's right hand no longer functions properly as it is covered in scar tissue. Much of the rest of his body is also covered by scar tissue, including his back.

303.    He also suffers from memory loss, nightmares, and post-traumatic stress disorder ("PTSD"). He has also sustained a traumatic brain injury ("TBI") and undergone psychological counseling.

304.    As a result of the attack, plaintiff Daniel Rozenstein has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

305.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a resident of the State of Florida. She is the sister of plaintiff Daniel Rozenstein.

306.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

307.    When Julia first saw Daniel, she did not recognize him because his body was horribly burned, and his face and ears were swollen beyond recognition. She spent many days in the hospital and was there when her brother slipped into a coma.

308.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls

her brother compulsively to be certain that he is not in danger.

309.    As a result of the attack, plaintiff Julia Rozenstein Schon has experienced severe mental anguish and extreme emotional distress.

310.    Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Daniel Rozenstein.

311.    As a result of the attack, plaintiff Alexander Rozenstein has experienced severe mental anguish and extreme emotional distress.

312.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of plaintiff Daniel Rozenstein.

313.    As a result of the attack, plaintiff Esther Rozenstein has experienced severe mental anguish and extreme emotional distress.

## THE SHOOTING ATTACK ON ROUTE #60 - JANUARY 29, 2003

314.    On January 29, 2003, Farah Hamad, and Yasser Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60, seriously injuring one person.

### The Steinmetz Family

315.    Plaintiff Jacob Steinmetz is a citizen of the United States and a resident of the State of Israel.

316.    Plaintiff Deborah Steinmetz is a citizen of the United States and a resident of the State of Israel. She is the wife of Jacob Steinmetz.

317.    On January 29, 2003, Jacob was driving their car on Route #60. Deborah sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

318.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg.

The other shot entered his arm and passed through his elbow.

319.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

320.    Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in his elbow.

321.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

322.    Presently, the use of Jacob's arm is greatly limited.

323.    As a result of the attack, plaintiff Jacob Steinmetz has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

324.    As a result of being in the car that terrorists targeted and the injuries suffered by her husband, plaintiff Deborah Steinmetz has experienced great anxiety and severe mental anguish and extreme emotional distress.

325.    Amichai Steinmetz was a citizen of the United States when he died. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

326.    In 2009, Amichai Steinmetz went missing while on a trip to India. In December 2015, an Israeli court declared Amichai Steinmetz dead.

327.    Following the attack and prior to his declaration of death in 2015, Amichai Steinmetz experienced severe mental anguish and extreme emotional distress as a result of the attack.

328.    Plaintiffs Jacob Steinmetz and Deborah Steinmetz bring this action both

individually and on behalf of the Estate of Amichai Steinmetz.

329.    Plaintiff Nava Steinmetz is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

330.    Plaintiff Orit Mayerson is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

331.    Plaintiff Netanel Steinmetz is a citizen of the United States and a resident of the State of Israel. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

332.    As a result of the attack, plaintiffs Nava Steinmetz, Orit Mayerson, and Netanel Steinmetz have experienced severe mental anguish and extreme emotional distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

333.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb planted inside the cafeteria exploded, killing nine people, five of them Americans, and injuring as many as 70 others.

334.    HAMAS planned and perpetrated the attack.

335.    Mohammad Odeh, a HAMAS operative, who worked at Hebrew University as a painter for an Israeli contractor, set off the bomb.

## The Coulter Family

336.    Janis Ruth Coulter was a citizen of the United States when she died.

337.    Janis was in the cafeteria when the bomb exploded, killing her, and injuring her friend who was eating lunch with her.

338.    Janis was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

40

339.    She had arrived in Israel just one day before the bombing to accompany a group of 19 American students who were scheduled to attend classes at the university.

340.    Robert L. Coulter, Sr. was a citizen of the United States and a resident of the State of Massachusetts when he died in 2018. He was the father of Janis Ruth Coulter.

341.    Robert L. Coulter, Sr.'s widow, Ann Coulter, brings this action on behalf of the Estate of Robert L. Coulter, Sr.

342.    Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw Janis's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York, and both Robert L. Coulter, Sr. and his daughter desperately tried to reach Janis on her cell phone without success.

343.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts. She is the sister of Janis Ruth Coulter.

344.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Janis Ruth Coulter.

345.    Plaintiffs Dianne Coulter Miller and Robert L. Coulter, Jr. bring actions individually and as the legal representatives of the Estate of Janis Ruth Coulter.

346.    Robert L. Coulter, Jr. had heard about the bombing on the radio on the way to work but did not make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria, whereupon he drove immediately to his father's house.

347.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

348.     As a result of Janis's death, (before his own death in 2018) plaintiff Robert L. Coulter, Sr. experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

349.     As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

350.     As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Carter Family**

351.     Diane Leslie Carter was a citizen of the United States when she died.

352.     She was eating lunch in the cafeteria when the bomb exploded.

353.     Diane was killed by the bomb blast.

354.     In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

355.     Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Leslie Carter.

356.     Plaintiff Larry Carter brings this action both individually and as the Administrator of the Estate of Diane Leslie Carter.

357.     Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

358.     Plaintiff Shaun Choffel is a citizen of the United States and a resident of the State of Virginia. She is the sister of Diane Leslie Carter.

359.     Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

360.     As a result of Diane's death, plaintiff Larry Carter has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

361.     As a result of Diane's death, plaintiff Shaun Choffel has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Blutstein Family**

362.     Benjamin Blutstein was a citizen of the United States when he died.

363.     He was killed by the bomb blast.

364.     Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

365.     Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' hometown of Harrisburg, Pennsylvania.

366.     Plaintiff Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. He is the father of Benjamin Blutstein.

367.     Plaintiff Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania. She is the mother of Benjamin Blutstein.

368.    Plaintiffs Richard Blutstein and Katherine Baker bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

369.    Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

370.    Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and heard a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, Richard received a call confirming Benjamin's death.

371.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then composed herself enough to inform her daughter, Rebekah.

372.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

373.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

374.    Although Rebekah's father had informed her about the attack, Rebekah learned that her brother had died when her mother telephoned her.

375.    As a result of Benjamin's death, plaintiff Rebekah Blutstein has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel, and severe mental anguish and extreme emotional distress.

## **The Gritz Family**

376.    David Gritz was a citizen of the United States when he died.

377.    He was killed by the bomb blast.

378.    He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

379.    He died after being in Israel for only two weeks.

380.    Norman Gritz was a citizen of the United States and a resident of France when he died in 2005. He was the father of David Gritz.

381.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

382.    Plaintiff Nevenka Gritz brings this action individually and on behalf of the Estate of David Gritz and the Estate of Norman Gritz.

383.    Nevenka and Norman were in New York on the day their son was murdered. Friends informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

384.    As a result of David's death, (prior to his death) Norman Gritz experienced emotional pain and suffering, loss of his only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

385.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of her only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING - MAY 7, 2002

386.    On the night of May 7, 2002, Muhammad Muammar, a HAMAS suicide bomber, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

387.    Fifteen people were killed in the attack, and more than 50 others were injured.

**The Bablar Family**

388.    Esther Bablar was a citizen of the United States when she died.

389.    Although Esther initially survived the attack, she died of her injuries the following morning.

390.    Plaintiff Jacqueline Chambers is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

391.    Plaintiff Levana Cohen is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

392.    Plaintiffs Jacqueline Chambers and Levana Cohen bring actions both individually and on behalf of the Estate of Esther Bablar.

393.    Esther had spent the month before the bombing in Florida with her youngest daughter, Levana, who had just given birth to Esther's grandchild. The day before the attack she had been in New York visiting her other daughter, Jacqueline.

394.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified, and they quickly made arrangements to fly to Israel with their aunt and uncle.

395.    As a result of Esther's death, plaintiff Jacqueline Chambers has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort,

protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

396.    As a result of Esther's death, plaintiff Levana Cohen has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

397.    Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar.

398.    As a result of Esther's death, plaintiff Eli Cohen has experienced emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

399.    Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

400.    As a result of Esther's death, plaintiff Sarah Elyakim has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

401.    Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of New York. He is the brother of Esther Bablar.

402.    As a result of Esther's death, plaintiff Joseph Cohen has experienced emotional pain and suffering and the loss of his sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA - MARCH 27, 2002

403.    On March 27, 2002, Abd al-Baset Odeh, a HAMAS suicide bomber, blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of

Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

404.    Thirty people were killed, and 140 others were injured.

**The Rogen Family**

405.    Hannah Rogen was a citizen of the United States when she died.

406.    Hannah was severely wounded in the attack and died of her wounds six days later, on April 2, 2002.

407.    Hannah was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

408.    Greta Geller is the great niece of Hannah Rogen. She, along with Ilana Dorfman, Rephael Kitsis, and Tova Guttman, bring this action as the court-appointed administrators of the Estate of Hannah Rogen.

## THE BEN YEHUDA STREET BOMBINGS - DECEMBER 1, 2001

409.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Bahar, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed, and 188 others were injured.

410.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Spetner Family**

411.    Plaintiff Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

412.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

413.    As a result of the attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

414.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

415.    Temima has also experienced psychological trauma as a result of the attack.

416.    As a result of the attack, plaintiff Temima Spetner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

417.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

418.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001, when the double suicide bombing took place.

419.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

420.    When he got up the second time, he felt numb. Jason saw his left arm dangling back

and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

421.    Jason was taken to Shaare Zedek Hospital in Jerusalem where he underwent two operations. Surgeons removed 8 metal bolts from his arm, leg and back.

422.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg, and back. He still has scarring where he was branded by the bolts that penetrated his skin.

423.    As a result of the attack, plaintiff Jason Kirschenbaum has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

424.    Plaintiff Isabelle Kirschenbaum is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jason Kirschenbaum.

425.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York when he died in 2008. He was the father of plaintiff Jason Kirschenbaum.

426.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

427.    Isabelle first learned of the double suicide bombing while watching *CNN*. After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

428.    As a result of the attack, plaintiff Isabelle Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

429.    Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

430.    As a result of the attack, (before his death) Martin Kirschenbaum experienced severe mental anguish and extreme emotional distress.

431. Plaintiff Joshua Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

432. Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle telephoned Joshua to advise him that his brother Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Zedek Hospital in Jerusalem.

433. As a result of the attack, plaintiff Joshua Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

434. Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of plaintiff Jason Kirschenbaum.

435. As a result of the attack, plaintiff Shoshana Burgett has experienced severe mental anguish and extreme emotional distress.

436. Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

437. As a result of the attack, plaintiff David Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

438. Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of plaintiff Jason Kirschenbaum.

439. As a result of the attack, plaintiff Danielle Teitelbaum has experienced severe mental anguish and extreme emotional distress.

**The Miller Family**

440. Plaintiff Netanel Miller is a citizen of the United States and a resident of the State of Israel.

441.    On the evening of December 1, 2001, Netanel was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet away from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

442.    A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

443.    Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

444.    Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

445.    Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

446.    Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

447.    Netanel was admitted to the hospital and remained there for two days.

448.    Netanel endured the pain in his leg for nearly two years.

449.    The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

450.    It is still painful for Netanel to hike, an activity that he has always enjoyed.

451.     Netanel had flashbacks as a result of the attack and underwent psychological counseling.

452.     As a result of the attack, plaintiff Netanel Miller has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

453.     Plaintiff Chaya Miller is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Netanel Miller.

454.     Upon learning that her son Netanel had been injured in the bombing and knowing he has suffered greatly as a result of those injuries, plaintiff Chaya Miller experienced great concern and anxiety.

455.     As a result of the attack, plaintiff Chaya Miller has experienced severe mental anguish and extreme emotional distress.

456.     Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of plaintiff Netanel Miller.

457.     Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

458.     Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

459.     As a result of the attack, plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional distress.

**The Steinherz Family**

460.     Plaintiff Altea Steinherz is a citizen of the United States and a resident of the State of Israel.

461.     Plaintiff Jonathan Steinherz is a citizen of the United States and a resident of the

State of Israel. He was the husband of plaintiff Altea Steinherz at the time of the attack.

462.    On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

463.    Altea wanted to get home to her daughter who was with a babysitter at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

464.    A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

465.    While walking in the street, they saw a crazed-looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

466.    As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

467.    She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

468.    Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

469.    Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

470.    Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

471.    Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

472.    As a result of the attack, plaintiff Altea Steinherz sustained physical injuries and

experienced severe mental anguish and extreme emotional distress.

473.    As a result of the attack, plaintiff Jonathan Steinherz experienced severe mental anguish and extreme emotional distress.

474.    Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of plaintiffs Altea Steinherz and Jonathan Steinherz.

475.    As a result of the attack, plaintiff Temima Steinherz has experienced severe mental anguish and extreme emotional distress.

476.    Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Altea Steinherz.

477.    As a result of the attack, plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional distress.

478.    Plaintiff Peter Steinherz is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Jonathan Steinherz.

479.    Plaintiff Laurel Steinherz is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jonathan Steinherz.

480.    As a result of the attack, plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional distress.

**PATT JUNCTION BUS # 32A BOMBING - JUNE 18, 2002**

481.    At approximately 7:50 a.m. on June 18, 2002, Muhamad al-Ghoul, a HAMAS terrorist, boarded Bus #32A in the Gilo neighborhood of Jerusalem. Almost immediately, he detonated the large bomb stuffed with ball bearings which he carried in a bag. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. Nineteen people were killed, and 74 others were injured.

**The Aluf Family**

482. Boaz Aluf was a citizen of the State of Israel when he died.

483. Plaintiff Gila Aluf is a citizen of the United States and a resident of the State of Israel. She is the widow of Boaz Aluf.

484. On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus #32A when al-Ghoul detonated the bomb.

485. As a result of Boaz's death, plaintiff Gila Aluf has experienced emotional pain and suffering, and the loss of her husband's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE ARIEL BOMBING – OCTOBER 27, 2002

486. On October 27, 2002, Muhammad Kazid Faysal al-Bustami, a HAMAS suicide bomber, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 other people.

**The Zahavy Family**

487. Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

488. On October 27, 2002, Yitzhak was waiting with his platoon for a transport pickup at a gas station at the entrance to the town of Ariel.

489. Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

490. Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Bustami before he detonated his explosives.

491. Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

492.    The emotional effects of the attack continue to affect Yitzhak to the present day.

493.    As a result of the attack, plaintiff Yitzhak Zahavy has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

494.    Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of plaintiff Yitzhak Zahavy.

495.    As a result of the attack, plaintiff Julie Zahavy has experienced severe mental anguish and extreme emotional distress.

496.    Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Yitzhak Zahavy.

497.    Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Yitzhak Zahavy.

498.    As a result of the attack, plaintiffs Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional distress.

**B.    The Defendant**

499.    Cairo Amman Bank was founded in 1960 under the regulations of the Central Bank of Jordan and commenced its banking services on July 1, 1960. It operates 89 branches in Jordan, and its headquarters is located on Arar Street in Wadi Sarqra, PO Box 950661, Amman, Jordan, 11195. CAB is a publicly traded company, listed on the Amman Stock Exchange.

500.    CAB first opened a branch in the Palestinian Territories in 1961. It returned to the Palestinian Territories in 1986 and has since expanded to 21 branches there. CAB's head office in the Palestinian Territories is located on National College Street in Ramallah.

501.    CAB is one of the largest banks both in Jordan and in the Palestinian Territories. As of June 30, 2018, it has over 2.8 billion Jordanian Dinars (approximately $4 billion USD) in

total assets, and over 1,000 employees.

502.    At all times relevant to this Second Amended Complaint, CAB's Chairman of the Board of Directors was Khaled Sabih al-Masri. He served as Chairman from July 1999 to October 2012. Although he is still a board member, Al-Masri was replaced as Chairman by Yazid Adnan Mustafa al-Mufti in 2012. Al-Mufti previously served as CAB's General Manager from 1989 until October 2004.

## FACTUAL ALLEGATIONS

## I.    THE ISLAMIC RESISTANCE MOVEMENT (HAMAS)

### A.    HAMAS's Founding

503.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS"), a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

504.    HAMAS[2] was established in the Gaza Strip on December 10, 1987, shortly following the outbreak of the First Intifada.[3] HAMAS announced its founding in an "official" communique on December 14, 1987.

505.    It represented the culmination of approximately 15 years of preparation and organization building, led by Ahmed Yassin (also known as "Sheikh Yassin"), the unrivaled leader of what had been the Muslim Brotherhood Movement in the Gaza Strip.[4]

---

[2]     HAMAS is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*" – Islamic Resistance Movement – but its name also means, in Arabic, enthusiasm, courage, zeal for battle.

[3]     The term "First Intifada," as used herein, relates to the violent conflict that broke out in December 1987 between the Palestinians and Israel.

[4]     The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna and was dedicated to the goals of fighting Western influences on Muslim society; ensuring the adherence of Muslims to Islamic law (Shari'a); and, following the rectification of Muslim society, establishing an Islamic state that would expand its rule over the world by means of jihad and a call to join Islam.

506.     Although Yassin had been confined to a wheelchair throughout his adult life, he worked unceasingly for the establishment of HAMAS in the Gaza Strip. When HAMAS was established in Yassin's home in 1987, the Islamic Resistance Movement already had a defined ideology and a group of pre-existing institutions in Gaza, such as *Al-Mujama Al-Islami* (the Islamic Center), *Al-Jam'iya Al-Islamiya* (the Islamic Society) and the Islamic University of Gaza that were the flagship institutions of the Brotherhood's civilian social framework – the *da'wa*.[5]

507.     The U.S. Government has described the purpose of HAMAS's *da'wa* as follows:

> Through this grass-roots approach, (known as *dawa* - "preaching" or "calling"), Hamas achieves a number of goals. Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the *dawa* frees resources that can then be devoted to terrorist activity.[6]

508.     On December 10, 1987, after violence broke out in the Jabalia Refugee Camp, Sheikh Yassin invited six of the leaders of the Muslim Brotherhood in Gaza to his home.

509.     There the group decided to establish HAMAS, an organization that would combine terror against Israel with its *da'wa* (civilian infrastructure) through organizations such as *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya*.

510.     In 1973, Yassin established *Al-Mujama Al-Islami*, and in 1976 he set up *Al-Jam'iya Al-Islamiya*. The two organizations, which were based in Gaza, quickly expanded and established

---

[5]     The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to "the civilian infrastructure of HAMAS."

[6]     *See* Second Supp. Trial Brief of the United States, *United States v. Holy Land Foundation*, 3:04-cr-00240-P, ECF No. 1171, at 5-6 (N.D. Tex. Sept. 12, 2008). A copy of the Trial Brief is attached as **Exhibit A** to the Second Amended Complaint.

branches throughout the Gaza Strip, but neither of them was, at the time of its establishment, *openly* militant. That changed once HAMAS was founded.

511.    Initially the two organizations placed their emphasis primarily on mosques. The mosques were not meant solely for prayer. They also served as centers for religious, social, educational, cultural, and political activity, while enjoying a measure of ex-territorial immunity that derived from their religious nature.[7]

512.    Once HAMAS was established by Sheikh Yassin and other *Mujama* officials, *Al-Mujama Al-Islami* immediately transitioned into the central headquarters of the organization in the Gaza Strip and was widely identified as being synonymous with HAMAS.

513.    The seven participants in the December 1987 meeting are considered by HAMAS to be its founding fathers. All of them were members of the Muslim Brotherhood, and six of them were members of *Al-Mujama Al-Islami*: Sheikh Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Isa al-Nashar, and Abd al-Fatah Dukhan.

514.    At the meeting, Sheikh Yassin was recognized as the supreme leader of HAMAS.

515.    His six associates in founding the movement became HAMAS's leadership council, and each of them was appointed to head a particular region: Salah Shehada was responsible for the northern Gaza Strip; Muhammad Sham'a was put in charge of Shati Refugee Camp; Ibrahim al-Yazuri was put in charge of Gaza City; Abd al-Fatah Dukhan was put in charge of the central camps (four refugee camps); Isa al-Nashar was put in charge of the Rafah area; and Abd al-Aziz al-Rantisi was responsible for the Khan Yunis area.

---

[7]    Yassin and the Muslim Brotherhood did not accept the secular Palestine Liberation Organization ("PLO") as the sole official representative of the Palestinian people, and subsequently began challenging representatives of PLO organizations in the trade unions, charitable societies, and universities in Gaza and the West Bank. In Gaza, where Yassin's leadership was more aggressive, the Muslim Brotherhood gradually seized control of the Islamic University of Gaza (founded in 1978) by removing the university's PLO-affiliated administration and replacing it with members of *Al-Mujama Al-Islami*.

516.    All seven of HAMAS's founders were members of the *da'wa* apparatus (the civilian infrastructure of the Muslim Brotherhood and later of HAMAS).

517.    From its inception, HAMAS's primary objective was to transform the essentially ethno-political Palestinian national cause into a holy war – i.e., a conflict defined in Islamic religious terms. Accomplishing this goal necessitated a transformation of what was once a relatively secular Palestinian society (compared to other Muslim societies in the Arab world) into one that was religiously zealous and politically extreme.

518.    From the early 1990s, HAMAS's policy and practice of carrying out terrorist attacks against civilian targets in Israel was notorious and well known to CAB and to the public at large because, from that period forward, HAMAS openly, publicly, and repeatedly acknowledged having such a policy and carrying out such attacks. HAMAS made these acknowledgments initially in pamphlets and official press releases and, during the relevant period, took credit for attacks on its official websites and in numerous news media interviews conducted by senior HAMAS officials.

519.    HAMAS's social and political elements are essential components of its efforts to radicalize Palestinian society and develop its violent activities. As noted terrorism expert Dr. Matthew Levitt wrote in his 2006 book, *HAMAS: Politics, Charity, and Terrorism in the Service of Jihad*:

> Indeed, Hamas relies on its political and social activists and organizations to build grassroots support for the movement, to spot and recruit future operatives, to provide day jobs and cover to current operatives, and to serve as the logistical and financial support network for the group's terror cells. Often the Hamas operatives running the group's political and charitable offices are closely tied to the group's terror cells, or are themselves current or former terror-cell members. Muddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations.

***

Inside the Palestinian territories, the battery of mosques, schools, orphanages, summer camps, and sports leagues sponsored by Hamas are integral parts of an overarching apparatus of terror. These Hamas entities engage in incitement and radicalize society, and undertake recruitment efforts to socialize even the youngest children to aspire to die as martyrs. They provide logistical and operational support for weapons smuggling, reconnaissance, and suicide bombings. They provide day jobs for field commanders and shelter fugitive operatives.

520. From the outset, the connection between HAMAS, Sheikh Yassin, and his "Islamic fundamentalist movement" was open and obvious.

521. For example, in a February 1, 1988, article titled "Islam's Voice in Gaza," *Time Magazine* wrote about Sheikh Yassin and his obvious connection to the Islamic Center in Gaza:

Sheik Yasin, 51, is a spiritual leader of the Islamic fundamentalist movement in Gaza and thus a prime force behind the religious gale that has recently fanned the flames of unrest in the occupied territories. Born in the Arab village of Al-Joura, Sheik Yasin has been paralyzed below the neck since age 15 as the result of an athletic accident. He resides with his wife and eleven children in a one-story house in Gaza City. Family members assist him in dressing and eating. **Despite his handicap, he runs al-Mujama al-Islami**, a community organization that builds mosques and sponsors cultural activities. (Emphasis added.)

522. In a January 1998 interview with a HAMAS publication, Dr. Ibrahim al-Yazuri, one of the aforementioned founders of HAMAS, offered a telling description of HAMAS's philosophy regarding charitable giving:

Everyone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine, from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern. Social work is carried out in support of this aim, and it is considered to be part of the HAMAS movement's strategy . . . The HAMAS movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. The movement takes care of their families and their children and provides them with as much

material and moral support as it can. This is one of the fundamental truths of Islamic work and thus represents the duties of the Islamic state . . . The movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.

523.    Years before the establishment of HAMAS, Sheikh Yassin and the Muslim Brotherhood in the Gaza Strip had developed the civilian infrastructure (such as *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya* and other organizations) which would soon form the backbone and recruiting grounds for HAMAS's operational terrorist wing, later named the *Izz al-Din al-Qassam* Brigades (herein, the "Qassam Brigades").[8]

524.    As Joshua L. Gleis and Benedetta Berti wrote in their book, *Hezbollah and Hamas, A Comparative Study*:

Much of Hamas's ideology is learned through its social welfare network, which spans everything from mosques, schools, food banks, clinics, summer camps, and hospitals. As is clearly outlined under Article 16 (Education of the [Young] Generation) of its charter, one of its major goals is to instill Islamist values into Palestinian children from a young age. At the same time, Hamas employs this wide social network to promote the group and its militant agenda with respect to Israel. This manifests itself in military activities for children in summer camps, indoctrination of kindergarteners to praise suicide attackers and wish to be like them, the reenactment of suicide bombings, and the use of schoolbooks laced with Islamist, anti-Semitic, and anti-Western propaganda.

525.    In January 1988, HAMAS also established a branch in the West Bank, through three of the leaders of the Muslim Brotherhood there: Jamil Hamami, Hamed Bitawi and Sa'id Bilal. As in the past, HAMAS relied on the infrastructure of the Muslim Brotherhood in the West Bank to build the backbone of command of HAMAS and its resources, while absorbing key zakat

---

[8]      In 1984, the Israel Defense Forces ("IDF") uncovered a weapons cache in Yassin's house. He was later arrested and convicted of "establishing a radical Islamic religious organization whose aim was to destroy the State of Israel and replace it with a religious Islamic state." He was sentenced to 13 years in prison but released a year later as part of the "Jibril Prisoners' Exchange" on May 21, 1985.

committees[9] and charitable societies in the West Bank, and where necessary, also setting up new institutions.

526.    On June 18, 1989, Israel outlawed HAMAS.

527.    Media reported that hours after this action was taken, "the body of a Jewish settler, a knife stick in his chest, was found in a deserted area of the occupied West Bank."[10]

**B.    HAMAS in the 1990s**

528.    In December 1992, as a result of increased terrorist activity perpetrated by HAMAS, the government of Israel decided to deport over 350 HAMAS operatives to Lebanon.

529.    This step later became known as the *Marj al-Zuhur* Deportation because the deported Islamists were delivered to a check point by that name in southern Lebanon during their brief exile.

530.    The *Marj al-Zuhur* Deportation was a formative moment in the history of HAMAS and its mythology. It established its status as a leading Palestinian political organization and brought it to prominence in the Arab and international arenas.

531.    HAMAS members who were deported to *Marj al-Zuhur* have a special place in HAMAS's history, quickly became the most iconic members of HAMAS, and later emerged as key leaders of the HAMAS *da'wa.*

532.    The international community condemned the deportations and at the end of 1993 the Israeli Supreme Court ultimately determined that the Government of Israel was compelled to return the *Marj al-Zuhur* deportees.

---

[9]      The term "Zakat" means tithing in Arabic. This is one of the five Pillars of Islam (Arkan al-Islam). It is loosely used herein to refer to a form of semi-compulsory charitable giving.

[10]     Ian Black, "Six killed as Israelis ban Gaza Islamic Groups," *The Guardian* (June 19, 1989).

533. The saga transformed the *Marj al-Zuhur* deportees into celebrities within the Palestinian arena. The HAMAS deportees later became the backbone of HAMAS leadership.

534. On September 13, 1993, President Clinton hosted the signing ceremony in Washington, D.C. for the so-called "Oslo Accords" presented by Yasser Arafat, Chairman of the Palestine Liberation Organization ("PLO") and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.

535. The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority ("PA"), headed by PLO Chairman Yasser Arafat.

536. Under the agreement, the newly formed PA would perform the services previously provided by Israel, including education, health, social welfare, taxation, and tourism.

537. The agreement also included Letters of Mutual Recognition, whereby the Israeli government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and purportedly renounced terrorism, violence, and the desire for the destruction of Israel.

538. The Oslo Accords were not, however, universally accepted by the Palestinian factions.

539. HAMAS rejected the agreement for its recognition of Israel's right to exist.

540. For HAMAS, the Oslo Accords contradicted its most valued tenet – the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

541. Accordingly, HAMAS pursued a three-pronged strategy in the early 1990s.

542. First, it upgraded its terror apparatus, improving the capabilities of its Qassam Brigades and beginning to perfect its bomb-making skills.

543. Second, it intensified its efforts to subvert existing social welfare institutions – particularly in the West Bank – in order to systematically gain control of pre-existing zakat committees and other religious and social institutions that would ultimately compete with the PA for the "hearts and minds" of the Palestinian public in Gaza, the West Bank, and even the Palestinian refugee camps in Jordan and Lebanon.

544. Third, it accelerated the development of its world-wide fundraising network. While HAMAS received support from wealthy patrons in the Persian Gulf even in its prior incarnation as Sheikh Yassin's Muslim Brotherhood "branch" in Gaza, the Oslo Accords galvanized the Brotherhood's supporters in Europe, Africa, and even the United States.

545. HAMAS fundraisers and other operatives located abroad are key members of the HAMAS *da'wa*, closely tied to *da'wa* and Qassam Brigades operatives on the ground in the West Bank and the Gaza Strip, as well as to HAMAS political leaders in Turkey, Qatar, and elsewhere in the Middle East.

546. HAMAS's push for global fundraising was described by the media during this time. An article in *The Observer* (UK) dated December 27, 1992, described how "Hamas's finance comes from the contributions of its supporters around the world," and how HAMAS established "charities, clinics, and mosques to further its cause."

547. On February 26, 1996, then-Israeli Prime Minister Shimon Peres addressed the Israeli parliament (the "Knesset") following two bombings the prior day. Discussing HAMAS's terrorist attacks, he stated:

> Hamas has established charitable organizations in order to camouflage its true nature. These charitable organizations raise funds abroad, supposedly

to aid orphans, but in fact they use the contributions to purchase explosives. The countries in which these funds are raised must put an end to these appeals.

Their infrastructure is demonstrated in public appearances in the territories. They hold memorial rallies for murderers and brandish their weapons in broad daylight. They maintain clandestine terrorist cells in the territories. This grave picture poses a challenge for the Palestinian Authority.[11]

548.    A March 10, 1996, article in *The Observer* specified that HAMAS's fundraisers are "active in the West, including in Britain, the US and Germany." The media also identified HAMAS's increased social welfare operations, designed to provide cover for its fundraising and recruiting – the same March 10, 1996, article in *The Observer* reported that at one of HAMAS's teaching colleges, HAMAS operative Abu Ahmed recruited college students to commit suicide bombings, leading Palestinian security in the West Bank to conduct a police raid on the college campus.

549.    In fact, HAMAS made its presence in the West Bank known to the Palestinian public as well.

550.    For example, *The Guardian* (UK) published reporting from *The New York Times* News Service on March 23, 1996, noting that "[i]n the West Bank and Gaza, most of the Zakat funds in institutions are now controlled by Hamas."

551.    The *Associated Press*, reporting on August 15, 1998, concerning the criminal prosecution in Chicago of Muhammad Salah (an alleged HAMAS fundraiser), quoted him as saying in an interview: "They (Hamas) have run schools, hospitals, mosques. They do so much for the Palestinians."

---

[11]    *See* Shimon Peres, "Address to the Knesset by Prime Minister Peres on Hamas attacks in Jerusalem and Ashkelon," Historical Documents 1995–1996, Israel Ministry of Foreign Affairs, February 26, 1996, https://mfa.gov. il/MFA/MFA-Archive/1996/Pages/PM%20Peres-%20Knesset%20Speech%20on%20Jerusalem%20and%20 Ashkelon.aspx.

552.     As a result of Israeli and American pressure on the Palestinian Authority, in the five years preceding the Second Intifada,[12] the Palestinian Authority periodically instituted a series of arrests and crackdowns against HAMAS operatives and institutions.

553.     For example, in June 1995, the Palestinian Authority raided the office of the Islamic Society (*Al-Jam'iya Al-Islamiya*).

554.     After a period of arrests of HAMAS operatives, however, in October 1996, the Palestinian Authority instituted a wholesale release of prisoners wanted by Israel. The most senior among them were often recruited into the Palestinian Police and General Security Service ("GSS").

555.     One of the prisoners released was Kamel Khalifa, a member of the Qassam Brigades who murdered two Israeli civilians in 1993 and killed two Israeli soldiers in a subsequent attack that same year.

556.     Khalifa was recruited to join the GSS.

557.     Likewise, Imad al-Din Aql, who served as an assistant to Yahya Ayyash, HAMAS's pre-eminent bomb-maker (the so-called "Engineer"), was also recruited into the GSS after his arrest.

558.     After a series of HAMAS suicide bombings, in September 1997 the Palestinian Authority temporarily closed *Al-Jam'iya Al-Islamiya* and 15 other societies identified with HAMAS.

559.     On October 4, 1997, in an interview with the high-circulation Palestinian newspaper, *Al-Hayat al-Jadida*, Dr. Abd al-Aziz al-Rantisi, one of HAMAS's founders, called for the Palestinian Authority to reopen all institutions it had previously closed.

---

[12]     The term "Second Intifada" refers herein to the violent conflict launched by Palestinian factions at the end of September 2000. While the violence had no "official" ending date, it is generally considered to have subsided at the end of 2004.

560.     The institutions were soon reopened, but the Palestinian Authority continued to periodically arrest (and release) senior HAMAS leaders, like Ibrahim al-Yazuri (briefly arrested in 1998)[13]; Qassam Brigades commander Ibrahim Hamed (briefly arrested in 1999 after he planned two murders); Ahmad Bahar, chairman of *Al-Jam'iya Al-Islamiya* (briefly arrested in October 1998); Ahmad al-Kurd, chairman of *al-Salah* (briefly arrested in October 1998 during the same sweep); and Sheikh Hamed al-Bitawi, chairman of Al-Tadamun (arrested for a few hours on October 25, 1998).

### C.     HAMAS's Global Fundraising Network

561.     After HAMAS was established in 1987 as the Palestinian branch of the Muslim Brotherhood, the Muslim Brotherhood directed its world-wide chapters to establish so-called "Palestine Committees" to support HAMAS from abroad.

562.     These "Palestine Committees" were then established throughout Europe, the United States, and elsewhere, often led by HAMAS operatives living abroad.

563.     For example, Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), HAMAS's primary fundraiser in France, was founded in 1990 and registered there as a non-profit organization. It was one of the Muslim Brotherhood's first "Palestine Committees."

564.     The Israeli government declared CBSP an illegal organization on May 6, 1997, because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

---

[13]     In January 1998, al-Yazuri gave an interview to *Filastin al-Muslima* ("Muslim Palestine," the official HAMAS newspaper) in which he was openly identified as "one of the founders of the Islamic Resistance Movement." In the interview he was asked how Palestinian society has been affected by the Palestinian Authority's actions against HAMAS's social welfare organizations. Yazuri responded that "[t]he blows dealt to the infrastructure institutions of the Palestinian society, at the hands of the Palestinian Authority are hurtful, insulting and destructive not only for Hamas, but also the Palestinian masses who have enjoyed the assistance of these institutions."

565. Interpal, HAMAS's most important fundraising organization in the United Kingdom, was formally registered as a charity with the U.K. Charity Commission on August 11, 1994, under its official name, the "Palestinian Relief and Development Fund."

566. Interpal was reported by the Western press, as well as by Israel and Arab press, "to be a principal conduit of funds for the Palestinian Hamas movement. Israeli officials say much of the money is spent on weapons."[14]

567. Published reports in Israel in 1995 continued to link Interpal to HAMAS.

568. These reports were repeated in Western publications, including a March 10, 1996, article in *The Observer*, which described Israel's claims that "Britain had become a 'focal point' for Hamas military fund-raising, most of it carried out under the guise of charitable relief," which was followed by the "Charity Commissioners [freezing] the assets of the Palestinian charity Interpal, pending an investigation."

569. On March 13, 1996, the *Financial Times* in London similarly reported that:

> Israeli military intelligence claimed that Interpal, a UK-based charity whose bank accounts were frozen last week by the Charity Commission, had **masterminded fund-raising for the Hamas Islamic movement in Europe**. Israeli police, meanwhile, released documents about financial support given to the families of three Hamas military activists by two Nazareth-based charities which they claim are funded by Interpal. A senior military officer said **Interpal**, also known as the Palestinian Relief and Development Fund, **raised money for Hamas institutions and directly provided support to families of Hamas guerillas and suicide bombers**….

> The Israeli military officer alleged that Interpal was directly connected to the Finance Committee of Hamas […]. 'All the European funds are coordinated by Interpal,' he said. Mr Daya [identified as Interpal's chairman] described this contention as 'rubbish'.

> Last week police named **Interpal and Al Aqsa, based in Germany**, as the source of funds to Mr Suleiman Agbariah […]. Police say they have more than 60 cases proving that Mr Agbariah's charities – the Islamic Salvation

---

[14] Evans, Kathy, "Radical time-bomb under British Islam," *The Guardian* (Feb. 7, 1994).

Fund and the Islamic Rescue Fund – gave money to the families of Hamas guerillas. They provided documents from three cases which they allege prove a link between Mr Agbariah and his charities with known activists in the Izz el-Deen al-Qassam Brigades….

The [Israeli] intelligence officer said Israel had material evidence that some of the money sent by Interpal to registered schools, clinics, orphanages and welfare societies had been diverted to the families of Hamas guerillas. He said several lists of orphans who receive charity included people above the age of 18 who were known Hamas activists. In London, Mr Daya said Interpal supported no orphans over the age of 15. Asked if any of the 36 charities which Interpal funds were linked to Hamas, he said: "Maybe."

(Emphasis added.)

570.    Moreover, a detailed article on March 15, 1996, in *The New York Times* titled "ROOTS OF TERROR: A special report. Alms and Arms: Tactics in a Holy War," described how HAMAS's *da'wa* system works and how it raised money abroad, noting: "Israeli officials say that among the key Hamas fund-raising operations are the Holy Land Foundation of Richardson, Texas and the London-based Palestine and Lebanon Relief Fund, known, for its telex address, as Interpal."

571.    Similarly, a July 8, 1996, article in *U.S. News & World Report* detailed Saudi Arabian funding of HAMAS, reporting:

From a spacious headquarters in a warehouse near Jidda Port, the International Islamic Relief Organization coordinates a multimillion-dollar campaign to fund communal and social work among refugees and the poor throughout Africa, Asia and the Middle East.

But according to Western intelligence sources, the relief organization does much more than that: They believe that the IIRO, one of the largest nongovernmental organizations in Saudi Arabia, is a major clearinghouse for an estimated $ 20 million a year in Saudi financial aid to Islamic extremists in Gaza and the West Bank. It's all a high-risk gamble for the kingdom. Allowing the raising of money for foreign groups that support religious extremism and terror, say these intelligence sources, could spark even greater dissent against the Saudi government.

Dangerous liaisons. Much of the aid sent to the West Bank and Gaza, report these sources, is given as **unsupervised cash grants**. **The funds are first transferred to London and Amman bank accounts of Islamic welfare organizations such as the Palestine and Lebanon Relief Fund (PLRF) and the Palestinian Relief and Development Fund (Interpal). At least some of that money, say the sources, winds up financing Hamas activities, from funding the families of suicide bombers to bankrolling the suicide units.**

Farid Y. Gurashi, the general secretary of the IIRO, denies that his organization sends support to any political group, "even if it's a good cause." But, adds the American-educated Gurashi, "it would be silly and unacceptable to say we cannot help Palestinians."

According to a copy of a document obtained by U.S. News, officials of a Hamas fund-raising group in the West Bank and Gaza were instructed to send letters of thanks to the executives of the IIRO and another Saudi organization, the World Association of Muslim Youth, for "charity for this year. (Emphasis added.)

572.     The Israeli government declared Interpal an illegal organization on May 6, 1997, because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

573.     On August 22, 2003, following the aforementioned deadly suicide bombing aboard Bus #2 in Jerusalem on August 19, 2003, in which Tehilla Nathansen was killed and multiple members of her family severely injured, the U.S. Treasury Department designated five HAMAS-related charities and six senior HAMAS leaders as Specially Designated Global Terrorists ("SDGTs").[15]

574.     The five HAMAS-related institutions that were designated as SDGTs were:

1.     CBSP, of France.

2.     Association de Secours Palestinien ("ASP"), of Switzerland (an organization affiliated with CBSP).

---

[15]     A copy of the U.S. Treasury Press Release is attached as **Exhibit B** to the Second Amended Complaint.

3. Palestinian Relief and Development Fund, or Interpal, headquartered in the United Kingdom.

4. Palestinian Association in Austria ("PVOE").

5. Sanabil Association for Relief and Development based in Lebanon.[16]

575. The U.S. Treasury Press Release announcing the designations of these five entities stated:

> The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS.

576. According to the U.S. Treasury Department, "Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS. Reporting indicates it is the conduit through which money flows to HAMAS from other charities, e.g., the Al Aqsa Foundation (designated under Executive Order 13224 on May 29th) and oversees the activities of other charities. … Reporting indicates that Interpal is the fundraising coordinator of HAMAS. This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy."

577. According to the U.S. Treasury Department, "CBSP and ASP are primary fundraisers for HAMAS in France and Switzerland, respectively. Founded in France in 1990, CBSP acts in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon. ASP,

---

[16] Sanabil was hardly the only HAMAS institution operating in Lebanon. The Union of Good raised significant sums through bank accounts in Lebanon and its affiliated organization, the Welfare Association for Palestinian and Lebanese Families ("Al-Waqfiya") (discussed below), was both a CAB customer and a significant HAMAS fundraising channel for the families of HAMAS "martyrs" and prisoners.

a subsidiary of CBSP, was founded in Switzerland in 1994. The group has collected large amounts of money from mosques and Islamic centers, which it then transfers to sub-organizations of HAMAS. Khalid Al-Shuli is the president of CBSP and ASP."

578. According to the U.S. Treasury Department, "PVOE is controlled by the leader of HAMAS in Austria. The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part of the HAMAS network of charitable organizations that includes the Al Aqsa Foundation."

579. The six senior HAMAS leaders who were designated SDGTs were:

    1.    Sheikh Yassin, the founder and spiritual leader of HAMAS.

    2.    Imad Khalil Al-Alami, a member of HAMAS's Political Bureau in Damascus, Syria.

    3.    Osama Hamdan, a senior HAMAS leader in Lebanon.

    4.    Khalid Mishal, (then) head of HAMAS's Political Bureau and Executive Committee in Damascus, Syria.

    5.    Moussa Abu Marzouk, (then) Deputy Chief of HAMAS's Political Bureau in Syria.

    6.    Abd al-Aziz al-Rantisi, (then) HAMAS leader in Gaza reporting to Sheikh Yassin.

580. In September 2003, the Central Bank of Jordan asked local Jordanian banks, including CAB, to freeze the accounts of the individuals and entities designated by the U.S. government on August 22, 2003. The freezing order was subsequently rescinded because of the political uproar and public opposition in Jordan to the freezing of HAMAS accounts.

581. The Al-Aqsa Foundation, a major fundraiser for HAMAS, had branch offices in Holland, Belgium, Denmark, Sweden, Yemen, South Africa, and Pakistan. It was founded in July

1991 in Germany (Al-Aqsa e.V.), where it was headquartered, and which served as its main branch until at least 2002.

582.    On May 6, 1997, Israel outlawed the Al-Aqsa Foundation (including its German headquarters). In January 1998, Israel declared it a terrorist organization.

583.    On May 21, 1997, *Agence France Presse* reported that "Israel has banned five foreign-based fundraising groups from carrying out activities in the country or the occupied territories on grounds they help finance armed Palestinian militants," and that the five groups included the "**Palestine Development Fund** [Interpal], also based in Britain, **the Al-Aqsa Foundation in Germany** and **the Holy Land Fund in the United States**." It also noted that Israeli intelligence officials "accused the five foundations of supporting the Islamic Resistance Movement (HAMAS), the biggest Palestinian group still waging an armed struggle against Israel …." (Emphasis added.)

584.    An August 6, 1997, article in the *Deutsche Presse—Agentur* reported:

> The Israeli government announced plans Wednesday to pressure the United States, Britain, Germany and France to stem the flow of funds from purportedly charitable organizations in those countries to the radical Hamas group.
>
> In a news conference for journalists from those countries, a high-ranking Israeli army representative said crushing the Hamas infrastructure invariably involved stopping the flow of funds from groups abroad masquerading under the guise of charities.
>
> He said Hamas--linked organizations in Europe included the Interpal Palestinian charitable organization in London and the Al Aksa Fund in Aachen, Germany. He claimed both organizations are firmly in the hand of Hamas.
>
> In America, the Holy Land Fund in suburban Dallas funneled 3 to 4 million dollars annually to Hamas, the official said. Similar amounts are raised by the groups in London and Aachen, he said. In France he cited the CBSP organization as a front for Hamas fundraising efforts.

Israel has long asked governments of those countries to take steps to curtail Hamas activities on their soil, he said, but to no avail.

585. The following day, the *Associated Press* reported that an "Israeli official, requesting anonymity, said that Hamas had set up offices in London, Paris and Aachen, which collected donations of more than $10 million a year. In addition to Al-Aqsa in Germany, the others were identified as the Palestinian Relief and Welfare Fund in London, and the Companie Benificent De Solidarite Avec Palestine (CBSP) in France."

586. On August 8, 1997, *The Jerusalem Post* reported:

Israel is asking Britain, France, and Germany to close down major fundraising operations run by Hamas in Europe.

An Israeli official said Hamas set up offices in London, Paris, and Aachen, which collected donations of more than $ 10 million a year.

The official identified the fundraising organizations as the Palestinian Relief and Welfare Fund in London, the Companie Benificent De Solidarite Avec Palestine, and Al- Aksa, which coordinates fundraising from Austria, Switzerland, Belgium, and the Netherlands.

A fourth Hamas fundraising organization is the Holy Land Foundation of Richardson, Texas - but the US has passed as yet unimplemented legislation to crack down on organizations like Hamas, the official said.

587. In 2001, the security service for the German State of Nordrhein-Westfalen concluded in its annual published report that "there are indications that the [Al Aqsa Foundation] is integrated into the financial infrastructure of Hamas and supports the extremist activities of Hamas under the guise of humanitarian aid for Palestine."

588. On June 9, 2002, the German daily newspaper *Die Welt* reported on the ongoing controversy concerning the Al-Aqsa Foundation and its connections to HAMAS in an article titled: "Suspicion confirmed: German donations for the terror against Israel."

589. In July 2002, the German government closed the offices of the Al-Aqsa Foundation located in Germany.

590. According to the closure order, "AL-AQSA e.V. advocates, supports and calls for violence as means to achieve political, religious or other goals by awakening or at least strengthening the willingness of third parties to use violence as a political, religious or other means."

591. With respect to Al-Aqsa's connection to HAMAS, the order stated: "AL-AQSA e.V. already financially supported the predecessor organization of HAMAS, the 'Al-Mujama Al-Islamiya' and to this day forwards at least some of the incoming donations to HAMAS. The funds resulting from collections of donations are flowing either directly to HAMAS or via seemingly unsuspected aid organizations."

592. On August 6, 2002, *Newsday* (NY) reported:

> German authorities shut down an Arab charity yesterday accused of collecting money for the militant Palestinian organization Hamas, the interior ministry said.

> Investigators seized the equivalent of $296,000 from accounts of the Al-Aqsa organization in the cities of Aachen and Cologne, Interior Minister Otto Schily told reporters. No one was arrested, but numerous documents were seized.

> **Schily said Al-Aqsa raised money for families of suicide bombers who carried out deadly attacks against Israelis.** The funds were transferred to "social and humanitarian organizations in the partially autonomous Palestinian territories which are connected with the organizational structure of Hamas or its associates," Schily said.

> Mahmoud Amr, 45, chairman of Al-Aqsa, denied the organization was funneling money to Hamas.

593. According to the article, "[a]mong it's [sic] activities, Al-Aqsa calls for donations to support 'martyr families,' which authorities interpreted as support for the families of suicide

bombers, [German Interior Minister Otto] Schily said."

594.     It also quoted Schily as stating that: "Organizations that support such horrific attacks must be shut down. We tolerate neither terrorist activities in Germany nor organizations that support attacks in foreign countries."

595.     On August 16, 2002, the *Associated Press* reported that police in two German cities carried out new raids against the Al-Aqsa Foundation and despite denials from the organization, "Interior Minister Otto Schily has said documents found in the group's headquarters support the government's belief that the charity was assisting Hamas, which has claimed responsibility for many of the suicide attacks in Israel."

596.     On August 20, 2002, *The Wall Street Journal* reported on Germany's actions against the Al-Aqsa Foundation in an article titled "Report on al Qaeda Prompts German Ban of Islamic Group." The article notes that the Al-Aqsa Foundation "raises money for the ostensibly humanitarian activities of Islamic militant group Hamas in the Palestinian territories, but al Aqsa also is accused of sending money to the families of suicide bombers."

597.     Following Germany's ban of the Al-Aqsa Foundation in August 2002, the General Intelligence and Security Service of the Netherlands (AIVD) intensified its own investigation into the Dutch branch of the organization and published its findings in its annual report for 2002, noting that: "Al Aqsa raises funds in the Netherlands for benefit of Palestinian organizations and is associated with the support of the radical Islamic Palestinian organization Hamas. Unlike Israel and the United States, in Europe only the military wing of Hamas, the al Qassam Brigade, is designated as a terrorist organization. In the past, personnel and administrative ties between Al Aqsa Germany and Al Aqsa Netherlands were detected. Investigation by the AIVD now has

[further] indicators. It has been found that funds collected here by the Al Aqsa foundation have been used for violent activities in the Middle East."

598.    On April 3, 2003, the Netherland Ministry of Finance and Ministry of Foreign Affairs froze the accounts of the Al-Aqsa Foundation in the Netherlands citing its connection to HAMAS.

599.    The Dutch government concluded that:

> The differentiation between social and terroristic activities of Hamas can no longer be upheld. Hamas, to which the named fundraising organizations are connected has to be viewed as an organization facilitating charitable services as well as terrorist acts, whereby these activities mutually complement each other.

> The Association Al-Aqsa maintains or maintained contacts with institutions raising funds in favor of Hamas. The association maintains or maintained contacts to Al-Aqsa in Germany (prohibited in mid-2002), Al-Aqsa in Denmark (assets frozen at the end of 2002), Al-Aqsa in Belgium, as well as to institutions raising funds for Hamas in Great Britain, Italy, Switzerland, Sweden and France.

> These fundraising institutions, including the Dutch Al-Aqsa, are carrying out a joint international action to raise funds for Hamas under the name of "Union of the Good" (in Arabic: Ittilaf Al-Khair). In the past, the head of the Union of the Good located in Qatar has approved suicide attacks for religious reasons.

600.    On April 9, 2003, the Dutch daily newspaper *Trouw* ("True") reported on the government's actions against the Al-Aqsa Foundation:

> Minister of Foreign Affairs De Hoop Scheffer has frozen the funds of a Rotterdam foundation that is used by Dutch Muslims to send money to the Palestinians. According to the minister, the Al Aqsa Foundation supports terrorists. The measure, published in the Government Gazette, takes effect today. Furthermore, it is now prohibited to donate money to Al Aqsa. Banks are no longer allowed to provide financial services to the foundation.

> It was already known that Al Aqsa is transferring money to the Palestinian organization Hamas, responsible for suicide attacks in Israel and the Palestinian territories. Al Aqsa leaflets state that money can be deposited in a "martyrs' fund." Hamas is also concerned with social services. Until now,

the Dutch government took the position that Al Aqsa could not be brought down, because it could not be established that euros collected here in the Palestinian Territories were used for bombs and not for beds.

Germany already banned the establishment of Al Aqsa in Aachen, after which the General Intelligence and Security Service intensified its investigation and now says it has hard evidence that money from Rotterdam is used directly for violent actions. It is still unknown whether Al Aqsa will also face criminal charges.

601. On May 29, 2003, the U.S. Treasury Department designated the Al-Aqsa Foundation (including all of its branches) as an SDGT pursuant to Executive Order 13224.[17]

602. The U.S. Treasury Press Release announcing Al-Aqsa's designation stated:

Al Aqsa is a critical part of Hamas' terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al Aqsa funnels money collected for charitable purposes to Hamas terrorists.

Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

603. CAB processed multiple transfers originating from Al-Aqsa Foundation branches to CAB account holders before the Al-Aqsa Foundation was designated an SDGT.

604. These included transfers to the Jenin Zakat Committee from Al-Aqsa Foundation in Germany in February 2000 and February 2001 and from the Al-Aqsa Foundation in Sweden in February and April 2003 (in USD).

605. CAB also processed multiple transfers originating from Al-Aqsa Foundation branches to CAB account holders *after* the Al-Aqsa Foundation was designated an SDGT.

606. These included transfers from the Al-Aqsa Foundation in Sweden to the Jenin Zakat Committee in July 2003 and May 2004.

---

[17]     A copy of the U.S. Treasury Press Release is attached as **<u>Exhibit C</u>** to the Second Amended Complaint.

607.    CAB also processed multiple transfers from the Al-Aqsa Foundation in Sweden to the HAMAS-operated Gaza office of the World Assembly of Muslim Youth ("WAMY") both before and after the Al-Aqsa Foundation was designated an SDGT.

608.    CAB maintained account no. 6266/1 for the Gaza Office of WAMY both during and after the relevant period.[18]

### D.    HAMAS in the United States – the Holy Land Foundation

609.    In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the so-called "Palestine Committee" in the United States (discussed above) gathered together in Philadelphia, Pennsylvania to discuss how to help HAMAS oppose the Oslo Accords and to continue and improve their fundraising and political activities in the United States.

610.    The Federal Bureau of Investigation (FBI) learned of the Philadelphia meeting and obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

611.    During the meeting, the participants discussed the problems that the Oslo Accords presented for those opposed to co-existence with Israel, and attendees were admonished not to mention "HAMAS," but rather to refer to it as "Samah," which is HAMAS spelled backwards.

612.    Attendees agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting HAMAS's vital social recruitment effort by financially supporting institutions, organizations, and programs in the West Bank and Gaza aligned with HAMAS.

---

[18]    In the context of this Second Amended Complaint, the relevant period encompasses the Second Intifada period and the years immediately preceding it (1997 through 2004).

613. The attendees noted that the United States provided them with a secure base from which to operate and their belief that continuation of jihad was inevitable.

614. They decided that most of the funds raised in the future should be directed toward HAMAS and to providing support to the injured, the prisoners and their families, and the martyrs and their families.

615. Attendees identified several charitable societies and zakat committees as "ours," identifying these outwardly charitable entities as belonging to HAMAS.

616. The Holy Land Foundation ("HLF"), which was established in 1989, emerged from the Philadelphia meeting as the preeminent HAMAS fundraising organization in the United States.

617. However, neither HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of HAMAS.

618. While HLF was a vital member of HAMAS's international network of organizations dedicated to financing HAMAS's agenda, it also worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of HAMAS-controlled charitable societies and zakat committees in the West Bank and Gaza.

619. These other organizations – including The Palestinian Relief and Development Fund (Interpal) in Great Britain, the Al-Aqsa Foundation in Germany, Belgium, and Holland, the CBSP in France, the ASP in Switzerland, the Palestinian Association in Austria (PVOE), and the Palestinian Branch of WAMY – all operated in similar ways, sharing fundraising techniques, projects, and connections to HAMAS leaders.

620. In May 1995, Israeli authorities raided HLF's branch office in Beit Hanina, a village near Jerusalem. Their review of the HLF branch's records led them to conclude that it was

distributing funds raised by the Texas-headquartered group and funneling them to HAMAS-controlled entities.

621. The raid yielded records listing dozens of HAMAS recipients of HLF money including the children of Yahya Ayyash, the aforementioned notorious "Engineer" – HAMAS's first master bomb-maker, who was assassinated by Israel in 1996.

622. Another recipient was the mother of Ahmed Hussein Mahmoud Shukri, a HAMAS operative sentenced to life in prison in Israel for murdering a Jewish person in Tel Aviv in 1989.

623. Other recipients of HLF funds included the father of a HAMAS operative killed in a 1994 clash with the Israeli army, the mother of a man serving a life sentence for killing three Israeli civilians in 1992, and the family of a convicted bomber who murdered a Canadian tourist in 1990.

624. On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations: "Most of Hamas's estimated $70 million annual budget goes to support a network of hundreds of mosques, schools, orphanages, clinics and hospitals that permeates virtually every village, town and refugee camp on the West Bank and Gaza Strip. But these social services provide both a cover and a recruiting ground for young terrorists. One of the important uses of charitable donations to Hamas is to provide lifetime annuities to the families of suicide bombers." The article specifically discussed Israeli government claims that Richardson, Texas-based HLF and the London-based Palestine and Lebanon Relief Fund, known, for its telex address, as Interpal, were the "key fundraising operations" for HAMAS. It also noted HAMAS's "Dawa activities -- from the Arabic word for the call to prayer" that included "the issuance of pamphlets and staging of ceremonies to spread Islamic doctrine" and "employing hundreds of people [as part of its] social and welfare network."

625.   The April 8, 1996, edition of the *Dallas Morning News* contained an article titled: "Paper Trail Leads to Hamas; Two Organizations Based in Richardson Deny They Promote Agenda of Anti-Israeli Terrorists." The article reported that:

> Leaders of the local groups denied affiliation with Hamas. Sharing a stage with Hamas speakers doesn't mean they approve of Hamas terrorism or provide support for it, they say.
>
> "We have never raised money for Hamas or tried to recruit members for Hamas," said Shukri Abu Baker, executive director of the Holy Land Foundation for Relief and Development.
>
> Public records, materials from the two groups and interviews over seven months show a pattern of personal, financial and philosophical ties between Hamas and the two nonprofit groups….
>
> Last month, the Israeli government closed the Jerusalem office of the Holy Land Foundation because of alleged ties to Hamas. Officials also closed the headquarters of an Islamic school partly funded by the Holy Land Foundation and arrested its director for allegedly being a Hamas activist.
>
> Mousa Abu Marzook, the political leader of Hamas, provided more than 10 percent of all donations to the Holy Land Foundation in 1992, according to Internal Revenue Service records. Mr. Marzook's wife is a cousin of Ghassan El-Ashi, a Holy Land Foundation board member, and …. The Israeli government alleges that Mr. Marzook is actually the military leader of Hamas and thus is involved in planning and financing the group's terrorist operations.

626.   On May 20, 1996, The *Jerusalem Post* reported on proceedings in the High Court of Justice resulting in a decree by the Israeli government shutting down HLF's Jerusalem office and authorizing confiscation of all of its property.

627.   On May 6, 1997, the government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks …."

628. Israeli designations of HAMAS organizations were published and publicized in the Palestinian Territories (as were all relevant Israeli laws as of June 8, 1967).[19]

629. On June 21, 1997, the *Associated Press* reported:

> The Israeli government has outlawed a Texas-based Muslim charity on grounds that the group has given financial support to the militant Palestinian movement Hamas, a newspaper reported Saturday.
>
> The Israeli Foreign Ministry provided a copy of the decree to The Dallas Morning News along with a statement saying the order stemmed from [the] determination about Hamas links to the Holy Land Foundation for Relief and Development.
>
> The group, based in Richardson, Texas, and three other Islamic groups "have become part of the communications and economic infrastructure of Hamas," the statement said.
>
> The decree, issued May 6, authorizes the Israeli government to seize the group's assets and any of its money found in Israel.

630. Following several HAMAS terror attacks, on September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions, including HLF's Gaza offices.

631. Nevertheless, even after Israel's and the Palestinian Authority's identification of HLF as a HAMAS institution in 1997, CAB continued to maintain one or more U.S. dollar-denominated accounts for HLF, including Account No. 4883 (001 000 4883 03 2111 813) in Hebron, located in the Palestinian Territories.

632. At the beginning of 2001, the aforementioned account had a balance in U.S. dollars in excess of $600,000.

---

[19] *See* Declaration of Shlomo Politis, *Linde v. Arab Bank, PLC*, No. 04-cv-2799-BMC-VVP (E.D.N.Y. Nov. 25, 2014), ECF No. 1193-13, attached as **Exhibit D** to the Second Amended Complaint., ¶¶ 15-17, 24-31. From 1994 to 2004, both the Palestinian Authority and the Government of Israel exercised jurisdiction over the Palestinian Territories. The Commanders of IDF forces in the Palestinian Territories therefore exercised governmental and administrative authority, including promulgation of laws and regulations. After September 1995, all notifications concerning new laws and regulations were promulgated through District Civil Liaison Offices ("DLCs") which printed them, translated them into Arabic, and made them available to Palestinian Authority DLCs as well. All persons and entities in the Palestinian Territories, including banks, were legally presumed to have access and notice to such laws and regulations, including those proscribing illegal organizations.

633.    On January 26, 2001, *Al-Hayat al-Jadida* reported that HLF was paying $700 to martyrs' families and $2,000 to married martyrs' families during the Second Intifada.

634.    Most of the funds HLF transferred from the United States to its offices in the Palestinian Territories were transferred through CAB's correspondent account with Citibank in New York.

635.    These transfers were often in very large amounts.

636.    For example, a transfer from HLF in Richardson, Texas, to HLF in the Palestinian Territories dated December 28, 1999, for $190,743 was sent via "CITIBANK NY FFC CAIRO AMMAN BANK AMMAN JORDAN BR WADI SAKRAH FCC CAIRO AMMAN BANK ISLAMIC TRANSACTION HEBRON ISRAEL."

637.    A transfer from HLF in Richardson, Texas, to HLF in the Palestinian Territories dated January 16, 2001, for $229,283 was sent via "CITIBANK NY FFC CAIRO AMMAN BANK AMMAN JORDAN BR WADI SAKRAH FCC CAIRO AMMAN BANK ISLAMIC TRANSACTION HEBRON ISRAEL." A copy is attached as **Exhibit E** to the Second Amended Complaint.

638.    HLF's Hebron branch not only helped fund other HAMAS institutions but it also provided funds to the families of Palestinian "martyrs" directly.

**E.    The United States Designates the Holy Land Foundation an SDGT in 2001**

639.    On December 4, 2001, HLF, a U.S.-based organization which provided millions of dollars to HAMAS, was designated an SDGT pursuant to Executive Order 13224 and a Specially Designated Terrorist ("SDT") under Executive Order 12947. HLF's designation was accompanied by an order blocking all its assets.

640.    The U.S. Treasury Press Release announcing HLF's designation stated, *inter alia*:

- The Holy Land Foundation for Relief and Development, headquartered in Richardson, Texas, raises millions of dollars annually that is used by HAMAS. Last year, Holy Land raised over $13 million.

- Holy Land supports HAMAS activities through direct fund transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ("zakat committees") and other charitable organizations that are part of HAMAS or controlled by HAMAS members.

- Mousa Mohamed Abu Marzook, a political leader of HAMAS, provided substantial funds to the Holy Land Foundation in the early 1990s. In 1994, Marzook (who was named a Specially Designated Terrorist by the Treasury Department in 1995) designated the Holy Land Foundation as the primary fund-raising entity for HAMAS in the United States.[20]

641. These findings were in part the product of an extensive FBI investigation that culminated in what has come to be referred to as the "Watson Memorandum" – named after former FBI official Dale Watson. A copy is attached as **Exhibit G** to the Second Amended Complaint.

642. The FBI report observed:

> It is the FBI's analysis that the zakat committees receiving HLFRD [Holy Land Foundation] financial support are controlled by HAMAS. GOI [Government of Israel] analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat committees. GOI analysis, as well as open source reporting, has identified **that the civilian population is aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS**. (Emphasis added.)

643. The FBI report also concluded that:

> [E]vidence strongly suggests that the [HLF] has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the [HLF] assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace.

---

[20] A copy of the August 29, 1995, update to the Federal Register noting Marzook's designation is attached as **Exhibit F** to the Second Amended Complaint.

> According to [an informant], in the words of Shukri Abu Baker, [HLF's] mission is to support the families of the martyrs.

644. On December 6, 2001, the *Los Angeles Times* reported on the Watson Memorandum noting that the "FBI memo provides a glimpse of how the federal government has gone about amassing evidence against groups it believes are aiding terrorists…. The money flowed from Texas to charity committees controlled by Hamas in the Palestinian territories, to Holy Land offices in the West Bank or to other groups that support Hamas, the FBI concluded."

645. On December 4, 2001, President Bush announced that "[t]he terrorists benefit from the Holy Land Foundation, and we're not going to allow it. Money raised by the Holy Land Foundation is used by Hamas to support schools and indoctrinate children to grow up into suicide bombers [and] to recruit suicide bombers and support their families."

646. These large deposits were then often translated into checks written by HLF in the Palestinian Territories to HAMAS *da'wa* institutions in smaller increments.

647. For example, HLF drafted separate checks on September 30, 2000, to three branches of *Al-Jam'iya Al-Islamiya* (the Islamic Society) for $2,906, $6,615, and $2,687.

648. The Watson Memorandum concluded that "FBI investigations of HAMAS activities in the United States have revealed that [HLF] is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the [HLF] are clearly being used by the HAMAS organization…[and] that the [HLF] is acting for or on behalf of HAMAS. Further, senior members of the [HLF] support HAMAS ideology and activities. These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States."

649. In designating HLF as an SDGT, The Treasury Department found that:

HAMAS raises tens of millions of dollars per year throughout the world using charitable fundraising as cover. While HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes. HAMAS relies on donations from Palestinian expatriates around the world and private benefactors located in moderate Arab states, Western Europe and North America. HAMAS uses a web of charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations are commingled, moved between charities in ways that hide the money trail, and are then often diverted or siphoned to support terrorism.

The political leadership of HAMAS directs its terrorist networks just as they oversee their other activities. HAMAS leader Yassin confirms this relationship, stating to al-Sharq al-Awsat on August 12, 2002: "When we make decisions on the political level and convey them to the military wing, it abides by it normally." The intensity of this relationship is reflected in Yassin's words quoted by Reuters on May 12, 1998:

"We cannot separate the wing from the body. If we do so, the body will not be able to fly. HAMAS is one body."

650.    On December 5, 2001, the Palestinian daily newspaper *Al-Quds* reported on the U.S. designation of HLF and the freezing of its assets because of its support for HAMAS.

651.    As a result of HLF's lawsuit challenging its designation as an SDGT, the federal district court for the District of Columbia commenced a detailed review of the administrative record and reiterated the evidence on which the Treasury Department relied in making its determination to designate HLF as an SDGT. It found that the record contained "ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas."[21]

---

[21]    *Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 69 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

652.    On August 9, 2002, the *Dallas Morning News* reported in an article titled "Court denies Muslim charity's bid to have assets unfrozen," that a U.S. District Judge determined "that the 3,130-page record that the Treasury Department's Office of Foreign Assets Control compiled before moving against Holy Land - based in large measure on a nearly nine-year FBI investigation and Israeli intelligence - provides 'ample support' for its conclusion that Holy Land acts 'for or on behalf of' Hamas. 'There is evidence that HLF raised funds for Hamas, that Hamas provided financial support to HLF, and that HLF paid for Hamas leaders to travel to the United States on fund-raising trips,' Judge Kessler wrote."

653.    In 2004, HLF and several of its directors were indicted on criminal charges that it was illegally providing material support to HAMAS.

654.    The U.S. government argued that HLF sent the money to "zakat" committees in the West Bank and Gaza (including CAB customers like the Jenin, Tulkarem and Nablus Zakat Committees) that are part of the "social wing" of HAMAS and that the social wing of HAMAS is "crucial to Hamas's success" because, among other things, it "helps win the 'hearts and minds' of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in [HAMAS's] ideology"; "supports the families of Hamas prisoners and suicide bombers, thereby providing incentives for bombing"; and "launders money for all of Hamas's activities."

655.    For these reasons, the U.S. government argued that "aid to Hamas's social wing critically assists Hamas's goals while also freeing resources for Hamas to devote to its military and political activities."

656.    In 2008, after a jury trial, HLF and five of its former directors were found guilty of illegally transferring more than $12 million to HAMAS.[22]

---

[22]    Ghassan Elashi and Shukri Abu Baker, leading members of HLF, were convicted, *inter alia*, on one count of

### F.  HAMAS *Da'wa* Organizations in Jordan and Lebanon

657.  The UAE-based Human Appeal International (HAI) was established in 1984 under the name Human Appeal Committee; its name was changed to Human Appeal International in 1998.

658.  HAI claims to operate in more than 10 countries and is a charter member of the original Union of Good's 101 Days Campaign.[23]

659.  A 1996 CIA report identifies HAI as having acted as a fundraiser for HAMAS.

660.  HAI transferred funds to various HAMAS-controlled organizations in the Palestinian Territories, but it also distributed substantial sums on behalf of HAMAS to select Palestinians living in Jordan.

661.  HAMAS also established a network of organizations in Lebanon, first among them Sanabil Association for Relief and Development, which received millions of dollars in support from Interpal, HLF, and other parts of HAMAS's fundraising network, and then channeled those funds to the Palestinian refugee camps in Lebanon to build HAMAS's support within that community.

662.  According to the Watson Memorandum, "FBI analysis has linked Sanabil, Interpal and the HLF."

### G.  Early Media Coverage of the HAMAS *Da'wa*

663.  As early as 1994, HAMAS fundraising activities were discussed in the media. For example, an article in *The New York Times* reported:

---

conspiring to provide material support to a designated FTO, in violation of 18 U.S.C. § 2339B(a)(1); nine counts of providing material support to an FTO, in violation of 18 U.S.C. § 2339B(a)(1); and one count of conspiring to provide funds, goods, and services to a specially designated terrorist group, in violation of 50 U.S.C. §§ 1701-1706.

[23]  The Union of Good, chaired by Muslim Brotherhood spiritual leader Sheikh Yusuf al-Qaradawi, evolved into HAMAS's premier fundraising umbrella organization. It began as a short-term fundraising campaign called the "101 Days" campaign.

HAMAS funding of all its activities is estimated by the Israelis at about $30 million a year. It comes from money collected by associations operating largely abroad but with ties to the international Muslim Brotherhood network. Money is also collected from Islamic and Arab communities in the United States and in Britain, the Netherlands and other Western European locations.

664.    Also, on April 14, 1994, *The Globe and Mail* (Canada) published an article titled, "Hamas evolves from political to military group" by Patrick Martin.

665.    The article explained HAMAS's *da'wa* in straightforward terms and identified its best-known institution:

The group calling itself Hamas first made its appearance in 1987, at the start of the Palestinian uprising known as the intifada. Concentrated in Gaza, where Islamic tendencies have always been strong, it stemmed from a decade-old Islamic movement known as the Mujamma …. Sheik Yassin, who had been an activist in the older Muslim Brotherhood, had been imprisoned by the Egyptians during the regime of Gamal Nasser. When the Mujamma turned into the political movement Hamas, Sheik Yassin was again arrested, this time by the Israelis.

666.    In 1996, *The New York Times* reported on HAMAS's intensified fundraising for its network of institutions:

Israeli, Palestinian and Western intelligence officials say Jordan is a major conduit for much of the Hamas budget, estimated at $70 million a year, nearly all of it for the social service network of mosques, hospitals, schools and other institutions that form the movement's political base in the West Bank and Gaza Strip.

…Jordan, intelligence officials say, is a major path through which money reaches the Hamas network of mosques and charities. Jordanian intelligence reports indicate that much of the money is coming from the Persian Gulf emirates and Saudi Arabia.

667.    On September 17, 1997, the British-based *Mideast Mirror* published an article titled "How to break the deadlock: Armed resistance, plus Arab pressure on U.S."

668.    The article quotes the Arabic press regarding Gulf State sources of funding for HAMAS:

According to al-Hayat's sources, only some $ 10 million dollars is raised annually by Palestinian Islamist charities in the Gulf, most of which is paid directly to visiting fund-raising delegations or the charities' bank accounts in Jordan, or via Palestinian support groups based in the U.S. or Britain.

Gulf-based charities also say they make a point of ensuring that recipients are recognized by the Jordanian religious affairs ministry or the PA's Jerusalem-based religious affairs department. They include the Zakat (alms) Committees in Hebron, Jerusalem, Tulkarem, Kalkilya and Gaza, which fund schools, Koran teaching classes and orphanages, provide cash or food aid to the families of martyrs, and run self-help schemes for needy families. Gulf funding also sustains the Islamic Charitable Society in Hebron, Jerusalem's Makassed Hospital, and the Wafa Society in Gaza which looks after the elderly.

Gulf donors also insist that they have always dealt openly with such organizations, which Israel accuses of constituting the "infrastructure" of Hamas. "We used to work with these organizations in broad daylight in the days of direct Israeli occupation, and continued dealing with them under the PA, though regrettably the pressures increased with the advent of the PA," *al-Hayat* quotes one aid worker as saying.

As for higher educational institutions, the main recipient of Gulf aid is Gaza Islamic University, which has long been described as a "Hamas stronghold."

669.    Similarly, an August 11, 2001, article in the *Washington Post* subsequently reported:

On the streets of Gaza, and to a somewhat lesser extent in the West Bank, Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized food to the needy.

According to Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; "martyrs" who have been killed by Israelis; and prisoners in Israeli jails. When pressed, he was vague about the provenance of the money, which, according to the State Department, comes mainly from Palestinians overseas, Iran and private benefactors in Saudi Arabia and other moderate Arab states.

Under pressure from Israel and the West, Arafat cracked down on Hamas and Islamic Jihad following the suicide bombings in 1996. Scores of Hamas activists were jailed, and the terror attacks on Israel faded.

670.     As noted above, on September 25, 1997, the Palestinian Authority temporarily closed what it identified as 16 HAMAS institutions and associations, including HLF's Gaza office, *Al-Mujama Al-Islami* (Islamic Center – Gaza) and *Al-Jam'iya Al-Islamiya* (Islamic Society – Gaza).

671.     *Agence France-Presse* reported on the closures, describing them as the Palestinian Authority's "most devastating blow on the infrastructure of the Islamic Resistance Movement (Hamas) in the Gaza Strip."

672.     The article further noted that the institutions were closed in front of "representatives of the international media, who were invited to accompany the operation" and that the Islamic Society in Gaza, "headed by Ahmad Bahr, one of Hamas['s] leaders" was also "used to host periodical meetings for the movement's leaders."

673.     The article was reprinted in the September 26, 1997, edition of the Palestinian daily newspaper, *Al-Quds*.

674.     The closures, including identification of HLF as a targeted HAMAS entity (together with the Islamic Society of Gaza and *al-Mujama al-Islami*), were detailed in a *Jerusalem Post* (an Israeli newspaper) news account on September 28, 1997.

675.     As the U.S. Government would later note, "[o]ver the years, the PA would, from time to time, attempt to take measures against the zakat committees and other organizations run by Hamas. Closures, however, were always short lived, a product of the political reality in which the PA needed Hamas to provide services that it was unable to effectively provide itself."[24]

676.     An unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's Intelligence Directorate noted that the Palestinian Authority:

---

[24]     *See U.S. v. Holy Land Foundation*, 3:04-cr-00240-P, ECF No. 1171, p. 15 (N.D. Tex. 2008) attached as **Exhibit A** to the Second Amended Complaint.

generally avoids damaging the HAMAS charitable associations and social institutions. A prominent (and practically unique) exception was the "Authority's" action resulting from the February-March '96 suicide attacks. At that time, the "Palestinian Authority" took vigorous steps against HAMAS's civilian infrastructure [by] closing several major charitable associations; confiscating funds, documents, and office equipment; and arresting heads of associations and other people involved in HAMAS-related finance. In our opinion, these moves disrupted the coordination of the associations' activities. Israel acted simultaneously against the Islamic movement's institutions in Nazareth and Um-al-Fahem (primary channels for transfer of funds to HAMAS in the territories) and against "The Holy Land Foundation's" representation in Beit Hanina.

However, a renewal of charitable association activity, even without formal authorization by the Authority (which was usually given retroactively), followed the mid-'96 decline in "Authority" activities against HAMAS's civilian and financial infrastructure.

## H.    Initial U.S. Designations of HAMAS

677.    On January 24, 1995, pursuant to Executive Order 12947, President Clinton designated HAMAS as a Specially Designated Terrorist organization.

678.    This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of HAMAS.

679.    HAMAS's designation as an SDT remained in place during the relevant period.

680.    On October 8, 1997, the Secretary of State designated HAMAS as a "Foreign Terrorist Organization" under section 219 of the Immigration and Nationality Act. That designation has remained in place since October 8, 1997, including throughout the relevant period of this case.

681.    As a result of HAMAS's designation as an FTO, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to HAMAS.

682.    In 1996, under heavy pressure from Israel, the Palestinian Authority (under the leadership of Yasser Arafat and the PLO), which had just been established, took very public measures against HAMAS as a result of a wave of HAMAS terrorist attacks that killed 56 Israelis.

683.    Over the years, the PA would, periodically, attempt to take measures against the charitable societies, zakat committees and other organizations controlled by HAMAS. Closures and arrests were, however, always temporary.

## I.    The Second Intifada

684.    The Second Intifada ("al-Quds" or "al-Aqsa Intifada"), which broke out in September 2000, was a key turning point in HAMAS's history.

685.    In the initial weeks of the Second Intifada, large demonstrations were organized in several Palestinian cities. During this period, a Palestinian mob in Ramallah attacked two off-duty Israeli reservists, lynched them, and celebrated their deaths – with much of the scene captured on camera.

686.    Soon thereafter, HAMAS, Palestinian Islamic Jihad, and the Palestinian Authority's ruling faction, Fatah, all launched attacks on Israeli civilian centers, military installations, vehicles, and civilians through suicide bombings, drive-by shootings, and rocket launchings, which killed over 1,000 Israelis, and left thousands severely wounded.

687.    From September 2000 forward, support by the Palestinian public for HAMAS grew steadily.

688.    At least in part as a result of the public perception that HAMAS was leading the terror campaign against Israel, it won elections at Palestinian universities and trade unions, and later, municipal elections in May 2005.

689.     For approximately the next four years after the outbreak of the conflict in 2000, HAMAS launched hundreds of terrorist attacks targeting civilians that killed and injured hundreds of civilians, including numerous American citizens.

690.     HAMAS's improved political standing among the Palestinians was partially a result of the work of its *da'wa* institutions which were a supportive framework for HAMAS's terror activities, including the use of suicide terrorists, in three main areas:

- HAMAS's *da'wa*'s educational institutions[25] contributed to the indoctrination of young Palestinians into what became a "culture of martyrdom for Allah," praising the religious virtues of those who sacrificed themselves in the framework of jihad against Israel. Suicide terrorists earned a place of honor when they received special praise as martyrs (*shuhada*).

- HAMAS's *da'wa* institutions served as a mechanism to transfer money to orphans, widows, and other relatives of suicide terrorists and movement prisoners, and thus provided a unique safety net for potential recruits concerned that their families would be adversely affected by their deaths or imprisonment. HAMAS committees collected the names of their activists and others who were killed by Israel and then solicited aid from its network of charitable societies abroad. In 2001, Sheikh Yassin, in an interview cited in the *Washington Post*, publicly disclosed that the *da'wa* infrastructure distributed $2-3 million dollars to the families of suicide bombers and prisoners.

- HAMAS's *da'wa* infrastructure provided a reservoir of new recruits for suicide attacks and for HAMAS's terror and murder apparatus.

691.     As Joshua L. Gleis and Benedetta Berti have written in their book, *Hezbollah and Hamas, A Comparative Study*:

---

[25]     The *da'wa* institutions include kindergartens, schools, clubs, mosques, Quran recitation classes, and student councils, most of which were controlled by HAMAS in the course of the Second Intifada. The *da'wa* also funds student associations such as *al-Kutla al-Islamiya*, which is a key source for recruiting operatives into the Qassam Brigades. For example, during the first year of the Second Intifada, at least five students from *al-Najah* University carried out suicide attacks. Other suicide terrorists were students at Hebron Polytechnic University and at al-Quds Open University. The HAMAS charitable societies and zakat committees also ran summer camps, which systematically indoctrinated children with hatred against Israel.

Recruitment for Hamas's active supporters is carried out, mainly through its web of social welfare activities. Palestinians with leadership skills are identified from a young age, and their indoctrination is nurtured through peers and mentors. Those deemed capable of meeting the physical and mental challenges of joining the group's military ranks are directed toward that part of the organization, while others participate in Hamas's plethora of other departments, including its Political Bureau and its offices of finance, propaganda, foreign affairs, and social welfare programs.

In the past, the group relied on a similar process to recruit members and train them to become suicide bombers, which they view as shaheeds, or "martyrs." Volunteers to carry out such operations were recruited through mosques, charities, universities, and student organizations such as the Kutla Islamiya (Hamas's Islamic block). Other community institutions that are part of Hamas's military, political, and social network also played roles in recruitment. The group's own social network was a natural choice for Hamas recruiters. By maintaining a strong social apparatus, Hamas was able to foster a sense of community and inclusiveness, with strong social bonds between the organization and its members. These are all necessary elements in developing a code of shared meanings and values to shape identity, perceptions, and preferences. In turn, this increased the chances of recruits to be loyal, reliable, and fully committed to their task. This was especially so in the case of suicide bombers: "An overarching sense of collectiveness consumes the individual. This fusion with group seems to provide the necessary justification for their actions with an attendant loss of felt responsibility ... if the group says it is required and justified, and then it is required and justified."

692. At the end of 2001, the Palestinian Authority (briefly) closed the offices of several Islamic associations identified with HAMAS, and the Palestinian Monetary Authority instructed bank managers in the Palestinian Territories to report all bank transfers of sums greater than $5,000 and attached a special page of instructions detailing the names of those institutions whose accounts must be reported.

693. These included HAMAS institutions with accounts at CAB.

694. In February 2002, Israel blacklisted 20 institutions belonging to HAMAS, including many of CAB's customers.[26]

695. As a 2009 Report by the Israel Security Agency ("ISA")[27] found:

> Since 1989, a gradual process began whereby Hamas took over charitable associations, which were not affiliated with the Muslim Brotherhood's current. These associations became completely identified with Hamas, and so, in effect, Hamas today controls a tangled web of charitable associations spread across "the Territories" and uses their funds to carry out its "Da'wa" activity….
>
> Hamas is actually funding institutions, which are not strictly used for charitable activities, and in effect they **encourage terrorism**. This is done by supporting religious, welfare, and educational institutions which are controlled by the movement. **These institutions preach for "Jihad" and strongly incite against Israel. They encourage the perpetration of terrorist attacks against Israel, and support the terrorists (deceased, prisoners and wounded) and their families, who are receiving benefits that include grants and monthly allowances.** (Emphasis in original.)

## J. Cultivation of the Culture of Death

696. HAMAS's *da'wa* institutions played (and play) a central role in financing its terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for HAMAS.

697. The terrorist attacks described herein cost between $500 and $5,000 to carry out, depending on the weapons used, whether a vehicle was purchased, or a safe house was rented.

698. The most significant operational costs incurred by HAMAS were reflected in its investment in its cradle-to-grave terrorism infrastructure.

699. From the 1990s through the end of the Second Intifada, HAMAS devoted the

---

[26] As noted above, by law, all commercial entities in the Palestinian Territories, including CAB, were presumptively on notice of Israeli designations.

[27] Attached to the Second Amended Complaint as **Exhibit H**, with an English translation.

majority of its resources to its *da'wa* institutions and activities.[28] This infrastructure provided, among other things, (1) employment to HAMAS leaders and operatives, (2) physical structures from which to operate, hold meeting, and store weapons, (3) a means by which HAMAS could infiltrate mosques and civil society institutions and use them to enhance the organization's public image, (4) a means to recruit young operatives (through camps and student organizations), (5) a means to indoctrinate young children into HAMAS's culture of "jihad" and "martyrdom," and (6) a vehicle to subsidize and reward its operatives and their families when they are killed, imprisoned, or wounded.

700.    The organization's strategy was set forth in an internal HAMAS memorandum captured by the Israeli army during a raid of the offices of the Islamic Charitable Society – Hebron. It confirmed that HAMAS arranged for the "transfer [of] large sums" to the charitable committees and other HAMAS *da'wa* institutions through the "charity activities" of their operatives abroad.

701.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that HAMAS will:

> invest efforts to transfer money for the martyrs (the *shuhada*) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

702.    The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its charitable organizations by, among other things, "***taking advantage of the conditions and the atmosphere of death***."

---

[28]    An op-ed in the *Jerusalem Post* from October 11, 1994, described a HAMAS terrorist attack involving automatic rifles and grenades fired into a crowded pub and cafe area in downtown Jerusalem. A questionnaire found on the HAMAS operative who committed the attack "was prepared by the Hamas-controlled Zakat committees" and asked the applicant about "the extent of his participation in Hamas activities," followed by a question about "the applicant's willingness to be a martyr in the name of the cause of jihad."

703.    Through its network of charitable organizations, since the early 1990s HAMAS has intensified its efforts to consolidate its position within Palestinian society via its social and welfare projects.

704.    Although these organizations perform actual social work and provide charitable services, they also raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up money to be redirected to those latter ends.

705.    These charitable organizations provide streams of income to HAMAS operatives. They also assist HAMAS in recruiting new supporters; generating and disseminating HAMAS propaganda; and competing with the Palestinian Authority in delivering social services and facilitating payments of honorariums (including "martyr" payments) to families of HAMAS operatives killed, injured, or imprisoned as a result of their terrorist activities.

706.    Funds raised by HAMAS's charitable and social organizations are fungible and are allocated in part to terrorist activities (including recruitment, training, and propagandizing) or used to free up other funds that are then allocated for terrorist activities, including planning, and carrying out suicide bombings and other violent attacks.

707.    The aforementioned unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's Intelligence Directorate noted that "HAMAS has acted to develop and expand [its religious-civilian infrastructure] in the 'territories' based on earlier activities of the 'Muslim Brothers' in the same fields" and that this activity:

> is usually carried out under the heading of "charity" ("zakah" one of the five basic principles of Islam). The movement's ideology attributes great importance to [charity] as central to expanding its circle of supporters in the general population….
>
> In the short term, this is designed to maintain HAMAS's influence with the public, to improve its ability to compete with the "Authority" [PA] regime, and to recruit terror activists - including suicide attackers. In the longer

term, the movement hopes that this infrastructure will help it broaden its power base and even create an alternate civilian structure to the "Authority" [PA] as part of its struggle against the "Authority" [PA] and the peace process. HAMAS's overt civilian infrastructure acts alongside its clandestine and terrorist activities and is usually referred to as "Da'wa" (literally: preaching). **This infrastructure serves the movement and it has implications for many aspects of the movement's terrorist activities. Money smuggled into the area and passed to institutions (generally under the heading "charity") reaches HAMAS activists, their families, and the HAMAS apparatus [itself] - including the operational apparatus. Other uses for HAMAS's overt infrastructure include disguising [other] activities and locating recruits to be suicide attackers.** (Emphasis added.)

708.     The Palestinian Authority's own intelligence assessment was similar, noting that "It is not a coincidence that Hamas officials tend to search for suicide operatives among their schools' students or their sport groups and teams. Hamas pays monthly stipends to families of martyrs and the wounded."

709.     For example, Ayman Asad Shaaban al-Shawa was a Qassam Brigades operative arrested in 1993 for attempting a suicide attack. He received five life sentences and was released as part of a prisoner exchange in 2011. During the 18 years he spent in prison, his wife received prisoner rewards payments from a variety of sources to her account no. 75797700 at CAB.

710.     Similarly, Ayd Abdalla Abd al-Hadi Musleh was a Qassam Brigades operative from the Gaza Strip who was arrested in 1992 for participating in attacks in which Israeli soldiers were killed. He received a life sentence and was released as part of the same prisoner exchange in 2011. During the 19 years he spent in prison, his wife received prisoner rewards payments from a variety of sources to her account no. 764687 at CAB.

711.     A June 30, 2002, research paper issued by the Israeli Coordinator of Government Activities in the Territories ("COGAT"), Department for Advisement on Palestinian Affairs, found that:

The Da'wa's informal education system, kindergartens, summer day camps and private schools –the younger generation, from pre-school children to teenagers, are educated in all these (and later also in the university institutions such as the Islamic University in Gaza) to support Jihad and martyrdom operations – the holy war and "death in the name of Allah." There is open and outright indoctrination in these institutions. Children from kindergarten age are educated to revere the suicide attackers and they receive a message according to which, when they grow up, they can fulfill themselves best by carrying out a suicide attack against Israelis. These institutions: kindergartens, charitable societies and schools that operate under the open eye of the PA (apart from closing them for limited periods and mainly for the sake of appearances) have no real limitations on their activity. From the publications of the societies themselves (on the Internet) and from confiscated documents it emerges that they enjoy financial support from various bodies, including Islamic charitable societies throughout the Arab and Western worlds, including international organizations for support and aid throughout the world.

712.    An October 2002 Human Rights Watch report (citing the Watson Memorandum) noted that: "Examples of Hamas-controlled societies that allegedly received funds from the Holy Land Foundation were the Islamic Charitable Society of Hebron, the Jenin Zakat Committee, and the Ramallah Zakat Committee, each of which had among its officials, persons who had allegedly admitted to armed activities with Hamas, including attacks against civilians."

713.    A report issued in December 2004 by the Israeli Civil Administration in the Palestinian Territories ("Government of Israel 2004 Report") also found that:

The financial support for the families of suicide bombers also promotes the phenomenon of suicide bombings, and increases the willingness to perform them, because the terrorist who decides to do so need not worry about his family, whose economic and social situation will improve following his deed. This support, both economic and moral, takes the sting out of the punishment, which in Israel's eyes aims to deter others from joining the ranks of terror. Hamas prisoners enjoy the benefits of special treatment by the associations.

714.    For example, the brother of Hamed Faleh Mustafa Abu Hijla, a HAMAS suicide bomber who blew himself up on Herzl Street in Netanya on January 1, 2001, received multiple payments rewarding the Hijla family for Hamed Hijla's death, including

payments from the *Shahid* Foundation in Lebanon (discussed below) and from the Al-Islah

Charitable Society in Ramallah (paid to Fathi Faleh Mustafa Abu Hijla's account at CAB).

715. Similarly, the family of another HAMAS "martyr" named Iyad Taqi, who

was killed in clashes with Israeli soldiers on November 6, 2001, received $5,100 from the

Arab Liberation Front ("ALF") to account 393501 at CAB.

716. As a 2009 Report by the Israel Security Agency also found:

> **Interrogations of Hamas activists and terrorists revealed that the support to the family sometimes contributed significantly to the mere decision to execute attacks, including suicide attacks….**
>
> **In addition, Hamas's "Da'wa" system serves as a central tool for nurturing the "future generation" of Hamas supports and new recruits, including those assigned to commit terrorist attacks.** In effect, all the "Da'wa" frameworks constitute a recruitment pool for the movement. The financial aid, which is guaranteed in various fields (including reduced tuitions and university scholarships), is luring people into joining the movement, and even into taking part in its military activity and into executing terrorist attacks.
>
> In this context it should be mentioned that a terrorist knows he will be rewarded even if he will only be injured. He also knows that in case he is killed during a terrorist attack, Hamas will continue to financially support his relatives, and so his death will not be in vain, as the livelihood of his family is assured. (Emphasis in original.)

**K.** **Union of Good**

717. As noted above, the Union of Good (also known as the Charity Coalition or *I'tilaf*

*Al-Khayr* in Arabic) was established in October 2000, at the beginning of the Second Intifada, as

the umbrella organization for HAMAS's global fundraising activity.

718. Comprising more than 50 separate organizations – several of which have been

designated SDGTs by the U.S. Treasury Department, including Interpal and CBSP (two major

HAMAS fundraising organizations in Europe) – the Union of Good originally was conceived of

and initially operated as a one-time fundraising campaign to support the Second Intifada – the so-

called "101 Days Campaign" – but it ultimately developed into a permanent structure.

719. In 2001, the Union of Good created an Arabic language website for the 101 Days Campaign, simultaneously launching English and French webpages soliciting donations.

720. At the same time, HAMAS's fundraising organization in the United Kingdom, Interpal, also created additional pages on its own website (www.interpal.org) to raise funds for the Union of Good and its "101 Days Campaign."

721. In 2001, Interpal's "International Donations" page listed the Holy Land Foundation[29] as the designated donation point in the United States and provided its website and banking information:



722. From its inception, Sheikh Yusuf al-Qaradawi, the Muslim Brotherhood's spiritual leader served as the chairman of the Union of Good.

723. Sheikh al-Qaradawi was and remains one of the most recognized and famous

---

[29] As noted above, in December 2001, the U.S. government designated the Holy Land Foundation as a Specially Designated Global Terrorist for its role in financing HAMAS. Accordingly, by February 2002, Interpal's "International Donations" page substituted the Global Relief Foundation as the designated donation point in the United States and provided its website and banking information (while still listing a bank account for the Holy Land Foundation). In October 2002, the U.S. government designated the Global Relief Foundation for providing support to Osama Bin Laden, Al Qaeda, "and other known terrorist groups."

people in the Arab and Muslim world. As illustrated below, his image is iconic:[30]



724.  When the Union of Good created its initial websites, Sheikh al-Qaradawi's widely recognized image appeared prominently on the homepage. For example, the English language homepage for www.101days.org in July 2001 appeared as follows:



---

[30]   The photograph shown here was taken in 2013 in Gaza where Sheikh al-Qaradawi was hosted by HAMAS (now supreme) leader Ismail Haniyah and other senior leaders of the organization. His image on the billboard has the place of honor above that of HAMAS's founder and deceased spiritual leader, Sheikh Ahmed Yassin, and Ahmed al-Jabari, the former second-in-command of the Qassam Brigades who was killed in 2012 in a precision air strike by the Israeli Air Force.

725. Born in 1926 in Egypt, Sheikh al-Qaradawi was an adherent of the teachings of Hassan al-Banna, the founder of the Muslim Brotherhood. Because of his connection with the Muslim Brotherhood, Sheikh al-Qaradawi was imprisoned for lengthy periods in Egyptian jails.

726. Sheikh Al-Qaradawi was (and is) one of the most recognizable figures in the Arab and Muslim world. During the years before, during, and after the Second Intifada, he was best known for his weekly television program on the *Al Jazeera* satellite channel called "Sharia and Life" ("al-Sharīʿa wa al-Ḥayāh"), on which he analyzed numerous topics through the lens of Islamic thought. The *Al Jazeera*-hosted program reached approximately 60 million viewers during its height before its end in 2013.

727. Sheikh al-Qaradawi was also one of the first Islamic scholars to launch his own website (Qaradawi.net) and was also a co-founder of the popular Muslim Brotherhood website IslamOnline.net, which features a large number of his *fatwas* (Muslim religious edicts). Both sites were launched in the late 1990's, provide religious guidance, and receive heavy internet traffic. He has written over 120 books and has gained even greater eminence throughout the Muslim world by serving as the chairman of numerous Islamic organizations and operating on a variety of media platforms. For example, for many years he has served as the chairman of the Dublin-based European Council for Fatwa and Research (ECFR), an influential European Muslim institution that has issued *fatwas* for Europe's practicing Muslims since its founding in 1997.

728. He is (and during the relevant period was) one of the Muslim world's most prominent public supporters of HAMAS and its campaign of violence against Israel.

729. Sheikh al-Qaradawi has long stated that "[t]he martyr operations [sic] is the greatest of all sorts of Jihad in the Cause of Allah."

730. Even before the Second Intifada erupted in 2000, Sheikh al-Qaradawi was a leading

voice in Arab and Islamic politics endorsing violence against Israel, publicly asserting, for example: "There should be no dialogue with these people [Israelis] except with swords."[31]

731.    Sheikh al-Qaradawi issued a *fatwa* that gave HAMAS and other terrorist groups religious approval authorizing suicide bombing attacks (including by women) against Israel. Indeed, in March 2002, in *Filastin al-Muslima*, al-Qaradawi stated that the participation of women in suicide terrorist attacks is not only permitted but even desirable, and that it is permitted for a woman to deviate from the rules that obligate her in daily life, from the point of view of preserving her modesty, to carry out the suicide attack (for example, in his ruling, al-Qaradawi permits women to travel for the purpose of carrying out the suicide attacks without being escorted by a male relative, and is even lenient in regard to covering her head and wearing a veil).

732.    During 2001, on his *Shariah and Life* broadcast on *Al Jazeera*, Sheikh al-Qaradawi was asked what could be done to show the Palestinian people that there were people standing by them. He replied:

> No doubt there are steps that need to be taken at the official and popular level… There is another thing: Financial Jihad. Our brethren are struggling for money. They are sacrificing themselves. They are giving martyrs every day. Thank God this means that the Umma is giving martyrs. Women cry for joy at the death of the martyrs… We should give aid to our brethren to reinforce their steadfastness, to try and overcome the blockade enforced on them.

733.    Later in the interview, Sheikh al-Qaradawi answered further questions about the duties of Muslims regarding the conflict with Israel, and he said:

> We should resist and resist with what we have. We do not have nuclear weapons… I am surprised at any Muslim who calls these acts "suicide acts." These are martyrdom, commando and heroic acts. We should hail those who carry out these acts and bless them and call on God to take them to live in Paradise. They are there, God willing, because of their intentions, works, efforts and Jihad.

---

[31]    *See* "Leading Muslim Cleric Under Fire for Meeting Israeli Chief Rabbi," *AP Worldstream*, January 7, 1998, quoting a January 6, 1998, article by al-Qaradawi in the Arab newspaper *Al-Shaab*.

734.     In an interview in the Egyptian newspaper *Al-Ahram Al-Arabi* on February 3, 2001, al-Qaradawi explained his ruling:

> He who commits suicide kills himself for his own benefit, while he who commits martyrdom sacrifices himself for the sake of his religion and his nation. While someone who commits suicide has lost hope with himself and with the spirit of Allah, the Mujahid is full of hope with regard to Allah's spirit and mercy. He fights his enemy and the enemy of Allah with this new weapon, which destiny has put in the hands of the weak, so that they would fight against the evil of the strong and arrogant. The Mujahid becomes a 'human bomb' that blows up at a specific place and time, in the midst of the enemies of Allah and the homeland, leaving them helpless in the face of the brave Shahid who... sold his soul to Allah, and sought the Shahada [Martyrdom] for the sake of Allah.

735.     In an April 25, 2001, interview with a Qatari newspaper, *Al-Raya*, al-Qaradawi further explained that suicide bombings against targets in Israel "are the supreme form of Jihad for the sake of Allah, and a type of terrorism that is allowed by the Shari'a." He cited a Koranic verse stating that one must be prepared to "spread fear among one's enemies and the enemies of Allah," and added that "the term 'suicide operations' is an incorrect and misleading term, because these are heroic operations of martyrdom, and have nothing to do with suicide. The mentality of those who carry them out has nothing to do with the mentality of someone who commits suicide."[32]

736.     On September 16, 2001, al-Qaradawi appeared on *Al Jazeera* Television in Qatar to discuss the September 11, 2001, attacks on the World Trade Center and Pentagon. Striking a note of "moderation" he distinguished the September 11th attacks from those targeting civilians in Israel:

> We must differentiate between two types of terror: the terror of those defending their homeland and their rights… This kind of terror is legitimate. The Palestinian factions defending their land, such as Fatah, Hamas, or Islamic Jihad, are not terrorists. [It is] a Jihad for the sake of Allah…

---

[32]     Also quoted in Michael Slackman, "Islamic Debate Surrounds Mideast Suicide Bombers," *Los Angeles Times*, May 27, 2001.

Even if the US is guilty, in that it supports this Israeli terror, I say that this does not mean that we may attack civilians in the US, because the civilians are not guilty. We should fight the American military if we can, and if we cannot, we should fight the US economically and politically.

737. On April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

738. Sheikh al-Qaradawi explained that:

one of this Intifada's merits and its good effects and its blessed fruits, is the awakening of the nation ... this blessed Intifada awakened the nation ... for gathering aid and support. I'm afraid to call it donations ... it is not voluntary. This is a duty which applies on the nation. Our brothers wage holy war and sacrificing their soul in the path of Allah. So, at least we should give some of our moneys ... the Quran always said: "fight the holy war with your souls and moneys in the path of Allah."

739. In a May 4, 2002, article published in *Akhbar al-Khaleej* (UAE), al-Qaradawi's lecture (given in the UAE) reiterated his view that collecting money for the mujahideen (jihad fighters, or "Muslim holy warriors") was not a donation or a gift, but "a duty necessitated by the sacrifices they made for the Muslim nation."

740. On June 13, 2003, al-Qaradawi appeared on Qatar Television to discuss, among other things, the Bush Administration's efforts to restart negotiations between the Palestinian Authority and Israel. Al-Qaradawi stated:

The Intifada expresses an assertive and proud people, a heroic people, a people that is unperturbed by death. A people that wants to live free, in honor, or die martyred. It is inconceivable that this people will die, despite the attempts of the Zionist entity state and of its strategic ally, the U.S. As much as they try to kill the Intifada and crush the resistance, they will not succeed….

I say to [PA Prime Minister] Mahmoud Abbas, to [PA Security Minister] Muhammad Dahlan, and to the ministers who support them, that the day Hamas and [Islamic] Jihad, Al-Aqsa Martyrs Brigades, and the Mujahideen cease to exist, nothing will remain to negotiate about or to cling to. You will

stand in your nakedness. No one will support you. What pushed the Zionists and the Americans to present the road map is the [defeat] they suffered as a result of the martyrdom operations that shook their foundations, undermined their existence, and sowed fear in their hearts.

741.    In a July 7, 2004, interview for BBC's "Newsnight," al-Qaradawi, referring to the suicide attacks, said: "I consider this type of martyrdom operation as an evidence of God's justice."

742.    As noted above, HAMAS has often relied on Sheikh Al-Qaradawi's legal rulings in matters of current import and often turn to him to obtain legal rulings, which are published from time to time in HAMAS's official newspapers (such as *Filastin al-Muslima*). As a 2009 ISA Report found: "Al-Qaradawi is considered by Hamas, among others, a religious and spiritual authority. His numerous public statements reveal his belief that 'Jihad' must be waged against Israel and the Jews."

743.    Al-Qaradawi's support of terrorism led the United States to ban him from entering the country in 1999.

744.    As noted above, the 101-day fundraising drive was so successful that the Union of Good was converted into a permanent institution. It quickly became the preeminent Muslim Brotherhood fundraising mechanism in the world, raising (at least) tens of millions of dollars for HAMAS.

745.    HAMAS leaders have also served openly in the Union of Good's executive leadership. For example, the Secretary General of the Union of Good, Essam Salih Mustafa Yussuf, also acted as the Vice-Chairman of Interpal while serving on the HAMAS executive committee under then-HAMAS leader Khalid Mishal.

746.    On February 25, 2002, the Union of Good was designated by Israel in an order of the Minister of Defense of the State of Israel, based on its being "part of the Hamas organization or supporting it and strengthening its infrastructure."

747. The Government of Israel 2004 Report also found that:

The "Union of Good" divided the Palestinian territories into four districts. In each district it was associated with institutions and societies that carried out projects on its behalf:

- Southern District - the city of Hebron, the surrounding villages and refugee camps and the city of Bethlehem, including the surrounding villages and refugee camps. The "Union" operates in this area in conjunction with the "Islamic Society," which is based in Hebron.

- Central District - Jerusalem, Ramallah, Al-Bireh and Jericho. In this area, the "Union" operates in conjunction with the "Al-Islah" Charitable Society, which is based in Ramallah.

- Northern District - Nablus, Tulkarem, Jenin and Qalqilya. Here, the Nablus-based "Al-Tadamun" Society serves as the link.

- Gaza Strip District - Gaza, Khan Yunis, Rafah and the surrounding villages and refugee camps.

748. The Union of Good was designated by the U.S. Treasury Department as an SDGT on November 12, 2008. According to the Treasury Department:[33]

Union of Good acts as a broker for HAMAS by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to HAMAS—and HAMAS-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.

Funds raised by the Union of Good affiliates have been transferred to HAMAS-managed organizations in the West Bank and Gaza. In addition to providing cover for HAMAS financial transfers, some of the funds transferred by the Union of Good have compensated HAMAS terrorists by providing payments to the families of suicide bombers. One of them, the Al-Salah Society, previously identified as a key support node for HAMAS, was designated in August 2007 under E.O. 13224. The Society employed a number of members of the HAMAS military wing and supported HAMAS-affiliated combatants during the first Intifada.

---

[33] A copy of the U.S. Treasury Press Release is attached as **Exhibit I** to the Second Amended Complaint.

## L.    World Assembly of Muslim Youth ("WAMY") in Gaza

749.    As noted above, WAMY operated an office for HAMAS in the Gaza Strip during the relevant period, and CAB maintained an account for WAMY in Gaza.

750.    WAMY is reportedly the world's largest Muslim youth organization. It was founded in Jeddah, Saudi Arabia, in 1972, and became a Union of Good member organization in 2001.

751.    Senior WAMY officials, Dr. Saleh Bin Sulaiman al-Wahibi (who served as the organization's general-secretary) and Dr. Abd Al-Wahhab Nurwali, al-Wahibi's aide in the region of Mecca, both sat on the Union of Good's board of trustees during the relevant period.

752.    In 1996, the Central Intelligence Agency determined that the International Islamic Relief Organization (IIRO) and WAMY, both Saudi charities associated with al-Qaeda, were also funding HAMAS through Interpal.

753.    Indeed, WAMY's Gaza office received funds from Interpal during the relevant period.

754.    As described below, Saudi media reported in 2001 that WAMY provided funding to the *Al-Salah* Islamic Society – Gaza ("*al-Salah*"), which was then disbursed as financial assistance to the families of "martyrs."

755.    In July 2001, the mass-circulation Arabic newspaper, *Al-Sharaq Al-Awsat*, reported that WAMY had decided to build a new mosque in the Dir al-Balah area of Gaza, as part of the organization's efforts to support the Palestinian people. According to the report, *al-Salah* was supervising the project.

756.    WAMY invited HAMAS's senior leader, Khalid Mishal, to its "Muslim Youth and Globalization" conference on October 29, 2002.

757. According to an October 29, 2002, *Agence France Presse* report, "[Mishal] was hugged and kissed by hundreds of participants."

758. *The Arab News* of April 12, 2002, reported: "The World Assembly of Muslim Youth (WAMY) has decided to raise its monthly contribution to Palestinian Intifada from [Saudi Riyal] 3 million [$800,000] to [Saudi Riyal] 10 million [$2.7 million] …" The increase in monthly aid to the Intifada was "in addition to the over $70 million they had collected from donations through WAMY offices abroad and on special occasions."

759. WAMY was declared an unlawful association by Israel on February 25, 2002, in large part for its role in funding HAMAS institutions discussed below.

760. In October 2003, CAB processed a transfer from the Al-Aqsa Foundation (designated an SDGT in May 2003) to WAMY's CAB account no. 6255/1 at its Gaza branch.

761. Even as late as 2004, CAB processed *multiple* funds transfers from the Al-Aqsa Foundation to WAMY's CAB account no. 6255/1 at its Gaza branch.

762. On at least one occasion, a January 2004 wire transfer for $68,989.31 from the Al-Aqsa Foundation to WAMY's CAB account was blocked in New York.

763. WAMY distributed at least some of the funds it received from the Al-Aqsa Foundation to *Al-Jam'iya Al-Islamiya* and the Jenin Zakat Committee.

## II. CORE INSTITUTIONS OF HAMAS'S SOCIAL WELFARE NETWORK

764. All of the organizations listed below were integral parts of HAMAS during the relevant period, and CAB knew this was so because (1) HAMAS repeatedly acknowledged those relationships in various Arab language and even Western media, (2) various media outlets repeatedly identified these organizations as integral parts of HAMAS both before and during the relevant period, (3) the Palestinian Authority took periodic steps to close these institutions and

arrest their leaders, and (4) Israel designated many of these institutions, raided their offices, and arrested their leaders.

765.    Most importantly, as the FBI determined in 2001, the Palestinian "civilian population is aware that the services being provided by the zakat committees …are being provided by HAMAS." In fact, the primary purpose of these organizations was to help HAMAS maintain popular support, to compete with the Palestinian Authority, and to recruit activists, including individuals for its deadly terrorist attacks.

### A.    Key HAMAS Institutions in Gaza

766.    At the Philadelphia Conference in 1993, the FBI's wiretaps caught the words of Dr. Mu'in Shabib, a HAMAS operative, describing the close connection between HAMAS and several of its core institutions in Gaza:

> The principal organization known to be affiliated with us is the **Islamic University of the Gaza** region, and we will speak later regarding solutions. We mention it because it is a real wound in our heart. **Number two, the Islamic Complex, which was founded in 1973 and received a license in 1976. The activities of the Complex were then more comprehensive. The Islamic Society**, which was founded in 1976. **The al-Salah Society** in the region (Gaza), which supervises the sacrifices and other matters. The Young Women's Muslim Association and **the al-Wafa Society for the Care of the Elderly**, the orphanage, a number of charity committees, a number of social service institutions which received new licenses, such as the Institution for Law and Justice, which cares for the prisoners. (Emphasis added.)

767.    Following the Palestinian Authority's temporary closure of various HAMAS institutions, on October 14, 1997 the Palestinian newspaper *Al-Quds* reported that the Deputy Chairman of the Palestinian Legislative Council, Ibrahim Abu Al-Najja, met to discuss the closures with a delegation of Islamic organizations in Gaza, which included the secretary general of *Al-Mujama Al-Islami* [Islamic Center], Ibrahim Al-Yazuri; his deputy, Sheikh Muhammad Shama;

Chairman of *Al-Jam'iya Al-Islamiya* [Islamic Society], Sheikh Ahmad Bahar; and the chairman of the *al-Salah* Association, Ahmad Al-Kurd.

### 1. Islamic University of Gaza

768. The Islamic University of Gaza was established in 1978 after the Egyptian government retaliated against the PLO for its criticism of Egypt's peace treaty with Israel and blocked Gazan students from studying in Egypt.

769. Sheikh Yassin used the controversy to orchestrate the violent removal of the university's PLO-affiliated administration and its replacement with *Al-Mujama Al-Islami* members. It took five years, but Yassin ultimately gained control, and the university was split into two entities: Al-Azhar University, which the PLO continued to control; and the Islamic University of Gaza, which came under the control of *Al-Mujama Al-Islami* and Yassin.

770. Since the 1990s, the Islamic University of Gaza has been identified exclusively with HAMAS and has served as a major source for recruitment of people into the organization's ranks in Gaza, including into the ranks of the Qassam Brigades.

771. Since the 1990s, the university's board, staff, and lecturers significantly overlapped with HAMAS's leadership in the Gaza Strip and the boards of directors of *Al-Mujama Al-Islami* and the Islamic Society of Gaza (*Al-Jam'iya Al-Islamiya*) – both discussed in detail below.

772. Many of the university's students were recruited by the Qassam Brigades, and committed suicide attacks during the Second Intifada, among them Nafedh Ayesh Mustafa al-Nadher, who blew himself up near a bus heading to Kfar Darom on July 9, 2001, thus "killing many of the sons of monkeys and pigs, the cowardly Zionist infidels," according to the Qassam Brigades website.

773. The Qassam Brigades also used the Islamic University's facilities for its military

purposes, such as storing weapons in it; exploiting the University's laboratories for developing and manufacturing weapons; and holding secret meetings of the Brigades' commanders and members in it. This was true both before and during the period relevant to this case.

774.     On March 8, 1994, the *South Florida Sun-Sentinel* published an article titled "Hamas Official Vows to Block Mideast Peace," reporting:

> Soft-spoken **Dr. Mahamoud Al-Zahar trains medical students and nurses by day and runs a terror organization by night.**
>
> He just smiles when asked whether he actually does the latter. He lets others, Palestinians and Israelis, confirm that he is a top operative of Hamas, the vicious military arm of the Islamic Brotherhood.
>
> With a kind smile, Al-Zahar goes on grading a batch of exams from nursing students. **Five pistol shots ring out outside, somewhere on the campus of the Islamic University of Gaza, where he is dean of the School of Nursing.**
>
> "Think nothing of it," he said. He gets up to point out several bullet holes in the glass partitions of an office nearby. "These shots were fired by the (Israeli) soldiers. One has to protect himself."
>
> From his demeanor, it would be unlikely to think of Al-Zahar as anything but an excellent surgeon and former chairman of the Arab Medical Association.
>
> But in the files of Shin Bet, the Israeli secret service, Al-Zahar is classified as one of the ranking men of Hamas, which is fighting a war of terror against Israel. (Emphasis added.)

775.     A May 3, 1994, article in the *Los Angeles Times* referred to the Islamic University of Gaza as "a Hamas stronghold."

776.     A November 8, 1994, article in *The New York Times* reported:

> Hebron has long been a bastion of Islamic fundamentalism. But the surge in Palestinian Islamic militancy has now become widespread in the West Bank and the Gaza Strip. Hamas, as the Islamic Resistance Movement is known in Arabic, is well entrenched, amply financed and thoroughly disciplined.

**Support for the group permeates the Palestinian landscape from the courtyards of the militant Islamic University of Gaza** to the little villages of the West Bank to the Arab restaurants of East Jerusalem, where wealthy Palestinian merchants and businessmen meet. (Emphasis added.)

777.     The *Miami Herald* reported on November 27, 1994, on its front page:

Outside the white-walled **Islamic University of Gaza, a center of Hamas support** with a student body of about 5,000, a 19-year-old physics major said in perfect English that the peace process will not liberate Palestinians.

"The Hamas people don't like to kill people," said the student, who identified himself only as Mos. "But I think Jews are our enemy, not our friends. They can't be our friends. They hate us. We hate them. We want all of Palestine, not just Gaza Strip." (Emphasis added.)

778.     On December 18, 1995, *Agence France Presse* reported:

Islamic Resistance Movement (HAMAS) militants put on a play Monday showing a Palestinian killing a Jew, on the day their movement began reconciliation talks with the PLO, witnesses said.

The play was shown at the **Islamic university of Gaza City** in front of 1,000 students crying "Allah Akbar" (God is great), the witnesses said.

A masked Palestinian representing HAMAS used a dagger and a pistol to kill the Jewish character, identified by his kippa hat, as students chanted: "We will throw the sons of the Zionists into the dustbin of Palestine."

The play marked the final day of a HAMAS campaign for student council elections at the university which take place on Tuesday. (Emphasis added.)

779.     On March 6, 1996,[34] the *Mideast Mirror* reported that:

[O]n Wednesday, **Arafat sent his police into the Islamic University of Gaza, a stronghold of Hamas, in a six-hour search for weapons and wanted activists**.

Arafat, under intense Israeli and U.S. pressure to crush Hamas, told reporters in Gaza he was taking "very big and tough" measures against the group.

---

[34]     The following day the *Toronto Star* reported on the raid: "A force of 200 police broke down the doors of the Islamic University of Gaza, a Hamas stronghold that had previously been immune from security sweeps."

> A Reuter correspondent who visited the university in Gaza after the swoop said police had shot open or broken doors and ripped asbestos roofs off several structures during the search.
>
> "They were asking about weapons and wanted Hamas activists," one of the guards said.
>
> No students were at the school during the night raid by 200 policemen and none came to class later.
>
> The Islamic University of Gaza condemned the raid, during which it said a number of guards were arrested and facilities damaged. In a statement it urged Arafat to stop such actions. (Emphasis added.)

780.    HAMAS's founders, Salah Shehada (who later co-founded HAMAS's Qassam Brigades), Ibrahim Fares al-Yazuri, and Abd al-Aziz al-Rantisi were among several prominent HAMAS leaders who were publicly affiliated with the University. In fact, more than ten percent (47) of the *Marj al-Zuhur* deportees were employees, administrators, or students at the Islamic University of Gaza.

781.    Khalil Isma'il Ibrahim al-Haya, who also served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005, lectured in Islamic Law at the Islamic University of Gaza. Haya is now the deputy of Hamas's senior leader in Gaza, Yahya Sinwar.

782.    Current supreme HAMAS leader Ismail Haniya (an SDGT) served as the dean of the University of Gaza.

783.    Muhammad Saleh Taha (discussed in detail below), a co-founder of *Al-Mujama Al-Islami*, also lectured at the Islamic University of Gaza as did other HAMAS luminaries, including Ahmed Bahar and Mahmud al-Zahar (both contemporaneously identified as senior HAMAS spokesmen and leaders in numerous news reports).

784.    A March 7, 1996, article in the French daily newspaper *Nouvel Obs* titled "Who can stop the killers of Hamas?" reported that HAMAS is not only a terrorist organization, but also

– and mostly – a nebula of associations, schools, and orphanages, and that HAMAS controls most of Gaza's kindergartens, as well as the Islamic University of Gaza and 40% of its mosques. Among the institutions controlled by HAMAS, the article also mentions *al-Salah* [Islamic Society] and the Islamic Society of Gaza – all CAB customers.

785.    On March 10, 1996, the *Los Angeles Times* reported:

> In the past week, Arafat has rounded up most of Hamas' political leaders, along with about 600 suspected Hamas activists detained since the wave of bombings began Feb. 25.
>
> The latest, Ibrahim Yazouri, one of seven Hamas founders and a pharmacist who heads the Islamic Community Center in Gaza,[35] was arrested at his home Friday night, his family confirmed Saturday.
>
> Palestinian security officials said they also arrested Ahmed Bahar, another co-founder of Hamas and a professor of religion at the Islamic University of Gaza, but relatives denied it.

786.    In a March 13, 1996, Op-Ed in *Newsday*, Gary E. Rubin, then executive director of Americans for Peace Now wrote: "The Palestinian Authority must prove it can control its own territory and has already taken several significant steps. Yasser Arafat has denounced the terrorists publicly and in Arabic. He has staged antiterror demonstrations in Gaza and the West Bank. His security forces have raided Hamas institutions - including the Islamic University of Gaza - that were misused to support terrorism, and have arrested over 600 Hamas supporters, including military wing leaders."

787.    An April 8, 1996, article in the *Dallas Morning News* about the Holy Land Foundation titled "Paper trail leads to Hamas; 2 organizations based in Richardson deny they promote agenda of anti-Israel terrorists," notes that "[i]n Gaza and the West Bank, Middle East experts say, Hamas is widely regarded as one of the largest and most efficient providers of social

---

[35]    *Al-Mujama Al-Islami.*

services. The Holy Land Foundation helps support some of those Hamas institutions. The Islamic

University of Gaza is listed by the foundation as one recipient. It is known as a Hamas bastion ….”

788.    A December 11, 1996, article published by *United Press International* reported:

> **More than a thousand supporters of the extremist Islamic Resistance
> Movement, Hamas, called Wednesday for a renewal of attacks on Israel
> at ceremonies marking the movement's ninth anniversary. During the
> gathering at the Islamic University of Gaza**, carried out without
> opposition by Yasser Arafat's governing Palestinian Authority, students
> burned an Israeli flag, chanted "revenge...revenge" and called for the
> resumption of the attacks against Israel.
>
> The students also waved pictures of the movement's ailing spiritual leader
> Sheikh Ahmed Yassin, who is serving a life sentence after he was convicted
> in 1989 for giving orders to kidnap and kill two Israeli soldiers. (Emphasis
> added.)

789.    On December 15, 1997, the German news service *Deutsche Presse-Agentur*

reported:

> Hamas activists Monday called for a resumption of suicide attacks on Israel,
> sources in Gaza said.
>
> **Hundreds of Hamas and Islamic Jihad supporters made the call at a
> student council election rally at the Islamic University of Gaza**.
>
> Dozens of students at the university burned an effigy of Israeli Prime
> Minister Benjamin Netanyahu, calling him a war criminal, and calling on
> Hamas to "fight the enemies of Allah," a reference to the Israelis. The
> activists also burnt Israeli and U.S. flags.
>
> The election campaign also featured banners calling for a renewal of suicide
> bombings against Israel and posters depicting a blown-up Israeli bus.
>
> "Jewish settlements are cancer in the Palestinians' body," read one poster.
> "The only way to eliminate it is by blood and martyrdom."
>
> Dozens of Israelis have been killed in suicide attacks perpetrated by the
> Moslem fundamentalist Hamas and Islamic Jihad in an effort to sabotage
> the peace process.
>
> **Supporters of fundamentalist Islamic movements have won every
> annual election to the Islamic University's student council since its**

**establishment in 1979.** The last suicide attack occurred in early September in a Jerusalem pedestrian mall. (Emphasis added.)

790. On April 22, 1998, the German news service *Deutsche Presse-Agentur* reported:

Islamic opposition leaders in the Gaza Strip called on the Palestinian police to release more than 300 prisoners from the Palestinian prisons.

Hamas leader Ismael Haneya told about 2,000 students in a rally at the Islamic University of Gaza that the arrests will "never dissuade Hamas from continuing its Jihad (holy war) against Israel."

791. A March 28, 2000, news item published by *United Press International* reported: "Palestinian Police forces on Monday broke into the Islamic University of Gaza looking for what they called 'incitement materials', Palestinian sources said Tuesday. The Islamic University is known as a supporter of the Islamic resistance movement Hamas."

792. A June 5, 2000, article in the *Jerusalem Report* (written by *The New York Times* correspondent Isabel Kershner) offered a detailed comparison between Al-Azhar University in Gaza and its rival, the Islamic University of Gaza:

The two universities of Gaza - one a Fatah institution, the other a bastion of Hamas - sit side by side but are worlds apart.

ZA'ED HASSANAT STRUTTED through the campus of Al-Azhar University in Gaza a day before the May 8 student council elections, relaxed in the knowledge that victory was only 24 hours away. Indeed, by the end of vote-counting the next evening, Hassanat's Shabibah bloc, the youth wing of Yasser Arafat's Fatah organization, had garnered 88 percent of the vote and Hassanat was safely installed as the new president of the student council.

The fact that Hassanat faced no serious opposition is easily explained: Al-Azhar is a "Fatah" university, founded in 1991 on direct orders from Arafat. "It was a political decision to establish a national Palestinian university," recalls Mazen Hamdan, director of Al-Azhar's president's office. "The order came from Tunis and we were obliged to respond."

The idea was to set up a counter to the Strip's only other university, **the Islamic University of Gaza (IUG), one of Hamas's leading institutions, with prominent members of Hamas's local political leadership, such as**

122

**Dr. Mahmud Zahar and Dr. Abd al-Aziz Rantisi, on its staff.** In student council elections at IUG in early April, the pro-Hamas bloc won 74 percent of the vote.

The campuses sit side-by-side in downtown Gaza, with only an old stone wall between them. Yet despite the proximity, the two universities are living in two very different realities. While the Shabibah-dominated Al-Azhar basks in the approval of the Palestinian Authority, the Hamas students and staff next door have fallen uncharacteristically silent, afraid of being arrested at every turn.

***

Student relations aren't always neighborly. Both campuses were closed down for a week shortly before the Al-Azhar elections in the wake of serious rioting between the Shabibah and Hamas students that left around 40 injured and the dividing wall demolished.

There are different versions of how the disturbances started, but it seems that the trouble began in the aftermath of the student elections at IUG. Members of the Shabibah contingent within IUG, who make up over 20 percent of the student body, had pasted posters of Arafat around the campus. The removal of the posters by the Hamas-dominated student council infuriated the Shabibah. The IUG conflict quickly spread to the next-door campus and stones started flying between the two. Al-Azhar's Hassanat claims he saw Islamist students running at the Shabibah with iron bars, shouting "Allahu Akbar, let me kill one and go to paradise." Meanwhile, the Shabibah from both campuses staged a sit-in on a disputed soccer ground that belongs to IUG, but to which the Al-Azhar students are laying claim.

According to eyewitnesses, the Palestinian Authority police only arrived two hours after the mayhem started. And when they finally showed up, they invaded the IUG campus in full riot gear, swinging clubs, while a few plainclothes members of the security forces went to deal quietly with the Shabibah on the soccer field and at the university next door. That, seasoned Gazan observers say, is because the police and Al-Azhar students are not just sitting cozily on the same side: with so many of the Shabibah activists on the PA security services' payroll, they are almost indivisible.

To a large degree, the student clash and its aftermath reflect the wider political atmosphere in Gaza. Until a few years ago Hamas activists in the Strip freely spouted against the Palestinian Authority police, openly accusing them of collaborating with the Israeli enemy. Now, administrators and Islamist students at IUG sit tight-lipped, refusing to make any pronouncements for fear of arrest. (Emphasis added.)

793.     An October 9, 2001, article by Lee Hockstader of the *Washington Post* appeared in

the *Pittsburgh Post-Gazette*. It reported that:

> Palestinian officials were embarrassed by scenes of celebration that broke
> out in some neighborhoods immediately after the Sept. 11 attacks in the
> United States. After Sunday's strikes on Afghanistan, officials of the
> Palestinian Authority predicted confidently there would be no
> demonstrations against the United States or in sympathy with bin Laden.
> Arafat allied himself with Iraq during the 1991 Persian Gulf War and is
> determined not to isolate his movement that way again.
>
> But at 10 a.m., about **1,000 students spilled out from the gates of the
> Islamic University of Gaza** and began marching west on 30th Street, a
> major Gaza City thoroughfare, toward the offices of the Palestinian
> Legislative Council. Some displayed posters of bin Laden and chanted anti-
> American slogans.
>
> **Islamic University, with about 14,000 students, is a stronghold of
> Hamas, the Islamic Resistance Movement, a radical group that has
> carried out a string of suicide bombings against Israelis.** The Islamic
> students were joined by students from neighboring Al-Azhar University,
> which is affiliated with Arafat's mainstream Fatah movement.
>
> Hundreds of Palestinian riot police blocked the march, and the students
> began pelting them with stones and bottles. The police drove them back
> several hundred yards into the walled Islamic University campus. Around
> 11 a.m., as the students continued to hurl rocks and bottles at the police
> from inside the gated campus, police opened fire with military rifles. (Emphasis
> added.)

794.     The unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's

Intelligence Directorate noted that "'The Islamic University' in Gaza is a HAMAS stronghold and

is in fact run by the movement."

795.     The June 30, 2002, research paper issued by COGAT found that a "considerable

number of suicide attackers studied at the Islamic University in Gaza and participated in Islamic

student activity there."

796.　On June 29, 2003, the *Toronto Star* reported:

> … **al-Mujamma al Islami**, or the Islamic Bloc, established 30 years ago by spiritual leader Yassin, operates projects ranging from kindergartens to health clinics. In the Islamic tradition of giving alms, even the sons and daughters of Palestinian collaborators share in the Bloc's bounty.
>
> Also associated with the Hamas social-welfare apparatus is the **Islamic Society**, **el-Salah** benevolent society, al-Arqam School and the **Islamic University of Gaza**.
>
> A visit to Islamic University of Gaza last week was a lesson in the tension surrounding Hamas. Like virtually all the related institutions, IUG has drawn a veil upon itself, with administrators refusing to meet with foreign media.
>
> ***
>
> With a student body of more than 10,000, IUG has gained respect for its schools of engineering, nursing, math and sciences, as well as for religious studies.
>
> **In its employ are three of the five main leaders of the Hamas political wing in Gaza, including ultra-hard-line professor Abdel Aziz Rantisi**, a pediatrician by training and a target of botched Israeli assassination attempt three weeks ago. (Emphasis added.)

797.　From the early 1990s through 2004, the Islamic University of Gaza received financial support from CBSP, Interpal, the Al-Aqsa Foundation – Germany and many other HAMAS fundraising organizations.

## 2.　The Islamic Center (or Complex) – Gaza (*Al-Mujama Al-Islami*)

798.　As noted above, the Islamic Center (*Al-Mujama Al-Islami*) was established in 1973 by Ahmed Yassin, the founder of HAMAS and the organization's spiritual leader.[36]

799.　The foundations, infrastructure, and key operatives of *Al-Mujama Al-Islami* laid the basis for the establishment of HAMAS, the future growth and expansion of HAMAS in the Gaza Strip, and later throughout the Palestinian arena.

---

[36]　In 2004, in prepared remarks accompanying the indictment of the Holy Land Foundation, Attorney General John Ashcroft confirmed, "The Islamic Center of Gaza was established by HAMAS leader and founder Sheik Ahmed Yassin and was used by him to coordinate and conduct HAMAS activities."

800.     Both *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* (the Islamic Society), which was founded three years later, in 1976, opened branches throughout the Gaza Strip.

801.     In 1978, a branch of *Al-Mujama Al-Islami* was established in Khan Yunis.

802.     In that same year, several kindergartens which belonged to the organization in Gaza, were established.

803.     In 1985, *Al-Mujama Al-Islami*'s al-Aqsa School was built in Khan Yunis. Shortly after HAMAS's establishment, an additional seven branches were set up throughout the Gaza Strip.

804.     These branches were run by people who later would become the founders of HAMAS, including al-Rantisi (the branch in Khan Yunis Refugee Camp) and Abd al-Fatah Dukhan (Nusairat branch).

805.     A 2000 fundraising brochure explicitly linked *Al-Mujama* to Al-Aqsa Foundation – Germany. The brochure referred to the "fragrance of the blood of the martyrs and wounded which watered the pure soil" and confirmed that Al-Aqsa Foundation donors "are committing Jihad with your monies in the land of [the people of] steadfastness, whose blood is violated and whose sanctuaries are desecrated everyday..."

806.     A subsequent brochure touting *Al-Mujama*'s social welfare activities featured photographs of HAMAS's iconic founder and spiritual leader, Sheikh Yassin, directly above one of the organization's bank account numbers at CAB. Attached as **<u>Exhibit J</u>**.

807.     An article in the December 19, 1992, issue of *The Economist* stated: "Ahmed Yassin, the wheelchair-bound founder of the fundamentalist Palestinian Islamic movement Hamas, is in prison for kidnapping and murder. Yassin, a former member of the Muslim Brotherhood, founded the **Islamic Center** in 1973 and Hamas in 1987." (Emphasis added.)

808. A December 31, 1992, article in the French daily newspaper *Le Monde*, titled "The Hamas Movement Struggles for the Creation of an Islamic State in Palestine" also noted that *Al-Mujama* was created by HAMAS's spiritual leader, Sheikh Ahmed Yassin.

809. A September 11, 1993, article in *Le Monde*, titled "Israel-PLO: Mutual Acknowledgment - Hamas, the Main Obstacle," explained how HAMAS used *Al-Mujama al-Islami* to develop multiple networks: sports clubs, youths and women organizations, day care centers, clinics, Qur'anic schools, and how it took control over students and workers unions.

810. A November 7, 1993, article in *The New York Times* reported:

> On the grass-roots level, Hamas leaders hope to maintain their movement's influence, which has been built through a growing network of social service organizations aided by financing from Saudi Arabia, other gulf Arab states and Iran. Hamas has used Islamic welfare groups to win support, especially in the impoverished Gaza Strip, where it has filled gaps left by inadequate Government services.
>
> Islamic associations run kindergartens and summer camps. They give food and money to poor families, provide clothing and financial aid to orphans and needy pupils and have organized cleanup and home repair campaigns in refugee neighborhoods. One group in Gaza appealed this week for donations to families whose houses were recently rocketed by Israeli troops searching for armed fugitives.
>
> "Our actions speak louder than 100 mosque sermons," said Ibrahim al-Yazuri, a pharmacist who leads Al-Mujama al-Islami, an Islamic group founded in Gaza in the 1970's. Hamas, a militant offshoot of Al-Mujama al-Islami, emerged when the Palestinian uprising began in the occupied territories in December 1987.

811. An October 21, 1994, article in *Le Monde*, titled "Après l'attentat de Tel-Aviv Hamas, mouvement de la résistance islamique" reported that HAMAS's spiritual leader, Sheikh Ahmed Yassin, was sentenced to life in prison in October 1991 for murder, incitement to violence and arms possession. It notes that he created *Al-Mujama Al-Islami*, which used to engage in Muslim proselytism, but which transformed into HAMAS with the advent of the First Intifada.

812.     An October 27, 1994, article in the French daily newspaper *Nouvel Obs* titled "Palestine: The Financial Supporters of Hatred," reported that HAMAS's objective is to destroy Israel; that one of its main tools is money; and that the Societe d'Aide Publique (Public Aid Society) and the Collectif Islamique (*Al-Mujama Al-Islami*) are HAMAS organizations. It further explained that HAMAS uses its funds to combine help for the poor (by funding schools, hospitals, and other social services) and terrorism.

813.     A January 26, 1995, article in the *Jerusalem Report* magazine reported:

> The bearded, thirtysomething organizers of **Mujama Islami** ("Islamic Collective"), another charity, decline to meet us, although we have an appointment. "We've decided not to talk to the press," their spokesman apologizes. "**They only write that we're working for Hamas." It's not hard to see why. The charity is housed in one of Gaza City's most imposing modern mosques, from whose pulpit crippled preacher Sheikh Ahmad Yassin launched Hamas, the Islamic Resistance Movement.** Yassin, who has been in an Israeli prison since 1989 convicted of organizing terrorist cells and operations, lived nearby in the Sabra neighborhood. The mosque's polished limestone walls are spray-painted liberally with the current Hamas slogan – "Dying for the Sake of Allah is our Highest Goal" - and plastered with posters of the latest "martyrs." (Emphasis added.)

814.     On December 1, 1996, the *Associated Press* ran a story titled, "From Gaza Alleys to Turkish Slums, Helping Hand Key to Success." The article reported:

> **The Islamic Society is part of a sprawling network of charities and social institutions with ties to the Islamic Resistance Movement, better known as Hamas, whose gunmen and suicide bombers have staged repeated attacks inside Israel.**
>
> **But before any Hamas activist picked up a gun, its affiliated social service groups were building popular support, mixing charity, Islamic consciousness and politics.**
>
> "Hamas is a grass-roots organization," said Khalil Shikaki, director of a Palestinian think tank. "It's very well-organized, its traditional message works well and it excelled in services under the occupation when you had no government to provide them."

128

*** 

Financed by up to $ 120 million a year, largely donated by Palestinians working abroad and supporters in the Persian Gulf, the community work of Hamas overshadows its smaller but influential military wing, to which only a fraction of its thousands of supporters belong.

The biggest charity in Gaza, **al-Mujama al-Islamiya, was founded by Sheik Ahmad Yassin, the jailed leader of Hamas.**

(Emphasis added.)

815. On January 15, 1997, the *Chicago Tribune* ran the same article quoted in the prior paragraph.

816. A December 9, 2001, article in *Le Monde*, titled "Sheikh Ahmed Yassin: The Soul of Extremists," reported that Sheikh Ahmed Yassin was the spiritual leader of HAMAS and Palestinian Islamists more generally. The article describes HAMAS as a movement included on the U.S. government's list of terrorist organizations and that it is responsible for most anti-Israeli terrorist attacks, including suicide attacks. It further attributes to Yassin the creation of *Al-Mujama Al-Islami* and HAMAS, whose charter states that "every Jew and every [Jewish] colonizer is a target and must be killed."

817. It is this violent terrorist goal of HAMAS that *Al-Mujama* institutions adhere to in carrying out their activities. For example, an April 25, 2002, article in the *San Francisco Chronicle* described the work of *Al-Mujama al-Islami* in encouraging children to grow up to become martyrs and kill Jews*:*

Six days a week, kindergarten teacher Samira Ali El Hassain tells her class of 30 5-year-old boys and girls what makes the world go round.

"Here is how an egg becomes a chicken," she says to a student. "Here is how to draw a circle," she tells another.

Hassain then quizzes the class about a previous, more serious lesson. "Who are the Jews?" she asks.

The children know the answer by heart: "The enemy!" they reply in unison.

"And what should we do to them?" Hassain asks in a voice that is as casual as when she discussed chickens and eggs.

"Kill them!" the children cry out.

Hassain works at a school run by **Al-Mujamma Al-Islami** (the Islamic Association), an Islamic charity group created in 1973 by Sheikh Ahmed Yassin, the founder and spiritual leader of the militant group Hamas. Such schools represent about 10 percent of Gaza kindergarten classes and are the only ones to teach such vitriol.

Signs that extol violence are found everywhere these days in the streets of Gaza City, the capital of the Palestinian-dominated Gaza Strip.

On the walls, graffiti calls on residents to "kill the Jews" and "die like shahid (martyrs)" – the men and women who have died trying to kill Israelis. Instructions on how to become a shahid are spray-painted, along with photos of weapons, exploding buses and portraits of men wrapped in explosives.

And if that isn't enough to convince Gaza's children – many of whom spend their days roaming the dusty streets, playing in sandbag barricades, shooting toy assault rifles and throwing stones at each other – hatred of Israelis is part of their kindergarten lesson plan.

TEACHING RESENTMENT

"I tell them that they are Palestinians, that they must defend their land when they grow up, that this land belongs to them and not to the Jews, our enemies," said the 35-year-old Hassain. "Every morning, I ask them: 'Did you watch the news? Do you love the enemy who massacres the Palestinian people? Would you want to make peace with them when you grow up?'"

Her 24-year-old colleague, Istama Showish, imparts a similar message.

"We teach them that Jews who live in Jerusalem and Palestine are occupiers, that they have taken even the air that we breathe," she said.

**Al-Mujamma Al-Islami** has won the hearts of many poor Palestinians in the Gaza Strip by donating food and clothes and setting up affordable schools. The kindergarten where Showish and Hassain teach costs just $7 a month, about half the cost of a regular day-care facility here.

But Yassin, the organization's founder, who uses a wheelchair and lives in a compound in the slums of the city, is also indelibly linked with Hamas – which claimed responsibility for some of the deadliest suicide bombings in Israel, including the March 27 attack that killed 25 Israelis at a Passover meal.

Abdel Aziz Rantisi, a top Hamas political leader, denies that his group is linked with **Al-Mujamma Al-Islami**. But he clearly supports the association's anti-Israeli curricula for 5-year-old children.

"You see? Even children want to sacrifice themselves for the sake of Palestine," Rantisi recently told The Chronicle at Hamas headquarters in Gaza City. "We are using our own, simple means to say to the aggression of a strong army: 'Stop.'

Back in Gaza, however, the kids at the **Al-Mujamma Al-Islami** kindergarten class started a new game last week called "martyr's funeral."

"One of them pretended to be a martyr, while the others lifted him up and pretended that they were burying him," said Showish. "We tell them that the shahid are very good people, our heroes. We tell them that they must grow up and do the same." (Emphasis added.)

818.     In a September 9, 2002, article titled "Hamas Uses Charity as Draw; Surpasses Arafat's Group in Popularity," New York's *Newsday* reported:

Hamas acknowledges exploiting the economic situation for political gain.

"Yes, we do it like any other political movement," said Ismail Abu Shanab, a senior Hamas leader in Gaza. Charitable work "comes from our ideological conception and our beliefs. … It has totally increased, maybe three times."

\*\*\*

"Most of our funding comes from Islamic organizations in Europe and some charitable organizations and individuals," said Mohammed Shama'a, the head of **Al-Mujama al-Islami**. (Emphasis added.)

819.     According to an April 2003 report by the International Crisis Group, the affiliation of the extensive network of institutions that comprise *Al-Mujama* with HAMAS is "readily apparent" and "all but official."

820.     In an article on the popular Islamist website Islamonline.net, Ismail Haniya,

HAMAS's current supreme leader, stated that *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya*, and *al-Sala*h Charitable Society provide financial support to the martyrs' families, the injured, the prisoners, and the detainees of the Intifada.

821. Following are details of the most important figures in *Al-Mujama Al-Islami*:

- **Ahmed Yassin**: Sheikh Yassin, one of the founders of HAMAS and the founder of *Al-Mujama Al-Islami.* Yassin was arrested in 1984 after founding *al-Mujahidun al-Filastiniyun*[37] and was sentenced to 13 years' imprisonment. He was released in 1985 as part of the "Jibril Prisoners' Exchange." He was arrested a second time in 1989, tried and sentenced to life imprisonment for his role in planning the murder of two Israeli soldiers before being released from prison once more, as a result of a botched Israeli assassination attempt in Jordan in 1997. On January 25, 1995, the U.S. Department of Treasury designated Yassin a Specially Designated Terrorist. Upon his return to Gaza, Yassin rebuilt his standing within the HAMAS leadership.[38] On August 22, 2003, the United States declared him a Specially Designated Global Terrorist for his involvement in HAMAS. On March 22, 2004, Yassin was killed by Israel's security forces. To this day, Yassin has remained an object of veneration for HAMAS supporters, who see him as a source of authority and inspiration for the continuation of their jihad against Israel.

- **Abd al-Aziz al-Rantisi**: Al-Rantisi was one of the seven founders of HAMAS, and one of the organization's key leaders in the Gaza Strip. With the founding of HAMAS in 1987, Rantisi was appointed to head the military wing (Qassam Brigades) in the southern districts of the Gaza Strip. Rantisi served as a member of *Al-Mujama Al-Islami*'s administrative board and founded the organization's Khan Yunis branch. In 1992 he was temporarily deported, along with other senior members of HAMAS, to *Marj al-Zuhur*, where he served as HAMAS's chief spokesman to the Western media.[39] In March 1998, Rantisi was

---

[37] The organization was the Muslim Brotherhood's precursor to HAMAS's Qassam Brigades.

[38] It is difficult to overstate Yassin's stature and notoriety within Palestinian and even pan-Arab culture from the mid-1990s until his death in 2004. For example, *Agence France Presse* reported on October 6, 1997: "Yassin, who has become an icon of resistance for Islamist and secular Palestinians during his years of prison, had to be lifted in his wheelchair to push through the cheering crowds towards the stage at Gaza's Yarmouk stadium. At the entrance, the armed wing of HAMAS, Ezzedin al-Qassam, which conducts HAMAS's bomb attacks, stretched a banner reading: 'We renew our oath and loyalty to the holy Warrior Sheikh Ahmed Yassin.'"

[39] Rantisi was regularly quoted on behalf of HAMAS in the Western press. For example, *Agence France Presse* reported on August 21, 1997, that "the social network created by HAMAS – kindergardens, medical clinics, charity organizations, youth clubs, even a matchmaking service -- employs hundreds of people and, more importantly, benefits thousands. 'Our services provide a large section on Palestinian society, and not just HAMAS supporters. This is public

arrested by the Palestinian Authority and held for a period of 15 months for his continued activities related to HAMAS. He was considered the most radical voice within HAMAS political leadership in the Palestinian Territories. He publicly and explicitly encouraged HAMAS operatives to carry out *suicide actions* against Israel; he praised those who responded to the call for "self-sacrifice"; and he preached ceaseless war that would end with the destruction of Israel. On August 22, 2003, the United States designated Rantisi an SDGT. After Sheikh Yassin was killed by Israeli forces on March 22, 2004, Rantisi was declared his successor and appointed as leader of HAMAS in the Palestinian Territories. On April 17, 2004, Rantisi was killed by Israel's security forces.

- **Ibrahim Fares al-Yazuri**: Al-Yazuri was one of the "founding fathers" of HAMAS and a close friend of Ahmed Yassin. He was also one of the founders of *Al-Mujama Al-Islami* in the seventies and a member of the organization's administrative board from its inception. Al-Yazuri served as Chairman of *Al-Mujama Al-Islami* following Yassin's arrest and imprisonment in 1984. In 2000, he was listed as the Secretary General of *Al-Mujama Al-Islami.* He also taught at the Islamic University of Gaza. Al-Yazuri was later sentenced to 26 months imprisonment in Israel because of his HAMAS-related activities and subsequently arrested several times by the Palestinian Authority (following terrorist attacks carried out by HAMAS against Israel). In October 1998, the PA arrested Yazuri because he was a HAMAS leader.

- **Muhammad Hasan Sham'a**: Sham'a was involved in the establishment of *Al-Mujama Al-Islami* and oversaw the organization's public relations. Sham'a was also listed as Deputy Secretary General of *Al-Mujama Al-Islami*. Subsequently he was one of the seven founders of HAMAS and one of its political leaders. He was among the deportees to *Marj al-Zuhur* and was later arrested by the Palestinian Authority in 1995[40] and 1998.

- **Issa Khalil al-Nashar**: Al-Nashar was one of the seven founders of HAMAS and was responsible for its activity in Rafah. He served on the board of *Al-Mujama Al-Islami.* Al-Nashar was briefly arrested by Israel in 1988 for his membership in HAMAS and later deported to *Marj al-Zuhur*. In November 1995, he participated in the creation of HAMAS's National Islamic Salvation Party and served as head of its political

---

work,' said Abdel Aziz al-Rantisi, a HAMAS political leader in Gaza City."

[40] *Agence France Presse* reported on June 26, 1995, that those arrested by the PA "included two HAMAS founders -- Ibrahim al-Yazuri and Mohammad Shama -- and three other senior fundamentalists, Mahmud Zahar, Sheikh Ahmed Bahr and Sheikh Ahmed Nimr."

bureau. In 1995, Al-Nashar was detained for four months by the PA Security Forces.

- **Khalil Isma'il Ibrahim al-Haya**: Haya served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005. In 1981, during his studies at the Islamic University of Gaza, he became a member of the Islamic Students Association (*al-Kutla al-Islamiya*) and tried, on several occasions, to take control of the University's campus together with other members of *Al-Mujama Al-Islami*. He served as Chairman of the HAMAS faction in the Palestinian Legislative Council in 2006-2007 and was one of the best-known HAMAS leaders in the Gaza Strip. He was imprisoned by Israel in 1991 for activities connected with HAMAS.

- **Abd al-Fatah Dukhan**: Dukhan was one of the seven founders of HAMAS. He served as head of the *Al-Mujama Al-Islami* branch in Nusairat Refugee Camp and was one of the *Marj al-Zuhur* deportees. He has served as a member of the Palestinian Legislative Council as part of HAMAS's Change & Reform Party.

- **Khalil Ibrahim al-Quqa**: Al-Quqa was one of the founders of *Al-Jam'iya Al-Islamiya* and headed the *Al-Mujama Al-Islami* branch in Shati. He was also one of the first to join HAMAS. Two weeks after HAMAS's establishment, Al-Quqa was arrested by Israeli security forces for incitement against Israel. Al-Quqa was deported by Israel to Lebanon in 1988, and from there he moved to Tunis and later Egypt. Two years later he was expelled from Egypt (1991) to the United Arab Emirates, where he died of natural causes in 2005.

- **Muhammad Saleh Taha**: Taha, a CAB customer discussed further below, took part together with Ahmed Yassin in the founding of *Al-Mujama Al-Islami* and served as a member of the organization's Administrative Council. He was arrested on several occasions, both by Israel and by the Palestinian Authority, for his HAMAS-related activities and was deported to *Marj al-Zuhur* in 1992 along with Rantisi and Sham'a. He has served as a lecturer at the Islamic University of Gaza. Taha was arrested numerous times by both Israel and the PA.

- **Osama al-Mazini**: Al-Mazini was one of the heads of HAMAS's political leadership and one of the movement's prominent spokesmen. Al-Mazini served as a member of the Administrative Council of *Al-Mujama Al-Islami*. He also served as a lecturer in the Department of Psychology at the Islamic University of Gaza. He is married to Ahmed Yassin's daughter. Al-Mazini was arrested many times by Israel and by the Palestinian Authority, following terrorist attacks committed by HAMAS.

- **Nizar Muhammad Awd-Allah**: As one of Ahmed Yassin's close associates, Awd-Allah was involved in the kidnapping and murder of Israeli soldiers Sasportas and Saadon in 1989, for which Yassin was sentenced to 13 years in prison. Awd-Allah was a senior operative in both HAMAS and *Al-Mujama Al-Islami*. Awd-Allah was also appointed as the commander of the Qassam Brigades in Gaza following the arrest of Salah Shehada in 1988.

- **Maryam Muhammad Yusuf Farhat:** In 1981, Farhat supervised the women's activities at *Al-Mujama Al-Islami.* Her eldest son, Nidal Farhat, joined the Qassam Brigades in 2000 where he oversaw the planning and carrying out of numerous terror attacks and became a HAMAS bombmaker. Farhat encouraged another son, Muhammad, to carry out a suicide attack, and was photographed with him before he departed for the attack. Farhat was elected in 2006 to the Palestinian Legislative Council as part of HAMAS's Change and Reform Party. She died in 2013.

822.    Because it was HAMAS's operational headquarters in Gaza, *Al-Mujama Al-Islami* was temporally closed by the PA on September 25, 1997.

823.    On August 24, 2003, the Palestinian Monitory Authority issued an order to freeze *Al-Mujama Al-Islami* bank accounts in all banks in the Palestinian Territories in order to stop funding HAMAS institutions.[41]

824.    Due to its central role as a supporter of HAMAS's jihad activity, *Al-Mujama Al-Islami* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the commander of the Israel Defense Forces ("IDF's") Central Command on June 30, 2002.

825.    Throughout the relevant period (including 2002-2003 after Israel separately outlawed *Al-Mujama Al-Islami*), CAB maintained accounts for *Al-Mujama Al-Islami.*

826.    On May 29, 2007, the United States Department of Justice identified *Al-Mujama*

---

[41]    *USA Today* reported on the freeze order, including the actions taken against *Al-Mujama* and also noting that "Palestinian officials confirmed Thursday that the Palestinian prime minister believes two of the charities – Al Jamiya Al Islamiya and As-Salah - are fronts for Hamas …."

*Al-Islami* as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

827. From the early 1990s through 2004, *Al-Mujama Al-Islami* enjoyed financial support from HAMAS fundraising organizations through its account(s) at CAB that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

828. From HAMAS's founding in 1987, *Al-Mujama Al-Islami* has been synonymous with HAMAS and has served as the nerve center of the movement. Its leadership, operatives, and activities have all been inextricably linked with HAMAS's violent terrorist activities.

### 3. The Islamic Society – Gaza (*Al-Jam'iya Al-Islamiya*)

829. The Islamic Society (*Al-Jam'iya Al-Islamiya*) was founded in the Gaza Strip in 1976 by Ahmed Yassin and other senior member of the Muslim Brotherhood.

830. Like *Al-Mujama Al-Islami* (the Islamic Center), it served as a base for disseminating ideology and the political platform of the Muslim Brotherhood in Gaza in the seventies.

831. From the time of HAMAS's establishment, *Al-Jam'iya Al-Islamiya* was a significant HAMAS stronghold, operated and controlled by individuals who were identified initially with the Muslim Brotherhood and ultimately with HAMAS.

832.  *Al-Jam'iya Al-Islamiya*'s official web site has, for many years, featured an image of Ahmed Yassin, the founder of HAMAS and *Al-Jam'iya Al-Islamiya*.

833.  Similarly, senior HAMAS figures regularly participate in *Al-Jam'iya Al-Islamiya* events. Since the mid-1990s, the society has not hidden its affiliation with HAMAS from Western journalists, and this fact was published by the leading Western media outlets.

834.  As early as 1993, an article in the *Independent* by Sarah Helm described a Gaza kindergarten "run by the Islamic Society which is controlled by Hamas, the militant Islamic movement."[42]

835.  An article in the *Boston Globe* on September 5, 1993, about tensions between HAMAS and the PLO, reported: "'The military option is the only way to liberate the rest of Palestine,' said Sheik Hassan Deib, head of the Islamic Society of Gaza, when asked if Hamas activists would give up their arms to a Palestinian police force. 'The struggle between us and the Jews is eternal . . . I expect Arafat to try to suppress us. If that happens, we'll have to resist.'"

836.  Similarly, both *The New York Times* ("In Gaza, Peace Meets Pathology," November 27, 1994) and the *Financial Times* ("Fundamentalists Split Palestinian Unity," September 9, 1988) identified the Islamic Society of Gaza as part of HAMAS.

837.  A December 18, 1994, *Jerusalem Post* article described a HAMAS rally in Gaza where a banner at the entrance to the soccer stadium showed a Qassam Brigades operative, "emerging from an exploding grenade with the words, 'We count the gates of paradise with the skulls of Jews.'" According to the article, "Sheikh Ahmed Bahr, head of the Islamic Society" was a featured speaker at the rally.

---

[42]  Even the *International Labour Review* (Vol. 132 – 1993) noted that "Hamas has drawn its greatest support from a programme of Islamic education and welfare run by its social wing, the Islamic Society, which distributes alms to the poor and runs nine kindergartens. It teaches children reading, writing and Islam."

838. A January 26, 1995, article in the *Jerusalem Report* magazine reported:

> The bearded, thirtysomething organizers of Mujama Islami ("Islamic Collective"), another charity, decline to meet us, although we have an appointment. "We've decided not to talk to the press," their spokesman apologizes. "They only write that we're working for Hamas." It's not hard to see why. The charity is housed in one of Gaza City's most imposing modern mosques, from whose pulpit crippled preacher Sheikh Ahmad Yassin launched Hamas, the Islamic Resistance Movement. Yassin, who has been in an Israeli prison since 1989 convicted of organizing terrorist cells and operations, lived nearby in the Sabra neighborhood. The mosque's polished limestone walls are spray-painted liberally with the current Hamas slogan – "Dying for the Sake of Allah is our Highest Goal" - and plastered with posters of the latest "martyrs."
>
> The biggest of the major charities, **the Islamic Society**, is less bashful, though its middle-aged managers say they're leaving for an out-of-town funeral when we pull up at their gate. The society's director is Sheikh Ahmad Bahar, **a senior Hamas ideologue** who returned a year ago after being deported to Lebanon in 1992. About 120 children are enrolled in one of its two Gaza City kindergartens, near the Shati refugee camp. Some of the little girls arrive with their heads covered for modesty. As well as verses from the Koran, they learn to sing songs in praise of Hamas operations. Their teachers regale them with stories of the armed struggle, which they project as the only way to build an Islamic state and "liberate" Jerusalem from the Jews. (Emphasis added.)

839. On April 11, 1995, an article in *Le Monde* titled "Peace threatened by Palestinian Kamikazes" describes Bahar's rationalization for Hamas-perpetrated terrorist attacks:

> The Imams of [Islamic] Jihad and Hamas, the Islamic resistance movement, found the theological parade. "They are not suicide operations"—Sheikh **Ahmad Bahar, one of the leaders of Hamas, Head of Jamaya Islamiya, first Islamic charitable association in Gaza**, will explain to us with a soft voice. "We call them Jihad operations. Jihad is recommended by the Koran against the enemy. In the eyes of Allah, it is legitimate to inflict upon the enemy what it inflicts upon you. It is God's vengeance, not man's. God chooses the sacrificial hero, no one else. Allah's will must be accomplished." (Emphasis added.)

840. On June 30, 1995, following a Palestinian Authority raid of *Al-Jam'iya Al-Islamiya*'s offices, *Agence France Presse* described it as a charity linked to the Islamic Resistance Movement [HAMAS] and identified Ahmed Bahar as a senior figure in HAMAS:

Palestinian intelligence officers raided Friday a charity linked to the Islamic Resistance Movement (Hamas) and confiscated files, video tapes and 400 dollars, Hamas said.

Hamas members described the raid at the Islamic Association office in Gaza City as "very serious".

The charity association was set up in 1976 by Sheikh Ahmad Bahr, today a senior figure in Hamas which spearheads resistance to Israeli occupation and PLO autonomy.

841. An August 29, 1997, article in *The Guardian* (UK) reported:

Hamas has won a string of small but indicative elections in student and professional organisations, and now controls the student body on almost every Palestinian campus. In Gaza City, its "Islamic Society" kindergarten for the children of the poor, political detainees and "martyrs" is one of the best-funded in the Strip.

The school, one of more than 10 controlled by Hamas, also holds summer camps for older children and computer workshops for adults.

842. In September 1997, the Palestinian Authority (temporarily) closed *Al-Jam'iya Al-Islamiya*, along with 15 other societies identified with HAMAS.

843. Following a HAMAS terrorist attack in Israel in October 1998, the Palestinian Authority began a wave of arrests against HAMAS operatives in Gaza. Among those arrested were the Chairman of *Al-Jam'iya Al-Islamiya*, Sheikh Ahmed Bahar, Muhammad Faraj Mahmud Husain al-Ghul, and other senior personnel in the society.

844. A July 23, 1999, article published by the *Knight Ridder* wire service titled "Hamas wedding a political event" noted: "Thursday night's event was organized by **the Islamic Society, the social arm of Hamas**, the militant Islamic organization better known for the deadly suicide bombings that stalled the Israeli-Palestinian peace process in 1996." (Emphasis added.)

845. The article described how the Islamic Society organized a mass wedding in Gaza. HAMAS distributed $100 in cash and $100 in gifts to each bridegroom. The Qassam Brigades

distributed fliers that called for a renewal of the Jihad against Israel and the United States. When Ahmed Yassin arrived at the celebration, the crowd cried out, "We have spilled our blood for you, Sheikh Yassin. Your way is the Jihad. We hope to die in the way that God has chosen." HAMAS leader (and the current head of HAMAS), Ismail Haniya, declared: "No leader may hand over even a meter of the territory of Palestine. This is Islamic land, belonging to the nation."

846.    On August 6, 2000, the *Dallas Morning News* published an article about its reporter's interview with HAMAS leader Mahmoud Zahar, described as a "frequent spokesman for Hamas" and "a co-founder of the Islamic Society, the social services wing of Hamas."

847.    According to HAMAS's official website, in December 2000, the Islamic Society of Gaza organized a ceremony in honor of the "martyrs'" families attended by Sheikh Ahmed Yassin. During the ceremony, the society's chairman, Ahmed Bahar, stated that "martyrdom" is life for the nation and the "martyrs" will be advocates for their relatives on judgment day. He expressed how proud he was of the "martyrs" and declared the upcoming victory of Allah's worshippers.

848.    In December 2001, the Palestinian Authority closed a number of societies run by Islamic organizations (HAMAS and Palestinian Islamic Jihad), among them *Al-Jam'iya Al-Islamiya*. And on January 6, 2002, the Palestinian Monetary Authority directed the Palestinian banks to report on the sums of money held in the accounts of *Al-Jam'iya Al-Islamiya* and required them to consult with it prior to withdrawing funds from those accounts.

849.    Also in December 2001, Ahmed Bahar, Chairman of *Al-Jam'iya Al-Islamiya*, delivered a speech in the Al-Omri Mosque in Gaza during the funeral of a Palestinian "activist." In the speech, Bahar condemned the policy of arrests carried out by the PA and called on the public to join "the warriors protecting the nation's honor and the Al-Aqsa Mosque." He demanded the

PA join the jihad, since it is the only way, according to Bahar, to get rid of the Israeli occupation. In addition, he called on the Qassam Brigades to land "painful blows on the Jews" and protect the Palestinian cities.

850.    A particularly disturbing example of indoctrination activity undertaken by the Islamic Society in Gaza is reflected in a video[43] of a graduation ceremony held for 1,650 children from its 41 kindergartens. According to a widely distributed video and photographs of the event, the children were dressed in uniforms and given "toy" rifles or suicide belts to carry and performed by swearing an oath "to pursue jihad, resistance, and Intifada."

851.    One little girl posed with her hands dipped in red paint mimicking the bloodied hands proudly displayed by several Palestinians after lynching two Israeli army reservists who had become lost near Ramallah. Another pair of children were dressed as Sheikh Yassin and Hezbollah's supreme leader, Sheikh Hassan Nasrallah, while many other children dressed as suicide bombers. Children read excerpts of Nasrallah's (then) recent speeches, and their friends waved Hezbollah flags.

852.    *Al-Jam'iya Al-Islamiya* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the IDF's Central Command on June 30, 2002.

853.    On January 1, 2002, the BBC Monitoring Service published an article translating a HAMAS report (put out by the HAMAS political bureau's official website) claiming "a large-scale campaign" by Palestinian police forces "closing a number of Hamas Islamic Resistance Movement and Islamic Jihad-backed institutions and societies."

---

[43]    Images from the video are attached to the Second Amended Complaint as **Exhibit K**. The video can be viewed at https://www.osenlaw.com/sites/default/files/uploaded/Counter-Terrorism/Arab_Bank/hamas_org/PX1132.mp4. The event was covered in the June 29, 2002, editions of multiple publications.

854. The report identified the Islamic Society of Gaza (*Al-Jam'iya Al-Islamiya*) as one of "[t]he Hamas-backed societies."

855. The *Mail on Sunday* (London) published an article in 2002 about a controversial donation made by the British Consulate in Jerusalem to the Islamic Society of Gaza.

> But our inquiries have revealed the leadership of **the Islamic Society**, known in Arabic as Al Jamayia Al Islamiya is closely associated with Hamas and the group has been shut down several times on Yasser Arafat's orders.
>
> Its secretary general, Sheikh Ahmed Bahar, was arrested by the Palestinian Authority's security forces alongside several Hamas leaders in October 1998 during a clampdown on terrorism. He was then described by the Palestinians as leader of the Hamas splinter group the Islamic National Salvation Party.
>
> Indeed, **the Islamic Society** makes no secret of its support for the terrorists. (Emphasis added.)

856. Following are details of some of the important leaders in *Al-Jam'iya Al-Islamiya*:

- **Ahmed Yassin**: He was also one of the founders of *Al-Jam'iya Al-Islamiya*.

- **Ahmed Bahar**: Bahar was Chairman of *Al-Jam'iya Al-Islamiya* between 1985 and 2004. Bahar was arrested by the Israeli security forces and was imprisoned several times in Israeli jails, as a result of his membership in HAMAS. One of the *Marj al-Zuhur* deportees in 1992, he was arrested several times by the Palestinian Authority following terrorist attacks carried out by HAMAS. In June 1995 he was arrested by the PA's Preventive Security, and his beard was shaved off as an act of humiliation by his captors.[44] Ahmed Bahar worked at the Islamic University of Gaza between 2002-2003, as a lecturer in the department of Arabic language and as deputy dean of the Faculty of Arts. Bahar also served as first deputy speaker of the Palestinian Legislative Council on HAMAS's "Change and Reform Bloc" political party.

---

[44] In 1996, HAMAS took a tentative step into electoral politics, briefly forming the Islamic National Salvation Party. *United Press International* reported on March 22, 1996, that: "Four others of the 19 members of the party's board have been arrested recently in a crackdown by Palestinian police against Hamas. One of them is Ahmed Bahar, senior head of the Islamic Society, who was deported by Israel in 1992 to South Lebanon, among more than 420 activists expelled."

- **Muhammad Faraj Mahmud Husain al-Ghul**: Al-Ghul is one of the founders of *Al-Jam'iya Al-Islamiya*, a member of its administrative board, and served as its Secretary General. Al-Ghul also worked at the Islamic University of Gaza as a lecturer. Before the outbreak of the Second Intifada, he also served as attorney for senior HAMAS figures imprisoned in Israel, among them Sheikh Ahmed Yassin. Al-Ghul was jailed by Israel between 1981 and 1992 for terrorist activities and was one of the *Marj al-Zuhur* deportees; in 1998 he was arrested by the PA Preventive Security Services.

- **Isma'il Hassan Muhammad Abu Shanab**: Abu Shanab was one of the founders of *Al-Jam'iya Al-Islamiya*. He also worked at Islamic University of Gaza as a lecturer at the faculty of engineering and as president of the Faculty of Applied Science. Abu Shanab was also Sheikh Yassin's deputy. He was arrested by Israel in 1989 and imprisoned for 8 years. After his release from Israeli prison, Abu Shanab became a political leader of HAMAS until he was killed in 2003.

- **Ismail Abd al-Salam Ahmed Haniya**: Haniya served as a member of the administrative board of *Al-Jam'iya Al-Islamiya*'s senior administrative body and headed its club in Gaza for approximately ten years. Haniya led the Islamic Students Association (*al-Kutla al-Islamiya*) in the Islamic University of Gaza in the early 1980s and was the head of the Islamic University Student Union in 1985-86. Haniya held several positions at the Islamic University of Gaza, among them Secretary of the Board of Trustees and the University's Director of Academic Affairs. Haniya was arrested by Israel several times and was also one of the *Marj al-Zuhur* deportees. He served as Sheikh Yassin's chief of staff following Yassin's release from prison in 1997. In 2006, he became "Prime Minister" in the HAMAS government in Gaza, and in 2017 he was appointed as the overall leader of HAMAS.

857. In a letter dated November 28, 2002, the German Intelligence Service (BND) informed the German Ministry of the Interior in Berlin that it believed the Islamic Society of Gaza was part of HAMAS.

858. According to the BND:

The association Al-Jam'iya Al-Islamiyaya should be considered closely associated with HAMAS. Al-Jam'iya Al-Islamiyaya has [at] least ten branches in the Gaza Strip. The president of the entire association is Dr. Ahmad Bahr, a member of the HAMAS leadership. In the winter of 2001/2002 Al-Jam'iya Al-Islamiyaya was banned by the Palestine Authority because of allegations of its affiliation with HAMAS. In 2001,

143

the association ran 41 of its own kindergartens for 1650 children of preschool age. During a schoolyear-end party of these kindergartens in the summer of 2001 in the center owned by the association in the refugee camp al-Shati (Gaza Strip) several kindergarten classes presented paramilitary performances and parades which clearly called for the glorification of violence and support for HAMAS suicide attacks. Thus, boys about 5 years old in uniform and equipped with toy automatic weapons presented paramilitary exercises. They wore the headbands of HAMAS suicide bombers with which assassins record a video message to their families before attacks. During the same party's show scenes appeared of a child disguised as HAMAS-leader Sheikh YASSIN, surrounded by more children with "bomb belts" and thus recognizable as suicide bombers. In another scene a girl before a model of the Jerusalem Dome of the Rock dipped her hands in "blood" (red paint) and with "bloody" hands held high symbolically called for the continuation of the Intifada. In closing the festive event, the president of the association Dr. Ahmad BAHR held a speech in which he praised, among other things, the "martyrs" fallen against Israel, more particularly he named the "martyr Mahmud MARMASH as a shining example for the children. On 5/18/2001, Mahmud MARMASH carried out a suicide attack in Netanya, during which 5 Israelis were killed and 74 injured.

859.     Payments to Marmash's family as a result of his "martyrdom" were deposited into CAB Account No. 1518 26968400 in Tulkarem.

860.     From the early 1990s through 2004, *Al-Jam'iya Al-Islamiya* enjoyed financial support from HAMAS fundraising organizations through its account(s) at CAB that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

861.     In sum, *Al-Jam'iya Al-Islamiya* was (and is) synonymous with HAMAS and since

the founding of HAMAS in 1987, has been closely intertwined with HAMAS's violent terrorist activities.

### 4. *Al-Salah* Islamic Society – Gaza (*Jam'iyat al-Salah al-Islamiya*)

862.     *Al-Salah* Islamic Society – Gaza ("*al-Salah*") was founded in the town of Dir al-Balah in the Gaza Strip in 1978 and was a key part of HAMAS's *da'wa* in Gaza after 1987.

863.     As part of its designation of *Al-Salah,* the U.S. government has determined that:

> AL-SALAH SOCIETY is controlled by, or acts for or on behalf of, Hamas since it is directed and run by an identified Hamas leader and employs a number of **Hamas** members, including members of **Hamas**' military wing; (2) the **AL-SALAH SOCIETY** assists, sponsors, or provides financial, material, or technological support for, or financial or other services to or in support of **Hamas** by providing **Hamas** with ostensibly legitimate charitable cover to conceal terrorist activity, by providing high quality new recruits predisposed to the plans and methods of Hamas, by generating popular support for the Hamas agenda, and by providing funds for **Hamas** combatants, prisoners and martyrs; and (3) Gaza-based **Hamas** leader Ahmad Harb **AL-KURD** plays an active role in the running of the **Hamas** movement….

> The **AL-SALAH SOCIETY** serves as a key node in the **Hamas** finance and support structure. In late 2001 and early 2002, the **AL-SALAH SOCIETY** was identified as the largest, best-funded **Hamas** organization in the Palestinian territories and included on a target list of **Hamas** infrastructure to be shut by the Palestinian Authority.

864.     The U.S. government also noted that:

> As of early 2001, nearly all non-governmental Persian Gulf money provided for aid in the West Bank and Gaza went to Hamas-controlled Islamic associations such as the **AL-SALAH SOCIETY** headed by **Ahmad AL-KURD**, according to long-time **Hamas** watcher and former Hamas member in Gaza, then-PA Minister of Communications Imad Falouji. Speaking on March 14, 2001, Falouji reported that associations like the AL-SALAH SOCIETY were not publicly labeled as **Hamas, "though everyone knew they were affiliated with Hamas and had Hamas directors."**

> In addition to providing the means for "charitable" work, external financial support for the **AL-SALAH SOCIETY** is used as a tool for **Hamas**…. Neither Saudi officials nor NGOs have hidden that their support for the **AL-SALAH SOCIETY** goes to the families of "martyrs." *Ain-Al-Yaqeen,* a

Saudi owned weekly political magazine, reported in 2001[45] that Saudi support for the **AL-SALAH SOCIETY** has come through Saudi relief committees including the Muslim World League and the World Assembly of Muslim Youth at the direction of Saudi Interior Minister Prince Naif Ibn Abdul Aziz. The report openly stated that the financial assistance goes to the families of "martyrs," as well as other activities, according to the *Ain-Al-Yaqeen* article.

865.    The U.S. government has also determined that "the leadership of the **AL-SALAH SOCIETY** is composed primarily of **Hamas** members and its membership includes members of the **Hamas** military wing … the AL-SALAH SOCIETY is controlled by, or acting for on behalf of **Hamas**."

866.    In sum, throughout the relevant period, *al-Salah* has been closely intertwined with HAMAS's terrorist activities.

867.    This was indirectly confirmed by *al-Salah*'s website featuring a certificate of appreciation from the central district of the "Islamic block committee" of the *al-Kutla al-Islamiya* – HAMAS's student organization, a key source of recruiting for HAMAS's Qassam Brigades. The certificate thanks *al-Salah* for its contribution to the success of an event called the "special third Al Quds camp" that took place in the central district.

868.    A January 26, 1995, article in the *Jerusalem Report* magazine reported on "Islamic charities managed by Hamas activists" and specifically identifies *al-Salah* as one of them. It also reported on its interview with a director of *al-Salah*'s kindergartens, Aladdin Hassan, who was proud of "having served six months in an Israeli prison for Hamas activities."

---

[45]    The article was dated December 14, 2001. Another article from April 13, 2001, in *Ain-Al-Yaqeen*, identified Ahmad Al-Kurd as "Chairman of the Islamic Salah Society" and described him as saying that the "Saudi Commission presented SR 20,000 (US $ 5300) to each of 400 martyrs' families as well as SR 20,000 for each of around 1000 injured and disabled because of the Intifada."

869.     The *al-Salah* Society was closed in September 1997 by the Palestinian Authority (along with *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* in Gaza) as a result of Israeli and American pressure on the Palestinian Authority.

870.     In November 1998, the *Free Palestine News* website published an article concerning the wave of arrests made by the Palestinian Authority following a HAMAS terrorist attack. The arrests were carried out by the Palestinian General Security agencies together with the Palestinian police. The arrest of Ahmad Al-Kurd, the Chairman of *al-Salah*, was reported along with his surrender to the Palestinian General Security service.

871.     Isma'il Abu Shanab, one of the senior leaders of HAMAS, gave an interview in January 2001 to the Jordanian newspaper *al-Watan*, in which he referred to *al-Salah* as an integral part of HAMAS's social infrastructure.

872.     An *Associated Press* article on March 2, 2001, described HAMAS's successful fundraising efforts particularly in the Persian Gulf and Saudi Arabia, adding: "With the money from Saudi Arabia alone, Islamic activists have distributed 200,000 food packages, and more are on the way, said Ahmed al-Kourd [sic], head of the Al Salah Charity Committee in Gaza City."

873.     A 2001 *Reuters* article titled "Hamas feeds struggle against Israel with charity" reported that "[a] charity called Al-Salah runs the facility. The Islamic fundamentalist group Hamas, best known for suicide bus bombings in Israel, says the charity is part of its welfare arm that generates grass roots support in Gaza and the West Bank."

874.     The article also reported that:

> Senior Hamas leader Ismail Abu Shanab says al-Salah is one of three Islamic charities that form Hamas's welfare arm.
>
> The militant movement, which opposes peacemaking with Israel and killed scores of Israelis in a wave of suicide bomb attacks in 1996, also has a military and political wing.

> "The political level is the face of Hamas but without the other divisions, Hamas would not be as strong as it is now. So it needs the three parts to survive," Abu Shanab said, explaining that the military, political and welfare branches are kept separate.
>
> Talking as he hands out sweets on an Islamic holiday to families of Palestinian "martyrs" and prisoners held in Israeli jails, Abu Shanab says helping poor families with food and money feeds their determination to fight Israel.
>
> "If nobody supports these needy families, maybe nobody would think of martyrdom and the resistance of occupation," he said.
>
> Abu Shanab, a construction engineer who studied at Colorado State University in the United States, teaches engineering at Gaza's Islamic University. He is a founder of Hamas and one of its top seven political leaders.

875.  In January 2001, the Omani newspaper *Al-Watan* quoted Ahmad Al-Kurd, the Chairman of *al-Salah*, as saying: "the Association provides aid amounting to US$ 8 million and food baskets to 200,000 families in the West Bank and the Gaza Strip." He added that *al-Salah* is planning to give $5,300 to the family of every Palestinian "martyr" and the same amount to every injured paralyzed person.

876.  Later, as a result of heavy pressure from Israel and the United States on the Palestinian Authority following several terrorist attacks, Palestinian security forces periodically arrested the leaders of *al-Salah*, while the Palestinian Monetary Authority temporarily froze its bank accounts in December 2001.

877.  *Al-Salah* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the IDF's Central Command on June 30, 2002.

878.  On May 10, 2002, the Israeli Foreign Ministry posted a report on one of its embassy websites noting that the Saudi Committee for the Support of the Intifada Al Quds (a Union of Good

member organization) was transferring funds to *al-Salah*:

> [T]he Saudi committee does not transfer its financial aid via the PA [Palestinian Authority] but it operated via charity committees and Islamic charity bodies which are mostly identified with Hamas. **The Al Salah Association in Gaza (mentioned in one of the captured documents) and the Islamic Association in Hebron, two of the largest Hamas institutions in the PA** areas play a prominent role in channeling the money. Prominent Hamas activists such as Ahmed Al Kared [al-Kurd] in the Gaza Strip and Nabil Naim Al Natse [Al-Natshe] in the West Bank, are senior members in the committees and hold ties with the Saudi committee. (Emphasis added.)

879.     A July 19, 2002, article in the online magazine *Salon.com* titled "Economic chaos - and a looming humanitarian crisis - undermine both the Palestinian Authority and the intifada" quoted long-time senior HAMAS leader Isma'il Abu Shanab:

> The Islamic Resistance Movement, better known as Hamas, is less circumspect about the ties it has with the Islamic charities. "**Of course, Salah and other Islamic foundations are identified with us,**" says Ismael Abu Shanab, a senior spokesman who lives in the Sheikh Radwan neighborhood. Hamas made huge strides in popularity among the Palestinians at the beginning of the intifada with its hard-hitting attacks against Israelis, but Hamas is clearly worried now that economic pressure may cause most people to abandon the uprising. Hamas may derive some political gain from the works of these organizations, Abu Shanab concedes, but he insists that is not the objective. Even though the tactics have not changed, he says, Hamas considers it prudent to also emphasize its humanitarian work. "We don't want to derive immediate political benefits," he explains. "We see it more as a means of extending the life span of the intifada." (Emphasis added.)

880.     In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed *al-Salah* was part of HAMAS.

881.     According to the BND:

> The association Jam'iyat al-Salah / Al-Salah Islamic Association in the center of the Gaza Strip is an Islamic social club to be directly linked to the HAMAS environment. The association's president, Ahmad AL-KURD, is a leading member of HAMAS.

882.    On August 7, 2007, the United States Treasury Department declared *al-Salah* a Specially Designated Global Terrorist. In a press release announcing the declaration, the Treasury stated that:

> Hamas has used the al-Salah Society, as it has many other charitable fronts, to finance its terrorist agenda. ... The al-Salah Society supported Hamas-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support Hamas's activities. It also financed commercial stores, kindergartens, and the purchase of land for Hamas. One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the al-Salah Society as "one of the three Islamic charities that form Hamas's welfare arm." The al-Salah Society has received substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors.[46]

883.    *Al-Salah* also received funding from several notable radical Islamic charitable organizations, which were members of the Union of Good: Interpal (SDGT), CBSP (SDGT), Al-Aqsa Foundation (SDGT) and HLF (SDGT).

884.    An article published in the December 2005 Issue of *Filastin al-Muslima* reported that from the outbreak of the Second Intifada in September 2000 to December 2005, *al-Salah*'s annual average budget was ten million dollars.

885.    Ahmad Harb Ahmad al-Kurd served as the chairman of *al-Salah* and the dominant senior figure in the Society during the relevant time period, as well as being a member of the Union of Good.

886.    Al Kurd was a senior HAMAS member in Gaza and is considered one of HAMAS's senior *da'wa* operatives.

887.    On August 7, 2007, the United States designated Ahmad al-Kurd, former Chairman and then board member of *al-Salah*, as a Specially Designated Global Terrorist, and declared (in

---

[46]    A copy of the U.S. Treasury Press Release is attached as **Exhibit L** to the Second Amended Complaint.

the same press release[47] announcing the declaration regarding *al-Salah* itself):

> The al-Salah Society is directed by Ahmad al-Kurd, a recognized high-ranking Hamas leader in Gaza. **Al-Kurd's affiliation with Hamas goes back over a decade.** During the first Intifada, al-Kurd served as a Hamas Shura Council member in Gaza. As of late 2003, al-Kurd was allegedly the top Hamas leader in Dir al-Balah, Gaza. Since mid-2005, he has served as the mayor of Dir Al-Balah, elected as a Hamas candidate. (Emphasis added.)[48]

888.    Several former members on the administrative board of *al-Salah*, in its various

branches, were also known as prominent operatives in HAMAS's *da'wa*, among them:

- **Osama al-Mazini**: al-Mazini was a senior HAMAS operative and political leader in the Gaza Strip. Al-Mazini was a member of the Board of *al-Salah,* (as well as *Al-Mujama Al-Islami*, as mentioned above). He was imprisoned by Israel between 1988-1994. Al-Mazini was arrested by the PA as well, following terrorist attacks committed by HAMAS.

- **Salem Salama**: Salama was a senior HAMAS member, a member of the administrative board of *al-Salah*, and one of the *Marj al-Zuhur* deportees. Salam was arrested several times by Israel during the First Intifada. Salama was a long-time member of the Palestinian Religious Scholars Association ("PRSA"), a body comprising senior Islamic legal scholars in the Palestinian Territories identified with HAMAS and the Muslim Brotherhood that provides HAMAS with religious legitimacy for its activities. The PRSA issued a 2002 *fatwa* sanctioning suicide attacks against Israel as lawful acts based on Islamic duty. Salama was later elected in 2006 to the Palestinian Legislative Council as a HAMAS candidate.

- **Mansur Abu Hamid**: Hamid was a senior member of HAMAS and Chairman of the Rafah branch of the *al-Salah* Society.

889.    From the early 1990s through 2004, *al-Salah* enjoyed financial support from

HAMAS fundraising organizations through its CAB account(s) that included the HLF in the

---

[47]    http://www.ustreas.gov/press/releases/hp531.htm.

[48]    The U.S. government elsewhere noted that "just over a decade earlier in 1995, AL-KURD was characterized as an 'extremely fanatic' and 'dangerous' Hamas member who played 'an active role in running the Hamas movement." In fact, an *Agence France Presse* report of arrests of HAMAS militants in Deir el-Balah in August 1994 referred to the fact that a senior HAMAS figure named Ahmad al-Kurd was detained for questioning by the Palestinian security forces.

United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

5.      **Al-Wafa Charitable Society – Gaza (*Jam'iyat Al-Wafa' Liri'ayat Al-Musinnin*)**

890.    The Al-Wafa Charitable Society was founded in 1980 in the Gaza Strip by the Muslim Brotherhood, and after 1987 it became a key component of HAMAS's *da'wa* network in the Gaza Strip, providing medical care to Gazan residents. Al-Wafa's administration, its center for the elderly, and the al-Wafa Hospital are located in the al-Saja'iya neighborhood of Gaza City. Al-Wafa established a medical center in Khan Yunis, whose establishment was funded by Interpal and the al-Aqsa Society in Yemen.

891.    Al-Wafa opened a branch in Rafah in 2003.

892.    An FBI recording made at the Philadelphia Conference in 1993 referred to the al-Wafa Society for the Care of the Elderly as one of "t*he principal organization known to be affiliated with us…"*

893.    The Al-Wafa Charitable Society's annual budget during the relevant period was approximately $10 million dollars.

894.    Its principal sources of funding were, *inter alia*, Islamic foundations in Arab states (Saudi Arabia, Yemen, the Persian Gulf States, and Jordan); and organizations around the world that were part of HAMAS's fundraising network, including:

- CBSP – France (designated an unlawful association in 1997 and terror organization in 1998 by Israel, and an SDGT in 2003 by the U.S.)
- Interpal – Britain (designated an unlawful association in 1997 and terror organization in 1998 by Israel, and an SDGT in 2003 by the U.S.)
- Al-Aqsa Foundation – Germany (designated an unlawful association in 1997 and terror organization in 1998 by Israel, and an SDGT in 2003 by the U.S.)
- IRFAN Fund – Canada (designated a terrorist organization in 2014 by Canada)
- The Union of Good (*Itilaf al-Khair*) – Lebanon/Saudi Arabia/UK (designated an unlawful association in 2002 by Israel and an SDGT in 2008 by the U.S.)
- Palestinian Association in Austria ("PVOE") – Austria (designated an SDGT in 2003 by the U.S.)
- Al-Aqsa Islamic Charitable Society – Yemen (designated an unlawful association in 1997 and terror organization in 1998 by Israel, and an SDGT in 2003 by the U.S.)
- WAMY – Saudi Arabia (designated an unlawful association in 2002 by Israel).

895. The *Mideast Mirror* reported on September 17, 1997, in an article titled "How to break the deadlock: Armed resistance, plus Arab pressure on U.S." that Israel accused Al-Wafa and other organizations "of constituting the 'infrastructure' of Hamas."

896. The Al-Wafa Charitable Society was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the IDF's Central Command on June 30, 2002.

897. The Society's bank account was confiscated by Israel in February 2004, during IDF operations to confiscate the funds of HAMAS associations in Ramallah.

898. From the early 1990s through 2004, Al-Wafa Charitable Society enjoyed financial support from HAMAS fundraising organizations through its account(s) at CAB that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S.

in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

899.   CAB processed multiple funds transfers from Interpal to CAB's Al-Wafa Charitable Society account *after* Interpal was designated an SDGT.

900.   Many of Al-Wafa Charitable Society's key operatives are publicly known to be members of HAMAS. Its principal leaders included:

- **Muhammad Rafiq al-Khudari**: Al-Khudari was Chairman of Al-Wafa Charitable Society's Board of Directors during the relevant period. He was known as a senior civilian official in HAMAS and was in regular contact with the HAMAS leadership.

- **Basem Naim Muhammad Naim**: Naim served as a member of Al-Wafa Charitable Society's Board of Directors and was a prominent HAMAS operative in the Gaza Strip. He later served as "Health Minister" in the HAMAS government in Gaza.

- **Dr. Muhammad Abd al-Hadi Abd al-Rahman Muhammad Shihab**: Shihab served as General Secretary for Al-Wafa Charitable Society Hospital's pharmacies and medical supplies department and was a prominent HAMAS leader and was later elected as a member of the Palestinian Legislative Council for HAMAS's Change & Reform Party.

- **Taysir Nasr al-Baltaji**: Al-Baltaji is the Director General of Al-Wafa Charitable Society and Al-Wafa Hospital. He was one of the HAMAS leaders at the Islamic University of Gaza in 1985 and was known as a senior civilian official in HAMAS.

- **Salah al-Rantisi**: Rantisi was a board member of Al-Wafa Charitable Society and also the Director of Social Health Department in the *de facto* HAMAS Health Ministry in Gaza. Rantisi is the younger brother of deceased HAMAS leader Abd al-Aziz al-Rantisi.

- **Muhi al-Din Saleh al-Hilu:** Al-Hilu was a member of the board of the Al-Wafa Charitable Society. Al-Hilu is also the headmaster of Dar al-Arqam school, which belongs to HAMAS.

- **Hazem al-Nakhala:** Al-Nakhala is a member of the board of the Al-Wafa Charitable Society. He is also the head of the Institutions Committee in HAMAS's Public Relations Department.

- **Jamal al-Zabda:** Zabda was the chairman of the Al-Wafa Charitable Society. He was also a professor at the Islamic University of Gaza, Dean of Community Service and Continuing Education, and a member of the University's board. In 2003, Zabda was elected on the HAMAS list to the Palestinian Engineers Association in Gaza.

## B. Key HAMAS Institutions in the West Bank

### 1. Islamic Charitable Society – Hebron (*al-Jam'iya al-Khiriya al-Islamiya al-Khalil*)

901. The Islamic Charitable Society – Hebron ("ICSH") was an important component in the *da'wa* infrastructure of HAMAS in the Hebron area, where it was considered the central civilian institution of HAMAS and was publicly identified with HAMAS (including by the *Associated Press*). The Society was also known as the central civilian institution of HAMAS in the entire West Bank, and HAMAS transfers money through it to other institutions identified with it.

902. The ICSH was founded in 1962 and unlike other *da'wa* institutions of HAMAS, such as *Al-Mujama Al-Islami, Al-Jam'iya Al-Islamiya* and *al-Salah* in the Gaza Strip, it was not under the complete control of HAMAS when HAMAS was officially founded in 1987.

903. ICSH had branches in the Hebron-area villages of Shuyukh, Beit Ula, Yata, Dura, Bani Na'im, Beit Omar, Halhul, Tafuh, Dahariya and Samu'a.

904. Since at least 1991, it has been widely associated with and controlled by HAMAS.

905. For example, in an article dated November 27, 1994, in the *Miami Herald*, a spokesman for the ICSH, while denying any "political acts," "acknowledged that many workers, including the society president, were active Hamas supporters."

155

906.     On March 5, 1996, Israel closed the offices of the ICSH, due to suspicions regarding the Society's relationship with HAMAS.[49] The Society's offices remained closed for a brief period but were then reopened by the Palestinian Authority.

907.     A report published in February 2001 on HAMAS's website describing an armed clash in the *Al-Rian* ranch, which is owned by the ICSH, noted that the administrative director of the ICSH and the HAMAS spokesman in Hebron, Abd al-Khaleq al-Natshe, said that the "occupation authorities" had summoned the acting head of the Society, Adel al-Junaydi, and the director of the ranch, Ibrahim Farjallah, and asked them to move the ranch elsewhere. The article also noted the "martyr," Shaker Mawas Al-Manasra, worked as the night supervisor on the ranch and was a known supporter of HAMAS.

908.     Abd al-Khaleq al-Natshe also appeared in public and lectured at HAMAS gatherings. For example, at a large HAMAS gathering at Hebron University in 2001, thousands of the organization's operatives and supporters came to hear Sheikh Yassin urge continuation of the Intifada and promise that HAMAS would continue the Intifada. Al-Natshe appeared in person on behalf of HAMAS and called for national unity while emphasizing the importance of continuing the Intifada and demanding the release of prisoners from the PA jails.

909.     A March 2, 2001, *Associated Press* article described a warehouse run by the ICSH and stated that across the Palestinian areas Islamic charities were filling a growing need created by skyrocketing unemployment and poverty and identified ICSH with HAMAS.

---

[49]     The *Associated Press* ran a story about the closures on March 5, 1996. The Hebron-area closures were also reported in the *Mideast Mirror* on March 6, 1996, noting that the Israeli army "ordered shut Hamas-affiliated institutions suspected of channeling funds supporting Hamas," including "the Islamic Charitable Society, which run boarding schools, kindergartens and medical clinics." It was also reported in Australia's *Daily Telegraph* on March 7, 1996, and the March 6, 1996, edition of the *St. Louis Post-Dispatch*.

910. In August 2001, HAMAS's website published a report concerning a parade in Hebron that was attended by thousands of HAMAS supporters commemorating the assassination of two prominent HAMAS leaders. According to HAMAS's website, leading the parade were the "leaders and symbols of Islamic and nationalist activity headed by Abd al-Khaleq al-Natshe, the HAMAS representative of Hebron." Mustafa Shawar, another member of the ICSH administrative board, was also mentioned in the HAMAS website report and is quoted as saying that the deaths of the two HAMAS leaders "is the true price of victory." The report added that the marchers demanded that the Qassam Brigades and HAMAS avenge the deaths of their leaders.

911. In December 2001, HAMAS's website published a report quoting Abd al-Khaleq al-Natshe as the HAMAS representative in the Hebron region. In that role, he condemned the PA's closure of four Islamic institutions in Hebron. He argued that this step constituted "surrendering to the American and Zionist pressure" and asserted it would not influence the future activity of HAMAS and Palestinian Islamic Jihad.

912. A December 8, 2001, *Los Angeles Times* article titled "The World; Social Work and Suicide Bombing" identified ICSH closely with Abd al-Khaleq al-Natshe and noted its receipt of money from HLF:

> Here in Hebron, Hamas has been on the ascendancy for years. The Islamic Charitable Society is not officially a Hamas organization, but its director and several of its managers are members of the militant group. Hamas has recently sought to distance itself from many of the charitable organizations to shield them from any Palestinian Authority reprisal.
>
> ***
>
> Some of the money goes directly to [Abd al-Khaleq] Natshe's group and pays for things such as the Ramadan care packages, and some of it goes into the bank accounts of relatives of Palestinians killed or wounded or to those whose homes have been destroyed in Israeli raids. The charity says it has delivered 100,000 care packages this Ramadan.

Natshe said his agency has also received money from a U.S. group, the Holy Land Foundation for Relief and Development. The U.S. government this week shut down Holy Land for allegedly funneling money to Hamas.

913. On December 13, 2001, the Associated Press published an article titled "Hamas Is a Slippery Target." The article stated:

The Hamas leader in the West Bank town of Hebron, Abdel Khaleq Natche, said he was confident that the Palestinian Authority would not move against Hamas.

"Nobody can close institutions that provide services to all the Palestinian people," said Natche, who also heads the Islamic Charitable Society, which runs nine schools in the Hebron area for 2,500 orphans and children from broken homes.

Natche suggested that Hamas would not resist an Arafat crackdown. "Hamas is pointing its guns toward the occupiers, not anyone else," he said.

914. Due to its activity and organizational identification with HAMAS, the ICSH was declared to be an illegal organization by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF Central Command on June 30, 2002.

915. On September 8, 2002, a *Time Magazine* article identified "Abdel Khaleq Natshe, 48," as the head of "the Islamic Charitable Society in Hebron" and reported that "[a]fter Defensive Shield [Israel's military operation in April 2002], Israeli officials and Palestinian sources say, Natshe began providing funding and coordination for Izzedine al-Qassam. They say Natshe was behind an April attack on the Israeli settlement of Adora, in which Hamas gunmen shot four Israelis. Natshe was finally arrested by Israeli soldiers two weeks ago in Hebron."

916. According to the *BBC* "Summary of World Broadcasts," the *Voice of Palestine* (radio) reported on March 24, 2003, that the (Israeli) "occupation forces" "closed the headquarters of the Islamic Charitable Society in the town of Dura and arrested its director Hashim al-Rujub…."

917.     In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the Islamic Charitable Society (Hebron) was part of HAMAS. According to the BND:

> Islamic Charitable Society (Hebron) is an Islamic social club directly linked to HAMAS. This club is the most important HAMAS association on the West Bank. In April of 2002 a document of the HAMAS Leadership Abroad (Damascus) of October 2000 was found on the premises of the club, which contained a direct call to violent Intifada against Israel.

918.     As stated above and reported in a December 8, 2001, *Los Angeles Times* article, the ICSH provided subsidies to the families of Palestinian "martyrs."

919.     HAMAS also used ICSH to provide employment to its operatives released from prison. For example, Jawad Ja'abari was a HAMAS operative since 1995 and first arrested in 1997. In 1998, he served as HAMAS spokesman in Israeli Megiddo prison. He was again arrested by the PA in January 1999 and upon his release in March 1999, he was given a job as the manager of the ICSH's cattle farm and later placed in charge of the ICSH's summer camp. By July 2000, he was appointed by ICSH's board to be the organization's agricultural farm manager.

920.     In addition, the Government of Israel 2004 Report described a document sent from overseas in January 2001 that was found in 2002 in the Islamic Charitable Society in Hebron that listed its activities, including:

- Immediate and rapid response to the needs of the resistance, in parades and confrontations.

- Mapping and identifying the main places of friction, and the weak points of the settlements and of the enemy's outposts, for the purpose of attacking them.

- Developing plans to mobilize the public, in a planned and organized manner, to confront the enemy, in a way that will minimize losses.

- Mapping the enemy's methods of operation in countering the popular resistance and identifying ways of protecting against them.

921.     The January 2001 document states that the organizational structure of the "popular resistance apparatus for the management and leadership of the Intifada" includes the establishment of an "organizational network which will cover all the areas of the required activities at times of need, such as trade areas, schools, mosques, neighborhoods, societies and universities."

922.     After his arrest in 2002, Abd al-Khaleq Hasan Shadli al-Natshe, the leader of the ICSH, gave a statement confirming that he was the representative of HAMAS's "political wing" in Hebron and that he was in charge of matters relating to the mosques, and caring for the families of HAMAS prisoners. He also confirmed that he was in direct contact with (then senior external HAMAS leader) Khalid Mishal, that he delivered money to the families of "prisoners," and that in May 2002 the Islamic Charitable Society of Hebron received $7 million dollars in donations to a CAB account in Hebron.

923.     According to a Government of Israel 2004 Report, the Islamic Charitable Society of Hebron rented houses for the families of suicide terrorists whose houses were demolished by the IDF. It also hosted "Mourning Houses" in honor of those killed in terrorist operations on the premises of the Society.

924.     During searches carried out at the offices of the Society, the IDF unearthed:

- Copies of an Islamic magazine containing the "Last Will and Testament" of a suicide terrorist who blew himself up in a bus in 1996.

- Copies of HAMAS publications dealing with the position of the movement with respect to the pressures applied by the West for "Causing the Failure of the Intifada."

- A book by Abdullah Azzam (Osama bin Laden's mentor), dealing with protecting Muslim soil, its front cover displaying fighters bearing weapons on their shoulders.

- Numerous posters of "martyred" Qassam Brigades operatives.

925.    Throughout the relevant period, most members of the ICSH administrative board were publicly identified with HAMAS. Five of the board members of the ICSH, during that period, were senior operatives in the *da'wa* infrastructure of HAMAS. Several board members were even Qassam Brigades commanders.

926.    The following is a partial list of the prominent HAMAS leaders who served as ICSH officials:

- **Abd al-Khaleq Hasan Shadli al-Natshe**: Al-Natshe was the Administrative Manager of the ICSH until August 28, 2002, when he was arrested by Israel and sentenced to 10 years' imprisonment. Among other things, he assisted Qassam Brigades operatives. Until his arrest in 2002, he was considered as the head of HAMAS in Hebron and was among the *Marj al-Zuhur* deportees.[50] Al-Natshe was arrested several times by Israel in the 1980s and 1990s for membership in HAMAS and his role in facilitating terrorism.[51] In July 1997, he was convicted for his membership in HAMAS, for transferring funds to HAMAS operatives, and for his links with HAMAS leadership abroad and for receiving directions from it. According to the Government of Israel 2004 Report, "**Al-Natshe is known as the most senior Hamas activist in Hebron and is considered by the public as the head of the movement and its representative in the district**…. Prior to his arrest, he frequently appeared on and was interviewed by the media as a Hamas representative and disseminated the movement's ideology. Al-Natshe moved through the city accompanied by bodyguards." (Emphasis added). In fact, an article in the Palestinian daily newspaper *al-Hayat al-Jadida* from November 13, 2001, publicly identified al-Natshe as a member of the Hamas Political Bureau. In 2003, Khalid Mishal, then

---

[50]    As part of his job, al-Natshe led HAMAS demonstrations in which he spoke about HAMAS's activities and ideology. He distributed propaganda material, served as the local spokesman describing HAMAS attacks and eulogizing "martyred" members, and distributed funds to families of HAMAS prisoners. His arrest was widely covered in the Palestinian media. HAMAS's website also reported on his arrest and purportedly interviewed his wife who related the circumstances of her husband's arrest and the searches conducted in their home. She reportedly added that he was interrogated about his responsibility for the HAMAS and Qassam Brigades cells in Hebron that carried out attacks during 2002. The HAMAS article also noted that al-Natshe worked as the administrative director of the ICSH.

[51]    On October 27, 1995, the *Jerusalem Post* reported on an unusual meeting between Palestinian Authority Chairman Yasser Arafat and HAMAS leaders, including al-Tadamun's Jamal Salim and al-Natshe. On December 15, 1995, Salim and al-Natshe were part of a HAMAS delegation to Khartoum, Sudan. According to the *BBC Summary of World Broadcasts Service*, the Palestinian newspaper *Al-Quds* reported on August 17, 1996, that HAMAS was conditioning dialog on a cease-fire on the release of Dr. Abd al-Aziz al-Rantisi and Abd al-Khaleq al-Natshe, among others.

the external leader of HAMAS, publicly identified him as one of the founders of HAMAS in Hebron.[52]

- **Adel Nu'man Salim al-Junaydi**: Al-Junaydi was the Chairman of the ICSH from the year 2000. In June 2002, he was arrested and convicted for his activity in HAMAS and was sentenced to eight months in prison;[53] in December 2004, he was again arrested by Israel. Al-Junaydi is a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab was a member of the ICSH administrative Board and served as Deputy Chairman under al-Junaydi. He is also a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal, then the leader of HAMAS's Political Bureau, publicly identified him as one of the founders of HAMAS in Hebron.[54] Salhab was also on the Board of Trustees of the Union of Good.

- **Mustafa Kamil Khalil Shawar**: Shawar was a member of the ICSH administrative board and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal identified him as one of the founders of HAMAS in Hebron. He also served on the board of the Muslim Youth Association in Hebron (discussed below).

- **Nabil Naim Ishaq al-Natshe**: Al-Natshe was a member of the ICSH administrative board and was among the *Marj al-Zuhur* deportees. He was also arrested several times by Israel, *inter alia*, based on information that he was involved in terror activities of the Qassam Brigades which included recruiting operatives and equipping them with weapons. In 2002, he was arrested and convicted for his HAMAS activities.[55]

- **Fathi Abd al-Aziz Amru**: Amru was a long-time leader of the Muslim Brotherhood in Hebron and after 1987 became one of HAMAS's leaders in the Hebron area. He was arrested several times by Israel and was

---

[52]     According to al-Natshe's police statement on October 30, 2002, he also held a personal account at CAB.

[53]     HAMAS's website reported on the arrest of several HAMAS operatives and identified al-Junaydi as one of those arrested.

[54]     According to the FBI: "During an interview in December 1990, Salhab admitted being recruited by HAMAS and being a member of the HAMAS headquarters and in charge of the prison committee."

[55]     Nabil al-Natshe recruited Qassam Brigades operative Suleiman Qawasmeh and transferred M-16 rifles, a pistol, and ammunition to Qawasmeh and his Qassam Brigades cell. Al-Natshe was later convicted in early 2003 for serving as a board member of ICSH, which was in unlawful association with, and providing services to, HAMAS.

among the *Marj al-Zuhur* deportees. Amru served as a manager at ICSH and on the board of directors of ICSH's Dura branch.

- **Naef Mahmud Muhammad Al-Rajub.** Rajub is one of HAMAS's most prominent leaders and officials in Hebron. He was arrested by Israel in 1989, was among the *Marj al-Zuhur* deportees in 1992 and was arrested in 1994 and 1996 by Israel and briefly by the Palestinian Authority in 1996. Rajub served on the board of directors of ICSH's Dura branch.

927.    From the early 1990s through 2004, ICSH received financial support from HAMAS fundraising organizations through its CAB accounts that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

928.    CAB processed multiple funds transfers from Interpal to CAB's ICSH account(s) *after* Interpal was designated an SDGT.

929.    The link between HAMAS's *da'wa* network and its Qassam Brigades is exemplified by ICSH's Dura branch.

930.    Both Fathi Abd al-Aziz Amru, the prominent HAMAS leader, and his brother, Muhammad Abd al-Aziz Abd Muhammad Amru, a professor of Islamic law, helped run and oversee the finances of the ICSH's Dura branch.

931.    In 2000, after graduating from university, Majdi Muhammad Amru went to work for the ICSH's Dura branch. In university, he was a member of *al-Kutla al-Islamiya*, HAMAS's student organization.

932.    In February 2001, while working at the ICSH's Dura branch, Amru was recruited into HAMAS's Qassam Brigades.

933.    In July 2001 he participated in the murder of an Israeli citizen.

934.    In March 2003, he participated in the planning and execution of a suicide bus bombing in Haifa that claimed 15 lives.

935.    In sum, throughout the relevant period, ICSH was closely intertwined with HAMAS's terrorist activities.

936.    On May 29, 2007, the United States Department of Justice identified the ICSH as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

## 2.    Tulkarem Zakat Committee (*Lajnat al-Zakaa Tulkarem*)

937.    The Tulkarem Zakat Committee is a part of HAMAS's civilian infrastructure, and as such is involved in a wide range of activities, including: financial aid; provision of clothing and food for the needy; and support for prisoners and the families of those killed, with emphasis on transferring funds to the families of terror operatives.

938.    The Tulkarem Zakat Committee was founded in 1981 but has, for many years, been identified as part of HAMAS's *da'wa* apparatus.

939.    When Israeli forces raided the Tulkarem Zakat Committee's offices in April 2002, they found posters, handbills, and other material praising suicide bombers and encouraging other Palestinian youths to follow in their footsteps. One handbill included a statement from the mother

of Muhammad Farhat, a nineteen- year-old HAMAS terrorist who killed five people and wounded 24 in a March 2002 rifle and grenade attack, calling on her fellow Palestinian mothers not to stand in the way of their sons' "martyrdom." A poster featuring Abdullah Azzam, Osama Bin Laden's mentor, includes a typical passage from Azzam: "Love of Jihad has taken over my life, my soul, my sensations, my heart and my emotions. If preparing [for jihad] is terrorism, then we are terrorists. If defending our honor is extremism, then we are extremists. If jihad against our enemies is fundamentalism, then we are fundamentalists."

940. The Tulkarem Zakat Committee was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002.

941. On May 7, 2002, the *Baltimore Sun* published an article titled: "Arab documents seized in West Bank, Israel says; Released on eve of Sharon visit; Disclosure may be effort to spoil U.S.-Saudi ties." The article reported that:

> Israeli officials say that in the past 16 months, the Saudis have sent $135 million to Palestinian organizations and individuals, including some involved in or connected to terrorism, such as Hamas and a group called the Tulkarm Charity Committee, which Israel said is identified with Hamas.
>
> Several suicide bombers have come from Tulkarm, a West Bank town on the pre-1967 border with Israel, or from nearby communities. The documents include the names of reported recipients, including the families of suicide bombers and of well-known Palestinian militants killed by Israeli troops.

942. On May 10, 2002, the Israeli Foreign Ministry posted a report on one of its embassy websites noting that the Saudi Committee for the Support of the Intifada Al Quds (a Union of Good member organization) was transferring funds to an account of another bank in the Palestinian Territories for "The Tulkarm 'Charity Committee' (identified with the Hamas)" – thereby

providing further notice of the HAMAS affiliation of the Committee and its participation in HAMAS's Union of Good fundraising campaign. The report went on to note:

> According to the captured documents, money from Islamic associations from around the world was deposited in the bank accounts of the Tulkarm "Charity Committee," including groups identified with radical Islam such as: "the Coalition of Benevolence" ("A'atalef Al-Khir") headed by Sheikh Yousef Kardawi who lives in Qatar (see below) or the "Holy Land Foundation for Assistance and Development" in the United States which was made illegal there. A title of one of the captured documents is: "The aid project for Palestinian families, the coalition of benevolence - financing of the Saudi committee for support of the Intifada Al Aqsa, in cooperation with the Tulkarm "Charity Committee." The document includes details of 89 families (apparently a project of the Saudi committee in cooperation with the "Charity Committee" which the Coalition of Benevolence has decided to assist). Persons and entities associated with the Hamas and with Radical Islam are the main beneficiaries of the funds of the Saudi Committee for Support of Intifada Al Aqsa.

> ***

> **The Tulkarm Charity Committee: An entity identified with Hamas, which is also connected to the Hamas terrorist-operational apparatus** … The Tulkarm Charity Committee where documents of the Saudi Committee for Support of the Intifada Al Aqsa were found, is identified as one of the power centers of the Hamas in Tulkarm. **It is headed by Husseini Hussein Hawaja [Husni Hasan Hussein al-Khawaja] who is known to be a Hamas activist … Additional Hamas activists are also members of the committee.**

> It is emphasized that on the surface, the committee carries out wide-ranging social-religious-economic activity. It operates two large centers for the study of the Koran, hospitals, clinics, a beehive project, sewing factories, elementary school and a kindergarten. It owns a residential building with some units rented out to the needy. However, **it is known and clearly proven by the material captured in the Tulkarm Charity Committee offices, that the committee also has ties with the operational apparatus of the Hamas which recruits youths in order to perpetrate suicide attacks and is engaged in carrying out terrorist attacks.** (Emphasis added.)

943.   In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the Tulkarem Zakat Committee was part of HAMAS. According to the BND:

> The Zakat-Committee of Tulkarm is clearly under the control of HAMAS. The HAMAS member Husni Hasan HAWAJA is president of the Zakat Committee. The Zakat Committee runs a chain of kindergartens under the direction of the two HAMAS members….

944.   In sum, throughout the relevant period, the Tulkarem Zakat Committee was closely intertwined with HAMAS's terrorist activities.

945.   On May 29, 2007, the United States Department of Justice identified the Tulkarem Zakat Committee as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

946.   Through late 2007, when the Palestinian Authority finally acted against the HAMAS civilian infrastructure in the West Bank and replaced a significant portion of the Tulkarem Zakat Committee's board, the key members of the Committee's board were known HAMAS operatives. Many of the leaders of the Tulkarem Zakat Committee, in the relevant period, did not attempt to hide their radical positions, and sometimes even gave lectures in mosques whose clear purpose was to incite hatred of Jews and Israelis.

947.   The following is a partial list of the prominent HAMAS leaders who served as Tulkarem Zakat Committee officials:

- **Husni Hasan Hussein al-Khawaja**: Al-Khawaja was Chairman of the Tulkarem Zakat Committee from 1993 until his resignation from the position in June 2008, and he was Chairman of the Board of Directors of the hospital associated with the Committee and signatory on most of the Committee's bank accounts at CAB. He is a publicly known HAMAS operative. *Agence France Presse* reported on March 18, 1996,

on his arrest by Palestinian police during an "ongoing crackdown on HAMAS."

- **Sheikh Bilal Khamis Yusuf abu Safira (a.k.a. Belal Khamis)**: Khamis was among the founders of the Tulkarem Zakat Committee and served in a variety of senior positions until its reorganization in 2007. During the relevant period he was a signatory on most of the Committee's bank accounts at CAB. Among the positions in which he served are Deputy Chairman, Treasurer, and Acting Director of the Tulkarem Zakat Committee's hospital. He was publicly known as a professed HAMAS operative who had influence in the various organizations connected with HAMAS in the town of Tulkarem. The same *Agence France Presse* report on March 18, 1996, described Khamis's arrest by the Palestinian police.

- **Sheikh Amar Tawfiq Ahmad Badawi**: Badawi was among the founders of the Tulkarem Zakat Committee and was a member of its board. He is one of the leaders of HAMAS in the region and signatory on most of the Committee's bank accounts at CAB.

- **Dr. Bashar Adnan Ibrahim al-Karmi**: Al-Karmi was a member of the Tulkarem Zakat Committee's administrative board and served as Director of the Committee's hospital. Al-Karmi was publicly known to be a HAMAS operative and was among the *Marj al-Zuhur* deportees.

- **Ikhlas Abd al-Karim al-Sawis**: Al-Sawis is the wife of **Abbas al-Sayed**, who was a senior commander in the Qassam Brigades convicted by an Israeli court of planning the suicide bombing during Passover 2002 at the Park Hotel in Netanya, one of the attacks implicated in this case. Al-Sawis worked as Director of the Tulkarem Zakat Committee's kindergartens.

- **Fathi Muhammad Ali Qasem Qar'awi:** Qar'awi was a member of the Tulkarem Zakat Committee's administrative board from at least 1996 to 1999. He was publicly known to be a HAMAS operative and was among the *Marj al-Zuhur* deportees. On March 17, 1996, the *Al Quds* radio reported that the PA arrested Qar'awi as part of a wave of arrests against HAMAS operatives. In 1997, the IDF arrested him and detained him for six months. *Reuters* reported on March 10, 2001, that during a funeral the previous day of Ahmad Oliyan, a HAMAS suicide bomber who carried out an attack in the Israeli city of Natanya, a massive rally was organized by HAMAS within the funeral itself and Qar'awi delivered a eulogy praising the attack. Hezbollah leader Hassan Nasrallah also delivered a speech by phone praising HAMAS and the attack carried out in Natanya.

948. From the early 1990s through 2004, the Tulkarem Zakat Committee enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations..

949. The Government of Israel 2004 Report noted that "all the members of the [Tulkarem Zakat Committee] Board are recognized by the public as Hamas activists."

950. That same report indicates that Tulkarem Zakat Committee maintained at least four accounts at CAB as of December 2004.

### 3. Nablus Zakat Committee (*Lajnat al-Zakaa Nablus*)

951. The operations of the Nablus Zakat Committee ("NZC") in the fields of social welfare, education, religious studies, and health have contributed to the prestige of HAMAS in the area and have reinforced its image as a movement with "clean hands," which looks after the public in general, in contrast to the operations of the Palestinian Authority in the Nablus District, which were perceived as inefficient and corrupt for a protracted period of time.

952. The NZC was founded in 1977. It was part of the *da'wa* infrastructure in the West Bank during the period under review. Additional zakat committees operate in the villages of the Nablus district; they are subordinate to the zakat committee in the city of Nablus and receive funds that are transferred through it.

953.     Sheikh Hamed al-Bitawi, the Deputy Chairman of the NZC and Chairman of the *Al-Tadamun* Charitable Society in Nablus (discussed below), has since the 1990s been a very public leader and spokesman for HAMAS. In fact, he later served as a member of the Palestinian Legislative Council on behalf of HAMAS,

954.     For example, a *Jerusalem Post* article from November 13, 1994, reported that Yasser Arafat "appointed two Hamas activists to official positions on the Palestinian religious courts, in the first appointments of Hamas members to the PA since he took office" and that "Hamed Bitawi of Tulkarm" was one of the appointees. The *Post* described al-Bitawi as "among the 400 Hamas activists expelled by Israel for one year to Marj a-Zahour, in south Lebanon, in 1992. He is considered to have great influence on Hamas ideology."

955.     An *Associated Press* article dated July 11, 1997, titled "Hamas wins Palestinian hearts with inexpensive Islamic group wedding" described "Sheikh Hamed Bitawi [as] the leading Hamas figure in Nablus" who organized inexpensive group weddings for devout Muslims. The article quotes Zohair Dubai, a mosque preacher loyal to Fatah criticizing the event: "'Hamas is entering the house through the window, staging social activities to strengthen itself politically.' Undeterred, Bitawi announced that Hamas also would establish a matchmaking office in Nablus."

956.     An *IPS-Inter Press Service* article dated September 25, 1997, titled "Palestine: Hamas Plays Fundamental Role in Palestinian Society" reported on HAMAS's group weddings and that in the "West Bank town [of Nablus], **Bitawi's name is synonymous with Hamas**, the militant organization that regularly dispatches suicide bombers to Israel -- so much so that a groom who participated in a wedding party for 15 couples staged by Bitawi in July has had trouble living the association down." (Emphasis added.)

957.    Describing the same group wedding phenomenon, the *Christian Science Monitor*

reported on July 27, 1998:

> The Islamic fundamentalist group, better known abroad for sending suicide bombers into Israeli cities, sponsored a mass wedding in Nablus's stadium July 9 before a rock-concert-size audience. It's an approach likely to keep winning fans.
>
> In contrast with the Western tradition, an Arab groom and his family must foot the bill. The husband-to-be also must provide a dowry, buy the bride's wedding dress, and provide a new home.
>
> Palestinians - who emphasize premarital chastity, usually marry young, and face a dismal economy - have often had to postpone matrimony until they can afford it.
>
> But by reducing the cost of weddings, Hamas is finding a way to cure the wedding blues in a way that suits conservative Palestinian tastes - and waging a public-relations battle against the West.
>
> ***
>
> As with Hizbullah in Lebanon and the Muslim Brotherhood in Egypt, Islamic fundamentalists here owe much of their success to community-outreach work. Palestinians don't automatically associate Hamas, the Islamic Resistance Movement, with bombings that kill innocent civilians and sabotage the chances of peace with Israel. They also think of Hamas's clinics, kindergartens, and loan societies - and now, even wedding ceremonies.
>
> Hashash, a schoolteacher who turned religious in college while studying Islamic law, doesn't deny that this kind of beneficence helps attract Muslims who are much less committed than he is.
>
> "Of course, Hamas's honest dealing with the people builds their belief in them," he says.
>
> But Sheikh Ahmed Bitawi, who organized the first such wedding last summer, says the event is less about building political clout than about fighting the encroachment of American style.
>
> "A uniform celebration eases the financial burden on these people, but money isn't the only reason," says Sheikh Bitawi.
>
> "Our concern is to avoid the wrongdoing in this country that people have inherited from the West, like women taking off their veils and dressing provocatively, men and women dancing together, and the drinking of

171

alcohol. We realize that you [in the West] have ultimately paid a price for such corruption. We want to show the West that Islam is not a severe religion, that there is joy, but within a limit."

**Bitawi, a known figure in the social wing of Hamas here in Nablus**, says such weddings will soon be held in other West Bank cities and Gaza. He also runs an Islamic matchmaking service for those looking for a spouse.

(Emphasis added.)

958. An *Associated Press* article on August 27, 1998, reported:

Palestinian militants burned American flags Thursday and called on Saudi dissident Osama bin Laden, suspected of being behind the East Africa embassy bombings, to attack Israel and the United States.

Some 400 people participated in the rally, where groups of masked men burned three American and then three Israeli flags.

"Bin Laden, we want bombs, bombs on America, bombs on Tel Aviv," crowds of young men chanted.

"Bin Laden is now the head of the war against America, so I support him," said Ala Taher, a 26-year-old bearded laborer at the rally.

Thursday's rally was one of several held by militant groups in Palestinian territories in support of bin Laden and against the recent U.S. missile strikes on suspected terror bases in Afghanistan and a factory in Sudan.

In the West Bank town of Nablus, **a leader of the militant Islamic Hamas group**, which opposes peace with Israel, called the strikes an attack on Muslims and Arabs. "America is the first terror state in the world, America is an enemy of Arab and Islamic people," **Jamal Salim** said.

**Sheik Hamad Bitawi** said he would ask worshipers at Friday prayer services to donate money to help Sudan rebuilt its destroyed pharmaceuticals plant. (Emphasis added.)

959. The infamous al-Bitawi was also quoted by the media for his calls to violence on behalf of HAMAS. An *Associated Press* article on November 24, 2000, reported on the funeral of Ibrahim Bani Odeh, a senior HAMAS operative and bombmaker who was assassinated by Israel. HAMAS pledged revenge for his death. The article quotes Sheik Hamed al-Bitawi "the Hamas

leader in Nablus" as stating "'Our response will be more car bombs and they (the Israelis) will pay a high price."

960.    On September 18, 2001, the *Associated Press* reported that HAMAS had issued a "religious edict" against Muslims cooperating with the United States in the wake of the September 11, 2001, attacks. According to the news service: "Tuesday's religious edict was issued by Sheik Hamed Bitawi, a spiritual leader of Hamas in the West Bank town of Nablus. 'It is illegal for any Muslim group or state … to cooperate or align itself with America in any way, whether by fighting alongside it, or facilitating its mission, or opening the skies or airports or harbors to its forces to wage an aggression against any Muslim country,' Bitawi said. Those violating the ban commit 'one of the biggest crimes and treason against God, the Prophet Muhammad and the believers,' Bitawi told a news conference."

961.    A *New York Sun* article dated October 3, 2002,[56] titled "Judge Praises Suicide Bombers" reported that:

> Sheikh Hamed Bitawi, one of the Palestinian Authority's senior religious judges, has given his authorization for the participation of women and children in suicide attacks.
>
> He also praised all those who have already fulfilled the "commandment of Jihad."
>
> Mr. Bitawi was appointed head of the appellate courts in Nablus at the establishment of the P.A. in 1995 and has been on Israel's wanted list since the beginning of the intifada.
>
> **He is considered an authority on religious edicts for Hamas in the Nablus area. During the past two years, he has encouraged Hamas activists to go the way of Jihad and carry out suicide attacks against Israel.**
>
> Mr. Bitawi told the Islam Online Website that "according to a religious edict and [relying on] the words of Allah: Youths and adults, Make haste. Fight

---

[56]    A similar report appeared on the same day in the *Jerusalem Post*.

the war of Jihad using your money and [sacrificing] your souls for the way of Allah."

In a special forum dedicated to religious sages and edicts, he said religious sages have pointed out that men, women, and children alike should all follow this route [of Jihad]. "In the era of Muhammad the prophet, the participation of children [in Jihad] was a well-known fact; now we live in this reality in Palestine," he explained.

"We hold a great deal of love towards Jihad and for the sacrifice of one's self in honor of Allah. This situation has brought many children to compete amongst themselves regarding the carrying out of the operations of Jihad and acts of suicide.

"However, many of these acts and operations were unsuccessful, and especially due to the anticipation and forecasting abilities of the enemy. Therefore, the Islamic movement was forced to ask these children to wait patiently and not carry out the suicide acts until they've completed their studies, trained, and learned to act diligently and with caution."

Asked about the religious ruling regarding the participation of women in suicide attacks, Mr. Sheikh Bitawi, who is on the Palestinian Authority's payroll, said:

"The sages have said that when the enemy occupies and conquers a land belonging to Muslims, the Jihad becomes a commandment that must be fulfilled by every Muslim man or woman. A woman can carry out Jihad without her husband's permission. The women in the era of Muhammad the prophet used to take part in Jihad. Women throughout Palestine can participate in a form of Jihad, including suicide terror attacks."

He said several "blessed women" have already fulfilled their tasks. But he added that women should be patient "because there is a very long queue of men willing to carry out suicide attacks."

He noted that the Palestinian women have shown great examples of willingness to participate in Jihad, following the tradition of the Islamic heroine H'ansa, who sent her four sons to the battle of Kadisiya in the era of Muhammad.

"The public has seen on their television screens how a mother sends her son to carry out Jihad, bids him farewell, and encourages him," Mr. Bitawi said.

Many mothers and women, after hearing their son was killed, cry out exclamations of happiness and joy. We raise our heads up high in honor of these women." (Emphasis added.)

962.     In 2002, the offices of the NZC's Quranic Studies Center were raided by the IDF. Among other incitement materials, the Center displayed a placard in memory of the deceased HAMAS leader Salah Al-din Daruzah.

963.     The Israeli army also recovered from the NZC's Quran center evidence of the Committee's support for HAMAS's violent terrorist activities. For example, the IDF recovered a video of a children's graduation ceremony at which its deputy chairman Hamed al-Bitawi spoke and lashed out at "the Jews, the Crusaders" and the "heretics," a video of the Qassam Brigades, postcards of HAMAS suicide bombers, and teaching aides showing pictures of bombings and wounded Israelis. The Committee also was in possession of a videotape depicting an armed individual reciting a speech about a planned kidnapping of someone from the Israeli Security Agency.

964.     According to the Government of Israel 2004 Report "[a]ll the members of the Zakat Committee Board of Directors are known as Hamas activists."

965.     The NZC was declared an unlawful association by the Israeli Minister of Defense on June 9, 2006, and by the head of the IDF Central Command on September 3, 2006, because of its HAMAS-related activities and organizational relevancy to HAMAS.

966.     The following is a partial list of the prominent HAMAS leaders who served as NZC officials:

- **Dr. Abd al-Rahim Muhammad Radi al-Hanbali**: Hanbali's father Muhammad established the NZC in 1977 and served as its Chairman before Abd al-Rahim inherited the post in 1993. Hanbali also served as a member of *al-Tadamun*'s administration and on the executive management of the Beit El-Mal Holdings, which was declared an unlawful association by Israel and designated an SDGT on the same day as the HLF in December 2001. The Government of Israel 2004 Report described Hanbali as "a senior political Hamas activist."

- **Sheikh Hamed Suleima Jaber Khader al-Bitawi**: Bitawi was considered one of the senior religious and HAMAS leadership figures in the West Bank and served as a member of *al-Tadamun*'s administrative board since 1991. Bitawi served as Chairman of *al-Tadamun* (in addition to his role as Deputy Chairman of the NZC) until the end of 2008. Bitawi was a senior member of the Muslim Brotherhood in the Nablus region (he joined in 1962) and is considered (and considered himself) a HAMAS religious authority. He served as Chairman of the Palestinian Religious Scholars Association since its establishment in 1992: this Association has approved suicide terrorist attacks against Israelis. Bitawi was also the Northern representative of the West Bank on the board of the Union of Good and one of the three West Bank representatives on the Union's board of trustees. Bitawi was arrested several times by both Israel and the PA. Bitawi was one of the *Marj al-Zuhur* deportees. He was known for his poisonous sermons against the Palestinian Authority and against Israel and Jews, which included calls for the murder of Jews and for jihad.[57] For example: on August 1, 2001, Bitawi gave a speech in Nablus before an audience of 150,000 people at the funeral of two senior HAMAS operatives, Jamal Mansur and Jamal Salim, and additional HAMAS operatives, and called for quick revenge for the deaths of the HAMAS operatives.[58] The Government of Israel 2004 Report described Bitawi as someone "considered to be Hamas['] spiritual leader in Judea and Samaria."

- **Adli Rif'at Salah Ya'ish**: Ya'ish served as Treasurer of the Committee. He is presently Mayor of Nablus on behalf of HAMAS (he was elected in the local elections of December 2005). Ya'ish is publicly known in Nablus and the West Bank in general as a HAMAS member; he has fulfilled many functions in the *da'wa* of HAMAS, including membership in the executive management of the *Beit al-Mal* Company, and he has served as Chairman of the *al-Tadamun* Charitable Society. Ya'ish was also among the *Marj al-Zuhur* deportees.

967. From the early 1990s through 2004, the NZC enjoyed financial support through its account(s) at CAB from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and

---

[57]     Following a suicide bombing at a Tel Aviv café in March 1997, Bitawi told a crowd of 10,000 HAMAS supporters, "I have good news. There is a suicide bombing in Tel Aviv." He continued, "This is the only language the occupiers understand, the language of martyrdom."

[58]     Images from the video are attached as **Exhibit M** to the Second Amended Complaint. The video of the Nablus event is available at https://www.youtube.com/watch?v=KKma5eW7_sw (12:12-14:18).

as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

968.     In sum, throughout the relevant period, the NZC was closely intertwined with HAMAS's terrorist activities.

969.     On May 29, 2007, the United States Department of Justice identified the NZC as "an organization which operates in the name of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal trial of *United States v. Holy Land Foundation*.

### 4.     *Al-Tadamun* **Charitable Society – Nablus** (*Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya*)

970.     *Al-Tadamun* Charitable Society – Nablus ("*al-Tadamun*") was founded in Nablus in 1956 and is one of the oldest charitable societies in the West Bank. Like other charitable societies or zakat committees, *al-Tadamun* is involved in a wide range of social activities.

971.     Unlike other institutions in HAMAS's *da'wa* infrastructure, such as *Al-Mujama Al-Islami* (The Islamic Center) or *Al-Jam'iya Al-Islamiya* (the Islamic Society), *al-Tadamun* was not a society out of which HAMAS grew. Rather, over time, HAMAS took control of *al-Tadamun*, such that by the end of the 1990s, the *al-Tadamun* management committee was composed primarily of HAMAS leaders, and its primary goal was to promote HAMAS's goals. Hamed Bitawi, one of the Society's prominent leaders, was one of the Palestine representatives in the Union of Good's leadership.

972.    *Al-Tadamun* is publicly identified as connected to HAMAS; in fact, it is largely considered the "flagship" of HAMAS's *da'wa* apparatus in the northern West Bank. The *al-Tadamun* Society works in close cooperation with the NZC (most of the management committee members serve in both associations at the same time), which also has a close connection with HAMAS.

973.    *Al-Tadamun*'s *da'wa* activities focused on the areas of social welfare, education and leisure, health, and other special activities, all carried out with the aim of strengthening HAMAS's power base; deepening its influence among the public; and emphasizing its image as a public national movement, providing social services to the whole population. The Society's success in promoting HAMAS's standing in the eyes of the public is attested to by the fact that many HAMAS representatives elected to the municipal council and Palestinian Legislative Council came from the Society's ranks.

974.    *Al-Tadamun*'s principal involvement in the support of HAMAS terror is reflected in the transfer of funds from *al-Tadamun* to other zakat committees and charitable societies that are part of HAMAS's *da'wa* infrastructure, including the Jenin Zakat Committee and the Tulkarem Zakat Committee.

975.    During the relevant period, *Al-Tadamun* also provided subsidies to the families of HAMAS terrorists, including suicide bombers associated with HAMAS, and to terrorists associated with other terrorist organizations, such as Palestinian Islamic Jihad and Fatah's Al-Aqsa Martyrs Brigades.

976.    To effectuate these payments, *Al-Tadamun* collected information on HAMAS "martyrs" to help facilitate payments to their family members.

977.    For example, the "Martyr File" for HAMAS operative Amjad Abd al-Rahim Abd

al-Razaq Tubasi (killed in a clash with the IDF on December 4, 2001) attached as **Exhibit N** to the Second Amended Complaint, includes his father's bank card from CAB identifying the account to which reward payment for Tubasi's death should be paid.

978. *Al-Tadamun* also provided the Society's buildings for mourning tents for HAMAS suicide terrorists and senior operatives "martyred" by Israel. For example, it set up a mourning tent for Hani Mustafa Rawajba, a Qassam Brigades operative who was killed while perpetrating a suicide attack. Similarly, it set up mourning tents for senior HAMAS terrorists Salah al-Din Darwazah and Yahya Ayyash. HAMAS and the Darwazah family announced on July 26, 2001, that the traditional reception for mourners would be held for three days at *al-Tadamun*'s hall, and that on the last day a memorial service would be held there. A similar service took place at *al-Tadamun* after Israel killed Yahya Ayyash, HAMAS's first master bomb-maker.

979. Due to pressure from the United States and other countries following the September 11, 2001, terrorist attacks, the Palestinian Authority temporarily closed the main offices of *Al-Tadamun* in December 2001.

980. *Al-Tadamun* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002.

981. In a letter dated November 28, 2002, BND informed the German Ministry of the Interior in Berlin that it believed the Al-Tadamun Charitable Society was part of HAMAS.

982. According to the BND:

> The association Jam'iyat al-Tadamun / Al-Tadamun Charitable Society is directly linked to the HAMAS sphere of influence. In the winter of 2001/2002, the association was banned by the Palestinian Authority based on charges of affiliation with HAMAS. The association's leadership includes several persons who were deported as HAMAS activists to South Lebanon (Marj al-Zuhur) and who were among the leading HAMAS

members, for example Munir AQD, Nabil BISHAWI, Kamal Abu AISHA, Abd Nassir QADAH, Adli YA'ISH, Salah al-Din MUSLAH and Hamza JABIR.

983. The following is a partial list of the prominent HAMAS leaders who served as *al-Tadamun* officials:

- **Sheikh Hamed Suleiman Jaber Khader al-Bitawi**: (See above.)

- **Dr. Abd al-Rahim Muhammad Radi al-Hanbali**: A member of the Society's administrative board. Hanbali also served as Chairman of the NZC from 1990 (when he inherited his father's place on the Committee) until the beginning of 2008. He is a senior political operative in HAMAS.

- **Adli Rif'at Saleh Ya'ish**: Ya'ish served in several senior positions in *al-Tadamun*, including Treasurer and Chairman of the management committee, during the 1990s until his election as Mayor of Nablus in 2005, on behalf of the HAMAS list. Similarly, he served as Treasurer of the NZC since 1990. He was one of the *Marj al-Zuhur* deportees.

- **Jamal Salim Ibrahim Damuni**: Salim was a member of *al-Tadamun*'s administrative board until he and Jamal Mansur, another HAMAS leader, were killed in an IDF operation in July 2001. He was considered one of the most senior HAMAS figures in the northern West Bank, and he often represented HAMAS in delegations in various negotiations with Fatah.[59] Salim was a disciple of Abdallah Azzam. Salim served several terms of imprisonment in Israel between 1985 and 1991 and was also among the *Marj al-Zuhur* deportees.[60] He was briefly arrested by the PA police in 1996.[61] Salim led a riot in Nablus in 1997 protesting a U.S. Congressional resolution recognizing Jerusalem as Israel's capital.[62]

---

[59] For example, Salim was interviewed on *Voice of Palestine*'s October 7, 1995, radio program, "New Day" and introduced as a "member of the Islamic Resistance Movement, Hamas." On December 4, 1995, the *Associated Press* interviewed him and identified him as "a Hamas leader." The *Associated Press* again identified him as a HAMAS leader in a newswire story on October 8, 1998. The Jordanian weekly *Al-Sabil* interviewed him on November 25, 1998, regarding HAMAS's disagreements with the Palestinian Authority.

[60] *Agence France Presse* reported his arrest by the IDF on December 12, 1994, noting his prior deportation to *Marj al-Zuhur*.

[61] On March 29, 1996, *Agence France Presse* reported on the arrest.

[62] On June 21, 1997, the *Associated Press* reported: "In fiery speeches, leaders condemned both Jewish settlement construction and a recent resolution in the U.S. Congress recognizing Jerusalem as Israel's capital. The Palestinians claim the city's eastern sector, captured by Israel from Jordan in the 1967 Mideast War, as their own

- **Abdallah Abd al-Rahman Abd al-Fatah Hijawi**: Hijawi was secretary of *al-Tadamun*. He also served as one of the directors of the Quran Memorization Society, operated by the NZC. From the early 1990s he was a member of the NZC. He took part in HAMAS public activities (for example, The Martyrs' Day in Nablus that was initiated by HAMAS and which was also attended by relatives of senior HAMAS members).

- **Nasuh Abas Muhamad Barham "al-Ramini"**: Barham was a member of *al-Tadamun*'s board of directors and a HAMAS candidate for the Palestinian Legislative Council, standing for HAMAS's Change & Reform Party. He was arrested by the IDF on numerous occasions from 1975 to 1996 and was under house arrest between 1981 and 1982. He was also among the *Marj al-Zuhur* deportees.

- **Hamza Muhammad Hussein Jaber**: Jaber was also active in the *al-Tadamun* Charitable Society and the Islamic Sports Club of the *al-Tadamun* Society. He is known as a veteran political HAMAS operative in Nablus, who formerly worked, *inter alia*, in the HAMAS media office in Nablus. Jaber was among the *Marj al-Zuhur* deportees.

984.    The Government of Israel 2004 Report states that:

The Society is run by Sheikh Hamed Bitawi, and its executive body is the same eleven activists running the Nablus Zakat Committee, all identified as members of Hamas …. In the past, Jamal Salim, one of the senior Hamas movement members in Judea and Samaria, and who was killed during a targeted prevention operation carried out by IDF forces, was also a member of the executive body. In addition, Hamas activists who were some of the "Marj Al-Zuhur" deportees were also members of the executive body ….

985.    From the early 1990s through 2004, the *al-Tadamun* enjoyed financial support through its account(s) at CAB from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal

---

future capital. East Jerusalem has 180,000 Palestinian residents. 'We are sending a message to the American Congress that the crowds here are ready to die for Jerusalem,' said Jamal Salim, a Hamas leader in Nablus. Pictures of Arafat and Yehiya Ayyash, a Hamas bomb maker assassinated last year - reportedly by Israel - draped the stage."

(designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008) and many other HAMAS fundraising organizations.

986.    For example, the Union of Good transferred more than $50,000 to *al-Tadamun* at CAB's Account No. 321494 in 2002, and it used *al-Tadamun* as its coordinator for sending funds to the northern part of the West Bank.[63]

987.    CAB processed multiple funds transfers from Interpal to CAB's *al-Tadamun* account(s) *after* Interpal was designated an SDGT.

988.    In sum, throughout the relevant period, *al-Tadamun* was closely intertwined with HAMAS's terrorist activities.

### 5.    Jenin Zakat Committee (*Lajnat al-Zakaa Jenin*)

989.    The Jenin Zakat Committee ("JZC") was founded in 1985 but has been controlled by prominent HAMAS operatives as early as the first years of the 1990s.

990.    The JZC's operations in the areas of health and education, services for children, and employment have increased HAMAS's prestige.

991.    According to the *Voice of Palestine* (radio), the Israeli army "stormed" the offices of the Jenin Zakat Committee in March 1995 and confiscated many of its files.

992.    In 1996, the Palestinian Authority temporarily closed down JZC's offices.

993.    The JZC was closely intertwined in HAMAS's violent terrorist activities. In fact,

---

[63]    *Al-Tadamun* even served as an intermediary for disbursing Saddam Hussein's terror rewards payments. A letter addressed to the ALF found in the charity's files explained that two "martyrs" had not yet received their $10,000 payments and requested that ALF "please take care of this matter," confirming the significant coordination between *al-Tadamun* and ALF with respect to these types of payments.

one of the core functions of the Jenin Zakat Committee during 2000-2004 was to provide payments to the families of "martyred" HAMAS operatives and other Palestinian "martyrs."

994.     The Jenin Zakat Committee's central role in supporting HAMAS's terrorism was confirmed by the criminal conviction of Ahmad Salim Ahmad Salatneh by an Israeli military court. The verdict noted that from July 2002 until the day of his arrest (September 25, 2005), he was a member of the Jenin Zakat Committee, "an illegal association" that "supports and strengthens Hamas's infrastructure."

995.     The verdict noted that the Jenin Zakat Committee received funds from:

> illegal associations which operate outside of Israel, such as Interpal in London, the Al-Aqsa institutions in Belgium, Holland and Germany, the Union of Good, The Holy Land Foundation for Relief and Development in the United States, the eastern region of the International Islamic Relief Organization - Saudi Arabia, the World Assembly of Muslim Youth in Saudi Arabia and [CBSP] in Paris, France. Among other things, the Committee transferred funds to relatives of senior military activists in Hamas and the Palestinian Islamic Jihad organizations, who were killed during confrontations with IDF forces; to relatives of the heads of the military infrastructures of the said organizations; as well as to the families of suicide attackers, who committed suicide attacks in the territory of the State of Israel and caused tens of fatal casualties.

996.     For example, the JZC made a martyr payment to the CAB account (no. 253062) of the family of Imad Faruq Mahmud al-Nashrati, who served as the head of HAMAS's Qassam Brigades in the Jenin area. He was responsible for organizing suicide bombings and other terror attacks, including the suicide bombing on an Egged bus at the Meron junction on August 4, 2002, in which 9 Israelis were killed and 53 injured. He was also responsible for a long line of shootings and bombings targeting Israeli soldiers before he was accidentally killed on November 26, 2002, while preparing explosive charges for a terror attack.

997.     The JZC also made a martyr payment to the CAB account (no. 266353) of the family of Shaman Hussein Muhammad Subh, another senior operative of HAMAS's Qassam

Brigades in the Jenin area who was responsible for recruiting terror cells which planned to execute many terror attacks and kidnap soldiers. He was killed on December 23, 2002, during a clash with Israeli soldiers.

998. The JZC also made a martyr payment to the CAB account (no. 243491) of the family of Shadi Zakariya Rida al-Tubasi, the HAMAS operative who perpetrated the suicide bombing at the "Matza" Restaurant in Haifa on March 31, 2002, killing 15 people.

999. The JZC also made a martyr payment to the family of Izz al-Din Shuhail Ahmad al-Masri, the HAMAS operative who perpetrated the suicide bombing at the Sbarro pizzeria in Jerusalem on August 9, 2001, killing 15 people.

1000. The JZC was declared to be an unlawful organization by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF Central Command on June 30, 2002.

1001. On October 6, 2003, the IDF raided the JZC's offices.

1002. The Government of Israel 2004 Report noted that:

> Documents were found in the offices of the Zakat Committee, which unequivocally prove the support received by the families of Palestinian terrorists from the Committee. One of the documents contains a request for aid for 12 activists, who were dominant figures amongst the terrorists in the Jenin region. This proves and exposes the connection between the Zakat Committee and terrorists and their families. In other documents, members of the Zakat Committee point to those killed ("shahids"), amongst them military Hamas operatives, as being the only ones whose families qualify for aid from the "Friends of the Arab Emirates Society."

1003. In February 2004, the IDF confiscated the JZC's funds from its bank accounts in Ramallah, as part of a comprehensive operation against terror financing.

1004.   The same 2004 Civil Administration report noted that even after the Israeli Army's February 2004 seizure of terrorist funds from CAB, the JZC still used a Jordanian dinar account at CAB to fund its operations.

1005.   Until the replacement of the executive management of the committees by the Palestinian Authority in late 2007, most of the members of the JZC executive management were openly related to HAMAS and were considered HAMAS operatives. Furthermore, the Chairman and the Administrative Manager of the JZC, who jointly made all the important decisions regarding the JZC throughout the relevant period and served as its *de facto* managers, were also HAMAS members.

1006.   The following is a partial list of the prominent HAMAS leaders who served as JZC officials:

- **Sheikh Zayd Mahmud Abd al-Rahim Zakarneh**: Zakarneh, who is known as a prominent HAMAS operative in the Jenin area, was among the founding members of the JZC and chaired the Committee from the early 1990s until 2008. In September 2005, Zakarneh was arrested and later convicted of membership in HAMAS.

- **Ahmad Salim Ahmad Salatneh**: Salatneh was the Administrative Manager of the JZC from 2002 to 2005 and de facto second-in-command to the Chairman of the Committee. Salatneh was involved in transferring bomb-making components in 1992 and was implicated in a car bomb attack in 1993. He was arrested by the Palestinian Authority and has also been arrested several times by Israel and was convicted twice for terrorist activities by Israel.

- **Jamal Abd al-Salam Asad Abu al-Hija**: Al-Hija was an employee of the JZC. He was arrested by the Palestinian security forces several times, starting in 1996. On April 12, 1999, Al-Hija was sentenced by an Israeli military court to 13 months' imprisonment, after having been convicted of membership in HAMAS. In April 2002, during an IDF campaign in Jenin, he served as commander of HAMAS in the Jenin area. **Al-Hija also participated in the planning of several suicide bombings and recruited suicide bombers. He was involved in the planning of a suicide bombing in the Sbarro Restaurant in Jerusalem in August 2001, a suicide bombing of a bus on Mt. Meron**

**in August 2002, and a suicide bombing in the Matza Restaurant in Haifa in March 2002.**[64] Al-Hija has been serving nine consecutive life sentences in an Israeli prison since August 2002.

- **Naser Khaled Ibrahim Jarar**: Jarar was one of the commanders of HAMAS's terror apparatus in Jenin. According to Israeli intelligence, he was "active in recruiting terrorist-operatives and in locating and dispatching suicide bombers and planned a series of deadly attacks against Israeli targets." He was also a founding member of the JZC. Jarar was arrested several times by Israel between 1989-1998.

- **Ibrahim Hasan Ali Jaber**: Jaber became a member of the JZC in 1988 and worked in its various institutions. He was also a senior HAMAS operative who was responsible for several lethal attacks against Israeli targets. During questioning, he admitted to planning the attacks, transporting explosive devices, providing military training, and possessing weapons.

1007.   From the early 1990s through 2004, the JZC enjoyed financial support through its account(s) at CAB from HAMAS fundraising organizations that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), and many other HAMAS fundraising organizations.

1008.   For example, in April 2003, CAB processed funds transfers from the Al-Aqsa Foundation (designated an SDGT in May 2003) to the CAB account for the JZC.

---

[64]      On April 24, 2002, the *New York Sun* reported that HAMAS's website quoted "Sheikh Jamal Abu Al-Hija, the commander of the Hamas Izz Al-Din Al-Qassam Brigades in the Jenin refugee camp" referring to HAMAS's effort to resist an Israeli army incursion into Jenin: "Some of the youths stood fast, and filled their school bags with explosive devices," the website quoted Abu al-Hija as saying.

1009.   In July 2003, CAB processed funds transfers from the Al-Aqsa Foundation to the CAB account for the JZC, *after* the Al-Aqsa Foundation was designated an SDGT.

1010.   CAB processed multiple funds transfers from Interpal to CAB's Jenin Zakat Committee's account(s) *after* Interpal was designated an SDGT.

1011.   On May 29, 2007, the United States Department of Justice identified the Jenin Zakat Committee as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 6.      Ramallah – Al-Bireh Zakat Committee
### (Lajnat al-Zakaa Ramallah Wal-Bireh)

1012.   The *Ramallah al-Bireh* Zakat Committee ("RBZC") was founded in 1977 but has for many years been identified as part of the HAMAS *da'wa* system in the West Bank.

1013.   The principal *da'wa* activities of the RBZC are support for orphans, providing health services, and running summer camps.

1014.   On March 17, 1996, Palestinian security forces raided several institutions, including the RBZC, and confiscated many documents.[65]

1015.   A Palestinian Authority intelligence document dated May 22, 2000, notes: "The monitoring of the Committee [RBZC] that we carried out made it clear that the Committee [RBZC] transfers funds from abroad to Hamas."

1016.   The RBZC was closely intertwined with HAMAS's violent terrorist activities. The Palestinian Authority's General Intelligence Service noted in an undated report seized by Israeli forces in 2002 that the charity "supports the families of imprisoned and deported individuals" and

---

[65]      *Agence France Presse* reported on February 1, 1995, that the IDF raided the committee's office charging that "Moslem fundamentalists, particularly the Islamic Resistance Movement HAMAS, collect money to support the armed struggle under the cover of charity, social or educational institutions."

that the "higher echelons of this society and others like it belong to Hamas, and some of them are movement [HAMAS] activists." In fact, the Committee's expense report for November and December 2000 reveals that among the families who benefited from the Committee's financial aid were several senior HAMAS operatives. The expense report also included entries for payments to the families of "martyrs."

1017.   The RBZC was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002.

1018.   In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the RBZC was part of HAMAS.

1019.   The BND concluded that the "Zakat Committee of Ramallah is closely connected with HAMAS and therefore, as part of the social network, it is to be linked to the immediate sphere of influence of HAMAS."

1020.   The following is a partial list of the prominent HAMAS leaders who served as RBZC officials:

- **Dr. Husni Muhammad Abd al-Qader Abu Awad**: During the relevant period, Awad served as Chairman of the Committee, and according to a Palestinian Authority intelligence report, was identified with HAMAS.

- **Hasan Yusuf Daud al-Khalil (a/k/a Hassan Yousef)**: Khalil was one of the founders of the RBZC and a member of its Board. He is one of HAMAS's most senior and prominent leaders in the West Bank.[66]

---

[66]     *See, e.g., The Economist*, December 2, 1995 (describing "Hassan Yousef, a Hamas leader in the West Bank"); *Associated Press*, February 1, 1996 (describing "Hamas spokesman Hassan Yousef"); *United Press International*, February 29, 1996 ("In the West Bank town of Ramallah Hamas spokesman Sheik Hassan Yousef, called on the PA to release the arrested activists."); *Deutsche Presse-Agentur* (German wire service), August 26, 1999 ("Hassan Yousef, a Hamas representative, said the roundup of Hamas activists does not help national Palestinian reconciliation and inter-Palestinian dialogue."); *Associated Press*, November 22, 1999 ("Hassan Yousef, a Hamas leader in the West Bank, said the deportations were a setback, but the movement would survive."); *Reuters News Agency*, October 18, 2000 ("Hassan Yousef, a senior Hamas leader in the West Bank."); *Associated Press*, May 18, 2001 ("In Ramallah, Hamas preacher Hassan Yousef announced the name [of the suicide bomber] over mosque loudspeakers Friday, after

Khalil was among the *Marj al-Zuhur* deportees, and he even served as Secretary of the deportees' camp. He was later arrested by the Palestinian Authority in 1996 and again by Israel on several other occasions.

- **Ibrahim Sa'id Hasan Abu Salem**: Abu Salem was one of the founders of the RBZC and served as the Committee's Director. In 1989 he was arrested by Israel and imprisoned for five months due to his ties with HAMAS. He was among the *Marj al-Zuhur* deportees and was arrested by the Israeli security forces in 1994 and 1999.

- **Fadel Muhammad Saleh Hamdan**: Fadel Hamdan was one of the founders of the RBZC and one of the most prominent HAMAS operatives in the Ramallah region. The FBI's Watson Memorandum noted that **Hamdan was "directly connected with the planning of suicide attacks and the psychological preparation of those who were about to carry out suicide attacks, including the Mahane Yehuda attack in July 1997**." Fadel Hamdan was among the *Marj al-Zuhur* deportees and was imprisoned in 1996 by the Palestinian Authority. *CNN* reported on his arrest by the IDF on December 1, 2003 "along with several other Hamas members."

- **Mahmud Ibrahim Mahmoud Muslih**: Mahmud Muslih was director of the RBZC and is considered one of the senior HAMAS operatives in the Ramallah region. During the First Intifada, Muslih was one of HAMAS's senior leaders in charge of public relations. In 1995 and 1996 he served as HAMAS's official spokesman. He was arrested and imprisoned by Israel in 1997-1998 and again in 2003-2005 on charges

---

noon prayers. Yousef said the blast came in retaliation for the killing of five Palestinian policemen by Israeli security forces earlier this week."); *USA Today*, June 13, 2001 ("Sheik Hassan Yousef, a senior Hamas leader in Ramallah, urged Palestinian leader Yasser Arafat on Tuesday to reject the U.S. plan, warning that 'the street will explode.' He said Hamas attacks, including suicide bombings like the one June 1, at a Tel Aviv disco that killed 21 people, would continue."); *Sunday Telegraph* (UK) August 5, 2001 ("Hassan Yousef, the once highly visible Hamas political chief in Ramallah, is also among those who have gone to ground."); *The Atlanta Journal-Constitution,* October 8, 2001 ("'What America is doing is a terrorism against Islam and Muslims,' said Hassan Yousef, spokesman for Hamas, a militant group that has claimed responsibility for a series of suicide bombings against Israelis."); *Chicago Tribune,* December 8, 2001 ("'We in the Hamas movement, we read the situation locally and regionally and globally. We understand and see the changes and we are moving in this frame,' explained Hassan Yousef, a leader in the West Bank."); *Newsweek*, December 31, 2001 ("'We will fight against Israel inside the occupied territories,' Sheik Hassan Yousef, a Hamas spokesman in Ramallah, told NEWSWEEK. 'We have the right to defend ourselves in our land.'"); *The Globe and Mail* (Canada), January 10, 2002 ("A Hamas spokesman, Hassan Yousef, said yesterday that it was resuming its attacks because there was never a truce on the Israeli side."); *Christian Science Monitor*, March 29, 2002 ("'We are going on with this,' says Sheikh Hassan Yousef, the West Bank spokesman for the Islamic Resistance Movement, or Hamas, the organization responsible for the Netanya bombing, referring to attacks on Israelis."); *Los Angeles Times*, September 1, 2002 ("Israeli forces Saturday also captured the senior Hamas political figure in the West Bank, Sheik Hassan Yousef, who was taken from his hide-out in the city of Ramallah. Israel accuses him of inciting Palestinians to attack Israelis, but Hamas said Yousef is just a politician, and vowed revenge.").

of membership and activity in HAMAS. Muslih was identified in 2003 by Khalid Mishal as one of the founders of HAMAS in Ramallah.

- **Omar Hamdan**: Omar Hamdan, was a member of the RBZC. He is a prominent senior HAMAS operative in Ramallah. He also served as director and chairman of the *al-Islah* Charitable Society in Ramallah, which was also a central HAMAS-controlled institution in Ramallah. Hamdan served long periods of imprisonment in Israeli jails for his HAMAS-related activities.

1021.   The RBZC's accountant during this period, Raeq Sakeb Ibrahim Omar, previously worked at CAB's branch in Ramallah.

1022.   Omar was himself a HAMAS operative and was among the *Marj al-Zuhur* deportees in 1992. Upon his repatriation from Lebanon, he joined CAB and eventually became a deputy branch manager.

1023.   From the early 1990s through 2004, the Ramallah al-Bireh Zakat Committee received funding through its CAB account(s) from HAMAS fundraising organizations such as HLF in the United States (after it was designated an unlawful association by Israel in 1997 and terror organization in 1998) as well CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), WAMY (designated an unlawful association by Israel in 2002), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008) and many other HAMAS fundraising organizations.

1024.   On May 29, 2007, the United States Department of Justice named the Ramallah al-Bireh Zakat Committee as an "organization that operates on behalf of, or under the control of,

HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 7. Muslim Youth Association – Hebron

1025. The Muslim Youth Association – Hebron ("MYAH") was established in Hebron in 1985. For many years, it has been identified as part of the HAMAS *da'wa* system in the West Bank.

1026. The principal *da'wa* activities of the MYAH are support for the education (particularly Islamic education) of poor students through financial support to kindergartens, schools, and libraries.

1027. During the relevant period, the MYAH served as a "breeding ground" for the recruitment of HAMAS terrorists.

1028. In March 1996, the Israeli Army ordered the temporary closure of MYAH.

1029. A March 10, 1996, article in the *Atlanta Journal and Constitution* reporting on the closure stated:

> [C]losing Hamas' loose network of institutions is just what Israel and the Palestinian Authority set out to do in the past week. Their forces shut dozens of schools, mosques and recreation centers in poor neighborhoods throughout the West Bank and the Gaza Strip.
>
> One such spot in Hebron was the **Muslim Youth Association**, a meeting hall on the fifth floor of a shabby office building that served as a type of Boys Club for nearly 1,000 teenagers. Israeli troops surrounded the building late Wednesday night, emptied it and welded shut the heavy steel doors to the association.
>
> To Israeli authorities, the club was a breeding ground for terrorists. The evidence of strident ideology was scrawled in Arabic on the hallway walls: "Hamas is everywhere," and "Ayyash is the symbol of courage" - a reference to master Hamas bombmaker Yehiya Ayyash, whose assassination in January, allegedly by Israeli agents, led to the revenge bomb attacks. (Emphasis added.)

1030.   Moreover, the Government of Israel 2004 Report notes that during searches carried out at the offices of the Muslim Youth Association, "incitement [video] tapes were unearthed that document the closing ceremonies of educational institutions and scout camps during which the children glorify HAMAS terrorists, with the 'Engineer,' Yihya Ayash, at the top of the list, and also calling out cries in favor of the 'Izz Al-Din Al-Qassam' Brigades, promising the coming of thousands [of holy warriors] in the wake of those killed, carrying toy R.P.G. [rocket propelled grenade] launchers on their shoulders, staging the murder of an ISA operative, operating weapons and calling out taunts against the Zionists and for the return of Jerusalem, Beit She'an, Acre, Jaffa and Haifa to the Palestinians."

1031.   In December 2001, the Palestinian Authority temporarily closed MYAH and imposed limitations on the Association's bank accounts due to pressure following the September 11, 2001, attacks in the United States. The closures were reported on one of HAMAS's official websites contemporaneously.

1032.   The MYAH was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002.

1033.   In March 2003, the executive offices of MYAH were shut down and sealed off (under an order from the head of the IDF's Central Command).

1034.   The following is a partial list of the prominent HAMAS leaders who served as MYAH officials:

- **Mustafa Kamil Khalil Shawar**: During the relevant period, Shawar served as a member of the MYAH board as well as the board of ICSH. Shawar was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal identified him as one of the founders of HAMAS in Hebron. He was arrested by the ISA in August 2002 and released in March 2003.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab was a member of the MYAH board as well as the ICSH administrative Board. He is also a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal identified him as one of the founders of HAMAS in Hebron.

- **Hatem Rashid Qafisha**: Qafisha served as the Vice President of MYAH. He was arrested on multiple occasions by Israel and the PA and was among the *Marj al-Zuhur* deportees. The Government of Israel 2004 Report refers to him as someone who is "known as a Hamas activist."

- **Malek abd al-Salam Misbah Nasser al-Din**: Nasser al-Din was an administrator at MYAH and played for its soccer team. He was also among the *Marj al-Zuhur* deportees and a commander of the Qassam Brigades.

1035.   From the early 1990s through 2004, MYAH enjoyed financial support through its CAB account(s) from HAMAS fundraising organizations that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

1036.   HLF, for example, funded "martyrs" through MYAH with one master list of payments made by MYAH divided into six columns: the name of the "martyr" (a Hamas operative who is killed), the "martyr's" beneficiary, the beneficiary's identity number, his/her relationship to the "martyr," the amount paid, and the signature of a MYAH official. The list contains the names of at least three HAMAS operatives:

- Iyad Hasin Abdal Aziz Hadid – involved in the murder of the Lapid family on December 6, 1993; then killed by the IDF on March 24, 1994.

- Marwan Muhamad Halil Abu Ramila – involved in the attack of Ephraim Zarviv in November 1993; then killed by the IDF on March 24, 1994.

- Khatem Kader Ya'akov Makhtaseb – a Qassam Brigades operative involved in shooting IDF personnel.

1037.  In sum, throughout the relevant period, MYAH was closely intertwined with HAMAS's terrorist activities.

1038.  On May 29, 2007, the United States Department of Justice named the MYAH as an "organization that operates on behalf of, or under the control of, HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 8.  Beit Fajar Zakat Committee

1039.  The Beit Fajar Zakat Committee ("BFZC") was founded in 1990 and was managed during the relevant period by Dr. Issa Thawabteh, a HAMAS operative.

1040.  Beit Fajar is a small town south of Bethlehem.

1041.  For many years, it has been identified as part of the HAMAS *da'wa* system in the West Bank.

1042.  The principal *da'wa* activities of the zakat committee have been to support orphans and the needy in the Bethlehem region and to operate kindergartens on HAMAS's behalf.[67]

1043.  According to Palestinian security officials, the BFZC opened an office in Bethlehem "as a result of intense pressure exerted by Dr. Issa Thawabteh and because Dr. Issa Thawabteh plays a central role in bringing [in] support funds to Hamas institutions in Bethlehem."

1044.  During the relevant period, BFZC received funding from the Al-Aqsa Foundation in Germany, Interpal, WAMY and a variety of other Union of Good institutions.

1045.  The BFZC received and distributed funds via at least two accounts at CAB throughout the relevant period.

---

[67]  The Palestinian Preventive Security Forces identified the kindergarten as being connected with HAMAS activity and under the control of HAMAS operative Issa Thawabteh.

1046.   In a June 20, 2001 letter, the Palestinian Authority's Preventive Security Service identified the BFZC as a prominent HAMAS institution, whose members were also associated with the Qassam Brigades.[68]

1047.   On January 6, 2002, the Palestinian Monetary Authority instructed the Palestinian banks to report on the sums of money held in the BFZC's accounts and demanded that they consult with it before any withdrawal of money from those accounts.

1048.   In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the BFZC was part of HAMAS.

1049.   According to the BND:

> The Zakat Committee of Beit Fajar is under the control of HAMAS and therefore, being part of the social network, is directly associated with HAMAS. The members of the Zakat committee's leadership: Is Muhammad Khalil THAWABTA, Kamal Said Rashid DIRIYA, Muhammad Jum's Aqil THAWABTA and Husain Musa Jum'a DIRIYA are members of HAMAS.

1050.   The Israeli Army carried out searches of the offices of the BFZC on April 25, 2002, and November 18, 2004.

1051.   The committee was declared an unlawful association in the State of Israel by the Israeli Minister of Defense on February 28, 2005, and was outlawed by the head of the IDF's Central Command on the same date.

1052.   The following is a partial list of the prominent HAMAS leaders who served on the board of or the management of the BFZC:

- **Dr. Issa Muhammad Khalil Thawabteh**: Thawabteh was Chairman of the Beit Fajar Zakat Committee.

- **Jaber Ibrahim Jaber Diriyeh**: Diriyeh is a publicly known HAMAS operative who served as a member of the board of BFZC until he was

---

[68]     This was later confirmed by HAMAS, which published an article in its daily newspaper in 2007 complaining about the Palestinian Authority's measures against zakat committees controlled by HAMAS.

forced out in 2007 as part of the Palestinian Authority's 2007 purge of HAMAS-controlled committees in the West Bank.

- **Muhammad Juma Aqel Thawabteh**

- **Hussein Musa Juma'a Diriya**

- **Sheikh Kamel Saad Rashid Diriyeh**

- **Amin al-Fatah Ali Shamarkhah.**

1053.   According to an Israeli government assessment, all six men are "HAMAS activists."

1054.   During the relevant period, the BFZC received funding through its CAB account(s) from the Al-Aqsa Foundation (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association in 2002 by Israel and an SDGT in 2008 by the U.S.) and many other HAMAS fundraising organizations.

1055.   In sum, throughout the relevant period, BFZC was closely intertwined with HAMAS's terrorist activities.

1056.   CAB processed multiple funds transfers from Interpal to CAB's BFZC account(s) *after* Interpal was designated an SDGT.

### 9.   *Al-Islah* Charitable Society in Ramallah & Al-Bireh

1057.   The *Al-Islah* Charitable Society in Ramallah & Al-Bireh ("*Al-Islah*") was one of the most important components in the *da'wa* infrastructure of HAMAS in the West Bank, where it was considered the pivotal civilian institution of HAMAS.

1058. It was created by HAMAS at the direction of HAMAS leaders for the purpose of transferring the organization's funds to HAMAS prisoners and coordinating HAMAS's *da'wa* activities in the Ramallah area. It was also tasked with providing scholarships to students and subsidizing and operating summer camps that encouraged young people to take part in jihad.

1059. *Al-Islah* was closely intertwined with HAMAS's violent terrorist activities, not only because it was responsible for recommending grants for, and transferring funds to, HAMAS prisoners, as well as the families of terrorists whose homes were destroyed, and who were injured or "martyrs," but also because it provided employment and operational cover to senior HAMAS operatives deeply involved in the organization's terror activities, including recruiting suicide bombers, planning attacks, and harboring operatives.

1060. In fact, HAMAS's senior *da'wa* leadership in the Ramallah region was prominently represented on *Al-Islah*'s administrative board and they were frequently replaced because several of them were arrested and convicted by Israel for their HAMAS activities.

1061. Among the members of *Al-Islah*'s administrative board were three *Marj al-Zuhur* deportees.

1062. The following is a partial list of the prominent HAMAS leaders who served on *Al-Islah*'s administrative board or as senior employees:

> **Jamal Muhammad Farah al-Tawil ("Jamal Tawil")**: Al-Tawil is one of the *Marj al-Zuhur* deportees and a member of the Palestine Religious Scholars Association. He founded *Al-Islah*'s Ramallah branch at the outbreak of the Second Intifada. At the beginning of 2002, al-Tawil was arrested by IDF forces[69] and was sentenced to three years in prison for transferring funds (through *Al-Islah*) to terrorists, the families of "martyrs," HAMAS prisoners, and members of the Qassam Brigades. Al-Tawil was identified in 2003 by Khalid Mashaal as one of the founders of HAMAS in Ramallah. He served approximately six years in Israeli prisons, including from 2002 to February 2005. Tawil was involved in planning several suicide attacks, including the car bomb

---

[69] His arrest was reported by the *Associated Press* on April 15, 2002, identifying him as a leader of HAMAS.

attack in Jerusalem's Ben Yehuda pedestrian mall in December 2001, an attack implicated in this case. He also served as head of a HAMAS prisoners committee. In 2005, al-Tawil was the successful HAMAS candidate for Mayor of the town of al-Bireh.

- **Omar Muhammad Ahmad Hamdan**: Hamdan served as Chairman of *Al-Islah* from al-Tawil's arrest in 2002 until May 2005, when the Society's name was changed. Hamdan also served in senior positions in the RBZC. Hamdan was imprisoned and served two years in an Israeli jail for his involvement in HAMAS terror activities.

- **Muhammad Subhi Yasin Samaha**: Samaha served as Chairman of *Al-Islah* from May 2005, when the Society changed its name from *Al-Islah* to *al-Farah* and was a member of the Society's Ramallah branch from its inception in the year 2000. Samaha is a known senior HAMAS operative in the Ramallah region. Since 2005 he has served as Secretary of the RBZC, which is also controlled by HAMAS.

- **Majed Ismail Mahmud Abu Khadija**: Abu Khadija was a member of *Al-Islah*, but upon the Society's reorganization and change of name in May 2005, he stopped serving on its administrative board. Abu Khadija was one of the *Marj al-Zuhur* deportees.

- **Bajes Khalil Mustafa Nakhla**: Nakhla was a member of the administrative board of *Al-Islah* until the Society's reorganization and change of name in May 2005. Nakhla was among the *Marj al-Zuhur* deportees and is considered one of the senior HAMAS figures in Ramallah. He was arrested several times by the IDF.

- **Fadel Muhammad Saleh Hamdan**: Fadel Hamdan was among the *Marj al-Zuhur* deportees and was imprisoned in 1996 by the Palestinian Authority. He was also one of the founders of the RBZC and one of the most prominent HAMAS operatives in the Ramallah region. He served as a member of *al-Islah*'s administrative board. The FBI has cited documents seized in the offices of the Islamic Relief Agency which noted that Hamdan was "directly connected with the planning of suicide attacks and the psychological preparation of those who were about to carry out suicide attacks, including the Mahane Yehuda attack in July 1997."

- **Falah Taher Abdallah Nada**: Falah Nada was a senior employee of *Al-Islah* (from June 2001 until his arrest by Israel on January 21, 2003) where he was responsible for the transfer of funds to families of HAMAS prisoners jailed in Israel and to HAMAS operatives who had been injured. Falah Nada was convicted for his membership in HAMAS and for recruiting a senior member of the Qassam Brigades, Muhamad

Arman, who guided the so called "Silwan Cell," which was responsible for a series of terrorist acts and murders in which dozens of Israeli civilians died and hundreds of others were injured. (Arman was later arrested, convicted, and sentenced to 36 life sentences.) Nada instructed three female couriers to transfer, on his behalf, letters, secret notes, money, and documents to a number of people including Jamal Al-Tawil, head and founder of the *al-Islah* society, and Omar Hamdan, also a senior HAMAS member in Ramallah who served as chairman of *Al-Islah* since the arrest of Al-Tawil in 2002. Within the scope of his employment at *al-Islah*, Nada was involved in recruiting suicide bombers and hiding wanted men. Based on these activities, Nada received an 81-month prison term.

1063. Jamal Tawil has long been known as a prominent HAMAS leader.

1064. In 1998 he was identified by the Dutch daily newspaper *NRC Handelsblad* as a HAMAS leader in Ramallah.

1065. On August 18, 2000, *Agence France Press* reported:

The Palestinian militant group Hamas threatened Friday to strike violently at Israel if any of Jerusalem's Islamic holy sites are damaged.

Hamas, or the Islamic Resistance Movement, is opposed to any dialogue with Israel and has attacked Israelis in the past, especially after an extremist Jew killed 29 Muslims at the Cave of the Patriarchs in Hebron in 1994.

"Israel should remember the suicide attacks led by Hamas after the massacre," **Hamas leader Jamal Tawil** told movement members assembled in Ramallah. (Emphasis added.)

1066. On October 28, 2000, the *Baltimore Sun* reported from Ramallah:

… cameramen encircled Marwan Barghouti, the West Bank leader of Yasser Arafat's Fatah faction, one of the key organizers of the demonstrations.

"This is a message for everybody," Barghouti said, repeating his refrain, "that the intifada will go on until the Israeli occupation ends."

Then a tap on a shoulder: Would you like to interview Hamas, a man asked. Standing placidly in suit and tie was **Jamal Tawil**.

"In the name of my God, we are going on in this intifada until we get our objectives," said **Tawil, the Ramallah representative of Hamas**, a militant Islamic group that has used violence to try to stop the peace process.

"Hamas has its own strategy. We will have to defend ourselves using any means." (Emphasis added.)

1067. On July 21, 2001, the Associated Press reported:

At a funeral Saturday in the West Bank town of Ramallah, a few hundred people mourned Dia Tawil, a Hamas bomber who injured two dozen Israelis by blowing himself up March 27 near an Israeli bus in Jerusalem. Israeli authorities released his remains Friday.

**Jamal Tawil**, Dia's uncle and **the Hamas spokesman** in the town, said Israeli cities including Tel Aviv and Beersheva should be "open for our fighters" to carry out attacks. He vowed more suicide bombers would "respond for all the Israeli escalation." (Emphasis added.)

1068. *Al-Islah*'s offices were (temporarily) closed by the Palestinian Authority on December 15, 2001, during one of its periodic crackdowns on HAMAS.

1069. On December 16, 2001, Ibrahim Al-Masri, director of the Palestinian Authority's General Intelligence Service in the Ramallah - Al-Bireh District, sent a letter to the director of the Palestinian Authority's General Intelligence Service's Northern Districts confirming *Al-Islah*'s closure due to its identification as a "Hamas-affiliated" institution.

1070. *Al-Islah* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002.

1071. In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the *Al-Islah* was part of HAMAS. According to the BND:

Al-Islah Charitable Society is directly associated with HAMAS. President of the association, until he was arrested by Israel, was Jamal ALTAWIL, known as a leading HAMAS member. In the winter of 2001/2002, the association was banned by the Palestinian Authority upon accusations of HAMAS membership. On the premises of the "Welfare Committee" of the association's branch in Ramallah was found a list of HAMAS activists some of whom died as "martyrs" and for whose families requests were made for financial support from donations received by the association.

200

1072.   According to *Voice of Palestine* (radio) on July 7, 2003, the Israeli army "stormed" the headquarters of *Al-Islah* in Ramallah.

1073.   As Dr. Levitt wrote in *HAMAS: Politics, Charity, and Terrorism in the Service of Jihad*: After his arrest by Israel, Jamal Tawil "told his interrogators that in March 1998 Abu Ahmad [a HAMAS leader based in Lebanon] began to wire monthly bank transfers of $12,000 for Hamas activities—first into Tawil's personal account and later into the local account of the al-Islah Charitable Society—the Hamas charity Tawil was instructed to found in Ramallah."

1074.   Dr. Levitt also described an expense report recording *Al-Islah*'s spending over a 41-day period in November and December 2000. Over the course of these 41 days, "the charity dispersed $4,990 in financial aid to the families of martyrs (including suicide bombers), $16,257 directly to prisoners, $17,275 for prisoner's families, and $3,833 for wounded militants. The charity even spent money on gifts to families commemorating their suicide bomber relatives; papers seized from the al-Islah charity show a series of small gifts—$100 each—presented to the families in celebration of the three-day Eid al-Fitr holiday in 2001. Spending supporting terrorists and their families represented 46 percent of al-Islah's spending over that time period, compared to 43 percent ($39,537) on social welfare."

1075.   During the relevant period, *Al-Islah* received funding through its CAB accounts(s) from CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), WAMY (designated an unlawful association in 2002 by Israel) and many other HAMAS fundraising organizations. In some cases, it received funding from SDGTs

even after those entities were designated by the United States.

1076.   *Al-Islah* continued to receive funding from Interpal even after the latter was designated in August 2003.

### 10.   Qalqilya Zakat Committee

1077.   Qalqilya Zakat Committee ("QZC") was established in 1968 and is considered the strongest and most dominant *da'wa* institution in the Qalqilya region.

1078.   According to the FBI's Watson Memorandum, reporting by the Israeli government "indicates that this zakat committee exists to support HAMAS activity. All four identified members of this committee have been identified by the GOI as HAMAS members."

1079.   Ibrahim Dawud (a/k/a Bilal Hanoun) served as chairman of the QZC during the relevant period. The FBI described him as "Imam of the local Mosque, as well as a HAMAS activist."

1080.   Sheikh Riyad Rashid Walwil was a founder, member, and vice chairman of the QZC. The FBI noted that Walil "was detained by [Israel] in August 1995 for interview and admitted membership in the HAMAS. He was held under administrative arrest until July 1996, due to his HAMAS activities." The Qassam Brigades later acknowledged him as one of HAMAS's prominent leaders.

1081.   The Government of Israel 2004 Report noted that "Members of the Committee's Board of Directors – [are] all publicly identified as Hamas members."

1082.   The QZC assisted the families of those killed in the Intifada and families of suicide bombers and prisoners, including assisting in the rebuilding of homes of terrorists that had been demolished.

1083.   In sum, throughout the relevant period, the Qalqilya Zakat Committee was closely intertwined with HAMAS's terrorist activities.

1084.   On May 29, 2007, the United States Department of Justice named the Qalqilya Zakat Committee as an "organization that operates on behalf of, or under the control of, HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

1085.   During the relevant period, the Qalqilya Zakat Committee received funding through its CAB accounts(s) from HLF (designated an unlawful association in 1997 and a terror organization in 1998 by Israel, and an SDGT in 2001 by the U.S.), the Union of Good (designated an unlawful association in 2002 by Israel, and an SDGT in 2008 by the U.S.), and many other HAMAS fundraising organizations.

### 11.   Quran and Sunnah Society – Qalqilya

1086.   The Quran and Sunnah Society – Qalqilya ("QSS") was founded in 1996 by a prominent local HAMAS leader, Ibrahim Dawud (a/k/a Bilal Hanoun).

1087.   During the relevant period, both its treasurer (and later chairman), Khalil Khader Mustafa Abu Khader, and its vice-chairman, Kheir al-Din Awda Farah Dik, were HAMAS operatives.

1088.   The QSS operated two schools and a kindergarten during the relevant period, all called "The Martyrs of al-Aqsa." The Society provided scholarships and subsidies to poorer students.

1089.   It also provided financial support to Palestinian terrorists in Israeli prisons.

1090.   During the relevant period, the QSS received funding through its CAB account(s) from the Al-Aqsa Foundation and Interpal (both designated unlawful associations by in 1997 and

terror organizations in 1998 by Israel, and as SDGTs in 2003 by the U.S.) WAMY (designated an unlawful association in 2002 by Israel), and many other HAMAS fundraising organizations.

1091. In sum, throughout the relevant period, QSS was closely intertwined with HAMAS's terrorist activities.

### 12. *Al-Ihsan* Charitable Society – Hebron

1092. Al-Ihsan Charitable Society - Hebron ("*Al-Ihsan*") was established in 1983. It specialized in taking care of the disabled and helped HAMAS develop its reputation for helping the poor, downtrodden, and unfortunate members of Palestinian society.

1093. *Al-Ihsan* is closely related to HAMAS's preeminent institution in Hebron, the ICSH, and many of Al-Ihsan's and ICSH's board members and employees overlap.

1094. For example, Muhammad Eid Misk, one of HAMAS's founders in Hebron, sat on the boards of both institutions, as did Azam Nu'man Abd al-Rahman Salhab al-Tamimi (discussed above).

1095. The following is a partial list of the prominent HAMAS leaders who served on the board of *Al-Ihsan:*

- **Nizar Ramadan**: Ramadan served as a board member and treasurer of the *Al-Ihsan* (Hebron) for 15 years. From 1984-1986, he was the Chairman of *al-Kutla al-Islamiya* at Hebron University and was one of the *Marj al-Zuhur* deportees. He was arrested in 2002. He was later elected to the Palestinian Legislative Council as part of HAMAS's Change and Reform Party.

- **Muhammad Eid Misk**: Misk is one of HAMAS's founders in Hebron and served as is a member of the board of directors of *Al-Ihsan* in Hebron. He was also an employee of HLF and arrested by Israel and detained twice for several months. In 2003, Khalid Mishal publicly identified him as one of the founders of HAMAS in Hebron.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab served as a board member of *Al-Ihsan* in addition to serving as a member of the ICSH administrative Board and Deputy Chairman and as a member of the Palestine Religious Scholars Association. He is also a senior operative in

204

HAMAS and was among the *Marj al-Zuhur* deportees. He was arrested by the IDF in 2002. In 2003, Khalid Mishal publicly identified him as one of the founders of HAMAS in Hebron.

1096.   During the relevant period, *Al-Ihsan* received funding through its CAB account(s) from HLF (designated an unlawful association in 1997 and terror organization in 1998 by Israel, and an SDGT in 2001 by the U.S.) Interpal and the Al-Aqsa Foundation (both designated unlawful associations in 1997 and terror organizations in 1998 by Israel, and as SDGTs in 2003 by the U.S.), and many other HAMAS fundraising organizations.

## III.    CAB KNOWINGLY AIDED AND ABETTED HAMAS

1097.   CAB has had a long history of facilitating the flow of money used to finance terrorism in the Palestinian Territories.

1098.   As far back as the First Intifada, the violent uprising by the Palestinians against Israeli rule on the West Bank and Gaza Strip that took place between 1987 and 1993, Israeli officials warned CAB that it was being used as a conduit to finance the uprising and that it might face closures by the Israeli government.

1099.   Specifically, Medhat Kanaan, then-Director of CAB's operations in the West Bank and CAB's then-Chairman Jawdat Sha'sh'a met with senior Israeli officials on August 8, 1988, who warned them that CAB "was a conduit for funds financing the Intifada."

1100.   This pattern continued during the Second Intifada (2000-2004) when CAB, once again, served as a major conduit for the financing of HAMAS.

1101.   A White House Bulletin dated June 24, 2002, noted that "in Jenin, Israel destroyed a building housing a branch of the Cairo-Amman Bank. Israeli officials said the building housed a bomb laboratory." *Agence France Presse* reported on the Israeli demolition action that same day.

1102. CAB provided millions of dollars to HAMAS during the relevant period in a variety of ways, including knowingly:

- Maintaining accounts and/or facilitating payments for prominent HAMAS leaders, including the commanders of HAMAS's Qassam Brigades;

- Maintaining accounts for HAMAS organizations in the West Bank and Gaza Strip;

- Maintaining accounts and/or providing financial services for Specially Designated Global Terrorists affiliated with or belonging to HAMAS; and

- Facilitating rewards payment to the families of HAMAS suicide bombers and other "martyrs," and HAMAS prisoners.

## IV. CAB'S KNOW-YOUR-CUSTOMER OBLIGATIONS

1103. Since at least 2000, CAB's principal regulator, Jordan's central bank, has instructed financial institutions to be on the lookout for customers engaging in "dubious" transfers, and to be particularly careful when handling foreign currency transactions, especially if the amounts involved are large or if the source of funds is in question.

1104. In October 2001, the inter-governmental Financial Action Task Force ("FATF") issued eight Special Recommendations on steps countries should take to address terrorist financing. These included, *inter alia*, strengthening customer identification measures on international and domestic wire transfers and ensuring that entities, in particular non-profit organizations ("NPOs"), cannot be misused to finance terrorism.[70]

---

[70]    The Central Bank of Jordan, which regulates foreign exchange transactions, issued anti-money laundering regulations designed to meet FATF's 40 Recommendations on Money Laundering in August 2001.

1105.   Similarly, in October 2001, the Basel Committee on Banking Supervision issued its report on "Customer due diligence for banks:"[71]

> Certain key elements should be included by banks in the design of KYC programmes. Such essential elements should start from the banks' risk management and control procedures and should include (1) customer acceptance policy, (2) customer identification, (3) on-going monitoring of high risk accounts and (4) risk management. Banks should not only establish the identity of their customers, but should also monitor account activity to determine those transactions that do not conform with the normal or expected transactions for that customer or type of account.

1106.   The Basel Committee also provided additional guidelines for higher risk accounts:

> There should be intensified monitoring for higher risk accounts. Every bank should set key indicators for such accounts, taking note of the background of the customer, such as the country of origin and source of funds, the type of transactions involved, and other risk factors. For higher risk accounts:
>
> - Banks should ensure that they have adequate management information systems to provide managers and compliance officers with timely information needed **to identify, analyse and effectively monitor higher risk customer accounts**. The types of reports that may be needed include reports of missing account opening documentation, transactions made through a customer account that are unusual, and aggregations of a customer's total relationship with the bank.
>
> - Senior management in charge of private banking business should know the personal circumstances of the bank's high risk customers **and be alert to sources of third party information**. Significant transactions by these customers should be approved by a senior manager. (Emphasis added.)

1107.   As a financial institution with correspondent banking relationships, including in the United States (a member of the Basel Committee), CAB was aware of international banking standards, including the above-referenced Know-Your-Customer and enhanced due diligence guidelines.

---

[71]     The Basel Committee, headquartered at the Bank for International Settlements in Basel (a consortium of central banks), was established to enhance financial stability by improving the quality of banking supervision worldwide. To this end, it issued the industry-standard and highly influential "Basel Accords" policy recommendations.

1108.   Accordingly, at all relevant times, including during the relevant period, CAB had actual knowledge that terrorist organizations such as HAMAS require access to funds, including wire transfers and untraceable, portable cash, and other banking services in order to operate and in order to plan, prepare for, and carry out terrorist attacks, and that providing these services to HAMAS-affiliated entities and senior HAMAS leaders would enable HAMAS to plan, prepare for, and carry out terrorist attacks and/or enhance HAMAS's ability to plan, prepare for, and carry out such attacks.

1109.   At all relevant times, including during the relevant period, CAB was also aware of, and subject to, the rules promulgated by FATF requiring banks to know their customers, perform due diligence, and not provide banking services to terrorist organizations.

1110.   At all relevant times, CAB had actual knowledge that providing financial services to HAMAS-controlled entities, HAMAS leaders, and the families of HAMAS "martyrs" and prisoners, would strengthen HAMAS's support and internal cohesion and enhance its ability to plan, prepare for, and carry out further terrorist attacks.

1111.   Although the Palestinian Authority's efforts to crack down on HAMAS were always temporary in nature and usually performed for the benefit of Western donor countries, it is worth noting that the Palestinian Monetary Authority (supervising banks in the Palestinian Territories) issued a general circular in May 2000 to Palestinian banks requesting them to report substantial incoming funds transfers from abroad.

1112.   In December 2001, the Palestinian Authority also closed a number of societies run by HAMAS and Palestinian Islamic Jihad, among them the Islamic Society of Gaza (*Al-Jam'iya Al-Islamiya*), which belongs to and is synonymous with HAMAS.

1113.   On December 23, 2001, the Palestinian Monetary Authority instructed Palestinian banks not to allow funds to be drawn on accounts controlled by the Union of Good and certain other charities, including *al-Salah*, the Islamic Center (*Al-Mujama Al-Islami*), and the Islamic Society in Gaza, without its prior approval, thereby providing CAB and other banks notice that these were (at an absolute bare minimum) high-risk accounts.

1114.   On January 6, 2002, the Palestinian Monetary Authority directed the Palestinian banks to report on the sums of money held in the accounts of *Al-Jam'iya Al-Islamiya* and required them to consult with it prior to withdrawing funds from those accounts.

1115.   On August 23, 2003, immediately following the HAMAS suicide bombing of Egged Bus #2 in Jerusalem (one of the attacks in this Second Amended Complaint), the Palestinian Minister of Security took official steps against HAMAS when he identified *Al-Jam'iya Al-Islamiya* and at least ten other organizations as part of HAMAS. The next day, the Palestinian Monetary Authority placed a temporary freeze on the bank accounts of *Al-Jam'iya Al-Islamiya* and other HAMAS organizations.

1116.   In the Order forwarded to the Palestinian Prosecutor General on August 24, 2003, then-Prime Minister and Minister of the Interior Mahmoud Abbas justified the freeze on the accounts by saying that it was a matter of "security issues" and "requirements for the public interest."

1117.   In a letter written to then-Minister of the Economy Salam Fayyad, then-Palestinian Minister of Internal Security Mohamed Dahlan openly declared that the steps that had been taken were directed against "Hamas organizations." The letter described the demand to freeze the accounts as stopping support for "Hamas Institutions."

1118.   Nevertheless, public outcry in the Palestinian Territories led the new Palestinian Cabinet to officially cancel the freeze order on November 17, 2003.

1119.   Because the PA and the Palestinian Monetary Authority continuously failed to take lasting and meaningful action against HAMAS and its fundraising apparatus, on February 25, 2004, the Israel Defense Forces and Israeli police forces, guided by Israel Security Agency officers, carried out an operation for what the Government of Israel described as "the confiscation of terror funds" which were deposited in a CAB branch in Ramallah (West Bank). According to the Israeli government, "[i]nformation regarding these bank accounts was presented to the legal elements of the ISA, IDF and the Attorney General's Office - all of whom authorized the operation."

1120.   The seizure targeted numerous HAMAS organizations with accounts at CAB and Arab Bank, Plc, including:

- *Al-Jam'iya Al-Islamiya* (Islamic Society – Gaza)
- Islamic Charitable Society – Hebron
- Islamic University of Gaza
- Tulkarem Zakat Committee
- *Al-Ansar* Charitable Society
- Jenin Zakat Committee
- Nablus Zakat Committee
- *Al-Tadamun* Charitable Society (Nablus)
- Ramallah - Al-Bireh Zakat Committee
- Muslim Youth Association Hebron
- Beit Fajar Zakat Committee
- *Al-Islah* Charitable Society in Ramallah & Al-Bireh.

## V.  CAB PROVIDED BANKING SERVICES TO NOTORIOUS HAMAS INSTITUTIONS

1121.   As alleged above, HAMAS operates a social service network through local zakat committees and charitable societies that were deeply involved in supporting and facilitating HAMAS's violent terrorist activities.

1122.   During the relevant period, CAB knowingly provided financial services to these HAMAS organizations and affirmatively assisted them in collecting, receiving, transmitting, and distributing funds to support HAMAS's ongoing terror campaign.

1123.   A June 30, 2002, research paper issued by COGAT found that:

> The testimonies of suicide terrorists and their families paint a picture according to which there is a strong relationship between the suicide attacker and his family members. The suicide attacker usually makes the effort to take leave of members of his family, sometimes farewell letters have been found asking for forgiveness from family members and /or explanations as to the motives for suicide and asking the relatives not to mourn him.
>
> It therefore seems that the family and relatives are important to the suicide attacker and concerns for his family have a considerable place in his thoughts about the consequences of the suicide.
>
> The suicide terrorist can put rest to his worries about the family's financial future, as the large sums of money that the suicide attacker's family receive ensure them a good standard of living and even make them rich. Today a terrorist's family receives twenty-five thousand dollars from Iraq and five thousand dollars from Saudi Arabia (written proof of this has been found in the Bi'ur Hametz operations in Tulkarem and Jenin), and ongoing support from Islamic charitable societies, the Da'wa (for orphans, widows, and the suicide attacker's family members). We do not have complete information relating to the "package" that the suicide attacker's family receives from all sources, but we know definitely that the various Da'wa institutions serve as a pipeline for transferring money to these families and that these are large sums totaling tens of thousands of dollars for each family.

1124.   Each of the HAMAS institutions identified as CAB customers during the relevant period were involved in providing financial support to the families of so-called "martyrs" – including suicide terrorists – thereby providing incentives for further terrorist attacks.

1125.   Each of the HAMAS institutions identified as CAB customers during the relevant period were controlled by and employed senior HAMAS leaders and operatives, including individuals directly involved in HAMAS's acts of terrorism.

1126.   Each of the HAMAS institutions identified as CAB customers during the relevant

period served HAMAS's overall goal to destroy Israel by building grassroots support for HAMAS to help it win the "hearts and minds" of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in its ideology.

1127.   Each of the HAMAS institutions identified as CAB customers during the relevant period helped launder money for all of HAMAS's activities and assisted HAMAS's goals while also freeing resources for HAMAS to devote to its violent activities.

- Throughout the relevant period, CAB knowingly provided financial services to these institutions, generally aware while it was doing so, that it was playing a role in unlawful activities from which HAMAS's terrorist attacks were a foreseeable risk, and thereby aided and abetted HAMAS by receiving, holding, and transferring funds for the following HAMAS institutions:[72]

- *AL-MUJAMA AL-ISLAMI* (ISLAMIC CENTER – GAZA)
  Account No. 1-974-3-2111-814
  Account No. 981

- *AL-JAM'IYA AL-ISLAMIYA* (ISLAMIC SOCIETY – GAZA)
  Account No. 6118643
  Account No. 5006

  Rafah Branch
  Account No. 749367

  Beit Hanoun Branch
  Account No. 4315

- AL SALAH ISLAMIC SOCIETY
  Account No. 388

- AL WAFA CHARITABLE SOCIETY
  Account No. 1411-1

- ISLAMIC CHARITABLE SOCIETY – HEBRON[73]
  Account No. 11 00513-0
  Account No. 951
  Account No. 2295

---

[72]   The cash balances in many of these accounts were seized by the Israeli Army in February 2004.

[73]   ICSH may have maintained as many as a dozen other accounts at CAB through its various sub-chapters and affiliates.

Yatta Branch
Account No. 001211100 - 9243
Account No. 001211100 - 2329

Dura Branch
Account No. 0021110 - 0742

Bani Naim Branch
Account No. 2068

Beit Awla Branch
Account No. 3041

- MUSLIM YOUTH ASSOCIATION - HEBRON
  Account No. 4316
  Account No. 1100771/0 (Wadi Al-Tufah Branch)

- JENIN ZAKAT COMMITTEE
  Account No. 476806-7 (Amman, Jordan Branch)
  Account No. 0150023640000

  Al Razi Hospital
  Account No. 1505239277
  Account No. 02505239277

- TULKAREM ZAKAT COMMITTEE
  Account No. 110740-0
  Account No. 6100439
  Account No. 130044
  Account No. 0/1105526
  Account No. 1109213/3
  Account No. 11092171/3
  Account No. 0150027124100 (JOD)
  Account No. 1250027123700 (USD)
  Account No. 3350027123700 (NIS)

- RAMALLAH AL-BIREH ZAKAT COMMITTEE
  Account No. 111767

- NABLUS ZAKAT COMMITTEE
  Account No. 0000211101051
  Account No. 0010000105032111
  Account No. 1102247 (Islamic banking)

Account No. 902/400336/50
Account No. 02 500 341100 (USD)
Account No. 01 500 341100 (JOD)

- AL-TADAMUN CHARITABLE SOCIETY – NABLUS
  Account No. 321494

- BEIT FAJAR ZAKAT COMMITTEE
  Account No. 15516700

- AL-ISLAH CHARITABLE SOCIETY IN RAMALLAH & AL-BIREH
  Account No. 0984

- QALQILYA ZAKAT COMMITTEE
  Account No. 11022-1
  Account No. 01500361866/00
  Account No. 01500361811
  Account No. 33/500/37533

- QURAN AND SUNNAH SOCIETY – QALQILYA
  Account No. 02/500/366181/00

- AL-IHSAN CHARITABLE SOCIETY – HEBRON
  Account No. 001000049032111813
  Account No. 0010000449032111
  Account No. 0010000449022111

- WORLD ASSEMBLY OF MUSLIM YOUTH (GAZA BRANCH)
  Account No. 6255/1.

1128.   As stated above, HAMAS's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured HAMAS fighters and making it more costly for them to defect (they would lose the material benefits that HAMAS provides them), and indirectly by enhancing HAMAS's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.

## VI. CAB AIDED AND ABETTED HAMAS BY DIRECTLY MAINTAINING ACCOUNTS FOR PROMINENT HAMAS LEADERS

1129. During the relevant period, CAB knowingly maintained accounts for well-known HAMAS leaders including Abbas al-Sayed, Mohamad Saleh Taha, Abd al-Khaleq Hasan Shadli al-Natshe, Ghazi Hamad, and Sayed Salem Abu Musameh.

1130. The first three of these leaders were at the center of HAMAS's violent terrorist activities, including serving as senior members of the Qassam Brigades, planning attacks, and recruiting and encouraging others to do so.

1131. These five HAMAS leaders were among more than 40 beneficiaries of funds transfers from HAMAS operatives in Lebanon, primarily from an individual known as Yusuf al-Hayek.

1132. Yusuf al-Hayek made transfers totaling at least $4 million between July 2000 and October 2001 from Arab Bank in Lebanon to beneficiaries in the Palestinian Territories.

1133. More than 30 of the beneficiaries were senior HAMAS operatives and leaders of the organization, or their relatives, including HAMAS founders Sheikh Ahmed Yassin, Muhammad Hasan Sham'a, and Salah Shehada (who later co-founded HAMAS's Qassam Brigades), current HAMAS supreme leader Ismail Haniya, and many others.

1134. A person with a name identical to "Yusuf al-Hayek" is connected to the Welfare Association for Palestinian and Lebanese Families ("Al-Waqfiya") (discussed below).

1135. The Hayek funds transfers were made on behalf of HAMAS to senior HAMAS operatives in the Palestinian Territories, including CAB account holders such as Abbas al-Sayed, Mohamad Saleh Taha, Abd al-Khaleq Hasan Shadli al-Natshe, Ghazi Hamad, and Sayed Salem Abu Musameh.

### A.    Abbas al-Sayed

1136.    Throughout the relevant time period (at least until Abbas al-Sayed's arrest in July 2002), CAB knowingly maintained account number 150027961600 for al-Sayed, one of HAMAS's most senior political and military leaders in the West Bank at that time.

1137.    Al-Sayed received <u>at least</u> seven transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between February 2001 and May 2001 totaling $69,000.

1138.    According to al-Sayed's statement to Israeli police, he first met Jamal Mansur (a senior HAMAS leader) in prison and was offered employment in HAMAS's political media department.

1139.    After leaving prison, Mansur introduced al-Sayed to several of HAMAS's most senior leaders and was "appointed as the representative of HAMAS in Tulkarem" where, according to al-Sayed, he was "participating in activities related to the Intifada, such as demonstrations on various occasions, delivering speeches at festivals, participating in seminars, lecturing, conducting phone interviews with various satellite channels, and representing Hamas Movement in front of popular and official parties." In sum, at the time al-Sayed maintained his CAB account and received funds transfers from HAMAS in Lebanon, he was a public figure, openly known to the Palestinian public as a prominent HAMAS leader.

1140.    According to al-Sayed, in August 2001, his "name was published as a person wanted by Israel" and he then decided to limit his movements to a minimum.

1141.    On October 8, 2001, the *St. Louis Dispatch* reported that: "In the West Bank city of Tulkarm, about 1,000 Palestinians demonstrated Sunday over the arrest by Palestinian police of

Abbas al-Sayed, spokesman for Hamas. The militant group has killed dozens of Israelis in suicide attacks."

1142.   Al-Sayed was one of the planners of the March 27, 2002, Park Hotel Bombing in Netanya, Israel. More than two dozen people were killed in the attack, including Hannah Rogen, whose estate is a plaintiff in this action.

1143.   According to the September 5, 2002, edition of the Palestinian daily newspaper, *Al-Hayat Al-Jadida,* Abbas al-Sayed was arrested while working at the Tulkarem Zakat Committee.

1144.   Al-Sayed was ultimately convicted for his central role in this attack as well as other attacks HAMAS carried out and sentenced to 35 life sentences.

1145.   One of al-Sayed's accomplices was Fawaz Bashir Badran, a senior Qassam Brigades commander in Tulkarem.

1146.   Badran recruited Ahmad Alyan to carry out the March 4, 2001, suicide bombing near a bus in Netanya.

1147.   Following the "success" of the bombing, al-Sayed connected Badran to the Qassam Brigades infrastructure in Nablus.

1148.   Badran also recruited Mahmud Marmash, who carried out a suicide bombing in the Sharon Mall in Netanya on May 18, 2001, killing 5 people. Ahmed Bahar, Chairman of *Al-Jam'iya Al-Islamiya*, publicly praised Marmash in a speech, extolling his martyrdom.

1149.   As noted above, payments to his family as a result of his "martyrdom" were deposited into CAB Account No. 1518 26968400.

1150.   Badran also recruited Ahmad Jayusi (convicted co-conspirator in the Passover massacre of March 27, 2002) and taught him how to make explosives, but he was killed by Israeli forces in July 2001 before he could commit further acts of terrorism.

1151.   Payments to his family as a result of his "martyrdom" were deposited into CAB Account No. 297445.

## B.     Mohamad Saleh Taha

1152.   Throughout the relevant time period, CAB knowingly maintained account number 3723-1 for Mohamed Saleh Taha, one of the founders of *Al-Mujama Al-Islami* (The Islamic Center – Gaza) and a prominent HAMAS leader in the central Gaza Strip.

1153.   Taha was arrested many times, both by Israel and the Palestinian Authority, for his HAMAS-related activities and was one of the terrorists deported to *Marj al-Zuhur* in 1992. He also has served as a lecturer at the Islamic University of Gaza, a core HAMAS institution.

1154.   Taha's notoriety is indicated by, for example, the *BBC* Summary of World Broadcasts summarizing a published report from the December 17, 1995, edition of the Israeli newspaper *Haaretz* which described his role in a HAMAS rally in Gaza: "A mass rally held by Hamas Islamic Resistance Movement in Gaza yesterday was officially told that the movement would not take part in the elections in the territories and that the decision was final. Some 30,000 people repeated the words of Muhammad Taha, a founder of the Muslim Brotherhood in the Gaza Strip, who read out the official announcement of the Islamic rejectionist movement. He repeated the declaration three times against the background noise of recorded shootings, and the crowd applauded him."

1155.   On October 8, 1997, Israeli television Channel 1 reported that: "a Hamas source in the Gaza Strip notes that Palestinian Authority Chairman Yasir Arafat has ordered the release of Muhammad Taha, a Hamas leader. This came in response to request by Shaykh Ahmad Yasin, the movement's leader. The Palestinian police arrested Muhammad Taha two weeks ago."

1156. *CNN* reported on March 2, 2003, regarding an Israeli military incursion into the Gaza Strip: "The operation included a search of the home of Muhammad Taha, one of the co-founders of Hamas and a **senior figure in the group's political and military wings in Gaza**. Taha and his son Amin were lightly wounded in a shootout with Israeli troops, IDF said. They were arrested and transferred by Israeli security to a hospital inside Israel." (Emphasis added.)

1157. Taha received <u>at least</u> five transfers through CAB's correspondent account from a representative of HAMAS in Lebanon at Citibank in New York between December 2000 and September 2001 totaling $9,870.

**C.      Ghazi Hamad**

1158. Throughout the relevant time period, CAB also knowingly maintained account number 706785 for Ghazi Ahmad Hamad, the long-time HAMAS public spokesman, and "Deputy Foreign Minister" in HAMAS's government in Gaza in 2012.

1159. Hamad was a senior editor of HAMAS's newspaper, *Al-Risala*, and was arrested twice by the PA in the 1990s.

1160. Since the mid-1990s, Hamad was widely identified as a spokesman for HAMAS. For example, an article dated May 31, 1994, in *The New York Times* titled "Gaza's Militants Must Decide What to Do Now" described him as follows:

> Ghazi Hamad, a Hamas leader in Rafah, suggested that the group's armed wing, the Qassam Brigades, might shift its attacks to Israel and to West Bank areas outside Jericho. "We will not use violence against the Palestinian police under any circumstances, and we are ready to cooperate with them," said Mr. Hamad, who recently completed a five-year jail term. "If an attack on Israeli settlers or soldiers will lead to a conflict with the Palestinian police, then we will take another decision. It will have to stop. We don't want to be a burden."

1161. The *Associated Press* reported on January 26, 1995, that "Ghazi Hamad … served five years in Israeli prisons for membership in the Muslim militant group Hamas."

1162.  *United Press International* reported on April 13, 1995, that "Palestinian police Thursday arrested a senior leader of the Hamas Islamic Resistance Movement as sweeps continued for the fourth day against Muslim fundamentalist groups in the Gaza Strip. Sayed Abu Mosameh, an editor of the al-Watan weekly, was taken into custody at the al-Watan newspaper offices along with Ghazi Hamad, another editor at the paper."

1163.  An August 29, 1997, article in *The Guardian* (UK) discussing HAMAS's control of *Al-Jam'iya Al-Islamiya* also identified Hamad as a HAMAS spokesman: "Gazi Hamed, a journalist and Hamas spokesman, said: 'Most of the Palestinian people have reached the conclusion there is no future in the peace process.'"

1164.  *Agence France Presse* reported on May 23, 1999, that "Palestinian security men on Saturday detained Ghazi Hamad, the editor of the weekly Al-Rissala newspaper, the mouthpiece for the Islamic movement in Gaza, apparently in connection with a criminal investigation."

1165.  On August 15, 1999, the *Associated Press* reported that "Palestinian police detained the editor of a weekly newspaper belonging to the Islamic militant group Hamas and are holding him for questioning, an employee of the newspaper said Sunday. Ghazi Hamad, the editor of HAMAS' official newspaper *al-Risala*, was taken into police custody late Saturday to answer questions about an article he published criticizing the Palestinian Authority, the employee said, speaking on condition of anonymity. Hamad has been detained several times in the past under similar circumstances."

1166.  Another *Associated Press* article dated October 12, 2000, described a Palestinian Authority prisoner release and cited Ghazi Hamad: "About 350 prisoners were freed in Gaza City, including scores of Islamic militants. Thirty-five were released in Nablus and dozens in the West Bank town of Hebron. Among those released were Mohammed Deif and Ibrahim Makadmeh,

leaders of Hamas' military wing, Izzedine al Qassam, said **Ghazi Hamad, a Hamas spokesman**."
(Emphasis added.)

1167.  On August 22, 2001, the (UK) *Daily Mirror* published an article about prospective Palestinian suicide bombers, describing a young man who "turned to Hamas and its unrelenting message of hostility to the Jews. He listened to the words of Hamas leaders like Ghazi Hamad, who has said: 'There will be no peace. The Jews hate us and we hate them. Israel is a cancer, it should be uprooted.'"

1168.  Hamad received <u>at least</u> six transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between October 2000 and April 2001 totaling $50,985.

**D.      Sayed Salem Abu Musameh**

1169.  Throughout the relevant period, CAB also knowingly maintained account number 6105176 for Sayed Salem Abu Musameh.

1170.  Musameh is a senior, veteran HAMAS member, and later, a member of the Palestinian Legislative Council on its behalf.

1171.  In a March 4, 1996, article in the *Independent,* Musameh was identified as "a prominent Hamas leader."

1172.  Musameh received three transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between February 2001 and September 2001 totaling $6,000.

**E**.      **Abd al-Khaleq Hasan Shadli al-Natshe**

1173.  During the relevant period, CAB also knowingly maintained an account for Abd al-Khaleq al-Natshe, the prominent HAMAS leader in Hebron (discussed above in detail.)

1174.   In addition to serving as a HAMAS leading spokesman and most senior leader in Hebron, al-Natshe also worked closely with the Qassam Brigades and assisted its operatives.

## VII. CAB AIDED AND ABETTED HAMAS BY KNOWINGLY MAINTAINING ACCOUNTS AND PROVIDED FINANCIAL SERVICES FOR HAMAS ORGANIZATIONS THAT WERE LATER DESIGNATED AS SPECIALLY DESIGNATED GLOBAL TERRORISTS

1175.   CAB knowingly provided financial services to HAMAS by maintaining bank accounts and/or providing financial services for Specially Designated Global Terrorists belonging to HAMAS, including but not limited to:

- HLF
  Account No. 2111-4883
  Account No. 6/375
  Account No. 2.5957
  Account No. 0250514976000
  Account No. 3611853
  Account No. 0255149760
  Account No. 4883

- *Al-Waqfiya*
  Account No. 002-500-100068-00

- *Al-Salah Islamic Society*
  Account No. 388.

1176.   All three entities were closely intertwined with HAMAS's terrorist activities.

1177.   As noted above, on May 6, 1997, the government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks…." Also as noted above, HLF's affiliation with HAMAS was widely reported, including in *The New York Times*, years before the United States designated HLF an SDGT.

1178.   With respect to HLF, the FBI concluded that:

evidence strongly suggests that the [HLF] has provided crucial financial support for the families of HAMAS suicide bombers, as well as the

Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the [HLF] assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace. According to HLFRD-4, an FBI asset who has provided reliable information in the past, in the words of Shukri Abu Baker, [HLF]'s mission is to support the families of the martyrs.

1179. According to the Government of Israel 2004 Report, as of December 2004, HLF maintained account no. 4883 at CAB's Islamic Bank branch in Hebron with "[t]ransactions amounting to hundreds of thousands of dollars … found in the Foundation's current account."

1180. HAMAS's Lebanese fundraising organization (and CAB customer), *Al-Waqfiya,* was designated by the U.S. Department of the Treasury in 2012.

1181. The Treasury Department found that *Al-Waqfiya*:

[E]xist[s] to support the families of Hamas fighters and prisoners and to raise money for programs and projects in the Palestinian territories intended to spread Hamas's influence and control.

Al-Waqfiya, a central component of the Union of Good, which was designated pursuant to E.O. 13224 in November 2008 for supporting Hamas, was established by Hamas in 2000 to financially support the families of Hamas terrorists. The organization has been run by senior Hamas leadership for years, and several senior Hamas leaders play a dominant role within the organization.

1182. Because *Al-Waqfiya* sent funds to support "Hamas fighters and prisoners," these reward payments could not have gone unnoticed by its banker. As noted below, according to the World Bank, the Gross National Income ("GNI") per capita in the Palestinian Authority by the end of 2003 had fallen to $1,070 U.S. dollars per year. Hence, cross-border transfers from Lebanon channeling these kinds of payments were obviously irregular, and there is simply no way CAB did not know that it was facilitating illegal support to the families of terrorists. This was especially true given *Al-Waqfiya*'s close connection to the infamous Union of Good.

1183.   As detailed above, *al-Salah* was designated an SDGT by the Treasury Department on August 7, 2007, determined to have been "run by an identified Hamas leader and employ[ed] a number of Hamas members, including members of Hamas' military wing … everyone knew they were affiliated with Hamas and had Hamas directors." The U.S. government further determined that in "late 2001 and early 2002, the AL-SALAH SOCIETY was identified as the largest, best-funded Hamas organization in the Palestinian territories and included on a target list of Hamas infrastructure to be shut by the Palestinian Authority."

1184.   Indeed, the PA temporarily closed *al-Salah* in September 1997, Palestinian security forces arrested its leaders, and the PMA temporarily froze its bank accounts in December 2001. It was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the IDF's Central Command on June 30, 2002. Nonetheless, CAB maintained account(s) for *al-Salah* throughout this period.

1185.   The services CAB provided to the SDGTs listed above were conducted through CAB branches located in the West Bank, Gaza Strip and Lebanon.

1186.   CAB also knowingly transferred funds for SDGTs affiliated with HAMAS through its correspondent accounts located in New York, and as detailed above, CAB processed numerous payments on behalf of several SDGTs (including the Al-Aqsa Foundation and Interpal) *after* they were designated by the United States.

## VIII.   CAB KNOWINGLY MAINTAINED ACCOUNTS FOR ORGANIZATIONS THAT FACILITATED PAYMENTS TO THE FAMILIES OF PALESTINIAN TERRORISTS

1187.   In the competition for notoriety in supporting Palestinian terrorists, Iraq, and Iran both established organizations that, at various times, transferred money in direct support of the

families of "martyrs" and prisoners, aiming at strengthening and encouraging the Palestinians to continue the violence.

### A. CAB Knowingly Facilitated Reward Payments Made by Saddam Hussein's Regime to the Families of Suicide Bombers

1188. Iraq established a Ba'athist surrogate in Ramallah called Arab Liberation Front ("ALF") in 1969. Itself responsible for a handful of terrorist attacks, during the Second Intifada ALF devoted most of its efforts to promoting Saddam Hussein by facilitating and promoting the Iraqi regime's reward payments to families of Palestinian suicide bombers, other "martyrs" and those injured during violent clashes with Israel.

1189. Because Iraq was a designated State Sponsor of Terrorism during the relevant period and was subject to strict economic sanctions, Saddam's regime could not easily transfer large sums of money denominated in U.S. dollars since that would require U.S. dollar-clearing and settlement activity in the United States.

1190. U.S. law prohibits most dollar clearing and settlement services performed on behalf of State Sponsors of Terrorism. In some cases, involving the evasion of U.S. economic sanctions managed by the Office of Foreign Assets Control ("OFAC"), State Sponsors of Terrorism have relied on foreign banks willing to deceive U.S. regulators, such as by removing all information identifying Iraq as the source of a U.S. dollar-denominated electronic funds transfer through New York.

1191. According to U.S. Congressional investigators, Saddam Hussein illegally diverted money from the U.N. oil-for-food program, meant to serve Iraq's humanitarian needs, to make these payments.

1192. Funds collected from Iraqi oil sales authorized by the U.N.'s oil-for-food program were processed exclusively from a U.N. account held at BNP Paribas's branch in New York.

1193.   As U.N. investigators would later learn, significant Iraqi oil sales revenues deposited in BNP's oil-for-food program account in New York were subsequently diverted through elaborate kickback schemes and secreted into accounts controlled by the Hussein regime.

1194.   These kickbacks allowed Saddam Hussein to maintain his grip on power and to transact regime business clandestinely despite severe restrictions imposed on Iraq's economy by U.N. and U.S. sanctions.

1195.   Because of Iraq's difficulty in transferring U.S. dollars through the global financial system, most of the money earmarked for Saddam's terror incentive program was siphoned from the oil-for-food program and covertly transferred from the head office of Iraq's state-owned Al-Rafidain Bank in Baghdad to its branch in Amman, Jordan.

1196.   From there, portions of the illicit U.S. dollar denominated funds were moved to Western Union accounts at CAB and ultimately deposited into one or more accounts at CAB controlled by the ALF in the Palestinian Territories. Seeking broad Palestinian support for Saddam Hussein, ALF made payments to families of martyrs affiliated with any terror organization and paid higher amounts than most martyr funding groups. The payments started at $10,000 for a martyr's family, but, as shown below, soon increased significantly.

1197.   Also, unlike other groups, ALF developed a system to incentivize suicide attacks over other types of attacks (that may be less spectacular or easier to foil), paying a premium upon evidence that the martyr intended to die during the attack, such as by committing a suicide bombing or by shooting into a crowded area until gunned down by law enforcement.

1198.   In August 2001, the families of a "martyr" who died as part of a suicide attack began receiving $15,000—in March 2002, this was increased to $25,000. Those who died for other

reasons, such as so-called "work accidents" (premature detonation of explosives) or in firefights with Israeli forces, were paid $10,000.[74]

1199.  These reward payments constituted a vast sum of money in the Palestinian Territories. For instance, according to the World Bank, in 1999, prior to the outbreak of the Second Intifada, the Gross National Income ("GNI") per capita in the Palestinian Authority was $1,730 U.S. dollars. By the end of 2003, the GNI per capita in the PA had fallen to $1,070 U.S. dollars.[75]

1200.  Although the Ba'athists did not gain significant traction politically in the Palestinian Territories, the ALF was among the "loudest" groups advertising its payments to the families of Palestinian terrorists, particularly to the families of successful suicide bombers.

1201.  ALF Martyr payment "ceremonies" received widespread media coverage, particularly in the local Palestinian media.

1202.  For example, one of the leading Palestinian daily newspapers, *Al Hayat al-Jadida*, reported on August 15, 2001, on the benefit increase to the families of suicide terrorists from $10,000 to $15,000.

1203.  Another leading Palestinian daily newspaper, *Al Quds*, reported on August 19, 2001:

> The Gaza representative of the Arab Socialist Ba'ath party, which rules Iraq, announced yesterday that president Saddam Hussein decided to allocate the sum of $15,000 for each Palestinian martyr's family….
>
> Al-Za'anin [the Gaza representative] clarified that the last decision by the Iraqi president to increase the grant given to Palestinians who carried out martyrdom attacks ("Amaliyat Istishadiya") to $15,000 comes to emphasize the continuation of the national struggle to restore the Palestinian rights.

---

[74]   Those only injured were paid $1,000.

[75]   The economic situation in the neighboring Arab countries, in terms of GNI, was even worse. Syria's GNI, for example, was $890 U.S. dollars; Egypt's GNI was $1,290 U.S. dollars; and Jordan's GNI was $1,650 U.S. dollars.

1204.   Media coverage was not limited to local newspapers, however.

1205.   On January 5, 2001, the *San Francisco Chronicle* reported that ALF visited the families of "martyrs" and "recited a Muslim prayer, then handed [a family member] a poster of the Iraqi dictator and a $10,000 check. They asked for her signature on a receipt before they left." The article further noted "[Saddam] Hussein's public succor to the families of these martyrs -- equal to years of annual income for many Palestinian families …."

1206.   *United Press International* reported on January 30, 2001, that "Iraqi president Saddam Hussein has given $10,000 to the family of every Palestinian killed in the latest round of clashes with Israel, *The Washington Post* reported Tuesday."

1207.   *Agence France Presse* reported on January 31, 2001:

> The intensive Iraqi aid campaign -- the most effective one in the West Bank and Gaza Strip according to families -- has helped bolster Saddam's already popular image among Palestinians.
>
> At the almost-daily protests in the Palestinian territories, marchers routinely carry posters of the Iraqi president and cry out: "Oh Saddam, oh my love, strike, strike Tel Aviv!"
>
> ***
>
> Rakad Sallim, secretary general of the Arab Liberation Front -- a spinoff of Iraq's ruling Baath party -- told AFP that the families of 300 "martyrs" of the intifada, the Palestinian revolt against Israeli occupation, have each been bestowed 10,000 dollar checks.
>
> Hundreds of seriously injured Palestinians were also handed 1,000 dollars, while those with moderate wounds were awarded 500 dollars, Sallim added, but he refused to provide a specific number.
>
> "The leader President Saddam Hussein pledged a billion euros (940 million dollars) to the Palestinian people in addition to an open amount for the martyrs and the injured," Sallim said.

1208.   On February 17, 2001, *Agence France Presse* described a rally in Nablus where approximately 1,000 marchers burned U.S., British, and Israeli flags as part of an ALF demonstration.

1209.   On February 19, 2001, *The Daily Telegraph* (UK) described a rally in Ramallah involving hundreds of supporters of Saddam Hussein, featuring ALF secretary-general Rakad Salem:

> Mr. Salem is a popular figure himself. He is charged with handing out sizeable compensation payments on behalf of Saddam to the families of the dead and wounded in the uprising. For every martyr, the family receives $10,000 (pounds 6,500) - about six years' average salary. The wounded are compensated with $1,000 or $500 depending on the severity.
>
> So far Mr. Salem has handed out almost $4 million and although Mr. Salem will not say how the money arrives, he assures visitors that it is not running out. "Even if there were 2,000 martyrs, His Excellency would continue to pay," he said.

1210.   On May 5, 2001, the *Associated Press* reported that "President Saddam Hussein has ordered the donation of 6 million euros (dlrs 5.3 million) to families of victims of the Palestinian uprising, the official Iraqi News Agency has reported."

1211.   On January 31, 2002, the *Los Angeles Times* reported that Saddam Hussein had ordered a memorial erected in one of Baghdad's main squares in honor of the first Palestinian female suicide bomber.

1212.   In March 2002, Saddam announced another increase in payments – families of suicide terrorists would receive $25,000 U.S. dollars, while the grants to the families of "ordinary" terrorists would remain at $10,000 U.S. dollars.

1213.   On March 26, 2002, an article in the *Sydney Morning Herald* described a meeting of some 200 members of forty-seven families who gathered in the Tulkarem chamber of commerce in March 2002 to collect checks.

1214.   The ALF's secretary-general Rakad Salem told reporter Paul McGeough that as of late March 2002 more than 800 families of Palestinians killed in the unrest had received $10,000 "martyr" payments, and that the funds had been "transferred by the banks-from the Iraqi banks to the banks in Palestine."

1215.   On that same day, March 26, 2002, *Fox News* reported on the *Sydney Morning Herald* article, stating: "In Tulkarm, one of the poorest towns on the West Bank, a member of the Palestinian Legislative Council handed out the checks from Saddam. The payments have been made for at least two years, but the amount has suddenly jumped up by $15,000 - a bonus for the families of martyrs, to reward those taking part in the escalating war against Israel."

1216.   On April 3, 2002, *CBS News* reported that "Iraqi President Saddam Hussein has raised the amount offered to relatives of suicide bombers from $10,000 per family to $25,000, U.S. Defense Secretary Donald Rumsfeld said Wednesday."

1217.   Also in April 2002, the White House issued a statement concerning Saddam Hussein's support for international terrorism,[76] noting:

> In April 2002, Saddam Hussein increased from $10,000 to $25,000 the money offered to families of Palestinian suicide/homicide bombers. The rules for rewarding suicide/homicide bombers are strict and insist that only someone who blows himself up with a belt of explosives gets the full payment. Payments are made on a strict scale, with different amounts for wounds, disablement, death as a "martyr" and $25,000 for a suicide bomber. Mahmoud Besharat, a representative on the West Bank who is handing out to families the money from Saddam, said, "You would have to ask President Saddam why he is being so generous. But he is a revolutionary and he wants this distinguished struggle, the intifada, to continue."

1218.   *The Boston Globe* reported on May 30, 2002:

> Local officials of the Arab Liberation Front, an organization sponsored by Hussein, said that starting a few days ago, they began giving $25,000 to each family whose dwelling in the camp was destroyed. Thirty awards have

---

[76]     Available at https://georgewbush-whitehouse.archives.gov/infocus/iraq/decade/sect5.html.

been made so far and another 30 to 40 will be made next week, distribution chief Mahmoud Bisharat said yesterday.

Hussein also is giving $1,000 to every person who was seriously wounded in the fighting, and $500 to those who were less gravely injured, Bisharat added. The donations are in addition to $25,000 awards Hussein has been making over the past two months to the families of suicide bombers and the $10,000 he gives to relatives of other Palestinians who die while attacking Israelis.

1219. A June 2, 2002, article in *Reuters* titled "Iraqi, Saudi aid money wins Palestinian hearts" reported that according to the ALF, Iraq provided $20 million since September 2000 and quoted one Gaza-based ALF official, Ibrahim al-Za'anin, stating that "President Saddam made clear that [suicide] attacks must be considered the utmost act of martyrdom."

1220. On July 10, 2002, *The New York Times* reported that Iraq sent large cash payments, using U.S. dollar-denominated banknotes, to the families of Palestinian suicide bombers, further cementing Saddam's popularity among the Palestinians.

1221. During a public ceremony held on September 10, 2002, in the Palestinian Territories, the participants praised the Second Intifada and thanked Saddam Hussein for the generous financial aid he bestowed upon the Palestinians. During the ceremony, certificates and grants were distributed to the families of the deceased, each receiving approximately $10,000.

1222. On September 12, 2002, the White House issued a Background Paper on Iraq again noting Saddam Hussein's increased payments to families of Palestinian suicide/homicide bombers from $10,000 to $25,000.

1223. On September 20, 2002, the Israel Ministry of Foreign Affairs published a detailed report on its website concerning Saddam Hussein's financial incentive program for Palestinian terrorists. The report identified CAB as a vehicle for these payments and listed eight public

ceremonies between May and August 2002 during which the ALF distributed funds to the families of Palestinian terrorists.

1224.   On October 9, 2002, *Agence France Presse* reported:

> Israel has evidence that Iraqi President Saddam Hussein has transferred some 15 million dollars in funds to the families of Palestinian suicide bombers and other militants over the last two years, Israel's General Intelligence Services (GSS) said Tuesday.
>
> Evidence of multiple financial transfers from Iraq to the West Bank town of Ramallah was revealed during the interrogation of the leader of a pro-Iraqi Palestinian group who was arrested at his Ramallah home last week, the GSS said in a statement.
>
> Rakat Salem, secretary general of the Arab Liberation Front and a member of the Palestine National Council, the PLO's parliament-in-exile, was "directly responsible for the transfer of financial help from Iraq to the families of suicide bombers," the GSS said.
>
> According to documents seized during Israel's five-week invasion of the West Bank last spring, Salem was identified as the individual appointed by Iraqi President Saddam Hussein to distribute financial grants, it said.

1225.   On October 11, 2002, the *Los Angeles Times* reported that "Most families of the dead received $10,000 [from ALF], but those of suicide bombers often got as much as $25,000-- the more generous grant awarded, as one of the documents put it, 'according to the decision of Commander Saddam Hussein ... in appreciation of their bravery.'" The article further noted that "the Arab Liberation Front has been very public in its activities for nearly two years. The checks are typically distributed with much fanfare at public rallies in the West Bank and Gaza Strip."

1226.   *Agence France Presse* reported on October 2, 2002, that:

> Israeli forces arrested the secretary general of a pro-Iraqi PLO group, the Arab Liberation Front, in the West Bank town of Ramallah on Wednesday, the group said.
>
> Rakat Salem was arrested in the Ramallah offices of the small Palestine Liberation Organisation faction in this reoccupied town, a Palestinian security official said.

The Arab Liberation Front distributes Iraqi aid to the families of Palestinians killed by Israeli soldiers and also gives Iraqi handouts to relatives of suicide bombers who blow themselves up in Israel.

1227. On February 1, 2003, the *Associated Press* reported that:

The Arab Liberation Front, a pro-Iraqi Palestinian group, says it has disbursed $35 million of Saddam's money to relatives of Palestinians killed or wounded in the confrontations with Israel.

Families of suicide bombers - there have been 90 since September 2000 - are entitled to $25,000 each, a small fortune in the impoverished Palestinian areas. Relatives of those killed in clashes with troops are paid $10,000. Militants whose homes are demolished by Israel as a deterrent against future violence receive $5,000.

1228. According to an article in the *Guardian* on March 12, 2003, CAB held accounts for ALF from which "martyr" payments were made:

With each cheque, drawn on the Cairo Amman Bank, came a large certificate decorated with the Iraqi and Palestinian flags. "A gift from President Saddam Hussein to the family of a martyr in the al-Aqsa intifada," the inscription read. "To those who irrigate the land with their blood. You deserve the honour you will receive from God and you will defeat all who bow before your will."[77]

1229. On March 13, 2003, *BBC News* reported on a public event held in a social hall in Gaza City: "One by one, at least 21 families came up to receive their cheques from the Palestinian Arab Liberation Front (PALF), a local pro-Iraq group. A Hamas suicide bomber's family got $25,000 while the others - relatives of militants killed in fighting or civilians killed during Israeli military operations - all received $10,000 each."

---

[77]     The Israeli government identified a bank account of Rakad Salem and two ALF persons who were authorized signatories in CAB, noting that CAB is Western Union's agent in Jordan and the PA and inferring from seized documents that the Iraqi regime used Western Union as one method of evading U.S. sanctions and transferring U.S. dollars to CAB in the Palestinian Territories.

1230. Also on March 13, 2003, the *San Jose Mercury News,* and the *Miami Herald*[78] reported from Gaza:

> In a graduation-style ceremony Wednesday, the families of 22 Palestinians killed fighting Israelis received checks for $10,000 or more, certificates of appreciation and a kiss on each cheek -- compliments of Iraq's Saddam Hussein.
>
> President Bush may say the Iraqi leader's days are numbered. But 30 months into the Palestinian uprising, with Yasser Arafat's authority and finances eroded and Israel's army waging a war against Hamas, Saddam is still one man who can deliver the goods.
>
> About 400 people attended the ceremony, staged by the Baghdad-backed Arab Liberation Front in a social hall leased for the occasion at the downtown YMCA. A 6-foot-tall portrait of Saddam festooned the room, with a slightly smaller image of Arafat looking over his shoulder.
>
> ***
>
> But the draw, and high point by far, was the presentation of checks, one by one, to a widow or parent or child of 22 Palestinians killed in Gaza in recent months. The certificates declared the gift from President Saddam Hussein; the checks were cut at a Gaza branch of the Cairo-Amman bank.
>
> One family got a larger award -- $25,000, reserved for suicide bombers -- for a Palestinian who was blown up aboard a boat loaded with explosives off Gaza last year.

1231. The payments were well enough known that, according to an April 4, 2002, *CBS* article, ALF officer Mahmoud Safi said: "Some people stop me on the street, saying if you increase the payment to $50,000, I'll do it immediately." While he said the comments were made "mostly ... in jest," he "acknowledged that the support payments for relatives make it easier for some potential bombers to make up their minds."

---

[78]     A similar report appeared in Canada's *National Post* on the same day: "As the names of each of the dead men were read into a microphone, their families came forward to the table, shook hands with the political dignitaries and accepted a cheque from the Cairo Amman Bank. Stapled to it was a certificate from Saddam dedicated 'to the people who pay with their souls and give the land of Palestine their blood.'"

1232.   By transferring U.S. dollar-denominated funds whose source was explicitly (and very publicly) identified as Saddam Hussein's regime, CAB knowingly assisted a State Sponsor of Terrorism to evade U.S. sanctions. By knowingly facilitating reward payments to the families of suicide bombers and other terrorists, CAB knowingly aided and abetted the attacks that injured the plaintiffs.

**B.    CAB Knowingly Facilitated Reward Payments to the Families of HAMAS "Martyrs" Made by Hezbollah's Martyrs Foundation**

1233.   Saddam Hussein's regime was not alone in sponsoring and encouraging Palestinian terrorists to perpetrate further attacks. Iran made payments to "martyrs" through Hezbollah' Lebanon-based *Shahid* Foundation (or "Martyrs Foundation"), which sent funds to the Palestinian Territories in coordination with the Gaza-based *al-Ansar* society.[79]

1234.   The United States designated Hezbollah an FTO in 1997. The designation has remained in effect since that time.

1235.   At all relevant times, Hezbollah was (and remains) a radical Islamic terrorist organization which views the State of Israel, the United States, and other Western countries as its sworn enemies.

1236.   Since its founding, Hezbollah has committed numerous acts of international terrorism, many against the United States and U.S. targets.

1237.   From its founding through the present, Hezbollah has carried out hundreds of terrorist attacks against American and Israeli targets that have killed hundreds of U.S. citizens and wounded hundreds more.

---

[79]     The Iranian Popular Committee for the Support of the Al-Aqsa Intifada appears to have also coordinated funds transfers for Palestinian Islamic Jihad through account 24693 at CAB in Jenin in the name of an individual named Adnan Farid Hassan Zayud.

1238.   Hezbollah's policy and practice of carrying out terrorist attacks against United States targets was well known to CAB, because Hezbollah has openly, publicly, and repeatedly acknowledged having such a policy and carrying out such attacks over several decades.

1239.   Hezbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, *Al-Manar*, on its official radio station, *Al-Nour*, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

1240.   For example, Hassan Nasrallah, Hezbollah's Secretary General, and supreme leader for decades, has made numerous public pronouncements that leave no doubt about Hezbollah's embrace of terrorism. For example:

- "... put a knife in your shirt, then get close to an Israeli occupier and stab him." (*Nightline*, October 19, 2000)

- "Suicide attacks shake the enemy from within, they plunge him into an existential crisis, and thus prepare the ground for victory; these acts are completely legitimate, since there are no innocent civilians in Israel; rather they all are occupiers and accomplices to crime and massacre." (Statement broadcast on *Al-Manar* TV, September 14, 2001)

- "Martyrdom operations - suicide bombings - should be exported outside Palestine. I encourage Palestinians to take suicide bombings worldwide. Don't be shy about it." (*Washington Times*, December 6, 2002)

1241.   Like HAMAS, Hezbollah has a unified leadership structure that oversees the organization's many complementary and deeply interconnected elements. Although Hezbollah formally divides its operations into various subordinate entities such as its political party that runs in parliamentary and local elections, its *da'wa* organizations, and its Islamic Jihad Organization (responsible for perpetrating terrorist attacks), these subordinate directorates are integral, constituent parts of Hezbollah itself, and to the extent that it raises or smuggles funds through various charitable or commercial entities which have any putatively separate legal personalities or

corporate forms, such legal personalities or forms are maintained to assist Hezbollah in its efforts to conduct its criminal and terrorist activities under different names and aliases.

1242. For example, through its Martyrs Foundation (a/k/a Shahid Foundation), Hezbollah provides welfare benefits to the families of its "martyrs" (Hezbollah terrorists killed while engaged in Jihad), particularly their children.

1243. Hezbollah has openly, publicly, and repeatedly acknowledged and publicized that the Martyrs Foundation belongs to and is a part of Hezbollah, including on its official websites, in official press releases issued by Hezbollah, on Hezbollah's official television station, *Al-Manar*, on Hezbollah's official radio station, *Al-Nour*, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

1244. The Martyrs Foundation's affiliation with Hezbollah was not only widely known in Lebanon. For example, as early as October 1991, *The Independent* newspaper (published in London) reported that the Martyrs Foundation supplies stipends to the families of Hezbollah terrorists.

1245. Similarly, on May 30, 2000, *The Irish Times* published an article reporting that Hezbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon.

1246. The Martyrs Foundation's stated purpose since its inception has been to help Hezbollah wage jihad against the perceived enemies of Shi'a Islam.

1247. Its website openly (and prominently) quoted Hezbollah leader Hassan Nasrallah offering his gratitude to donors for giving money to the "martyrs' children who are truthful to their covenant with Allah."

1248.   The Martyrs Foundation is part of Hezbollah's *da'wa*, which a senior U.S. military analyst has correctly characterized as the "most important branch of the Hezbollah organization… The Social Service Section serves as an equal arm within the organization and is used as much as the military and political wing in terms of leverage." The Martyrs Foundation's purpose is to provide financial and other material support to Hezbollah terrorists wounded in action, and to the families of Hezbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to current and prospective" Hezbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[80]

1249.  The U.S. Department of the Treasury has described the Martyrs Foundation–Lebanon as "openly affiliated with Hezbollah."[81]

1250.   The Martyrs Foundation was designated an SDGT by the U.S. Government on July 24, 2007.

1251.  The U.S. Treasury Department noted at that time that the *Shahid* Foundation provided funding to, among others, Palestinian suicide bombers:

> The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

---

[80]     Major James B. Love, *Hezbollah: Social Services as a Source of Power*, U.S. Joint Special Operations University, at 21-24 (2010).

[81]     *See* Press Release, U.S. Department of the Treasury, *Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist* (August 29, 2019), *available at* https://home.treasury.gov/news/press-releases/sm760 and incorporated by reference into the Second Amended Complaint.

1252.   The Martyrs Foundation largely channeled its support to the families of Palestinian suicide bombers and other "martyrs" through a Gaza-based organization calling itself *al-Ansar*.

1253.   Announcements in Palestinian papers called on the "honorable families of the martyrs of the Al-Aqsa Intifada" seeking payments from the *al-Ansar* society to produce documentation proving their claims. For instance, the documents the martyrs' families from the West Bank had to provide included the martyr's identification card and his picture (if they had it), the beneficiary's identification card, a copy of the death certificate, and a copy of the birth certificate of the martyr's sons if they had them.

1254.   During the relevant period, the Martyrs Foundation's website openly identified prominent HAMAS operatives as martyrs whose families received payments via accounts controlled by *al-Ansar*.

1255.   These HAMAS "martyrs" included senior HAMAS terrorists like Ibrahim Abd al-Karim Bani Awda and Basel al-Qawasmeh (commander of the HAMAS cell responsible for the Jerusalem Egged Bus #2 bombing and the Jaffa Road Bus #14A bombing, both attacks implicated in this case). He appears as Martyr #193 on the *al-Ansar*'s list of martyrs.

1256.   The list also included the family of Basem Takruri, the suicide bomber responsible for the Commuter Bus #6 bombing on May 18, 2003, an attack implicated in this case.

1257.   In yet another example, the family of Iyad Awda Mahmud Taqi, a Qassam Brigades operative killed on November 6, 2001, during an attack on Israeli soldiers, received a "martyr" payment from the Martyrs Foundation. His father also received a reward payment from the ALF to his CAB Account No. 393501.

1258. On May 15-16, 2001, *al-Ansar* published paid ads in *Al-Hayat Al-Jadida* newspaper, calling the families of martyrs in Gaza to come to the Society's headquarters to receive their allocations.

1259. According to *Al-Hayat Al-Jadida,* on August 22, 2001, *al-Ansar* held a public celebration in honor of the martyrs' families

1260. On its website, *al-Ansar* expressed its goals explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn. Al-Ansar follows their path and shares with their families and their parents the grief, the burden and the hope.

1261. On its website, the Martyrs Foundation was even more direct by publishing lists of Palestinian "martyrs" who received support from the foundation and included the dates of the martyr's birth and death, as well as his organizational affiliation (Fatah, HAMAS, PIJ, and the PFLP).

1262. On its website, *al-Ansar* listed two accounts at CAB:

- Cairo– Amman Bank, Islamic Transactions Department, 6912/3 – Gaza; and

- Cairo– Amman Bank, Islamic Business Department, 6157/1 – Nablus.

1263. *Al-Ansar* was declared an unlawful association by Israel on October 25, 2003.

1264. By providing the Martyrs Foundation with the means to transfer funds into the Palestinian territories (via *al-Ansar*) for distribution to the families of Palestinian terrorists, CAB was once again deeply involved in both providing financial services to both Hezbollah and HAMAS that incentivized, facilitated, and rewarded violent terrorist attacks.

## IX. CAB KNOWINGLY MAINTAINED ACCOUNTS FOR THE FAMILIES OF HAMAS TERRORISTS AND FACILITATED "MARTYR PAYMENTS" TO THOSE ACCOUNTS

1265.   Particularly during the Second Intifada period, it was common for families of so-called "martyrs" killed during the commission or attempted commission of terrorist attacks, to receive *multiple* reward payments in amounts vastly exceeding the average yearly income of a Palestinian family.

1266.   Speaking in 2001, HAMAS's founder, Sheikh Ahmed Yassin, claimed that his organization distributed $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers, "martyrs" killed in attacks on Israelis, and prisoners in Israeli jails.

1267.   These payments were *separate* from the incentives paid to the same families by the ALF and Hezbollah's Martyrs Foundation (discussed above).

1268.   In sum, the flow of funds to the families of the "martyrs" was unusual, repetitive, and involved sums that would raise glaring red flags at any bank.

1269.   Moreover, the payments not only removed an important psychological disincentive for suicide bombers and other operatives who otherwise might have worried that their deaths would adversely impact their families' financial situations, but the widely publicized and comparatively large sums dispensed also encouraged future would-be terrorists to enlist, knowing that they would not only be publicly honored as "martyrs," but their families would be actively rewarded financially for their deeds.

1270.   As described above, CAB maintained accounts for family members of prominent HAMAS operatives and processed "martyr payments" made to the families of these individuals, including:

- The family of Mahmud Marmash, a HAMAS suicide bomber who carried out a suicide attack in Netanya. Payments to Marmash's family were deposited into CAB Account No. 1518 26968400 in Tulkarem.

- The family of Imad Faruq Mahmud al-Nashrati, who served as the head of HAMAS's Qassam Brigades in the Jenin area and who was responsible for organizing suicide bombings and other terror attacks, including the suicide bombing on an Egged bus at the Meron junction on August 4, 2002. Payments to al-Nashrati's family were deposited into CAB Account No. 253062.

- The family of Shaman Hussein Muhammad Subh, another senior operative of HAMAS's Qassam Brigades in the Jenin area who was responsible for recruiting terror cells which planned to execute many terror attacks and kidnap soldiers. Payments to Subh's family were deposited into CAB Account No. 266353.

- The family of Shadi Zakariya Rida al-Tubasi, the HAMAS operative who perpetrated the suicide bombing at the "Matza" Restaurant in Haifa on March 31, 2002. Payments to al-Tubasi's family were deposited into CAB Account No. 243491.

- The family of Ahmad Jayusi, a HAMAS operative involved in the planning of the Passover suicide bombing of March 27, 2002. Payments to Jayusi's family were deposited into CAB Account No. 297445.

- The family of Iyad Awda Mahmud Taqi, a Qassam Brigades operative killed on November 6, 2001, during an attack on Israeli soldiers. Payments to Taqi's family were deposited into CAB Account No. 393501.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING HAMAS, A FOREIGN TERRORIST ORGANIZATION, IN VIOLATION OF 18 U.S.C. § 2333(d)

1271.  Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth herein.

1272.  Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331 that were committed, planned, and authorized by HAMAS, a designated FTO at the time each act of terrorism described occurred.

1273.   HAMAS has been a terrorist organization headquartered in the Gaza Strip since 1987.

1274.   CAB is a Jordanian bank with substantial operations in the Palestinian Territories.

1275.   Banking regulations and industry standards require banks to know their customers.

1276.   CAB knowingly provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS and its operatives and maintaining bank accounts for its senior operatives and key institutions which were controlled by and/or were alter egos of HAMAS.

1277.   CAB knowingly provided substantial assistance to HAMAS by transferring significant sums of money though ALF, the Martyrs Foundation/*al-Ansar*, and various institutions which were controlled by and/or were alter egos of HAMAS to the families of HAMAS suicide bombers and other HAMAS "martyrs" and prisoners.

1278.   CAB was fully aware of HAMAS's conduct, including its campaign of suicide bombings and other terrorist acts over a sustained period of time.

1279.   CAB even employed a HAMAS operative and *Marj al-Zuhur* deportee at its Ramallah branch after his return from Lebanon.

1280.   CAB's own actions knowingly and substantially assisted HAMAS, and plaintiffs' injuries were a foreseeable result of the significant sums of money and related assistance CAB provided and made available to HAMAS, its leaders, and operatives.

1281.   CAB understood the value and importance to HAMAS of its own role in facilitating large transfers of funds, including the cross-border transfer of U.S. dollars, from donors and co-conspirators around the world to the Palestinian Territories and making those funds easily available to HAMAS.

1282. The nature of the acts assisted, which were acts of international terrorism, benefited from, *inter alia*, illegal access to millions of U.S. dollars provided by Defendant.

1283. CAB knowingly provided this substantial assistance to HAMAS for years, including throughout the relevant period.

1284. Plaintiffs' injuries were proximately caused by HAMAS's conduct, which Defendant substantially assisted.

1285. The customers and counter-parties CAB assisted were all involved in supporting and facilitating HAMAS's violence and were closely intertwined with HAMAS's violent, terrorist activities.

1286. CAB's customers and counterparties identified herein included HAMAS leaders directly involved in recruiting suicide bombers and assisting Qassam Brigades operatives. They also included organizations dedicated to supporting and encouraging HAMAS's terrorist violence, including incentivizing HAMAS suicide bombers and other HAMAS operatives by providing "martyr" and prisoner payments to their families.

1287. In sum, all of CAB's customers and counterparties identified herein were so "closely intertwined" with HAMAS's violent terrorist activities that it is clear that CAB was generally aware while it was knowingly providing substantial banking services to those individuals and entities that it was playing a role in unlawful activities from which the terrorist attacks described above were foreseeable.

1288. Plaintiffs allege that CAB knowingly aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly,

to foreign organizations or persons that engage in terrorist activities against the United States." *See* JASTA, §2(b).

## SECOND CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

1289.  Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

1290.  Plaintiffs were injured in terrorist attacks (which were acts of international terrorism as defined by 18 U.S.C. § 2331) committed by HAMAS, an FTO so-designated at the time each act of terrorism at issue occurred.

1291.  By knowingly providing financial services to HAMAS, CAB has provided material support to an FTO designated under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

1292.  CAB was fully aware of HAMAS's terroristic nature, including its long-standing campaign of suicide bombings and other acts of terrorism.

1293.  CAB knew that HAMAS had been designated an FTO by the Government of the United States.

1294.  CAB's own actions on behalf of HAMAS – which included knowingly providing extensive financial services and maintaining accounts for more than a dozen of HAMAS's most prominent institutions, several prominent HAMAS leaders, the families of HAMAS prisoners and "martyrs" – constituted violations of 18 U.S.C. § 2339B(a)(1) that satisfy the definition of "acts of international terrorism" under 18 U.S.C. § 2331(1).

1295.  Knowingly facilitating massive payments over an extended period of time to the families of suicide bombers and other HAMAS "martyrs" violated all conceivable banking

standards and were in no way "routine." Nor was helping Saddam Hussein, Hezbollah's Martyrs Foundation, and HAMAS subsidize the families of HAMAS suicide bombers and provide financial reassurance to "prospective" suicide bombers and terror operatives benign.

1296. CAB provided financial services and facilitated massive funds transfers over an extended period to individuals and entities it knew belonged to HAMAS and to the families of HAMAS suicide bombers, other HAMAS "martyrs" and HAMAS prisoners. That conduct was a substantial factor in the sequence of responsible causation of the attacks described herein and plaintiffs' injuries were a reasonably foreseeable consequence of that conduct.

1297. Hence, CAB's conduct was dangerous to human life and its acts constituted violations of the criminal laws of the United States.

1298. Because CAB continued to knowingly provide vital services to a designated FTO during a mass terror campaign and knowingly helped facilitate reward payments to the families of, among others, HAMAS suicide bombers, its conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel, intimidate its government, or affect its conduct.

1299. CAB's conduct transcended national boundaries in terms of the means by which it was accomplished.

1300. By knowingly providing material support to a designated Foreign Terrorist Organization, CAB is civilly liable for damages to the plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against CAB and in favor of plaintiffs for compensatory damages in amounts to be determined at trial;

(c)     Enter judgment against CAB and in favor of plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against CAB and in favor of plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

September 3, 2021

By:     /s/ Ari Ungar
**OSEN LLC**
Ari Ungar, Esq.
Gary M. Osen, Esq.
Michael Radine, Esq.
Aaron Schlanger, Esq.
Dina Gielchinsky, Esq.
190 Moore Street, Suite 272
Hackensack, NJ 07601
Telephone (201) 265-6400

1441 Broadway
New York, NY 10018
Telephone (212) 354-0111

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Telephone (501) 791-2277

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone (215) 238-1700

**ZUCKERMAN SPAEDER LLP**
Shawn P. Naunton, Esq.
485 Madison Avenue
10th Floor
New York, NY 10022
Telephone (212) 704-9600

Attorneys for Plaintiffs

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
<u>DALLAS DIVISION</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CR NO. 3:04-CR-240-P |
| | § | |
| HOLY LAND FOUNDATION | § | |
| FOR RELIEF AND DEVELOPMENT, | § | |
|     also known as the "HLF" (01) | § | |
| SHUKRI ABU BAKER,   (02) | § | **ECF** |
| MOHAMMED EL-MEZAIN, (03) | § | |
| GHASSAN ELASHI, (04) | § | |
| HAITHAM MAGHAWRI,  (05) | § | |
| AKRAM MISHAL,  (06) | § | |
| MUFID ABDULQADER,  (07) and | § | |
| ABDULRAHMAN ODEH  (08) | § | |

### <u>GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF</u>

The United States submits this supplemental trial brief in support of the evidence

and arguments relied upon in its case-in-chief.   The purpose of this submission is to

refresh and update the government's previously filed Trial Briefs [ecf # 656, 757],

provide the Court with an overview of the case and the different kinds of evidence that

the government will seek to admit at trial, and to bring to the Court's attention evidentiary

issues that arose during the first trial.  This submission does not repeat all of the issues

raised in the government's earlier Trial Briefs, and this supplemental Trial Brief should

be construed as incorporating those earlier matters as if they were fully set forth herein.

# I. PROCEDURAL HISTORY

On July 26, 2004, a federal grand jury indicted the above-named defendants in a 42 count indictment. The indictment charged the defendants with conspiracy to provide material support to a designated foreign terrorist organization; twelve counts of providing material support to a foreign terrorist organization; conspiracy to provide funds, goods and services to a Specially Designated Terrorist; twelve counts of providing funds, goods and services to a Specially Designated Terrorist; conspiracy to commit money laundering; twelve counts of money laundering; one count of conspiracy to impede the Internal Revenue Service and to file false tax returns; and three counts of filing false tax returns of an organization exempt from income tax. The defendants Akram Mishal and Haitham Maghawri have not been arrested in this case and are fugitives.

The first trial of this matter began July 16, 2007. The jury was unable to reach a verdict on any count against defendants HLF, Baker, Elashi, Abdulqader and Odeh. With respect to defendant El-Mezain, the jury hung on Count I and acquitted on the remaining counts. On August 29, 2008, the government dismissed the non-conspiracy counts against Abdulqader and Odeh only. All defendants will be retried beginning September 15, 2008.

# II. FACTUAL BACKGROUND

As set forth in the superceding indictment, Hamas is an international terrorist organization with the stated objective of destroying the State of Israel and replacing it

with an Islamic state comprised of what is now Israel, the West Bank and the Gaza Strip. Hamas is organized into distinct wings, or bureaus, that perform different functions, but operate as a seamless whole. It includes a military wing, responsible for carrying out suicide bombings and other terrorist attacks; a social wing, which operates much like a social welfare agency; and a political wing, which sits above the military and social wings and is responsible for setting policies and guidelines regarding Hamas' activities. The defendant Holy Land Foundation (HLF), sometimes called "the Fund," was an integral part of the Hamas social infrastructure. Not only did HLF operate to support the Hamas agenda, but it was created for that very purpose.

On January 24, 1995, pursuant to Executive Order 12947, the President designated Hamas as a Specially Designated Terrorist organization. This designation makes it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of Hamas. Hamas' designation as a Specially Designated Terrorist organization has remained in place since January 24, 1995. On October 8, 1997, the Secretary of State, pursuant to the laws of the United States, designated Hamas as a "Foreign Terrorist Organization." As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

## A. The Rise of Hamas in the United States

The conspiracy surrounding this case and involving these defendants began years before the enactment of the Executive Order and material support statutes at issue. In late 1987, violent confrontations between the Palestinians and Israelis sharply increased, and Palestinian demonstrations evolved into wide-spread physical resistence. This grass-roots resistence to the Israeli presence in the West Bank and Gaza was labeled the First Intifada, an Arabic term translated as "uprising."

At the outbreak of the First Intifada, Sheik Ahmed Yassin, an Islamic cleric from Gaza, was the leader of the Palestinian branch of the Muslim Brotherhood.[1] Sheik Yassin and his followers, fueled by their resentment of Israel's existence and a fundamentalist Islamist ideology, were instrumental in the First Intifada. While many Palestinians were satisfied to have a "two state solution" to the conflict, this was not an acceptable compromise for Sheik Yassin and his followers.

In December 1987, Sheik Yassin, among others, formally established *Harakat al-Muqawamah al-Ilamiyya*, Arabic for the "Islamic Resistance Movement" (known by its acronym, Hamas). Hamas' founding charter makes clear that Hamas is, in fact, the Palestinian branch of the Muslim Brotherhood, and calls for the annihilation of Israel through *"jihad"* (holy war), and the creation of an Islamic state in its place. Hamas

---

[1]The Muslim Brotherhood is an international, Islamic fundamentalist movement, which started in Egypt in 1928, under the following of Islamic leader Sheik Hassan Al Banna. The Brotherhood – also called the "Ikwan" – has members and branches all around the world, including the United States, and is divided into sub-groups along ethnic and nationalistic lines.

defines *jihad* as including violent activities, with such violent activities being carried out by Hamas' military wing, commonly known as the Izz Al-Din Al-Qassam Brigades ("Al-Qassam Brigades").  Hamas frequently engages in suicide bombings, whereby a person is smuggled into a civilian population center in Israel wearing an explosive vest, and then detonates the explosives at the moment calculated to inflict the most damage.  Often, a second bomber follows, detonating his explosive device once a crowd of first responders have gathered around the wreckage of the first bombing.

In addition to violent jihad, the Hamas charter also calls for charity as a means of securing the population's loyalty.  Through social responsibility, the charter explains, "brotherliness would deepen, cooperation, sympathy and unity will be enhanced and the ranks will be solidified to confront the enemies."

Sheik Yassin designed Hamas on the model of the Muslim Brotherhood, which, in addition to armed, paramilitary action, builds its strength on providing for the needs of the people as a means of gaining popular support for the Movement and acceptance of its Islamic fundamentalist way of life.  Through this grass-roots approach, (known as *dawa* - "preaching" or "calling"), Hamas achieves a number of goals.  Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which

millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the *dawa* frees resources that can then be devoted to terrorist activity.

In order to raise the requisite funds to support its operations, including its social support network, Hamas looked outside of the Palestinian areas, to individuals, organizations and foreign governments sympathetic to its mission, including the United States.

By the outbreak of the First Intifada, the Muslim Brotherhood in the United States was significant and well organized.  In 1987, the governing body of the International Muslim Brotherhood decided to focus its mission on the Palestinian issue, and directed that Palestine Committees be formed in countries throughout the world.  In the United States, the Palestine Committee was comprised of active Muslim Brotherhood members of Palestinian origin.  The leader of the Palestinian Committee in the United States at that time was unindicted co-conspirator Mousa Abu Marzook.  Marzook is now – and has been since 1995 – a Specially Designated Terrorist and Hamas leader.  In fact, in the early 1990s, Marzook left his post as a leader of the United States-based Muslim Brotherhood and Palestinian Committee to take over as Hamas' Political Bureau Chief, the organization's highest official position.

Case 1:03-cv-01040-KGH Document 96-1 Filed 09/03/21 Page 8 of 41 PageID
Case 3:04-cr-00240-P   Document 1171   Filed 09/12/08   Page 7 of 40   PageID 15807
#: 1754

**B.  Documents Seized from Co-Conspirator Ismail Elbarasse**

The creation and growth of the Palestine Committee in the United States are
evidenced in part by documents that the government seized in 2004 from the Virginia
home of unindicted co-conspirator and Palestinian Committee member Ismail Elbarasse.
As shown by those documents and other evidence, the Muslim Brotherhood directed its
Palestinian Committees throughout the world, including the United States, to carry out the
mandate of assisting Sheik Yassin and his newly-formed Hamas Movement.  In
accordance with that mandate, the Palestinian Committee in the United States, which
included the defendants Elashi, Baker and El-Mezain, oversaw a number of sub-
organizations charged with varying missions calculated to comprehensively address
Hamas' needs.  These organizations included the United Association for Studies and
Research (UASR) ("think tank"), the Islamic Association of Palestine (IAP) (propaganda
and information) and the Occupied Land Fund (OLF) (money), later to become the
defendant HLF.  The defendant Shukri Abu Baker was in charge of the HLF and, along
with the defendants El-Mezain and Elashi, set out to establish what would become the
highest grossing Islamic charity in the United States.

The UASR involved, among others, unindicted co-conspirators Mousa Abu
Marzook (a Hamas leader) and Yousef Saleh, a.k.a. Ahmed Yousef, and was designed for
ideological research and development intended to promote a fundamentalist view of the
Palestinian issue.  The UASR was also involved in passing Hamas communiques to the

United States-based Muslim Brotherhood community and relaying messages from that community back to Hamas.  The IAP, which involved the defendant Ghassan Elashi as an original incorporator and bank account signatory, was designed as a propaganda facility, responsible for Intifada festivals (involving the defendant HLF), pro-Hamas publications, and the general rallying of support within the American Muslim community.  The IAP was the first organization to publish an English version of the Hamas charter.  Further, during their existence, unindicted co-conspirator and Hamas leader Mousa Abu Marzook funneled well over a million dollars into the three organizations (UASR, IAP, OLF/HLF) during a time when he was an unemployed graduate student.

The defendant HLF's role was to subsidize Hamas' vital social recruitment and rewards program designed to win the hearts and minds of the Palestinian population and solidify loyalty to Hamas.   In order for Hamas to achieve its objectives, it had to win the broad support of the Palestinian population, and it needed a way to bring in large amounts of cash from abroad.  The defendant HLF set out to do both.  Moreover, the HLF did not embark on this mission alone.  Throughout the world, organizations similar to the HLF were being established to achieve the same mission of supporting Hamas.

**C.  The Philadelphia Conference**

Although there are varying accounts as to the exact date at which the First Intifada officially ended, by most accounts, 1993 and the signing of the Oslo Accords, officially called the Declaration of Principles on Interim Self-Government Arrangements, signified

the end.  The Oslo Accords were a dramatic event in the Israeli-Palestinian conflict   So, too, were the Oslo Accords significant in the United States, as President Clinton brokered the agreement and held a nationally televised signing in Washington, D.C. on September 13, 1993, between Yasser Arafat (PLO Chairman) and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.  The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority (PA), headed by PLO Chairman Yasser Arafat.  Under the plan, the PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.  The agreement also included Letters of Mutual Recognition, whereby the Israeli government recognized the PA as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and renounced terrorism, violence and the desire for the destruction of Israel.

The Oslo Accords were not, however, universally accepted.  Hamas rejected the agreement for its unacceptable condition of recognizing Israel's right to exist.  For Hamas, the Oslo Accords were a threat to Hamas' survival and in direct confrontation with its most valued tenet - the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

For Hamas' support network in the United States (the Palestine Committee), the signing of the Oslo Accords and America's brokering of the agreement presented a

difficult challenge.  The Oslo Accords had provided a degree of public expectation for a peaceful resolution to the historic conflict.  In order for the Palestine Committee to fulfill its mandate of assisting and strengthening Hamas, it would have to be much more cautious and organized in its efforts, so as to avoid overt alignment with a group now dedicated to undermining the American-backed peace process.

In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the Palestine Committee gathered together in Philadelphia, Pennsylvania to discuss how to proceed in light of the Olso Accords.  The defendants Shukri Abu Baker, Ghassan Elashi and Mufid Abdulqader were present.  Although expected to attend, the defendant Muhammad El-Mezain was ill and unable to attend.

The Federal Bureau of Investigation (FBI) was still in the early stages of its investigation of Hamas in the United States when the Palestine Committee met in Philadelphia.  One of the initial Hamas cases investigated by the FBI involved unindicted co-conspirator Abdelhalem Ashqar, an Oxford, Mississippi-based Hamas activist.  The FBI learned of the Philadelphia meeting through the Ashqar investigation and, as a result, the FBI obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

During the meeting, the participants openly discussed the problems that the Oslo Accords posed for achieving their objectives and strategized about how best to defeat the peace process.  The United States was fertile ground for fundraising and propaganda,

offering the essential Constitutional protections which afforded the freedom to operate. Since the United States had publicly positioned itself behind the peace process, the attendees were concerned that disclosure of their true purpose would threaten their established infrastructure by aligning them with what they knew was a terrorist organization. Attendees were admonished not to mention "Hamas," but rather to refer to it as "Samah," which is Hamas spelled backwards. Attendees questioned how they could continue their quest to defeat the peace process without being viewed as "terrorists." They discussed their concern that the peace process would attract Palestinian support and further complicate their ultimate goal of creating an Islamic state throughout Israel. They agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting Hamas' vital social recruitment effort.

In order to facilitate their continued support of Hamas, the attendees discussed the method by which they could provide financial support without an overt alignment with Hamas. That method involved supporting institutions, organizations and programs in the West Bank and Gaza aligned with the Hamas movement. Attendees identified several organizations and zakat committees as "ours." The infiltration and control of social committees and organizations providing humanitarian relief in the West Bank and Gaza provided a perfect opportunity for Hamas to widen and strengthen its grip on the Palestinian population. Countless interviews and speeches by Hamas leaders have lauded its social apparatus as the bedrock of the organization, and the primary source of its

influence in the region.  This influence would continue to grow, culminating in Hamas' rise to political power, and violent take-over of the Gaza Strip from the PA.

### D.  Hamas' Designation as a Terrorist Organization

By 1995, Hamas had made clear its intention to violently derail the peace process by undermining what was perceived as a corrupt and ineffective PA.  It did so by increasing its violent campaign of suicide bombings, kidnappings and other paramilitary actions.  The United States fully realized the significant impediment that Hamas and other Islamic extremist organizations posed to the peace process.   In response, President Clinton issued Executive Order 12947 (January 23, 1995), which declared a national emergency and made it unlawful to support organizations and individuals committed to disrupting the Middle East peace process.  Hamas was included in the Annex to the original Executive Order, and officially became a Specially Designated Terrorist; a designation status created by Executive Order 12947.  Subsequently, in 1996, Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA), which created the term "Foreign Terrorist Organization" and resulted in the codification of the material support statute of Title 18, United States Code, Section 2339B.  In October 1997, the State Department listed Hamas as a Foreign Terrorist Organization.

The new statutes enacted pursuant to Executive Order 12947 and AEDPA prohibited the provision of any type of support – including charitable – to any component of the designated organization.  This broad prohibition recognized the vital role a terrorist

group's social infrastructure plays in strengthening the movement by exploiting the needs of the civilian population and providing radical indoctrination through its schools and social programs.

The defendants were well aware of Executive Order 12947 and AEDPA and expressed considerable concern over the laws' application. Wiretaps and search warrant material revealed significant exposure to and familiarity with the laws. Once again, the defendants were forced to adapt to a changing environment. The tone and language of the conferences, publications and speakers supported by the defendants began to change in order to avoid being publicly associated with Hamas and its agenda. Conference tapes possessed by and involving the defendants and the organizations of the Palestine Committee reveal the contrast before and after the designations. These early tapes reveal the true spirit and intent behind the defendants' activities and unveil the purpose and motive of their organizations.

In the years following the new anti-terrorism laws, the defendants continued providing support to the same organizations and institutions that they supported prior to the legislation; however, much more of the defendant HLF's money was being diverted to its own offices and/or representatives located throughout the West Bank and Gaza, which would then be passed to the zakat committees and charitable organizations. Between 1995 and December 2001, the defendant HLF delivered hundreds of thousands of dollars into the West Bank and Gaza to construct schools, medical clinics, libraries and other

community-based facilities, in addition to supporting individuals and families of individuals arrested, detained or injured during violent confrontations with Israel. This aid continued to be distributed through an insular network of charity committees controlled by Hamas, including many of the same committees identified as "ours" in the 1993 Philadelphia Conference.

In September 2000, the violence between Israel and the Palestinians was reignited, and quickly escalated into what was labeled the Second Intifada. The Second Intifada resulted in numerous arrests, detentions, suicide bombings, and confrontation-related injuries and deaths. The defendant HLF was quick to respond and show its support for the uprising.

Various operations and initiatives were conducted by Israel during the Second Intifada in an effort to diminish the rapidly growing use of suicide bombings, kidnappings and other violent techniques aimed at threatening Israel's civilian and military populations. On March 27, 2002, on the eve of the Jewish holiday of Passover, a Hamas operative entered a hotel in a resort town of Natanya and blew himself up. Among the many killed were elderly people gathered for the traditional Passover meal, several of whom were Holocaust survivors. In response, Israel launched Operation Defensive Shield, which targeted the Hamas infrastructure, including certain Islamic charitable institutions in the West Bank. This effort, and others that followed, reflected Israel's increasing realization that Hamas' social network of institutions and programs was a

significant contributor to Hamas' ability to execute terrorist operations.  Israel believed

the targeted institutions were providing employment and cover for Hamas operatives, in

addition to creating an environment through its schools, clinics and mosques that praised

terrorist activities, facilitated recruitment, and significantly perpetuated the violent

confrontation.

Hamas used its leadership role in the Second Intifada and the loyalty it gained

through its provision of social services to catapult itself into Parliamentary control.

Shortly thereafter, it attacked the PA, and ousted them from control in the Gaza Strip. The

PA remains the governing body in the West Bank.  Hamas is now the controlling entity of

the PA.  While Hamas' suicide bombings and other violent engagement with Israel are

paramount in the public awareness, it is its social infrastructure that Hamas credits with

its rise to power.

Over the years, the PA would, from time to time, attempt to take measures against

the zakat committees and other organizations run by Hamas.  Closures, however, were

always short lived, a product of the political reality in which the PA needed Hamas to

provide services that it was unable to effectively provide itself.  After Hamas attacked the

PA and took control of Gaza, however, the PA began to take more serious measures

against the Hamas social infrastructure.  In December 2007, the PA reorganized the zakat

committees into districts, and began an attempt to enforce existing laws that previously

went ignored.  Hamas decried these measures, and in numerous Arabic publications

declared the PA's actions to be directed against Hamas, a position which confirms the fact that Hamas controlled these committees and organizations.

### E.  The Hamas International Fundraising Network

Neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of Hamas.  HLF was a vital member of Hamas' international network of organizations dedicated to financing the Hamas agenda, and worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of Hamas-controlled charity committees in the West Bank and Gaza.  These other organizations -- including The Palestinian Relief and Development Fund (Interpal) in Great Britain, the Al-Aqsa Foundation in Germany, Belgium and Holland, the Comite' de Bienfaisance et de Secours aux Palestiniens (CBSP), in France, the Association de Secours Palestinien (ASP) in Switzerland; the Palestinian Association in Austria (PVOE); and the Palestinian Branch of the World Organization of Muslim Youth (WAMY) -- operated in much the same way as HLF, sharing fundraising techniques, projects, and connections to Hamas leaders.  Interpal, Al-Aqsa, CBSP, ASP and PVOE  are all designated as terrorist organizations in the United States.

### III.  CHARGES AND ELEMENTS

The following chart shows the charges contained within the superseding indictment and which defendants are named in which counts:

| DEF. | CT. | CHARGE |
|---|---|---|
| All | 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) |
| HLF, Baker, Elashi | 2 - 10 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 |
| HLF, Baker, Elashi, Abdulqader, Odeh | 11 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 |
| HLF, Baker, Elashi | 12 -21 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 |
| HLF, Baker, Elashi, Abdulqader, Odeh | 22 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) |
| HLF, Baker, Elashi | 23 - 32 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) |
| Baker, Elashi | 33 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 |
| Baker, Elashi | 34 - 36 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) |

The following chart shows the elements for each offense named in the superseding indictment:

| CT. | CHARGE | ELEMENTS |
|-----|--------|----------|
| 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) | <u>First</u>, that two or more persons agreed to provide material support or resources to a foreign terrorist organization; <u>Second</u>, that the defendant knowingly became a member of the conspiracy with the intent to further its unlawful purpose; <u>Third</u>, that the charged conspiracy existed on or after October 8, 1997, the date on which Hamas was designated a foreign terrorist designation, and that the defendant was a member of the conspiracy on or after that date. |
| 2 - 10 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 | <u>First</u>, that the defendant in question provided material support or resources to a foreign terrorist organization; <u>Second</u>, that the defendant in question did so knowingly; and <u>Third</u>, that this court has jurisdiction over the offense. |
| 11 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 | <u>First</u>: that two or more persons agreed to provide funds, goods or services to a Specially Designated Terrorist; <u>Second</u>: that the defendant knew the purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and <u>Third</u>: that one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act in order to accomplish some object or purpose of the conspiracy. |

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 18**

| 12 - 21 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 | First: that the defendant himself or, by aiding and abetting another defendant or by being aided or abetted by another defendant, contributed funds, goods, or services to, or for the benefit of a Specially Designated Terrorist; Second: that such funds, goods or services were in the United States, or thereafter came within the United States, or thereafter came within the possession or control of United States persons; Third: that the defendant did so knowingly and willfully. |
|---|---|---|
| 22 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) | First: that two or more persons agreed to accomplish a common and unlawful plan to violate 18 U.S.C. Section 1956, as charged in the indictment; and Second, that the Defendant, knowing the unlawful purpose of the plan, willfully joined in it; |
| 23 - 32 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) | First: that the Defendant knowingly transported transmitted, or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States or attempted to do so; and Second: that the Defendant engaged in the attempted transportation, transmission or transfer with the intent to promote the carrying on of "specified unlawful activity." |
| 33 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 | First: two or more persons agreed to commit an offense against the United States or to defraud the United States; Second: the defendant's knowing and voluntary participation in the conspiracy; and Third: the commission of an overt act in furtherance of the conspiracy. |

| 34 - 36 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) | First: That the defendant signed an income tax return that contained a written declaration that it was made under penalties of perjury; Second: That in this return the defendant falsely stated that the payments shown were going to Program Services when in the fact the payments were going to Hamas; Third: That the defendant knew the statement was false; Fourth: That the false statement was material; and Fifth: That the defendant made the statement willfully, that is, with intent to violate a known legal duty. |

Case 1:09-cv-10000-RGHWD-DKurn-De64ment 96-d1 I3ile4/09/03/21age P2ge 226342PageID
#17880
Case 3:04-cr-00240-P   Document 1171   Filed 09/12/08   Page 21 of 40   PageID 15821

# IV.  EVIDENTIARY ISSUES

**A.**     **Expert Testimony**

**1. The Government's Experts**

As set forth in the government's expert notices, the government will call several experts to explain the history and evolution of the Hamas organization, its structure, central cast, and the goals and objectives of the organization; the charitable organizations in the West Bank and Gaza that constitute Hamas' social infrastructure and their control by Hamas; and the methodology by which terrorist organizations, including Hamas, use charity to achieve the overall terrorist objectives of the organizations.   These experts are addressed in the government's response to the Defendants' Joint Motion *in Limine* and for a Daubert Hearing [ecf # 1123].

Judge Fish conducted Daubert hearings with respect to Dr. Matthew Levitt and the ISA Witness, and found both to qualify as experts.  Defendants do not challenge the qualifications of Dr. Bruce Hoffman, an expert that the government did not call in the previous trial, but have instead stated that they challenge his "methodology."

Rule 703 of the Federal Rules of Evidence codifies the commonly accepted principle that an expert's opinion may be based on otherwise inadmissible material, so long as it is of the type reasonably relied upon by other experts in the field.  *See United States v. Williams*, 447 F.2d 1285, 1290-91 (5th Cir. 1971) (*en banc*), *cert. denied*, 405 U.S. 954 (1972).   As it did in the first trial, the government will present videos, posters

and pictures through the testimony of its expert witnesses to assist the jury in evaluating

their testimony. In addition, there are items that the experts have reasonably relied upon

to reach their opinions and which will aid the jury in understanding their testimony. The

government will seek to admit into evidence many of these same items, and, pursuant to

Fed. R. Evid. 703, the Court should find that the probative value of these items in

assisting the jury to evaluate the experts' opinions substantially outweighs any prejudicial

effect. *See* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be

disclosed to the jury by the proponent of the opinion or inference unless the court

determines that their probative value in assisting the jury to evaluate the expert's opinion

substantially outweighs their prejudicial effect."); *United States v. Gonzalez*, 307 F.3d

906 (9th Cir. 2002).

## B. Co-Conspirator Statements

### 1. General Principles of Conspiracy Law

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is

offered against a party" and "is a statement by a coconspirator of a party during the course

and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

The admission of a coconspirator statement against a defendant is proper where the

government establishes, by a preponderance of the evidence; (1) that a conspiracy existed,

(2) that the coconspirator and the defendant against whom the coconspirator's statement

is offered were members of the conspiracy, and (3) that the statements were made during

the course and in furtherance of the conspiracy." *United States v. Ruiz*, 987 F.2d 243, 247 (5th Cir. 1993) (citation omitted*)*.

The trial court's decision to admit a statement as a coconspirator's statement is reviewed by the appellate court under the abuse of discretion standard. *United States v. Manzella*, 782 F.2d 533, 544-46 (5th Cir. 1986). All findings of fact made by the trial court in its determination regarding the coconspirator exception are to be accepted by the appellate court unless clearly erroneous.

In determining the admissibility of a coconspirator's statement, the court may consider the coconspirator's statement itself to decide whether a conspiracy existed and whether the defendant participated in it. *United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996) *citing Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In rejecting a *per se* rule against considering these statements when ruling on their admissibility, the Supreme Court has reasoned that presumptively unreliable hearsay may become probative if the statements are considered in light of other evidence in the case. Chief Justice Rehnquist, writing for the Court in *Bourjaily*, explained:

> First, out-of-court statements are only *presumed* unreliable. The presumption may be rebutted by appropriate proof . . .. Second, individual pieces of evidence, insufficient in themselves to prove a point, may in accumulation prove it . . .. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary fact-finding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as fact-finders, and there is no reason

> to believe that courts are any less able to properly recognize the probative value of evidence in this particular area.

107 S.Ct. at 2781 (emphasis in original). As the italicized segment of the above excerpt demonstrates, the heart of the Chief Justice's reasoning is that while out-of-court statements are only *presumed* unreliable, they may nevertheless become quite probative when corroborated by *other evidence, id.* at 2781, and therefore may be considered along with the other evidence in ruling on the admissibility of the hearsay statement.

Some of the documents that the government intends to offer into evidence will not always identify the speaker or author of a document. The lack of such information does not prevent the admission of such evidence.

There will be instances during the trial when the government will seek to introduce evidence as the acts or statements of a coconspirator or joint venturer, which acts were committed, or statements made, prior to the time that one of the defendants has been shown to be a member of a conspiracy or joint venture. An example of these type of documents are those that were seized from the home of co-conspirator Elbarrasse. As Judge Fish found during the first trial, these documents should be admitted as co-conspirator statements, even as against those defendants who later joined the conspiracy. The rationale behind the admissibility of such evidence is the well-established rule that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators made after the formation and in furtherance of the conspiracy. *United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992).

In addition to establishing the existence of the conspiracy and the defendant's and co-conspirator's membership in the conspiracy, Fed. R. Evid. 801(d)(2)(E) also requires that a statement be made in furtherance of the conspiracy. *United States v. Solis*, 299 F.3d 420, 443 (5th Cir.) *cert. denied*, 537 U.S. 1060, 123 S.Ct. 640, 154 L.Ed.2d 543 *and cert denied*, 537 U.S. 1094, 123 S.Ct. 705, 154 L.Ed.2d 642 (2002).  A trial court's finding that a statement was made in furtherance of a conspiracy is a factual finding, which may be reversed only if clearly erroneous. *United States v. Green*, 180 F.3d 216, 222 (5th Cir. 1999).

A statement is not in furtherance of a conspiracy unless it advances the ultimate objects of the conspiracy. *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) (internal citation omitted).  "Mere idle chatter" is not admissible under Rule 801(d)(2)(E). *Id*.  The courts have consistently held, however, that the "in furtherance" requirement is not to be construed too strictly; otherwise, the purpose of the exception would be defeated.  *United States v. Burton*, 126 F.3d 666, 674 (5th Cir. 1997).  Accordingly, the following types of statements have been found to be "in furtherance of" a conspiracy: a statement that identifies the role of one co-conspirator to another (*United States v. Magee,* 821 F.2d 234, 244 (5th Cir.1987)); statements conveying information that could have been intended to affect future dealings between the parties (*United States v. Patton,* 594 F.2d 444, 447 (5th Cir.1979)); puffing, boasts, and other conversation when used by the declarant to obtain the confidence of one involved in the conspiracy ( *[United States*

*v.] Miller,* 664 F.2d [94,] 98 [ (5th Cir.1981) ] ); statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed (*United States v. Johnson,* 872 F.2d 612, 623 (5th Cir.1989)).*Burton,* 126 F.3d at 675 (internal quotation marks, brackets, and ellipses omitted). *See also United States v. Flores*, 63 F.3d at 1377 (statements made to inform conspirators of progress of conspiracy or made "in order to encourage loyalty and obedience among the conspirators" are in furtherance of the conspiracy).

### 2. Breadth of Conspiracy

As explained in the summary of the case, the focal point of this case is the designated terrorist group Hamas, also known as the Islamic Resistance Movement or sometimes simply referred to by its followers as "the Movement." Although the indictment in this case charges the seven named individual defendants and the Holy Land Foundation for Relief and Development, it will be obvious that the defendants were not acting alone. As noted in the case summary, the defendants were operating in concert with a host of individuals and organizations dedicated to sustaining and furthering the Hamas movement. Several of the individuals who hold leading roles in the operation of Hamas are referenced by name in the indictment.

The object of the conspiracy was to support Hamas. The support will be shown to have taken several forms, including raising money, propaganda, proselytizing, recruiting, as well as many other types of actions intended to continue to promote and move forward

Hamas's agenda of the destruction of the State of Israel, the establishment of an Islamic

state in its place, and disruption of the peace process led by the United States.

In terms of the organizations comprising the conspiracy, the following non-

inclusive collection of organizations are within the conspiracy:   The International

Muslim Brotherhood (the parent organization of Hamas); Hamas and its international

support network;  the United States-based Muslim Brotherhood and its sub-group the

Palestine Committee; organizations overseen by the Palestine Committee, such as the

defendant Holy Land Foundation (HLF), the Islamic Association for Palestine (IAP), and

the United Association for Studies and Research (UASR), as well as other organizations.

*See* Superceding Indictment, pp. 6-7.  Each of the above organizations, as well as its

members, representatives and supporters were participants in the same joint venture or

conspiracy -- the conspiracy to support Hamas.

### 3.    Co-conspirator statements made after the latest date in the indictment.

The dates of the actions alleged in the indictment are not controlling for

determining the duration of a conspiracy.  The indictment, in fact, alleges that the

conspiracy at issue continued until the date of the return of the indictment.  The Supreme

Court addressed the issue of the duration of a conspiracy in *Grunewald v. United States*,

353 U.S. 391, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957).  The Court stated, "[T]he crucial

question . . . is the scope of the conspiratorial agreement, for it is that which determines

both the duration of the conspiracy, and whether the act relied on as an overt act may

properly be regarded as in furtherance of the conspiracy. *Id*. at 970. "Even a unilateral act by a single coconspirator, if in furtherance of the purposes of the agreement, is sufficient under the terms of § 371" to extend the duration of the conspiracy. *United States v. Girard*, 744 F.2d 1170, 1174 (5th Cir. 1984) (citations omitted).

> ### 4.    Documents and Materials Seized During the Search of the Home of Ismael Elbarasse, 4502 Whistler Court, Annandale, Va., on August 21, 2004

As noted above, Judge Fish admitted into evidence the documents seized from the home of Ismael Elbarasse. *See* Order (oral), Sept. 4, 2007**.** This Court should do the same.

On August 21, 2004, agents of the FBI executed a search warrant at 4502 Whistler Ct., Annandale, Virginia, the residence of Ismail Elbarasse. Elbarasse was an associate and joint bank account holder of unindicted co-conspirator Mousa Abu Marzook. During the first trial, the government offered into evidence selected documents and other items seized from Elbarasse's home, such as audio and video tapes. The audio cassette tapes contain the recorded statements of co-conspirators to the defendants in this case. The Elbarasse documents lay out the origins, creation and structure of the Muslim Brotherhood and the Palestine Committee in the United States. They specifically place the HLF within the Palestine Committee, including its mission of supporting Hamas. These documents are corroborated by other evidence, including documents seized from

co-conspirator Abdelhalim Ashqar, the Philadelphia Conference, and other intercepted phone calls.

Although many of the Elbarasse documents pre-date January 25, 1995, the date that Hamas was first designated as a terrorist organization, Rule 801(d)(2)(E), as described above, authorizes the admission of statements of persons who were members of a joint venture as well as a criminal conspiracy. *See United States v. Saimiento-Rozo*, 676 F.2d 146, 149-150 (5th Cir. 1982)("it is not necessary that the conspiracy upon which the admissibility of [the] statements is predicated be the conspiracy charged. * * * Nor need the conspiracy or agreement be criminal in nature; it may be in the form of a joint venture"); *United States v. Postal*, 589 F.2d 862, 886 (5th Cir. 1979)(noting that 801(d)(2)(E) "was meant to carry forward the universally accepted doctrine that a joint venturer is considered a coconspirator for the purposes of this rule even though no conspiracy has been charged."); *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979) ("The co-conspirator exception to the hearsay rule . . . is merely a rule of evidence founded, to some extent, on concepts of agency law.  It may be applied in both civil and criminal cases . . .  Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not."); s*ee also United States v. Layton,* 855 F.2d 1388 (9th Cir.1988).

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 29**

## 5. Al-Zaytouna / Ila Falestine

As described above, and as the government established at the last trial, the defendants, through the HLF, were engaged in a conspiracy to support Hamas through their membership in the Palestine Committee, an organization created by the U.S. branch of the Muslim Brotherhood to assist Hamas, which itself is the Palestinian branch of the Muslim Brotherhood. Along with the HLF, whose function was to raise funds on behalf of Hamas, the Palestine Committee oversaw the Islamic Association for Palestine ("IAP"), the United Association for Studies & Research ("UASR") and, later on, the Council on American Islamic Relations ("CAIR").

The function of the IAP was to be the media arm of Hamas in America. In fulfilling that function, the IAP published the Hamas charter in English and distributed Hamas communiques. The IAP also published, each month, Arabic language magazines called *Al Zaytouna* and *Ila Falestine* which focused on Palestinian issues with an emphasis on support for Hamas. *See, e.g.*, Govt. Exh. 3-23 p. 6 (Elbarasse Search-14). Govt. Exh. 3-23, a Palestine Committee document, states, under the heading of "achievements of the Islamic Association for Palestine," that the IAP issued "9 issues from *Al-Zaytouna* magazine, 4 issues from the *Palestine Monitor* newspaper in English, one issue from *Ila Falestine* and reprinting and distributing 6 statements for Hamas." *Id* at 6. One issue contained an article about Hamas in which the readers were encouraged to donate to the HLF. Another issue included a poem written by the defendant Shukri

Abu Baker that praised Hamas. The government intends to offer into evidence several redacted issues of the Al Zaytouna and Ila Falestine magazines as co-conspirator statements.

The periodicals are self-authenticating pursuant to Fed. R. Evid. 902, which states in part that, "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following...(6) **Newspapers and Periodicals**. Printed materials purporting to be newspapers or periodicals." Newspapers and magazines are commonly accepted in this Circuit as self-authenticating and do not require any additional evidence to authenticate. *Woolsey v. National Transportation Safety Board*, 993 F.2d 516, 520 (5th Cir. 1993); *Snyder v. Whittaker Corporation*, 839 F.2d 1085, 1089 (5th Cir. 1988)("However, Fed. R. Evid. 902(6) dispenses with 'extrinsic evidence of authenticity' for printed articles from periodicals."); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 271 fn. 10 (5th Cir. 2002); *Hicks v. Charles Pfizer & Company, Inc.*, 446 F. Supp. 2d 799, 805 (E.D. Tx. 2005)("Under the Federal Rules of Evidence, newspaper articles are self-authenticating.").

In addition, the magazines are not hearsay for at least two reasons. The articles and advertisements were created and published by the IAP in order to generate support for Hamas. As such, they are co-conspirator statements made in furtherance of the conspiracy pursuant to Fed. R. Evid. 801(d)(2)(e), or statements of a defendant pursuant to Fed. R. Evid. 801(d)(2)(A), depending on the particular item. In the alternative, the

articles are not being offered for their truth but instead to show the state of mind of the

defendants and their co-conspirators, in the manner to which they hold themselves out to

the target audience of the magazine.  For these reasons, issues of *Al Zaytouna* and *Ila*

*Falestine* should be admitted into evidence.

## C. Documents Admissible Pursuant To Fed. R. Evid. 807

During the first trial, the government sought to introduce documents seized by the

Government of Israel from the offices of the Palestinian Authority.  These documents

include internal memoranda identifying the financial sources of Hamas, including the

HLF; PA intelligence documents discussing how Hamas uses schools to recruit

Palestinian youth; lists of Hamas institutions closed by the PA, including zakat

committees supported by the defendants; and other similar documents.  The documents

were authenticated by the IDF officer Major Lior.  With respect to the hearsay contained

within the documents, the government argued that Rule 807 applied.[2]  Rule 807 provides

that

> [a] statement not specifically covered by Rule 803 or 804 but having
> equivalent circumstantial guarantees of trustworthiness, is not excluded by
> the hearsay rule, if the court determines that (A) the statement is offered as
> evidence of a material fact; (B) the statement is more probative on the point
> for which it is offered than any other evidence which the proponent can
> procure through reasonable efforts; and (c) the general purposes of these
> rules and the interests of justice will best be served by admission of the
> statement into evidence. However, a statement may not be admitted under

---

[2] On April 9, 2007, prior to the first trial, the government provided the defense with a notice of
intent to admit evidence pursuant to Rule 807.  The government renewed that notice at the time it
renewed its prior motions and notices [ecf # 1035, Exh. A, p.7.].

this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The government argued specifically that the PA documents were trustworthy because it was in the interest of Yassir Arafat and Fatah, who operated the PA at the time the PA documents were created, to accurately report the movements and activities of an organization that was trying to undermine its authority. *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000)("In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made."). As discussed above, Hamas' agenda was not only to eliminate Israel, but also to sabotage the Oslo Accords and to replace the secular PA regime with an Islamist government that would control all of Israel, the West Bank and Gaza.

Judge Fish declined to admit the seized PA documents under the residual hearsay rule. Tr. Transcript, 8/14/07 at 107-08. Since that time, however, events in the West Bank and Gaza have proven the reliability of the documents. In December 2007, the PA reorganized the entire zakat committee structure in the West Bank in an effort to take control of the Hamas social infrastructure. Hamas correctly interpreted the PA measures as an attack on its charitable institutions. These widely reported and public measures validate the information contained in the seized documents that the government seeks to admit, information that identifies some of the committees and individuals known by the

PA to be Hamas.  Given that these documents seized from the PA have proven to be trustworthy, and their probative value is self-evident, the Court should now permit their admission pursuant to Fed. R. Evid. 807.  *See generally* Government's Supplemental Trial Brief [ecf #757]; Response to Defendants' Objections Regarding Documents from the Government of Israel [ecf #763].

### D.  Federal Rule of Evidence 106

During the prior trial, the government admitted hundreds of documents into evidence.  The vast majority of documents were admitted in their entirety through two FBI Special Agents who were questioned about the contents of the documents and were often asked to read certain passages.  On many occasions, the defendants requested, pursuant to Rule 106 of the Federal Rules of Evidence ("106"), to have additional portions of the document read by the agent during direct examination.  *See, e.g.* Testimony of Agent Burns, 8/1/07 p. 120-21, 124, 155-56, 160, 162; 8/6/97 p. 57, 69, 8/7/07 p. 34, 94, 99; 8/27/97 p. 197, 199, 215; 8/8/07 p. 11, 71.  Although this tactic was disruptive to the government's presentation, initially, as a courtesy, the government did not contest defendants' requests to have the witness read additional portions.  However, when the defendants raised Rule 106 continuously, the government objected and argued that the defendants were improperly using Rule 106.  The Court overruled the government's objection.  In the upcoming trial, this Court should ensure that Rule 106 is

invoked only where appropriate and applicable, and not permit defendants to disrupt the presentation of evidence under the guise of Rule 106.

Rule 106 states that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The purpose of the rule is to put into context an admitted written or recorded statement in order to "secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 171 (1988) (citation omitted). In essence, the additional part, or other document, is being admitted for the purposes of putting into context, explaining or qualifying what was said in the original excerpt or document. The intent of the rule is not to require additional sections of a document, already admitted in its entirety and subject to cross-examination, to be read by a witness on direct examination at the behest of a defendant.

The Fifth Circuit recently stated that "Fed. R. Evid. 106 seeks to relieve this tactical disadvantage by permitting an opposing party to combat the unquestioned 'cold transcript' at the moment of its introduction by *entering into evidence the remainder*." (italics added) *United States v. Garcia*, 530 F.3d 348, 354 (5th Cir. 2008). *Garcia* identifies the term "introduction" as contemplated by the Rule to mean entering into evidence, not requiring already admitted evidence to be read.

The government has found no case law citing 106 that requires an adverse party to compel a witness to read portions of an already admitted document prior to that adverse party's opportunity to question the witness. Specifically, in this matter, when the government moves into evidence a complete document, but then only questions the witness about a portion of that document, the defendants are not entitled under 106 to require an additional portion of the same document or transcript to be read. By admission of the complete document, the defendants have an opportunity to question the witness about other portions of the exhibit during cross-examination.

In circumstances where 106 may be applicable -- *i.e.*, when the government admits a redacted transcript of an intercepted telephone call -- the defendants must first establish that the additional portions of the item that they wish to introduce are relevant and explanatory of the already admitted passages. *United States v. Garrett*, 716 F. 2d 257, 272 (5th Cir. 1983); *United States v. Abrams*, 947 F. 2d 1241, 1250 (5th Cir. 1991). "The passages sought to be admitted by the defendants must be relevant and necessary to qualify, explain or place into context the portion already introduced." *United States v. Branch,* 91 F.3d 699, 728 (5th Cir. 1996). A mere request to have additional portions admitted, without more, is insufficient to meet the requirements of the rule.

As a practical matter, the government has provided to the defense the redacted transcripts of intercepted telephone calls and seized videotapes that the government anticipates offering into evidence. If the defendants wish to play additional portions of

the videos or calls under Rule 106, the defendants should notify the government as soon

as possible, and certainly prior to the testimony of the admitting witness (in all likelihood,

FBI Special Agent Burns). If the government agrees that the additional portions meet the

requirements of Rule 106, and the government receives sufficient notice, the government

will amend the transcripts and accompanying tapes prior to admission.

### E.  Statements of the Defendants

As it did in the last trial, the government intends to introduce statements of several

of the defendants. Among the statements to be introduced are:

1)      statements made by the defendant Mohamed el-Mezain during interviews with the
        FBI;

2)      statements made by the defendant Mufid Abdulqader during an interview with the
        FBI;

3)      excerpts from a sworn declaration by the defendant Shukri Abu Baker which was
        filed in conjunction with the civil lawsuit HLF brought against the government
        seeking to overturn its designation as a Specially Designated Terrorist and
        Specially Designated Global Terrorist;

4)      excerpts from a sworn deposition given by the defendant Shukri Abu Baker in the
        case styled *Stanley Boim, et al, v. Quranic Literacy Institute, et al*, in the U.S.
        District Court of the Northern District of Illinois, case number 00-C-2905.

5)      excerpts from a deposition given by the defendant Mohamad El-Mezain in the
        case styled *Stanley Boim, et al, v. Quranic Literacy Institute, et al,* in the U.S.
        District Court of the Northern District of Illinois, case number 00-C-2905.

The government contends that certain of the statements made by the defendants in

these various settings were true. Those statements are admissible as to that defendant as

the statements of a party opponent under Rule 801(d)(2) of the Federal Rules of Evidence.

Certain statements made by the defendants in the above referenced settings were false. These statements are admissible as to all defendants on two grounds. First, it is part of the government's allegations that the false statements were a part of the conspiracies among and between the defendants and others, and that one of the objects of the conspiracy was to conceal the conspiracy's existence and true purpose. The making of false statements by the defendants, either in interviews with law enforcement authorities or in other contexts in which a true answer would risk exposing the existence and true nature of the conspiracy, are acts made in furtherance of that conspiracy. These false statements are admissible as the statements made by a coconspirator during the course of and in furtherance of a conspiracy. Fed. Rule of Evidence 801(d)(2)(E).

Second, such statements are also admissible in that, because the statement is not true, it is not being offered for the truth of the matter contained therein and is therefore not hearsay. The statement will be offered by the government to show that the statement was made by the declarant, not that the contents of the statement are true. *See United States v. Holmes*, 406 F.3d 337, 349 (5th Cir.), *cert. denied* 126 S.Ct. 375 (2005).

The above referenced statements are not all of the statements that may fall within this category.. Other instances of defendants' statements or testimony may arise during

the trial.  The government will establish the admissibility of those statements at the

appropriate time.

### V.  CONCLUSION

The above is in addition to the government's earlier trial briefs describing the

kinds of evidence that the government intends to introduce at trial and the bases for

admission.  To the extent additional evidentiary issues arise that merit the Court's

attention, the government will supplement this submission as appropriate.

Dated:   Sept. 12, 2008                      Respectfully submitted,

                                             RICHARD B. ROPER
                                             United States Attorney


                                      By: */s/ James T. Jacks*_____
                                          James T. Jacks
                                          Barry Jonas
                                          Elizabeth J. Shapiro
                                          Assistant United States Attorney
                                          1100 Commerce St., Third Floor
                                          Dallas, Texas 75242
                                          214.659.8600
                                          214.767.2898  (facsimile)
                                          Texas State Bar No. 10449500
                                          jim.jacks@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2008, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Nancy Hollander
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Joshua L Dratel
Law Office of Joshua L Dratel
2 Wall St, 3rd Floor
New York, NY 10005

John W. Boyd
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Marlo P Cadeddu
Law Office of Marlo P Cadeddu
3232 McKinney Ave, Suite 700
Dallas, TX 75204

Linda Moreno
Law Office of Linda Moreno
2403 N. Washington Ave., # 320
Dallas, TX. 75204

Greg Westfall
Westfall Platt & Cutrer
Mallick Tower
One Summit Ave, Suite 910
Fort Worth, TX 76102

/s/ *James T. Jacks*
JAMES T. JACKS
Assistant United States Attorney

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 40**