# Exhibit 23

No. 12-1485

# In the Supreme Court of the United States

---

ARAB BANK, PLC, PETITIONER

*v.*

COURTNEY LINDE, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

---

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
STUART F. DELERY
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
GINGER D. ANDERS
  *Assistant to the Solicitor*
    *General*
DOUGLAS N. LETTER
SHARON SWINGLE
KEITH I. MCMANUS
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

Respondents sued petitioner under the Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.*, alleging that petitioner provided banking services to entities and individuals engaged in terrorist activities or affiliated with terrorist organizations. During discovery, petitioner declined to produce certain bank records located in foreign jurisdictions on the ground that doing so was prohibited by those jurisdictions' bank secrecy laws. The district court imposed sanctions in the form of permissive adverse inferences and preclusion of certain evidence. The question presented is:

Whether the court of appeals erred in declining to issue a writ of mandamus vacating the district court's order imposing sanctions for petitioner's non-production of bank records.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States ........................................................1

Statement.....................................................................................1

Discussion ...................................................................................8

I.   The lower courts' international comity analysis is erroneous in several respects ................................9

    A.   A district court may sanction a party for failing to disclose materials protected by foreign bank secrecy laws only if doing so is consistent with international comity...................9

    B.   The lower courts' international comity analysis rested on several erroneous premises................................................................12

II.  This Court's review is not warranted at this time ......21

Conclusion.................................................................................25

**TABLE OF AUTHORITIES**

Cases:

    *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396 (2003) ...............................................................12

    *Cheney* v. *United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367 (2004)..............................21

    *Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224 (Fed. Cir. 1996)..............................22

    *Daimler AG* v. *Bauman*, 134 S. Ct. 746 (2014) ..................18

    *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155 (2004) ..............................................14

    *Hilton* v. *Guyot*, 159 U.S. 113 (1895) ....................................10

    *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ........................................................................2

    *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) .........................................10

(III)

IV

Cases—Continued:                                                        Page

*SEC* v. *Banca Della Svizzera Italiana*, 92 F.R.D. 111
   (S.D.N.Y. 1981) ...................................................................12

*Societe Internationale pour Participations Indus-*
   *trielles et Commerciales, S.A.* v. *Rogers,* 357 U.S.
   197 (1958) ...........................................................................11

*Société Nationale Industrielle Aérospatiale* v.
   *United States Dist. Court for the S. Dist. of Iowa,*
   482 U.S. 522 (1987) .......................................9, 10, 11, 16, 17

*United States* v. *Davis,* 767 F.2d 1025 (2d Cir. 1985).........12

*United States* v. *First Nat'l Bank,* 699 F.2d 341
   (7th Cir. 1983)....................................................................22

*Westinghouse Elec. Corp. Uranium Contracts Litig.,*
   *In re,* 563 F.2d 992 (10th Cir. 1977)...................................22

Treaty, statutes and rule:

United Nations International Convention for the
   Suppression of the Financing of Terrorism, Dec. 9,
   1999, 2178 U.N.T.S. 197:
      Art. 12, 2178 U.N.T.S. 235 .................................13

Alien Tort Statute, 28 U.S.C. 1350.........................................2

Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.* .................2

      18 U.S.C. 2333(a) ...........................................................2

8 U.S.C. 1189 ...........................................................................2

12 U.S.C. 3402-3408...............................................................17

15 U.S.C. 6802(a) ...................................................................17

15 U.S.C. 6802(e)(8)................................................................17

31 U.S.C. 5313 ........................................................................17

31 U.S.C. 5318(g)(2)................................................................17

31 U.S.C. 5326 ........................................................................17

Fed. R. Civ. P. 37(b)(2) ............................................................5

V

Miscellaneous:                                              Page

International Organization of Securities Commis-
    sions, Multilateral Memorandum of Understanding
    Concerning Consultation and Cooperation and the
    Exchange of Information, May 2012, http://www.
    iosco.org/library/pubdocs/ pdf/IOSCOPD386.pdf...........13

Memorandum of Understanding Between the Gov-
    ernments of the Member States of the Middle East
    and North Africa Financial Action Task Force
    Against Money Laundering and Terrorist Financ-
    ing, Nov. 30, 2014, http://www. sic.gov.lb/
    downloads/MENAFATF_MOU_EN.pdf..........................17

Restatement (Third) of the Foreign Relations Law of
    the United States (1987)..........................3, 10, 11, 14, 16, 21

U.N. Conference on Trade & Dev., *Report on
    UNCTAD assistance to the Palestinian people:
    developments in the economy of the Occupied Pal-
    estinian Territory* (2013), http://unctad.org/
    meetings/en/SessionalDocuments/tdb60d3_en.pdf .........20

