# Exhibit 24

**No. 16-499**

IN THE

# Supreme Court of the United States

————

JOSEPH JESNER, ET AL.,

*Petitioners*,

v.

ARAB BANK, PLC,

*Respondent.*

————

On Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit

————

**BRIEF FOR THE
HASHEMITE KINGDOM OF JORDAN
AS *AMICUS CURIAE* SUPPORTING
RESPONDENT**

————

NEAL KUMAR KATYAL
 *Counsel of Record*
JESSICA L. ELLSWORTH
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.........................................ii

STATEMENT OF INTEREST ...................................1

SUMMARY OF ARGUMENT....................................4

ARGUMENT..................................................................6

I. JORDAN STRENUOUSLY OPPOSES THE UNJUSTIFIED ASSERTION OF EXTRATERRITORIAL JURISDICTION OVER ITS LEADING FINANCIAL INSTITUTION ....................................................6

   A. Petitioners' Suit Offends Jordan's Sovereignty And Threatens Its Economic Stability...................................6

   B. Petitioners' Suit Undermines Jordanian-American Cooperation ................9

II. THIS COURT CAN AFFIRM THE JUDGMENT BELOW ON MULTIPLE GROUNDS..........................................................12

   A. The ATS Does Not Contemplate Corporate Liability .....................................13

   B. Historical And Prudential Limits On Federal-Court Relief Independently Require Dismissal.......................................16

   C. In Any Event, Petitioners' Allegations Cannot Displace The Presumption Against Extraterritorial Application ..........21

CONCLUSION .......................................................24

(i)

ii

# TABLE OF AUTHORITIES

Page

**CASES:**

*Abelesz* v. *Magyar Nemzeti Bank*,
  692 F.3d 661 (7th Cir. 2012) .......................18, 19

*Arab Bank, PLC* v. *Linde*,
  No. 12-1485 (U.S. 2014) ......................................3

*EEOC* v. *Arabian American Oil Co.*,
  499 U.S. 244 (1991) ..........................................22

*F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*,
  542 U.S. 155 (2004) ....................................4, 6, 7

*Fischer* v. *Magyar Államvasutak Zrt.*,
  777 F.3d 847 (7th Cir. 2015) ......................19, 20

*Interhandel (Switz.* v. *U.S.)*,
  1959 I.C.J. 6 (Mar. 21) ................................17, 18

*Kiobel* v. *Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013) ..............................*passim*

*Linde* v. *Arab Bank, PLC*,
  269 F.R.D. 186 (E.D.N.Y. 2010).....................8, 9

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)..........................5, 22, 23, 24

*RJR Nabisco, Inc.* v. *European Cmty.*,
  136 S. Ct. 2090 (2016) ......................................22

*Sarei* v. *Rio Tinto, PLC*,
  550 F.3d 822 (9th Cir. 2008) ......................18, 19

*Sosa* v. *Alvarez-Machain*,
  542 U.S. 692 (2004) ...................................*passim*

iii

## TABLE OF AUTHORITIES—Continued

Page

**STATUTES:**

Alien Tort Statute,
28 U.S.C. § 1350 ......................................*passim*

Anti-Terrorism Act,
18 U.S.C. § 2331 *et seq*. ......................................7

18 U.S.C. § 2333(a) ......................................7, 20

Securities Exchange Act of 1934
15 U.S.C. § 78j(b) ..............................................22

Foreign Sovereign Immunities Act
28 U.S.C. § 1602 *et seq*. ....................................19

**REGULATION:**

22 C.F.R. § 120.32 ................................................10

**OTHER AUTHORITIES:**

Anti-Money Laundering Law No. 46 of
2007 (Jordan)......................................................11

Anti-Terrorism Law No. 55 of 2006
(Jordan)...........................................................7, 11

Central Bank of Jordan, Regulations of
Anti-Money Laundering and Terrorism
Financing, Circular No. 29/2006 (2006) ...........11

Convention for the Protection of Human
Rights and Fundamental Freedoms,
Nov. 4, 1950, 213 U.N.T.S. 222.........................18

International Convention for the
Suppression of the Financing of
Terrorism, Dec. 9, 1999,
2178 U.N.T.S. 229 ......................................11, 15

Law No. 83 of 2003 (Jordan) ..................................11

iv

## TABLE OF AUTHORITIES—Continued

Page

Letter from the Permanent Representa-
     tive of Jordan to the Chairman of the
     United Nations Counter-Terrorism
     Committee, Mar. 24, 2006 ...............................11

Penal Code No. 16 of 1960, as amended by
     Provisional Law No. 54 of 2001
     (Jordan)...........................................................7, 11

Restatement (Third) of Foreign Relations
     Law § 703 (1987)................................................18

Restatement (Third) of Foreign Relations
     Law § 713 (1987)................................................17

