# Exhibit 27

No. 12-1485

In The

# Supreme Court of the United States

———————

Arab Bank, PLC,

*Petitioner,*

v.

Courtney Linde et al.,

*Respondents.*

———————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

———————

**MOTION FOR LEAVE TO FILE BRIEF
AND BRIEF OF AMICUS CURIAE
THE HASHEMITE KINGDOM OF JORDAN
IN SUPPORT OF PETITIONER**

———————

Neal Kumar Katyal
*Counsel of Record*
Jessica L. Ellsworth
David M. Ginn
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amicus Curiae*

IN THE

# Supreme Court of the United States

————

No. 12-1485

————

ARAB BANK, PLC,

*Petitioner,*

v.

COURTNEY LINDE ET AL.,

*Respondents.*

————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

————

**MOTION FOR LEAVE TO FILE BRIEF AS
AMICUS CURIAE IN SUPPORT OF PETITIONER**

————

Pursuant to Rule 37.2(b) of the Rules of this Court, the Hashemite Kingdom of Jordan moves for leave to file the attached brief amicus curiae in support of the petition for writ of certiorari to review the judgment of the Court of Appeals of the Second Circuit in *Linde* v. *Arab Bank*, 706 F.3d 92 (2013).

All parties were timely notified of Jordan's intent to file the attached brief as required by Rule 37.2. Petitioner has consented to the filing of this brief. Respondents have withheld consent.

Petitioner is the largest financial institution in the sovereign State of Jordan. In the decision below, the Second Circuit refused to vacate a sanctions order that severely punishes Petitioner for adhering to Jordan's financial privacy laws during discovery. That ruling—which suggests that Petitioner should

have violated the criminal laws of its home country—undermines Jordan's sovereign right to enact and enforce laws for its citizens within its territory. If allowed to stand, the decision will expose Petitioner to unwarranted economic and reputational harm, which in turn risks destabilizing the economies of Jordan and surrounding countries. Jordan has a profound interest in avoiding these harms, as well as ensuring that its laws are observed and explaining why such a result is consistent with the laws of the United States.

Accordingly, Jordan respectfully requests that the Court grant the motion for leave to file a brief amicus curiae.


July 2013                  Respectfully submitted,


                           NEAL KUMAR KATYAL
                             *Counsel of Record*
                           JESSICA L. ELLSWORTH
                           DAVID M. GINN
                           HOGAN LOVELLS US LLP
                           555 13th Street, NW
                           Washington, DC 20004
                           (202) 637-5600
                           neal.katyal@hoganlovells.com

                           *Counsel for Amicus Curiae*

## QUESTIONS PRESENTED

The questions presented are:

1. Whether the Second Circuit erred when, in conflict with the decisions of this Court and in disregard of international comity and due process, it failed to vacate severe sanctions for non-production of records located in countries where production would subject the Bank to criminal penalties, hobbling the Bank's defense.

2. Whether the courts below erred by failing to dismiss plaintiffs' ATS claims, as the Second Circuit's and this Court's decisions in *Kiobel* require.

(i)

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................ i

TABLE OF AUTHORITIES...................................... iii

STATEMENT OF INTEREST .................................... 1

SUMMARY OF ARGUMENT..................................... 4

ARGUMENT ............................................................... 6

I.   THE SECOND CIRCUIT'S DECISION
     UNDERMINES THE SOVEREIGNTY
     OF A KEY UNITED STATES ALLY .............. 6

     A.   Jordan Has Long Been One Of The
          United States' Closest And Most
          Critical Allies In The Middle East........... 6

     B.   The Sanctions Order At Issue Here
          Punishes      Jordan's      Largest
          Financial Institution For Merely
          Following Jordanian Law......................... 9

II.  THIS COURT'S INTERVENTION IS
     NEEDED......................................................... 15

CONCLUSION .......................................................... 20

iii

## TABLE OF AUTHORITIES

Page(s)

CASES:

*Ex parte Peru,*
    318 U.S. 578 (1943) ............................................ 15

*Kiobel* v. *Royal Dutch Petroleum,*
    133 S. Ct. 1659 (2013) ................................. 16, 17

