UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

AHARON MILLER, et al.

                Plaintiffs,      :     Case No. 18-cv-2192 (RPK)(PK)

     -against-

ARAB BANK, PLC,

                Defendant.

_____

NATHAN PAM, et al.

                Plaintiffs,      :     Case No. 18-cv-4670 (RPK)(PK)

     -against-

ARAB BANK, PLC,

                Defendant.

_____


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO MOTION FOR PROTECTIVE ORDER BY ARAB BANK, PLC**

# Table of Contents

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Plaintiffs and Their Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Commencement of the *Linde* Litigation and Resulting U.S. Government Sanctions. . . . . 4

    *Linde* Initial Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The District Court's Reprimand of the Bank for Delay and Obfuscation. . . . . . . . . . . . . . 5

    The Saudi Committee Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Overruling Bank Secrecy Objections and Sanctioning the Bank . . . . . . . . . . . . . . . . . . . 6

    The Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Plaintiffs' Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.     THE APPLICABLE STANDARDS FOR ESTABLISHING LIABILITY . . . . . . . . . . . 10

    A.     JASTA Aiding and Abetting Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.     Primary Liability Under Section 2333(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    EVIDENCE OF FINANCIAL SERVICES PROVIDED TO FOREIGN TERRORIST ORGANIZATIONS IS HIGHLY RELEVANT TO PLAINTIFFS' CLAIMS . . . . . . . . 12

    A.     The Standards Governing Rule 26 Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.     *Linde* and Subsequent Caselaw Did Not Change the Relevancy Standard for Discovery Concerning Primary or Secondary Liability for Material Support . . . 13

    C.     The Discovery Plaintiffs Seek Is Highly Relevant to Their Claims . . . . . . . . . . 18

          1.     The Significance of "Martyr" Payments and Martyr Lists . . . . . . . . . . . . 18

          2.     Documents Concerning the PA and PLO . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.     Internal Documentation and Communications . . . . . . . . . . . . . . . . . . . . . 20

4.     The Affiliation of Persons/Entities
Identified in the Document Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     a.     Discovery Is Not Limited to Persons or Entities for
Whom There Is Contemporaneous Public Source Information . . 28

     b.     Discovery Is Not Limited to Individuals Who
Committed, Planned, or Authorized Terrorist Attacks . . . . . . . . . 29

II.     EVEN MORE THAN IN *LINDE*, THE RESTATEMENT/
AÉROSPATIALE BALANCING SUPPORTS AN ORDER
COMPELLING PRODUCTION OF THE REQUESTED DISCOVERY . . . . . . . . . . 29

     A.     The Critical U.S. Interests in Deterring Terrorism and Promoting the Fair
Resolution of Disputes Significantly Outweigh the Private Confidentiality
Interests of the Bank's Customers and Transferees . . . . . . . . . . . . . . . . . . . . . . . 31

     1.     The U.S. Interests Underlying the ATA Heavily Support
Ordering the Bank to Provide the Requested Discovery . . . . . . . . . . . . 31

     2.     The Privacy Interests that the Bank Invokes-
Including Those of Identified Terrorists-Pale
in Comparison to the Importance of the U.S. Interests . . . . . . . . . . . . . . 36

     B.     The Importance of the Requested Documents to This
Litigation Heavily Favors Compelling Their Production . . . . . . . . . . . . . . . . . . . 40

     C.     The Specificity of the Narrowed Production Supports
Compelling The Production of the Requested Documents . . . . . . . . . . . . . . . . . 42

     D.     The Plaintiffs Have No Alternative Means to Overcome
the Information Asymmetry That the Bank Has Created . . . . . . . . . . . . . . . . . . . 44

     E.     The Additional Factors the Second Circuit Has Considered
in Assessing Objections Based on Foreign Law also
Support Compelling the Production of the Requested Documents . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*CapRate Events, LLC v. Knobloch*, No. 17-cv-5907,
2018 WL 4378167 (S.D.N.Y April 18, 2018) ........................................................ 12

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
495 F. Supp. 3d 144 (E.D.N.Y. 2020) ........................................ 18, 29, 45

*Flores v. Stanford,* No. 18-cv-02468 (VB)(JCM),
2022 WL 354719 (S.D.N.Y. Feb. 7, 2022) ........................................................ 12

*Gucci Am., Inc. v. Curveal Fashion,* No. 09-cv-8458 (RJS)(THK),
2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ........................................................ 32

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........................................................ 19, 26

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........................................................ 34

*Honickman v. BLOM Bank SAL,*
6 F.th 487 (2d Cir. *2021*) ........................................................ 16, 28, 29

*In re Grand Jury Subpoena dated August 9, 2000*,
218 F. Supp. 2d 544 (S.D.N.Y. 2002) ........................................................ 32, 47

*Jesner v. Arab Bank, PLC*,
138 S. Ct. 1386 (2018) ........................................................ 35

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ........................................................ *passim*

*Laydon v. Mizuho Bank, Ltd.*,
183 F. Supp. 3d 409 (S.D.N.Y. 2016) ........................................ 31, 46, 47, 48

*Linde v. Arab Bank, PLC*,
97 F. Supp. 3d 287 (E.D.N.Y. 2015) ........................................................ *passim*

*Linde v. Arab Bank, PLC*,
269 F.R.D. 186 (E.D.N.Y. 2010) ........................................................ *passim*

*Linde v. Arab Bank, PLC*,
463 F. Supp. 2d 310 (E.D.N.Y. 2006) ........................................................ *passim*

*Linde v. Arab Bank*, PLC CV-04-2799 (NG)(VVP),
2007 WL 4373252 (E.D.N.Y. Dec. 10, 2007) ........................................................ 45

*Linde v. Arab Bank, PLC*, CV-04-2799 (NG)(VVP),
2009 WL 1743988 (June 18, 2009) ...................................................................................7

*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) ........................................................... *passim*

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ........................................................... *passim*

*Linde v. Arab Bank, PLC*,
2009 WL 8691096 (E.D.N.Y. June 1, 2009) ........................................... 7, 9, 40, 50

*Linde v. Arab Bank, PLC,* No. CV-04-2799 (NG)(VVP),
2000 WL 8691096 (E.D.N.Y. June 1, 2009) ...................................................... 1, 2

*Miller v. Arab Bank, PLC*,
372 F. Supp. 3d 33 (E.D.N.Y. 2019) ............................................... *passim*

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
116 F.R.D. 517 (S.D.N.Y. 2018) ................................................................. 35, 47

*New Falls Corp. v. Soni,* No. 16-cv-6805 (ADS)(AKT),
2020 WL 2836787 (E.D.N.Y. May 29, 2020) ........................................................ 12

*Nike, Inc. v. Wu*,
349 F. Supp. 3d 346 (S.D.N.Y. 2018) .................................................................. 32

*Rothstein v. UBS AG*,
708 F 3d 82 (2d Cir. 2013) ............................................................................... 11

*S.E.C. v. Gibraltar Glob. Secs., Inc.,* No. 13-cv-2575 (GBD)(JCF),
2015 WL 1514746 (S.D.N.Y. Apr. 1, 2015) ...................................................... 30, 31

*Societe Internationale Pour Participations v. Rogers*,
357 U.S. 197 (1958) ...................................................................................... 35

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
482 U.S. 522 (1987) ............................................................................. 1, 30, 39

*Sokolow v. Palestine Liberation Org.,* No. 04-cv-397 (GBD)
2022 WL 719261 (S.D.N.Y. Mar. 10, 2022) ........................................................ 21

*Strauss v. Crédit Lyonnais, S.A.*,
242 F.R.D. 199 (E.D.N.Y. 2007) ................................................................ *passim*

*Tansey v. Cochlear Ltd.,* No. 13-cv-4628 (SJF) (SIL),
2014 WL 4676588 (E.D.N.Y. Sept. 18, 2014) ..................................................... 31

*Trade Dev. Bank v. Cont'l Ins. Co.*,
469 F.2d 35 (2d Cir. 1972) ............................................................................... 48

*U.S. Appellee Br., Holy Land Found. for Relief & Dev. v. Ashcroft*, No. 02-5307,
  2003 WL 25586055 (D.C. Cir. Jan. 24, 2003) ........................................ 17

*Ungar v. The Palestine Liberation Org.*,
  402 F.3d 274 (1st Cir. 2005) ............................................................ 39

*United States v. El-Mezain*,
  664 F.3d 467 (5th Cir. 2011) ............................................................ 15

*United States v. First Nat'l City Bank*,
  396 F.2d 897 (2d Cir. 1968) ........................................................ 46, 47

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ............................................................ 39

*Weiss v. Nat'l Westminster Bank PLC*,
  993 F.3d 144 (2d Cir. 2021) ............................................................ 15

*Weiss v. Nat'l Westminster Bank*,
  242 F.R.D. 33 (E.D.N.Y. 2007) ................................................... *passim*

*Weiss v. Nat'l Westminster Bank*,
  768 F.3d 202 (2d Cir. 2014) ............................................................ 34

*Wultz v. Bank of China Ltd.*,
  910 F. Supp. 2d 548 (S.D.N.Y. 2012) .......................................... *passim*

*Wultz v. Bank of China*,
  942 F. Supp. 2d 452 (S.D.N.Y. 2013) ................................................. 40

**Statutes**

Further Consolidated Appropriations Act, 2020,
  Pub. L. No. 116-94, 133 Stat. 3082 (Dec. 20, 2019).............................. 23

Taylor Force Act,
  Pub. L. 115-141, Division S, Title X, 132 Stat. 1143 (Mar. 23, 2018) .................. 23

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (September 28, 2016) ........................... *passim*

Antiterrorism and Effective Death Penalty Act of 1996,
  Pub. L. No. 104-132 (April 24, 1996) .......................................... 33, 34

15 U.S.C. § 6802 ........................................................................ 35

18 U.S.C. § 2331(1) ......................................................... 11, 22, 34

18 U.S.C. § 2333(a) ............................................................... 16, 40

18 U.S.C. § 2333(d)..................................................................... 40

18 U.S.C. § 2334 ....................................................................... 23

18 U.S.C. § 2339A ............................................................... 11, 34

18 U.S.C. § 2339B ........................................................................ 11, 15, 40

18 U.S.C. § 2339C ........................................................................ 11, 34

**Rules**

Fed. R. Civ. P. 26 ......................................................................... 3, 31, 45

**Other Authorities**

Executive Order No. 12947, *Prohibiting Transactions with*
   *Terrorists Who Threaten to Disrupt the Middle East Peace Process*,
   60 Fed. Reg. 5,079 (Jan. 23, 1995) .........................................................33

Executive Order 13224, *Blocking Property and Prohibiting Transactions*
   With Persons Who Commit, Threaten *to Commit, or Support Terrorism*,
   66 Fed. Reg. 49,079 (Sept. 23, 2001) .....................................................33

*Restatement (Third) of Foreign Relations Law* (1987) ......................................... 1, 30

*Restatement (Fourth) of Foreign Relations Law:*
   *The Foreign Relations Laws of the United States* (2019) ................................ *passim*

Plaintiffs respectfully submit this Memorandum of Law in opposition to Defendant Arab Bank, PLC's ("the Bank") Motion for a Protective Order Pursuant to Federal Rule 26(c) ("MPO") and in support of Plaintiffs' cross-motion to compel.

## PRELIMINARY STATEMENT

In 2007, the court in *Linde v. Arab Bank, PLC,* applied the balancing test set out in the draft *Restatement (Third) of Foreign Relations Law* § 442 (now incorporated in *Restatement (Fourth)* § 426) and *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa,* 482 U.S. 522, 544 n.29 (1987) ("*Aérospatiale*") to reject the Bank's foreign bank secrecy objections to discovery of transactional and customer records for ***thousands*** of terrorism-linked customers and counterparties ostensibly located abroad. *See* Declaration of Aaron Schlanger ("Schlanger Decl.") ¶45 and Ex. 43.

The Bank refused to comply even in substantial part with the resulting May 7, 2007, production order, withholding, in particular, "account statements; unredacted Know Your Customer material that the Bank is required to collect under international and local anti-terrorism laws; reports created by terrorism detection software that the Bank says it uses and that it acknowledges is required to use to comply with anti-terrorism laws; internal correspondence regarding Bank work for the Saudi Committee [in Support of the Intifada Al Quds]; unredacted minutes of Bank meetings at which the Saudi Committee was discussed; or any other documents that 'might confirm an accountholder or payment beneficiary's identity or circumstantially evidence the Bank's knowledge of identity.'" *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 198 (E.D.N.Y. 2010) (citation omitted). Even in the production it made, the Bank engaged in "years of delay" and "obfuscat[ion]," unsuccessfully seeking credit for producing documents that were either already publicly available, previously disclosed in other investigations, or incomplete. As a result, both the magistrate judge and the district court found that the Bank had not "undertaken its discovery obligations with the utmost good faith." *Id.* at 198-200; *Linde v. Arab Bank, PLC*, No.

CV-04-2799 (NG)(VVP), 2000 WL 8691096, at *5 (E.D.N.Y. June 1, 2009).

By the instant motion, the Bank doubles down on the same incomplete production with some of the same excuses, while demanding a do-over of the *Restatement/Aérospatiale* balancing analysis. But recognizing that the mere passage of time cannot cure the absence of good faith, it is forced to claim that the law has changed. Without so much as even citing the law of the case established by the District Court's opinion denying the Bank's motion to dismiss Plaintiffs' claims under the Anti-Terrorism Act ("ATA") and Justice Against Sponsors of Terrorism Act ("JASTA"), *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019),[1] it asserts that this Circuit's earlier finding of an instructional error in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), changed the standard of relevancy for discovery. It also argues that the 2015 amendment of Rule 26 added a new proportionality requirement that (somehow) impacts the otherwise unchanged *Restatement/Aérospatiale* § 442 balancing test.

The Second Circuit in *Linde*, however, held "only" that evidence of material support to a foreign terrorist organization does not, standing alone, compel a finding of ATA primary or JASTA secondary liability *as a matter of law*, not that such evidence is irrelevant to those claims. 882 F.3d at 328-30; *accord*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021). Indeed, by remanding for the jury to decide whether the evidence of material support involved violent acts or acts dangerous to human life and showed apparent intent for primary liability, or general awareness and substantial assistance for aiding and abetting liability, *Linde* confirmed the relevance, and thus the discoverability, of such evidence.

