# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
COURTNEY LINDE, et al.,    :

    Plaintiffs,    :  04 CV 2799 (NG)(ASC)

  - against -    :  **DECLARATION OF SHUKRY BISHARA IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

ARAB BANK plc    :

    Defendant.    :
----------------------------------------------------X

Shukry Bishara declares under penalty of perjury:

1. I am the Chief Banking Officer of Arab Bank plc (the "Bank"), the defendant in the above-captioned action, and am resident at the Bank's headquarters in Amman, Jordan. I submit this declaration in support of the Bank's motion to dismiss the First Amended Complaint on the grounds of *forum non conveniens* and on other grounds. The sections of this declaration are as follows:

| Section | Page |
|---|---|
| Preface | 2 |
| Personal Background | 2 |
| History of Arab Bank | 4 |
| The New York Branch | 5 |
| Operating in Gaza and West Bank | 5 |
| Role of the Arab League and the Saudi Committee | 8 |
| Payments By Other Banks and Organizations | 10 |
| The Beirut Account | 10 |
| Policies and Systems | 11 |
| Documents and Witnesses | 12 |

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 4 of 16 PageID #: 1157

| | |
|---|---:|
| *Forum Non Conveniens* Consents | 13 |
| Conclusion | 13 |

### Preface

2. I am told by our New York lawyers that this motion to dismiss must be made under certain rules which apply in United States Federal Courts. I understand that these rules require that the allegations in the Amended Complaint be accepted as true for purposes of the motion and that factual information, documents, explanations and other evidence are not appropriate at this stage of the proceedings.

3. However, for personal reasons of my own and as the person who re-opened Arab Bank's branches in Palestine, developed its business in the areas, implemented its policies and set out its strategy, I cannot allow the first submission from the Bank to be put into this Court without addressing the terrible and untrue allegations leveled against the Bank in this case.

4. I understand that the Court is likely to not consider my comments for purposes of deciding the Bank's motion to dismiss. Nevertheless, I have insisted with our lawyers and I feel that I must, at least briefly, address these issues. I respectfully ask the Court's indulgence in this respect.

### My Personal Background

5. I was born in Jerusalem in 1947. I attended high school and graduated from the Christian Brothers in Jerusalem. Thereafter, in 1972 I received a Bachelor of Arts Degree in Economics from the American University in Beirut. I received a Master's Degree in Economics from University College London in 1973.

6. I began my professional career at Midland Bank (U.K.). I then moved to Fidelity Bank (now part of the Wachovia Banking Group) in Philadelphia, Pennsylvania. In 1974, I was transferred to New York and later to London, still with Fidelity, until 1979 when I moved to Paris to establish Arab Bank's operations there.

2

JA1786

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 5 of 16 PageID #: 1158

7. I was the General Manager of Arab Bank's operations in France from 1979 - 1994. In addition, I was the Regional Manager for Southern and Central Europe, as well as North Africa. During this period, I was responsible for the opening of our offices in New York (1982) and Singapore (1983).

8. In 1993, upon hearing of the potential breakthrough in peace initiatives and progress of settlement of Israeli-Arab issues set out in the Oslo Accords, I offered to take charge of the Bank's reopening of branches in Gaza and the West Bank ("GWB"). I was well aware of the complications and challenges of setting up the branches operating in Palestine during those transitional years, but I could imagine no more exhilarating a challenge in my career. In the midst of the peace process between the Israelis and the Palestinians, I welcomed the opportunity to personally participate in the development process of the economic infrastructure in Gaza and the West Bank, and to take part in the transfer of best practices and know-how to the region.

9. I moved from Paris to Ramallah to oversee the resumption of Arab Bank's operations in GWB where we presently enjoy a leading market share in excess of 50% of the banking activities carried out there by approximately 22 branches. I held that position from 1994-2002.

10. One of the most exciting moments of my tenure in this position was the licensing ceremony of our first branch in Nablus in November 1994. At the ceremony, the Israeli commanding officer in the Palestinian territories at that time welcomed Arab Bank back into GWB and expressed his sincere wishes for success in our endeavors there.

11. In February 2002, I was called to headquarters in Amman and was promoted to the position of Chief Banking Officer, which I still presently hold. In this capacity, I am in charge of and responsible for Arab Bank's global banking activities, including commercial lending, as well as corporate and institutional operations.

