# Exhibit 30

## Statement of Chairwoman Sue Kelly
## Subcommittee on Oversight and Investigations
## "Starving Terrorists of Money: The Role of Middle Eastern Financial Institutions"
### May 4, 2005

This hearing was called to examine and assist efforts to reckon with the very difficult problem of charities being used to support terrorism and the spread of extremism.

Since the vicious attacks on our country, we have placed a special focus on this issue. Despite the important progress we have made, this particular problem is not one that lends itself to simple solutions.

As we continue our push for progress, our approach must continue to reflect an understanding of the complexities inherent in this task.

We must consistently improve our understanding of the context which makes an honorable humanitarian impulse vulnerable to dangerous exploitation and misdirection.

And while it is improper to think that the cure to this particular problem can be found through a stronger relationship with any one country, it is clear in this case that a key to greater success will involve improvements in our partnership with Saudi Arabia, which possesses a unique status as a beacon in the Muslim world and has historically been a leader in Islamic charitable activities.

There is good reason for us to be troubled with this aspect of the U.S.-Saudi relationship in fighting terror finance. In that regard, I would like to enter for the record an exchange of letters that Congressman Royce and I had with Saudi Ambassador Bandar earlier this year.

Recently, attention has rightly focused on the Saudi relief committee for the Palestinians, one of the charitable committees run directly by the Saudi government.

Though it has provided legitimate relief aid, it also apparently provided a structured financial reward system for the families of Palestinian suicide bombers.

This abominable practice was advertised openly on a government-run website that was only taken down about two weeks ago.

Unfortunately we have seen reports that Arab Bank and other institutions may have been involved in this payment scheme.

Concerns related to this matter are amplified by actions taken by the Treasury Department in response to inadequate money-laundering controls at Arab Bank's branch in New York City.

The OCC said: "The inadequacy of the branch's controls over its funds transfer business is especially serious in light of the high-risk characteristics of many of the transfers."

The Oversight & Investigations Subcommittee is committed to learning more about these deeply troubling circumstances. The public has a right to know what has happened and how our government

has responded. The committee's attention to this issue in the coming months will remain focused on finding out what has happened, and I will be holding another hearing on this matter. The public will learn more about the Saudi charitable committee, the role of institutions used as conduits for supporting terrorism, and the response of our government to these circumstances. The public, and particularly the victims of these attacks and their family members, deserve nothing less.

This must be pursued not only because of the critical importance of ensuring accountability for those who support terrorism, but also because of the disturbing precedent it ostensibly sets for other Saudi-run charitable committees which direct relief to other areas such as Kosova and Iraq.

While on a fact-finding trip to Saudi Arabia last month, I learned about some of the positive efforts undertaken by the Saudi government in dealing with these charitable committees. There are significant efforts underway that we must acknowledge.

But there is still more to learn about the controls for these government-run charities. Recent reports about the Saudi Arabian chief justice encouraging the donation of funds to insurgents in Iraq should intensify our interest in assessing the effectiveness of Saudi charitable controls.

In addition to these charitable committees, we must focus on international Islamic charities based in Saudi Arabia, such as the World Assembly of Muslim Youth (WAMY) and the International Islamic Relief Organization (IIRO), which are unaffected by new Saudi government regulations.

These organizations are alleged to have supported Al-Qaeda, and are known to proselytize a form of Islam which has shown itself prone to spawning extremist, militant movements such as the Taliban.

These Saudi-based charities still operate throughout the world with minimal transparency or controls. To date, the Saudi officials have indicated that these charities operate largely outside their sphere of influence.

It is difficult to accept this argument.

There are deep interconnections - WAMY and IIRO were in fact created by the Saudi government, and are run currently by Saudi citizens.  I note that even earlier this year, the Saudi embassy put out a media release heralding a donation made by IIRO. This suggests a deep, continuing relationship. I very much agree with Under Secretary Levey's statement in his written testimony which underscores the importance of placing these charities under the review of the charitable commission the Saudi government is in the process of establishing for monitoring charitable donations outside the kingdom. These charities are currently not included in the commission's portfolio.

There must be an open, continuing dialogue with the Saudis about this issue. Based on my meetings in Riyadh last month, I believe Saudi officials would be willing participants in more frequent discussions with Congress, as they too bear the scars and burdens of an Al-Qaeda target. Officials in Riyadh expressed to me repeatedly their interest in working with our government and the Congress in fighting terrorism. We must engage this interest.

In our discussions, we must also be prepared to refine our own approach to this issue. We have to be mindful that we are directly addressing one of the five pillars of the Islamic faith: *zakat*, which guides Muslims to regularly donate a portion of their wealth to charitable causes.

U.S. complaints regarding Muslim charities are often perceived as lacking in respect for this fundamental obligation of the Islamic faith, thereby creating a serious complication for our hopes of resolving our national security concerns.

It's critical that we continue discussions not just with Saudi Arabia, but with all governments in the Middle East and North Africa on steps they can take to strengthen their ability to detect and stop terrorist money flows without impeding important, honorable humanitarian efforts.

An important step forward in this effort has been the establishment of the Middle East-North Africa Financial Action Task Force. MENA-FATF, as it is known, provides the ability for governments in the region to develop best practices and to share information on terrorists and their networks.

I am pleased that the US Department of the Treasury is an official observer delegation to MENA-FATF and has provided technical assistance to the organization and its members.

Most nations have laws on their books to fight money laundering and terror financing, yet there is no way to measure their effectiveness.

Banks, charities, and agencies of our own government are left to use their own resources to find out whether certain countries are trustworthy business partners.

While organizations like MENA-FATF can help, the U.S. government must take action to protect institutions that deal with nations that are not enforcing their anti-terror finance laws.

I have introduced HR 1952 along with Mrs. Berkley, Mr. Royce and Mr. Feeney to do just that.

A terror finance certification regime can eliminate uncertainty businesses and charities face working overseas while spurring other countries to enforce their own laws.

I look forward to working with the Treasury and my colleagues to move this bill forward in the near future.

The United States and its allies continue to fight a ruthless enemy that will use whatever weapon is at its disposal to defeat us, whether it is defaming its own religion, misleading banks and community lenders, or stealing aid meant for the poor and starving.

As we continue to take the necessary steps to defend ourselves, we must ensure that those who are victimized because of Al-Qaeda are not unduly hurt by those measures and are provided the means for making themselves as whole as possible.