# Exhibit 39

# LeBoeuf, Lamb, Greene & MacRae llp

| | | |
|---|---|---|
| NEW YORK | 125 West 55th Street | LONDON |
| WASHINGTON, D.C. | New York, NY 10019-5389 | A MULTINATIONAL PARTNERSHIP |
| ALBANY | (212) 424-8000 | PARIS |
| BOSTON | FACSIMILE: (212) 424-8500 | BRUSSELS |
| CHICAGO | | JOHANNESBURG (PTY) LTD. |
| HARTFORD | | MOSCOW |
| HOUSTON | | RIYADH |
| JACKSONVILLE | | AFFILIATED OFFICE |
| LOS ANGELES | | BISHKEK |
| PITTSBURGH | | ALMATY |
| SAN FRANCISCO | | BEIJING |

June 20, 2005

**BY HAND & ELECTRONIC FILING**

The Honorable Viktor V. Pohorelsky
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

**Re:**   *Linde, et al. v. Arab Bank, PLC, 04-2799 (NG) (VVP)*
*Litle, et al. v. Arab Bank, PLC, 04-5449 (NG) (VVP)*
*Coulter, et al. v. Arab Bank, PLC, 05-365 (NG) (VVP)*
*Almog, et al. v. Arab Bank, PLC, 04-5564 (NG) (VVP)*
*Afriat-Kurtzer, et al. v. Arab Bank, PLC, 05-388 (NG) (VVP)*
Defendant's Opposition to Plaintiffs' Motion to Compel

Dear Judge Pohorelsky:

We represent defendant Arab Bank plc ("Arab Bank" or the "Bank").  We write to oppose plaintiffs' letter brief to the Court dated June 3, 2005 ("Plaintiffs' Letter Brief"), in which plaintiffs have requested an order compelling the Bank to produce certain documents.

The five related actions before this Court have been commenced by more than 2,000 plaintiffs.  Each claims injury as the result of a specific incidence of violence mostly in Israel, Gaza, or the West Bank.  Plaintiffs allege that certain organizations are responsible, or have claimed responsibility, for the attacks upon them.  Plaintiffs appear to contend that three organizations, in particular -- Hamas, the Al Aqsa Martyrs Brigade, and the Palestinian Islamic Jihad -- are responsible for substantially all of their injuries.  During the Status Conference before this Court on April 20, 2005, for instance, Mark Werbner, who provided an "overview"

June 20, 2005
Page 2

on behalf of all plaintiffs, stated that "in 99 percent . . . it's really Hamas, Islamic Jihad and one of the Palestinian Fattah Tonzim [sic]." (Conf. Tr. at 4, 7.)[1]

It is notable, however, that the discovery sought by plaintiffs in these actions is not calculated to obtain documents relevant to these three organizations, or other organizations that are specifically alleged to have received material support from Arab Bank. To the contrary, plaintiffs have demanded discovery that in every respect resembles the traditional fishing expedition. (*See, e.g.*, Pls. Doc. Req. Nos. 6, 7, 13, 15, requesting information concerning payments to and accounts held by unidentified "family members" of those killed in the Second Intifada; Pls. Doc. Req. No. 19, 20, seeking personal financial information concerning unnamed individuals without alleged connection to the incidents at issue.)

At the April 20, 2005 conference, the Court made certain observations in the course of Mr. Werbner's remarks. Among other things, the Court noted that:

- "I presume you're not going to ask them for every transaction that occurred on or around [the date on which a] particular incident occurred." (Conf. Tr. at 22);

- "You want e-mails . . . and they're confined to a set of recipients and senders; right?" (Conf. Tr. at 23);

In fact, however, the plaintiffs have refused to tailor their requests to the allegations of their pleadings in this fashion.

## I.    THE BANK HAS AGREED TO PRODUCE DOCUMENTS RELEVANT TO THE ALLEGATIONS OF THE COMPLAINT

The plaintiffs freely acknowledge in their Letter Brief that they are unwilling to limit discovery to the particular incidents at issue in the complaints and to the entities and organizations that are alleged to have been aided and abetted by Arab Bank. Plaintiffs instead seek far broader discovery with respect to "other incidents of the same type." (Pls. Ltr. Br. at 3.) Plaintiffs have done nothing to define such "other incidents of the same type," however, nor have they specified why such incidents are relevant to the particular injuries they allege. If, in fact, as Mr. Werbner claims, "99 percent" of all plaintiffs' injuries are attributable to three organizations, it is surely unreasonable for plaintiffs to now seek the production of records relating to "all payments relating to the families or representatives of all . . . Palestinians in Israeli custody," among other irrelevant and overbroad requests. (Pls. Doc. Req. No. 6, 7, 8, 22.)

