# Exhibit 40

**No. 12-1485**

# In the Supreme Court of the United States

ARAB BANK, PLC,

*Petitioner*,

v.

COURTNEY LINDE, ET AL.,

*Respondents.*

**On Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit**

**REPLY BRIEF FOR PETITIONER**

KEVIN WALSH
DOUGLAS W. MATEYASCHUK
 *DLA Piper LLP (US)*
 *1251 Ave. of the Americas*
 *New York, NY 10020*
 *(212) 335-4500*

STEPHEN M. SHAPIRO
 *Counsel of Record*
TIMOTHY S. BISHOP
JEFFREY W. SARLES
 *Mayer Brown LLP*
 *71 S. Wacker Dr.*
 *Chicago, IL 60606*
 *(312) 782-0600*
 *sshapiro@mayerbrown.com*

*Counsel for Petitioner*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................ ii

REPLY BRIEF FOR PETITIONER ...........................1

A.    The Bank's Obedience To Foreign Criminal Law Cannot Deprive It Of A Meaningful Defense. ............................................3

B.    The Sanctions Order Conflicts With Due Process And Comity Decisions Of This Court And Other Circuits ..................................6

C.    The Sanctions Order Is Reviewable On Mandamus Or Collateral Order Appeal...........10

CONCLUSION ........................................................12

ii
# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abelesz* v. *OTP Bank*,
  692 F.3d 638 (7th Cir. 2012) ................................. 11

*Cochran Consulting* v. *Uwatec USA, Inc.*,
  102 F.3d 1224 (Fed. Cir. 1996) .............................. 8

*Crane* v. *Kentucky*, 476 U.S. 683 (1986) ..................... 5

*Credit Suisse* v. *U.S. Dist. Ct.*,
  130 F.3d 1342 (9th Cir. 1997) ............................... 11

*F. Hoffmann-La Roche, Ltd.* v. *Empagran S.A.*, 542 U.S. 155 (2004) ....................................... 9

*General Dynamics Corp.* v. *United States*,
  131 S. Ct. 1900 (2011) .......................................... 9

*Griffin* v. *California*, 380 U.S. 609 (1965) .................. 4

*Hammond Packing Co.* v. *Arkansas.*,
  212 U.S. 322 (1909) ................................................ 6

*Insurance Corp.* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) ........................... 11

*Kiobel* v. *Royal Dutch Petroleum*,
  133 S. Ct. 1659 (2013) ........................................ 2, 9

*Koon* v. *United States*, 518 U.S. 81 (1996) ................ 10

*Mohawk Indus.* v. *Carpenter*,
  558 U.S. 100 (2009) ............................................. 10

*Morrison* v. *Nat'l Australia Bank,*
    130 S. Ct. 2869 (2010) ............................................ 9

*Ohio* v. *Arthur Andersen & Co.,*
    570 F.2d 1370 (10th Cir. 1978) ............................ 11

*In re Philippine Nat'l Bank,*
    397 F.3d 768 (9th Cir. 2005) ................................ 11

*Schlagenhauf* v. *Holder,*
    379 U.S. 104 (1964) ............................................. 10

*Société Internationale* v. *Rogers,*
    357 U.S. 197 (1958) .................................... 6, 7, 8, 9

*Société Nationale Industrielle Aérospatiale* v.
    *U.S. Dist. Ct.,* 482 U.S. 522 (1987) .................... 7, 8

*Sosa* v. *Alvarez-Machain,*
    542 U.S. 692 (2004) ............................................... 9

*United States* v. *First Nat'l Bank,*
    699 F.2d 341 (7th Cir. 1983) ................................. 8

*In re Westinghouse Elec. Corp. Uranium*
    *Contracts Litig.,* 563 F.2d 992
    (10th Cir. 1977) ...................................................... 8

**MISCELLANEOUS**

American Bar Association, Resolution and
    Report No. 103 (Feb. 6, 2012) ............................. 8

16 Charles Wright, Arthur Miller & Edward
    Cooper, FEDERAL PRACTICE AND PROCEDURE
    § 3935.3 (3d ed. 2010) ......................................... 10

