UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------
AHARON MILLER, et al.,

                    Plaintiffs,     :  Case No. 1:18-cv-02192-RPK-PK

        -v-

ARAB BANK, PLC,

                    Defendants.

------------------------------------
NATHAM PAM, et al.

                    Plaintiffs,     :  Case No. 1:18-cv-04670-RPK-PK

        -v-

ARAB BANK, PLC,

                    Defendants.

------------------------------------


**DEFENDANT ARAB BANK, PLC'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER
PURSUANT TO RULE 26(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE AND
<u>IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

COUNTER-STATEMENT OF PROCEDURAL HISTORY .....................................2

ARGUMENT ...............................................................................................................5

    I.     THE BANK IS ENTITLED TO A PROTECTIVE ORDER
          NARROWING THE SCOPE OF PLAINTIFFS' REQUESTS ...........................5

          A.    Saudi Committee Requests (Category A) ....................................5

                1.    Cash Payments to Non-Customers..................................6

                2.    Customer Accounts ........................................................7

          B.    Charities and Social Service Institutions (Category B) .............9

          C.    Individuals Not Identified as Both Linked to an FTO and Closely
              Intertwined with Its Terrorist Activities During the Relevant Time
              Period (Category C) .................................................................12

          D.    Individuals and Entities Linked by Public Source Information
              During the Relevant Time Period to an FTO (Category D).....................15

          E.    The Palestinian Government and Political Parties (Category E) ..............15

    II.    THE COURT SHOULD DEFER ORDERING THE BANK TO
          VIOLATE FOREIGN BANK SECRECY LAWS ................................................17

CONCLUSION............................................................................................................18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Atchley v. Astrazeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ................................................................................13

*Fuld v. Palestine Liberation Org.*,
  No. 20-CV-3374 (JMF), 2022 WL 62088 (S.D.N.Y. Jan. 6, 2022) .......................16

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..................................................................................................17

*Honickman v. Blom Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) .............................................................................. *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) ............................................................................. *passim*

*Linde v. Arab Bank*,
  882 F. 3d 314 (2d Cir. 2018) ..............................................................3, 10, 11, 15

*Linde v. Arab Bank, PLC*,
  706 F.3d 92 (2d Cir. 2013) ......................................................................................3

*Linde v. Arab Bank, PLC*,
  No. CV-04-2799 (NG)(VVP), 2009 WL 8691096 (E.D.N.Y. Jun. 1, 2009) .................. *passim*

*Miller v. Arab Bank*, PLC,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ...................................................................9, 10

*Siegel v. HSBC North America Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) .....................................................................................4

*Societe Nationale Industrielle Aerospatiale v. United States District Court for the
  Southern District of Iowa*,
  482 U.S. 522 (1987) ................................................................................................14

*Sokolow v. Palestine Liberation Org.*,
  No. 04-cv-397 (GBD), 2022 WL 719261 (S.D.N.Y. Mar. 10, 2022) .....................16

*Tucker v. Am. Intern. Group, Inc.*,
  No. 3:09-cv-1499 (CSH), 2011 WL 6020851 (D. Conn. Dec. 2, 2011) ...................9

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ...................................................................................16

*Weiss v. National Westminster Bank PLC*,
No. 21-381 (Nov. 22, 2021)................................................................................................10

*Weiss v. National Westminster Bank PLC*,
No. 20-381 (Sept. 3, 2021)................................................................................................10

*Weiss v. National Westminster Bank, PLC*,
993 F.3d 144 (2d Cir. 2021)....................................................................4, 10, 11, 17

*Weiss v. Nat'l Westminster Bank PLC*,
242 F.R.D. 33 (E.D.N.Y. 2007) (Opp. Mem. ).............................................17, 18


**Other Authorities**

Fed. R. Evid. 408(a)..................................................................................................................4

Fed. R. Civ. P. 26..............................................................................................................2, 13

Restatement (Third) of Foreign Relations Law Section § 442 (1987)............................................2

Arab Bank plc ("Arab Bank" or the "Bank") respectfully submits this Reply Memorandum of Law in support of its Motion for a Protective Order and in opposition to Plaintiffs' Motion to Compel.

## PRELIMINARY STATEMENT

It is perhaps not surprising that Plaintiffs would spend the first eight pages of their brief rearguing the history of discovery in *Linde v. Arab Bank, PLC*, 1:04-CV-02799 (BMC) (PK) (E.D.N.Y., filed Jul. 2, 2004) rather than addressing the merits of Arab Bank's Motion for a Protective Order. But what is before this Court is the overbreadth of Plaintiffs' discovery requests[1] *in this case* and the actions of the parties *in these discovery proceedings*, not discovery disputes of fifteen years ago or a jury verdict vacated by the Second Circuit because the jury was wrongly charged on the law.

