# EXHIBIT 2

No. _____

IN THE

# Supreme Court of the United States

———————

TZVI WEISS, ET AL.

*Petitioners*,

v.

NATIONAL WESTMINSTER BANK PLC,

*Respondent.*

———————

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Second Circuit

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

| | |
|---|---|
| Peter Raven-Hansen | Thomas C. Goldstein |
| Gary M. Osen | *Counsel of Record* |
| Michael Radine | Tejinder Singh |
| Ari Ungar | GOLDSTEIN & RUSSELL, P.C. |
| OSEN LLC | 7475 Wisconsin Ave. |
| 190 Moore Street | Suite 850 |
| Suite 272 | Bethesda, MD 20814 |
| Hackensack, NJ 07601 | (202) 362-0636 |
| | tg@goldsteinrussell.com |
| | |
| | James P. Bonner |
| | FLEISCHMAN BONNER & |
| | ROCCO LLP |
| | 81 Main Street, Suite 515 |
| | White Plains, NY 10601 |

*Counsel for Petitioners*

i

## QUESTION PRESENTED

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), this Court scrutinized and endorsed Congress's finding that "[f]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct." *Id*. at 29 (citation omitted). The Court thus upheld the constitutionality of 18 U.S.C. § 2339B, which makes it a felony to knowingly provide material support—even for charitable purposes—to entities that the Department of State has designated as foreign terrorist organizations (FTOs).

Congress subsequently enacted the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016), which provides enhanced relief to Americans injured by terrorist attacks that were committed, planned, or authorized by FTOs. JASTA allows the victims of such attacks to assert a cause of action for aiding and abetting against any person or entity that "knowingly provid[ed] substantial assistance" to the people or entities that committed the attack. 18 U.S.C. § 2333(d)(2). Congress's objective was to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief" from any party that "provided material support, directly or indirectly," to FTOs that injured Americans. JASTA § 2(b).

The question presented is:

Whether a person who knowingly transfers substantial funds to a designated FTO aids and abets that organization's terrorist acts for purposes of civil liability under JASTA, 18 U.S.C. § 2333(d)(2).

ii

## PARTIES TO THE PROCEEDING

Petitioners are Tzvi Weiss, Leib Weiss, Malke Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Matanya Nathansen, Chana Nathansen, Matanya and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, S.N., a minor, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Bluma Rom, Rivka Pollack, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard Goldstein, Michael Goldstein, Chana Freedman, Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, David Goldstein, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, A.A., a minor, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Natanel Steinmetz, Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L. Coulter, Sr., Robert L. Coulter, Jr., Larry Carter for the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah

iii

Blutstein, Nevenka Gritz for the Estate of David Gritz,
Nevenka Gritz, Nevenka Gritz for the Estate of Nor-
man Gritz, Jacqueline Chambers as the Administrator
of the Estate of Esther Bablar, Jacqueline Chambers,
Levana Cohen, Eli Cohen, Sarah Elyakim, Yehuda
Agababa, Menache Agababa, Yehezkel Agababa,
Greta Geler, Ilana Eropa Dorfman, Refael Kitsis and
Tova Guttman as the Administrator of the Estate of
Hannah Rogen, Akiva Anachovich, Joshua Faudem,
Zohar Fater, Bruce Mazer, Orly Rom, Richard Coffey,
Gal Ganzman, Judith Buchman-Ziv, Ora Cohen,
Mirav Cohen, Daniel Cohen, O.C., a minor, S.C., a mi-
nor, E.N.C., a minor, Faiga Zvia Lieberman, Einat
Noked for the Estate of Eyal Noked, Einat Noked,
A.N., a minor, Avishag Noked, Baruch Zuri Noked,
Binyamin Elkana Noked, Neta Nechama Cohen, T.N.,
a minor, Karen Goldberg, Chana Weiss, Esther Gold-
berg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer
Goldberg, Y.M.G., a minor, T.Y.G., a minor, Nilly Cho-
man, Temima Spetner, Jason Kirschenbaum, Isabelle
Kirschenbaum, Isabelle Kirschenbaum for the Estate
of Martin Kirschenbaum, Joshua Kirschenbaum, Sho-
shana Burgett, David Kirschenbaum, Danielle Teitel-
baum, Netanel Miller, Chaya Miller, Arie Miller, Altea
Steinherz, Jonathan Steinherz, Baruch Yehuda Ziv
Brill, Chaya Beili, Gila Aluf, the Estate of David Ap-
plebaum, the Estate of Naava Applebaum, Debra Ap-
plebaum, the Estate of Jacqueline Applebaum, Natan
Applebaum, Shira Applebaum, Yitzchak Applebaum,
Shayna Applebaum, Tovi Belle Applebaum, Geela Ap-
plebaum Gordon, Chaya Tziporah Cohen, Philip Litle,
the Estate of Abigail Litle, Elishua Litle, Hannah Li-
tle, Heidi Litle, Josiah Litle, Noah Litle, Ari Horovitz,
Batsheva Horovitz Sadan, David Horovitz, the Estate
of Debra Ruth Horovitz, the Estate of Eli Natan

iv

Horovitz, the Estate of Leah Horovitz, The Estate
Moshe Horovitz, Nechama Horovitz, Shulamite Ho-
rovitz, Tovi Horovitz, Tvi Horovitz, Uri Horovitz, Ber-
nice Wolf, Bryan Wolf, Stanley Wolf, Fran Strauss
Baxter, William J. Baxter, Ariela Freirmark, Men-
achem Freirmark, Hadassah Freirmark, Phyllis Pam,
Rivka Reena Pam, Shoshana Tita, Ezra Tita, Ephraim
Tita, Ephriam Tita for the Estate of Bertin Tita, Ra-
chel Potolski, Ovadia Topporowitch, Yisrael Toppor-
owitch, Yitzchak Topporowitch, Miriam Ehrenfeld,
Rose Joseph, Leibel Reinitz, Malvia Reinitz, Margali
Reinitz, Mendy Reinitz, Miriam Reinitz, Rivka Rei-
nitz, Samuel Reinitz, Shmuel Reinitz, Yakov Reinitz,
the Estate of Mordechai Reinitz, the Estate of Yisso-
cher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon,
Leah Tauber, Helen Weider, Avrohom D. Richter,
Breina Richter, Miriam Leah Richter, Moshe Richter,
Nechama Richter, Sara Malka Richter, Shlomo Chaim
Richter, Tranne Richter, Yakov Yosef Richter, Yechiel
Richter, Yehudis Richter, Yisroel Richter, Yitzchok
Richter, Perl Brailofsky, Malky Breuer, Ester
Buxbaum, Gittel Cohen, Chaya Freisel, Rachel Ros-
ner, Elizabeth Schwartz, Jacob Schwartz, Max
Schwartz, Michael Schwartz, Phillip Schwartz, Abra-
ham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky
Richter, the Estate of Eli Zarkowsky, Ezriel Zarkow-
sky, Gittel Zarkowsky, the Estate of Goldie Zarkow-
sky, Joseph Zarkowsky, Mendel Zarkowsky, Miriam
Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, Ye-
huda Zarkowsky, Erik Schecter, Shlomo Tratner, the
Estate of Tiferet Tratner, Averham Grossman, Devo-
rah Chechanow Leifer, Joseph Leifer, Bracha Milstein,
Shifra Miller, Chaya Rosenberg, Abraham Waxler, Ar-
thur Waxler, Baruch Waxler, Chana Waxler, Dina
Waxler, Ezekiel Waxler, Gedalia Waxler, Haggi

v

Waxler, Nachum Waxler, Obadiah Waxler, Yaakov Waxler, Yoel Waxler, Zacharia Waxler, Nethaniel Bluth, Moshe Naimi, Faye Chana Benjaminson, the Estate of Moshe Gottlieb, Seymour Gottlieb, and Sheila Gottlieb.

