# EXHIBIT 3

No. 21-381

IN THE

# Supreme Court of the United States

TZVI WEISS, ET AL.

*Petitioners*,

v.

NATIONAL WESTMINSTER BANK PLC,

*Respondent.*

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Second Circuit

## REPLY BRIEF FOR PETITIONERS

Peter Raven-Hansen
Gary M. Osen
Michael Radine
Ari Ungar
OSEN LLC
190 Moore Street
Suite 272
Hackensack, NJ 07601

Thomas C. Goldstein
*Counsel of Record*
Tejinder Singh
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0636
tg@goldsteinrussell.com

James P. Bonner
FLEISCHMAN BONNER &
ROCCO LLP
81 Main Street, Suite 515
White Plains, NY 10601

*Counsel for Petitioners*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................ii

REPLY BRIEF ........................................................... 1

I. There Is a Clear, Outcome-Determinative Circuit Split ...................................................... 1

II. The Question Presented Is Important and Ripe for This Court's Review ............................ 6

III. The Essential Dispute Is Legal, Not Factual ............................................................... 8

IV. The Decision Below Is Wrong ........................ 11

V. In the Alternative, a CVSG Would Be Appropriate .................................................... 11

CONCLUSION ........................................................ 12

## TABLE OF AUTHORITIES

### Cases

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) .......................... *passim*

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) .................................... 2

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) .................................. 2, 3

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........................ *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ................................................. 9, 10

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .............................. *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ............................. 1, 7, 8

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) ................................ 4, 5

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ................................. 7, 8

*Retana v. Twitter, Inc.*,
1 F.4th 378 (5th Cir. 2021) ..................................... 2

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) ............................ 2, 5, 6

**Statutes**

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 .......... 9

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) .... *passim*

§ 2(a)(3) .................................................................. 11

§ 2(b) ............................................................... 3, 6, 8

18 U.S.C. § 2331(1) ........................................................ 3

18 U.S.C. § 2333(d)(2) .................................................... 2

18 U.S.C. § 2339B ........................................... 5, 8, 9, 12

18 U.S.C. § 2339B(a)(1) .................................................. 8

## REPLY BRIEF

### I. There Is a Clear, Outcome-Determinative Circuit Split.

1. In the Second Circuit, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*." Pet. App. 37a-38a (quotation marks and brackets omitted). Specifically, if a defendant knowingly provides substantial funds to parts of an FTO that "performed charitable work," and the funds are not earmarked or used for a "terroristic purpose," *e.g.*, attacks or recruiting, the Second Circuit holds that the defendant is entitled to judgment as a matter of law. *Id*. at 41a. The court also expressly rejects the argument that because money is fungible, transfers to the charitable or social wing of an FTO foreseeably lead to terrorist violence. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021). Instead, the recipients of the funds must be "closely intertwined with [the FTO's] violent terrorist activities" for the Second Circuit to allow claims to proceed (even past the pleading stage). *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021).

The Seventh Circuit, by contrast, holds that "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities," and emphasizes that "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (en

banc). This is because money is fungible and an FTO's "social welfare activities reinforce its terrorist activities." *Ibid*. The Fifth Circuit similarly recognizes that "purportedly charitable donations also indirectly aid[] … violent activities" because "money is fungible." *United States v. El-Mezain*, 664 F.3d 467, 508 (5th Cir. 2011) (quotation marks and brackets omitted).

2. NatWest disputes this clear split, citing cases from the Fifth, Sixth, and Ninth Circuits that it contends support the Second Circuit's rule. Opp. 19. Two of these cases are irrelevant, and the third reinforces the split.

In *Retana v. Twitter, Inc.*, 1 F.4th 378, 381-82 (5th Cir. 2021), and *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019), the claims under JASTA failed because the plaintiffs had not shown that FTOs "committed, planned, or authorized" the attacks (an essential predicate to secondary liability under JASTA, 18 U.S.C. § 2333(d)(2)). The courts never considered the aiding and abetting standard.

In *Gonzalez v. Google LLC*, 2 F.4th 871, 903 (9th Cir. 2021), plaintiffs alleged that Google shared advertising revenue from the Islamic State's (ISIS) YouTube videos with ISIS (as Google did for YouTube channel owners generally). The Ninth Circuit held that the "general awareness" element of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) was satisfied because "the allegation that Google knowingly gave fungible dollars to a terrorist organization plausibly alleges that Google was aware of the role it played." 2 F.4th at 903. Thus, the Ninth Circuit embraced the same fungibility principle that the Fifth and Seventh Circuits accept, and the Second Circuit rejects. Other plaintiffs

in *Gonzalez* prevailed on the same rationale. *See id.* at 908-10.

