UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ X
                                                :

AHARON MILLER, *et al.*,            :
                                                :

                  Plaintiffs,       :             **DECISION AND ORDER**
                                                :

        -against-                 :             1:18-CV-2192 (HG)(PK)
                                                :

ARAB BANK, PLC,                :
                                                :

                  Defendant.       :

------------------------------------------------------ :

                                                :             1:18-CV-4670 (HG)(PK)

NATHAN PAM, *et al.*,            :

                  Plaintiffs,       :

        -against-                 :

ARAB BANK, PLC,                :

                  Defendant.       :

------------------------------------------------------ X

**Peggy Kuo, United States Magistrate Judge:**

       Aharon Miller and Nathan Pam, along with other named plaintiffs (collectively, "Plaintiffs"),

brought these actions against Arab Bank, PLC ("Defendant" or "Arab Bank") alleging that Arab Bank

aided and abetted foreign terrorist organizations ("FTOs"), provided material support to terrorists

and FTOs, and committed acts of international terrorism under the Anti-Terrorism Act ("ATA"), 18

U.S.C. §§ 2331 *et seq.*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), *id.* §

2333(d)(2).

       Before the Court are Defendant's Motions for a Protective Order ("Def. Mot. in *Miller*," Dkt.

84; "Def. Mot. in *Pam*," Dkt. 68) and Plaintiffs' Cross Motions to Compel ("Mot. to Compel in *Miller*,"

1

Dkt. 87; "Mot. to Compel in *Pam*," Dkt. 71).[1]  For the reasons set forth below, Defendant's Motion

for a Protective Order is denied and Plaintiffs' Motion to Compel is granted in both cases.

## BACKGROUND

### I.       Factual Background

The background of this case is set forth in *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 38

(E.D.N.Y. 2019).   Briefly stated, Plaintiffs are American citizens who were either injured or had

relatives who were injured in terrorist attacks that occurred in Israel and surrounding areas as "part of

the Second Intifada, a terrorist campaign against the State of Israel from approximately 2000-2004."

*Id.* at 38-39, 42.  Arab Bank, a Jordanian bank that had a branch in New York until 2005 when it was

converted into a federal agency, is accused of providing financial support to FTOs responsible for the

terrorist attacks.   *Id.* at 38; (Am. Compl. ¶¶ 1, 1 n.1; 210, Dkt. 25).  Plaintiffs allege that Arab Bank

maintained accounts for, and transferred funds to or from, individuals or organizations known to be

controlled by or affiliated with designated terrorist organizations under U.S. law.  (*See, e.g.*, Am. Compl.

¶¶ 1, 506-15, 540-48, 580-82.)  Arab Bank is alleged to have administered a terrorist insurance scheme

by which the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee"), a member

organization of the fundraising network of Hamas, a terrorist organization formally known as the

Islamic Resistance Movement (*see id.* ¶¶ 5, 8, 249), provided over $35 million to "martyrs," *i.e.*,

terrorists who died during terrorist attacks, and Palestinians who were wounded or captured by Israeli

forces, and their families.  *See Miller*, 372 F. Supp. 3d at 39-40.  To distribute the funds, the Saudi

Committee and Hamas-affiliated organizations provided local branches of Arab Bank "with detailed

lists containing the names of the martyrs, their personal information, . . . the date and manner of their

death," and instructions to distribute the money to the martyr's beneficiaries.  *Id.*  Plaintiffs allege that

---

[1] The motions filed in *Pam* and *Miller* are identical.  Therefore, the Court's analysis will apply equally
to the motions filed in both cases, but the Court will cite only to the filings in *Miller*.

the insurance scheme incentivized terrorists to commit acts of violence in order for them or their families to receive benefits. *Id.* at 40; (*see* Am. Compl. ¶¶ 267, 291).

## II.     Procedural Background

On October 5, 2018, Defendant filed a motion to dismiss the complaint in both the *Miller* and *Pam* cases. ("Mot. to Dismiss," Dkt. 30.)  On March 11, 2019, the Honorable Brian M. Cogan denied Defendant's motion to dismiss, except as to six non-United States national plaintiffs whose relative survived the attacks. *Miller*, 372 F. Supp. 3d at 42.

On July 22, 2019, Plaintiffs served Defendants with two requests for production of records covering the period from January 1, 1998 through December 31, 2004 ("the Relevant Period").  (*See* First Request for Production ("First RFP") ¶ 13, Ex. 4 to Declaration of Courtney G. Saleski ("Saleski Decl."), Dkt. 84-6; Second Request for Production ("Second RFP," collectively, the "RFPs") ¶ 13, Ex. 5 to Saleski Decl., Dkt. 84-7.)

Defendant served its Responses and Objections to the RFPs on August 23, 2019.  (*See* "Def. Discovery Letter" at 1, Dkt. 53.)  Defendant asserted that many of Plaintiffs' discovery requests were subject to the bank secrecy laws of foreign jurisdictions, and stated that it would seek customer consent or waivers for the requested documents if Plaintiffs narrowed the scope of their requests.  (*Id.* at 1-2.) Plaintiffs declined to do so.  (*See id.* at 1.)

After a conference with the parties, the Court issued Letters Rogatory to Jordan, Lebanon and the Palestinian National Authority requesting that those jurisdictions grant Arab Bank permission to disclose records related to Plaintiffs' requests, and attaching a list of the individuals and entities named in the requests.  (*See* Letters Rogatory, Dkts. 60-1 to 60-3.)  The foreign governments declined to grant such authorization.  (Defendant's Memorandum of Law in Support of its Motion for a Protective Order ("Def. Mem. of Law") at 8, Dkt. 84-1; Exs. 9, 10, & 11 to Saleski Decl., Dkts. 84-11, 84-12, 84-13.)

