UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AHARON MILLER, et al.,           *      Case Nos. 18-CV-2192(RPK)
                                 *                18-CV-4670(RPK)
                                 *
              Plaintiffs,        *      Brooklyn, New York
                                 *      September 29, 2023
      v.                         *
                                 *
ARAB BANK, PLC,                  *
                                 *
              Defendant,         *
                                 *
and a related case.              *
                                 *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

           TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
                  BEFORE THE HONORABLE PEGGY KUO
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Miller Plaintiffs:        GARY M. OSEN, ESQ.
                                  ARI UNGAR, ESQ.
                                  AARON SCHLANGER, ESQ.
                                  Osen, LLC
                                  190 Moore Street, Suite 272
                                  Hackensack, NJ 07601

                                  ZAHRA DEAN, ESQ.
                                  Kohn, Swift & Graf, P.C.
                                  1600 Market Street, Suite 2500
                                  Philadelphia, PA  19103


For the Pam Plaintiffs:           JAMES P. BONNER, ESQ.
                                  Fleischman Bonner & Rocco, LLP
                                  317 George Street, Suite 320
                                  New Brunswick, NJ  08901


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:  (Cont'd)


For the Pam Plaintiffs:          SUSAN M. DAVIES, ESQ.
                                 Fleischman Bonner & Rocco, LLP
                                 81 Main Street, Suite 515
                                 White Plains, NY  10601

                                 JOSEPH TIPOGRAPH, ESQ.
                                 Heideman Nudelman & Kalik, P.C.
                                 5335 Wisconsin Ave., Suite 440
                                 Washington, DC 20015


For the Defendant:               BRETT INGERMAN, ESQ.
                                 DLA Piper, LLP (US)
                                 650 S. Exeter Street
                                 Baltimore, MD  21209

                                 ANTHONY P. COLES, ESQ.
                                 MARGARET CIVETTA, ESQ.
                                 DLA Piper, LLP, (US)
                                 1251 Avenue of the Americas
                                 New York, NY  10020

3

1          (Proceedings commenced)

2          THE COURT:  Civil cause for a status conference,

3    Docket Nos. 18-CV-2192 and 18-CV-4670, Miller, et al. vs.

4    Arab Bank, PLC and Pam, et al. vs. Arab Bank, PLC, Magistrate

5    Judge Peggy Kuo presiding.

6          Will the parties present as to Miller please state

7    their appearances beginning with the plaintiffs in Miller.

8          MR. OSEN:  Good morning.  This is Gary Osen on

9    behalf of the Miller plaintiffs.  I'm joined by my colleagues

10   Ari Ungar and Aaron Schlanger from Osen, LLC.

11         And now I'll turn to my colleague, Ms. Dean.

12         MS. DEAN:  Good morning.  This is Zahra Dean from

13   Kohn, Swift & Graf representing the Miller plaintiffs.

14         THE CLERK:  And now the defendants in Miller.

15         MR. INGERMAN:  Yes.  Hi.  It's Brett Ingerman, Tony

16   Coles and Margaret Civetta from DLA Piper on behalf of the

17   defendant.

18         THE CLERK:  And now the plaintiffs in Pam.

19         MR. BONNER.  Good morning, Your Honor.  My name is

20   Jim Bonner.  I'm from Fleischman Bonner & Rocco.  And I'm

21   here this morning with my colleagues Susan Davies, also from

22   our firm.  And there was some co-counsel who will introduce

23   themselves.

24         MR. TIPOGRAPH:  Hi.  This is Joe Tipograph from

25   Heideman Nudelman & Kalik on behalf of the Pam plaintiffs.

4

1          THE COURT:  And the defendants in Pam, please.

2          MR. INGERMAN:  Yeah.  Thank you.  Brett Ingerman,

3    Tony Coles, Margaret Civetta, DLA Piper on behalf of the

4    defendant.

5          THE COURT:  All right.  Good morning, everyone.

6          We are having this conference just so I have a

7    sense of where things are.  It's been awhile.  And I know the

8    parties have been working hard exchanging information.  The

9    last communication I got was a filing on August 14th

10    indicating that the defendant had produced some material and

11    was continuing to produce additional material.

12          There appears to be some disagreement.  But since

13    it's been awhile since the letter, I'd like to find out if

14    any progress has been made.

15          So why don't I start with the defendant.  Mr.

16    Ingerman, you can fill me in on where things are.  And then

17    I'll find out from plaintiffs --

18          MR. INGERMAN:  Sure.

19          THE COURT:  -- if there are problems from their

20    perspective.

21          MR. INGERMAN:  Sure.  Thank you, Judge Kuo.  Brett

22    Ingerman on behalf of the defendant.

23          So Your Honor will recall that you issued a

24    production order on March 31st, 2023.  There were some

25    letters back and forth about that order.

5

1          And then there was another production order issued

2   by Your Honor on April 14th, 2024, I'm sorry, 2023.  And

3   since that April 14th, 2023 order, the bank has been working

4   very hard to obtain waivers from account holders as to bank

5   secrecy so that we are able to produce documents to the

6   plaintiffs without running afoul of the bank secrecy laws.

7          We have produced -- the bank has produced in total

8   in this case over 215,000 pages of documents.  About 15,000

9   pages of those are new documents that were not produced in

10  the prior case, in *Linde*.  And since -- since your production

11  order, Your Honor, we have obtained more than 100 waivers

12  from account holders, and we have produced a total of about

13  5,000 pages of documents from the account holders who have

14  given us the waivers.

