```
               UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK (BROOKLYN)
-----------------------------:
NATHAN PAM, et al.,          : Case No.: 18-cv-4670
                             :
                  Plaintiffs,: Brooklyn, New York
                             : February 14, 2024
        v.                   :
                             :
ARAB BANK, PLC,              :
                  Defendant. :
-----------------------------:
AHARON MILLER, et al.,       : Case No.: 18-cv-2192
                  Plaintiffs,:
        v.                   :
                             :
ARAB BANK, PLC,              :
                  Defendant. :
-----------------------------:



         TRANSCRIPT AND STATUS CONFERENCE HEARING
             BEFORE THE HONORABLE PEGGY KUO
             UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:       OSEN LLC
Miller               BY:  Gary M. Osen, Esq.
                          Ari Ungar, Esq.
                          Dina Gielchinsky, Esq.
                          Aaron Schlanger, Esq.
                          Michael J. Radine, Esq.
                     190 Moore Street
                     Suite 272
                     Hackensack, New Jersey 07601

For Plaintiff        KOHN, SWIFT & GRAF, P.C.
Miller               BY:  Zahra Dean, Esq.
                     1600 Market Street - Suite 2500
                     Philadelphia, PA 19103


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

```
 1                    APPEARANCES (Continued)

 2

 3   For Plaintiff:      FLEISCHMAN BONNER & ROCCO LLP
     Pam                 BY:  James P. Bonner, Esq.
 4                            Susan M. Davies, Esq.
                         317 George Street - Suite 320
 5                       New Brunswick, New Jersey 08901

 6   For Plaintiff       HEIDEMAN NUDELMAN & KALIK, PC
     Pam                 BY:  Joseph Tipograph, Esq.
 7                            Edward MacAllister, Esq.
                         5335 Wisconsin Avenue, NW
 8                       Suite 440
                         Washington, DC 20015
 9

10   For Defendant:      DLA PIPER LLP
     Arab Bank           BY: Brett Ingerman, Esq.
11                           Anthony P. Coles, Esq.
                             Andrew J. Peck, Esq.
12                       650 S. Exeter Street
                         Baltimore, Maryland 21202
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE DEPUTY CLERK:  Conference for Docket

2     Numbers: 18-cv-2192 and 18-cv-4670, Aharon Miller,

3     et al. vs. Arab Bank, Public Limited Company, and

4     Nathan Pam, et al. vs. Arab Bank Public Limited

5     Company.  Magistrate Judge Peggy Kuo presiding.

6          Will the parties present as to the Miller

7     matter please state their appearances, beginning

8     with plaintiffs.

9          MR. OSEN:  Good morning, Your Honor.  This

10    is Gary Osen from Osen, LLC, on behalf of the Miller

11    plaintiffs.  I'm joined on the phone this morning

12    by --

13          THE COURT:  Mr. Osen, you're cutting out.

14          MR. OSEN:  I'm joined this morning by my

15    colleagues, Ari Ungar, Dina Gielchinsky, Michael

16    Radine and Aaron Schlanger.

17          MS. DEAN:  Good morning, Your Honor.  This

18    is Zahra Dean from Kohn Swift, also representing the

19    Miller plaintiffs.

20          THE DEPUTY CLERK:  As for the defendants in

21    the Miller matter.

22          MR. INGERMAN:  It's Brett Ingerman from DLA

23    Piper for the defendants, along with my colleagues

24    Tony Coles and Andrew Peck.

25          THE DEPUTY CLERK:  As for the plaintiffs in

1   the Pam matter.

2          MR. BONNER:  Good morning, Your Honor.

3   This is Jim Bonner from Fleischman Bonner & Rocco

4   LLP.  I'm here this morning with my colleague, Susan

5   Davies.

6          MR. TIPOGRAPH:  Good morning, Your Honor.

7   This is Joe Tipograph from the law firm Heideman

8   Nudelman & Kalik for the Pam plaintiffs.

9          MR. MACALLISTER:  Good morning, Your Honor.

10   This is Edward MacAllister from the Perles Law Firm

11   also for the Pam plaintiffs.

12          THE DEPUTY CLERK:  Thank you.  And for the

13   defendants in the Pam matters.

14          MR. INGERMAN:  Good morning.  It's the same

15   lawyers, Brett Ingerman, Tony Coles, Andrew Peck

16   from DLA Piper on behalf of the defendant.

17          THE COURT:  All right.  Good morning,

18   everyone.  It's good to hear your voices again.

19          We are here for a status report to talk

20   about outstanding issues in discovery and what still

21   needs to happen.  I've read the joint report, and I

22   know that there are a couple of things that the

23   parties indicated they might want to bring up that

24   were not included in that joint letter.

25          I'll start with hearing from the defendant

1    on the issues that it is having with discovery from

2    the plaintiffs, and then we'll turn to the

3    plaintiffs' issues with discovery by the bank.

4            Mr. Ingerman, do you want to start?

5            MR. INGERMAN:  Yes.  Thank you, Your Honor.

6    Good morning.  Bret Ingerman on behalf of the

7    defendant.

