



190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

March 15, 2024

**VIA ECF**

Hon. Peggy Kuo
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *Miller, et al. v. Arab Bank, PLC*, No. 18-cv-2192 (HG) (PK)
             *Pam, et al. v. Arab Bank, PLC*, No. 18-cv-4670 (HG) (PK)

Dear Magistrate Judge Kuo:

    We submit this letter solely on Plaintiffs' behalf in response to the Court's February 16, 2024, Minute Order directing the parties to file a "joint status report detailing their progress with discovery" and have advised Defendant to file its own submission.

    Plaintiffs are writing separately for several reasons. First, during the IT professionals' conference, which Defendant first scheduled for yesterday afternoon (three months after Plaintiffs requested such a discussion), it became clear from our perspective that the discovery Defendant has so far conducted for the limited universe of customers from whom it purports to have obtained waivers is deeply problematic and required a fulsome recitation for the Court. After the conference, *Miller* and *Pam* counsel exchanged notes and finished drafting what would become the body of this letter. Second, we then sent Plaintiffs' section late last night to Defense counsel, who apprised us that they would not circulate their portion of the letter to Plaintiffs' counsel by 3 pm today as Plaintiffs' counsel had requested, alluding to the late hour that they received Plaintiffs' section and its length.

    Given the fact that this is not a garden variety status update but one raising very serious and intricate issues, detailed at substantial length, we wanted to afford Defendant an opportunity to file its own letter at Defense counsel's own pace without incurring delays caused by late-night exchanges of drafts and revisions with *Pam* counsel.[1]

    We hope that under the circumstances set forth below, this approach is satisfactory to the Court.

---

[1]     *Miller* counsel are not available after 7 pm this evening.

A.  **Status of Arab Bank's (Limited) Discovery**

In Plaintiffs' counsel's view, substantial gaps remain in Defendant's production of paper records and its ESI productions for the accounts for which it purportedly has obtained customer waivers.[2]

**Paper records**

Plaintiffs have not received any additional document productions since the last status conference on February 14, 2024. That includes any additional purported waivers from Arab Bank customers or counterparties. Arab Bank previously stated that for each of its customers it maintained printed paper copies of bank account statements, important e-mail messages, checks, SWIFT and Western Union payment orders, credit card statements, and Telex messages. However, to date, Defendant has not produced *any* e-mail messages, checks, SWIFT,[3] Telex or Western Union payment messages for any of the entities or individuals for whom it has purportedly obtained waivers to produce.

At the last conference on February 14, 2024, Arab Bank's counsel informed the Court that:

> My understanding is that the bank's hard copy production as to customers who have waived bank secrecy in the Palestinian Territories, Lebanon and Jordan is **substantially complete**. So whatever hard copy records that we had related to those customers who waived bank secrecy have been produced.
>
> Mr. Osen [*Miller* Plaintiffs' counsel] said we haven't produced any wire transfers, SWIFT records, telex, Western Union. That is true as it relates to the customers who have waived bank secrecy **because we don't have them in hard copy**.

2-14-24 Hearing Tr. 21:23 to 22:8 (emphases added).

However, in its March 8, 2024, letter to Plaintiffs' counsel (see **Exhibit A** to this letter), Defense counsel offered a very different explanation for the absence of any SWIFT records in its productions:

> [T]he Bank has not manually searched the daily jackets for hard copy SWIFT records associated with particular customers. The burden (as described above) of manually searching these hard copy documents is not proportional to the needs of

---

[2]  It is worth noting that by its own admission Defendant intends to defy this Court's order as to the vast majority of the responsive records in its possession. Thus, the gamesmanship detailed below applies only to the modest subset of records for which the Bank at least purports to be trying to produce.

[3]  Defendant states that it has identified SWIFT transactional data in paper-based format in the customers' daily jackets for the years 1998-2004, but only maintained SWIFT transactions in electronic form for the period April 2004-December 2004 (due to the litigation hold in *Linde v. Arab Bank*) because the Bank maintained a 90-day retention period for SWIFT-related ESI. Plaintiffs have requested – and Defendant has agreed to search for – the Bank's memorialization of that 90-day retention period for SWIFT-related ESI.

the case and the burden and expense of the proposed discovery outweighs its likely benefit.

Exhibit A (March 8 Ltr.) at 3.

To begin with, Plaintiffs note that this Court's March 31, 2023, decision **overruled** Defendant's objections to the scope of Plaintiffs' document discovery requests, and its subsequent April 14, 2023, document production order **requires** ("for the time period between January 1, 1998, through December 31, 2004") Arab Bank to produce, among other things:

- "All Documents concerning accounts maintained at Arab Bank by the [listed] HAMAS leaders, operatives and agents."

