

DLA Piper LLP (US)
650 S Exeter Street
Suite 1100
Baltimore, Maryland 21202-4576
www.dlapiper.com

Brett Ingerman
brett.ingerman@us.dlapiper.com
T  410.580.4177
F  410.580.3177

March 15, 2024

**VIA ECF**

Hon. Peggy Kuo
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re**:   *Miller, et al. v. Arab Bank, PLC*, **No. 18-cv-2192 (HG) (PK)**
          *Pam, et al. v. Arab Bank, PLC*, **No. 18-cv-4670 (HG) (PK)**

Dear Magistrate Judge Kuo:

We submit this letter on behalf of Defendant Arab Bank, plc ("Arab Bank" or the "Bank") in the above-referenced actions in response to the Court's February 16, 2024 Minute Order directing the parties to file a "joint status report detailing their progress with discovery and including any request for an extension of time to complete discovery." Despite Arab Bank's intention to file this status report jointly with Plaintiffs, as ordered by the Court, Plaintiffs provided the Bank an eight-page, single spaced draft of their portion of the joint status report at 11:38 PM on March 14, 2024, requesting the Bank's portion by 3 PM on March 15, 2024. The Bank informed the Plaintiffs that it would provide its section, but would not be able to do so by 3 PM in light of the length of the report Plaintiffs provided. Plaintiffs stated that they would file their status report separately instead of waiting for the Bank's section. *See* Exhibit 1, March 15, 2024 Email from B. Ingerman to A. Ungar. Accordingly, the Bank is left with no choice but to file its own status report.

### A. Status of Plaintiffs' Discovery

*Document Production*

The *Pam* and *Miller* Plaintiffs' document productions are still incomplete. The *Miller* Plaintiffs have failed to produce medical records for three Plaintiffs, who identified additional doctors in their depositions. For one of these three Plaintiffs, counsel for the *Miller* Plaintiffs has declined to produce records. The Bank will meet and confer with counsel for the *Miller* Plaintiffs regarding these records.

Arab Bank wrote to the *Pam* Plaintiffs on March 7, 2024, requesting missing doctor logs for two Plaintiffs – Estate of Shoshana Bluth and Estate of Shoshana Spitz. On March 13, 2024, the *Pam* Plaintiffs provided a doctor log for the Estate of Shoshana Spitz and indicated that they are searching for records and/or information concerning medical providers for the Estate of Shoshana Bluth.

*Plaintiff Depositions*

Arab Bank has taken the depositions of 31 of the 68 Plaintiffs. The *Miller* Plaintiffs wrote to Arab Bank on March 13, 2024, suggesting that the remaining 9 depositions of the *Miller* Plaintiffs occur in April in Israel. Arab Bank responded on March 14, 2024, stating that counsel would be available to conduct those depositions in Israel in May. The *Miller* Plaintiffs declined and stated that the *Pam* Plaintiffs are available for their depositions in mid-May, and that the *Miller* Plaintiffs would be available in July or August. We will work with Plaintiffs on scheduling these depositions at mutually agreeable times.

B. **Status of Arab Bank's Discovery**

*Background of Arab Bank's Production of Documents[1]*

Plaintiffs' "status" of Arab Bank's discovery progress largely ignores the 217,391 pages of documents that the Bank has already produced from Arab Bank New York and *Linde*, which production was complete on June 7, 2021, nearly three years ago, and the sequence of events leading to the production of documents from Lebanon, Jordan, and the Palestinian Territories. Plaintiffs also falsely claim that Arab Bank is somehow delayed in searching its ESI, when Plaintiffs took *four years* to complete their document productions. The Bank is burdened by searching for data that is over 20 years old, in Arabic, and in a conflict zone. The Bank has been diligently working to search for and produce information in this case, and has done so by producing 223,698 pages of documents, including those documents obtained and produced from the foreign jurisdictions. Accordingly, the Bank provides this background summary before responding to Plaintiffs' specific contentions.

After the Bank received Plaintiffs' discovery requests on July 22, 2019, the Bank immediately began searching for non-privileged, responsive documents that it had in its possession from Arab Bank New York, as such records were not subject to bank secrecy. The Bank conducted searches of an archived Straight Through Processing ("STP") transaction server, an internal drive, emails, and hard copy documents from Arab Bank New York. In addition to the documents it produced to Plaintiffs in *Linde*, Arab Bank produced over 14,000 pages of additional documents from the searches it conducted in New York. As of June 7, 2021, Arab Bank had completed its production of documents that were not subject to bank secrecy.

---

[1] The Bank is responding to Plaintiffs' statements that they made in the draft joint status report that they sent to the Bank at 11:38 PM on March 14, 2024.

