UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

```
----------------------------:
NATHAN PAM,                  :Case No.: 18-cv-4670
                Plaintiff,   :
        v.                   :Brooklyn, New York
                             :April 16, 2024
ARAB BANK, PLC,              :
                Defendant.   :
----------------------------:
AHARON MILLER, et al.,       :Case No.: 18-cv-2192
                Plaintiff,   :
        v.                   :
ARAB BANK, PLC,              :
                Defendant.   :
----------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE PEGGY KUO

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff:<br>Pam | FLEISCHMAN BONNER & ROCCO LLP<br>BY:  Susan M. Davies, Esq.<br>317 George Street - Suite 320<br>New Brunswick, New Jersey 08901 |
| For Plaintiff:<br>Pam | HEIDEMAN NUDELMAN & KALIK, PC<br>BY:  Joseph Tipograph, Esq.<br>       Edward MacAllister, Esq.<br>5335 Wisconsin Avenue, NW<br>Suite 440<br>Washington, DC 20015 |
| For Plaintiff<br>Miller | OSEN LLC<br>BY:  Gary Osen, Esq.<br>       Ari Ungar, Esq.<br>       Dina Gleichinsky, Esq.<br>       Michael Radine, Esq.<br>190 Moore Stree - Suite 272<br>Hackensack, New Jersey 07601 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

1                    APPEARANCES (Continued)

2

3    For Defendant:          DLA PIPER LLP
                             BY:  Brett Ingerman, Esq.
4                                 Anthony P. Coles, Esq.
                             650 S. Exeter Street
5                            Baltimore, Maryland 21202

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  Status conference.

2    Docket Number: 18-cv-2192; Miller, et al., versus

3    Arab Bank, PLC.  Docket 18-cv-4670; Pam, et al.,

4    versus Arab Bank, PLC.  Magistrate Judge Peggy Kuo

5    presiding.

6          Will the plaintiffs in the Miller case

7    please state their appearances.

8          MR. OSEN:  Good morning, Your Honor.

9          This is Gary Osen on behalf of the Miller

10   plaintiffs.  I'm joined this morning by some of my

11   colleagues, Ari Ungar, Michael Radine and Dina

12   Gielchinsky.

13         THE DEPUTY CLERK:  Will plaintiffs in the

14   Pam case please state their appearances.

15         MS. DAVIES:  Good morning, Your Honor.

16         This is Susan Davies for the Pam plaintiffs.

17   And also appearing are my co-counsel, Edward

18   MacAllister and Joseph Tipograph.

19         THE DEPUTY CLERK:  And will defendants

20   please state their appearances.

21         MR. INGERMAN:  Good morning, Your Honor.

22         Brett Ingerman and Tony Coles on behalf of

23   the defendant, Arab Bank, in both cases.

24         THE COURT:  All right.  Good morning,

25   everyone.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          We are having a status conference.  And I

2     had asked the parties to file a joint status report,

3     which you did.  And that stated, April 8th, you

4     raised several issues, and I have read it.  There

5     were issues that sounded like the parties didn't

6     quite understand each other or there are still

7     disagreements.  And so I am hopeful that in the time

8     since that was filed last week, the parties have

9     continued to have discussions and have ironed out

10    some of those issues.  But I'll go through what I

11    understand has happened and what remain issues so

12    that we can deal with those today.

13         Before we do that, I just want to go back to

14    basics, which is that in discovery, normally we start

15    with a request.  And so the party in this case --

16    well, I'll start with the plaintiffs' request to Arab

17    Bank because that's how it's been addressed.

18         So, in this case, plaintiffs have sought

19    certain information from Arab Bank.  So that's number

20    one.  That's what is being sought.  And then number

21    two from the defendant's side, the question should be

22    where can we find that information?  And in this

23    case, it will be things like, is it in paper?  Is it

24    in electronic format?  If it's in electronic format,

25    is it still accessible?  If it's not accessible, can

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    it be restored?  And if it is accessible, how can we

2    best locate that information?  And that might require

3    looking for custodians and search terms.

4            And so I just wanted to get -- and then, you

5    know, once the parties have agreed on that, you'll

6    run some searches to test out, you know, whether this

7    is the right way to go forward.  And you might tweak

8    that process to make it more efficient and actually

9    result in the information that you're seeking and

10   that must be produced.

11           So I go back to that very basic formulation,

12   which I'm sure you all know, but, somehow, I feel has

13   gotten lost in a lot of the discussion, especially

14   about ESI.  And so, you know, it's not an exercise

15   for the sake of the exercise in examining everything,

16   but sometimes a certain amount of examination is

17   important to know whether you're looking in the right

18   places.

19           And, you know, so you need to know what the

20   house looks like, what rooms are in the house,

21   examine whether there's a basement, whether there's

22   an attic, whether there are closets and if there are

23   places that are locked.  And within those rooms,

24   whether there are, like I said, closets or other

25   places, or if there are cabinets that you need to

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    look into.

2             You just need to understand where to look

3    for the things.  And if it's not likely to be there,

4    then you don't have to look, but if it might be

5    there, you should be looking.  And if a cabinet, it

6    turns out, you know, everything in it got water

7    damaged and it's destroyed or something else, then

8    you can say, you know, this is what happened and,

9    therefore, we can't look there.  But at least you

10   know.  But if you don't look for that cabinet and if

11   you don't open it up, then you don't know what the

12   state of the contents are.

13            So, you know, what I saw from what you filed

14   is a lot of dispute as to where things are, where

15   they could be, whether they exist, whether they're

16   accessible, how you should look for it.  But I think

17   the basic idea is the plaintiffs are entitled to get

18   certain information.  Arab Bank has certain

19   information and needs to explain where it is so it

20   can be produced or where it isn't so that everybody

21   can feel comfortable that it's not there, okay.

22            And so I, like I said, understand that

23   everybody being experienced and good lawyers know

24   this, but a lot of this letter, which is, you know,

25   25 pages long -- 24 pages long -- just go into a lot

1    of detail.  And there's a lot of disputes that I'm

2    not quite sure why that's -- I guess I'm not sure why

3    the discovery isn't going forward more smoothly based

4    on those principles.

5         So I will start with the plaintiff today on

6    the plaintiffs' request because I do want to be clear

7    on the things they're looking for.  I also saw that

8    in the joint filing, Arab Bank got the last word

9    because it replied to the things that it says the

10   plaintiffs misunderstand.

11        So I'll start with the plaintiffs because

12   they will be in a position to address, you know, what

13   they understand the state of affairs is based on

14   everything that Arab Bank has said.  But I do want to

15   go back, like I said, the basic information of what

16   they're looking for, and then what the problem is in

17   terms of what you're getting.  All right.

18        So, Mr. Osen, I will start with you.

19        MR. OSEN:  Good morning again, Your Honor,

20   and thank you.

21        We couldn't agree more with, sort of, your

22   framing of the issue.  And at the risk of sounding

23   like an old movie line, you know, I would divide this

24   into five topics with, unfortunately, like, 100

25   subparts.  But I'm going to try and distill it as

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  best as I can, based on how you described and framed

2  the issue.

3        So as a threshold matter, you know, topic 1

4  is our view of the defendant's ESI disclosure.

5  Your Honor's minute order said they were supposed to

6  give us complete information about how they stored

7  information electronically.  And from our

8  perspective, they have not done so or come close to

9  doing so.  And this is really important, as

10  Your Honor noted, because it's important for the

11  plaintiffs and the Court to understand the bank's ESI

12  landscape and the underlying IT systems they have in

13  the relevant jurisdictions so that we know what we're

14  looking at.  Are we looking at a house, an office

15  building, a warehouse, et cetera, to use the

16  architectural analogy.

17        So what we've asked for and what hasn't been

18  produced basically falls into six categories.  One is

19  the comprehensive data maps for the bank's IT

20  infrastructure.  The second is the database schema.

21  The third is data dictionaries.  The fourth is entity

22  relationship diagrams.  Fifth is data migration

23  details.  And the last one is, kind of, an asterisk

24  because it deals with their search for customer

25  records in Lebanon, and that's the RPG code for the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    bank's account-holder searches in that jurisdiction.

2    So I can briefly, and I think pretty briefly

3    with each one, kind of, set forth why those are

4    important as, sort of, threshold steps before we ever

5    get to search or the, sort of, burden of where to

6    look and what room in the house and so forth.

7    The threshold point is that data maps are

8    important because they tell us the sources of data,

9    where they're physically located, what formats

10   they're in, kind of, what volume of data we're

11   dealing with, with a particular system, and how that

12   data flows through the bank systems.  So that's, sort

13   of, the basic blueprint, if you will, of the ESI for

14   the bank.

15   The data schema, which, again, we have not

16   gotten in this case, are the, sort of, granular

17   blueprints for understanding the structure and

18   organization and relationships within these

19   databases.

20   And I think it's important to stress again,

21   Your Honor, that we're not asking them to create

22   something from whole cloth here.  Not only do the

23   bank's own IT people and their consultants need these

24   schema to understand the work they're doing, but

25   these are the kind of things that are generated

1    usually with a couple of keystrokes of code.

2         So, for example, for the Oracle database

3    schema which underlies the Arab Bank's so-called

4    Court Order database, the command to generate a

5    schema is literally two words, "report schema," and

6    it generates.  So we're not talking about a huge

