

DLA Piper LLP (US)
650 S Exeter Street
Suite 1100
Baltimore, Maryland 21202-4576
www.dlapiper.com

Brett Ingerman
brett.ingerman@us.dlapiper.com
T  410.580.4177
F  410.580.3177

May 15, 2024

**VIA ECF**

Hon. Peggy Kuo
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *Miller, et al. v. Arab Bank, PLC*, No. 18-cv-2192 (HG) (PK)
       *Pam, et al. v. Arab Bank, PLC*, No. 18-cv-4670 (HG) (PK)

Dear Magistrate Judge Kuo:

We submit this letter on behalf of Plaintiffs and Defendant in the above-referenced actions in response to the Court's April 17, 2024 Order directing the parties to "file a joint status report by May 15, 2024." The parties offer the following update.

*Arab Bank's Position*

**The Lack of Transparency and Gaps in Plaintiffs' ESI Productions**

The Bank has uncovered significant gaps in the Plaintiffs' production of electronically stored information ("ESI"). Since April 5, 2024, the Bank has requested the following information regarding the search protocol for the sources of ESI for each Plaintiff including: (1) how the sources of ESI were identified; (2) the sources of ESI that were considered for searching; (3) the sources that were searched; (4) an explanation of how the sources were searched and obtained; (5) an explanation as to why any data source is no longer available; and (6) an explanation as to why any available sources were not searched. *See* April 5, 2024 Letter from B. Ingerman to G. Osen & J. Bonner, attached as **Exhibit 1**. *See also* April 16 and April 22, 2024 Emails from B. Ingerman, attached as **Exhibit 2**. When Plaintiffs finally responded on April 24, 2024, they refused to provide the requested information, accusing the Bank of, seeking "discovery-on-discovery as a ploy to deflect attention from your client's non-production of ESI" and trying to "find fault" with the Plaintiffs' production. *See* April 24, 2024 Letter from S. Davies to B. Ingerman, attached as **Exhibit 3**; April 26, 2024 Email from S. Davies to B. Ingerman, attached as **Exhibit 4**.



May 15, 2024
Page Two

Despite these claims, the Bank provided five representative examples of gaps in Plaintiffs' ESI production for Plaintiffs to evaluate before the May 7 meet and confer. And, on May 6, 2024, Plaintiffs admitted that the What's App messages for at least ***ten Plaintiffs*** (eight of whom are scheduled to be deposed in Israel starting May 19) "were not fully captured" or "were not fully collected" (even though Plaintiffs had certified to the Bank that its document production was complete months ago). *See* May 6, 2024 Letter from S. Davies to B. Ingerman, attached as **Exhibit 5**. In light of these significant issues, on the May 7 meet and confer, the Bank reiterated its request for the six categories of information enumerated in its April 5 letter. Plaintiffs purportedly took the request under advisement.

After the meet and confer, and after admitting that they had failed to fully collect ESI for at least ten Plaintiffs, Plaintiffs still refused to produce the requested search information claiming that it was "disproportionate to the needs of the case." *See* May 7, 2024 Email from S. Davies to B. Ingerman, attached as **Exhibit 6**.

Plaintiffs' position is meritless in light of the gaps in their production. The *Pam* Plaintiffs certified that their ESI production was complete on September 28, 2023 and the *Miller* Plaintiffs certified that their production was complete on November 2, 2023. Had the Bank not requested this information when it identified various gaps in the productions, it would never have discovered that Plaintiffs failed even to collect (let alone review and produce) a significant amount of ESI. Indeed, Plaintiffs were not even aware of their own discovery shortcomings until the Bank identified the issue. Presently, the Bank has virtually no transparency into what categories of ESI were considered, collected and/or reviewed for each Plaintiff. Plaintiffs' May 6 letter, where they admitted the omissions in their collection and production, only generally describes the search process and the sources of ESI that were searched. Without understanding the sources of ESI searched ***for each Plaintiff***, the Bank cannot evaluate whether there are additional gaps in the production. Moreover, given the recently discovered problems with Plaintiffs' ESI collection, it is now more important than ever for the Bank to receive information on the collection process for each Plaintiff so that the Bank (and the Plaintiffs) can understand precisely what was considered, collected and searched, and the parties can identify and remedy any other issues with the Plaintiffs' ESI production.

