

**DLA Piper LLP (US)**
650 S Exeter Street
Suite 1100
Baltimore, Maryland 21202-4576
www.dlapiper.com

Brett Ingerman
brett.ingerman@us.dlapiper.com
T  410.580.4177
F  410.580.3177

June 17, 2024

**VIA ECF**

Hon. Peggy Kuo
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *Miller, et al. v. Arab Bank, PLC*, No. 18-cv-2192 (HG) (PK)
          *Pam, et al. v. Arab Bank, PLC*, No. 18-cv-4670 (HG) (PK)

Dear Magistrate Judge Kuo:

We submit this letter on behalf of Plaintiffs and Defendant in the above-referenced actions in response to the Court's May 23, 2024 Order directing the parties to "file a joint status report by June 13, 2024." The parties offer the following update to the Joint Status reported submitted by the parties on May 15, 2024 (ECF Nos. 138, 117).

**Plaintiffs' Electronic Discovery**

*Arab Bank's Position*

As indicated in the May 15, 2024 Joint Status Report, the Bank has identified significant gaps in the Plaintiffs' ESI production.  *See* May 15, 2024 Joint Status Report at 1-3 (ECF Nos. 138, 117).  On April 5, 2024, after identifying discrepancies in the Plaintiffs' production, the Bank requested the following information regarding the search protocol for the sources of ESI for each Plaintiff including: (1) how the sources of ESI were identified; (2) the sources of ESI that were considered for searching; (3) the sources that were searched; (4) an explanation of how the sources were searched and obtained; (5) an explanation as to why any data source is no longer available; and (6) an explanation as to why any available sources were not searched.  *Id.* at 1.  Plaintiffs have refused to provide this information, even after their May 6, 2024, revelation that the WhatsApp messages for at least ***ten Plaintiffs*** "were not fully captured" or "were not completely collected" (even though Plaintiffs had certified to the Bank that its document production was complete months ago).  *See* May 6, 2024 Letter from S. Davies to B. Ingerman, at ECF No. 138-5, 117-5.  The Plaintiffs May 6, 2024 letter only generally describes the search process and the sources of ESI searched and does not provide information specific to each plaintiff or the other categories of



June 17, 2024
Page Two

information the Bank seeks. In light of the defects in Plaintiffs' collection and production of ESI, such generalized information is insufficient. The information the Bank seeks and has requested ***for each Plaintiff***, will enable the Bank to identify whether there are any additional gaps in Plaintiffs' production.

This information is even more critical, because Plaintiffs discovered their ESI issues over a month ago (after the Bank identified the gaps in ESI productions), but Plaintiffs have made nominal progress in remedying their ESI deficiencies. As of June 5, 2024, Plaintiffs informed the Bank that they "do not have a solution" for the collection of the uncollected WhatsApp messages and have not even retained a vendor for collection. *See* June 5, 2024 Email from S. Davies to B. Ingerman, attached as Exhibit 1. For the first time, in this Joint Status Report, Plaintiffs have identified a collection date of June 24, but cannot yet commit to a firm deadline for production.

The apparent issues and delays in Plaintiffs' collection of the missing ESI underscores the importance of the Bank's requests and the prejudice to the Bank. Indeed, if it turns out (as the Bank suspects based on the identified gaps in production to date), that there is additional missing ESI, then these issues need to be identified as soon as possible to avoid delay in collection and production.[1] The Bank's queries will help identify any additional gaps and facilitate the collection and production of ESI. Accordingly, the Bank reiterates its request that the Court require the Plaintiffs to produce this information, or, in the alternative, set a briefing schedule for the Bank's motion to compel this information.

***Plaintiffs' Position***

Plaintiffs dispute Arab Bank's assertion that there are "significant gaps in Plaintiffs' ESI production[s]" as a result of the difficulties encountered in collecting WhatsApp text messages of 24 Plaintiffs (7 *Miller* Plaintiffs and 17 *Pam* Plaintiffs). The current "gaps"—which Plaintiffs have committed to rectify—are insignificant in terms of both the likely quantity of ESI and its importance in resolving the issues in these actions. As noted in the parties' May 15 Joint Status Report, only a small percentage of the Plaintiffs' ESI has proven to be responsive to the search terms agreed upon by the parties. *See* May 15 Joint Status Report at 3. Moreover, even responsive WhatsApp texts are likely to be of minimal relevance to the producing Plaintiffs' damages because, among other things, they will not be contemporaneous with the terror attacks that caused Plaintiffs'

---

[1] Although Plaintiffs argue that these messages will likely be of "minimal relevance", they have committed to produce them (and have produced messages that were responsive to the agreed-upon search terms for other plaintiffs). Thus, this is no excuse to now decline to provide relevant information concerning the collection and production of responsive ESI.