U.S. & Foreign Commercial Serv. & U.S. Dep't of
    State, *Doing Business in the West Bank and Gaza*
    (updated June 12, 2013), http://export.gov/
    westbank/build/groups/public/@eg_we/documents/
    webcontent/eg_we_064047.pdf ...........................20

U.S. Dep't of State, *Bureau of Counterterrorism*,
    http://www.state.gov/j/ct/index.htm (last visited
    May 15, 2014).........................................19

White House Office of the Press Secretary, *Remarks
    by President Obama and His Majesty King Abdul-
    lah II of Jordan in a Joint Press Conference* (Mar.
    22, 2013) ............................................19

# In the Supreme Court of the United States

––––––––––

No. 12-1485

ARAB BANK, PLC, PETITIONER

*v.*

COURTNEY LINDE, ET AL.

––––––––––

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

––––––––––

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

––––––––––

## INTEREST OF THE UNITED STATES

This brief is submitted in response to the Court's order inviting the Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

## STATEMENT

1. Petitioner is a multinational bank headquartered in the Kingdom of Jordan, with branches throughout the Middle East and elsewhere in the world. Pet. App. 2a, 5a-6a. As Jordan has explained, petitioner is Jordan's "leading financial institution" and plays a "significant role in the Jordanian and surrounding regional economies." *Id.* at 232a.

Respondents are United States citizens who are the victims, or the family members of victims, of terrorist attacks committed in Israel, Gaza, and the West

(1)

2

Bank.[1] Pet. App. 5a-6a, 138a-140a; Br. in Opp. App. 13a-14a. In 2004, respondents brought suit against petitioner under the Antiterrorism Act of 1990 (ATA), 18 U.S.C. 2331 *et seq.*, which provides that "[a]ny national of the United States injured * * * by reason of an act of international terrorism" may sue for treble damages. 18 U.S.C. 2333(a).

Respondents allege that petitioner "knowingly and purposefully supported foreign terrorist organizations between 1995 and 2004 by providing financial services to those organizations." Pet. App. 1a-2a; see *id.* at 6a. Specifically, respondents allege that petitioner helped administer a "death and dismemberment benefit plan" in which the Saudi Committee for the Support of the Intifada Al Quds (Saudi Committee) made payments to terrorist "martyr[s]" and their families. *Id.* at 6a-7a, 118a. Respondents further allege that petitioner performed financial services for other persons affiliated with Hamas and other designated foreign terrorist organizations. *Id.* at 7a, 119a.

2. a. In 2005, respondents requested that petitioner produce records of specified accounts maintained at petitioner's branches, primarily concerning organizations designated by the United States as foreign terrorist organizations, see 8 U.S.C. 1189, and their alleged affiliates. Pet. App. 8a. Most of the records were located in Jordan, Lebanon, and the West Bank and Gaza. Br. in Opp. App. 16a. Petitioner objected

---

[1] The plaintiffs initially included foreign nationals who asserted claims under the Alien Tort Statute (ATS), 28 U.S.C. 1350. The district court subsequently dismissed the ATS claims in light of *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). Br. in Opp. 1-2. This brief uses "respondents" to refer to the remaining plaintiffs.

3

that producing the requested documents would violate bank secrecy laws, and expose petitioner to criminal or other penalties, in the jurisdictions in which the records were located. *Id*. at 16a-17a. In July 2005, a magistrate judge directed petitioner to seek permission to disclose certain records from the appropriate foreign regulatory authorities. Pet. App. 8a; Br. in Opp. App. 15a. Authorities in Jordan and the West Bank and Gaza denied permission. Br. in Opp. App. 15a.

b. Respondents ultimately moved for an order "overruling all objections" based on foreign bank secrecy laws in order to "remove * * * [petitioner's] assertion of foreign bank secrecy laws as a bar to disclosure." Br. in Opp. App. 13a.

In November 2006, the magistrate judge held that petitioner's "objections to providing discovery in this action based on foreign bank secrecy laws are overruled." Br. in Opp. App. 24a. The judge observed that the documents were primarily located in Jordan, Lebanon, and the West Bank and Gaza, but that some documents were in Great Britain, France, and other countries. *Id*. at 16a & n.2. To determine whether compelling production was consistent with international comity, the magistrate judge weighed the United States and foreign-jurisdiction interests at stake, as well as the importance of the documents to respondents' claims and the availability of alternative sources of information. *Id*. at 18a-19a (citing Restatement (Third) of the Foreign Relations Law of the United States § 442(1)(c) (1987) (Restatement)). The judge acknowledged that "maintaining bank secrecy is an important interest" of the relevant foreign jurisdictions. *Id*. at 21a-22a. He reasoned, however, that

4

Jordan and Lebanon had subordinated that interest to their interest in fighting terrorism by entering into a multilateral agreement in which they "renounc[ed] bank secrecy as a basis for refusing requests for mutual legal assistance" from other governments in terrorist financing investigations. *Id.* at 22a & n.5. The judge further reasoned that the United States' interest in fighting terrorism through private ATA actions and the importance of the withheld documents to the litigation supported compelling production. *Id.* at 20a, 21a-23a. In March 2007, the district court affirmed the magistrate judge's ruling. *Id.* at 26a-28a.