The American Convention on Human
     Rights: "Pact of San José, Costa Rica,"
     Nov. 22, 1969, 1144 U.N.T.S. 144....................18

U.S. Dep't of State, Remarks by Secretary
     Condoleezza Rice on the Terrorist
     Bombings in Jordan (Nov. 9, 2005) .................10

White House Office of the Press Secretary,
     Remarks by President Obama and His
     Majesty King Abdullah II of the
     Hashemite Kingdom of Jordan (Feb. 14,
     2014) ..................................................................10

White House Office of the Press Secretary,
     Remarks by President Trump and His
     Majesty King Abdullah II of Jordan in
     Joint Press Conference (Apr. 5, 2017)..............10

IN THE

# Supreme Court of the United States

————

No. 16-499

————

JOSEPH JESNER, ET AL.,

*Petitioners*,

v.

ARAB BANK, PLC,

*Respondent*.

————

On Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit

————

**BRIEF FOR THE
HASHEMITE KINGDOM OF JORDAN
AS *AMICUS CURIAE* SUPPORTING
RESPONDENT**

————

**STATEMENT OF INTEREST[1]**

The Hashemite Kingdom of Jordan has long been one of the United States' closest allies in the Middle East. Petitioners ask this Court to endorse a grasping theory of jurisdiction that would undermine that vital relationship, threaten Jordan's economy, and

———————

[1] No party or counsel for a party authored this brief in whole or in part. No party, counsel for a party, or person other than the *amicus curiae* or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. The parties have filed blanket consents to the filing of amicus curiae briefs in this case.

2

offend its sovereignty. This Court should reject petitioners' arguments and affirm.

Petitioners are approximately 6,000 non-U.S. citizens who allege that they, or their family members, were victims of terrorist attacks perpetrated in Israel over a ten-year period. They seek hundreds of millions of dollars in damages from Arab Bank, based on routine banking services that the Bank provided in conjunction with its correspondent banks in the Middle East. But instead of filing suit in Jordan, where Arab Bank is based, or in Israel, where the attacks occurred, petitioners brought suit halfway around the world in the Eastern District of New York.

Petitioners did not come to the United States because they lacked a forum elsewhere or because anything—apart from incidental, automated clearing transactions—happened here. Rather, they filed suit in the United States in what appears to be the hope of reaping the largest possible amount in punitive damages. When the Bank would not risk the serious consequences of violating Jordan's banking privacy laws, the District Court took the view that it could sanction the Bank on the theory that U.S. civil discovery obligations trump Jordan's law. And the sanction the District Court imposed all but guarantees that petitioners' claims will have "an overwhelming impact on [the Bank's] financial condition." U.S. Amicus Br. 32.

Jordan's economic stability is linked to Arab Bank's financial health. The Bank's market capitalization accounts for between one-fifth and one-third of the total market capitalization of the Amman Stock Exchange. And Jordan's primary pension fund holds

3

a sizeable stake in the Bank. The Bank also plays a key role in Jordanian-U.S. cooperation. The Bank processes U.S. foreign aid to Jordan. And as the United States has told this Court, the Bank serves as "a constructive partner with the United States in working to prevent terrorist financing," and is "a leading participant in a number of regional forums on anti-money laundering and combatting the financing of terrorism." Brief for the United States as Amicus Curiae 20, *Arab Bank, PLC* v. *Linde*, No. 12-1485 (U.S. 2014) (U.S. *Linde* Br.). By exposing Arab Bank to massive liability, this suit thus threatens to destabilize Jordan's economy and undermine its cooperation with the United States.

This case has been a recurring source of concern in the U.S.-Jordan relationship for more than a decade. Jordan has consistently voiced its view that subjecting a Jordanian corporation to U.S. jurisdiction on the basis of claims by foreign citizens for injuries sustained abroad is a grave affront to Jordan's sovereignty. Jordan is a beacon of political stability in the Middle East. Its laws comprehensively regulate its financial sector and its courts administer those laws fairly. Petitioners' effort to hale Arab Bank into a U.S. court denigrates Jordan's institutions and offends its sovereign dignity.

The Court should put an end to this litigation, once and for all. For years, petitioners' baseless invocation of the Alien Tort Statute ("ATS") has cast an unwarranted cloud over Jordan's key financial institution—and thus on Jordan, its economy, and the Jordanian people. The Bank is entitled to prevail for multiple reasons, and it should do so now.

4

## SUMMARY OF ARGUMENT

It would be a direct affront to Jordan's sovereignty for a U.S. court to subject a Jordanian national to suit based on alleged conduct halfway around the world that caused wholly foreign injuries. Jordan, no less than the United States, has the sovereign authority to regulate the conduct of its nationals. This suit would interfere unjustifiably with that right. *See F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 165 (2004). This suit also risks destabilizing Jordan's economy and undercutting one of the most stable and productive alliances the United States has in the Middle East. Jordan and the United States work closely together on the most pressing foreign policy challenges in the region—from the fight against ISIS, to the Israeli-Palestinian peace process, to the humanitarian crisis in Syria.