*Societe Internationale pour Participations Industrielles et Commerciales, SA* v. *Rogers,*
    357 U.S. 197 (1958) .................................. 5, 15, 16

*Societe Nationale Industrielle Aerospatiale* v. *U.S. District Court,*
    482 U.S. 522 (1987) ........................................... 16

STATUTES:

12 U.S.C. §§ 3401-22................................................ 11

15 U.S.C. §§ 1681-81x.............................................. 11

15 U.S.C. §§ 6801-09............................................... 11

15 U.S.C. § 6801(a) ................................................. 11

18 U.S.C. § 2331(1) ................................................. 17

18 U.S.C. § 2333(a) ................................................. 17

22 U.S.C. § 2378a...................................................... 6

Cal. Fin. Code §§ 4050-60....................................... 11

N.D. Cent. Code, §§ 6-08.1-01 to -08...................... 11

iv

**TABLE OF AUTHORITIES—Continued**

Page(s)

TREATIES:

Int'l Convention for the Suppression of the
Financing of Terrorism, Dec. 9, 1999,
2178 U.N.T.S. 197 .........................................9, 12

REGULATIONS:

22 C.F.R. § 120.32.....................................................6

61 Fed. Reg. 59,809 (Nov. 25, 1996).........................6

FOREIGN LAWS:

Anti-Money Laundering Law No. 46 of 2007 .... 9, 12

Anti-Terrorism Law No. 55 of 2006.........................8

Banking Law No. 28 of 2000 ............................ 10, 11

Central Bank of Jordan, Regulations of Anti-
Money Laundering and Terrorism
Financing (2006)..................................................8

Penal Code No. 16 of 1960, as amended by
Provisional Act No. 54 of 2001............................8

Provisional Law No. 83 of 2003.............................. 11

OTHER AUTHORITIES:

Geoffrey Sant, *So Banks Are Terrorists
Now?: The Misuse of the Civil Suit
Provision of the Anti-Terrorism Act*,
45 Ariz. St. L.J. 533 (2013) ............................... 17

H.M. King Abdullah II of Jordan, *Our Last
Best Chance: The Pursuit of Peace in a
Time of Peril* (2011).............................................7

v

## TABLE OF AUTHORITIES—Continued

Page(s)

Jeffrey Goldberg, *The Modern King in the Arab Spring*, The Atlantic, Mar. 18, 2013 .......... 8

Joby Warrick, *In Foiled Jordanian Terror Plot, Officials See Hand of Resurgent al-Qaeda in Iraq*, The Washington Post, Dec. 2, 2012 ......................................................... 8

Letter from the Permanent Representative of Jordan to the Chairman of the United Nations Counter-Terrorism Committee (Mar. 24, 2006) ..................................... 9

Michael R. Gordon & Thom Shanker, *U.S. to Keep Warplanes in Jordan, Pressing Syria*, The New York Times, June 15, 2013 ....................................................... 7

Organization for Economic Cooperation & Development, *Improving Access to Bank Information for Tax Purposes* 7 (2000) ............. 11

Remarks by President Obama and His Majesty King Abdullah II of Jordan in Joint Press Conference, Mar. 22, 2013 ............... 7

Remarks by Secretary Rice on the Terrorist Bombings in Jordan, Nov. 9, 2005 ...................... 9

*Restatement (Third) of Foreign Relations Law* (1987) ............................................. 14, 15, 16

IN THE

## Supreme Court of the United States

_____

No. 12-1485

_____

ARAB BANK, PLC,

*Petitioner,*

v.

COURTNEY LINDE ET AL.,

*Respondents.*

_____

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

_____

**BRIEF OF AMICUS CURIAE
THE HASHEMITE KINGDOM OF JORDAN
IN SUPPORT OF PETITIONER**

_____

### STATEMENT OF INTEREST[1]

The Hashemite Kingdom of Jordan is a sovereign nation that borders Israel, Syria, Palestine, Iraq, and Saudi Arabia. The sovereign State of Jordan has been one of the United States' closest allies in the Middle East for many years, and Jordan has enormous respect for the United States judiciary. This is the first time Jordan has filed an amicus brief

_____

[1] No party or counsel for a party authored or paid for this brief in whole or in part, or made a monetary contribution to fund the brief's preparation or submission. No one other than amicus or its counsel made a monetary contribution to the brief.