The Rule 26 amendment did not change the relevancy standard for discovery, either. It simply restored the proportionality test to its original location in Rule 26(b)(1) and replaced the

---

[1] The Bank does not contest for purposes of this motion that the *Miller* decision is correctly decided and controls here.

"reasonably calculated" language with the clearer statement that information "need not be admissible to be discoverable." As the Rules Advisory Committee remarked, "[r]estoring the proportionality calculation to Rule 26(b)(1) does not change the existing responsibilities of the court and the parties to consider proportionality, and the change does not place on the party seeking discovery the burden of addressing all proportionality considerations. Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26, Adv. Comm.'s Note, 2015 Amd.

What *has* changed since *Linde* is the weight of *Restatement/Aérospatiale* factors favoring the production of the Bank's documents. The 2016 enactment of JASTA to provide "the broadest possible basis … to seek relief against persons, entities, and foreign countries … that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States," Pub. L. No. 114-222, § 2(b), significantly strengthens the U.S. interest in production of the discovery sought here, which (contrary to the Bank's contentions) is far narrower and more specific than the production ordered by the *Linde* court in 2007.

The balancing of interests in *Linde* weighed strongly in favor of the requested discovery, as every court that reviewed the matter correctly found. The U.S. interest is even more dispositive now in 2022, after the enactment of JASTA and Plaintiffs' considerable narrowing of the discovery requests made in *Linde*. This Court should therefore deny the Bank's motion and order the production Plaintiffs have requested.

## PROCEDURAL HISTORY

**Plaintiffs and Their Claims.** Plaintiffs are victims of terrorist attacks perpetrated by four U.S.-designated Foreign Terrorist Organizations (the "FTOs")—Hamas; Palestinian Islamic Jihad ("PIJ"); Al-Aqsa Martyrs Brigade ("AAMB"), the terrorist arm of the Palestinian Authority's ("PA") political faction, Fatah; and the Popular Front for the Liberation of Palestine ("PFLP"), a

part of the Palestine Liberation Organization ("PLO"). Plaintiffs assert claims under the ATA, alleging that the Bank itself committed acts of international terrorism, as well as under JASTA, alleging that the Bank substantially assisted and knowingly provided material support to the FTOs that committed the terrorist attacks that injured Plaintiffs during the "Second Intifada," a violent uprising marked by suicide bombings and other terrorist attacks in Israel and the Palestinian Territories that commenced in October 2000.

**Commencement of the *Linde* Litigation and Resulting U.S. Government Sanctions.** In July 2004, the *Linde* plaintiffs filed suit against the Bank. *See* Schlanger Decl., ¶2. As a direct result of that filing, the Federal Office of the Comptroller of the Currency ("OCC") and Financial Crimes Enforcement Network ("FinCEN") investigated the Bank's then-operating New York branch ("ABNY") for failing to monitor and report suspected terror financing. *See id.*, ¶3 and Ex. 1, pp. 1-3; *id.*, ¶4 and Ex. 2, pp. 1-7. In February 2005, the regulators fined the Bank $24 million and forced it to convert ABNY into an agency that could no longer clear U.S. dollars. *See id.*, Ex. 1, pp. 15-27; *id.*, Ex. 2, pp. 8-9.

***Linde* Initial Discovery.** The *Linde* plaintiffs' initial discovery requests were narrow, targeting: (1) an account identified on Hamas's website at the Bank's Beirut branch (the "Hamdan Account"); and (2) accounts for relatives and representatives of nine suicide bombers alleged to have been involved in attacks that injured plaintiffs in that case.

The Bank initially refused to produce the Hamdan Account records on relevance grounds. *Id.*, ¶5 and Ex. 3, pp. 4-5. After the magistrate judge overruled the objection, the Bank insisted that it could produce the records only pursuant to a court order that it could present to the Lebanese government. *Id.*, ¶6 and Ex. 4, pp. 18-19, 86-87.

After the court signed a stipulated order to assist the Bank in seeking the permission of Lebanese regulators to disclose those documents, the Bank heralded the Lebanese government's

"consent" to production as proof of its good faith in addressing bank secrecy objections and its ability to secure permission to produce responsive records.[2] *Id.*, ¶ 44 and Ex. 42. In fact, the Bank had *already* produced the Hamdan Account records in connection with the OCC investigation prompted by the *Linde* lawsuit *without* the Lebanese government's knowledge. Thus, the Bank misled the court, and the plaintiffs, with a redundant, time-consuming, bad-faith exercise designed to hide its prior voluntary production of those documents.[3]

As for the account records relating to the nine suicide bombers, in October 2005, the Bank advised the court that permission to disclose bank records for these individuals was unlikely to be granted by the PA or the Kingdom of Jordan ("Jordan").

The parties then proceeded to confer (and disagree) on the scope of plaintiffs' broader discovery requests. After extensive briefing, the magistrate judge issued a production order in March 2006. While refusing to produce any responsive records from outside the United States, the Bank did agree to produce records from its New York branch. However, it refused to produce documents it had provided to the OCC and FinCEN, claiming that "the Bank does not know what documents were reviewed by the OCC and was not in the practice of 'cataloging' the records reviewed by the OCC." *See id.*, ¶10 and Ex. 8, pp. 2-3.

**The District Court's Reprimand of the Bank for Delay and Obfuscation.** When the Bank produced only a subset of responsive records from its New York branch, the *Linde* plaintiffs moved to compel, and the district court unsurprisingly held that the Bank *was* "able to determine the documents which the OCC reviewed," ordered their production, and found that the Bank's

---

[2]     The Bank repeats that same canard in this case. *See* MPO at 34.

[3]     Moreover, the Bank's then-Chief Banking Officer, Shukry Bishara, submitted a sworn declaration supporting the Bank's motion to dismiss averring that the Bank did not provide services to Hamas through the Hamdan Account. Schlanger Decl., ¶8 and Ex. 6, ¶¶41-43. But records the Bank belatedly produced identified the account holder as Osama Hamdan, a senior Hamas leader and U.S.-designated Specially Designated Global Terrorist ("SDGT"), and revealed that multiple transfers to the account listed "Hamas" by name as beneficiary. *Id.*, ¶9 and Ex. 7.

conduct "does not create confidence that reliance on other requests will be effective." *Id.*, ¶11 and Ex. 9 at 3-5. The court also chastised the Bank for "obfuscat[ing] its obligation to produce evidence of funds transfers that went through New York." *Id.* Notwithstanding the court's admonition, the Bank waited until May 2008, *Id.*, ¶12 and Ex. 10, to produce ABNY wire transfers the *Linde* plaintiffs requested in 2006 and 2007 for, among others, Hamas founders and senior leaders Sheikh Ahmed Yassin, Salah Shehadah, and Ismail Abu Shanab. *Id.*, ¶¶ 13-15 and Exs. 13-15.

**The Saudi Committee Documents.** In March 2006, the Bank purportedly obtained the consent of a *non*-customer, the Saudi Committee for the Support of the Intifada al Quds ("Saudi Committee"), to disclose certain documents concerning payments it made during the Second Intifada. *Id.*, ¶16 and Ex. 14 at 1-2. The records showed that the Bank effectuated payments, pursuant to the Saudi Committee's instructions and lists[4] that *Hamas* compiled, of between $1,325.64 and $5,333.33 to recipients identified explicitly as "martyrs," "prisoners," and the "injured" (and their families). *Id.*, ¶17 and Ex. 15; *see also id.*, Exs. 16-18. Over 90% of the beneficiaries received *cash* and were *not* Bank customers. *Id.*, ¶17 and Ex. 15. Nonetheless, the Bank refused to disclose documents regarding these non-customers. *Id.*, ¶21 and Ex. 19 at 11-12.

**Overruling Bank Secrecy Objections and Sanctioning the Bank.** When the Bank continued to assert bank secrecy objections to the court's production order, plaintiffs moved to compel, and the magistrate judge overruled the Bank's objections. *See Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 314-17 (E.D.N.Y. 2006); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 98 (2d Cir. 2013). He found that the Bank had not acted "in the utmost good faith" and concluded that "some

---

[4]    For example, a 2001 letter from Arab National Bank (the Bank's correspondent bank in Saudi Arabia) titled "Outward Transfers as Per the Request of the Saudi Committee for Support of the Intifada Al Quds" appended lists of payments to the families of deceased individuals, whose cause of death was noted as "*amaliya istashidaya*," which a bank employee testified means "martyrdom operations." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 304-05, 307 (E.D.N.Y. 2015) ("martyrdom operations," "which defendant's regional compliance manager acknowledged means 'suicide operation'"), *vacated on other grounds*, 882 F.3d 314.

sanction must be imposed if for no other reason than to restore the 'evidentiary imbalance'" caused by the Bank's refusal to comply with discovery. *Linde v. Arab Bank, PLC*, 2009 WL 8691096, at *1, *5 (E.D.N.Y. June 1, 2009), *mod'd on reconsideration,* 2009 WL 1743988 (June 18, 2009).

Reviewing these recommendations and the Bank's prior discovery misconduct, the district court agreed that the record did not support the Bank's "argument that it has acted in utmost good faith." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 199-200 (E.D.N.Y. 2010); *see also* Schlanger Decl., ¶11 and Ex. 9, pp. 4-6 (highlighting the Bank's dilatory, unacceptable, and "obfuscat[ory]" conduct unrelated to its bank secrecy objections). The district court also highlighted the Bank's admittedly *unauthorized* disclosure of precisely the type of documents the *Linde* plaintiffs requested to prosecutors, the OCC, and FinCEN and concluded that the Bank's tactics "highlight[] the limits of its supposed good faith and cast[] doubt on its claims of hardship." *Linde,* 269 F.R.D. at 199-200 (also noting "the Bank has not faced any repercussions as a result of its prior disclosures"). The Second Circuit concluded that these assessments were not clearly erroneous. *Linde*, 706 F.3d at 116 ("we can hardly conclude that Arab Bank was faultless").

**The Trial Evidence.** After a six-week trial in 2014, a jury unanimously found the Bank liable for knowingly providing material support to Hamas based, as the district court noted, "on volumes of damning circumstantial evidence that defendant knew its customers were terrorists." *Linde*, 97 F. Supp. 3d at 313. The evidence established that the Bank knowingly made transfers totaling at least $3.2 million to Hamas's senior leadership. *Id.* at 328. The recipients of those transfers included: Sheikh Yassin, Hamas's iconic founder and spiritual leader; Salah Shehadah, then head of Hamas's terror apparatus; Ismail Haniyeh, Yassin's then-chief of staff and later Hamas's "prime minister" (now its supreme leader); and Osama Hamdan, a Hamas senior leader and media spokesman in Lebanon and an SDGT. *See id.* at 301, 303, 313-14, 333; Schlanger Decl., ¶¶ 13-15, 22-23 and Exs. 11-13, 20-21. The Bank also *admitted* that it maintained accounts

for 11 Palestinian terrorists and terrorist organizations designated by the U.S. government and that the Bank processed transfers totaling over $2.5 million for those terrorists *after* their designations. *Linde,* 97 F. Supp. 3d at 309; *see also* Schlanger Decl., ¶24 and Ex. 22.

Through expert testimony, Plaintiffs also developed a "substantial record," *id.* at 334, principally consisting of documents from the Bank's New York branch, establishing that the Bank maintained accounts in the Palestinian Territories for 11 Hamas-controlled "charities" that received more than $32 million in transfers. *Id.* at 303-04; Schlanger Decl., ¶25 and Ex. 23. The district court concluded that the *Linde* plaintiffs introduced "a cornucopia of circumstantial evidence to support a jury finding that defendant knew or was willfully blind to the charities' Hamas affiliations." 97 F. Supp. 3d at 335.

The *Linde* plaintiffs also introduced spreadsheets—so-called "martyr lists"—*from the Bank's files* (produced with the Saudi Committee's purported consent) that identified families of "prisoners" and "martyrs" who collectively received tens of millions of dollars in Saudi Committee payments; and the dates and causes of the "martyrs'" deaths. *Id.* at 301, 304-05. The attacks the spreadsheets referenced included: multiple "martyrdom operations" or "suicide operation[s]" (*id.* at 304-05, 307); "a mission in Jerusalem" (Schlanger Decl., ¶26 and Ex. 24, p. JA1058); and the "French Hill operation," a deadly machine gun attack on a bus in Jerusalem that killed two and wounded 45 (*id.*; 269 F.R.D. at 201). The district court concluded that this evidence "indicate[s] that defendant knew – or should have known – that some of the 'martyrs' died while engaged in terrorist activities." 269 F.R.D. at 203. Furthermore, the Bank transferred Saudi Committee payments to the families of at least 24 Hamas suicide bombers, including five terrorists who killed and injured *Linde* plaintiffs, and Hamas operatives who participated in at least 12 of the 24 attacks that injured *Linde* plaintiffs. Schlanger Decl., ¶ 27 and Ex. 25.