3

**JA1787**

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 6 of 16 PageID #: 1159

### History of Arab Bank

12. Arab Bank was founded in Jerusalem on July 14, 1930 by Abdul Hameed Shoman. Arab Bank's development and growth are inevitably tied to the political and social context of the history of the Middle East for the last century.

13. From 1960 forward, the Bank began to develop its services to other parts of the world beyond the Middle East. We were the first Arab financial institution to establish a presence in Switzerland and we opened branches in many parts of the world, including London, Paris, Italy, Singapore and Greece.

14. During its history, Arab Bank faced many challenges. As a result of political and unforeseen events, such as the Israeli-Palestinian conflicts and the nationalization of branches in countries such as Egypt, Syria, Libya, Iraq and Sudan, the Bank lost its presence in various countries. However, the Bank has continued to meet such challenges and move forward in spite of all the difficulties.

15. Indeed in spite of the fact of not being legally responsible to its customers for the deposits lost as a result of the above referred events, the Bank always, truthful to its tradition and high level of ethics, made up and honored its customers' trust and confidence by reimbursing out of its headquarters and its own funds for all deposits lost by its customers without having any recourse towards third parties for indemnification. This approach to banking practices helped the Bank earn the trust and respect not only of its customers by also of the entire banking community.

16. The Bank has consolidated assets of US$32 billion. Its stock is publicly traded on the Amman Stock Exchange. Today we have a presence in 30 countries on five continents and we employ 7300 people worldwide. Arab Bank is as much an international institution as it is a regional one.

4

**JA1788**

### The New York Branch

17. Arab Bank's New York branch was established in 1982. It has 51 employees, offers a full range of commercial banking services and is an active participant in the capital and money markets. It enjoys an excellent reputation in the United States especially for Middle East and North Africa related trade business. Deposits at Arab Bank are insured by the Federal Deposit Insurance Corporation (FDIC) and Arab Bank is regulated and supervised by the Board of Governors of the Federal Reserve System, the FDIC and the Office of the Comptroller of the Currency.

18. I am aware that the plaintiffs have attempted to cause damage to the New York branch by reporting to our regulators the untrue claims and unfounded accusations contained in the Amended Complaint. I am also aware that we ourselves, in line with our general policy of keeping our regulators always aware of any event concerning our branch, informed the Office of the Comptroller of the Currency of this lawsuit and have kept them apprised of all developments.

19. As a general policy, our Bank has always applied a very conservative and traditional approach to banking and has strived to apply the highest standards of compliance. As a result, we have consistently enjoyed high ratings in general of all the banking regulatory agencies in the jurisdictions in which we operate, including those which are known to be among the leading agencies, such as those of the U.S., UK, France, Italy and Austria.

### Operating in Gaza and the West Bank

20. Arab Bank's operations in GWB are subject to the supervision and control of the Palestinian Monetary Authority and the Central Bank of Jordan. Pursuant to the Basel Accords, a financial institution operating in multiple jurisdictions will be subject to the supervisory authority of the other countries in which it operates, as well as its home country.

5

**JA1789**

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 8 of 16 PageID #: 1161

21. In the initial period of our activities in GWB, we were also subject to the supervision of the Israeli Central Bank until the handing over of economic and banking activity in 1996 to the Palestinian Authority pursuant to the Economic Protocol under the Oslo Accords of 1993. The Oslo Accords provided for Israeli-Palestinian cooperation in economic and development programs, specifically:

> cooperation in the field of finance, including a <u>financial development</u> and action programme for the encouragement of <u>international investment</u> in the West Bank and the Gaza Strip, and in Israel, as well as the establishment of a Palestinian Development Bank. (Oslo Accords, Annex III) (emphasis added).[1]

22. The Oslo Accords recognized the importance of investment in Palestine to the peace process. The Bank committed to help with that investment. Among other projects, we partnered with the International Financial Corporation (of the World Bank) and the German government to establish a long-term development bank known as the Arab Palestine Investment Bank. We worked with several U.S. entities to develop a major power project in the Gaza Strip and we participated in long-term projects in telecommunications and manufacturing. Also, the Bank became a founding shareholder in the US$172 million Palestine Development Investment Company (PADICO), which was established to help revitalize the Palestinian economy.