The Bank has agreed to produce documents relating to the plaintiffs' specific claims of injury arising from the alleged conduct of particular assailants. In other words, the Bank will search for, and produce subject to governing bank secrecy laws, transactional records, if such records exist, involving identified assailants who are alleged to have participated in

---

[1]    The transcript of the April 20, 2005 Conference ("Conf. Tr.") is conference is attached as Exhibit 8 to the letter to the Court of Kevin Walsh dated June 3, 2005.

June 20, 2005
Page 3

specific acts of violence and to have been aided and abetted by Arab Bank. This is the proper scope of discovery. By comparison, it is unreasonable to require Arab Bank to produce records of hundreds of thousands of transactions entirely unrelated to the allegations of the complaint, merely because plaintiffs believe they are entitled to obtain evidence of "other incidents of the same type." (Pls. Ltr. Br. at 3.)

The Bank has agreed, moreover, to search for responsive information by searching for the names of particular individuals and entities identified by the plaintiffs in their complaints. Such a production is neither "overly restrictive" nor "inappropriate," as plaintiffs argue; to the contrary, it is a production which corresponds to the facts as alleged. The Bank has also offered to search for transactional records involving identified family members of the alleged assailants. Thus, to the extent that plaintiffs allege that the father of an assailant has received a payment processed by Arab Bank, the Bank has agreed to search for any record of such a transaction. It cannot do so, however, unless the plaintiffs provide the names of such family members, as well as any other relevant information in their possession. To date, however, plaintiffs have not done so; instead, they have sought to impose the entirely unreasonable burden upon the Bank of identifying the "family members" of assailants whom the plaintiffs have themselves been unable to identify. Nor is it reasonable to require the Bank to identify "Martyrs," "Shuhada," or "suicide bombers" (Pls. Doc. Req. Nos. 6, 7, 13, 15) whom the plaintiffs themselves have not identified.

The failure to specify records by name plainly contravenes Rule 34, which requires that a document request "shall set forth, either by individual item or by category, the items to be inspected and describe each *with reasonable particularity*." Fed. R. Civ. P. 34. The "test is whether a reasonable person would know what documents or things are called for in the request." 7 James Wm. Moore, *et al.*, *Moore's Federal Practice*, §34.11 (3d ed. 1999)**.**

A random selection of plaintiffs' requests reveals the manifold ways in which these requests fail to comply with Rule 34. Plaintiffs' Document Request No. 7, for instance, seeks documents concerning payments made through Arab Bank "to the families or representatives of all persons, including so called martyrs or Shuhada as defined herein, killed as a result of injuries sustained during the Second Intifada." Plaintiffs' Document Request No. 14 similarly seeks databases or lists that "contain" names of "Palestinians in Israeli custody, martyrs, suicide bombers or other persons killed or injured during the Second Intifada."

It is self-evident that the Bank has no better means to identify "Palestinians in Israeli custody" than do the plaintiffs, nor is it remotely apparent why it should be required to do so to discharge its discovery obligations in this case. *See, e.g., Lemanik v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 608 (S.D.N.Y. 1989) (denying defendant's motion to compel the plaintiff Swiss financial institution to search its customer files to determine if customers "gave instructions inconsistent with reliance, or other essential elements of [plaintiff's] cause of action for securities fraud"). Indeed, requests of this sort, which bear no apparent relationship to the particular injuries allegedly suffered by the plaintiffs and instead focus upon the "Second Intifada," compel the inference that the plaintiffs' true purpose is a political one.

June 20, 2005
Page 4

## II.   PLAINTIFFS' REQUESTS ARE OVERBROAD AND ARE NOT TAILORED TO THE ALLEGATIONS OF THE COMPLAINTS

Substantially all of plaintiffs' document requests are overbroad. For example, notwithstanding the statement of Mr. Werbner that "99 percent" of the attacks at issue in these actions are attributable to Hamas, the Al Aqsa Martyrs Brigade and the Palestinian Islamic Jihad, plaintiffs have sought information from the Bank about a host of other organizations, many of which are not identified in the complaint. Plaintiffs' Document Request No. 19, for instance, seeks "all documents which refer or relate to accounts maintained at Arab Bank in the name of or for the benefit of" 65 organizations, many of which are neither alleged to have had any role in the events at issue nor named in the complaints. It is plainly unreasonable to request that the Bank produce "all documents pertaining to accounts" for such 65 organizations. The wholesale production of all banking records for each of these organizations is obviously not a legitimate discovery request. Rather, it appears that plaintiffs are attempting to enlist the discovery processes of this Court as a means of scrutinizing every action of every charitable organization in the West Bank and Gaza.