## REPLY BRIEF FOR PETITIONER

The district court imposed draconian sanctions on Arab Bank for refusing to produce personal customer account information where disclosure would violate the criminal laws of Jordan, Lebanon, and the Palestinian Territories. We have shown that those outcome-determinative sanctions offend international comity and due process, conflict starkly with decisions of this Court and other courts of appeals, and satisfy the requirements for mandamus, collateral order review, and certiorari. The Kingdom of Jordan—"a critical U.S. ally" taking the "unprecedented step" of filing a brief in this Court—has explained its "profound interest" in preserving its sovereign right to enforce Jordanian banking law and warned of "grave consequences" if this Court does not intervene. A sanctions-induced judgment against Arab Bank, Jordan explains, would "destabiliz[e]" the "economies of Jordan and surrounding countries," disrupt efforts "to broker peace in the Middle East," and "seriously undermine the international community's anti-money laundering and anti-terrorism efforts," in which the Bank plays "a pivotal role." Amicus Union of Arab Banks has described the stringent financial privacy laws that govern its 340 members and the dire consequences if U.S. courts order banks to violate them.

Plaintiffs respond that the Bank could comply with orders to disclose these records to private U.S. plaintiffs without fear of prosecution. But the Lebanese and Jordanian governments say that they will "institut[e] legal action against Arab Bank and its employees if it attempts to comply with the discovery orders." Pet. App. 244a; see Jordan Br. 13. It is no contradiction that the Bank disclosed to

2

plaintiffs records previously provided to U.S. officials with permission and under mutual aid treaties (Jordan Br. 12-13), for it did so with the consent of its regulators (as plaintiffs well know).

Plaintiffs deny that the sanctions prevent Arab Bank from defending itself. But the trial court recognized that the sanctions have "very severe consequences" that "mak[e] it very difficult to defend the case," in which plaintiffs demand hundreds of millions of dollars in trebled damages and threaten to make the Bank responsible for every terrorist attack during the intifada. July 30, 2013 Hearing Tr. 21-22, 37 ("Tr."). Applying the sanctions, the court excluded all evidence of foreign laws, the Bank's anti-terrorism practices, its closures of accounts of designated terrorists, and USAID grants to the same organizations that plaintiffs say were Hamas "fronts," as well as a dozen key expert and fact witnesses. These rulings leave the Bank with no fair opportunity to rebut the inference that it "knowingly and purposefully" conducted business with terrorists. Pet. 3-4; Supp. 2-3. Plaintiffs have no answer to our showing that where foreign criminal law bars disclosure, such severe sanctions violate due process and international comity under this Court's and other circuits' decisions.[1]

---

[1] Because the district court has now dismissed plaintiffs' ATS claims under *Kiobel* this Court need not address the second Question Presented. The first mass trial of hundreds of ATA claims arising from 24 separate terror attacks is now set for April 2014.

3

### A. The Bank's Obedience To Foreign Criminal Law Cannot Deprive It Of A Meaningful Defense.

The sanctions deprive the Bank of a fair opportunity to defend against the "quasi-criminal" charge (Tr. 74) that it facilitated terrorism. Plaintiffs attempt to transform the key legal question—the propriety of draconian sanctions for complying with foreign criminal law—into a factual dispute. But the sanctions are erroneous as a matter of law because the dispositive fact is undisputed: the laws of Jordan, Lebanon, and the Palestinian Territories make disclosure of customer account records a criminal offense. See Jordan Br. 10; Pet. App. 244a-247a. Fundamental precepts of due process and comity forbid severe penalties for *complying* with foreign law. See Pet. 24-29.

1. Plaintiffs (at 16) call our description of the sanctions' impact "overblown." But the sanctions not only eliminate plaintiffs' burden to prove that the Bank had a culpable state of mind, but also prevent the Bank from defending against that charge with meaningful evidence. As Judge Cogan (who replaced Judge Gershon) acknowledged, the sanctions make it "very difficult" for the Bank to make "any argument or offe[r] any evidence regarding its state of mind" unless it were "to produce the files" barred from production by foreign law. Tr. 21. He explained that the sanctions preclude any evidence that "shows what the bank does and why it does it" or "makes it less likely that [the Bank was] giving money to people [it] shouldn't have been giving money to," as well as any and all "circumstantial evidence of the intent of the bank." Tr. 35, 37, 53.

4

Plaintiffs (at 33) argue that "the jury is free to reject" the adverse inference. But when the jury is instructed that it may infer a culpable state of mind from the Bank's withholding of documents—without being told that the Bank did so only because it would face criminal penalties if it produced them—it inevitably will treat the instruction as tantamount to a directed finding. "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." *Griffin* v. *California*, 380 U.S. 609, 614 (1965).