When Plaintiffs do turn to the issue at hand, they argue that there has been no change in law that would affect the relevancy of their requests. But as set forth herein, counsel for Plaintiffs just a few months ago argued the opposite to the United States Supreme Court. Their counsel claimed that the Second Circuit now recognizes a humanitarian charity exception to aiding and abetting liability that, *as a matter of law*, disregards evidence of funds transfers to parts of a Foreign Terrorist Organization ("FTO") that perform charitable work, unless those transfers are specifically earmarked or used for terroristic purposes. Plaintiffs also disregard recent Second Circuit precedent that make irrelevant transactions with individuals who were not known through public sources to have a connection to terrorism during the relevant time period. Finally, Plaintiffs

---

[1] Copies of Plaintiffs' First and Second Requests for Production of Documents (hereinafter referred to as "First RFP" and "Second RFP" or collectively the "Requests") are attached to the Declaration of Courtney G. Saleski in Support of Arab Bank's Motion for Protective Order dated March 4, 2022, ECF No. 84-2 ("Saleski Decl.") as Exhibits 4 and 5.

raise straw man arguments that the Bank nowhere advances in support of its Motion for a Protective Order, such as limiting discovery to the accounts of those who committed, planned, or perpetrated the attacks.

Accordingly, the Bank renews its request that the Court narrow Plaintiffs' Requests to discovery demands that are relevant, vital, and proportionate to this case in accordance with Rule 26 of the Federal Rules of Civil Procedure and Section 442(1)(c) of the Restatement (Third) of Foreign Relations Law (the "Restatement") and deny Plaintiffs' Motion to Compel.

## COUNTER-STATEMENT OF PROCEDURAL HISTORY

Although the Bank hesitates to take the bait, it would not want its silence to be misconstrued as agreement with what Plaintiffs refer to as the "Procedural History." (ECF No. 85, Plaintiffs' Memorandum of Law in Opposition to Motion for Protective Order by Arab Bank, PLC, ("Opp. Mem.") at 3−9.) Unlike the Bank's description of the relevant procedural history *in this case* in its moving papers, Plaintiffs devote six pages of their brief to relitigating the procedural history and trial in *Linde*. Only one paragraph on the last page of this "Procedural History" relates to the Requests at issue here (Opp. Mem. at 9), and that lone paragraph says nothing about the procedural history of discovery in this case. Plaintiffs cannot point to any delay, obstruction, or non-compliance with discovery in this case, other than the pandemic-related delays which Plaintiffs argue have prevented them from completing their own responses to the Bank's discovery requests.

To the extent Plaintiffs dwell on discovery disputes and motion practice from 13−15 years ago in *Linde*, such as their claims of selective compliance with bank secrecy laws because the Bank produced foreign records to the United States Government in response to a grand jury subpoena in the Holy Land Foundation case or to the Office of the Comptroller of the Currency

("OCC"), Plaintiffs simply gloss over Magistrate Judge Pohorelsky's rejection of their claim that this demonstrated bad faith by the Bank. To the contrary, he held that:

> [T]he defendant's prior disclosure was made to government authorities, whose requests are typically viewed as exemplifying strong national interests . . . Arguably the defendant would be less fearful that foreign governments would pursue sanctions against it for disclosures made to governmental authorities than for disclosures made in private civil litigation. It is also noteworthy that the Bank's disclosures to United States governmental authorities is not public information.

*Linde v. Arab Bank, PLC*, No. CV-04-2799 (NG)(VVP), 2009 WL 8691096, at *3 (E.D.N.Y. Jun. 1, 2009). Similarly, he noted with respect to other discovery disputes that had arisen that the "court is not prepared to find . . . any evidence of bad faith." *Id.* at *5. Almost a year later, and without holding a hearing, Judge Gershon disagreed. Judge Gershon's ruling on bank secrecy and sanctions was, of course, one of the key issues on appeal in *Linde*, which the Second Circuit deemed it unnecessary to reach given its decision to vacate the jury verdict on other grounds.[2] *Linde v. Arab Bank*, 882 F. 3d 314, 332-33 (2d Cir. 2018).

Similarly, Plaintiffs try to make much of consent orders that the Bank voluntarily entered into with the OCC and Financial Crimes Enforcement Network ("FinCEN"), but fail to note that: (a) the orders contained no admission of wrongdoing; (b) the OCC and FinCEN acknowledged that the Bank "largely complied with the requirement to cease clearing funds transfers once the [United States] designated an entity" and did not deem the Bank's failures willful or intentional; and (c) the Court granted the Bank's motion *in limine*, finding the orders inadmissible at trial under

---

[2] Although the Second Circuit had earlier denied the Bank's request for a writ of mandamus challenging Judge Gershon's order given the extraordinary nature of such a writ, it emphasized that, "Our conclusion today should not be read, however, to preclude a future court from holding that the district court erred in imposing the sanctions." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 108 (2d Cir. 2013).

Fed. R. Evid. 408(a), which precludes for sound policy reasons such evidence of settlements and compromise.  ECF No. 86, Declaration of Aaron Schlanger ("Schlanger Decl."), ¶ 3, Ex. 1.