Respondent is National Westminster Bank, PLC.

## RELATED PROCEEDINGS

*Weiss v. National Westminster Bank PLC*, No. 05-cv-4622 (DLI) (RML) (E.D.N.Y. Mar. 31, 2019), consolidated with *Applebaum v. National Westminster Bank PLC*, No. 07-cv-916 (DLI) (RML) (E.D.N.Y.)

*Weiss v. National Westminster Bank PLC*, Nos. 19-863, 19-1159 (2d Cir. Apr. 7, 2021)

*Weiss v. National Westminster Bank PLC*, No. 13-1618-cv (2d Cir. Sept. 22, 2014)

vi

# TABLE OF CONTENTS

QUESTION PRESENTED ...........................................i

PARTIES TO THE PROCEEDING ...........................ii

RELATED PROCEEDINGS......................................v

TABLE OF AUTHORITIES ....................................viii

INTRODUCTION ......................................................1

OPINIONS BELOW ...................................................4

JURISDICTION...........................................................4

STATUTORY PROVISIONS INVOLVED.................4

STATEMENT OF THE CASE...................................4

    I. The Anti-Terrorism Laws ..................................4

    II. Factual Background and Procedural
        History............................................................12

REASONS FOR GRANTING THE WRIT ...............21

    I. The Decision Below Conflicts With Decisions
        From Other Circuits. ....................................21

    II. The Decision Below Is Incorrect. ...................29

    III. The Question Presented Is Important. .........32

    IV. This Court Should Consider Calling For
        The Views Of The Solicitor General...............35

CONCLUSION ........................................................36

APPENDIX A:  Opinion of the Court of Appeals
                   (2d Cir. 2021)....................................1a

APPENDIX B:  Opinion and Order of the District
                   Court (E.D.N.Y. 2019)....................43a

vii

APPENDIX C: Opinion and Order of the District
Court (E.D.N.Y. 2017).....................73a

APPENDIX D: Opinion and Order of the District
Court (E.D.N.Y. 2016)..................101a

APPENDIX E: Opinion of the Court of Appeals
(2d Cir. 2014)...............................145a

APPENDIX F: Statutory Provisions ....................165a

viii

## TABLE OF AUTHORITIES

### Cases

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ................... 27

*Averbach ex rel. Est. of Averbach v. Cairo
    Amman Bank*,
    2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ........... 34

*Banque Worms v. BankAmerica Int'l*,
    570 N.E.2d 189 (N.Y. 1991) ................................... 35

*Bartlett v. Société Générale de Banque Au Liban
    SAL*,
    2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ......... 34

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) .......................... *passim*

*Boim v. Quranic Literacy Inst.*,
    2012 WL 13171764 (N.D. Ill. Aug. 31, 2012) ........ 22

*Cent. Bank of Denver, N.A. v. First Interstate
    Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ........................................... 9, 10

*Est. of Henkin v. Kuveyt Türk
    Katilim Bankasi, A.Ş.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020) ................... 34

*Freeman v. HSBC Holdings PLC*,
    2021 WL 76925 (E.D.N.Y. Jan. 7, 2021) ............... 34

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ....................... *passim*

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................... *passim*

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ......................... 28, 30, 34

ix

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ............................ 28, 34

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) .......................... *passim*

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................... 34

*O'Sullivan v. Deutsche Bank AG*,
    2020 WL 906153 (S.D.N.Y. Feb. 25, 2020)............ 34

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ..................................... 34

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ................................... 34

*Spetner v. Palestine Inv. Bank*,
    495 F. Supp. 3d 96 (E.D.N.Y. 2020) ..................... 34

*Strauss v. Crédit Lyonnais, S.A.*,
    842 F. App'x 701 (2d Cir. 2021) ....................... 21, 34

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ................................... 34

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011)................. 3, 25, 26, 27

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................... 14

*Weiss v. Nat'l Westminster Bank PLC*,
    936 F. Supp. 2d 100 (E.D.N.Y. 2013) ................... 14

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .............................. 9

x

## Statutes

Antiterrorism and Effective Death Penalty
   Act of 1996, Pub. L. No. 104-132,
   110 Stat. 1214 ................................................ 1, 4, 29

Anti-Terrorism Clarification Act of 2018,
   Pub. L. No. 115-253, 132 Stat. 3183 ..................... 35

Justice Against Sponsors of Terrorism Act,
   Pub. L. No. 114-222, 130 Stat. 852 (2016) .... *passim*

Promoting Security and Justice for Victims of
   Terrorism Act of 2019, Pub. L. No. 116-94,
   133 Stat. 2534 ................................................... 36

8 U.S.C. § 1189(a)(1) ................................................. 5

18 U.S.C. § 2331(1) ............................................... 8, 18

18 U.S.C. § 2333 ............................................... 1, 8, 22

18 U.S.C. § 2333(a) ........................................... 2, 8, 14

18 U.S.C. § 2333(d)(2) ..................................... *passim*

18 U.S.C. § 2339A(b)(1) .......................................... 1

18 U.S.C. § 2339B ............................................. *passim*

18 U.S.C. § 2339B(a)(1) ................................... *passim*

28 U.S.C. § 1254 ....................................................... 4

## Other Authorities

*Antiterrorism Act of 1990: Hearing on S.2465*
   *Before the S. Subcomm. on Cts. & Admin.*
   *Practice of the S. Comm. on the Judiciary*,
   101st Cong. (1990) .................................................. 8

Exec. Order No. 13,886, 84 Fed. Reg. 48,041
   (Sept. 9, 2019) ...................................................... 33

Jimmy Gurulé, *Unfunding Terror: The Legal*
   *Response to the Financing of Global Terrorism*
   (2008) .................................................................... 33

xi

Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad* (2006)...............7

S. Rep. No. 102-342 (1992) .........................................9

U.S. Dep't of State, Executive Order 13224, https://www.state.gov/executive-order-13224/ (last visited Sept. 2, 2021) .....................................5

U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/ (last visited Sept. 2, 2021) ..................................................................5

Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* (2013) (ebook)..................................................................33

**INTRODUCTION**

Petitioners are more than 200 American nationals (or the family members or estates of American nationals) who were injured or killed in terrorist attacks committed by Hamas in Israel during the Second Intifada, a widely reported period of intense terrorist violence in the early 2000s. They brought this action under the Antiterrorism Act (ATA), 18 U.S.C. § 2333, against respondent National Westminster Bank PLC (NatWest).

Petitioners allege that for more than a decade NatWest processed hundreds of transfers moving millions of dollars for Hamas's principal European fundraiser, Interpal. Although these transfers were nominally for charitable purposes, the evidence shows that NatWest knew that Interpal was closely linked with Hamas and that the transferees were controlled by or alter-egos of Hamas. These contributions swelled Hamas's coffers, enabling its terrorist violence.

Congress enacted a comprehensive legal regime to deter and punish such support to terrorists. First, Congress made it a felony to knowingly provide any material support (including currency and financial services) to certain designated foreign terrorist organizations (FTOs), including Hamas. *See* 18 U.S.C. §§ 2339A(b)(1), 2339B(a)(1). This prohibition applies with full force to charitable and humanitarian support. The only *mens rea* requirement is that the defendant must know that the support is going to a designated FTO, because they "are so tainted by their criminal conduct that *any contribution* to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L.

2

No. 104-132, § 301(a)(7), 110 Stat. 1214, 1247 (emphasis added).