3. NatWest attempts to downplay the split with *Boim*, Opp. 19-21, but doesn't even address the most important part of the case, *i.e.*, the unequivocal statement that those who provide money to "the nonviolent wing" of an FTO "knowingly contribut[e] to the organization's terrorist activities." 549 F.3d at 698. This point is critical: NatWest does not dispute the crux of the split.

Instead, NatWest observes that *Boim* was not a JASTA case. Opp. 19-21. Petitioners anticipated this argument by explaining that in every way that matters, the *Boim* standard is indistinguishable from JASTA. The case was about aiding and abetting liability when a defendant provides money to an FTO; it cited *Halberstam*, which supplies the JASTA standard; and it found that defendants that provided substantial monetary assistance to largely the same Hamas social welfare organizations at issue here knowingly contributed to terrorism. Pet. 22-23.

To the extent the pre-JASTA distinction is relevant, it only helps petitioners: *Boim* found liability for aiding and abetting even under the ATA's primary liability provisions—which are more demanding than JASTA's secondary liability provision establishing the "broadest possible basis" for relief, JASTA § 2(b). To win in *Boim*, the plaintiffs had to show that giving money to Hamas's charitable arm itself involved acts "dangerous to human life," and proximately caused a terrorist attack. 549 F.3d at 690 (quoting the definition of international terrorism at 18 U.S.C. § 2331(1)); *id*. at 698 (explaining that donations to Hamas "significantly enhanced the risk of terrorist acts and thus the

probability that the plaintiff's decedent would be a victim"). The Seventh Circuit held that even these relatively demanding elements were satisfied by donations to Hamas's social wing. *A fortiori*, the same facts establish scienter under JASTA, which only requires a general awareness that donations to an FTO's charitable arm foreseeably contribute to terrorist violence. Thus, the fact that *Boim* is a pre-JASTA case only makes the conflict with this case starker.

This also answers NatWest's argument that the Second Circuit in *Honickman* distinguished *Boim* as a pre-JASTA case. Opp. 20. The distinction is immaterial, and *Honickman* also acknowledged clear tension between *Boim* and the Second Circuit's binding decisions. Pet. 28 (quoting *Honickman*, 6 F.4th at 499 n.14). Ultimately, whether *Honickman*'s footnote acknowledged a circuit split or dismissed *Boim*'s "persuasive value" as "insufficient," 6 F.4th at 499 n.14, so as to avoid saying the words "circuit split," the circuit conflict is clear from *Honickman*'s holding—which explicitly rejected the "'fungibility' rationale" in civil cases, dismissing *at the pleading stage* a JASTA case against a bank that knowingly helped Hamas fundraisers. *Id.* at 499.

NatWest cites *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018), for the proposition that JASTA liability is "more limited" than the scienter standard the Seventh Circuit articulated in *Boim*. Opp. 20. This is misleading. In *Kemper*, the district court held that JASTA did not apply because "the attack" that injured the plaintiff "was orchestrated by Iran," and not by an FTO; the plaintiff did "not contest[] th[at] holding on appeal," and thus "waived" reliance on JASTA. 911 F.3d at 396. The court then held

that unless the FTO orchestrated the attack, *Boim* could not support primary liability for conspiracies, lest JASTA's conspiracy provision become superfluous. *Ibid*. It was *in that sense only* (*i.e.*, requiring FTO involvement) that *Kemper* deemed JASTA more limited than *Boim*. Nonetheless, *Kemper* reaffirms *Boim*'s holding that "giving fungible dollars to a terrorist organization" is "dangerous to human life." *Id*. at 390.

NatWest's arguments about the Fifth Circuit's precedents are similarly unpersuasive. NatWest observes that *El-Mezain* addressed 18 U.S.C. § 2339B (the criminal material support statute), not JASTA. But the key point is that *El-Mezain* concluded that donations to largely the same Hamas social welfare organizations at issue here support terrorist violence—*see El-Mezain*, 664 F.3d at 486—a proposition the Second Circuit rejects as a matter of law. NatWest also ignores that district courts in the Fifth Circuit have relied on *El-Mezain* and *Boim* to impose broad liability in civil ATA cases. *See* Pet. 27.

Finally, NatWest argues that *Boim* and *El-Mezain* were about donors who sent funds to Hamas, as opposed to banks that processed the transfers. Opp. 21-23. But donors and banks are both vital participants in the exact same transactions, and banks are just as capable as donors of foreseeing that funding an FTO risks violence—which is all that JASTA's scienter requirement asks. At the very most, NatWest's distinction is a jury argument.