3

Defendant has completed its document production in response to the RFPs, other than those documents that it asserts are protected under the foreign governments' bank secrecy laws. (Dkt. 64 at 1.)

On March 4, 2022, Defendant filed a motion for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, requesting that the Court narrow Plaintiffs' outstanding requests for production of documents located in Jordan, Lebanon, and the Palestinian Territories on the basis of scope, relevancy and proportionality. (Def. Mot. in *Miller*; Def. Mem. of Law at 1-2; *see* Minute Entry dated Jan. 20, 2022.) Defendant also argues that the Court should not compel it to produce the requested documents because doing so would violate the bank secrecy laws of the foreign jurisdictions; however, it requests that the Court defer ruling on the issue of bank secrecy until Defendant has had an opportunity to seek customer waivers after the Court has narrowed the demands. (Def. Mem. of Law at 3.)

Plaintiffs filed a cross motion to compel Defendant to comply with the outstanding production requests contained in their First and Second RFPs. (Mot. to Compel in *Miller*.)

## DISCUSSION

I.    **Legal Standards**

   A.   *The ATA and JASTA*

Plaintiffs' claims against Arab Bank arise under the ATA, which provides a civil cause of action for damages to "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . . ." 18 U.S.C. § 2333(a). "[F]or an act to constitute 'international terrorism,' it must violate federal or state law if committed within this country," must "involve violence or endanger human life," "must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government," and "must have occurred primarily outside the territorial jurisdiction of the United States or transcend

4

national boundaries." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 325-26 (2d Cir. 2018) [hereinafter *Linde II*] (quoting 18 U.S.C. § 2331(1)).

Pursuant to the "material support" provision of the ATA, liability may be imposed on "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so . . . ." 18 U.S.C. § 2339B(a)(1). To violate this provision, "a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism . . . ." *Id.*

In September 2016, the ATA was amended "to create a cause of action against 'any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism.'" *Honickman v. Blom Bank Sal*, 6 F.4th 487, 494 (2d Cir. 2021) (alteration in original) (quoting 18 U.S.C. § 2333(d)(2)); *see* "JASTA," Pub. L. No. 114-222, 130 Stat. 852 (2016). "Aiding and abetting liability under the ATA requires that: '(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation.'" *Miller*, 372 F. Supp. 3d at 47 (quoting *Linde II*, 882 F.3d at 329 (quotation marks omitted)). The amendment was intended "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. No. 114-222, §2(b), 130 Stat. 852 (2016).

## B. *Rule 26*

Rule 26 of the Federal Rules of Civil Procedure sets forth the general scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

"Information is relevant if: '(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088, 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016) (quoting Fed. R. Evid. 401).  "This standard is applied more liberally during discovery than at trial." *6340 NB LLC v. Cap. One, N.A.*, No. 20-CV-02500 (JMA)(JMW), 2022 WL 17832860, at *1 (E.D.N.Y. Dec. 21, 2022).

The Court "must limit the frequency or extent of discovery . . . if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).  Rule 26 further provides that "[a] party or any person from whom discovery is sought may move for a protective order . . . [and] [t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." *Id.* at (c)(1).

"A party seeking a protective order under Rule 26(c) has the burden of establishing 'good cause.'" *Bodner v. Paribas*, 202 F.R.D. 370, 372 (E.D.N.Y. 2000) (citation omitted).

II.   **Defendant's Motion for Protective Order**

A.  *Defendant's Request to Narrow Plaintiffs' RFPs*

Defendant requests that the Court issue a protective order narrowing and/or striking Plaintiffs' RFPs, dividing its arguments into the following categories: (1) "Saudi Committee Requests," (2) "Charities and Social Service Institutions," (3) "Individuals Not Identified as Both Linked to an FTO and Closely Intertwined with Its Terrorist Activities During the Relevant Time Period," (4) "Individuals and Entities Linked to an FTO During the Relevant Time Period," and (5) "The Palestinian Government and Political Parties." (*See* Def. Mem. of Law at i.)[2]

As an initial matter, Defendant asserts that the RFPs should be narrowed to the 2000-2004 time period when the attacks occurred, but it fails to explain why the material sought from 1998-2000 is not properly discoverable. (*See id.* at 18, 21.) Part of Plaintiffs' theory of liability is that payments made to martyrs and prisoners incentivized both "prospective recruits and . . . individuals contemplating the commission of independent acts of violence" to carry out violent attacks. (*See* Am. Compl. ¶ 291.) Therefore, actions taken before the attacks and documents pre-dating them are relevant to the claims alleged. Accordingly, the Court declines to narrow the Relevant Period.

Defendant also argues that the district court's discovery rulings in *Linde v. Arab Bank, PLC* "are no longer relevant and do not reflect current law," primarily because the District Court's order "that the Bank produce *all* customer transfers over a multi-year period regardless of the nature of the transaction [was] based on its erroneous view that even transfers for humanitarian aid and social services are sufficient to establish primary liability" and because Rule 26 was amended in 2015. (Def. Mem. of Law at 11.)

---

[2] Although Plaintiffs do not adopt these categories in their opposition or Motion to Compel, for ease of reference, the Court refers to them when analyzing Defendant's Motion.

The lawsuits in *Linde* were brought against Arab Bank in 2004 and 2005 by relatives of individuals who were killed in terrorist attacks committed by Hamas in Israel between March 2002 and June 2003. *See Linde II*, 882 F.3d at 319. The plaintiffs alleged that Arab Bank "facilitated the attacks . . . by knowingly providing financial services to Hamas, Hamas-controlled charities, and the Saudi Committee . . . , an entity that made payments to the families of Hamas suicide bombers." *Id.* at 318. After a jury found Arab Bank liable under the ATA, the Second Circuit vacated the verdict, finding that the jury instruction was erroneous in that, although providing material support to a designated terrorist organization *could* "satisfy the § 2331(1) definitional requirements of international terrorism in some circumstances," it did not invariably do so. *Id.* at 326.