15         And I want to make a point about the effort that

16  the bank has undertaken in order to obtain these waivers of

17  bank secrecy.

18         The bank has about 125,000 accounts in the

19  Palestinian territories.  And the process that the bank has

20  undertaken in order to get its account holders to waive the

21  bank secrecy laws in the various jurisdictions has been

22  extensive.  And I'll just give you an example of how the

23  process works.

24         So first, you know, we started with the list that

25  was attached to Your Honor's production order, 677 or so

6

1     individuals and entities that the plaintiffs are looking for

2     documents for.  And to the extent that someone on that list

3     or an entity on that list is an account holder, the bank has

4     to obtain a waiver in order to produce the relevant

5     information.

6              So the bank, in order to get the waiver, first has

7     to locate the account for the customer, identify a contact

8     person, and get an address.  And remember, we're talking

9     about the West Bank.  We're talking about Gaza.  This is not

10    New York City here.

11             And once the bank has an address and a contact

12    person, they have to visit that person or that entity.  And

13    sometimes it takes three or four visits to get a person even

14    to talk to the bank.

15             And the bank is trying to do this discreetly,

16    because it's not in the bank's interest for everyone in the

17    community to know that it's asking its customers to waive the

18    bank secrecy laws.

19             And so once they find the account holder, they get

20    the appropriate address, they then have to try to convince

21    the account holder to waive.  Which takes time.  It takes

22    effort.  And if the account holder is deceased, they've got

23    to find an heir who can waive on behalf of the deceased

24    account holder.

25             The bank has got dozens of employees working on

1  this waiver process.  There have been in excess of 10,000

2  person hours dedicated to this process already.  As I've

3  mentioned, the bank's obtained more than 100 waivers and is

4  producing account records for those accounts for which it has

5  received waivers.

6          Now, once the bank gets the waiver, after all this

7  time and effort to get the waiver, then they first have to

8  locate the account records, which are all in Arabic, and

9  could be strewn across 20 to 25 different branches within the

10  Palestinian territories and other jurisdictions, and then we

11  have to review them, we have to determine whether they're

12  responsive or not, and then they get sent over from the

13  Palestinian territories or wherever to the U.S. and final --

14  for final review and production.

15          And so it's been really quite honestly a Herculean

16  effort on behalf of the bank to try to get the waivers so

17  that that we can comply with Your Honor's order.  And

18  frankly, I'm a little shocked at the progress that the bank

19  has made.  You know, to get over 100 waivers from account

20  holders I think has been an unbelievable feat.

21          Of the 677 names, about a third, maybe a little bit

22  more, Your Honor, are not account holders of the bank.  So we

23  don't have accounts for about a third of the names on the

24  list.

25          So, you know, we are continuing to work hard to get

8

1    waivers and produce documents.  We're going to make another

2    production to the plaintiffs next week.  We made one this

3    week.  And we just -- we'd like the time to continue this

4    process because frankly it's proved to be much more fruitful

5    than I thought it would be.  And we're making real progress

6    here.

7             So that's where we are with respect to the waivers

8    and the bank's production.

9             THE COURT:  All right.  Thank you, Mr. Ingerman.

10            Can you talk briefly about the ESI because that was

11   also a subject of dispute.

12            MR. INGERMAN:  Yeah.  So the ESI, you know, where

13   we have -- so we have produced emails in this case already.

14            Since the production order, we are searching for

15   whether there are responsive emails or not.  As you can

16   imagine, the time period we're dealing here with is 1998 to

17   2004 in Gaza and the West Bank.  And so my understanding is

18   that email was not used necessarily in these branches.  It

19   was lucky -- you know, they were lucky to have power during

20   that time period, let alone internet connections.

21            So to the extent that there are responsive emails

22   that we have, we are searching for them and will produce

23   them, but I haven't seen any yet to be quite honest with you.

24   And we've told the plaintiffs yet -- we've told plaintiffs

25   this too -- we have not seen any responsive emails yet for

9

1      account holders for whom we have waivers.  And that's --

2              THE COURT:  Okay.

3              MR. INGERMAN:  And I assume -- I assume, Your

4      Honor, when you were asking about ESI, you were asking about

5      the defendant's production, not the plaintiffs', because we

6      have some ESI issues with the plaintiffs' production as well.

7              THE COURT:  Yes.  I want to focus first on the

8      plaintiffs' complaint about their -- the discovery production

9      by defendant, and then I'll turn to any other issues perhaps

10     going the other way.

11             So are you -- have you completed reviewing the

12     potential ESI and come to the conclusion that there isn't

13     anything responsive or are you continuing to search?

14             MR. INGERMAN:  We are continuing to search.

15             THE COURT:  Okay.

16             MR. INGERMAN:  you know, it's just -- it's just --

17     I apologize, Your Honor.  It's not like -- it's not like

18     it's J.P. Morgan in New York City.

19             You know, I mean, we're just -- the difficulty of

20     tracking down and reviewing these records from Gaza and the

21     West Bank from 1998 or 2000 that are in Arabic, it's just a

22     very time-consuming and difficult undertaking.

23             THE COURT:  Okay.  And I think part of the issue is

24     understanding how much more time will be needed and when the

25     plaintiff can expect continuing production.