8            Just a few issues on the defense side here.

9    As Your Honor will recall, you ordered the Pam

10   plaintiffs to produce doctor logs.  So, in other

11   words, lists of doctors that they had seen for any

12   reason, so that we could evaluate whether those

13   records might contain relevant information about

14   their alleged injuries.  That order was on

15   January 20, 2022, and we still don't have all of the

16   doctor logs.

17           The plaintiffs have indicated in their

18   section -- the Pam plaintiffs have indicated in

19   their section of the joint status report that

20   they're working on getting those logs for us, but we

21   still don't have them, and we don't have a date

22   certain by which we'll get them, nor do we have an

23   explanation for why it's taken two years to get

24   those logs.  So that's issue number one.

25           With respect to the Miller plaintiffs, we

1    are still waiting for medical records from three of

2    the plaintiffs, Tova Miller, Adiya Miller and

3    Phillip Bauer.  According to the plaintiffs' section

4    of the joint status report, they claim to be working

5    on getting us the medical records that were

6    identified by Tova Miller and Adiya Miller in their

7    depositions, but were not provided to the defense.

8    And they claim for the first time now that Mr. Bauer

9    does not remember the name of the marital therapist

10    that he saw for issues that he was having with his

11    wife.  We'll evaluate that and perhaps propose an

12    alternative to the plaintiffs on that issue.

13          And then the third issue relates to both

14    the Miller and the Pam plaintiffs.  There's still

15    about, I think the number is, 27 plaintiff

16    depositions left to take.  They're all in, or I

17    think nearly all, are in Israel.  And, of course, as

18    Your Honor knows, given what's happening there, we

19    haven't yet scheduled those depositions.  I think

20    the US State Department still has an alert, a travel

21    advisory for Israel, claiming or stating that we

22    should reconsider travel to Israel due to terrorism

23    and civil unrest.  So that's been a bit of an issue.

24          The bank does believe that taking the

25    plaintiff depositions in person is important,

1    particularly since they're claiming majority only

2    emotional injuries here.  And so being able to sit

3    across from the table from the plaintiff has proved

4    to be valuable.  So we prefer not to do them

5    remotely.  And so we have told the plaintiffs that

6    we'd like to wait a few weeks and see how things

7    play out in Israel.  Hopefully, for everybody's

8    benefit, there will be some type of resolution or

9    ceasefire there, and we'll be able to go over and

10   get the remainder of those depositions done.

11           But those are the three issues on the

12   defense side, Your Honor.

13           THE COURT:  All right.  Thank you.

14           So let me hear a response from the Pam

15   plaintiffs first with regard to the doctor logs.

16           MS. DAVIES:  Yes, Your Honor, this is

17   Susan Davies for the Pam plaintiffs.  We have four

18   of our plaintiffs in Israel who have had extensive

19   consultations with doctors for therapy and

20   treatments of different kinds.  All of their medical

21   records are in Hebrew.  So what we have decided to

22   do, as an extra step to provide more information to

23   defendants, is we've actually gone through, we're

24   reviewing the medical records that we have produced,

25   and in our doctor log, we are identifying which

1    medical records belong to which doctor.  So that

2    will make the process for the defendants a little

3    easier.  But these are people who have produced

4    hundreds of pages of medical records.  And so we're

5    just being a little bit more thorough in this

6    respect.

7         But we think we can have these records -- I

8    mean, we'll certainly have them produced by March.

9    I think we have a date of March 29 for completion of

10   all document discovery, and we'll certainly complete

11   the logs by then.

12        THE COURT:  All right.  So, Ms. Davies, let

13   me just try to understand.  The request I heard from

14   Mr. Ingerman was that you produce doctor logs.  Have

15   you done that?

16        MS. DAVIES:  We haven't.  We could do that

17   immediately, the logs that don't identify the

18   medical records.  And we have produced the medical

19   records already separately.

20        THE COURT:  Right.  Okay.  So produce the

21   logs.  You say you have them, so produce those

22   immediately, and I'll just say by tomorrow,

23   February 15.  Okay.  Because there's no reason to

24   wait on those just because you're working on the

25   records.  The request was that you produce the logs.

1    So that should be done by tomorrow.

2              MS. DAVIES:  Okay.

3              THE COURT:  Now, as far as the records, are

4    you getting them translated from Hebrew?

5              Ms. Davies, are you getting the records

6    translated?  You mentioned that they're in Hebrew --

7              MS. DAVIES:  No.

8              THE COURT:  -- and I didn't understand.

9              Okay.  So what did you mean?

10             MS. DAVIES:  No.

11             THE COURT:  You're going to produce them in

12   Hebrew?

13             MS. DAVIES:  We have already produced them

14   in Hebrew.

15             THE COURT:  I see.  Okay.  So then what

16   were you talking about in terms of production by the

17   end of fact discovery at the end of March?

18             MS. DAVIES:  Just that our doctor log will

19   identify by Bates number the records that belong to

20   each of the medical providers identified on the log.