- "All Documents concerning accounts at Arab Bank or funds transfers by Arab Bank concerning the [listed] HAMAS leaders and operatives."

- "All Documents concerning accounts maintained at Arab Bank by or for the [listed] HAMAS zakat committees, Islamic societies and social institutions or transfers involving those committees, societies and institutions."

- "All Documents concerning accounts maintained at Arab Bank by or transfers involving the [listed] HAMAS fundraising organizations designated as SDGTs."

- "All Documents concerning accounts at Arab Bank or funds transfers by Arab Bank involving the [listed] PIJ leaders, operatives and agents."

- "All Documents concerning accounts maintained at Arab Bank by the [listed] PIJ zakat committees, charitable societies and social institutions or transfers involving those committees, societies and institutions."

Accordingly, once Arab Bank identified the approximately 180 customers for whom it chose to produce records, this Court's order **required** it to produce "all documents" for those customers regardless of whether those sources of responsive records (such as e-mail messages, checks, SWIFT, Telex or Western Union payment messages) were stored separately from the customer account statements.[4]

In sum, after first advising this Court that Arab Bank's production of paper records was "substantially complete" and it did not possess SWIFT records, Telex, and Western Union transactions "in hard copy," the Bank now states for the first time that it never searched for these

---

[4] Arab Bank claims it must first conduct a search for all statements of account from 1998 to 2004 for those approximately 180 customers, before reviewing the contents of the Bank's "daily jackets" (files containing daily repositories of records, including SWIFT records, checks and some e-mails). Paper-based records related to Western Union were purportedly stored in separate boxes at the Ramallah branch and searched by Defendant, but to date, Plaintiffs have not located any such records in the Bank's document productions.

records (which the Court has ordered produced) because it has unilaterally decided that a manual review of these record repositories would be too burdensome.[5]

The Bank's effort to limit its production in this manner, although it never advanced this supposed burden as a basis for its failed motion for a protective order, ignores the fact that SWIFT, Telex and Western Union payment messages **are at the very heart of Plaintiffs' case**. As Defense counsel have surely understood from the outset of this process, customer account statements, although useful for tracking the raw amounts flowing in and out of particular accounts, **do not generally disclose the identity of the sources and beneficiaries of payments** – the most critical circumstantial evidence of the Bank's facilitation of terror financing, apart from the Bank's inculpatory internal communications. For the Court's easy reference, Plaintiffs attach **Exhibit B** to provide samples of funds transfers through Arab Bank that demonstrate the kind of details regarding terror-affiliated (and sometimes U.S. designated) counterparties that are critical in this case – and which Defendant apparently refuses to search for, let alone produce. Those types of fund transfer documents constituted a critical component of the evidence that produced a plaintiffs' liability verdict in *Linde v. Arab Bank.*

Thus, nearly a year after this Court ordered production of "All Documents" for a six-year period, including wire transfer records,[6] Arab Bank has withheld all records for over 250 customers identified in that order, and has only produced low resolution scans of some account statements and account opening records (often obscured by watermark imposed over the text) for approximately 180 customers identified in that order. The Bank also represented unequivocally to this Court that no other paper records responsive to the Court's order exist ("wire transfers, SWIFT records, telex, Western Union … as it relates to the customers who have waived bank secrecy … we don't have them in hard copy"), only to advise Plaintiffs now that the paper records exist but the Bank unilaterally decided that the Court's April 14, 2023, Order is too burdensome and has chosen not to comply with it.

**Electronically stored information ("ESI")**

In multiple letters and meet and confers over the past several months, Plaintiffs have outlined relevant ESI sources Defendant maintained during the relevant period that should reasonably contain the transaction-level information showing specific account activity that Plaintiffs seek. On January 29, 2024, Defendant identified (*see* **Exhibit C** to this letter) the following sources of relevant ESI:

- Enterprise Content Management ("ECM") document management system (containing ESI dated between 1998 and 2004).

---

[5] Even this assertion about the way the search needs to be conducted is dubious, for reasons that can be elaborated upon at the next status conference.

[6] "[T]he circumstances of the transfers may 'strongly suggest that Arab Bank was generally aware of the nature of the conduct it was supporting,' and therefore, information about the transfers is relevant to the claims alleged." 3/31/2023 Decision at 13 (citation to *Miller* omitted).

- Equation centralized online real-time environment ("CORE") banking system (containing ESI dated between 1998 and 2004).
- SWIFT Alliance Access financial messaging system (containing ESI dated between April 2004 and December 2004).