2

At the same time in September 2019, the parties agreed to send a subset of the 673 names in Plaintiffs' document requests to the foreign jurisdictions of Lebanon, Jordan, and the Palestinian Territories, to determine if these jurisdictions would permit the Bank to produce documents notwithstanding the bank secrecy laws of those countries. In January 2020, the Bank submitted the proposed letter to the Court and the Court signed these letters. In November 2020 and October 2021, the Bank received responses from Jordan, Lebanon, and the Palestinian Territories, declining to permit Arab Bank to produce documents located in these jurisdictions. During the January 20, 2022 status conference, the Court ordered that Arab Bank file a motion for protective order under Federal Rule of Civil Procedure 26(c) and bank secrecy. The briefing went forward and on April 14, 2023, the Court overruled Arab Bank's objections.

After receiving the Court's order, the Bank undertook an extensive process of identifying which of the 673 individuals and entities were current or former customers of the Bank, and sought waivers from those individuals and entities. The waiver process, as the Bank has detailed for the Court, occurred principally through in-person discussions with the legal representative of that customer's account, often requiring multiple in-person visits. The Bank obtained waivers between July 2023 and October 2023.

Once it had obtained waivers from its customers, the Bank began the process of collecting the account statements and account opening documents, which are hard copy documents. It began producing these documents to Plaintiffs on August 10, 2023. The Bank has produced 6,307 pages of documents, including the waivers.

Thereafter, the Bank began to inventory its IT systems and subsequently hired an IT consultant to help identify the relevant sources of ESI, whether these systems are reasonably accessible, whether they are searchable, and if so, how can they be searched. This process is understandably extremely time consuming and difficult. Because of the enormous undertaking in identifying and searching for this data, the Bank did not seek to incur such expense until it had waivers from its customers. And, while undertaking this process, Plaintiffs have sent the Bank nearly *100 questions* to answer concerning its ESI. The Bank has answered every single question while trying to engage in the herculean effort of inventorying, restoring (where necessary), and searching ESI in the foreign jurisdictions.

### *Paper Records*

The Bank has produced over 6,000 pages of account opening records and account statements for the customers who have provided waivers. For Plaintiffs to suggest that the Bank "never searched for these records" is patently false. The Bank has searched its customer files for relevant records.

At the February 14, 2024 status conference, the Court requested that counsel for the Bank obtain clarification on Arab Bank's maintenance of SWIFT records and report back to Plaintiffs. Feb. 14, 2024 Hearing Tr. at 34:14-24. On March 8, 2024, the Bank did just that and explained to Plaintiffs the process that the Bank would have to undertake to search for and produce hard copy SWIFT records. *See* Exhibit 2, March 8, 2024 Letter. This process is detailed below.

3



Plaintiffs claim that the Bank has improperly withheld these documents despite the Court's April 14, 2023 Production Order. This is not true. The Bank has informed Plaintiffs of the burden and expense of searching for SWIFT records of its customers from January 1998 to April 2004. The Bank is prepared to meet and confer further with the Plaintiffs on this issue.

*Electronically Stored Information ("ESI")*

The Bank has identified the sources of its ESI to Plaintiffs in its responses to Plaintiffs' questions to the Bank. The Bank is working on determining the searchability of these systems. Once it determines that these systems can be searched, it will conduct a reasonable search of the systems (assuming that is possible), and produce responsive documents, if any.

*Search Terms/SQL Queries*

With respect to the searches conducted to date by the Bank, these searches were conducted to determine whether any of the 673 names were customers of the Bank, and then, if a waiver was obtained, identify the account number such that the Bank could search the customer files to obtain the responsive records.

Consistent with the Bank's representations at the February 14, 2024 status conference, the Bank has retained IT consultants to identify, access, and search for records in the Bank's electronic databases. The Bank's IT consultants are working to: (1) identify all systems with potentially responsive information; (2) once a system is identified, determine whether it is searchable; and (3) if it is reasonably searchable, run search terms, principally by using customer names. This is exactly what the Bank's counsel stated at the last status conference and that is what is occurring. As the Bank has repeatedly told Plaintiffs, this effort is taking a substantial amount of time due to

working with systems and data that are 20 years old, in Arabic, and in a conflict zone. Without these issues, Plaintiffs took four years to produce documents, so it should come as no surprise that this is a complicated process that will take time.

*IT Professionals Conference*

Plaintiffs scheduled this IT conference after the Bank had responded to their nearly 100 questions over the course of three letters.[2] Instead of providing an agenda in advance so that the Bank could meaningfully prepare for the conference, Plaintiffs' IT consultant, David Scantling, asked the Bank's IT consultant, David Alfaro, a myriad of questions, ranging from information clearly outside of the scope of ESI (such as questions concerning paper records, knowledge of the airstrike on the facility in Gaza, and whether Mr. Alfaro could obtain records from a third party in Bahrain) to Mr. Alfaro's scope of work and his access to the Bank's files.

Just as counsel for the Bank stated at the February 14, 2024 conference, Mr. Alfaro reiterated that the Bank and its IT professionals are working to identify the electronic systems, determine the searchability of these systems, and then conduct searches to the extent the systems are reasonably searchable. Contrary to Plaintiffs' assertions, Mr. Alfaro's knowledge is ***not*** based solely on the letters and court transcripts.[3] Mr. Alfaro stated that the foundation of his knowledge is from the correspondence and that he is in "active dialogue" with the Bank's IT professionals. What Mr. Alfaro did confirm is that based on his work to date, the systems and information identified in the Bank's correspondence is accurate.