7    burden here.  We're just talking about basic steps

8    for ESI, for mapping what they have.

9         And the same thing holds true for data

10   dictionaries.  None of us are born knowing the

11   abbreviations and codes that a given bank uses for

12   its systems.  So different banks and different

13   systems use different acronyms, different

14   terminology.  And, again, every bank and every large

15   enterprise has these data dictionaries for their own

16   use.  And, once again, to generate data dictionaries

17   is generally not very complex.  I can't do it, but an

18   IT person, for example, with that same Oracle

19   database, types in a command that says "select

20   asterisk from all tab columns."  That's it.  So

21   that's as far as dictionaries go.

22        Relationship diagrams, these, you know,

23   represent in a visual sense the connections and

24   dependencies between different data entities.  So

25   when you're dealing with a bank, there are a lot of

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    different databases that are drawing information into

2    the core banking system.  So to these flowcharts of

3    how, for example, the database tracking SWIFT, SWIFT

4    transfers, integrates and interacts with the core

5    banking system would be in that kind of diagram.

6         And then lastly, in this respect, the data

7    migration details.  This deals with when a bank, or

8    any entity, moves over from a legacy system to a

9    newer platform.  There are always questions about the

10   integrity and completeness of the preservation of the

11   materials that go from one system to the next.  And

12   there's usually -- you know, when the folks do the

13   migration, they have a sort of protocol for how they

14   preserved, or what they preserved from the old

15   systems.

16        And then lastly, on this note with the RPG

17   code, this is a less important issue from a, sort of,

18   architectural standpoint.  But the defendant was

19   asked to provide these so-called report program

20   generator codes for Lebanon which they used to search

21   for account records -- or to identify account

22   customers, rather, in Lebanon.  But they won't give

23   us the code because they say it's part of the

24   system's general functionality and not specifically

25   designed for the searches conducted.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          And we're not asking for that code because

2     we were under the impression it was specifically

3     written for these particular searches, but because

4     we've been advised that it's essential in order to

5     understand the workings of the banking system that

6     they were searching itself to see if that was a

7     reasonable step that they took.

8          So that provides us just, kind of, the

9     ability to test the system's logic, the dataflow, and

10    any potential constraints that were involved in that

11    search.  But I put that as, sort of, master it

12    because that really goes to the search process that

13    they undertook for account identification and not to

14    the schema as a whole or to the map of their data.

15         So I think Your Honor has already

16    illuminated why we need this kind of technical

17    information.  The defendant says we don't.  We should

18    just sit down and have a discussion about search

19    terms in a couple weeks.  But it's important to

20    stress here that most of what we're looking for is

21    not static.  It's not e-mails or PDFs or Word files.

22    Banking systems are primarily interconnected through

23    a series of databases, and so understanding how to

24    search them properly, we need to know how they work,

25    what data is being fed into them, what fields

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    populate the database and what rules govern what

2    appears in them, and, frankly, what fields in the

3    database and other technical terms mean with them.

4              So that's why we need all of this.  And,

5    frankly, it's true for the bank's IT consultants.

6    For them to do their job, they need this kind of

7    technical information in mind.  And as I mentioned a

8    moment ago, most of this stuff is not a heavy lift.

9    The IT consultants need it, too, and most of it

10   requires just a couple of keystrokes each for each

11   one.

12             So that's sort of my issue number one.  I

13   can stop there or go on to the other topics.

14             THE COURT:  Mr. Osen, why don't you just --

15   you said there were five items, so just enumerate

16   what the five are, and then we can go back and talk

17   in more detail.

18             MR. OSEN:  Sure.  Absolutely.

19             So the second one is questions about the

20   bank's litigation hold implementation and potential

21   issues of spoliation here.

22             The next issue is the limited searches the

23   bank did so far to identify customer account records.

24             And then the fourth subject is to, sort of,

25   address our bank's search plan.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          And number five is just to make our proposal

2     as to what we should do from here.

3          THE COURT:  Okay.  And so my understanding,

4     just to go backwards a little bit, is, number four,

5     as far as the search plan, the bank has said that you

6     have not yet sat down and come up with a search plan

7     together; is that accurate?

8          MR. OSEN:  Yeah.  They want to sit down for

9     a search plan on April 29th, but we don't think

10    that's practical, given that we don't know yet

11    whether their initial search for customer accounts

12    was reasonable.  It may have been, but we can't tell

13    that yet.

14         More importantly, the bank's IT consultants

15    don't physically have the bank's ESI in their

16    custody, and they haven't -- at least as of last

17    week, hadn't completed their own data mapping.  So

18    we're really talking at the very infancy of this

19    process.  And since they don't have -- that is, the

20    consultants don't have the ESI in their possession,

21    they're far away from attempting to load that data

22    into an environment that allows it to either be run

23    on a native system or converted into data, into a

24    platform where they can search it.

25         So normally, from past experience, we're

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    talking about, you know, six months from them being

2    able to actually get to the stage of knowing or

3    having a reasonable idea of how to search.  There are

4    so many preliminary steps to that, that we think, you

5    know, April 29th is not going to be very productive

6    for that purpose.

7            THE COURT:  Okay.  And then the issue of the

8    litigation hold.  You really only need that

9    information to the extent that there is spoliation,

10   right?

11           I mean, if we assume that, and we've been

12   told that the litigation hold did go out, and so it

13   really is only as you try to figure out where things

14   are.  And if you discover that, you know, in my

15   analogy the file cabinet was flooded, and so

16   everything there is gone, or maybe something was

17   thrown out, that you would have concern.  You don't

18   need to know all the details of it until you reach

19   the point where something's missing.

20           MR. OSEN:  I would modify that slightly,

21   Your Honor.

22           THE COURT:  Okay.

23           MR. OSEN:  I would say that, based on their

24   ESI matrix which they provided to you as an exhibit

25   to the letter, we see that they have a number of

1    systems that they've identified as "no longer

2    available."

3          THE COURT:  Okay.

4          MR. OSEN:  And for us, there's no question,

5    at least from what has been stated, that they no

6    longer exist or are no longer available.  The only

7    question -- the reason we're not pressing this issue

8    at the moment in terms of spoliation is that it's

9    possible that the other systems they do have captured

10   the data that is in those systems that are no longer

11   available.

12         THE COURT:  Right.

13         MR. OSEN:  We just don't know.  And, you

14   know, they've made the argument that technological

15   changes since the relevant time period explain why

16   they excluded various legacy systems from their

17   matrix.  But from our standpoint, the age of the ESI

18   doesn't diminish its potential relevance to the case

19   or the bank's obligation to preserve and produce it.

20         So from our perspective, again, their claim

21   that it has fulfilled their preservation duties, for

22   example, by printing and preserving certain data in

23   hard-copy format, is pretty problematic because,

24   obviously, as Your Honor understands, a paper copy of

25   even an e-mail, for example, doesn't preserve the

1    metadata, the data relationships, other potentially

2    important electronic attributes of a record.

3            So we're not happy with the response we're

4    getting, but because we have so many other issues

5    with how we're going to deal with the data they do

6    have, we really just want to put a marker for that

7    and flag it for the Court that we may come back to

8    it, but at the moment, it's very far down our list of

9    problems.

10           THE COURT:  And also, I would note that the

11   obligation to preserve arises at a certain point.

12   And you need to fix that date as to when that

13   obligation arose because if, in the normal course of

14   banking, providing banking services, the procedure

15   was not to maintain that record or to only have it in

16   paper format, or if there was some legacy migration

17   or some migration from a legacy system into a new

18   system that predated the litigation or when the

19   litigation hold would be effective and information

20   was lost in that migration, then that's just life,

21   right?

22           MR. OSEN:  Sure.

23           THE COURT:  So you just need to be clear on

24   the dates where the obligation would arise, and then,

25   you know, keep that as a benchmark for when things

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    occurred before or after it.

2         And then as far as the legacy systems, if

3    the bank migrates from an old system and things are

4    lost and they no longer use that old system, but now

5    they're using a new system, then I think it makes

6    sense to look at the new system, unless there's some

7    way to go back to the old system, the old legacy

8    system, you know, without undue burden.  Because if

9    you migrate, it's usually for a good reason, to use

10   some updated system.  And I don't expect that an

11   institution would hold on to the old system, you

12   know, for very long, if at all.  You move on, and

13   then everything else just gets thrown out.

14        Again, if you don't have an obligation to

15   hold on to it, then there's no reason to be exploring