Curiously, here, Plaintiffs argue that the ESI they have failed to collect is of "negligible relevance to the case." However, during the May 14 conference with this Court, the *Pam* Plaintiffs represented to the Court that this ESI is likely to contain information relevant to their alleged emotional injuries, a central issue in this case. Thus, by Plaintiffs' own admission, this information is not of "negligible relevance to the case". Notwithstanding Plaintiffs' belated claims that they would have objected to production of ESI had they known the burden, Plaintiffs have agreed to



May 15, 2024
Page Three

search for and produce ESI in this case. The Bank has now found that there are gaps in this collection and production. This warrants additional information regarding the Plaintiffs' search and retrieval process.

Accordingly, the Bank respectfully requests that the Court require the Plaintiffs to produce this information, or, in the alternative, set a briefing schedule for the Bank's motion to compel this information.

### *Plaintiffs' Position*

**First**, Plaintiffs have never refused, even at this late date, to disclose their ESI "search protocol," which is what defense counsels' April 5 letter requested. *See* Exhibit 1. Indeed, Plaintiffs' May 6 letter has already provided, for the *Pam* and *Miller* Plaintiffs resident in Israel, all six categories of information requested by defense counsels. *See* Exhibit 5. Defense counsel is insisting that this information be provided separately for each Plaintiff, without explaining why the information already provided is insufficient.

**Second**, the problem that Plaintiffs' IT consultant in Israel experienced with WhatsApp message collection was not caused by any deficiency in Plaintiffs' ESI search protocol, and was not uncovered as a result of Arab Bank's April 5 information request. The IT consultant's failure to successfully retrieve WhatsApp text messages from some Plaintiffs' mobile phones was caused by a shortcoming in the forensic software the consultant used. Arab Bank's April 5 request for information about Plaintiffs' search protocol did not lead to the discovery of that software problem. Rather, the problem was only discovered when—in response to repeated requests—defense counsel finally disclosed the names of the Plaintiffs in whose ESI productions the Bank had identified gaps. In short, the technical problem that resulted in non-collection of some WhatsApp messages–which Plaintiffs are diligently working to rectify–does not justify the Bank's insistence on a Plaintiff-by-Plaintiff explanation of the ESI collection and search protocol.

**Third**, and perhaps most importantly, while Plaintiffs agreed to retrieve and search their ESI and fully intend to complete the process, Plaintiffs' ESI as a whole has been of negligible relevance to the case. The Bank mischaracterizes *Pam* Plaintiffs' counsel's statements at the May 14, 2024 pre-motion conference. The overall rates of responsiveness of Plaintiffs' ESI to the search terms negotiated and agreed-upon by the parties has proven to be in the low single digits. Had Plaintiffs sampled this dataset at the outset, knowing what we now know about its response rate and relevance, we would have objected to producing this data altogether–given that the burden of production vastly outweighs the marginal relevance of what has been produced. However, having not done so at the time, Plaintiffs are committed to completing the process, notwithstanding its proven futility.



May 15, 2024
Page Four

In sum, the Court should deny the Bank's request to compel the Plaintiffs to describe their ESI collection and search efforts on a granular level. Plaintiffs have been transparent and cooperative with defense counsel throughout their collection and search process. The Plaintiff-by-Plaintiff information the Bank now seeks is unnecessary and disproportionate to the needs of the case, particularly given the marginal relevance of the Plaintiffs' responsive ESI (let alone the vast majority of ESI generated by the searches that proved to be wholly irrelevant).

**Arab Bank's Electronic Discovery**

*Arab Bank's Position*

On April 29, 2024, Arab Bank sent Plaintiffs its search and retrieval plan which included the sources of ESI to be searched and the search terms. *See* April 29, 2024 Search & Retrieval Plan, attached as **Exhibit 7**. In that search and retrieval plan, the Bank explained to Plaintiffs it was preparing an appendix of search terms to include customer name, customer identification number, and customer account number(s) for customers who have waived bank secrecy. In an effort to work collaboratively and to provide the Plaintiffs with an opportunity to provide their input on the search terms, the Bank asked to meet and confer with Plaintiffs on the search terms to be used.