June 17, 2024
Page Three

injuries. WhatsApp first became available for use (limited to iPhones) in August 2009, which is years after the terror attacks at issue in these actions.

As explained in the parties' May 15 Joint Status Report, the technical issue encountered with collecting some Plaintiffs' WhatsApp messages was due to the fact that the forensic software used by Plaintiffs' IT consultant in Israel did not support WhatsApp's data storage architecture, which presents unique forensic challenges which vary depending on each mobile phone's operating system (Apple's iOS vs. Google's Android) and specific model. After extensive consultations with multiple e-discovery vendors specializing in mobile data collection, Plaintiffs have determined that the only viable option for addressing this issue is to send a qualified digital forensics expert from the United States to meet with all 24 affected Plaintiffs in person and forensically image each of their phones individually. Plaintiffs have therefore arranged for this collection process to take place during the week of June 24, with the forensics expert traveling to Israel to collect the available WhatsApp data on a phone-by-phone basis. Once the data is successfully retrieved, it will be processed and searched (using the agreed-upon search terms in both English and Hebrew) by Plaintiffs' ESI discovery vendor in the United States. Counsel will then review the search results for production. Plaintiffs' current best estimate of the time line for completion of production of this discovery is sometime in August 2024. Once Plaintiffs' counsel has the search results in hand, we will be in a position to commit to a firm deadline for completion.

As noted in the parties' May 15 Joint Status Report, Plaintiffs already have provided for **all** Plaintiffs the six categories of information Arab Bank seeks concerning Plaintiffs' ESI search protocol. *See* Exhibit 5 to the May 15 Joint Status Report (FBR May 6, 2024 letter to DLA) at *Miller* ECF 138-5 and *Pam* ECF 117-5. Arab Bank has failed to explain why the information Plaintiffs' counsel already have provided is insufficient, and why the Bank cannot seek any additional information at the individual Plaintiff's depositions. Moreover, the technical problems encountered in collecting some Plaintiffs' WhatsApp messages do not justify the Bank's demand for additional information. Those problems are unique to WhatsApp's data storage architecture, and did not result from any deficiency in Plaintiffs' protocol for identifying sources of ESI. Moreover, those problems were not identified as a result of the Bank's demand for the six categories of information. Plaintiffs' counsel have provided the Bank with sufficient information regarding the sources from which Plaintiffs' ESI was collected, and the methods of collecting, processing, and searching that data.

### **Arab Bank's Electronic Discovery**

#### *Arab Bank's Position*

##### Arab Bank's Search and Retrieval Plan

Since the May 15, 2024 Joint Status Report, the Bank has provided Plaintiffs with the appendix of search terms. *See* June 10, 2024 Email from B. Ingerman, attached as Exhibit 2. This



June 17, 2024
Page Four

appendix includes customer name, customer account number(s), and customer identification number(s). Pursuant to the search protocol shared with Plaintiffs, the Bank intends to search by customer identification number(s) and customer account number(s). It will use the customer name, as reflected on the account statement(s), as a confirmatory step to verify that the returned data is for the named customer.

Plaintiffs complain that the appendix of search terms does not suffice because they do not have the "actual search results" from the Bank's searches through Court Order and Equation to identify its customers in Palestine, Jordan, and Lebanon. But Plaintiffs still fundamentally misunderstand the Bank's the search process. In the March 29, 2024 ESI Report, the Bank described its search efforts to determine whether the 673 individuals or entities were Bank customers from 1998-2004. In doing so, the Bank manually tracked the results. However, as the Bank has indicated numerous times, it can only reveal the results for those customers who waived bank secrecy. On June 10, 2024, the Bank produced the names of the 144 customers who waived bank secrecy, their unique customer identification number(s), and their account number(s). This is consistent with what the Bank told Plaintiffs and the Court it would provide at the April 16, 2024 Status Conference. *See* April 16, 2024 Tr. at 59:8-60:9.

Plaintiffs further claim that the Bank has not searched for and produced documents since September 2023. This too is wrong.

First, as described in the August 14, 2023 status report, the Bank was searching for and collecting the records that were kept in hard copy and scanned. And, the Bank ***did*** produce the hard copy records for the customers who have waived bank secrecy. This totaled 6,060 pages of customer account records produced between August 10, 2023 and December 8, 2023.