Rather than require immediate production, the magistrate judge permitted petitioner to seek foreign authorities' permission through "letters rogatory or other devices." Br. in Opp. App. 24a. In September 2007, Jordan, Lebanon, and the Palestinian Authority denied those requests. Pet. App. 11a, 63a. Petitioner accordingly declined to produce materials covered by the relevant foreign laws. Those documents include "records regarding ten specific accounts" allegedly maintained by petitioner for certain terrorist organizations, "general account records for other named organizations" allegedly linked to terrorism, and "account records for the beneficiaries of Saudi Committee transfers." *Id.* at 14a; see *id.* at 63a.

c. Over the course of discovery, respondents did obtain certain documents. In 2006, petitioner received the Saudi Committee's permission to disclose records relating to transactions handled on its behalf, which enabled petitioner to produce the records consistent with applicable bank secrecy laws. Pet. App. 13a & n.22, 114a; Br. in Opp. App. 16a. Petitioner also complied with the district court's order to produce certain

5

documents that were held in New York at the time of the suit and that previously had been disclosed to the Department of the Treasury in connection with a regulatory investigation of petitioner's New York branch. Pet. App. 11a-12a, 61a. Respondents also obtained through unidentified sources documents that petitioner had disclosed to the Department of Justice in connection with the criminal prosecution in Texas of the Holy Land Foundation for Relief and Development. *Id*. at 12a-13a, 61a. Those documents included ones that originally were located in the West Bank, Gaza, and London. *Id*. at 12a-13a.

3. In December 2007, respondents moved for sanctions under Federal Rule of Civil Procedure 37(b)(2). Pet. App. 15a. In 2009, the magistrate judge found that sanctions were warranted and recommended that the jury be instructed that it could infer that petitioner had provided financial services to terrorists. *Id*. at 107a-137a.

In 2010, the district court imposed broader sanctions than those recommended by the magistrate judge. Pet. App. 55a-91a. The court explained that determining whether to impose sanctions for nonproduction involved consideration of international comity, petitioner's good faith, and the hardship imposed by the production orders. *Id*. at 68a-69a. The court observed that it had already determined that compelling production was consistent with international comity principles. *Id*. at 68a. The court next found that petitioner had not acted with the "utmost good faith," because it had initially refused to produce documents previously disclosed to the United States government, and its "refusals to produce" documents had caused "years of delay." *Id*. at 75a, 77a. The

6

court also concluded that petitioner was unlikely to face prosecution in foreign jurisdictions because petitioner had not been prosecuted for its disclosures to government agencies. *Ibid.* The court accordingly held that "[e]ven absent bad faith, adverse inference sanctions are appropriate here." *Id.* at 78a.

With respect to the scope of the sanctions, the district court found that the withheld documents would be crucial to respondents' ability to establish petitioner's knowing provision of financial services to terrorists, and that, based on respondents' threshold showing, the documents would "likely substantiate [respondents'] claims." Pet. App. 80a; see *id.* at 78a-84a. Accordingly, the court ruled that, among other things, the jury would be instructed that it could infer that petitioner had provided financial services to terrorist organizations and that petitioner did so "knowingly and purposefully." *Id.* at 90a-91a. The court also precluded petitioner from "making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents." *Id.* at 91a. The court subsequently ruled, in an order that was not before the court of appeals in these mandamus proceedings, that petitioner would not be permitted to offer evidence of its adherence to foreign bank secrecy laws. Pet. Supp. Br. 2.

4. Petitioner sought a writ of mandamus directing vacatur of the district court's sanctions order.[2] The

---

[2] Petitioner also filed an interlocutory appeal of the district court's order. Pet. App. 3a. The court of appeals concluded that it did not have jurisdiction to hear the appeal under the collateral order doctrine. *Id.* at 19a-27a. Petitioner does not challenge that holding. See Pet. 13-14.

7

court of appeals denied the writ of mandamus. Pet. App. 1a-54a.