Petitioners' claims are not just offensive to Jordan and harmful to U.S. interests, they also suffer from multiple independent legal flaws, any one of which justifies affirmance. Petitioners identify no international-law norm of holding corporations liable for the type of conduct alleged in this case—let alone for violations of the law of nations generally—and there is none. That alone disposes of their claims because customary international law controls the scope of any new ATS "cause of action," including the set of defendants against whom those claims may be brought. *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 725 (2004); *see id.* at 732 n.20.

Each of the two examples of case-specific constraints on ATS jurisdiction this Court identified in *Sosa* also justifies affirmance. *See id.* at 733 n.21. First, ATS plaintiffs like petitioners should be re-

5

quired to prove they have exhausted domestic reme-
dies before filing suit in the United States. Because
petitioners chose not to present their claims in
available domestic forums first, respect for comity
militates against permitting their suit to go forward.
*See id.* at 761 (Breyer, J., concurring); *Kiobel* v. *Royal
Dutch Petroleum Co.*, 133 S. Ct. 1659, 1674 (2013)
(Breyer, J., concurring) (noting that requiring ex-
haustion can "help to minimize international fric-
tion"). Second, separation-of-powers concerns inde-
pendently support denying federal-court relief where,
as here, the Executive Branch determines that
permitting a suit to go forward would be detrimental
to the interests of the United States. *See Sosa*, 542
U.S. at 733 n.21; *id.* at 760-761 (Breyer, J., concur-
ring).

Finally, petitioners' claims fail because their alle-
gations cannot displace the presumption against
extraterritorial application of the ATS. This case
does not involve any U.S. conduct that falls within
the "focus of congressional concern" under the ATS.
*Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266
(2010) (internal quotation marks omitted). If neces-
sary, the Court should address these alternative
grounds for affirmance and bring this litigation to its
long overdue end.

This Court should affirm.

6

## ARGUMENT

### I. JORDAN STRENUOUSLY OPPOSES THE UNJUSTIFIED ASSERTION OF EXTRATERRITORIAL JURISDICTION OVER ITS LEADING FINANCIAL INSTITUTION

Three successive U.S. administrations have recognized Jordan as a valued partner and a source of stability in the Middle East. Permitting this suit to go forward undermines our nations' important and mutually-beneficial relationship.

### A. Petitioners' Suit Offends Jordan's Sovereignty And Threatens Its Economic Stability

1. This Court has recognized that the application of U.S. law to foreign conduct carries a "serious risk of interference with a foreign nation's ability independently to regulate its own * * * affairs." *Empagran S.A.*, 542 U.S. at 165. Jordanian nationals—whether natural or legal persons—are answerable for their conduct on Jordanian soil under Jordanian law in Jordanian courts. And Jordan comprehensively regulates financial institutions such as the Bank through a modern regulatory framework. Affording petitioners federal-court relief in this case demeans Jordan by usurping its sovereign authority to regulate the conduct of its own nationals on its own soil.

To be sure, this Court has recognized that the United States has an interest in righting wrongs that impact the United States directly. *See id.* And Congress has expressly authorized suits against foreign nationals for terrorism-related conduct abroad that injures "[a]ny national of the United

7

States" under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq*. *Id.* § 2333(a).

But unlike the ATA, the ATS is not limited on its face to claims involving some direct domestic impact. ATS claims thus present a heightened risk that U.S. courts will trench on foreign sovereign prerogatives. This suit is the case in point. Petitioners identify *no* U.S. interests that could ground U.S.-court jurisdiction over a foreign defendant. Far from it: petitioners are foreign nationals and both the injury alleged and the conduct at issue occurred abroad. Where foreign conduct is alleged to have "cause[d] independent foreign harm and that foreign harm alone g[ave] rise to the plaintiff's claim," the risk of interference with the rights of foreign sovereigns cannot be justified. *Empagran S.A.*, 542 U.S. at 166 (emphasis omitted).

It is no answer to contend that U.S. courts may hear this case because terrorists are "common enemies of all mankind." Pet. Br. 52 (internal quotation marks omitted). Jordan is committed to eradicating terrorism in all its forms. It has suffered terrorist attacks on its own territory, directed against its citizens. And it has enshrined the struggle against terrorism in its laws. *See, e.g.*, Penal Code No. 16 of 1960, as amended by Provisional Law No. 54 of 2001, arts. 147-149; Anti-Terrorism Law No. 55 of 2006. The suggestion that a federal-court forum in the United States is somehow necessary to address petitioners' claims is both flatly untrue and offensive to the sacrifices made by the Jordanian people.