2

in this Court, which it feels compelled to do given the grave affront to its sovereignty and the grave threat to its stability and prosperity resulting from the District Court's sanctions order and the Second Circuit's refusal to review that order.

The petition in this case concerns private plaintiffs in a U.S. federal district court who are attempting to use civil discovery to obtain a wide variety of records including the names and bank account numbers of customers of Arab Bank, the largest financial institution in Jordan. Jordan—like the United States—has bank privacy laws that criminalize disclosing this information. Jordanian law, in fact, provides for imprisonment, fines, and revoking a bank's license as a penalty for violations of the bank privacy law. Arab Bank went to extensive lengths to request permission from the Jordanian courts to disclose the information that the private plaintiffs requested, but when those requests were denied and Arab Bank followed Jordanian law in not disclosing that customer information, the U.S. district court sanctioned the Bank with a case-dispositive jury instruction: based on the Bank's unwillingness to violate Jordanian law and turn over every last customer name, account, and transaction detail that the private U.S. litigants wanted, the jury may conclude that Arab Bank knowingly and purposefully provided financial services to foreign terrorist organizations:

> At trial, the jury will be instructed that, *based on defendant's failure to produce documents*, it may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to

3

individuals associated with the FTOs; (2) that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully. In addition, (4) defendant is precluded from making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents; (5) all requests for admissions in plaintiffs' First Set of Requests for Admissions which defendant refused to answer on foreign bank secrecy grounds are deemed admitted, and any documents referred to in those requests, which plaintiffs obtained from sources other than defendant, are deemed authentic and are admissible as such at trial; and (6) defendant is prohibited from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds.

Pet. App. 90a-91a (emphasis added).

The Second Circuit's unwillingness to review this outlandish order merits review and reversal. It has been over half a century since this Court described the risk of foreign criminal prosecution as a "weighty excuse for nonproduction," *Societe Internationale pour Participations Industrielles et Commerciales, SA* v. *Rogers*, 357 U.S. 197, 211 (1958). In the intervening years, the international comity concerns have only grown in magnitude. This case, involving a key Middle Eastern ally and threatening devastating financial liability for the leading

4

financial institution in the region, presents precisely
the sort of situation in which this Court's review is
warranted. Jordan respectfully requests that this
Court grant certiorari.

## SUMMARY OF ARGUMENT

Jordan is a critical United States ally in the Middle
East. Our two countries have long worked closely on
everything from defense to trade. Joint counter-
terrorism efforts have been a cornerstone of that
partnership in recent years. And with the situation
in neighboring Syria becoming ever more violent, the
friendship between Jordan and the United States
has never been more important than it is today.

The petitioner in this case, Arab Bank, is the
largest financial institution in Jordan, and one of the
most important private banks in the Middle East.
The District Court ordered Arab Bank to produce an
enormous volume of documents relating to customer
accounts in Jordan and elsewhere. Although
Jordanian law barred Arab Bank from disclosing
many of those records, the Bank went through an
extraordinary and sweeping effort to produce what it
could and to seek permission from Jordanian
officials, including its judicial system, to produce
additional documents. The District Court was not
satisfied with that effort, however, and decided to
impose severe sanctions that will effectively deprive
Arab Bank of a fair defense—indeed any defense—at
trial.

The sanctions order is a serious affront to Jordan's
sovereignty. Like the United States, Jordan has a
right to prescribe and enforce laws within its
territory. And like the United States, Jordan has
enacted laws to protect the financial privacy of

5

banking customers.  When Arab Bank refused to risk criminal prosecution in Jordan for turning over certain customer account documents, it was doing no more than following Jordanian law.  Yet the District Court still felt free to punish Arab Bank for the non-disclosure by imposing severe sanctions.  The notion that a judge can punish a litigant simply for adhering to its home country's law is so extraordinary that Jordan's Prime Minister took the step of writing to the U.S. Secretary of State to register his objection to the District Court's order. Nevertheless, the lower courts brushed aside the Prime Minister's concerns and treated Jordan's laws as little more than trifling suggestions.  That was unacceptable, and this Court should grant review to correct the affront to Jordan's sovereignty.