The Bank's own employees confirmed the shocking and irregular nature of the services the

Bank provided to the supposed "martyrs" and their family members. One trial exhibit showed that the Bank completed a wire transfer listing the beneficiary as the "family of the martyr Ibrahim Abdul Karim Beni Awda." 97 F. Supp. 3d at 305. When confronted with that document, the former head compliance officer for the Bank's London branch testified, "*We would never in a million years have dealt with a payment order such as this*." *Id.*

Given the detailed record of support for terrorists that the *Linde* plaintiffs amassed despite the Bank's defiance of multiple production orders, the district court ruled that the documents the *Linde* plaintiffs unearthed were "sufficient to show that the withheld evidence would likely substantiate plaintiffs' claims." *Linde*, 269 F.R.D. at 201.[5]

**Plaintiffs' Requests.** Plaintiffs have requested the Bank's account records and transfer records for hundreds of individuals and entities with close, documented ties to the FTOs that injured Plaintiffs and killed and injured their loved ones (the "Relevant Persons"). Those requests (the "Document Requests" or "RFPs") seek the production of a much smaller range of documents (the "Requested Documents") than the court ordered produced in *Linde*. Plaintiffs limited the scope of the RFPs, to the extent possible, by matching the names of the individuals about whom they seek documents to the names of so-called "martyrs" killed in terrorist attacks or those wounded or imprisoned as a result of terrorist attacks. As part of that process, Plaintiffs cross-referenced the dates of the "martyrs'" deaths with the dates of various terrorist attacks and matched the names of family members who received payments through the Bank with those of their terrorist relatives. *See* Schlanger Decl., ¶28; *see also id.,* Ex. 26. During the parties' meet-and-confer efforts, the Bank suggested that it did not recognize certain of the Relevant Persons. *See id.*, ¶29

---

[5]     *Accord Linde*, 2009 WL 8691096, at *6 (finding that "it would require a suspension of disbelief to conclude that the only financial services the Bank ever provided to those alleged by the plaintiffs to be terrorists or their affiliates are reflected in the documents that have been produced"); *id.* at *10 ("That the withheld records could provide . . . proof [of financial services to Hamas and its affiliates] is hardly debatable.…").

and Ex. 27. In response, Plaintiffs provided the Bank with detailed explanations regarding that person's tie to the FTOs. *Id.* The Bank has not identified any Relevant Person (or entity) that lacks a documented connection to the FTOs and/or Palestinian terrorism during the relevant period.

**ARGUMENT**

## I. THE APPLICABLE STANDARDS FOR ESTABLISHING LIABILITY

### A. JASTA Aiding and Abetting Liability

As the District Court found in its opinion denying the Bank's motion to dismiss before referring the case to this Court, the elements for aiding and abetting liability under JASTA are that: (1) a foreign terrorist organization planned, authorized or committed the attacks that injured or killed the plaintiffs; (2) the party whom defendant aids must perform a wrongful act that causes an injury; (3) defendant must be "generally aware" of its role as part of an overall illegal or tortious activity—*not* the specific acts of terrorism at issue—at the time assistance is provided; and (4) defendant must knowingly and substantially assist the principal violation. *Miller*, 372 F. Supp. 3d at 47 (citing *Linde*, 882 F.3d at 329). To determine "knowing and substantial assistance,"[6] courts consider six factors (which are weighed in their totality): (1) the nature of the act encouraged; (2) the amount of assistance given by defendant; (3) defendant's presence or absence at the time of the tort; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of defendant's assistance. *Id.* (citing *Linde*, 882 F.3d at 329).

Therefore, Arab Bank documents and testimony concerning its knowledge of its customers' and their counterparties' involvement in terrorism and terrorist organizations are at the core of one of the key elements of a JATSA aiding and abetting claim – the Bank's general awareness of its role in an overall illegal activity from which the acts of international terrorism that caused the

---

[6] The knowledge component is satisfied for aiding and abetting liability if the defendant "knowingly--and not innocently or inadvertently, gave assistance…." *Kaplan*, 999 F.3d at 864.

Plaintiffs' injuries were a foreseeable risk. *See Kaplan*, 999 F.3d at 860. Moreover, Arab Bank documents establishing the overall amount of assistance given by the Bank to various terrorist organizations, the duration of the assistance, and the length and depth of its relationships with these terrorist organizations are critical to establishing substantial assistance under JASTA.

## B. Primary Liability Under Section 2333(a)

Through a chain of incorporations by reference, the elements for primary liability under 18 U.S.C. § 2333(a) incorporate the elements of criminal liability for material support to terrorism – 18 U.S.C. §§ 2339A-C. For example, a defendant violates the criminal prohibition of material support to an FTO at 18 U.S.C. § 2339B if it provides material support to an FTO knowing that the organization (a) is a designated FTO, (b) has engaged or engages in terrorist activity, or (c) has engaged or engages in terrorism. 18 U.S.C. § 2339B(a)(1). Primary liability also requires evidence that the defendant's actions were a substantial factor in the sequence of responsible causation and the injury was reasonably foreseeable or anticipated as a natural consequence. *Rothstein v. UBS AG*, 708 F. 3d 82, 91-92 (2d Cir. 2013) (citations omitted); *see also Miller*, 372 F. Supp. 3d at 44-46 (discussing why Plaintiffs' allegations satisfy the requirements to plead primary liability).

Therefore, for primary liability, Arab Bank documents and testimony concerning its knowledge of its customers'/counterparties' involvement in terrorism and terrorist organizations have largely the same probative value, and therefore relevance, as they have for JASTA aiding and abetting claims. And because primary liability also requires showing proximate cause, documents establishing the overall amount of assistance the Bank gave to terrorist organizations are also critical to establishing that providing funds was a substantial factor in facilitating the attacks.[7]

---

[7]     The Second Circuit has held that a jury was required to separately determine whether a defendant's violations of the criminal statute also satisfy the definitional elements of an "act of international terrorism," as defined at 18 U.S.C. § 2331(1). *Linde*, 882 F.3d at 326. Those elements require that the act(s): (1) "involve" violent acts or acts dangerous to human life; (2) are violations of the criminal laws of the United States or of any State; (3) appear to be intended to intimidate or coerce a civilian population or government; and (4) occur primarily outside the territorial

## II. EVIDENCE OF FINANCIAL SERVICES PROVIDED TO FOREIGN TERRORIST ORGANIZATIONS IS HIGHLY RELEVANT TO PLAINTIFFS' CLAIMS.

### A. The Standards Governing Rule 26 Discovery

"As a general matter, federal law encourages disclosure of relevant information in light of the broad scope of discovery and truth-seeking purpose of Rule 26(b)." *Flores v. Stanford*, No. 18-cv-02468 (VB)(JCM), 2022 WL 354719, at *6 (S.D.N.Y. Feb. 7, 2022). Rule 26(b) "is liberally construed and is necessarily broad in scope." *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS)(AKT), 2020 WL 2836787, at *1 (E.D.N.Y. May 29, 2020) (citation omitted). "Information is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." *Id.* at *2 (citation omitted). A court considers Rule 26's proportionality requirement, which "focuses on the marginal utility of the discovery sought," in connection with the relevance of the information sought. *Id.* (citation omitted). "[T]he greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.* (quotation and citation omitted).

To sustain a discovery objection, the party opposing production must ordinarily show that the requested discovery (1) does not come within the broad scope of relevance as defined under Rule 26 or (2) is of such marginal relevance that the potential harm occasioned by discovery would far outweigh the presumption in favor of broad disclosures. The objection must be specific: "stating that the requests are 'overly broad and unduly burdensome' is meaningless boilerplate." *CapRate Events, LLC v. Knobloch,* No. 17-cv-5907, 2018 WL 4378167, at *2 (S.D.N.Y April 18, 2018). But the Bank makes no attempt to detail why Plaintiffs' requests are burdensome, and its efforts to redefine relevance by willfully misreading recent JASTA cases should also be rejected.

---

jurisdiction of the United States. *Id.*

**B.** ***Linde* and Subsequent Caselaw Did Not Change the Relevancy Standard for Discovery Concerning Primary or Secondary Liability for Material Support.**

The Bank argues that the Second Circuit's decision in *Linde* suggests that the 2007 discovery rulings in *Linde*, and later decisions by the trial court applying those rulings, were premised on a mistaken reading of the ATA. In fact, the Second Circuit merely identified an incorrect jury instruction that does not restrict the scope of discovery. The Bank asserts that the Second Circuit's 2018 finding of an error in the *Linde* jury instructions reflected the "principle under the ATA, that bank transfers for 'humanitarian aid do not manifest the intent required to establish an act of international terrorism and thus primary liability under the ATA,'" and that evidence of them is therefore irrelevant. MPO at 10-11. Similarly, it argues that *Linde* and subsequent caselaw also reflect the principle that "transfers for routine banking services related to charitable and humanitarian programs that are not identifiable as being for a terrorist purpose" cannot establish general awareness and substantial assistance for aiding and abetting liability, and that evidence of them is therefore also irrelevant. MPO at 18.

As an initial matter, these arguments are premised on the erroneous assumption that the Bank has shown that the transactions about which Plaintiffs seek discovery lack any connection to terrorist activity. In fact, the jury verdict in *Linde* compels the opposite conclusion. More importantly for present purposes, discovery is the process through which Plaintiffs develop evidence of those connections, not a remedy Plaintiffs obtain after proving their claims.

Moreover, these arguments willfully misconstrue *Linde* and subsequent caselaw by erroneously conflating the sufficiency of evidence with its relevancy. For example, in *Kaplan*, the Second Circuit recognized that "whether a defendant bank's financial services to an FTO or its affiliates should or should not be viewed as routine is a question of fact for a jury to decide." 999 F.3d at 858 (quoting *Linde*, 882 F.3d at 327).

Furthermore, *Linde* did *not* hold that material support, even purportedly humanitarian aid directed through so-called "charities," can *never* establish primary liability, or that providing what a bank claims are "routine banking services" can never support findings of general awareness or substantial assistance for aiding and abetting liability. The *Linde* panel was careful to emphasize that "we hold *only* that [providing such support] is not so akin to providing a loaded gun to a child *as to excuse the charging error here and compel a finding that as a matter of law*, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." 882 F.3d at 327 (emphasis added). In fact, it reiterated that "conduct that violates a material support statute can also satisfy the [primary liability requirements] in some circumstances," just "not invariably." *Id.* at 326. Similarly, after agreeing that, to establish (JASTA) aiding and abetting liability, plaintiffs do not have to prove that the Bank's own acts constitute acts of international terrorism, that it had specific intent, or that it knew that the specific attacks at issue had occurred when it provided financial assistance for the FTOs' benefit, *Linde* held only that the record did not "*compel*[] a finding that the bank was aware that by processing future transfers it was playing a role in violent or life-endangering acts." *Id.* at 330 (emphasis added). It did not find that processing transfers can never give rise to inferences of such awareness.

It further held that the failure to instruct the jury on the analytically distinct question of substantial assistance for aiding and abetting liability also prevented finding for the *Linde* plaintiffs *as a matter of law*. "Even if a properly charged jury could conclude that Arab Bank's financial services provided substantial assistance to Hamas's murderous activities so as to support aiding and abetting liability, we cannot conclude that such a finding *is compelled as a matter of law, thereby avoiding the need for vacatur and remand*." *Id*. (emphasis added).

Lest *Linde*'s plain words leave any doubt, the Circuit explained them again in *Kaplan*. Quoting the very same language from *Linde* on which the Bank rests its relevance argument (MPO

at 15), *Kaplan* explains:

> Our statement that aiding-and-abetting liability "requires *more than* the provision of material support to a terrorist organization," *Linde*, 882 F.3d at 329 (emphasis added), does not establish that [a defendant's provision of] material support to an FTO *is never* sufficient for aiding and abetting liability. Instead, that statement articulates the principle that knowingly providing material support to an FTO, without more, does not as a matter of law satisfy the general awareness element. *See Linde*, 882 F.3d at 329-30. Whether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry.

999 F.3d at 860 (emphasis in original).

Subsequent Circuit authority only confirms the fact-intensive nature of the inquiry. For example, the Bank claims that in *Weiss v. Nat'l Westminster Bank PLC*, 993 F.3d 144 (2d Cir. 2021), the court dismissed evidence that a British bank had transferred funds to Hamas's charitable or social service programs as "non-probative and immaterial" for establishing aiding and abetting liability. MPO at 17. In fact, *Weiss* affirmed summary judgment for a British bank defendant based on what *Kaplan* characterized as "the undisputed factual record as to the state of the defendant bank's knowledge—*developed during some 10 years of pretrial discovery*…." *Kaplan*, 999 F.3d at 861 (citing 993 F.3d at 163-167) (emphasis added). *Weiss* did not find the evidence of the defendant's assistance to Hamas-controlled entities to be "non-probative and immaterial" (although in that case, they were not the defendant's own customers). It simply found that, after fulsome discovery (which included account records, internal bank communications, compliance records and extensive testimony by bank employees produced after the courts rejected the defendant bank's foreign bank secrecy objections), the evidence of the British bank's *awareness*[8] of the violent nature of its customer's counterparties in the Palestinian Territories was *insufficient* to withstand summary judgment. It thus confirmed that a "fact-intensive inquiry" is needed to

---

[8] The court did not determine that either the counterparties or the transactions were in fact benign, but only that the defendant lacked awareness of their terroristic purpose. By contrast, in *United States v. El-Mezain*, 664 F.3d 467, 483 (5th Cir. 2011), the Fifth Circuit affirmed criminal liability under 18 U.S.C. § 2339B (the material support statute) for individuals and charities that sent funds to many of the same charities at issue here.

assess general awareness after discovery. *Kaplan*, 999 F.3d at 860.[9] Needless to say, Plaintiffs can only develop through discovery the type of scienter evidence *Kaplan* described as lacking in *Weiss*.

The Circuit in *Honickman v. Blom Bank SAL*, held plaintiffs must show the "threshold issue" that the bank "was aware of [its customers'] connections with Hamas before the relevant attacks" and that they "were so closely intertwined with Hamas's violent terrorist activities that one can reasonably infer [the] Bank was generally aware of its role in unlawful activities from which the attacks were foreseeable…." 6 F.4th 487, 501 (2d Cir. 2021) (quoting *Kaplan*). "Contrary to BLOM Bank's argument" (and the Bank's, here), "[the defendant Bank's] customers do not themselves need to be 'engaged in ... violent or terrorist acts.'" *Id*. at 499 n.15.

Thus, there is no basis for the assertion that evidence is only relevant if it intrinsically relates, or manifests a connection, to violence or terrorism. On the contrary, there is no requirement that any bank customer is "engaged in ... violent or terrorist acts," let alone that a specific transaction manifests a connection to violence. *Id.* Rather, the legal standard for liability at trial – looking at the totality of the record – asks whether, ***after full discovery***, there is evidence from which a jury could reasonably conclude that the bank was generally aware that at least some of its customers were intertwined with a terrorist organization's violent terrorist activities such that terrorist attacks were a foreseeable risk of providing those customers with substantial assistance.