23. From the very beginning, Arab Bank strategically identified the potential bottom-up growth for the local economy. For this reason, Arab Bank partnered with a number of specialized non-governmental organizations (NGO's) including USAID, IFC, OXFAM, ANERA, CARITAS, Save the Children Fund, Catholic Relief Services, CHF and DEG that all support the development of micro, small and medium-sized businesses. The dedicated services of Arab Bank and success in the delivery of these programmes are recognized by all of the above agencies.

---

[1] Attached hereto as Ex. 1.

JA1790

24. Owing to its reputation for ethical standards and reliability, Arab Bank has emerged as the main vehicle for the payments by the international donor community, especially the European Union, World Bank and mainstream Arab governments. Although the Bank is a non-political entity, it has a vested interest that the peace process should succeed and contrary to the implicit allegations in the Amended Complaint, Arab Bank has absolutely no motive to see the peace process derailed.

25. Since 1996, the Israeli Central Banking Authority supervisory role in GWB was officially transferred to the Palestinian Monetary Authority. Nevertheless, the Israeli authorities maintain indirect monitoring of the Arab Bank's activities through the flow of physical (cash bank notes) transfers of funds in and out of GWB, which are subject to the pre-approval and clearance by the Israeli security authorities.

26. In addition, and given Israel's strategic and close interest in fighting terrorism and its right to pursue such activities in GWB, as also expressed in the Oslo Accords, I am confident that had the Israeli authorities found any activities of the Bank to be engagement in aiding and abetting terrorism, as alleged in the Amended Complaint, they would have acted to prevent such activities, as they have done in many other cases. The fact that we have and continue to have business relations and transactions with Israeli banks reflects, in my opinion, the Arab Bank's professional and unstained goodwill in Israel.

27. Arab Bank enjoys a highly professional relationship with its Israeli counterparts, which is one of full cooperation and mutual respect. As the official currencies in effect in GWB are Israeli Shekels, Jordanian Dinars and U.S. dollars, Arab Bank is regularly engaged in transactional and corresponding relationship with its Israeli counterparts. In addition, Arab Bank maintains a professional relationships with the Israeli authorities as it handles many of the payments made by the Israeli authorities to the Palestinian Authority.

7

JA1791

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 10 of 16 PageID #: 1163

### Role of the Arab League and the Saudi Committee

28. Since the Oslo Accords, there were several attempts to finalize a true and lasting peace between Palestinians and Israelis. Amongst the key milestones was the Wye River Memorandum in October of 1998, entered into by President Clinton, Yaser Arafat and Benjamin Netanyahu, which provided, *inter alia*, that "the Israeli and Palestinian sides reaffirm their commitment to enhancing their relationship and agree on the need to actively promote economic development in the West Bank and Gaza." The Memorandum also provided that:

> the two sides agree on the importance of continued international donor assistance to facilitate implementation by both sides of agreements reached. They also recognized the need for enhanced donor support for economic development in the West Bank and Gaza. They agree to jointly approach the donor community to organize a Ministerial Conference ... to seek pledges for enhanced levels of assistance. (Wye River Memorandum, Section III) (emphasis added).[2]

29. In addition, in 2002-03, representatives from the United States, the European Union, the United Nations and Russia ("the Quartet") proposed a "Roadmap" for peace, which re-emphasized the vital importance of improving:

> the humanitarian situation and prospects for economic development in the West Bank and Gaza and [initiating] a major donor assistance effort. (Roadmap, Phase I) (emphasis added).[3]

30. By 2000, the process contemplated by the Oslo Accords had not been completed. Ariel Sharon visited the Al-Aqsa Mosque in September of 2000 and as a result, a second Intifada began causing economic deterioration in GWB. Unemployment was rising, foreign investments diminished considerably and violence between the two parties was on the rise and many innocent people were killed or injured. The Intifada continues to this day.[4]

---

[2] Attached hereto as Ex. 2.
[3] Attached hereto as Ex. 3.
[4] The word Intifada did not originally mean insurrection or rioting with violence. Technically, it means an uprising, a movement toward some rational goal. It has, unfortunately, come to mean an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip.