Such an effort is, of course, impermissible. *See, e.g., Lemanik*, 125 F.R.D. at 608 (opponent not permitted "walk through clients' confidential financial transactions in the hope that something of arguable relevance might turn up").[2] It appears obvious that plaintiffs are seeking to use the Bank's account records to conduct this very type of "walk through."

With respect to account information concerning alleged "front" organizations, the Bank has agreed to produce documents, to the extent any exist, that concern payments to such organizations that allegedly funded the incidents that allegedly gave rise to plaintiffs' injuries. The Bank has also agreed to search for documents concerning payments, if any, to Hamas, Al Aqsa Martyrs Brigade or Palestinian Islamic Jihad, the three organizations allegedly responsible for "99 percent" of the plaintiffs' injuries at issue. This proposal plainly obviates any need for the intrusive and overbroad search that plaintiffs seek in Plaintiffs' Document Request Nos. 15, 19, 20, 21, 26, 28, 29, 30 and 34.

## III.   PLAINTIFFS' REQUEST FOR DOCUMENTS CONCERNING THE TRANSACTIONS DIRECTED BY THE SAUDI COMMITTEE IS OVERBROAD

Plaintiffs contend that because they have characterized the charitable activities of the Saudi Committee as a "death and dismemberment scheme . . . for all actual and potential

---

[2]     In Plaintiffs' Document Request Nos. 11 and 16, for instance, plaintiffs seek documents concerning alleged donations to "Palestinians injured in the Second Intifada" and to the "Fund for Support of the Persistence of the Palestinian People." Evidence of any such donations would not, of course, be probative of plaintiffs' allegations, since no such donations are alleged to relate to the specific incidents at issue, nor, in any event, would they constitute evidence of material support for the alleged terrorist acts. Plaintiffs' contention that any donation to support those injured in the Second Intifada is somehow evidence of a pattern of bad acts (Pls. Ltr. Br. at 6) plainly does not articulate a sustainable theory of discovery.

June 20, 2005
Page 5

Palestinian terrorists," they are entitled to discovery of more than 200,000 transactions directed by the Saudi Committee.  Such an argument is meritless.

Plaintiffs' requests are overbroad because they are not confined to payments to those individuals or entities that are alleged to have harmed them.  Such alleged harm delimits the universe of what is relevant to plaintiffs, and the production of documents concerning payments made at the instruction of the Saudi Committee should thus be confined to documents evidencing transactions which are alleged to have resulted in the injuries at issue in these proceedings.

## IV.    THE "OCC DOCUMENTS" THAT PLAINTIFFS DEMAND ARE EITHER PRIVILEGED OR AVAILABLE ELSEWHERE

Plaintiffs' Document Request No. 5 seeks "all documents which refer or relate to any pending investigation of Arab Bank by any agency of the U.S. government or discussions or communications between Arab Bank and any agency or office of the U.S. government . . . including but not limited to the pending investigation by the Office of the Comptroller of the Currency."  This request is grossly overbroad.  It is not tailored, moreover, in any respect to the allegations of the complaint, but instead reflects an effort to invade the Bank's privileged relationship with its examiners.

Although plaintiffs seek to cloak themselves in the public interest, it is well-settled that the examination privilege exists to serve this interest by shielding the examination process from private litigants and permitting free and open communications between institutions and their regulators.  Plaintiffs concede this in their letter acknowledging that they have no right to non-factual, deliberative matter: "[p]laintiffs' request has been tailored to avoid privileged materials."  (Pls. Ltr. Br. at 7.)

In conceding that they will respect the examination privilege, the plaintiffs have, moreover, acknowledged the importance of the public purpose served by this privilege.  The bank examination privilege has long been recognized as a doctrine born of the "practical necessity" of having banks and their regulators communicate freely in a cooperative environment of trust and reciprocation.  *In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992); *Bank of China v. St. Paul Mercury Ins. Co*, No. 03 Civ. 9797, 2004 WL 2624673, at *4 (S.D.N.Y. Nov. 18, 2004) (The purpose of the bank examination privilege is to encourage "openness and honesty between bank examiners and the banks they regulate.").  As noted, "[b]ank safety and soundness supervision is an iterative process of comment by the regulators and response by the bank.  The success of the supervision therefore depends vitally on the communication between the regulated banking firm and the bank regulatory agency."  *Id.*  Accordingly, the OCC owes a duty to regulated banks to maintain the confidentiality of its communications with those banks and banks have a duty, in turn, to maintain the confidentiality of bank-created documents submitted to the OCC.  *In re Bank One Sec. Litig.*, 222 F.R.D. 582, 590 (N.D. Ill. 2004) ("banks have a duty of confidentiality as to bank-created documents submitted to the OCC").