Plaintiffs (at 33-34) seek to justify the adverse inference on the ground that withheld documents likely would substantiate their claims. But the Magistrate Judge rejected that inference precisely because plaintiffs made "no showing that the withheld evidence would be likely to provide direct evidence of the *knowledge and intent* of the Bank." Pet. App. 123a (emphasis added). Judge Weinstein, based on the same evidentiary record, found "no proof" that the Bank knowingly provided financial services to terrorists. See Pet. 29.

Plaintiffs point to documents suggesting that the Bank processed transactions for persons allegedly connected to Hamas. But they ignore large gaps between the dates of those transactions and when those persons were designated as terrorists, as well as a large geographic disconnect between the transactions and the governing lists of designated terrorists. There is no logical basis for inferring knowing support for terrorism from the Bank's processing of a handful of transactions for persons *later* or *elsewhere* designated as terrorists. A bank processing tens of millions of transactions must rely on

5

computer-implemented government lists to block transactions. The Bank pioneered computerized application of the U.S. government's terrorist list in the Middle East and promptly closed any account once it learned that the holder was designated a terrorist. Nothing in the produced documents indicates otherwise, leading the Magistrate Judge to call the contents of the withheld documents "a subject of speculation." Pet. App. 136a.

Plaintiffs say (at 35) that the preclusion sanction does not exclude "*all* evidence." But that is like saying cutting off nine toes leaves the victim able to walk. The sanctions order is equally crippling. See *Crane* v. *Kentucky*, 476 U.S. 683, 690 (1986) ("Due Process" guarantees "'a complete defense'"). State-of-mind is an essential element of plaintiffs' ATA claims, yet the sanctions order precludes the Bank "from making *any* argument or offering *any* evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents." Pet. App. 91a (emphasis added). The Bank cannot even present any evidence that "the withheld documents *could* disprove." *Id.* at 95a (emphasis added). A jury cannot reach informed answers to the trial questions listed by plaintiffs (at 2-4) if the Bank is precluded from providing any evidence that "could" address them.

2. Plaintiffs (at 38) dispute the Bank's good faith in seeking a waiver of foreign law prohibitions. But Arab Bank "undertook a sustained effort to seek relief from those obligations," including requests to the Jordanian courts and executive branch officials for permission to disclose protected financial records, all of which "were denied, in accordance with Jordan's Banking Law." Jordan Br. 13. Plaintiffs (at

6

38) blame the Bank for "years of delay," but that delay resulted from plaintiffs' own demands for documents subject to privacy laws and the Bank's efforts to obtain disclosure waivers—in some cases successfully. The Magistrate Judge found that the Bank was "fairly quick" to act. A981. Courts may not penalize a party "for a failure to do that which it may not have been in its power to do." *Hammond Packing*, 212 U.S. at 347. Nor may they ignore formal government statements that it is unlawful to produce these documents.

### B. The Sanctions Order Conflicts With Due Process And Comity Decisions Of This Court And Other Circuits

1. Plaintiffs contend that *Rogers* approved broad district court discretion and involved a default judgment different from the sanction here. To the contrary, under *Rogers* this is an *a fortiori* case.

In *Rogers*, a Swiss plaintiff invoked federal court jurisdiction to recover property that the U.S. government had seized after finding it "tainted" by plaintiff's relationship with the Nazi regime. The U.S. sought discovery of Swiss banking documents that plaintiff controlled, which would show whether plaintiff could sustain its burden of proof. Plaintiff declined to produce them because disclosure was prohibited by "Swiss penal laws and consequently might lead to imposition of criminal sanctions." 357 U.S. at 200. The district court ordered dismissal as a sanction and the court of appeals unanimously affirmed.

The Solicitor General in opposing certiorari argued—like respondents here—that the case involved the exercise of "sound judicial discretion"

7

and that the courts below had reasonably "weighed the various considerations which entered into the exercise of that discretion." U.S. Br. in Opp., No. 348, at 8 n.6, 9 (filed Sept. 4, 1957). The U.S. also argued that "whatever impediments to production may have been interposed" by Swiss banking law, a plaintiff "seeking to avail itself of the processes of our courts" is "required, upon pain of default," to permit the defendant "access to all of the underlying facts." *Id.* at 8-9. This Court nonetheless granted certiorari and unanimously held that "fear of criminal prosecution" by "a foreign sovereign" is "a weighty excuse for nonproduction" and that a sanction that deprives the non-disclosing plaintiff of its day in court denies due process. 357 U.S. at 211-212.