Finally, Plaintiffs constantly refer to evidence of "material support" that they introduced in the *Linde* trial, such as the transfers the Bank processed for eleven charities.  But material support for humanitarian or social services, as discussed in the Bank's motion papers and as discussed further herein, is not the standard for Anti-Terrorism Act ("ATA") liability, and requires far more focused discovery requests.[3]

Much as Plaintiffs might wish it otherwise, this case is not *Linde.*  The Second Circuit had its say on that case when it vacated the judgment and set forth the proper standard for establishing primary liability under the ATA and aiding and abetting liability under the Justice Against Sponsors of Terrorism Act ("JASTA").  And it is those guidelines, as further defined and clarified by the Second Circuit in *Honickman v. Blom Bank SAL*, 6 F.4th 487 (2d Cir. 2021), *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), *Weiss v. National Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021), and *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), that should now guide this Court in deciding the parties' motions before it. We therefore turn to the specifics of the Bank's Motion for a Protective Order and Plaintiffs' arguments in response.

---

[3] In point of fact, ten of the eleven charities were never designated by the United States, and the eleventh, Al Salah, was first designated three years after the last attack.  Moreover, most of these charities, including Al Salah, which Plaintiffs reference in their brief at page 26, also received funding from USAID during the relevant 2000-2004 time period.

## ARGUMENT

## I.   THE BANK IS ENTITLED TO A PROTECTIVE ORDER NARROWING THE SCOPE OF PLAINTIFFS' REQUESTS

In their Opposition, Plaintiffs ignore the grouping of Requests by category as set forth in the Bank's Motion.  By doing so, Plaintiffs conveniently allow themselves to sidestep, and thereby avoid addressing, the specific arguments made by the Bank with respect to each category and the relief requested, while conflating the Bank's arguments or asserting positions the Bank nowhere takes.  The Bank therefore returns to those categories in this Reply in order to respond to Plaintiffs' arguments, as best as it can make them out, with respect to the Requests contained in each.

## A.   Saudi Committee Requests (Category A)

As stated in the Bank's moving papers, the Bank has already produced in this case all transfer records and related correspondence, including internal Bank memos, regarding the transactions processed by Arab Bank on behalf of Arab National Bank's ("ANB") customer, the Saudi Committee.

Plaintiffs spend pages of their brief confirming that the Bank did, in fact, produce what it said it produced, even attaching to their papers as exhibits lists that the Bank received and produced both in *Linde* and here, identifying the names of prisoners, martyrs, dates of death, causes of death, names of beneficiaries, dates of transfer, and amounts of transfer.  (*See, e.g*., Opp. Mem. at 8, 18; Schlanger Decl., ¶¶ 26–28, Ex. 24–26.)  Nonetheless, using innuendo, mischaracterization, and inconsistent arguments, Plaintiffs paint a false picture of that production both with respect to the cash payments to non-customers and the Saudi Committee transfers to existing account holders in an effort to suggest the production was incomplete.

### 1. Cash Payments to Non-Customers

Contrary to Plaintiffs' "merits" argument in this discovery motion (Opp. Mem. at 16), there is nothing improper about Arab Bank, as a correspondent bank, distributing payments as directed by ANB and its customer, the Saudi Committee, to intended recipients in the jurisdiction where Arab Bank operates. That is the very function of a correspondent bank: to provide banking services to an originating foreign bank not licensed to do business in the jurisdiction.[4] Nor is there anything "irregular" about a bank operating in a cash-based economy, such as the Palestinian Territories, to transfer funds in over-the-counter transactions, particularly where many of the intended recipients are either too poor to have bank accounts or lack confidence in any banking system.[5] But that is a merits argument, which the Bank will address more fully on an appropriate substantive motion or at trial. The issue on this discovery motion is Plaintiffs' contention, apparently *based on the document demand in Linde*, which covered over 15,545 recipients, and the Bank's response *there* (Opp. Mem. at 42), that the Bank, *in this case*, is "endeavor[ing] to conceal" (Opp. Mem. at 37–38) the identities of non-customer recipients whom they claim represent 90% of the Saudi Committee payments. (Opp. Mem. at 6.) That is a blatant misrepresentation of the Bank's document production in *these* discovery proceedings.

---

[4] It bears repeating that during the time period relevant to these payments, although politically controversial, there was no United States law or banking rule or regulation prohibiting payments to families of prisoners or martyrs in the Territories. Nor did the United States, the European Union, or Israel blacklist the Saudi Committee (which publicly disclosed these payments on its website) during this time period. *See* ECF No. 84-1, Defendant Arab Bank, PLC's Memorandum of Law in Support of Its Motion for a Protective Order Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("MPO") at 20, n.19 (citing Saleski Decl., Ex. 16 (excerpt from the book "Countering the Financing of Terrorism," edited by T. Biersteker & S. Eckert, entitled *Terrorism, Charities and the Diaspora, Contrasting the Fundraising Practices of Hamas and al Qaeda among Muslims in Europe*, written by Jeroen Gunning)).