Second, the ATA imposes complementary civil liability and provides redress to victims of terrorist attacks. *See* 18 U.S.C. § 2333(a). Congress strengthened the ATA with the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). This statute mirrors the criminal prohibition, providing the "broadest possible basis, consistent with the Constitution of the United States, to seek relief" from anybody that has "provided material support, directly or indirectly," to FTOs. JASTA § 2(b). Thus, when a designated FTO commits, plans, or authorizes an act of international terrorism, JASTA imposes civil liability on anybody who "aids and abets" that act by "knowingly providing substantial assistance" to the entity that committed it. 18 U.S.C. § 2333(d)(2).

Under these laws, any bank—like NatWest—that knowingly sent millions of dollars to Hamas should be liable for aiding and abetting its terrorist attacks. The Second Circuit nevertheless ruled for NatWest as a matter of law. That is because Second Circuit precedent holds that knowingly providing support (including substantial funds) to an FTO is insufficient to permit a jury to find that the defendant aided and abetted the FTO's attacks when, as here, the transferor did not admit that the funds were for a "terroristic purpose," and the victims cannot trace the funds to attacks or terrorist recruiting. Pet. App. 41a. In effect, the Second Circuit recognizes a humanitarian charity exception to aiding and abetting liability.

Other circuits disavow any such exception. The Seventh Circuit holds that "[a]nyone who knowingly contributes to the nonviolent wing of an organization

3

that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc). The Fifth Circuit likewise recognizes that "purportedly charitable donations . . . aid[] Hamas's violent activities." *United States v. El-Mezain*, 664 F.3d 467, 508 (5th Cir. 2011). These cases involved donations to many of the same Hamas "charities" at issue here.

The Second Circuit's holding also conflicts with the findings of every branch of our government, including this Court. In *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010), this Court accepted "the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization." The Court held that this judgment was supported by "persuasive evidence," which showed that it was "wholly foreseeable" that even peaceful support for designated FTOs would advance these organizations' violent agendas. *Ibid*.

Thus, people and entities that transferred money to Hamas "charities," even for purported humanitarian purposes, have been found civilly liable in the Seventh Circuit, and criminally culpable in the Fifth Circuit. But banks that enabled indistinguishable transactions escaped accountability in the Second Circuit—a particularly concerning result because of that court's near-monopoly on terror-financing cases, which generally premise jurisdiction on transfers routed through New York branches and accounts. This Court should grant certiorari to bring uniformity to the law, and to ensure that Congress's important objectives in

4

enacting the ATA are not frustrated by the Second Circuit's erroneous construction of the statute.

## OPINIONS BELOW

The Second Circuit's opinion (Pet. App. 1a-42a) is reported at 993 F.3d 144. The district court's opinion (Pet. App. 43a-72a) is reported at 381 F. Supp. 3d 223.

## JURISDICTION

The Second Circuit's judgment was entered on April 7, 2021. Pet. App. 1a. This petition is timely filed under this Court's March 19, 2020 order extending the deadline to file any petition for a writ of certiorari to 150 days from the date of the lower court judgment, and remains in effect in this case pursuant to this Court's July 19, 2021 order. This Court has jurisdiction pursuant to 28 U.S.C. § 1254.

## STATUTORY PROVISIONS INVOLVED

The relevant statutory provisions are reproduced in the appendix at 165a-68a.

## STATEMENT OF THE CASE

### I. The Anti-Terrorism Laws

1. It has been the longstanding policy of the United States that certain terrorist organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA § 301(a)(7). Such organizations are designated FTOs by the Secretary of State.

The Secretary may designate an FTO by finding that the organization is: (1) foreign; and (2) engages in terrorism or retains the capability and intent to engage in terrorism; which (3) threatens the security of

5

United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1). The list of FTOs includes entities like al-Qaeda, ISIS, and Hamas that have engaged in sustained violence against Americans and our allies. *See* U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/ (last visited Sept. 2, 2021).

Designation as an FTO is not the only tool the government uses to curb support for terrorism. Under Executive Order 13,224 (as amended), people or entities that provide support to terrorists may be named Specially Designated Global Terrorists (SDGTs). *See* U.S. Dep't of State, Executive Order 13224, https://www.state.gov/executive-order-13224/ (last visited Sept. 2, 2021). SDGT designation enables asset restrictions, and thus "provides a means by which to disrupt the financial support network for terrorists and terrorist organizations." *Ibid*.

2. FTO designation is particularly significant because it is a felony to knowingly provide any material support to an FTO. 18 U.S.C. § 2339B(a)(1). Such support is punishable by up to 20 years in prison, or by life imprisonment if death results. *Ibid*. This Court analyzed this prohibition in *Holder*, undertaking a detailed analysis of the legal history and policy behind our anti-terrorism laws.

In *Holder*, the respondents were advocacy organizations that wished to provide peaceful aid to members of designated FTOs, including training members "on how to use humanitarian and international law to peacefully resolve disputes," teaching them "how to petition various representative bodies such as the United Nations for relief," and offering "legal expertise in negotiating peace agreements." 561 U.S. at 14-15

6

(citation omitted). The respondents argued that the support they wished to provide was lawful because they lacked specific intent to advance terrorism or, in the alternative, that the statute was unconstitutional as applied to such support.

This Court held that the statute prohibited the support the respondents wanted to provide, rejecting the argument that the statute requires any intent "to further a foreign terrorist organization's illegal activities." *Holder*, 561 U.S. at 16. Instead, the statute is satisfied if the defendant has "knowledge about the organization's connection to terrorism." *Id*. at 16-17.

Regarding constitutionality, the Court applied strict scrutiny, and found that the statute survived it. The parties agreed, and the Court found, that the Government's "interest in combating terrorism" was compelling. The respondents argued, however, that the statute was not narrowly tailored to that interest because "their support will advance only the legitimate activities of the designated terrorist organizations, not their terrorism." *Holder*, 561 U.S. at 28-29.

This Court rejected that argument. It noted that "[w]hether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question," which Congress resolved in 1996 by making "specific findings," including that "*any contribution to [an FTO] facilitates*" its terrorist conduct. *Holder*, 561 U.S. at 29 (quotation marks omitted). Congress also specifically "considered and rejected the view that ostensibly peaceful aid would have no harmful effects" when, during drafting, it "removed an exception" to liability "for the provision of material support in the form of

7

'humanitarian assistance to persons not directly in-
volved in' terrorist activity." *Ibid*. (citation omitted).

Consistent with the requirements of strict scru-
tiny, the Court did not blindly accept Congress's con-
clusion, but instead found it "justified." *Holder*, 561
U.S. at 29. The Court held that peaceful support still
"further[s] terrorism by foreign groups in multiple
ways." *Id*. at 30. Teaching FTO members how to re-
quest international disaster relief would enable them
to access funds. *Id*. at 37. Those funds would "free[] up
other resources within the organization that may be
put to violent ends." *Id*. at 30. After all, "[m]oney is
fungible." *Id*. at 31. Thus, when terrorist organizations
raise funds for "civilian and humanitarian ends," that
money is often redirected "to fund the purchase of
arms and explosives." *Ibid*. (quotation marks omitted).
As a specific example, the Court stated that "Hamas is
able to use its overt political and charitable organiza-
tions as a financial and logistical support network for
its terrorist operations." *Ibid.* (quoting Matthew
Levitt, *Hamas: Politics, Charity, and Terrorism in the
Service of Jihad* 2 (2006)).[1] The Court further found
that support legitimizes FTOs, enabling recruiting
and fundraising. *Id*. at 30.