What NatWest hasn't shown is that the Seventh and Fifth Circuits would grant judgment to it as a matter of law. On the contrary, the defendants in *Boim* and *El-Mezain* argued that their intentions were benign, and so they lacked scienter—just as NatWest

does here. The other circuits correctly held that this contention was for a jury to accept or reject. *See Boim*, 549 F.3d at 698 (observing that most of the defendants "directed their support exclusively to" Hamas's "health, educational, and other social welfare services," but deeming this irrelevant); *El-Mezain*, 664 F.3d at 489, 508 (explaining that "[t]he defendants' theory at trial largely was that they did not support Hamas or terrorism, but rather shared a sympathy for the plight of the Palestinian people," but finding that the jury was entitled to reject that defense because "money is fungible" such that "purportedly charitable donations also indirectly aided Hamas's violent activities") (cleaned up). The Second Circuit, by contrast, treats the absence of a stated "terroristic purpose" as a conclusive defense as a matter of law. Pet. App. 41a. That's a circuit split.

## II. The Question Presented Is Important and Ripe for This Court's Review.

NatWest ignores how important the question presented is. Petitioners explained that terrorists are—right now—relying primarily on international banks to access funds. Pet. 32-35. Applying JASTA consistently with its broad scope is essential to curbing bank participation in this misconduct, and to providing redress to victims. Moreover, Congress has already enacted the "broadest possible" statute. JASTA § 2(b). The legislature having spoken clearly, it falls to this Court to ensure that lower courts follow Congress's directive.

Five amicus briefs—by national security and counterterrorism policy experts, legal scholars, prominent U.S. senators on both sides of the aisle, and

advocacy organizations—confirm the question's importance. These diverse and well-qualified amici have spent their own time and resources to ask this Court to review this question—and to do so now before the Second Circuit's rule further undermines efforts to counter terror financing.

NatWest argues that other JASTA cases are percolating, so this Court can wait to take one. Opp. 23-24. But NatWest does not (and cannot) argue that further percolation will cause the Second Circuit to change its erroneous rule (recently reaffirmed in *Kaplan* and *Honickman*), which matters because the vast majority of cases against banks are pending (and will always be pending) in the Second Circuit. Pet. 34-35 (string-citing cases).

NatWest also disputes the contention that JASTA is a "dead letter" in the Second Circuit, citing two cases that did not dismiss JASTA claims. Opp. 23. But the "dead letter" language isn't petitioners' verbiage; it's a direct quote from *Boim*. Pet. 32 (quoting *Boim*, 549 F.3d at 702). To the extent NatWest disagrees with that proposition, it is disagreeing with the Seventh Circuit—reinforcing the circuit split.

Moreover, the cases NatWest cites hardly show that the Second Circuit gives JASTA its intended breadth. In *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), the jury was not instructed about JASTA, and the question was whether the jury's findings (including that the defendant knowingly provided substantial funds to an FTO and proximately caused the plaintiffs' injuries) necessarily made out a JASTA claim. The court held "no," dealing a defeat to the plaintiffs. *See id.* at 329-30. In *Kaplan*, the Second Circuit held that the claim survived a motion to dismiss—

but scienter is relatively easy to allege. *See* 999 F.3d at 861 (distinguishing *Linde* and this case because they "were not decided on the basis of their pleadings"). *But see Honickman*, 6 F.4th at 503 (dismissing JASTA case for lack of knowledge at the pleading stage). The question is whether a defendant wins as a matter of law when the *evidence* shows (as it often will) that the defendant knew it was assisting an FTO, but the plaintiff cannot prove that the funds were earmarked or explicitly used for a "terroristic purpose." *Kaplan* has nothing to say about that; the precedential decision below, however, says "yes." That rule risks scuttling every case against a bank that knowingly provided funds to an FTO, unless the bank's customers were naïve enough to admit that they were financing terrorism.

## III. The Essential Dispute Is Legal, Not Factual.

NatWest attacks a straw man by characterizing the question presented as whether every violation of § 2339B constitutes aiding and abetting under JASTA. Opp. 3-4. That isn't the question. Petitioners acknowledge that not every instance of providing material support to an FTO in violation of § 2339B will violate JASTA because the support could be of a type or an amount that renders it insubstantial. Pet. 32. On the other hand, the same policy considerations that led Congress to enact a broad criminal prohibition against "knowingly provid[ing] material support or resources to [FTOs]," 18 U.S.C. § 2339B(a)(1), plainly also inform the scope of JASTA, which Congress intended to provide "the broadest possible" civil remedy against those who "have provided material support, directly or indirectly, to [FTOs]," JASTA § 2(b).