Despite the similarities between the cases now before the Court and those in *Linde*, including that they involve the same defendant, the Court is not bound by discovery rulings in other cases. Moreover, the Court does not view the Second Circuit decision as negating the relevance of the evidence Defendant describes; providing material support *could* constitute international terrorism, and, therefore, evidence of material support is still *relevant* to that claim. This Court conducts an independent analysis of the discovery requests before it based on the current requirements of Rule 26, including whether the requested information is relevant to any party's claims or defenses and proportional to the needs of the case.

### 1. "Saudi Committee Requests"

Several of Plaintiffs' discovery demands request production of records related to transactions processed by Arab Bank for the Saudi Committee for the benefit of the families of Hamas, Palestinian Islamic Jihad ("PIJ"), Popular Front for the Liberation of Palestine ("PFLP"), and the Palestinian National Liberation Movement ("Fatah")/Al Aqsa Martyrs Brigade ("AAMB") martyrs, terrorists, suicide bombers, and operatives during the Relevant Period. (First RFP ¶¶ 6-8; Second RFP ¶¶ 4-7, 11-14, 18-21; *see* Def. Mem. of Law at 12-13.) The requests are for "[a]ll documents concerning

transactions processed by Arab Bank for or on behalf of the Saudi Committee for the benefit of the families" of 400 listed individuals, "including, but not limited to, transaction records, account statements, account opening documentation, communications concerning the transactions and/or receipts issued by Arab Bank to account holders and/or payees, and death certificates, photographic identification and/or certificates of martyrdom for the individuals that qualified the account holder or payee to receive payment." (First RFP ¶¶ 6-8; Second RFP ¶¶ 4-7, 11-14, 18-21; Def. Mem. of Law at 13.)

Defendant states that, as a result of a waiver from the Saudi Committee, it has already produced "the transfer records and related correspondence of transactions processed by Arab Bank on behalf of . . . the Saudi Committee, which included transfer instructions identifying recipients, dates, and amounts for any and all beneficiary payments, as well as all internal communications relating to those instructions, related correspondence, and documentation provided by beneficiaries *redacted to delete the identifying information*, as required by law." (Def. Mem. of Law at 14 (emphasis added).) Defendant asserts that Plaintiffs' outstanding requests are merely for "the mirror-image credit into those accounts of the transfers already identified in the Bank's production," and argues that they should be stricken as duplicative of information already provided. (*Id.*) Additionally, Defendant argues that it would be "burdensome (if not impossible during the COVID-19 pandemic when vaccines are largely unavailable in the Territories) to obtain waivers" from approximately 400 family members "to produce information that Plaintiffs already have, or other account information of family members unrelated to the Saudi Committee transfers." (*Id.* at 14-15.)

Although Defendant characterizes the undisclosed information as "the mirror-image credit" into beneficiaries' accounts, Plaintiffs' requests are broader than that, including account statements, documents used to open those accounts, and the identification documentation that individuals presented to qualify them to receive cash payments from the Saudi Committee through Defendant,

such as photographs and certificates of martyrdom (First RFP ¶¶ 6-8; Second RFP ¶¶ 4-7, 11-14, 18-21), of which Defendant has produced only a sampling.  (*See* Plaintiffs' Memorandum of Law in Opposition to Motion for Protective Order ("Pls. Opp.") at 24, Dkt. 85.)  Plaintiff states that Defendant has produced "virtually none" of Arab Bank's internal communications about the Saudi Committee's recipients or records of those recipients who were bank customers.  (*Id.*)  Indeed, Defendant specified that it had withheld "identifying information" when making its production.  (Def. Mem. of Law at 14.)

Because Defendant has withheld more than the "mirror-image" credits into customer accounts, the information sought in the Saudi Committee Requests is not duplicative of what has already been produced.

Defendant has not established good cause to narrow the scope of the Saudi Committee Requests.  What information Arab Bank had about the individuals receiving cash payments is relevant to the issues of whether the bank knowingly provided material support to a foreign terrorist organization, *see* 18 U.S.C. § 2339B(1), and whether it is "generally aware" of its role as part of an overall illegal activity for aiding and abetting liability.  *Miller*, 372 F. Supp. 3d at 47.  The documents that Arab Bank seeks to withhold, including photographic identification for the individuals that received cash payments, are highly "probative as to the presence, or absence, of defendant's knowledge as to with whom it was dealing."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 313 (E.D.N.Y. 2015) [hereinafter *Linde I*], *vacated on other grounds*, *Linde II*, 882 F.3d 314.  Other information, such as account opening documents and internal communications about recipients, can also shed light on what Arab Bank did or did not know about its customers and others to whom it was giving money from the Saudi Committee.  Even absent knowledge that an organization to whom it is providing financial support is engaged in terrorism, a defendant may be found liable when it "knows there is a substantial probability that the organization engages in terrorism but … does not care."  *Miller*, 372 F.

10

Supp. 3d at 45 (quoting *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 693 (7th Cir. 2008).) Accordingly, the information encompassed in the Saudi Committee Requests is within the scope of Rule 26.

To the extent that Defendant contends that compliance with the Saudi Committee Requests is unduly burdensome, it has not sufficiently articulated what it must do to obtain waivers from the 400 family members. Thus, the Court cannot grant Defendant's motion on that basis. The Court also notes that waivers are unnecessary if the Court orders Defendant to produce the requested information.

### 2. **"Charities and Social Service Institutions"**

In the second category described by Defendant, Plaintiffs request all documents "concerning accounts maintained at Arab Bank by or for" 38 charities and social service institutions that are alleged to be part of FTOs' infrastructure over the relevant period, or transfers involving those institutions. (*See* First RFP ¶¶ 4, 5, 10, 11; Second RFP ¶¶ 3, 17, 22, 28, 29, 32; Def. Mem. of Law at 15; Appendix 1 to Def. Mem. of Law at 43 (ECF pagination), Dkt. 84-1.)