10

1        Are you in a position to give a timeline?

2        MR. INGERMAN:  So we did get a proposal from the

3   plaintiffs about a broader schedule.  And they had in that

4   schedule a March 29, 2024 deadline for substantial completion

5   by both sides of the document production.  I think that's a

6   reasonable goal.  I think by the end of March of 2024 we'll

7   know pretty much, you know, who we're going to be able to get

8   waivers from and who are just, you know, going to dig in and

9   say no.

10       So, you know, I'm okay setting that date.  It was

11  proposed by the plaintiffs.  I'm okay setting that date for

12  substantial completion of both sides' document production.

13       And, you know, along the way, if we look like we're

14  running into an issue, we can certainly meet and confer.  And

15  if we can't resolve it, come back to Your Honor.

16       THE COURT:  All right.  Thank you.

17       So then, let me hear from the plaintiffs.

18       Mr. Osen or Ms. Dean, do you want to speak for the

19  Miller plaintiffs?

20       MR. OSEN:  Sure.  This is Gary Osen.  Good morning,

21  Your Honor.  Gary Osen from Osen, LLC on behalf of the Miller

22  plaintiffs.

23       As you may hear, I have a bad head cold, so I

24  apologized for that.  I hope I'm still basically

25  intelligible.

11

So I think Mr. Bonner will address the schedule
issue, but there are a couple of other things, including ones
just raised by Mr. Ingerman's presentation.

So before I get into what I was going to talk
about, let me just respond briefly to a couple of things that
Mr. Ingerman said about the production.

The order which Your Honor issued on April 14th and
the bankruptcy decision that proceeded it was not contingent
in any way on the defendant obtaining waivers. It's a ruling
on -- overruling their bank secrecy objections.

And in their response to that order, they wrote on
April 12th that they are not going to, you know, take a Rule
72 objection to the order and that they intended to proceed
and complete the discovery required by that order.

So to be clear, we don't have any objection if they
obtain waivers from all of the roughly 400 customers and
roughly 250 or more non-customers to produce. That's fine by
us. And we understand that takes additional time.

But as I hear Mr. Ingerman, they're not even
searching for records that are responsive to the order unless
they -- until they receive a waiver.

And so one of the fundamental questions here is
whether the defendant intends to comply with the production
order, which was issued in April, or whether they intend only
to comply for those customers they obtain waivers. And

12

1    that's still not clear to us.

2           So I can stop there or I can continue further.

3           THE COURT:  What did you want to continue and talk

4    about?

5           MR. OSEN:  Well, so, we obviously have no

6    visibility on that question.

7           We also heard Mr. Ingerman just now talking about

8    the Palestinian territories.  And we appreciate that that

9    presents additional logistical complications, but again the

10   order is not limited to those jurisdictions.  And in fact,

11   you know, there are responsive records particularly in Jordan

12   and Lebanon as well, so it's very hard from our perspective

13   to understand how there is no discernible ESI in this case.

14          And you know, I'll jump ahead to just say that

15   normally we'd expect documents to be produced from a database

16   generated by the bank's, quote, "banking system."  It looks

17   like we're getting almost exclusively paper records that have

18   been scanned.  The same goes for electronic transfers.  We've

19   asked them about that because we haven't seen a lot of them.

20          In our experience, invariably, they originate on

21   the bank's server that runs its Swift messaging platform,

22   that's the electronic platform that connects banks to the

23   global financial system.

24          And also obviously although it's been 20 years,

25   even in 2000-2001, companies that, you know, large companies

13

1    like Arab Bank were routinely using email.

2          And remember, Arab Bank's a global bank.  It has

3    branches in Europe, the United States at the time.  And

4    obviously it's headquarters in Jordan.  So it's, again, hard

5    for us to understand that there isn't ESI here.

6          It may not be as comprehensive as we would like,

7    but, you know, our questions are, you know, did these systems

8    which are common to every bank we've dealt with just not

9    exist in Arab Bank?  Were they destroyed for some reason

10   during the last 19 years of litigation?

11         So for our purposes, it's just more efficient from

12   our perspective to get some clarity now rather than four,

13   five, six months from now, particularly if any forensic ESI

14   discovery proves to be warranted.

15         We've had no discussion about search terms or

16   anything like that because the defendant hasn't really

17   engaged with us on that.  They basically told us that if we

18   have questions we should wait until the end of the

19   production.

20         But again, just hearing Mr. Ingerman this morning,

21   it sounds like they're only searching for records once they

22   get a customer waiver.

23         Let me just flag one more issue if I may, Your

24   Honor, then I'll stop there.

25         The last two productions that we received, which

14

1    Mr. Ingerman referred to, including the one this past week,

2    this week, they've been placing a watermark across the

3    documents with the words highly confidential across each

4    page, as opposed to what they did previously with their

5    earlier production in headers and footers, and that makes it

6    difficult at times to physically read a document.

7         But more importantly, it makes it harder to OCR the

8    document, which isn't easy to begin with because they're not

9    high-resolution images to begin with.  So it really makes it

10   impossible for us to search them.

11        And in our view, the July 2019 ESI protocol that

12   was entered in this case speaks of ESI being produced as text

13   searchable image files.  So that may not be possible with

14   scanned paper records, but we think anything that makes it

15   even harder to OCR them really isn't justified here.

16        So we asked them to remove the watermark and

17   designate these things highly confidential as they had

18   previously.  They've declined to do so.  So I would imagine

19   we'll discuss a briefing schedule if necessary with defense

20   counsel on that issue.