21             THE COURT:  Okay.  Again, let me try to

22   understand.  So you can produce the logs, and you

23   will do so tomorrow, but you have not yet correlated

24   the logs with the Bates stamps of the actual

25   records; is that right?

1          MS. DAVIES:  That's exactly right.  We're

2     in the process of doing that second step now.

3          THE COURT:  Okay.  And there does not seem

4     to be a need to wait until the last day of discovery

5     to produce that.  When can you produce that

6     correlated log?  When can you produce that earlier

7     than the last day of discovery?

8          MS. DAVIES:  For two out of the four, we

9     can probably do it by the end of this week, and I'm

10     not sure about the other two.  I'm not sure on what

11     the status of those two is.

12          THE COURT:  Okay.  So I'll say you've

13     committed to producing two of those four by

14     February 16.  And the remaining two, I would like

15     you to have some discussions with defense counsel

16     about when you can produce those.

17          I, again, prefer that they not be produced

18     at the very last minute, because it doesn't sound

19     like that's necessary.  So please come up with a

20     date when those can be produced, the correlated one.

21          MS. DAVIES:  Yes, Your Honor.

22          THE COURT:  Okay.  Great.  Thank you.

23          So then I'll hear from the Miller

24     plaintiffs as far as the medical records for those

25     three people.

1          MR. OSEN:  Yes.  Good morning again, Your

2     Honor.  Gary Osen for the Miller plaintiffs.

3          I believe we have inquiries outstanding to

4     two plaintiffs in Israel with respect to a few

5     miscellaneous records, and we're following up with

6     them.

7          With respect to the third, I think

8     Mr. Ingerman may have confused the reference in our

9     letter, in our joint letter.  It was not to

10    Mr. Bauer, whose records we are seeking to obtain,

11    but rather to another client, Mr. Rosenstein, who

12    does not any longer recall the specific physician

13    that he spoke about in his deposition.

14         So we're working on all three of them.  And

15    the first two might be a little bit more, not

16    through any fault of ours, but because of the

17    situation in Israel, might be a little bit more

18    delayed than we would normally expect in response

19    time, but we are following up with it.

20         As far as -- sorry, go ahead, Your Honor.

21         THE COURT:  No.  So let me just finish

22    this.  So for those two individuals, they're still

23    in Israel; is that right?

24         MR. OSEN:  Yes.

25         THE COURT:  Okay.  And so are you able to

1  have communications with them?

2      MR. OSEN:  I understand that we do.  But

3  because of the situation, they're a little less

4  responsive than they normally are.  So we've been

5  following up.  But I should stress, this isn't their

6  medical records writ large, this is sort of the

7  miscellaneous outstanding that came up in their

8  (inaudible).  We're following up with them, but

9  we're also trying to be a little bit mindful of the

10  (inaudible).

11      THE COURT:  I'm sorry, Mr. Osen, that last

12  part I didn't hear.

13      MR. OSEN:  I said, we're following up with

14  them, but we're also a bit more sensitive and

15  mindful than we might otherwise be to the other

16  pressing issues that they have to deal with at the

17  moment.

18      THE COURT:  Of course.  And that's why I

19  was asking if the communication is difficult.  And

20  then also, you said they're not medical records writ

21  large, but they are medical records, even if you're

22  calling them miscellaneous.

23      MR. OSEN:  Yes.  No.  My point was simply,

24  Your Honor, that their records have been

25  substantially produced.  These are sort of stray

1    records that are a result of a deposition question

2    that leads to a follow-up request.

3            So I just didn't want the Court to have the

4    impression that there were no records produced for

5    these individuals.  They were substantially

6    produced, and the witnesses were deposed.  We're

7    just doing sort of what I'll call cleanup from the

8    deposition.  And again, we're in touch with the

9    clients.  We're just not, perhaps, as aggressive as

10   we would be under other circumstances in following

11   up because of their circumstances.

12           THE COURT:  Okay.  And I never had the

13   impression that your clients were not producing

14   medical records, but I think it is fair to make sure

15   that their medical record production is complete.

16   So please follow up with them and complete that

17   production.  I certainly appreciate the

18   circumstances in that part of the world, so people

19   should do the best they can, but at some point, they

20   still do need to fulfill their obligations here.

21           So I don't know if the problem is that

22   they -- I haven't heard that they have problems

23   remembering the names of those providers.  So

24   perhaps it's just a question of them getting those

25   records or I don't know if there's a way,

1   alternatively, to have authorizations for you to

2   produce the records.  Whatever it is, please have

3   your clients take that first step to getting the

4   records produced, even if they don't have it.  If

5   the providers have it, then there might be a way to

6   help them out in that regard.

7          So please diligently work to get whatever

8   information they can provide you so that that can

9   all be completed.

10          MR. OSEN:  Understood, Your Honor.  We

11   completely agree.  So we will do that.  We're just

12   proceeding a little bit more delicately than we

13   normally would.

14          THE COURT:  Okay.  But please still be

15   mindful that there's a deadline coming up, and if

16   there's going to be a request for an extension of

17   the deadline, then the parties should be consulting

18   on that.