**Search Terms/SQL Queries**

In its January 29, 2024, letter, Arab Bank stated that:

> The Bank also restored the monthly back-up cartridges tapes related to Arab Bank Palestine's Equation CORE banking system, for the period from January 1, 1998 to December 31, 2004 and used a SQL Code developed for this exercise to search into the restored database.
>
> The above exercise (using the new SQL CODE) did not yield additional matches and as such the Bank **relied on the internally developed searching system for Arab Bank Palestine, Jordan, and Lebanon**.
>
> **Once a name was identified and the Bank validated that there were responsive records,** the Bank used the Enterprise Content Management System "ECM" to retrieve the customer's bank statements, KYC documents, and credit cards statements, if any, using the customer's account number identified through the electronic searches conducted above.

Exhibit C (Jan 29 Ltr.) at 4 (emphases added).

However, at the last conference on February 14, 2024, Defense counsel told the Court that:

> We've actually retained two IT consultants, one in the Middle East and one here in the US. They are working to do two things with the ESI that we have identified in the Middle East. The first thing they're trying to understand is, **is any of it searchable**. **And if it is searchable, then they are going to search those records mainly by customer name**. But if there are additional search terms that we intend to use or that the plaintiffs want us to use, we intend to have a conversation with the plaintiffs' counsel about that. But given the fact that we're operating in a conflict zone with systems that are sometimes 20 plus years old and that are in Arabic, it's taken us just a little bit longer than we thought it would.

12-14-24 Hearing Tr. 23:4-19 (Emphasis added.)

As of today, Defendant has not provided Plaintiffs with the search terms and structured query language ("SQL") code that Defendant has purportedly used so far to search the above systems. Nor, as far as Plaintiffs can discern, has the Bank produced *any* electronic records identified through its searches of ESI.

In summary, Plaintiffs will continue to seek the significant clarification still needed as to Defendant's search terms, SQL code, and methods used for searching its relevant ESI.

### IT Professionals Conference

Despite Plaintiffs' counsel's prior attempts on December 19, December 29, January 5, January 8, and January 25, Defendant first made its IT professional available for a call yesterday. During the one-hour long call, Arab Bank's IT consultant, Mr. Alfaro, stated that his knowledge of Arab Bank's ESI and IT infrastructure is based primarily on reviewing court hearing transcripts and correspondence exchanged between the parties, and that his firm is in the early stages of assessing what ESI is available in the three jurisdictions at issue. He also stated that some of Arab Bank's legacy data has been loaded into a Microsoft SQL Server database – which should be searchable – but specifics on the database's schema, data dictionary, and language are still being determined and that he had not personally seen or reviewed any search terms or SQL queries previously used by Arab Bank to search the Bank's ESI.

Mr. Alfaro stated that his team needs more time to provide specific answers on topics like tape backups, database schemas, the mapping of payment flows to underlying systems, sources feeding into bank statements, and credit card data. Plaintiffs' counsel offered and will provide written follow-up questions to Arab Bank and its consultant. In sum, Mr. Alfaro was unable to provide Plaintiffs with any new information during yesterday's conference, and further conferences will be necessary after Mr. Alfaro and his team get up to speed.

Thus, (a) the current state of knowledge of Arab Bank's consultant is derived primarily from reviewing court hearing transcripts and correspondence exchanged between the parties; (b) his team is still preparing to "audit and inventory" what records/ESI Arab Bank has; and (c) that team is only now *preparing* to acquire or build its initial data map to ascertain Arab Bank's systems architecture. Defendant therefore appears to be at the *beginning* of a lengthy and complex process that is likely to take many, many months—and that **should have started years ago**.

For instance, in January 2024, Arab Bank stated that it "has data from its CORE banking system from 1998–2004 stored in electronic format." However, during the IT conference call, Mr. Alfaro stated that he did not yet have information about Arab Bank's CORE banking system ESI in the three jurisdictions.

Furthermore, although Arab Bank previously stated that the Bank's "SWIFT Payment Messages from April 2004 to December 31, 2004 are available electronically," Mr. Alfaro stated that he did not yet have any additional information about Arab Bank's SWIFT financial messaging ESI in the three jurisdictions.

Over the course of the past six months, Defense counsel have provided Plaintiffs and the Court various – often contradictory – representations concerning the existence and accessibility of Arab Bank's ESI. Last September, Defense counsel told the Court "there are not ESI databases in those jurisdictions for these – that would have responsive information for these accounts." 9/29/2023 Hearing Tr. at 23:13-15. But Defense counsel also assured the Court that he would

"certainly go back and see if there's some electronic database that would have the exact same [transactional] information in it." *Id.* at 25:23-26:1.

At the December 19, 2023, status conference, Defense counsel told the Court that "we are working to meet and confer on these ESI issues. The reality is, there may not be searchable ESI. There are backup tapes, there are floppy disks, there is microfiche. My understanding is that it is not accessible, certainly not reasonably accessible under Rule 26, but we are in the process of working through those issues with the plaintiffs…" 12/19/23 Hearing Tr. 21:12-19.