Plaintiffs' claim that they did not learn any new information from Mr. Alfaro yesterday is also false. In addition to asking questions outside of the scope of ESI and repeating questions from Plaintiffs' letters, Mr. Scantling asked for information concerning database schemas, data dictionaries, and methods of searching. As Mr. Alfaro told Mr. Scantling, and as counsel for the Bank has repeatedly stated, the Bank is in the process of identifying, accessing, and searching its electronic databases. Mr. Alfaro told Mr. Scantling that this is actively in process and that he is keenly focused on the ESI.

---

[2] Although Plaintiffs claim they have tried to schedule this call several times, it was at Plaintiffs' request that the Bank answer all of Plaintiffs' inquiries before the conference with IT professionals. *See* Exhibit 3, Feb. 1, 2024 Email from A. Ungar to B. Ingerman ("Once we have received the additional information and clarifications, we can schedule a hopefully productive call between the IT professionals.").

[3] Despite Plaintiffs' statements at the beginning of the March 14 call that this was an "informal discussion" between the IT professionals, it appears that the real reason Plaintiffs had this call was to attempt to discredit the work that the Bank and Mr. Alfaro have done to date by mischaracterizing Mr. Alfaro's statements and taking them out of context. Going forward, it will be difficult to have candid discussions if the result is that Plaintiffs will attempt to disingenuously use this information.

5

To the extent Plaintiffs claim that the Bank should have started this years ago, the Bank did just that. The Bank searched for and produced ESI from New York in 2020 and 2021. Once the Court ruled in April 2023 that the Bank was required to produce records from foreign jurisdictions, the Bank obtained waivers, and then retained its IT consultant so that it could search for and produce documents that are 20 years old, in Arabic, and located in a conflict zone. The Bank has not delayed any of its searching or production of documents. Indeed, Mr. Alfaro confirmed that he was obtaining additional information about the CORE banking systems, including auditing and inventorying these local and central systems, so that he can best understand how to access this information.

At the end of the call, Mr. Scantling indicated that instead of letting Mr. Alfaro and his team do the actual work that Mr. Alfaro outlined during the call, Plaintiffs would be sending yet another letter with yet more detailed questions. At this point, the Bank has complied with its obligation to respond to all of Plaintiffs' inquiries. The Bank now intends to focus only on cataloging, searching, and producing any responsive ESI. To the extent Plaintiffs have additional questions, they can pose these questions once the Bank has completed its production.

Over the past six months, the Bank has continued to provide Plaintiffs detailed information as to the sources of electronic information that existed between 1998-2004 and how that information is currently maintained. As explained in the Bank's letters to Plaintiffs, much of the information was printed and stored in hard copy in the ordinary course of business. At the September 29, 2023 conference, the Court asked that counsel confer with the Bank about whether information kept in paper was also available electronically:

> So that's another thing that would be important for you to talk to the bank about. Because even if in the ordinary course the bank was printing things out and putting it into a paper folder, there may still be an electronic version of it, let's call it the original electronic version, that the bank didn't use because it was let's say more convenient to use the paper. But if it still exists, that might be something that you can go back and look at, because in the electronic format, it might be easier to handle and process for purposes of (indiscernible).

Sept. 29, 2023 Hearing Tr. at 26:2-12. Counsel for the Bank "commit[ted] to investigate that and report back to the plaintiffs on that." *Id.* at 26:13-14. That is exactly what the Bank has done. Any clarifications or additional information Plaintiffs have requested, the Bank has answered, this includes Plaintiffs nearly 100 "clarification" questions.

### *30(b)(6) Deposition*

At the February 14, 2024 status conference, both parties agreed that they would endeavor to schedule a 30(b)(6) deposition on the waiver process ("Waiver Deposition") at the end of March or early April. Feb. 14, 2024 Hearing Tr. at 25:5-12; 35:4-8. Nearly a month after that status conference, on March 11, 2024, Plaintiffs for the first time proposed April 3 or 4 as the date for Waiver Deposition. The Bank promptly responded on March 12, 2024 and told Plaintiffs that the Bank would look into the proposed dates. As it turns out, those dates do not work for the Bank, but the Bank proposed that the Waiver Deposition and the *Miller* Plaintiff depositions occur in

6

mid-May, such that the parties could minimize their travel from the US to Israel and Jordan to complete these depositions. If these dates do not work for Plaintiffs, then they can propose alternate dates and the parties will work to find a mutually agreeable date for the Waiver Deposition.

### C. Request for Extension of Time for Substantial Completion of ESI

The Bank respectfully requests a 60-day extension to the substantial completion deadline for ESI to May 28, 2024. Both the *Pam* and *Miller* Plaintiffs have consented. *See* Exhibit 4, March 14, 2024 Email from A. Ungar to B. Ingerman.

Sincerely,

/s/ Brett Ingerman

cc: All Counsel of Record