16   the legacy system when it was no longer relevant or

17   used.  That's how I would be looking at it.

18        MR. OSEN:  That's right.  And that's part of

19   the reason we talked about, or I started with -- in

20   my sort of shopping list there, one of the items was

21   data migration details because --

22        THE COURT:  Right.

23        MR. OSEN:  -- it's possible that nothing was

24   lost.  They were sitting on an old system and they've

25   migrated to a newer platform, and the information we

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    want is there.

2              So, you know, I'm just flagging for the time

3    being, the fact that there are clearly identified

4    sources of ESI that are "not available."  We don't

5    know the parameters of that at this time, and that

6    has not been provided to us.

7              THE COURT:  Okay.  And just to, kind of,

8    round that out, if something was migrated and

9    everything is in the current system, there's no

10   reason to delve into migration details, because you

11   don't need to push through a pre-migration

12   understanding of the system if everything was

13   perfectly fine in the new system.

14             So, again, you would need to know when the

15   migration happened and what information you're

16   lacking before you get to looking at the migration to

17   see if there's anything that happened that you could

18   then possibly retrieve.

19             So I understand that some of it may not be

20   relevant, and so that's why I'm trying to get you to

21   focus on the present day.  And then as you push back,

22   if it's not necessary, you know, you don't --

23             MR. OSEN:  Right.

24             THE COURT:  If you have everything present

25   day, there's no reason to know what happened earlier

AMM TRANSCRIPTION SERVICE - 631.334.1445

1      in the migration because you have everything, right?

2              MR. OSEN:  Well, not exactly, because

3      understanding how the systems migrated -- for

4      example, if you switch over from one core banking

5      system to another, it may be as simple as

6      transactions, you know, up to a certain date six

7      months, a year before the migration took place.

8      There's a cutoff point and nothing before that point

9      still exists.  It's just a question of knowing what

10     it is.

11             THE COURT:  Right.  Okay.

12             MR. OSEN:  We're far away from the question

13     of, like, how do we retrieve it, or how do we assess

14     what, you know, was destroyed.  We're not there yet.

15     We're just flagging the fact that there is a certain

16     significant subset of ESI no longer available, and we

17     don't know yet, you know, what the implications of

18     that are.

19             THE COURT:  Okay.  So what I hear you saying

20     is, when it says "no longer available," you are

21     asking, is it really no longer available, or can you

22     go back and find it somewhere?  And also, is it

23     problematic that it got lost because there was an

24     obligation to preserve?

25             MR. OSEN:  Right.  And also, Your Honor, we

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    recognize that this is -- you know, this is not an

2    exercise in trying to achieve perfection.  So, you

3    know, if you can get 95 percent of what you need with

4    10 percent of effort, it's certainly better than

5    spending 90 percent of effort for the last 5 percent.

6    But we're so far away from that calculation.  Right

7    now, we're just, kind of, trying to identify for the

8    Court what issues were raised by their ESI matrix and

9    what we think the steps are, you know, practically

10   speaking, going forward.

11            THE COURT:  Right.  Okay.

12            So when you say "migration details," you are

13   not saying minute details.  It sounds, actually, like

14   more general information about what was migrated and

15   what wasn't and when.

16            MR. OSEN:  Yeah.  Usually, when big

17   corporations do these kind of migrations, they have,

18   sort of, their own internal rules for it, right.

19   Because, for example, if a bank were to delete all

20   manner of prior account records and so forth, at

21   least in the U.S., they have a seven-year legal

22   requirement for them.  So they have to generate, sort

23   of, their own rules for how they decided to do the

24   migration, what would be included, what would be

25   transferred over.  Some stuff they might consider,

1  you know, obsolete.  Some of it, they carried over to

2  the new system.  They just have their own set of

3  rules for that.  The point isn't at this point to say

4  those are right or wrong; just to know what they

5  were.

6         THE COURT:  Right.  Okay.

7         Because, like, when people move homes, they

8  might say, I'm throwing out the old furniture, no

9  reason to take that with us.  But if there were --

10 you know, not just on a case-by-case basis, if this

11 couch goes or this one doesn't, that there's, like,

12 all the furniture goes or all the dishes go or things

13 of a certain date in time.  We just want to know --

14        MR. OSEN:  Right.  None of this is customer

15 specific or anything.

16        THE COURT:  Right.

17        MR. OSEN:  It's just -- as you say, it's

18 like if you're getting rid of stuff from your home

19 office, are you throwing out everything that's nine

20 years old --

21        THE COURT:  Right.

22        MR. OSEN:  -- seven years old, et cetera.

23        And these are the kind of rules that the IT

24 platform installers have to, kind of, come to terms

25 with, with the bank, because obviously they don't

1  want to do anything that deletes important data

2  they're going to need.

3         THE COURT:  Right.  Okay.  Great.

4         So I think that's very useful.  And before

5  we get to your proposal, I will turn it over to, I

6  guess, Mr. Ingerman to talk about these points.

7         Oh, sorry.  Go ahead.

8         MR. OSEN:  I'm sorry, Your Honor.  Can I

9  address one more point before that, just so --

10         THE COURT:  Sure.

11         MR. OSEN:  And Mr. Ingerman can obviously

12  address it in his response.  And that has to do with

13  the bank's existing searches for the account holders.

14         So, as we said in our letter, the bank

15  basically searched two sources of ESI in order to

16  come up with the list of customers responsive to the

17  court order.

18         So the first was the bank's so-called court

19  ordered database.  That's just what they called it.

20  And the second was Arab Bank Lebanon's Equation Core

21  Banking database.  And they searched them through a

22  protocol using customer names rather than account

23  numbers, which sometimes you have to do, but it is

24  not optimal for searching banking systems.  The

25  optimal way is to search through account numbers, if

1    you have them, the account customer identification

2    numbers.

3            So just very briefly, like most banks, our

4    bank generates unique customer --

5            THE COURT: Okay. Ms. Osen, can I --

6            MR. OSEN: Yeah. Sure. Sorry, Your Honor.

7            THE COURT: Yeah. No, I understand the

8    point, and I understand that defendants have spent a

9    lot of time trying to figure out the names, and names

10   can be confusing, and they can also contain all kinds

11   of variations and errors. And so it sounds like

12   you've proposed use of bank account numbers.

13           Do you have such a list of numbers that you

14   would like to be run, or that still needs to be run?

15           MR. OSEN: I was coming to that, which is --

16   we asked the bank for the Excel spreadsheet that had

17   the hits that they generated from their search, which

18   would have the customer account numbers and customer

19   identification numbers. And we told them they can

20   redact the ones for whom they didn't get these

21   purported waivers, so it would be a subset that they

22   can disclose. And we asked for that, and they turned

23   us down on that and said that we weren't entitled to

24   the hit report.

25           To answer Your Honor's question, one of the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    reasons why we're puzzled by the way they went about

2    searching for accounts is that the court order which

3    tracks plaintiffs' document requests actually sets

4    forth in a very large number of cases on the list of

5    600-plus names -- it sets forth a Bates number that

6    reflects a transaction tied to that individual.  And

7    so for many of them -- and we provided an example in

8    the letter.

9            For many of these accounts, the transaction

10   records that are identified in the court order itself

11   set forth the account number of the individual or

12   entity.  And in the remaining cases, when you're

13   dealing with Saudi Committee payments to the

14   prisoners and martyrs and so forth, those

15   transactions sometimes have the account numbers.

16   Sometimes the payments were made in cash.  But in

17   order for a recipient to collect the money in cash,

18   they had to provide photo identification and other

19   things to the bank.

20           So all that material was produced by the

21   bank 18 years ago, and it's listed on a granular

22   basis in the court order.  So it's not clear why

23   they -- at least for those that they had, which is

24   the majority of them, they didn't, at least in

25   addition, search by account number, too, because they

1    didn't have to guess about the names.  They're in the

2    documents themselves.

3          So that's our --

4          THE COURT:  Okay.  So, Mr. Osen, you're

5    saying that even if you don't -- you are not

6    currently in possession of a list of account numbers

7    or ID numbers that you want the bank to run.  But

8    you're saying the bank itself does have that

9    information, and that's what you want them to run.

10         MR. OSEN:  Well, we'd like to start by just

11   having them produce the Excel spreadsheet of what

12   they generated from their search of names.  If we get

13   that, maybe we'll be satisfied with it and they don't

14   have to re-run the search.  But we haven't gotten

15   that and they've declined to give it to us.

16         THE COURT:  Okay.  All right.  Thank you.

17         So, Mr. Ingerman, let me hear from you.  And

18   I want you to focus on the information that the

19   plaintiffs are saying is missing with regard to the

20   architecture -- let's just use that for shorthand --

21   of how the information is stored by your client, and

22   then also the manner in which you will be doing the

23   searches.

24         In particular, I was concerned about the use

25   of the names versus the account numbers.  And so if

1    the request is that -- what I'm hearing Mr. Osen say,

2    that if you've already run the search on the names,

3    would you not provide that?  And if that takes care

4    of it, you wouldn't have to run it again.  But if