On May 2, 2024, Plaintiffs responded claiming that they could not meet and confer regarding search terms (including the customer identification numbers) until the Bank provided "key system details for each dataset." *See* Letter from G. Osen to B. Ingerman, attached as **Exhibit 8**. The Bank responded to this letter on May 9, 2024, explaining that ▮▮▮▮▮ customer identification number and customer account number.[1] *See* May 9, 2024 Letter from B. Ingerman to G. Osen, attached as **Exhibit 9**. This means that when the Bank searches using the account number or customer identification number fields, the database either will or will not return results. There will not be a "false hit" on an account number; information concerning the account either exists or it does not. There is no other information needed regarding these databases. The only information Plaintiffs need is what has been provided: these are relational databases where the customer account and customer identification fields will be used to search for responsive information.

In its May 9 letter, the Bank also told Plaintiffs that ▮▮▮▮▮

---

[1] The Bank plans to use the customer name as a confirmatory step to verify that the returned data is for the named customer.



May 15, 2024
Page Five

███████████████████████████████. *See* Ex. 9 at p. 3.

On May 10, 2024, the parties met and conferred regarding the additional information Plaintiffs seek concerning Arab Bank's databases. The parties agreed that a meet and confer between the IT experts would be more productive to determine what, if any, additional information is needed for the parties to agree on a search and retrieval plan for the Bank's ESI. The parties have scheduled this call for May 16, 2024 at 3PM EST.

### Arab Bank's Transparency Regarding Its ESI Searches

Plaintiffs claim that Arab Bank has not been transparent in its ESI searches. This is belied by the hundreds of pages of information that the Bank has provided to the Plaintiffs related to its ESI. The Bank has provided responses to nearly 100 questions regarding how it stores its information, provided a 411-page document explaining the searches it had conducted as of March 29, 2024, provided a matrix of the sources of ESI for Lebanon, Jordan, and the Palestinian Territories, engaged in two extended IT consultant calls, and provided a search and retrieval plan setting forth the sources of ESI to be searched and the proposed search terms.

In support of their contention, Plaintiffs incorrectly state that Arab Bank has refused to provide the listing of account numbers and customer identification numbers for customers who have waived bank secrecy.[2] This is not true. In its April 29, 2024 search and retrieval plan, the Bank told the Plaintiffs that it would provide this information. Ex. 7, n.1. But rather than meet and confer on these issues, Plaintiffs refused to discuss the search methodology, again demanding more information that has nothing to do with the Bank's ESI searches. *See* Ex. 8 ("We therefore request that Arab Bank provide the key system details for each dataset you have listed ***before we move forward with proposing or negotiating any search methodologies***.") (emphasis added). On the May 10, 2024 meet and confer, Plaintiffs reversed course and requested the Bank's proposed search terms. For the avoidance of doubt, ***the Bank will provide the listing of account numbers and customer identification numbers for customers who have waived bank secrecy to Plaintiffs***.[3]

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[2] Plaintiffs claim that they have not received "search results indicating customer identification numbers." As explained during our last status conference, the Bank is not producing all of the search results from its search for all customers, but only the identification numbers and account numbers for the customers who have waived bank secrecy.

[3] Plaintiffs complain that they do not know whether complete account information across jurisdictions has been provided. Upon receipt of the listing of customer name, account number, and identification number, we expect that these issues will be resolved.



May 15, 2024
Page Six

[REDACTED]

**Arab Bank's Search and Retrieval Plan Provided the Requisite Search Information**

Since December 1, 2023, the Bank has provided Plaintiffs with extensive information concerning its ESI, such that the parties can now meaningfully meet and confer on the searches of the Bank's systems. Indeed, in its April 3, 2024, ESI matrix, the bank provided the Plaintiffs with the sources of data, the type of data maintained in each source, whether the information resides electronically, and if so, how the data is maintained on that system (i.e., the operating system). Based on that information, on April 29, 2024, the Bank then provided the Plaintiffs with its search and retrieval plan, identifying the sources of ESI to be searched [REDACTED], and the proposed terms (customer name, customer account number, and customer identification number). Plaintiffs' three complaints about the Bank's plan ignore the information that has already been provided.