Second, as the Bank correctly stated at the September 29, 2023 conference, "we are searching for whether there are responsive emails or not . . . And my understanding is that email was not used necessarily in these branches." Sept. 29, 2023 Transcript at 8:14-9:1. That is what the Bank has consistently represented to Plaintiffs and confirmed in the nearly 100 questions Plaintiffs have asked. *See e.g.*, Jan. 29, 2024 Letter at 3 (ECF Nos. 138-10, 117-10) ███████████████████████████████████████████████████████████████████; Dec. 1, 2023 Letter at 4 (ECF Nos. 122-1, 101-1) ███████████████████████████████████████████████████████████████████████████████████.

***Third***, the Bank's statement at the December 19, 2023 conference that there are backup tapes, floppy disks, and microfiche has been confirmed and even more detailed information has been provided concerning these non-system media sources. *See e.g.*, April 3, 2024 ESI Matrix (ECF Nos. 134-1, 111-1) █████████████████████████████████████████████████.



June 17, 2024
Page Five

*Fourth*, the Plaintiffs' claim that the bank secrecy objections "limit transparency" in the process is not true. Plaintiffs' example concerning Union of the Good does not legitimize their erroneous claim that the Bank has not been transparent. Rather, this example confirms that the Plaintiffs already have documents that relate to the Bank's compliance obligations but are not subject to bank secrecy laws. To be sure, the PMA Circular that the Plaintiffs cite ***was already produced by the Bank***. These compliance materials from 1998-2004 were kept in hard copy and have been produced as scans of the hard copy documents. Thus, there is no issue with electronic searches for these documents since they are not maintained electronically. Moreover, the April 3, 2024 ESI Matrix identifies the types of data the Plaintiffs seek concerning customer transactions and whether that information is available in electronic format. Thus, for the customers who have waived bank secrecy, there is total transparency as to what types of data will be produced and from which source(s).

It is concerning that the Plaintiffs continue to bemoan lack of transparency. Conspicuously absent from Plaintiffs' section of this Joint Status Report is the work that the Bank has done since the December 19, 2023 status conference. Since that time, the Bank has been working with the Plaintiffs to identify the sources of ESI that may have responsive information and develop a search and retrieval plan. Throughout the course of that process, the Bank has answered nearly 100 questions on its electronically stored information, provided a 411-page document describing its procedure for identifying which of the 673 individuals and entities Plaintiffs identified were customers of Arab Bank, participated in two IT conferences, created a detailed ESI Matrix, drafted a proposed search plan, and provided proposed search terms. The notion that the Bank wants, "the Court to bless its approach to searching ESI without any input from Plaintiffs" is wholly belied by the information the Bank has provided to date.

<u>Plaintiffs' Requests for Arab Bank's "Database Details" Are Irrelevant, Disproportionate, and Unduly Burdensome</u>

Since the May 15, 2024 Joint Status Report, the Bank's position has not changed with respect to the production of the "database details" that Plaintiffs have requested. *See* May 15, 2024 Joint Status Report at 6-9. For the reasons stated in the May 15, 2024 Joint Status Report, the information Plaintiffs' have requested concerning the Bank's IT infrastructure is irrelevant, disproportionate, and unduly burdensome. Indeed, the Bank does not have data maps, database schemas, data dictionaries, or entity relationship diagrams,[2] and Plaintiffs have not identified any authority to suggest that the Bank must create these documents. And, as the Bank explained in the May 15, 2024 Joint Status Report, such an effort would not inform the search and retrieval process. The Bank has already provided responses to nearly 100 questions regarding how it stores its

---

[2] The data migration details that Plaintiffs have requested have already been provided in the nearly 100 questions the Plaintiffs have asked the Bank. *See* May 15, 2024 Status Report at 8.



June 17, 2024
Page Six

information, provided a 411-page document explaining the searches it had conducted as of March 29, 2024, provided a matrix of the sources of ESI for Lebanon, Jordan, and the Palestinian Territories, engaged in two extended IT consultant calls, provided a search and retrieval plan setting forth the sources of ESI to be searched, and provided an appendix of the search terms. The Plaintiffs have the information they need to understand the Bank's search and retrieval process. It is now time to let the Bank conduct its searches and produce the responsive documents.