The court of appeals first held that petitioner had not established the requisite "clear and indisputable" entitlement to a writ of mandamus. Pet. App. 30a; see *id*. at 29a-47a. The court explained that the district court had not clearly abused its discretion in concluding that the sanctions were consistent with comity principles because the "interests of other sovereigns in enforcing bank secrecy laws are outweighed by the need to impede terrorism financing as embodied in" the ATA. *Id*. at 38a. The court of appeals also upheld the district court's finding that petitioner had not acted with the "utmost good faith * * * based in large part on the uncontested observation that the discovery dispute had resulted in years of delay," *id*. at 40a (internal quotation marks and citation omitted), as well as the district court's finding that petitioner was unlikely to be prosecuted for any disclosures, *id*. at 41a. Finally, the court of appeals concluded that the sanctions order did not violate due process. The court reasoned that it was proper to consider "the extent to which the sanctions are necessary to restore the evidentiary balance upset by incomplete production." *Id*. at 45a. The court also determined that the sanctions order was reasonably related to petitioner's non-production and its "degree of fault," and the order would "not preclude * * * [petitioner] from defending itself at trial." *Id*. at 47a; see *id*. at 44a-47a.

The court of appeals further held that petitioner could obtain adequate review of the sanctions order by appealing any adverse final judgment. Pet. App. 47a-51a. The court rejected as speculative petitioner's assertions that the sanctions effectively precluded it

8

from mounting a defense, and that a judgment against petitioner could cause significant "reputational harm" and destabilize foreign states' banking systems. *Id.* at 48a.

Finally, the court of appeals held that mandamus would not be appropriate in any event because petitioner's arguments "involve the application of a well-elaborated legal scheme and a fact-intensive inquiry in the midst of ongoing, lengthy litigation." Pet. App. 53a-54a.

## DISCUSSION

Petitioner contends (Pet. 13-35) that the court of appeals erred in denying a writ of mandamus vacating the discovery sanctions imposed by the district court. In analyzing whether the sanctions were consistent with principles of international comity, the lower courts erred in several significant respects, including by assuming that petitioner's previous production of documents to United States government agencies reflected the sort of selective compliance with foreign bank secrecy laws that would support sanctions in this private litigation; failing adequately to consider the broad range of United States foreign-relations and anti-terrorism interests implicated by the sanctions order; and failing to accord sufficient weight to the foreign jurisdictions' interests in enforcing their bank secrecy laws.

Despite those errors, this Court's review is unwarranted at this time. Mandamus is an extraordinary remedy that is appropriate only when a party is clearly and indisputably entitled to relief and review on appeal from a final judgment would be inadequate. The court of appeals' conclusion that mandamus was unwarranted is not obviously incorrect. And the inter-

9

locutory posture of the case makes it difficult to assess the scope, severity, and consequences of the sanctions, which remain to be implemented in the district court through evidentiary rulings and as-yet-unwritten jury instructions.

## I. THE LOWER COURTS' INTERNATIONAL COMITY ANALYSIS IS ERRONEOUS IN SEVERAL RESPECTS

In ordering petitioner to produce documents protected by foreign jurisdictions' bank secrecy laws, and in sanctioning petitioner for failing to comply, the district court was required to, and did, consider whether its orders were consistent with international comity. See *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543-544 & n.27 (1987) (*Aérospatiale*). The district court's comity analysis, however, was erroneous in important respects. In particular, the court failed to give adequate weight to United States and foreign sovereign interests that weighed in favor of a lesser sanction than the one the court imposed in this private litigation.

### A. A District Court May Sanction A Party For Failing To Disclose Materials Protected By Foreign Bank Secrecy Laws Only If Doing So Is Consistent With International Comity

When a litigant in a United States court seeks discovery of materials that are located abroad and assertedly protected from disclosure by foreign bank secrecy laws, the district court must determine whether compelling production is consistent with "the demands of comity." *Aérospatiale*, 482 U.S. at 546. International comity is "the recognition which one nation allows within its territory to the legislative,

10

executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895). Although the existence of a foreign statute barring disclosure "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute," *Aérospatiale*, 482 U.S. at 544 n.29, courts should carefully weigh comity considerations when, as here, the exercise of United States jurisdiction implicates a foreign government's interest in a generally applicable law regulating activity occurring within its own jurisdiction. Cf. *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869, 2885-2886 (2010).

The Court has explained that the factors "relevant to any comity analysis" concerning such discovery include:

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aérospatiale*, 482 U.S. at 544 n.28 (internal quotation marks and citation omitted); see Restatement § 442(1)(c) (setting forth factors listed in *Aérospatiale* as considerations that courts should take into account).

11

In analyzing the respective interests of the United States and foreign jurisdictions, it is appropriate for a court to examine not only the specific interests at issue in the particular case, but also the more general foreign-relations interests that are implicated by the determination of the weight to be given to foreign law. See *Aérospatiale,* 482 U.S. at 544 n.29. In particular, a court should consider the United States' "long-term interests * * * in international cooperation in law enforcement and judicial assistance, * * * in giving effect to formal or informal international agreements, and in orderly international relations." Restatement § 442 cmt. c.