2. Permitting this suit to be adjudicated in the United States also undermines Jordan's economy. The degree to which the Kingdom's economic stabil-

8

ity and well-being is tied to the Bank cannot be overstated: In recent years, the Bank's market capitalization has represented 20% to 33% of the total market capitalization of the Amman Stock Exchange. The pension fund that provides for most of Jordan's labor force has an ownership stake of approximately 15% in the Bank. And the Bank processes the financial assistance that Jordan receives from various U.S. foreign-aid programs.

Earlier in these proceedings, the District Court entered a deeply flawed order sanctioning Arab Bank for adhering to foreign privacy laws and government directives and resisting production of certain bank documents. The court's rationale was that the Bank had previously produced such documents to the United States Department of the Treasury and Department of Justice. In other words, the order penalized the Bank for cooperating with U.S. government investigations while respecting Jordan's laws. The sanction permits jurors to infer that Arab Bank provided financial services to terrorist organizations "knowingly and purposefully." *Linde* v. *Arab Bank, PLC*, 269 F.R.D. 186, 205 (E.D.N.Y. 2010). That sanction eviscerates the Bank's core merits defense. And it underscores the need for this Court to bring this case to an immediate end without further proceedings.

The United States has told this Court that the District Court's sanctions order is wrong, offensive to Jordan's sovereignty, and detrimental to "the United States' vital interest in maintaining close cooperative relationships with Jordan and other key regional partners in the fight against terrorism." U.S. *Linde*

9

Br. 12, 19; *see* U.S. Amicus Br. 7, 30-32.  It could also sound the Bank's death knell.[2]

The "combined damages claims" of some 6,000 foreign petitioners "threaten to have an overwhelming impact on [Arab Bank's] financial condition."  U.S. Amicus Br. 32.  With so much of Jordan's economy bound up in the Bank's financial health, the collateral effects could be profoundly destabilizing.  That fact alone counsels in favor of resolving this matter now, on any of the numerous grounds available to the Court.

### B. Petitioners' Suit Undermines Jordanian-American Cooperation

Destabilizing Jordan's economy by allowing this litigation to continue would also undermine one of the most stable and productive alliances in the Middle East.

The United States relies on its longstanding partnership with Jordan to address some of the most pressing security and diplomatic challenges in the region.  Jordan's intelligence and law enforcement agencies and their U.S. counterparts cooperate in combating the threat of global terror, including ISIS; Jordan was the second Arab state to conclude a peace treaty with Israel and has been a key proponent of negotiated peace in the Middle East; Jordan has provided crucial humanitarian support to its neighbors by opening its borders to millions of Syrian

---

[2]  The sanctions order applies both to this case and to *Linde* v. *Arab Bank*, the ATA suit brought by a class of 500 U.S. plaintiffs that was consolidated with it for purposes of pre-trial discovery.  *See Linde*, 269 F.R.D. at 186 n.1.  Petitioners' claims were dismissed after the sanctions order was entered.

10

and Palestinian refugees; and Jordanian banks and businesses contribute to regional stability. *See, e.g.*, U.S. Amicus Br. 31-32; U.S. *Linde* Br. 19.

Small wonder that the United States has designated Jordan a major non-NATO ally, 22 C.F.R. § 120.32, and that successive U.S. administrations have lauded Jordan as "an important partner in advancing a range of broad U.S. interests in the region." U.S. Amicus Br. 31; *see, e.g.*, White House Office of the Press Secretary, Remarks by President Trump and His Majesty King Abdullah II of Jordan in Joint Press Conference (Apr. 5, 2017) (stating that the United States remains "deeply committed to preserving [its] strong relationship" with Jordan);[3] White House Office of the Press Secretary, Remarks by President Obama and His Majesty King Abdullah II of the Hashemite Kingdom of Jordan (Feb. 14, 2014) (stating that the United States has "very few friends, partners and allies around the world that have been as steadfast and reliable as" Jordan);[4] U.S. Dep't of State, Remarks by Secretary Condoleezza Rice on the Terrorist Bombings in Jordan (Nov. 9, 2005) (stating that the United States "has had no closer ally than Jordan in the war on terror").[5]

One of its shared priorities with the United States is Jordan's deep commitment to the fight against the

---

[3] *Available at* https://www.whitehouse.gov/the-press-office/2017/04/05/remarks-president-trump-and-his-majesty-king-abdullah-ii-jordan-joint.

[4] *Available at* https://obamawhitehouse.archives.gov/the-press-office/2014/02/14/remarks-president-obama-and-his-majesty-king-abdullah-ii-hashemite-kingd.

[5] *Available at* http://2001-2009.state.gov/secretary/rm/2005/56729.htm.