Certiorari is warranted for at least three other reasons as well.  First, there is hopeless confusion in the lower courts on what to do when foreign criminal laws conflict with domestic discovery obligations. This Court has not directly addressed the issue since its 1958 decision in *Rogers*, 357 U.S. 197 (1958).  It is time to clear up that confusion.  Second, the decision below is wrong on the merits.  The court of appeals misconstrued *Rogers* and relied on inapposite authorities to fashion a "balancing test" that gives short shrift to foreign nations' criminal laws. Finally, a failure to intervene could have grave consequences in Jordan and across the Middle East.  Arab Bank is responsible for a large portion of Jordan's economy, and is a critical source of financial transparency and stability in the region.  Forcing Arab Bank to stand trial under the sanctions order will expose the Bank to irreparable reputational damage as well as the prospect of an enormous damages award.  Those

6

harms, in turn, could lead to economic and political instability in a region that can ill-afford any more of either.

For all of these reasons, the Court should grant certiorari and reverse the decision below.

### ARGUMENT

## I.  THE SECOND CIRCUIT'S DECISION UNDERMINES THE SOVEREIGNTY OF A KEY UNITED STATES ALLY.

### A.  Jordan Has Long Been One Of The United States' Closest And Most Critical Allies In The Middle East.

The relationship between Jordan and the United States is among the most robust relationships among sovereigns in the world today. Jordan's government works closely with the United States in countless areas, from civil aviation and defense to science, investment, and trade. The President has formally recognized the importance of this relationship by designating Jordan a "major non-NATO ally" of the United States. 22 C.F.R. § 120.32; 61 Fed. Reg. 59,809 (Nov. 25, 1996). That designation entitles Jordan to numerous legal privileges relating to defense and security cooperation. *See, e.g.*, 22 U.S.C. § 2378a (exemption from prohibition against sale of certain munitions). Jordan shares that honor with only fourteen other close U.S. allies, including Australia, Israel, and Japan—a reflection of Jordan's strategic importance and its commitment to global security.

Jordan's unique position in the Middle East— bordering Israel, Syria, the West Bank, Iraq, and Saudi Arabia—and its willingness to act as a bridge between the Arab world and the West enhance its

7

value as a U.S. ally in the region. Among other things, Jordan has played a central role in past and ongoing efforts to resolve the Palestinian-Israeli conflict. Jordan is home to nearly two million Palestinian refugees, has had normal relations with Israel for nearly two decades, and is a key proponent of negotiated peace. *See* H.M. King Abdullah II of Jordan, *Our Last Best Chance: The Pursuit of Peace in a Time of Peril* (2011). Jordan is also vital to the success of Secretary Kerry's economic peace plan and other renewed peace efforts. As President Obama recently underscored, Jordan's continued support is "critical to making progress towards a just and lasting peace between Israelis and Palestinians." Remarks by President Obama and His Majesty King Abdullah II of Jordan in Joint Press Conference, Mar. 22, 2013.

The "extraordinary cooperation" between our nations, *id.*, has assumed even greater importance recently. Much of that cooperation now focuses on containing and addressing the violence in neighboring Syria. A number of U.S.-led initiatives depend on Jordan's support. *See, e.g.*, Michael R. Gordon & Thom Shanker, *U.S. to Keep Warplanes in Jordan, Pressing Syria*, The New York Times, June 15, 2013. Jordan is hosting more than 600,000 Syrian refugees within its borders. And the ongoing cooperation between Jordan and the United States on political transition in Syria is equally critical.

In light of the long history of collaboration between our countries, it is no surprise that President Obama describes Jordan as a "great friend" and "invaluable ally" of the United States. Remarks by President Obama and His Majesty King Abdullah II of Jordan in Joint Press Conference, Mar. 22, 2013. Senator

8

John McCain, the ranking member of the Senate Armed Services Committee, has been even more categorical in his praise: "Other countries have helped us—but none the way Jordan has." Jeffrey Goldberg, *The Modern King in the Arab Spring*, The Atlantic, Mar. 18, 2013 (quoting Sen. John McCain).