Here, the Amended Complaint alleges that the Bank facilitated the payment of subsidies to families of suicide bombers and other terrorists and did so, in part, through an extraordinary and irregular process of largely over-the-counter cash payments to non-customers identified from martyr lists provided to the Bank. This practice supplemented the Bank's direct assistance to various terrorist organizations by holding accounts for their leaders, operatives, and core

---

[9]     The *Weiss* case is currently subject to a petition for a writ of certiorari, and the Supreme Court has requested the views of the Solicitor General.

16

institutions. *See* Amended Complaint ("AC") ¶¶267, 291-94.[10] In *Kaplan*, the Circuit found Hezbollah's Martyrs Foundation—which "provides financial support to wounded Hizbollah terrorists and to the families of Hizbollah terrorists killed in action"—to be "closely intertwined with Hizbollah's violent terrorist activities." 999 F.3d at 849, 860. Similarly, the U.S. government has recognized consistently that even ostensibly charitable actions undertaken by terrorist organizations advance their violent objectives. *See, e.g.,* U.S. Appellee Br., *Holy Land Found. for Relief & Dev.* v. *Ashcroft*, No. 02-5307, 2003 WL 25586055 (D.C. Cir. Jan. 24, 2003). It declared that "[t]he social and charitable elements of Hamas are *inexorably intertwined* with the terrorist elements in the organization's overall mission." *Id.* (emphasis added). Thus, Plaintiffs will establish their claims at trial by introducing evidence that the Bank's customers and payees are intertwined with Hamas's and other FTOs' violent terrorist activities.

Arab Bank also asserts that the Second Circuit has now narrowly delimited the "types of transactions" that may give rise to the substantial assistance required for aiding and abetting liability. MPO at 16. As set forth above, JASTA does not require a showing that any given transaction be earmarked for violent or terroristic purpose. Whether a transaction provides substantial assistance for aiding and abetting liability does not depend on its "type," but on factors such as "the nature of the act encouraged or assisted," the "amount" of the transaction (together with others) and "the period of defendant's assistance." *See Miller*, 372 F. Supp. 3d at 47. As the U.N. Security Council noted as recently as 2019, to finance their violence, "terrorists, including foreign terrorist fighters, and terrorist groups may move and transfer funds, including through financial institutions, [and the] abuse of legitimate businesses and *non-profit organizations* …." S.C. Res. 2462, at 2 (March 28, 2019) (emphasis added). Thus, funds transfers labeled for

---

[10]    For the ease of the Court and the parties, Plaintiffs cite only to the Amended Complaint in *Miller*, which contains the same allegations as the Complaint in *Pam*.

charitable or humanitarian purposes are relevant because they can "move and transfer funds" and thereby provide substantial assistance to terrorist organizations.[11]

In another JASTA aiding and abetting case, Judge Cogan said "[i]t would … be misguided to construe the *Linde* Court's discussion of evidentiary sufficiency after years of discovery and a fully contested trial as setting forth the minimum pleading standard under JASTA at the motion to dismiss stage." *Henkin v. Kuveyt Turk Katilim Bankasi, A.S.,* 495 F. Supp. 3d 144, 158 (E.D.N.Y. 2020) (currently on interlocutory appeal). It would be equally misguided to construe *Linde*'s rulings on whether particular facts compel finding for plaintiffs as a matter of law as setting forth the scope of relevant discovery. Evidence of material support provided directly or indirectly to an FTO and its operatives is *relevant* to both the primary and secondary claims, even if any given piece of evidence standing alone might not be *sufficient* to compel findings as a matter of law.

### C. The Discovery Plaintiffs Seek Is Highly Relevant to Their Claims.

#### 1. The Significance of "Martyr" Payments and Martyr Lists

Having found an instructional error, the *Linde* panel did not need or purport to review the record for all evidence that could support jury findings of primary or aiding and abetting liability for plaintiffs. Nevertheless, it did identify an "example": "certain communications dating from as early as 2001, i.e., before the attacks here at issue, [that] could have alerted the bank that the transfers being requested therein were payments for suicide bombings." 882 F.3d at 330 (citing *Linde*, 97 F. Supp. 3d at 304) (describing lists of payments to families of martyrs—hereinafter

---

[11] Nor is the recognition of the financial system's vulnerability to this "charitable" loophole recent. In October 2001, the Financial Action Task Force ("FATF") issued eight Special Recommendations on steps countries should take to address terrorist financing. It noted that "[c]ommunity solicitation and fundraising appeals are one very effective means of raising funds to support terrorism. Often such fundraising is carried out in the name of organisations having the status of a charitable or relief organization and it may be targeted at a particular community." *See, e.g.,* Guidance For Financial Institutions in Detecting Terrorist Financing, FATF, at 4, April 24, 2002, available at: https://www.fatf-gafi.org/media/fatf/documents/Guidance%20for%20financial%20institutions% 20in%20detecting%20terrorist%20financing.pdf (last visited April 4, 2022).

"martyr lists"). Such evidence "might permit a jury, properly instructed as to aiding and abetting, to infer the requisite awareness." 882 F.3d at 330.

If such martyr lists are evidence from which a jury could find elements of liability, then so are any corresponding account records for a "martyr's" family member who received such a payment, any identifying documentation that the Bank used or had available to it concerning the payment or pattern of payments (family members often received payments from multiple sources), and related internal Bank communications that could also support inferences of apparent intent and general awareness. Moreover, the relevance of any such document or communication cannot be decided in isolation—as the Bank would have it—but in light of the "complaint as a whole" and "in the context of the enterprise they aided," *Kaplan*, 999 F.3d at 865 (quoting *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983)), a years-long campaign of terror attacks.

The same martyr lists are part of this case and described in the Amended Complaint. AC ¶¶272-289. Here, these lists were "more than sufficient notice for Arab Bank about the nature of the Insurance Scheme it was administering.…" *Miller*, 372 F. Supp. 3d at 45. The Bank "was generally aware of its role in violent activities in light of the causes of death identified on the lists Arab Bank received as part of the Insurance Scheme and in light of the information Arab Bank received indicating that it cleared fund transfers for entities that the United States government later designated as terrorist organizations." *Id.* at 47–48.

The Bank also maintained accounts for the al-Ansar Society, an organization expressly dedicated to distributing martyr payments from the Martyrs (or "Shahid") Foundation in Lebanon (designated an SDGT for channeling "financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories"). AC ¶¶587-93. The lists published by the Martyrs Foundation not only provided the dates of so-called martyrs' deaths (which can be used to match dates of terrorist attacks, as Plaintiffs did to narrow the

production request to terrorists and their families), but their terrorist organizational affiliation. AC ¶589. The account records of al-Ansar, any martyr lists provided to the Bank by that organization, and the transactional records and documentation provided in connection with the organization's martyr payments during the relevant period are all undeniably relevant.

## 2. Documents Concerning the PA and PLO

The Bank takes Plaintiffs to task for purported "fishing expeditions" in seeking certain financial records relating to the PA, "in the absence of any factual allegation that the Bank had an account or processed violent, life-endangering, or unlawful transactions for the PA or PLO." MPO at 22-23. But the Amended Complaint alleges that the AAMB was the terrorist arm of the PA's dominant political faction, Fatah, AC ¶¶319-21, 534-40, and that the PLO and PA transferred payments through their Arab Bank accounts to AAMB leaders, operatives, and family members. AC ¶¶541-54. Again, therefore, this objection improperly seeks to impose an evidentiary burden upon Plaintiffs at the discovery stage.

Moreover, in *Sokolow v. Palestine Liberation Org.*, the court held that trial evidence supported finding that the PA and PLO "provided material support and resources to the terrorists and terror groups who committed the six attacks at issue in this case," and that PA employees "committed or supported five of those six attacks within the scope of their employment." No. 04-cv-397 (GBD), 2015 WL 13675738, at *1 (S.D.N.Y. Aug. 24, 2015). Two of those six attacks are directly implicated in this case.

Yet the Bank simply dismisses Plaintiffs' request for the Bank's records concerning the PA, PLO, Fatah and governmental agencies such as the Institution for Families of Martyrs and the Injured,[12] as "designed to fail," MPO at 22, and insists that the Institution for Families of Martyrs

---

[12] The Bank lists the entity as "Palestinian Ministry of Social Welfare's Institute for the Care of Martyrs' Families and the Injured" in Appendix 5 to its brief.

and the Injured, among other entities, is "integral to the operation of the Palestinian Government and partners of the United States in the peace process with Israel." MPO at 21. This is simply unmoored from reality.[13]

In *Sokolow*, the district court found that the PA and PLO "have a practice of making payments to the families of individuals who died while committing acts of terrorism" and that the PA "has administered monthly payments to the families of individuals who died while committing acts of terrorism since at least 1994." No. 04-cv-397 (GBD), 2022 WL 719261, at *3 (S.D.N.Y. Mar. 10, 2022) (citations omitted). The court went on to find that these payments "are administered by the Institution for Families of Martyrs and the Injured" and further noted that the PA and PLO "have made shahid payments to the families of individuals killed while committing acts of terrorism because of the death of the individual or 'martyrdom.'" *Id.* at *3-4. It also found that the defendants, through the Institution for Families of Martyrs and the Injured, made martyr payments to the family of the suicide bomber responsible for the January 27, 2002 attack, that injured Plaintiffs *in this case*. *Id.* at *4.

Realizing that *Linde* expressly singled out evidence of payments reflected in martyr lists as probative of both primary and secondary liability, the Bank's desperate fallback argument is that Plaintiffs "do not allege that any of the family members who received these payments, and whose bank accounts Plaintiffs now seek, were *themselves so incentivized or thereafter engaged in terrorist acts*, justifying production of their personal accounts." MPO at 20 (emphasis added).

The Amended Complaint plainly alleges that the martyr payments, prisoner payments, and injured payments "provide a meaningful incentive both *to prospective recruits and to individuals*

---

[13]     While it is certainly true that "there is no allegation in the pleadings that the PA directed transfers **in violation of its own laws and banking regulations,**" MPO at 22, liability for certain attacks turns on whether the PA directed transfers in violation of U.S. laws.

*contemplating the commission of independent acts of violence* in the name of the 'popular resistance'," not an incentive to their surviving parents, minor children, or spouses to themselves commit terrorist attacks. AC ¶291. It is the promise to prospective martyrs that the large payments will be provided to their families after they are "martyred," injured during attacks, or imprisoned for committing terrorist attacks, that incentivized terrorism—hence the Plaintiffs' (accurate) characterization of the Saudi Committee payments as "universal death and dismemberment coverage." AC ¶267; *see Miller*, 372 F. Supp. 3d 33, 45 ("Arab Bank's administration of the Insurance Scheme was dangerous to human life under 18 U.S.C. § 2331(1)(A) because, by rewarding acts of terrorism, *it incentivized prospective 'martyrs'* to commit acts of violence and enhanced Hamas's reputation among potential recruits.") (emphasis added).[14] The Second Circuit acknowledged the significance of this very point, observing that the complaint in *Kaplan* did not "suggest that the Customers' relevant operations were benign. It alleged that Shahid was known to subsidize the families of Hizbollah suicide bombers—and indeed to provide financial reassurance to '*prospective*' suicide bombers." 999 F.3d at 858 (citing complaint; emphasis by the court)). Indeed, this sufficed even though the attacks there were not even suicide bombings. *Id.* at 845 (victims of Hezbollah rocket attacks).

Congress, too, understands the terrorist incentives created by martyr payments. It even expanded the reach of the ATA in 2019 by amending it to provide personal jurisdiction over the PA if it continued to make martyr payments and payments to prisoners "imprisoned for committing

---

[14]     Although the Bank concedes that "[t]his motion is not about the accuracy of Plaintiffs' characterization" of the martyr payments, it proceeds to contest Plaintiffs' allegations. MPO at 13 nn.12-13. It even disputes the nature of the Saudi Committee payment program during the relevant period by quoting press interviews outside the Amended Complaint. MPO at 12. If these were appropriate for consideration in deciding relevancy, then this Court could also consider this conclusion of the State Department: "**In 2003, the United States provided evidence to Saudi authorities that the Saudi al Quds Intifadah Committee ('Committee') founded in October 2000, was forwarding millions of dollars in funds to families of Palestinians engaged in terrorist activities, including those of suicide bombers.**" Schlanger Decl., ¶30 and Ex. 28 at 2 (emphasis added).

any act of terrorism that injured or killed a national of the United States."[15] In 2018, Congress also enacted the Taylor Force Act, finding that the "Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror" and calling on "the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations to stop payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism and to repeal the laws authorizing such payments."[16] Congress even called on "all donor countries providing budgetary assistance to the Palestinian Authority to cease direct budgetary support until the Palestinian Authority stops all *payments incentivizing terror*" and urged the State Department "to highlight the issue of Palestinian Authority payments for acts of terrorism and to urge such governments and organizations to join the United States in calling on the Palestinian Authority to immediately cease such payments." *Id.*, § 1003(2), (5) (emphasis added). If the Bank really believes that the payments solely incentivize the surviving family members of terrorists, it stands alone.

### 3.    Internal Documentation and Communications

In *Linde*, the Bank argued that "evidence external" to its records is "not evidence of what the Bank knew." 269 F.R.D. at 203 n.19. The district court found that this argument only put "in stark relief the necessity of full production of Bank documentation." *Id*. Now, in its appendices, the Bank painstakingly tries to argue that the absence of external evidence ("public sources") makes discovery of its internal records irrelevant. *See* MPO, Appendices 1-5. This again puts the necessity of producing all internal records related to the Bank's administration of martyrs' payments into stark relief.

---

[15]    Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 amending 18 U.S.C. § 2334 (Dec. 20, 2019).

[16]    Pub. L. 115-141 Title X, §§ 1002(1), 1003(1), 1004(a)(1), 132 Stat. 797-98 (Mar. 23, 2018).

The Bank's carefully manicured description of the records it has produced ("internal communications related to [the Saudi Committee's] instructions, related correspondence, and documentation provided by beneficiaries redacted to delete the identifying material," MPO at 14), obscures that these communications include virtually none of: the Bank's internal communications *about* the Saudi Committee's recipients, *see Linde*, 269 F.R.D. at 198, quoted *supra* at 1; the documentation that family members presented to obtain cash payments from the Saudi Committee through the Bank (the Bank just sampled a few); or the Bank's internal communications and customer records pertaining to Saudi Committee recipients who were Bank customers. Thus, the Second Circuit found that the withheld "documents related to the Saudi Committee are directly relevant to whether Arab Bank knowingly provided banking services in support of terrorist operations and are thus essential to plaintiffs' case. Arab Bank has unique access to the records and only Arab Bank can make a complete production." *Linde*, 706 F.3d at 115.