8

**JA1792**

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 11 of 16 PageID #: 1164

31. At a meeting in Cairo in October of 2000, the Arab League recognized, as had the peace negotiators before it, that economic and humanitarian circumstances prevailing in GWB were worsening as a result of the hardships and difficult circumstances suffered by the civilian population.[5] It agreed to "put in place an operating mechanism" to support and alleviate the civilian population's hardships.

32. As a result, the Arab League resolved to create two funds to support humanitarian efforts and economic developments in Palestine.

33. It also called upon the member states to find new and flexible mechanisms that would ensure the availability of funds, in response to which a committee was created in Saudi Arabia (later on to be called the Saudi Committee Relief for the Palestinian People).[6] Payments were made to thousands of unemployed Palestinians, persons in hospitals, Palestinians that were wounded or injured during the violence, persons whose houses were destroyed, as well as payments to Palestinian schools, hospitals and infrastructure in general.

34. Plaintiffs characterize the work of this Committee as designed to encourage terrorism. Nothing could be further from the truth. The Arab League's goals and the Committee's goals were to counter unemployment and generally alleviate the suffering of the civilian population.

35. Obviously all this aid from the Saudi Committee had be channeled to the GWB through banking networks.

36. Beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000. The payments were made to institutions and individuals alike.

37. The allegations in the Amended Complaint regarding our conspiracy with the Saudi Committee to encourage suicide bombers and reward their families for their deaths are

---

[5] Attending the Cairo Summit were representatives from Kuwait, Lebanon, Libya, Egypt, Saudi Arabia, Mauritania and

9

JA1793

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 12 of 16 PageID #: 1165

completely false and untrue. I cannot imagine more horrible accusations to tarnish our reputation.

### Payments by Other Banks and Organizations

38. The Arab League is not the only entity that gives money to the Palestinians in order to relieve suffering, unemployment and support a devastated economy. The donor community is made up of many contributors, such as the United Nations Development Program, European Union, Arab Monetary Fund, French Development Agency, Italian government, World Bank and USAID. A substantial amount has been paid into GWB through various banks, including Arab Bank, as well as various Israeli banks.

39. While the Intifada continues and while there is conflict and violence between the Israelis and the Palestinians, humanitarian organizations contribute and will continue to contribute funds. Palestine cannot survive during these times without donor support.

40. There are numerous other examples of humanitarian aid, charitable contributions and other assistance to countries going through violent conflict. For instance, non-partisan world humanitarian organizations have supported victims of violence in Afghanistan, Darfur, Sudan, Cambodia, Bosnia and Ivory Coast.

### The Beirut Account

41. The Amended Complaint falsely claims: "Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut." Am. Compl. Para. 345. This is not true. It is inconceivable that we would open an account for HAMAS whether in Beirut or in any of our branches.

42. The Amended Complaint refers to account number 3-810-622-473-0330 in Arab Bank El-Mazra branch, Lebanon as a main account used to fund terrorism. We have

---

Yemen.
⁶ Royal Decree No. (8636), dated 18-7-1421 A-H.

10

JA1794

investigated this account and our findings were that this account, which had a balance of US$ 8000, had been opened by an individual and has been dormant for the past three years.

43. We also discovered that unknown to the Bank, as plaintiffs claim, that this account number was used on a website that plaintiffs allege is a HAMAS website. Upon confirming that this account was at some time available on a website alleged to belong to HAMAS, a fact that the Bank was unaware of, the Bank closed this account, froze the balance of its funds and reported it to the appropriate authorities.

### Policies and Systems To Prevent Money Laundering and Terrorism

44. The Bank is at the forefront of preventing money-laundering and terrorist financing. It employs complex, sophisticated and state of the art software programs, commonly known as "filters," which are designed to identify terrorists and terrorist organizations and to detect suspicious patterns of financial activity.

45. Arab Bank's supervisory authority is the Central Bank of Jordan. In addition, Arab Bank is supervised by the regulatory authorities in all the countries where it operates. Among the main regulatory authorities with oversight over the operations in Arab Bank branches are: Office of the Comptroller of the Currency in the U.S., the Financial Services in the United Kingdom, and the Commission Bancaire in France. As a matter of general policy, the Bank deliberately applies the strictest of the rules as set out by the various regulators. Arab Bank is in good standing and highly regarded by the various regulatory bodies in question.