June 20, 2005
Page 6

Plaintiffs nonetheless contend that the Bank has "flatly refused" to provide any documents in response to their request for OCC documents. (Pls. Ltr. Br. at 7.) This statement is not accurate; nor is it true, as plaintiffs argue, that Arab Bank is seeking to shield otherwise responsive documents from production merely because such documents may have been separately provided to the OCC in connection with its investigation and examination of the Bank. To the contrary, the Bank has stated to plaintiffs that it is willing to produce documents; to the extent any exist, concerning the incidents described in the complaints that are claimed to have damaged the plaintiffs. The Bank will produce such documents regardless of whether they were provided to the OCC; it has never asserted, as plaintiffs now suggest, that it is seeking to shield "its internal documents" merely because these documents may have been obtained by the OCC. (Pls. Ltr. Br. at 10.) Indeed, this information, such as records regarding particular transfers or transactions, has been separately sought by plaintiffs elsewhere in their document requests. (*See, e.g.,* Pls. Doc. Req. No. 25.)

Plaintiffs also contend that they have no wish to interfere in Arab Bank's relationship with its examiners. (Pls. Ltr. Br. at p. 11: "it is important to note that plaintiff's actions do not interfere with any government investigation.") Plaintiffs' conduct to date suggests otherwise, however. Plaintiffs have, for instance, previously invited the OCC to participate in the proceeding before this Court and have advised the OCC that Judge Gershon had requested such participation in a statement that led Judge Gershon to reprimand counsel:

THE COURT:        If you don't understand things that well, I'm going to have to spell this out chapter and verse. *The letter that you sent to the OCC mischaracterizes my ruling*. I consider that an exceedingly serious matter and if anything like that happens again, I will take more serious action than I'm going to do today, which is to identify the errors and direct you not to do it again. But I tell you that if you do anything like that again, I will not just let it slide.

MR FRIEDMAN:        I apologize. It was not my intent.

THE COURT:        *It has to have been your intent because it's perfectly obvious what went on here*. You identified to the OCC that the court had invited them to address this. . . .

. . . .

THE COURT:        I did not invite [the OCC] to appear. You are inviting them to appear. It's a big difference.

. . . .

THE COURT:        *And this is never to happen again because the remedy that I'm ordering now will not be enough if anything like this happens again. I'm*

June 20, 2005
Page 7

> *telling you, it's going to be directed at counsel personally, they cannot behave in this fashion. I will not tolerate it.*

(Transcript of proceedings before Hon. Judge Nina Gershon on Nov. 5, 2004 7:9-23; 8:9-10; 9:12-16 (emphasis supplied), attached hereto as Exhibit 1.)

## V.    THE APPLICABILITY OF FOREIGN BANK SECRECY LAWS MUST BE DETERMINED ON A COUNTRY-BY-COUNTRY BASIS

Plaintiffs have requested the opportunity to submit briefs to the Court with respect to the applicability of foreign bank secrecy laws. (Pls. Ltr. Br. at 12.) Arab Bank believes that this Court should entertain such briefing from both plaintiffs and the Bank in light of the fact that the discovery matters before this Court can be resolved only after consideration of foreign law.

In particular, the bank secrecy laws of Gaza, the West Bank, and Jordan are implicated by plaintiffs' discovery requests. Because plaintiffs have requested information about an account maintained in Beirut, Lebanese bank secrecy law is also at issue. (Pls. Doc. Req. No. 17.)

These bank secrecy laws vary by country, of course. In Lebanon, for example, local law prohibits banks from disclosing to third parties the names of clients, their assets and the movements of their accounts, among other information. This prohibition can be lifted only by application to the Special Investigation Commission of the Lebanese Central Bank. Unless the discovery process overseen by this Court takes laws such as this into consideration, Arab Bank will be exposed unfairly to civil and criminal penalties.

## VI.   PLAINTIFFS' REQUESTS FOR DISCOVERY CONCERNING THE BANK'S ASSETS ARE IMPROPER

Plaintiffs concede that "asset discovery should be confined to post-judgment proceedings" (Pls. Ltr. Br. at 13), but nonetheless have demanded documents concerning Arab Bank's assets and net worth. (Pls. Doc. Req. Nos. 2-4 & 24.) They have failed to articulate any reason why such a departure from the "general rule" should be permitted here.