In each relevant respect Arab Bank is more entitled to relief from the sanction than the *Rogers* plaintiff. Arab Bank did not invoke the jurisdiction of the district court like the *Rogers* plaintiff, but instead was haled into U.S. court by private claimants challenging foreign events. Sanctions that deny the Bank its day in court are no less injurious than the dismissal in *Rogers*. And the sanction here has far worse consequences; an adverse judgment would undermine the viability of an important ally's leading financial institution and create economic and political instability in a volatile region. Jordan Br. 17-19. If there was a violation of due process in *Rogers*, there is certainly one here.

2. This Court in *Aérospatiale*—far from endorsing a chancellor's-foot weighing approach (Opp. 18-19)—held that courts must "demonstrate due respect for any special problem confronted by the foreign litigant" and "for any sovereign interest expressed by a foreign state." 482 U.S. at 546. Mouthing respect,

8

while deeming these interests outweighed by plaintiffs' tactical demand for more customer records, does not satisfy this requirement. If the violation of foreign financial privacy laws ordered here, the formal statements of foreign governments that the Bank will be criminally prosecuted, and the explanations by three sovereign governments of their interests are not enough to garner judicial "respect," then nothing is: "weighing" will *always* tip in favor of sanctions and this Court's decisions in *Rogers* and *Aérospatiale* will be meaningless. It is precisely that approach that the ABA has condemned. See ABA, Resolution and Report No. 103 (Feb. 6, 2012) ("U.S. courts have often misapplied the standard" set out in this Court's decisions by ruling "that the needs of the proceeding before them inevitably must take precedence over the privacy and data protection concerns of other nations"). In the circumstances here, *Rogers*, *Aérospatiale*, and other decisions of this Court (see UAB Br. 23) *categorically* require deference to foreign law.

3. Contrary to plaintiffs' assertion (at 29-30), other circuits, citing *Rogers*, recognize that a party's interest in discovery is outweighed when a foreign government insists that disclosure would violate its criminal laws. The Tenth Circuit in *Westinghouse* reversed even the lesser sanction of contempt and a fine when disclosure would have violated Canadian criminal law. 563 F.2d 992. The Federal Circuit in *Cochran Consulting* set aside a sanction because the district court had ignored the "great weight" of "Swiss criminal law" that prohibited the disclosure. 102 F.3d at 1228, 1230-1231. And the Seventh Circuit in *First National Bank* stressed the "special weight" to be given to the risk of criminal sanctions by the foreign state. 699 F.2d at 345. Those circuits

9

would have decided this case differently. Plaintiffs' opposition cites **not one appellate decision that upholds severe sanctions for failure to violate the criminal laws of another country.**

4. As our Petition showed (at 16-22), comity decisions after *Rogers* confirm that U.S. courts must avoid sowing "international discord" when they adjudicate "clashes between our laws and those of other nations." *Kiobel*, 133 S. Ct. at 1664. Severely punishing a foreign defendant for refusing to violate foreign criminal laws would have "adverse foreign policy consequences" that courts lack institutional capacity to gauge, and would interfere with the Executive's and Congress's authority to "manag[e] foreign affairs." *Sosa*, 542 U.S. at 727-728.

Plaintiffs' only response (at 22) is to point to the ATA's extraterritorial reach. But nothing in the ATA authorizes draconian Rule 37 sanctions for obeying foreign criminal laws that protect the privacy of tens of thousands of foreign citizens, or allows courts to ignore the protests of sovereign nations whose laws would be trampled. In cases like this involving "private plaintiffs" with no concern for "foreign governmental sensibilities" or the national interest (*Empagran*, 542 U.S. at 171), these comity concerns are amplified and do not permit application of U.S. law "incompatib[ly] with the applicable laws of other countries." *Morrison*, 130 S. Ct. at 2885.