[5] The Palestinian Minister of Justice made this very point in his Response to this Court, noting that one of the reasons for its insistence on compliance with bank privacy laws is to attract "the trust and confidence of a population that had a serious mistrust of the system." Saleski Decl., Ex. 11 (Oct. 28, 2021 Palestinian Minister of Justice's Response at 3).

The documents produced by Arab Bank in response to Plaintiffs' discovery requests in this case identify all but five of the hundreds of family members.  Plaintiffs know this full well since their own Requests *in this case* expressly reference those Bates-stamped documents, which identify, among other things, the name of the recipient, the amount of the transaction, the date of payment, and other information identifying the payment.  In the five instances (First RFP Nos. 6(16), 7(15) and 7(37); Second RFP Nos. 12(3) and 19(3)) where the documents produced do not identify the family member by name, it is because the instructions from the Saudi Committee contained only the instruction to pay the "family of" the named prisoner or decedent without identifying a specific family member.  The Bank produced to Plaintiffs the documents reflecting that instruction, which are the same documents cited by Plaintiffs in the Requests noted above. *See* Declaration of Brett Ingerman dated April 25, 2022 ("Ingerman Decl."), Ex. 1 (ABPLC030783, ABPLC030627, ABPLC011605, ABPLC011676, and ABPLC011683).  It then made the cash payment to the family member who presented documentation that they were the family member entitled to receive the funds.  In *Linde*, the Bank produced to Plaintiffs the proofs of inheritance it received for the requests made in that case.  Should the Court so order, the Bank will endeavor to produce the documents submitted by the five family members in this case identifying that individual as the person entitled to receive the payment.

### 2.    Customer Accounts

The Bank has not produced the personal accounts for family members who were existing customers of the Bank and received Saudi Committee transfers.  Plaintiffs do not contest that their personal accounts are covered by the bank secrecy laws cited by the Bank in its motion papers.  However, by reason of the Saudi Committee waiver, the Bank has already provided all other documentation regarding these transfers, including the identities of the recipients, the amount and dates of payment, all instructions, correspondence and spreadsheets, its own internal

communications, if any, regarding Saudi Committee payments, and communications of the Bank with ANB and the Saudi Committee regarding these transfers. Thus, to the extent Plaintiffs seek documents from which to argue that the Bank was aware or should have been aware that it was processing payments to families of prisoners or martyrs, it already has that documentation.

Plaintiffs do not allege that any of these recipients themselves engaged in terrorist activity at the time of these payments or were incentivized to commit acts of terrorism in the twenty years since, which would justify intrusion into their personal accounts and the violation of bank secrecy laws respecting their right to privacy.[6] Plaintiffs' own response to the Bank's argument in this regard is telling. Plaintiffs allege that:

> The Amended Complaint plainly alleges that the martyr payments, prisoner payments, and injured plaintiffs . . . [are] ***not an incentive to their surviving parents, minor children, or spouses to themselves commit terrorist attacks***. It is the promise to prospective martyrs that the large payments will be provided to the families after they are 'martyred,' injured during attacks, or imprisoned for committing terrorist attacks, that incentivized terrorism . . . .

(Opp. Mem. at 22.) Setting aside the merits of Plaintiffs' contention that the Saudi Committee payments incentivize terrorism—which as the Bank noted in its motion papers is not before the Court to decide on this discovery motion—Plaintiffs' own argument undermines the need for the family member accounts. That is, Plaintiffs' theory of liability is that the existence or ***fact*** of the payments alone incentivizes terrorism in others—***not*** that the family recipients were incentivized and committed acts of terrorism as a result of receiving a payment. And the Bank has already produced all documents regarding the fact of the payments.

---

[6] Rather than repeat an argument already made, the Bank also respectfully refers the Court to MPO at 20 n.19

Accordingly, the Requests for the accounts of the family members should be stricken both on grounds of relevancy and bank secrecy since they are not vital to Plaintiffs' claims against the Bank.

**B.      Charities and Social Service Institutions (Category B)**

In its Motion for a Protective Order, the Bank described Plaintiffs' Requests for seven years of account records for 38 charities and social service institutions as far too broad because transfers for humanitarian aid do not manifest the intent required to establish primary liability under the ATA.  Moreover, transfers for charitable and humanitarian programs, that are not identifiable as being for a terrorist purpose, do not establish the elements for JASTA aiding and abetting liability. Citing Second Circuit precedent that post-dates both the District Court discovery rulings in *Linde* and the Motion to Dismiss in *Miller*,[7] the Bank contends that the Requests should be narrowed to the 2000-2004 time period relevant to the attacks and specifically tailored, in accordance with the law of this Circuit, to exclude banking transactions related to charitable and humanitarian programs that are not identifiable as being for a terrorist purpose.  (MPO at 15-18.)