In this regard, the Court credited an affidavit
from the Executive Branch averring that "it is highly
likely that any material support to [FTOs] will ulti-
mately inure to the benefit of their criminal, terrorist
functions—regardless of whether such support was os-
tensibly intended to support non-violent, non-terrorist
activities" *Holder*, 561 U.S. at 30, 33 (quotation marks

---

[1] Notably, Dr. Levitt delivered similar testimony in this case
as one of petitioners' expert witnesses.

8

omitted). The Court found that this "evaluation of the facts by the Executive, like Congress's assessment, [was] entitled to deference." *Id*. at 33. The Court accordingly held that Congress's decision to outlaw even peaceful support to designated FTOs was narrowly tailored to its objective of combating terrorism. *Id*. at 40.

3. In parallel with criminal statutes forbidding material support to FTOs, the ATA's civil liability provision, 18 U.S.C. § 2333, provides a remedy for victims of terrorism. When the ATA was enacted, witnesses from the Department of Justice explained to Congress that § 2333 was "a significant new weapon against terrorists" that would "supplement [the Department's] criminal law enforcement efforts." *Antiterrorism Act of 1990: Hearing on S.2465 Before the S. Subcomm. on Cts. & Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. 25 (1990) (testimony of Steven R. Valentine, Deputy Asst. Att'y Gen., Civil Div.).

As originally enacted, the ATA provided a remedy to any American national injured by reason of an act of international terrorism. 18 U.S.C. § 2333(a). To constitute "international terrorism," activities must: (1) involve "violent acts" or "acts dangerous to human life"; (2) violate federal or state criminal law (assuming extraterritorial application of those laws); (3) "appear to be intended" to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping; and (4) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." 18 U.S.C. § 2331(1).

9

Congress intended for the ATA's civil cause of action to provide broad relief. Other than the requirement that injury result from acts of international terrorism, the substance of the action was "not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts." S. Rep. No. 102-342, at 45 (1992). Congress was clear, moreover, that the law was designed to impose "liability at any point along the causal chain of terrorism" and therefore to "interrupt, or at least imperil, the flow of money" to terrorists. *Id*. at 22.

Consistent with the flexible cause of action Congress created, courts held that knowingly providing funds to FTOs in violation of 18 U.S.C. § 2339B can itself constitute an act of international terrorism under the ATA. This is because the provision of such support is criminal, dangerous to human life, objectively appears intended to promote terrorists' political ends, and typically transcends national borders. *See Boim*, 549 F.3d at 690; *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43-49 (D.D.C. 2010). But some courts questioned whether this Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), foreclosed a cause of action predicated on aiding and abetting when Congress had not expressly codified one.

Congress put that issue to rest in 2016 with JASTA, which provides that if the "act of international terrorism" that injured the plaintiff was "committed, planned, or authorized" by a designated FTO, then "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such

10

an act of international terrorism." 18 U.S.C. § 2333(d)(2). Thus, defendants that support an FTO are liable even if their assistance does not itself meet all the elements of an "act of international terrorism." JASTA applies retroactively to any pending case based on injuries that arose on or after September 11, 2001. JASTA § 7.

Aiding and abetting liability under JASTA is intended to be very broad. The statute seeks:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b).

To achieve the intended breadth, Congress adopted the standards for secondary liability from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). JASTA § 2(a)(5); *see also Central Bank*, 511 U.S. at 181 (describing *Halberstam* as a "comprehensive opinion on the subject"). Under *Halberstam*, aiding and abetting liability is available when three elements are met:

> (1) the party the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and

11

(3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 487-88.

In *Halberstam*, a woman who provided administrative support to a burglar was held liable for aiding and abetting an unplanned murder he committed during a botched getaway—even though the defendant did not intend, know about, or cause the killing, and may not even have known she was aiding burglaries. 705 F.2d at 474-75, 488-89.

The D.C. Circuit held that when a plaintiff alleges that a defendant aided and abetted an act of violence, the general awareness element is met if the defendant was generally aware that she was playing a role in any illegal activity from which violence is a foreseeable risk. *See Halberstam*, 705 F.2d at 488. The defendant need not intend for violence to occur, nor contribute directly to the violent act; indeed, the defendant need not even know the precise nature of the illegal activity she is assisting. *See ibid.* All she has to know is that the principal is engaged in unlawful activity, and that "violence and killing is a foreseeable risk" from that activity. *Ibid.* For the support to be "substantial," courts look to multiple factors, including, but not limited to, the amount and duration of the assistance. Under this standard, even acts that are "neutral standing alone" can support liability based on the "context of the enterprise they aided." *Ibid*. By incorporating *Halberstam* into JASTA, Congress showed it was serious about creating the broadest possible cause of action.

12

## II. Factual Background and Procedural History

1. Petitioners are victims, family members of victims, and estates of victims of terrorist attacks Hamas committed during the Second Intifada. *See* Pet. App. 7a-8a. Petitioners filed their consolidated complaints in 2005 and 2007, seeking redress for attacks that occurred from 2001 to 2004. *Ibid.*; *id.* at 9a.

The complaints allege that NatWest knowingly sent money to Hamas for an entity called Interpal. Pet. App. 9a. Interpal was one of Hamas's principal fundraisers; it raised funds from around the world (mostly in Western Europe) and sent those funds to Hamas. Interpal was a NatWest customer from at least 1994 to 2007. *Id.* at 9a-10a. During that period, NatWest executed over 450 wire transfers on Interpal's behalf to 13 Hamas-controlled entities. *Id.* at 10a.

These recipients are described as the "13 Charities." Pet. App. 10a. They operate as Hamas's "social network," and are controlled by, or are alter-egos of, Hamas itself. *Id.* at 85a. Specifically, the 13 Charities have "shared personnel and overlapping leadership" with Hamas. *Ibid.* And "multiple government agencies, including the German Ministry of Interior, the Israeli Minister of Defense, and the U.S. Department of Treasury," have found "that the 13 Charities were Hamas-controlled." *Ibid.* As petitioners' expert Dr. Matthew Levitt explained, "there is ample evidence for the role of Hamas social institutions in the terror activities directed and authorized by Hamas leaders and commanders" and that "[t]hese activities amplify, enable, and accelerate Hamas's overall ability to engage in incitement, recruitment, and logistical and operational

13

support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire." A-243.[2]

The United States designated Interpal an SDGT on August 22, 2003. Pet. App. 9a; A-1032.[3] The Treasury Department explained that Hamas raises "tens of millions of dollars per year throughout the world using charitable funding as cover." A-1035. Using "a web of charities to facilitate funding and to funnel money," Hamas obtains funds that are "often diverted or siphoned to support terrorism." *Ibid*. Although this money is sometimes also used "for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes." *Ibid*. Thus, charitable donations "allow the group to continue to foment violence, strengthen its terrorist infrastructure, and undermine responsible leadership." *Ibid*.

The government identified Interpal as "a principal charity utilized to hide the flow of money to Hamas," which acted as "the conduit through which money flows to Hamas from other charities," and was also "the fundraising coordinator of Hamas." A-1036 (capitalization altered). In addition to raising funds for Hamas, Interpal's activities included "supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred

---

[2] Citations to A-____ are to the joint appendix in the court of appeals.

[3] For convenience, the public announcement of the designation, which was reproduced in the Joint Appendix below (A-1032-1037), is available at https://www.treasury.gov/press-center/press-releases/pages/js672.aspx. Excerpts appear in the Second Circuit's 2014 opinion. Pet. App. 149a.

14

from one charity to another, and even determining public relations policy." *Ibid*.