Specifically, when Congress enacted § 2339B in 1996, it adopted a fundamental axiom of American counterterrorism policy: "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(7), 110 Stat. 1214, 1247. In defending the statute, the Executive Branch confirmed that "it is highly likely that any material support to [FTOs] will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) (quotation marks omitted). This Court agreed, endorsing the view that "providing material support to a designated [FTO]—even seemingly benign support—bolsters the terrorist activities of that organization." *Id.* at 36. In support, the Court accepted the proposition that "[m]oney is fungible," so that donations to an FTO's charitable arm foreseeably enable violence. *Id*. at 37.

That axiom is relevant to JASTA's "general awareness" element, which asks whether the defendant was "generally aware" that it was playing a "role as part of an overall illegal or tortious activity" from which violence was "a foreseeable risk." *Halberstam*, 705 F.2d at 487-88. Knowingly providing funds to an FTO is an illegal activity (a felony under § 2339B) that all three branches of our government have recognized causes terrorist violence—even when the funds are earmarked for nonviolent purposes. Unless Congress, the Executive Branch, and this Court have been wrong for decades about the relationship between funding

FTOs and terrorist violence, a jury could reasonably conclude that sophisticated defendants like international banks are at least generally aware that by illegally providing funds to an FTO, they are playing a role in unlawful activities that foreseeably risk violence—even if those funds are not earmarked for a "terroristic purpose." *Contra* Pet. App. 41a.

The Second Circuit rejects that legal argument, disparaging any "attempt to equate the *Halberstam* foreseeability standard with the 'fungibility' theory in *Holder*." *Honickman*, 6 F.4th at 498. As explained *supra*, other courts hold that fungibility is directly relevant to civil liability for aiding and abetting. That legal disagreement is the crux of the circuit split—and the Second Circuit's approach is wrong for the reasons explained in the petition. Pet. 29-32.

NatWest also argues that the *Halberstam* test is inherently fact-intensive, and that the only thing at issue is the Second Circuit's application of that test. Opp. 17-18. Not so. Here, the Second Circuit affirmed summary judgment for NatWest as a matter of law. It did not weigh evidence—but instead held that JASTA's general awareness requires plaintiffs to come forward with evidence that funds were earmarked or used for a "terroristic purpose," like "fund[ing] terrorist attacks or recruit[ing] persons to carry out such attacks." Pet. App. 41a. In the court's view, the fact that a bank knowingly provided substantial funds to an FTO is insufficient to infer culpable awareness. In other words, the Second Circuit rejects—as a matter of law—a key foundation of America's counterterrorism policy.

That legal error is worthy of this Court's review because FTOs' fundraising is one of JASTA's

heartland concerns, *see* JASTA § 2(a)(3), and similar facts arise in essentially every JASTA case involving banks. *See* Pet. 34 (string-citing cases). The analysis this Court employs to resolve the question will surely have implications for other forms of support, too.

**IV. The Decision Below Is Wrong.**

NatWest's merits argument was addressed in the petition. Pet. 29-32. The only point that warrants reply is NatWest's contention that its assistance was not "substantial." As NatWest concedes, the lower courts did not reach this element. Opp. 26 n.10; Pet. App. 71a-72a. Had they reached it, they would have resolved it in petitioners' favor. Under *Halberstam*, whether a defendant's assistance is "substantial" turns on the nature of the act assisted (*i.e.*, whether the type of assistance given is likely to advance the particular act), the amount of assistance, the duration of the assistance, and other factors. *See* 705 F.2d at 488. Here, NatWest spent years providing Hamas-controlled organizations with millions of dollars—including contemporaneously with the Second Intifada, when Hamas was actively engaged in terrorist violence against Israelis and Americans. There is no plausible argument that this support was "insubstantial" as a matter of law.

**V. In the Alternative, a CVSG Would Be Appropriate.**

NatWest disputes the propriety of a CVSG, arguing that the government already made its views clear in prior cases. Opp. 26-28. Actually, the government has never provided this Court with its views about JASTA.

NatWest also notes that the government has not prosecuted NatWest under § 2339B, but NatWest has admitted for purposes of this appeal that a jury could find that it violated § 2339B by knowingly providing material support to an FTO. The fact that the government never brought criminal charges is a question of prosecutorial discretion, not infirmity in the civil case against NatWest. The government's prosecutorial decisions are also irrelevant because Congress in JASTA deliberately empowered the victims of terrorist attacks to pursue justice against supporters of FTOs even when the government does not.

## CONCLUSION

Certiorari should be granted.

Respectfully submitted,

Peter Raven-Hansen
Gary M. Osen
Michael Radine
Ari Ungar
OSEN LLC
190 Moore Street
Suite 272
Hackensack, NJ 07601

Thomas C. Goldstein
*Counsel of Record*
Tejinder Singh
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362-0636
tg@goldsteinrussell.com

James P. Bonner
FLEISCHMAN BONNER & ROCCO LLP
81 Main Street, Suite 515
White Plains, NY 10601

November 22, 2021