Defendant argues that these RFPs are overbroad to the extent that they seek "transfers involving humanitarian and social service programs," because such transfers "do not involve violence or endanger human life or appear intended to intimidate or coerce a civilian population." (Def. Mem. of Law at 15-16.) Transfers that do not meet these requirements, Defendant argues, are not relevant to Plaintiffs' claims because Plaintiff is required to prove that Arab Bank's actions involved violence or acts dangerous to human life.

Defendant conflates what is required for Plaintiffs to establish its liability as a matter of law under the ATA and Rule 26's less exacting relevance and proportionality standards for discovery.

To prove Arab Bank's liability as a principal under the ATA, Plaintiffs must establish that Arab Bank committed acts of international terrorism, which requires a showing that its actions were

dangerous to human life.  *See Miller*, 372 F. Supp. 3d at 45.  However, providing financial services under certain circumstances can be "dangerous to human life since 'financial services increase Hamas' ability to carry out attacks . . . .'"  *Id.* (quoting *Linde I*, 97 F. Supp. 3d at 323).  In addition, "by rewarding acts of terrorism, [the alleged insurance scheme] incentivized prospective 'martyrs' to commit acts of violence . . . ."  *Id.*

Moreover, to prove their aiding-and-abetting claim, Plaintiffs must show that the charities or social service programs that Arab Bank aided were involved, directly or indirectly, in violent terrorist activities, but it does not need to prove that the accounts or transfers themselves involved violence or endangered human life.  *See, e.g.*, *Honickman*, 6 F.4th at 495 (The requirement that "'the party whom the defendant aids must perform a wrongful act that causes an injury' . . . is satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act." (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983))); *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 856 (2d Cir. 2021) (same).

While the Second Circuit concluded that "providing routine financial services to members and associates of terrorist organizations . . . [does not] compel a finding that as a matter of law, the services" met the definition of "international terrorism" under the ATA, *Linde II*, 882 F.3d at 327, it also stated, in the context of causation, that "[w]hether financial services are 'routine . . . raises questions of fact for a jury to decide.'"  *Miller*, 372 F. Supp. 3d at 44-45 (quoting *Linde II*, 882 F.3d at 327.)  Thus, to be relevant, each financial transaction or account does not need to "involve violence or endanger human life or appear intended to intimidate or coerce a civilian population"; the transactions and accounts, along with the circumstances surrounding them, are all pieces of the puzzle, and, therefore, relevant for purposes of discovery.

Nor must an individual transfer or account evince a specific connection to acts of terrorism.  For example, fund transfers may be labeled as being for benign or charitable purposes even though

the funds are used by terrorists to further their violent or life-endangering activities. "Terrorist groups 'do not maintain legitimate financial firewalls' between funds used for charity and funds used for violent activities." *Linde I*, 97 F. Supp. 3d at 333 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010)). Plaintiffs directly address this duality of purpose when they allege that Defendant's "humanitarian" activities included processing payments for the families of martyrs and suicide bombers on behalf of the Saudi Committee and Hamas. (*See, e.g.*, Am. Compl. ¶¶ 264, 353, 359); *see also Miller*, 372 F. Supp. 3d at 48.

The documents requested are also relevant to Arab Bank's state of mind in processing transfers for the named charities and social service institutions. Records that indicate that Arab Bank knew, or was deliberately indifferent to the fact, that these organizations were linked to FTOs who carried out violent acts are relevant to Plaintiffs' claims. *See id.* at 47. Thus, while fund transfers may appear on their face to be for humanitarian purposes, the circumstances of the transfers may "strongly suggest that Arab Bank was generally aware of the nature of the conduct it was supporting," and therefore, information about the transfers is relevant to the claims alleged. *See id.* at 48.

To establish their primary liability claim, Plaintiffs must also show that Arab Bank's conduct was a proximate cause of Plaintiffs' harm. *Id.* at 46. To that end, "[a]llegations that a defendant . . . transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA." *Id.* Thus, evidence that Arab Bank processed transfers for charitable organizations that are alleged to be part of FTOs' infrastructure is relevant to establish a causal link.

Defendant has not established that the requests regarding the charities and social services institutions are overbroad.

**3. "Individuals Not Identified as Both Linked to an FTO and Closely Intertwined with Its Terrorist Activities During the Relevant Time Period"**

The third of Defendant's categories includes requests for all documents related to (1) bank accounts maintained by Arab Bank for specified individuals, (2) funds transferred by Arab Bank concerning specified individuals, and (3) transactions processed by Arab Bank for the families of specified martyrs or terrorists. (*See* First RFP ¶¶ 2, 3, 7, 10; Second RFP ¶¶ 1, 2, 8, 9, 15, 16.) Requests for production of documents related to 174 individuals are included in this category. (*See* Def. Mem. of Law at 19; Appendices 2 & 3 to Def. Mem. of Law at 45, 64 (ECF pagination), Dkt. 84-1.)

Defendant asserts that RFPs in this category should be stricken because Plaintiffs do not cite the public source material that was available before the attacks that would have alerted Arab Bank to these individuals' connection to an FTO and its terrorist activities. (*See* Def. Mem. of Law at 19.)

To establish a defendant's liability as a principal under the ATA, a plaintiff must show that the defendant had knowledge that the entity it was supporting was a terrorist organization and engaged in terrorism or terrorist activity. *See* 18 U.S.C. § 2339B(1). To establish secondary liability, a plaintiff must show that the defendant was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance." *Miller*, 372 F. Supp. 3d at 47. Defendant argues that to establish Arab Bank's secondary liability, Plaintiffs must show that it was aware "from public source information available prior to the attacks that its customer was 'closely intertwined with the [FTO's] violent terrorist activities.'" (Def. Mem. of Law at 18 (alteration in original) (emphasis omitted) (quoting *Honickman*, 6 F.4th at 501).)