21        THE COURT:  All right.  Thank you, Mr. Osen.

22        I'll hear from Mr. Bonner before I turn back to Mr.

23   Ingerman.

24        MR. BONNER:  I just have one brief point to add to

25   what Mr. Osen just said, and following up also on what Mr.

1  Ingerman had spoken about.

2           We have agreed, Your Honor, to have a six-month

3  deadline for completing the document production

4  substantially.  And we had proposed to the defendants that we

5  have a full schedule for the case like any other case would

6  have.  And I would just note that Rule 16 mandates that we

7  have a schedule in place and there's really no reason why we

8  can't have that here.

9           And this case has been long running, as Mr. Osen

10  just referenced, and it makes every sense in the world to

11  have a schedule in place so we can bring it to trial as

12  quickly as possible.

13          What the defendants told us was that they would

14  like to complete their document production and then only at

15  that point have a discussion about the schedule going forward

16  for depositions and dispositive motions and pretrial matters.

17          But as I said, Your Honor, and as you're well aware

18  I'm sure, Rule 16 mandates that we have a schedule in place

19  for this case.  And we told the defendants we're not wedded

20  to any particular dates and that we were flexible in terms of

21  what would be reasonable deadlines, but I do think that this

22  case is one that needs a little bit of discipline, Your

23  Honor.

24          And so what we would propose is that you order the

25  parties have a discussion about a schedule and that we come

16

1    back to you with something for your consideration.  Or if the

2    parties can't agree on a schedule that's required by Rule 16,

3    that we put in our competing versions and that the Court

4    order the deadlines so that we can get this case to trial as

5    expeditiously as possible.

6            THE COURT:  All right.  Thank you, Mr. Bonner.

7            I do agree that we should have a schedule in place.

8    It has been several months since my discovery order.  And so

9    even if the parties don't have a perfect idea of how much

10   longer things will take, I think you should have a pretty

11   good idea so that you can project forward.

12           And indeed it sounds like the parties are agreeing

13   that the end of March for the substantial production of the

14   documents, the parties have agreed that that is a reasonable

15   time period.

16           I haven't -- other than that date, nobody has

17   mentioned any other dates.

18           Did the parties come to any -- have the parties

19   proposed amongst themselves or agreed on any other deadlines,

20   or is that the only date that the parties have agreed on?

21           MR. INGERMAN:  This is Brett Ingerman.

22           That's the only date that the parties have agreed

23   on.  Mr. Bonner did propose a broader schedule.  And I think,

24   you know, the defendant is totally fine with trying to agree

25   on a schedule now, Your Honor.  I think part of the issue is

17

1    going to be whether at the end of the production of the

2    documents is there going to be motion practice as to whether

3    or not the defendant has complied with your production order.

4    And that's going to take time if there's going to be motion

5    practice as to that.

6            And, you know, is that going to delay the

7    depositions that the plaintiffs want to take?  So that was my

8    hesitation with respect to agreeing to some schedule now.

9            But if that's what's Your Honor wants to do, we can

10   certainly meet and confer on a schedule that builds in time

11   for that contingency.

12           THE COURT:  Well, I would hope that the parties are

13   talking all along in terms of the production so that we don't

14   have to have the motion practice be a surprise to anybody at

15   the end of the production.  In other words, if there are

16   deficiencies as you go along, I hope the parties are bringing

17   them up and trying to work them out.  Or at the very -- you

18   know, if you can't get things resolved amongst yourselves,

19   you can bring them to the Court's attention.

20           I don't -- it is not my practice to build in any

21   time at the end of discovery for disputes because I assume

22   that the parties will be making those requests as we go

23   forward with an eye on the -- toward the actual deadline.

24           So I -- I want the parties to be looking at or

25   thinking about things in that way and not to say, okay, we're

1    only going to get as far as we think we need to go and then

2    we'll have some arguments about whether that's enough and

3    then we'll move forward.

4            I think that is building in unnecessary delay, so I

5    urge the parties to talk on an ongoing basis, clarify things,

6    and to bring up issues as you move forward.

7            So for example, this OCR issue is something that

8    the parties should -- I'm puzzled as to why that can't be

9    worked out because I know that there are technical issues,

10    But you should be able to talk to your vendors or

11    whoever else is handling this in terms of how these issues

12    can be resolved.

13            And I don't understand why the watermark is causing

14    there to be issues that can't just be resolved by using an

15    alternative.

16            So, Mr. Ingerman, why don't we start there because

17    that seems to me a straightforward issue.

18            MR. INGERMAN:  Sure.  So the watermark is important

19    here.  And it's been on all of the bank documents that it

20    designates as highly confidential, starting all the way back

21    in the *Linde* case.

22            And the reason for that, in particular in this

23    case, Your Honor, is that the bank is going out to its

24    account holders.  And part of the pitch for asking for a

25    waiver is that these documents will be highly protected and

1    dealt with as highly confidential and used only in this case

2    and only for purposes of this case.

3          And we've had circumstances where the plaintiff

4    counsel in this case have attempted to use documents produced

5    in one case in another case we think in violation of the

6    protective order.

7          So the -- it's important to the bank that the

8    highly-confidential stamp be prominently displayed on the

9    document.