19          MR. OSEN:  Understood, Your Honor.

20          THE COURT:  All right.  Okay.  So then

21   let's talk about the depositions.  Again, being

22   mindful of the situation there, I'll start with you,

23   Mr. Osen.  Do you have a sense of when those

24   depositions can be scheduled?

25          MR. OSEN:  Well, our view is we certainly

1    understand Mr. Ingerman and his team's reluctance to

2    travel, and we're certainly willing to wait another

3    couple of weeks to see if the situation calms down

4    somewhat and we can schedule those depositions in

5    person.  On the other hand, at some point it becomes

6    a little bit more attenuated.  And if in a few weeks

7    we're still in the same position we're in now, we

8    don't think it's unreasonable to compromise and do

9    these depositions by video conference.

10          We recognize that Mr. Ingerman would prefer

11    to sit across the table, but we also recognize that

12    the law firm has an office in Tel Aviv, so if they

13    don't want to use local counsel to take the

14    depositions in person, they can still certainly be

15    in a position of having those depositions held at

16    their offices where the documents are transmitted

17    live to the witnesses.

18          I realize that many lawyers feel -- they

19    prefer to do them in person.  I do.  But given the

20    circumstances, if we go past another four to six

21    weeks under the current environment, then we'd ask

22    the Court and defendant to revisit the issue and

23    maybe schedule these by videoconference to get them

24    done.

25          THE COURT:  Could your clients travel to

1      Tel Aviv to sit in person for a deposition?

2                MR. OSEN:  Yes.  We have previously, when

3      we were talking about this in terms of in-person

4      depositions, we offered to produce them all in

5      Tel Aviv.

6                THE COURT:  Okay.  And then let me find out

7      from Ms. Davies about the Pam plaintiffs.

8                What is their situation with their

9      depositions; is it the same as for the Miller

10     plaintiff?

11               MS. DAVIES:  Your Honor, we haven't

12     actually spoken with our clients in terms of their

13     ability to travel to Tel Aviv to have their

14     depositions taken or their availability otherwise in

15     the current circumstances.  But we agree with the

16     Miller plaintiffs that these depositions could be

17     conducted remotely by video deposition.  We have

18     approximately 25 plaintiffs who are residents in

19     Israel who are yet to be deposed.

20               THE COURT:  All right.  And I appreciate

21     that they can be deposed remotely, but if the strong

22     preference by the defendant is that they be deposed

23     in person, and if that's possible to do safely and

24     without undue delay, then it's something that should

25     be considered.

1    So please, Ms. Davies, talk to your clients

2    about whether they could travel to Tel Aviv, if

3    that's where the depositions end up being.  And then

4    let me hear with regard to that, then.

5    Mr. Ingerman, can you be in touch with

6    counsel for the plaintiffs and just try to check in

7    with them and see what the state of affairs is?

8    Could you -- there was a proposal that somebody from

9    your office in Tel Aviv conduct the depositions so

10   that a lawyer from the United States would not have

11   to travel into Israel to do the depositions.  Is

12   that something that is possible, or it has to be

13   somebody traveling there?

14   MR. INGERMAN:  Yeah, unfortunately, there's

15   no one in our Tel Aviv office.  It's a very small

16   office.  I think it's three or four lawyers, and

17   nobody in that office is involved in this case.  So

18   that would not be feasible.

19   Actually, the proposal of the plaintiffs is

20   exactly what we proposed, which is we'll check in

21   with them in a couple of weeks, hopefully things are

22   better, and we'll schedule them in Tel Aviv in

23   person.  And if not, then we can talk about other

24   options.

25   THE COURT:  Okay.  All right.  So please

1    keep talking.  And it's a fluid situation, so

2    hopefully things will be better.  It will be good

3    for this case, but also good for all sorts of other

4    reasons.  So let us hope for the best in that

5    regard.

6            All right.  So, Mr. Ingerman, that's the

7    list of the issues that you have with plaintiffs'

8    production?

9            MR. INGERMAN:  Yes, Your Honor.

10           THE COURT:  Okay.  Then let me turn to the

11   plaintiffs' issues with the bank's production, and I

12   don't know who wants to take the lead on that from

13   the plaintiffs' side.

14           MR. OSEN:  I think that will be me, Your

15   Honor; Gary Osen for the Miller plaintiffs.

16           THE COURT:  Okay.  Go ahead, Mr. Osen.

17           MR. OSEN:  I wouldn't describe it as issues

18   per se, but just to flag some of the outstanding

19   questions or matters that are sort of out there and

20   are reflected primarily in our joint status letter.

21           So first of all, Mr. Ingerman previously

22   told the Court that he expected the waiver process

23   to be completed by February 23rd, which is in about

24   nine days or so.  And I guess the question that is

25   out there, first of all, is just how many more

1    waivers they've obtained since our last status

2    conference and how many they expect by the 23rd or

3    by the end of the month in terms of that process, so

4    we have some sense of the universe that may be

5    forthcoming.

6            I can stop there, or I can just check off

7    the other point.