On January 29, 2024, Defense counsel advised Plaintiffs that the Bank maintained *extensive* ESI, including its entire core banking system from that period.

Yesterday, Mr. Alfaro informed Plaintiffs' counsel that his firm was retained "a few months ago" and had not yet meaningfully completed preliminary steps of assessing what ESI sources Arab Bank has – and cannot yet offer any timetable for completion of his firm's work.

It has been five years since Defendant's motions to dismiss were denied. It now appears that Defendant is in the process of *commencing* its ESI retrieval process in the coming weeks. To say the least, this is not the discovery process mandated by the Federal Rules, or the Court's rulings in this matter.

### Rule 30(b)(6) Witness on Waiver Process

Consistent with the discussion on the record at the February 14, 2024, conference, Plaintiffs have asked Defense counsel to schedule the contemplated Rule 30(b)(6) deposition of Arab Bank's designee on the "waiver process" on either April 3 or 4 by video/Zoom. Arab Bank has countered that it will make a witness available in Amman, Jordan sometime in May, despite having told the Court that "doing that towards the end of March, early part of April, should not be a problem." 2/14/24 Hearing Tr. 25:10-12

### Extension of Time for Defendant to Substantially Complete Its Productions for The Accounts for Which it Purportedly Has Obtained Customer Waivers

Defense counsel have informed us that they intend to ask the Court for a 60-day extension of the deadline for substantial completion of the Bank's foreign jurisdiction ESI. Plaintiffs have indicated their consent.

However, for the reasons set forth above, Plaintiffs do not believe Arab Bank can substantially complete its ESI production for the accounts for which it purportedly has obtained customer waivers. We do, however, believe the Court deserves a candid exposition of the true state of the Bank's ESI efforts.

Moreover, Plaintiffs request that the Court order Defendant to use the 60-day extension it is seeking to produce **all** paper records responsive to the Court's April 14, 2023, document production order.

**B.      Status of Plaintiffs' Discovery**

**Document Production**

The *Miller* Plaintiffs have again contacted the two Plaintiffs who are resident in Israel to determine if there are some, limited, remaining documents left to produce. In one case, Plaintiffs obtained the records sought by Defendant and produced them. In the other case, the doctor has declined to provide the requested records, and Plaintiffs' counsel have followed up to clarify if there is an alternative method for obtaining the records. The third Plaintiff for whom Defendant has sought additional records has confirmed that he no longer recalls the name of the internist that he saw in Israel, and counsel cannot therefore obtain any additional records, if they exist.

*Pam* Plaintiffs have completed production of their "doctor logs" and medical records in accordance with the process outlined by Mr. Bonner, and accepted by the Court, at the January 20, 2022 status conference. *See* 1/20/2022 Hearing Tr. at 54:6-56:7, 61:20-62:11. In summary, *Pam* Plaintiffs' counsel undertook to produce (1) all records of treatment by mental health professionals, (2) a list of all other medical providers consulted beginning five years before the terror attack at issue; and (3) for those other medical providers that Plaintiffs recalled having consulted about mental health issues or their injuries at issue in this litigation, the medical records reflecting such consultations. As part of that process, Plaintiffs' counsel had not anticipated providing doctor logs for the two estate Plaintiffs, whose Personal Representatives have no personal knowledge of the issues the decedents discussed with their health care providers. The two decedents—Shoshona Bluth and Shoshona Spitz—were not known by their Personal Representatives (their widowers) to have sought mental health treatment for any reason. On March 8, 2024, Defense counsel indicated for the first time that they expected to receive doctor logs for the Estates of Shoshona Bluth and Shoshona Spitz. On March 13, 2024, Plaintiffs' counsel produced a list of medical practitioners consulted by the late Shoshona Spitz from 1993 until her death in December 2017, based on information provided by her HMO. That list did not include any doctors specializing in mental health treatment. Plaintiffs' counsel are currently investigating whether equivalent records can be obtained from the HMO of the late Shoshona Bluth, who died in August 2015.

**Plaintiff Depositions**

Plaintiffs' counsel would like to proceed with and complete the depositions of the nine remaining *Miller* Plaintiffs and 23 remaining *Pam* Plaintiffs who reside in Israel. Defense counsel have indicated that they are willing to travel to Israel in May. Subject to confirmation of the availability of the *Miller* Plaintiffs, Plaintiffs' counsel can be made available during the first two weeks in April. However, given counsel's travel schedules, hearings and trials scheduled for May and June, we would ask that should the depositions not take place during April, the *Miller* depositions be carried over until July-August. *Pam* Plaintiffs have offered to schedule client depositions in Israel in May as requested by Defendant.

                Respectfully submitted,

                /s/ Gary M. Osen

Encls.

cc: All Counsel