5    then another search might make sense using the

6    account numbers, why wouldn't that be a good idea?

7            So those two things, and then anything else

8    you want to address.

9            MR. INGERMAN:  Yeah, thank you, Your Honor.

10   I appreciate that.

11           And I think this discussion requires a

12   little bit of context, so if you'll just bear with me

13   for a moment.

14           The way that this process has evolved is

15   that we are essentially writing you briefs in status

16   reports.  And, you know, for instance, we got the

17   plaintiffs' 12-page insert at 1 o'clock on the day it

18   was due.  And it's like -- if you consider it a

19   double-spaced brief, it's like trying to respond to a

20   24-page brief, you know, in a half a day.  And then

21   it results in a status conference where Your Honor is

22   issuing orders.

23           And so we think that the process --

24           THE COURT:  Mr. Ingerman, if you need more

25   time to make it a truly joint report, you can always

1    ask the Court for more time --

2            MR. INGERMAN:  Okay.

3            THE COURT:  -- of a day or two or whatever

4    you need so that you have enough time to -- I don't

5    like having briefs in status reports.  I agree with

6    you.  But if, in order for this to be a joint

7    report -- well, let me just backtrack.

8            In order for it to be a truly joint report,

9    it requires the parties to actually meet and confer

10   and agree point by point on the things you're going

11   to include.  If you're going to have disagreement, or

12   when you see a proposal that is raising issues that

13   you disagree with, then it is appropriate to say,

14   hey, let's talk about this, and let's ask the Court

15   for, you know, an extension of a day or two, whatever

16   it is.  Especially since I don't think we had, you

17   know, a status conference the next day that meant

18   that you had to have it filed at that time.

19           So I'll just put out there that if the

20   question is about the timing, you can ask for an

21   extension.  But, you know, the preference is that

22   you've given yourselves enough time to actually talk

23   about what you want to file in the report so that you

24   are in basic agreement on things, or if there's lack

25   of clarity, you've ironed them out before you present

1    them to the Court.

2        It comes to the Court as a brief when

3    parties don't talk to each other.  And then it's one

4    side says this, the other side says that, and you

5    disagree even about the things you're agreeing on.

6        So, as a point of procedure, Mr. Ingerman,

7    going forward, please have -- this maybe is addressed

8    to the plaintiffs.  If you're proposing a status

9    report, please send it to the other side with enough

10   time for you to have discussions before it's filed

11   and not the day of or the day before.

12       And then on the other side, if you get

13   something that requires more discussion, have those

14   discussions.  Ask the Court for an extension so that

15   you're not filing one side said this, one side said

16   that kind of thing.

17       Now, there may still be those.  That's

18   understandable.  And that's the purpose of these

19   status conferences, is to try to resolve some of

20   those things.  And I don't mind doing it, but just so

21   you don't feel like you have to file something that

22   you don't agree with or that you think there isn't

23   clarity on, I just want to put that out there.  So

24   ...

25       MR. INGERMAN:  Okay.  Well, I appreciate

1    that, Your Honor.  Thank you.  And just two other

2    small points.

3         I mean, we're seeing things in the status

4    report for the first time that were never mentioned

5    in meet and confers.  And you saw probably in the

6    joint status report we filed that, had the plaintiffs

7    just reached out to us on some of these issues, they

8    would have been easily resolved.

9         THE COURT:  Right.  And so that's why,

10   again, I'm saying, even if they didn't reach out, you

11   can reach out.  And since this report was filed on

12   the 8th, I was hoping the parties would have had

13   further discussion.

14        MR. INGERMAN:  Okay.

15        THE COURT:  So have there been further

16   discussions?

17        MR. INGERMAN:  There have not, Your Honor.

18        THE COURT:  Okay.  So this is what I mean.

19   You should be having discussions.

20        MR. INGERMAN:  Yes.  We understand.

21        THE COURT:  Okay.  Because some of these

22   things, you're saying the plaintiff misunderstood

23   you.  And so then the natural next thing is to try to

24   explain it.  And if you-all made your best efforts

25   and you still disagree, it's different from not

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    understanding.

2          So please, please keep talking to each

3    other.  And if you think the other side doesn't

4    understand you properly, make them understand, or do

5    your very best to get them to understand.  I mean,

6    you're all smart and experienced people, but you

7    should be able to explain things so that the other

8    side understands.  If you can't do that, how are you

9    going to explain these things to a jury?

10          MR. INGERMAN:  Yeah.  And we --

11          THE COURT:  So I think you need to find a

12    way to achieve mutual understanding as best as

13    possible.  You can still disagree, but it shouldn't

14    be based on misunderstandings.  So ...

15          MR. INGERMAN:  Okay.  So just a little bit

16    of context for what the bank has done.  I know

17    Your Honor has read the paper, so I'm not going to

18    spend much time on it.

19          But at a high level, in phase one, the bank

20    took the 673 names from the Court's production order

21    and they initially searched backup tapes.  And the

22    backup tapes -- in order to search the backup tapes,

23    the bank actually created a SQL query, a custom SQL

24    query to search the backup tapes to see whether or

25    not any of the 673 names from the Court's production

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    order were bank customers.  And we go in great detail

2    in the joint status report about what we did with

3    those names, how we cleanse them, how we check them

4    against World-Check and other databases to make sure

5    that we were doing the most reliable and accurate

6    search of the backup tapes.

7         The backup tapes yielded a tremendous number

8    of false positives and false negatives, so we

9    determined that --

10        THE COURT:  Can I pop in for a moment?

11        MR. INGERMAN:  Yes.

12        THE COURT:  One second, just so I

13   understand.

14        The backup tapes were backup tapes of what?

15        MR. INGERMAN:  Backup tapes of the core

16   banking system in Palestine from the -- remember,

17   we're dealing with 1998 to 2004.  So there are 84,

18   84 -- eight-four -- backup tapes for the core banking

19   system for Palestine for that time period.  And so

20   that search --

21        THE COURT:  And the question there -- and

22   that first search was to just determine if they were

23   bank customers or not?

24        MR. INGERMAN:  Correct.  And did not yield

25   reliable data.

        AMM TRANSCRIPTION SERVICE - 631.334.1445

1          But pursuant to the Court's order, we

2    provided the plaintiffs with 100 percent of the SQL

3    queries that the bank developed to do that search.

4          What the bank does, the way the bank

5    searches -- I'm sorry.  Go ahead, Your Honor

6          THE COURT:  Can I just ask -- again, I'm

7    sorry.  I don't want you to keep going down a path

8    where I don't understand, so that's why I'm

9    interrupting you.  I apologize.

10          You said it did not yield reliable data.

11   Why not?

12          MR. INGERMAN:  There were too many false

13   positives and false negatives.  Because what happens

14   is the backup tapes are -- they capture the data at a

15   moment in time.  It's static.  So there could be a

16   banking customer spelled one way, spelled another

17   way, spelled a third way, and it comes up three

18   different times.  It may be different customers.  It

19   was just unreliable results for the bank, okay.

20          THE COURT:  Okay.  Right.

21          MR. INGERMAN:  So the bank has a database

22   for Jordan and Palestine called Court Order, and

23   that's what they use to determine if a certain person

24   or entity is a bank customer.  And they do that in

25   the ordinary courts, whether it's a court order,

1    whether it's a regulatory inquiry, and they do it by

2    name.  That's how the bank searches.

3         And the reason they don't search by account

4    number is because Brett Ingerman could have five

5    different accounts with five different account

6    numbers at the bank.  And so if you search by one or

7    two account numbers, you may miss other accounts or

8    you may miss me as a customer.

9         So the bank, in its ordinary course,

10   searches by name, and that's what they did here.  And

11   so they searched --

12        THE COURT:  Let me stop there.

13        MR. INGERMAN:  Please.

14        THE COURT:  In what circumstances is the

15   bank doing a search at all of a name?

16        MR. INGERMAN:  I'm sorry, Your Honor?

17        THE COURT:  What are the circumstances that

18   will cause a bank to run a search of a particular

19   name?

20        MR. INGERMAN:  It could be litigation.  It

21   could be an inquiry from a regulator.

22        THE COURT:  Okay.

23        MR. INGERMAN:  Okay.  And they use -- in

24   Jordan and Palestine, they use this Court Order

25   database.  And the reason the Court Order database is

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    more reliable than the backup tapes is because it is

2    constantly receiving data in real time.

3              THE COURT:  Right.

4              MR. INGERMAN:  So customer names are getting

5    corrected.  Customer addresses are getting corrected.

6    So if I come in, for instance, in 2002, and I'm Brett

7    Ingerman and I live at One Main Street, and then I

8    change my address and my name is spelled with two Ns,

9    but I'm now at 25 State Street, that gets updated in

10   the Court Order database.  So that database is much

11   more reliable than the backup tapes.

12             So what we did was we took the names --

13             THE COURT:  Again, let me stop you there.

14             MR. INGERMAN:  Please.

15             THE COURT:  The backup tapes for the core

16   banking system you said was in Palestine?

17             MR. INGERMAN:  Palestine.  Yes, Your Honor.

18             THE COURT:  Only?

19             MR. INGERMAN:  Only.

20             THE COURT:  Okay.  Because we're talking

21   about Palestine, Jordan and Lebanon.

22             MR. INGERMAN:  Yes.  And that's -- I'm

23   getting to that.

24             So Court Order is just Jordan and Palestine,

25   okay?