*First*, the Bank has explained the basis for its proposal to search by customer identification number and customer account number. As the Bank has told Plaintiffs, [REDACTED] *See* Ex. 9. Because of this, the most reliable way to obtain the information is to use these fields/terms for searching.

*Second*, the Plaintiffs' claim that the Bank "refuses to disclose any details about the systems it will be searching or how they work" defies credulity. The Bank has provided hundreds of pages of information explaining how it stores information and on what systems. [REDACTED].

*Third*, the Bank will provide the listing of account numbers and customer identification numbers for customers who have waived bank secrecy to Plaintiffs.

**The Information Plaintiffs Have Requested is Irrelevant, Disproportionate, and Unduly Burdensome**

Plaintiffs have identified five categories of information that they seek concerning Arab Bank's ***entire IT infrastructure***. Plaintiffs have not met their burden to demonstrate that they are



May 15, 2024
Page Seven

entitled to this information, and the only information Plaintiffs need is what has already been provided: the three databases to be searched are relational databases where the customer account and customer identification fields will be used to search for responsive information. *See LADS Network Sols., Inc. v. Agilis Sys., LLC*, No. 4:19-CV-00011-AGF, 2019 WL 5696147, at *3 (E.D. Mo. Nov. 4, 2019) (requiring more information where the requesting party, "does not explain what database schema is; what type of information would be produced in response to the request; why it is relevant; or why the protections offered by the protective order are sufficient for this information, while perhaps insufficient for the source code as a whole."); *Cyberbest Tech., Inc. v. Little*, No. CV 05-0163-CG-C, 2006 WL 8437785, at *5 (S.D. Ala. Mar. 13, 2006) (denying production of database information where, "[D]efendants have failed to show that such a production would produce information that would lead to admissible evidence. No clear presentation was made of the type of information to be produced or its utility in determining if protected materials had been improperly accessed and used.").

1. *Data Maps for the Bank's IT infrastructure*. The Bank has identified: (1) three electronic databases that it will search ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; (2) the information stored on each system; and (3) the search terms it proposes using for each system. Plaintiffs' claim that it needs to understand the "multi-national IT infrastructure" is not true and overbroad. Plaintiffs need to know which sources of electronic information are being searched, the type of information stored on those sources, and what terms will be used to search. All of this has been provided to Plaintiffs.

2. *Database schemas.* In a relational database, database schemas are unnecessary for the search and retrieval of data. In order to retrieve ESI from these systems, Plaintiffs do not need to know the architecture of the system so long as there is a retrieval plan that demonstrates how responsive data can be retrieved. Arab Bank has provided such a plan.

3. *Data dictionaries*. The Bank has repeatedly told Plaintiffs that it will search the customer identification number and customer account number fields. Plaintiffs' request for all data dictionaries is patently disproportionate to the needs of the case and will necessarily encompass irrelevant information. Indeed, the Sedona Conference Database Principles provide that "a requesting party is ***only entitled to database fields that contain relevant information***" *See* The Sedona Conference, *The Sedona Conference Database Principles Addressing the Preservation and Production of Databases and Database Information in Civil Litigation A Project of the Sedona Conference Working Group on Electronic Document Reten*, 15 Sedona Conf. J. 171, 176 (2014) (emphasis added). The only fields that are relevant for the search and



May 15, 2024
Page Eight

  retrieval process are the customer account number and customer identification number fields.

4. *Entity relationship diagrams.* The Plaintiffs have provided no basis to explain how this information is relevant to search and retrieval, only that this will explain how "a database for processing and tracking SWIFT transfers interacts with the Bank's core banking system." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Plaintiffs will get all responsive information from those databases for customers who have waived bank secrecy

5. *Data migration details*. The Bank has provided information on the data systems it has migrated to newer platforms and the forms of backup. *See e.g.*, Jan. 29, 2024 Letter from B. Ingerman to Plaintiffs, attached as **Exhibit 10** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Bank has also repeatedly told Plaintiffs that it is in compliance with its preservation obligations. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; April 8, 2024 Joint Status Report at p. 21 (ECF No. 111) ("The Bank is in compliance with its document preservation obligations."). Therefore, there is no basis for Plaintiffs to obtain data migration details, when the Bank has confirmed the data has been migrated (where applicable) and retained.