The Plaintiffs citation to *In re Morgan Stanley Data Sec. Litig.* 2020 U.S. Dist. LEXIS 231432 (S.D.N.Y. 2020), in support of their request for the Bank's database details is wholly misleading. That citation is to an "agreement reached between Plaintiffs and Defendant herein" that "this Court adopts and orders the following protocol." *In re Morgan Stanley Data Sec. Litig.*, 2020 U.S. Dist. LEXIS 231432, at *1. Judge Torres approved the parties' ***joint*** approach by entering the agreed-upon ESI Order. *In Re Morgan Stanley Data Security Litigation*, 1:20-cv-5914 (S.D.N.Y. 2020) (ECF No. 42).

Of course, in this action, the parties already agreed upon an ESI protocol, which ***does not*** require the disclosure of this information. (*See* ECF Nos. 48, 41). Here, Plaintiffs do not need the database details because the Bank's databases are relational databases predicated on the customer identification and customer account numbers. Therefore, Plaintiffs have not met their burden to show that the production of this information would be relevant to the search and retrieval process. *See LADS Network Sols., Inc. v. Agilis Sys., LLC*, No. 4:19-CV-00011-AGF, 2019 WL 5696147, at *3 (E.D. Mo. Nov. 4, 2019) (requiring more information where the requesting party, "does not explain what database schema is; what type of information would be produced in response to the request; why it is relevant; or why the protections offered by the protective order are sufficient for this information, while perhaps insufficient for the source code as a whole."); *Cyberbest Tech., Inc. v. Little*, No. CV 05-0163-CG-C, 2006 WL 8437785, at *5 (S.D. Ala. Mar. 13, 2006) (denying production of database information where, "[D]efendants have failed to show that such a production would produce information that would lead to admissible evidence. No clear presentation was made of the type of information to be produced or its utility in determining if protected materials had been improperly accessed and used.").

Plaintiffs' claim that it is not burdensome to obtain these database details because it "merely requires the Bank to type a few simple commands," is wrong. Specifically, Plaintiffs propose a command for the Bank's SWIFT Alliance database. However, the Bank is only a user of the SWIFT Alliance server, it is not an administrator and therefore, does not have the rights or credentials to run this command.[3] Plaintiffs have posed yet another query they request that the Bank run through Equation. However, Plaintiffs still articulate no basis as to how this information

---

[3]   The Bank actually reached out to SWIFT to obtain this information for the database files and structure. SWIFT told the Bank that there are not such public lists available and the structures are not disclosed.



June 17, 2024
Page Seven

is relevant to searching and retrieving responsive ESI in relational databases premised on customer identification number(s) and customer account number(s).

Accordingly, the Bank respectfully requests that this Court deny the Plaintiffs' request to require the Bank to produce the "database details."

### *Plaintiffs' Position*

Plaintiffs largely stand by their portion of the May 15, 2024 Joint Status Report and agree that nothing has materially changed since then, including Defendant's continued failure to produce the *actual* search results based on the searches performed in the Court Order database[1] that constituted the "robust search process to identify which of the 673 individuals and entities in the Court's April 14, 2023 Production Order were customers in Arab Bank Jordan, Lebanon, and/or Palestine." May 15, 2024, Joint Status Report at 9. That request has now been pending for two months without response.

To be clear, nothing is preventing Arab Bank from conducting its searches and producing responsive documents. In fact, it should have been doing just that for the last year, and since September 2023 it has been telling the Court that it is doing just that. For example:

A. *"All of the Bank records from the relevant time period are in hard copy form"*

In its portion of the joint status report of August 14, 2023, in response to Plaintiffs' statement that "Defendant has declined to inform Plaintiffs as to whether its production process includes seeking waivers from current or former customers, or how it is searching for or prioritizing its searches, including for ESI," Defendant advised the Court that:

> And it is important to note that **all of the Bank records from the relevant time period are in hard copy form—that is, old paper records**. We produced them to Plaintiffs by scanning them in, but as Plaintiffs were told, they are paper records that the Bank made Herculean efforts to obtain from numerous branches and other depositaries overseas. The appropriate time for a meet and confer is when the Bank's continuing productions are actually or nearly complete, not now or within the next 30 days.[4]

B. *"Searching for responsive e-mails"*

During the first status conference following issuance of the April 14, 2023, Document Production Order, defense counsel informed the Court that:

> So, the ESI, you know, where we have -- so we have produced emails in this case already. Since the production order, **we are searching for whether**

---

[4]   ECF No. 117, August 14, 2023, p. 2 (emphasis added).