The district court also should take comity concerns into account in considering potential remedies for non-production. Although sanctions may be appropriate even when the party's non-production is the result of its compliance with foreign law, the court should recognize that a party's "inability to comply [with a production order] because of foreign law" can be a "weighty excuse for nonproduction." *Societe Internationale pour Participations Industrielles et Commerciales, S.A.* v. *Rogers*, 357 U.S. 197, 211-212 (1958) (emphasis omitted). A party's good faith in attempting to produce the documents consistent with foreign law is also relevant, as is the impact on United States foreign-relations interests that may result from sanctioning a party when foreign law prohibits production of the documents. See Restatement § 442(2) & cmt. h; see also *Aérospatiale*, 482 U.S. at 546; *Rogers*, 357 U.S. at 201-202.

12

### B. The Lower Courts' International Comity Analysis Rested On Several Erroneous Premises

The lower courts' comity analysis was flawed in several respects.

1. The lower courts erred in suggesting that petitioner's reliance on foreign bank secrecy laws in this private action did not reflect good faith simply because petitioner previously produced some of the documents to the Departments of the Treasury and Justice. Pet. App. 40a-42a, 72a, 77a, 78a. That reasoning fails to account for the distinct United States and foreign interests implicated when the government, as opposed to a private party, seeks disclosure. It also threatens to undermine important United States law-enforcement and national-security interests by deterring private entities and foreign jurisdictions from cooperating with government requests.

The United States has a compelling sovereign interest in obtaining documents located abroad for use in criminal prosecutions, civil enforcement actions, and other proceedings through which the government investigates and addresses violations of United States law and protects the Nation. See, *e.g.*, *United States* v. *Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985); *SEC* v. *Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117-118 (S.D.N.Y. 1981). When it decides whether to seek documents assertedly covered by foreign bank secrecy laws, the government balances the need for the information sought and the public interest in the investigation against the interests of the foreign jurisdictions where the information is located and any potential consequences for our foreign relations. See *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413-415 (2003). A government request for production therefore re-

13

flects the Executive Branch's conclusion, in the exercise of its responsibility for both foreign affairs and the enforcement of laws requiring production, that disclosure would be consistent with both the domestic public interest and international comity concerns.

Although the United States government may seek to compel disclosure of foreign bank records in court when necessary, the United States also relies heavily on cooperative methods for obtaining documents. Government agencies often negotiate voluntary disclosures or agreements that allow examination of documents consistent with both United States and foreign law. The United States may also make state-to-state requests for information pursuant to mutual legal assistance treaties (which apply in criminal matters) and other bilateral and multilateral agreements that govern official requests for information. See, *e.g.*, United Nations International Convention for the Suppression of the Financing of Terrorism, art. 12, Dec. 9, 1999, 2178 U.N.T.S. 235 (providing for mutual legal assistance in connection with criminal investigations, which may not be refused on bank-secrecy grounds); International Organization of Securities Commissions, Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information, paras. 6(b), 7(b), May 2012, http://www.iosco.org/library/pubdocs/pdf/IOSCOPD386.pdf (providing for mutual state-to-state assistance in securities matters notwithstanding domestic secrecy laws). As such treaties and agreements reflect, many sovereigns recognize that government document requests reflect important sovereign interests and should be dealt with cooperatively when possible. That cooperation, by both foreign sovereigns and

14

private entities under their auspices, directly advances the United States government's ability to investigate violations of United States law.

The balance of relevant interests is materially different when a private party seeks documents located in foreign jurisdictions. Private requests may intrude more deeply on foreign sovereign interests because private parties often do not "exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government." *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 171 (2004) (internal quotation marks and citation omitted); see Restatement § 442 rep. note 9. And although private litigants may be asserting a federal statutory claim that embodies important United States interests, their document requests do not reflect a specific determination by the government that the request is sufficiently in the public interest to warrant the adverse consequences that could ensue. In addition, banks may be able to produce documents to government agencies—but not private parties—consistent with foreign bank secrecy laws because of exceptions in the laws, applicable treaty provisions, or approval by governmental authorities. And a foreign state considering whether to permit or facilitate a bank's cooperation with a disclosure request—or whether to prosecute a bank for its disclosures—may view the matter differently based on whether the party requesting the information is a government entity or a private one. See Pet. App. 41a.