11

financing of international terrorism. Jordan has enacted legislation that comprehensively regulates the Kingdom's financial institutions and prohibits money laundering and other forms of assistance to would-be terrorists. *See, e.g.*, Penal Code No. 16 of 1960, as amended by Provisional Law No. 54 of 2001, arts. 147-149; Anti-Terrorism Law No. 55 of 2006; Anti-Money Laundering Law No. 46 of 2007, art. 24; *see also* Central Bank of Jordan, Regulations of Anti-Money Laundering and Terrorism Financing, Circular No. 29/2006 (2006); Letter from the Permanent Representative of Jordan to the Chairman of the United Nations Counter-Terrorism Committee, Mar. 24, 2006.[6]

Jordan is also a party to the International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229, and has incorporated the Convention's provisions into its laws. *See* Law No. 83 of 2003. As part of its treaty commitment to afford co-signatories "the greatest measure of assistance in connection with criminal investigations or criminal or extradition proceedings," 2178 U.N.T.S. at 235, Jordan has repeatedly complied with U.S. government requests to share information with investigators in this country. *See* U.S. *Linde* Br. 12-13.

With Jordan's support and encouragement, Arab Bank is likewise "a constructive partner with the United States in working to prevent terrorist financing," and "is a leading participant in a number of regional forums on anti-money laundering and

---

[6] *Available at* http://dag.un.org/bitstream/handle/11176/18609/S_2006_212-EN.pdf?sequence=3&isAllowed=y.

12

combatting the financing of terrorism." *Id*. at 20; *see* U.S. Amicus Br. 32.

This lawsuit undermines that vitally important cooperation with the United States. A destabilizing shock to Jordan's economy could diminish U.S. influence in one of the world's most volatile regions. Jordan has consistently voiced its objection to this suit in its diplomatic communications to the United States, and it regards this litigation as a direct affront to its sovereignty. The United States agrees. It has told this Court that one of the "primary means" of "protect[ing] American citizens from international terrorism is by ensuring that foreign governments * * * cooperate in United States-led counterterrorism efforts." U.S. *Linde* Br. 19. And it has warned that the "unwarranted continuation of this case" would undermine such efforts by "harm[ing] the United States' relationships with Jordan and other important allies in the fight against terrorism." U.S. Amicus Br. 7. Indeed, it has expressed concern that the "uncertainty and attendant diplomatic tensions" of prolonging this litigation could "produce significant and undesirable consequences" even if the suit is ultimately dismissed. *Id*. at 32. The stakes—and the need for resolution at this juncture—could not be higher.

## II. THIS COURT CAN AFFIRM THE JUDGMENT BELOW ON MULTIPLE GROUNDS

Jordan agrees with Arab Bank and its other *amici* that claims against corporate defendants are not cognizable under the ATS. But this Court can affirm the judgment below without resolving any dispute over Founding-era notions of the common law or

13

contemporary international norms. Because of the negative effect this litigation has on U.S.-Jordanian cooperation and the Jordanian economy and people, the Court should reach these alternative grounds if necessary to affirm the judgment below. This Court has previously considered two case-specific constraints on ATS jurisdiction—an exhaustion requirement and deference to the Executive branch—each of which would require dismissal here. *See Sosa*, 542 U.S. at 733 n.21. And even if these limits did not bar this litigation, petitioners' fundamentally foreign claims are plainly insufficient to displace the presumption against extraterritoriality. *See Kiobel*, 133 S. Ct. at 1669.

## A. The ATS Does Not Contemplate Corporate Liability

This Court made clear in *Sosa* that federal courts "considering a new cause of action" under the ATS "should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the [statute's] 18th-century paradigms." 542 U.S. at 725; *see id.* at 732.

Petitioners do not seriously dispute there is no universally recognized international-law norm of corporate liability. Instead, petitioners, joined in this argument by the United States, contend that the ATS directly authorizes actions against corporations by incorporating common-law terms of art—either "tort" (according to petitioners) or "cause of action" (according to the United States). *See* Pet. Br. 18-20; U.S. Amicus Br. 9 (internal quotation marks omitted). And they argue that *Sosa*'s requirement of a

14

clear definition refers only to the *conduct* alleged to violate the law of nations, and not to who may be held liable. *See* Pet. Br. 28-32; U.S. Amicus Br. 18-21. Those contentions are misguided.

Under *Sosa*, customary international law controls the scope of the "cause of action." 542 U.S. at 725. And, as the United States points out, "[t]he task of 'defining a cause of action' includes, *inter alia*, 'specifying who may be liable'—*i.e.*, the set of permissible defendants." U.S. Amicus Br. 9 (quoting *Kiobel*, 133 S. Ct. at 1665) (citation omitted). International law thus defines both the *claims* a court can hear and the set of *defendants* against whom those claims may be brought. *See Sosa*, 542 U.S. at 732 n.20 (court must determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued"); *id.* at 760 (Breyer, J., concurring) ("The norm [of international law] must extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue.").