Nowhere is the partnership between Jordan and the United States more important than in the fight against international terrorism. Jordan is regrettably all too familiar with the pernicious effects of terrorism. Dozens of Jordanians died in terrorist attacks in Amman in 2005. Jordan's King Abdullah II was the target of an al Qaeda assassination attempt in 2000. And just last year, Jordan thwarted a chilling terrorist plot to "unleash mayhem" in its capital city. Joby Warrick, *In Foiled Jordanian Terror Plot, Officials See Hand of Resurgent al-Qaeda in Iraq*, The Washington Post, Dec. 2, 2012.

Steeled by these events and by the attacks on its allies, Jordan has worked diligently to root out terrorism both domestically and internationally. Terrorism is a crime under Jordanian law. Those who finance terrorism or conspire to commit it face severe punishment, ranging from hard labor to the death penalty. *See* Penal Code No. 16 of 1960, as amended by Provisional Act No. 54 of 2001, arts. 147-149; Anti-Terrorism Law No. 55 of 2006. The Governor of Jordan's Central Bank has reinforced these prohibitions by directing banks within the country to monitor customer accounts, combat money laundering, and freeze funds used in connection with terrorist activities. Central Bank of Jordan, Regulations of Anti-Money Laundering and Terrorism Financing (2006); Letter from the

9

Permanent Representative of Jordan to the Chairman of the United Nations Counter-Terrorism Committee (Mar. 24, 2006); *see also* Anti-Money Laundering Law No. 46 of 2007, art. 24 (establishing penalties for money laundering offenses).

Jordan works closely with the United States and the rest of the international community in the fight against terrorism. Jordan is also actively involved with the United Nations Counter-Terrorism Committee and has joined more than ten terrorism-related treaties. *See, e.g.,* Int'l Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 197. Jordan remains firmly committed to continued international cooperation in efforts to combat terrorism and the financing of terrorism. What the Secretary of State said of Jordan in 2005 is equally true today: "The United States has no closer ally than Jordan in the war on terror * * *." Remarks by Secretary Rice on the Terrorist Bombings in Jordan, Nov. 9, 2005.

**B.   The Sanctions Order At Issue Here Punishes Jordan's Largest Financial Institution For Merely Following Jordanian Law.**

The District Court's sanctions order threatens the close U.S.-Jordan partnership by punishing Jordan's largest financial institution for its decision not to violate Jordanian law. That decision, made under the risk of criminal prosecution by Jordanian authorities had Arab Bank complied with the order of this federal judge sitting thousands of miles away, can hardly be the basis for sanctions.

Just as in the United States, the banking industry in Jordan is highly regulated. The government has enacted and enforces a comprehensive set of laws

10

and regulations relating to banking, securities, debt, foreign currency control, anti-money laundering, and combating the financing of terrorism. Like many countries, Jordan has also enacted measures to protect the financial privacy of bank customers. Its principal banking law imposes a mandatory duty of confidentiality on banks operating within its jurisdiction. It states:

> A bank shall observe full confidentiality regarding all accounts, deposits, trusts, and safe-deposit boxes of its customers. It shall be prohibited from providing directly or indirectly any information thereon except upon a written consent of the owner of such account, deposit, trust or safe-deposit box, or an heir of his, upon a decision issued by a competent judicial authority in a current litigation, or due to one of the permissible situations pursuant to this law.

Banking Law No. 28 of 2000, art. 72. Here, lacking consent from the account holders, a decision from a Jordanian court, or any other permissible grounds for disclosure, the confidentiality rule applied with full force to Arab Bank.[2]

Banks and individuals who violate the confidentiality rule face criminal penalties. Jordanian law provides that any such person "shall be punished with imprisonment for a period not less than six months, a fine not less than ten thousand Dinars and not more than fifty thousand Dinars, or with both penalties." *Id.*, art. 75. The Governor of

---

[2] To be clear, the exception for disclosures pursuant to the decision of a "competent judicial authority" requires an order from a *Jordanian* court.