Nor has the Bank produced any records of any kind concerning the other martyrs' payments programs funded by the Martyrs Foundation and distributed by the Bank's customer, the al-Ansar Society.

Furthermore, the production of full internal records for the identified terrorists (and their immediate family members who were conduits for payments) is relevant not only to the Bank's general awareness of its role in an unlawful enterprise, but also to showing the "deliberate indifference" referred to in *Miller*, 372 F. Supp. 3d at 44-45 ("Even if Arab Bank did not know the nature of its customers, its ignorance would be the result of deliberate indifference.").

In October 2001, the Basel Committee on Banking Supervision[17] issued its report on "Customer due diligence for banks," describing "essential elements" of know your customer

---

[17] The Basel Committee (which is related to the Bank for International Settlement, a consortium of central banks) issues the industry-standard and highly influential "Basel Accords" policy recommendations.

("KYC") programs banks must implement, including "ongoing monitoring of high risk accounts … to determine those transactions that do not conform with the normal or expected transactions for that customer or type of account." *See* https://www.bis.org/publ/bcbs85.pdf, ¶ 19 (last visited April 4, 2022). As the Basel Committee report states, "[t]here should be intensified monitoring for higher risk accounts," including monitoring "sources of third party information" and "[s]ignificant transactions." *Id*. at ¶54. Moreover, even banks that are not legally required to implement KYC rules and Anti-Money Laundering ("AML") Programs in their domestic jurisdictions, have often done so because they, like the Bank, maintained a branch in New York and other jurisdictions that require such measures. These KYC, AML and combating the financing of terrorism ("CFT") policies typically require the bank to collect information such as names, addresses, and identification (driver's licenses, certificate of incorporations) and, most relevant here, to monitor the nature of both routine and unusual transactions conducted by the customer. Transactions inconsistent with a customer's profile or, for example, a large funds transfer from overseas may be flagged for further review, particularly for high-risk customers. Thus, even the absence of such due diligence documentation from the Bank's files would evidence its "deliberate indifference."

An account may also be reviewed because it maintains accounts for, receives funds from, or transfers funds to, suspicious entities such as one of the SDGTs identified in the Amended Complaint (HLF, Interpal, Al Aqsa Foundation) or because the account itself has been frozen or restricted in some way by the bank's regulator. AC ¶¶473, 440-42, 448-51. For example, the Amended Complaint alleges that the Palestine Monetary Authority ("PMA") temporarily froze the accounts of al-Salah, one of the Bank's customers (later designated an SDGT), in August 2003. AC ¶496. Of course, internal communications about why it did so are relevant to Plaintiffs' claims.

Furthermore, "Arab Bank cannot ignore blatant red flags and then use its deficient compliance program as a shield against liability." *Miller*, 372 F. Supp. 3d at 45. In anticipatory

defense, the Bank complains that the Plaintiffs have not tied each of their requests to "transactions that bore red flags that were performed in 'an unusual way, under unusual circumstances' from which terrorist acts are reasonably foreseeable—such as money laundering or cash bribes in violation of anti-terrorism laws (for secondary liability)"—as opposed to "ordinary lawful routine banking, such as transactions for humanitarian purposes." MPO at 26-27.

The District Court expressly rejected this argument in denying the Bank's motion to dismiss:

> The Bank's "humanitarian" activities involved providing payments to the families of terrorists through the Insurance Scheme that Arab Bank administered. The allegation that Arab Bank provided banking services "in an unusual way under unusual circumstances," *Halberstam*, 705 F.2d at 487—*including by administering the Insurance Scheme for individuals whose cause of death included "Martyr Operation"*—strongly suggests that Arab Bank was generally aware of the nature of the conduct it was supporting. Therefore, Arab Bank's argument is not persuasive.

372 F. Supp. 3d at 48 (emphasis added). The Amended Complaint is replete with highly specific and credible allegations of the Bank's participation in the Saudi Committee's elaborate payment scheme for families of "martyrs" and prisoners," the Bank's processing of millions of dollars in payments on behalf of SDGTs after their designations (AC ¶¶441-42), its facilitation of large payments to Hamas's most senior leaders (AC ¶¶339-439), and its transfer of tens of millions of dollars to putative Hamas "charities." AC ¶¶491-99. Those purported charities included one entity that, as the U.S. government found, "employed a number of Hamas military wing members" and one of whose leaders was "the principal leader of a Hamas military wing structure in the Al-Maghazi refugee camp in Gaza." AC ¶495.

Nor can the Bank explain how millions of dollars in over-the-counter cash payments to non-customers identified from martyr lists are "routine" banking, rather than "red flags." Indeed, as noted above, when faced with one such transfer record processed by the Bank in the Palestinian

Territories, the Bank's own compliance officer for its London branch admitted, "*We would never in a million years have dealt with a payment order such as this*." *Linde,* 97 F. Supp. 3d at 305.

Plaintiffs are entitled to examine and evaluate all relevant transactions Arab Bank processed for the four FTOs at issue in this case. At the close of discovery, the Bank can argue its own inferences from the evidence produced, but it is not entitled to foreclose the production of that evidence based on Plaintiffs' supposed failure, pre-discovery, to tie particular transactions to the Bank's support of terrorism.

### 4.    The Affiliation of Persons/Entities Identified in the Document Requests

The Bank also complains that "[o]nly 123 of these individuals and entities are mentioned in the operative Complaints and only twelve are alleged to have committed, planned, or authorized any of the fourteen attacks that Plaintiffs allege resulted in their injuries." MPO at 4. Of course, "a plaintiff is not required to plead evidence." *Kaplan*, 999 F.3d at 860. Moreover, the Bank knows the basis for every name that appears in Plaintiffs' document requests. Between September 2019 and January 2020, the parties corresponded and met and conferred regarding the relevance of bank records concerning the persons and entities the Plaintiffs' requests identified. Plaintiffs provided a comprehensive chart identifying the relevance of the Bank's records, including specific references to how plaintiffs' experts in *Linde* cited evidence related to those individuals and entities in discussing the bases of Plaintiffs' claims. *See, e.g.*, Schlanger Decl., ¶29 and Ex. 27.

The Bank submits Appendix 3 to its brief professing mystification as to the link between the identified persons and an FTO or violent activities because "none of the family members of these individuals referenced in this Appendix are themselves alleged in the pleadings to have been members of any FTO, much less closely intertwined with an FTO's terrorist activity." MPO at 20. But, based on prior communications with Plaintiffs and the evidence introduced at the *Linde* trial, the Bank knows that the list largely tracks the martyr list published by the al-Ansar Society on its

website. *See* Schlanger Decl, ¶31 and Ex. 29. Moreover, several of the names belong to infamous suicide bombers such as Muhammad Mashhur Muhammad Hashaikeh, a Fatah-AAMB operative who blew himself up on King George Street in 2002 (injuring members of the Bauer family) and Izz al-Din Shuhayl Ahmad al-Masri, a Hamas suicide bomber who blew himself up in a Sbarro pizzeria in 2001 (an attack described in the *Linde* trial).

### a. Discovery Is Not Limited to Persons or Entities for Whom There Is Contemporaneous Public Source Information

Tacitly conceding that the RFPs list highly relevant terrorists and terrorist-affiliated entities, the Bank falls back on the assertion that Plaintiffs have not demonstrated that contemporaneous news articles established the terrorist organization affiliations of each of the discovery targets prior to particular attacks. According to the Bank, "[f]or secondary liability, it must (a) as a 'threshold' requirement be aware of a customer's connection to the FTO ***before the relevant attacks*** and (b) also be aware ***from public source information available prior to the attacks*** that its customer was 'closely intertwined with the [FTO's] violent terrorist activities.'" MPO at 18, putatively citing *Honickman*, 6 F.4th at 501 (emphasis added).

But *Honickman* does not state that public source information such as media articles is required either to plead aiding or abetting liability or to prove it. While a court assessing state of mind allegations in a complaint can draw an inference from public sources to "plausibly suggest a defendant's knowledge *which can be confirmed during discovery*," *id.* at 501 n.18 (emphasis added), nothing in *Honickman* or *Kaplan* suggests that discovery is limited to customers or counterparties for whom plaintiffs have cited incriminating media articles published prior to the attacks. On the contrary, when *Kaplan* credited allegations citing to "press conferences and news media interviews," the Circuit explicitly noted that "further needed specificity can be sought in discovery." 999 F.3d at 864. Furthermore, although media articles may alone support a plausible

28

inference of a defendant's general awareness, more direct evidence of such knowledge can only be found in a defendant's own records. As Judge Cogan observed in *Henkin*: "As a practical matter – absent discovery – terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities." 495 F. Supp. 3d at 156.

### b. Discovery Is Not Limited to Individuals Who Committed, Planned, or Authorized Terrorist Attacks.

The Bank erroneously assigns significance to the fact that within the list of names contained in the RFPs "only twelve are alleged to have committed, planned, or authorized any of the fourteen attacks that Plaintiffs allege resulted in their injuries." MPO at 4. The District Court has disagreed in this case. It found that "a defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual 'triggerman' or suicide bomber." *Miller*, 372 F. Supp. 3d at 4. *See also Henkin*, 495 F. Supp. 3d at 158 ("It would therefore make little sense to relieve a financial institution of liability for aiding and abetting Hamas simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence."). *Kaplan* concurred, approving a claim for aiding and abetting by material support, "even where [the defendant's] relevant substantial assistance was given to an intermediary" of the principal. 999 F.3d at 856. Moreover, in *Honickman,* the Second Circuit made clear that a bank's customers "do not themselves need to be 'engaged in ... violent or terrorist acts'" for a Bank to be liable for aiding and abetting acts of terrorism. 6 F.4th at 499 n.15.

### II. EVEN MORE THAN IN *LINDE*, THE *RESTATEMENT/AÉROSPATIALE* BALANCING SUPPORTS AN ORDER COMPELLING PRODUCTION OF THE REQUESTED DISCOVERY.

The Bank once again invokes the same foreign bank secrecy statutes that it invoked unsuccessfully in *Linde*, now arguing that its case for resisting otherwise proper discovery is bolstered by the 2015 amendment to Rule 26. As the party resisting discovery based on a foreign

statute, the Bank bears "the burden of proving what that law is and demonstrating why it impedes production." *S.E.C. v. Gibraltar Glob. Secs., Inc*., No. 13-cv-2575 (GBD)(JCF), 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015). Even where the resisting party sustains that burden, the Supreme Court has emphasized that "[i]t is well settled that [such] statutes do *not* deprive an American court of the power to order a party subject to its jurisdiction to produce evidence." *Aérospatiale,* 482 U.S. 522, 544 n.29 (1987). Thus, where a party asserts that a foreign bank secrecy statute bars production, courts perform a comity analysis weighing the interests of the U.S. and the foreign state in permitting or denying the discovery. *See, e.g., Linde,* 706 F.3d at 111-12.

In *Aérospatiale*, the Supreme Court endorsed the five-factor balancing test for assessing objections to discovery based upon foreign law that was then set forth in the draft § 437 of the *Draft Restatement (Third) of Foreign Relations Law of the United States*. 482 U.S. at 544 n.28. Section 442(1)(c) of the published *Restatement (Third)* adopted that test. Section 426, Comment (a) of the *Restatement (Fourth) of the Foreign Relations Law of the United States*, which the American Law Institute published in 2018, now adopts its predecessor's § 442(1)(c) standard.

The *Restatement* provides that courts weighing bank secrecy objections should "take into account" the following factors:

> [1] the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States;[18] [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Restatement (Fourth)* § 426, cmt. (a). "Courts in the Second Circuit also consider two additional factors: (6) the hardship of compliance on the party or witness from whom discovery is sought;

---

[18] Plaintiffs do not dispute that most of the requested documents probably originated abroad, notwithstanding the Bank's history of delaying and obfuscating production of documents held in the United States. *See supra* at 5-6.

and (7) the good faith of the party resisting discovery." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 420 (S.D.N.Y. 2016). In addition, some courts weigh "whether the person resisting discovery is a party to the litigation and, 'where the issue is the application of another country's privacy laws, … whether such privacy requirements are absolute.'" *Id.* (quoting *Tansey v. Cochlear Ltd.*, No. 13-cv-4628 (SJF) (SIL), 2014 WL 4676588 at *2 (E.D.N.Y. Sept. 18, 2014)).

The 2015 amendment to Rule 26 does not in any way alter the balancing test that courts have traditionally applied when weighing whether to order discovery. It simply moved the consideration that relevant discovery "be proportional to the needs of the case" from Rule 26(b)(2) to Rule 26(b)(1). Fed. R. Civ. P. 26(b), Advisory Comm.'s Note, 2015 Amd. Such proportionality is already factored into the *Restatement*'s weighing of the "degree of specificity" and the "availability of alternative means of securing the information" against its "importance to the … litigation." However, the 2015 amendment did add a new factor—consideration of "the parties' relative access to relevant information"—that helps inform the "availability of alternative means" in the *Restatement* balancing, as discussed *infra* at 44-46.

Moreover, since it has been clear for more than a decade that Arab Bank has no intention of complying with any production order issued by this Court, "proportionality" is a purely theoretical factor.

**A.     The Critical U.S. Interests in Deterring Terrorism and Promoting the Fair Resolution of Disputes Significantly Outweigh the Private Confidentiality Interests of the Bank's Customers and Transferees.**

**1.     The U.S. Interests Underlying the ATA Heavily Support Ordering the Bank to Provide the Requested Discovery.**

The "'most important'" factor in the *Restatement*/*Aérospatiale* comity analysis weighs the U.S. interests implicated by the requested discovery against the foreign state interests that a foreign bank secrecy statute protects. *Laydon,* 183 F. Supp. 3d at 422 (quoting *Gibraltar Glob. Sec.*, 2015

WL 1514746, at *5); *Weiss v. Nat'l Westminster Bank,* 242 F.R.D. 33, 45 (E.D.N.Y. 2007). Here, as *Linde* concluded, multiple compelling U.S. interests easily outweigh the waivable personal privacy rights the foreign bank secrecy statutes protect.[19] Those vital interests have only been further confirmed and expanded by the 2016 enactment of JASTA.