46. Our headquarters office in Amman maintains state of the art systems to prevent any money-laundering or terrorist activity and coordinates with the Central Bank of Jordan in that regard. Jordan has severe penalties for money laundering, pursuant to Anti-Money Laundering Regulations in Jordan No. 10 for the year 2001 issued by the Central Bank of Jordan under Section 99/B of the Banking Law.

11

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 14 of 16 PageID #: 1167

47. In order to counter terrorist financing transactions, Arab Bank applies the Office of Foreign Assets Control's list (the "OFAC list"), as well as local lists developed by the jurisdictions in which the Bank operates.

48. The Bank's compliance is of the highest technical quality.

49. The Bank enjoys an excellent rating from independent and internationally recognized agencies, such as Moody's Investors Service. Moody's has described Arab Bank as "one of the most prominent and well-known banking institutions in the banking world."[7] Moody's says that its rating is based, among other things, on the Bank's "preparedness to deal with catastrophic events and its long-standing track record of surviving wars, nationalizations, and economic crises."[8] Moody's adds, "in a region with a history of political and economic uncertainties ... Arab Bank is recognized as the flight-to-quality bank in the Middle East."[9]

50. Independently of any regulatory requirements, the Bank has been at the forefront of creating and implementing strict standards on its own.

### Documents and Witnesses

51. Arab Bank's documents that may be relevant to this case are located in four places: Amman, Ramallah, New York and Beirut.[10] I would say that more than 95% of the documents are in Amman; about one-half of them are in Arabic.

52. With regard to witnesses, I would estimate now that Arab Bank has approximately 12 employees, in addition to myself, who have knowledge of the subject matter in this case. Most of the witnesses are in the Bank's headquarters in Amman with only one or perhaps two witnesses in New York and one in Ramallah.

---

[7] Moody's Analysis, December 2003, pg. 1, attached hereto as Ex. 4.
[8] Moody's Credit Opinion, February 2004, pgs. 1-2, attached hereto as Ex. 5.
[9] See Ex. 4 at pg. 2.
[10] Ramallah is the headquarters center for GWB and is located in the West Bank, about 40 miles from Amman.

12

JA1796

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 15 of 16 PageID #: 1168

53. As appears below, even though most of the documents and witnesses are in Amman, to remove any doubt, the Bank will agree to produce any relevant documents and witnesses in an action in Jordan if this case is dismissed for *forum non conveniens*.

### *Forum Non Conveniens* Consents

54. I am informed that certain conditions must be fulfilled in order for an action to be dismissed on the grounds of *forum non conveniens*. I have set forth below certain consents that I understand are necessary to satisfy those requirements. I am the person authorized to give such consents on behalf of the Bank.

55. In connection with the motion to dismiss on the grounds of *forum non conveniens*, Arab Bank hereby agrees to consent to:

    (a) the jurisdiction of the Jordanian courts in any action filed by plaintiffs alleging the same or similar claims asserted in the Amended Complaint;

    (b) the application of U.S. law in such action, including, without limitation, the statute known as the Anti-Terrorism Act, 18 U.S.C. Section 2331, *et seq.*;

    (c) produce any relevant documents and witnesses in such action;

    (d) waive any statute of limitations or other time limit defense for bringing suit in such action; and

    (e) pay plaintiffs three times the amount of damages and reasonable attorney's fees in such action.

### Conclusion

56. This lawsuit is made up of false claims. Arab Bank is an honorable and reputable commercial enterprise that has served its customers in the Middle East and throughout the world for 75 years. It has always been conscious of its obligations to conduct safe, sound and prudent banking in all jurisdictions in which it operates.

57. For myself personally and on behalf of the Bank, I wish to state unequivocally that I reject violence for any purpose, political or otherwise. Plaintiffs allegations are unfair and untrue; they seek to exploit the current worldwide fear of terrorism.

13

Case 1:04-cv-02799-BMC-PK Document 64-4 Filed 06/03/05 Page 16 of 16 PageID #: 1169

58. It seems ironic, but apropos, that I sign this document in this city, just across the Jordan River from Ramallah, on this day -- a day that will surely be on every timeline of the history of the Middle East. I respectfully ask this court to look hard at these most serious allegations and to judge us fairly.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Amman, Jordan, on the __11th__ day of November 2004.

_____
Shukry Bishara

JA1798