Plaintiffs have instead informed the court that "Arab Bank . . . is ceasing its operations in the United States" in an attempt to suggest that a miscarriage of justice will result unless asset-related discovery is permitted. This statement is false, as is plaintiffs' suggestion that Arab Bank is moving financial assets held in New York out of the country. (Pls. Ltr. Br. at 14.) As the Consent Order annexed by plaintiffs as Exhibit 6 to Plaintiffs' Letter Brief reflects, Arab Bank is converting its New York Branch to a federal agency (Article VII at p. 15), not "ceasing its operations in the United States," as plaintiffs claim. The Consent Order also contains extensive provisions regarding an increase in the Capital Equivalency Deposit required of the Bank in New York, as well as other provisions regarding Asset Maintenance. (Articles I and II.) Plainly, the Bank's asset base is not "moving out of the country," as plaintiffs contend.

June 20, 2005
Page 8

## VII.    PLAINTIFFS' UNTIMELY REQUEST FOR DOCUMENTS GOING BACK AN ADDITIONAL FIVE YEARS IS UNWARRANTED

In their document requests, plaintiffs have defined the "relevant time period" as "January 1, 2000 through the present." (Pls. Ltr. Br. Ex. 1, at p. 6.) Plaintiffs now contend that the relevant time period should begin on January 23, 1995, and that an intended revision reflecting such a change was not made so because of inadvertence. (Pls. Ltr. Br. at 16.)

The dramatic expansion of the relevant time period in this fashion is improper. The plaintiffs' complaints are devoted in substantial part to allegations of an "insurance scheme" that allegedly was implemented after September 2000, the date on which the Second Intifada is alleged to have begun. This Court should reject the untimely efforts of certain plaintiffs to recast the relevant time frame for discovery, especially since expanding such a time frame by five full years will result in enormous additional burden upon the Bank.

## VIII.   DISCOVERY OF ARAB BANK SUBSIDIARIES IS NOT APPROPRIATE

Plaintiffs contend that "Arab Bank is required to produce documents . . . in the possession of its subsidiaries." (Pls. Ltr. Br. at 15.) Such a request is unreasonably burdensome because it will require the search for documents in places where no responsive documents are likely to be found. Rather, the search for relevant, responsive documents should be conducted only in those locations where they are most likely to exist: New York, Jordan, Gaza, and the West Bank. It is plainly unreasonable to require that the Bank search each of its global facilities -- in such places as Singapore, China and Australia -- where there is no likelihood that responsive documents will be found.

Arab Bank is a global institution with presence in 28 countries. With the sole exception of an account alleged to have been maintained in Lebanon, there are no facts alleged in the complaints that suggest that responsive documents are likely to exist outside of the Bank's facilities in New York, Jordan, the West Bank and Gaza. To the extent that plaintiffs are now able to demonstrate that particular subsidiaries of the Bank are likely to possess documentation relevant to their claims -- something they have yet to do -- the Bank will, of course, comply with its obligation to search for such documentation. The Bank, however, cannot search the millions of transactional records maintained throughout its global operations without any legitimate direction or specification from plaintiff.

## IX.    THIS COURT SHOULD ENTER A SCHEDULING ORDER

The Bank agrees that a scheduling order, as suggested by plaintiffs, would assist the conduct of discovery in this action. We respectfully suggest that such an order take several matters into consideration:

June 20, 2005
Page 9

- While Arab Bank's motions to dismiss the five related actions are pending, the discovery efforts of the parties should be focused upon the most readily available evidence, which includes records located in New York.

- The application of foreign bank secrecy laws must be considered by this Court. Arab Bank respectfully requests that this Court establish a briefing schedule with respect to the requirements of bank secrecy laws in Jordan, Gaza and the West Bank and Lebanon. To the extent that plaintiffs can establish to the satisfaction of this Court that discovery is appropriate from other foreign jurisdictions, this Court should require briefing with respect to the bank secrecy laws of these jurisdictions.

- The timing of document production from foreign countries should await resolution of these bank secrecy issues and must also take into consideration the fact that many documents are written in foreign languages and are in locations that are not readily accessible to counsel.

### CONCLUSION

For the foregoing reasons, the Bank respectfully requests that the Court reject plaintiffs' motion to compel production in its entirety.

Respectfully submitted,

Kevin Walsh

cc: All counsel on attached service list
Encls.