There is nothing unjust about this result. This Court held in *General Dynamics Corp.* v. *United States*, 131 S. Ct. 1900, 1908-1910 (2011), that even in suits involving the U.S. government the parties should be "left where they are" when secrecy law precludes discovery and any judgment for the claimant "might represent an undeserved windfall."

10

Plaintiffs here bear the burden of proof and should not be awarded a "windfall" judgment simply because Arab Bank obeyed foreign privacy law.

### C. The Sanctions Order Is Reviewable On Mandamus Or Collateral Order Appeal.

Prompt review and reversal of the decision below will correct a "particularly injurious" and "consequential" ruling (*Mohawk*, 558 U.S. at 110-111) and provide "the necessary guidelines" for district courts (*Schlagenhauf*, 379 U.S. at 111-112), bringing this case squarely within this Court's "supervisory" jurisdiction to review an important "discovery question." 16 FEDERAL PRACTICE AND PROCEDURE § 3935.3, at 717; S. Ct. R. 10(a).

The petition does not present a "case-specific grievance," as plaintiffs assert (at 14). It involves public policies of three governments, privacy interests of tens of thousands of bank customers, important and recurring questions of international comity, and the obliteration of defenses critical to a fair trial. These are issues with repercussions far beyond this case. Whether under mandamus or collateral order review (see UAB Br. 22-23), there must be a "safety valve" to enable prompt consideration of manifestly unjust orders in cases of such importance. *Mohawk*, 558 U.S. at 111.

1. Plaintiffs (at 18-19) argue against mandamus by contending that the district court did not commit "a clear abuse of discretion." But "[a] district court by definition abuses its discretion when it makes an error of law." *Koon* v. *United States*, 518 U.S. 81, 100 (1996). Here, the district court erred as a matter of law by imposing severe sanctions for a foreign bank's refusal to violate foreign criminal law, flouting inter-

11

national comity principles. Moreover, the requirement that "any sanction must be 'just'" is a "due process restrictio[n] on the court's discretion." *Insurance Corp.*, 456 U.S. at 707.

2. Plaintiffs (at 25-26) deny that delaying appeal until after a final judgment would cause "irreparable harm." But a final judgment is years away given the planned series of liability trials before damages are even addressed. As Jordan explains (at 17), a single adverse verdict risks "grave consequences in Jordan and elsewhere in the Middle East" because "no bank wants to do business with a bank labeled a terrorism-financier." Plaintiffs say (at 27) that no "such consequences" flowed from "the original production order." But the production order did not deem the Bank a terrorist accomplice. The sanctions will produce a show trial that brands the Bank as an international terrorist. Given the Bank's vital role in the Middle East, a rigged trial threatens economic security throughout the region.

3. Plaintiffs incorrectly assert (at 31) that there is no "conflict in the circuits about interlocutory review" of sanctions like those imposed here. The Ninth Circuit twice has held that requiring a bank "to choose" between harsh punishment and "violating [foreign privacy] law" constitutes "severe prejudice that could not be remedied on direct appeal." *Credit Suisse*, 130 F.3d at 1346; *In re Philippine Nat'l Bank*, 397 F.3d 768, 774 (9th Cir. 2005). The Tenth Circuit found collateral order review appropriate on the same issue in *Arthur Andersen*, 570 F.2d at 1372. And the Seventh Circuit recently held mandamus appropriate in cases with "appreciable foreign policy consequences" and "astronomical" financial stakes (*Abelesz* v. *OTP Bank*, 692 F.3d 638, 651 (7th Cir.

12

2012)), an apt description of this case. The Second Circuit's ruling conflicts with these authorities, as well as with this Court's precedents. See UAB Br. 21-24. This Court should grant the petition to resolve this conflict over a frequently recurring issue of extraordinary importance to our civil justice system in a period of increasing cross-border litigation.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

| | |
|---|---|
| KEVIN WALSH | STEPHEN M. SHAPIRO |
| DOUGLAS W. MATEYASCHUK | *Counsel of Record* |
| *DLA Piper LLP (US)* | TIMOTHY S. BISHOP |
| *1251 Ave. of the Americas* | JEFFREY W. SARLES |
| *New York, NY 10020* | *Mayer Brown LLP* |
| *(212) 335-4500* | *71 S. Wacker Dr.* |
| | *Chicago, IL 60606* |
| | *(312) 782-0600* |
| | *sshapiro@mayerbrown.com* |

*Counsel for Petitioner*

OCTOBER 2013