Plaintiffs contend that the Bank "willfully misconstrue[s]" Second Circuit caselaw, conflating the sufficiency of evidence with its relevancy, that "the jury verdict in *Linde* compels the opposite conclusion," and that there is no requirement a transaction be "earmarked for violent or terrorist purpose" in order to be relevant to proving liability.  (Opp. Mem. at 13-18.)  Contrary to the position Plaintiffs' counsel now takes before this Court, Plaintiffs argued just the opposite to the United States Supreme Court a few months ago.

---

[7] Contrary to Plaintiffs' assertion, Judge Cogan's opinion denying the Bank's motion to dismiss Plaintiffs' ATA and JASTA claims, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019), has no preclusive effect here.  (*See* Opp. Mem. at 2.)  The Bank is not refusing to allow discovery on these claims, it is merely asking that Plaintiffs issue Requests that comply with Rule 26 and Section 442(1)(c).  *Cf. Tucker v. Am. Intern. Group, Inc.*, No. 3:09-cv-1499 (CSH), 2011 WL 6020851, at *8 n.21 (D. Conn. Dec. 2, 2011).

Attached as Exs. 2 and 3 to the Ingerman Declaration are, respectively, the Petition for a Writ of Certiorari and Reply Brief filed in *Weiss v. National Westminster Bank PLC*, No. 21-381 (U.S., Sept. 3, 2021, Nov. 22, 2021).  The *Weiss* Petitioners and the *Miller* Plaintiffs share the same counsel, and Petitioners claimed to have suffered injuries from many of the same attacks at issue here.  After dismissal of their ATA and JASTA claims on summary judgment, and the affirmance of that dismissal by the Second Circuit, counsel argued to the Supreme Court that the Second Circuit's decisions in *Linde*, *Weiss*, *Kaplan*, and *Honickman* create "a humanitarian charity exception to aiding and abetting liability."  Ingerman Decl., Ex. 2 (Writ of Certiorari *Weiss v. National Westminster Bank PLC*, No. 20-381 (Sept. 3, 2021)) at 2.  In direct contradiction to the spin Plaintiffs' counsel now tries to put on those cases, counsel argued that:

> In the Second Circuit, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist organization."  ***Specifically, if a defendant knowingly provides substantial funds to parts of an FTO that "performed charitable work," and the funds are not earmarked or used for a "terroristic purpose," e.g., attacks or recruiting, the Second Circuit holds that the defendant is entitled to a judgment as a matter of law***.  The court also expressly rejects the argument that because money is fungible, transfers to the charitable or social wing of an FTO foreseeably lead to terrorist violence.  *See Honickman v. Blom Bank SAL,* 6 F.4th 487, 499 (2d Cir. 2021).

Ingerman Decl., Ex. 3 (Reply Brief, *Weiss v. National Westminster Bank PLC*, No. 21-381 (Nov. 22, 2021)) at 1 (emphasis added) (internal citations omitted).

Moreover, contrary to Plaintiffs' assertion in their memorandum here that the Second Circuit's decisions in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) and *Kaplan* confirm their position in this case and undermine the Bank's argument (Opp. Mem. at 14-15), counsel argued the opposite to the Supreme Court:

> In *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), the jury was not instructed about JASTA, and the question was whether the jury's findings (including that the defendant knowingly provided substantial funds to an FTO and proximately caused the plaintiffs' injuries) necessarily made out a JASTA

claim. ***The court held "no," dealing a defeat to the plaintiffs***. . . .  In *Kaplan*, the Second Circuit held that the claim survived a motion to dismiss—but scienter is relatively easy to allege.  *See* 999 F.3d at 861 (distinguishing *Linde* and this case because they "were not decided on the basis of their pleadings").  *But see Honickman*, 6 F.4th at 503 (dismissing JASTA case for lack of knowledge at the pleading stage).  ***The question is whether a defendant wins as a matter of law when the evidence shows (as it often will) that the defendant knew it was assisting an FTO, but the plaintiff cannot prove that the funds were earmarked or explicitly used for a "terroristic purpose."  Kaplan has nothing to say about that; the precedential decision below, however, says "yes."***

***

Here, the Second Circuit affirmed summary judgment for NatWest as a matter of law.  It did not weigh evidence—but instead held that JASTA's general awareness requires plaintiffs to come forward with evidence that funds were earmarked or used for a "terroristic purpose," like "fund[ing] terrorist attacks or recruit[ing] persons to carry out such attacks."  In the court's view, the fact that a bank knowingly provided substantial funds to an FTO is insufficient to infer culpable awareness.