Even after NatWest knew its customer was an SDGT, it continued to make transfers from Interpal to Hamas-controlled charities. Petitioners seek to hold NatWest liable for its role in Hamas's violence.

2. The case has a long procedural history. As relevant here, the complaints originally asserted causes of action for primary liability as well as aiding and abetting. The pre-JASTA aiding and abetting claims were initially dismissed, and the case proceeded on primary liability claims predicated on violations of the material support statutes, including 18 U.S.C. § 2339B. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 612, 633 (E.D.N.Y. 2006).

After discovery, NatWest moved for summary judgment. In 2013, the district court granted the motion on the element of scienter. *Weiss v. Nat'l Westminster Bank PLC*, 936 F. Supp. 2d 100, 114, 120 (E.D.N.Y. 2013).

The Second Circuit reversed, holding that the relevant legal question when considering "scienter for liability under 18 U.S.C. § 2333(a) predicated on a violation of 18 U.S.C. § 2339B(a)(1)" was whether "NatWest had knowledge that, or exhibited deliberate indifference to whether, Interpal provided material support *to a terrorist organization*, irrespective of whether Interpal's support aided *terrorist activities* of the terrorist organization." Pet. App. 147a. The court held that there was "a triable issue of fact as to whether NatWest possessed the requisite scienter." *Id.* at 148a.

The court of appeals described some of the evidence that would support a jury finding that NatWest

15

knew that it was providing material support to Hamas. This included:

- NatWest's knowledge that Treasury designated Interpal as an SDGT in August 2003.

- The 2004 written acknowledgment by the head of NatWest's Group Enterprise Risk that she was "aware that we had accounts for people connected to Hamas, but not Hamas itself."

- Testimony from the head of NatWest's Group Security and Fraud Office that NatWest would only terminate a relationship with a customer on terror financing grounds if the customer was first "convicted in a court of law," *and* NatWest had "clear evidence" that the money transferred had been used to "buy bullets or explosives."

Pet. App. 161a-163a (cleaned up).

That evidence was sufficient for the Second Circuit to hold that there was a triable issue as to whether NatWest knew it was providing material support to Hamas. But it was only some of the favorable record evidence. Additional evidence demonstrated that:

- NatWest filed an internal suspicious activity report based on a 1996 *Financial Times* article recounting Israeli government charges that Interpal "had masterminded fund-raising for the Hamas Islamic movement in Europe," and was providing "support to families of Hamas guerillas and suicide bombers." A-1054. The article stated that when Interpal's then-Chairman, Abdul Rahman Daya, was asked whether any of the charities funded by Interpal were linked to Hamas, he admitted, "Maybe." *Ibid.*

16

- Israel outlawed Interpal in 1997 and declared it a terrorist organization a year later. A-280.

- In September 2001, the same executive who later testified about NatWest's reluctance to close Interpal's accounts saw (and personally hand-delivered to British authorities), A-1119, a leaked South African National Intelligence Agency report indicating that Interpal was Hamas's principal fundraiser in Western Europe, and that Hamas used the Interpal funds to support terrorist activities, A-1171-1200.

- NatWest's internal customer risk program marked Interpal with a "red flag" throughout the relevant period, signifying "Extreme caution is advised," A-1479, "serious grounds for concern," *ibid.*, and after 2004, "[f]irm evidence of wrongdoing," A-1524.

- NatWest contemporaneously knew that the United States and the United Kingdom both designated Interpal's counterparty, the Al-Aqsa Foundation, on May 29, 2003, A-1569-1572. U.K. Chancellor Gordon Brown publicly explained that "[t]he Al-Aqsa Foundation describes itself as an organisation that helps widows and orphans but we have linked them to supporting terrorists." A-1572 (emphasis added). Nevertheless, NatWest kept depositing transfers from the Al-Aqsa Foundation into Interpal's account. A-3242, A-3247-3248.

Notwithstanding these damning facts, Interpal remained a NatWest customer until 2007 (after the motion to dismiss in this case was denied), at which point NatWest finally closed Interpal's accounts. *See* Pet. App. 151a.

17

On remand, the district court adjudicated Nat-West's remaining summary judgment arguments, and denied the motion. *See* Pet. App. 73a-100a. Thus, the court held that petitioners had introduced sufficient evidence that the 13 Charities were controlled by, or alter-egos of, Hamas. *Id*. at 83a-86a.

The district court also found sufficient evidence that Hamas had committed 16 of the 18 terrorist attacks at issue, Pet. App. 89a, and that the money transferred to the 13 Charities had proximately caused the attacks. The court explained that by "provid[ing] funds to Hamas front-groups," NatWest's conduct proximately caused the attacks because "[t]he social services provided by Hamas and its front groups are integral to building popular support for its organization and goals, which then facilitates its ability to carry out violent attacks*." Id.* at 83a.

3. While this case was pending, Congress enacted JASTA in 2016, expressly adding a claim for aiding and abetting to the ATA. *See* 18 U.S.C. § 2333(d)(2).

4. Two years later, the Second Circuit decided *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018). There, the plaintiffs, who were injured in attacks committed by Hamas from 2001 to 2004, sued a Jordanian bank for providing financial services to Hamas entities, leaders, and operatives. The plaintiffs prevailed after a liability trial. *See id.* at 317-18.

On appeal, the Second Circuit found that the district court had improperly instructed the jury regarding the elements of ATA primary liability. *See Linde*, 882 F.3d at 318. Specifically, the Second Circuit held that the district court erroneously allowed the jury to impose liability upon finding that the bank knowingly

18

provided material support to a terrorist organization without separately requiring the jury to find that the bank satisfied the elements of the ATA's § 2331(1) definition of "international terrorism" (*e.g.*, the "violent" or "dangerous to human life" requirement, and the apparent intent requirement).

The plaintiffs in *Linde* argued that any charging error was harmless, in part because, under JASTA (enacted after the trial in *Linde*), knowingly providing material support to a designated FTO was effectively the same as aiding and abetting the organization's terrorist violence. Thus, the plaintiffs argued, and the Second Circuit agreed, "the jury found Arab Bank to have provided material support in the form of financial services to what it knew was a designated terrorist organization." *Linde*, 882 F.3d at 329.

Nevertheless, the Second Circuit held that the jury's findings did not support a JASTA claim because "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization." Linde*, 882 F.3d at 329. Specifically, *Linde* held that aiding and abetting liability requires a jury to find that, "in providing [financial] services, the bank was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." *Ibid.* It was not enough, in the court's view, for the bank to know of Hamas's "connection to terrorism." *Id*. at 330.

Because the court concluded that the instructional error was not harmless, it vacated and remanded for a jury to consider JASTA's aiding and abetting elements. Pursuant to a settlement, the retrial never occurred. *See Linde*, 882 F.3d at 318-19.

19

5. NatWest filed another summary judgment motion, arguing that under *Linde*, evidence showing that NatWest had knowingly provided material support to Hamas was insufficient to render it liable. Indeed, NatWest instructed the district court to assume that there was sufficient evidence in the record for a jury to conclude that NatWest "knowingly provided material support to an FTO in violation of § 2339B," the felony material support statute. Pet. App. 55a. Contemporaneously, petitioners sought to amend their complaints to re-introduce claims for aiding and abetting liability under JASTA.

The district court granted NatWest's renewed motion. *See* Pet. App. 43a-72a. After finding the evidence insufficient to support primary liability, the court denied petitioners' motion for leave to amend as futile. *Id*. at 70a. The court explained that "[e]vidence that Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement" because even if the evidence showed knowing support to an FTO, that would not "create[] a jury question as to whether [NatWest] generally was aware that it played a role in any of Hamas's or even Interpal's . . . violent or life-endangering activities" under *Linde*. *Id*. at 72a.