While Plaintiffs must prove these elements at trial, it is not necessary to establish them in order to obtain discovery. Plaintiffs need only demonstrate here that the information they request is relevant

to any of the elements of the claims alleged, including that Defendant had knowledge of these individuals' ties to an FTO or terrorist activities.[3]

Despite the large number of individuals named, the information sought is also proportional to the needs of the case.  The cumulative evidence provided by the transactions may tend to demonstrate Defendant's knowledge.  Therefore, Plaintiffs RFPs for this category of documents are not overbroad.  Plaintiffs, thus, are not required to cite the public source material before they are entitled to obtain discovery pursuant to these requests.

### 4.  "Individuals and Entities Linked to an FTO During the Relevant Time Period"

Defendant's fourth category encompasses Plaintiffs' requests for the same information requested in the third category, but with respect to 44 individuals and entities whom Defendant characterizes as "allegedly linked to an FTO."  (Def. Mem. of Law at 20; Appendix 4 to Def. Mem. of Law at 66 (ECF pagination), Dkt. 84-1; *see* First RFP ¶¶ 2, 3; Second RFP ¶¶ 2, 9, 15-17, 26.)  Plaintiffs similarly request all documents "concerning accounts maintained at Arab Bank in the name of or for the benefit of" specified organizations.  (Second RFP ¶ 26.)  The information sought includes "account numbers of such accounts, individuals or entities that opened such accounts, and the deposit of funds into and disbursement of funds out of such accounts; the source of funds deposited into such accounts and the recipients of funds disbursed from such accounts; the identity of Arab Bank employees with knowledge of such accounts, and all correspondence between Arab Bank and such organization."  (*Id.*)

Defendant agrees to seek waivers from the individuals and entities that were its customers, but argues that the requests should be narrowed "to account information involving transfers . . . that

---

[3] Plaintiffs also assert that it is not necessary to identify such public source material because Defendant was aware of each individual's connection to an FTO or terrorist activities, as the list of individuals included in this category of RFPs "largely tracks the martyr list published by the al-Ansar Society on its website . . . [and] several of the names belong to infamous suicide bombers . . . ."  (Pls. Opp. at 27-28.)

either on their face, or by their unlawful nature, could foreseeably result in terrorist attacks . . . ." (Def. Mem. of Law at 21.)  For the reasons stated above regarding the second category of RFPs, the Court rejects these arguments.

### 5. **"The Palestinian Government and Political Parties"**

Finally, Defendant's fifth category involves requests for documents concerning accounts maintained by Arab Bank for specified "Fatah/AAMB leaders, operatives and agents" and "PLO/PA/Fatah social institutions" (Second RFP ¶¶ 15, 17); accounts maintained at Arab Bank in the name of or for the benefit of specified Palestinian institutions and agencies (*see id.* ¶ 26); and documents concerning transactions processed by Arab Bank to or from the "Palestinian Ministry of Social Welfare's Institute for the Care of Martyrs' Families and the Injured that concern 'Martyrs' and prisoners," the PLO, and the Palestine National Fund.  (*Id.* ¶¶ 23-25.)

Defendant argues that Plaintiffs' RFPs related to the Palestinian government and political parties are "designed to harass," stating that it assumes that "Plaintiffs made these Requests to ensure that any Letters Rogatory containing them would be denied by the Palestinian government since [the PLO, Fatah, and departments and ministries of the Palestinian Authority] were or are integral to the operation of the Palestinian Government and partners of the United States in the peace process with Israel . . . ." (Def. Mem. of Law at 21.)

The Court finds no evidence to support Defendant's assumption that Plaintiffs' RFPs are "fishing expeditions" designed to harass.  (*See id.* at 23.)  The Amended Complaint contains allegations supporting Plaintiffs' good faith basis for requesting this information, including that "AAMB emerged at the outset of the Second Intifada as a deniable arm of Farah" and that it "committed numerous terrorist attacks, including several that have killed and injured American[] citizens."  (Am. Comp. ¶¶ 536-37.)  Plaintiffs further allege that Fatah maintained an account with Arab Bank and received

payments through Arab Bank from Hezbollah and/or the Saudi Committee.  (*Id.* ¶¶ 541-44.)  Thus, these RFPs request relevant information within the scope of Rule 26.

*       *       *

Because Defendant has not shown that Plaintiff's RFPs are overly broad or not proportionate to the needs of the case, Defendant's request for a protective order narrowing the scope of Plaintiffs' RFPs is denied.

### B.  Defendant's Request for a Protective Order Based on Bank Secrecy Laws

Defendant requested that it be given an opportunity to seek customer consent or waivers to obtain the requested documents after the Court narrowed the scope of the RFPs.  Because the Court declines to narrow the RFPs, there is no reason to defer ruling on the issue of bank secrecy, and the Court proceeds with its analysis of that issue.

### 1.  Comity Analysis Legal Standard

"[I]t is beyond dispute that the Federal Rules of Civil Procedure provide the court with authority to issue discovery orders requiring the disclosure of information protected by foreign bank secrecy laws."  *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 314 (E.D.N.Y. 2006) [hereinafter *Linde Discovery Decision & Order*] (citing *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-06 (1958)); *see Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 221 (E.D.N.Y. 2007) (A foreign jurisdiction's bank secrecy laws "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate the [foreign] statute."  (alteration in original) (quoting *Societe Nationale Industrielle Aerospatiale & Societe de Construction d'Avions de Tourisme v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987))).