10          Now as to Mr. Osen, he has two complaints about

11    that.  One is he said it makes it difficult to read with the

12    eye.  Well, if there are documents that he thinks are

13    difficult to read with -- they're all in Arabic by the way,

14    for the most part -- and if he thinks there's a document

15    that's difficult to read to the human eye, I'm happy to meet

16    and confer with him about those documents and see if we can't

17    solve that problem.

18          I don't think that the OCR issue is a real issue.

19    Because unless the plaintiffs have better OCR technology than

20    we do, the OCR technology doesn't work on Arabic documents,

21    so it ends up with a bunch of wingdings symbols and things

22    like that.  So it can't be that the watermark is interfering

23    with the OCR of an Arabic document.

24          And we're happy to, you know, if we end up having

25    to brief this issue, because it is an important issue to the

20

1    bank, we can attach for Your Honor examples of what the OCR

2    output of an Arabic document looks like.  And the watermark

3    simply doesn't interfere with it.

4         And there's case law out there to support the use

5    of a watermark, particularly on sensitive financial documents

6    where we have committed to our account holders that we are

7    going to protect these as carefully as we can in this

8    litigation.

9         So, you know, I'm happy to try to meet and confer

10   to resolve the issue to the extent the watermark interferes

11   with the ability of a human being to read the document.  But

12   as to the OCR issue, we actually don't think that is a real

13   issue.

14        THE COURT:  All right.  So this is -- I agree that

15   the parties should meet and confer and work this out.  Again,

16   if it's a highly-technical issue about what can or cannot be

17   done in terms of the OCR and whether the watermark

18   interferes, I can't answer that question, so the parties need

19   to talk about it.

20        As far as the prominence of the highly-confidential

21   designation on the document, I don't hear anybody saying that

22   you can't have it on the document, but there are many ways to

23   do so.

24        And what I heard from the plaintiff is that an

25   alternative is to put it in a -- somewhere else on the

21

1    document so it's not across the face of the document in a way

2    that causes interference with some sort of scan, non-human

3    eye reader.

4         And so again, I don't know the answer to that, but

5    it seems that there are many ways to approach this issue

6    leaving a highly-confidential designation on each page of the

7    document, as the defendant wishes and is entitled to, and

8    then -- but not interfering with the plaintiffs' ability to

9    read, I mean read in the human and also machine sense, the

10   document.  So please work that out.

11        As far as the misuse of documents, if you learn of

12   those things, Mr. Ingerman, you are free to bring that to the

13   Court's attention.  No party should be in violation of any

14   confidentiality order.  All right.

15        MR. INGERMAN:  Understood.  Understood.

16        THE COURT:  If that's your concern, you should

17   bring that to the Court's attention, and don't think that the

18   only way to address it is by creating an issue that is

19   broader than the problem that you're identifying.  Okay.  So

20   work that out.

21        Now, as far as the other issues that were raised,

22   the question, as I see it, is one of the waivers.  And the

23   question that was posed is what if people, account holders,

24   are not agreeing to a waiver?

25        Are you -- what are you doing with those accounts,

22

1    Mr. Ingerman.

2         MR. INGERMAN:  To be honest with Your Honor, I

3    don't know the answer to that right now.  We would need to

4    speak with the bank to see if there was some way to produce

5    the documents in some redacted form that still gets the

6    plaintiffs what they're looking for, but I don't have an

7    answer for that for you right now.  I apologize.

8         THE COURT:  Okay.  Well, that's an important

9    question.  So I'm glad the issue was brought up now so that

10   you have plenty of time to talk to the bank about that and

11   come up with a proposal.

12        MR. INGERMAN:  Understood.

13        THE COURT:  All right.  And the issue of the ESI, I

14   am concerned about the statement that the parties have not

15   agreed on search terms.

16        How are you searching for ESI, Mr. Ingerman?

17        MR. INGERMAN:  There is no ESI database for the --

18   for the documents for the transaction records that are in --

19   the majority of them are in the Palestinian territories.  We

20   are searching in Lebanon and Jordan as well.

21        But from that time period, my understanding is the

22   bank was not using -- for instance, the employees in the bank

23   branches were not using emails to discuss accounts or deal

24   with account business.  They just didn't do it.  So as far

25   as I know, there is no ESI database to be searched.  There

23

1   has been no destruction of any ESI or any ESI database as Mr.

2   Osen mentioned.  We put a -- we put a litigation hold in

3   place in 2004 in this case, and it's been -- it's been in

4   place since then.

5           So the way that we're searching is that if there

6   were emails, they were likely printed out and put in the

7   account files.  And so that's where we're seeing them.  But

8   there is no ESI database that I'm aware of for the years 1998

9   to 2004 that would have responsive records for the names that

10  are on your production order.

11          THE COURT:  Well, both of you -- I heard you say

12  that that was the West Bank.  What about Jordan and Lebanon?

13          MR. INGERMAN:  My understanding is that they are --

14  there are not ESI databases in those jurisdictions for these

15  -- that would have responsive information for these accounts.

16          THE COURT:  Okay.  And for any geographic area,

17  even the -- part of what you said earlier was in the West

18  Bank internet and power were not consistent.  But for Jordan

19  and Lebanon, I wouldn't think that's a problem.  But

20  nevertheless, are you saying that for all geographic regions

21  there is no ESI database?

22          MR. INGERMAN:  For that relevant time period for

23  these accounts, that's my understanding, Your Honor.