8            THE COURT:  Why don't you go through your

9    list, Mr. Osen, and then I'll check with

10   Mr. Ingerman and have him respond to each one in

11   turn.

12           MR. OSEN:  Okay.  Thank you, Your Honor.

13           So Mr. Ingerman also told the Court last

14   time that he believed production for account holders

15   who had provided waivers would be completed by the

16   end of January.  I assume based on the January 29th

17   letter from defense counsel and the further

18   progress, I'll call it, made on electronically

19   stored information, ESI, that there is, in fact,

20   going to be substantial production after January 31,

21   since we didn't receive one by that date.

22           To be clear so far, to date the plaintiffs

23   haven't received any wire transfers or split

24   messages, no checks, e-mails, telex messages or

25   Western Union transfers.

1          So breaking it down for the future, what we
2     would expect from the production going forward is
3     paper records where no ESI exists, and that would
4     appear to be the majority of SWIFT messages and wire
5     transfers, checks, e-mails, telex, et cetera.  And
6     for those, Your Honor, I'll flag the issue again.
7     Where there are only paper records, we'd hope to get
8     high resolution scans and with a confidentiality
9     mark that doesn't obscure any of the text in the
10    documents.
11         With respect to the ESI, originally we were
12    advised that there was unlikely to be any, but on
13    January 29th, defense counsel advised us that there
14    appears to be quite substantial ESI, including their
15    entire core banking system from that period, seems
16    to be accessible.  So for that, we would just,
17    again, ask that the materials that were responsive
18    to the Court's order be produced in native format,
19    which usually means what they call CSE files, not
20    just print out, but scans of the ESI.
21         And then just to check two more boxes, Your
22    Honor, once we have a response to our, I believe,
23    February 1st e-mail on ESI, we'd like to schedule an
24    IT conference with the IT professional to sort of
25    follow through on the various technical issues.

1          And then lastly, Your Honor, we'd also like

2     to schedule the Rule 30(b)(6) deposition for late

3     March or early April for a witness who would walk us

4     through the bank's waiver process in this case.

5          THE COURT:  All right.  Thank you,

6     Mr. Osen.

7          So, Mr. Ingerman, I'll turn to you.  You

8     can address each of those.

9          MR. INGERMAN:  Sure.  So the first one, we

10    do expect that the waiver process will be completed

11    by February 2023 -- by February 23, 2024.

12         I don't know how many additional waivers

13    we're going to get.  I think, as I pointed out to

14    the Court the last time, with the events of

15    October 7th in Israel and in Gaza and the

16    Palestinian territories, and the ongoing conflict in

17    Lebanon, that has certainly had a chilling effect on

18    our ability to get waivers.  But we did produce on

19    January 31 all of the waivers that we have obtained

20    to date, which I think were about 150 or so waivers.

21    And to the extent we have additional waivers between

22    that date and February 23, we will produce them.

23         My understanding is that the bank's hard

24    copy production as to customers who have waived bank

25    secrecy in the Palestinian territories, Lebanon and

1    Jordan is substantially complete.  So whatever hard
2    copy records that we had related to those customers
3    who waived bank secrecy have been produced.

4              Mr. Osen said we haven't produced any wire
5    transfers, SWIFT records, telex, Western Union.
6    That is true as it relates to the customers who have
7    waived bank secrecy because we don't have them in
8    hard copy.  Based on the documents we've reviewed,
9    they may be held in some of the electronic records
10   that we are searching, but we don't know yet.

11             We did produce wire transfers, SWIFT
12   records, telex and Western Union, and checks for the
13   customers for whom we had records in the US.  And
14   that information has all been produced.  That
15   production was complete in 2021.

16             So we're really focused now only on
17   customers in the Middle East, I'll call it, which I
18   intend to mean Lebanon, Jordan and the Palestinian
19   territories for whom we have received waivers.

20             So for that cohort, my understanding is
21   that our hard copy document production is
22   substantially complete.  I think that addresses the
23   first and second point for Mr. Osen.

24             With respect to ESI, for the Middle Eastern
25   customers who have waived bank secrecy, we have an

1    ESI protocol, Your Honor, that's in place.  So any

2    ESI we produce will be in accordance and in

3    compliance with that ESI protocol.  I don't know

4    what the volume of the ESI will be.  We've actually

5    retained two IT consultants, one in the Middle East

6    and one here in the US.  They are working to do two

7    things with the ESI that we have identified in the

8    Middle East.  The first thing they're trying to

9    understand is, is any of it searchable.  And if it

10   is searchable, then they are going to search those

11   records mainly by customer name.  But if there are

12   additional search terms that we intend to use or

13   that the plaintiffs want us to use, we intend to

14   have a conversation with the plaintiffs' counsel

15   about that.  But given the fact that we're operating

16   in a conflict zone with systems that are sometimes

17   20 plus years old and that are in Arabic, it's taken

18   us just a little bit longer than we thought it

19   would.