```
 1                    THE COURT:  Okay.
 2                    MR. INGERMAN:  And so the bank took --
 3                    THE COURT:  And that's a better -- I'm
 4          sorry.
 5                    MR. INGERMAN:  Please.  No, no.  I'd rather
 6          you understand it.  Yes.
 7                    THE COURT:  Yes.  And that would overlap, or
 8          it's a better alternative, core, because it covers
 9          Palestine, but it's live rather than static.
10                    MR. INGERMAN:  It covers Palestine and it
11          covers Jordan as well.
12                    THE COURT:  Okay.
13                    MR. INGERMAN:  And it pulls from the bank's
14          core banking system, which is called Equation, and it
15          also pulls biographical information for the customers
16          from the bank's customer information system.  So it
17          is the most reliable database for determining whether
18          someone is a bank customer in Jordan and in
19          Palestine.
20                    THE COURT:  Okay.
21                    MR. INGERMAN:  Okay?
22                    THE COURT:  So you didn't start there,
23          though.  You started with the backup tapes.
24                    MR. INGERMAN:  We did.  We started with the
25          backup tapes.  That's where we started.
```

1          THE COURT:  Why did you do that?

2          MR. INGERMAN:  Because we thought --

3     initially we thought if we're trying to go back to

4     '98, to 2004, that that might have more data or

5     better data.  It turns out it didn't, based on the

6     testing that we did.

7          THE COURT:  Okay.  Great.

8          So now you're moving -- you say, well, that

9     was terrible, it's not very accurate.  So now we have

10    this -- you called it -- Court Order is the name of

11    the database?

12         MR. INGERMAN:  It is.

13         THE COURT:  Okay.  And so you've run it

14    there now with the names.

15         MR. INGERMAN:  Correct.

16         And not only did we run it electronically,

17    but the bank had a series of bank personnel checkers

18    so that if we got a hit or we didn't get hit, they

19    were able to check it against the actual name in the

20    production order.  So we didn't just rely on the

21    search function.

22         And the search function that was used,

23    Your Honor -- if Your Honor or your clerk is familiar

24    with CourtLink, it's like a search function in

25    CourtLink.  So if I put "Brett Ingerman" into

1    CourtLink, it runs a query in the background looking

2    for every case with "Brett Ingerman" in it, and then

3    gives me the hits.

4        THE COURT:  Okay.

5        MR. INGERMAN:  So there's no, like, custom

6    SQL query or anything.  It's just a search function

7    that's used on that database.

8        THE COURT:  Okay.

9        MR. INGERMAN:  Okay?

10        THE COURT:  And so you have results from

11    that search?

12        MR. INGERMAN:  We have results from that.

13    And that is what the bank used to then go out and ask

14    for waivers.

15        THE COURT:  Okay.  And have you turned over

16    the results of that search to plaintiffs?

17        MR. INGERMAN:  What we turned over to the

18    plaintiffs was we turned over the actual waivers that

19    we got from the bank.

20        THE COURT:  But if you now have a list of

21    the accounts that are associated with these

22    individuals, why don't you turn that over to the

23    plaintiffs?

24        MR. INGERMAN:  Your Honor, with respect to

25    bank customers who have waived bank secrecy, we have

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    turned over account records and will continue to do

2    that.

3            THE COURT:  But how many people waived?

4            MR. INGERMAN:  I think it's about 140.

5            THE COURT:  Okay.  So of the 500 or so

6    others who did not waive, are you saying you're not

7    going to turn over that information?

8            MR. INGERMAN:  Well, it's not 500 bank

9    customers.  There's some subset of the remainder are

10   bank customers who did not waive.

11           THE COURT:  Okay.  Well, how many of the --

12   well, let's do the numbers.

13           So the 673 names, how many of them are bank

14   customers?

15           MR. INGERMAN:  I don't have that number in

16   front of me, Your Honor.  I apologize.

17           THE COURT:  Okay.  But it's a big enough --

18           MR. INGERMAN:  I think it's somewhere in the

19   300 range.  Something in there, just to give you a

20   sense of magnitude.

21           THE COURT:  Okay.  That's fine.

22           So of the 300 or so who are bank customers,

23   140 waived.

24           MR. INGERMAN:  Correct.

25           THE COURT:  Okay.  So that remains

1    approximately 160 who did not waive.  You're not

2    going to turn that over?

3         MR. INGERMAN:  At this point, the bank is

4    constrained by the Bank Secrecy laws, Your Honor, and

5    is not in a position --

6         THE COURT:  Notwithstanding my order.  So

7    the bank is going to defy the court order?

8         MR. INGERMAN:  The answer right now is yes,

9    Your Honor.

10         THE COURT:  Okay.

11         MR. INGERMAN:  And we recognize that that

12    will be a motion for another day, and we will address

13    it.

14         THE COURT:  Okay.  Well, I mean, if that's

15    the case, then it's good to know now --

16         MR. INGERMAN:  Yes.

17         THE COURT:  -- so that you're not fighting

18    over turning over that information because you'll

19    have other consequences.  And the plaintiffs can

20    start gearing up to make that argument because it's

21    clear now that you're intending to not comply with

22    the court order.  Okay.

23         All right.  So --

24         MR. INGERMAN:  That is where we are right

25    now, Your Honor.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1        THE COURT:  Okay.

2        MR. INGERMAN:  Okay.  So that's --

3        THE COURT:  Those already who waived, you

4   said you have turned over the account number

5   information -- the account information?

6        MR. INGERMAN:  So Mr. Osen said we haven't

7   given him a hit report.  He has every person that got

8   a hit that waived because we turned over all the

9   waivers, and we also turned over account records for,

10  I think, nearly all of those people.  And we're still

11  in the process of doing that.  So he knows exactly

12  which bank customers waived because he has the

13  waivers.

14        THE COURT:  And what did you turn over for

15  those customers?

16        MR. INGERMAN:  So we have started searching

17  the bank's ECM system, which is the --

18        THE COURT:  Wait.  Before you start talking

19  about searches, what have you turned over?  What

20  information with regard to the 140 customers who did

21  waive?  What information about them did you turn over

22  to plaintiffs?

23        MR. INGERMAN:  We turned over the waiver,

24  the picture ID, and then to the extent we had it,

25  account opening records, bank statements and Know

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    Your Customer documents for each of those 140 or so

2    that waived.

3         THE COURT:  And when you say "bank records,"

4    are you talking about the transaction records, credit

5    card records, that kind of thing?

6         MR. INGERMAN:  They're account records.  To

7    the extent that there were credit card transactions,

8    they would be in there too.

9         THE COURT:  Okay.

10        MR. INGERMAN:  And that all came out of

11   the -- I'm sorry.

12        THE COURT:  And then also you said "Know

13   Your Customer information"?

14        MR. INGERMAN:  Correct.

15        THE COURT:  Okay.  All right.  And that's

16   it?

17        MR. INGERMAN:  And that's it.  That's what

18   we have searched for and produced so far.

19        THE COURT:  Okay.  And so what are you

20   searching for now?

21        MR. INGERMAN:  Well, that goes -- if I could

22   just finish phase one, Your Honor, because that

23   really goes to phase two.

24        So we talked about Jordan.

25        THE COURT:  I'm sorry.  So phase one is the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    search of that database and turning over this

2    information.

3         MR. INGERMAN:  Phase one is determining

4    which of the 673 are bank customers.  That was the

5    phase one search.  So that's what I was talking

6    about, Court Order for Jordan and Palestine.

7         And then there's a separate Equation

8    database for Lebanon.  And so we searched Court Order

9    for Jordan and Palestine.  We searched Equation for

10   Lebanon in phase one to determine which of the 673

11   names were bank customers.  And then we went out and

12   tried to get waivers from as many of those as we

13   could.  And that was phase one, figuring out who is a

14   bank customer.

15        THE COURT:  Right.  But I heard you also say

16   that you did turn over information and you listed the

17   waiver, picture ID, account opening documents, bank

18   records, including credit card records and Know Your

19   Customer information.

20        So that information for Jordan, Palestine

21   and Lebanon, you have turned over to plaintiffs?

22        MR. INGERMAN:  Yes.  I would include bank

23   statements in your list, but yes.

24        THE COURT:  Yes.

25        MR. INGERMAN:  That has been turned over.  I

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    consider that to be part of phase two because what we

2    did to get that information was we actually searched

3    our ECM database by account number, and then we found

4    the accounts and we produced the documents.

5         THE COURT:  Okay.  So let me say -- because

6    you've characterized this as "phase two," phase one

7    was just to answer the question, who are the

8    customers?

9         MR. INGERMAN:  Correct.

10        THE COURT:  And then it sounds like phase

11   1.5 was, can you get waivers?  Who can you get

12   waivers from?  And then phase two is you ran the

13   database search; for everyone, or just the ones who

14   gave you waivers?

15        MR. INGERMAN:  Just the ones who gave us

16   waivers and only for the Enterprise Content

17   Management database.

18        THE COURT:  Okay.  And what is contained in

19   the ECM database?

20        MR. INGERMAN:  I'm sorry.  Say that again,

21   Your Honor.

22        THE COURT:  You said you only ran it on the

23   ECM database.

24        MR. INGERMAN:  As so far, correct.

25        THE COURT:  But what is contained in there?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. INGERMAN:  That's got the customer

2     files.  So whatever went into the customer file.  So

3     opening the account, KYC, bank statements.  Those

4     types of things that are in the customer file were in

5     ECM.

6          THE COURT:  Okay.  So you ran on the ECM.

7     And is that for, again, Jordan, Palestine and

8     Lebanon, or a subset?

9          MR. INGERMAN:  Well, I think we only have --

10    it's for all three jurisdictions, Your Honor, but I

11    think we only have waivers -- I think the 140 or so

12    are all in Palestine.

13         THE COURT:  All right.  But I know that you

14    have limited your searches because you've just

15    explained it, to those who waived.  But when you ran

16    the search, it was in the ECM database, which would

17    capture -- I'm trying to figure out if there's

18    anything that wouldn't be in the ECM database, such

19    that you would have to run another search to be

20    completed.

21         MR. INGERMAN:  Yeah, I think there are.

22    There are other databases that we identified for the

23    plaintiffs.  For instance, the SWIFT Alliance server.

24    The SWIFT Alliance server will have SWIFT information

25    for a limited period of time, April to December of

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  2004.  In our phase two search plan, we are going to

2  search that database.

3           There's also, for Palestine, there are

4  backup.  The 84 backup tapes also would be part of

5  our phase two search protocol.  So there are other

6  databases, and we intend to include those in the

7  search protocol we hope to share with the plaintiffs

8  by April 29th.

9           THE COURT:  All right.  So the SWIFT

10  Alliance server database will have all transactions?

11           MR. INGERMAN:  It will have all transactions

12  for the relevant time period, from April to December

13  2004, for all jurisdictions.

14           THE COURT:  All right.  And so what it

15  sounds like, if the ECM database has all the customer

16  files, things that you enumerated earlier, then you

17  are going to run the SWIFT Alliance server database

18  for transactions in a particular time period.  You're

19  going to go back to the backup tapes even though you

20  found problems with those before, but you're looking

21  for -- what are you looking for in Core in the backup

22  tapes?

23           MR. INGERMAN:  I think -- and, again, the

24  only caveat I'll give you, Your Honor, is, you know,

25  I'm not sure how much of an effort or time it's going

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    to take to restore or rehydrate those backup tapes,

2    as the IT consultants say.  But what we would search

3    the backup tapes by would be customer ID and account

4    number.  So we would try to identify any transactions

5    that were in the backup tapes for any of the bank

6    customers who waived.

7         THE COURT:  Okay.  And that sounds like the

8    kind of search that the plaintiffs were asking you to

9    do, which is --

10         MR. INGERMAN:  Yeah, and we are.  I mean --

11    I mean, look, part of the problem is, you know, we

12    don't think the plaintiffs are ever going to be

13    satisfied with any of our answers.  We think this has

14    become a bit of a fishing expedition.  What they're

15    asking for -- and I'll go through the five, Your

16    Honor, but what they're asking for --

17         THE COURT:  Hold on.  So just to be clear,

18    it doesn't matter if the plaintiffs are satisfied.

19    It's what the Court finds is the time to stop.  So if

20    I don't understand what you've done, I can't make a

21    decision as to whether you've done enough.  So don't

22    worry about the plaintiff being satisfied.  You need

23    to address the Court on that.

24         MR. INGERMAN:  Fair enough.

25         THE COURT:  So you're talking to get as far

1    as you can get because, if they are satisfied, great,

2    but if they're not and you don't think they ever will

3    be, you know, that is important, but ultimately you

4    need to explain it sufficiently to me so I understand

5    it.  And so, you know, you still have to explain it

6    to a layperson who has an understanding of how these

7    things generally work, but you still have to explain

8    to me how it works in this case.

9          MR. INGERMAN:  Yes, I understand that, and

10   I'm doing my best to do that, Your Honor.

11         THE COURT:  Okay.

12         MR. INGERMAN:  So with respect to the Court

13   Order database, because there's been an allegation

14   that we did not comply with Your Honor's minute

15   order, which I categorically reject, we provided the

16   plaintiffs with all of the search terms.  In other

17   words, all of the different name variations and the

18   search protocol that we used to search the Court

19   Order database to get the results that we got.

20         And then moving on to Lebanon, we searched

21   the equation database.  That was using what's known

22   as a "find function," an FND, FND function, which

23   also operates a lot like the CourtLink find function.

24   And that runs various name searches with variations.

25   And we provided the plaintiffs with screenshots of --

AMM TRANSCRIPTION SERVICE - 631.334.1445

1
2          THE COURT:  Mr. Ingerman?  Hello?
3          Mr. Osen, can you hear me?
4          MR. OSEN:  Yes, Your Honor.
5          THE COURT:  Oh, okay.
6          Mr. Ingerman, you dropped off.
7          Mr. Coles, is there any way you can let
8  Mr. Ingerman know that we can't hear him?  Or is
9  there somebody else?  I don't know how to convey that
10 we can't hear Mr. Ingerman.
11         MR. OSEN:  Your Honor, we can at least
12 e-mail Mr. Ingerman.
13         THE COURT:  Yeah.
14         MR. OSEN:  One of my colleagues can do that
15 and see if we can get them back on.
16         (Pause in proceedings.)
17         MR. OSEN:  Your Honor, this is Gary Osen
18 again.  We're writing to Mr. Ingerman.  I assume by
19 now he realizes the problem and was trying to dial
20 back in.  Just in case, we'll contact him as well.
21         THE COURT:  All right.  Thank you.
22         MR. INGERMAN:  -- determine whether or not
23 these customers -- or whether or not these --
24         THE COURT:  Mr. Ingerman?
25         MR. INGERMAN:  Yes?

        AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE COURT:  Mr. Ingerman, this is Judge Kuo.
 2   We lost you for about two minutes.
 3              MR. INGERMAN:  Oh, I'm sorry.  That was my
 4   best stuff.
 5              THE COURT:  You've been talking and
 6   unfortunately nobody else on the call could hear you.
 7              MR. INGERMAN:  I'm sorry.  Where did I leave
 8   off?
 9              THE COURT:  I have here that you gave a list
10   of names.
11              MR. INGERMAN:  Okay.  So I was talking about
12   the March 29th --
13              THE COURT:  And, Mr. Ingerman, you've cut
14   off again.  I don't know what the problem is.
15              MR. INGERMAN:  Your Honor, I don't know
16   what's happening with the phone.  I'm going to try to
17   dial in on another line.  I apologize.
18              THE COURT:  Yeah.  Yes, can you please do
19   that.
20              MR. INGERMAN:  Just give me one moment.  One
21   moment.
22              (Pause in proceedings.)
23              THE COURT:  Mr. Ingerman?
24              MR. INGERMAN:  Your Honor, I'm back.  Can
25   you hear me?
```