### Arab Bank's Database Information Is Sufficient for Search and Retrieval

  Plaintiffs claim that there is a "stumbling block" regarding Arab Bank's database documentation. The Plaintiffs are complicating what should be a simple process: a customer provides a waiver, the Bank searches for that customer's banking information using the customer identification number and customer account number, and the Bank produces those records. The databases the Bank has included in its search and retrieval plan have been developed in the market place to retrieve precisely what Plaintiffs have requested: customer-level data.

  Plaintiffs claim that the Bank's relational databases are "highly complex" and that they need the database schemas, data dictionaries, and entity relationship diagrams to assess whether searching by customer identification number and customer account number will be sufficient. This ignores the nature of the systems, which were specifically developed to obtain customer data by searching based on customer account number and/or customer identification number. The Plaintiffs have requested customer-level account records. Searching through customer identification number and/or customer account number is the way to obtain those records for customers who have waived bank secrecy.



May 15, 2024
Page Nine

The Plaintiffs' attempts to complicate the search process is evident from its series of three questions as to the Bank's search methodology.[4] These "questions" ignore that the Bank is using the search functionality of the three databases it identified. These databases are designed to obtain customer records by the search function. Plaintiffs have not demonstrated that there is any reason to doubt the search features of these systems.

As explained in the April 8, 2024 Joint Status Report and the April 16, 2024 status conference, Arab Bank engaged in a robust search process to identify which of the 673 individuals and entities in the Court's April 14, 2023 Production Order were customers in Arab Bank Jordan, Lebanon, and/or Palestine. Apparently ignoring that process, Plaintiffs now claim that "searches limited to identifiers could fail to capture all records." Since the Bank has already searched for and identified its customers, as described to Plaintiffs, conducting searches using the customer account numbers and customer identification numbers will provide the customer level data Plaintiffs have requested.

Instead of engaging with the Bank to create an efficient and effective search process, the Plaintiffs are attempting to burden the Bank with unnecessary, irrelevant, and unduly burdensome requests for information. These requests will not further the search process, but instead will delay the Bank's progress for the search and retrieval of records.

*Plaintiffs' Position*

**Arab Bank's Lack of Transparency Regarding Its ESI Searches**

Arab Bank's approach to electronic discovery has been marked by a concerning lack of transparency that undermines Plaintiffs' ability to assess the adequacy and reliability of the Bank's searches for responsive ESI. This is exemplified by the Bank's refusal to produce the Excel spreadsheet listing the account numbers and customer identification numbers it retrieved when searching for persons or entities who provided waivers.

Even before the last status conference, Plaintiffs requested Arab Bank's spreadsheet of account numbers and customer identification numbers retrieved as part of its search for persons or entities for which the Bank claimed to have obtained a waiver. We asked for it again at the last conference on April 16, emphasizing that the Bank had not provided its list of customer identification numbers. Tr. 24: 15-24: 26:10-15; 57:2-22. This led to the following exchange:

> THE COURT: Okay. So, it sounds like plaintiffs are also asking for the unique ID numbers. Did you have a reason for not producing that?

---
[4] [redacted]



May 15, 2024
Page Ten

> MR. INGERMAN: No. I think actually that would be part of our phase two search protocol because we would propose searching by those IDs.
>
> THE COURT: Okay. Great. Fantastic. So, turn over the ID numbers as well because plaintiffs are asking for that, and that will help them assess whether your search is resulting in as complete a result set as possible.

Tr. 59-24-35; 60:1-9.

Plaintiffs have not received the search results indicating customer identification numbers, and while it is reassuring to read that Defendant pledges that "the Bank will provide the listing of account numbers and customer identification numbers for customers who have waived bank secrecy to Plaintiffs," Plaintiffs' request predates the last status conference in April and defense counsel agreed to provide that basic threshold information a month ago at the April 16 conference. This entire process presents a very serious issue of transparency which is exacerbated by Defendant's interposing of overruled bank secrecy objections. One example illustrates the problem:



. Not only have the Bank's bank secrecy objections been overruled (and therefore constitute an illegitimate basis for concealment), but they obscure not only

Case 1:18-cv-02192-HG-PK   Document 138   Filed 05/15/24   Page 11 of 17 PageID #: 3422



May 15, 2024
Page Eleven

what records have been withheld but also whether records have even been identified and searched. This problem is endemic to this entire process.