June 17, 2024
Page Eight

**there are responsive emails or not.** As you can imagine, the time period we're dealing here with is 1998 to 2004 in Gaza and the West Bank. And so my understanding is that email was not used necessarily in these branches. It was lucky -- you know, they were lucky to have power during that time period, let alone internet connections. **So, to the extent that there are responsive emails that we have, we are searching for them and will produce them, but I haven't seen any yet to be quite honest with you.** And we've told the plaintiffs yet -- we've told plaintiffs this too -- we have not seen any responsive emails yet for account holders for whom we have waivers.[5]

C. *"ESI not reasonably accessible."*

During the status conference held on December 19, 2023, defense counsel advised the Court that:

The reality is, there may not be searchable ESI. There are backup tapes, there are floppy disks, there is microfiche. My understanding is that it is not accessible, certainly not reasonably accessible under Rule 26, but we are in the process of working through those issues with the plaintiffs …[6]

Arab Bank appears to want the Court to bless its approach to searching ESI without any input from Plaintiffs. That is its prerogative, but Plaintiffs have not sought to restrain Arab Bank from engaging in unilateral searches of its ESI. Until very recently, based on its (inaccurate) representations to the Court, Plaintiffs assumed that had *already taken place*.

In theory, however, the purpose of the meet and confer process over the past few months was to ascertain whether the parties can work cooperatively and *agree upon* the parameters of the ESI search process and collaborate on search terms and SQL queries.

To accomplish a *collaborative* approach, Plaintiffs self-evidently need to know how Arab Bank's databases work, what information is stored in them, and what fields may be relevant to search. This is hardly controversial or unreasonable, but as of this date, Plaintiffs have not even received the *actual* search results based on the searches performed in the Court Order database simply to determine which names listed in the Court Order were Arab Bank customers at the time.

The Bank's (overruled) bank secrecy objections further complicate matters and limit the transparency of the process.

---

[5] September 29, 2023, Tr. 8:12-25 -9:1 (emphasis added).

[6] December 19, 2023, Tr. 21:13-19.



███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████ Stating that the Bank produced a paper copy of the Circular hardly addresses the question of whether relevant *ESI* exists or what search terms are likely to capture relevant information.

This makes Plaintiffs' requests for basic transparency all the more *critical if their input into the search process is actually sought.*

As Judge Torres recognized in *In re Morgan Stanley Data Sec. Litig.* 2020 U.S. Dist. LEXIS 231432 (S.D.N.Y. 2020), it is appropriate for parties to meet and confer regarding:

> the production format and scope of data contained in enterprise database or database management system (e.g., Oracle, SQL server, DB2), including the types of information stored in the database(s), the types of reports that can be generated from or for the data, whether there are existing and reasonably available reports that include the information, and whether the Receiving Party will need any information in native form in order to ensure that any information produced is reasonably usable by the Receiving Party and that its production does not impose an undue burden.

Judge Torres went on to note that:

> Subject to reasonable requests by the Requesting Party, the Producing Party shall provide a description of each field produced, as well as database schema, codes, values and abbreviations used to populate a data field, and other information necessary for the Requesting Party to understand the nature and function of the structured data source and the meaning of structured data produced.[8]

In sum, nothing Plaintiffs have requested is either extraordinary or burdensome. Arab Bank now claims that "the Bank does not have data maps, database schemas, data dictionaries, or entity relationship diagrams," but as Plaintiffs have previously noted, much of that information is resident in the database program code and merely requires the Bank to type a few simple commands to generate. For example, to generate a schema for the Bank's SWIFT Alliance Access database, someone needs to type the following:

---

[7] The Union of Good was designated a Specially Designated Global Terrorist by the U.S. Department of the Treasury in 2008 for its role as an umbrella organization for Hamas fundraising.

[8] *In re Morgan Stanley Data Sec. Litig.* did not involve a case where more than half the court ordered account records were being withheld in defiance of a court order.