The lower courts therefore erred in concluding that petitioner had engaged in "selective compliance" with foreign bank secrecy laws by producing documents to

15

United States agencies but not to respondents. Pet. App. 78a. The district court appears to have relied solely on the fact of petitioner's production to government agencies, rather than on any conclusion that petitioner actually violated applicable foreign laws when it produced documents to the United States. See *id.* at 11a-12a, 40a-42a, 72a, 77a; Resp. C.A. Br. 9-10 (noting that magistrate judge found that petitioner produced documents to the Department of the Treasury "*without obtaining the prior formal consent of the applicable governmental authorities* in Jordan, Lebanon, or the Palestinian Authority," a finding that does not in itself establish that the disclosures violated applicable laws); see also Cert. Reply Br. 1-2 (representing that petitioner furnished information to United States government with consent of petitioner's regulators, and that respondents are aware of that fact). The courts below also erred in assuming that petitioner would not be subjected to penalties for producing documents in this private action solely because it apparently was not prosecuted for providing documents to the United States. Pet. App. 41a, 77a; see *id.* at 243a-245a; Hashemite Kingdom of Jordan Amicus Br. 10-11 (Jordan Amicus Br.).

By equating the status of government and private-party document requests, the lower courts' reasoning may undermine the United States' ability to obtain documents located in foreign jurisdictions through cooperation by the entity in question or the foreign jurisdiction. If a foreign financial institution's previous cooperation with governmental authorities may be used against it when it resists production in private litigation, those institutions may restrict their cooperation with governmental authorities in the first place.

16

And the United States' foreign-government partners may similarly be deterred from facilitating cooperation with government requests if their financial institutions may later have that cooperation weighed against them in private litigation.

2. The district court also gave insufficient weight to the interests of foreign governments in enforcing their own laws within their own territories. Although it is "well settled" that foreign laws "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate" those laws, *Aérospatiale*, 482 U.S. at 544 n.29, the extent to which "compliance with the request would undermine important interests of the state where the information is located" is an important component of the comity analysis.[3] Restatement § 442(1)(c).

Here, criminal statutes governing bank secrecy in a number of foreign jurisdictions prohibit disclosing the records sought by respondents. Pet. App. 111a-112a; Br. in Opp. App. 16a-17a & n.3. The lower courts identified no reason to conclude that those statutes were enacted to shield wrongdoers from foreign legal process, like the blocking statute at issue in *Aérospatiale*, or that they are anything other than laws of general applicability that reflect legitimate sovereign interests in protecting foreign citizens' privacy and confidence in the nations' financial institutions.[4] See,

---

[3] As discussed above, less deference to foreign law would be appropriate when the government has determined that it has a need for the information notwithstanding the foreign-relations concerns at issue. But that situation is not present here.

[4] United States law does not impose any comparably broad prohibition on disclosure of banking records that would necessarily

17

*e.g.*, C.A. App. A1075-A1079; cf. *Aérospatiale*, 482 U.S. at 545 n.29 (blocking statutes "need not be given the same deference by courts of the United States as substantive rules of law").

Although the district court acknowledged that "maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides," Br. in Opp. App. 21a-22a, the court gave that interest scant weight because it believed that "[b]oth Jordan and Lebanon[] have recognized the supremacy of [the] interest[]" in combating terrorism "over bank secrecy," *id.* at 22a.  In so concluding, the court relied on those governments' adoption of a memorandum of understanding in which the signatory governments pledged not to rely on bank secrecy "as a basis for refusing requests for mutual legal assistance" in terrorist financing investigations. *Id.* at 22a n.5; Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, Nov. 30, 2004, http://www.sic.gov.lb/

---

preclude disclosure of such records to private parties involved in litigation. See, *e.g.*, 15 U.S.C. 6802(a) and (e)(8) (prohibiting disclosure of nonpublic account information except on notice to the customer, but exempting disclosures made in response to subpoenas or other judicial processes); 31 U.S.C. 5313, 5318(g)(2), 5326 (requiring banks to report and record certain transactions, and mandating confidentiality only for suspicious activity reports and geographic targeting orders); 12 U.S.C. 3402-3408 (prohibiting disclosure of banking records to governmental entities, except pursuant to consumer consent, administrative and judicial subpoenas, or certain formal requests).  That does not demonstrate, however, that foreign bank secrecy laws do not reflect legitimate sovereign interests.

18

downloads/MENAFATF_MOU_EN.pdf. But that memorandum of understanding pertains only to official state-to-state requests for mutual legal assistance.[5] It does not suggest that member states have agreed to subordinate their interest in protecting certain banking information from public disclosure when private litigants seek documents.[6] See Pet. App. 238a, 245a, 251a-252a; C.A. App. A1064.