As a result, whether the first federal courts—authorized by the same statute as the ATS—would have thought themselves generally competent to adjudicate "causes of action" or "tort" claims brought against corporations is irrelevant. The ATS "was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims *derived from the law of nations.*" *Sosa*, 542 U.S. at 731 n.19 (emphasis added). And this Court has directed today's courts to consider "whether *international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued." *Id.* at 732 n.20 (emphasis added).

15

Eliding the Court's references to "causes of action," petitioners focus on *Sosa*'s footnote 20. They urge that the footnote refers to nothing more than an international-law state-action doctrine. *See* Pet. Br. 30; U.S. Amicus Br. 19-20. But that argument, even if it is a fair reading of the substantive issue addressed in *Sosa*'s footnote 20, proves too much. The point is that *Sosa* requires courts to ensure that "the perpetrator being sued" is a *proper party* under international law. And that flatly contradicts petitioners' contention that the clear-definition requirement applies only to the conduct at issue.

Petitioners get no further with their arguments about international law itself. They note that "most norms specify only the conduct prohibited, not the identity of the perpetrator," and that corporations can engage in such conduct "just as natural persons can." Pet. Br. 30-31. But *Sosa*'s cautious approach to new causes of action asks whether a claim is supported by "sufficiently definite" norms—not merely whether it avoids collision with international law. 542 U.S. at 732.

Petitioners have not attempted to identify a universal norm of holding corporations liable for the type of conduct alleged in this case—let alone for violations of the law of nations generally.[7] Their claims thus fall beyond the ATS's scope.

---

[7] Petitioners' lone authority is the reference to entity liability in the International Convention for the Suppression of the Financing of Terrorism. Pet. Br. 33 (citing art. 5 of the Convention). But the Convention would presumably not need to specify its application to entities if corporate liability were an accepted norm of customary international law. And, in any

16

## B. Historical And Prudential Limits On Federal-Court Relief Independently Require Dismissal

While *Sosa*'s requirement of a clear international-law norm is sufficient to dispose of this case, it "[wa]s not meant to be the only principle limiting the availability of relief in the federal courts" under the ATS. 542 U.S. at 733 n.21; *see id.* at 760-761 (Breyer, J., concurring). Rather, the same historical and prudential considerations that counsel caution in recognizing new causes of action justify other, equally important constraints on federal-court relief. In particular, the Court stated it would "certainly consider" a requirement that ATS plaintiffs exhaust any available domestic remedies before pursuing claims in federal court. *Id.* at 733 n.21. And it suggested that "a policy of case-specific deference to the political branches" might be appropriate where an ATS claim threatened adverse foreign policy consequences. *Id.* Adopting either one of those requirements would be sufficient to affirm dismissal here.

1. The history of the ATS straightforwardly supports adopting each of the requirements the Court considered in *Sosa*. The driving force behind the ATS was concern over a discrete gap in jurisdiction— at both the federal and state levels—to address a "narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs." *Sosa*, 542 U.S. at 715. In particular, the

---

event, one example does not make a definite and universally accepted norm.

17

United States was worried about "its potential inability to provide judicial relief to foreign officials injured in the United States." *Kiobel*, 133 S. Ct. at 1668. That was no small matter; "[a]n assault against an ambassador, for example, impinged upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war." *Sosa*, 542 U.S. at 715. The passage of the ATS "ensured that the United States could provide a forum for adjudicating such incidents." *Kiobel*, 133 S. Ct. at 1668.

Requiring exhaustion and deferring to the views of the Executive naturally complements the historical concerns that led the First Congress to enact the ATS. There is no gap in jurisdiction, and thus no need for a federal-court forum, to adjudicate claims that can be brought elsewhere. And deferring to the Executive Branch's view of whether a case would threaten U.S. interests ensures that courts apply the ATS in a way that actually "avoid[s] diplomatic strife" instead of "generat[ing] it." *Kiobel*, 133 S. Ct. at 1669.