11

Jordan's Central Bank may impose additional
penalties on disobedient banks. Among other things,
the Governor may fine the bank, instruct it to
suspend or dismiss any administrator or board
member, remove the chairman or any member of the
board, dissolve the board of directors and take
control of the bank's management, or revoke the
bank's license. *Id.*, art. 88.

Jordan's confidentiality rule is hardly unusual.
"All countries provide, to a greater or lesser extent,
the authority and obligation for banks to refuse to
disclose customer information to ordinary third
parties." Organisation for Economic Cooperation &
Development, *Improving Access to Bank Information
for Tax Purposes* 7 (2000). The United States is no
exception. The federal government and many states
have enacted financial privacy laws. *See, e.g.,*
Graham-Leach-Bliley Act, 15 U.S.C. §§ 6801-09;
Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22;
Fair Credit Reporting Act, 15 U.S.C. §§ 1681-81x;
California Financial Information Privacy Act, Cal.
Fin. Code §§ 4050-60; North Dakota Disclosure of
Customer Information Law, N.D. Cent. Code,
§§ 6-08.1-01 to -08. In one of those laws, for instance,
Congress imposed on banks "an affirmative and
continuing obligation to respect the privacy of [their]
customers and to protect the security and
confidentiality of those customers' nonpublic
personal information." 15 U.S.C. § 6801(a). Jordan's
Banking Law has a similar purpose and effect.

To be sure, there are exceptions to the duty of
confidentiality—both in the United States and in
Jordan. Of particular relevance here, the
government of one nation often may authorize the
disclosure of bank records to the government of

12

another nation in connection with a pending criminal investigation. This sort of government-to-government cooperation is especially important in counter-terrorism operations. Jordan and the United States have both joined the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to "afford one another the greatest measure of assistance in connection with criminal investigations or criminal or extradition proceedings in respect of the [financing or support of terrorist acts], including assistance in obtaining evidence in their possession necessary for the proceedings." Int'l Convention for the Suppression of the Financing of Terrorism art. 12(1).[3] A signatory to the Convention "may not refuse a request for mutual legal assistance on the ground of bank secrecy." *Id.*, art. 12(2); *see also* Anti-Money Laundering Law No. 46 of 2007, art. 29 ("[p]rovisions related to banking confidentiality stipulated in any other law shall not hinder the implementation of any provisions of this law"). Jordan has gone so far as to incorporate this treaty into its domestic law. *See* Provisional Law No. 83 of 2003.

As a Convention signatory, Jordan has complied with several U.S. requests in pending criminal investigations. Importantly, however, requests for mutual legal assistance under the Convention are made directly from one government to another and are focused on *criminal* activities. The Convention

---

[3] Jordan's money laundering laws likewise obligate the judiciary to cooperate with foreign criminal investigations and "requests of foreign parties to pursue, freeze or seize funds related to money laundering crimes." Anti-Money Laundering Law No. 46 of 2007, art. 22.

13

does not create an exception to otherwise applicable financial privacy laws for private parties in foreign *civil* litigation. The framers of the Convention concluded that their mutual interest in stanching the flow of money to terrorists would not be served by allowing private civil litigants to take matters in their own hands.

In punishing Arab Bank for following Jordanian law, the District Court directly undermined Jordan's sovereign right to prescribe and enforce laws within its territory. As the Petition explains, complying with the plaintiffs' discovery requests would have required Arab Bank to violate its confidentiality obligations under Jordanian law. Pet. 15. There is no dispute on that point. Arab Bank nevertheless undertook a sustained effort to seek relief from those obligations. Among other things, it asked the Jordanian courts and executive branch officials for permission to disclose protected financial records. All of those requests were denied, in accordance with Jordan's Banking Law.[4] The Governor of Jordan's Central Bank also indicated that Arab Bank would face civil and criminal penalties if it violated its legal obligations.

The District Court was not moved by Arab Bank's plight, however, and imposed an essentially case-dispositive sanction. It brushed aside Arab Bank's concerns about violating Jordan's Banking Law, remarking that there was "nothing in the record indicating that [Arab Bank] faces a real risk of prosecution" if it violates the law. Pet. App. 71a.