"Axiomatically, the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts.'" *Weiss*, 242 F.R.D. at 46 (citation omitted). *Accord, e.g., Linde,* 706 F.3d at 112 (recognizing "the United States' interests in the effective prosecution of civil claims under the ATA"); *Strauss v. Crédit Lyonnais, S.A.*, 249 F.R.D. 429, 443 (E.D.N.Y. 2008). Even outside the terrorism context, that interest alone often outweighs the personal privacy rights that bank secrecy statutes protect.[20]

Moreover, "[w]hen the U.S. interest 'in fully and fairly adjudicating matters before its courts' is combined with its interest in combating terrorism directed against its citizens, the U.S. interest 'is elevated to nearly its highest point, and diminishes any competing interests of the foreign state.'" *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 559 (S.D.N.Y. 2012) (quoting *Strauss*, 249 F.R.D. at 443). *Accord, e.g., Weiss,* 242 F.R.D. at 46. Thus, in terrorism cases, courts have *uniformly* rejected bank secrecy objections because they impede the critical U.S. interests in

---

[19]     *See Linde*, 463 F. Supp. 2d at 315 (deferring to the bank secrecy jurisdictions' statutes would undermine "important interests of the United States" and make it "difficult if not impossible to vindicate" those interests); *see also Linde,* 706 F.3d at 115 (characterizing the district court's comity analysis as "in line with … precedent," including its conclusion that "the important U.S. and international interests in preventing the financial support of terrorist organizations weigh in favor of producing the material at issue"); *Strauss*, 249 F.R.D. at 446 ("[G]ranting Credit Lyonnais a protective order would undermine the irrefutably vital interest of the United States in ensuring that plaintiffs who are victims of terrorist attacks receive the discovery they seek in prosecuting their civil claims.").

[20]     *See, e.g., Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 367-68 (S.D.N.Y. 2018) (rejecting Chinese bank secrecy objections of six non-party Chinese banks because, among other reasons, the U.S. interest in enforcing the policies underlying the Lanham Act outweighed China's interest in protecting account holders' privacy); *Gucci Am., Inc. v. Curveal Fashion*, No. 09-cv-8458 (RJS)(THK), 2010 WL 808639, at *7 (S.D.N.Y. Mar. 8, 2010) (rejecting non-party's Malaysian bank secrecy objections because, among other factors, "the United States interest in fully and fairly adjudicating matters before its courts … outweighs Malaysia's interest in protecting the confidentiality of its banking customers' records"); *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002) (courts "consistently hold that the United States interest in law enforcement outweighs the interests of foreign states in bank secrecy and the hardships imposed on the entity subject to compliance").

deterring and punishing terrorist attacks upon American civilians.[21]

Those holdings find strong support in Executive Branch statements regarding the critical U.S. interests that the ATA and other anti-terrorism laws protect. For example, multiple Executive Orders have recognized the grave threat that FTOs and other terrorist organizations pose and their reliance upon banks to fund their operations.[22] This is true even of nominally charitable entities controlled by FTOs. As noted above, the Department of Justice concluded that "[t]he social and charitable elements of Hamas are inexorably intertwined with the terrorist elements in the organization's overall mission." U.S. Appellee Br., cited *supra* at 17. The Department of the Treasury has similarly recognized that Hamas "uses a web of charities to facilitate funding and to funnel money" to "terrorism," and uses "legitimate charitable work" as "a primary recruiting tool for the organization's militant causes." U.S. Dep't of the Treasury, *U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities* (Aug. 22, 2003), https://home.treasury.gov/news/press-releases/js672.

Since at least 1996, American counterterrorism policy has embraced a simple empirical proposition: FTOs "are so tainted by their criminal conduct that any contribution to such an

---

[21]    *See, e.g., Linde,* 706 F.3d at 112 ("[t]he District Court here appropriately recognized the important U.S. interests at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the support of terrorism"); *Wultz,* 910 F. Supp. 2d at 559 ("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty."); *Strauss,* 249 F.R.D. at 443 (U.S. interest in "fully and fairly adjudicating matters before its courts … combined with the United States' goals of combating terrorism … diminishes any competing interests of the foreign state") (citations omitted); *Weiss*, 242 F.R.D. at 46, 48 (rejecting UK bank secrecy objection because the U.S. has "profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks," and the defendant's "noncompliance with plaintiffs' discovery requests would undermine [these] important interests"); *Linde,* 463 F. Supp. 2d at 315 ("Although maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides—indeed the United States has enacted similar bank secrecy protection—that interest must yield to the interests of combating terrorism and compensating its victims."). The Bank neither cites nor discusses any of these *Restatement* balancing opinions except *Linde.*

[22]    *See Weiss,* 242 F.R.D. at 46-47 (citing Executive Order No. 12947, Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process, 60 Fed. Reg. 5,079 (Jan. 23, 1995) and Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001)); *Strauss,* 249 F.R.D. at 445 (same).

organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(7). Citing this finding by Congress, the government has consistently argued, and the Supreme Court has held, "that providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010).

More recently and more tellingly, Congress has emphasized that the ATA and JASTA advance critical U.S. policy interests in punishing and deterring terrorism. As noted above, JASTA was expressly enacted "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Pub. L. No. 114-222, § 2(b). Congress also made clear its expectation that foreign defendants accused of providing material support for terrorism "should reasonably anticipate being brought to court in the United States to answer for such activities," *id.*, § 2(a)(6), an obligation that necessarily includes answering to judicial process for production of important documents.[23]

Such defendants prominently include international banks.[24] The Supreme Court observed in 2018 in another terrorism suit against Arab Bank for the same conduct alleged in this case that the ATA is part of "[t]he detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions [that] reflect the careful deliberation of the political branches on *when, and how, banks should be held liable for the financing of*

---

[23]     Congress's decision to make the ATA extraterritorial is also irreconcilable with permitting expansive foreign bank secrecy statutes to impede discovery. *See Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 211 (2d Cir. 2014) ("Congress clearly expressed its intention for §2333(a) to apply to extraterritorial activities when the statute's standards are met, regardless of the views and laws of other nations").

[24]     *See* 18 U.S.C. § 2331(1) (statute addresses attacks and conduct undertaken abroad); 18 U.S.C. § 2339A(b)(1) (defining the "material support" that the ATA criminalizes to include "financial services"); 18 U.S.C. § 2339C(a), (e)(4), (e)(5) (criminalizing "transmitting" or "receiving" funds with knowledge that they will be used for terrorism).

*terrorism.*" *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018) (emphasis added).[25] That

structure makes no allowance for foreign banks to resist otherwise proper discovery on bank

secrecy grounds, especially when U.S. banks cannot reciprocally invoke secrecy to resist judicial

process. *See* 15 U.S.C. § 6802(e)(8) (listing, among other exceptions to banks' obligations of

nondisclosure, "the disclosure of nonpublic personal information … to respond to judicial

process").

The government's swift, punitive response to *Linde*'s filing also underscores the

significance of the U.S. interests at stake in combating terror financing by international banking

institutions like the Bank.[26] As stated above, the OCC and FinCEN substantially shuttered the

Bank's New York operations and imposed a significant fine due to its failure to prevent the "high-

risk" funds transfers about which Plaintiffs seek discovery. *Supra* at 4. A Congressional committee

also recognized "the deeply troubling circumstances" surrounding the inadequate controls that the

Bank employed with respect to "high-risk" funds transfers to potential terrorists. Schlanger Decl.,

¶32 and Ex. 30 at 1-2.

In light of these factors, "'it is difficult to imagine a private commercial lawsuit which

could be more infused with the public interest'" than this one. *Strauss v. Crédit Lyonnais, S.A.*,

242 F.R.D. 199, 218 (E.D.N.Y. 2007) (quoting *Minpeco*, 116 F.R.D. at 523-24).[27]

---

[25]     "'[W]e will do everything humanly possible to stop this illicit financial activity ....'" *Weiss,* 242 F.R.D. at 47 (quoting Statement of Chairman Evan Bayh, The Role of Charities and NGOs in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing and Urban Affairs, Subcommittee on International Trade and Finance, August 1, 2003, at 1-2); *see also id.* at 45-50 (citing NatWest's relationship with a single "charity" designated as an SDGT for funneling money to Hamas in concluding that sustaining a bank secrecy objection would undermine important U.S. interests); *Strauss,* 249 F.R.D. at 445-56 (citing statement by Senator Bayh and reaching same conclusion regarding a different SDGT).

[26]     *See, e.g., Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y. 2018) (strong American interests in litigation's subject matter were "demonstrated by the extensive investigations conducted by both the CFTC and more than one congressional committee" as well as the fact that the alleged misconduct "amount[ed] to massive violations of this nation's most fundamental economic regulatory statutes").

[27]     *See, e.g., Societe Internationale Pour Participations v. Rogers,* 357 U.S. 197, 206 (1958) (given the importance of the "policies underlying the Trading with the Enemy Act," district court properly ordered party to produce documents that Swiss authorities had found subject to criminal secrecy laws); *Wultz,* 910 F. Supp. 2d at 559

## 2. The Privacy Interests that the Bank Invokes—Including Those of Identified Terrorists—Pale in Comparison to the Importance of the U.S. Interests.

In contrast to the substantial American interests implicated in Plaintiffs' ability to obtain the Requested Documents, the foreign bank secrecy statutes merely seek to protect personal privacy interests, including primarily the privacy interests of terrorists and their family members (who were rewarded for the terrorists' acts). The district court gave this example in *Linde*:

> Abbas Al–Sayyed was convicted and sentenced to thirty-five life terms for his role in orchestrating Hamas terrorist attacks, including the Park Hotel bombing on March 27, 2002. According to Israeli court documents, Al–Sayyed strapped a bomb to a young man, Abdal–Baset Odeh, who subsequently detonated it amidst a group of elderly Holocaust survivors enjoying Passover Seder at the Park Hotel. American citizens were among the thirty people killed and 160 injured. There is no need to rely on circumstantial evidence to determine whether Al–Sayyed had an Arab Bank account or used money sent to it to further Hamas' "military activities," because he admitted it himself.
>
> Vindicating the right of a convicted mass-murderer like Al–Sayyed to the privacy of his financial records over the right of his victims to compensation is not in the interest of any nation.

97 F. Supp. 3d at 321.

Plaintiffs' RFP ¶2(j) in this case requests documents for Al-Sayed, among other terrorists and FTO leaders, operatives, and agents. Demonstrating the Bank's continuing penchant for evasion and euphemism, it lists him as "allegedly linked to an FTO," despite his 35 life sentences for his role in the mass murder of Holocaust survivors at a Passover dinner in 2002. *See* MPO App. 4. The Bank has also admitted that it held account records for at least 11 U.S. government-designated Palestinian terrorists. *Linde,* 269 F.R.D. at 197-98. *See also Weiss*, 242 F.R.D. at 55

---

("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty."); *Weiss,* 242 F.R.D. at 46 ("The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and a task force, reveal this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks.").

(Treasury's "designation of Interpal as a[n SDGT] and the Department's decision to freeze Interpal's American accounts, strongly militates against honoring Interpal's unasserted bank privacy interest"). *Linde* trial testimony demonstrated that *dozens* of additional account holders and transferees named in Plaintiffs' current pending requests played significant roles in terrorist attacks. *See supra* at 7-9; Schlanger Decl., ¶¶ 27, 33 and Exs. 25, 31. Judge Cogan's observation that protecting the financial privacy of Al-Sayyed and his ilk does not serve the interest of any nation is no less true today than it was in 2015.

The Bank's past tactical decisions to ignore the foreign jurisdictions' bank secrecy statutes in connection with the HLF and OCC/FinCEN investigations (*see supra* at 4-6) reinforce the conclusion that no critical governmental interests support upholding the Bank's objections. It now protests that its obligations are different in "*private civil* discovery," MPO at 31, but the three bank secrecy statutes it cites make no such exceptions for government discovery. Indeed, the Bank asserts in boldface that Lebanon prohibits disclosure "to any person or entity, **even the Lebanese government**," MPO at 6, yet it disclosed the account records of Hamas leader Osama Hamdan to the OCC without notice to or the permission of the Lebanese government.

Such strategic calculations—even for foreign laws imposing "absolute secrecy"—are irreconcilable with the Bank's contention that the Court, unlike the Bank, should assign dispositive importance to the foreign jurisdictions' supposed interests in preventing disclosure of the Requested Documents. *See, e.g., Wultz*, 910 F. Supp. 2d at 554, 560 & n.84 (compelling production of documents, notwithstanding conflict with Chinese state secret law, where the foreign bank defendant's "actions reflect[ed] a conscious decision to selectively disclose information pertinent to the case … only as it suits [its] litigation interests").

The Bank also ignores that many of the Relevant Persons whose identities and documents the Bank endeavors to conceal collected over-the-counter cash payments from the Saudi

Committee without opening Arab Bank accounts. *See* Schlanger Decl., ¶17 and Ex. 15; *id.*, ¶21 and Ex. 19 at 11-12. The Bank has never provided any authority suggesting that PA bank secrecy protections apply to non-customer recipients of cash, as noted above. *See id.*, ¶¶34-36 and Exs. 32-34. This is not "absolute bank secrecy." It is bank secrecy à la carte.