## SERVICE LIST

**BY ELECTRONIC DELIVERY:**

### IN *LITLE, ET AL. V. ARAB BANK, PLC,* CV 04-5449

**Liaison Counsel for *Litle* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rheideman@HLNKlaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1615 New Hampshire Avenue
Suite 200
Washington, D.C. 20009
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

### IN *LINDE, ET AL. v. ARAB BANK, PLC,* CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC,* CV 05-365

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kindermack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven A. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

## IN *ALMOG, ET AL. . v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC,* CV 05-388

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557

# EXHIBIT 1

1105GERB

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3      - - - - - - - - - - - - - - X
                                         CV 04-2799
 4      LINDE, et al,

 5                    Plaintiff,

 6                    v.                  United States Courthouse
                                          Brooklyn, New York
 7      ARAB BANK, PLC

 8                                        November 5, 2004
                      Defendant.          11:30 a.m.
 9      - - - - - - - - - - - - - - X

10

11                    TRANSCRIPT OF PROCEEDINGS
                      BEFORE THE HONORABLE NINA GERSHON
12                    UNITED STATES DISTRICT JUDGE

13

        APPEARANCES:
14
        For the Plaintiff:      WECHSLER HARWOOD LLP
15                              488 Madison Avenue
                                New York, N.Y. 10022
16                              BY:   ANDREW D. FRIEDMAN, ESQ.
                                      JOSHUA D. GLATTER, ESQ.
17                                        and
                                      GARY M. OSEN, ESQ.
18
        For the Defendant:      WINSTON & STRAWN
19                              200 Park Avenue
                                New York, N.Y. 10166
20                              BY:   MICHAEL D. BURROWS, ESQ.
                                      CATHERINE B. SCHUMACHER, ESQ.
21

22      Court Reporter:         Burton H. Sulzer
                                225 Cadman Plaza East
23                              Brooklyn, New York 11201
                                (718) 260-4526
24                              Fax (718) 260-4504

25      Proceedings recorded by mechanical stenography, transcript
        produced by CAT.
```

Burton H. Sulzer, OCR, CRR, CSR, CM

1105GERB