Ingerman Decl., Ex. 3 (Reply Brief, *Weiss v. National Westminster Bank PLC*, No. 21-381 (Nov. 22, 2021)) at 7-8, 10 (emphasis added).[8]

The Bank thus seeks to narrow the Requests directed at the charities and social institutions to transfers that, according to Plaintiffs' own reading of this Circuit's precedent, would be relevant to establishing ATA and JASTA liability, to wit: account transfers that were earmarked for a terrorist purpose or used to fund or recruit persons to conduct terrorist attacks.  For example, Plaintiffs could presumably request that the charities and social institutions produce transfers to any of the 100-plus operatives of FTOs that its experts have identified as planning and committing terrorist attacks between 2000 and 2004 to support their allegation that the charities recruited

---

[8] As the Second Circuit noted in *Weiss*, "The [district] court did not find that Interpal [the bank's customer] in fact had only charitable purposes; rather . . . that Interpal had not identified any of the moneys it instructed NatWest to transfer to the charities as being for any violent or terroristic purpose."  993 F.3d at 161.  It went on to hold that summary judgment was warranted precisely because it presented no evidence "that the transfers by NatWest involved violence, or danger to human life, or had the appearance of intending to intimidate or coerce a population or government."  *Id.* at 162.

terrorists, or transfers "explicitly identified as payments for suicide bombings" (*Linde*, 882 F.3d at 321; *Weiss*, 993 F.3d at 157), similar to the waiver the Bank sought and obtained from the Saudi Committee.[9]  The Bank is prepared, as it has repeatedly advised Plaintiffs, to seek these waivers from the charities and social service institutions that were its customers based on agreed-upon search terms or, in the absence of such an agreement, an order of this Court.  What the Bank should not be required to do is seek overly broad waivers that are doomed to fail from the start and that request documents the Second Circuit has clearly held will not, *as a matter of law*, establish primary or aiding and abetting liability.

C.    **Individuals Not Identified as Both Linked to an FTO and Closely Intertwined with Its Terrorist Activities During the Relevant Time Period (Category C)**

In its motion, the Bank has requested that the Court strike Plaintiffs' Requests that seek the account records of 174 individuals for whom Plaintiffs provided no public source material to support an inference that Arab Bank was aware of these individuals' ties to an FTO and were critically intertwined with its terrorist activities prior to the relevant attacks.  (MPO at 18-20.)  Significantly, in their opposition, Plaintiffs do not contest the accuracy of the information contained in Appendices 2 and 3 of the Bank's motion.[10]  Nor do they contest that a bank cannot be liable for providing financial services to a customer absent such a showing.  *See generally Kaplan*, 999 F.3d at 858; *Honickman*, 6 F.4th at 501.

---

[9] This would include, for example, any such transfers by Al-Ansar that Plaintiffs identify in their opposition.  (*See* Opp. Mem. at 20.)

[10] Although they misleadingly infer that the Bank maintains there are no relevant public source materials for individuals such as Ahmed Yassin, the founder of Hamas, when, in fact, they do appear in category D (individuals for whom public source material has been provided), not category C (where it has not been provided and the allegations in the pleading, like the allegations in *Honickman* of public knowledge, are unsupported).  *Honickman*, 6 F.4th at 501-02.

Rule 26 places the burden on Plaintiffs to establish the relevancy of their requests.  (*See* MPO at 9.)[11]  The Second Circuit has explicitly differentiated between public source materials, such as media articles that pre-date the relevant attack, which can "plausibly suggest a defendant's knowledge which can be confirmed during discovery" with other "publicly available" materials that post-date the relevant attack because it "requires the implausible inference that the defendant was aware of those facts even before the news media."  *Honickman*, 6 F.4th at 502 n.18.  Citing the Second Circuit's decision in *Kaplan*, the D.C. Circuit in *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022) held, in language relevant here, "[W]e bear in mind the challenges of establishing a defendant's state of mind without the benefit of discovery . . . .  At the same time, discovery into a party's state of mind is intrusive and should not proceed based on bare, conclusory allegations.  What plaintiffs must plead are 'allegations of the facts or events they claim give rise to an inference.'"  That is what Plaintiffs fail to do to justify their request for the account records of these 176 individuals.  They fail to allege any circumstantial evidence, in the form of public sources, that these individuals were linked to an FTO and closely intertwined with terrorist activities ***prior to the attacks***, just as the plaintiffs failed to do in *Honickman*.[12]

---

[11] The 2015 amendments made three key changes to Rule 26.  First, they "restore[d] the proportionality factors to their original place in defining the scope of discovery."  2015 Committee Note.  The Committee explained that moving the proportionality factors from the body of the rule to a subpart "may have . . . softened, although inadvertently," their import.  Second, they deleted the provision authorizing the court to order discovery "of any matter relevant to the subject matter involved in the action."  The 2015 Committee Note explained that "[p]roportional discovery relevant to any party's claim or defense suffices, given a proper understanding of what is relevant to a claim or defense."  Third, and finally, the amendments deleted the provision permitting discovery of information that appears "reasonably calculated to lead to the discovery of admissible evidence" because it was being "used by some, incorrectly, to define the scope of discovery."  The Committee Notes explain that using that phrase to "define the scope of discovery 'might swallow any other limitation on the scope of discovery.'"  Chief Justice Roberts explained that these changes were made to "provide parties with efficient access to what is needed to prove a claim or defense, but eliminate ***unnecessary*** or ***wasteful*** discovery.  The key here is careful and realistic assessment of actual need."  2015 Year-End Report on the Federal Judiciary, p. 7 (emphasis added).