6. Petitioners appealed, and the Second Circuit affirmed. Pet. App. 7a.[4] The court explained that under *Linde*, "the mens rea element of aiding and abetting is 'different from the *mens rea* required to establish

---

[4] NatWest cross-appealed the denial of its summary judgment motion on personal jurisdiction grounds. The Second Circuit did not reach that issue because it ruled for NatWest on the merits. Pet. App. 25a.

20

material support in violation of 18 U.S.C. § 2339B,'" and that "'[a]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.'" Pet. App. 37a-38a (quoting *Linde*, 882 F.3d at 329-30).

Under the Second Circuit's rule, the ample evidence demonstrating that NatWest knowingly transferred funds for and to Hamas-controlled entities was deemed insufficient even to create a jury question regarding aiding and abetting because: petitioners conceded that the 13 Charities also "performed charitable work"; there was "no evidence that the charities funded terrorist attacks or recruited persons to carry out such attacks";[5] and "Interpal did not indicate to NatWest that the transfers were for any terroristic purpose." Pet. App. 41a. Legally, it did not matter that Interpal and the 13 Charities were controlled by Hamas or that Hamas was a designated FTO engaged in a campaign of violent terrorism when NatWest transferred funds for Interpal. *See ibid*. (rejecting the argument that NatWest's awareness "was established by evidence that NatWest was assisting Interpal").

7. This petition followed. Although the lower courts addressed primary and secondary liability, this

---

[5] Although the "charities" did not directly fund attacks or recruit terrorists in their own name, employees and management of the charities were directly involved in planning two of the suicide bombings at issue in this case. A-279, A-362. Other "charitable" committee employees also recruited Hamas operatives, A-256-57; transported suicide bombers to their targets, A-363; and paid benefits to the families of Hamas "martyrs," A-308, A-313-314, A-431-432, A-2410.

21

petition solely concerns aiding and abetting under JASTA, 18 U.S.C. § 2333(d)(2).

Petitioners have filed a separate petition seeking review of the Second Circuit's decision in *Strauss v. Crédit Lyonnais, S.A.*, 842 F. App'x 701 (2d Cir. 2021). There, another bank processed donations to many of the same Hamas charities on behalf of another Hamas fundraiser. The Second Circuit decided this case and *Strauss* on the same day, issuing a published opinion here and an unpublished decision in *Strauss* incorporating the reasoning below. The Court may wish to consider the two petitions together.

## REASONS FOR GRANTING THE WRIT

### I. The Decision Below Conflicts With Decisions From Other Circuits.

Certiorari should be granted because two other circuits have squarely rejected the core premise underlying the Second Circuit's ruling—*i.e.*, that knowingly providing material support to a terrorist organization does not equate to knowingly playing a role in illegal activities that foreseeably risk violence. The conflict is exceptionally clear because all three cases arose out of indistinguishable transactions (*i.e.*, transfers to putative charities controlled by Hamas—at least five of which appear in each case).

1. In *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685, 687-88 (7th Cir. 2008) (en banc), the parents of an American national killed in Israel sued U.S.-based charities for providing financial

22

support to Hamas in violation of the ATA.[6] The defendants were found liable; on their appeal, the Seventh Circuit, sitting *en banc*, considered the standard for ATA liability "against financial supporters of terrorism." *Id*. at 688.

Because *Boim* arose before JASTA's enactment, the discussion nominally concerned primary liability, *i.e.*, whether donations to terrorist organizations constitute acts of international terrorism. However, as the Seventh Circuit explained, secondary liability concepts applied because "[p]rimary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors." *Boim*, 549 F.3d at 691-92. JASTA essentially codifies the Seventh Circuit's primary-liability rule as a secondary-liability cause of action. Indeed, the Seventh Circuit cited and relied on *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), *see* 549 F.3d at 691, which Congress incorporated into JASTA § 2(a)(5).

As relevant here, the Seventh Circuit held that § 2333's scienter requirement is met if a person who provides funds to an organization "either knows that the organization engages in such [terrorist] acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial

---

[6] At least six of the charities that received money in *Boim* also received transfers from Interpal: Islamic Charitable Society – Hebron; Jenin Zakat Committee; Nablus Zakat Committee; Tulkarem Zakat Committee; Ramallah al-Bireh Zakat Committee; and Sanabil Association for Relief and Development. *See Boim v. Quranic Literacy Inst.*, 2012 WL 13171764, at *6 (N.D. Ill. Aug. 31, 2012).

23

probability that the organization engages in terrorism but one does not care." *Boim*, 549 F.3d at 693. Applying that standard, the court reasoned that "[a] knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know . . . that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound . . . more people," including the "many U.S. citizens" who "live in Israel." *Id.* at 693-94.

The Seventh Circuit also grappled with the fact that Hamas was "engaged not only in terrorism but also in providing health, educational, and other social welfare services," and that many defendants "directed their support exclusively to such services." *Boim*, 549 F.3d at 698. The court concluded that "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook." *Ibid*. The court cited two bases for that holding. "The first is the fungibility of money. If Hamas budgets $2 million for terrorism and $2 million for social services and receives a donation of $100,000 for those services, there is nothing to prevent its using that money for them while at the same time taking $100,000 out of its social services 'account' and depositing it in its terrorism 'account.'" *Ibid*.

The second reason is that "Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect," as well as "indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren." *Boim,* 549 F.3d at 698.

24

The Seventh Circuit was explicit that:

> Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities. And that is the only knowledge that can reasonably be required as a premise for liability. To require proof that the donor *intended* that his contribution be used for terrorism—to make a benign intent a defense—would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent.

*Boim*, 549 F.3d at 698-99.

Finally, the Seventh Circuit held that those who provide funds to terrorists cannot "escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations." *Boim*, 549 F.3d at 701-02. As long as the defendant "either knows or is reckless in failing to discover" that the donations "end up with Hamas," it is liable. *Id*. at 702. "[T]o set the knowledge and causal requirement higher . . . would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare)," rendering the statute "a dead letter" against terrorist financing. *Ibid*.

The Seventh Circuit was assisted by the United States' *amicus* brief, which argued that defendants that knowingly provide substantial support to terrorist organizations can be liable even absent "a specific intent to further terrorist activities or the violent components of a terrorist organization." *Boim* U.S. Amicus Br., 2008 WL 3993242, at *31.

25

Under the Seventh Circuit's rule, NatWest was not entitled to summary judgment. The Second Circuit previously held (and NatWest instructed the district court to assume for present purposes) that there was sufficient evidence in the record to permit a jury to find that NatWest "knowingly provided material support to an FTO in violation of § 2339B" (the felony material support statute). Pet. App. 55a. Even if those transfers were purportedly earmarked for charitable purposes, they supported liability under *Boim* because the Seventh Circuit recognizes that any knowing support to an FTO foreseeably furthers that organization's violence, and therefore supports ATA liability. The facts that the Second Circuit found dispositive—*i.e.*, that the 13 Charities performed some charitable work, that transferred funds were not traced to specific terrorist attacks, and that Interpal did not admit that its transfers were for terroristic purposes—would not entitle NatWest to judgment as a matter of law. At most, they would create a jury issue.