Defendant, as the party opposing production on the basis of foreign law, bears the burden of demonstrating that production should be denied.  *See Strauss*, 242 F.R.D. at 207.  "In order to meet

that burden [Defendant] must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.* (quoting *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)). Defendant must describe, *inter alia*, "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id.* (quoting *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005)).

Defendant has established, and Plaintiffs do not deny, that the discovery requested is prohibited by the bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories. (*See, e.g.*, Def. Mem. of Law at 5-7 (describing bank secrecy laws of Jordan, Lebanon, and the Palestinian Territories and citing to expert reports analyzing those laws)); *see also Linde Discovery Decision & Order*, 463 F. Supp. 2d at 313 (Jordan, Lebanon, and Palestinian Monetary Authority "have all promulgated bank secrecy laws which prevent the disclosure of certain types of information about business conducted by the bank, including the identities of accountholders and the transactions occurring in their accounts, without the consent of the affected customers.").

Once Defendant has demonstrated that the requested documents are protected by the laws of the foreign jurisdictions, the Court conducts a comity analysis by looking to the factors set forth in the Restatement (Third) of Foreign Relations Law § 442 ("Third Restatement") to determine whether production of the evidence should be denied. *E.g.*, *Laydon v. Mizuho Bank, LTD.*, 183 F. Supp. 3d 409, 419-20 (S.D.N.Y. 2016); *Strauss*, 242 F.R.D. at 210. Pursuant to the Third Restatement, the Court considers:

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

18

*Strauss*, 242 F.R.D. at 210 (quoting *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, No. 90-CV-2370, 2000 WL 713057, at *8-9 (S.D.N.Y. June 2, 2000) (citation omitted)).   Courts in this circuit consider two additional factors: "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery."   *Id.* (alteration in original) (quoting *Minpeco, S.A. v. Conticommodity Servs. Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)); *see Reino De Espana v. Am. Bureau of Shipping*, No. 03-CV-3573, 2005 WL 1813017, at *3 (S.D.N.Y. Aug. 1, 2005).

### 2.  Third Restatement Factors

#### a.  *Importance of the documents to the litigation*

The documents sought by Plaintiffs relate to various elements of the claims alleged, and therefore, "there is a substantial likelihood [they] will prove to be important to the prosecution of the plaintiffs' claims."  *Laydon*, 183 F. Supp. 3d at 420 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 53 (E.D.N.Y. 2010)).

Moreover, Plaintiffs' requests relate to determining how money flowed from its funding source, through Arab Bank, into the hands of family members of known terrorists, including what Defendant knew or should have known about these payments.  "Proof concerning the flow of money, if any, from those allegedly funding the payments through the bank to the families of known participants in the attacks . . . [and] proof concerning the arrangements for making such payments and the breadth of the payment scheme [are] crucial" to Plaintiffs' ability to prosecute their case.  *See Linde Discovery Decision & Order*, 463 F. Supp. 2d at 311-12.  The discovery sought is also critical for Plaintiffs to be able to establish that Defendant was aware that either its customers or the transfers it was processing had the requisite ties to FTOs or terrorist activities.  *See id.* at 315 (finding that without the requested discovery, "the plaintiffs cannot prove the defendant's involvement in and knowledge of the financial transactions that are the basis of the plaintiffs' theory of liability").

Accordingly, this factor weighs in favor of production.

### b.  Specificity of the requests

The RFPs are specifically tailored to request bank account and transaction information only as to named individuals whom Plaintiffs have identified as terrorists, martyrs, operatives, FTO leaders, agents, or the family members of these individuals, and charitable organizations and institutions that are or are linked to terrorist organizations.  (*See* Pls. Opp. at 42.)  Despite the relatively large number of individuals and organizations, the requests are very specific.

Thus, this factor weighs in favor of production.

### c.  Origin of the information

This factor weighs against production because the records requested are located outside the United States.  *See, e.g.*, *Laydon*, 183 F. Supp. 3d at 421 (finding location of documents outside country weighs against disclosure); *Linde Discovery Decision & Order*, 463 F. Supp. 2d at 315 (finding that the fact that vast majority of documents requested were located outside of the United States was the only factor weighing against disclosure).

### d.  Availability of alternative means of securing the information

Defendant argues that there are alternative reasonable means for Plaintiffs to obtain the requested information, suggesting that Plaintiffs could obtain documents from the Israeli government, or, more generally, that Plaintiffs could "limit the scope of their requests and obtain necessary information from other sources in accordance with the Rules of Evidence."  (Def. Mem. of Law at 27.)

Defendant provides no basis for its assertion that the Israeli government has the requested information.  (*See* Pl. Opp. at 45 n.37.)

As discussed above, the Court finds no basis to require Plaintiffs to limit the scope of their requests.  Furthermore, as the court noted in *Linde*, "[t]he only other sources of most of that information would be customers and other participants in the transactions at issue, and . . .  it is

20

unlikely that those persons would willingly disclose information to the plaintiffs for fear that any information verifying their connection to the perpetrators of violent acts would expose them to retaliation." *Linde Discovery Decision & Order*, 463 F. Supp. 2d at 315.

This factor, thus, weighs in favor of production.

### e. *Competing interests of states involved*

Courts generally give the most weight to the fifth factor—the competing interests of the states involved. *E.g.*, *Strauss*, 242 F.R.D. at 211; *Laydon*, 183 F. Supp. 3d at 422. "Where 'there is a true conflict between American law and that of a foreign jurisdiction,' New York conflict of law rules require the court to conduct a comity analysis." *Strauss*, 242 F.R.D. at 218 (quoting *Maxwell Commc'n Corp. v. Societe Generale*, 93 F.3d 1036, 1050 (2d Cir. 1996) (citation omitted)). This analysis is guided by the Third Restatement, which provides that the Court should consider:

> expressions of interest by the foreign state, as contrasted with expressions by the parties; . . . the significance of disclosure in the regulation by the foreign state of the activity in question; . . . indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought . . . [and] the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations.