24          THE COURT:  All right.  And then the other issue

25  is, traditionally people have focused on emails when they

24

1    talk about ESI, but electronically store information can

2    refer to many things that are electronically stored.

3              You said that there are no emails.  Are there other

4    electronically store information that need to be searched?

5              MR. INGERMAN:  To the extent there was at the time

6    that the -- at the time that the document retention notice

7    was sent, it was -- it was taken off and stored in other

8    ways.  It was either printed or it was stored on microfiche.

9    And we've produced transaction records and other records that

10   are -- you know, they're effectively electronic, but they're

11   now in paper form.

12             THE COURT:  Can you explain why that happened?

13             MR. INGERMAN:  I can't explain that to you at this

14   moment.  I can certainly investigate that.  But that's my

15   understanding.

16             THE COURT:  Okay.  So let me just try to understand

17   what you said.

18             So there were transaction records that were

19   produced electronically.  They are no longer in the native

20   electronic format.  For some reason they were printed out and

21   so they've been produced as scanned versions of the paper

22   printout.

23             MR. INGERMAN:  No.  I'm sorry if I wasn't clear

24   about that.

25             THE COURT:  Okay.

25

1        MR. INGERMAN:  My understanding is that the

2   electronic records in the ordinary course are printed and put

3   in account files.  And so whatever we had at the time of the

4   preservation notice, at the time preservation notice went

5   out, for that time period, from 1988 to 2004, they would have

6   been paper records.  I'm not aware of any electronic

7   information.

8        For instance, Mr. Osen mentioned EFTs and Swift

9   records.  We have those.  They were in paper form.  We didn't

10  have them in electronic form for these accounts at that time.

11       THE COURT:  But they are originally electronic.

12  But you're saying in real time the electronic version was

13  destroyed somehow and it was converted into paper form?

14       MR. INGERMAN:  I don't know if it --

15       THE COURT:  I'm not saying there's anything wrong

16  with it.

17       MR. INGERMAN:  Yeah.  Yeah.

18       THE COURT:  I'm saying that it doesn't exist

19  anymore.  Is that right?

20       MR. INGERMAN:  I don't -- I don't know if it was --

21  I don't know if it's destroyed or doesn't exist anymore.  I

22  know that the relevant documents, the ordinary course of

23  business at the bank was to print them out.  So I can

24  certainly go back and see if there's some electronic database

25  that would have the exact same information in it.  I just

26

1    don't know the answer to that, Your Honor.

2              THE COURT:  Okay.  So that's another thing that

3    would be important for you to talk to the bank about.

4    Because even if in the ordinary course the bank was printing

5    things out and putting it into a paper folder, there may

6    still be an electronic version of it, let's call it the

7    original electronic version, that the bank didn't use because

8    it was let's say more convenient to use the paper.

9              But if it still exists, that might be something

10   that you can go back and look at, because in the electronic

11   format, it might be easier to handle and process for purposes

12   of (indiscernible).

13             MR. INGERMAN:  I will commit to investigate that

14   and report back to the plaintiffs on that.

15             THE COURT:  Okay.  Great.  And then let me just

16   see, I think I have addressed the questions.

17             Mr. Osen, was there anything else I need to bring

18   up with Mr. Ingerman?

19             MR. OSEN:  Yes.  A couple of things if I may, Your

20   Honor?

21             So first of all, just because Mr. Ingerman raised a

22   very serious accusation that we have somehow misused

23   confidential data in another case, I have no idea what he's

24   referring to.  But if he has a concern about that, the first

25   stop would be to inform us of chapter and verse of what he

27

1    thinks that entails rather than make an accusation of that

2    kind in court.  So you know, to our knowledge, we have never

3    in any case violated a protective order.

4              Now, that having been said, there are a number of

5    further issues that are raised by Mr. Ingerman in his

6    responses.  I'll save the most important one for last, but

7    let me just go back to where we left off.

8              Every bank that we've ever been involved with in

9    litigation has a core banking system, that is, a giant server

10   platform essentially that runs its core applications in

11   various jurisdictions and generates account ledgers.

12   Remember, banks are issuing credit cards.  They're running

13   letters of credit as well as retail banking, so there's a

14   core banking system.  And many of those banks of course have

15   moved on to newer and better technologies, but it is

16   inconceivable that Arab Bank did not have an operational core

17   banking system at that time.  And the same goes true for

18   electronic funds transfers.

19             When funds move electronically from across border,

20   it is run off of a messaging platform.  It's ESI 101 in

21   banking.  And so the idea that they only have paper records,

22   that might be true, but it can only be true if the messaging

23   platform servers have been decommissioned and destroyed.  And

24   the same goes --

25             THE COURT:  Mr. Osen, can I stop you.

28

1          MR. OSEN:  Yeah.

2          THE COURT:  Mr. Osen.

3          MR. OSEN:  Sure.

4          THE COURT:  Can I just stop you there.

5          I already addressed with Mr. Ingerman searching for

6    the original basis of the documents that are -- that the bank

7    was in the ordinary course keeping in paper format.  So he's

8    going to look at the transaction record, the electronic

9    format for those.

10          MR. OSEN:  Understood.

11          THE COURT:  But you're saying that there's a

12   messaging system that's different from email.  Is that what

13   you mean by messaging or --

14          MR. OSEN:  Yes.

15          THE COURT:  -- or are we talking about the same

16   electronic basis?