20            So we are likely to talk to the plaintiffs

21   about some modest extension of the March 29th

22   deadline to substantially complete ESI.  We have two

23   sets of consultants who are working hard on doing

24   the two things I identified:  (1), which of the ESI

25   is searchable and which is not, and if it's not, we

```
 1   will tell the plaintiffs why we think it's not
 2   searchable.  And if they want to have communications
 3   about that, that's fine.  And if it is searchable,
 4   we will certainly search it by the 673 names that
 5   the plaintiffs provided to us.  And if there are
 6   additional relevant search terms, we're happy to
 7   consider those as well.
 8         As I said, we may come back to the Court
 9   and ask for some modest extension given the
10   circumstances of the March 29th deadline for
11   substantial production of ESI.
12         We are considering the plaintiffs'
13   February 1st e-mail.  I mean, what tends to happen
14   here, Your Honor, is we get a whole list of
15   questions, we provide extensive detailed responses,
16   and then immediately we get a whole list of
17   additional questions.  Then we provide responses and
18   we get additional questions, and we don't think it's
19   going to end anytime soon.  The bank believes that
20   it has met and it is meeting its Rule 26
21   obligations.  So we are evaluating those questions
22   and we'll respond as appropriate.
23         With respect to the IT to IT person
24   discussion, as I mentioned earlier, we're not
25   opposed to that.  And after we respond to their
```

1    February 1st e-mail, if they want to have that IT to

2    IT person discussion, maybe that can stem some of

3    the letter writing campaigns and resolve some of

4    these issues.  So we're not opposed to that.

5            And with respect to the 30(b)(6) deposition

6    of a bank representative on the waiver process,

7    that's fine.  We will make that person available,

8    most likely in Amman, Jordan.  If the plaintiffs

9    want to travel there to take that deposition, that's

10   fine.  If they want to do it remotely, that's fine

11   too.  And doing that towards the end of March, early

12   part of April, should not be a problem.

13           THE COURT:  Okay.  That sounds good.

14           So let me just go through each of these.

15   You said that you think the waiver process will be

16   done by February 23rd.  You're not sure how many

17   waivers there will be.  You've produced 150 as of

18   January 31st, and by February 23rd, you will produce

19   the rest.

20           And so my understanding is, as of

21   February 23rd, if you have not yet produced a

22   waiver, the process is done.  And so you need to

23   make the productions notwithstanding the lack of

24   waiver; is that correct?

25           MR. INGERMAN:  Yes.  I mean, the bank, I

1    think, will have a decision to make at that point.

2    We understand Your Honor's order, but yes.

3             THE COURT:  Okay.  Great.

4             So then for the hard copy production, you

5    said that is substantially complete.  And you've

6    produced the wire SWIFT, telex, Western Union, and

7    checks, documents that were in the United States.

8    The ones in the Middle East, you're still looking to

9    see what there is.

10             MR. INGERMAN:  Yes.  My understanding is

11    that those documents do not exist in hard copy for

12    the customers who have waived bank secrecy in the

13    Middle East.  They may have been scanned and put

14    into the ESI databases that we're hoping to search.

15    I just don't know.

16             THE COURT:  Okay.  So the hard copy then,

17    the production, you said it's substantially

18    complete.  And the things that the plaintiffs have

19    identified as lacking, you're saying don't exist in

20    hard copies.  So you're looking in the ESI bucket to

21    see if it's there.

22             MR. INGERMAN:  Correct.

23             THE COURT:  Okay.  So then let's turn to

24    ESI.  You said that there's a protocol in place.

25    You have the consultants; one in the Middle East,

```
 1    one in the United States.  And they are looking to
 2    see if any of the ESI is searchable.  And if so, you
 3    will search by the 673 customer names and any of the
 4    search terms that you will be able to discuss with
 5    the plaintiffs.
 6              MR. INGERMAN:  Yes, and I'll add to that.
 7    There was one database that we were able to search
 8    and run the 673 names through to determine at a
 9    minimum which of those 673 were actually bank
10    customers or not.  So we have been able to run that
11    search.  I just don't know beyond that how much more
12    we're going to be able to do.
13              THE COURT:  Okay.  So please keep talking
14    with your consultants to see what you can do.
15    You're constrained by the reality that this is a
16    system that's more than 20 years old, and it's in
17    Arabic.  So that is presenting some difficulties.
18    You may need to have an extension beyond March, but
19    you will let the Court know after consulting with
20    plaintiffs, what that extended time frame will be
21    once you have a better handle on what needs to be
22    done.
23              MR. INGERMAN:  Yes, and we'll certainly get
24    input from our IT experts as well on that.
25              THE COURT:  Okay.  Great.  And then the IT
```

```
 1    conference everybody agrees is a good idea.  So that
 2    should happen.  And I think it's also good to get as
 3    much done as you can so that everybody understands
 4    what questions will need to be addressed at that IT
 5    conference.  So the parties should continue to talk
 6    and see when it makes sense to make that happen.
 7           And then the last point is the 30(b)(6)
 8    witness will be produced by the bank in Jordan.  And
 9    so the parties need to figure out how to make that
10    happen.
11           MR. INGERMAN:  Yes.
12           THE COURT:  Okay.  All right.  Great.
13           So then let me hear from Mr. Osen if you
14    had any follow up to that information.
15           MR. OSEN:  Yes, a couple of things, Your
16    Honor.  So first of all, in principle, we don't
17    oppose an extension of the discovery deadline to the
18    extent that there is meaningful ESI to be recovered.
19    So that's the first thing.
20           I have to say, I remain puzzled by some of
21    Mr. Ingerman's statements, and it may be a function
22    of my lack of comprehension or more late breaking
23    information.  But let me just draw the Court's
24    attention to two issues.  One is in their
25    January 29th letter, Arab Bank advised us that SWIFT
```