1           THE COURT:  Yes.

2           MR. INGERMAN:  Okay.  I apologize.  I don't

3    know what happened with our phones there, but --

4           THE COURT:  That's fine.  You gave a list of

5    names.

6           MR. INGERMAN:  Yeah.  So we provided the

7    plaintiffs, pursuant to the Court's minute order, a

8    March 29th ESI report.  And for each jurisdiction --

9    Jordan, Lebanon and Palestine -- we provided the

10   originating system, so the system that was in place

11   that would have responsive information in the

12   1998-2004 time period.

13          So just by way of example, in Jordan, we

14   identified the core system, the Equation system, the

15   customer information system, whatever was in play at

16   the relevant time period.  And then we talked about

17   where that data resides today, what database or

18   schema was searched, what search methodology and

19   terms were used.  And we provided them with every

20   single name and search term that we used, including

21   the wildcards and variations.  All of that was

22   provided to the plaintiffs.  And then we identified

23   the SQL query or the equivalent search that was

24   actually done, all provided in great detail for each

25   jurisdiction.

1          So to Your Honor's -- the bank took

2     Your Honor's comments at the last status conference

3     to heart.  We have provided absolute and total

4     transparency about what we've done, and there is no

5     more reliable way to search to determine whether or

6     not these individuals and entities are bank

7     customers.  It is how the bank does it every day, and

8     it is the most reliable way.

9          So after we provided that, Your Honor, we

10    then provided, pursuant to Your Honor's minute order,

11    an ESI matrix, which we attached to the joint status

12    report, which explains each of the databases where

13    potentially responsive information might live for

14    each jurisdiction and then what's in it.

15         So, for instance, you know, in the Equation

16    backup or successor system, we identify, you know,

17    inward money transfers, outward money transfers,

18    SWIFT messages, et cetera, the types of bank

19    information that the plaintiffs would find in each of

20    the ESI databases.

21         And so we provided -- to use Your Honor's

22    example, we've identified the house.  We've told them

23    what's in every room, in every cabinet, in the attic,

24    in the basement.  What they're asking you for is the

25    wiring and the plumbing and the -- I mean, what

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    they're asking for goes well beyond anything that's

2    required.

3         And we've done a little bit of research on

4    this, Your Honor, and this is why I raised the

5    process issue at the beginning, because if they're

6    going to ask you to order us to produce the types of

7    things that Mr. Osen articulated, there's case law

8    out there on data dictionaries and enterprise

9    relationship diagrams or entity relationship diagrams

10   and schema and when that information is obligated to

11   be produced or created.  And there's a burden that

12   the plaintiffs have to meet, and then we get an

13   opportunity to respond.

14        And so we're concerned from a process and a

15   fairness perspective that this is getting dumped on

16   us by the plaintiffs at the last minute in a joint

17   status report, and then we're having to argue it

18   without really the opportunity to brief it so Your

19   Honor can see the cases and what the law requires.

20   So --

21        THE COURT:  Well, again, Mr. Ingerman, I

22   just want to clarify my process, which is, I asked

23   for the status reports because I want the parties to

24   identify what the issues are.  If there is enough

25   information for me to make a ruling in a call, I will

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    do so.  But if the parties want an opportunity to
2    brief it, I've never denied it.  So if --
3              MR. INGERMAN:  That's great.  Thank you.
4              THE COURT:  If you need more time to explain
5    the issue, that's fine.  But I would also say as far
6    as the data dictionary, that it may be that it's not
7    required in every case, but I don't use the
8    dictionary that often until I need it.  So if there's
9    information that's not understandable and a
10   dictionary is needed to understand it, then I don't
11   see why it shouldn't be provided just so the other
12   side can understand.
13             So just, you know, as a general matter,
14   that's the case and that's the situation, and I don't
15   want you to cite me cases where a court said it's not
16   necessary because that's not necessarily this case.
17   You may argue why it's not necessary here, but I
18   don't think we have time to go through all of that.
19   And if you want more time to talk to -- you want an
20   opportunity to brief it, you know, that's fine.  We
21   can talk about that.  So, again, that is --
22             MR. INGERMAN:  So let me just finish the
23   context, and then I'll talk quickly about the other.
24             Thank you, Your Honor.  We appreciate that.
25   I didn't realize that that was an option for us.

1            So phase one is we've identified who the

2    bank customers are.  To use Your Honor's phasing,

3    1.5, we've gotten the waivers from 140 or so bank

4    customers.

5            Phase two is now, okay, we're going to

6    produce to the plaintiffs everything we have for

7    these customers.  Everything.  There's nothing we're

8    going to hold back that we have for these customers

9    because they have waived bank secrecy.

10           So phase two is going to be the search and

11   retrieval protocol for the relevant information.  And

12   we've already started that process with the ECM

13   searches and production.  I think we produced a

14   couple of thousand, at least, pages of documents for

15   those bank customers.  And that is what we propose to

16   give to the plaintiffs on April 29th.

17           I disagree with Mr. Osen's characterization

18   of this process as inchoate or at the very early

19   stages.  We think we can get this done in a matter of

20   months.  The only caveat is going to be the

21   restoration or rehydration of the backup tapes.

22           And so what we'd like to do is to propose to

23   the plaintiffs, on April 29th, a search and retrieval

24   protocol for the various ESI databases.  And if they

25   want to use account numbers, fine.  If they want to

1    use customer IDs, fine.  Names, fine.  And we'll meet

2    and confer and agree on that.  And we will produce

3    everything we have for their customers.  Period.

4    Full stop.

5              THE COURT:  Okay.  So --

6              MR. INGERMAN:  But what they're asking for

7    and what Mr. Osen has articulated -- and, by the way,

8    our IT expert is at FTI.  His name is David Alfaro.

9    He's one of the preeminent IT consultants in the

10   country.

11             THE COURT:  Mr. Ingerman, I trust that to be

12   the case, and so I don't think anybody's attacking

13   the credentials of the people you've hired.

14             I think there is a gap.  And if I could

15   just -- I'm a little concerned about where I think

16   that gap -- how it got created, but I'm just going to

17   check with Mr. Osen.

18             Is the information you're seeking with

19   regard to the other people on the list of the 637

20   names not -- of the customers who did not waive?  In

21   other words, did you know that there was this

22   position by the bank that they were simply not going

23   to produce information with regard to the customers

24   who did not waive?

25             MR. OSEN:  This is Gary Osen for the

                 AMM TRANSCRIPTION SERVICE - 631.334.1445

1  plaintiffs.

2          Yes, Your Honor, we're aware of their

3  position.  And to be clear, there are a number of

4  things I'd like to address.  But on the first part,

5  what we've asked them for is not the Excel

6  spreadsheet of all the hits for every customer,

7  meaning the 400 or so, whatever it is, who had

8  accounts.  But rather we told them they could redact

9  out anyone who they didn't get a waiver for.

10          We want the Excel spreadsheet they generated

11  when they ran this process through their databases.

12  And the reason for that is simple.  Mr. Ingerman

13  says, well, they know who they are because we

14  produced records for them or we produced their

15  waivers.  But what we want is the actual hit report,

16  which hopefully provides their account numbers,

17  alternate account numbers.  Some of them might have

18  had multiple accounts.  And most importantly, the

19  unique customer identification number, which I can't

20  stress enough, Mr. Ingerman's characterization of how

21  this works is just not consistent with our prior

22  experience.

23          THE COURT:  Okay.  So --

24          MR. OSEN:  When you have a customer

25  identification number, it generates information that

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   tells you all of the accounts that that customer has,

2   which is why it has embedded in it the customer

3   account information.  So let me just stop there first

4   and just say --

5          THE COURT:  Okay.  Mr. Osen, I'm sorry to

6   interrupt you.  I have a hearing at 12:30, so I need

7   to stop, so I want to wrap up.