The disclosure of search results list of account numbers and customer identification numbers requested by the Plaintiffs will at least answer the third question and clarify whether the searches used to identify customers were reasonably reliable.

### Arab Bank's "search and retrieval plan"

Arab Bank's "search and retrieval plan" consists of notifying Plaintiffs that it intends to search specific systems and "rehydrate" others and then search them using account number or customer identification number. It is unclear how the parties can meaningfully meet and confer as to search terms when (1) the Bank has already announced it is determined to search solely using account numbers and/or customer identification numbers (2) refuses to disclose any details about the systems it will be searching or how they work and (3) has not even provided the results of its search for customers that would identify customer account numbers or customer identification numbers.

Although Plaintiffs are skeptical of the efficacy of this approach, we cannot compel defense counsel to engage with us or to provide us with information sufficient to meaningfully assess its discovery plan. If Defendant is determined to proceed with its searches without our input or any transparency about its ESI systems, we can only await the results and comment on them when we receive the document productions.

### What Plaintiffs Have Previously Requested

Plaintiffs previously requested (and Arab Bank has refused to produce) the following:

1. Data maps for the bank's IT infrastructure
2. Database schema
3. Data dictionaries
4. Entity relationship diagrams
5. Data migration details

These are all standard types of information that Arab Bank's own consultants need (and have presumably been gathering) to assess the nature of the Bank's ESI and how to best search it. Below is a brief summary of what Plaintiffs requested and why it should have been reasonably produced:

- ***Data maps for the bank's IT infrastructure***: Data maps outline which systems and databases within the Bank exchange ESI, making it possible to understand the flow of data within the Bank's complex, multi-national IT infrastructure.



May 15, 2024
Page Twelve

- o ***Database schemas***: Database schemas are essential for understanding the structure, organization, and relationships of the Bank's ESI within its databases. The Bank's consultants need the same schema to perform their own analysis and schema are usually generated with a few keystrokes of code.  For example, to obtain an Oracle database's schema like the ones underlying Arab Bank Palestine's SWIFT Alliance Access database and Arab Bank Jordan's Court Order database, the command is simply: "REPORT SCHEMA."

- o ***Data dictionaries***: Data dictionaries define the fields, tables, and other elements within the Bank's databases. These dictionaries are critical to deciphering the meaning and significance of the Bank's ESI. Different systems use different acronyms and different terminology.  Again, every bank and large enterprise has these for their own use. Defendant cites The Sedona Conference for the proposition that "a requesting party is ***only entitled to database fields that contain relevant information,***" but without a data dictionaries one cannot discern what database fields *mean* and therefore cannot know which fields may contain relevant information.

- o ***Entity relationship diagrams***: Entity relationship diagrams visually represent the connections and dependencies between different data entities, making it easier to understand how ESI is linked across multiple systems. For example, how a database used for processing and tracking SWIFT transfers interacts with the Bank's core banking system. These diagrams complement the data maps described above.

- o ***Data migration details***: Some of the Bank's data has migrated from legacy systems to newer platforms. Details about those data migrations ensure the integrity and completeness of Defendant's ESI identification and retention of older data.

In sum, these requested materials are the fundamental blueprints to Arab Bank's ESI architecture and underlying database systems that Plaintiffs need in order to *knowledgeably* evaluate the soundness of the Bank's discovery efforts. To do their job effectively, the Bank's IT consultants undoubtedly need the same documentation Plaintiffs have requested and since the Bank has already determined that searching solely using customer identification number and customer account number is sufficient, the Bank's IT consultants have presumably collected and analyzed the materials Plaintiffs requested. Accordingly, the burden of producing this information is negligible (a point which the Bank studiously elides) and the production of this information now

Case 1:18-cv-02192-HG-PK   Document 138   Filed 05/15/24   Page 13 of 17 PageID #: 3424



May 15, 2024
Page Thirteen

will allow the parties to engage in a meaningful discussion of how to properly search the Bank's ESI.

**Stumbling Block Over Arab Bank's Database Documentation**

In this Status Report, Arab Bank still contends Plaintiffs have been provided with all the documentation they need regarding the Bank's databases and that "there is no other information needed." Arab Bank's position grossly oversimplifies the complexity of effectively searching the Bank's ESI in its large-scale relational databases and ignores industry standard practices for e-discovery.