June 17, 2024
Page Ten

1. Connect to the SWIFT Alliance Access database using Oracle's Recovery Manager ("RMAN"):

    $ rman TARGET sys/password@SWIFTDB

    [replace "sys" and "password" with Arab Bank's actual database admin username and password, and "SWIFTDB" with the database's name or connection string]

2. Once connected, run the "report schema" command:

    RMAN> report schema

Arab Bank's response only serves to further illustrate the roadblocks Plaintiffs have continually faced in this process. Here, we provided a single illustration of what is technically required to generate a schema and the response is that the Bank cannot provide the requested Oracle database documentation because it lacks administrator rights on the SWIFT Alliance server. But even assuming that is correct, it does not mean that the Bank has no access to any documentation that would answer the questions Plaintiffs have posed and per its ESI "Search and Retrieval Plan," Arab Bank is itself the owner and administrator of its Equation CORE banking system, which is an IBM DB2 database running on an AS/400 server. It can easily generate the schema details for the Equation DB2 database by following DB2 command:

    db2look -d EQUATION -e -o eq_schema.ddl[9]

The key point is that for a database like DB2 underlying Equation which the Bank owns and administers, extracting schema details is simply not remotely burdensome. It is therefore clear that months after Arab Bank first made clear that it had not meaningfully searched its ESI (despite numerous prior representations to the contrary), it has no interest in providing Plaintiffs transparency concerning its ESI and no interest in Plaintiffs' input on how best to search that ESI. Accordingly, we agree with Defendant that "[i]t is now time to let the Bank conduct its searches and produce the responsive documents" – but without waiver of any of Plaintiffs' rights to pursue all remedies in the event those searches prove to be inadequate.

---

[9] This will extract the Data Definition Language ("DDL") statements for all objects in the Equation database and save them to a file named "eq_schema.ddl". The "-e" flag includes metadata about each DB2 object, such as column names and data types.



June 17, 2024
Page Eleven

### Other Discovery

### Pam Plaintiff Depositions

*Arab Bank's Position*

As detailed more thoroughly in the Bank's Emergency Pre-Motion Letter to Compel Depositions, the Bank was unable to take the twelve *Pam* Plaintiff depositions scheduled for May 19-24, due to the untimely death of the undersigned counsel's father-in-law. *See* June 6, 2024 Emergency Pre-Motion Letter to Compel Depositions (ECF No. 116). The Bank has proposed scheduling the same deponents in Israel for July 8-15. The *Pam* Plaintiffs have refused to produce these Plaintiffs until they remedy the issues with their ESI production. *Id.* As this Court has already ruled, the Plaintiffs' missing ESI should not preclude scheduling these depositions.[10] *See* May 14, 2024 Minute Order. On June 10, 2024, the Bank served notices of deposition for these deponents.

Accordingly, the Bank respectfully requests that the Court compel the *Pam* Plaintiffs to produce these witnesses for depositions.

*Pam Plaintiffs' Position*

On May 14, 2024, the Court denied *Pam* Plaintiffs' motion to postpone depositions of 12 *Pam* Plaintiffs that were scheduled to begin in Israel on May 19, 2024. Notwithstanding that ruling, Arab Bank thereafter unilaterally postponed those depositions, just two days before they were scheduled to commence. *Pam* Plaintiffs' counsel are willing to schedule in July the depositions of 12 *Pam* Plaintiffs whose document productions are complete, and will prioritize the review and production of the WhatsApp messages of the seven other *Pam* Plaintiffs who had been scheduled for deposition in May, so that their depositions can be rescheduled in the near future. The Bank has offered no compelling reason for needing to reschedule those seven *Pam* Plaintiffs' depositions before their document productions have been completed. The Bank's assertion that *Pam* Plaintiffs' counsel have "refused to abide by" the Court's May 14th order (*supra* n.9) is not accurate: it was the Bank's counsel who postponed the May depositions.

---

[10]   Incredibly, while Plaintiffs' counsel refuse to abide this Court's Order and produce these Plaintiffs for deposition allegedly because their WhatsApp ESI has not been collected, Plaintiffs tell this Court in this same Joint Status Report that "only a small percentage of the Plaintiffs' ESI has proven to be responsive to the search terms agreed upon by the parties" and "even responsive WhatsApp texts are likely to be of minimal relevance to the producing Plaintiffs' damages because, among other things, they will not be contemporaneous with the terror attacks that caused Plaintiffs' injuries." If this is a true statement, then there should be only a small risk that the Bank would even ask to reopen any of the depositions under Rule 30(a)(2)(A)(ii).



June 17, 2024
Page Twelve

### Miller Medical Records

*Arab Bank's Position*



*Miller Plaintiffs' Position*

Certainly, Defendant has not previously asked that reformulate a new request to ▇▇▇▇▇▇ and Plaintiffs have not therefore refused to do so. We remain mystified as to why this matter is before the Court.



June 17, 2024
Page Thirteen

Sincerely,

/s/ Brett Ingerman

Brett Ingerman

cc: All counsel