3. Finally, in considering whether the United States' interests would be furthered by sanctioning petitioner for non-production, the lower courts did not consider the broad range of interests implicated by this case, including those that could favor a lesser sanction.[7] See *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 763 (2014). The lower courts viewed the government's interest in combatting terrorism by means of the ATA's private right of action as the sole United States interest at stake. Pet. App. 37a, 97a. While private actions under the ATA can be one important means of disrupting terrorism financing and compensating victims of terrorism, *id.* at 37a-38a, Br. in Opp. App. 29a-30a, other important interests are at stake as well.

---

[5] The court also disregarded statements by the Palestine Monetary Authority that it views both bank secrecy laws and anti-terrorism banking regulations in the West Bank and Gaza as serving important interests. See C.A. App. A1060-A1061; Pet. App. 246a-248a; cf. *id.* at 98a.

[6] The lower courts also failed to separately analyze the interests of several jurisdictions whose bank secrecy laws were implicated, including Great Britain and France. See Pet. App. 36a-37a; Br. in Opp. App. 16a n.2.

[7] Although the United States was aware of this litigation (see Pet. App. 250a-252a), it did not participate before the district court or the court of appeals, and those courts did not invite its views.

19

a. The sanctions order could undermine the United States' vital interest in maintaining close cooperative relationships with Jordan and other key regional partners in the fight against terrorism. A primary means by which the United States government protects American citizens from international terrorism is by ensuring that foreign governments and entities continue to cooperate in United States-led counterterrorism efforts. See, *e.g.*, U.S. Dep't of State, *Bureau of Counterterrorism*, http://www.state.gov/j/ct/index.htm (last visited May 15, 2014). Jordan in particular is an invaluable partner in the region. The United States relies on Jordan in accomplishing a host of critical security and foreign-policy interests, including combatting terrorism. See White House Office of the Press Secretary, *Remarks by President Obama and His Majesty King Abdullah II of Jordan in a Joint Press Conference* (Mar. 22, 2013).

The sanctions order may have an impact on these important counterterrorism relationships. Jordan views the sanctions order as a "direct affront" to its sovereignty. Jordan Amicus Br. 14. The State Department has informed this Office that the governments of Saudi Arabia and the Palestinian Authority have also expressed significant concerns about the order and its effect on their relationships with the United States.

The sanctions order's potential to harm counterterrorism efforts is exacerbated by the lower courts' reasoning. See pp. 12-16, *supra*. As discussed above, the possibility that foreign financial entities could be penalized based on their cooperation with United States government agencies may deter foreign private

20

entities and governments from assisting in United States investigations or enforcement actions.

b. The United States has a significant interest in the stability of Jordan's financial and political system. Petitioner is the single largest financial entity in Jordan. Pet. App. 232a-233a. This Office is informed by the Departments of State and the Treasury that petitioner is responsible for processing financial assistance to Jordan through various United States foreign aid programs. Those Departments also report that petitioner is a constructive partner with the United States in working to prevent terrorist financing, including by reporting suspicious financial activities to the government of Jordan, which in turn exchanges information with the United States through international sharing arrangements. For example, petitioner is a leading participant in a number of regional forums on anti-money laundering and combatting the financing of terrorism.

Petitioner is also by market share the largest bank in the West Bank and Gaza, and it plays an important role in financing public debt there. See U.S. & Foreign Commercial Serv. & U.S. Dep't of State, *Doing Business in the West Bank & Gaza* 54-55 (updated June 12, 2013), http://export.gov/westbank/build/groups/public/@eg_we/documents/webcontent/eg_we_064047.pdf. In addition, petitioner processes the customs clearance revenues from Israel that represent the overwhelming majority of Palestinian Authority revenue. See U.N. Conference on Trade & Dev., *Report on UNCTAD assistance to the Palestinian people: developments in the economy of the Occupied Palestinian Territory* 8 (2013), http://unctad.org/meetings/en/SessionalDocuments/tdb60d3_en.pdf.

21

The district court's sanctions order, by (among other things) permitting the jury to draw an adverse inference with respect to petitioner's mental state, increases the likelihood that petitioner will be found liable at trial. See Pet. App. 240a-241a; Jordan Amicus Br. 17-19. Beyond the obvious financial stakes for petitioner's shareholders, petitioner asserts (Pet. 31-32) that correspondent banks and other counterparties could cease doing business with petitioner, and depositors might withdraw their accounts out of concern for petitioner's solvency. See Jordan Amicus Br. 18.

To be sure, petitioner would face the risk of losing at trial even in the absence of the sanctions imposed by the district court. But the sanctions order makes a finding of liability more likely by permitting the jury to draw inferences adverse to petitioner and by barring petitioner from presenting certain evidence. The possible effect of a judgment of liability on United States foreign-relations interests and the stability of the region was therefore a relevant consideration in determining the appropriate form and severity of the sanctions. See Restatement § 442 cmt. c.