2. The historical case for exhaustion is reinforced by international-law norms and comity concerns. The requirement that claimants exhaust domestic remedies "is a well-established rule of customary international law." *Interhandel (Switz.* v. *U.S.)*, Judgment, 1959 I.C.J. 6, 27 (Mar. 21); *see* Restatement (Third) of Foreign Relations Law § 713, cmt. f (1987). The rule follows from elementary notions of comity. It is "based on the idea that the state where the alleged violation" of international law "occurred should have an opportunity to redress it by its own means, within the framework of its own legal system." *Abelesz* v. *Magyar Nemzeti Bank*, 692 F.3d

18

661, 680 (7th Cir. 2012) (citing *Interhandel*, 1959 I.C.J. at 26-27).[8]

The comity concerns reflected in the exhaustion rule apply with special force to claims arising from conduct in another sovereign's jurisdiction. *See Sosa*, 542 U.S. at 761 (Breyer, J., concurring) (noting that comity concerns are triggered "when foreign persons injured abroad bring suit in the United States under the ATS"). Requiring plaintiffs to prove that they have exhausted domestic remedies—or that exhaustion would be futile—*before* turning to a U.S. court can "help to minimize international friction" and avoid potentially damaging repercussions. *Kiobel*, 133 S. Ct. at 1674 (Breyer, J., concurring).[9]

That is why the Ninth Circuit has held that "ATS claims are appropriately considered for exhaustion

---

[8] Exhaustion is likewise generally required by "[i]nternational agreements providing remedies to individuals." Restatement (Third) of Foreign Relations Law § 703, cmt. d (1987); *see, e.g.*, The American Convention on Human Rights: "Pact of San José, Costa Rica," Nov. 22, 1969, 1144 U.N.T.S. 144, art. 46(1)(a); Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222, art. 26.

[9] Although exhaustion is typically an affirmative defense, the international comity interests served by requiring exhaustion in cases brought under the ATS counsel placing the burden to demonstrate exhaustion on the plaintiff. *Compare, e.g.*, *Sarei* v. *Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc) (controlling plurality opinion) (placing burden on defendant) *with id.* at 835-836 (Bea, J., concurring) (cautioning that a discretionary rule "would permit a single district court judge to interject the judiciary into ongoing international disputes and crises of foreign affairs"). Neither a foreign sovereign's dignity, nor the foreign relations of the United States can be made to depend on a private defendant's litigation strategy.

19

under both [U.S.] prudential standards and core principles of international law," especially in cases "[w]here the 'nexus' to the United States is weak." *Sarei*, 550 F.3d at 824. And the Seventh Circuit has explained that "the comity at the heart of international law require[s]" plaintiffs to exhaust domestic remedies before seeking federal-court relief for foreign conduct "or to show a powerful reason to excuse the requirement." *Fischer* v. *Magyar Államvasutak Zrt.*, 777 F.3d 847, 858 (7th Cir. 2015) (addressing claims brought under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*); *see id.* at 859.

The same considerations require dismissal of petitioners' lawsuit. Petitioners' claims arise entirely from conduct that took place halfway around the world. The only purported "nexus" to the United States is the incidental, automated clearance of dollar-denominated transactions. The defendant is a Jordanian corporation; and the plaintiffs are alleging that they were injured in Israel. Comity thus demands that petitioners give Jordan, or Israel, "an opportunity to redress" the alleged misconduct "by its own means, within the framework of its own legal system" *first*, before a U.S. court considers whether there is a basis to address any remaining claims. *Abelesz*, 692 F.3d at 680.

Requiring exhaustion is all the more appropriate here because petitioners do not dispute that they could have filed in Jordan or Israel. Jordan has an established and well-functioning judiciary that is fully capable of adjudicating petitioners' tort claims. Israel, too, has a mature and well-developed tort regime. The only apparent reason for petitioners' decision to invoke the ATS is their counsel's candid

20

admission that "you cannot compare the amounts that could be awarded in America in torts cases to anything we know [in Israel]." C.A. App. 310. A desire to reap a greater damages award cannot supply the "powerful reason" that could justify dispensing with exhaustion here. *Fischer*, 777 F.3d at 858. Petitioners' failure to exhaust thus offers an alternative basis to affirm the judgment below.[10]

3. Prudential considerations also reinforce the historical argument for the kind of "case-specific deference to the political branches" *Sosa* contemplated as an independent limitation on the ATS's scope. 542 U.S. at 733 n.21.

This Court has "repeatedly stressed the need for judicial caution" in considering new causes of action under the ATS, *Kiobel*, 133 S. Ct. at 1664, lest the courts "imping[e] on the discretion of the Legislative and Executive branches in managing foreign affairs." *Sosa*, 542 U.S. at 727; *see id.* at 727-728 (warning that "attempts by federal courts to craft remedies for the violation of new norms of international law * * * should be undertaken, if at all, with great caution"). And it has warned that the "danger of unwarranted judicial interference in the conduct of foreign policy"

---

[10]  It makes no difference that the District Court had jurisdiction under the ATA to hear some plaintiffs' claims arising from the same alleged attacks. *See* Cert. Reply 9. While Congress has expressly authorized such actions under the ATA, *see* 18 U.S.C. § 2333(a), it has not done so under the ATS. And "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." *Sosa*, 542 U.S. at 726. "[T]he danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS because the question is not what Congress has done but instead what courts may do." *Kiobel*, 133 S. Ct. at 1664.