---

[4] A Jordanian trial court initially granted Arab Bank permission to disclose certain records, but that ruling was reversed on appeal.

14

The District Court evidently believed the Bank should have turned over the protected documents in violation of Jordanian law—on the theory that Jordan's government might not punish Arab Bank for the violation. That flippant attitude caused serious alarm within Jordan's government—just as it would if the tables were turned, and, for example, Citibank were ordered by a Jordanian court to turn over U.S. customer names and bank account statements to private citizens in Jordan. Jordan's Prime Minister took the extraordinary step of writing to the U.S. Secretary of State to express his concern. Pet. App. 250a-252a. As the Prime Minister explained, the "nature and severity of the sanctions imposed against Arab Bank and the [District Court's] interpretation of Jordanian banking laws raise serious national security concerns for the Kingdom." Pet. App. 250a.

Jordan believes it important to register its concern with this Court as well, and is therefore taking the unprecedented step of filing a brief in this Court. Like the United States, Jordan has a sovereign right to enact and enforce laws of general applicability within its territory. *Restatement (Third) of Foreign Relations Law* §§ 403, 431 (1987). When an American judge punishes a Jordanian company simply for following Jordan's laws—as the District Court did here—it is a direct affront to Jordan's sovereignty. The United States government would naturally (and justifiably) be upset if the roles were reversed. Such punishments place the affected company in an impossible position and exhibit contempt for a foreign sovereign's law. Companies are left with the catch-22 of violating their home country's laws and risking imprisonment for doing so

15

(as the District Court suggested Arab Bank should have done), or facing a jury instructed that they can be found liable for doing nothing more than abiding by their home country's law.  This is precisely why international law prohibits countries from requiring the performance of illegal acts in another country. *Restatement (Third) of Foreign Relations Law* § 441. A nation's failure to adhere to that settled rule violates the principle of sovereign equality under international law and threatens the stability of the international order.

Judicial disregard for the laws of another country is always a serious matter.   It is particularly intolerable here given the unique and calibrated relationship between the United Sates and Jordan. District courts should not be permitted to conduct the foreign policy of the United States in such a harmful and arbitrary manner.   Certiorari is warranted to review the Second Circuit's decision and to correct the District Court's affront to Jordan's sovereignty. *Cf. Ex parte Peru*, 318 U.S. 578, 586-87 (1943) (mandamus review warranted because case involved "the dignity and rights of a friendly sovereign state").

## II.   THIS COURT'S INTERVENTION IS NEEDED.

Three additional reasons militate in favor of certiorari.   First, apart from the unique considerations of sovereignty and foreign relations at stake, certiorari is warranted to resolve the important questions presented in the petition.  This Court has not directly addressed the relationship between foreign criminal laws and domestic discovery since its 1958 decision in *Rogers*, 357 U.S. 197.   In the intervening half-century, lower courts

16

have struggled to determine when production orders and sanctions are appropriate and when they are not. This has resulted in confusion among the circuits that only this Court can resolve. Pet. 23-24. Review is needed to bring uniformity to this important area of the law.

Second, the Second Circuit's decision is wrong on the merits. In reaching its decision, the Court of Appeals relied heavily on this Court's decision in *Societe Nationale Industrielle Aerospatiale* v. *U.S. District Court*, 482 U.S. 522 (1987), and the factors listed in *Restatement (Third) of Foreign Relations Law* § 442(1)(c). *See* Pet. App. 32a-33a. But those authorities relate to the production of documents when foreign law poses *no obstacle*. This Court's decision in *Rogers* is the relevant authority for determining whether production should be ordered *notwithstanding* a prohibition under foreign law. The District Court and the Court of Appeals gave short shrift to that controlling authority.

A proper application of *Rogers* and this Court's more recent comity decisions would have shown that the District Court's harsh sanctions are entirely unwarranted. There is no dispute that releasing the records sought by the plaintiffs is illegal under Jordanian law, nor is there any dispute that Arab Bank nevertheless made a substantial effort to secure permission to release those records. It was wrong under this Court's precedent for the District Court to punish Arab Bank simply for following Jordan's law. *See Rogers*, 357 U.S. at 210-12.