The public commitments that Jordan and Lebanon have made to rejecting bank secrecy as a basis for withholding evidence regarding terror financing and other financial crimes further support compelling production.[28] Those commitments include U.N. conventions and U.N. Security council resolutions that require members to prevent terror financing. *See, e.g.*, International Convention for the Suppression of the Financing of Terrorism (joined by the U.S. and Jordan),[29] S.C. Res. 1373 (Sep. 28, 2001). Jordan's reports to the U.N. Counter-Terrorism Committee state that bank disclosures concerning terrorism-related transactions are "not regarded as dereliction of the duty of bank secrecy."[30] Lebanon and the U.S. are parties to the U.N. Convention Against Transnational Organized Crime, which mandates that "States Parties shall not decline to render mutual legal assistance pursuant to this article on the ground of bank secrecy."[31]

Absolute bank secrecy is also inconsistent with U.N. Security Council Resolution 2462,

---

[28]     *See Linde,* 706 F.3d at 111 ("Jordan and Lebanon have expressed a strong interest in deterring the financial support of terrorism, and … these interests have often outweighed the enforcement of bank secrecy laws, even in the view of the foreign states."); *Weiss*, 242 F.R.D. at 48-49, 51, 53 (citing the shared participation of the U.S. and the U.K. in the U.N.'s International Convention for the Suppression of the Financing of Terrorism (the "Terror Financing Convention") and the Financial Action Task Force ("FATF") as evidence of the nations' shared interest in preventing terror financing and in the production of documents allegedly subject to U.K. secrecy protections); *Strauss,* 249 F.R.D. at 443 (the shared "interests of the United States and France in combating terrorist financing," as evidenced by their "participation in international treaties and task forces aimed at disrupting terrorist financing, outweigh the French interest in bank secrecy laws and its generally-asserted interest in 'sovereignty'").

[29]     *See* Terror Financing Convention, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. Af54/49 (Vol. 1) (1999), *entered into force* April 10, 2002; available at http://www.un.org/law/cod/finterr.htm (last visited April 4, 2022).

[30]     Jordan Report to the CTC, dated February 7, 2005, S/2005/162, Section 1.7, available at https://documents-dds-ny.un.org/doc/UNDOC/GEN/N05/278/13/PDF/N0527813.pdf?OpenElement.

[31]     *See* Organized Crime Convention, G.A. Res. 25, Annex I, U.N. GAOR, 55th Sess., Supp. No. 49, at 44, Art. 18(8), U.N. Doc. A/45/49 (Vol. I) (2001), entered into force Sept. 23, 2003; available at http://www.unodc.org/pdf/crime/a_res_55/res5525e.pdf (last visited April 4, 2022).

aimed at suppressing terror financing and noting terrorist groups' "abuse of legitimate businesses and non-profit organizations." S.C. Res. 2462, at 2 (March 28, 2019). That Resolution expressly prohibits making "financial or other related services available, directly or indirectly, for the benefit of terrorist organizations or individual terrorists *for any purpose* ... even in the absence of a link to a specific terrorist act." *Id.*, ¶3 (emphasis added). It also calls for "establishment of a mechanism by which competent authorities can obtain relevant information, including but not limited to bank accounts, to facilitate the detection of terrorist assets …." *Id.*, ¶19(d). A U.S. federal court is a competent authority empowered to issue discovery orders overriding the confidentiality of customer banking records.

The Bank's reliance on the PA's bank secrecy statute also ignores that the comity analysis considers foreign *state* interests. *Societe Nationale,* 482 U.S. at 544 n.28 (assessing the "district court's power to order foreign discovery in the face of objections by *foreign states*") (emphasis added); *Restatement (Fourth)* § 426, cmt. (a) (courts weigh whether "compliance with the request would undermine important interests of the *state* where the information is located") (emphasis added). The Palestinian Territories do not qualify as a state at all.[32] Thus, because no case has ever denied discovery based upon the bank secrecy law of a non-state actor, the PA's bank secrecy statute cannot bar discovery here.

Moreover, as the *Linde* court previously observed, the PMA operates in an area that is partially governed by Hamas. Thus, "it would be absurd for this court to exalt the bank secrecy interests of those under the jurisdiction of the Palestinian Monetary Authority over the anti-terrorism interests of the United States." *Linde*, 463 F. Supp. 2d at 316.

Finally, the Bank's objections disregard the Protective Order governing the parties' use of

---

[32]     *See, e.g., Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 329 (2d Cir. 2016); *Ungar v. The Palestine Liberation Organization,* 402 F.3d 274, 291-92 (1st Cir. 2005). At most, the PA is a governmental authority.

confidential materials. In light of that Order, unless the Requested Documents are admitted at trial, their production will minimally impact account holders' and transferees' privacy because only a small group of people obligated to maintain the documents' confidentiality will see them. *See, e.g., Wultz v. Bank of China*, 942 F. Supp. 2d 452, 472 (S.D.N.Y. 2013).

**B.    The Importance of the Requested Documents to This Litigation Heavily Favors Compelling Their Production.**

Because this litigation hinges upon whether the Bank knowingly provided material support or substantial assistance to four FTOs (*see* 18 U.S.C. §§ 2339B, 2333(d)(2)), no credible question exists concerning "the importance to the … litigation of the documents" Plaintiffs request. *Restatement (Fourth)* §426, cmt. (a). *See Strauss*, 249 F.R.D. at 433-35, 439-40, 456; *Weiss*, 242 F.R.D. at 38-39, 43-44, 68. Indeed, Plaintiffs seek production of a far more limited class of documents than the discovery subject to the court's May 7, 2007, production order in *Linde*. *See supra* at 5-7.

While the transfers that the Bank facilitated for the benefit of terrorists and their families, various charitable fronts for Hamas, and Hamas's most senior leaders all supported the *Linde* plaintiffs' arguments that the Bank knowingly provided material support to Hamas, *see, e.g.*, *Linde, 97* F. Supp. 3d at 303-05, the Bank's refusal to comply with the court's discovery orders deprived the plaintiffs of substantial additional evidence that would undoubtedly have strengthened their case. *Linde*, 269 F.R.D. at 200-01; *accord Linde*, 2009 WL 8691096, at *6 ("It would require a suspension of disbelief to conclude that the only financial services the Bank ever provided to those alleged by the plaintiffs to be terrorists or their affiliates are reflected in the documents that have been produced."); *id.* at *10 ("That the withheld records could provide such proof [of financial services to Hamas and its affiliates] is hardly debatable."). For example, while the Bank admitted to maintaining accounts for 11 SDGTs, it did not produce the records or its internal

communications about those customers.[33] The production of such records will bolster the inference that the Bank knowingly provided material support to the FTOs, as will the records showing that the Bank provided extensive financial services to other terrorists.

As the district court observed in *Linde*:

> The quantity of evidence plaintiffs can offer from which a jury could infer intent is … crucial to their ability to prove their claim. Simply put, if the withheld documents support plaintiffs' claims—and I am satisfied that plaintiffs have shown the high likelihood that the withheld documents would show repeated transfers by the Bank to terrorists, terrorist organizations, or their fronts, or on their behalf—the documents are powerful additional direct evidence of defendant's knowledge and circumstantial evidence of defendant's intent.

269 F.R.D. at 203. Of course, quantity also matters to prove substantial assistance. The Bank's woefully incomplete production is therefore prejudicially incomplete, and Plaintiffs are entitled to the remainder to prove their case.

Moreover, the records showing that the Bank performed no diligence concerning recipients of Saudi Committee transfers made as a result of terrorist activity, including "martyrdom operations," will further undermine the Bank's protests that it would "never" provide support to terrorists and support findings of what the district court termed "deliberate indifference." *Miller*, 372 F. Supp. 3d at 45. Thus, as the court held in *Linde*, this factor heavily favors compelling the Bank to produce the Requested Documents.[34]

---

[33]     The exception was the account of Osama Hamdan for whom the Bank had already produced the relevant records to the OCC in New York without consent of its Lebanese regulators.

[34]     *See Linde*, 706 F.3d at 115 (characterizing as "in line with … precedent" the district court's finding "that the importance of the documents" supported compelling their production); *Linde,* 463 F. Supp. 2d at 315 (the "discovery sought here is essential to the proof of the plaintiffs' case"); *Strauss*, 249 F.R.D. at 433-35, 439-40, 456 (compelling production of "[a]ll account records" concerning the Hamas-affiliated charity CBSP, "including account opening records, bank statements, wire transactions, deposit slips and correspondence between Defendant and CBSP," "[a]ll documents and communications by or to Defendant concerning CBSP, including all internal reports and the contents of any internal investigations undertaken by Defendant that reference CBSP," all "communications by or to the Defendant" with banking regulators regarding CBSP, and all documents concerning the closure of CBSP's accounts); *Weiss*, 242 F.R.D. at 38-39, 43-44, 68 (compelling production of similar documents regarding a purported charity and emphasizing that "the discovery sought is both relevant and crucial to the litigation of plaintiffs' claims").

## C. The Specificity of the Narrowed Production Supports Compelling Their Production.

As previously noted, using available martyr lists, evidence from the *Linde* trial (*see, e.g., Linde*, 97 F. Supp. 3d at 299-305), and findings by the Israeli and U.S. governments, Plaintiffs were able to narrow and tailor their requests to: specific terrorists and their families (most of whom received documented payments via the Bank); FTO leaders, operatives, and agents; and ostensibly charitable entities that helped coordinate the martyrs' payments, had FTO leadership, and were otherwise controlled by FTOs.

The May 7, 2007, Order which was the basis for the *Linde* court overruling Arab Bank's foreign bank secrecy objections and ultimately sanctioning the Bank for non-compliance, swept much more broadly. Among other things, the order called for the production of all documents concerning payments made through Arab Bank by or on behalf of the Saudi Committee, Hamas, or Palestinian Islamic Jihad, including documents concerning the "opening and maintenance of accounts for individuals or entities that received payments from the Saudi Committee," "customer files" and "correspondence." *See* Schlanger Decl, ¶45 and Ex. 43. That provision of the order alone called for the disclosure of over **15,545** distinct sets of records – far in excess of the combined total of 677 requested in this case. *See* Schlanger Decl., ¶17 and Ex. 15 (listing the numbers of separate Saudi Committee payments to families of "martyrs," prisoners and the injured.)

Arab Bank objects that not all persons who are called "martyrs" were killed as a result of a terrorist operation. MPO at 13 n.12. As noted above, however, the Bank knows that **all** of the "martyrs" and transactions identified in the Plaintiffs' requests are directly linked to terrorism. Neither in its discussions with Plaintiffs' counsel nor in its brief has it identified a single "martyr" listed in Plaintiffs' requests lacking a terrorism pedigree. That the final list still numbers 677 persons (according to the Bank's count) reflects the breadth of the Bank's material support for

FTOs and terrorism rather than overreach by the Plaintiffs.

Still, the Bank objects that there are no public sources from the relevant time period that would have enabled it to link the individuals and entities identified in Plaintiffs' requests to potential terrorism. As discussed above, this objection completely misstates the legal standard for relevancy. It is also misleading in other respects. For example, the second name is "Ismail Abd Al Salam Haniyeh a/k/a Ismail Haniya." MPO, App. 2 at ECF p. 45. The Bank asserts that public sources identifying Haniyeh "post-date the relevant time period." *Id*. But Haniyeh headed HAMAS founder Sheik Yassin's office starting in 1997, served as his chief of staff and a board member of the Islamic Society Gaza, and had sufficient notoriety and presence in Gaza that he was elected Hamas's "prime minister" in 2006. Because Hamas transferred large sums to him through Arab Bank's New York branch, even without access to his account records, Plaintiffs are able to document the fact that Haniyeh received 19 transfers of funds through the Bank totaling over $420,000. *See* Schlanger Decl., ¶37 and Ex. 35. The frequency and amount of those transfers by itself raises a red flag in a territory in which the per capita Gross National Income was only $1,730 in 1999. *See* Schlanger Decl., ¶38 and Ex. 36.

Another example is "Ahmed Yassin a/k/a Ahmad Yasine," whom the Bank lists as only "allegedly linked" to an FTO during the relevant period. MPO App. 4 at ECF p. 67. Sheikh Yassin was the *founder* of Hamas and its spiritual leader from its establishment in 1987. He was designated a Specially Designated National by the U.S. government in 1995 "based on his continued support for terrorism." Indeed, "[t]he evidence showed that the wheelchair-bound Yassin, a man with a highly distinctive appearance, was well-known as a Hamas leader both internationally, and particularly in the Palestinian Territories, during the relevant time period; *indeed, he could fairly be described as the face of Hamas*." *Linde,* 97 F. Supp. 3d at 313 (emphasis added). The Bank processed transactions not just for his account—for which donations "during

the war" were publicly solicited—but at least six more transactions totaling more than $153,000 for his wife.[35] *See* Schlanger Decl., ¶¶ 13, 22, 39 and Exs. 11, 20, 37.

If Sheikh Yassin's link to FTO Hamas is only "alleged," as the Bank says, it is an allegation made by the U.S. government; Hamas itself; Sheikh Yassin himself; the Bank employee who admitted that he knew Yassin was "a terrorist leader of a terrorist group"; the Bank's Chief Compliance Officer, who testified that Yassin "'is known throughout the world' as 'the head of the Hamas organization in the Palestinian Territories, and this is no secret,'" *Linde,* 97 F. Supp. 3d at 305; and nearly everyone else in the Palestinian Territories during the relevant time period. It is hard to be more specific about his identity. But Haniyeh and Yassin are just examples, exposing the Bank's feigned ignorance and calling into question the credibility of similar objections and, indeed, the Bank's good faith.

The broader document requests in *Linde* were held sufficiently specific, and so are the narrower ones in this case – often identifying specific transactional documents the Bank produced in *Linde*.[36]

### D. The Plaintiffs Have No Alternative Means to Overcome the Information Asymmetry That the Bank Has Created.

*Linde* squarely rejected the Bank's disingenuous contention that discovery available from terrorists and their family members constitutes a viable alternative to obtaining the Bank's

---

[35]     A significant number of the individuals named in Plaintiffs' requests are also the wives or close relatives of some of Hamas's most senior terrorist operatives and deceased terrorists. For example, Muna Mansur (herself a Hamas leader) is the widow of senior Hamas leader Jamal Mansur. Maysar Muhammad Hamed al-Surakji is the wife of Yusuf Khaled al-Surakji, who was the head of Hamas's terror apparatus in the West Bank until his death in 2002.