```
1                (Open court.)
2                MR. FRIEDMAN:   Andrew Friedman, Wechsler Harwood,
3    for the plaintiff.
4                MR. GLATTER:  Joshua Glatter, with Mr. Friedman.
5                MR. OSEN:  Gary Osen for plaintiffs.
6                MR. BURROWS:   Michael Burrows, Winston & Strawn,
7    for the defendant.
8                MS. SCHUMACHER:  Catherine Schumacher, Winston &
9    Strawn, for defendant.
10               THE COURT:   Can I have Mr. Friedman and Mr.
11   Burrows.  I assume you're the two who will speak.
12               Counsel, I scheduled this conference, which I
13   expect to be very brief, in response to the letters that I
14   received, first, from the defense, dated October 18, and then
15   the responding letter from plaintiff, dated October 22.
16               Have there been any new developments with respect
17   to those letters that I should know about before I speak?
18               MR. FRIEDMAN:   Not that I'm aware.
19               MR. BURROWS:  I don't think so.
20               THE COURT: All right.  Then plaintiff's letter
21   suggested that the plaintiffs didn't feel the need to respond
22   in detail to the letter because they said they didn't want to
23   divert judicial resources from the resolution of the
24   preliminary injunction motion.
25               I appreciate your concern for my time, but I think
```

Burton H. Sulzer, OCR, CRR, CSR, CM

1105GERB

1    you have in fact wasted my time.  If you want to address the

2    merits of the letter now, you may, but it seems to me patent

3    on the face of the letter that you sent to the OCC that the

4    letter mischaracterized my order, and I think I have a deep

5    interest in making sure that what the court does is properly

6    represented.

7         MR. FRIEDMAN:    Your Honor, I didn't believe that

8    it does misrepresent your order, but we were told by the OCC

9    that the document should go to FinCEN not to OCC, in any

10   event, and I feel very comfortable with allowing the

11   defendants to draft a cover letter, if they would like to.

12        It wasn't intended to do anything other than

13   explain to the lawyers over at OCC that if they felt that the

14   court was entering into their jurisdiction or whatever it

15   might be that they wanted to come and appear and that they

16   could.

17        To the extent that they responded to us, it was

18   essentially that this wasn't their jurisdiction, that it

19   should go to a separate division, the FinCEN division, and

20   that was essentially all that they were going to deal with.

21        They were attorneys so I didn't think I needed to

22   explain the order to show cause aspect to them, but, as I've

23   explained to Mr. Burrows as well, I just think that the

24   documents should be sent to the appropriate governmental

25   agency and if they have decide that they would like to weigh

Burton H. Sulzer, OCR, CRR, CSR, CM

4

1    in or whatever that they should or they could.

Page 3

1105GERB

2          I don't care what the cover letter says.  If he
3     wants to send it to me, that's fine.
4          MR. BURROWS:   Your Honor, I see it a little
5     differently.  I think that it's a more serious matter than,
6     since the OCC doesn't want the documents, to forget about
7     what they did.
8          What happened is, they show up here a couple of
9     weeks ago ex parte, without an affidavit, and your Honor
10    accommodates them, gives them a break because there is a
11    conference already scheduled the next day or something.
12    That's fine.  But then they took advantage of that
13    flexibility by saying to the OCC that your Honor had invited
14    the OCC into the case.
15         The damage done by this statement, your Honor, is
16    itself immeasurable.  This is a statement that they attribute
17    to a Federal judge.  This is not one of their Internet
18    comments or some newspaper, this is a Federal judge and one,
19    who I might add, who has been on the bench for 30 years.
20         So what does the OCC make of this?  How do you fix
21    this?  This is what they think, this is what they told them.
22    They made it appear that the order you signed was more than
23    it really was, there is no doubt about it.
24         Then, is it a coincidence, your Honor, that The
25    Forward comes out a week later and Mr. Osen is giving them an

                   Burton H. Sulzer, OCR, CRR, CSR, CM


                                                            5


1     interview about this very injunction proceeding that they
2     wanted to keep so secret?
3          And then what happens?  The next week, your Honor,
                            Page 4

1105GERB

4   the next week they are in Israel advertising.  This is more

5   champerty; I guess this is legalized champerty.  They are in

6   Israel advertising for more plaintiffs to bring in here.

7        I think they misled you on the secrecy thing.  I

8   think that they have not been candid with the court and

9   certainly not with the OCC.

10       Your Honor now knows, of course, that the OCC has

11  been informed of everything that's happened in this case

12  since it started in July.  They have been given all the

13  documents.

14       Your Honor should also know that the bank is

15  cooperating with the investigation in Dallas, with the grand

16  jury investigation going on there, and as they have asked us

17  for help in documents, we provided those.

18       But, your Honor, the letter responding to my letter

19  says that they deny all of the allegations.  I stand by my

20  contention.  They did it for publicity, they did it so they

21  could tell clients and perspective clients that that they had

22  already obtained an order from your Honor to show cause.

23       What does a layman make of that order to show

24  cause, the judge knows the bank is bad so she didn't even

25  give them a chance to be heard, she just signed the order?


                Burton H. Sulzer, OCR, CRR, CSR, CM



                                                            6


1   That's what I believe they had in mind, your Honor.

2            THE COURT:  With respect to --

3            MR. FRIEDMAN:   with respect to a layman, it was

4   sent to an attorney who knows what an order to show cause is.

1105GERB
5      We have not revealed any of these proceedings to

6  anyone. Mr. Osen didn't give an interview to The Forward.

7  We have not talked to anybody about this. We have not sought

8  publicity. We have not done any of the things that Mr.

9  Burrows is saying.