[12] Seeking to hedge their bets, Plaintiffs also claim the right to discovery with respect to these accounts in order to show that the Bank's failure to identify these individuals as "high-risk customers" through its due diligence Know Your Customer and Anti-Money Laundering procedures would evidence its "deliberate indifference."  (Opp. Mem.

Plaintiffs try to turn *Honickman* on its head by plucking out of context the Court's statement that a defendant's knowledge "can be confirmed during discovery." (Opp. Mem. at 28.) As set forth in full above, the Court made clear that Plaintiffs first had to provide "publicly available evidence" to "plausibly suggest a defendant's knowledge." *Honickman* at 502 n.18. Plaintiffs present a similarly tortured reading of *Kaplan.* (Opp. Mem. at 28.) *Kaplan* merely held that further specificity ***regarding the public media cited in the complaint*** could be sought in discovery, not that discovery could proceed in the absence of any such citations. *See Kaplan*, 999 F.3d at 864.

Requiring such circumstantial evidence as a prerequisite to such discovery is all the more important when the accounts at issue are foreign records located abroad and subject to bank secrecy. As the Supreme Court stated in *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 546 (1987), "When it is necessary to seek evidence abroad, the district court must supervise pretrial proceedings ***particularly closely*** to prevent discovery abuses." (emphasis added, ellipses omitted). Here, knowing that the Bank is prohibited from producing the account records of these 176 individuals, Plaintiffs seek to do indirectly what they cannot do directly. That is, to obtain an adverse inference through a discovery sanction that the Bank was aware it was providing services to known terrorists, when no public source materials available at the time exist to establish the required predicate to such a finding. By any definition, that is gaming the system through abusive discovery which a protective order is designed to prevent.

---

at 24-25.) Of course, that is precisely what the Second Circuit held in *Honickman* to be an "implausible inference" in the absence of public source materials during the relevant time period, which, of course, Plaintiffs fail to cite for these 176 individuals. *See Honickman*, 6 F.4th at 502 n.18.

14

**D.      Individuals and Entities Linked by Public Source Information During the Relevant Time Period to an FTO (Category D)**

As the Bank stated in its moving papers, unlike the individuals in Category C, the Bank acknowledges that Plaintiffs have provided public source information, published during the relevant time period, which Plaintiffs allege shows that the individuals and entities in Category D were closely intertwined with terrorist activities of an FTO.  It has also already agreed that to the extent any of these individuals were customers of the Bank between 2000 and 2004, it would seek waivers from them.  However, as the Bank has already stated, just as providing routine banking services to an FTO, ***without more*** is insufficient to establish primary or secondary liability, neither is the provision of routine banking services to a leader of an FTO ***without more***.  *Linde*, 882 F.3d at 326-30 (vacating verdict against Bank where many of the same leaders were alleged to be customers of the Bank).  Therefore, the Requests for these individuals should be narrowed to requesting transfers that could foreseeably have a terroristic purpose, such as transfers to operatives who committed terrorist attacks.

Accordingly, the Bank requests that the Court order the parties to try to reach agreed-to search terms for the accounts of these individuals or, failing that, provide the Bank with search terms acceptable to the Court, so that it may attempt to seek waivers based on terms approved by the Court.

**E.      The Palestinian Government and Political Parties (Category E)**

Lacking facts to support its requests for Category E documents, Plaintiffs misstate facts and mischaracterize the Bank's motion with respect to their Second RFP Nos. 17(a), (n)-(p), and 25 (requesting the accounts of various ministries and departments of the Palestinian Authority ("PA")), Second RFP No. 24 (seeking ***all*** Palestinian Liberation Organization ("PLO") accounts),

and Second RFP Nos. 17(b),(c) (f), (g) and (m) (relating to Fatah's social service-related entities). (Opp. Mem. at 20-23.)

First, Plaintiffs allege that "the PLO and PA transferred payments through their Arab Bank accounts to AAMB leaders, operatives, and family members."  (Opp. Mem. at 20 (citing ¶¶ 541-54 of the *Miller* Complaint).)  But those paragraphs do not refer to any transfers from the PLO and PA accounts to Al-Aqsa Martyrs Brigade ("AAMB") operatives.  They refer to individual accounts of AAMB operatives, such as Marwan al-Barghuthi, who in fact appears in the Category D list of individuals from whom the Bank agrees to seek waivers.  They also refer to individuals associated with AAMB who either themselves received, or whose families received, payments from the Saudi Committee, not the PLO or PA.  The Bank, of course, has already produced to Plaintiffs all of the documents relating to Saudi Committee payments in its possession.