2. In *United States v. El-Mezain*, 664 F.3d 467, 483 (5th Cir. 2011), the Fifth Circuit affirmed criminal liability under 18 U.S.C. § 2339B (the material support statute) for individuals and charities that sent funds to entities in Hamas's "social wing." The transfer recipients in *El-Mezain* included five of the same charities at issue here and in *Boim*. *See supra* n.6. Despite acknowledging that these "entities performed some legitimate charitable functions," the Fifth Circuit affirmed the defendants' convictions. 664 F.3d at 483. The court reasoned that the purported charities "were actually Hamas social institutions" and that, "by supporting such entities, the defendants facilitated Hamas's activity by furthering its popularity among

26

Palestinians and by providing a funding resource" that "allowed Hamas to concentrate its efforts on violent activity." *Id.* at 483-84.

The Fifth Circuit detailed the clear connections between Hamas's social wing and its terrorist objectives. It explained that "social services like education and medical care to the needy . . . build[] grassroots support for Hamas and its violent activities." *El-Mezain*, 664 F.3d at 486. Indeed, Hamas's social activities are "crucial to Hamas's success because, through its operation of schools, hospitals, and sporting facilities," Hamas can "win the 'hearts and minds' of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in its ideology." *Ibid*. Not only that, but Hamas's "social wing also supports the families of Hamas prisoners and suicide bombers, thereby providing incentives for bombing, and it launders money for all of Hamas's activities." *Ibid*. Consequently, "aid to Hamas's social wing critically assists Hamas's goals while also freeing resources for Hamas to devote to its military and political activities." *Ibid*.

Like the defendants in *Boim*, the defendants in *El-Mezain* argued "that they did not support Hamas or terrorism, but rather shared a sympathy for the plight of the Palestinian people." *El-Mezain*, 664 F.3d at 489. They also contended that the court could not treat the charities as Hamas fronts because the government had never designated them as terrorist organizations. *See ibid*.

The Fifth Circuit held that these arguments were properly presented to the jury, which rejected them in light of the government's "evidence of Hamas control of the" putative charities, which the Fifth Circuit described as "substantial." *El-Mezain*, 664 F.3d at 489-

27

90. The "plethora of evidence," *id.* at 527, the court cited largely overlapped with the evidence in this case: Dr. Levitt offered indistinguishable expert testimony, and petitioners relied on much of the same documentary evidence that supported the *El-Mezain* convictions, including voluminous materials seized by the Government of Israel from the "charities" offices.

Although *El-Mezain* is a criminal case, it stands clearly for the proposition that those who aid an FTO's peaceful arm necessarily enable terrorist violence. That empirical proposition is no less true when presented as an argument for civil liability. Unsurprisingly, in civil cases under the ATA, district courts in the Fifth Circuit have noted that this Court's "discussion of fungibility, legitimacy, and foreign affairs" in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), "confirms the broad sweep of the statute and supports the reasoning of *Boim*." *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 634 (S.D. Tex. 2011).

3. The Second Circuit's decisions in this case and *Strauss* are irreconcilable with the conclusions reached by the Fifth and Seventh Circuits. While other courts recognize that support for an FTO's nonviolent activities constitutes support for its terrorism, the Second Circuit adopted a contrary rule. The Second Circuit particularly stands apart in its willingness to grant judgment to defendants as a matter of law and thereby prevent a jury from considering whether a defendant that knows it is sending money to an FTO is also aiding that organization's violent activities. The split is stark.

In subsequent cases, the Second Circuit has adhered to its position that knowingly providing material support to FTOs is insufficient to support liability

28

for aiding and abetting. Thus, in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860-61 (2d Cir. 2021), the court reaffirmed the rule in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), but found that the plaintiffs' complaint satisfied it by alleging that the bank's customers "were so closely intertwined with Hizbollah's violent terrorist activities that one can reasonably infer that [defendant] LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable." The Second Circuit does not permit such an inference, however, when the donations were nominally charitable.

The court made the point even more explicitly in *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). There, the Second Circuit rejected the plaintiffs' "attempt to equate the *Halberstam* foreseeability standard with the 'fungibility' theory in *Holder v. Humanitarian Law Project*" because "*Linde* determined that the facts in *Holder*—adequate for criminal material support—fall short for the general awareness element of JASTA aiding and abetting." *Id.* at 498-99.

*Honickman* also acknowledged the conflict between the Seventh Circuit's decision in *Boim* and the Second Circuit's rule. The court noted that the Seventh Circuit held that "anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." 6 F.4th at 499 n.14 (quotation marks and alteration omitted). But the Second Circuit held that "any persuasive value [*Boim*] might have is insufficient to overcome the binding effects of *Linde* and *Kaplan* on us." *Ibid.*

29

In sum, a circuit split exists over whether, when a person knowingly provides funds to an FTO (or its fronts), a jury may find that the person aided and abetted the FTO's terrorist acts. The split is entrenched, and calls out for this Court's immediate review.

## II. The Decision Below Is Incorrect.

Certiorari should also be granted because the decision below is incorrect. The Second Circuit's holding rejects a fundamental axiom of American counterterrorism policy: that any material support to designated FTOs advances their terrorist agendas. Congress found as much in 1996 in AEDPA, and operationalized that finding as a felony prohibition in the material support statute, 18 U.S.C. § 2339B(a)(1). The Executive Branch reaffirmed the principle before this Court in *Holder*, where this Court found it sufficiently powerful to overcome strict scrutiny.

Congress followed up with JASTA, codifying an action for aiding and abetting against any person who "knowingly provid[es] substantial assistance" to FTOs, 18 U.S.C. § 2333(d)(2), and explaining that by doing so, it invested victims of FTO violence with "the broadest possible basis, consistent with the Constitution of the United States, to seek relief" against any person or entity that "provided material support, directly or indirectly," to an FTO. JASTA § 2(b). The natural reading of the phrase "broadest possible basis" is that Congress intended JASTA liability to extend at least as far as the liability this Court recognized in *Holder* (which explored the limits the Constitution imposes on liability for material support). And under *Holder*, the fact that support to FTOs is given for nominally charitable or humanitarian purposes—or even

30

used for such purposes—does not eliminate liability as a matter of law. *Holder*, 561 U.S. at 30 ("Material support meant to promote peaceable, lawful conduct, can further terrorism by foreign groups in multiple ways.") (cleaned up).

Notwithstanding these authorities, the Second Circuit has insisted that the knowing provision of material support to FTOs is insufficient to establish aiding and abetting. The Second Circuit seeks to justify this approach by citing purported distinctions between supporting an organization, on the one hand, and supporting its terrorist acts, on the other. Pet. App. 37a-38a. But any such distinction is illusory vis-à-vis designated FTOs. As this Court observed in *Holder*, "the considered judgment of Congress and the Executive," is "that providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization." 561 U.S. at 36. The Court found that view supported by "persuasive evidence," sufficient to overcome a strict scrutiny challenge. *Ibid*. All three branches of the federal government thus reject the Second Circuit's core legal premise, *i.e.*, that providing support to FTOs is not the sort of unlawful activity that foreseeably leads to terrorism.

In *Honickman*, the Second Circuit also concluded that treating material support for terrorist organizations as a proxy for aiding and abetting would conflict with *Halberstam*, which Congress identified as the standard for aiding and abetting under JASTA. *See* 6 F.4th at 498-99. This is incorrect. Under *Halberstam*, a defendant can be liable for aiding and abetting an act of violence if the defendant was "generally aware of his role as part of an overall illegal or tortious

31

activity," and violence was a "foreseeable consequence of the activity." 705 F.2d at 487-88. Thus, the D.C. Circuit determined that the defendant could be held liable for an unplanned murder even if she did not know that her partner was a burglar, let alone a killer—and even though she personally played no role in the murder. *See id.* at 488. Indeed, "her own acts were neutral standing alone." *Ibid*. But she was liable because she knew she was involved in "some type of personal property crime," and "violence and killing is a foreseeable risk" of that enterprise. *Ibid*.