*Id.* at 218-19 (alteration in original) (quoting Comment (c) to Third Restatement § 442).

"[I]t has been repeatedly recognized that the United States has an 'obvious interest' in having its own procedural rules applied to discovery," which is strengthened "where the discovery sought is 'vital to the litigation.'" *Laydon*, 183 F. Supp. 3d at 423 (quoting *Tansey v. Cochlear Ltd.*, No. 13-CV-4628 (SJF)(SIL), 2014 WL 4676588, at *4 (E.D.N.Y. Sept. 18, 2014) (citations omitted)). It is also indisputable that the United States has a strong interest in combating terrorism and compensating victims of terrorist attacks. When the United States' "'substantial interest in fully and fairly adjudicating matters before its courts' . . . is combined with [its] goals of combating terrorism, [its interest] is elevated 'to nearly its highest point.'" *Weiss v. Nat'l Westminster Bank PLC*, 242 F.R.D. 33,

46 (E.D.N.Y. 2007) (citation omitted); *see, e.g.*, *Strauss*, 242 F.R.D. at 214; *Linde Discovery Decision & Order*, 463 F. Supp. 2d at 315-16.

Defendant argues that the United States' interests in combating terrorism and enforcing compliance with its discovery laws are outweighed by its interest in "maintaining[] 'close cooperative relationships with Jordan and other key regional partners in the fight against terrorism,' and 'the stability of Jordan's financial and political system.'" (Def. Mem. of Law at 29 (quoting "Brief for United States as Amicus Curiae" at 18-20, Ex. 23 to Saleski Decl., Dkt. 84-25).) It argues that Arab Bank "plays a key role in the Middle East economy" and performs important functions in the region, such as processing financial assistance payments from the United States. (*Id.*) Were it to violate bank secrecy laws, Defendant argues that Arab Bank could lose its banking license, or the public could lose trust in the bank. (*Id.*)

In support of its argument that violating foreign jurisdictions' bank secrecy laws could damage the United States' relationship with those governments, Defendant cites to the amicus brief that the United States government (the "Government") submitted to the U.S. Supreme Court in *Linde*. However, the concerns that the Government expressed in its brief were with respect to sanctions ordered against Arab Bank for failing to comply with the court's discovery orders, not with the discovery orders themselves. The Government feared that "[t]he sanctions order could undermine the United States' vital interest in maintaining close cooperative relationships with Jordan and other key regional partners in the fight against terrorism." (Brief for United States as Amicus Curiae at 19.) It noted that Jordan viewed the sanctions order as an "affront" to its sovereignty and that Saudi Arabia and the Palestinian Authority also expressed concerns. (*Id.*)

Notwithstanding those concerns, Defendant has not provided any evidence that the United States' relationship with Jordan or other governments suffered as a result of the court's sanctions order in *Linde*, or of any court order directing a bank to disclose documents in violation of that

jurisdiction's bank secrecy laws. Moreover, the Government, despite its arguments regarding the deficiencies of the district court's comity analysis, argued in its amicus brief that the Supreme Court should deny certiorari of Arab Bank's petition seeking reversal of the Court of Appeals' affirmance of the sanctions order in *Linde*.

Defendant further argues that the foreign governments at issue have a substantial interest in having their bank secrecy laws enforced and that the United States has an obligation to respect those laws, as it would expect other nations to respect American laws. (*See* Def. Mem. of Law at 33.)

There is no doubt that maintaining bank secrecy is an important interest. *E.g.*, *Strauss*, 242 F.R.D. at 219-20; *Linde Discovery Decision & Order*, 463 F. Supp. 2d at 315. However, that interest is outweighed by the United States' vital interest in combating terrorism and compensating victims of terrorist attacks. As the court found in *Linde*,

> [a]lthough maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides—indeed the United States has enacted similar bank secrecy protections—that interest must yield to the interests of combating terrorism and compensating its victims. Both Jordan and Lebanon[] have recognized the supremacy of those interests over bank secrecy. As members of the Middle East and North Africa Financial Action Task Force, they have expressly adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering and terrorist financing.

*Linde Discovery Decision & Order*, 463 F. Supp. 2d at 315-16. The Palestinian Monetary Authority has not adopted similar policies, but it is afforded less deference because it is not a state. *Id.* at 316. Moreover, both the United States and Jordan are parties to the International Convention for the Suppression of the Financing of Terrorism. (Declaration of Aiman Y. Odeh ("Odeh Decl.") ¶¶ 15, 18, Ex. 1 to Saleski Decl., Dkt. 84-3); *see Strauss*, 242 F.R.D. at 222.

"The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and an international task force, reveal this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks." *Strauss*, 242 F.R.D. at 214. The ATA's

broad application further evinces the United States' interest in stopping the provision of aid to terrorist organizations. *See, e.g.*, *id.* at 215; *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 582 (E.D.N.Y. 2005) ("Section 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts."). Congress's decision to amend the ATA to provide for aiding-and-abetting liability re-emphasizes the United States' commitment to combatting international terrorism. Congress instructed "that JASTA is to be read broadly and to reach persons who aid and abet international terrorism 'directly or indirectly[.]'" *Kaplan*, 999 F. 3d at 855 (quoting JASTA, Pub. L. No. 114-222, §2(b), 130 Stat. 852 (2016)). "[P]rivate tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism," such as this one, "vindicate the national and international public interest." *Strauss*, 242 F.R.D. at 218.

Accordingly, this factor weighs in favor of production.