17          MR. OSEN:  No.  For example, Your Honor, if I send

18   a wire transfer from New York to Amman, my bank is processing

19   that through a Swift messaging platform.  When banks talk to

20   one another in the global marketplace, they do so in a number

21   of ways.  But the most common and ubiquitous is Swift.

22          THE COURT:  Okay.

23          MR. OSEN:  And that is an entirely electronic

24   system that was certainly in place in the relevant time

25   period.

29

1          And we've seen from New York, from Arab Bank's

2     former New York Branch, we've seen printouts that they've

3     produced of the local side of those transactions that were

4     processed through New York.

5          THE COURT:  (Indiscernible) --

6          We also have in our possession -- I'm sorry, Your

7     Honor.

8          THE COURT:  Okay.  No.  So I think I've already

9     addressed that with Mr. Ingerman, that he will look for the

10    original source of those transactions in the electronic

11    format.

12         MR. OSEN:  Right.  The other part of this, and this

13    is sort of a two-part, is I still haven't heard whether Arab

14    Bank is searching currently and collecting records for all

15    persons and entities in the production order or are limiting

16    their searches to those records for which they have waivers.

17         THE COURT:  What would that --

18         MR. OSEN:  To my mind there's a --

19         THE COURT:  That, Mr. Osen, was also a question

20    that I posed to Mr. Ingerman and he is going to be asking his

21    client.

22         MR. OSEN:  Okay.  But this brings us to the last

23    and perhaps most important point, Your Honor.

24         Normally, in past practice in bank secrecy cases,

25    when the Court issues its order, if it overrules bank

30

1    secrecy, the non-producing party either further appeals it if

2    it's, you know, a recommendation from a magistrate judge.  Or

3    if it's from the district judge, Arab Bank has been known to

4    mandamus that decision to the circuit.

5         Either way, when a non-producing party receives the

6    order, they then have the option of either saying, you know,

7    we're going to comply and produce, we're not going to comply

8    because we're still bound by foreign bank secrecy, or give us

9    more time so we can try to comply, and then we'll get back to

10   you.

11        In this case, the defendant wrote to the Court on

12   April 12th and said notwithstanding the bank's disagreement

13   with the Court's recommendation that no limits on the scope

14   of the discovery requested by plaintiffs be imposed, they

15   intend to make a good-faith effort to comply with the

16   decision and not file objections.

17        That's fine.  But what that means to us is that

18   they, at least the way we understood their response, was that

19   they were going to produce whatever responsive records they

20   have.

21        If on the other hand they are taking the position

22   that they're only going to produce for people they've

23   obtained waivers for, well, then, that's a whole different

24   story, because that then goes into the question of remedy.

25   What's our remedy when the defendant fails to produce records

31

1    for hundreds of accounts identified?

2              And again, this goes to your point, Your Honor,

3    with Mr. Bonner.

4              Normally these issues are -- if they're going to be

5    litigated, they're litigated now, not a surprise at the end

6    of production.

7              So I think from our standpoint, they've had time.

8    They've had months now.  The Court should know whether they

9    intend to fully comply with the order, or whether their April

10   12th letter to the Court meant they were going to comply only

11   to the extent that they could obtain waivers because that

12   would impact --

13             THE COURT:  Oh, I --

14             MR. OSEN:  -- the whole issue.

15             THE COURT:  Of course.  Yes.

16             And what I heard from Mr. Ingerman man is that he

17   is not clear yet as to what his client's intention was on the

18   waiver point and he needs to get clarity on that.

19             I agree with you the time to appeal or object to my

20   ruling has passed.  And so people are moving forward.  They

21   have to live with that.

22             And, you know, notwithstanding it, there may be

23   some wisdom in trying to get the waivers first to make those,

24   the ones where waivers are obtained, those will be easier

25   because you won't have problems with the account holders

1    later, but it doesn't absolve the bank from the need to

2    produce everything, notwithstanding the lack of a waiver.

3            So that whole issue, the fact that they're doing

4    the waivers or seeking the waivers first, is fine and

5    practical, but it's not the end of the issue.

6            And so I appreciate what you're saying, Mr. Osen.

7    And Mr. Ingerman is going to get some clarify from his

8    client.

9            And if the client is taking the position that it

10   does not have to do anything or produce anything if there's

11   no waiver, then that is going to be a litigated issue in

12   light of what has transpired.  But that needs to be

13   determined sooner rather than later, which is why I've

14   directed Mr. Ingerman to get that clarity as soon as

15   possible.

16           All right.  So, you know, there should not be --

17   the March deadline as the parties have characterized it is

18   for substantial completion of document production.  But I

19   don't want it to be, well, we're going to produce what we

20   think we should produce without the parties having had

21   discussions about whether that's proper.

22           So you should be -- six months is enough time for

23   the parties to be checking in with each other, to be making

24   partial productions, to be checking the productions, and

25   going back and saying, hold on, this is not what -- and leave

33

1   out certain things that we think we should get.  Do you

2   intend to produce that or is there objection of producing

3   that?

4           So all the normal discussions should be taking

5   place in this case.  And (indiscernible) --

6           MR. OSEN:  I couldn't agree more, Your Honor.

7           I will just say, just so that it's clear, we've

8   repeatedly asked Mr. Ingerman and his colleagues these

9   questions and have been told to wait until the end of the

10  production to obtain clarity, so we couldn't agree more with

11  that.