1     records, that's the wire transfer records from 1998

2     to 2004, are in a paper-based format in the daily

3     jackets for the clients.  So one would expect,

4     especially with certain of these clients, where we

5     know definitively that they received wire transfers

6     through the SWIFT system, that they would, in fact,

7     be able to produce copies of paper records.  So

8     there may be an explanation for that.  But again,

9     we're just going off of the representations made to

10    us in defendant's letter.

11         The second thing goes to the question of

12    the searching of the databases.  Again, the letter

13    from the counsel says that (indiscernible) database.

14    In fact, developed a specific sort of customized

15    code to search restored databases on site.  That

16    might have been an overstatement of the progress

17    made and that they're in the process of refining

18    that further, which is, again, fine, as far as it

19    goes.

20         But what we would suggest, Your Honor, and

21    we've been asking for this since December, is that

22    the party schedule a IT conference this month so

23    that it's not Mr. Ingerman translating what he's

24    hearing from IT, people who are, in turn, perhaps

25    getting a translation from Arabic and then we, in

1  turn, are reading that and responding based on what

2  our IT consultants tell us.

3          We've had past experience with this, where

4  it's been quite helpful to just have those IT

5  individuals who have the technical knowledge talk to

6  one another.  It doesn't have to be a one time

7  thing.  They can have an initial call next week and

8  then a follow-up call in two weeks when there's more

9  information.  But really to sort of take this out of

10  the realm of mystery and out of the realm of

11  lawyers, at least, speaking for our side, people who

12  are not extremely well versed in SQL codes and

13  legacy banking software, and let the experts just

14  talk to each other.

15          THE COURT:  Okay.  So what I hear you

16  saying is that you think having an IT conference

17  sooner rather than later is a good idea and it

18  doesn't preclude a more fulsome conference later.

19          MR. OSEN:  That's right, Your Honor, and

20  obviously, follow up with Mr. Ingerman and his team

21  on the paper records.  You know, there may be an

22  explanation for the absence of what should otherwise

23  be a pretty voluminous amount of paper records in

24  the form of SWIFT messages and checks and so forth.

25  But again, we can only go by what was previously

1   represented to us.

2           THE COURT:  Okay.  And so with regard to

3   that, you are puzzled by the statement that there

4   are no hard copy versions of documents including

5   SWIFT information, because you seem to have gotten

6   contrary information that, in fact, there is a paper

7   based SWIFT document that is in the jacket of some

8   older -- perhaps for each of the customers.

9           MR. OSEN:  Right.  This is just page 3 of

10  the defendant's January 29th letter.

11          THE COURT:  And I, unfortunately, don't

12  seem to have a copy of that letter.  What was

13  attached was the e-mail correspondence, but not the

14  January 29th letter, as far as I can see.  But

15  that's fine.

16          Mr. Ingerman, does it make sense to try to

17  do an IT conference in the next couple of weeks

18  before everything is perfectly understood, just so

19  that people can clear up what they're talking about

20  at this stage?

21          MR. INGERMAN:  Yeah, I think I'd like it to

22  be productive as opposed to just an introductory

23  call.  So maybe the first week in March.

24          Our guys, they're working hard to

25  understand the systems and get as much information

1    as possible.  So I'm not opposed to the idea.  I

2    just think we need a little bit of time so that it's

3    productive.

4            THE COURT:  Right.  Okay.  And productive

5    can occur in different varieties.  And so sometimes

6    just checking in and saying, when you said this, did

7    you mean this, or something else, and even if it's a

8    very short conference to get those things clarified,

9    that can, in itself, be productive.

10           MR. INGERMAN:  Right.

11           THE COURT:  So please check in with each

12   other on what issues might need to be addressed or

13   would be helpful to address early and then set that

14   up.  I agree that ongoing dialogue may be helpful.

15   And if you -- we're already in the middle of

16   February, so when Mr. Osen said this month, I wasn't

17   sure if you met in the next two weeks or whether you

18   met in the next 30 days.

19           So please just talk and see when the

20   soonest is that the IT folks can talk to each other

21   and then get things clarified so when they talk to

22   the lawyers, it makes sense.  Okay.

23           MR. OSEN:  Your Honor --

24           THE COURT:  -- and then as far as the

25   SWIFT.

1          Oh, Mr. Osen.

2          MR. OSEN:  I'm sorry, Your Honor.  I didn't

3     mean to interrupt.