8          But what I'm hearing is that the bank is

9   willing to turn over all the information that's

10  requested with regard to those people who have given

11  waivers, and the plaintiffs are not in this

12  discussion asking for more than that.  There may be

13  other discussions about the bank's position, that

14  they're not turning over information for the other

15  customers, but we're putting that aside because the

16  discovery production that we're focusing on are just

17  the people who gave waivers, and there's no dispute

18  in this discussion about that.

19         MR. OSEN:  Correct.

20         THE COURT:  Very good.

21         There does seem to be a dispute at the

22  granular level of what information the plaintiff

23  needs so that the plaintiff can assess whether the

24  defendants are doing a thorough enough job.  So I

25  think the parties -- and I don't know if you're there

1    yet, so I want the parties to continue to talk about

2    whether you have looked everywhere and these are the

3    places that is the total universe or the, let's say,

4    95 percent good enough universe of where you should

5    be looking.  And then, you know, understand that

6    universe so that you can do the searches and then

7    make the production.  All right.

8            Now, I don't know.  I just want to be very

9    specific because, again, I'm running out of time.

10   So, Mr. Ingerman, is there a particular reluctance to

11   turn over the account numbers?

12           MR. INGERMAN:  I just don't think that Excel

13   spreadsheet has the account numbers on it, as I think

14   about it.  But we've already -- so they have the

15   account numbers.  We've given them --

16           THE COURT:  Okay.  So they have the account

17   numbers.  Do they have the unique customer ID

18   numbers?

19           MR. INGERMAN:  I don't know if the customer

20   ID number is on the bank statements they have, but

21   all the account numbers certainly are.  They have the

22   account numbers.  They're on the statements we

23   produce.

24           THE COURT:  Okay.  So it sounds like

25   plaintiffs are also asking for the unique ID numbers.

1    Did you have a reason for not producing that?

2              MR. INGERMAN:  No.  I think actually that

3    would be part of our phase two search protocol

4    because we would propose searching by those IDs.

5              THE COURT:  Okay.  Great.  Fantastic.

6              So turn over the ID numbers as well because

7    plaintiffs are asking for that, and that will help

8    them assess whether your search is resulting in as

9    complete a result set as possible.

10             So those two things you'll get, Mr. Osen.

11   Okay?

12             MR. OSEN:  Okay.

13             THE COURT:  I haven't heard anybody say that

14   you're not getting that.  So you'll get that.  You'll

15   have a fuller discussion about what the systems are

16   Mr. Ingerman has set forth, where he thinks the

17   relevant information is lodged.

18             If you have questions about whether there

19   are other places that are better or that would give a

20   better timeframe -- I mean, I don't know whether

21   there are things that are older and you think should

22   be somewhere else, but just have a discussion so you

23   understand where things are.

24             Mr. Ingerman seems to be very confident that

25   he and his team do know where all the rooms are, and

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    they just need to articulate that to you, Mr. Osen,

2    so that you understand it.  And then you can have a

3    discussion where you can ask, did you look here, did

4    you look there, that kind of thing.

5           Okay.  So it sounds like you're pretty

6    close, or at least Mr. Ingerman feels pretty

7    comfortable that they're close.  And so, Mr. Osen, if

8    you have questions about specific things where you

9    think they didn't look, but they should be looking,

10   please have those discussions, all right?

11          MR. OSEN:  Yes, Your Honor.

12          THE COURT:  Because you don't need to know

13   every, you know, nail in the structure to understand.

14   But, you know, I appreciate if you think that there's

15   a room that hasn't been searched, or you have a

16   question about where the faucet is located, that

17   that's fair to ask.  And then you can come to

18   agreement as to whether there should be a fuller

19   database for you to be looking.  And then you can

20   also have the discussion as to whether the

21   restoration of the core backup tapes is necessary,

22   because I heard some skepticism about whether it was

23   a really useful system in the first place.  And it

24   may be duplicative of what else -- the live system.

25   Sometimes live has less information because the new

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    information is blind to the old information.  And

 2    sometimes the old information is useful.  So just

 3    have a discussion as to what needs to be done or

 4    might not be necessary.  All right?

 5              MR. OSEN:  Yes, Your Honor.

 6              Three really quick points before we head

 7    out.

 8              THE COURT:  Yes.  Go ahead.

 9              MR. OSEN:  So, first of all, it sounds like

10    we may have to do a motion to compel on the data maps

11    and dictionaries, but we'll obviously, first, meet

12    and confer with the defendant, see what they're

13    willing to compromise on with that, and take it up if

14    we have to.

15              Two quick additional points.  I heard for

16    the first time today, Your Honor, from Mr. Ingerman

17    that the account statements and KYC information that

18    they produced to us for the 140 waiver customers came

19    from their ECM system.

20              We have been told up until this morning that

21    those records originated in their paper files, so

22    were not the product of ESI.  So I think this

23    again -- maybe I misheard Mr. Ingerman, but if what I

24    heard is correct, it's just another example of how we

25    do not understand the processes that have been
```

```
 1    undertaken in this case, or they haven't been

 2    represented to us accurately to this point.

 3            MR. INGERMAN:  Your Honor, I have to -- may

 4    I respond to that?

 5            THE COURT:  Hold on.  Wait.  Wait.  Wait.

 6            So let me pause here because, Mr. Osen, you

 7    said you had three points.

 8            But for this point, Mr. Ingerman, we did

 9    have a lot of discussions about the file jackets and

10    paper and things like that.  So is that still an

11    issue?  Is there still information that is contained

12    only in paper format?  Or have you now located

13    everything in electronic format such that we don't

14    need to search paper anymore?

15            MR. INGERMAN:  There is still the daily

16    jackets, which are in paper format.  But the

17    statement that Mr. Osen made to you, Your Honor, is

18    false.