While it is helpful to know that Arab Bank plans to search its customer account and customer identification fields within its relational databases, this high-level representation alone is woefully insufficient for Plaintiffs to meaningfully assess the adequacy of the proposed searches. Relational databases are highly complex systems with intricate architectures, and a myriad of technical factors can significantly impact the reliability and completeness of searches performed within them.

At a minimum, as discussed above, Plaintiffs' experts would need to review the database schemas to understand exactly how the customer account and customer identification information is structured and stored across various tables, as well as any foreign key constraints that may affect data retrieval. Data dictionaries are needed to define the meaning and format of the data within those fields. Entity relationship diagrams would shed light on dependencies between related data elements that could impact the results.

Furthermore, Arab Bank's method of search is critical. Will the Bank be performing an SQL query across a particular set of tables? Are the tables properly indexed to ensure accurate and complete retrieval of records? Will the Bank rely on any proprietary software to conduct the searches? If so, Plaintiffs are entitled to understand the capabilities and limitations of that software. These are just a few examples of the additional technical details Plaintiffs' experts require to properly evaluate the Bank's approach.

It is also important to recognize that customer account and identification numbers are not necessarily unique across all the Bank's IT systems in Gaza, the West Bank, Jordan, and Lebanon. It is common for large financial institutions like Arab Bank to have multiple legacy platforms that use different data formats and identifiers. Without a comprehensive understanding of the Bank's data environment and the architecture of the various databases, there is a real risk that searches limited to certain identifiers could fail to capture all relevant records.

Plaintiffs' expert consultants must be able to test the Bank's proposed searches to validate that they are returning complete and accurate results. This requires, at a minimum, detailed technical documentation about the Bank's databases and the ability to review samples of the



May 15, 2024
Page Fourteen

underlying data. The Bank's conclusory statements that its proposed approach is adequate and that no further information is needed are simply not sufficient to meet the standards for transparency in discovery.

In sum, Arab Bank's refusal to provide Plaintiffs with the requested technical, non-proprietary details about its databases is unjustified and contrary to standard e-discovery practices. The complexity of relational databases requires a far more granular level of technical transparency for the opposing party to have any hope of meaningfully assessing the sufficiency of the Bank's proposed search efforts. The Bank can proceed unilaterally, but it cannot expect Plaintiffs to simply take it at its word that its searches will be adequate, particularly given the Bank's track record of failing to identify all relevant accounts even when presented with evidence of their existence. Plaintiffs are entitled to the information they need to independently verify the reliability of the Bank's discovery efforts, and the Court should not permit those efforts to proceed otherwise.

### **Stumbling Block Redux**

Arab Bank's latest additions to the status report do nothing to allay Plaintiffs' well-founded concerns about the Bank's lack of transparency regarding its databases and proposed search methodology. If anything, the Bank's new arguments only serve to underscore its fundamental misunderstanding of the technical complexities involved in searching large-scale relational databases.

The Bank's contention that Plaintiffs are somehow "complicating what should be a simple process" is both dismissive and misguided. Searching relational databases with large volumes of records stored in multiple systems located in different countries is an inherently complicated undertaking. It requires careful analysis and planning to ensure accurate and complete retrieval of responsive data. The "market place" software solutions the Bank vaguely alludes to are not magic bullets—their effectiveness still depends on a myriad of technical factors like the database schema, indexing, and query construction. Plaintiffs are seeking to collaborate with the Bank on addressing these issues, not unnecessarily complicating them.

The Bank's oversimplification of relational databases is further evident in its blanket assertion that "searching through customer identification number and/or customer account number is the way to obtain [responsive] records." Without insight into the data dictionaries defining these fields across various systems or the entity relationship diagrams showing dependencies, there is no way to confirm these fields alone are sufficient to retrieve all relevant data. Customer IDs and account numbers may not be unique across all systems and could fail to capture linked transactions. Plaintiffs' requests for technical documentation are aimed at probing these very issues to validate the searches will be comprehensive.