## II. THIS COURT'S REVIEW IS NOT WARRANTED AT THIS TIME

Notwithstanding the errors discussed above, this case's procedural posture renders this Court's review inappropriate at this time. Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney* v. *United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted). In order to demonstrate entitlement to mandamus relief, petitioner must establish that "[its] right to

22

issuance of the writ is clear and indisputable," that it has "no other adequate means to attain the relief [it] desires," and that issuance of the writ is "appropriate under the circumstances." *Id.* at 380-381 (internal quotation marks and citations omitted).

The court of appeals applied that standard, and its ultimate denial of mandamus is not clearly wrong. The district court's erroneous assessment of petitioner's previous production to government agencies, and the United States and foreign interests implicated by the sanctions order, do raise substantial questions and concerns about the analysis underlying the sanctions order.[8] If petitioner is found liable, those issues will warrant close scrutiny on appeal of a final judgment, taking into account any further assessment of the issues addressed by the district court and the manner in which the sanctions are implemented through jury instructions and evidentiary rulings. But it is a different question whether petitioner has demonstrated a "clear and indisputable" right to relief here, by way of mandamus.

---

[8] Nevertheless, the court of appeals' decision upholding the sanctions order does not, as petitioner contends (Pet. 23-24), conflict with the decisions of other courts of appeals. The decisions on which petitioner relies state that courts may in appropriate cases compel production, or impose sanctions for non-production, even when the documents in question are protected from disclosure by foreign law. See *Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224, 1226-1228 (Fed. Cir. 1996); *United States* v. *First Nat'l Bank*, 699 F.2d 341, 345-346 (7th Cir. 1983); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 997 (10th Cir. 1977). In each case, the court conducted a comity analysis and concluded that sanctions or compelled production were not appropriate in the specific circumstances presented.

23

Moreover, the ordinary way to challenge a sanctions order like that at issue here is by appealing from a final judgment. Petitioner's primary contention with respect to the adequacy of relief on appeal is that the sanctions order makes an adverse judgment virtually inevitable, and in the event of a liability finding, petitioner "might not survive long enough to take an appeal." Pet. C.A. Br. 19; see Pet. 31-32. The court of appeals concluded that petitioner's forecast was "speculation," Pet. App. 48a, and that an appeal would provide a meaningful opportunity to avoid the harm to petitioner and the region that could result from a finding of liability. Although petitioner's concerns found some support in an amicus brief filed in the Second Circuit by Jordan, see *id.* at 240a-241a, there necessarily is a considerable degree of speculation in such a forecast. That is especially so given that the period covered by the suit ended a decade ago and a finding of liability would not address petitioner's current practices. In these circumstances, the court of appeals permissibly concluded that the increased possibility of an adverse judgment did not warrant a departure from the ordinary processes of appellate review. *Id.* at 49a.

With respect to the appropriateness of mandamus, the court of appeals correctly observed that the dispute involves "a fact-intensive inquiry in the midst of ongoing, lengthy litigation." Pet. App. 53a-54a. The court was within its discretion to decline to grant the extraordinary remedy of mandamus in the circumstances of this case.

The interlocutory posture of the case also renders the effect of the sanctions difficult to assess. Until the sanctions are implemented at trial, they remain sub-

24

ject to reconsideration or modification by the district court. See Pet. App. 23a. Although the sanctions appear broad on their face, because they take the form of permissive jury inferences and preclusion of evidence, their precise scope will be determined by their implementation in jury instructions that have not yet been drafted, as well as evidentiary rulings made prior to and during the trial. See Br. in Opp. 37. Indeed, petitioner contends that subsequent district court rulings, including a July 2013 order that precludes petitioner from presenting evidence of foreign bank secrecy laws to the jury, have exacerbated the sanctions' effect. Pet. Supp. Br. 1-2. Without knowing what evidence petitioner will present and the precise content of the jury instructions, however, it is difficult to evaluate whether petitioner is likely to prevail at trial despite the sanctions, a result that would obviate the need for further review of the sanctions order. If a final judgment is entered against petitioner, the cumulative effect of the district court's orders implementing the sanctions can be evaluated on appeal, on the basis of the record as a whole.

25

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

> DONALD B. VERRILLI, JR.
>   *Solicitor General*
> STUART F. DELERY
>   *Assistant Attorney General*
> EDWIN S. KNEEDLER
>   *Deputy Solicitor General*
> GINGER D. ANDERS
>   *Assistant to the Solicitor*
>   *General*
> DOUGLAS N. LETTER
> SHARON SWINGLE
> KEITH I. MCMANUS
>   *Attorneys*

MAY 2014