21

is even greater "when the question is whether a
cause of action under the ATS reaches conduct
within the territory of another sovereign." *Kiobel*,
133 S. Ct. at 1664-65.

If these separation-of-powers concerns are compel-
ling in the abstract, they should be dispositive
where, as here, the Executive Branch determines
that permitting a particular suit to go forward would
be detrimental to the interests of the United States.
*See Sosa*, 542 U.S. at 733 n.21 (observing that "there
is a strong argument that federal courts should give
serious weight to" such views when deciding whether
to permit an action to go forward); *id.* at 760-761
(Breyer, J., concurring).

The United States has warned that affording peti-
tioners federal-court relief in this case would offend
Jordan's sovereignty and could "undercut U.S. for-
eign policy interests in both direct and indirect
ways." U.S. Amicus Br. 32; *see id.* at 30-31; *supra*
pp. 8-9. The ATS was designed precisely to *avoid*
such "diplomatic strife." *Kiobel*, 133 S. Ct. at 1669.
The statute's purpose and respect for the Executive's
constitutional responsibility to conduct foreign
affairs offer yet another basis to affirm.

## C. In Any Event, Petitioners' Allegations Cannot Displace The Presumption Against Extraterritorial Application

In *Kiobel*, this Court "conclude[d] that the pre-
sumption against extraterritoriality applies to claims
under the ATS, and that nothing in the statute
rebuts that presumption." 133 S. Ct. at 1669. The
statute therefore does not reach cases in which "all
the relevant conduct took place" overseas. *Id.* "And
even where the claims touch and concern the territo-

22

ry of the United States, they must do so with sufficient force to displace the presumption." *Id.* That guidance offers yet another way to dispose of this case.

Whether particular U.S. conduct is sufficient depends on "the focus of congressional concern" under the relevant statute. *Morrison*, 561 U.S. at 266 (internal quotation marks omitted); *see Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application" of the statute in question "even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco, Inc.* v. *European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

Thus, in *EEOC* v. *Arabian American Oil Co.*, 499 U.S. 244 (1991), the Court held that the defendant's hiring of an American citizen in Houston did not establish a sufficient link to the United States to justify applying Title VI to claims of workplace discrimination overseas where the statute's focus was U.S.-based employment. *See id.* at 247, 255. And in *Morrison*, the Court held that because "the focus of the [Securities] Exchange Act [of 1934]" is on "purchases and sales of securities in the United States," the statute's anti-fraud provision, 15 U.S.C. § 78j(b), applies only to claims involving "securities listed on [U.S.-based] exchanges, and [U.S.-based] transactions in other securities." 561 U.S. at 266-267.

23

Petitioners' allegations of automated clearance of foreign, dollar-denominated payments cannot displace the presumption under any reasonable reading of the ATS. The "focus of congressional concern" when the ATS was enacted was the risk of injury to foreign officials *in the United States*. *Morrison*, 561 U.S. at 266 (internal quotation marks omitted); *see Kiobel*, 133 S. Ct. at 1668; *Sosa*, 542 U.S. at 720 (observing that torts against ambassadors appear to have been "[u]ppermost in the legislative mind").[11]

The automated clearance of foreign, dollar-denominated payments is nothing more than an incident of using U.S. currency with no meaningful connection to petitioners' injuries or any allegedly tortious conduct; it comes nowhere close to displacing the presumption against extraterritorial application of the ATS. Put another way, if the parties to these alleged transactions had used Euros, petitioners would not be here today.[12]

---

[11] The United States contends that the relevant conduct is conduct for which "the international community might consider the United States accountable"—a concern it does not contend this case presents. U.S. Amicus Br. 26. By contrast, two members of this Court have argued that the U.S. conduct must be "sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations." *Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). Either way, petitioners' allegations cannot possibly suffice.

[12] The United States suggests that "petitioners have made other allegations that might affect the extraterritoriality inquiry in this case." U.S. Amicus Br. 29. Those allegations do not require remand. The issue of extraterritoriality was fully briefed below and the Second Circuit understood petitioners' argument as based on the alleged "clearing of foreign dollar-

24

Arab Bank is accused only of carrying out routine banking transactions on behalf of third parties. Petitioners' theory would require this Court to hold that some *non-party's* preference for dollar-denominated transactions, which resulted in a series of automated interactions among computers, is sufficient to displace the presumption against extra-territorial application. If that were sufficient, "the presumption * * * would be a craven watchdog indeed." *Morrison*, 561 U.S. at 266.

## CONCLUSION

The judgment of the Second Circuit should be affirmed.

Respectfully submitted,

NEAL KUMAR KATYAL
  *Counsel of Record*
JESSICA L. ELLSWORTH
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amicus Curiae*

AUGUST 2017

---

denominated payments through a branch in New York"—nothing more. Pet. App. 28a.