The problematic effects of that error are compounded by the weakness of the underlying claims in the Complaint. The 6,000 foreign plaintiffs' Alien Tort Statute claims are plainly barred by this

17

Court's decision in *Kiobel* v. *Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013). *See* Pet. 33-35. The 500 U.S. plaintiffs' Anti-Terrorism Act claims fare no better. Arab Bank's alleged provision of ordinary banking services cannot plausibly be considered an "act of international terrorism" within the meaning of the Anti-Terrorism Act, for it does not involve "violent acts or acts dangerous to human life" and is not intended to influence a government or intimidate a civilian population.   18 U.S.C. §§ 2331(1), 2333(a); *see generally* Geoffrey Sant, *So Banks Are Terrorists Now?: The Misuse of the Civil Suit Provision of the Anti-Terrorism Act*, 45 Ariz. St. L.J. 533 (2013).   By permitting the jury to infer liability despite this shaky (at best) foundation, the District Court has effectively conjured a billion-dollar case out of thin air.

Finally, inaction may have grave consequences in Jordan and elsewhere in the Middle East.   This is not a situation where review of the sanction at some later date, months or years after a jury follows the District Court's invitation to brand Arab Bank a knowing financier of terrorism, can provide an adequate remedy.   Banks depend on doing business with other banks—and no bank wants to do business with a bank labeled a terrorism-financier by the United States.   Arab Bank is the leading financial institution in Jordan and plays a unique and important role in the Jordanian economy and surrounding region.   Its market capitalization has represented 20% to 33% of the total market capitalization of the Amman Stock Exchange in recent years.   In addition, the pension fund for most of Jordan's labor force has an ownership stake of approximately 15% in Arab Bank.   Jordan's economic

18

well-being is thus tightly linked to Arab Bank's well-being. The Bank's importance is not limited to Jordan, either. In the Palestinian Territories, for example, Arab Bank maintains branches that provide some of the only safe, sophisticated, and transparent financial infrastructure available—a measure of stability in a turbulent region.

The District Court's sanctions order could devastate the Bank, which could in turn destabilize Jordan and the surrounding region. The order makes it practically impossible for Arab Bank to defend itself at trial. Pet. 24-29. With nearly 500 plaintiffs seeking treble damages under the Anti-Terrorism Act and over 6,000 more seeking relief under the Alien Tort Statute, the jury could return an astronomically high damages verdict. Merely standing trial for allegedly supporting terrorism without being able to mount a serious defense will cause Arab Bank great reputational harm. And the unfavorable verdict that the sanction all but ensures would be even more devastating, stigmatizing the Bank in the international banking community and the global capital markets. Arab Bank's correspondent banks and other critical counter-party financial institutions could cease doing business with it. The damage to Arab Bank's reputation as a sound and reliable financial institution could also threaten the Bank's important customer relationships, as well as its role as a premier wholesale bank for top global businesses and an important depository institution for many corporate and individual clients with ties to the region.

Given Arab Bank's prominence, severe reputational and economic harm to Arab Bank also could destabilize the economies of Jordan, the Palestinian

19

Territories, and the surrounding region. Economic instability could in turn lead to political instability, which would disrupt the mutual efforts of Jordan and the United States to broker peace in the Middle East.

A decline in Arab Bank's soundness and standing would also seriously undermine the international community's anti-money laundering and anti-terrorism efforts in the region. Arab Bank is an industry and regional leader in those areas. Its efforts deter criminal and terrorist activity and play a pivotal role in promoting economic development throughout the region—particularly in the Palestinian Territories. If customers lose confidence in the Bank and withdraw from formal banking services in favor of unregulated, informal, and opaque funds-transfer systems, the consequences for the region would be calamitous.

20

**CONCLUSION**

For the foregoing reasons, and those in the petition, Arab Bank's petition for a writ of certiorari should be granted.  In the alternative, the Court may wish to call for the views of the Solicitor General.

July 2013

Respectfully submitted,

NEAL KUMAR KATYAL
  *Counsel of Record*
JESSICA L. ELLSWORTH
DAVID M. GINN
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Amicus Curiae*