[36]     *See also, e.g., Linde*, 463 F. Supp. 2d at 315; *Strauss,* 249 F.R.D. at 441 (where plaintiffs alleged that French bank supported Hamas by providing financial services to the Hamas-affiliated charity CBSP, the specificity of the plaintiffs' requests supported rejecting the defendant's bank secrecy objection where the plaintiffs sought "documentation of and testimony regarding the relationship between defendant and CBSP, the nature and extent of the services that defendant provided to CBSP, the collection or distribution of funds by [the defendant] that may have been used by CBSP and/or its associates to support terrorism, and [the defendant's] knowledge of CBSP's alleged terrorist connections"); *Weiss,* 242 F.R.D. at 44 (same findings with respect to British bank that allegedly supported Hamas by providing financial services for Hamas-affiliated charity Interpal).

documents. *See* 463 F. Supp. 2d at 315.[37] It found that Plaintiffs cannot fashion more targeted discovery because the Bank's blanket foreign bank secrecy claims leave "plaintiffs and the court … at a loss to determine what kinds of transaction records may exist and which ones may be relevant." *Linde*, 2007 WL 4373252, at *2 (E.D.N.Y. Dec. 10, 2007). *See also Henkin*, 495 F. Supp. 3d at 156 ("absent discovery … terrorist victims … do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags").

In other words, this case is a classic instance of the information asymmetry that prompted the Rules Advisory Committee to add "the parties' relative access to relevant information" to Rule 26(b)(1), and that justifies its consideration under the *Restatement/Aérospatiale* factor of "availability of alternative means." The Advisory Committee explained that one party "may have vast amounts of information, including information that can be readily retrieved and information that is more difficult to retrieve. In practice these circumstances often mean that the burden of responding to discovery lies heavier on the party who has more information, and properly so." Fed. R. Civ. P. 26(b), Advisory Comm.'s Note, 2015 Amd. *Cf. Henkin*, 495 F. Supp. 3d at 156 (doubting that any "financial institution … would so freely and publicly air its own dirty laundry or otherwise prematurely disclose sensitive internal communication among its agents" as to render unnecessary discovery from a financial institution as to its mental state).

Only the Bank knows what is actually contained in its own records, and the burden of producing therefore falls on it "and properly so," as the Advisory Committee concluded. Thus, the fourth *Restatement* factor—"the availability of alternative means of securing the information"—

---

[37] The Bank's even more facetious suggestion here that Plaintiffs could commandeer the Israel Defense Forces to raid its branch banks for documents deserves no reply. MPO at 27-28 & n.21. The Bank's reference to the alternative of "Israeli intelligence or police interrogation reports of persons referenced in their Requests" or banking records obtained from third parties, fares no better. The Bank cannot explain how police interrogation reports would relate its own conduct or state of mind or what third-party banking records would be available to Plaintiffs that contain Arab Bank's own account information and communications.

also heavily favors ordering the Bank to produce the Requested Documents. *See, e.g., Linde*, 463 F. Supp. 2d at 315; *Strauss*, 249 F.R.D. at 442 (only defendant bank could provide plaintiffs with financial records of Hamas-affiliated charity); *Weiss*, 242 F.R.D. at 44 (same). It is also profoundly ironic that the Bank now suggests that "Plaintiffs' counsel has in other cases alleged that Israeli forces have seized such records from raids on institutions, including banks, in the Territories, and has referenced such documents," MPO at 28, given that its local counsel previously wrote to an Israeli think tank that published some of those "seized records," urging it to "act responsibly and completely avoid publishing all the material regarding the Arab Bank, directly or indirectly, which could serve as evidence as part of the legal proceedings …." *See* Schlanger Decl., ¶40 and Ex. 38, ECF p. 8, ¶8.

E.   **The Additional Factors the Second Circuit Has Considered in Assessing Objections Based on Foreign Law also Support Compelling the Production of the Requested Documents.**

**Party vs. Non-Party Status.** Parties to litigation bear a significantly higher burden than non-parties when asserting objections based upon foreign law. *See, e.g., Linde*, 706 F.3d at 109-110; *Strauss*, 249 F.R.D. at 454 ("If, however, the objecting litigant is a party to the action, courts accord that party's hardship less weight."); *Laydon*, 183 F. Supp. 3d at 420 ("whether the person resisting discovery is a party to the litigation" is relevant to the comity analysis).

That burden is heightened further where, as here, a defendant conducts extensive U.S. commercial operations. *First Nat'l City Bank*, 396 F.2d at 905; *Wultz,* 910 F. Supp. 2d at 553 (fact that discovery target was "a party doing business in the United States … makes the case for compelling production even stronger"); *Restatement (Third)* § 442, Reporter's Notes, No. 8 ("United States courts have placed heavy burdens on banks having offices in both the United States and bank secrecy jurisdictions" that attempted to avoid discovery based upon foreign statutes). By accepting the benefits of operating a branch in the world's banking center, the Bank subjected itself to New York and U.S. law, including the prospect of participating in litigation concerning material

support the Bank simultaneously provided to terrorist groups that murdered and injured Americans. *See, e.g., First Nat'l*, 396 F.2d at 905 (when a bank elects to operate in the U.S. and abroad, it may "confront the choice … to 'surrender to one sovereign or the other the privileges received therefrom' or … accept the consequences"); *Grand Jury Subpoena,* 218 F. Supp. 2d at 563 ("businesses that 'serve two sovereigns' assume the risk of conflicting legal imperatives"). In fact, the majority of the illicit transactions Plaintiffs are aware of were transferred through Arab Bank's then operating New York branch.

**Hardship.** The supposed "hardship" the Bank will suffer if it produces the Requested Documents also does not support sustaining its objections. *See Linde*, 269 F.R.D. at 196, 200. In assessing this factor, courts consider the *actual* likelihood and consequences of "enforcement of foreign law" and disregard unsubstantiated assertions that disclosure will lead to punishment.[38]

Nearly two decades after the Bank's unauthorized productions in connection with the OCC/FinCEN and HLF investigations, the Bank's brief cites no evidence that any of the foreign jurisdictions at issue ever prosecuted it or any of its employees for violating bank secrecy laws. Even apart from its prior "tactical" decisions to violate foreign laws the Bank cites *no* instance where any of the three jurisdictions pursued enforcement actions against any financial institution for purported violations of bank secrecy laws resulting from compelled disclosure in litigation.[39]

---

[38]     *Minpeco*, 116 F.R.D. at 522, 525-27; *see also, e.g., Linde,* 706 F.3d at 114 (courts must focus on the likely consequences of production because "foreign states would not necessarily prosecute the Bank or any of its employees for the disclosure of sensitive banking information to private civil litigants in the context of the current proceedings"); *First Nat'l City Bank,* 396 F. 2d at 900, 904-05 (absence of practical consequences of production supported affirming ruling sanctioning Citibank for failure to produce documents allegedly subject to German bank secrecy doctrine); *Grand Jury Subpoena,* 218 F. Supp. 2d at 563 (rejecting objections based upon foreign executive privilege although the company resisting production offered an opinion by the foreign state's Justice Ministry because neither the corporation nor the Ministry "presented any evidence that the confidentiality asserted by the Republic is enforced by any active prosecution"); *Wultz,* 910 F. Supp. 2d at 559-60 (rejecting bank secrecy objections where defendant "has produced no evidence that it has been meaningfully sanctioned by the Chinese government for complying with the two previous U.S. court orders to produce documents in contravention of China's bank secrecy law").

[39]     *See Laydon,* 183 F. Supp. 3d at 425 (hardship factor favored production where the resisting party could not "cite a single instance in which" a bank faced enforcement efforts for producing documents pursuant to a U.S. court order); *Wultz,* 910 F. Supp. 2d at 553-54 (failure "to indicate any sanctions that [the defendant bank] has in fact

In any event, any supposed hardship associated with violating the privacy rights of the Bank's account holders and transferees is mitigated—if not eliminated—by the Court's Protective Order.[40] The Bank cannot cite any manner in which that order fails to provide adequate protection to the legitimate confidentiality interests of the Relevant Persons targeted by Plaintiffs' discovery demands, all of whom have demonstrated ties to terrorism.

**Good Faith.** As both the magistrate judge and the district court judge in *Linde* concluded, the Bank cannot sustain its burden of demonstrating utmost "good faith" in pursuing production of the requested documents. *Linde* cataloged the many ways in which the Bank had misled the court and the plaintiffs and endeavored to prevent the full disclosure of the Bank's documents. *See Linde*, 269 F.R.D. at 199-200; *see also supra* at 6-7. To those, the Court could now add the Bank's disingenuous claims of ignorance of the identity of Hamas's "prime minister" Ismail Haniyeh and its iconic founder and spiritual leader, Sheikh Yassin, to cite just two examples. Time has not purged its record of less than good faith when it insists on resting primarily on the same woefully incomplete production it made in *Linde*.

Demonstrating the same lack of candor with the Court that was endemic to its conduct in *Linde*, the Bank actually claims "it worked diligently to identify and produce on a timely basis all responsive documents that are not subject to applicable bank secrecy laws," "promptly produced all responsive foreign bank transfer records of the Saudi Committee" and "produced all foreign

---

received as a result of its compliance with the two prior orders" compelling discovery negated claim that production would produce hardship); *Strauss*, 249 F.R.D. at 455 (hardship factor favored rejecting bank secrecy objections despite evidence that France prosecuted violations of the statute where defendant bank had previously made disclosures regarding relevant accounts without ramifications).

[40]     *See, e.g., Trade Dev. Bank v. Cont'l Ins. Co.,* 469 F.2d 35, 41 n.3 (2d Cir. 1972) (where bank resisted discovery on the basis of the Swiss bank secrecy statute, any "apprehension on the part of the Bank's clients that the information as to their identities would be misused could have been minimized by a protective order"); *Weiss*, 242 F.R.D. at 56 (entry of a "confidentiality order in this case … further lessens NatWest's potential hardship" from producing documents subject to U.K. bank secrecy laws); *Laydon,* 183 F. Supp. 3d at 425 ("the UK's interest in protecting the privacy of its citizens is mitigated by the protective order in place in this case").

account records for Osama Hamdan" by obtaining "the consent of Lebanese Government Authorities in *Linde*." MPO at 34.

To begin with, the Bank fails to acknowledge the *Linde* court's finding that the Bank failed "to produce promptly the transactional documents at issue" and that "the defendant's papers are replete with suggestions that, in fact, the Bank has not fully recognized its obligation to use all of its resources in responding to discovery requests." Schlanger Decl., ¶11 and Ex. 9 at 4-5. Moreover, by "promptly producing" Saudi Committee records, the Bank presumably means strenuously *opposing production* of these very same Saudi Committee transactions and describing plaintiffs' request for them as "meritless" because they were "not confined to payments to individuals or entities that are alleged to have harmed them," *id.*, ¶41 and Ex. 39, p. 5, and "obfuscat[ing] its obligation to produce evidence of funds transfers that went through New York involving the Saudi Committee," *id.*, ¶11 and Ex. 9, p. 6.

Lastly, the Bank initially *refused* to produce the Hamdan Account documents on the grounds that the account records were not connected to plaintiffs' injuries—despite having *already disclosed* those records to the U.S. government without seeking permission from the Lebanese government or informing plaintiffs or the court. Thus, the Bank's showing of "less than good faith" has carried over to the motion practice here.

In fact, the Bank's selective prior disclosures and continued refusal to accurately describe its past conduct are the antithesis of good faith. Even in its briefing to the Supreme Court, the Bank misrepresented its prior tactical disclosures, asserting that "the Bank disclosed to plaintiffs records previously provided to U.S. officials with permission and under mutual aid treaties … with the consent of its regulators (as plaintiffs well know)." *See* Schlanger Decl., ¶42 and Ex. 40 at 1-2.

This, despite a binding and uncontested court order to the contrary. *See id.*, ¶43 and Ex. 41.[41]

Furthermore, even a showing of utmost good faith in seeking the production of documents subject to foreign bank secrecy (a situation decidedly not present here) does not immunize those materials from disclosure. *See, e.g., Weiss,* 242 F.R.D. at 56 ("'notwithstanding [a litigant's] good faith, [the court is] not precluded from issuing a production order'") (citation omitted). Given the record in this case, the Bank's contention that it truly "wants" to produce the Requested Documents strains credulity beyond the breaking point.

## CONCLUSION

The Bank cites two 60-year-old decisions in urging this Court to defer to foreign interests in conducting the *Restatement* balancing. MPO 24. Neither involved claims under the ATA. It also fails to cite any decision from any circuit that has conducted such balancing for ATA claims. No wonder: every reported ATA case involving bank secrecy has found that the balancing required granting the ATA plaintiffs' discovery request, even before Congress further emphasized the compelling U.S. interest justifying discovery by enacting JASTA.

For all of the reasons set forth above, the Court should deny the Bank's motion, grant Plaintiffs' cross-motion, and enter the production order Plaintiffs seek.[42]

---

[41]　*See also Linde*, 2009 WL 8691096, at *3 ("It is also noteworthy that the Bank's disclosures to United States governmental authorities is [sic] not public information, and the fact that those disclosures were made apparently remains unknown to foreign authorities.").

[42]　The Bank has asked for more time to seek customer waivers. It could have sought such waivers long ago, but instead has delayed as long as possible, knowing (and even conceding, MPO at 24 n.20) that the effort would fail. Indeed, many of the accountholders like Sheikh Yassin have been dead for nearly twenty years. Nevertheless, Plaintiffs do not object to an order granting production, but allowing the Bank 120 days to obtain waivers or make further requests to foreign jurisdictions for approval.

Dated: April 4, 2022

Respectfully submitted,

/s/ Gary M. Osen
**OSEN LLC**
Peter Raven-Hansen
Gary M. Osen
Ari Ungar
Aaron Schlanger
Michael Radine
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
(201) 265-6400

*Attorneys for Miller Plaintiffs*

/s/ James P. Bonner
**FLEISCHMAN BONNER & ROCCO LLP**
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
(908) 516-2066

**HEIDEMAN NUDELMAN & KALIK, PC**
Richard D. Heideman (*admitted pro hac vice*)
Noel J. Nudelman
Tracy Reichman Kalik (*admitted pro hac vice*)
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles (*not admitted in E.D.N.Y.*)
Ed Macallister (*admitted pro hac vice*)
816 Connecticut Avenue, NW, 12th Floor
Washington DC 20006
Tel.: (202) 955-3806

*Attorneys for Pam Plaintiffs*