10      If we were seeking publicity, we wouldn't have

11  sought this to be under seal and we certainly wouldn't have

12  started our campaign with The Forward, we would have been in

13  the New York Times and on CNN and everything like that. That

14  is just ridiculous to say this is a publicity stunt.

15      There are some very serious information and issues

16  here that the bank still hasn't even bothered to respond to.

17  They haven't explained one iota why they believe that it's

18  appropriate to be continuing to hold money for those entities

19  that have been shown to be owned and controlled by Hamas;

20  they haven't even addressed that.

21      THE COURT: I didn't call you in to discuss the

22  preliminary injunction motion, but I do think you must recall

23  that at the last hearing we discussed how we would proceed on

24  the preliminary injunction motion and the defendants were

25  authorized not to address the specific factual allegations

Burton H. Sulzer, OCR, CRR, CSR, CM

7

1  but to address the fundamental first issue, which was whether

2  or not there was any legal right that supported the

3  plaintiff's request for a preliminary injunction. That was

4  my ruling at the time. So I don't think you should be

5  attacking them for --

6      MR. FRIEDMAN:   I don't believe that was your
Page 6

1105GERB

7    ruling.

8              THE COURT:    I know what my ruling was, sir.

9              MR. FRIEDMAN:    I didn't understand it to be that.

10             THE COURT:    If you don't understand things that

11   well, I'm going to have to spell this out chapter and verse.

12             The letter that you sent to the OCC

13   mischaracterizes my ruling.  I consider that an exceedingly

14   serious matter and if anything like that happens again, I

15   will have to take more serious action than I'm going to do

16   today, which is simply to identify the errors and direct you

17   not to do it again.  But I tell you that if you do anything

18   like that again, I will not let it just slide.

19             MR. FRIEDMAN:    I apologize.  It was not my intent.

20             THE COURT:  It has to have been your intent because

21   it's perfectly obvious what went on here.

22             You identified to the OCC that the court had

23   invited them to address this.  You raised this and you said

24   you were going to do it and I acquiesced to that.  It was

25   certainly not me that issued any kind of direction to the OCC

Burton H. Sulzer, OCR, CRR, CSR, CM

8

1    with respect to their being able to come into this case.

2              If they choose to come into the case, they'll make

3    an application to me and I'll consider it.

4              MR. FRIEDMAN:    I thought that's what I was saying.

5              THE COURT:    That's not what you said.

6              MR. FRIEDMAN:    I was saying if they wanted to come

7    in they could come in.  I thought if you invited them to

Page 7

1105GERB

8  appear they could appear.

9      THE COURT:  I did not invite them to appear.  You

10 are inviting them to appear.  It's a big difference.

11     MR. FRIEDMAN:  Okay, I'm sorry, your Honor.

12     THE COURT:  I have made no finding or ruling at all

13 on that subject, other than to give you permission that you

14 could file these papers that you otherwise are saying are

15 under seal with this government agency.

16     It's an enormous difference, and if you don't

17 recognize that difference, that's unfortunate because you may

18 find yourself in court before me again for other kinds of

19 proceedings.

20     MR. FRIEDMAN:  I recognize it.

21     THE COURT:  The second thing is that the

22 description in the letter of the order to show cause is

23 entirely misleading, entirely misleading, and that is

24 perfectly obvious.  You identify as if they are decretal

25 paragraphs of the order to show cause --

Burton H. Sulzer, OCR, CRR, CSR, CM

9

1      MR. FRIEDMAN:  I put the order to show cause with

2  the documents, your Honor.

3      THE COURT:  That's nice.  So the accurate order to

4  show cause is attached, but that is not sufficient.  You are

5  not permitted to mischaracterize what I do or any other judge

6  does for your own purposes, I won't tolerate it.

7      I think it would be important for you to take the

8  transcript of this proceeding and submit it to the -- whoever

9  you submitted this letter to, and to file an affidavit with

Page 8

1105GERB

10    the court that you have done so.

11              MR. FRIEDMAN:    Sure, your Honor.

12              THE COURT:    And this is never to happen again

13    because this remedy that I'm ordering now will not be enough

14    if anything like this happens again.    I'm telling you, it's

15    going to be directed at counsel personally, they cannot

16    behave in this fashion.    I will not tolerate it.

17              Now, the preliminary injunction motion, I believe,

18    is now fully submitted, but I have not scheduled this for

19    argument so, unless there was something that anyone needs to

20    say with respect to it, I could hear you now, but if not, if

21    I need to hear from you further I'll call you in.

22              MR. BURROWS:    Thank you, your Honor.

23              MR. FRIEDMAN:    The only thing I would want to

24    address is, we would like to send the documents to FinCEN.

25    Like I said, I would invite Mr. Burrows to write the cover

Burton H. Sulzer, OCR, CRR, CSR, CM

10

1    letter --

2              THE COURT:    Why should he write the cover letter?

3    This is bizarre.

4              MR. FRIEDMAN:    If he thinks -- all right.    I

5    understand.

6              THE COURT:    You're an attorney.    You have to be

7    trusted to write an appropriate cover letter.

8              MR. FRIEDMAN:    Okay.    I will send this to FinCEN

9    send with an appropriate cover letter.

10              THE COURT:    Very good.    Thank you.    I think from

Page 9

1105GERB

11   now on that if you send things, you not only copy Mr. Burrows

12   but you copy me, which you did not.

13            MR. FRIEDMAN:   I did copy you.

14            THE COURT:  On the letter?

15            MR. FRIEDMAN:   Yes.

16            THE COURT:   Yes, you did.  Thank you.  According

17   to your letter -- we did not receive it.  That's what I

18   thought.  We did not ever receive it although you sent it by

19   FedEx.  Just make sure we get a copy of the next one.  All

20   right.  Thank you, counsel.

21                    *********

22

23

24

25


              Burton H. Sulzer, OCR, CRR, CSR, CM