Second, the Bank has included AAMB as well as other militant groups identified in Plaintiffs' Requests in Category D.  Those entities are not included in Category E.

Third, Plaintiffs make repeated references to the *Sokolow* case against the PLO and PA (*see* Opp. Mem. at 20-21), which was originally tried under the pre-*Linde* standard of material support and where the decision was subsequently vacated by the Second Circuit on jurisdictional grounds.  *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 322 (2d Cir. 2016).  In their opposition, Plaintiffs specifically refer to martyr and prisoner payment programs authorized by the PA and cite to acts of Congress passed in 2018 (calling on the PA to cease making such payments) and 2019 (authorizing federal courts to assert jurisdiction over the PA and PLO by reason of such payments).  *See Sokolow v. Palestine Liberation Org.*, No. 04-cv-397 (GBD), 2022 WL 719261 at *1 (S.D.N.Y. Mar. 10, 2022) (holding Congress' attempt to expand the scope of federal jurisdiction through these acts unconstitutional); *Fuld v. Palestine Liberation Org.*, No. 20-CV-3374 (JMF),

2022 WL 62088 at *1 (S.D.N.Y. Jan. 6, 2022).  Both of those statutes, of course, post-date the time period relevant here.  Even if discovery into whether the Bank processed such payments for the PA and PLO were discoverable, it would not justify Plaintiffs' Requests for all other account records and transactions that the Bank processed for the Palestinian government.

## II.    THE COURT SHOULD DEFER ORDERING THE BANK TO VIOLATE FOREIGN BANK SECRECY LAWS

The parties have briefed their respective positions on bank secrecy, and the Bank will not burden the Court with repeating arguments already made.  The Bank's position remains the same as the United States Government's position in *Linde*, that the bank secrecy ruling in that case was deeply flawed because it "fail[ed] adequately to consider the broad range of United States foreign-relations and anti-terrorism interests . . . [and] fail[ed] to accord sufficient weight to the foreign jurisdictions' interests in enforcing their bank secrecy laws."  (Saleski Decl., Ex 23 (Brief for United States as *Amicus Curiae*) at 8.)

As the Solicitor General informed the Supreme Court in *Linde*, the district court's reasoning in that case, and its reliance on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), "fail[ed] to account for the distinct United States and foreign interests implicated when the government, as opposed to a private party, seeks disclosure."  (Saleski Decl., Ex 23 (Brief for United States as *Amicus Curiae*) at 18-20).  In short, the Solicitor General's opinion in *Linde* is the clearest example of the United States Government's view as to the balance to be struck in a private civil litigation involving the ATA.[13]  Plaintiffs also rely on the district court bank secrecy ruling in *Weiss v. Nat'l Westminster Bank PLC*, 242 F.R.D. 33 (E.D.N.Y. 2007) (Opp. Mem. at

---

[13] The significance of the Solicitor General's view is not lost on Plaintiffs, who elsewhere note (Opp. Mem. at 16 n.9) that the Supreme Court has specifically requested the views of the Solicitor General on the petition for a writ of certiorari filed by their counsel in *Weiss,* referenced *supra* pp. 10 *et. seq.*, at 35.

32, 36, 40, 46, 50), but fail to note that the British Government, unlike Jordan, Lebanon, and the Palestinian Authority here, did not object to production. *See id.* at 39.[14]

That said, Plaintiffs now state that they do not object to the Court giving the Bank 120 days to seek customer waivers following a production order by this Court. (Opp. Mem. at 50 n.42.) The Bank, too, requests a production order, albeit one that properly narrows the scope of the Requests, so that it may seek waivers. The difference between the parties' positions, therefore, is not whether the Court should issue a production order defining the proper scope of the Requests, but whether the Court should defer ordering the Bank to violate the bank secrecy laws of foreign sovereigns as a matter of international comity before it has an opportunity to evaluate the success of the Bank in obtaining waivers. The Bank respectfully submits that the Court should not prejudge whether such an order to override bank secrecy will be required or its scope before knowing what is actually produced.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in its moving papers, the Bank respectfully requests that its Motion for a Protective Order be granted and Plaintiffs' Cross-Motion to Compel be denied.

---

[14] Plaintiffs' argument that a confidentiality order should alleviate any concerns about the public disclosure of personal financial information misses the public policy point that bank secrecy laws of general application are intended to assure confidentiality absent state-to-state requests and also does not protect against public disclosure of documents in open court at trial.

18

Dated: April 25, 2022

Respectfully submitted,

**DLA Piper LLP (US)**

By: _/s/ Jonathan D. Siegfried_
Jonathan D. Siegfried
Andrew J. Peck
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
jonathan.siegfried@us.dlapiper.com
andrew.peck@us.dlapiper.com

Brett Ingerman
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-4177
brett.ingerman@dlapiper.com