Similar logic supports liability for NatWest—or at least precludes summary judgment. Knowingly providing an FTO with access to currency and financial services is playing a role in an illegal enterprise; terrorist violence is at least a foreseeable (if not inevitable) consequence of that enterprise. *See, e.g.*, *Holder*, 561 U.S. at 36. Thus, even if support for Hamas-controlled charities is "seemingly benign," *ibid.*, or "neutral standing alone," *Halberstam*, 705 F.2d at 488, that support is culpable "in the context of the enterprise" it aids, *ibid*. Under *Halberstam*, no more is required. The facts the Second Circuit deemed exculpatory—including that Interpal did not foolishly earmark its transfers for terroristic purposes, that Hamas-controlled charities performed charitable work, and that the funds donated did not necessarily pay directly for violence—are insufficient to defeat JASTA liability as a matter of law. At most, these facts create a jury question about whether terrorist violence was a foreseeable risk from providing financial support to Hamas.

Indeed, the burden the Second Circuit imposed eviscerates JASTA. Sophisticated terrorist fundraisers know better than to admit that they are funding

32

terrorism. And victims of terrorism have no way to trace funds received by a terrorist front group through to terrorist attacks or recruiting. FTOs, after all, do not open their ledgers to the public. Congress knows this, which is why it outlawed all material support to FTOs. But if defendants are entitled to judgment as a matter of law any time terrorists do not hand the plaintiffs evidence connecting transfers to terrorism, "the statute would be a dead letter" against terrorist financing. *Boim*, 549 F.3d at 702.

On the other hand, answering the question presented in petitioners' favor does not require the Court to hold that *every* act that violates 18 U.S.C. § 2339B(a)(1) also gives rise to aiding and abetting liability under JASTA. For example, knowingly providing material support to an FTO might not equate to aiding and abetting the FTO's terrorist acts where the support was not "substantial" under JASTA. The question presented here focuses on the provision of substantial funds, the form of support most easily "diverted or siphoned to support terrorism." A-1035. NatWest knowingly moved millions of dollars from Interpal to Hamas, even after Interpal was designated an SDGT, and while Hamas was carrying out a wave of terrorist attacks during the Second Intifada. At a minimum, the aiding and abetting claim required a jury's consideration.

### III. The Question Presented Is Important.

The question presented is important and frequently recurring. Halting the flow of money to terrorist organizations is key to stopping their violence against Americans, and civil liability is a critical deterrent to illicit terror financing.

33

It is well-understood that terrorists rely on U.S. dollars moving through the international banking system to finance violence. *See, e.g.*, Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 145-46 (2013) (ebook) (former Deputy Assistant to the President and Deputy National Security Advisor for Combating Terrorism explaining that "[f]or any criminal or terrorist enterprise to have global and sustained reach, it must have a financial infrastructure to raise, hide, and move money to its operatives and operations. Banks are the most convenient and important of these nodes of the financial system and are critical to nefarious networks."); Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 151 (2008) (former Under Secretary of the Treasury for Terrorism and Financial Intelligence and later Assistant Attorney General explaining that banks are attractive to terrorists "because they provide an extensive range of financial services," "wide geographic availability," and the capacity to transfer "large sums of money . . . instantaneously" across the world). That is why, for example, Congress observed in JASTA that "terrorist organizations" "act[] through affiliated groups or individuals [and] raise significant funds outside of the United States." JASTA § 2(a)(3). For the same reason, the United States recently modernized its sanctions regime by authorizing the Treasury Department to deny foreign financial institutions that assist sanctioned terrorists any further access to U.S. dollar accounts. *See* Exec. Order No. 13,886, § 1, 84 Fed. Reg. 48,041 (Sept. 9, 2019).

Nevertheless, many banks have not halted the flow of terrorist financing. Indeed, NatWest continued

34

to transfer funds from Interpal to Hamas-controlled charities even after NatWest learned of Interpal's designation and after the U.K. froze payments "to, or for the benefit of, Hamas." Pet. App. 150a. It only ceased doing so in 2007, after losing the motion to dismiss this case. *See id*. at 151a.

As explained *supra* pp.31-32, the Second Circuit's rule undermines Congress's efforts to deter terror financing by imposing an illogical burden on plaintiffs, and excusing banks from undertaking even minimal diligence. The flaw in the Second Circuit's rule is particularly significant because most ATA cases against commercial banks arise in the Second Circuit. *See, e.g.*, *Honickman*, 6 F.4th 487; *Kaplan*, 999 F.3d 842; *Strauss*, 842 F. App'x 701; *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019); *Linde*, 882 F.3d 314; *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013); *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019); *Freeman v. HSBC Holdings PLC*, 2021 WL 76925 (E.D.N.Y. Jan. 7, 2021); *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020); *Est. of Henkin v. Kuveyt Türk Katilim Bankasi, A.Ş.*, 495 F. Supp. 3d 144 (E.D.N.Y. 2020), *motion to certify appeal granted,* 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020); *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96 (E.D.N.Y. 2020); *Averbach ex rel. Est. of Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020); *O'Sullivan v. Deutsche Bank AG*, 2020 WL 906153 (S.D.N.Y. Feb. 25, 2020).

These cases, many of which remain pending, are incredibly consequential; they are brought by the victims of the September 11th attacks, Gold Star

35

families, and myriad other Americans killed and in-
jured by terrorists. The cases arise in the Second Cir-
cuit because most international transfers of U.S. dol-
lars pass through branch or intermediary banks in
New York. *See Banque Worms v. BankAmerica Int'l*,
570 N.E.2d 189, 194 (N.Y. 1991). The Second Circuit
thus plays an outsized role in determining what stand-
ard governs ATA claims against banks—and it has
adopted the wrong rule. This Court should intervene
immediately.

## IV. This Court Should Consider Calling For The Views Of The Solicitor General.

If the Court is uncertain about the need for re-
view, it should call for the views of the Solicitor Gen-
eral. The Court did so in *O'Neill v. Al Rajhi Bank*, No.
13-318, which concerned whether the ATA (before
JASTA) included an action for aiding and abetting. A
CVSG makes sense because, as this Court recognized
in *Holder*, terrorism cases implicate "sensitive and
weighty interests of national security and foreign af-
fairs." 561 U.S. at 33-34.

The United States also has an interest in the
scope of civil liability. The ATA's civil liability provi-
sion "was supported by the Executive Branch as an ef-
fective weapon in the battle against international ter-
rorism." *Boim* U.S. Amicus Br., 2008 WL 3993242, at
*1. Indeed, the Government lobbied for the statute,
and argued for its broad application in *Boim*. Since
then, Congress has only broadened the ATA with
JASTA and other laws, including the Anti-Terrorism
Clarification Act of 2018, Pub. L. No. 115-253, 132
Stat. 3183, and the Promoting Security and Justice for

36

Victims of Terrorism Act of 2019, Pub. L. No. 116-94, § 903, 133 Stat. 2534, 3082.

The Government also has an interest in this case because of how the civil and criminal liability provisions interact with the FTO and SDGT sanctions regime, which the Executive Branch enforces.

### CONCLUSION

Certiorari should be granted.

Respectfully submitted,

Peter Raven-Hansen
Gary M. Osen
Michael Radine
Ari Ungar
OSEN LLC
190 Moore Street
Suite 272
Hackensack, NJ
07601

Thomas C. Goldstein
  *Counsel of Record*
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0636
tg@goldsteinrussell.com

James P. Bonner
FLEISCHMAN BONNER &
ROCCO LLP
81 Main Street, Suite 515
White Plains, NY 10601

September 3, 2021