### f. Hardship on Defendant

Defendant argues that Arab Bank employees in foreign jurisdictions could face criminal prosecution if they are forced to violate those jurisdictions' bank secrecy laws, and that Arab Bank could lose its banking license. (Def. Mem. of Law at 33.) It argues that "the Bank would likely be subject in all three jurisdictions to lawsuits seeking large amounts of compensation by customers whose right to confidentiality has been breached." (*Id.* at 34.) Defendant's experts opine that based on the text of each jurisdictions bank secrecy laws, punishment for violating the laws is possible. (*See* Odeh Decl. ¶ 43; Declaration of Chakib Cortbaoui ("Cortbaoui Decl.") ¶¶ 13-15, Ex. 2 to Saleski Decl., Dkt. 84-4; Declaration of Rasem Kamal ("Kamal Decl.") ¶¶ 10-11, 14, 27, Ex. 3 to Saleski Decl., Dkt. 84-5.)

In analyzing the hardship to Arab Bank if it were compelled to produce the requested discovery, the Court considers the likelihood that the foreign jurisdictions' laws that punish bank secrecy violations would be enforced. *See Minpeco*, 116 F.R.D. at 526 ("In examining the hardship on

the party from whom compliance is sought, courts . . . look at the likelihood that enforcement of foreign law will be successful.").

Defendant has failed to cite any instance in which Arab Bank or its employees were punished for complying with an American court's discovery order.  Therefore, the consequences that Defendant fears are purely speculative.  Moreover, courts considering similar arguments have found them unpersuasive.  *See, e.g.*, *Laydon*, 183 F. Supp. 3d at 425 (finding that despite defendants' arguments that violation of bank secrecy laws could subject it to fines, enforcement action, and prosecution, defendants "are unable to cite a single instance in which a UK enforcement action was taken against an entity for violating the [UK's data protection law] by complying with discovery demands in the United States; nor have they provided an instance where a UK financial institution was found liable for damages for producing otherwise confidential customer information pursuant to an order by a United States court"); *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 199 (E.D.N.Y. 2010) ("As far as this court knows, the Bank has not faced any repercussions as a result of its prior disclosures.  Yet it emphasizes its fear of such reprisals as a reason for its noncompliance here." (citation omitted)); *Bodner v. Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000) (denying request for protective order and finding that the foreign law at issue "does not subject defendants to a realistic risk of prosecution, and cannot be construed as a law intended to universally govern the conduct of litigation within the jurisdiction of a United States court.").

Accordingly, this factor weighs in favor of production.

### g.  *Defendant's good faith*

Plaintiffs urge the Court to find that Defendant has acted in bad faith by refusing to produce documents that it was ordered to produce in *Linde* and "[misleading] the court and plaintiffs," for example, by making "disingenuous claims of ignorance of the identity of Hamas's 'prime minister' Ismail Haniyeh and its iconic founder and spiritual leader, Sheikh Yassin . . . ."  (Pls. Opp. at 48-49.)

25

Plaintiffs also argue that Defendant "initially *refused* to produce the Hamdan Account documents on the grounds that the account records were not connected to plaintiffs' injuries—despite having *already disclosed* those records to the U.S. government without seeking permission from the Lebanese government or informing plaintiffs or the court." (*Id.* at 49 (emphasis in original).)

The Court rejects Plaintiffs' argument that bad faith is evidenced by Arab Bank's differing responses to document requests made by the United States government and Plaintiffs. Bank secrecy laws may allow for disclosure to a foreign government and not to private litigants seeking to use the information in a civil lawsuit. The Court also rejects Plaintiffs' arguments that Defendant has not produced documents that it was ordered to produce in *Linde*. As noted above, the facts of this case and those of *Linde* are similar, but they are not identical, and Defendant is not bound by discovery rulings made in that case.

Arab Bank has tried to obtain permission from the foreign jurisdiction via Letters Rogatory to produce the requested documents and has offered to seek waivers and customer consent, albeit only after Plaintiffs narrow their RFPs. These efforts indicate at least some measure of good faith, but "'the Court is not convinced that [defendant's] efforts, [are] sufficient to tilt the balance in its favor,' and against disclosure." *Weiss*, 242 F.R.D. at 56 (alteration in original) (quoting *Reino De Espana*, 2005 WL 1813017, at *8).

*     *     *

After considering the five Third Restatement factors and the two additional factors of hardship and good faith, and having given them appropriate weight, the Court rejects Defendant's arguments regarding bank secrecy and denies Defendant's motion for a protective order.

## III.   Plaintiffs' Motion to Compel

Plaintiffs' motion to compel seeks a Court order "overruling Defendant's objections to Plaintiffs' requests for production of the documents that are the subject of Defendant's Motion for a

Protective Order . . . and [] compelling Defendant to produce the documents responsive to those requests." (*See* Mot. to Compel in *Miller* at 1-2.)

A party seeking to compel discovery "must make a prima facie showing, that the discovery sought is more than merely a fishing expedition." *Evans v. Calise*, No. 92-CV-8430 (PKL), 1994 WL 185696, at *1 (S.D.N.Y. May 12, 1994). "Motions to compel are left to the court's sound discretion." *Mirra v. Jordan*, No. 13-CV-5519 (AT)(KNF), 2016 WL 889683, at *2 (S.D.N.Y. Feb. 23, 2016). In determining whether to compel production of material located in a foreign jurisdiction, the Court considers the same Third Restatement factors analyzed above. *See, e.g.*, *Strauss*, 242 F.R.D. at 210; *Linde Discovery Decision & Order*, 463 F. Supp. 2d at 314.

Having already concluded that a protective order narrowing or allowing Defendant to withhold production of the RFPs at issue is not warranted, Plaintiffs' motion to compel production of the same is granted.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for a protective order is denied and Plaintiffs' motion to compel is granted.

**SO ORDERED:**


*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge


Dated:   March 31, 2023
        Brooklyn, New York