12          THE COURT:  All right.

13          MR. INGERMAN:  Your Honor, that's -- I'm not going

14  -- I'm not going to respond.  That's just not true.  But

15  that's okay.

16          THE COURT:  All right.  So it's fine.  And the

17  reason the Court is involved in discovery is so that I can

18  help the parties communicate more clearly and to resolve

19  these issues as we move forward.

20          I heard somebody join the call.  I know I have a

21  conference at 11:00.  I'm wrapping up this case, so whoever

22  called in, just put yourself on mute until we're done here.

23  Thank you.

24          So I'm directing the parties to confer.  I'm

25  directing the parties to talk to each other and to respond in

34

1    real time.

2         I do not want to have a situation at the end of

3    March where the parties say, okay, now we're going to start

4    objecting or litigating discovery production issues.  I want

5    the parties to be talking about these issues and to bringing

6    them to my attention whenever you can't resolve them.

7         Because I think having a quick phone call usually

8    can get things moving because the parties will either figure

9    out that they can agree, or I will make a ruling that one

10   side is going to be unhappy with, but it will get things

11   moving.  Okay.

12        MR. INGERMAN:  Understood, Your Honor.

13        THE COURT:  And I've been somewhat hands-off in

14   this production because it seems that I've been told that

15   it's difficult.  I appreciate all those things.  But I think

16   perhaps it's time for me to get more involved.

17        And so what I think makes sense is that I will

18   schedule another conference in about three months.  And in

19   advance of that, I would like to get an update in paper, on

20   paper, from the parties so that I have something to work off

21   when we meet.

22        So today is already the end of September, three

23   months is December, let's pick a date in December and have it

24   on our calendars.  It's easy enough to call in by phone.

25        MR. INGERMAN:  Okay.  And Your Honor, this is Brett

1    Ingerman.

2              I know you've got another call at 11:00, but, you

3    know, we are still waiting for documents from the plaintiffs

4    too.

5              THE COURT:  Mm-hmm.  Okay.

6              MR. INGERMAN:  It's been years since we -- since we

7    served our document requests.  So we can -- we can certainly

8    meet and confer with the plaintiffs on when we're going to

9    see that information as well.

10             THE COURT:  Yes.  Please do that.

11             And I did not get a heads up on it, so I was not

12   prepared to discuss it.  But if you're not able to resolve

13   that when you meet and confer, Mr. Ingerman, and you have an

14   issue with the plaintiffs' production, you can certainly put

15   that in writing to the Court.  And I will schedule a phone

16   call within a few days so that we can talk through that

17   issue, because I think, that's important too.

18             MR. INGERMAN:  Thank you very much.

19             THE COURT:  So let's say that on December 19th,

20   which is a Tuesday, we will meet at 10 o'clock by telephone.

21             MR. OSEN:  Your Honor, this is Gary Osen.  One

22   other request --

23             THE COURT:  Yes.

24             MR. OSEN:  -- in advance of that.

25             Can we have a date on the calendar by which we will

36

1    be advised by defense counsel on their bank secrecy position?

2         THE COURT:  Yes, I will.  But I want to put the

3    date in first for the conference, and then we'll work

4    backwards.

5         MR. OSEN:  Understood.

6         THE COURT:  So December 19th on Tuesday at 10

7    o'clock, is that problematic for anybody?

8       (No response)

9         THE COURT:  Okay.  So we'll have a telephone call

10   on that date.

11        Now, the outstanding questions I asked Mr. Ingerman

12   to check with his client about, what happens if people do not

13   give waivers, and then the issue of the core banking system

14   electronic sources of transactions before those specific

15   transactions were converted to paper, those two issues, Mr.

16   Ingerman, you need to talk to your client about and come back

17   with answers at the very least to the plaintiffs.

18        I don't necessarily need to hear that unless you

19   think it's important to file something letting me know, but

20   you need to get some answers and get to the plaintiffs.  So I

21   will say I'll give you about two weeks.

22        Is two weeks enough time, Mr. Ingerman?

23        MR. INGERMAN:  Yeah.  I'm just looking at my

24   calendar, Your Honor.  I'm out of the country.  Two weeks.

25   Could we have until Monday October 16th?

37

1          THE COURT:  Okay.  That's fine.  Monday, October

2    16, you need to let plaintiffs know the answers to those

3    questions.

4          And you should continue to make productions on a

5    rolling basis as you're able to so that as issues arise you

6    can -- the parties can have discussions about them.

7          And I'm not going to give you a deadline as far as

8    this whole watermark issue, but you should get your technical

9    people together as well to figure out what's possible.  All

10   right.

11         MR. INGERMAN:  Will do.

12         THE COURT:  So, Mr. Osen, anything else?

13         MR. OSEN:  Nothing here, Your Honor.  Thank you.

14         THE COURT:  And, Mr. Bonner?

15         MR. BONNER:  No, Your Honor.  Thank you so much for

16   your time.

17         THE COURT:  And Mr. Ingerman?

18         MR. INGERMAN:  No.  Thank you very much, Your

19   Honor.

20         THE COURT:  All right.  Thank you, everybody.  Have

21   a good weekend.

22      (Proceedings adjourned)

23

24

25

38

1          I, CHRISTINE FIORE, court-approved transcriber and

2     certified electronic reporter and transcriber, certify that

3     the foregoing is a correct transcript from the official

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6

7

8     _____          October 3, 2023

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24