4          I was just going to say that first week of

5     March is fine for the initial IT conference.  As

6     we've said in our prior e-mail to the defendant,

7     which I think Your Honor does have, what would

8     really help the process along is getting the cert

9     terms or the SQL queries that have already -- or are

10    being run, because that's sort of a basic starting

11    point for ESI discussions.  So if we could just have

12    that before we have our initial IT conference in

13    early March, that would be very helpful.

14         THE COURT:  The parties can talk and try to

15    reach some agreement on what can be done, including

16    searches before that conference.  But I'm

17    encouraging the lawyers to talk, figure out what

18    needs to be done so that you have an agenda for that

19    first IT conference and issues that need to be

20    resolved and knowledge that you will have by that

21    point.  That will be helpful.

22         Okay.  So when you say first week of March,

23    March 1 is on a Friday, so I'll just say the week of

24    March 4, this should happen.

25         Okay.  And then, Mr. Ingerman, do you know

1    the answer to this issue of what appears to be a

2    contradiction about the SWIFT being in paper format

3    or not?

4         MR. INGERMAN:  Yeah, I don't think it's a

5    contradiction.  I mean, the bank has told us that

6    that's what they did with SWIFT records.  They would

7    print them out and they would put them in the

8    customer jackets.  We've searched the customer

9    account files.  If we found a SWIFT record, we

10   produced it.  If it wasn't there, it wasn't there.

11   So I'm not sure it's a contradiction, and we can

12   certainly go back to the bank and ask some questions

13   about that.

14        THE COURT:  Okay.  So please get some

15   clarification if that's the bank's normal process.

16   But if those paper documents don't exist as a result

17   of your search, then that's certainly information.

18   And following up with the bank would be a good idea

19   to find out --

20        MR. INGERMAN:  Understood.

21        THE COURT:  -- what could have happened.

22   If their process was to put it there and it's not

23   there when you're looking, then the question is,

24   where is it?  What happened?

25        MR. INGERMAN:  Understood.

1          THE COURT:  Very good.

2          So, Mr. Osen, was there anything else from

3    the plaintiff side?

4          MR. OSEN:  I don't think so, Your Honor.

5    As I understand it, we'll have our IT conference the

6    week of March 4, and we'll endeavor sometime at the

7    end of March or early April to do the Rule 30(b)(6)

8    on the waiver process.  And, obviously, we'll await

9    the response to our further inquiries on the ESI and

10   other materials before then.

11         THE COURT:  Okay.  That sounds good.

12         All right.  So I think, given where we are,

13   I would like to hear from the parties by March 15th,

14   as far as where you are, and if you're looking for

15   an extension of time, that's also a good time to

16   propose an extension to the Court so that both sides

17   have a chance to consider whether that proposed

18   extension makes sense, or maybe you have different

19   ideas on what that extension might look like.  And

20   then you can also let me know what has been

21   happening with all of these other issues, the

22   depositions, the ESI, et cetera.

23         All right.  So I think in a month's time,

24   you should have a better idea of where things are

25   and where the loose ends may still be.

```
 1                MR. INGERMAN:  That's fine for the
 2    defendant, Your Honor.
 3                THE COURT:  Okay.
 4                Mr. Osen, anything further for the
 5    plaintiff?
 6                MR. OSEN:  No, Your Honor.
 7                THE COURT:  Okay.  Thank you, everybody.
 8                So I'm looking for joint status report.
 9    Should we set another conference with this group of
10    people?  It's sometimes hard to set a date.
11                MR. INGERMAN:  Was that going to be the
12    March 15th?
13                THE COURT:  Well, I mean, I could do that.
14    We could have a conference on March 15th, if you
15    thought that was helpful.  But then I would ask you
16    to send a letter before then.  Or we could have it
17    slightly after that date, if that's the date for the
18    letter.
19                MR. INGERMAN:  Yeah, maybe the joint status
20    report on the 15th, and then I have a summary
21    judgment hearing on the 19th, Your Honor, but the
22    20th or 21st for the status conference.
23                THE COURT:  Mr. Osen, do you have any
24    thoughts on when we can have a status conference?
25                No?  All right.
```

1          So then I will set a date.  And I am on

2    arraignment duty that week, so I'll have to schedule

3    this early before that gets underway.  So I'll just

4    say by Wednesday, March 20, at 9:00.

5          MR. INGERMAN:  That's fine for the

6    defendant, Your Honor.

7          MR. OSEN:  Thank you.  That works for the

8    Miller plaintiffs, Your Honor.

9          THE COURT:  Okay.  Good.  And this will be

10   by telephone, so we'll talk at that point.

11         All right.  Thank you very much, everybody.

12   This conference is complete.

13

14                         0o0

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Adrienne M. Mignano, certify that the

4    foregoing transcript of proceedings in the case of

5    Pam, et al., v. Arab Bank, et al., Docket #18CV2192

6    was prepared using digital transcription software and

7    is a true and accurate record of the proceedings.

8

9

10   Signature  _Adrienne M. Mignano_

11             ADRIENNE M. MIGNANO, RPR

12

13   Date:      February 16, 2024

14

15

16

17

18

19

20

21

22

23

24

25