19            In our January 29, 2024 letter to Mr. Osen,

20    we said specifically that the ECM database was

21    searched to retrieve the customers' bank statements,

22    KYC documents and credit card statements using the

23    customers' account number identified through the

24    electronic searches.  So he's just -- it's just a

25    misstatement to the Court.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE COURT:  No.  No.  Mr. Ingerman,
 2     respectfully, we've had a lot of discussions about
 3     paper and I don't understand.  I don't understand how
 4     the paper format plays into this.
 5              So you just -- if what you're saying is all
 6     that information is in electronic format, that's
 7     fine.  All right.  But then you still have to explain
 8     why you would need to search in paper.
 9              MR. INGERMAN:  Yeah.  Let me just address
10     that.
11              THE COURT:  What's in the paper?
12              MR. INGERMAN:  Let me address that quickly
13     because I know Your Honor has to go.
14              The customer files were scanned and uploaded
15     into the ECM database.  That, we told Mr. Osen back
16     in January, that we had searched those
17     electronically.  And that's the information that we
18     have produced for the customers who have waived.
19              There are additional paper documents, like
20     the SWIFT transaction records and potentially e-mails
21     that were printed out and put in daily jackets that
22     are only in hard copy in Nablus and Gaza.  And so
23     there are hard-copy documents, and we have been
24     trying to locate -- that will take a whole other hour
25     to explain where they are and how they're stored, but
```

1      there are paper documents.

2              THE COURT:  You already told us about the

3      daily jackets, but --

4              MR. INGERMAN:  Yes.

5              THE COURT:  So information that was

6      produced, the account -- what you told me today,

7      waivers, paper, the picture ID, account opening

8      documents, bank records, credit card statements,

9      account statements, Know Your Customer; all of that

10     is electronic.  None of it is paper.

11             MR. INGERMAN:  Correct.  Out of the ECM

12     database.  I mean, it was scanned into the database,

13     but yes.

14             THE COURT:  Okay.  So it could have been

15     paper originally, but it was scanned into that

16     database such that, if you search the database, that

17     that should be complete.

18             MR. INGERMAN:  It was absolutely paper

19     originally, yes, and is now in the database, yes.

20             THE COURT:  Okay.  Well, fine.

21             So, Mr. Osen, can you continue to your

22     second or third point?

23             MR. OSEN:  Yes.  We'll meet and confer with

24     Mr. Ingerman and try and get greater clarity on that

25     issue.

1          The last point I want to make before our

2    time expires is to be clear that, as far as we

3    understand, the defendant's consultant doesn't have

4    physical possession of the ESI we're talking about

5    and hasn't --

6          THE COURT:  Mr. Osen, when you say "physical

7    possession," we're talking about electronic.  So what

8    is the physical that you're talking about?

9          MR. OSEN:  Yes.  I mean, in other words,

10   usually with -- especially with historical data,

11   we're talking about backup tapes and so forth that,

12   to use Mr. Ingerman's phrase, have to be rehydrated;

13   meaning they have to be spun up on an emulator of the

14   original system or put into a computer environment in

15   which they can basically be searched as if they were

16   in the native environment.

17         So that's usually done by the consultants.

18   They get copies of the original ESI, of the backup

19   tapes, et cetera, and then they run that whole thing.

20   They do the examination of it, see what the best way

21   to do it and so on.

22         THE COURT:  But why do you need to get

23   involved in that?  You just need to know where the

24   information is and then figure out a way to get it.

25   And so however it's being done -- a lot of things are

1    not physical anymore.  A lot of things can be done

2    remotely.  So if that's your concern, that they don't

3    physically have information -- maybe they don't

4    physically have the tapes.  Why does that matter?

5              MR. OSEN:  Yeah.  The point isn't the

6    physical location.  The question is the direct

7    oversight of the process by the consultant, as

8    opposed to what we've had so far, which is the

9    consultant advising us as to what they've been told

10   by bank IT people who've been doing whatever they've

11   been doing.

12             In other words, this isn't in the custody or

13   control of the consultant.  So, in our conversation

14   so far, they have the out.  They don't actually have

15   the material.  They're not working with it directly.

16   They don't have anyone on site.  And they haven't --

17             THE COURT:  Mr. Osen, that degree of

18   micromanaging, I don't think, is necessary, unless

19   there is an important thing that is lacking.  And so

20   whatever -- if you think the information is

21   unreliable in some way, you can raise that with

22   defense counsel and you can figure out a way to get

23   the information in a more reliable format, but this

24   degree of concern about how the consultants are doing

25   the work is not something that I would be worried

1    about just yet.  All right?

2              MR. OSEN:  I understand, Your Honor.

3              My only point in raising this is that, when

4    we have our meet and confers on this, it's not very

5    productive if the consultant doesn't have answers

6    because they don't have actual hands-on on the

7    material.  So we're spending a lot of time --

8              THE COURT:  Well, they just need the answer.

9              MR. OSEN:  Yeah.

10             THE COURT:  If the person who has the

11   information is not at the table, then you can make a

12   request for the person with information to be at the

13   table.  Sometimes, you know, like, the reason we have

14   30(b)(6) witnesses is that it's -- you don't know who

15   that person is.  And it's not the person that's

16   important, it's the information.  So --

17             MR. OSEN:  I agree with Your Honor.  I was

18   just going to use that analogy.  It's like a 30(b)(6)

19   witness if you're putting up a person who isn't

20   prepared to answer, then it's, you know, a few pounds

21   or something.  So we'll --

22             THE COURT:  And so you need to have a -- and

23   you need to be just very specific about what the

24   missing information is, and then figure out how to

25   get that information, okay?

1          MR. INGERMAN:  Your Honor, we obviously

2    disagree with that characterization of the --

3          THE COURT:  Well, I know.  It doesn't

4    matter, though.

5          MR. INGERMAN:  Yeah.

6          THE COURT:  It doesn't matter.

7          MR. INGERMAN:  I know.

8          THE COURT:  The characterization doesn't

9    matter.  You can be -- you know, you can nitpick all

10   day.  You can disagree.  You can be offended.  But it

11   doesn't matter.  So just move on, all right.  What's

12   important is that you get the information you're

13   entitled to.

14         And so, Mr. Osen, what was your third point?

15   And then we're done.

16         MR. OSEN:  No, that was it, Your Honor.

17         THE COURT:  That's it.  Okay.

18         So, Mr. Ingerman, was there anything else

19   that you need to say that you haven't had a chance to

20   say?

21         MR. INGERMAN:  Your Honor, there were a

22   couple of issues on the plaintiffs' side that we can

23   address at the next status conference.  I know you

24   have another call at 12:30, so --

25         THE COURT:  Right.  But what I looked at

1  from the plaintiffs' side did not seem to be a lot of
2  disagreement, and it sounds like you're working on
3  it.  So please just work on producing what is
4  necessary, okay?

5        MR. INGERMAN:  Yeah, we've asked for some
6  ESI information from them that they haven't given us,
7  so we'll meet and confer with them on that further.

8        THE COURT:  Okay.  So please do that.

9        So let's recap.  Parties need to confer.
10  You need to make sure that you have enough of an
11  understanding of what you're doing so that when you
12  do it, then everybody's satisfied that it was done
13  properly.  If it's not necessary, then it doesn't
14  need to be done.

15        Now, I will give you permission to file a
16  motion to compel, but then I'm going to apply the
17  Federal Rule of Civil Procedure, which is whoever
18  loses has to pay, all right.

19        This is one of the reasons that I tend to
20  tell parties -- I discourage parties from filing
21  motions to compel because the Federal Rules actually
22  say the Court shall order costs to the side that
23  loses.  So if you make the motion, you need to be
24  sure that you're going to win it because if you make
25  the motion and you're wrong and/or I rule against

1    you, then you will have to pay the cost of going

2    through that practice.  So I just want the parties to

3    be aware of that.

4         And conversely, if you realize it's better

5    to just comply, then, you know -- if I grant the

6    motion to compel, then the side that is now being

7    told to compel needs to pay for the cost of the

8    motion.  So I just need to let you know that because

9    I have not been imposing costs so far, because I

10   haven't allowed any formal motions to go forward --

11   we've just been having discussions and requests and

12   back and forth -- but once we move into formal motion

13   practice, I will be invoking that rule.  So proceed

14   with caution.

15        So let's have another status report and

16   another status conference.  What is a reasonable

17   amount of time to think for us to have another call?

18        MR. INGERMAN:  Your Honor, we'd like to get

19   them our phase two search and retrieval protocol by

20   the 29th, which is Monday, and then we can -- Monday,

21   the 29th -- and then we could meet and confer on that

22   and perhaps have a status conference the following

23   week.

24        THE COURT:  So you think we should meet

25   again a week after the 29th?

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. INGERMAN:  No.  I thought you said --
 2   I'm sorry.  Status report or status conference, did
 3   you ask for?
 4              THE COURT:  I need both.  I would like to
 5   have a status report followed by a status conference.
 6              MR. INGERMAN:  So maybe two weeks after we
 7   give them our phase two search and retrieval
 8   protocol, which will be April 29th.  So maybe the
 9   status report is May 13th, and then we have the
10   status conference on Thursday the 16th.  I mean,
11   that's subject to the Court's calendar, of course.
12              THE COURT:  Mr. Osen, what do you think?
13              MR. OSEN:  Your Honor, I think the one
14   suggestion I would make is that we build in a little
15   extra time for an exchange of views once they've
16   given us the materials and they've given us their
17   part of the status report, so that we don't have a
18   repeat of last time.  So maybe we could do it -- push
19   it out a little bit.  If they give us their part of
20   the status report on the 13th, we give them ours on
21   the 14th, and we file on the 15th, and then maybe
22   push it another week.
23              MR. INGERMAN:  The only thing, Your Honor,
24   is that I'm going to be with Ms. Davies, I think, in
25   Israel, depending on how things evolve there, for
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    depositions that week of May 20th.

2              THE COURT:  All right.  So I think having a

3    structured exchange of information is useful.  I

4    think the 13th, for the defendant to propose

5    something and send it to the plaintiffs.  Plaintiffs

6    will put their views in on the 14th, and then on the

7    15th, you'll file the report.  I can have the

8    conference on the 17th.

9              Are you still in the country, Mr. Ingerman?

10             MR. INGERMAN:  I think we leave on the 17th,

11   Your Honor.

12             THE COURT:  I see.  All right.

13             And when will you be back?

14             MR. INGERMAN:  We are back on Tuesday the

15   28th of May.

16             THE COURT:  Okay.  So why don't we schedule

17   this for the 30th of May.  We'll have our status

18   conference on the 30th.

19             MR. INGERMAN:  That's fine here, Your Honor,

20   for the defendant.

21             THE COURT:  Okay.

22             Mr. Osen?

23             MR. OSEN:  I think the 30th is fine.

24             THE COURT:  Okay.  Great.  So let's do that

25   for 11 o'clock on Thursday, May 30th, and we'll have

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1    a status conference at that point.

2            And I'll do the 13th, the 14th, and the

3    filing on the 15th.  If you need another day because

4    you've been going back and forth and there are things

5    you need to iron out, it would be fine to file -- to

6    request an extension to the 16th.  It doesn't make

7    sense to have it beyond that because it sounds like

8    Mr. Ingerman will not be around.

9            But I just want to make sure that whatever

10   you file, captures a full discussion of your

11   understanding back and forth so that you set forth

12   clearly the things that you have agreed on, and then

13   you set forth your disputes at that point.

14           Now, this filing was very long, and I

15   realize that you probably felt you needed to put

16   everything in there, but I think the next one will be

17   shorter because you won't have as much time devoted

18   to misunderstandings, all right.  So I want you to

19   have your understandings clarified and set forth

20   there.

21           Now, if you want to file motions to compel,

22   like I said, you can do so.  You should file a motion

23   to compel only on the things that you can't work out

24   as a result of the discussions.

25           So if you're going to file a motion to

1   compel, you can put in your status report on May 15th
2   that you intend to file that motion to compel, and
3   then we can talk about it when we have our conference
4   on the 30th. And if it's still a problem, then you
5   can go forward and brief it fully, right.
6          And if there is anything as a result of our
7   discussion today that you don't think you can resolve
8   and you're intending to go forward on the motion to
9   compel now, then, you -- you know what, I don't think
10  you should do that because I think most of these
11  things you can still talk through. And, like I said,
12  the motion to compel process will entail cost
13  shifting to the non-prevailing party. So I
14  discourage that. So work it out. Set forth your
15  points of disagreement so we can discuss it on the
16  30th, and let's move forward there.
17         Now, after the 30th, if it turns out there's
18  a problem, I will grant you specific leave to file a
19  specific motion to compel if the parties really feel
20  like there's something that they're willing to risk
21  having to pay the other side's costs, all right. But
22  we'll have that discussion on May 30th.
23         In the meantime, please work together.
24  Please iron things out. Please try to make each
25  other understand what's going on. Please consult

1    with whatever experts you need to, to make sure you

2    do understand.  And I look forward to your status

3    reports.

4            Mr. Osen, anything else?

5            MR. OSEN:  Thank you, Your Honor.

6            MR. INGERMAN:  Thank you, Your Honor.

7            THE COURT:  Okay.  Thank you, everybody.

8

9                        0o0

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        I, Adrienne M. Mignano, certify that the

5   foregoing transcript of proceedings in the case of

6   Miller, et al., versus Arab Bank, PLC, Docket Number:

7   18CV2192 and Pam, et al., versus Arab Bank, PLC,

8   Docket Number: 18CV4670 was prepared using digital

9   transcription software and is a true and accurate

10  record of the proceedings.

11

12

13  Signature  _Adrienne M. Mignano_____

14               ADRIENNE M. MIGNANO, RPR

15

16  Date:       April 18, 2024

17

18

19

20

21

22

23

24

25

         AMM TRANSCRIPTION SERVICE - 631.334.1445