May 15, 2024
Page Fifteen

The Bank's complaint that Plaintiffs have not shown any "reason to doubt the search features of these systems" misses the mark. It is not Plaintiffs' burden to preemptively identify flaws in the Bank's databases. Rather, it is the Bank's obligation to be transparent about its systems so any issues can be collaboratively identified and resolved. This is the cooperation Plaintiffs have been seeking from the start, while the Bank has been fighting tooth and nail to withhold even the most basic, non-proprietary technical information about its data environment.

The Bank's attempt to cast Plaintiffs' requests as a fishing expedition for irrelevant information is equally unavailing. Data maps, schemas, dictionaries, and diagrams are not obscure technical minutiae—they are essential building blocks for any competent database search in a litigation of this scale. If the Bank's position is that this documentation is truly unnecessary, it should be willing to produce the full results of its searches to Plaintiffs to independently analyze for completeness, something the Bank conspicuously declines to do.

Finally, Arab Bank's dismissive and superficial treatment of Plaintiffs' requests for database documentation confirms it still fails to grasp the technical complexity of the task at hand. The Bank cannot expect to unilaterally devise search parameters, withhold all information about its data systems, and then demand blind deference to its assurances of adequacy. In litigation of this magnitude, transparency and cooperation should be the rule, not the exception. The Bank's ongoing insistence on secrecy in the face of multiple Court orders only highlights the potential inadequacies in its search process that Plaintiffs' requests for information are intended to address. The Court should not condone the Bank's refusal to engage in meaningful collaboration on this critical discovery issue.

### **Moving Forward**

Again, Plaintiffs cannot compel defense counsel to engage with us or to provide us with information sufficient to meaningfully assess the Bank's discovery plan. We welcome a further meet and confer between IT experts, even though the Bank has allotted 30 minutes for the call. However, this should not be a substitute for the Bank providing the requested information about their IT systems, data, and metadata. Plaintiffs urge the Bank to provide detailed documentation about their databases, data fields and tables, and proposed search methodology in advance of future IT expert meet and confer to ensure a productive discussion.

In sum, Plaintiffs would like to work collaboratively with Arab Bank to develop an effective search and retrieval plan for the Bank's ESI. However, this requires transparency and a willingness to share detailed information about the Bank's systems and databases. Without being able to understand the key system details for each dataset, Plaintiffs cannot meaningfully contribute to search process.



May 15, 2024
Page Sixteen

### Paper Records

Pursuant to the discussion at the March 20, 2024, status conference, Plaintiffs provided defense counsel with a sample date and transaction for the Bank to search paper records in its "daily jackets" for transactional records related to customers who provided waivers. On April 5, 2024, defense counsel advised that the Bank was unable to locate the daily jacket for that day. Plaintiffs then provided a different sample on April 5, 2024, but as indicated below, neither "daily jacket" has been located to date.

*Arab Bank's Position*

Plaintiffs have not asked for any update concerning this daily jacket until this status report. To date, the Bank has been unable to locate the requested daily jacket. The Bank is continuing to search for these documents and will provide Plaintiffs with an update if the Bank can locate this daily jacket.

### Other Discovery

*Arab Bank's Position*

*Pam Plaintiff Depositions*

The depositions of 12 *Pam* Plaintiffs are scheduled for May 19-24, 2024 in Israel. The parties will confer to schedule the remaining *Pam* and *Miller* Plaintiff depositions. Plaintiffs' failure to produce the ESI discussed above affects eight of the twelve Plaintiffs that are scheduled for these depositions. The Bank reserves its right to reopen these depositions if the production of this electronic information (for which Plaintiffs could not provide a date certain for completion) warrants additional questioning. If Plaintiffs disagree, the Bank will seek leave to reopen from the Court.



May 15, 2024
Page Seventeen

*Miller Medical Records*

One of the Plaintiffs' doctors has refused to release her medical records. The Bank is evaluating whether the doctor can refuse to release records where a patient has authorized release.

Another Plaintiff obtained previously undisclosed marital counseling records. The Plaintiffs have reviewed and indicated that they will not produce these records since they do not discuss the Plaintiff's injury. The Bank is evaluating whether these records should be produced in light of the *Miller* Plaintiffs prior position where they agreed to disclose all medical records.

Sincerely,

/s/ Brett Ingerman

Brett Ingerman

cc: All counsel